UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

UNITED STATES OF AMERICA,

              Plaintiff,              CASE NO. 21-cr-20264

vs.                                   HON. DENISE PAGE HOOD

YLLI DIDANI,

              Defendant.

---

**GOVERNMENT'S RESPONSE TO DEFENDANT'S ORAL MOTION TO REVOKE ORDER OF DETENTION**

---

From at least 2015 until his arrest in March 2021, the defendant, Ylli DIDANI directed a massive transnational cocaine distribution conspiracy that operated in part, in this district. Didani secured financing from a now deceased co-conspirator and other conspirators, to purchase thousands of kilograms of cocaine from South America. Didani and other conspirators would then arrange to have the cocaine hidden on containerships so it could be transported from South America to Europe for further distribution. To accomplish the objectives of the conspiracy, Didani used a wide array of anti-law enforcement detection methods to communicate with other conspirators including encrypted cellular telephones and encrypted text messaging applications.

1

Up until his arrest in March 2021, Didani also utilized international money laundering organizations to move millions of dollars around the world. These organizations moved money at Didani's request for a variety of purposes including to fund the drug conspiracy, to launder drug proceeds, to pay for luxury armored vehicles that Didani purchased, and in one instance, to transfer over $200,000 in cash for a down payment towards a $2,775,000 parcel of real estate in the Dominican Republic that Didani was attempting to purchase.

Didani is a substantial flight risk and is an extreme danger to the community. This Court should deny his oral motion for revocation of the detention order.

## I. BACKGROUND

On March 26, 2021, Didani was charged in a sealed complaint with three counts: (1) conspiracy to distribute controlled substances in violation 21 U.S.C. §§ 841 and 846; (2) conspiracy to distribute controlled substances on board a vessel subject to the jurisdiction of the United States in violation of 46 U.S.C. § 70503; and (3) money laundering in violation of 18 U.S.C. § 1956(a). (ECF No. 1, PageID.1). On March 31, 2021, Didani was arrested on the complaint at the Charlotte Douglas International Airport in Charlotte, North Carolina after arriving on a flight from the Dominican Republic. Prior to Didani's arrest, United States Customs and Border Protection agents performed a border search of Didani's

property and located $10,002 in U.S. currency, which was seized because Didani

failed to declare it upon arriving in the United States.

On April 1, 2021, Didani was interviewed by Pretrial Services in North

Carolina. Based on his risk of nonappearance and his risk of danger, Pretrial

Services recommended that Didani be detained. On the same date, Didani appeared

before a United States Magistrate in the Western District of North Carolina and

waived his right to a removal hearing, agreeing to have his case transferred to this

district.  (21-mj-30148, ECF No. 4-1, PageID.35).

On April 21, 2021, a grand jury in this district returned a one-count indictment

charging Didani with conspiracy to distribute controlled substances in violation of

21 U.S.C. §§ 841 and 846. (ECF No. 1, PageID.1-6). On the same day, Didani

made his initial appearance in this district and was temporarily detained. Didani

was interviewed by Pretrial Services in this district but midway through the

interview, Didani requested that counsel be present, so the interview ended.

Subsequently, Didani's counsel advised Pretrial Services that Didani declined to be

interviewed further. On April 28, 2021, Pretrial Services in this district prepared an

addendum to the North Carolina report agreeing with Pretrial Services in North

Carolina that Didani posed a risk of nonappearance, a risk of danger, and that he

should be detained. On April 28, 2021, Didani was arraigned on the indictment and

consented to detention. (ECF No. 13, PageID.24).

3

On March 16, 2022, a grand jury returned a three-count superseding indictment charging Didani with two additional counts – Count Two: conspiracy to possess with intent to distribute and distribute a controlled substance on board a vessel subject to the jurisdiction of the United States in violation of 46 U.S.C. §§ 70503(a) and 70506(b); and Count Three: conspiracy to launder monetary instruments in violation of 18 U.S.C. § 1956(h). (ECF No. 38, PageID.153-174).

