## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

UNITED STATES OF AMERICA,

       Plaintiff,                      Case No. 21-20264

v.                                    Hon. Denise Page Hood

YLLI DIDANI,               **ORAL ARGUMENT REQUESTED**

       Defendant.

---

Mark Bilkovic (P48855)
Timothy P. McDonald
Assistant United States Attorneys
211 W. Fort St., Ste. 2001
Detroit, MI 48226
(313) 226-9623
mark.bilkovic@usdoj.gov
Timothy.mcdonald@usdoj.gov
*Attorneys for the United States*

Wade G. Fink (P78751)
WADE FINK LAW, P.C.
550 W. Merrill St., Ste 100
Birmingham, MI 48009
(248) 712-1054
wade@wadefinklaw.com
*Attorneys for Didani,* Local Counsel

Brian Kaplan
BRIAN KAPLAN, P.C.
11 Park Place, Suite 1005
New York, New York 10007
brian@bkaplanlaw.com
212-269-2363
*Attorneys for Didani,* Trial Counsel

---

### DEFENDANT'S MOTION TO DISMISS
### <u>COUNTS ONE AND THREE OF SUPERSEDING INDICTMENT</u>

Defendant YLLI DIDANI (hereinafter "Defendant" or "Didani"), by and through counsel, WADE FINK LAW, P.C., and BRIAN KAPLAN, P.C., requests this Court dismiss Counts One and Three of the Superseding Indictment in this matter, because there is no basis for venue in the Eastern District of Michigan and because exercising jurisdiction over Didani would violate his rights to due process. The government does not concur in this motion.

Date: October 19, 2022

Respectfully Submitted,

WADE FINK LAW P.C.

/s/ Wade G. Fink
550 W. Merrill St., Ste 100
Birmingham, MI 48009
(248) 712-1054
wade@wadefinklaw.com
*Attorneys for Didani,* Local Counsel

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

v.

YLLI DIDANI,

      Defendant.

Case No. 21-20264

Hon. Denise Page Hood

**ORAL ARGUMENT REQUESTED**

---

Mark Bilkovic (P48855)
Timothy P. McDonald
Assistant United States Attorneys
211 W. Fort St., Ste. 2001
Detroit, MI 48226
(313) 226-9623
mark.bilkovic@usdoj.gov
Timothy.mcdonald@usdoj.gov
*Attorneys for the United States*

Wade G. Fink (P78751)
WADE FINK LAW, P.C.
550 W. Merrill St., Ste 100
Birmingham, MI 48009
(248) 712-1054
wade@wadefinklaw.com
*Attorneys for Didani,* Local Counsel

Brian Kaplan
BRIAN KAPLAN, P.C.
11 Park Place, Suite 1005
New York, New York 10007
brian@bkaplanlaw.com
212-269-2363
*Attorneys for Didani,* Trial Counsel

---

## BRIEF IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS
## <u>COUNTS ONE AND THREE OF THE SUPERSEDING INDICTMENT</u>

## **TABLE OF CONTENTS**

**TABLE OF AUTHORITIES**………………………………………………………………………………iii

**I.        INTRODUCTION AND FACTUAL BACKGROUND**……………………………………..……1

**II.       ARGUMENT**………………………………………………………………………………………3

      A.   THERE IS NO BASIS FOR VENUE IN THE EASTERN
          DISTRICT OF MICHIGAN…………………………………..………………………………3

      B.   EXERCISING JURISDICTION OVER DIDANI
          WOULD VIOLATE HIS RIGHTS TO DUE PROCESS…………………..………9

**III. CONCLUSION**…………………………………………………………………………………17

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Small v. United States*, 544 U.S. 385 (2005) ................................................................ 9

*Strassheim v. Daily*, 221 U.S. 280 (1911) .................................................................... 11

*United States v. Anderson*, 328 U.S. 699 (1946) .......................................................... 8

*United States v. Baker*, 609 F.2d 134 (5th Cir. 1980) ............................................. 9, 10

*United States v. Bowman*, 260 U.S. 94 (1922) ........................................................... 10

*United States v. Cabrales*, 524 U.S. l (1993) ................................................................ 8

*United States v. Elliott*, 876 F.3d 855 (6th Cir. 2017) ................................................ 5, 6

