# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,                          Case No. 21-20264

v.                                     Hon. Denise Page Hood

YLLI DIDANI,                   **ORAL ARGUMENT REQUESTED**

      Defendant.

---

Mark Bilkovic (P48855)
Timothy P. McDonald
Assistant United States Attorneys
211 W. Fort St., Ste. 2001
Detroit, MI 48226
(313) 226-9623
mark.bilkovic@usdoj.gov
Timothy.mcdonald@usdoj.gov
*Attorneys for the United States*

Wade G. Fink (P78751)
WADE FINK LAW, P.C.
550 W. Merrill St., Ste 100
Birmingham, MI 48009
(248) 712-1054
wade@wadefinklaw.com
*Attorneys for Didani,* Local Counsel

Brian Kaplan
BRIAN KAPLAN, P.C.
11 Park Place, Suite 1005
New York, New York 10007
brian@bkaplanlaw.com
212-269-2363
*Attorneys for Didani,* Trial Counsel

---

## DEFENDANT'S MOTION TO SUPPRESS
## <u>EVIDENCE AND FOR EVIDENTIARY HEARING</u>

Defendant YLLI DIDANI (hereinafter "Defendant" or "Didani"), by and through counsel, WADE FINK LAW, P.C., requests this Court suppress evidence obtained from Defendant's cell phones seized at the United States border and all fruits therefrom. In order to make a full and appropriate record, Defendant requests an evidentiary hearing on this matter. The government does not concur in this motion.

Date: October 19, 2022

Respectfully Submitted,

WADE FINK LAW P.C.

/s/ Wade G. Fink
550 W. Merrill St., Ste 100
Birmingham, MI 48009
(248) 712-1054
wade@wadefinklaw.com
*Attorneys for Didani,* Local Counsel

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,                      Case No. 21-20264

v.                                Hon. Denise Page Hood

YLLI DIDANI,                  **ORAL ARGUMENT REQUESTED**

      Defendant.

---

| | |
|---|---|
| Mark Bilkovic (P48855)<br>Timothy P. McDonald<br>Assistant United States Attorneys<br>211 W. Fort St., Ste. 2001<br>Detroit, MI 48226<br>(313) 226-9623<br>mark.bilkovic@usdoj.gov<br>Timothy.mcdonald@usdoj.gov<br>*Attorneys for the United States* | Wade G. Fink (P78751)<br>WADE FINK LAW, P.C.<br>550 W. Merrill St., Ste 100<br>Birmingham, MI 48009<br>(248) 712-1054<br>wade@wadefinklaw.com<br>*Attorneys for Didani,* Local Counsel<br><br>Brian Kaplan<br>BRIAN KAPLAN, P.C.<br>11 Park Place, Suite 1005<br>New York, New York 10007<br>brian@bkaplanlaw.com<br>212-269-2363<br>*Attorneys for Didani,* Trial Counsel |

---

## BRIEF IN SUPPORT OF DEFENDANT'S MOTION TO SUPPRESS EVIDENCE AND FOR EVIDENTIARY HEARING

## **TABLE OF CONTENTS**

**TABLE OF AUTHORITIES**………………………………………………………………….…………iii

**I.     INTRODUCTION AND FACTUAL BACKGROUND**……………………………………1

**II.     ARGUMENT**…………………………………………………………………………………..…...5

      A.  THE BORDER SEARCH EXCEPTION DOES NOT APPLY TO THE SEARCHES HERE BECAUSE THE SEARCHES OF MR. DIDANI'S PHONES WERE TOO INTRUSIVE AND HAD NO NEXUS TO THE EXCEPTION'S RATIONALE……………………………………………………………………………5

      B.  THE PHONE SEARCHES WERE IMPROPER BECAUSE AUTHORITIES HAD NO EVIDENCE THAT MR. DIDANI'S PHONES WOULD CONTAIN CONTRABAND…………………………………………………………………..…….12

      C.  MR. DIDANI IS ENTITLED TO A HEARING BECAUSE IT IS CLEAR THAT CERTAIN ISSUES OF FACT REQUIRE EXPLORING AND A RECORD………15

