# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

UNITED STATES OF AMERICA,

     Plaintiff,

                                 Case No. 21-20264

v.

                                 Hon. Denise Page Hood

YLLI DIDANI,

     Defendant.

---

| | |
|---|---|
| Mark Bilkovic | Wade G. Fink (P78751) |
| Timothy P. McDonald | WADE FINK LAW PC |
| Assistant United States Attorneys | 500 W. Merrill St., Suite 100 |
| 211 W. Fort Street, Suite 2001 | Birmingham, Michigan 48009 |
| Detroit, Michigan 48226 | (248) 712-1054 |
| (313) 226-9100 | wade@wadefinklaw.com |
| Mark.bilkovic@usdoj.gov | *Attorneys for Ylli Didani* |
| Timothy.mcdonald@usdoj.gov | Local Counsel |
| *Attorneys for the United States* | |
| | Brian Kaplan |
| | BRIAN KAPLAN, P.C. |
| | 11 Park Place, Suite 1005 |
| | New York, New York 10007 |
| | brian@bkaplanlaw.com |
| | 212-269-2363 |
| | *Attorneys for Ylli Didani* |
| | Trial Counsel |

---

## MOTION TO DISMISS COUNT TWO OF THE SUPERSEDING INDICTMENT AND FOR EVIDENTIARY HEARING

Defendant Ylli Didani ("Didani"), through counsel, WADE FINK LAW, P.C. and BRIAN KAPLAN, P.C., moves this Court for an order dismissing Count Two of the Superseding Indictment because (1) the Maritime Drug Law Enforcement Act (the "MDLEA") is unconstitutional and/or (2) the Court otherwise lacks jurisdiction.

Didani relies on the law, facts, and argument in the attached Brief.

Date:  October 19, 2022                              Respectfully Submitted,

                                                    /s/ Wade G. Fink (P78751)
                                                    WADE FINK LAW PC
                                                    500 W. Merrill St., Suite 100
                                                    Birmingham, Michigan 48009
                                                    (248) 712-1054
                                                    wade@wadefinklaw.com
                                                    *Attorneys for Ylli Didani*
                                                    Local Counsel

                                                    Brian Kaplan
                                                    BRIAN KAPLAN, P.C.
                                                    11 Park Place, Suite 1005
                                                    New York, New York 10007
                                                    brian@bkaplanlaw.com
                                                    212-269-2363
                                                    *Attorneys for Ylli Didani*
                                                    Trial Counsel

                                                    Eugene Kontorovich
                                                    Professor of Law, George Mason
                                                    University, Antonin Scalia Law
                                                    School
                                                    3301 Fairfax Dr.
                                                    Arlington, VA 22201
                                                    *Consulting Expert*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

UNITED STATES OF AMERICA,

     Plaintiff,

                           Case No. 21-20264

v.

                           Hon. Denise Page Hood

YLLI DIDANI,

     Defendant.

---

Mark Bilkovic
Timothy P. McDonald
Assistant United States Attorneys
211 W. Fort Street, Suite 2001
Detroit, Michigan 48226
(313) 226-9100
Mark.bilkovic@usdoj.gov
Timothy.mcdonald@usdoj.gov
*Attorneys for the United States*

Wade G. Fink (P78751)
WADE FINK LAW PC
500 W. Merrill St., Suite 100
Birmingham, Michigan 48009
(248) 712-1054
wade@wadefinklaw.com
*Attorneys for Ylli Didani*
Local Counsel

Brian Kaplan
BRIAN KAPLAN, P.C.
11 Park Place, Suite 1005
New York, New York 10007
brian@bkaplanlaw.com
212-269-2363
*Attorneys for Ylli Didani*
Trial Counsel

---

## BRIEF IN SUPPORT OF MOTION TO DISMISS COUNT TWO OF THE SUPERSEDING INDICTMENT AND FOR EVIDENTIARY HEARING

## **TABLE OF CONTENTS**

**TABLE OF AUTHORITIES**………………………………………………iv

**I.     FACTUAL BACKGROUND**……..…..………………………………1

**II.     ARGUMENT**……………………………………....…………..………4

     **A.     THE MDLEA STATUTORY LANGUAGE AT ISSUE**………..…4

     **B.     THE MDLEA IS UNCONSTITUTIONAL ON ITS FACE, AND AS APPLIED, BECAUSE IT EXCEEDS CONGRESS' ARTICLE I POWERS**…………………………………………………………..5

          **1.   Drug trafficking is not piracy**………………………......7

          **2.   Drug trafficking is not a universally cognizable offense in international law**…………………………………………..8

          **3.   The MDLEA is facially unconstitutional**…………………9

          **4.   The MDLEA is unconstitutional as applied to Didani**…10

     **C.     THE MDLEA IS UNCONSTITUTIONAL ON ITS FACE, AND AS APPLIED, BECAUSE IT EXCEEDS CONGRESS' ARTICLE I POWERS**…………………………………………………………...5

          **1.   Consent does not "relate back" to the time of the offense**…………………………………………………………14

               **a.   The statutory language does not permit "relation back"**……………………………………………………15

               **b.   The lack of consent deprives this Court of subject matter jurisdiction**………………………………...17

               **c.   Other policy considerations do not permit a "relation back" analysis**…………………………..19

        **d.  Whether consent was satisfied at the proper time is, at a minimum, a jury question under the Sixth Amendment**…………………………………………..22

    **D.  THE ALLEGED CONDUCT IN THIS CASE LACKS A NEXUS WITH THE UNITED STATES SUCH THAT PROSECUTION OFFENDS DEFENDANT'S DUE PROCESS RIGHTS**…………24

    **E.  AN EVIDENTIARY HEARING IS REQUIRED**………………...31

**III. CONCLUSION**…………………………………………………………...32

**CERTIFICATE OF SERVICE**………………………………………………33

# TABLE OF AUTHORITIES

**Supreme Court Cases**

*Carr v. United States*,
　　560 U.S. 438, 458–59 (2010)……………………………………………17

*Fernandez-Vargas v. Gonzales*,
　　126 S. Ct. 2422, 2428 (2006)……………………………………………15

*Ford v. United States*,
　　273 U.S. 593, 606 (1927)………………………………………………..18

*See International Shoe v. Washington*,
　　326 U.S. 310 (1945)……………………………………………………..30

