UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

United States of America,

        Plaintiff,             Case No. 21-cr-20264

v.

                                Hon. Denise Page Hood

Ylli Didani,                United States District Judge

        Defendant.

---

## GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS COUNT TWO OF THE SUPERDEDING INDICTMENT AND FOR EVIDENTIARY HEARING (ECF No. 54)

---

### I.    INTRODUCTION

From at least October 2016, until his arrest in March 2021, the defendant, Ylli DIDANI directed an expansive transnational cocaine distribution conspiracy that operated in part, in this district and had substantial ties to the United States. Didani secured financing in this district from a now deceased co-conspirator and other conspirators, to purchase thousands of kilograms of cocaine from South America. Didani and other conspirators then arranged to have the cocaine hidden on containerships so it could be transported from South America to Europe for further distribution. To accomplish the objectives of the conspiracy, Didani regularly communicated with other conspirators in furtherance of the conspiracy,

1

including while he was in the United States, and specifically, while he was in this district.

## II.     PROCEDURAL BACKGROUND

On March 26, 2021, Didani was charged in a sealed complaint with three counts: (1) conspiracy to distribute controlled substances in violation 21 U.S.C. §§ 841 and 846; (2) conspiracy to distribute controlled substances on board a vessel subject to the jurisdiction of the United States in violation of 46 U.S.C. § 70503; and (3) money laundering in violation of 18 U.S.C. § 1956(a). (See 21-mj-30148: ECF No. 1, PageID.1). On March 31, 2021, Didani was arrested on the complaint at the Charlotte Douglas International Airport in Charlotte, North Carolina after arriving on a flight from the Dominican Republic.

On April 21, 2021, a grand jury in this district returned a one-count indictment charging Didani with conspiracy to distribute controlled substances in violation of 21 U.S.C. §§ 841 and 846. (ECF No. 1, PageID.1-6).

On March 16, 2022, a grand jury returned a three-count superseding indictment charging Didani with two additional counts – Count Two: conspiracy to possess with intent to distribute and distribute a controlled substance on board a vessel subject to the jurisdiction of the United States in violation of 46 U.S.C. §§ 70503(a) and 70506(b) (a violation of the Maritime Drug Law Enforcement Act,

hereinafter the "MDLEA"); and Count Three: conspiracy to launder monetary instruments in violation of 18 U.S.C. § 1956(h). (ECF No. 38, PageID.153-174).

On October 19, 2022, Didani filed a motion to dismiss Count Two of the superseding indictment. (ECF No. 54, PageID.311). In his motion, Didani argues that Count Two should be dismissed because (1) the MDLEA is unconstitutional on its face and as applied to Didani; (2) the United States did not comply with the MDLEA jurisdictional requirements; and (3) Count Two violates Didani's due process rights under the Fifth Amendment. For the reason's set forth below, Didani's motion to dismiss Count Two is meritless and should be denied.

## III.   FACTS

In 2016 and 2017, Didani received large amounts of U.S. currency from a coconspirator (a/k/a "Toni Stark" hereinafter, "Toni Stark") residing in the Eastern District of Michigan ("this district") for the purpose of purchasing bulk cocaine. At least one transfer of over $100,000 occurred in this district. A separate bulk cash transfer that occurred in December 2017, also started in this district. In that transfer, a coconspirator obtained approximately $450,000 from Toni Stark in this district. The coconspirator then flew from this district in a private airplane owned by Toni Stark to Washington D.C., where the coconspirator gave the $450,000 to Didani for the purchase of bulk cocaine.

While Didani oftentimes arranged to have the cocaine hidden in containers on containerships, that was not Didani's only plan. Instead, in 2016, Didani and Toni Stark, who was still residing in this district, came up with a plan to transport cocaine underwater, and by 2017, they contracted with a company to design a submersible container ("torpedo" or "drone") capable of holding up to 1000 kilograms of cocaine. The torpedo would operate using remote control, GPS, and magnets. The cocaine would be loaded into the torpedo before the torpedo magnetically attached to a containership. Once the containership was approximately 100 miles from its destination, the torpedo would detach from the containership via remote control, the torpedo would come to the surface, and a fishing boat using GPS, would locate and retrieve the cocaine-filled torpedo. Didani kept multiple conservations regarding the cocaine torpedo stored on his cellular telephones, a few of which are depicted below:






Following the July 2018 death of Toni Stark, Didani began utilizing Europe-based financers to fund his cocaine trafficking and he continued to arrange transportation of cocaine from South America to Europe.

Between August 2019 and September 2020, law enforcement in Europe, working in conjunction with United States law enforcement, seized several large shipments of cocaine belonging to Didani and his conspirators. Count Two of the superseding indictment charges Didani for his involvement in three cocaine shipments that were seized. All three of these seizures occurred at the Port of Rotterdam, in the Netherlands and all three countries where the vessels were registered, consented to United States jurisdiction.

The first charged seizure occurred on August 11, 2019, when law enforcement seized 753 kilograms of cocaine located inside of a shipping container

on the vessel, MSC Anisha R ("Anisha R"). At the time of the seizure, the Anisha R was registered in Liberia. On December 29, 2021, the Government of Liberia notified the United States that it had no objections to enforcement of United States law over the Anisha R.

