United States District Court
Eastern District of Michigan
Southern Division

United States of America,

                                      Case No. 21-cr-20264

v.

                                      Hon. Denise Page Hood
                                        United States District Judge

Ylli Didani,

          Defendant.

---

## GOVERNMENT'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS EVIDENCE (ECF No. 53)

---

After Didani entered the United States in Chicago, Illinois on July 30, 2015, the United States Department of Homeland Security (DHS) conducted a routine border search of Defendant Ylli Didani's iPhone. When Didani returned to the United States on August 6, 2016, DHS again conducted a routine border search of Didani's luggage and iPhone. During the routine searches of Didani's iPhones in 2015 and 2016, officers found evidence of contraband and border-related crimes. In Didani's luggage in 2016, officers found multiple vials of Human Growth Hormone. Didani's iPhones were later subject to a non-routine search where agents uncovered evidence of Didani's significant involvement in high volume transnational drug trafficking. Didani now seeks to have the evidence suppressed,

claiming that the border search was too intrusive and had no nexus to the border search exception's rationale. Didani also argues that authorities had no evidence that his cellphones contained contraband. Defendant's motion fails because (1) the routine border searches of Didani's cellphones in 2015 and 2016 required no level of suspicion, and (2) law enforcement had reasonable suspicion to believe that Didani's cellphones contained evidence of contraband or evidence of cross-border criminal activity.

Accordingly, Didani's motion to suppress evidence should be denied.

## I.    Background

### a. The 2015 Border Search

In 2013[1], two years before the first border search, Border Patrol Agents received information regarding suspicious persons and activity occurring at the "11 Mile Boat Launch." Agents later identified E.P.[2] as one of the individuals associated with the boat launch. Agents learned that E.P. had been previously convicted of drug and weapon offenses and was recently (at that time) released

---

[1] As far back as 2008, the Department of Homeland Security had information about Didani and his potential involvement in cross-border marijuana smuggling and money laundering. That information is contained within law enforcement sensitive databases and DHS Records of Investigation (ROI). Official disclosure and redaction of those records is initially governed by record disclosure personnel within the relevant agencies. That process is currently underway.

[2] To protect the privacy of individuals not charged with criminal violations, the United States will refer to certain individuals by their initials.

from prison. In addition, E.P. was arrested for cocaine smuggling, but prosecution was declined. Furthermore, agents discovered that E.P. recently purchased property near a private airport and had traveled to Colombia. In August 2014, Agents learned that a third party, H.H., made airline reservations for E.P. and Didani to travel to Colombia. Didani flew to Colombia but returned to the United States on the same day. This unusual flight activity raised the suspicion of agents, particularly since Colombia is a well-known source country for cocaine.

On July 1, 2015, the United States Coast Guard witnessed a boat traveling at a high rate of speed from Canada landing at Harbortown in Detroit. By the time the Coast Guard caught up to the boat, the boat was already on a trailer. The trailer was attached to a vehicle registered to H.H. - the same person that made reservations for Didani and E.P. to travel to Colombia. Agents learned that H.H. was tied to a 2008 narcotics investigation in Detroit. In addition, H.H. had been stopped on several occasions in 2008 crossing the United States/Canada border with large amounts of currency, just under the amount that would trigger reporting requirements. In one of these encounters, U.S. Customs and Border Protection (CBP) officers found multiple identification and Medicare cards in the names of other people inside H.H.'s vehicle. H.H. told CBP that he delivers prescriptions for his friend. Furthermore, in the months leading up to the first border search, Didani

made four reservations to fly into the United States but never boarded the plane.

This behavior raised the suspicion of agents too.

In July 2015, investigators were alerted via law enforcement databases that Didani would be attempting to enter the United States on July 30, 2015 at Chicago O'Hare International Airport on an inbound flight originating from Albania. Upon Didani's arrival at Chicago O'Hare, he was greeted by United States Border Patrol (BP) and was referred for a secondary inspection and interview.

