United States District Court
Eastern District of Michigan
Southern Division

United States of America,

                                        Case No. 21-cr-20264

v.

                                        Hon. Denise Page Hood
                                        United States District Judge

Ylli Didani,

          Defendant.

---

**GOVERNMENT'S SUPPLEMENTAL POST-HEARING BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS EVIDENCE (ECF No. 53)**

---

On April 24, 2023,  the Court conducted an evidentiary hearing on Defendant Ylli Didani's Motion to Suppress Evidence. (ECF No. 53). At the hearing, the government introduced ten exhibits and called three witnesses: United States Border Patrol (BP) Agent Joshua Bianchi, United States Customs and Border Protection (CBP) Supervisory Officer Matthew Parisi and United States Homeland Security Investigations (HSI) Special Agent Daniel Nugent. (ECF No. 77, PageID.532-821). At the conclusion of the hearing, the Court allowed the parties to file supplemental briefs. (*Id*., at 824; ECF No. 80, PageID.835).

1

As detailed below, the testimony of these witnesses established that the 2015 and 2016 routine border searches of Didani's cellphones required no level of suspicion. The testimony further established that law enforcement had reasonable suspicion to believe that the cellphones contained evidence of contraband or cross-border criminal activity. As a result, law enforcement's nonroutine border searches of Didani's cell phones were reasonable under the Fourth Amendment. Therefore, Didani's motion to suppress evidence should be denied.[1]

## I.    Factual Background

### A. The investigation of Didani prior to the 2015 border search

BP Agent Joshua Bianchi opened an HSI investigation into Didani in January of 2015. (ECF No. 77, PageID.544). At that time, Agent Bianchi was assigned to HSI Detroit as a Task Force Officer (TFO) and had received Title 19 cross-designation training, parts of which pertain to the authority to conduct border searches. (*Id.*, 541, 543). Agent Bianchi explained that he has been a Border Patrol agent for approximately 20 years; he had also been assigned as a Drug Enforcement Administration (DEA) TFO; and he had undergone immigration, criminal, and border search training. (*Id.*, 539-541).

---

[1] The government incorporates in its arguments here, the Government's Brief in opposition to Defendant's Motion to Suppress Evidence, filed on January 13, 2023. (ECF No. 65, PageID.450).

The investigation involved drug trafficking and money laundering and was

opened based on information that Agent Bianchi received from Border Patrol (ECF

No. 77, PageID.544-545). Specifically, in 2013 a security guard at a marina in St.

Clair Shores told Border Patrol that individuals were traveling on jet skis (from the

marina) to Canada. (*Id*., 545). These individuals were gone for a couple hours and

then returned to the marina leading Border Patrol to suspect this was related to

drug or money smuggling between Canada and the United States. (*Id*., 544, 545).

One of the names mentioned in this suspicious activity was E.P.[2] (*Id*., 546).

Agent Bianchi explained that E.P. had a conviction for cocaine possession

and felony firearm, had an arrest for cocaine trafficking and, at that time, was on

parole, having been recently released from prison. (ECF No. 77, PageID.547).

After learning about the suspicious activity, Agent Bianchi researched  E.P.'s

travel history and discovered E.P. made two trips to St. Maarten in 2014. Agent

Bianchi testified that this was unusual because both times, E.P. only spent one full

day in St Maarten before flying back to the United States. (*Id*., 549). Shortly

thereafter, E.P. and Didani flew to Columbia. (*Id*., 549, 550). Bianchi testified that

this travel was significant to him because Colombia is a "source country for

cocaine."  (*Id*., 550). Didani returned to the United States on the same day whereas

---

[2] To protect the privacy of individuals not charged with criminal violations, the
United States will refer to certain individuals by their initials, even though
witnesses at the 4/24/23 evidentiary hearing testified to their full names.

E.P. remained in Colombia for three or four days. (*Id.*, 550-551). Two months later, Didani and E.P. traveled together to Albania. (*Id.*, 555).

Agent Bianchi learned that Didani and E.P.'s airline reservations for the Columbia trip were made by a third party, H.H. (ECF No. 77, PageID.551). Agent Bianchi explained that he began to research H.H.'s background and learned that H.H. had been arrested for controlled substances and that he was running a business that was part of a large-scale narcotics investigation. (*Id.*, 552). In addition, Agent Bianchi examined records that showed H.H. was stopped entering the United States in 2008 with large amounts of cash. (*Id.*, 553, 594-595).

