UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**UNITED STATES OF AMERICA,**

    **Plaintiff,**

v.

**YLLI DIDANI,**

    **Defendant.**

_____/

CASE NO. 21-20264

HON. DENISE PAGE HOOD

## ORDER DENYING MOTION TO SUPPRESS and MOOTING MOTION FOR EVIDENTIARY HEARING (ECF No. 53)

**I.     BACKGROUND**

An Indictment was filed against Defendant Ylli Didani on April 21, 2021 alleging one count of Conspiracy to Distribute Controlled Substances of five kilograms or more of cocaine in violation of 21 U.S.C. §§ 841(a)(6) and 846, and a Forfeiture Allegation.  (ECF No. 1) On March 16, 2022, a Superseding Indictment was filed charging Didani with:   Count One – Conspiracy to Distribute Controlled Substances, 21 U.S.C. §§ 841(a)(1) and 846; Count Two – Conspiracy to Possess with Intent to Distribute and Distribute a Controlled Substance on Board a Vessel Subject to the Jurisdiction of the United States, 46 U.S.C. §§ 70503(a) and 70506(b), 21 U.S.C. § 960(b)(1)(B); and Count Three – Conspiracy to Launder Monetary Instruments, 18 U.S.C. § 1956(h).  The Superseding Indictment (ECF

No. 38) alleges that no later than July 30, 2015 through 2020, in the Eastern District of Michigan and elsewhere, Didani and others known and unknown conspired to finance and distribute controlled substances. They used residences in this District to plan their accumulation and distribution of controlled substance transactions. Didani and others utilized automobiles, aircraft, and other means of transportation for purposes of obtaining and distributing controlled substances. As part of the conspiracy, Didani and others planned to have a container (torpedo) designed, capable of holding large quantities of cocaine, that would be used to transport cocaine across waterways.

Based on information from the Immigration and Customs Enforcement (ICE) in Detroit regarding various contraband and possible counterfeit money, on July 30, 2015, Didani was stopped upon his arrival from his homeland Albania at Chicago's O'Hare International Airport. Customs Border Patrol (CBP) performed a border search of Didani's cell phones. Didani provided passcodes after the phones were seized. After questioning Didani about the contents in his phone, he was released.

On August 6, 2016, Didani arrived at O'Hare from Albania. CBP officials again referred him for a secondary inspection and interview. CBP was provided the passcodes to two phone he was carrying, an iPhone and BlackBerry. In

addition, agents later sought a warrant because at least one of the phones had encryption software that impeded their ability to access the contents. Didani asserts that the border search exception does not apply to the searches because the searches of his phones were too intrusive and had no nexus to the exception's rationale.

This matter is before the Court on Defendant's Motion to Suppress Cell Phone Evidence (ECF No. 53, 10/19/22). Responses and supplemental briefs were filed and an evidentiary hearing was held where testimony of three witnesses was taken.

## II. EVIDENTIARY HEARING

### A. Joshua Bianchi

Joshua Bianchi, a Homeland Security Investigations (HSI) agent with the United States Border Patrol, opened an investigation on Didani in January 2015 after recieving information from Border Patrol about a 2013 suspicious activity of possible drug trafficking at a marina in St. Clair Shores, Michigan. A security guard at the marina reported that jet skis were used to go to Canada for a couple of hours before returning to the marina. Bianchi investigated Eric Puzio who was attached to the marina activity. Puzio was previously arrested for cocaine trafficking; was convicted for cocaine possession and felony firearm. He was

released on parole in October 2013. If Puzio were to travel outside the United States, Bianchi would be notified.

Early in 2014, there were two times Puzio traveled to St. Maarten. These trips were suspicious because travel arrangements were made the day before and Puzio stayed at St. Maarten only one or two days at a time. Puzio also traveled to Colombia in August 2014, with Didani as his travel companion. On that trip, Didani returned the same day, while Puzio stayed in Colombia three to four days. Bianchi testified that Colombia is known as a source of cocaine.

The arrangements for the Colombia trip were made four days prior to the trip by Hussein Hussein from Detroit, who was not a travel agent. Bianchi investigated Hussein who had a controlled substance arrest and was part of a large-scale narcotics investigation. Border records revealed that Hussein was entering the United States with large amounts of cash. Hussein was tied to suspicious activity at the Detroit River involving a vessel that came over from Canada. The Coast Guard tried to stop the vessel, but the vessel was loaded up on a trailer pulled by a truck and took off. The truck that hauled the vessel was registered to Hussein.

