United States District Court
Eastern District of Michigan
Southern Division

United States of America,

Case No. 2:21-cr-20264

Honorable Denise Page Hood

v.

Ylli Didani,

Defendant.

_____/

**GOVERNMENT'S RESPONSE OPPOSING DIDANI'S MOTION
TO EXCLUDE SKY ECC EVIDENCE**

There is no basis to exclude from Didani's trial evidence that was

seized by the government of France from Sky ECC. Didani's motion

should be denied.

Respectfully submitted,

Julie A. Beck
Acting United States Attorney

*s/Timothy P. McDonald*
Timothy P. McDonald
Mark Bilkovic
Assistant U.S. Attorneys
211 W. Fort Street, Suite 2001
Detroit, MI  48226
timothy.mcdonald@usdoj.gov
(313) 226-0221

1

United States District Court
Eastern District of Michigan
Southern Division

United States of America,

Case No. 2:21-cr-20264

Honorable Denise Page Hood

v.

Ylli Didani,

Defendant.

_____/

**GOVERNMENT'S BRIEF IN SUPPORT OF RESPONSE
OPPOSING DIDANI'S MOTION TO EXCLUDE SKY ECC
<u>EVIDENCE</u>**

Ylli Didani used encrypted communications on Sky ECC, an

internet-based messaging platform, to facilitate his international drug

conspiracy. French law enforcement obtained a warrant from a French

judge and seized communications, including Didani's, that took place

through Sky ECC. Three weeks before trial and well past the motion

cut-off in this case, Didani moved for his Sky communications to be

excluded because the French government violated the Fourth

Amendment to the United States Constitution. But neither the Fourth

Amendment nor the exclusionary rule apply to foreign searches by

2

foreign governments. Accordingly, Didani's motion to exclude should be denied.

Didani also incorrectly claims the government cannot authenticate the messages he sent and received over Sky. The government will, however, produce sufficient evidence to prove the evidence is what the government claims: messages sent and received by Didani. Indeed, Didani did much of the work of authenticating the messages by identifying himself and sending his picture in several of the messages. His motion should be denied.

## I. Relevant Background

### a. Background on Sky ECC and the European Investigation

A witness will testify that Sky ECC was a subscription-based messaging platform on which encrypted communications could be exchanged. In 2019, law enforcement officials from multiple countries, including the United States, participated in a conference to discuss how to address the intelligence challenges posed by the use of Sky ECC among suspected criminals.

Meanwhile, according to the witness, law enforcement agencies in

three European countries—Belgium, the Netherlands, and France—were working collaboratively to investigate the platform's technical operation and user base. By 2019, the European investigators had determined that the Sky ECC servers were located in France, and French law enforcement sought judicial authorization to monitor traffic on the servers. In June 2019, a French judge granted the wiretap request and authorized the initial interception of all communications on the Sky ECC servers. Subsequent to the French judge's order, the three countries formalized their collaboration as a "Joint Investigation Team" ("JIT") to determine how to decode the still-encrypted messages. Once a method of decryption was identified, a French judge authorized several weeks of additional message interception for all Sky ECC users, from December 2020 until approximately March 2021, when the JIT investigation was revealed to the public.

### b. The Sky ECC evidence in this case

A federal law enforcement agent will testify that in June 2021 the United States made a request to the government of France for data associated with numerous Sky ECC user accounts, each denominated

by a six-digit alphanumeric PIN or a Sky ECC moniker. He will testify that French officials provided a set of 6 files partially responsive to that request in January 2022[1], along with a certification, signed by a French judicial officer to authenticate the materials. This data included Sky ECC Pins "BTJ56N Panco" and "E5D826 Panco Backup," the pins and monikers used by Didani. Through that agent, the government expects to offer relevant excerpts taken from this Sky data that the agent received directly from the French government.

The Sky data, in the form in which France produced it to the government (and in which the government re-produced it in discovery to the defendant), consists of an account folder that is further divided into subfolders for individual "chats." The chat subfolders are designated by the user PIN(s) of the participant(s) in the respective chat, and each contains a spreadsheet of captured communications within the chat between the specified users—analogous to text message "conversations" on typical cell phones or social media platforms. Some chats contain only the one-sided communications of a singular PIN. Others include

---

[1] The French Government provided a second set of Sky ECC data in May 2022. The United States originally requested this data in June 2020, but it was not

chats with multiple PINS. The chat subfolders also include transferred media files (*i.e.*, photos, audio recordings, etc.), and in such cases the chat subfolder includes a further "media" subfolder containing the media files, which are referenced by filename in the chat spreadsheet.

