UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| Plaintiff, | Case No. 21-cr-20264 |
| v. | HON. DENISE PAGE HOOD<br>United States District Judge |
| D-1 YLLI DIDANI, | |
| Defendant. | |

---

**GOVERNMENT'S TRIAL BRIEF**

---

The defendant, Ylli Didani, is charged in a superseding indictment with Count One, conspiracy to distribute controlled substances in violation of 21 U.S.C. §§ 841 and 846; Count Two, conspiracy to possess with intent to distribute and distribute a controlled substance on board a vessel subject to the jurisdiction of the United States in violation of 46 U.S.C. §§ 70503(a) and 70506(b); and Count Three, conspiracy to launder monetary instruments in violation of 18 U.S.C. § 1956(a). (ECF No. 38, PageID.153). The government submits this trial brief to summarize the facts and to identify potential evidentiary issues that may arise during trial.

I.   FACTS

From the numerous pleadings and hearings, the Court is well aware of the pertinent facts. The government will not repeat all of them but will instead summarize them here.

From at least October 2016, until his arrest in March 2021, the defendant, Ylli Didani was an integral part of an expansive transnational cocaine distribution conspiracy that operated in part, in this district, and had substantial ties to the United States. Didani secured financing in this district from a now deceased co-conspirator and other conspirators, to purchase thousands of kilograms of cocaine from South America. Didani and other conspirators then arranged to have the cocaine hidden on containerships so it could be transported from South America to Europe for further distribution. To accomplish the objectives of the conspiracy, Didani regularly communicated with other conspirators in furtherance of the conspiracy, including while he was in the United States and in this district.

In 2016 and 2017, while the drug distribution conspiracy was well underway, Didani received large amounts of U.S. currency from a co-conspirator (a/k/a "Toni Stark") residing in this district for the purpose of purchasing bulk cocaine. At least one transfer of approximately $100,000 occurred in this district. A separate bulk cash transfer that occurred in December 2017, also started in this district. In that transfer, a co-conspirator obtained approximately $450,000 from

Toni Stark in this district. The co-conspirator then flew from this district in a private airplane owned by Toni Stark to Washington D.C., where the co-conspirator gave the $450,000 to Didani for the purchase of bulk cocaine.

While Didani oftentimes arranged to have the cocaine hidden in containers on containerships, that was not Didani's only plan. Instead, in 2016, Didani and Toni Stark, who was still residing in this district, came up with a plan to transport cocaine underwater, and by 2017, they contracted with Peregrine 360, a Canadian company, to design a submersible container ("torpedo" or "drone") capable of holding up to 1000 kilograms of cocaine. The torpedo would operate using remote control, GPS, and magnets. The cocaine would be loaded into the torpedo before the torpedo magnetically attached to a containership. Once the containership was approximately 100 miles from its destination, the torpedo would detach from the containership via remote control, the torpedo would come to the surface, and a fishing boat using GPS, would locate and retrieve the cocaine-filled torpedo.

Peregrine 360 ceased working on the torpedo after the July 2018 death of Toni Stark. However, prior to Toni Stark's death, Didani oftentimes used encrypted Blackberry cellular telephones and encrypted applications to discuss the progress of the torpedo. These encrypted messages were usually programmed to self-destruct in a matter of days:

However, Didani regularly documented these encrypted messages before they self-destructed by taking photographs of them with his iPhone. Didani did this with hundreds of encrypted messages related to the cocaine distribution conspiracy, including encrypted messages related to the torpedo, a few of which are depicted below:




Following the July 2018 death of Toni Stark, Didani began utilizing Europe-based financers to fund his cocaine trafficking and he continued to arrange transportation of cocaine from South America to Europe.

Between August 2019 and September 2020, law enforcement in Europe, working in conjunction with United States law enforcement, seized several large shipments of cocaine belonging to Didani and his conspirators. Count Two of the superseding indictment charges Didani for his involvement in three cocaine shipments that were seized. All three of these seizures occurred at the Port of

Rotterdam, in the Netherlands, and all three countries where the vessels were registered consented to United States jurisdiction.