## II. FACTS

In 2016 and 2017, Didani received over $550,000 in U.S. currency from a co-conspirator for the purpose of purchasing bulk cocaine. At least one bulk cash transfer of over $100,000 occurred in this district. A second bulk cash transfer occurred in December 2017. In that transfer, a co-conspirator carrying approximately $450,000 in cash travelled from this district in a private airplane owned by another conspirator to Washington D.C., where the cash was given to Didani. Didani kept several photographs of the cash he received on his phone:

 

Didani used the cash to purchase bulk cocaine from South America and arranged for the cocaine to be transported to Europe. Much to Didani's dismay, not all these cocaine transfers were successful. In November 2017, law enforcement seized approximately 140 kilograms of cocaine in the Netherlands. Didani was extremely upset over the seizure and sent a text message to a conspirator in this district that contained a link to an online news article describing the cocaine seizure. Didani and the conspirator exchanged text messages about the cocaine seizure with Didani texting the conspirator, "We just fucked up." The conspirator responded, "We will fix brother." Didani replied, "Not like this brother we need to clear heads." Didani saved a screenshot of the text message thread in his phone:



While Didani and other conspirators normally arranged to have the cocaine hidden in containers on containerships, that was not always Didani's plan. Instead,

Didani and a conspirator residing in this district planned to have a company design a submersible container ("torpedo" or "drone") capable of holding up to 1000 kilograms of cocaine. The torpedo would operate using remote control, GPS, and magnets. The cocaine would be loaded into the torpedo before the torpedo magnetically attached to a containership. Once the containership was approximately 100 miles from its European destination, the torpedo would detach from the containership via remote control, the torpedo would come to the surface, and a fishing boat using GPS, would locate and retrieve the cocaine-filled torpedo.

Didani used encrypted phones and applications to discuss the torpedo and its progress. These encrypted messages were often set to self-destruct in a matter of days.



However, Didani regularly used his iPhone to take photographs of the messages that were on his encrypted phones before the encrypted messages self-destructed. Didani did this with hundreds, if not thousands, of encrypted messages related to the cocaine distribution conspiracy, including encrypted messages related to the torpedo, a few of which are depicted below:

 



Following the July 2018 death of a Michigan-based co-conspirator, Didani began using international money laundering organizations (MLOs) to move millions of dollars around the world. These MLOs utilized at least two methods to move money for Didani. The first method involved the use of purported General Trading Companies that wired payments at Didani's request. The second method involved the use of "tokens." When Didani wanted to transfer bulk currency, he would text the intended recipient of the bulk currency requesting that the intended recipient send him (Didani) a photograph of a paper currency, for example, a dollar bill showing the serial number (the "token"). Didani would then provide the photograph of the dollar bill ("token") to the MLO with instructions detailing the amount of the payment and location of the intended recipient. When a courier for the MLO met with the intended recipient, the intended recipient would have to produce the same dollar bill and serial number that they had sent to Didani as verification that they were the person that was supposed to receive the bulk currency.

Between April 2020 and January 2021, the MLOs used both methods to make over $800,000 in payments towards Didani's purchase of several luxury armored vehicles. Didani purchased these vehicles from a company in North America and had them shipped to Ecuador and the Dominican Republic. At Didani's request, the MLOs made the first several payments via wire, including

payments of $259,907.08 and $63,800 that were made by purported General

Trading Companies located in the United Arab Emirates. At one point, the

salesman advised Didani that he (Didani) could also make cash payments for the

armored vehicles. After hearing that he could pay cash for the armored vehicles,

Didani introduced the "token" method to the salesman and instructed the salesman

that he (the salesman) would have to send Didani a photograph of a one-dollar bill.

As an example, Didani then sent the salesman a photograph depicting a portion of

a United States twenty-dollar bill displaying the serial number:



After Didani sent the photograph, Didani and the salesman exchanged the

following text messages:

- **Didani:**   Like this
- **Didani:**   With numbers
- **Didani:**   Once you send me that I send to them
- **Didani:**   They will contact you and come to your adr
- *Salesman:*   *Now, I'm confused*
- **Didani:**   You have to pull out the same dollar
- *Salesman:*   *Hahahahahahahaa*

A few months later, while discussing another payment for the armored vehicles, the salesman utilized the "token" method and sent Didani a photograph of a Columbian 10,000-peso bill. The next day, the salesman informed Didani that he (the salesman) had received $147,410. Days later, the salesman sent Didani the following photograph depicting the bulk currency that had been dropped off to him by a courier for the MLO.