*United States v. Lopez-Vanegas*, 493 F.3d 1305 (11th Cir. 2007) ................. 11, 12, 13

*United States v. Reed*, 773 F.2d 477 (2d Cir. 1985) ..................................................... 7

*United States v. Turner*, 936 F.2d 221 (6th Cir. 1991) ................................................. 4

**STATUTES**

§ 846 ............................................................................................................................... 9

18 U.S.C. § 3237(a) ........................................................................................................ 4

21 U.S.C. § 841(a)(1) ...................................................................................................... 9

**RULES**

Fed. R. Crim. P. 18...................................................................................................4

## I.   INTRODUCTION AND FACTUAL BACKGROUND

In March of 2022, the Government superseded its indictment against Didani.

Count One accuses Didani of Conspiracy to Distribute Controlled Substances in

violation of 21 U.S.C. § 841(a)(1) and 846 (specifically attributable to Didani,

according to the indictment, is the foreseeability of five kilograms or more of a

mixture containing a detectable amount of cocaine). *See* Superseding Indictment,

R. 38, Page ID # 154 ("Count One"). Meanwhile, Count Three accuses Didani of

Conspiracy to Launder Monetary Instruments, in violation of 18 U.S.C. § 1956(h).

*Id*. at Page ID # 169 ("Count Three").

The overt acts described in the charging document allege that Didani: met

with a Co-Conspirator for the purpose of receiving U.S. currency alleged to be for

the purchase of cocaine; exchanged text messages and news article links about

what is purported to be a large seizure of cocaine in the Netherlands (there is no

indication where Didani was when he texted this information)[1]; drove a Co-

---

[1] This seizure involved 753 kilograms of cocaine (see ECF No. 42, PageID.191, Gov't Brief). The United Nations estimated that in 2010, in the Netherlands, the cost of a kilogram of cocaine was about $46,000.00. For 753 kilograms of cocaine, it would cost about $34,638,000.00. For 190 kilograms of cocaine in 190-square shaped packages, it would cost over $8,000,000.00. That is substantially more than

Conspirator's vehicle from Michigan to Washington D.C. (where it is alleged that Didani rendezvoused with yet another Co-Conspirator who provided him with a large amount of currency purportedly intended for the purchase of bulk cocaine); and took photographs with his cellular telephone of another photograph, displayed on the screen of a separate cellular telephone, depicting 190 rectangular-shaped packages.[2] *Id*. at Page ID # 156-57. The same overt acts are utilized for Count Three, with no notable differences. *Id*. at Page ID # 171 – 72. The Superseding Indictment does not describe who Didani was purchasing narcotics from, the amount, or any other information. Further,

None of the overt acts allege that the conspiracy involved plans to, at any point, transport cocaine—or any other controlled substance, for that matter—to, through, or within the State of Michigan. Nor do any of the alleged overt acts describe how specifically Didani conspired to do so. Rather, the alleged over acts, when untethered from the strained inferences the government desires, are otherwise benign, innocuous, and legal actions (whether it be receiving money from or giving it to an associate, forwarding a news link via text message, traveling

---

the $450,000.00 the government tries to tether to this seizure without any basis. *See* https://www.unodc.org/unodc/secured/wdr/Cocaine_Heroin_Prices.pdf.

[2] Upon information and belief, this photograph will be found on other cell phones.

to the nation's capital, and booking a hotel room, taking photographs with a cellular phone, etc.). In other words, the government does not tether these acts to nefarious maneuvers in furtherance of some sort of broad, complex conspiracy to distribute controlled substances, certainly not in a way that describes how, if at all, there is a connection to the United States. After all, one cannot escape acknowledging that while the aforementioned photograph of "190 rectangular-shaped packages" could very well have been a photograph of kilogram-sized quantities of cocaine, but without further information or evidence, one also cannot discount the possibility that those packages could just as easily have contained anything from electronics to coffee beans to books, or merely been an example of someone attempting to appear cool and impress their friends or acquaintances with what the government purports it to be—a very pervasive problem nowadays with the proliferation of social media.