**III. CONCLUSION**……………………………………………………………………………..……..17

## TABLE OF AUTHORITIES

### Cases

*Cohen v. United States*, 378 F.2d 751 (9th Cir. 1966) ................................................15

*In re Searches and Seizures Conducted, Etc*., 665 F.2d 775 (7th Cir.1981). ...............15

*Riley v. California*, 134 S. Ct. 2473 (2014) ................................................................6, 7

*Terry v. Ohio*, 392 U.S. 1, 21 (1968) ...........................................................................13

*United States v. Aigbekaen*, 943 F.3d 713 (4th Cir. 2019), ..................................10, 11

*United States v. Cano*, 934 F.3d 1002 (9th Cir. 2019)..........................................13, 14

*United States v. Duncan*, 693 F.2d 971 (9th Cir. 1982). ...............................................8

*United States v. Flores-Montano*, 541 U.S. 149 (2004)................................................7

*United States v. Jacobsen*, 466 U.S. 109, 1 (1984) .......................................................8

*United States v. Losing*, 539 F.2d 1174 (8th Cir.1976)........................................15, 16

*United States v. Montoya de Hernandez*, 473 U.S. 531. ...............................................7

*United States v. Poe*, 462 F.2d 195 (5th Cir.1972) .....................................................15

*United States v. Ramsey*, 431 U.S. 606 (1977).......................................................7, 12

*United States v. Seljan*, 547 F.3d 993 (9th Cir. 2008)...................................................7

*United States v. Smith*, 546 F.2d 1275 (5th Cir.1977)................................................15

*United States v. Urrieta*, 520 F.3d 569 (6th Cir. 2008)...............................................13

*Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646 (1995) ............................................6, 9

## I.    INTRODUCTION AND FACTUAL BACKGROUND

In early January of 2015, the Special Agent-in-Charge ("SAC") of the Immigration and Customs Enforcement ("ICE") office in Detroit received unknown information regarding the possible smuggling of steroids, contraband, vehicles, possible counterfeit money, and money laundering.[1] As far as can be discerned in discovery, Didani was allegedly implicated by the "information" that was received by ICE, namely in the context of what is asserted to be "suspicious travel."

Pursuant to this information, on July 30, 2015, Defendant was stopped upon his arrival from Albania at Chicago's O'Hare International Airport.[2] U.S. Customs Officers ("CBP") were prepared, and apparently expecting, his arrival, which appears to have been due to a notification from the Department of Homeland Security. Didani was asked numerous questions regarding his recent travels to various countries. A DHS/ICE memorandum recounts that Didani provided

---

[1] All factual assertions made in this Motion and Brief are based on discovery materials provided by the government. An evidentiary hearing has been requested to make a full record. Having reviewed the Protective Order in this matter, defense counsel is not filing any exhibits and is making representations as cautiously as possible.

[2] It is important to note that Didani is Albanian, making his arrival from his native country less suspicious. *See* Gov't Brief, ECF No. 42.

reasonable explanations for his travels to each of the countries or regions he was asked about. Yet, in that same memorandum, ensuing ones, and other government documents, the government indicates that Didani was involved in nefarious activities. These allegations seem to be based, at least initially, on nothing more than his travel destinations, as well as circumspect claims regarding the receipt of "information" whose origin is either never described, attributed simply to "law-enforcement databases," or otherwise ambiguous.

For example, Defendant's travels to and from Albania, which he described as being in connection with a coal mining business he had started, as well as family-related matters, are implied to be tied to organized crime and narcotics.[3] The government characterized travel to Colombia for a wedding as indicative of narcotics trafficking, and a visit to Dubai for a music concert by the rapper Drake is implied to be connected to money laundering activities.[4] The government documents, without support, also conclude that Didani's travels to Istanbul, Turkey, and other cities in the country, which he noted were related to his coal business, and visiting some family members who reside there, are described by the

---

[3] Government Discovery at DIDANI-00205 (hereinafter identified by Bates Label only and not filed with the Court at this time).