*McCullen v Coakley*,
　　573 U.S. 464 (2014)……………………………………………………..12

*Quill Corp v North Dakota*,
　　504 US 298, 312 (1992)…………………………………………………25

*Saenz v Roe*,
　　526 U.S. 489 (1999)………………………………………………………6

*Strassheim v. Daily*,
　　221 U.S. 280, 285 (1911)………………………………………………..24

*Sullivan v. Louisiana*,
　　508 U.S. 275, 277-78 (1993)……………………………………………23

*United States v. Gaudin*,
　　515 U.S. 506, 510 (1995)………………………………………………..23

*United States v Haymond*,
　　139 S. Ct. 2369 (2019)…………………………………………………..24

*United States v Kebodeaux*,
　　570 U.S. 387, 409 (2013)…………………………………………………6

*United States v. Palmer,*
    16 U.S. (3 Wheat.) 610 (1818)…………………………………………………7

*United States v. Robins,*
    37 F Cas. 825 (D.S.C. 1799)……………………………………………...7

*United States v. Smith,*
    18 U.S. (5 Wheat.) 153 (1820)……………………………………………7

## Circuit Cases

*Morrison v. Nat'l Australia Bank Ltd.,*
    547 F.3d 167 (2d Cir. 2008)……………………………………………...19

*Phelps-Roper v. Ricketts,*
    867 F.3d 883 (8th Cir. 2017)……………………………………………...12

*Theunissen v Matthews,*
    935 F.2d 1454 (6th Cir. 1991)……………………………………………31

*United States v Aybar-Ulloa,*
    987 F.3d 1 (1st Cir. 2021)………………………………………………9, 28

*United States v. Bellaizac-Hurtado,*
    700 F.3d 1245 (11th Cir. 2012)………………………………………..7, 10

*United States v. Bustos-Useche,*
    273 F.3d 622, 626 (5th Cir. 2001)………………………………………18

*United States v Campbell,*
    743 F3d 802, 803 (11th Cir. 2014)………………………………………18

*United States v. Cardales-Luna,*
    632 F.3d 731 (1st Cir. 2011)…………………………………………*passim*

*United States v Davila-Mendoza,*
    972 F.3d 1264 (11th Cir. 2020)………………………………………11, 14

*United States v. De La Garza,*
    516 F.3d 1266, 1271 (11th Cir. 2008)……………………………………18

*United States v. Gonzalez,*
  311 F.3d 440, 443 (1st Cir. 2002)……………………………………...18, 22, 29

*United States v. Greer,*
  285 F.3d 158, 176 (2d Cir. 2002)…. …………………………………….......16

*United States v. Iossifov,*
  45 F.4th 899 (6th Cir 2022)…. …………………………………………...25, 27

*United States v Lawrence,*
  727 F.3d 389 (5th Cir. 2013)… …………………………………………..29

*United States v. Madera-Lopez,*
  190 Fed. Appx. 832 (11th Cir. 2006)… ………………………………………5

*United States v Matos-Luchi,*
  627 F.3d 1 (1st Cir. 2010)…. …………………………………………………6

*United States v. Medjuck,*
  156 F.3d 916, 918 (9th Cir. 1998)…………………………………………..25

*United States v Miranda,*
  780 F.3d 1185, 1192 (D.C. Cir. 2015)…………………………………………18

*United States v. Moreno-Morillo,*
  334 F.3d 819 (9th Cir. 2003)…………………………………………...5, 11

*United States v. Napa Moreira,*
  810 Fed. Appx. 702 (11th Cir. 2020)…………………………………...29

*United States v. Perlaza,*
  439 F.3d 1149 (9th Cir. 2006)…………………………………………….*passim*

*Flores v. S. Peru Copper Corp.,*
  414 F.3d 233 (2d Cir. 2003)……………………………………………8

*United States v Prado,*
  933 F.3d 121, 154 (2d Cir 2019)…………………………………..18, 22

vi

*United States v. Rodriguez-Duran,*
    507 F.3d 749 (1ˢᵗ Cir. 2007)………………………………………………...29

*United States v Suerte,*
    291 F.3d 366, 375 (5ᵗʰ Cir. 2002)………………………………………….6

*United States v. Van Der End*,
    943 F.3d 98, 104 (2d Cir. 2019)……………………………………………22

*United States v. Wilson,*
    503 U.S. 329, 333 (1992)……………………………………………13, 16

*United States v. Wright-Barker,*
    784 F.2d 161, n. 5 (3d Cir. 1986)………………………………………….8

**District Courts**

*United States v Raybon,*
    138 F. Supp 2d 1029 (W.D. Tenn. 2001)…………………………………31


**Statutes**

U.S. Const. Art. I, §8……………………………………………………*passim*

46 U.S.C. §§ 70502, 70503……………………………………….…*passim*

**Secondary Sources**

Eugene Kontorovich, *The "Define and Punish" Clause and the Limits of Universal Jurisdiction,* 103 NW. U. L. Rev. 149 (2009)………………………………...5

Eugene Kontorovich, *Beyond the Article 1 Horizon: Congress's Enumerated Powers and Universal Jurisdiction over Drug Crimes,* Minn. L. Rev. 93, 1191 (2009)………………………………………………………………..*passim*

# I. PERTINENT FACTUAL BACKGROUND

The initial Indictment in this case was returned April 21, 2021. It charged Didani with a single count of conspiracy to distribute a controlled substance. ECF No. 1, Indictment. Nearly a full year later, however, on March 16, 2022, the government filed a Superseding Indictment adding a second count – conspiracy to possess with intent to deliver a controlled substance on board a vessel subject to the jurisdiction of the United States, contrary to the Maritime Drug Law Enforcement Act (the "MDLEA") MDLEA, 46 U.S.C. §§70503(a) and 70506(b). ECF No. 38, Superseding Indictment. This second count in the Superseding Indictment is the subject of this motion.

The government's MDLEA conspiracy alleges that Didani and others conspired to distribute cocaine by shipping the narcotic aboard certain international ocean vessels, including what are referred to as the MSC Anisha R, the Jean Gabriel, the Cartagena Express, the Jenny, and the Star Care. *Id.* at ¶¶1, 27, and 31. The alleged distribution of the cocaine was purely international, as all the vessels were traveling either from South America to Europe, or from one European location to another. *Id* at ¶6, 27, and 33. In fact, the government asserts Didani and others caused the cocaine to be loaded upon these international ocean vessels with the goal of

1

having the substance transported "on the high seas and in international waters…" *Id.*
at ¶7. There is no allegation that any of the narcotics ever touched American soil.

More specifically, the government alleges the following transportation of
cocaine.

First, the MSC Anisha R left Ecuador on July 23, 2019, and, after traveling
directly to the Netherlands, was found by the Dutch to have 753 kilograms of cocaine
on August 9, 2019. *Id.* at ¶¶ 8 through 10.

Second, the Jean Gabriel departed Ecuador on January 20, 2020, headed non-
stop to the Netherlands. At sea, individuals, allegedly under the direction of Didani
and others, boarded the Jean Gabriel in the middle of the ocean and placed 644
kilograms of cocaine inside of a shipping container. *Id.* at ¶¶13 through 17. Dutch
authorities in the Netherlands seized the cocaine when it arrived on February 22,
2020. *Id.* at ¶15.