The second charged seizure occurred on February 22, 2020, when law enforcement seized 644 kilograms of cocaine located inside of a shipping container on the vessel, CMA CGM Jean Gabriel ("Jean Gabriel"). At the time of the seizure, the Jean Gabriel was registered in Malta. On December 21, 2021, the Government of Malta notified the United States that it waived its right to exercise jurisdiction over the CMA CGM Jean Gabriel.

The third charged seizure occurred on April 7, 2020, when law enforcement seized 1000 kilograms of cocaine located inside of a shipping container on the vessel, Cartegena Express. At the time of the seizure, the Cartegena Express was registered in Germany. On January 31, 2022, Germany notified the United States that it had no objections to enforcement of United States law over the Cartegena Express.

In addition to the three charged seizures, law enforcement in Europe also seized two additional large shipments of cocaine belonging to Didani and his coconspirators. These two additional cocaine seizures are described Count Two of

the superseding indictment in the Overt Acts section. (ECF No. 38, PageID.167-168).

The first of these two seizures occurred on April 20, 2020, in the Port of Bilboa in Spain, when law enforcement seized 1100 kilograms of cocaine located inside of a shipping container on the vessel, Jenny. At the time of the seizure, the Jenny was registered in Portugal. On October 28, 2022, the Government of Portugal notified the United States that it had no objections to enforcement of United States law over the Jenny.[1]

The second seizure occurred on September 21, 2020, at the Port of Dover in the United Kingdom, when law enforcement seized 1200 kilograms of cocaine hidden in the hull of the vessel, Star Care. At the time of the seizure, the Star Care was registered to in Singapore. The Government of Singapore has not responded to the United States' request for jurisdiction and as a result, has not waived its right to exercise jurisdiction over the Star Care. As a result, Didani is not charged in Count Two with this seizure. Instead, it is identified as an overt act in furtherance of Count Two.

---

[1] At the time the Grand Jury returned the Superseding Indictment, the Government of Portugal had not consented to United States' jurisdiction over the Jenny. Therefore, to avoid confusing the Grand Jury, the Government did not allege Didani's involvement in the Jenny cocaine shipment in the body of Count Two; but instead, only alleged Didani's involvement in the Jenny cocaine shipment as an overt act under Count Two.

On April 21, 2021, a grand jury returned a one-count indictment charging Didani with conspiracy to distribute controlled substances in violation of 21 U.S.C. §§ 841 and 846. (ECF No. 1, PageID.1-6). On March 16, 2022, **after** Liberia, Malta, and Germany consented to United States jurisdiction over the respective vessels, a grand jury returned a three-count superseding indictment charging Didani with two additional counts, including Count Two: conspiracy to possess with intent to distribute and distribute a controlled substance on board a vessel subject to the jurisdiction of the United States in violation of 46 U.S.C. §§ 70503(a) and 70506(b) of the MDLEA. (ECF No. 38, PageID.153-174).

## IV.   ARGUMENT

### A.   The MDLEA is constitutional on its face and as applied to Didani.

Didani argues that a portion of the MDLEA is unconstitutional on its face and is unconstitutional as applied to him. "A facial challenge to a law's constitutionality is an effort to invalidate the law in each of its applications." *Speet* v. *Schuette*, 726 F.3d 867, 871 (6th Cir. 2013), whereas an as-applied challenge "argues that a law is unconstitutional as enforced against" the party challenging the statute. *Id.* at 872. The MDLEA is neither unconstitutional on its face, nor as applied to Didani. Didani's contention that the MDLEA is unconstitutional is not novel. This argument has been made – and repeatedly rejected since the MDLEA was enacted in 1986. In challenging the constitutionality of the MDLEA, Didani

curiously, or conveniently omits several facts from his brief – most notably, that

Didani, a permanent resident of the United States, committed several overt acts in

furtherance of the MDLEA conspiracy while he was in the United States.

Furthermore, Didani's argument that the MDLEA is unconstitutional as

applied to him is based on the faulty premise – that "the government seeks to apply

an American law…for foreign conduct that took place… only on the soil of foreign

nations (not the high seas)." (ECF No. 54, PageID.327). Didani really misses the

mark here. To the contrary, although the cocaine was ultimately seized in foreign

nations, the MDLEA *conspiracy* that Didani is charged with occurred in several

locations, including on "the high seas." (ECF No. 38, Page ID158). As a result,

Didani's motion should be denied.

> i.  *The MDLEA is a proper exercise of Congresses Article I powers to*
>     *define and punish felonies committed on the high seas.*

Finding that "trafficking in controlled substances aboard vessels is a serious

international problem, is universally condemned, and presents a specific threat to

the security and societal well-being of the United States," Congress enacted the

MDLEA, to, among other things, criminalize narcotics trafficking on the high seas

as well as conspiracies to commit those acts. The MDLEA prohibits narcotics

trafficking by individuals "while on board a covered vessel." 46 U.S.C. § 70503(a).