During the interview, Didani stated that he was coming into the U.S. to visit family and friends and planned to return to Albania in approximately 1-1.5 months to continue working on his coal business operation that he had bought into for $100,000 in U.S. currency. At some point during the interview, BP Agent Joshua Bianchi asked Didani about his travel. Didani opened his iPhone in front of Agent Bianchi using a passcode and began quickly scrolling through photographs on the iPhone in front of Agent Bianchi, ostensibly to demonstrate that he traveled to various locations.  Agent Bianchi was not able to fully view the photographs because Didani was scrolling through the photographs so quickly. The agents subsequently conducted a routine border search of the iPhone by manually scrolling through the photographs on the device. During this routine border search, agents observed images of bulk currency, shipping routes and the movement of large quantities of money. In addition, Agent Bianchi observed multiple

photographs of Didani with large amounts of bundled/rubber banded United States currency along with a photograph of Didani holding an assault rifle and a photograph of someone holding a semi-automatic handgun:



Given the evidence of contraband and potential cross-border crimes on Didani's iPhone, combined with historical information he knew about Didani, Agent Bianchi made the decision to make an image of Didani's iPhone for further forensic analysis. After that process was completed, Agent Bianchi returned the iPhone to Didani and Didani was released.

### b. **The 2016 border search**

In early August 2016, investigators were alerted via law enforcement

databases that Didani made flight reservations to travel from Tirana, Albania to Juarez, Mexico. Juarez has a notorious history of drug trafficking and drug cartel related violence[3].  Investigators learned that Didani's flight reservations to Mexico transited the United States and that on August 6, 2016 Didani planned to fly into Chicago O'Hare.

On August 5, 2016, Agent Bianchi contacted Homeland Security Investigations (HSI) in Chicago, IL and was directed to HSI Special Agent (SA) Daniel Nugent, who was assigned to Chicago O'Hare. Given the breadth of historical information agents had learned about Didani and the images found on his iPhone in 2015, Agent Bianchi requested that SA Nugent (or agents from HSI Chicago) attempt to interview Didani about his suspicious travel history and conduct a border search of Didani's personal property.

The next day, August 6, 2016, Didani entered the United States at Chicago O'Hare where he was greeted by CBP Officer Robert Personett. CBP Officer Personett referred Didani to a secondary inspection and interview. Didani was observed to have one iPhone and one Blackberry cellphone in his possession at that time.

During the secondary inspection and interview, CBP located seven vials of

---

[3] "TIMELINE-Events in Mexico's drug war city Ciudad Juarez". https://www.reuters.com/article/idUSN16449, June 16, 2010

the Human Growth Hormone, Kigtropin, in Didani's luggage. All seven vials were

seized by CBP. In addition, the iPhone and Blackberry that were in Didani's

possession were also detained by CBP. Didani told officers that he was traveling to

Mexico City to attend his friend E.P.'s wedding. Didani also stated that he owns a

trucking business in Michigan and that his partner was A.S. At that time, DHS had

historical information that A.S. was involved in smuggling drugs from Canada

using commercial trucks. CBP officers asked Didani about his suspicious travel.

Didani told agents that he owned and operated a mineral company in Tirana,

Albania. Yet, Didani was unable to identify an address of the company or provide

a business card. CBP officers asked Didani about his numerous trips to Turkey in

2015. Didani claimed that the businesses in Turkey were his biggest customer.

However, Didani was unable to identify the names of the businesses or provide

evidence of doing business in Turkey.

At some point during the secondary encounter, Agent Nugent arrived and

took possession of Didani's iPhone and Blackberry. When agents unlocked the

Blackberry, it was blank[4]. Agent Nugent conducted a routine border search of

---

[4] Agents later discovered that Didani's Blackberry was equipped with encrypted software. Through research, investigators have discovered that Blackberry encrypted phones are issued with two distinct passcodes. One passcode is to unlock the Blackberry for use. The second passcode ("Duress Passcode") will wipe all contents of the Blackberry if the user feels the phone has been compromised. When the Duress Passcode is used, the phone will also emit a message to the main phone server and all contacts stored in the encrypted Blackberry that the

Didani's iPhone by manually scrolling through the photographs on it. During that routine border search, Agent Nugent located a photograph of the interior of a shipping container with an arrow pointing to the container's floor. Believing that the image was evidence of narcotics smuggling, Agent Nugent ceased his search and, shortly thereafter, mailed both phones to Agent Bianchi in Detroit for a continued border search.