Agent Bianchi received information regarding suspicious activity involving H.H. and a vessel that occurred on the Detroit River. (*Id.*, 553-554). In July 2015[3], the United States Coast Guard (USCG) observed a vessel crossing the Detroit River from Canada. (*Id.*, 554). The USCG unsuccessfully attempted to interdict the vessel before it reached the United States, and eventually located the vessel at a marina. (*Id.*, 554, 555). At that time, the vessel had been already loaded on a trailer that was being towed by a vehicle that was  registered to H.H. (*Id.*, 555).

---

[3] The transcript appears to contain a transcription error or a misstatement by Agent Bianchi relative to the date of this incident. Agent Bianchi's memory was refreshed with his July 29, 2015 report. (ECF No. 77, PageID.595, Lines 18-20). Thereafter, according to the transcript, Agent Bianchi testified that the incident occurred on July 1, 2019. (*Id.*, Line 23). The accurate date is almost certainly July 1, 2015, since it is improbable that Agent Bianchi would draft a report on July 29, 2015, for an incident that occurred four years later.

While continuing to investigating Didani's background, Agent Bianchi learned that Didani was a citizen of Albania and a Lawful Permanent Resident of the United States. (ECF No. 77, PageID.556). He learned that Didani had multiple convictions for driving under the influence of alcohol, some of which were felonies. (*Id.*, 557). And in 2014, Didani was arrested for felony firearm and a controlled substance offense. (*Id.*). Agent Bianchi also reviewed Didani's travel history and discovered that between January 2015 and July 2015[4], although Didani made six international airline reservations, he only boarded two of the six flights. (*Id.*, 558). Agent Bianchi learned that Didani was released from prison for one of his convictions on July 3, 2007. (*Id.*, 561). Shortly thereafter, in 2008, Didani was part of a HSI and FBI joint task force investigation involving drug trafficking and money laundering.[5] (ECF No. 77, PageID.558-559). Agent Bianchi testified that the investigation involved a Detroit-based trucking company and individuals

---

[4] The transcript contains a second transcription error or misstatement by the government. The transcript indicates that Agent Bianchi was asked about Didani's travel between January 1, 2015, and January 30, 2015. (ECF No. 77, PageID.557, Lines 17-19). The accurate travel period is between January 1, 2015, and July 30, 2015, as Bianchi testified the travel was over a "seven-month span." (*Id.*, 558, Lines 8-9).

[5] Didani ridicules the government's assertion that he was being investigated in 2008 for drug trafficking, arguing that he was in prison in 2008. In his pleadings, Didani asks, "[h]ow exactly was he an international drug dealer from prison?" (ECF No. 70, PageID.506.). The answer as Agent Bianchi testified, is that Didani was not in prison in 2008. Instead, he was released from prison in July 2007.

suspected of moving cocaine and marijuana between the United States and Canada. (*Id.*, 559). Didani was suspected of hiring truck drivers for the company that was moving the drugs. (*Id.*, 560). During the investigation, agents conducted surveillance of Didani and recorded Didani talking to a law enforcement informant. (*Id.*, 560, 709-711); (See also: Gov. Exs. 7, 8, and 9 – Reports of the 2008 HSI/FBI investigation reviewed by Agent Bianchi). Given all this information, Agent Bianchi set up an alert in law enforcement databases where he would be notified should Didani travel into or out of the United States. (*Id.*, 561).

### B.  The 2015 border search of Didani's cell phone

In July 2015, Agent Bianchi received an alert that Didani had made reservations to fly into the United States at Chicago's O'Hare airport on July 30, 2015. (ECF No.77, PageID.562). As noted above, in July 2015, Agent Bianchi was employed with the U.S. Border Patrol but was assigned as a TFO to HSI Detroit, and the Didani investigation was opened through HSI. (*Id.*, 544, 563, 593). Agent Bianchi traveled to Chicago O'Hare to assist with Didani's interview. (*Id.*, 562). Once there, Agent Bianchi met with CBP Officer Fuentes, who was assigned to O'Hare airport. After Didani arrived, Officer Fuentes interviewed him in Agent Bianchi's presence. (*Id.*, 563).