Bianchi testified that Puzio and Didani traveled to Albania together in 2014, but did not return together. Didani is a permanent resident of the United States

and a citizen of Albania. Didani has multiple convictions for driving under the influence and other felonies. Didani was found not guilty on controlled substance and weapons charges in 2014. Didani's travel history between January 1, 2015 to January 30, 2015 included six reservations for international travels, of which Didani was on board for two flights, but not on the other four reservations.

Bianchi testified that his investigation revealed that Didani was released on July 3, 2007 from the Michigan Department of Corrections. Didani was part of a previous drug investigation in 2008. A joint task force between the HSI and the Federal Bureau of Investigation (FBI) was investigating a trucking company going in and out of Canada and Detroit involving marijuana and cocaine and money laundering. There were recorded phone calls involving Didani.

In July 2015, Bianchi received information that Didani was flying into the United States entering via the Chicago O'Hare airport. Bianchi notified Customs and Border Patrol (CBP) at Chicago O'Hare to set up an interview. Bianchi went to meet Didani at O'Hare on July 30, 2015. Bianchi met with CBP Officer Fuentes and went over the information that he had on Didani. Another CBP agent escorted Didani to the interview and Fuentes began interviewing Didani in the presence of Bianchi. The interview was "laid back." Didani was joking around, indicating he gets stopped every time he comes into the United States. Didani was

asked normal questions, to produce his passport, where he was going, his travel history, and where he lived. He said he lived on Sabre Lane, but Bianchi knew this was not true based on his research. Didani indicated he traveled to many different places for vacation, like the Maldives Island and Germany, and to Dubai for a Drake concert. He indicated he was a part owner of a coal business with his uncle in Albania and that he traveled many times to Istanbul, Turkey for the business. Bianchi asked about the many reservations that Didani made, but then did not travel. Didani indicated that things kept coming up and he had to push off the reservations. When asked about the Colombia trip, Didani indicated he was back the same day because he was not allowed admission into Colombia. Didani indicated he went to Colombia for the wedding of "Paul" whose last name Didani did not know.

Didani told Bianchi that he owned a car wash in Fraser, Michigan, named DES Detailing. Didani noted that his friend Puzio owned a trucking company with six or seven trucks. Bianchi indicated that his research on Puzio was that he did not own a company or business, nor did he own a truck. Bianchi also stated that Didani did not own any business in Michigan. All the misrepresentations by Didani were suspicious to Bianchi because he believed Didani was covering up his home address and how he was making money. Fuentes asked Didani about his

6

travels to Istanbul and the coal business, but Didani did not provide any information about his uncle, with whom he claimed he was in business.

During the interview, Didani went through his iPhone to support his answers, like the pictures of his business meeting in Istanbul with a man named Tiku. He showed pictures of friends in a bar in Albania and photos of a Drake concert. Bianchi recognized the picture of the man in Istanbul as Adriatic Sheko who was part of a 2008 investigation for drug smuggling and who owned a trucking company.

Fuentes eventually asked Didani if he could look at his phone and the pictures. Didani gave him the phone. Fuentes scrolled through the phone where he saw what appeared to be AR-style rifles and pistols Didani was holding. There was a picture of a duffel bag full of large amounts of U.S. Currency that was wrapped in cellophane. There were many photos of U.S. Currency bundled up. Bianchi indicated the photos showed criminal activity, like cross-border criminal narcotics activity including smuggling of narcotics and money laundering. There were over 10,000 photos so Fuentes and Bianchi did not have enough time to go through the information on the phone since Didani had a connecting flight. Bianchi asked the CBP if they had the capabilities to extract the phone, which they did and so a forensic extraction was done on Didani's iPhone.