Investigators learned from Didani's iCloud and phone extractions, that Didani utilized the Sky ECC Pins, BTJ56N and E5D826, among others. The January 2022 Sky data provided by the French government included electronic file folders entitled "export_49460 BTJ56N Panco" and "export_49463 E5D826 Panco Backup." Within these file folders contained sub folders that each contained a spreadsheet of chats, and, where applicable, another subfolder named "Media File" that contained photographs, videos, audio messages and text attachments sent by Didani or by the person(s) he was communicating with.

For example, one of the sub folders within "export_49460 BTJ56N Panco" was named "5_btj56n-f1c203." Inside the "5_btj56n-f1c203" folder was a spreadsheet entitled "conversation_5_export_49460."  The spreadsheet contained Didani's, one-sided communications between March 24, 2020 and November 18, 2020 utilizing the BTJ56N Pin. The

provided in the January 2022 production

spreadsheet also included a column that contained the filename of the media (photo, video, etc.) Didani sent. Files with matching media file names were located in the "Media File" folder.

## II.   Didani's motion should be denied because the Fourth Amendment does not apply to France's seizure of evidence from Sky ECC.

Didani argues that the Sky evidence seized by France should be suppressed because the French search violated the Fourth Amendment. (ECF No. 138, PageID.1658, 1659). But "the purpose of the Fourth Amendment was to protect the people of the United States against arbitrary action by their own Government." *United States v. Verdugo-Urquidez*, 494 U.S. 259, 266, (1990). The protections of the Fourth Amendment do not apply, therefore, to foreign searches by foreign officials in enforcement of foreign law. *United States v. Milligan*, No. 20-CR-20134, 2023 WL 4744900, at *2 (E.D. Mich. July 25, 2023)(*citing United States v. Serhan*, No. 14-20685, 2015 WL 3578744, at *2 (E.D. Mich. June 5, 2015); *See also United States v. Rose*, 570 F.2d 1358, 1361 (9th Cir. 1978); *United States v. Hawkins*, 661 F.2d 436, 455-456 (5th Cir. 1981); *United States v. Getto*, 729 F.3d 221, 227 (2d Cir. 2013).

7

Because the Fourth Amendment does not apply to foreign searches, it follows that the exclusionary rule does not apply to foreign searches either. *United States v. Janis*, 428 U.S. 433, 455-56 n.31 (1976). Indeed, the Supreme Court has found this principle to be "well established." *Id.* This is because the exclusionary rule would have no deterrent effect on a foreign law enforcement agency. *United States v. Valdivia*, 680 F.3d 33, 51 (1st Cir. 2012). "The exclusionary rule is intended to inculcate a respect for the Constitution in the police of our own nation. Since it has little if any deterrent effect upon foreign police, it is seldom used to bar their work product." *United States v. Cotroni*, 527 F.2d 708, 712 (2d Cir. 1975)(*internal citations and quotation marks omitted*); *see also United States v. Barona*, 56 F.3d 1087, 1091 (9th Cir. 1995) ("Neither our Fourth Amendment nor the judicially created exclusionary rule applies to acts of foreign officials." (quotation marks and alteration omitted)); *United States v. Mount*, 757 F.2d 1315, 1317-18, 244 U.S. App. D.C. 320 (D.C. Cir. 1985) ("[T]he exclusionary rule does not normally apply to foreign searches conducted by foreign officials.").

Courts have recognized two circumstances where evidence obtained in a foreign jurisdiction may be excluded. *Milligan*, No. 20-CR-20134, 2023 WL 4744900, at *2. The exclusionary rule might apply if (1) the foreign official's conduct was so extreme that it shocks the judicial conscience, or (2) if American law enforcement substantially participated in the search or controlled it such that foreign law enforcement were acting as the agents of the United States. *United States v. Angulo-Hurtado*, 165 F. Supp. 2d 1363, 1370 (N.D. Ga. 2001), *report and recommendation adopted* (Aug. 20, 2001); *Milligan*, No. 20-CR-20134, 2023 WL 4744900, at *2. Neither circumstance is present in this case.

The Fourth Amendment exclusionary rule may apply to foreign searches and seizures if the defendant can show that "the conduct of foreign police shocks the judicial conscience." *United States v. Odeh*, 815 F.3d 968, 987 (6th Cir. 2016)(*quoting United States v. Valdivia,* 680 F.3d 33, 51 (1st Cir.2012)). "The requirement of a showing that conduct 'shocks the conscience' stems not from the Fourth Amendment, but instead from a federal court's authority to exercise its supervisory

powers over the administration of federal justice." *United States v. Getto*, 729 F.3d 221, 229 (2d Cir. 2013). Didani does not even allege that the French search shocked the conscious. For good reason: he cannot. Conduct does not shock the conscience when it is simply illegal—which the French search was not—the conduct must be egregious. *Id.* at 228. Thus, "[c]ircumstances that will shock the conscience are limited to conduct that "not only violates U.S. notions of due process, but also violates fundamental international norms of decency." *United States v. Mitro*, 880 F.2d 1480, 1483–84 (1st Cir. 1989). The French did nothing shocking in this case, therefore, Didani cannot meet this burden.