The first charged seizure occurred on August 11, 2019, when law enforcement seized approximately 753 kilograms of cocaine located inside of a shipping container on the vessel, MSC Anisha R. The second charged seizure occurred on February 22, 2020, when law enforcement seized approximately 644 kilograms of cocaine located inside of a shipping container on the vessel, CMA CGM Jean Gabriel. The third charged seizure occurred on April 7, 2020, when law enforcement seized approximately 1000 kilograms of cocaine located inside of a shipping container on the vessel, Cartegena Express.

In addition to the three charged seizures, law enforcement in Europe also seized two additional shipments of cocaine belonging to Didani and his co-conspirators. These two additional cocaine seizures are described in Count Two of the superseding indictment in the Overt Acts section. (ECF No. 38, PageID.167-168).

The first of these two seizures occurred on April 20, 2020, in the Port of Bilboa in Spain, when law enforcement seized approximately 1000 kilograms of cocaine located inside of a shipping container on the vessel, MSC Jenny. The second seizure occurred on September 21, 2020, at the Port of Dover in the United

Kingdom, when law enforcement seized approximately 952 kilograms of cocaine hidden in the hull of the vessel, Star Care.

By this time, Didani was also utilizing international money laundering organizations (MLOs) to move millions of dollars of drug proceeds around the world. These MLOs utilized at least two methods to move drug proceeds for Didani. The first method involved the use of purported General Trading Companies that wired payments at Didani's request. The second method involved bulk cash money drops, facilitated using "tokens."

Between April 2020 and January 2021, the MLOs used both methods to make over $800,000 in payments towards Didani's purchase of several luxury armored vehicles from an armored vehicle company in Canada. Didani also made sure that some of the armored vehicles were equipped with "traps" that would be able to conceal firearms. Didani purchased these vehicles from a company in North America and had them shipped to Ecuador and the Dominican Republic. To send these wire payments to the armored car company, the MLOs, on Didani's behalf, utilized correspondent banks in the United States.

Didani also attempted to purchase a $2,775,000 parcel of real estate in the Dominican Republic through a United States-based realtor. In September 2020, at Didani's request, a courier for a MLO delivered over $200,000 of Didani's drug proceeds to New York as a down payment towards the property. Unfortunately for

6

Didani, the sale of the property fell through, and law enforcement seized the $200,000.

In addition to utilizing the United States banking system to purchase multiple armored vehicles with drug proceeds, Didani also arranged the purchase of several bulletproof jackets from an individual in the United States. Didani did so while he was also in the United States.

On March 31, 2021, Didani was arrested at the Charlotte Douglas International Airport in North Carolina. Agents met with Didani and recovered an iPhone that Didani had in his jacket. Agents obtained a search warrant for the iPhone and subsequently downloaded its contents. A large portion of the evidence that the government will present in this case came from the download of Didani's iPhone. Additional evidence came from several downloads of Didani's iCloud account, and his phones that were searched in 2015 and 2016 when he entered the United States.

## II. POTENTIAL EVIDENTIARY ISSUES

### A. Hearsay/Non-Hearsay

Certain statements that the government will offer at trial are admissible as non-hearsay. An out-of-court statement or assertion is hearsay only if "offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c)(2). Any statement offered for a purpose other than to prove the truth of the matter asserted

is not hearsay. *Id.* Frequently, "it is the fact that the declaration was made, and not the truth of the declaration, which is relevant." *United States v. Childs*, 539 F.3d 552, 559 (6th Cir. 2008).