Didani also used the "token" method while attempting to purchase a $2,775,000 parcel of real estate in the Dominican Republic. In September 2020, at Didani's request, a courier for a MLO delivered over $200,000 in cash to New

York as a down payment towards the property. Unfortunately for Didani, the sale of the property fell through, and law enforcement seized the down payment.

The down payment was not the only item law enforcement seized. Between August 2019 and September 2020, law enforcement in Europe seized several large shipments of cocaine belonging to Didani and his conspirators, four of which are described below. The first seizure occurred in August 2019, when law enforcement seized approximately 753 kilograms of cocaine from a shipping container on the vessel, the MSC Anisha R, after the vessel arrived at the Port of Rotterdam in the Netherlands. Days after the seizure, Didani texted a conspirator a link to an online news article dated August 13, 2019, describing the MSC Anisha R cocaine seizure and an additional seizure of 500 kilograms of cocaine at the Port of Rotterdam. On September 6, 2019, while Didani was in the United States, he sent a series of text messages to another conspirator stating, "I got some very sad news about the lost" and "I mad as fuck bro." After sending these text messages, Didani texted the conspirator a link to the same August 13, 2019, online news describing the cocaine seizures.

Another seizure occurred in February 2020, when law enforcement seized approximately 644 kilograms of cocaine from a shipping container on the vessel, the CMA CGM Jean Gabriel, after the vessel arrived at the Port of Rotterdam in the Netherlands. A few days later, Didani exchanged text messages with a

11

conspirator that discussed the 644 kilograms of cocaine that were seized. Didani texted the conspirator, "And this with CMA is very bad." The conspirator sent a text message back to Didani, "Yes bro we also lost."

A third seizure occurred in April 2020, when law enforcement seized approximately 1000 kilograms of cocaine from a shipping container on the vessel, the Cartegena Express, after the vessel arrived at the Port of Rotterdam in the Netherlands. Between April 7, 2020, and April 10, 2020, Didani sent and received text messages to/from several individuals discussing the seizure of the cocaine. On April 7, 2020, a conspirator sent photographs to Didani depicting the lock seals that had been broken off the shipping container where the cocaine was hidden and photographs of the new fraudulent lock seals that were used to reseal the shipping container. Two days later, Didani sent a text message to his father that contained a screenshot of an online news article that described the cocaine seizure. On the same day, Didani sent a text message to another individual containing a screenshot of the same news article. After sending the screenshot, Didani texted the individual that he was really sad and that he had lost three, one after the other.

The last seizure occurred in September 2020, when law enforcement seized approximately 1200 kilograms of cocaine from the hull of a vessel, the Star Care, after the vessel arrived at the arrived at the Port of Dover in the United Kingdom. Starting the day after the seizure, Didani sent text messages to several individuals

discussing the seizure. Didani sent these individuals an internet link to an online news article and photographs of the news article describing the seizure.





News

## Joint NCA and Police Scotland operation leads to £100m cocaine seizure in Dover

Drug trafficking

Around a tonne of cocaine, concealed within a load of fruit, has been seized at Dover, as part of a joint National Crime Agency and Police Scotland Organised Crime Partnership investigation.

The discovery was made in the early hours of Tuesday 22 September after specialist Border Force search teams were brought in to assist

After the seizure, Didani texted one of the individuals, "Had some prbl today in morning," "Lost 11 mil," "My cost was 11 mil," and "Someone make mistake." Didani sent a second individual the internet link to the news article and after doing so, texted the individual, "Delete after you see the news," "I lost millions yesterday," "Stupid fuckes there bro," "Use sistem of phones I never approved," "I don't mind losing bro," and "But they was using sistem police broke in." Didani

sent the screenshot of the news article to a third individual. Didani also sent several text messages to the individual stating, "I'm mad and angry," "But I'm ok," and "I'm sending one 4 times bigger then that."