## II.    ARGUMENT

Counts One and Three are lacking in definiteness and many other critical respects. But even assuming, *arguendo*, that the allegations in the charging document are sufficient to support a finding of probable cause as to the existence of the alleged criminal conspiracy to distribute controlled substances, or to launder monetary instruments, the allegations are still insufficient for venue in the Eastern

District of Michigan. Similarly, but distinctly, Counts One and Three's dismissal is also appropriate, mandatory, in fact, given that exercising jurisdiction over Didani, a foreign national, is complicated even further considering that extraterritorial application of the controlled substances statute in question is improper here. There is not only a lack of evidence pointing to direct actions in the United States, but a woefully inadequate showing that any conduct was intended to effect the United States.

### A. THERE IS NO BASIS FOR VENUE IN THE EASTERN DISTRICT OF MICHIGAN.

The Constitution mandates that a criminal prosecution occur in the state and district where a crime is committed. *See* U.S. Const. art. III § 2, cl. 3; *id.* at amend. VI. The Federal Rules of Criminal Procedure likewise compel the Government to "prosecute an offense in a district where the offense was committed." Fed. R. Crim. P. 18.

Where, as here, a crime against the United States lacks a venue otherwise prescribed by statute, Congress has provided that the crime may be prosecuted "in any district in which such offense was begun, continued, or completed." 18 U.S.C. § 3237(a). For a drug conspiracy like the one at issue in this case, the relevant offenses are "'continuous crimes"; that is, they are not completed until the drugs reach their final destination. *United States v. Turner*, 936 F.2d 221, 226 (6th Cir.

1991). In *Turner,* for example, the Sixth Circuit held that Michigan was a permissible venue for defendants charged with drug importation offenses stemming from their operation of an air-strip in the Bahamas, which drug smugglers used to fly cocaine from Colombia **to Michigan**. The Court explained that because the offense continued up to the drug's arrival in Michigan, the defendants could be tried in the state. *Id*. at 223.

More recently, the Sixth Circuit concluded similarly when faced with a major conspiracy involving the trafficking of opioid pain pills from Ft. Lauderdale, Florida. In *United States v. Elliott*, a clinic known as the Pain Center of Broward, or PCB was the source of opioid to several other states. 876 F.3d 855 (6th Cir. 2017). Kentucky was the most impacted state. More specifically, over 20% of all PCB patients were from Kentucky, and seven of Eastern Kentucky's largest drug trafficking organizations relied on the PCB as their primary source of painkillers. At the peak of PCB's business, one or more of these organizations was sending crews of up to a dozen people to PCB on a weekly basis to ensure a steady stream of pills would be available for sale to addicts in Kentucky. *Id*. at 858. Those working at PCB were well aware of this, as the PCB's parking lot was constantly filled with vehicles bearing Kentucky license plates, many even featuring weary travelers snoozing briefly in

their automobiles, fatigued from the frequent and frantic journeys back and forth. *Id*.

The Sixth Circuit held that venue in the Eastern District of Kentucky was appropriate even though no act of the PCB conspiracy actually occurred in Kentucky. In fact, no PCB defendant even traveled to Kentucky.. *Id*. at 862. The Court noted that the latter fact was immaterial and emphasized that the relevant consideration was the fact that uncontroverted evidence established that the PCB defendants had been aware that they were distributing excessive quantities of opioids to Kentucky residents. *Id*. at 861. The Court reasoned that finding venue in Kentucky based on the intended destination of the pills prescribed by PCB "is fully consistent with venue law" because the overt act was intended to have an effect in the district where the case is brought. *Id*.

Clarifying further, the Court also rejected one of the PCB defendants' contentions that the absence of clear collaboration with one or more of the seven Kentucky drug gangs that utilized PCB as their pill source supported the notion that none of the acts by the members of the PCB conspiracy occurred in Kentucky. *Id*. at 862. The Court explained that for purposes of finding venue, it was sufficient that the PCB defendants were aware that the destination of the pills was Kentucky; they did not need to have committed any specific act in Kentucky. *Id*.

Here, though, Didani is in a much different position. The allegations central to Count One (and its over acts) fail to establish or support a claim that cocaine or any other controlled substances were ever intended for Michigan as a final destination. Worse, the allegations do not demonstrate that anywhere else in the United States was the destination either. Given this fact, alone, that Michigan, nor the United States can be said to be the intended destination for the alleged narcotics, venue in the Eastern District of Michigan is not proper. As the Court held in *Turner*, the fact of the matter is that the relevant offenses in a drug conspiracy are continuous crimes and thus not completed until the narcotics reach their final destination, and the Government has not established or proven in any fashion that Michigan was the destination, *or intended destination,* of any narcotics.