[4] *Id*.

government as indicative of drug trafficking. The government includes a bizarre, unsupported discussion about terrorist groups.[5] Compounding this, the memorandums point out that one of these areas was struck by a suicide bomb attack two days after Didani and three associates visited, ominously noting that follow-up research on Didani and the associates was pending.[6] Of course, Didani has absolutely no connection to the terrorist group.

Relying on this innuendo, CBP officials at O'Hare performed a border search of Didani's two cell phones. Defendant provided passcodes for his phones *after* they were seized.[7] Upon reviewing the phones' contents, investigators discovered photos of Didani and what appeared to be some bundles of currency, as well as some photos of him with firearms.[8] He was released after being interviewed.

---

[5] DIDANI-00206.

[6] DIDANI-00207.

[7] From the Search Warrant Affidavit.

[8] No effort was ever made, at least as far as is noted in discovery, to confirm or determine whether the photos featured genuine currency and firearms, rather than prop items. In this era of social media attention seeking, an entire industry now exists solely to provide individuals with rentable prop items to allow them to portray a certain image or lifestyle. Instead of determining whether this factor may have been at play here, agents appear to have immediately concluded that the currency and firearms were authentic, and by extension, that Didani was doing something wrong and illegal.

Again, on August 6, 2016, Didani arrived at O'Hare from Albania. And once more, just as in July 2015, CBP officials were waiting.  He was again referred for a secondary inspection and interview. This occurred because Task Force Officer Josh Bianchi learned of Didani's travel plans and coordinated with HSI Special Agent Daniel Nugent (based at O'Hare Airport) to ensure that Didani would be subjected to a thorough border examination.[9] Thus, when Didani arrived, he was scrutinized in accordance with the plan devised by TFO Bianchi and HIS. And while Didani provided the passcodes to two phones he was carrying (an iPhone and BlackBerry), agents later sought a warrant, asserting that at least one of the phones featured "encryption software" that impeded their ability to access the contents.[10] Additionally, authorities discovered an exceedingly small amount of Kigtropin, or Human Growth Hormone (HGH), in Didani's luggage, which is illegal and was seized.[11]

On August 17, 2016, United States Magistrate Judge R. Steven Whalen authorized a federal search warrant for the iPhone possessed by Didani on August 6, 2016. Relying on the contents and information in the phones from both searches

---

[9] DIDANI-00215.

[10] *Id*.

[11] DIDANI-02428

in 2015 and 2016, federal agents of the DEA and other agencies sought and obtained numerous warrants for iCloud accounts, bank accounts, and more associated with Didani and many of his associates, ultimately leading to the instant case.

## II.   ARGUMENT

Given the extraordinary quantity and quality of sensitive information border agents may uncover during any search of a cell phone, searches of digital devices implicate significant privacy interests. To protect these privacy interests, the Constitution requires government agents to have some level of suspicion before searching a phone at the border for the purpose of stopping the import of contraband. Because the CBP agents who seized and searched Didani's cell phones had no information to *reasonably* conclude that criminal activity was afoot; because border agents relied on the border search exception as a pretext and subterfuge to gain warrantless access to Didani's phones, essentially on behalf of another federal agency; and, because this conduct was in support of a broader criminal investigation and fishing expedition, rather than out of any genuine concern in safeguarding the United States' borders, any and all evidence discovered during the searches must be suppressed, as well as all unlawful fruits of these illegal searches.

### A. THE BORDER SEARCH EXCEPTION DOES NOT APPLY TO THE SEARCHES HERE BECAUSE THE SEARCHES OF DIDANI'S PHONES WERE TOO INTRUSIVE AND HAD NO NEXUS TO THE EXCEPTION'S RATIONALE.

The Fourth Amendment requires that all searches and seizures of "persons, houses, papers, and effects" be reasonable. U.S. Const. amend. IV. "Where a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing, . . . reasonableness generally requires the obtaining of a judicial warrant" supported by probable cause. *See Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 653 (1995). A warrantless search is reasonable "only if it falls within a specific exception to the warrant requirement." *See Riley v. California*, 134 S. Ct. 2473, 2482 (2014).