Third, the Cartegena Express sailed from Columbia on March 26, 2020,
headed to the Netherlands. The government alleges that Didani and conspirators
loaded a shipping container with cocaine onto another ship in Peru, which was later
transferred to the Cartegena Express in Columbia. *Id.* at ¶¶20 through 22. The
unspecified amount of cocaine was seized by Dutch officials on April 7, 20202. *Id.*
at ¶20.

Fourth, the Jenny departed Belgium on April 17, 2020, destined for Spain, where, on April 20, 2020, Spanish officials seized 1100 kilograms of cocaine. *Id.* at ¶27. According to the government, Didani and conspirators loaded a shipping container with cocaine onto another ship in Ecuador, which was later transferred to the Jenny in Belgium. *Id.* at ¶28.

Fifth, the Star Care journeyed from Ecuador to the United Kingdom, where English officials seized 1200 kilograms of cocaine on September 5, 2020. *Id.* at ¶32. The government alleges this cocaine was loaded aboard the foreign vessel at Didani's direction. *Id.*

As discussed thoroughly herein, the government must obtain consent to prosecute this case in the United States from the foreign nations where the drugs were seized. The government has represented to defense counsel the following with regard to the foreign nations' consent: Germany consented on January 31, 2022; Liberia consented on December 29, 2021; and, Malta consented on December 21, 2021. As of July 10, 2022, Portugal and Singapore had not consented.[1] Didani was arrested in April of 2021.

---

[1] An evidentiary hearing or stipulation from the government is requested below to make an adequate record regarding this factual issue.

## II.  ARGUMENT

Count II of the Superseding Indictment, charges pursuant to the MDLEA, must be dismissed for several reasons. First, the statute is unconstitutional on its face. Or, at a minimum, it is unconstitutional as applied to Didani. Second, the government did not receive timely consent from the foreign nations involved, which is required to confer subject matter jurisdiction upon this Court. And third, prosecution of Didani on these facts violates the Fifth Amendment Due Process Clause.

### A. THE MDLEA STATUTORY LANGUAGE AT ISSUE

Didani is charged under 46 U.S.C. §70503(a)(1) and its related subsections. This part of the MDLEA provides that "[w]hile on board a covered vessel, an individual may not knowingly or intentionally . . . manufacture or distribute, or possess with intent to manufacture or distribute, a controlled substance." *Id*. A "covered vessel" is "a vessel subject to the jurisdiction of the United States" *Id.* at 70503(e)(1). Whether a ship is subject to United States' jurisdiction is defined in several ways, but relevant here, it is defined as "a vessel registered in a foreign nation if that nation **has consented** or waived objection to the enforcement of the United States law by the United States." *Id.* at 70502(c)(1)(A), (C) (emphasis added).

4

**B. THE MDLEA IS UNCONSTITUTIONAL ON ITS FACE, AND AS APPLIED, BECAUSE IT EXCEEDS CONGRESS' ARTICLE I POWERS.**

Congress lacked Article I power to enact the MDLEA. Because Congress lacked any Constitutional grant of authority to have enacted the MDLEA, the statute is void *ab initio.* For similar reasons, the MDLEA's application here is unconstitutional as applied to Didani. The issues here are ones of first impression in the Sixth Circuit and have never been decided by the Supreme Court.[2] In short, the MDLEA is a powerful sword that federal prosecutors use to criminalize foreign conduct (and often foreigners) that otherwise have little or no relationship with the United States.[3][4]

---

[2] Other Circuits that have addressed and denied Article I challenges are discussed herein, but, see for example *United States v. Madera-Lopez,* 190 Fed. Appx. 832 (11th Cir. 2006) and *United States v. Moreno-Morillo,* 334 F.3d 819 (9th Cir. 2003). The Ninth Circuit, though, requires a showing of a sufficient nexus to the United States under the Fifth Amendment Due Process Clause. *United States v. Perlaza,* 439 F.3d 1149 (9th Cir. 2006).

[3] Eugene Kontorovich consulted on this Motion and his analysis is used frequently herein. He is a leading expert in academia on these issues. *See, e.g., Cardales-Luna, inra,* (Kontorovich is "a learned scholar on this subject…").

[4] *See* Eugene Kontorovich, *The "Define and Punish" Clause and the Limits of Universal Jurisdiction,* 103 NW. U. L. Rev. 149 (2009); *see also* Eugene Kontorovich, *Beyond the Article 1 Horizon: Congress's Enumerated Powers and Universal Jurisdiction over Drug Crimes,* Minn. L. Rev. 93, 1191 (2009).

Fundamentally, Congress is of limited powers, only those which are granted to it in Article I, § 8 of the Constitution. *United States v Kebodeaux,* 570 U.S. 387, 409 (2013). And those grants of power are "limited [] by the scope of the Framers' affirmative delegation." *Saenz v Roe,* 526 U.S. 489 (1999). In Didani's view, "Congress does not have the power to extend the criminal jurisdiction of the United States" to wholly foreign actors or conduct in the way it does here. *See United States v. Cardales-Luna,* 632 F.3d 731 (1st Cir. 2011) (Judge Torruella, dissenting); *see also, however, cf. id.* at 737-738 (majority holding that they need not reach the question of constitutionality).

In the Circuits that have blessed the facial constitutionality of the MDLEA, the courts have relied on Article I, §8, cl. 10 of the Constitution. Known as the Define and Punish Clause, the provision grants Congressional authority to "define and punish piracies and felonies committed on the high seas, and offenses against the law of nations…." *See, e.g., United States v Matos-Luchi,* 627 F.3d 1 (1st Cir. 2010) (the MDLEA was promulgated pursuant to Congress' Article I, §8, cl. 10 powers). In fact, the Define and Punish Clause is "the only specific grant of power to be found in the Constitution for the punishment of offenses outside the territorial limits of the United States." *United States v Suerte,* 291 F.3d 366, 375 (5th Cir. 2002). However, hardly any scholarship has examined the modern meaning of the Define and Punish

Clause and the limits it places on Congressional authority to employ, essentially, universal jurisdiction over drug crimes.

The Supreme Court has interpreted the Define and Punish Clause to provide three specific grants of power: the power to punish piracies, the power to define and punish felonies on the high seas, and the power to define and punish offenses against the law of nations. *United States v. Smith,* 18 U.S. (5 Wheat.) 153 (1820). None of those powers authorized the MDLEA. It is therefore unconstitutional.

### 1.  Drug trafficking is not piracy.

The Eleventh Circuit held that Congress did not have the power to proscribe drug trafficking in the territorial waters of another nation under its power to define and punish offenses against the laws of nations. *United States v. Bellaizac-Hurtado,* 700 F.3d 1245 (11th Cir. 2012). This is because, at the time of the framing of the Constitution, piracy "was the only [universal jurisdiction] offense." Indeed, it was "hostis humani generis (enemy of all mankind)." *See United States v. Robins,* 37 F Cas. 825 (D.S.C. 1799). Piracy, though, was narrowly defined – "it is robbery on the high seas." *See Kontorovich, Beyond the Article I Horizon,* fn. 3, at 1209. And, almost since the beginning of time (in this country), the Supreme Court rejected Congress' authorities to expand the definition of piracy beyond this narrow definition. *See, e.g., United States v. Palmer,* 16 U.S. (3 Wheat.) 610 (1818).