The term "covered vessel" is defined to include "a vessel subject to the jurisdiction

of the United States." *Id.* § 70503(e)(1). The phrase "vessel subject to the

jurisdiction of the United States" is defined to include six different categories of vessels, including at least one that applies to Didani: "a vessel registered in a foreign nation if that nation has consented or waived objection to enforcement of United States Law by the United States." *Id.* § 70502(c)(1)(C). The MDLEA also explicitly applies to acts "committed outside the territorial jurisdiction of the United States." *Id.* § 70503(b).

Didani claims the MDLEA is "facially unconstitutional with regard to foreign flagged vessels." (ECF No. 54, PageID.326). In making this claim, the primary "authority" Didani relies on are a series of law review articles. In fact, Didani admits that "other Circuits" have rejected constitutional challenges to the MDLEA. (ECF. No 54, PageID. 322-334).

To establish that a statute is facially unconstitutional, the party challenging the statute must establish that no set of circumstances exists under which the statute or a subpart of the statute would be valid. *Green Party of Tennessee v. Hargett*, 791 F.3d 684, 691 (6th Cir. 2015); *United States v. Mazzio*, 48 Fed. Appx. 120 (6th Cir. 2002). In asserting a facial challenge to the section of the MDLEA regarding foreign flagged vessels, Didani offers no authority to carry his burden of establishing that no set of circumstances exists under which this specific provision of the MDLEA would be valid. The reason for this is simple – he can't.

This is because Congress has the power to "[t]o define and punish Piracies and Felonies committed on the High Seas, and Offences against the Law of Nations." U.S. Const. art. I, § 8, cl. 10. The Supreme Court has interpreted that provision to grant three distinct powers: (1) to define and punish piracies, (2) to define and punish offenses against the Law of Nations; and relevant to Didani, to define and punish felonies committed on the high seas (also known as the "Felonies Clause or "High Seas Clause"). See *United States v. Smith*, 18 U.S. 153, 158-59 (1820); *United States v. Bellaizac-Hurtado*, 700 F.3d 1245, 1248. (11th Cir. 2012).

Didani cites the Eleventh Circuit's holding in *Bellaizac-Hurtado* to support his argument, but it doesn't. In that case, the Eleventh Circuit held that because drug trafficking is not an offense against the Law of Nations, Congress exceeded its power when it proscribed the defendant's conduct in the territorial waters of Panama. *Bellaizac-Hurtado*, 700 F.3d at 1258. However, the *Bellaizac-Hurtado* Court noted, "none of our earlier precedents about the extraterritorial application of our drug trafficking laws have answered the constitutional question presented in this appeal. Indeed, all of the appeals in which we have considered the constitutionality of those laws involved conduct on the high seas." *Id.* at 1257. The *Bellaizac-Hurtado* Court further noted, "[a]nd we have always upheld

11

extraterritorial convictions under our drug trafficking laws as an exercise of power under the Felonies Clause."

The Court in *Bellaizac-Hurtado* clearly distinguished cases occurring in territorial waters and those occurring on the high seas. In other words, the Court held that the defendant's conduct, which did not fall under the Felonies Clause because it occurred in territorial waters of another country instead of on the high seas, also did also not fall under the Law of Nations Clause. Because Didani's conduct occurred on the high seas, invoking the Felonies Clause, the holding in *Bellaizac-Hurtado* does not apply to him. As evidence of this, is the Eleventh Circuit's decision two years later in *United States v. Campbell*, 743 F.3d 802 (11th Cir. Feb. 20, 2014). There, the Eleventh Circuit held that the MDLEA was a constitutional exercise of Congress's power under the Felonies Clause of the Constitution. The Court stated, "we have repeatedly held that Congress has the power, under the Felonies Clause, to proscribe drug trafficking on the high seas that it has always upheld drug trafficking convictions as an exercise of power under the Felonies Clause. *Id.* at 17, 22

In fact, circuit courts have routinely held that Congress had the authority pursuant to the Felonies/High Seas Clause in Article I, Section 8, Clause 10 of the United States Constitution to enact the MDLEA. See *United States v. Martinez Hidalgo,* 993 F.2d 1052, 1056 (3rd Cir. 1993) (the High Seas Clause provided

Congress with the authority to enact the MDLEA and criminalize drug trafficking on the high seas, regardless of whether a nexus to the United States existed); *United States v. Moreno-Morillo*, 334 F.3d 819, 824 (9th Cir. 2003) (holding that the MDLEA was a constitutional exercise of Congressional power pursuant to the High Seas Clause); *United States v. Estupinan-Estupinan*, 244 F. App'x 308, 309-10 (11th Cir. 2007) ("[W]e have always upheld extraterritorial convictions under our drug trafficking laws as an exercise of power under the Felonies Clause." "[Movant] directs us to no case in which any court has held that the MDLEA was an unconstitutional exercise of Congressional power").

In noting that other Circuits had previously found that the enactment of the MDLEA did not exceed Congress's authority under the Felonies Clause of the United States Constitution, the Eleventh Circuit in *United States v. Garcia*, 182 F. App'x 873 (11th Cir. 2006) stated, "Congress enacted the MDLEA because drug trafficking aboard vessels (1) 'is a serious international problem and is universally condemned' and (2) 'presents a specific threat to the security and societal well-being of the United States." *Id.* at 876-877 (citing 46 app. U.S.C. § 1902 (current version at 46 U.S.C. § 70501)). Based on the foregoing, the Court in *Garcia* held that Congress did not exceed its authority in enacting the MDLEA as Article I, Section 8, Clause 10 of the United States Constitution grants Congress the power

"[t]o define and punish Piracies and Felonies committed on the High Seas….". *Id.* at 876.