On August 17, 2016, eleven days after the devices were detained, United States Magistrate Judge R. Steven Whalen signed a search and seizure warrant for Didani's iPhone and Blackberry. (*see In the Matter of the Search of Two Cellular Telephones Currently in the Possession of the US Department of Homeland Security*, Case: 2:16-mc-51179). During the forensic search of Didani's iPhone, agents located substantial evidence of drug trafficking within and outside of the United States including photographs of messages between Didani and an unknown person discussing the concealment and transportation of "product" using maritime containerships.

## II.    Procedural History

On March 26, 2021, Didani was charged in a sealed complaint with three counts: (1) conspiracy to distribute controlled substances in violation 21 U.S.C. §§

---

Blackberry has been compromised. The passcode Didani used for his encrypted Blackberry on August 6, 2016 was the Duress Passcode, which allowed Didani to wipe the encrypted Blackberry of all stored materials.

841 and 846; (2) conspiracy to distribute controlled substances on board a vessel subject to the jurisdiction of the United States in violation of 46 U.S.C. § 70503; and (3) money laundering in violation of 18 U.S.C. § 1956(a). (See 21-mj-30148: ECF No. 1, PageID.1). On March 31, 2021, Didani was arrested on the complaint at the Charlotte Douglas International Airport in Charlotte, North Carolina after arriving on a flight from the Dominican Republic.

On April 21, 2021, a grand jury in this district returned a one-count indictment charging Didani with conspiracy to distribute controlled substances in violation of 21 U.S.C. §§ 841 and 846. (ECF No. 1, PageID.1-6).

On March 16, 2022, a grand jury returned a three-count superseding indictment charging Didani with two additional counts – Count Two: conspiracy to possess with intent to distribute and distribute a controlled substance on board a vessel subject to the jurisdiction of the United States in violation of 46 U.S.C. §§ 70503(a) and 70506(b) (a violation of the Maritime Drug Law Enforcement Act, hereinafter the "MDLEA") ; and Count Three: conspiracy to launder monetary instruments in violation of 18 U.S.C. § 1956(h). (ECF No. 38, PageID.153-174).

Didani now claims that his Fourth Amendment rights were violated when agents conducted a border search of his phones.  Didani's argument relies on a misunderstanding of the facts and the law.  For the reasons set forth below, Didani's motion should be denied.

### III.    Argument

#### A. The 2015 and 2016 routine border searches of Didani's property at the port of entry were reasonable under the Fourth Amendment pursuant to the government's border search authority

The initial manual reviews of Didani's personal property, including his iPhone at the port of entry in 2015 and 2016 were routine border searches that did not require any degree of individualized suspicion. A routine search of a cellphone occurs when a law enforcement officer simply scrolls through the device to view its contents. *United States v. Kolsuz*, 890 F. 3d 133, 139-140 (4th Cir. 2018) (See also: *United States v. Almadaoji*, 567 F. Supp. 3d 834, 839 (S.D. Ohio 2021)). "The government's interest in preventing the entry of unwanted persons and effects is at its zenith at the international border." *United States v. Flores-Montano*, 541 U.S. 149, 152 (2004). Under the border search exception, "routine searches of people and their property do not require a warrant or probable cause." *United States v. Ramsey*, 431 U.S. 606, 619 (1977). The United States Supreme Court has repeatedly stated that "searches made at the border, pursuant to the longstanding right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border," *Flores-Montano*, 541 U.S. at 152–53 (quoting *Ramsey* at 616).

Further, as the Sixth Circuit has held, the border-search exception extends to computers and other electronic media, permitting suspicionless searches of those items at the international border. *United States v. Stewart*, 729 F.3d 517, 525–26 (6th Cir. 2013). In *Stewart*, officers seized the defendant's two laptop computers at the Detroit airport after he arrived on an international flight. *Id.* at 520–21. They searched the computers and found child pornography. *Id.* at 521. On appeal, the Sixth Circuit held that the border-search exception not only permitted a routine, suspicionless search of those computers at the airport, but also allowed the search to continue, one day later, at the CBP field office 20 miles away. *Id.* at 524–26.