During the interview, Officer Fuentes asked Didani the "normal stuff" – to see his passport; where he was going; his travel history; and where he lived. (ECF

No. 77, PageID.564). Agent Bianchi testified that Didani lied about his current residence and about E.P. owning a company. (*Id*., 564-565, 567-568). Didani also lied about his own ownership of a business in Michigan. (*Id*., 568). Bianchi found Didani's lies suspicious "because he was obviously trying to cover up, one, his home address and maybe how he was making money." (*Id*.). In addition, Didani was unable, or unwilling, to answer seemingly obvious questions: the last name of the groom whose wedding he was allegedly supposed to attend in Colombia; details of his travel to Turkey; and his uncle's name who, according to Didani, owned part of Didani's coal-mining business. (*Id*., 567-569).

On multiple occasions throughout the interview Didani went through his iPhone ostensibly to prove that he traveled to particular locations. (ECF No. 77, PageID.569). While doing this, Didani showed Agent Bianchi a picture of an individual nicknamed "Tiku" and claimed "Tiku" was trying to sell coal to him in Turkey. (*Id*., 570; Gov. Exhibit 1). However, Agent Bianchi recognized "Tiku" as A.S., who owned the trucking company that was the subject of the 2008 HSI and FBI drug smuggling investigation. (*Id*., 571).

Officer Fuentes then conducted a routine border search of Didani's iPhone and started manually scrolling through the iPhone photographs in Agent Bianchi's presence. (ECF No. 77, PageID.571). Didani had over 10,000 images. (*Id*., 572). According to Agent Bianchi, several of Didani's photographs were indicative of

7

cross-border criminal activity such as narcotics smuggling and money laundering.
(*Id.*, 572). For example, Agent Bianchi observed photos of Didani holding AR-
style rifles, a picture of a pistol on Didani's hip, a photograph depicting a duffel
bag full of a large amount of wrapped, U.S. currency and numerous photographs of
stacks of bundled U.S. currency. (*Id.*, 572, 583; Gov. Exs. 2, 3, 4 & 5). At that
point, Agent Bianchi requested that CBP officers conduct a nonroutine border
search, i.e., a forensic extraction of Didani's iPhone. (*Id.*).

Agent Bianchi testified that he requested the extraction based on the totality
of his investigation, not a singular piece of information. (*Id.*, 717). At the
conclusion of the extraction, CBP returned the iPhone to Didani and allowed him
to leave. (*Id.*, 573).

### C. The continued investigation of Didani prior to the 2016 border search of Didani's cell phone

Prior to Didani returning to the United States in August 2016, Agent Bianchi
had reviewed the extraction of Didani's iPhone from 2015. (ECF No. 77,
PageID.573). He reviewed all of the photographs and videos on the iPhone. (*Id.*).
The photographs and videos depicted "[a] lot of what appeared to be narcotics,
guns, currency. There was a video of someone snorting cocaine. There was another
picture of a pistol next to what appeared to be a small pouch of cocaine and
bundles of cash." (*Id.*, 574). One of these photographs depicted Didani standing in
a kitchen with four $5000 bundles and three $10,000 bundles of currency laid out

in front of him. (*Id*., 577-578, 583; Gov. Ex. 4). Agent Bianchi also recalled seeing

photos indicative of international shipping. (*Id*.). "There was shipping containers,

shipping lines, like they were researching ways to ship things." (*Id*.).

Agent Bianchi also explained that between May 19, 2015, and June 23,

2015, an individual named "D.L." sent five, separate wire transfers to Didani

totaling $23,322. (ECF No. 77, PageID.711-713). Agent Bianchi found this

suspicious because combined with the pictures on Didani's phone, his suspicious

travel history, and the fact that D.L., a previously convicted cocaine trafficker, was

wiring money in denominations under $10,000 to a person outside the United

States (Didani) that was suspected of being involved in a cocaine-smuggling

investigation. (*Id*., 667-670, 713). Agent Bianchi also testified that he observed

D.L. and Didani together in August 2015 at D.L.'s residence in Fraser, Michigan.

(*Id*., 713-714).

Agent Bianchi testified about his September 11, 2015 report that contained a

text message conversation between Didani and another individual with a drug

trafficking history. (ECF No. 77, PageID.715). In the text messages, Didani and

the individual discussed the apparent export of a new, $180,000 Corvette. (*Id*.,

715-716). Didani texted the individual, "once the car is out of the U.S. you don't

owe any money to anyone and you will get $10,000 when the deal is done." (*Id*.,

716). Agent Bianchi suspected that the pair were discussing the export of a stolen Corvette, or criminal activity involving the border. (*Id.*, 717).