Bianchi later reviewed the photos and videos on Didani's phone. There were photos of narcotics, guns, currency, someone snorting cocaine and bulk U.S. Currency. There were photos of shipping containers, shipping lines of international shipping. Bianchi identified Exhibit 1 as a picture he saw at the interview with Didani of Didani talking to Sheko. Bianchi identified Exhibit 2 as a photo of Didani holding an AR-style rifle, which Bianchi saw when Didani was scrolling through the phone at the airport. Exhibit 3 is a photo of Didani on top of a four-wheeler with a pistol on his hip, which was one of the photos Bianchi saw while Fuentes was scrolling through Didani's phone. A photo of Didani standing in a kitchen with eight stacks of bulk currency in front of him was identified by Bianchi as a photo he saw while scrolling through the phone marked as Exhibit 4. Bianchi identified Exhibit 5 as a large amount of currency wrapped in cellophane inside a black duffel bag which he observed when Fuentes was scrolling through Didani's phone. Bianchi testified that after reviewing the photos and available apps on Didani's phone for over a year, his suspicions were heightened. On cross-examination, Bianchi recalled five wire transfers amounting to $23,000 from Don Larsen to Didani which was on Bianchi's September 11, 2015 Report.

In August 2016, Bianchi received information that Didani was flying into the United States via the Chicago O'Hare airport. Bianchi believed Didani was

flying from Albania, to Rome, to Chicago, then to Mexico. Bianchi also received an alert that Puzio was traveling from Detroit to Mexico City on the same date. Bianchi was on leave at that time and so he requested that Special Agent Daniel Nugent in Chicago meet Didani in Chicago. Bianchi summarized the investigation of Didani. Bianchi requested that while Didani is at O'Hare, he should be searched and interviewed.

Bianchi later received information from Nugent as to Didani's cellphone and Blackberry, and illegal steroid found on Didani. Didani's phone and Blackberry were seized in Chicago on August 6, 2016, which were later forwarded to Bianchi in Michigan. The ICE retention policy for cell phones is 30 days. Bianchi identified Exhibit 6, a chain of custody form, with Bianchi's signature of August 15, 2016 and August 26, 2016. A search warrant at the Eastern District of Michigan, was obtained, to search the iPhone and Blackberry on August 17, 2016.

### B. Matthew Parisi

On August 6, 2016, Matthew Parisi was employed with the CBP at O'Hare airport, as a Passenger Enforcement Rover Team (PERT) officer. The day to day operations of PERT included looking at a "board" where there is a list of "lookout" passengers. A supervisor may also assign the PERT officer to a certain "lookout" passenger. The PERT officer then reviews the reason for what an agent is actually

looking for on a particular passenger. On August 6, Parisi met Didani at the plane upon arrival before the door opened. There are two "lookout" officers when meeting a passenger and Officer Leeker was with Parisi that day. Didani was part of an ongoing drug related investigation. The officers positively identified Didani, looked at his passport, took his cellular device, an Apple iPhone, and placed it on airplane mode pursuant to policy to prevent any deletion of data and contact with others. Didani was arriving from Rome, Italy and was not handcuffed. Didani was taken to the primary inspection officer who positively identified Didani. His passport was then swiped for history and Didani's immigration status was verified. Didani's checked in baggage was retrieved, then Didani was taken to secondary inspection. The secondary inspection area was a place to check the luggage and person. Didani declared he possessed human growth hormone at secondary inspection. His luggage was searched and seven vials of HGH were found and seized. HGH is unlawful.

Parisi wrote a report of the encounter identified as Exhibit 10. He does not remember the details of the encounter. The Report indicated that Didani was on his way to Mexico. Didani's his cell phone was detained, but not seized. Didani was not arrested at that time. Parisi also filled out a form 6051D, identified as Exhibit 6.

### C. Daniel Nugent

On August 6, 2016, Daniel Nugent was the duty agent with HSI at Chicago O'Hare. His duties at that time included investigating narcotics smuggling. HSI frequently received calls from CBP for seizures at mail units, at O'Hare, and other requests. Bianchi, from the HSI in Detroit, informed HSI at O'Hare that Didani was coming into O'Hare and requested a secondary inspection at the port of entry. Nugent arrived during inspection of Didani after HGH was located. Didani had two cell phones, an iPhone and a Blackberry. Nugent did not recall whether he was present for Didani's interview during the secondary inspection. Nugent conducted a cursory inspection of one of the phones, and briefly searched the photos section. Nugent could not remember whether he looked at the iPhone or the Blackberry. One of the photographs Nugent saw was a photograph of a handwritten picture of a cargo container and with a raised floor. It was significant to Nugent because he was familiar with how drugs are hidden in cargo containers. Nugent stopped searching the phone. The phone and the Blackberry were then sent to Detroit via Federal Express, with a Form 6051D. Nugent testified that the HSI Border Searches policy in 2016, identified as Exhibit 11, "Border Search Memorandum for Electronic Devices," was followed. The policy allowed HSI to keep the phones for 30 days. Nugent could not recall why he stopped looking at

11

the photos. He sent the phones to the investigating agent in order for the agent to make a determination on how to proceed with the border search or whether to obtain a search warrant. Nugent testified that Didani was released without his phones and was not charged with the HGH possession.