Instead, Didani seems to argue that the exclusionary rule should apply because the French acted as agents for the United States. But Didani concedes that the United States was not a part of the French seizure. Specifically, he alleges the government intends to use "evidence from France that was obtained through a European Police hacking operation," (ECF No.138, PageID.1658), and that the government "knew the manner in which this data was obtained by France." (*Id.*). Even if he was right that the French acted illegally—he's not—and that the

government requested the Sky evidence afterwards, he has not met his burden of showing that the French were acting as agents of the United States *during* the search.

In this context, the exclusionary rule applies to foreign searches only "if American law enforcement officials participated in the foreign search, or if the foreign authorities conducting the search were acting as agents for their American counterparts." *Milligan*, No. 20-CR-20134, 2023 WL 4744900, at *2 (E.D. Mich. July 25, 2023). Didani doesn't allege the United States took part in the search, only that the French acted as agents of the United States after the search. This is not enough. "[T]o render foreign law enforcement officials virtual agents of the United States, American officials must play some role in controlling or directing the conduct of the foreign parallel investigation." *United States v. Aleem*, 641 F. App'x 96, 97 (2d Cir. 2016). So, courts have found that the exclusionary rule doesn't apply to foreign searches "even though American officials are present and cooperating to some degree." *United States v. Rosenthal*, 793 F.2d 1214, 1231 (11th Cir. 1986). And it doesn't apply if the search was based on information provided by the

United States. *United States v. Maturo*, 982 F.2d 57, 61 (2d Cir. 1992).

Or to a search that was funded in part by the United States. *Id.* at 60

(DEA's provision of "money, information and wiretapping equipment" to

Turkish investigators did not make them agents of the United States).

Didani cannot meet his burden here because the French were not

acting as agents of the United States when they seized the Sky ECC

evidence. His motion should be denied.

### III.   The government will properly authenticate the Sky evidence by establishing they are the communications if Didani.

The government anticipates introducing excerpts from two Sky

ECC Pins used by Didani. An agent will testify that he requested the

government of France to produce data from numerous Sky Accounts.

The agent identified the accounts by their PIN numbers. He'll testify

that he received a set of files for six accounts that were partially

responsive to that request from the French. The files were certified and

signed by a French judicial officer to authenticate the materials.

The United States can demonstrate that the Sky communications

that will be introduced at trial are in fact encrypted Sky ECC

communications transmitted to or from Didani. By doing so, the government can satisfy the "slight" burden for authentication under Rule 901. *Gregg v. Ohio Dep't of Youth Servs.*, 661 F. Supp. 2d 842, 852 (S.D. Ohio 2009) (citing *Lexington Ins. Co. v. W. Pa. Hosp.*, 423 F.3d 318, 328 (3d Cir. 2005)).

Authentication requires the proponent of the record to "produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). This is not an exacting burden, *United States v. Gagliardi*, 506 F.3d 140, 151 (2d Cir. 2007), and the government may establish the authenticity of an exhibit through circumstantial evidence. *United States v. Crosgrove*, 637 F.3d 646, 658 (6th Cir. 2011). The government must only make a prima facie showing of authenticity so that a reasonable jury could infer that the text messages are in fact what the government claims. *United States v. Carriger*, 592 F.2d 312, 316 (6th Cir. 1979); *Gagliardi*, 506 F.3d at 151. Once this threshold showing has been made, any questions concerning the genuineness of the item bear on the weight of the evidence, rather than its admissibility. *See United States v. Knox*, 166 F.3d 1215, 1998

WL 777986, at *3 (6th Cir. Oct. 22, 1998).

Rule 901 sets forth an illustrative, non-exhaustive list of methods that can be employed to authenticate exhibits. *See* Fed. R. Evid. 901(b)(1)–(10). Thus, the task of authenticating "can be accomplished in a number of ways—with testimony from someone with knowledge of the evidence offered, for example, or by pointing to distinctive characteristics that establish authenticity." *United States v. Farrad*, 895 F.3d 859, 876 (6th Cir. 2018).

Here, the United States will authenticate the Sky messages in several ways. The text messages have distinctive characteristics that serve to authenticate them. Fed. R. Evid. 901(b)(4) (authentication can be achieved through "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken in conjunction with all the circumstances"); *United States v. Jones*, 107 F.3d 1147, 1150 (6th Cir. 1997) ("[T]he contents of a writing may be used to aid in determining the identity of the declarant." (quotation omitted)). The following are examples of distinctive characteristics that can serve to authenticate the text messages:

- Pictures, PINS, names, birthdays, etc.