Here, the government will offer some statements simply to prove that they were made – not for their truth. The government will also offer some statements to put Didani's statements into context. For example, as the following text message thread demonstrates, "Pete" sends Didani a text message that says, "Make that money and get out of it brother please." Didani responds, "After I have 400 mil."

| | | App Message |
|---|---|---|
| Participants: Pete Pete, P P (owner) | Timestamp: 2/3/2020 9:12:18 PM(UTC-4) | Direction: Incoming<br>Body: Make that money and get out of it brother please<br><br>Source file: 00008020-000574DA1138002E_files_full.zip/private/var/mobile/Containers/Shared/AppGroup/B525EA07-16DE-4E85-BC1D-518DEE7BC383/grdb/signal.sqlite/signal.sqlite.decrypted : 0x5B2523 (Table: model_TSInteraction, model_OWSUserProfile, Size: 20688896 bytes)<br>Message Type: App Message |
| Participants: Pete Pete, P P (owner) | Timestamp: 2/3/2020 9:14:26 PM(UTC-4) | Direction: Outgoing<br>Body: After I have 400 mil<br><br>Source file: 00008020-000574DA1138002E_files_full.zip/private/var/mobile/Containers/Shared/AppGroup/B525EA07-16DE-4E85-BC1D-518DEE7BC383/grdb/signal.sqlite/signal.sqlite.decrypted : 0x5B2097 (Table: model_TSInteraction, model_OWSUserProfile, Size: 20688896 bytes)<br>Message Type: App Message |

Statements offered to provide context to a conversation of a party are non-hearsay. *United States v. Townsend*, 206 Fed. Appx. 444, No. 04 - 5117 (6th Cir., Nov. 15, 2006). Without any context surrounding Didani's statement, the jury would be left to speculate what Didani was referring to. However, when examining

8

Didani's statement made in response to "Pete's" statement, it makes it clear to the jury as to what Didani is referring to – getting out of what he was doing after he has made $400 million.

Another example of non-hearsay include questions. Under FRE 801(a), "[a] question is typically not hearsay because it does not assert the truth or falsity of a fact." *United States v. Rodriguez-Lopez*, 565 F.3d. 312, 314 (6th Cir. 2009) *quoting United States v. Thomas* 343 F.3d 849, 865 (6th Cir. 2003); s*ee also, United States v. Wright*, 343 F.3d 849, 865 (6th Cir. 2003) (a question is not typically hearsay because it lacks factual content and does not assert anything.). Therefore, a text message where an individual asks Didani a question is not hearsay. Even if questions were considered a "statement," the government will not offer any questions to prove the truth of the matter asserted. Instead, the questions will be offered simply to place Didani's responses to those questions in context.

### 1) Co-conspirator statements in the course of and in furtherance of the conspiracy are admissible as a hearsay exception.

A co-conspirator's statement made "during and in furtherance of the conspiracy" is not hearsay, so the government may use it against any of the co-conspirators at trial to prove the truth of the matter asserted. Fed. R. Evid. 802(d)(2)(E). For a statement to fit within this rule, the government must show by a preponderance of the evidence that (1) a conspiracy existed; (2) the defendant against whom the hearsay is offered was a member of that conspiracy; and (3) the

hearsay statement was made in the course and in furtherance of the conspiracy. Fed. R. Evid. 801(d)(2)(E); *United States v. Vinson*, 606 F.2d 149, 152 (6th Cir. 1979). "[T]he rule does not require that both parties be co-conspirators; it merely requires the statement to be offered against a party and be made by a co-conspirator of a party during the course and in furtherance of the conspiracy." *United States v. Pike*, 342 F. App'x 190, 193 (6th Cir. 2009) (quotations and citation omitted).

Under Rule 104(a), the Court is responsible for determining that the statement satisfies these requirements. *Vinson*, 606 F.2d at 152. This finding is commonly referred to as an *Enright* finding. *See United States v. Enright,* 579 F.2d 980, 986-87 (6th Cir. 1978); *United States v. Young*, 847 F.3d 328, 352 (6th Cir. 2017). The Sixth Circuit has identified three ways for a court to make the *Enright* finding: (1) conduct a "mini-hearing" in which the court hears the government's proof of conspiracy and makes a preliminary *Enright* finding; (2) require the government to produce independent evidence establishing a conspiracy at trial before the court makes an *Enright* finding; or (3) conditionally "admit the hearsay statements subject to a later demonstration of their admissibility by a preponderance of the evidence." *Vinson*, 606 F.2d at 152-53.