In addition to purchasing multiple armored vehicles to protect himself and other conspirators, in September 2019, Didani arranged the purchase of several bulletproof jackets from an individual in the United States. On September 9, 2019, Didani sent a video to several conspirators depicting himself wearing and describing one of the bulletproof jackets. Didani also sent a series of text messages to a conspirator discussing the bulletproof jackets, including the following text messages, "I got 4 of those," "One for me and one for you," and "They will stop all the gun bullets." In November 2019, Didani sent videos to the individual that assisted him in purchasing the bulletproof vests. The videos show an unknown male shooting an Uzi type submachine gun with a suppressor at one of the bulletproof jackets. The videos then show the bulletproof jacket up close, verifying that the bullets did not penetrate the jacket. After sending the videos, Didani texted the individual, "Well done brother."

## III.  ARGUMENT

### A.  Bail Reform Act of 1984

The Bail Reform Act governs release or detention determinations in federal criminal proceedings. 18 U.S.C. §§ 3141-3150. It allows courts to detain a

defendant pending trial under two circumstances. First, if the government proves by a preponderance of the evidence that the defendant poses a risk of flight such that no condition or combination of conditions will reasonably assure the defendant's appearance at future court hearings. 18 U.S.C. § 3142(e); and second, if the government demonstrates by clear and convincing evidence that no set of conditions of release will reasonably ensure the safety of the community, 18 U.S.C. §§ 3142(e) and(f).

Additionally, there is a rebuttable presumption in favor of detention where a defendant has been indicted for an offense under the Controlled Substances Act if the maximum term of imprisonment is 10 years or more. (18 U.S.C. § 3142(e)(3)(A). "This presumption represents the belief of Congress that in the majority of Controlled Substance Act offenses, there is an increased risk of flight or danger to the community, and in particular, the danger that the defendant will resume drug trafficking activities while released." *United States v. Williams*, 948 F.Supp. 692, 693 (E.D. Mich. 1996). Accordingly, because Count One carries a maximum term of imprisonment of up to life, Didani is presumed to be a flight risk and a danger to the community. This presumption imposes on Didani the "burden of production" to show that he does not pose a risk of flight and that he is not a danger to the community. Didani has not rebutted this presumption.

## B.   18 U.S.C. § 3142(g) Factors

Despite the unrebutted presumption here, in deciding whether to detain a

defendant, the Court is required to review the factors outlined in 18 U.S.C. §

3142(g). The factors are: (1) the nature and circumstances of the offense charged,

including whether the offense involves a firearm; (2) the weight of the evidence

against the person; (3) the history and characteristics of the person; and (4) the

nature and seriousness of the danger to any person or the community that would be

posed by the person's release. 18 U.S.C. § 3142(g). A review of those factors

demonstrates by a preponderance of the evidence that Didani is a flight risk and by

clear and convincing evidence that he is a danger to the community.

### 1.  The nature and circumstances of Didani's offenses.

Didani led a vast cocaine distribution conspiracy that began in this District

and expanded into a far-reaching maritime drug smuggling network. This

conspiracy was responsible for the shipment of thousands, if not tens of thousands,

of kilograms of cocaine worth hundreds of millions of dollars. This conspiracy

generated millions of dollars in proceeds which Didani cleaned using a

sophisticated Money Laundering Organization based in the United Arab Emirates.

The quantity of drugs sold by Didani, combined with his criminal history, likely

results in a guideline range of 360 months to life – ample reason from him to flee if

released. See *United States v. Townsend*, 892 F. 2d 989, 995 (9th Cir. 1990)

(potential punishment that may be imposed if convicted is a consideration whether defendant is a risk of nonappearance if released on bond).

In short, the nature and circumstances of the charged offenses leave little doubt that Didani is not a suitable candidate for pretrial release.