In fact, the Government will likely assert in response that our Circuit and others have recognized that so long as an overt act is intended to have an effect on the district where the case is finally brought, venue is proper there. At face value, this is correct, but the purpose underlying this concept is not served in this case. As the Second Circuit noted, "places that suffer the effects of a crime are entitled to consideration for venue purposes. Such districts have an obvious contact with the litigation in their interest in preventing such effects from occurring." *United States v. Reed*, 773 F.2d 477, 482 (2d Cir. 1985). In the present case, though, none of the

overt acts demonstrate that this District has suffered the effects of crime. The government has also failed to allege conduct that, on its face, is illicit or plainly and unambiguously blameworthy. Instead, the allegations can be reasonably read as: "Joe accepted money from a friend; Joe checked into a hotel; Joe dined at a restaurant; Joe and his friend exchanged text messages about a major breaking news story" and so on and so forth. Sure, the government is going to respond to this Motion with evidence and inferences way outside the four corners of the Superseding Indictment, but such evidence, inference, and legal narrative is not at all the inquiry.

Without clear illegality or impropriety associated with the actions of Didani as they supposedly relate to this conspiracy, *in Michigan,* and *in this District,* the claim that venue is proper in the Eastern District of Michigan is without merit.

Consequently, given that the statute central to Count Three states specifically that venue is proper in any district where the financial or monetary transaction is conducted, or where a prosecution for the underlying specified unlawful activity (in this case, conspiracy to distribute controlled substances) could be brought, venue in the Eastern District of Michigan for Count Three is likewise improper. Not only do the overt acts mentioned feature little more than conclusory allegations — or a modicum of reasonable suspicion or probable cause that the acts

are indeed in furtherance of money laundering or the overarching main conspiracy—but because venue here would not be proper for Count One, it in turn renders it improper as well for Count Three. Worse, the charging document does not describe with any detail how this money was used to buy drugs – no method, no identification of a country, not even a continent. It would be insufficient for the government to observe an individual leave the courthouse and conclude they are a criminal. It cannot just write isolated conduct followed by a conclusion. It must bridge the two.

The charging document here is ugly and disjointed. The government, unsure of how the years' worth of isolated events fit together, in the spirit of Halloween, sewed together Sally from the Nightmare Before Christmas, in indictment form, and hoped for the best.  But venue is determined from the "nature of the crime alleged and the location of the act or acts constituting it." *United States v. Cabrales*, 524 U.S. l, 6 – 7 (1993), *quoting United States v. Anderson*, 328 U.S. 699, 703 (1946) (holding improper venue in Missouri for money laundering that took place solely in Florida even though the funds laundered stemmed from drug dealing in Missouri).

As a result, this Honorable Court should dismiss both Counts One and Three for improper venue.

**B. EXERCISING JURISDICTION OVER DIDANI WOULD VIOLATE HIS RIGHTS TO DUE PROCESS.**

Counts One and Three should also be dismissed because the exercising extraterritorial jurisdiction over Didani, as it relates to Counts One and Three do not comply with due process principles under the Fifth Amendment.

21 U.S.C. § 841(a)(1), in conjunction with § 846, makes it unlawful for any person to conspire to possess with the intent to distribute a controlled substance, such as cocaine. Neither statute expressly requires that possession, distribution, nor an act in furtherance of the conspiracy, occur in the United States. But a silent statute is presumed to apply only domestically. *Small v. United States*, 544 U.S. 385, 388, 125 S. Ct. 1752, 1755, 161 L. Ed. 2d 651 (2005).  It is true, though, that where the nature of the law permits, and Congress intends it, such statutes *may* be given extraterritorial application. *United States v. Baker*, 609 F.2d 134, 136 (5th Cir. 1980). However, "[a]bsent an express intention on the face of the statutes to do so, the exercise of that power may be inferred from the nature of the offenses and Congress' other legislative efforts to eliminate the type of crime involved." *Id*. at 136.