When weighing the reasonableness of a search, courts must first decide whether the search was performed to discover evidence of wrongdoing. If the purpose of the search is to perform an ordinary criminal investigation, then law enforcement officers must get a warrant. *Vernonia Sch. Dist.*, 515 U.S. at 653. To be sure, "when special needs, beyond the need for law enforcement, make the warrant and the probable-cause requirement impracticable," a search without a warrant or probable cause may be reasonable. *Id*. But courts "determine whether to exempt a given type of search from the warrant requirement by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on

the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Riley*, 134 S. Ct. at 2484 (internal quotation marks omitted).

The single most critical portion of the analysis here is the following: any exception to the warrant requirement must be tethered to the justifications underlying the exception. *Id*. at 2485. At issue here is what is known as the border search exception. The exception provides that, *generally,* searches performed at international borders do not generally require a warrant, probable cause, or reasonable suspicion. *United States v. Ramsey*, 431 U.S. 606, 617-619 (1977). However, this authority is not unfettered; "highly intrusive" border searches typically require at least reasonable suspicion of a crime. *United States v. Flores-Montano*, 541 U.S. 149, 152 (2004).

To be clear, the government's legitimate interest in securing its borders does not mean that at the border "anything goes." *United States v. Seljan*, 547 F.3d 993, 1000 (9th Cir. 2008) (en banc). Even at the border, individual privacy rights are not abandoned but "[b]alanced against the sovereign's interests." *United States v. Montoya de Hernandez*, 473 U.S. 531, 539, 105 S. Ct. 3304, 87 L. Ed. 2d 381 (1985). It is true that this balance "is qualitatively different . . . than in the interior" and is "struck much more favorably to the Government." *Id.* at 538, 540. That said, the

touchstone of the Fourth Amendment analysis, even with an exception that is generous to the government, remains reasonableness. *Id*. at 538. The reasonableness of a search or seizure depends on the totality of the circumstances, including the scope and duration of the deprivation. *See United States v. Jacobsen*, 466 U.S. 109, 124 (1984); *see also United States v. Duncan*, 693 F.2d 971, 977 (9th Cir. 1982).

At bottom, the fact that the government enjoys broad authority to take reasonable measures for the narrow purpose of enforcing immigration and customs laws does not then mean that  CBP has free reign at the border to search anything in any way they see fit. Cell phones, computers, hard drives, flash drives, and DVDs store extraordinary quantities of information ranging "from the mundane to the intimate," meaning that any examination of a computer or phone has the potential to expose "many sensitive records previously found in the home" and "a broad array of private information never found in a home in any form," *Riley*, 134 S. Ct. at 2490-91.

In the instant case, the totality of the circumstances surrounding the border searches of Didani's phones militate in favor of a finding that the searches were not reasonable and exceeded the scope of the Fourth Amendment for a number of reasons. First, the mere fact that they were premised, as far as undersigned counsel

can deduce, on little more than speculative claims made to law enforcement that Didani was involved in "steroids" or "smuggling of contraband" is hardly enough to merit or justify the invasive searches of his entire phone, which in these modern times house far more information than one's actual home. As noted in *Vernonia Sch. Dist. 47J v. Acton*, "where a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing, . . . reasonableness generally requires the obtaining of a judicial warrant." 515 U.S. at 653.