Drug offenses under the MDLEA are clearly outside the definition of piracy. *Cardales-Luna,* 632 F.3d at 745 (dissent). And the Supreme Court has long prohibited Congress from simply labeling "run of the mill felonies" as piracy. *See Furlong,* 18 U.S. (5 Wheat.) 196 (1820) ("[i]f by calling murder piracy, [the United States] might assert jurisdiction over that offense committed by a foreigner in a foreign vessel, what offense might not be brought within [its] power by the same device?"). For these reasons, Congress cannot use its power to define and punish piracy and felonies on the high seas to reach all international conduct, such as drug trafficking. *See Kontorovich, Beyond the Article I Horizon,* fn. 4, at 1194 ("Congress cannot punish dog-fighting by Indonesians in Java because Congress has not been authorized by the Constitution to make such laws.").

### 2. Drug trafficking is not a universally cognizable offense in international law.

So, then, the only potential authority under Article I, §8, cl. 10 remaining for Congress to have enacted the MDLEA is its power to define and punish "Offences against the Law of Nations." Generally, the "Law of Nations" is defined as "customary international law." *See Kontorovich, Beyond the Article I Horizon,* fn. 4, at 1224; *see also Flores v. S. Peru Copper Corp.,* 414 F.3d 233 (2d Cir. 2003).

Drug tracking is not, and has never been, recognized by international law as a universally cognizable offense. No court that has ever passed on the issue has ever ruled as such. *See Kontorovich, id.*; *see also United States v. Wright-Barker,* 784

F.2d 161, n. 5 (3d Cir. 1986). But the precise definition of what *does* qualify as customary international law is inexact. As a general matter, academics and international law groups have concluded that to be considered an international law crime, the crime must be "so inhumane, so shocking to the conscience, that it makes al jurisdictional" considerations irrelevant. *See Cardales-Luna,* 632 F.3d at 746 (dissent); *see also Kontorovich, Beyond the Article I Horizon,* fn. 4, at 1226-1227.

There are situations under the MDLEA that may be properly under Congress' authority. In fact, the vast majority of its cases may be a proper exercise of its power – that is, stateless vessels that are not registered to a country may be considered to have "turned pirate." *See Kontorovich, Beyond the Article I Horizon,* fn. 4, at 1228. The problem, though, is the MDLEA goes far beyond stateless vessels and reaches conduct that is beyond customary international law.

### 3.  The MDLEA is facially unconstitutional.

For the reasons above, and as discussed thorough by Professor Kontorovich (*see* fn. 4), the MDLEA is facially unconstitutional, generally, and, at a minimum, with regard to foreign flagged vessels. And while numerous courts have held that the MDLEA does not violate Article I, there has been increasing skepticism amongst the circuits to have addressed the issue. *See United States v Aybar-Ulloa,* 987 F.3d 1 (1st Cir. 2021) (rehearing en banc) ("We opt not to decide one way or the other whether the United States may prosecute a foreign citizen engaged in drug

trafficking on a stateless vessel where the United States never boarded and seized the vessel."). It is important to understand, as discussed in the next subsection, the unique situation where a vessel is foreign flagged and never boarded at sea. The reach of the United States is much further in such cases because the vessel has a jurisdiction, and the alleged crime is committed on foreign soil. Thus, the fact that some aspects of the MDLEA have been found to exceed Congress's Article I power like situations in foreign territorial waters with a foreign-flagged vessel makes it follow *a fortiari* that this conduct, <u>on foreign soil</u> is even worse. S*ee, e.g, Bellaizac-Hurtado*, 700 F.3d at 1247.

### 4. The MDLEA is unconstitutional as applied to Didani.

Professor Kontorovich believes this to be the only case he has seen with these facts. Didani, a foreign national, is charged under the MDLEA for alleged drug trafficking associated with wholly foreign conduct. The alleged conduct involved the transport of narcotics aboard duly registered, foreign flagged vessels that traveled from one international port to another international port. None of these vessels were boarded at sea by law enforcement and Didani is not alleged to have ever been aboard any of these vessels. In other words, with regard to Count II specifically, the government seeks to apply an American law against a foreign national for foreign conduct that took place in only on the soil of foreign nations (not the high seas).

At a minimum, the statute as applied to this Defendant, is unconstitutional. Didani is aware of no precedent, nor any law, standing for the proposition that application of the MDLEA here is constitutional on these facts. Indeed, the most common nucleus of facts in MDLEA cases are either stateless vessels boarded at sea or in the territorial waters of the United States (*United States v. Moreno-Morillo,* 334 F.3d 819(9th Cir. 2003)); or, a stateless or foreign flagged vessel that is boarded at sea (*United States v Davila-Mendoza,* 972 F.3d 1264 (11th Cir. 2020) (or boarded in the territorial waters of the United States). Never, we believe, and upon information and belief of Professor Kontorovich, using the MDLEA, has the United States, from a random, unrelated venue like Michigan, tried to reach foreign conduct, committed <u>on foreign land</u> (not at sea), aboard a foreign flagged vessel <u>at port</u>, by an alleged defendant who was never even aboard the alleged foreign flagged vessel.

The implications are jarring. Can the United States charge a Spanish national with murder for active euthanasia in Spain (where such is now legal)? Can the United States charge a sex worker in the Netherlands with solicitation? Can Michigan charge a Canadian citizen with underage drinking for imbibing at a bar in Windsor (where the legal drinking age is 19)? If the answer is no to these questions, even an Olympian mental gymnast cannot square such logic with what the United States is purporting to do here. Foreign nationals should not be held in American prisons, without bail, on crimes that were never committed against the United States – putting

11

aside the conduct, and looking at how enforcement of the MDLEA operates, imagine an American held without bail overseas for a crime not committed in said country.

As a general matter, a criminal defendant must show that a law "has in fact been . . .unconstitutionally applied to him." *McCullen v Coakley,* 573 U.S. 464 (2014). And, if "an as-applied challenge is successful, the statute [] may not be applied to the challenger but is otherwise enforceable." *Phelps-Roper v. Ricketts,* 867 F.3d 883 (8th Cir. 2017).

Congress does not have the power to reach wholly foreign conduct. And, application of American law, extraterritorially, requires some grant of power to Congress. For the reasons discussed herein, at an absolute bare minimum, Art. I, § 8, cl. 10 does not confer Congressional authority to reach the one-of-kind set of facts here: Michigan charging a foreigner with conduct allegedly committed on foreign soil, at a port, on a vessel flagged in a foreign nation, where that foreigner was not even aboard. We challenge the government to justify such overreach.