Frankly, Didani's argument here confounds the government. Didani cabins his argument that the MDLEA is facially unconstitutional because it does not fall under the Piracy Clause or the Offenses against the Law of Nations Clause. However, Didani knows from the language contained in the superseding indictment that the government is not relying on either of those Clauses. Instead, the government relies on Congress's Article I power to define and punish felonies committed on the high seas. Didani completely ignores any analysis of the Felonies Clause and for some reason, bases his argument on two other clauses that are not relevant here. And he does this despite the body of Count Two specifically charging him with a conspiracy on "the high seas." (ECF No. 38, PageID.158).

Armed with the overwhelming authority upholding the MDLEA as a valid exercise of Congress's Article I power combined with Didani's failure to offer any contrary authority which would support his position, this Court should reject Didani's facial challenge to the section of the MDLEA pertaining to foreign flagged vessels where, as here, part of the conspiracy occurred on the high seas.

    ii.  *Didani's due process rights were not violated when he was charged with violating the MDLEA.*

Didani's contention that the MDLEA is unconstitutional as applied to him is based on a false premise. Didani incorrectly argues that his drug trafficking

14

involved "wholly foreign conduct" and "conduct that took place …only on the soil of foreign nations (not on the high seas)." (ECF No. 54, PageID.327). Didani characterizes this case this way because he is aware that if the conduct did not take place "only on the soil of foreign nations," but instead, also occurred on the high seas, his whole argument collapses. Perhaps that is why Didani ignored an analysis of the Felonies Clause.

Didani also wants to limit his role in the conspiracy to a small window of time when he was not residing in the United States. However, Count Two of the superseding indictment alleges that the conspiracy began in October 2016 and continued for several years. It was during this time that Didani, while living in the United States, including at times, in the this district, started planning, arranging, and obtaining financing for large shipments of cocaine, including shipments of cocaine from South America to Europe. After Didani moved from the United States, he frequently returned to the United States, and while here, continued to engage in acts in furtherance of the conspiracy.

Didani also wants to limit the conspiracy to just the few dates the cocaine was seized in Europe. That way, he can argue that the conspiracy occurred "solely on foreign soil." However, Didani forgets that the cocaine didn't magically appear in Europe – it had to transit the high seas to get there. While Didani is correct that the cocaine was seized on foreign soil, he ignores the fact that to transport the

cocaine to "foreign soil," Didani and his conspirators engaged in months-long planning and coordination for each shipment, some of which occurred while Didani was in this district, some of which occurred while he was in the United States, and some of which occurred on the high seas. That is why the superseding indictment alleges that the conspiracy occurred "in the Eastern District of Michigan, the high seas, in international waters, and elsewhere."

For example, while Didani was in the United States, he communicated with a coconspirator about having a customs officer provide one of the coconspirators a uniform so that the coconspirator could pass as a customs officers on the day that a shipment was in port. During the same period, Didani also communicated with another coconspirator about a cocaine shipment destined for Spain with Didani informing the conspirator that he was waiting for the money:

While he was in the United States, Didani also regularly communicated with coconspirators in furtherance of the conspiracy by discussing various encrypted applications, such as Sky Ecc, that they could use to openly communicate with each other about their drug trafficking while at the same time, keeping those communications from law enforcement.

During this time, they also communicated with each other about ways to protect themselves from the perils of the very dangerous profession they had chosen. For example, in September 2019, while Didani was in the United States, he

purchased bullet proof jackets from a supplier in the United States that were going to be utilized by Didani and other members of the conspiracy. Didani even modeled the bulletproof jackets so his coconspirators outside the United States could see what they looked like:



While Didani was in the United States he also regularly communicated with conspirators to plan and arrange cocaine shipments; to facilitate payments for cocaine shipments; and he regularly discussed the seizures of cocaine shipments and ways to avoid future seizures.

These examples represent just a miniscule fraction of the evidence in this case establishing that this conspiracy took place not just on the "soil of foreign nations" but also took place in this district, the United States and on the high seas. So Didani's claim that his due process rights have been violated because as a "foreign national, he is being prosecuted for solely foreign conduct that took place on solely foreign soil," simply is not accurate and should be rejected by this Court.

Furthermore, as discussed above, Didani is not being prosecuted solely for foreign conduct that took place solely on foreign soil. Didani is charged in a conspiracy that started in the United States and took place in several locations – including the high seas. Didani seems to forget that as a conspirator, he is responsible for conduct of other conspirators. "It is a well-settled rule in the law of conspiracy that the overt act of one partner in crime is attributable to all." *United States v. Alarcon Sanchez*, 972 F.3d 156, 165 (2d Cir. 2020), quoting *Pinkerton v. United States*, 328 U.S. 640, 647 (1946); See also *United States v. Williams*, 894 F.2d 208, 212 (6th Cir. 1990).