Didani points to *Riley v. California*, 573 U.S. 373 (2014), where the Supreme Court held that law enforcement could not search a cellphone incident to arrest because cellphones contain extensive information which heighten privacy interests. *Id*. at 393. The Court reasoned that individuals have a substantial privacy interest in cellphones and that searching a cellphone after the defendant has been arrested does not protect the officers during this heightened encounter or prevent the concealment and destruction of evidence. *Id*. at 387-392.

But *Riley* does not apply to searches at the border. *United States v. Touset*, 890 F.3d 1127, 1234 (11th Cir. 2018). *Riley* did not involve a border search and the Court made no effort to widen its holding to other well-delineated exceptions to the search warrant requirement. "[E]ven though the search incident to arrest exception

does not apply to cell phones, other case-specific exceptions may still justify a warrantless search of a particular phone." *Riley* at 2494. In addition, *Riley's* rationale is inapposite to border searches. First, an individual's expectation of privacy is different at the border. "But on many occasions we have noted that expectation of privacy is less at the border than it is in the interior" *Flores-Montano,* 541 U.S. at 154 (citing *United States v. Montoya de Hernandez*, 437 U.S. 531, 539 (1985). Second, the government's interest in protecting the territorial integrity of the United States during a border search is quite different than its interests in protecting the arresting officer and safeguarding evidence during a search incident to arrest. "No case post-*Riley* has limited the Government's authority to conduct suspicionless manual searches of electronic devices at the international border." *United States v. Laynes*, 481 F. Supp 3d 657 (S.D. Ohio 2020) (quoting *Touset,* 890 F.3d at 1233).

In this case, CBP officers conducted a routine border search of Didani's iPhone after Didani entered the United States in 2015 at the Chicago O'Hare International Airport. During the course of that routine border search, Agent Bianchi located images of shipping routes, bulk currency and the movement of large quantities of money. In addition, Agent Bianchi observed photographs of Didani possessing a rifle-style firearm, Didani standing in front of stacks of banded

U. S. currency and an open black bag with a large amount of packaged, bulk U. S. currency.

When Didani returned to the United States in 2016, agents conducted a routine border search of his luggage and located seven vials of the Human Growth Hormone, Kigtropin. Again, "[r]outine searches of the persons and effects of entrants are not subject to any requirement of reasonable suspicion, probable cause, or warrant ...." *Montoya de Hernandez,* 437 U.S. at 538.  See also: *Dodd v. Doe*, 118 F. Supp. 2d 777, 780 (E.D. Mich. 2000) (finding that the initial warrantless search of the defendant, including the search of her luggage, was "clearly part of a routine search at an international border, and thus is within the bounds of the Fourth Amendment"). As noted above, Agents were unable to conduct a routine border search of Didani's Blackberry because it was blank. However, HSI SA Nugent conducted a brief routine border search of Didani's iPhone and located an image of a shipping container with an arrow pointing to the floor of that container. Believing that the image represented evidence of narcotics smuggling, Agent Nugent concluded his manual review and sent both devices to HSI Detroit for a continued border search of the phones.

Because DHS's routine border searches of Didani's iPhone in 2015 and his iPhone and luggage in 2016 were per se reasonable pursuant to the border search exception to the Fourth Amendment, Didani's motion must be denied.

### B.  The nonroutine search of Didani's phone in 2015 was supported by reasonable suspicion

Although the border search exception to the warrant requirement "is broad, it is not boundless. Even when the exception applies, the Supreme Court has explained that certain "highly intrusive searches" may qualify as " 'nonroutine' " and so require some level of individualized suspicion. *Flores-Montano*, 541 U.S. at 152 (quoting *United States v. Montoya de Hernandez*, 473 U.S. at 541 n.4). Based on this principle, border searches of an "individual's outer clothing, luggage, and personal effects consistently are routine searches, whereas more physically intrusive searches—such as strip searches, alimentary-canal searches, x-rays, and the removal of an artificial limb—are nonroutine searches requiring particularized reasonable suspicion." *United States v. Kolsuz*, 185 F.Supp.3d 843, 853 (E.D. Virginia 2016).