### D.    The 2016 border searches of Didani's cell phones

In August of 2016, Agent Bianchi was alerted that Didani was flying into the United States from Italy. (ECF No. 77, PageID.586-587). According to his itinerary, Didani was traveling to Mexico City, but the trip required him to transit Chicago O'Hare on August 6, 2016. (*Id.*, 587, 588). Agent Bianchi also learned that E.P. was traveling to Mexico City on the same day. (*Id.*). After receiving the alert, Agent Bianchi contacted HSI Chicago Special Agent (SA) Daniel Nugent, and provided him a summary of the investigation into Didani, and asked SA Nugent that Didani be interviewed and searched upon his arrival. (*Id.*, 588, 589).

CBP Officer Matthew Parisi was assigned to Chicago's O'Hare Airport on August 6, 2016. (ECF No. 77, PageID.730). Officer Parisi testified that he has been with CBP for 11 years and he described his various assignments and extensive classroom and on-the-job border search training. (*Id.*, 721-730). Officer Parisi testified that he is the Acting Chief of Cargo and Air Operations at Chicago O'Hare but at the time of this incident was assigned to the Passenger Enforcement Rover Team (PERT). (*Id.*, 725, 730). He explained that the PERT handles "lookouts," or requests from federal law enforcement agencies to examine arriving international passengers upon their entry into the United States. (*Id.*, 723). These

requests are stored in a database called "TECS" and the database is a tool used by federal law enforcement to communicate. (*Id.*).

On August 6, 2016, Officer Parisi was assigned to Agent Bianchi's lookout of Didani. (ECF No. 77, PageID.731). Officer Parisi reviewed the TECS record and learned that Didani's lookout involved an ongoing, drug-related investigation. (*Id.*, 731). Officer Parisi testified that he and CBP Officer Leeker went to Didani's gate of arrival, located Didani, and detained his passport along with an Apple iPhone that Didani had on his person or in his carryon luggage. (*Id.*, 731-735). Although he did not recall this specific incident, Officer Parisi testified that when he would take an individual's cell phone, he would always place it in "Airplane Mode" to prevent the remote deletion of data. (*Id.*, 734). Officer Parisi and Officer Leeker then escorted Didani to the CBP's "primary inspection" area. (*Id.*, 735). This was not unique as Officer Parisi explained that all inbound, international passengers are required to pass through primary inspection to verify immigration status and ensure that they are lawfully permitted to enter the U.S. (*Id.*, 736-737). Didani also gave a binding declaration at the primary inspection booth. (*Id.*, 739). Officer Parisi did not recall if Didani declared any property or merchandise that he intended to bring into the United States. (*Id.*).

After the primary inspection of Didani was complete, Officers Parisi and Leeker retrieved Didani's checked luggage and proceeded to CBP's "secondary

inspection" area. (ECF No. 77, PageID.737-738). In this area, CBP obtained a

second binding declaration from Didani wherein he declared that he possessed

Human Growth Hormone (HGH). (*Id.*, 739). Officer Parisi testified that HGH is an

FDA-controlled substance, and regardless of Didani's declaration, it is illegal to

bring HGH through the international border. (*Id.*, 740). While searching Didani's

checked luggage CBP discovered seven vials of HGH and a Blackberry cell phone.

(*Id.*, 741). Officer Parisi seized the HGH and detained Didani's Blackberry, which

would not turn on. (*Id.*, 749 – 750; Gov. Ex. 6, August 6, 2016 Form 6051D).

Officers Parisi and Leeker then interviewed Didani. (ECF No. 77,

PageID.742, 746-749). Again, as was the case during his 2015 interview, Didani

was unable to answer obvious questions, including the address of  "US Mineral," a

company Didani claimed he owned; names of Turkish companies he did business

with, particularly since Didani claimed they were his biggest customer; and the

names or addresses of businesses he visited while in Turkey. (*Id.*, 747-748).

Ultimately, Officer Parisi seized the HGH and detained Didani's cell phones

under CBP's border search authority. (*Id.*, 749-750; Gov. Ex. 6, August 6, 2016

DHS Form 6051D, "Detention Notice and Custody Receipt for Detained

Property"). Officer Parisi testified that later that day, he transferred Didani's

phones to HSI Special Agent (SA) Daniel Nugent because "any time we find an

illegal substance we have to make a notification to HSI." (*Id.*, 749).

Officer Parisi testified that prior to this date he had conducted countless border inspections and searches. Based on his training and experience, Officer Parisi believed that reasonable suspicion existed to conducted a further border search of Didani's phones, particularly given Didani's attempt to smuggle HGH into the United States. (*Id.*, 752).