D.   **Motion to Suppress**

Under the Fourth Amendment, searches and seizures "conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established... exceptions." *Katz v United States*, 389 U.S. 347, 357. The "border-crossing exception," searches of people and their property at the borders, are per se reasonable, meaning that they typically do not require a warrant, probable cause, or even reasonable suspicion. *United States v. Stewart*, 729 F.3d 517, 524 (6th Cir. 2013). This exception authorizes only searches and seizures that are "routine," *United States v. Ramsey*, 431 U.S. 606, 619 (1977), and not "highly intrusive." *United States v. Flores-Montano*, 541 U.S. 149, 152 (2004). Simply put, "at a border or its functional equivalent, like an international airport[,] government agents may conduct routine searches and seizures of persons and property without a warrant or any individualized suspicion." *United States v. Aigbekaen*, 943 F.3d 713, 720 (4th Cir. 2019) (internal punctuation omitted;

12

emphasis added). The Sixth Circuit has also stated that a "routine border search of a laptop computer is not transformed into an 'extended border search' simply because it is transported twenty miles beyond the border and examined within twenty-four hours of the initial seizure." *United States v. Stewart*, 729 F.3d 517, 525 (6th Cir. 2013) "The Court has characterized such searches as per se reasonable[.]" *Stewart*, 729 F.3d at 525. Congress has passed legislation stating that "[i]n the course of conducting a customs examination, property remains in the custody of CBP and may be tested off-site by private testing or by CBP until 'cleared' for entry." *Id.* (citing 19 U.S.C. § 1499(a)(1), (a)(2)(B), (b)(1-3), and (c)(1)).

Didani urges this Court to extend the holding in the Supreme Court case of *Riley v. California*, 573 U.S. 373 (2014) requiring a warrant before search of cell phone data absent exigent circumstances. In *Riley*, the Supreme Court recognized that modern cell phones contain and may reveal "the privacies of life," and the fact that technology now allows an individual to carry such information in his hand does not make the information any less worthy of the protection under the Fourth Amendment. *Id*. at 403. The Supreme Court held that police must obtain a warrant before searching a cell phone seized incident to an arrest. *Id*. *Riley* did not involve a border search incident. The Eleventh Circuit has recognized that

13

"*Riley*, which involved the search-incident-to-arrest exception, does not apply to searches at the border." *United States v. Touset*, 890 F.3d 1227, 1234 (11th Cir. 2018). *See also United States v. Cano*, 934 F.3d 1002, 1015 (9th Cir. 2019) (noting that this difference is "critical.").

Didani has not presented binding case law which extends the warrant requirements to a border search or otherwise overrules the Sixth Circuit's holding in *Stewart*. As the Sixth Circuit noted in *Stewart*, the Supreme Court "has recognized a broad exception to the Fourth Amendment's requirement of probable cause or a warrant for searches conducted at the border because '[t]he Government's interest in preventing the entry of unwanted persons and effects is at its zenith at the international border.'" *Stewart*, 729 F.3d at 524 (quoting *Flores-Montano*, 541 U.S. at 152). Warrantless border searches are justified "pursuant to the long-standing right of the sovereign to protect itself by stopping and examining persons and property crossing into this county." *Ramsey*, 431 U.S. at 616. The warrantless border search predates the Fourth Amendment. *Id*.

There is no doubt that cell phones hold quantitatively more private information than ever. But that "simply means there is more room to hide digital contraband, and therefore more storage space that must be searched." *United States v. Feiten*, No. 15-20631, 2016 WL 894452, at *6 (E.D. Mich. Mar. 9, 2016).

14

"Merely because a large container is presented at the border, the government's right to inspect its contents is not diminished as compared to its right to inspect a comparatively small container." *Id*. If customs officials may search an entire cargo container, which they may, then they may search an entire computer. *United States v. Boumelhem*, 339 F.3d 414 (6th Cir. 2003) (holding that search of a forty-foot long shipping container was a constitutional border search); *see also United States v. Seljan*, 547 F.3d 993, 1015 (9th Cir. 2008) (Kozinski, J. dissenting) ("[C]ontainers of any size and kind can be opened at the border and inspected for contraband") (citing *Ramsey*, 431 U.S. at 606).