Didani regularly self-authenticated the content of the SkyECC data by sending photographs of himself, photographs of cell phones where his face appears in the reflection, a photograph of his mother (found in E5D826 Panco Backup, "conversation_13_export_49463"), audio messages, and screenshots of cell phones showing his contact information. Below are several examples:



BTJ56N Panco
"conversation_3_export_49460"



BTJ56N Panco
"conversation_14_export_49460"



BTJ56N Panco
"conversation_24_export_49460"



BTJ56N Panco
"conversation_5_export_49460"

In addition, many of the text messages contain personal information that further confirmed the identity of the writer. See Fed. R. Evid. 901 advisory committee notes ("[A] document or telephone conversation may be shown to have emanated from a particular person by virtue of its disclosing knowledge of facts known peculiarly to him."). For example, the text messages often contain personal or private information known only to Didani and his closest associates. *See Jones*, 107 F.3d at 1150 (holding greeting card was properly authenticated where recipient of card testified that card was signed by defendant and contained references to defendant's family "that no one else could have

written").

For example, using the E5D826 SkyECC Pin, Didani communicated about his partner Marty Tibbitts and his untimely death ("conversation_31_export_49463") and about bringing his mother to South America to spend some time with "mefi's" mother (conversation_31_export_49463). On June 24, 2020, using the BTJ56N SkyECC Pin, Didani messaged about the 2016 border search of his phone in Chicago – "4 years ago they catch my phone airport Chicago." (conversation_41_export_49460"), and about Holland seizing his gray jacket depicted above, along with his Rolex ("conversation_3_export_49460"), a fact corroborated by evidence received via Dutch MLAT:




Rolex of DIDANI

The SkyECC messages will also be authenticated by witnesses and coconspirators. They will testify that Didani used Sky, advised them to use Sky, and in one instance, sent one witness a Sky cell phone. The Sky evidence will also be authenticated by evidence seized directly from Didani's phones. An agent will testify that media attachments in the Sky records match media files sent from Didani's phone.

For example, in a December 19, 2019, WhatsApp conversation with 31684159237 located on the phone he was arrested with, Didani sent the below photograph of the bulletproof jackets he purchased from the United States using drug proceeds:



On March 16, 2020, using Sky ECC Pin BTJ56N ("conversation_23_export_49460") Didani said, "Let's (sic) me show jackets I have" and then sent a photograph of a cell phone displaying

the identical photograph:



This is just one of many examples that establish the authenticity of the Sky ECC data. As such, a reasonable jury could infer that the Sky ECC data found in Pins BTJ56N and E5D826 are in fact the messages and media of Ylli Didani. Didani's arguments regarding the genuineness bear on the weight of the evidence, not admissibility.

## IV.   Evidence from SkyECC is not unfairly prejudicial

Didani lastly argues that the admission of his own statements would unfairly prejudice the jury "by painting defendant in a negative light….without providing reliable evidence of Defendant's involvement in illegal activity." (ECF No. 138, PageID. 1661). "Relevance requires only that a piece of evidence make a fact in issue more probable than it

would be without the evidence." *United States v. Neuhausser*, 81 F. App'x 56, 65–66 (6th Cir. 2003). Yet relevant evidence may nevertheless be excluded if "its probative value is substantially outweighed by a danger of…unfair prejudice." "Unfair prejudice does not mean the damage to a defendant's case that results from the legitimate probative force of the evidence; rather it refers to evidence which tends to suggest [a] decision on an improper basis." *United States v. Newsom*, 452 F.3d 593, 603 (6th Cir. 2006).

Here, all of Didani's Sky ECC statements were made during the course of the conspiracy(s) charged in the government's superseding indictment and they relate to Didani's identification and his direct involvement in the charged crimes. "Thinly alleged prejudice does not outweigh, substantially or otherwise, the probative value here." *United States v. Growder*, 2018 WL6932119 *4 (E.D.Kentucky, November 14, 2018).

## V.    Conclusion

Based on the foregoing reasons, the United States respectfully requests that the Court deny Didani's motion.

20

Respectfully submitted,

Julie A. Beck
Acting United States Attorney

_s/Mark Bilkovic_
Mark Bilkovic
Assistant United States Attorney
211 W. Fort St., Suite 2001
Detroit, MI 48226
Phone: (313) 226-9623
mark.bilkovic@usdoj.gov

Dated: February 3, 2025

_s/Timothy P. McDonald_
Timothy P. McDonald
Assistant United States Attorney
211 W. Fort St., Suite 2001
Detroit, MI 48226
Phone: (313) 226-0221
timothy.mcdonald@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on Monday, February 03, 2025, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Standby Counsel Wade Fink, Esq.

I have also mailed a copy of this document to Defendant Ylli Didani at the following address:

Ylli Didani
Register No. 37630-509
FCI Milan
Federal Correctional Institution
P.O. Box 1000
Milan, MI 48160

s/*Timothy P. McDonald*
Timothy P. McDonald
Assistant United States Attorney