Under the third method, the *Vinson* Court established procedures to protect defendants, which include, "[a]t the conclusion of the government's case-in-chief,

10

the court should rule on the defendant's hearsay objection. If the court finds that the government has met the burden of proof. . . it should overrule the objection and let all the evidence, hearsay included, go to the jury[.]" *Id.* at 153. If the court finds that the government "has failed to carry its burden, it should, on defendant's motion, declare a mistrial unless convinced that a cautionary jury instruction would shield the defendant from prejudice." *Id.*

The third method is the preferred method in the Sixth Circuit. *See, e.g.*, *United States v. Holloway*, 740 F.2d 1373, 1375 n.2 (6th Cir. 1984) (noting this method is "firmly entrenched in this circuit's practice"); *United States v. Peterson*, No. 20-20448, 2022 WL 3568979, at *1 (E.D. Mich. Aug. 18, 2022) (Cleland, J.) (collecting cases); *United States v. Bell*, No. CR 17-20183, 2022 WL 993634, at *3 (E.D. Mich. Apr. 1, 2022) (Goldsmith, J.) (noting this method is "the general and preferred practice within this circuit").

This Court has also approved of this method. "It appears that the general practice is to conditionally allow the admission of co-conspirator statements to prove the charged conspiracy." *United States v. Driver*, No. 09-20549, 2011 WL 761496, at *6 (E.D. Mich. Feb. 25, 2011) (Hood, J.), citing *United States v. Moss*, 9 F.3d 543, 549 (6th Cir. 1993).

This method is also the most consistent with the Supreme Court's decision in *Bourjaily v. United States*, 483 U.S. 171 (1987), since "[t]his procedure allows

11

trial courts to rely on the hearsay statements themselves to determine whether the statements are admissible under Fed. R. Evid. 801(d)(2)(E)."

Courts have also set forth some examples of statements that meet the "in furtherance" requirement: "[S]tatements identifying other conspirators and their roles in the conspiracy, statements to inform other conspirators of the activities or status of the conspiracy, and statements as to the source or purchaser of controlled substances." *United States v. Zertuche*, 565 F. App'x 377, 385 (6th Cir. 2014). Furthermore, "[s]tatements designed to conceal an ongoing conspiracy are made in furtherance of the conspiracy for purposes of Rule 801(d)(2)(E)." *United States v. Payne*, 437 F.3d 540, 546 (6th Cir. 2006).

### 2) Didani's statements that are not offered by the government are inadmissible hearsay.

A defendant's statements are admissible, non-hearsay statements when offered by the government as statements of a party opponent. *See* Fed. R. Evid. 801(d)(2)(A) ("A statement that meets the following conditions is not hearsay . . . The statement is offered against an opposing party and was made by the party.").

However, a defendant cannot admit his own statements under this rule. *United States v. Henderson*, 626 F. 3d 326, 344 (6th Cir. 2010). *See also*, *United States v. Holden*, 557 F.3d 698, 706 (6th Cir. 2009) (Holding that a defendant's statements that the defendant sought to introduce were "inadmissible hearsay and

12

were properly excluded."). Didani should therefore be prohibited from attempting to introduce any of his own out-of-court statements.

### B. Permissible Testimony

The government also intends to elicit testimony about several other relevant topics. These include the background of the investigation, testimony about what some of the evidence does not contain, and testimony about Didani's unexplained wealth.

#### 1) Background of the investigation

"Agents are permitted to testify regarding how they became involved in a case, what allegations they were investigating, who the suspects were, and similar background information." *Id*. (*citing United States v. Kilpatrick*, 798 F.3d 365, 381 (6th Cir. 2015). "This sort of testimony, which is designed to set the stage for the introduction of evidence, differs substantively from problematic 'preview testimony' that 'purports to sum up (in advance of the evidence) the government's overall case.'" *Id*. (*quoting Kilpatrick*, 798 F.3d at 381-82).