### 2. The weight of the evidence against Didani.

The weight of the evidence against Didani likewise establishes that release is inappropriate. "Section 3142(g)(2) considers weight of the evidence of dangerousness, not the weight of the evidence of defendant's guilt." *United States* v. *Stone*, 608 F.3d 939, 948 (6th Cir. 2010). The Sixth Circuit "routinely affirms, on dangerousness grounds, the pretrial detention of run-of-the-mill drug dealers, even without any indication that the defendant is engaged in violence…To be sure, drug trafficking is a serious offense that, in itself poses a danger to the community." *Id.* at 955. Didani is not a 'run-of-the-mill' drug dealer. He led a vast international drug conspiracy that trafficked in thousands of kilograms of cocaine and that utilized armored vehicles and bulletproof jackets for their own protection.

Narcotics trafficking alone poses a danger to the community, but that danger is magnified by the scope of Didani's involvement in this conspiracy, the quantity of the drugs that he was distributing and his leadership role in the conspiracy. The dangerousness of his conduct cannot be overstated.  An evaluation of dangerousness requires a comprehensive view of community safety—"a broader

construction than the mere danger of physical violence." *United States v. Cook*,

880 F.2d 1158, 1161 (10th Cir. 1989) (per curiam) (evaluating dangerousness of

defendant in a drug case in connection with pretrial release).

### 3. Didani's history and characteristics.

Didani's history and characteristics, which includes a review of his past

conduct, ties to the district, employment, history relating to drug or alcohol abuse,

and criminal history, also favors detention.

*No ties to the Eastern District of Michigan*.  Didani has no ties to this

district. At the time of his arrest, he was residing in the Dominican Republic,

where he had been residing for several years. During this investigation, Didani

travelled all over the world including to Ecuador, Europe, Colombia, and the

United Arab Emirates. Didani was a Lawful Permanent Resident of the United

States who presumptively abandoned his status because he had been outside the

United States continuously for more than one year. *See* 8 C.F.R § 211.1(a)(2).

Furthermore, even if Didani can establish he did not abandon his LPR status, if

convicted, Didani will be removable from the United States.

Didani does not have a residence or family ties in Michigan. And he has not

identified a third-party custodian in Michigan. He has not lived in this district since

approximately 2016 and he has not lived in the United States since at least 2019.

Didani's lack of ties to this district, and perhaps more importantly, his extensive

18

history of international residence and travel, raise serious concerns that Didani will flee if released on bond.

Didani falsely told Pretrial Services that he has lived at an address in Illinois since April 1, 2017, and that if he were released, he would continue to live at that address with his parents. This is demonstrably untrue. Evidence seized in this case shows that Didani was living in the Dominican Republic prior to his arrest. In fact, travel records show that prior to his arrest, Didani had not travelled to the United States since December 2019. And this wasn't because Didani couldn't travel. Between February 2019 to when he was arrested, Didani travelled the globe to facilitate his drug trafficking business and to spend his illicit proceeds. During this time, he travelled to the Netherlands, Ecuador, Spain, the United Arab Emirates, Turkey, and France. And on at least one of those trips, Didani travelled in a private jet.

While Didani claims that he would reside with his parents in Illinois if released, this provides no comfort or assurance that Didani will not flee. Didani's parents simply have no ability to ensure that Didani does not flee. There is also no evidence that his parents would notify authorities if Didani did flee. In fact, there is evidence that Didani's father was aware of some of Didani's criminal activities. For example, two days after the April 2020 seizure of 1000 kilograms in the

Netherlands (described above), Didani sent a text message to his father that contained a screenshot of an online news article that described the cocaine seizure:



Didani has also sent his father several photographs depicting large amounts of cash including the following photograph Didani sent in September 2019 depicting Didani sitting next to a large amount of banded bulk currency:



Didani's argument that electronic monitoring would ensure his appearance at future court hearings is unpersuasive. While electronic monitoring may be useful in many cases, it would be useless here. Unlike most defendants, Didani has access to MLOs, large amounts of cash, and private aircraft. It would take seconds for Didani to remove a tether, access his extensive cash and private airplanes, and flee the United States.

*Employment*. Didani is not currently, nor has he been legitimately employed in the last 10 years. When interviewed by pretrial services in North Carolina and in

Michigan, Didani declined to provide employment history. The reason is simple. He had no legitimate employment. He was a drug dealer.