The Supreme Court explained the issues involved with a statute silent as to its extraterritorial application in *United States v. Bowman*, 260 U.S. 94, 97-98 (1922):

The necessary locus, when not specially defined, depends upon the purpose of Congress as evinced by the description and nature of the crime and upon the territorial limitations upon the power and jurisdiction of a government to punish crime under the law of nations. Crimes against private individuals or their property, like assaults, murder, burglary, larceny, robbery, arson, embezzlement, and frauds of all kinds, which affect the peace and good order of the community must, of course, be committed within the territorial jurisdiction of the government where it may properly exercise it. If punishment of them is to be extended to include those committed outside  of the strict territorial jurisdiction, it is natural for Congress to say so in the statute, and failure to do so will negative the purpose of Congress in this regard.

. . .

But the same rule of interpretation should not be applied to criminal statutes which are, as a class, not logically dependent on their locality for the government's jurisdiction, but are enacted because of the right of the government to defend itself against obstruction, or fraud wherever perpetrated, especially if committed by its own citizens, officers, or agents. Some such offenses can only be committed within the territorial jurisdiction of the government because of the local acts required to constitute them. Others are such that to limit their locus to the strictly territorial jurisdiction would be greatly to curtail the scope and usefulness of the statute and leave open a large immunity for frauds as easily committed by citizens on the high seas and in foreign countries as at home. In such cases, Congress has not thought it necessary to make specific provision in the law that the locus shall include the high seas and foreign countries, but allows it to be inferred from the nature of the offense.

Courts have generally concluded that the narcotics statutes, such as the ones

in question relating to Didani, were intended to have extraterritorial application

given the great interest and effort of Congress to minimize drug use and trafficking.

11

That said, when jurisdiction reaches extraterritorially, it still must meet the traditional requirement of law - that applying criminal jurisdiction to acts committed outside its territorial borders is only appropriate where an effect occurs within those borders. *See, e.g., Strassheim v. Daily*, 221 U.S. 280, 285, 55 L. Ed. 735, 31 S. Ct. 558 (1911); *see also, e.g., United States v. Perlaza,* 439 F.3d 1149 (9th Cir. 2006) ("For a United States court to properly exercise jurisdiction, the government still needs to establish some detrimental effect within, or nexus to, the United States); *United States v Al-Kassar,* 660 F.3d 108, 118 (2d Cir. 2011) (holding that due process requires sufficient nexus between foreign conduct and the United States). The Sixth Circuit has not expressly adopted this requirement, but seemed to conclude there may be such a nexus requirement. *See, e.g., United States v. Iossifov,* 45 F.4th 899 (6th Cir 2022) (assuming for purposes of appeal that there was a Fifth Amendment limit on extraterritorial application of money laundering statute).

*United States v. Lopez-Vanegas*, 493 F.3d 1305 (11th Cir. 2007) is particularly illuminating here. In *Lopez-Venegas,* the defendants brokered a deal between a Colombian drug trafficking organization (the "Usuga Group," led by Juan Gabriel Usuga in Medellin, Colombia) and a Saudi Arabian prince. The deal was for the

defendants to transport cocaine on the prince's airplane from Caracas, Venezuela to Paris, France for distribution in Europe.

The defendants participated in multiple meetings across the world, several of which were in Miami, Florida. These meetings in Florida happened several times at different locations in the city. *Id*. at 1308. In fact, it was specifically one of the defendants who introduced Usuga to a friend, who would turn into a co-conspirator, at one of these meetings. *Id*. It was this friend who knew and brought the Prince into the deals and meetings, which spanned several years (from late 1998 to early 2001). *Id*. More specifically, among other things, the details discussed at some of these meetings in Miami included the rate of commission defendants would receive for each kilogram transported, the assignment of important duties (such as who would be responsible for communications with the Prince, who would be responsible for handling the movement of the cocaine, who would be responsible for setting up straw corporations), and even at one point the idea of routing some of the cocaine to New York (though this did not ultimately pan out). *Id*. at 1309. As time went on, and transactions occurred, other topics were discussed, like the amount of money owed to the Prince (an additional $10 million on top of $5 million that he had already been paid), problems and difficulties that

had been encountered (such as the seizure of 804 kilograms by French authorities in 1999), and more. *Id*. at 1310.