Significantly, CBP policies themselves are tailored to reflect the general approach courts have taken to this issue. The agency permits "basic" *manual* searches of electronic devices with or without suspicion of criminal activity, but it restricts "advanced" forensic searches to those cases where there is reasonable suspicion or a national security concern.[12] Furthermore, CBP permits officers to "detain" an electronic device (or copies of information from such a device) but not without limit. Specifically, CBP policy permits the detention of electronic devices "for a brief, reasonable period of time" generally not exceeding a period of five days.[13] Here, where in one of the relevant instances Didani's phone was held for 11

---

[12] U.S. Customs & Border Prot., Subject: Border Search of Electronic Devices ¶3.2(Jan.4,2018),https://www.dhs.gov/sites/default/files/publications/CBP%20Directive%203340-049A_Border-Searchof-Electronic-Media.pdf

[13] *Id*. ¶ 5.4.1

days (from August 6, 2016 to August 17, 2016, when the warrant was authorized), the propriety of the agents' actions are further compromised. And this according to its own rules on reasonableness. *See, e.g., United States v. Laynes,* 482 F. Supp 3d 657, 665 (SD Ohio 2020) ("CBP's failure to follow its own procedures [] warrants suppression …").

Even worse—and one of the foremost factors markedly undermining the propriety of the border searches—is the fact that they appear to clearly have been carried out not out of a random concern that the national security or similar interests of the United States may be at stake (or at least weigh in favor of further investigation), but instead as a sly workaround to the warrant requirement. It is fairly inferred from discovery that agents wanted to get into Didani's phones because they believed he was involved in the trafficking of controlled substances and felt that in any other scenario, save for his arrival at the international border, they'd need to first obtain a warrant to do so. This type of behavior of law enforcement is precisely what the Fourth Amendment is designed to prevent – the notion that the ends justify the means.

_____

For example, in *United States v. Aigbekaen*, 943 F.3d 713, 721 (4th Cir. 2019), the Court held that the warrantless forensic search by HSI agents of Raymond Aigbekaen's laptop computer, cell phone, and digital media player upon his return to the United States (at John F. Kennedy International Airport)—despite strong suspicion that he was involved in domestic sex trafficking of minors—did not fall within the border search exception because the search "lacked the requisite nexus to the recognized historic rationales justifying the border search exception" (e.g., to protect national security, block entry of unwanted persons, and exclude contraband). In fact, the court did so despite explicitly acknowledging that when Aigbekaen landed at the airport with his multiple electronics, HSI agents had not only reasonable suspicion "but **probable cause to suspect that he had previously committed grave … crimes**." *Id* (emphasis added). Even so, because the suspicions "were entirely unmoored" from the government's sovereign interests—such as in protecting national security, blocking Aigbekaen's own entry (assuming he was designated as an unwanted person), etc.—the court ruled that the border search exception could not logically apply to nor justify the agents' search of his electronics when he arrived at the airport. *Id*.

Surely then, in Mr. Didani's case, where there was not nearly the same level of suspicion, evidence, or cause to believe reasonably that he was involved in illegal

11

activity as there was regarding Mr. Aigbekaen, the searches of his phones should not have been performed. And rather than adhering to their duties under the Constitution, law enforcement opted to make use of the border exception as a subterfuge, asking CBP to instead confront Didani and gain access to his materials that way.[14] Put another way, the government's interest in the content of Didani's phones was rooted in and fueled by the belief that he was engaged in criminal narcotics trafficking activity, rather than rooted in any sort of genuine concern tied to the safeguarding of the nation's borders and entry points.

In *United States v Laynes,* 481 F Supp 3d 657 (SD Ohio 2020), a district court suppressed fruits of a border search conducted on a cell phone. The district court found that while CBP "searched defendant's iPhone [he used cloud storage] for videos [and pictures]." *Id.* at 662. In so doing, the CBP violated its own rules regarding placing an iPhone in airplane mode. *Id.* The search was "therefore [] unlawful." While it is evident that the CBP did not follow its own policies with regard the length of property detention (see *supra*), we simply do not know without an evidentiary hearing (discussed *infra*) whether any information from Didani's phones that later formed the basis of this case came from his cloud or similar.

---

[14] Upon information and belief, several law enforcement actors have since been promoted. Whether that was based on this case is unknown.