## C. THE FAILURE TO TIMELY OBTAIN THE CONSENT OF THE FLAG NATIONS LEAVES THIS COURT WITHOUT SUBJECT MATTER JURISDICTION.

Again, the most common situation under the MDLEA is for narcotics to be seized from "stateless" vessels – that is, ships not duly registered in a foreign country. *See, generally,* Kontorovich, fn. 4, at 1252. That is not the case here. All of

the narcotics allegedly seized in this case were aboard foreign flagged, duly registered vessels. To that end, the government will not dispute the following:

1. Cartegena Express: Germany

2. Anisha R: Liberia

3. Jean Gabriel: Malta

4. Jenny: Portugal

5. Star Care: Singapore

Generally speaking, United States law does not extend to foreign-flagged vessels; rather, these ships fall under the exclusive jurisdiction and sovereignty of the flag nation. *Id.*

However, the MDLEA makes one, narrow exception: foreign vessels are "subject to the jurisdiction of the United States" only when that nation "**has consented** or waived objection to the enforcement of United States law by the United States." 46 U.S.C. § 70502(c)(1)(C). In other words, in order for a foreign flag vessel to fall under the jurisdiction of the United States, the foreign nation under whose laws the vessel is duly registered, must have consented at the time of the offense. Indeed, the statutory phrase "has consented" is past tense. And our Supreme Court instructs that "Congress' use of a verb tense is significant in construing statutes." *United States v. Wilson,* 503 U.S. 329, 333 (1992).

13

That did not happen here. In fact, some of the flag nations here have *still* not consented (Portugal and Singapore).[5] The nations that have allegedly consented (Germany, Liberia and Malta) did not consent until 2021 and early 2022.[6] The failure to obtain state consent *at the time of the offense*, or even *at the time of arrest* and arraignment, means this requirement for U.S. prosecution of foreigners on foreign vessels is not satisfied. The Court is deprived of jurisdiction and Count II must be dismissed.

### 5. Consent does not "relate back" to the time of the offense.

Some courts who have considered this issue have taken the position that "while the individuals may challenge jurisdiction over a vessel on the basis that the flag nation failed to consent before trial, they may not do so on the basis that the flag nation's consent was obtained after the vessel was boarded." *See, e.g., Devila*, 216 F.3d at 1017, opinion vacated in part, 242 F.3d 995 (11th Cir. 2001). In these cases, courts essentially allow the consent of a foreign nation to "relate back" to the time of the offense. Leaving aside the fact that no vessel here was ever "boarded," but rather, made it to a foreign port, nevertheless, whether or not consent can "relate back" is an issue of first impression here and has received little scrutiny, largely

---

[5] As of July 10, 2022 representation from the government's lawyer.

[6] An evidentiary hearing in this regard is require, or, at a minimum, a factual stipulation by the government.

14

because, again, duly registered foreign vessels in this context are relatively rare. *See* Kontorovich, fn. 4, at 1225.

### a. The statutory language does not permit "relation back."

The idea that the United States can claim a foreign nation consented to jurisdiction *after* the offense is unfaithful to the statutory language - and reason. Indeed, the few who have more thoroughly analyzed the issue have expressed skepticism about "the validity of the retroactive application of U.S. criminal law to [a foreign criminal defendant], that is, the application of U.S. law [] for actions that were not violations of that law until after the consent was given by the [foreign] government to subject [defendant] to" the MDLEA. *See Cardales-Luna,* 632 F.3d at 740, n. 9.

Permitting the government to claim a nation "has consented" at any point, including years after a seizure, boarding, arrest and/or arraignment effectively reads the jurisdictional limitation out of the statute altogether. It would have to read, then, in the present tense: "consent" rather than "has consented" for this position to be a logical one. And such a construction is problematic for a number of reasons.

To begin, the statutory language itself clearly forbids this concept. "[A] statute shall not be given retroactive effect unless such construction is required by explicit language or by necessary implication." *Fernandez-Vargas v. Gonzales*, 126 S. Ct. 2422, 2428 (2006). In this case, it is evident that Congress knows how to

distinguish between past tense "has consented" and the present tense "consent." To be sure, in 46 U.S.C. §70502(c)(1), Congress provides for jurisdiction where the foreign nation "consents." That latter provision deals with a situation of seizure not on the high seas, but in foreign territorial waters. The distinction is purposeful. Congress gave greater scope for foreign consent in territorial waters, where the foreign state's interests are seemingly much greater than on the high seas. The provision has constitutional issues of its own. Regardless, Congress knows what it is doing when using grammar. *See, e.g., United States v. Greer*, 285 F.3d 158, 176 (2d Cir. 2002) (noting that the foreign-flagged vessel "has consented" language is "an arguably more restrictive provision than the "consented" language); *see also Wilson,* 503 U.S. at 333 (1992) ("Congress' use of a verb tense is significant in construing statutes.").

Congress further showed its intent here in another MDLEA provision. The statute begins with: "while on a covered vessel…". Sec. 70503(a). Then, subsection (e)(1) of that provision defines "covered vessel" as, inter alia, a "vessel subject to the jurisdiction of the United States," (as defined in 70502(c)(1)(C), i.e., where the flag state "has consented.") The word "while" is also temporal and makes even more clear that the prohibited conduct must take place on a qualified vessel. In the case of vessels without nationality, this will apply throughout their journey, and, again, is the most common situation. But in duly registered, foreign flagged vessels, this

16

means state consent must be given "while" the offense is being committed, or at least prior to indictment. There is no other plausible reading of "while."

For these reasons alone, the relation back doctrine in this context should not be followed in this Circuit. The inquiry ends here: the foreign nations had not consented at the time of the offense and the United States is without jurisdiction. Indeed, the courts "have stated time and again that [we] presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete." *Carr v. United States*, 560 U.S. 438, 458–59 (2010) (citations and internal quotation marks omitted).

### b. The lack of consent deprives this Court of subject matter jurisdiction.

But even beyond the language of the statute, fundamental constitutional principles preclude the relation back doctrine. There is a dearth of authority regarding these constitutional principles. But, critically, for foreign flagged, as opposed to stateless, vessels, the consent of the foreign state is central to making the vessel "subject to the jurisdiction of the United States," and thus goes to the very subject matter jurisdiction of the court. See § 70504(a).  As a result, the great majority of Circuits that have addressed this issue have held that the conditions making a vessel "subject to the jurisdiction of the U.S." – in this case, flag state

consent - go to the subject matter jurisdiction of the district court. *See, e.g., United States v Miranda,* 780 F.3d 1185, 1192 (D.C. Cir. 2015); *United States v. De La Garza,* 516 F.3d 1266, 1271 (11th Cir. 2008); *United States v. Bustos-Useche*, 273 F.3d 622, 626 (5th Cir. 2001); but, *see also, cf., United States v. Gonzalez*, 311 F.3d 440, 443 (1st Cir. 2002).[7]