In *Alarcon Sanchez*, the Second Circuit rejected the defendant's challenge that application of the MDLEA to his foreign land-based conspiratorial conduct violated the Constitution's Define and Punish Clause and the Due Process Clause stating, "we agree with the government that prosecuting MDLEA conspirators who are not on the high seas is a means that is rationally related to the legitimate end of

prosecuting MDLEA conspirators who are on the high seas." *Id.* at 167. The

Court's conclusion was "reinforced by recognition that the conspirators most likely

to control, direct, finance, and profit from such drug trafficking are more apt to

remain on land than to venture on the seas." *Id.* See also, *Ballestas,* 795 F.3d at

145; *Ali,* 718 F.3d at 940. The Court then held that "in order reasonably to address

the serious problem of drug trafficking on the high seas, it is therefore, necessary

and proper for Congress to confer federal jurisdiction over all conspirators, both

those who go on the seas and those who remain on land." *Id.*

    The Court in *Alarcon Sanchez* could have very well been describing Didani.

And Didani was not merely a land-based conspirator operating on foreign soil – he

was also operating in the United States and in this district as well. For all these

reasons, the MDLEA charge as applied to him is not unconstitutional.

> **B.   The United States timely complied with jurisdictional
> requirements of the MDLEA when it obtained consent from the
> flag nations prior to Didani's indictment on Count Two.**

    The certifications of the Secretary of State, which have been provided to

Didani, affirmatively and conclusively prove that the Anisha R, the Jean Gabriel,

and the Cartegena Express are "vessel[s] subject to the jurisdiction of the United

States" and therefore, covered vessels under § 70502(c)(1)(C ) and (c)(2)(B) of the

MDLEA. However, in an attempt to get around the conclusive and dispositive

nature of the consent of the flag nations (Liberia, Malta, and Germany), Didani

argues that "consent" must be obtained at the time of the offense, thereby attempting to inject a timing element into the MDLEA's definition of a "vessel subject to the jurisdiction of the United States." Didani's invented timing requirement is not found anywhere in the statute. Didani further maintains that "the foreign nations had not consented at the time of the offense and the United States is without jurisdiction." (ECF No. 54, Page ID.334). However, conspicuously absent from these bold assertions is any legal authority supporting them. The reason is obvious – the argument Didani makes here has been explicitly rejected in *every* Circuit that has considered this issue. See e.g.*, United States v. Cardales*, 168 F.3d 548, 552 (1st Cir. 1999) (MDLEA's jurisdictional requirement satisfied although consent provided after Coast Guard boarded ship); *United States v. Mitchell-Hunter*, 663 F.3d 45, 50 n.1 (1st Cir. 2011) (No error in basing jurisdiction on a certificate that was created after boarding and arrest but prior to trial); *United States v. Greer*, 285 F.3d 158, 175–76 (2d Cir. 2002) (upholding MDLEA jurisdiction based on flag-state consent provided five years after the fact: "consent given any time prior to trial achieves the purpose of [the MDLEA, and]…consent under the MDLEA can relate back to activity that occurred before consent"); *United States v. Bustos-Useche*, 273 F.3d 622, 627 (5th Cir. 2001) (the "only statutory prerequisite to the district court's jurisdiction" pursuant to subsection (c)(1)(C) "is that the flag nation consent to the enforcement of United States law

before trial"); *United States v. Juda*, 46 F.3d 961, 966 (9th Cir. 1995) ("when MDLEA jurisdiction is premised on consent of the flag nation, such consent relates back to activity that occurred prior to consent"); *United States v. Khan*, 35 F.3d 426, 431 (9th Cir.1994) ("[T]he timing of ... consent is irrelevant"); *United States v. Devila*, 216 F.3d 1009, 1017 (11th Cir. 2000) ("while the individuals may challenge jurisdiction over a vessel on the basis that the flag nation failed to consent before trial, they may not do so on the basis that the flag nation's consent was obtained after the vessel was boarded"); *United States v. Reeh*, 780 F.2d 1541, 1547 (11th Cir. 1986) (noting that consent under predecessor statute, 21 U.S.C. § 955a, is valid if given "before th[e] case came to trial").

This authority makes clear that "consent" does not need to be obtained at the time of the offense, and although it was here, consent does not even need to be obtained prior to indictment. Instead, as these cases demonstrate, so long as the flag-state consents or waives objection to the enforcement of United States law sometime before trial, a defendant has no legal basis to challenge MDLEA jurisdiction – and for good reason. The MDLEA's jurisdictional requirement is not an element of an MDLEA offense and as a result, does not have to be decided by a jury. *United States v. Hernandez*, 864 F.3d 1292, 1303 (11th Cir. 2017); *United States v. Tinoco*, 304 F.3d 1088, 1109 (11th Cir. 2002). Instead, the "legitimacy of a flag nation's consent is ... a question of international law that can be raised only

by the foreign nation." *Bustos-Useche*, 273 F.3d at 627; See also, *Tinoco*, 304 F.3d at 1109 (11th Cir. 2002) ("the statutory jurisdictional requirement contained in [the MDLEA] is unique because it is not meant to have any bearing on the individual defendant, but instead is meant to bear only on the diplomatic relations between the United States and foreign governments."). In other words, the MDLEA "requires the consent of a vessel's flag nation for jurisdiction to protect the interest of that flag nation and international comity, not the interest of the individual defendants charged with violating the MDLEA. *Devila*, 216 F.3d at 1013, 1017 (upholding jurisdiction where, after trial but before a retrial, the Venezuelan government "retroactively authorized" the United States to board the vessel and enforce United States law).