Several circuit courts have concluded that a forensic search of a digital phone must be treated as a non-routine border search, requiring some form of individualized suspicion. *United States v. Kolsuz*, 890 F. 3d 133, 146 (4th Cir. 2018); *United States v. Cotterman*, 709 F.3d 952, 967 (9th Cir. 2013). The Sixth Circuit has yet to decide this issue. However, courts, including the District Court for the Eastern District of Michigan, have agreed. (See. e.g. *Kolsuz*, 890 F. 3d at 145-146 ("After *Riley*, we think it is clear that a forensic search of a digital phone must be treated as a nonroutine border search, requiring some form of

individualized suspicion"); *Salloum v. Kable*, 2020 WL 7480549 (E.D. Mich,. 2020)(J. Leitman) (the downloading of computer and cell phone data alleged by Salloum was "nonroutine" and "highly invasive."); *Almadaoji,* 567 F.Supp.3d. at 839-840 (agreeing that the forensic examination of a cell phone requires reasonable suspicion).

Reasonable suspicion exists when agents demonstrate some objective, articulable facts that justify the intrusion as to the particular place or item searched. *Terry v. Ohio*, 392 U.S. 1, 21 (1968). Reasonable suspicion is a lower standard than probable cause, but more than a mere hunch; it requires some particularized grounds for suspecting that the individual has engaged in criminal conduct. *United States v. McCallister*, 39 F.4th 368, 373–74 (6th Cir. 2022). Furthermore, the officer may rely on his "own experience and specialized training to make inferences from and deductions about the cumulative information available." *United States v. Arvizu*, 534 U.S. 266, 273 (2002). This assessment is to be made in light of "the totality of the circumstances - the whole picture - must be taken in account." *United States v. Cortez*, 449 U.S. 411, 417 (1981). "[E]ven when factors considered in isolation from each other are susceptible to an innocent explanation, they may collectively amount to a reasonable suspicion." *United States v. Berber-Tinoco*, 510 F.3d 1083, 1087 (9th Cir. 2007).

In the context of electronic devices, a reasonable suspicion has been defined as "a 'particularized and objective basis for suspecting the particular' " device to be searched contains contraband or evidence of criminal activity." *United States v. Soboonchi*, 990 F. Supp 2d 536 (D. Mary. 2014) referencing *Montoya de Hernandez,* 473 U.S. at 541–42, (quoting *United States v. Cortez,* 449 U.S. 411, 417 (1981). "This standard is far from onerous and still leaves officers with considerable freedom to search suspicious persons and respond to unexpected factual developments." *Saboonchi,* 990 F. Supp 2d at 570. *See, e.g., United States v. Brignoni–Ponce,* 422 U.S. 873, 884–85 (1975) ("Any number of factors may be taken into account in deciding whether there is reasonable suspicion.... In all situations the officer is entitled to assess the facts in light of his experience in detecting illegal entry and smuggling." (citations omitted)).

Here, the images of firearms and bulk, banded currency along with evidence of the movement of money initially found on Didani's iPhone in 2015, single-handedly satisfy the reasonable suspicion threshold. But the 'whole picture' slams the door shut on Didani's argument. When Didani arrived in the United States he was already subject to a lengthy investigation. In 2013, two years before the first border search, Border Patrol Agents received information regarding suspicious persons and activity occurring at the "11 Mile Boat Launch." Agents later identified E.P. as one of the individuals associated to the boat launch. Agents

learned that E.P. had been previously convicted of drug and weapon offenses and was recently (at that time) released from prison. In addition, E.P. was arrested for cocaine smuggling, but prosecution was declined. Furthermore, agents discovered that E.P. recently purchased property near a private airport and had traveled to Colombia. In August 2014, Agents learned that H.H. made airline reservations for E.P. and Didani to travel to Colombia. H.H. also trailered a boat that the U.S. Coast Guard witnessed speeding across the Detroit River from Canada.  Didani flew to Colombia but returned to the United States *on the same day*. This unusual flight activity raised the suspicion of agents. Moreover, in the months leading up to the first border search, Didani made 4 reservations to fly into the United States but never boarded the plane. This behavior also raised the suspicion of agents. "[D]ubious travel plans" are often a "strong indicator of criminal activity." *United States v. Calvetti,* 836 F.3d 654, 667 (6th Cir. 2016).