HSI Chicago SA Daniel Nugent testified that on August 6, 2016, he was assigned to Chicago O'Hare Airport as the duty agent. (ECF No. 77, PageID.793). As the duty agent, he was required to respond to the airport in the event CBP seized contraband. (*Id.*, 794). He was also expected to respond to the airport to handle requests for assistance from other offices around the country. (*Id.*). SA Nugent testified that prior to August 6, 2016, HSI Detroit Agent Josh Bianchi provided him information about Ylli Didani. (*Id.*, 794-795). Agent Bianchi explained to him that HSI Detroit was investigating Didani for drug smuggling or drug trafficking and that Didani was scheduled to fly into Chicago O'Hare on August 6, 2016. (*Id.*). "The task force officer in Detroit, Bianchi, asked that Mr. Didani have a secondary inspection conducted at the port of entry." (*Id.*, 795).

When SA Nugent arrived at the airport on August 6, 2016, he spoke to Officer Parisi. (ECF No. 77, PageID.796). Officer Parisi explained that CBP located HGH inside Didani's luggage and had also conducted a standard secondary inspection interview. (*Id.*). Officer Parisi also provided Didani's detained cell

phones to SA Nugent; an iPhone and a Blackberry. (*Id*., 797). SA Nugent

conducted a cursory inspection of one of the phones. (*Id*.). "Just a brief search like

photographs stored inside. Nothing intrusive, nothing where we hooked up

technology to it to dump the phone." (*Id*.). During this routine (border) search, SA

Nugent observed "a photograph of a hand-drawn picture of what appeared to be a

cargo container with a raised floor and an arrow pointing, I believe, to the raised

floor." (*Id*., 798; *See also,* Defendant's Ex. 1, Pg. 5, photograph of similar

drawing). Nugent found the image significant because "drug smuggling occurs

inside containers with raised floors." (*Id*.).

SA Nugent testified that he stopped searching Didani's phone after

discovering this image "[b]ecause I saw what may have been evidence of a crime."

(ECF No. 77, PageID.800-801). Nugent then detained Didani's phones and sent

them, via FedEx to HSI Detroit. (*Id*.; Gov. Ex. 6). SA Nugent also believed that

reasonable suspicion existed to warrant a further forensic search of Didani's phone.

(*Id*., 802). "I believe that because of what was found on the phone, the totality of

the circumstances, I guess, what was found on the phone, what was found in his

luggage, and the fact that he was under investigation for drug smuggling or drug

trafficking." (*Id*., 802-803).

After the encounter, SA Nugent informed Agent Bianchi about the HGH

seizure and the interview of Didani. (ECF No. 77, PageID.590-591, 797-798). On

14

August 15, 2016, Agent Bianchi took possession of Didani's cell phones. (Gov.

Ex. 6). Agent Bianchi testified that he was familiar with HSI/ICE border search

policy at the time, which permitted detention of the device for up to 30 days.[6] (*Id.*,

593; Gov. Ex. 11, ICE Border Search Policy). On August 17, 2016, well within

that 30-day period, Agent Bianchi obtained a federal search warrant for the phones

in the Eastern District of Michigan. (*Id.*, 593-594).

## II. Argument

### A. Law Enforcement was authorized to conduct routine border searches of Didani's cell phones when entered the United States.

As Didani acknowledges (ECF No. 53, PageID.297), when he arrived in the

United States in 2015 and 2016, law enforcement did not need any degree of

suspicion to conduct a routine border search. *United States v. Ramsey*, 431 U.S.

606, 619 (1977). This includes scrolling through a cell phone to view its contents.

*United States v. Kolsuz*, 890 F. 3d 133, 139-140 (4th Cir. 2018). Further, as the

Sixth Circuit has held, the border-search exception extends to computers and other

electronic media, permitting routine suspicionless searches of those items at the

international border, even where the search continues into the following day.

*United States v. Stewart*, 729 F.3d 517, 525–26 (6th Cir. 2013).

---

[6] Special Agent Nugent also confirmed that HSI/ICE Border Search Policy applied once he received Didani's electronic devices from CBP. (ECF No. 77, PageID.804-805; Gov. Ex .11).  Under that policy, HSI is permitted to detain an electronic device for up to 30 days to conduct a border search. (*Id.*, 804).