Even though searches of cell phones and other electronic devices implicate significant privacy concerns, the constitutional limits for border searches remain the same. *See Cano*, 934 F.3d at 1016 ("post-*Riley*, no court has required more than reasonable suspicion to justify even an intrusive border search."); *United States v. Laynes*, 481 F. Supp. 3d 657, 664 (S.D. Ohio 2020)("No case post-*Riley* has limited the Government's authority to conduct suspicionless manual searches of electronic devices at the international border.").

There is a difference between a manual search or a forensic search. *United States v. Almadaoji*, 567 F. Supp. 3d 834, 840 (S.D. Ohio 2021) A manual search, whereby an officer simply scrolls through the device to view its contents, is

15

classified as a "routine" border search for which no warrant, reasonable suspicion or probable cause is required. *Id*. at 839-40. Such a search is *per se* reasonable. A forensic search, which involves the use of computer software to analyze the contents of an electronic device, constitutes a "non-routine search" and requires reasonable suspicion that the person be engaged in criminal activity. *United States v. Cotterman*, 709 F.3d 952, 960, 968 (9th Cir. 2013); *see also Cano*, 934 F.3d at 1016 ("manual searches of cell phones at the border are reasonable without individualized suspicion, whereas the forensic examination of a cell phone requires a showing of reasonable suspicion.").

As noted above, the Sixth Circuit's ruling in *Stewart* still stands. There is no attenuation between Stewart's border crossing and the search of his computers; the government conducted that search before clearing them for entry and before he could regain an expectation of privacy in that property. *Accord Cotterman*, 709 F.3d at 961–62 (no extended border search when customs agents seized laptop at the border and forensically searched it two days later at an ICE field office 170 miles from the border).

As to the 2015 search of Didani's cell phone, there was testimony that while scrolling through the phone during the secondary search, photos of Didani holding an AR-style rifle and pistol, along with cash in a duffel bag and wrapped in

cellophane were seen. This is a routine border search. Even if required, this is sufficient to establish reasonable suspicion that there may be more evidence in the cell phone to warrant a longer review of the phone by way of a more extensive forensic investigation at a later time once the cell phone data was copied. Didani was released and his cell phone was returned. There was no further requirement for a warrant to search the data on Didani's phone, which was copied while at the border search.

Regarding the 2016 search, Nugent testified that he saw a photograph of a handwritten picture of a cargo container with raised floor. It was significant to Nugent because he was familiar with how drugs are shipped in cargo containers. Again, this search was a routine border search of the phone. The subsequent search by Bianchi after the phone was forwarded to Detroit from Chicago, was sufficient to raise reasonable suspicion that there may be other evidence in the phone of criminal activity. Bianchi testified that a search warrant was obtained to search the phones thereafter. Didani makes no argument that the warrant was not facially valid nor that the affidavit submitted to support the search warrant lacked sufficient probable cause.[1]

---

[1] Didani's counsel at a hearing indicated a motion to suppress as to the warrant may be filed after the Court ruled on the motion to suppress. However, Didani expressed at the hearing his desire to move forward with a trial instead of filing additional motions in this matter.

Even if the facially valid warrant does not satisfy probable cause, the good faith exception applies under *United States v. Leon*, 468 U.S. 897, 922 (1984). The "good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate judge's authorization." *Id.* at 922 n. 23. As set forth above, based on *Stewart*, the Sixth Circuit holding that a phone obtained during a border inspection, which is taken away from the border to be inspected, falls under the warrantless border search exception. The agent seeking the warrant would not have known at the time of requesting the warrant that the search of Didani's phones was illegal despite the magistrate judge's authorization.

### III. CONCLUSION/ORDER

For the reasons set forth above,

IT IS ORDERED that Defendant Ylli Didani's Motion to Suppress Cell Phone Evidence is DENIED and the Motion for an Evidentiary Hearing is MOOT, since an evidentiary hearing was held. (ECF No. 53)

<pre>
                              S/DENISE PAGE HOOD
                              DENISE PAGE HOOD
                              United States District Judge
</pre>

DATED: May 8, 2024