#### 2) Testimony about what the evidence does not contain

There may be instances where the government asks a witness whether or not a particular document or text message conversation contains a certain item. "It is also permissible for an agent who has reviewed the evidence to testify concerning what the evidence does not contain." *Kilpatrick*, 798 F.3d at 382. "A witness who

13

has examined the records may testify that no record 'of a specific tenor is there contained.'" *Id.* (*quoting United States v. Scales*, 594 F.2d 558, 562 (6th Cir. 1979).

### 3) Testimony about unexplained wealth

The government will seek to introduce testimony about Didani's unexplained wealth because such testimony is relevant when a defendant is charged with a drug conspiracy. *See, e.g., United States v. Jackson-Randolph*, 282 F.3d 369, 378 (6th Cir. 2002) ("evidence of unexplained wealth is probative and admissible if it creates an inference of a defendant's involvement in drug trafficking . . . as long as other evidence, mainly that the wealth was not derived from legitimate sources, is presented to support the charge."); *United States v. Okayfor*, 996 F.2d 116 (6th Cir. 1993) (other acts committed during time frame of drug conspiracy were admissible to show unexplained wealth and consciousness of guilt); *United States v. Quintero*, 117 F.3d 1421 (6th Cir. 1997) ("In light of the fact that [defendant] was jobless, the source of his unexplained wealth bore directly on whether he was trafficking in drugs.").

### 4) Summary Charts/Exhibits

During trial, the government may seek to utilize pedagogical-device summaries or secondary evidence summaries. Pedagogical-device summaries consist of things like "chalkboard drawings, graphs, calculations, or listings of data

taken from the testimony of witnesses or documents in evidence, which are intended to summarize, clarify, or simplify testimonial or other evidence…" *United States v. Bray*, 139 F.3d 1104, 1112 (6th Cir. 1998). Secondary evidence summaries are a combination of summaries under Rule 1006 and pedagogical devices in that they are not prepared in compliance with Rule 1006. Instead, they are more than mere pedagogical devices that are designed to simplify and clarify other evidence in the case. *Id.*

Here for example, the government will elicit testimony of numerous cell phone numbers and the name of the person each number is associated to. Even though the jury will be able to take notes, it will be difficult for the jury to keep track of all of the cell phone numbers – especially considering that some individuals had multiple cell phone numbers under different names or monikers.

Once the government elicits sufficient testimony about all of the numbers and the name of the individual associated with each number, the government may seek to introduce a summary or list of the cell phone numbers and the name of the person associated with each number. This will assist the jury in being able to follow the voluminous text message evidence by having a simple one or two page list that includes all of the relevant phone numbers and who they belong to.

Respectfully submitted,

JULIE A. BECK
Acting United States Attorney

| | |
|---|---|
| *s/Mark Bilkovic* | *s/Timothy P. McDonald* |
| Mark Bilkovic | Timothy P. McDonald |
| Assistant United States Attorney | Assistant United States Attorney |
| 211 W. Fort St., Suite 2001 | 211 W. Fort St., Suite 2001 |
| Detroit, MI 48226 | Detroit, MI 48226 |
| Phone: (313) 226-9623 | Phone: (313) 226-0221 |
| mark.bilkovic@usdoj.gov | timothy.mcdonald@usdoj.gov |

Dated: February 4, 2025

## CERTIFICATE OF SERVICE

I hereby certify that on Tuesday, February 04, 2025, the forgoing document was electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Standby Counsel Wade Fink, Esq.

A copy of this document was also mailed to Defendant Ylli Didani at the following address:

Ylli Didani
Register No. 37630-509
FCI Milan
Federal Correctional Institution
P.O. Box 1000
Milan, MI 48160

                                                s/*Mark Bilkovic*
                                                Mark Bilkovic
                                                Assistant United States Attorney