*Criminal History.* Didani has an abysmal criminal history and a record of not appearing in court. In fact, when he was arrested in March 2021, he had two active bench warrants for his arrest including a warrant that was issued on March 1, 2019, in Cook County for hit and run – leaving the scene of an accident. Didani also has several criminal convictions including:

- 2001  48th District Court, Oakland County, MI
  - Disorderly Person, Operating While Intoxicated – 90 days jail
- 2001 6th Circuit Court, Oakland County Michigan
  - Operating While Impaired, Third Offense – 1-5 years prison
- 2002  3rd Circuit Court, Wayne County
  - False Pretenses – Probation
- 2005  6th Circuit Court, Oakland County, MI
  - Operating While Impaired, Third Offense – 1-10 years prison
- 2009  3rd Circuit Court, Wayne County, MI
  - Operating While Impaired, Third Offense – 1-5 years prison
- 2014  3rd Circuit Court, Wayne County, MI
  - Assault and Battery – Probation

Furthermore, Didani has a significant history of substance abuse. In a 2009 MDOC report referenced by Pretrial Services, the author describes how Didani began consuming alcohol in 2001 and did so daily until 2009. Didani attended residential substance abuse treatment in 2001 and 2004. Yet after attending these

programs, Didani was imprisoned twice for Operating While Impaired – 3rd Offense. Since his release from prison for these offenses, Didani has exponentially escalated his criminal behavior. As a result, Didani poses a significant danger to community and should not be released on bond.

Didani's criminal record, his record of non-appearance, his history of substance abuse, as evidenced by his multiple convictions for drunk driving, and his lack of legal employment, combined with the other factors, weigh in favor of his detention.

### 4. The nature and seriousness of the danger to any person or the community that would be posed by Didani's release

Didani's release poses a danger the community. Didani conspired with international drug traffickers to distribute cocaine and launder the proceeds. The addictive nature of cocaine is well known, yet Didani decided to distribute it for his own greed. Coupled with his previous criminal history, his access to firearms, and his previous violations of court orders, no conditions or combination of conditions can reasonably protect the public.

### C. Overall Risk of Non-appearance and Dangerousness

The above factors overwhelmingly demonstrate that Didani should remain detained because he is a flight risk and a danger to the community. If Didani is convicted, his guideline range is 360 months to life; he is facing up to life

imprisonment; and a mandatory minimum prison sentence of 10 years. Didani's incentive to flee is substantial and his means to do so are limitless.

Didani's release would also endanger himself and the community. Didani conspired with drug traffickers around the world to transport cocaine from South America to Europe. As discussed above, law enforcement seized multiple shipments of cocaine belonging to Didani and his co-conspirators costing them millions of dollars. During the investigation, law enforcement recovered multiple conversations between Didani and his co-conspirators where they discussed the seizures and were trying to figure out how law enforcement knew what containers to search. However, in the end, law enforcement knew what containers to search because Didani documented the shipments on his cell phones, and he saved this information to his iCloud account. Due to Didani's carelessness, on several occasions, law enforcement knew what vessels the cocaine was on, the container number where the cocaine was hidden, and when the cocaine would arrive in Europe. So, when the vessels carrying the cocaine arrived, law enforcement was waiting.

If Didani is released, not only does he have an additional incentive to flee and go into hiding to avoid these co-conspirators, if he is released, Didani and the members of the community where he lives also face the potential danger that could

24

result from any of Didani's co-conspirators, whom he cost millions of dollars, attempting to take retribution against him.

## IV.  CONCLUSION

There are no conditions or combination of conditions that can reasonably assure Didani's future appearance. Nor are there conditions or combination of conditions that would protect the public from Didani. The Government requests that Didani remain detained, and his motion be denied.

Respectfully submitted,

DAWN N. ISON
United States Attorney


*s/Mark Bilkovic*
Mark Bilkovic
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, Michigan 48226
(313) 226-9623
mark.bilkovic@usdoj.gov

*s/Timothy P. McDonald*
Timothy McDonald
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, Michigan 48226
(313) 226-0221
timothy.mcdonald@usdoj.gov


Dated: April 12, 2022