On appeal, the defendants asserted that the agreement to ship cocaine from Colombia to Venezuela to Saudi Arabia, and then ultimately to France for distribution throughout Europe, did not violate 21 U.S.C. § 846 because the object of such a conspiracy—the possession and distribution of cocaine on foreign soil—was not a violation of 21 U.S.C. § 841(a)(1). The defendants argued that the district court should have granted their motion for acquittal. *Id*. at 1311. Faced with the issue of whether discussions held in the United States on the topic of the possession of controlled substances that are located outside of the United States—with the intent to ultimately distribute those substances outside of the United States—is a crime, the Eleventh Circuit explicitly held that it was not. *Id*. at 1313.

The Court began by noting that § 841(a)(1) and § 846 were applied extraterritorially in certain circumstances (which Congress had not specifically articulated). *Id.* But, Congress had not stated its intent to reach discussions held in the United States (in furtherance of a conspiracy to possess controlled substances outside the territorial jurisdiction of the United States, with the intent to distribute those controlled substances outside of the territorial jurisdiction of the United States). In light of this, the Court held that §§ 841 and 846 did not apply

extraterritorially and the conduct of defendants in having meetings featuring such discussions did not violate the statutes.

Surely, then, in Didani's case, due process screams. The overt acts described in the charging document not only fail to clarify or prove that the controlled substances in question are headed to Michigan, or that, for instance, money exchanged was for said controlled substances and were intended for or destined to Michigan, they do not even manage to make clear that there is a criminal conspiracy at all. Even if it were unequivocal and unmistakable that a criminal conspiracy existed in Didani's case, that would have little bearing on the matters of venue and jurisdiction. After all, in *Lopez-Vanegas*, there was not a single doubt that there was a criminal conspiracy at the center of the matter and that it involved large-scale trafficking of cocaine. The Miami discussions featured unambiguous discussion on all sorts of matters ranging from the seizure of cocaine by authorities to the commissions that were to be paid to members of the conspiracy for the cocaine or their part in handling it, and more. It is the fact that those discussions failed to touch upon or invoke the United States itself in the conspiracy, even though the very meetings themselves were held in Florida, that were terminal to the government's assertions that the court could exercise jurisdiction.

And even if they had featured discussions regarding the distribution of controlled substances in the United States itself, that would still likely fail to be enough given that the defendants in the case above at one point indeed discussed during one of their meetings the possibility of distributing some of the cocaine in New York (which ultimately did not occur). Here, though, there is no allegation comparable to any of the discussions or conduct in *Lopez-Venegas.* Not even the consideration of distributing controlled substances in the United States was ever considered, let alone any sort of formal agreement to actually plan to do so.

In fact, not a single component relating to Count One or Count Three offers any measure allege that any conduct revolved around or featured any distribution of controlled substances within the United States. Simply put, the connection to the United States in this matter is not even a tenuous one, but one that is plainly nonexistent. No component of the alleged conspiracy expressed or featured any intention or plans in which the United States was the endpoint destination or even a point of temporary storage along the way.

This conclusion with also be consistent with the Sixth Circuit's holding two months ago in *Iossifov, supra.* There, the Sixth Circuit held that assuming Fifth Amendment due process principles applied to extraterritorial conduct, there was a sufficient nexus between the conduct and the United States because "there was

significant evidence that defendant collaborated in a money laundering scheme that took place, at least in part, in the United States" and the "nexus" between the United States and the conduct was clear. *Id.* at 914. The nexus was the fact that the defendant was luring American victims to pay money for nonexistent goods. *Id.* None of that exists here. There are no American victims and there is not American conspiracy by the government's very own allegations.

Ultimately, where it is so tenuous from the charging document whether due process would allow the prosecution of a crime like the one here, it should go no further. Exercising jurisdiction over Didani would violate his rights to due process under the Fifth Amendment.

### III.   <u>CONCLUSION</u>

For the foregoing reasons, Didani requests that this Honorable Court enter an order dismissing Counts One and Three.

Date: October 19, 2022                          Respectfully Submitted,

WADE FINK LAW P.C.

<u>/s/ Wade G. Fink</u>
550 W. Merrill St., Ste 100
Birmingham, MI 48009
(248) 712-1054
wade@wadefinklaw.com
*Attorneys for Didani,* Local Counsel

## <u>CERTIFICATE OF SERVICE</u>

On October 19, 2022, the foregoing was filed using the Court's e-filing system, which will send notice of same to all parties of record.

<u>/s/ Wade G. Fink</u>