Based on the foregoing, any claim by the government that Didani was instead investigated merely as part of a standard or otherwise routine concern regarding the national security interests of the country is not believable and strains credulity. Didani provided rational and reasonable explanations for each of his travels to the countries he was asked about, he was not arriving from a country or region that is of concern (for instance, North Korea or Iran), and had ample and perfectly reasonable justification for traveling to Chicago (several of his immediate family members reside there). On the current record, the totality of the circumstances makes clear that the government had no reasonable basis for believing that he in any way posed a threat or risk to the country and thereby implicated the "longstanding right of the sovereign to protect itself by stopping and examining persons and property crossing into this country." *United States v. Ramsey*, 431 U.S. at 606.

### B. THE PHONE SEARCHES WERE IMPROPER BECAUSE AUTHORITIES HAD NO EVIDENCE THAT DIDANI'S PHONES WOULD CONTAIN CONTRABAND.

Moreover, the mere fact that a search of electronics takes place at the border does not mean that the search then automatically fits within the border search exception and is justified. CBP officers may not rely on a hunch that contraband might be on the phone; they must be able to "point to 'specific and

articulable facts, which taken together with rational inferences from those facts,' reasonably suggest that" contraband or customs-related information will be found on the external hard drive. *United States v. Urrieta*, 520 F.3d 569, 573 (6th Cir. 2008) (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)).

For the sake of argument—even if Didani were to concede that the totality of the circumstances gave rise to reasonable suspicion or probable cause that he was involved in illegal activity, that still would not implicate the border search exception. The mere fact that someone is likely involved in illegal activity does not then open the door for any of their possessions and property to be searched without limitation. Even when there is reasonable suspicion or probable cause that a suspect is involved in illegal activity, authorities are still required to demonstrate and articulate specifically how and why each place or property they seek to search is connected to that illegal activity.

For this reason, in *United States v. Cano*, 934 F.3d 1002, 1020 (9th Cir. 2019), reh'g denied, 973 F.3d 966 (9th Cir. 2020), the Ninth Circuit held that border officials may conduct a forensic search of a cell phone only if there is reasonable suspicion that the phone itself physically contains contraband (such as child pornography). The court distinguished searches of items that themselves are being

smuggled from searches of evidence (like electronics) that may merely reveal the importation of contraband. *Id*. at 1018.

This is precisely why the searches of Didani's phones were improper. Even if Didani were to concede that the agents had enough information to suspect his involvement in the trafficking of controlled substances (which we have no idea based on the discovery and why the need for an evidentiary hearing is clear), it is axiomatic that actual narcotics are not going to be found in the contents of the phone's software. While evidence or information *related* to narcotics trafficking activity obviously could be, that is markedly different from the physical contraband itself. When faced with a nearly identical situation, the court in *Cano* expressly held that electronic device searches must be limited for digital contraband within the device itself, and do not encompass searching the device for any evidence that may lead to the discovery of a crime. *Id*. at 1018-19.

In the case at bar, the agents' suspicion that Didani was trafficking narcotics is likewise insufficient. To search his phones, they were required to have suspicion that the phones themselves would, in some manner, contain digital contraband. But they did not have any such suspicion or convincing evidence, because narcotics cannot be stored in a computer file. Bombs or firearms also won't be found in a

computer file, so even the insinuation that Didani is involved with terrorist (which is absolutely untrue) would be as immaterial as it is insulting.

In *United States v Cotterman,* 709 F.3d 952 (9th Cir. 2013), the Court held that when a search is "transformed into something far different" than a "quick look and unintrusive search" of a storage device (there, a laptop). The Court concluded that a forensic examination analyzing a laptop, without a warrant, and pursuant to the border search exception, was unconstitutional. *Id.* at 960-961.

On one end of the spectrum you have the quick look at a person's phone, without digging into its contents or cloud-based information (like in most cases that are not unconstitutional) and on the other end of the spectrum you have a situation like in *Cotterman* where a full forensic analysis is down without a warrant. The question, then, is where on that spectrum does this case fall and what are the boundaries. As a threshold matter, an evidentiary hearing is required to fully understand the justifications and actions of law enforcement. But, the fact that there was some "information" that led to the targeting of Didani, and an intrusive search of his entire life based on a small amount of HGH, is completely untethered from the justifications of the border search exception.