Under the majority view, the establishment of flag state consent must be treated consistent with well-established law regarding subject matter jurisdiction. Indeed, subject matter jurisdiction must exist at every stage of the litigation. A

---

[7] In *United States v Prado,* the Second Circuit, over the objection of one judge, did not follow the majority approach. 933 F.3d 121, 154 (2d Cir 2019), *see* J. Pooler, concurring) (considering this the "majority" approach) (collecting cases). The Second Circuit did **not** say, though, that a "vessel subject to the jurisdiction of the United States" is **not** jurisdictional. Rather, the Court indicated that it goes to the United States' prescriptive jurisdiction over the conduct. Indeed, this element is crucial to Congress's Article I jurisdiction over the conduct. In these cases, the question of whether the jurisdictional issue is waivable as litigation progresses. It did **not** involve the present question of whether such jurisdiction must exist at the outset of the prosecution. While this Court should follow the reasoning of the majority of Circuits, and the *Prado* concurrence, and treat the jurisdictional requirement as going to subject matter jurisdiction, even if it went only to prescriptive (legislative) jurisdiction, it would have the same effect at the outset of the case. The statute makes clear that "jurisdictional questions arising under this chapter are preliminary questions of law to be decided…by the trial judge." § 70504(a). If they are preliminary questions, their existence must be ascertainable at the outset of prosecution. Indeed, the Supreme Court ruled in a prosecution for smuggling alcohol on the high seas in contravention of a treaty with Britain, the location of the seizure was treated as a question of personal jurisdiction. And the "issue whether the ship was seized within the prescribed limit … only affected the right of the court to hold their persons for trial. It was necessarily preliminary to that trial." *Ford v. United States*, 273 U.S. 593, 606 (1927).

federal court simply may not exercise its judicial authority without subject matter jurisdiction. *Morrison v. Nat'l Australia Bank Ltd.*, 547 F.3d 167 (2d Cir. 2008), aff'd 130 S. Ct. 2869 (2010) ("'Determining the existence of subject matter jurisdiction is a threshold inquiry.") And the burden of proof lies with the government at all times on this issue. *Id.* Without flag state consent, there is no subject matter jurisdiction, period. And the court must dismiss the indictment.

### c. Other policy considerations do not permit a "relation back" analysis.

The government may argue that requiring the consent, as described in the statute, would frustrate the purpose of the statue, or pose an extraordinary burden. None of these arguments have a basis in law, nor are they compelling.

As a threshold matter, to more broadly apply the MDLEA, the United States has entered into called "bilateral maritime counter-narcotics agreements" with dozens of countries, including almost all Latin American and Caribbean ones. These treaties exist to establish in advance a summary mechanism for establishing consent at sea.[8] So the notion that the government does not have the ability to enforce the statute would be inaccurate.

---

[8] *See* Kontorovich, Beyond the Article I Horizon, fn. 4, at 1202-03.

19

Regardless, cases where consent is obtained after arraignment are exceedingly few. As mentioned throughout this motion, this situation occurs in a very small percentage of drug trafficking cases where the vessel is duly registered, and that registration is confirmed by the flag state upon inquiry. For example, silence from a vessel on the question of registration is treated as equivalent to denial of registration. Even the United States treats a vessel as stateless if registration is not confirmed within four hours of a request.[9] For this reason, any policy argument made by the government should be treated with extreme skepticism – the government was absurdly dilatory here in seeking the consent of the foreign nations to prosecute this case.

Enforcing the plain language of the statute and resolving the related constitutional issues in favor of Didani, will not undermine the MDLEA. In fact, it will do the opposite. It will create proper incentives for the government.[10] It is the notion that the government may obtain consent "any time prior to trial" that

_____

[9] See *Agreement concerning co-operation in suppressing illicit maritime and air trafficking in narcotic drugs and psychotropic substances in the Caribbean area* Par. 6(3) (2003), and the attached U.S. Declaration, par. 15, available at https://2009-2017.state.gov/s/l/2005/87198.htm.

[10] And this is consistent with a foreign nation being given the dignity to determine which and how to prosecute its own citizens. The United States is welcome to assist these nations. *See, e.g., Treaty, United Nations Convention Against Traffic in Narcotic Drugs and Psychotropic Substance,* available at https://treaties.un.org/Pages/ViewDetails.aspx?src=TREATY&mtdsg_no=VI-19&chapter=6&clang=_en, where each

manifestly unjust, not the enforcement of the statute in the way urged here. Such an interpretation as the government will ask for invites dilatory tactics. Consider the facts of this case, where the government did not even *request* consent from the relevant flag states until six months or even over a year after Didani's arrest. Having dragged its feet, the government then turned around and pointed to the lack of response from the foreign country as a reason to avoid Speedy Trial Act limitations.[11]

At bottom, there is no other precedent outside this context for the government to confer jurisdiction upon American courts years after it indicts. Plainly, basic notions of due process mean that the government cannot first arrest and indictment a man and then seek to fulfil the statutory conditions for federal criminality.

---

[11] The government stated it requested consent from Portugal on September 8, 2021 and expected consent within 120 days. That period long expired. As of July 10, 2022, Portugal had still not consented.

21

### d. Whether consent was satisfied at the proper time is, at a minimum, a jury question under the Sixth Amendment.[12]

While the MDLEA says that jurisdictional questions must be tried "solely" by a judge, some courts have called this procedure into question.[13] This Circuit has not decided the issue. The Second Circuit has suggested that such jurisdictional issues should be submitted to a jury at trial after a preliminary judicial determination because of the "increase[d] likelihood" that the Supreme Court would "invalidate" this statutory language. *See Prado*, 933 F.3d at 139 n. 6; *see also United States v. Van Der End*, 943 F.3d 98, 104 (2d Cir. 2019) ("If the issue were properly presented for appellate review, Section 70504(a)'s provision that the jurisdiction of the United States be determined solely by the trial judge might be stricken as violative of a criminal defendant's right to a jury trial."); but, *see, cf., e.g.*, *United States v Campbell*, 743 F3d 802, 803 (11th Cir. 2014) (rejecting an argument that a jury must determine jurisdiction under 46 U.S.C.S. § 70504(a)).

---

[12] The government has indicated it will be filing a motion on this issue. Didani will address the issue broadly here, but reserve other arguments, for judicial economy and clarity, for its response to the government's motion.

[13] *See, e.g., United States v. Gonzalez*, 311 F.3d 440, 444 (1st Cir. 2002) ("[B]y providing for a judge to decide the vessel issue rather than jury, Congress has introduced a possible Sixth Amendment objection to the statute.").