With Didani, by January 2022, the United States had obtained consent from the flagged nations alleged in Count Two of the superseding indictment (Liberia, Malta, and Germany). It was not until after that, in March 2022, that a grand jury charged Didani in the superseding indictment with violating the MDLEA. So here, the United States not only obtained consent from the flag nations prior to Didani being charged in the superseding indictment with violating the MDLEA, but obtained consent well before trial, which is currently scheduled in April 2023. Accordingly, the only question before the Court is whether the vessels in Didani's case, the Anisha R, the Jean Gabriel, and the Cartegena Express are "covered

vessel[s]" as defined by 46 U.S.C. § 70503(e) which includes "a vessel subject to the jurisdiction of the United States." And they clearly are as § 70503(c) of the MDLEA unambiguously states that a "a vessel subject to the jurisdiction of the United States" includes "a vessel registered in a foreign nation if that nation has consented or waived objection to the enforcement of United States law by the United States." And here, the certifications of the Secretary of State prove they have. So, because the United States has conclusively proven that Liberia, Malta, and Germany consented to the enforcement of United States law by the United States, the statutory requirements under the MDLEA have been satisfied, and Didani's motion to dismiss should be denied.

    **C.**   **The jurisdictional question of whether the flag nations have consented is a pretrial issue to be determined by the Court.**

Section 70504(a) of the MDLEA provides that "[j]urisdiction of the United States with respect to a vessel…is not an element of an offense" and that "[j]urisdictional issues arising under this chapter are preliminary questions of law to be determined solely by the trial judge." In deciding whether the Court or jury determines whether Liberia, Malta, and Germany consented to the enforcement of United States law by the United States, this Court is bound by plain language of the MDLEA itself. *United States v. Pertuz-Pertuz*, 679 F.3d 1327, 1328 (11th Cir. 2012) ("The plain text of a statute controls"); *Williamson v. Recovery Ltd. Partnership*, 731 F.3d 608, 618 (6th Cir. 2013) ("Where the text is plain and

unambiguous, we must apply a statute according to its terms"); *United States v. Steele*, 147 F.3d1316, 1318 (11th Cir. 1998) ("Where the language Congress chose to express its intent is clear and unambiguous, that is as far as we go to ascertain its intent because we must presume that Congress said what it meant and meant what it said"). So, in Didani's case, in accordance with the plain language of the statute, the issue of jurisdiction – specifically, whether Liberia, Malta, and Germany consented or waived objection to the enforcement of United States law, is a decision for the Court.

Didani does not appear to dispute that Liberia, Malta, and Germany consented to the enforcement of United States law by the United States. As the government pointed out in its previously filed Motion for Pretrial Determination as to Jurisdiction (ECF No. 57, PageID.355), as part of discovery in this matter, the government provided Didani with copies of the certifications of the Secretary of State concerning the Anisha R, the Jean Gabriel, and the Cartegena Express.[2] These Certifications set forth that the Government of the United States requested

---

[2] On October 19, 2022, Didani filed the instant motion arguing that the question of whether the flagged nations have consented to United States jurisdiction is one to be decided by a jury. On October 25, 2022, the government filed a Motion for Pretrial Determination as to Jurisdiction arguing that the issue of consent should be decided by the Court prior to trial. (ECF No. 57, PageID.355). The government's response here to Didani's motion will contain several references to the government's October 25, 2022 motion, as the October 2022 motions filed by Didani and the Government both address the issue of whether the Court or jury decides whether the flagged nations have consented to United States Jurisdiction.

that the respective governments (Liberia, Malta, and Germany) waive "their

jurisdiction for the enforcement of United States law by the United States with

respect to" the specified vessels. The Certifications also set forth that the

Governments of Liberia and Germany notified the Government of the United

States that they had no objection to enforcement of United States law over the

specified vessels and that the Government of Malta notified the Government of the

United States that it had waived its right to exercise jurisdiction over the specified

vessel. As a result, the Secretary of States' Certifications clearly establish that

Liberia (MSC Anisha R), Malta (CMA CGM Jean Gabriel), and Germany

(Cartegena Express), either had no objection to enforcement of United States law

over the specified vessels or waived their right to exercise primary jurisdiction

over the respective vessels, 46 U.S.C. § 70502(c)(1)(C).

Instead of disputing that Liberia, Malta, and Germany consented to the

enforcement of United States law by the United States – and he can't because of

the conclusive proof provided to him in the form of the Secretary of State

Certificates – Didani chooses to ignore the plain reading of the MDLEA which

provides that jurisdiction is not an element of an offense but is instead a

"question[s] of law to be determined solely by the trial judge." § 70504(a).