Didani finally flew into the United States from Albania on July 30, 2015. CBP Officer Joshua Bianchi interviewed Didani and ultimately conducted a border search of Didani's personal property including a manual review of his iPhone. During the manual review, Officer Bianchi located photographs of Didani in possession of a firearm and large sums of bulk United States currency – both indicative of drug smuggling. These images corroborated parts of CBP's earlier investigation. In addition, Officer Bianchi discovered images of shipping routes,

bulk currency and the movement of money. The totality of circumstances here was sufficient to give Agent Bianchi reasonable suspicion that Didani's electronic devices contained evidence of narcotics/bulk cash smuggling or cross-border offenses.

Didani argues that border searches of electronic devices are limited to searches for contraband. He claims that the border search was unjustified because "narcotics cannot be stored in a computer file." (ECF No. 53, PgID 303). But such an argument ignores existing caselaw and frankly the obvious – cellular phones are capable of storing evidence of contraband and/or cross-border crimes, including communications, photographs, emails, videos, and text messages and chats of a drug smuggler's methods, plans or illicit proceeds.

Here, Didani relies on *United States v. Cano*, 934 F. 3d 1002 (9th Cir. 2019). But he avoids entirely *Alasaad v. Mayorkas*, 988 F.3d 8 (1st Cir. 2021), a case with a contrary holding to *Cano*. "As to plaintiffs' distinction between evidence of contraband and contraband itself, the border search exception is not limited to searches for contraband itself rather than evidence of contraband or a border-related crime (on electronic devices). Searching for evidence is vital to achieving the border search exception's purposes of controlling "who and what may enter the country." *Id*. at 20 (Citing *Ramsey* 431 U.S. at 620). "This is so because the government's interest in preventing crime at international borders 'is at its zenith,'

18

and it follows that a search for evidence of either contraband or a cross-border crime furthers the purpose of the border search exception to the warrant requirement." *Id*. at 19.  Didani also ignores a similar analysis by the Fourth Circuit in *Kolsuz*, 890 F. 3d at 143 ("The justification behind the border search exception is broad enough to accommodate not only the direct interception of contraband as it crosses the border, but also the prevention and disruption of ongoing efforts to export contraband illegally, through searches initiated at the border"). See also, *United States v. Gurr*, 471 F.3d 144, 149 (D.C. Cir. 2006) (holding in the context of the border search exception that "[t]he distinction that [plaintiff] would draw between contraband and documentary evidence of a crime is without legal basis").

Didani also makes little meaningful distinction between the various border searches in this case. He lumps them together and argues that CBP conducted a border search "as a sly workaround to the warrant requirement." (ECF No. 53, PgID 298). He goes further and infers, without evidence, that the "agents wanted to get into Didani's phones because they believed he was involved in the trafficking of controlled substances" and that in any other scenario the agents felt they needed a warrant. (*Id*.). But, even if true, the subjective intent of the agents initiating or conducting the border search "does not make otherwise lawful conduct illegal or unconstitutional." *Scott v. United States*, 436 U.S. 128, 138 (2005). "[T]he

important factor for a Court to consider is whether the search was conducted under

proper authority, not the "underlying intent or motivation of the officers involved."

United States v. *Gurr,* 471 F.3d 144, 149 (D.C. Cir. 2006) (quoting *Scott*). In

*United States v. Smasal,* 2015 WL 4622246 (D. Minn. 2015)(unpublished), a case

involving child exploitation, the defendant maintained that the border searches of

his electronic devices were "pretextual," "orchestrated," and, like Didani here, only

related to general law enforcement duties, not customs enforcement. *Id*. at *4. The

Court disagreed and reminded the defendant that "the Supreme Court has

repeatedly held that the validity of a search or seizure under the Fourth

Amendment does not depend on the subjective motivations of government

officials." *Id*. at *10.