**B. Law enforcement had reasonable suspicion to perform nonroutine border searches of Didani's phones in 2015 and 2016.**

Based on the totality of circumstances, law enforcement had reasonable suspicion to conduct nonroutine searches of Didani's phones in 2015 and 2016. In 2015, prior to law enforcement conducting a nonroutine border search (i.e., a forensic extraction) of Didani's iPhone, Agent Bianchi was aware of the following:

- In 2013 a security guard at a marina in St Clair Shores reported suspicious activity to Border Patrol leading Border Patrol to believe that the suspicious activity involved drug or money smuggling between Canada and the United States. (ECF No. 77, PageID.544-545).

- E.P. was identified as one of the individuals involved in suspicious activity. (*Id.,* 546).

- E.P. had a criminal history involving convictions for cocaine possession, and felony firearm, and an arrest for drug trafficking. (*Id.,* 547).

- E.P. made several international trips with Didani, including travelling to Columbia – a source country for cocaine. (*Id.*, 549, 550).

- E. P. and Didani's airline reservations were made by a third party, H.H. (*Id.*, 551).

- H.H. had a prior arrest involving controlled substances and was running a business that was part of a large-scale narcotics investigation. (*Id.*, 552).

- In July 2015, the USCG attempted to interdict a suspicious vessel crossing the Detroit River from Canada to the United States. When the USCG located the vessel, it had been loaded onto a trailer being towed by a vehicle owned by H.H. (*Id.*, 553-555).

- In a seven-month span in 2015, Didani made six international airline reservations but only boarded two of the six flights. (*Id.*, 558).

- Didani was part of a 2008 HSI and FBI drug trafficking and money laundering investigation into a Detroit-based trucking company. (*Id.*, 558-559).

- Didani was suspected of hiring drivers for that company to transport drugs. (*Id.*, 560).

- When Didani was interviewed by Officer Fuentes, he lied about his current residence. (*Id.*, 564-565).

- During the interview, Didani lied about E.P.'s occupation. (*Id.*, 567-568).

- During the interview, Didani lied about his ownership of a business in Michigan. (*Id.*, 568).

- Didani was unable to provide the last name of the groom whose wedding he was supposed to attend in Columbia. (*Id.*, 566-567).

- Didani was unable to provide his uncle's name even though according to Didani, his uncle was a part owner of Didani's purported coal mining business. (*Id.*, 558-569).

- The person Didani identified in a photograph on his phone ("Tiku") as a coal salesman from Turkey was in fact, an individual Agent Bianchi knew owned the same trucking company that was the subject of the 2008 HSI and FBI drug trafficking and money laundering investigation involving Didani.  (*Id.*, 569-571).

- During the routine border search of Didani's cell phone, Agent Bianchi noticed photographs that were indictive of narcotics smuggling and money laundering. (*Id.*, 572).

- Agent Bianchi noticed a photograph of Didani holding an AR-style rifle. (*Id.*; Gov. Ex. 2).

- Agent Bianchi noticed numerous photographs of bundled U.S. currency. (*Id.*; Gov. Ex. 4).

- Agent Bianchi noticed a photograph depicting a duffel bag full of wrapped U.S. currency. (*Id*.; Gov. Ex. 5).

Again, it was only after having knowledge of all these facts, that a nonroutine search of Didani's iPhone was conducted. These facts were more than enough to provide Agent Bianchi with some particularized grounds for suspecting that Didani's cell phone contained evidence of criminal activity involving the border. *United States v. McCallister*, 39 F.4th 368, 373–74 (6th Cir. 2022); *United States v. Soboonchi*, 990 F. Supp 2d 536 (D. Mary. 2014) *referencing Montoya de Hernandez,* 473 U.S. at 541–42, (quoting *United States v. Cortez,* 449 U.S. 411, 417 (1981). Furthermore, Agent Bianchi was "entitled to assess the facts in light of his experience…." *United States v. Brignoni–Ponce,* 422 U.S. 873, 884–85 (1975).

In August 2016, Didani's cell phones were again detained for a nonroutine border search. By the time SA Nugent detained Didani's phones and sent them to Agent Bianchi so that a nonroutine border search of the cell phones could be conducted, the information law enforcement was armed with was even more overwhelming than was the case in 2015, when the first nonroutine search occurred. In addition to all the information Agent Bianchi was aware of in 2015, by the time Didani's cell phones were detained in August 2016 for a nonroutine border search, the following had occurred:

18

- During a one-month span in 2015, D.L., a convicted cocaine trafficker, sent five wire transfers to Didani totaling $23,322. (*Id.*, 711-713).