## C. DIDANI IS ENTITLED TO A HEARING BECAUSE IT IS CLEAR THAT CERTAIN ISSUES OF FACT REQUIRE EXPLORING AND A RECORD.

Under Fed. R. Crim. P. 41(e), an evidentiary hearing is required on a motion to suppress only when necessary to receive evidence on an issue of fact. *See In re Searches and Seizures Conducted, Etc.*, 665 F.2d 775 (7th Cir.1981). Evidentiary hearings are not granted as a matter of course, but are held when the defendant alleges sufficient facts which, if proven, would justify relief. *United States v. Smith*, 546 F.2d 1275 (5th Cir.1977); *United States v. Poe*, 462 F.2d 195 (5th Cir.1972), *cert. denied*, 414 U.S. 845, 94 S. Ct. 107, 38 L. Ed. 2d 83 (1973).  A defendant must set forth factual allegations in the suppression motion which are "sufficiently definite, specific, detailed, and nonconjectural, to enable the court to conclude that a substantial claim is presented." *United States v. Poe*, 462 F.2d at 197 (*quoting from Cohen v. United States*, 378 F.2d 751, 761 (9th Cir.), *cert. denied*, 389 U.S. 897, 88 S. Ct. 217, 19 L. Ed. 2d 215 (1967)). *Accord, United States v. Smith; United States v. Losing*, 539 F.2d 1174 (8th Cir.1976), *cert. denied*, 434 U.S. 969, 98 S. Ct. 516, 54 L. Ed. 2d 457 (1978). Furthermore, inherent in these flexible guidelines is a judicial recognition that "the determination of whether a hearing is required [on a motion to suppress] is necessarily dependent upon the particular facts which attend a particular request, and the district court is properly left with a certain amount of discretion in this regard." *United States v. Losing*, 539 F.2d at 1178.

Given this, Didani is entitled to an evidentiary hearing in the case at bar. In this motion, Didani has set forth numerous factual allegations that are sufficiently definite, specific, detailed, and nonconjectural enough to enable the court to conclude that a substantial claim is presented. In addition, the Court should grant Didani's request for an evidentiary hearing given the dearth of information and explanation surrounding what served as the impetus for the intense government interest in Didani to begin with. The government's discovery merely indicates there was "information" which was then relayed to the border. Defense counsel is entitled not only to examine on this "information" and its relationship to a border search, but also, defense counsel is entitled to explore whether there was an intentional design to use a border search as an end run around the Fourth Amendment.

In addition, without understanding precisely what happened at the border – whether the phones were placed in airplane mode (warranted suppression in *Laynes, supra*), what precisely was searched, what information was gleaned, why are warrant was not sought at the outset, how much of the subsequent discovery is based on the border searches – this Court cannot possibly be expected to fully appreciate whether there was a constitutional violation here. This is a fact-

intensive inquiry and given the restrictions on some discovery, a full record should be made.

On balance, given the nature and complexity of this case, as well as the significance and expected impact of ultimate ruling on this matter, Didani urges the court, at a minimum, to err on the side of caution and exercise its discretion to hold the hearing. The impetus for the search, the purpose for the border stop, the information obtained, and the steps taken by law enforcement here require exploring so that this Court can decide what is always a fact question based on unique circumstances: reasonableness.

### III.    CONCLUSION

For the foregoing reasons, Didani requests that this Honorable Court enter an order suppressing the evidence obtained from Defendant's cell phones seized at the United States border and all fruits therefrom.

Date: October 19, 2022                    Respectfully Submitted,

WADE FINK LAW P.C.

/s/ Wade G. Fink
550 W. Merrill St., Ste 100
Birmingham, MI 48009
(248) 712-1054
wade@wadefinklaw.com
*Attorneys for Didani,* Local Counsel

## CERTIFICATE OF SERVICE

On October 19, 2022, the foregoing was filed using the Court's e-filing system, which will send notice of same to all parties of record.

/s/ Wade G. Fink