In fact, the Second Circuit has "cautioned that district courts would be well advised 'to submit the issue of jurisdiction over the vessel to the jury notwithstanding the statutory word 'solely' — after making the preliminary determination required by § 70504(a) so that trial may proceed." *Van Der End, supra,* at 104. Supreme Court precedent bolsters this conclusion in holding that the Fifth and Sixth Amendments "require criminal convictions to rest upon a jury determination that the defendant is guilty of every element of the crime with which he is charged, beyond a reasonable doubt." *United States v. Gaudin*, 515 U.S. 506, 510 (1995); *see also Sullivan v. Louisiana*, 508 U.S. 275, 277-78 (1993) ("The prosecution bears the burden of proving all elements of the offense charged and must persuade the factfinder beyond a reasonable doubt of the facts necessary to establish each of those elements.") (Citations omitted).

It is the better view that consent is a jurisdictional element of the offense. The statutory language here is not all that complicated. Among other elements, 46 U.S.C. § 70503(a)(1) requires that the government show that there was "a covered vessel." A "covered vessel" is one that is subject to the jurisdiction of the United States. 46 U.S.C. § 70503(e)(1). And a vessel is subject to American jurisdiction if it is "registered in a foreign nation" and that foreign nation "has consented" to a United States' prosecution. These are all factual questions and essential elements of the offense charged here under the MDLEA. These elements, if believed and proven,

23

subject a criminal defendant to a loss of liberty. And, "[o]nly a jury, acting on proof beyond a reasonable doubt, may take a person's liberty." *United States v Haymond,* 139 S. Ct. 2369 (2019) (holding that certain supervised release violation required factual findings by a jury).

### D. THE ALLEGED CONDUCT IN THIS CASE LACKS A NEXUS WITH THE UNITED STATES SUCH THAT PROSECUTION OFFENDS DEFENDANT'S DUE PROCESS RIGHTS.

The MDLEA was enacted to expand, extraterritorially, the United States' war on drugs, which had been an abysmal failure domestically. *See Cardales-Luna,* 632 F.3d at 742. But it cannot be permitted to override Fifth Amendment principles of Due Process as it does here. There is an insufficient nexus between the conduct alleged in the Superseding Indictment and United States such that the MDLEA count should be dismissed for violating Didani's Due Process rights. The due process requirements in this regard is an issue of first impression in our Circuit.

As this Court is well aware, when criminal defendants are prosecuted for conduct abroad, the conduct must have some nexus to the United States. That is, there must be some effect on the United States. *See*, *e.g.*, *Strassheim v. Daily,* 221 U.S. 280, 285 (1911) (applying criminal jurisdiction to acts committed outside its territorial borders is only appropriate where an effect occurs within those borders); *See also Perlaza,* 439 F.3d at 1152 (9th Cir. 2006) ("For a United States court to properly exercise jurisdiction, the Government still needs to establish some

24

detrimental effect within, or nexus to, the United States."); *United States v. Medjuck*, 156 F.3d 916, 918 (9th Cir. 1998) (holding that the government must demonstrate that there exists a sufficient nexus between the conduct condemned and the United States" such that the application of the statute would not be arbitrary or fundamentally unfair to the defendant."). The Sixth Circuit has not expressly adopted this requirement but seemed to conclude there may be such a nexus requirement. *See, e.g., United States v. Iossifov,* 45 F.4th 899 (6th Cir 2022) (assuming for purposes of appeal that there was a Fifth Amendment limit on extraterritorial application of money laundering statute).

This nexus requirement is found in Fifth Amendment due process jurisprudence, which "concerns the fundamental fairness of government activity . . . [and requiring an analysis of] whether an individual's connection with a state are substantial enough to legitimate the state's exercise of power…" *Quill Corp v North Dakota,* 504 US 298, 312 (1992). The "analytic touchstone" of due process nexus analysis is whether there is "notice" or "fair warning" of enforcement. *Id.*

In the MDLEA context, the nexus requirement is relatively narrow because the MDLEA provision at issue applies only to foreign-registered vessels, rather than stateless vessels. In other words, "a defendant on [a foreign-flagged ship] would have a legitimate expectation that because he has submitted himself to the laws of one nation [the foreign-flag nation], other nations will not be entitled to exercise

25

jurisdiction without some nexus." *Perlaza,* at 439 F.3d at 1168. Thus, the nexus requirement is easily satisfied not only when drugs are destined for the United States, but also where there is reason to believe they might be destined to the United States, or for reasons of geography, that some of the cargo might eventually wind up in the United States In the vast majority of MDLEA cases, this is not a difficult inquiry.

There is no allegation here that any of the conduct, related to the MDLEA, had an effect on the United States. There is likewise not allegation of an intended effect on the United States. This is wholly foreign conduct (this is to be separated from the inquiry regarding Count I, which is charged as a conspiracy). Because there is virtually no nexus between the conduct and the United States, prosecution under the MDLEA under these facts would offend due process.

In analyzing this issue, this Court should adopt the Ninth Circuit's view described in *Perlaza.* In *Perlaza,* the Ninth Circuit explained that in addition to the statutory jurisdiction requirements, "due process requires the Government to demonstrate that there exists 'a sufficient nexus between the conduct condemned and the United States' such that the application of the statute would not be arbitrary or fundamentally unfair to the defendant." *Perlaza* at 1161. In analyzing the issue, the Court concluded that because the government "did not present any evidence indicating that the cocaine jettisoned from the Go-Fast had any nexus to the United States," the case should have been dismissed. *Id.* at 1169. Without a sufficient nexus,

a district court errs "in exercising jurisdiction [over] members of an indisputably foreign-flagged vessel [and b]ecause nexus is an essential part of the jurisdictional analysis that our case law requires," reversal was required. *Id.*

Here, Didani is an Albanian national who resided outside the United States and is alleged to have transported narcotics from South America to Europe aboard German, Portuguese, Liberian, and Singaporean ships. This alleged conduct has a nexus with a large number of sovereign states, all of which could prosecute without due process concerns. But there is no nexus, whatsoever, with the United States, specifically as it relates to Count II. Didani is not alleged to have made use of quasi-piratical stateless vessels (which may change the analysis because the expectation of enforcement is different), but rather regular, registered foreign flagged ships. He availed himself of the law and protection of many countries – but not this country. It is manifestly unfair to try these crimes using American law in an America courtroom.[14] Using the Ninth Circuit's analysis in *Perlaza* requires this conclusion.[15]

---

[14] "Didani has no ties to this district. At the time of his arrest, he was residing in the Dominican Republic, where he had been residing for several years." ECF No. 42, PageID.198, Government's Response to Didani's Motion for Bail.