As the government pointed out in its October 2022 motion, (ECF No. 57,

PageID.355), Courts have applied the plain wording of the MDLEA itself and have

consistently held that jurisdiction of the United States with respect to a vessel under the MDLEA is not an element of an MDLEA offense. *United States v. Hernandez*, 864 F.3d 1292, 1303 (11th Cir. 2017). Instead, as the MDLEA mandates, Courts have uniformly held that jurisdictional issues arising when a defendant is charged with violating the MDLEA are to be determined solely by the trial judge. 46 U.S.C. §70504(a). See *United States v. Garza*, 516 F.3d 1266, 1271 (11th Cir. 2008); *United States v. Mitchell-Hunter*, 663 F.3d 45, 51 (1st Cir. 2011); *United States v. Miranda*, 780 F.3d 1185, 1192-93 (D.C. Cir. 2015); *United States v. Brant-Epigmelio*, No. 8:09-cr-404-T-23TGW, 2010 WL 557283, at *3 (M.D. Fla. Feb. 11, 2010).

So, although Didani is correct that all essential elements of a crime must be proven beyond a reasonable doubt, the plain language of the MDLEA and substantial authority leaves no doubt that jurisdiction is not "an essential of [a] MDLEA substantive offense, and as a result, it does not have to be submitted to a jury for proof beyond a reasonable doubt." *United States v. Tinoco*, 304 F.3d 1088, 1109-10 (11th Cir. 2002). In other words, this Court – not a jury – decides jurisdiction. This is so because the MDLEA's "jurisdictional requirement does not affect the defendant's blameworthiness or culpability, which is based on [a] defendant's participation in drug trafficking activities, not on the smoothness of international relations between countries." *Id.*

As the government outlined in detail in its October 2022 motion, the Secretary of State Certifications conclusively prove that Liberia (MSC Anisha R), Malta (CMA CGM Jean Gabriel), and Germany (Cartegena Express), either had no objection to enforcement of United States law over the specified vessels or waived their right to exercise primary jurisdiction over the respective vessels, 46 U.S.C. § 70502(c)(1)(C) &(2)(B). As a result, the MSC Anisha R, the CMA CGM Jean Gabriel, and the Cartegena Express are vessels subject to the jurisdiction of the United States.

Therefore, the Court should reject Didani's position that jurisdiction for the MDLEA offense is jury question. Instead, the Court should grant the government's previously filed motion and make a pretrial ruling that the vessels in this case, specifically the MSC Anisha R, the CMA CGM Jean Gabriel, and the Cartegena Express are vessels subject to the jurisdiction of the United States.

**D.    Didani's conspiratorial acts while he was in the United States and his conspiratorial acts with United States-based coconspirators establishes any required nexus to the United States.**

Didani's MDLEA prosecution does not violate his due process rights. In making the claim that it does, Didani again wrongfully asserts that his prosecution as a "foreign national" was based on "wholly foreign conduct" and because that conduct has "no nexus, whatsoever, with the United States," his due process rights have not been violated.

Didani makes an issue that he is a foreign national who has no ties to this district.[3] He argues that as a result, it would offend his due process rights to be prosecuted in a country he has no ties to – the United States, for a crime that has no connection to the United States. However, as described above, during the conspiracy, Didani was a Lawful Permanent Resident of the United States. Furthermore, during significant portions of the conspiracy, Didani was not only residing in the United States, but he was residing in this district.

As described above, Didani also engaged in numerous acts in furtherance of the conspiracy while either living in or visiting the United States. First, Didani engaged in multiple conspiratorial acts while he was in the United States. So even if a MDLEA prosecution required a nexus to the United States, which the government does not concede, that nexus exists here because Didani's prosecution was not based on "wholly foreign conduct." Even after Didani left the United States, he returned to the United States several times until the COVID-19 pandemic halted his travel. And after entering the United States, during every one of those trips, he engaged in conspiratorial conduct while he was here.

---

[3] In his brief, Didani attempts to use the government's words from a 2022 pleading relating to Didani's motion for bond that he has no ties to this District. That is true. In 2022, when that hearing took place (as opposed to 2016-2021 when the conspiracy took place), Didani had no ties to this district. By 2022, Didani's financer here was dead, and his friends here abandon him. However, during the beginning of the conspiracy and for several years that followed, Didani lived in, regularly visited, and regularly communicated with coconspirators in this district.

Several circuits have rejected a nexus requirement in a MDLEA prosecution involving foreign flagged vessels. These circuits have held that the government is not even required to prove a nexus between a defendant's criminal conduct and the United States or a nexus between a defendant and the United States where the flag nation consented to application of United States law. *United States v. Cardales*, 168 F.3d 548 (1st Cir. 1999) ("[D]ue process does not require the government to prove a nexus between a defendant's criminal conduct and the United States in a prosecution under the MDLEA when the flag nation has consented to the application of United States law to the defendants."); See also, *United States v. Rodriguez-Duran* 507 F.3d 749, 761-62 (1st Cir. 2007) ("We have previously held that the MDLEA does not contain such a nexus requirement; the flag nation's consent to jurisdiction is sufficient"). These circuits have also held that due process did not require a nexus between a foreign citizen and the United States for application of the MDLEA where the flag nation for the vessel consented or waived objection to the enforcement of United States law by the United States. *United States v. Suerte*, 291 F.3d 366 (5th Cir. 2002) (Due process did not require a nexus between a foreign citizen and the United States for application of the MDLEA where the flag nation for the vessel consented or waived objection to the

enforcement of United States law by the United States); [4]  (*United States v.*

*Kurdyukov*, 48 Fed. Appx. 103, (5th Cir. 2002) (A nexus between a foreign

defendant or his conduct to the United States is not required in MDLEA

prosecution where the flag nation of the vessel consents to United States

jurisdiction).