Didani next claims that the border searches of his phones lacked the required

nexus to the border search exception's rationale. (ECF No. 53, PgID 298-301). He

relies on *United States v. Aigbekaen*, 843 F. 3d 713 (4th Cir. 2009). In *Aigbekaen*,

government officials conducted a forensic warrantless search of the defendant's

electronic devices and the Court was asked to determine if the good-faith

exclusionary rule applied. The Court concluded that even though the officers had

probable cause that Aigbekaen previously committed grave crimes in the United

States, the officers "suspicions were entirely unmoored from the government's

sovereign interests in protecting national security….blocking Aigbekaen's own entry, or excluding contraband." *Id*. at 721.

But Didani's case is distinguishable. CBP agents in this case did not conduct a border search of Didani's electronic devices based on Didani's prior criminal history. They did so after receiving a glut of information surrounding Didani's potential involvement in drug smuggling and money laundering. Among other information, CBP was aware of Didani's association with E.P. & A.S., his one-day trip to Colombia, his pattern of unusual flight activity leading up to his entry into the United States, and the discovery of images on his iPhone during a routine border search, which included images of shipping routes, bulk currency, the movement of money and firearms – all of which are evidence of contraband and evidence of cross-border offenses. CBP's suspicions not only relate directly to the border search exception, but they are also anchored to the government's interest in protecting national security, blocking Didani's own entry, and excluding contraband.

### C. The non-routine border search and seizure of Didani's cell phones in 2016 was based on reasonable suspicion

In August 2016, CBP discovered that Didani and E.P. made flight reservations to fly to Juarez, Mexico via the United States. On August 6, 2016, Didani flew into O'Hare International Airport in Chicago, Illinois. Upon entry, Didani was greeted by CBP Officer Robert Personett. Officer Personett referred

Didani to a secondary inspection and interview. At that time, CBP agents observed Didani to be in possession of an iPhone and Blackberry cellular telephone.

During the interview, CBP officers asked Didani about his suspicious travel. Didani told agents that he owned and operated a mineral company in Tirana, Albania. Yet, Didani was unable to identify an address of the company or provide a business card. CBP officers asked Didani about his numerous trips to Turkey in 2015. Didani claimed that the businesses in Turkey were his biggest customer. However, Didani was unable to identify the names of the businesses or provide evidence of doing business in Turkey.

CBP also conducted a routine border search of Didani's checked luggage and found seven vials of the Human Growth Hormone (HGH), Kigtropin (Somatropin)  In the United States, it is illegal to distribute or possess with the intent to distribute HGH for use in humans other than the treatment of a disease or other medical condition, where such use has been authorized by the Secretary of Health and Human Services and pursuant to the order of a physician. 21 U.S.C. § 333(e)(1). Furthermore, it is unlawful to knowingly smuggle or import HGH into the United States. 18 U.S.C. § 545; 21 U.S.C. § 381(d). HSI SA Nugent also conducted a brief manual review of Didani's iPhone and located an image of a shipping container with an arrow pointing to the floor of that container.

Didani was released but his iPhone, Blackberry, the HGH were not.  Officers

in Chicago detained the iPhone and Blackberry. Shortly thereafter, HSI SA Nugent mailed the devices to Agent Bianchi in Detroit to continue the border search. Eleven days later, United States Magistrate Whalen authorized a warrant for the forensic examination of both the iPhone and Blackberry.

Regardless of the search warrant, CBP had reasonable suspicion to believe both of Didani's phones contained evidence of contraband or cross-border offenses. CBP's reasonable suspicion assessment included Didani's suspicious travel patterns, the discovery of the container image during SA Nugent's initial routine border search, Didani's answers to interview questions, and the discovery of Didani's attempted importation of a prohibited substance into the United States.

Furthermore, CBP's formulation of reasonable suspicion was not limited to the vacuum of events that occurred on August 6, 2016. When Didani arrived in the United States thirteen months earlier, Didani was already the subject of multiple investigations that pertained to drug smuggling and money laundering. Furthermore, CBP was aware of Didani's one-day trip to Colombia, his association with convicted drug traffickers and suspected drug smugglers, and his pattern of unusual flight activity leading up to his entry into the United States. Moreover, CBP discovered images of shipping routes, firearms and bulk, banded U.S. currency on his iPhone during the routine border search in 2015. And investigators reviewed hundreds of images and videos during the forensic review of Didani's

iPhone from 2015. Among others, law enforcement found images of maritime container fee quoting, containers in port, the use of encrypted SkyECC cell phones, a note with names of shipping lines, vials of human growth hormone and other substances, firearms and countless images of bulk, high-denomination U.S. currency.