- Didani illegally brought HGH into the United States. (*Id.*, 739-741).

- During the August 2016 an interview with Officer Parisi, Didani was unable to provide the address of a mineral company that he claimed he owned. (*Id.*, 747-748).

- During the interview, Didani was unable to provide the names or addresses of businesses he claimed he visited while in Turkey. (*Id.*, 747-748).

- During the routine border search of Didani's cell phone, SA Nugent noticed a hand drawing of a cargo container with a raised floor, which SA Nugent thought was significant because oftentimes drugs are smuggled inside containers with raised floors. (*Id.*, 798).

- The image SA Nugent saw was so significant to him that he immediately stopped searching Didani's phone after viewing the image because he believed "he saw what may have been evidence of a crime." (*Id.*, 800-801).

And these facts don't include what was recovered from Didani's cell phone during the 2015 nonroutine border search. If the Court believes Agent Bianchi had reasonable suspicion to perform a nonroutine border search in 2015, the Court can also consider the following facts in determining whether there was reasonable suspicion to conduct a nonroutine border search of Didani's phones in August 2016:

- Didani's phone contained a video of someone snorting cocaine. (*Id.*, 574).

- Didani's phone contained a photograph depicting a handgun next to suspected cocaine and bundles of cash. (*Id*.).

- Didani's phone contained photographs of shipping containers and shipping lines. (*Id*.).

- Didani's phone contained a text message conversation between Didani and an individual with a drug trafficking history where they discussed the export of a new, $180,000 corvette. (*Id*., 715-716).

- Didani texted the individual, "once the car is out of the U.S. you don't owe any money to anyone and you will get $10,000 when the deal is done." (*Id*., 716).

- Agent Bianchi suspected that the pair were discussing the export of a stolen Corvette, or criminal activity involving the border. (*Id*., 717).

Again, these facts were more than enough to provide Agent Bianchi with some particularized grounds for suspecting that Didani's cell phone contained evidence of criminal activity involving the border. *McCallister*, 39 F.4th at 373-374. While Didani wants this Court to look at each one of these facts in isolation, the assessment of whether there was reasonable suspicion is to be made in light of "the totality of the circumstances" and the complete picture "must be taken into account." *United States v. Cortez*, 449 U.S. 411, 417 (1981). The Supreme Court has even cautioned against the type of isolated facts argument Didani makes here stating, "even when factors considered in isolation from each other are susceptible to an innocent explanation, they may collectively amount to a reasonable suspicion." *United States v. Berber-Tinoco*, 510 F.3d 1083, 1087 (9th Cir. 2007)

Didani also takes issue that it took law enforcement 11 days to obtain a search warrant for his cell phones after the cell phones were detained on August 6, 2016. To support his argument, he cites a CBP policy which generally permits detention of an electronic device for five days. (ECF No. 53, PageID.297). However, as was made clear during the evidentiary hearing, the August 2016 detention of Didani's cell phones fell under ICE/HSI policy– not CBP policy. Officer Parisi testified that on August 6, 2016 (the day the cell phones were detained), in accordance with CBP policy, he transferred the phones to HSI custody. (ECF No. 77, PageID.749). At the time, ICE/HSI border search policy permitted the detention of electronic devices for up 30 days. (ECF No. 77, PageID.803-804; Gov. Ex. 11). And Agent Bianchi obtained a federal search warrant for Didani's phones on August 17, 2017, well within the 30 days.

Knowing that he was caught flat-footed here, Didani attempts to argue that the government should be precluded from arguing that ICE/HSI policy applies because the government earlier argued CBP policies applied. However, the government's argument was in response to Didani's initial argument that CBP policy applied. (ECF No. 53, PageID.297-298).  Furthermore, Didani specifically requested an evidentiary hearing to better understand "precisely what happened at the border…" (ECF No. 53, PageID.306). And while preparing the witnesses for the hearing, and to get a better understanding of "precisely what happened at the

border," government counsel became aware that the witnesses were required to operate under ICE/HSI policy once the cell phones were transferred to HSI custody.  The government then obtained the ICE/HSI policy (which Didani also could have obtained at any time considering it is available on the Internet) and provided it to Didani. So, prior to the evidentiary hearing, Didani was aware that the government's position was the HSI policy controlled. And the testimony from the witnesses at the evidentiary hearing confirmed that.