[15] It is also consistent with the Sixth Circuit's holding in *Iossifov, supra.* There, the Court held that assuming Fifth Amendment due process principles applied to extraterritorial conduct, there was a sufficient nexus between the conduct and the United States because "there was significant evidence that defendant collaborated in a money laundering scheme that took place, at least in part, in the United States" and the "nexus" between the United States and the conduct was clear. *Id.* at 914. The nexus was the fact that the defendant was luring American victims to pay money for

And the Ninth Circuit's reasoning is sound. Indeed, requiring an appropriate nexus to the United States will weed out the most tenuous of MDLEA cases, like the one here, which is far from the common situation. Judge Baron's concurrence in *United States v Aybar-Ulloa,* 987 F.3d 1, 15-16 (1st Cir. 2021), in casting doubt on the MDLEA's constitutionality, is illustrative in this regard:

> There is a fair amount of support for the contention that Article I's Define and Punish Clause is impliedly limited by the law of nations in ways that constrain Congress's authority to rely on that Clause to subject foreign nationals to our criminal laws for conduct that they engage on while they are on foreign vessels -- even when those vessels are on the high seas…the majority nevertheless rejects Aybar's constitutional challenge.
>
> The majority does so because, it rightly points out, although Aybar was on the high seas while he was in possession of the cocaine that led to his MDLEA charges, he was not at that time on a foreign vessel. Instead, he was on a stateless one that our national authorities had interdicted in accord with international law. Thus, in the majority's view, Aybar was within the territorial jurisdiction of the United States when he violated the MDLEA no less than if he had been on a ship flying our nation's flag.

Didani's conduct was not at all related a stateless vessel. And that is precisely why the analysis makes more sense in the context of a foreign flagged vessel, where the expectation is different and the forums for prosecution are clear.

---

nonexistent goods. *Id.* None of that exists here. There are no American victims and there is not American conspiracy by the government's very own allegations.

Nationally, there is a circuit split on the issue. The Fifth Circuit requires a nexus to the United States similar to the Ninth Circuit. *See, e.g., United States v Lawrence,* 727 F.3d 389 (5th Cir. 2013) ("In the context of non-U.S. citizens, "due process requires the Government to demonstrate that there exists 'a sufficient nexus between the conduct condemned and the United States' such that application of the statute would not be arbitrary or fundamentally unfair to the defendant.").

At least two circuits do not require a sufficient nexus. *See, e.g.*, *United States v. Rodriguez-Duran,* 507 F.3d 749 (1st Cir. 2007); *United States v. Napa Moreira,* 810 Fed. Appx. 702 (11th Cir. 2020). But the reasoning underlying these cases are unfaithful to centuries of jurisprudence. Among other reasons, courts taking this view forward the argument that "drug trafficking [is] condemned by all nations"[16] and therefore anyone, anywhere is on notice of same consistent with due process principles. But such a justification is superficial and absurd. Notice goes to more than just proscribed conduct, but also *penalties* in the forum prosecuting the conduct. The fact is that different countries impose different penalties for similar conduct. Thus, when the First Circuit takes this position – that it is a crime everywhere so there are no due process concerns – it ignores the reality of vastly different penalty exposure. The United States is an outlier in the Western world, requiring mandatory and lengthy prison sentences, just look at the case here. An individual takes the risks

---

[16] *United States v Gonzalez,* 776 F.2d 931 (11th Cir. 1985).

29

and anticipates potential prosecution in the place his or her crime is committed (or effects).

But even assuming this Court is inclined to use the "nexus-less" approach, Didani's case has really never been addressed, maybe ever. In this case, there is no question about whether the narcotics were destined for the United States because the drugs were not seized on the high seas. That is the primary focus of the MDLEA and most common facts. Here, all narcotics were destined for the other side of an ocean. There is no allegation that any narcotics were smuggled and sent back this direction. The lack of <u>any possible nexus</u> is manifest from the government's own allegations.

Using the MDLEA in the way desired here turns the United States into the global police at the expense of Didani's due process. It stands to reason that a criminal defendant could mount a better defense in a jurisdiction which he could have at least foreseen charging him, as the Supreme Court has noted in its "minimum contacts" Due Process jurisprudence. *See International Shoe v. Washington,* 326 U.S. 310 (1945); *see also Perlaza,* at 1168 ("The nexus requirement is a judicial gloss applied to ensure that a defendant is not improperly haled before a court for trial . . . . [It] serves the same purpose as the 'minimum contacts' test in personal jurisdiction") (citations omitted).

To be sure, the MDLEA was designed to deal with the difficulties of drug enforcement on the high seas, where the lack of a regular law enforcement presence,

and the ease of disguising nationality, create potential gaps in enforcement. The MDLEA is certainly designed to prevent situations where no country has jurisdiction over drug trafficking, or perhaps only narcotics exporters have jurisdiction. This is not that case. Here, at least ten different countries have jurisdiction over the alleged crimes. Some of these have already applied their enforcement jurisdiction, in seizing the narcotics in their ports. None is alleged to be institutionally incapable of prosecuting. All these countries have a nexus but have chosen not to prosecute. For the United States to step in and impose its jurisdiction instead of all the countries with which the conduct may actually have a connection is the kind of arbitrariness that minimum Due Process prohibits.

### E. AN EVIDENTIARY HEARING IS REQUIRED.

This Court has "considerable discretion" in ordering an evidentiary hearing on pre-trial motions related to jurisdiction. *See, e.g., Theunissen v Matthews,* 935 F.2d 1454 (6th Cir. 1991). There are situations, though, where evidentiary hearings should be held regarding subject-matter jurisdiction. *See, e.g., United States v Raybon,* 138 F. Supp 2d 1029 (W.D. Tenn. 2001) (granting motion for evidentiary hearing and taking testimony on the issue of interstate nexus and jurisdiction). Here, a factual record regarding when (and if) consent was obtained from the foreign nations, pursuant to 46 U.S.C. § 70502(c)(1)(A), (C), is required. Didani's counsel will work with the government to determine appropriate witnesses – whether that is

State Department officials, or otherwise. The Court must know the timing of the consent in order to resolve the issues above.

### III. CONCLUSION

For the foregoing reasons, Count II of the Superseding Indictment should be dismissed.

Date:  October 19, 2022                           Respectfully Submitted,

                                                  /s/ Wade G. Fink (P78751)
                                                  WADE FINK LAW PC
                                                  500 W. Merrill St., Suite 100
                                                  Birmingham, Michigan 48009
                                                  (248) 712-1054
                                                  wade@wadefinklaw.com
                                                  *Attorneys for Ylli Didani*
                                                  Local Counsel

                                                  Brian Kaplan
                                                  BRIAN KAPLAN, P.C.
                                                  11 Park Place, Suite 1005
                                                  New York, New York 10007
                                                  brian@bkaplanlaw.com
                                                  212-269-2363
                                                  *Attorneys for Ylli Didani*
                                                  Trial Counsel

                                                  Eugene Kontorovich
                                                  Professor of Law, George Mason
                                                  University, Antonin Scalia Law
                                                  School
                                                  3301 Fairfax Dr.
                                                  Arlington, VA 22201
                                                  *Consulting Expert*

**CERTIFICATE OF SERVICE**

On October 19, 2022, the foregoing was filed using the Court's e-filing system, which will send notice of same to all parties of record.

/s/ Wade G. Fink