Under either scenario, when the foreign flag nation consents to the

application of United States law, jurisdiction attaches under the statutory

requirements of the MDLEA without violating due process rights or the principles

of international law because the flag nation's consent eliminates any concern that

the application of United States law may be arbitrary or fundamentally unfair.

The Ninth Circuit is the only circuit to require a nexus between a foreign

defendant's conduct and the United States where the defendant has been

prosecuted under the MDLEA and the flag nation has consented to United States

jurisdiction. *United States v. Perlaza*, 439 F.3d, at 1149 (9th Cir. 2006). For the

United States to properly exercise jurisdiction, the Ninth Circuit requires the

government to establish some detrimental effect within, or nexus to the United

---

[4]In his brief, Didani cites *United States v. Lawrence*, 727 F.3d 389 (5th Cir. 2013)
to support his position that at least two Circuits require the government to establish
a nexus between a defendant or his conduct and the United States. However,
*Lawrence* did not involve an  MDLEA prosecution. The Fifth Circuit case cited by
the government, *United States v. Suerte*, 291 F.3d 366 (5th Cir. 2002) did, and in
*Suerte*, the Fifth Circuit held no nexus was required.

States. *Id.* at 1169. In this context, the Ninth Circuit's "nexus requirement is a judicial gloss applied to ensure that a defendant is not improperly haled before a court for trial." *Id*.

In examining the holding in *Perlaza*, it is important to note that the defendants there had no ties to the United States and committed no acts in furtherance of the conspiracy while in the United States. By contrast, during the MDLEA conspiracy, Didani was a Lawful Permanent Resident of the United States, and either was living here, traveled here, vacationed here, and as outlined above, committed multiple acts in furtherance of the conspiracy here.

Didani's criminal acts also had a detrimental effect within the United States. For example, he utilized drug proceeds and the United States banking system to purchase armored vehicles in furtherance of the conspiracy and drug proceeds were coming back to the United States. In sum, to the extent that a nexus to the United States was required, the allegations against Didani in the superseding indictment and the additional facts contained in this brief, sufficiently establish that nexus.

### E.    An evidentiary hearing is not required.

An evidentiary hearing is not required because there are no material facts in dispute. The government and Didani agree (1) that on December 29, 2021, Liberia notified the Government of the United States that it had no objections to enforcement of United States law over the MSC Anisha R; (2) that on December

21, 2021, Malta notified the Government of the United States that it waived its

right to exercise jurisdiction over the CMA CGM Jean Gabriel; and (3) that on

January 31, 2022, Germany notified the Government of the United States that it

had no objections to enforcement of United States law over the Cartegena Express.

The government and Didani also agree that Didani was not indicted on the

MDLEA charge until March 16, 2022 – *after* the necessary waivers were obtained

from Liberia, Malta, and Germany.

The Court is not required to hold an evidentiary hearing when a defendant's

arguments are entirely legal in nature. *United States v. Abboud*, 438 F.3d 554 (6th

Cir. 2006). Because the relevant facts here are not in dispute, an evidentiary

hearing would serve no purpose and would add very little, if anything, to the briefs.

As a result, the Court should rule on Didani's motion without holding an

evidentiary hearing. See, *United States v. Gross*, 1993 WL 300393 (6th Cir.

August 3,1993).

## V.     CONCLUSION

Didani filed two motions to dismiss one superseding indictment. He filed the

instant motion to dismiss Count Two on the same day he filed a motion to dismiss

Count One and Three. (ECF No. 52, PageID.259). But in deciding each motion, the

Court should consider them in tandem. By filing two separate motions, Didani

conceals what he is ultimately asking for. Didani is asking this Court to hold that

the United States is powerless to prosecute him for his drug dealing or to stop him from drug dealing. And he does this despite the fact that while he was a Lawful Permanent Resident of the United States and while he was residing in the United States, he was the mastermind of a conspiracy to distribute massive quantities of cocaine; despite the fact that he planned the conspiracy while living in the United States; despite the fact that he committed multiple overt acts in furtherance of the conspiracy while in the United States; and despite the fact that after he moved from the United States he increased his cocaine distribution using vessels on the high seas through overt acts that he and other coconspirators committed while in the United States.

Didani's actions violated the laws of the United States, and he has been appropriately charged in the Eastern District.  His motion should be denied.

Respectfully submitted,

DAWN N. ISON
United States Attorney


s/Mark Bilkovic
Mark Bilkovic
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, Michigan 48226
(313) 226-9623
mark.bilkovic@usdoj.gov

s/Timothy P. McDonald
Timothy McDonald
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, Michigan 48226
(313) 226-0221
timothy.mcdonald@usdoj.gov


Dated: January 13, 2023

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 13, 2023, I electronically filed the

foregoing document with the Clerk of the Court using the ECF system which

will send notification of such filing to counsel of record.

*s/ Mark Bilkovic*

Mark Bilkovic P48855
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI 48226
mark.bilkovic@usdoj.gov
(313) 226-9623