Based on a totality of circumstances, including information learned prior to 2015, information learned during the 2015 routine border search, images, and videos discovered during the 2015 non-routine, forensic search of Didani's iPhone, CBP officers had reasonable suspicion to detain Didani's iPhone and Blackberry on August 6, 2016 to conduct a non-routine border search.

Didani argues that the evidence from his iPhone and Blackberry should be suppressed because CBP detained the cellphones for 11 days in violation of their own policy. CBP border search policy at the time permitted detention of electronic devices for a brief, reasonable time to perform a thorough non-routine border search that ordinarily should not exceed 5 days. *CBP Directive 3340-049, Eff. August 2012.* But the policy also permitted additional detentions up to 15 days with Supervisory Approval. *Id.*

Didani banks on *United States v. Laynes*, 481 F. Supp 3d 657 (S.D. Ohio 2020). In *Laynes*, the District Court suppressed evidence because CBP failed to place the defendant's cellular phone into Airplane Mode in violation of their

policy[5]. Airplane mode is designed to turn off the device's connection to Wi-Fi or a cellular network preventing the device from retrieving or accessing information stored remotely so that the border search is limited to data on the device itself. *Laynes* at 666. In other words, the violation of CBP's policy was central to ensuring that contraband or evidence of contraband was present on the device itself.  As a result, the court concluded CBP's initial border search was unlawful. But *Laynes* did not hold that *any* violation of CBP policy requires suppression.

Absent a clear Fourth Amendment violation, Courts generally do not suppress evidence even when agents fail to comply with certain procedural requirements in Rule 41 and statutory violations that do not implicate constitutional rights, much less a violation of internal policy. See *United States v. Abdi*, 463 F.3d 547, 556 (2006); *United States v. Rutherford*, 555 F.3d 190, 196 (6th Cir. 2009). The Supreme Court has warned that "a rigid application of an exclusionary rule to every regulatory violation could have a serious deterrent impact on the formulation of additional standards to govern prosecutorial and police procedures." *United States v. Caceres*, 440 U.S. 741, 755-756 (1979). "Accordingly, exclusion based on a failure to follow regulatory procedure is only

---

[5] The requirement to place an electronic device into airplane mode did not exist at this time of the 2016 border search. It was not effective until January 4, 2018, some 17 months after the search at issue here. See CBP Directive 3340-049A, Eff. January 4, 2018

warranted if (1) the procedure is mandated by the Constitution or (2) the defendant reasonably relied on the procedure in governing his conduct". *United States v. Brown*, 2021 WL 3828797 (N.D. Ga. 2021) (citing *Caceres* at 749–53) (finding that CBP's failure to follow administrative rules governing the length of detention of cell phone seized during a border search did not warrant suppression of the phone evidence).

Didani has not shown that CBP's five-day policy was independently mandated by the constitution or that he reasonably relied to his detriment on CBP's policy. As a result, even if CBP detained Didani's cellular phones beyond the five-day timeframe without supervisory approval, which the government does not concede, suppression is not the appropriate remedy.

## V.    Conclusion

The government requests that the Court deny Ylli Didani's motion to suppress evidence.

Respectfully submitted,

DAWN N. ISON
United States Attorney

*s/Mark Bilkovic*
Mark Bilkovic
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, Michigan 48226
(313) 226-9623
mark.bilkovic@usdoj.gov

*s/Timothy P. McDonald*
Timothy McDonald
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, Michigan 48226
(313) 226-0221
timothy.mcdonald@usdoj.gov

Dated: January 13, 2023

## CERTIFICATE OF SERVICE

I hereby certify that on Friday, January 13, 2023, I electronically filed the

foregoing document with the Clerk of the Court using the CM/ECF system which

will send notification of such filing to the following:

Wade Fink, Esq.
Brian Kaplan, Esq.

s/*Timothy P. McDonald*
Timothy P. McDonald
Assistant United States Attorney