Furthermore, as the government initially argued, even if there was a violation of policy, suppression is not warranted. Suppression of evidence based on a failure to follow regulatory procedure is only warranted if (1) the procedure is mandated by the Constitution or (2) the defendant reasonably relied on the procedure in governing his conduct". *United States v. Brown*, 2021 WL 3828797 (N.D. Ga. 2021) (citing *United States v. Caceres*, 440 U.S. 741, 749-753 (1979) (finding that CBP's failure to follow administrative rules governing the length of detention of cell phone seized during a border search did not warrant suppression of the phone evidence).

So, whether the witnesses were required to proceed under ICE/HSI or CPB policy, the result is the same. The evidence should not be suppressed.

### C. A nonroutine search of a cell phone does not require a search warrant based on probable cause.

Now for the first time, Didani argues that a nonroutine border search requires a search warrant issued on probable cause. To do so, he relies on *United States v. Smith*, 2023 WL 3358357, at *4-11 (S.D.N.Y. May 11, 2023). However, *Smith* is an outlier and is not binding upon this Court. And the ruling in *Smith* is against the great weight of authority. "Every circuit that has faced this question has agreed that *Riley* does not mandate a warrant requirement for borders searches of electronic devices, whether basic or advanced." *Alasaad v. Mayorkas,* 988 F.3d 8, 17-18 (1st Cir. 2021). See also: *United States v. Vergara*, 884 F.3d 1309, 1312-1313 (11th Cir. 2018); *United States v. Aikbekaen*, 943 F.3d 713, 719 n.4 (4th Cir. 2019); *United States v. Molina-Isidoro*, 884 F.3d 287, 298 (5th Cir. 2018); *United States v. Wanjiku*, 919 F.3d 472, 481 (7th Cir. 2019) (citing *Montoya de Hernandez*, 473 U.S. at 541., "The highest standard that has been applied by the Supreme Court at the border is reasonable suspicion."); *United States v. Xiang*, 67 F.4th 895, 900-901 (8th Cir. 2023) ("Many of our sister circuits have distinguished between "routine" and "non-routine" border searches of electronic devices. Most have concluded that a seizure at the port of entry, followed by a forensic or "advanced" search, particularly if time consuming and conducted away from the port of entry, becomes a non-routine border searches requiring some level of reasonable, individualized suspicion, but not probable cause or a warrant.").

And while the district court in *Smith* held that a search warrant was required, the court there also denied the motion to suppress the cell phone evidence holding that the nonroutine search border search of the cell phone fell under the good faith exception to the exclusionary rule. *Smith*, at \*12. "[G]iven the historic breadth of the 'border search exception' a reasonable government agent could have a good faith belief that that such a search …was permissible absent Supreme Court or Third Circuit precedent to the contrary." *Id.,* \*13. So even if *Smith* applied here, the agents here also acted in good faith. There *is* no contrary Supreme Court or Sixth Circuit precedent that could have possibly put the agents on notice that a search warrant based on probable cause was required. Therefore, it cannot be reasonably argued that the agents "deliberately, recklessly, or with gross negligence" disregarded Didani's Fourth Amendment rights. *Davis v. United States*, 564 U.S. 229, 240 (2011). Absent such a showing, the exclusionary rule is not an appropriate remedy.

## III. Conclusion

As Didani admits, there is no level of suspicion required before law enforcement can perform a routine border search of electronic devices. Therefore, the routine border searches of Didani's cell phones in 2015 and 2016 were proper.

Considering all the information Agent Bianchi became aware of during his investigation, combined with the multiple lies Didani told during the 2015

secondary inspection interview, and the photographs found on Didani's cell phone during the 2015 routine inspection, Agent Bianchi had more than reasonable suspicion to perform a nonroutine search of Didani's cell phone.

Likewise, considering the additional information law enforcement became aware of between the 2015 and 2016 encounters, combined with Didani's evasiveness during the 2016 secondary inspection, his possession of an illegal controlled substance, and the discovery during the 2016 routine inspection of a handwritten drawing on Didani's cell phone depicting a container with raised floor, Agent Bianchi had particularized grounds to suspect that Didani's cell phone contained evidence of criminal activity.

Therefore, Didani's motion to suppress evidence obtained from his cell phones should be denied.

Respectfully submitted,

DAWN N. ISON
United States Attorney

s/Mark Bilkovic
Mark Bilkovic
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, Michigan 48226
(313) 226-9623
mark.bilkovic@usdoj.gov

s/Timothy P. McDonald
Timothy P. McDonald
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, Michigan 48226
(313) 226-0221
timothy.mcdonald@usdoj.gov

July 3, 2023