```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF MICHIGAN
 2                         SOUTHERN DIVISION

 3                           -  -  -

     UNITED STATES OF AMERICA,
 4
                    Plaintiff,
 5
        v.                              Case No. 21-20264
 6
     YLLI DIDANI,
 7
                    Defendant.
 8   _____/

 9                  JURY TRIAL - VOLUME 2 - EXCERPT
                 BEFORE THE HONORABLE DENISE PAGE HOOD
10                    UNITED STATES DISTRICT JUDGE

11             Theodore Levin United States Courthouse
                    231 West Lafayette Boulevard
12                       Detroit, Michigan
                     Friday, February 14, 2025
13
     APPEARANCES:
14
      For the Plaintiff:        Mark Bilkovic
15                              Timothy McDonald
                                UNITED STATES ATTORNEY'S OFFICE
16                              211 W. Fort Street, Suite 2001
                                Detroit, Michigan  48226
17                              (313) 226-9623

18    For the Defendant:        Ylli Didani
                                Appearing in Pro Se
19
                                Wade Fink
20                              WADE FINK LAW, P.C.
                                550 W. Merrill Street, Suite 100
21                              Birmingham, Michigan  48009
                                (248) 712-1054
22                              (Appearing as standby counsel.)

23    Also present:            Agent Chad Hermans
                               Maria Dicarlo, Paralegal
24
          To obtain a copy of this official transcript, contact:
25             Sheila D. Rice  Official Court Reporter
            (313) 234-2610 • sheila_rice@mied.uscourts.gov
```

1 | **TABLE OF CONTENTS**

2 | MATTER                                                    PAGE

3 | **JURY TRIAL - VOLUME 2 - EXCERPT**

4 | **Government's Case in Chief**

5 | **JOSHUA BIANCHI**

6 | Direct examination by Mr. Bilkovic.................   5
Cross-examination by Defendant Didani...............  95

7 |

Certificate of Court Reporter..................... 143

8 |

9 |

10 |            E X H I B I T   I N D E X

11 |

Exhibit No.              Description              Admitted

12 |

**Government's Exhibits**

13 |

Government's 1.0      Photo of Eric Puzio            14
14 | Government's 1.1      Photo of Donald Larson         15
Government's 1.2      Photo of Martin Tibbitts       16
15 | Government's 1.3      Photo of Piotr Synowiec        18
Government's 2.0      Photo of Ylli Didani ID        35
16 | Government's 2.1      Photo of prescription bottle   37
Government's 2.2      Photo of Ylli Didani           38
17 | Government's 2.3      Photo of Didani in front of    39
                     currency
18 | Government's 2.4      Photo, SKY ECC Sales message   42
                     on BlackBerry
19 | Government's 2.5      Mr. Didani flight itinerary    45
                     to Colombia
20 | Government's 2.6      Mr. Didani flight itinerary    46
                     from Colombia
21 | Government's 2.7      Video                          49
Government's 5.0      Photo of BlackBerry            80
22 | Government's 5.1      Photo, Martin Tibbitts and     62
                     Ylli Didani
23 | Government's 5.2      Photo, Martin and Belinda      67
                     Tibbitts' residence

24 |

25 |

1    (Continued)

                   E X H I B I T   I N D E X

2

3    Exhibit No.              Description              Admitted

4
     Government's 5.3     Photo, stacks of U.S. currency      68
5    Government's 5.4     Photo, stacks of U.S. currency      68
     Government's 5.5     Photo, stacks of U.S. currency      68
6    Government's 5.6     Photo, sealed bags of U.S.          72
                          currency
7    Government's 5.7     Photo, Piotr Synowiec bank          81
                          accounts
8    Government's 5.12    Photo of BlackBerry                 74
     Government's 5.13    Photo, MI Freight and               64
9                         Donald Larson chat
     Government's 5.14    Video                               63
10   Government's 5.15    Video                               85
     Government's 5.16    Photo, Phantom Secure               86
11                        Subscription

12

13   **Defendant's Exhibits**

14   Defendant's A        Photo of containers                 95

15

16

17

18

19

20

21

22

23

24

25

1    Detroit, Michigan

2    Friday, February 14, 2025

3    11:13 a.m.

4                              —   —   —

5           (Beginning of excerpt.)

6           THE COURT:  You may call your next witness.

7           MR. BILKOVIC:  Your Honor, the Government would call

8    Joshua Bianchi.  And, your Honor, may I -- I have some exhibits

9    I'm going to go through with him.  Can I set them up with

10   the --

11          THE COURT:  Yes, you may.  I kind of cut you off, but

12   you were going to ask could you put them up here at the witness

13   box; right?

14          MR. BILKOVIC:  Yes, your Honor.

15          THE COURT:  Okay.  You may step forward, sir, and be

16   sworn in.  Raise your right hand, please.

17          (Oath administered.)

18          THE COURT:  All right.  You may be seated, and when

19   you're seated state your full name and spell your last name for

20   the record.

21          (Briefly off the record.)

22          MR. BILKOVIC:  Has he been sworn?

23          THE WITNESS:  Yes.

24          THE COURT:  Did you state your name?

25          THE WITNESS:  I did not.

1           THE COURT:  State your name and spell your last name.

2           THE WITNESS:  My full name is Joshua Allen Bianchi.

3   My last name is Bianchi, B-I-A-N-C-H-I.

4           THE COURT:  Now you may proceed.

5           MR. BILKOVIC:  Thank you, your Honor.

6                      *         *         *

7                      JOSHUA BIANCHI,

8        was called as a witness at 11:15 a.m. after having been

9        duly sworn to testify to the truth.

10                     *         *         *

11                  DIRECT EXAMINATION

12  BY MR. BILKOVIC:

13  Q.   Sir, how are you employed?

14  A.   I'm with the United States Border Patrol.

15  Q.   How long have you been employed by the United States Border

16  Patrol?

17          THE COURT:  Okay.  One second.

18          Mr. Didani and Mr. Fink, turn off your mic.  Do you

19  know how to do that?

20          MR. FINK:  Yeah.  It's the button in front of

21  Mr. Didani.  We'll make sure to do that, your Honor.

22          THE COURT:  Yes, turn it off, because otherwise we can

23  hear you whispering at the --

24          MR. FINK:  I'm not sure if we can permanently turn it

25  off, if there's a way to do that, but we'll press the button

  1    and we'll do that.  Thank you, your Honor.

  2           THE COURT:  And check with Ms. Saulsberry during the

  3    break to make sure you can do both; okay?

  4           MR. FINK:  We will, Judge.  Thank you.  Sorry.

  5           THE COURT:  It's okay.

  6           Go ahead.  Pose your question again.

  7           How long has he been with Border Patrol?

  8           MR. BILKOVIC:  Correct.

  9           THE COURT:  Okay.

 10           THE WITNESS:  Since July of 2003.  So approximately

 11    just shy of 22 years.

 12    BY MR. BILKOVIC:

 13    Q.  And what is it that you do with United States Border

 14    Patrol?

 15    A.  I'm a intelligence agent.

 16    Q.  How long have you been an intelligence agent with Border

 17    Patrol?

 18    A.  Since 2017.

 19    Q.  And what did you do with Border Patrol prior to becoming an

 20    intelligence agent?

 21    A.  Prior to becoming an intelligence agent I was on the HSI

 22    task force.

 23           THE COURT:  You were on the what?

 24           THE WITNESS:  HSI task force.

 25           THE COURT:  And what is that, HSI?

1          THE WITNESS:  It's Homeland Security Investigations.

2     BY MR. BILKOVIC:

3     Q.  Now, did you work for Homeland Security Investigations or

4     were you kind of just on loan to them?

5     A.  Kind of on loan to them.

6     Q.  Is that something that's common where agents basically are

7     on loan to other federal agencies?

8     A.  Yes, sir.

9          THE COURT:  And you said it was a task force?

10          THE WITNESS:  Yes, ma'am.

11          THE COURT:  Does that mean people were on it from

12     other agencies?

13          THE WITNESS:  Yes, ma'am, and local police

14     departments.

15          THE COURT:  Like who?

16          THE WITNESS:  My co-case agent was from Farmington

17     Hills Police Department.

18          THE COURT:  Any other agencies?

19          THE WITNESS:  DEA.  Well, HSI was the agency.  There

20     was also Troy Police Department, Sterling Heights Police

21     Department.

22          THE COURT:  Okay.  Thank you.

23          Counsel, if I raise a question and Mr. Didani and you

24     think it's objectionable, you should say so for the record.

25     Otherwise, your objection will be waived.

```
 1              Do you have any objection to the question I just
 2   raised?
 3              MR. BILKOVIC:  No, your Honor.
 4              THE COURT:  What about you, Mr. Didani?
 5              DEFENDANT DIDANI:  No, your Honor.
 6   BY MR. BILKOVIC:
 7   Q.  I may have asked you this.  How long have you been with
 8   United States Border Patrol?
 9   A.  Just shy of 22 years.
10   Q.  And when you started with Border Patrol what did you start
11   as?
12   A.  I started as a regular Border Patrol agent.  I worked -- my
13   first assignment was in Ajo, Arizona on the southwest border.
14   Q.  And how long did you work as a Border Patrol agent?
15   A.  Up until -- technically up until 2017 when I became an
16   intel agent.
17   Q.  So when you were working in Arizona -- I want to go through
18   some of the duties you had as a border patrol agent.  So when
19   you started what was it that you did?
20   A.  Basically I would track and follow people that were
21   sneaking into the country at places other than illegal port of
22   entry.
23   Q.  So did you work at this basically Arizona/Mexico border?
24   A.  Yes, sir.
25   Q.  And have there been other borders that you have worked at
```

1    during your career as a Border Patrol agent?

2    A.   Yes, the northern border here in Canada and U.S.

3    Q.   And how long did you work at the Canada/United States

4    borders?

5    A.   I've been there since 2007.

6    Q.   So since 2007 to when then?

7    A.   Current, present day.

8    Q.   And what were your general duties as a Border Patrol agent?

9    A.   The same duties as the southwest border, except a major

10   difference was the entire border here in our area was water.

11   So a lot of it was being done on boats.

12   Q.   A lot of what was being done on boats?

13   A.   Patrolling the area, making sure nobody was trying to sneak

14   in or smuggle any contraband into the United States.

15   Q.   So is that what you would do then, you would be basically

16   looking out for things like that?

17   A.   Yes, sir.

18   Q.   Now, you indicated that you worked for a Homeland Security

19   Investigation task force from 2014 to 2017?

20   A.   Yes, sir.

21   Q.   And where was that located?

22   A.   In Detroit.

23   Q.   And approximately how many members were there on that task

24   force?

25   A.   Very drastically throughout the three years, I would say on

1    average between six and ten.

2    Q.   And the agencies that you listed for Judge Hood a few

3    minutes ago, is that what you were talking about?

4    A.   Yes, sir.

5    Q.   And what type of a task force was it?

6    A.   It was -- initially it was a guns task force.  So we would

7    investigate crimes that related to guns, whether it's violent

8    crimes, drug smuggling, money laundering.  All of those usually

9    involved guns.

10   Q.   So guns and crimes related to guns?

11   A.   Correct.

12   Q.   And when you went to Homeland Security Investigations from

13   Border Patrol were you basically assigned cases?

14   A.   Yes, either assigned cases by my group supervisor or I

15   bring cases over from my home agency or the United States

16   Border Patrol.  At that time, my home agency was the Detroit

17   station downtown.

18   Q.   And from 2007 -- at some point in time did you leave the

19   HSI task force?

20   A.   Yes, during 2017.

21   Q.   And where did you go in 2017?

22   A.   After I left in 2017, there was a period of about three to

23   six months I was at my station, which is when I became an intel

24   agent, and then I was reassigned to DEA task force.

25   Q.   You say you went back to your station.  What do you mean

1    you went back to your station?

2    A.   To Detroit Border Patrol station.

3    Q.   You said that was approximately three to six months?

4    A.   Somewhere around there, approximately.

5    Q.   And then you were assigned where after that?

6    A.   The Detroit DEA Group 6.

7    Q.   DEA is the Drug Enforcement Administration?

8    A.   Yes, sir.

9    Q.   And you said Group 6.  What does that mean?

10   A.   They have different task forces within DEA, and we were --

11   the 6 group would be my best guess.  Other than that, I'm not

12   sure.

13   Q.   You were assigned to what was called Group 6?

14   A.   Yes, sir.

15   Q.   And at that time you said you were as task force officer?

16   A.   Yes, sir.

17   Q.   Were there other task force officers?

18   A.   Yes, sir.

19   Q.   Were there DEA agents in that group?

20   A.   Yes, sir.

21   Q.   And did you work with them on investigations?

22   A.   Yes, sir.

23   Q.   What were your duties and responsibilities when you were a

24   DEA task force officer?

25   A.   To investigate drug-related crimes and money laundering.

1  Q.  I want to take your attention back to your time with

2  Homeland Security Investigation.  In February of 2015, did you

3  open up an investigation into Ylli Didani?

4  A.  Yes, sir.

5           THE COURT:  What's the date again, February when?

6  BY MR. BILKOVIC:

7  Q.  In February of 2015, did you open up an investigation into

8  Ylli Didani?

9  A.  Yes, sir.

10          MR. BILKOVIC:  Am I talking loud enough in the

11  microphone?  I can't tell if it's amplifying.

12          THE COURT:  It's just that I didn't hear it.  I'm

13  sorry.

14          MR. BILKOVIC:  Oh, okay.

15  BY MR. BILKOVIC:

16  Q.  And why did you open up an investigation into Mr. Didani?

17  A.  Due to reporting that I had received from Detroit Border

18  Patrol station involving suspicious travel and across border

19  possible marijuana or drug smuggling and money laundering.

20  Q.  Okay.  So is that an investigation then that you brought

21  with you?

22  A.  Yes, sir.

23  Q.  Had you been investigating Mr. Didani prior to February of

24  2015 as well?

25  A.  Yes, sir.

1   Q.   And do you see Mr. Didani in Court today?

2   A.   Yes, sir.

3   Q.   Can you please point to him and tell the jury what he's

4   wearing.

5   A.    He is wearing a suit with no tie and first button's undone.

6           MR. BILKOVIC:  Your Honor, can the record reflect

7   identification of the defendant, Ylli Didani?

8           THE COURT:  Any objection?

9           DEFENDANT DIDANI:  No objection, your Honor.

10          THE COURT:  So identified for the record.

11          MR. BILKOVIC:  Thank you, your Honor.

12  BY MR. BILKOVIC:

13  Q.   During the investigation of Mr. Didani, did you also come

14  across individuals associated with Mr. Didani?

15  A.   Yes, sir.

16  Q.   You have a book up there that has exhibits in there.  Could

17  you please open it.  And I want to start with Government's

18  proposed Exhibit 1.0.  Do you see that?

19  A.   Yes, sir.

20  Q.   And is that -- what is that that you're looking at?

21  A.   I'm looking at a picture of -- a picture of Eric Puzio, an

22  associate of Ylli Didani.

23  Q.   Is that something that you came across during your

24  investigation?

25  A.   Yes, sir.

```
 1              MR. BILKOVIC:  Your Honor, at this time I would move
 2   for admission into evidence of Government's proposed Exhibit
 3   1.0 and request permission to publish it to the jury.
 4              THE COURT:  Any objection?
 5              DEFENDANT DIDANI:  No objection, your Honor.
 6              THE COURT:  Very well.  It's admitted as Government's
 7   1.  You may show it to the jury.
 8   BY MR. BILKOVIC:
 9   Q.  You indicated that's Mr. Puzio?
10   A.  Yes, sir.
11   Q.  When you were investigating Mr. Didani, do you know if
12   Mr. Puzio was living -- where Mr. Puzio was living?  And I
13   don't mean address.  I mean basically start with country and
14   then we'll go to state.
15   A.  Yes.  United States, Michigan, in the Detroit area,
16   Hamtramck area I should say.
17              MR. BILKOVIC:  Okay.  Can you take that down.
18   BY MR. BILKOVIC:
19   Q.  And we're going to move to Government's proposed Exhibit
20   1.1.  Do you see that?
21   A.  Yes, sir.
22   Q.  And do you recognize that individual?
23   A.  Yes, sir.
24   Q.  And is that a photograph of somebody?
25   A.  Yes.  That's a photograph of Donald Larson, another
```

1    associate to Mr. Didani.

2              MR. BILKOVIC:  Your Honor, at this time I would move

3    for admission into evidence of Government's proposed Exhibit

4    1.1 and request permission to the publish it to the jury.

5              THE COURT:  Any objection?

6              DEFENDANT DIDANI:  No objection, your Honor.

7              THE COURT:  Very well.  It's admitted as 1.1, and you

8     may show it to the jury.

9    BY MR. BILKOVIC:

10   Q.  You indicated that is Donald Larson?

11   A.  Yes, sir.

12   Q.  Have you ever had contact with Mr. Larson during this

13   investigation?

14   A.  Yes, sir.

15   Q.  At some point in time was Mr. Larson arrested as a result

16   of this investigation?

17   A.  Yes, sir.

18   Q.  I don't want to get into what was said, but at some point

19   in time did you participate in an interview with him?

20   A.  Yes.

21   Q.  Following his arrest?

22   A.  Correct.

23   Q.  I don't mean the same day, but some point after he was

24   arrested?

25   A.  Correct.

1    Q.   Okay.  If we can take that down and if you can look at

2    Government's proposed Exhibit 1.2, Mr. Bianchi?

3    A.   Yes, sir.  It's a photo of another associate of Mr. Didani,

4    Martin Tibbitts.

5    Q.   And can you spell Tibbitts?

6    A.   T-I-B-B-I-T-T-S, I believe.

7            MR. BILKOVIC:  Your Honor, at this time I would move

8    for admission into evidence of Government's proposed Exhibit

9    1.2 and request permission to publish it to the jury if the

10   Court permits it.

11           THE COURT:  Any objection, Mr. Didani?

12           DEFENDANT DIDANI:  No objection, your Honor.

13           THE COURT:  Very well.  It's admitted as 1.2, and you

14   may show it.

15   BY MR. BILKOVIC:

16   Q.   Now, during your investigation when you were investigating

17   Mr. Didani, were you also at some point in time investigating

18   Mr. Tibbitts?

19   A.   Yes, sir.

20   Q.   And do you know what state Mr. Tibbitts was living in at

21   the time that you were investigating him?

22   A.   Yes, sir.  Michigan.

23   Q.   Do you know what city?

24   A.   Grosse Pointe Park.

25   Q.   Was that in the Eastern District of Michigan?

1    A.   Yes, sir.

2    Q.   Did there come a point in time where you stopped

3    investigating Mr. Tibbitts?

4    A.   Yes, sir.

5    Q.   And do you recall approximately when that was?

6    A.   I believe that was July 20th, 2018 when Mr. Tibbitts was

7    killed in a plane crash.

8            MR. BILKOVIC:  We can take that down.

9    BY MR. BILKOVIC:

10   Q.   We're going to go through just one more.  Can you take a

11   look at Government's proposed Exhibit 1.3 and tell me if you

12   recognize that?

13   A.   Yes, sir.

14   Q.   And what is that?

15   A.   That is a picture of another associate of Mr. Didani, Piotr

16   Synowiec.

17           THE COURT:  How do you spell that last name?

18           THE WITNESS:  Synowiec is S-Y-N-O-W-E-I-C, I believe.

19           MR. BILKOVIC:  Actually, I think it's I-E-C.

20           THE WITNESS:  Is it I-E-C?  And --

21           MR. BILKOVIC:  Hold on one second.

22           Your Honor, would the Court like me to spell it for

23   the court reporter?

24           THE COURT:  I just was hoping that --

25           MR. BILKOVIC:  The first name is actually P-I-O-T-R,

1    and the last name is spelled S-Y-N-O-W-I-E-C.

2              THE COURT:  This is 1.3?

3              MR. BILKOVIC:  This is 1.3.  And, your Honor, I move

4    for admission into evidence of Government's proposed Exhibit

5    1.3, and if the Court admits it I would request permission to

6    publish it to the jury.

7              THE COURT:  Any objection?

8              DEFENDANT DIDANI:  No objection, your Honor.

9              THE COURT:  Very well.  It's admitted and you may show

10   it to the jury.

11   BY MR. BILKOVIC:

12   Q.   Now, Mr. Synowiec -- do you know back when you were

13   investigating Mr. Didani do you know what Mr. Synowiec did for

14   a living?

15   A.   Yes, sir.  He worked at Cattleman's.

16   Q.   Pardon me?

17             THE COURT:  What?

18             THE WITNESS:  Cattleman's.

19   BY MR. BILKOVIC:

20   Q.   What is Cattleman's?

21   A.   It's like a meat market, meat distributor.

22   Q.   And do you know what state that was located in?

23   A.   In Michigan.

24   Q.   Do you know whether that was located in the Eastern

25   District of Michigan?

1    A.   It was.

2    Q.   And at the time was Mr. Synowiec living in the Eastern

3    District of Michigan?

4    A.   He was.

5          MR. BILKOVIC:  All right.  We can take that down.

6    BY MR. BILKOVIC:

7    Q.   Now, when you were investigating Mr. Didani back in two

8    thousand -- beginning of 2015, do you know where he was living?

9    A.   Precisely, no.  I have my assumptions, but --

10   Q.   I don't want you to assume.

11   A.   He was traveling between -- no, I do not know where he was

12   living.

13   Q.   Were you monitoring his travel?

14   A.   Yes.

15   Q.   And do you know basically countries that he was traveling

16   from and countries he was traveling to?

17   A.   Yes.

18   Q.   And what were some of the countries he was traveling to?

19   A.   Albania; Istanbul, Turkey; Germany, Italy.

20   Q.   What about the United States?

21   A.   United States.

22   Q.   Did you ever have Mr. Didani or did you ever participate in

23   surveilling Mr. Didani, having him under surveillance?

24   A.   Yes, sir.

25   Q.   Was this something that you physically participated in?

1    A.   Yes, sir.

2    Q.   And we'll get into the specific time period later, but

3    would this have been sometime in 2015?

4    A.   Yes, sir.

5    Q.   And what state would that have been in?

6    A.   In Michigan.

7    Q.   And what city would that have been in?

8    A.   Multiple cities around Detroit and Detroit metro area.

9    Q.   Can you name a couple of the cities?

10   A.   West Bloomfield, Fraser, Oakland County.

11   Q.   And these were cities -- and you said Oakland County.

12   Those are in the Eastern District of Michigan?

13   A.   Yes, sir.

14   Q.   Are these locations that you physically observed Mr. Didani

15   while you had him under surveillance?

16   A.   Yes, sir.

17   Q.   Now, you indicated earlier that you were monitoring

18   Mr. Didani's travel?

19   A.   Yes, sir.

20   Q.   Are we talking -- what type of travel are we talking?

21   A.   Just international travel, flight reservations.  I would

22   get an E-mail alerted as soon as there was a flight reservation

23   for Mr. Didani to fly into or out of the United States.

24   Q.   And was there an interest that you had in Mr. Didani when

25   he traveled into the United States?

1   A.   There was.

2   Q.   What was that interest?

3   A.   To be able to have him interviewed and searched.

4   Q.   By who?

5   A.   By Customs and Border Protection or myself if possible.

6   Q.   And is that something that you had authority to do as a

7   Border Patrol agent?

8   A.   Yes.

9   Q.   I want to take your attention to July of 2015.  Is there a

10   database?  You said you were monitoring his travel.  How is it

11   you're able to do that?  International travel, how are you able

12   to do that?

13   A.   I can create an alert within that database.  This is not a

14   database like that you can look at.  I just create an alert in

15   there, and from my alert I would get an E-mail whenever

16   somebody on my alert would make reservations.

17   Q.   Is this a law enforcement database?

18   A.   Yes, sir.

19   Q.   So you would -- would you put, for example, Mr. Didani's

20   name in it?

21   A.   Yes, sir.

22   Q.   And would you put other identifying identification about

23   Mr. Didani in there?

24   A.   Yes, sir.

25   Q.   And what was the purpose of you doing that?

1    A.   In order to be notified of his travel into or out of the

2    United States.

3    Q.   And so if Mr. Didani were going to travel into the United

4    States after you put this alert on what would happen?

5    A.   I would get an E-mail stating the date and flight

6    information that Mr. Didani had reserved.  Basically the

7    itinerary.

8    Q.   And at some point in time in 2015 did you receive such an

9    alert?

10   A.   I did.

11   Q.   What type of an alert did you receive?

12   A.   That Mr. Didani was flying into Chicago O'Hare.

13   Q.   And do you know where he was flying from?  If you don't,

14   it's okay.  Was it another country?

15   A.   It was another country.

16   Q.   And do you recall approximately when Mr. Didani was

17   supposed to be flying?

18   A.   Meaning the time?

19   Q.   Dates wise -- date wise.

20   A.   Date wise?  I know it was July.  I want to say July 30th.

21   Q.   Of 2015?

22   A.   Of 2015.

23   Q.   And so what did you do when you received that alert?

24   A.   As soon as I received an alert I reached out to my current

25   group supervisor and asked if it was okay, since it was

```
 1   Chicago, close by, if I went there to help interview and do an
 2   interview of him.  I got permission to do that.  So I reached
 3   out to Chicago O'Hare and spoke with somebody at CBP and
 4   requested that he be interviewed and searched.  I created
 5   another alert.
 6   Q.   I'm going to stop you for a second.
 7   A.   Okay.
 8   Q.   I want to break this down a little more.  You said you
 9   called somebody in Chicago?
10   A.   Yes, sir.
11   Q.   What law enforcement agency?
12   A.   Customs and Border Protection.
13   Q.   And do you know who it is you spoke to?
14   A.   I don't, sir.
15   Q.   And did you make any request of them?
16   A.   I did.
17   Q.   And what was that request?
18   A.   First and foremost that Mr. Didani be interviewed and
19   searched, and secondly if they would mind if I came there to
20   stand in or be part of that interview.
21   Q.   And was there any objection to that?
22   A.   No, sir.
23   Q.   Did there -- did you go there right away or did you wait
24   for a certain time period?
25   A.   I waited for a certain time period.  I waited until I knew
```

1    Mr. Didani had boarded the plane.

2    Q.   How would you get that information?

3    A.   Via law enforcement databases.

4    Q.   And so when you received an alert that Mr. Didani had

5    boarded the plane what did you do?

6    A.   I drove to Chicago.

7    Q.   When you got to Chicago, what did you do?

8    A.   I was introduced to a CBP officer, Mr. Fuentes.

9    Q.   I'm sorry.  What was that name?

10   A.   Fuentes.

11   Q.   Do you know how to spell that last name?

12   A.   I don't.  It was George Fuentes.  I do not know how to

13   spell the last name.

14          MR. BILKOVIC:  Your Honor, I can -- I believe I know

15   what the spelling is.  I can either -- would you like me to

16   spell it?

17          THE COURT:  Yes.  Do you have any objection to that,

18   Mr. Didani.

19          DEFENDANT DIDANI:  No, your Honor.  No.

20          THE COURT:  Very well.

21          MR. BILKOVIC:  F-U-E-N-T-E-S.

22          THE COURT:  Okay.  You may proceed.

23   BY MR. BILKOVIC:

24   Q.   And where did you meet Mr. Fuentes?

25   A.   In secondary inspection at the international terminal of

1    the airport.

2    Q.   This is at Chicago O'Hare?

3    A.   Yes, sir.

4    Q.   And what happened when you met with Officer Fuentes?

5    A.   We went over -- basically he had questions for me on what I

6    would like him to ask during the interview of Mr. Didani and

7    what questions I had.  We basically went over the investigation

8    up until that point.

9    Q.   I don't want you to say what you said, but you basically

10   filled him in on what your interest was?

11   A.   Yes, sir.

12   Q.   And so what happened after you met with Officer Fuentes and

13   had that conversation?

14   A.   After that we just stood by for Mr. Didani's plane to

15   arrive.

16   Q.   And did it?

17   A.   It did.

18   Q.   What happened after the plane with Mr. Didani arrived?

19   A.   Another CBP officer was escorting Mr. Didani into secondary

20   when Mr. Fuentes started beginning the process -- the interview

21   process and the searching of the luggage and whatnot.

22   Q.   Were you present for that?

23   A.   I was.

24   Q.   Did the two of you eventually sit down and have a

25   conversation with Mr. Didani?

1  A.   We had a conversation.  We were all standing.  There was no

2  seats at the time, but yes.

3  Q.   The area that you were at, you said it was secondary

4  inspection?

5  A.   Yes, sir.

6  Q.   Can you describe that?

7  A.   There was multiple podiums and with tables next to it and

8  like rollers where people could set their luggage on the roller

9  and roll it off to the table so that their luggage could be

10  searched there.  And the individual being interviewed would go

11  up to the podium and be interviewed there.

12  Q.   Was there more than one podium?

13  A.   Yes.

14  Q.   Was it kind of an open area?

15  A.   Yes, sir.

16  Q.   And so you and Officer Fuentes were at one podium?

17  A.   Yes, sir.

18  Q.   And you were there with Mr. Didani?

19  A.   Yes, sir.

20  Q.   Were there other people in there at other podiums as well?

21  A.   Initially, yes.

22  Q.   Okay.  At some point no?

23  A.   At some point, no.  Mr. Didani was there for a while and

24  that cleared out.

25  Q.   So were these all people that had come off of that same

1    plane?

2    A.   Yes, sir.

3    Q.   And what was Mr. Didani's demeanor like when you were

4    talking to him?

5    A.   Very good, laid back, relaxed, joking around with us.

6    Q.   Cordial conversation?

7    A.   Cordial conversation.

8    Q.   And who asked the questions during the interview?

9    A.   Mainly Mr. Fuentes.  I did ask some questions.

10   Q.   And during the interview was Mr. Didani asked where he

11   lived?

12   A.   Yes.

13   Q.   And do you recall what he said?

14   A.   Yes.  In Fraser, Michigan, Sabre Lane Road, I believe.

15   Q.   Would that be S-A-B-R-E?

16   A.   Correct.

17   Q.   And then Lane?

18   A.   Yes, sir.

19   Q.   And was Mr. Didani asked about his travel history?

20   A.   Yes, sir.

21   Q.   Was that something you wanted to ask?

22   A.   Yes, sir.

23   Q.   Why did you want Officer Fuentes to ask Mr. Didani about

24   his travel history?

25   A.   Multiple reasons, for the areas and the frequency that he

1    had traveled to.  For instance, Istanbul nine times.  He made

2    multiple reservations to fly back into the United States, but

3    didn't board a lot of them.

4            DEFENDANT DIDANI:  Objection, your Honor.  That's

5    irrelevant.

6            THE COURT:  How is it relevant, Counsel?

7            MR. BILKOVIC:  I just asked him as to why he was

8    interested in this travel.  I can move on.

9            THE COURT:  Okay.  Move on.  Sustained.

10   BY MR. BILKOVIC:

11   Q.  Was Mr. Didani asked about any businesses that he may have

12   owned?

13   A.  He was asked after he said he just started his own coal

14   mining business with his uncle, I believe.

15   Q.  And where did he say that coal mining business was?

16   A.  In Albania.

17   Q.  Was he asked about any businesses in Michigan?

18   A.  Yes.

19   Q.  And what did he say?

20   A.  He was part owner of a car wash, DES Detailing in Fraser,

21   Michigan.

22   Q.  And at some point in time did you conduct a search to see

23   if there were any businesses in Michigan in Mr. Didani's name?

24   A.  Yes, sir.

25   Q.  Were there?

1   A.   No.

2   Q.   And we mentioned Mr. Puzio who was the first picture that

3   we showed the jury.  Did you ask Mr. Didani about Mr. Puzio and

4   what he did for a living, or did Officer Fuentes?

5   A.   Neither.  He -- again, he just gave that information

6   freely.  He said this was his --

7   Q.   Who gave that information?

8   A.   Mr. Didani.

9   Q.   What did he say?

10  A.   That his friend, Eric, owned the trucking company with six

11  or seven trucks.

12  Q.   And had you at some point conducted a search of Mr. Puzio

13  to see if he owned any trucking company with six or seven

14  trucks?

15  A.   Yes.

16  Q.   And did he?

17  A.   No.

18  Q.   Now, you said that Mr. Didani talked to you about a coal

19  mining business with his uncle.  What else did he say about

20  that?

21  A.   That he was traveling a lot overseas to Istanbul and

22  Germany trying to sell the coal for that business.  He had said

23  that Germany was their big supplier, but because of the

24  financial crisis they were looking at other people to buy the

25  coal.

30

1   Q.  And did he did -- did you at some point during the

2   interview learn who his business partner was, who his uncle

3   was?

4   A.  I did not.

5   Q.  Did Mr. Didani have any phones in his possession?

6   A.  Yes, sir.

7   Q.  What type of a phone?

8   A.  An iPhone.

9   Q.  And was that something that you allowed him to hold onto

10  when you were questioning him?

11  A.  Yes, sir.

12  Q.  And was he utilizing the phone at all during the interview?

13  A.  Yes, sir, quite a bit.

14  Q.  In what way?

15  A.  In my opinion, he was trying --

16  Q.  Not in your opinion.  What was he doing?

17  A.  He was trying to validate, as we were asking him questions,

18  his answers by showing us pictures of what he did in those

19  various places.

20  Q.  So was he scrolling through the phone and then showing you

21  photographs?

22  A.  Yes, sir.

23  Q.  Can you give the jury an example of something that he

24  showed you?

25  A.  Yes, sir.  He said he was trying to sell his coal in

1    Istanbul, Turkey and he had a business associate there.  He

2    pulled up a picture of a meeting they had together.  He also

3    showed me a picture of his friends in a bar in Albania.  There

4    were various other pictures.

5    Q.  Did you say he showed you a photograph of his business

6    partner?

7    A.  Not business partner.  I don't know that it was his

8    business partner.  I just know it was a person he was in a

9    business meeting with to sell coal to.

10   Q.  Gotcha.  Did you recognize the person in that photograph?

11   A.  I did.

12   Q.  And how did you recognize that person?

13   A.  As a person that was under investigation in a previous drug

14   trafficking case.

15   Q.  Do you know that individual's name?

16   A.  Yes.

17   Q.  What is it?

18   A.  If I'm pronouncing it correctly, Adriatik Sheko.

19        MR. BILKOVIC:  Your Honor, I'm going to have to get

20   the spelling for the Court on that one.  If I can do that on a

21   break, I will get the spelling for the court reporter.

22        THE COURT:  Okay.  You can.

23        MR. BILKOVIC:  Thank you.

24   BY MR. BILKOVIC:

25   Q.  At some point in time did you or Officer Fuentes look at

1    the phone?

2    A.   Yes, sir.

3    Q.   How did that come about?

4    A.   Mr. Fuentes asked if he minded if he looked through his

5    phone.

6    Q.   He asked who?

7    A.   Mr. Didani.   Sorry.

8    Q.   How did Mr. Didani reply to that?

9    A.   Sure, handed him his phone.

10   Q.   And what did Officer Fuentes do?

11   A.   Officer Fuentes started going through the pictures on

12   Mr. Didani's phone.

13   Q.   And where were you in relation to Officer Fuentes?

14   A.   Maybe a couple feet next to him.

15   Q.   Were you also looking at the phone as Officer Fuentes

16   scrolled through it?

17   A.   Not the complete time he was looking at it, but yes.

18   Q.   At times?

19   A.   At times.

20   Q.   And when Officer Fuentes was scrolling through the phone

21   did you see any photographs that alerted your attention?

22   A.   Absolutely.

23   Q.   What type of photographs did you see?

24   A.   Photos of guns, large bulks of currency, U.S. currency.

25   There was even a picture of a bag of what appeared to be white,

1    powdery substance.

2    Q.   Were you able to go through all the photographs?

3    A.   There at the airport?

4    Q.   Yes.

5    A.   No.

6    Q.   Why not?

7    A.   There's thousands -- over 10,000 photographs.

8    Q.   So what did you do?

9    A.   So I requested Mr. Fuentes to see if CBP had the correct

10   equipment to make a phone extraction of that phone.

11   Q.   What does that mean to make a phone extraction?

12   A.   Basically a digital copy of what's on that phone so that we

13   can give the phone back to Mr. Didani.

14   Q.   And was somebody from CBP able to do that extraction?

15   A.   Yes, sir.

16   Q.   And what happened with the phone after that?

17   A.   We gave it back to Mr. Didani.

18   Q.   And why did you want to give the phone back to Mr. Didani?

19   A.   Mr. Didani had a connecting flight, and we were just trying

20   to get him out of there at the time.

21   Q.   Do you know where his connecting flight was to?

22   A.   Detroit.

23   Q.   And was that the final destination?

24   A.   Yes, sir.

25   Q.   And so was Mr. Didani given the phone back?

1   A.   Yes, sir.

2   Q.   Do you know whether or not he made his flight?

3   A.   He did not.

4   Q.   Was it because of the phone extraction?

5   A.   No, sir.

6   Q.   Why?  What was the reason that he missed his flight?

7   A.   CBP's records systems were down.  They were waiting for

8   them to come back online so that they could clear him to leave

9   secondary.

10   Q.   And did that eventually happen?

11   A.   It did.

12   Q.   And after the forensic download of the phone was done did

13   you have an opportunity to review it?

14   A.   Yes, sir.

15   Q.   Did you review the photographs on the phone?

16   A.   Yes, sir.

17   Q.   The videos on the phone?

18   A.   Yes, sir.

19   Q.   Was there anything any photographs or videos on that phone

20   that attracted your attention?

21   A.   Yes, sir.

22   Q.   Now, you said there was approximately how many photographs?

23   A.   Over 10,000.

24   Q.   We're going to go through some of them.  Obviously we're

25   not going to go through all of them, but we're going to go

 1   through some of them.  If you could look at --

 2            Were there any photographs on the phone tying the

 3   phone to Mr. Didani?

 4   A.  Yes, sir.

 5   Q.  Any personal identifying information?

 6   A.  Yes, sir.

 7   Q.  Can you look at Government's proposed Exhibit 2.0.

 8   A.  Yes.

 9   Q.  And do you recognize that?

10   A.  Yes.  That is an identification card, a Michigan

11   identification card of Mr. Ylli Didani.

12   Q.  And was that one of the photographs that was on the phone?

13   A.  Yes, sir.

14            MR. BILKOVIC:  Your Honor, at this time I would move

15   for admission into evidence of Government's proposed Exhibit

16   2.0 and request permission to publish it to the jury?

17            THE COURT:  Any objection?

18            DEFENDANT DIDANI:  No objection, your Honor.

19            THE COURT:  It's admitted as 2.0, and you may show it

20    to the jury.

21            MR. BILKOVIC:  Can we just zoom in on the license

22    part.

23   BY MR. BILKOVIC:

24   Q.  And so what is this?  I said license, but what is this?

25   What is this?

1    A.   This is a Michigan identification card.

2    Q.   And the photograph there is ...

3    A.   Of Mr. Didani, which shows his address and DOB, date of

4    birth.

5    Q.   And what is the address?

6    A.   The address is 15843 Sabre Lane, Fraser, Michigan.

7    Q.   Sabre Lane or Sabre Line?

8    A.   Sabre Line.  I'm sorry.

9    Q.   L-I-N-E?

10   A.   Yes.

11   Q.   And does it show what date that that was issued?

12   A.   It does.  July 10, 2014.

13        MR. BILKOVIC:  Okay.  We can take that down.

14   BY MR. BILKOVIC:

15   Q.   Agent Bianchi, if you could look at Government's proposed

16   Exhibit 2.1.  Do you recognize that?

17   A.   Yes, sir.

18   Q.   And what is that?

19   A.   That is a prescription bottle with Mr. Didani's name on it

20   and address.

21   Q.   And this was also a photograph that was found on the phone?

22   A.   Yes, sir.

23        MR. BILKOVIC:  Your Honor, at this time I would move

24   for admission into evidence of Government's proposed Exhibit

25   2.1 and request permission to publish to the jury.

```
1              THE COURT:  Any objection?

2              DEFENDANT DIDANI:  No objection, your Honor.

3              THE COURT:  Very well.  It's admitted, and you may

4    show it to the jury.

5              MR. BILKOVIC:  Thank you, your Honor.

6              And could we just go on the top third starting there

7    and captioning the address.  Go up a little, yes.

8    BY MR. BILKOVIC:

9    Q.   And again, the name here is -- on the prescription pill

10   bottle is who?

11   A.   Ylli Didani.

12   Q.   And the address?  You might not be able to read the

13   numbers, but the street?

14   A.   The street is Sabre in Fraser, Michigan.

15             MR. BILKOVIC:  You can take that down.

16   BY MR. BILKOVIC:

17   Q.   You indicated that you also noticed a -- back in Chicago

18   photographs of bulk U.S. currency?

19   A.   Yes.

20   Q.   Did you notice -- when you had an opportunity to look

21   through the full phone, did you notice additional -- or

22   pictures of currency or videos of bulk currency?

23   A.   Yes, sir.

24   Q.   Now, have you seen the video that is Government's proposed

25   Exhibit 2.2?
```

1    A.   Yes, sir.

2    Q.   And is that a video that was located on the phone from

3    2015?

4    A.   Yes, sir.

5            MR. BILKOVIC:  Your Honor, at this time I would move

6    for admission into evidence of Government's proposed Exhibit

7    2.2 and request permission to publish it to the jury.

8            THE COURT:  Any objection to 2.2?

9            DEFENDANT DIDANI:  No objection, your Honor.

10           THE COURT:  Very well.

11           MR. BILKOVIC:  Can I have one minute, your Honor, just

12    one minute to confer with Mr. Didani briefly?

13           THE COURT:  Okay.

14           (Briefly off the record.)

15           MR. BILKOVIC:  Thank you, your Honor.

16           THE COURT:  Okay.  It's admitted since there's no

17    objection, and you may show it to the jury.

18           MR. BILKOVIC:  Okay.  Thank you, your Honor.

19           (Video played.)

20    BY MR. BILKOVIC:

21    Q.   Do you recognize the voice of the person talking in the

22    video?

23    A.   Yes, sir.

24    Q.   Whose voice is that?

25    A.   Mr. Didani's.

1    Q.  Can you look at Government's proposed Exhibit 2.1 -- I'm

2    sorry, not 2.1.  2.3.

3    A.  Yes, sir.

4    Q.  And what is that?

5    A.  A photo of Mr. Didani standing over a large amount of

6    currency and the -- what appears to be soft-sided cooler or bag

7    right next to it.

8    Q.  And was this again a photograph found on the phone?

9    A.  Yes, sir.

10            MR. BILKOVIC:  Your Honor, I would move for admission

11   into evidence of Government's proposed Exhibit 2.3 and request

12   permission to publish to the jury.

13            THE COURT:  Any objection to 2.3?

14            DEFENDANT DIDANI:  No objection, your Honor.

15            THE COURT:  Very well.  2.3 is admitted, and you may

16    show it to the jury.

17            MR. BILKOVIC:  Thank you.

18   BY MR. BILKOVIC:

19   Q.  And what are we looking at here?

20   A.  Mr. Didani standing with large amounts of currency wrapped

21   in front of him on the counter.

22            MR. BILKOVIC:  Can we zoom in on the bottom portion,

23   just the currency itself.

24   BY MR. BILKOVIC:

25   Q.  Kind of hard to tell from there, but can you see the types

1    of denominations?

2    A.   Yes, sir.

3    Q.   Starting on this side, I guess, which would be the right

4    side, what denominations are those?

5    A.   The first four stacks are one hundred-dollar bills.

6    Q.   And do you know -- you see -- is there an item basically

7    wrapped around them?

8    A.   Yes.

9    Q.   What is that?

10   A.   It's stating that there's $10,000 in each stack.

11   Q.   Okay.  And you said the first four are one hundred-dollar

12   bills?

13   A.   Yes, sir.

14   Q.   What about the last ones?

15   A.   The last four are fifty-dollar bills.

16   Q.   And how much is in each one of those?

17   A.   $5,000.

18   Q.   According to the wrapper?

19   A.   According to the wrapper.

20   Q.   So a total of $60,000 if my math is correct?

21   A.   Yes, sir.

22        MR. BILKOVIC:  Okay.  We can take that down.

23   BY MR. BILKOVIC:

24   Q.   Are you familiar with phone encryption?

25   A.   Yes, sir.

1   Q.   What is phone encryption?

2   A.   It is -- it's a way to encrypt a message to send or receive

3   messages so that basically nobody else can see it, but you and

4   the other party.

5   Q.   Are there -- is there software that people can buy or

6   obtain or put on their phone in order to be able to encrypt

7   messages?

8   A.   Yes, sir.

9   Q.   Had you ever heard of Sky ECC?

10  A.   Yes, sir.

11  Q.   And generally what is Sky ECC?

12  A.   Encryption software or phone that you can buy from them to

13  encrypt messages.

14  Q.   When you say you can buy from them, you can buy from who?

15  A.   From the company, Sky ECC.

16  Q.   Did you see any evidence relating to Sky ECC on the 2015

17  phone?

18  A.   Yes, sir.

19  Q.   If you can look at Government's proposed Exhibit 2.4 and

20  tell me if you recognize that?

21  A.   Yes, sir.

22  Q.   And what is that?

23  A.   That is a photo of what appears to be a BlackBerry and a

24  message from Sky EE -- or I'm sorry, Sky CC Sales to another

25  person that is 177 --

1  Q.  I'm sorry.  You don't have to get into that detail.

2  Basically this is a photograph that you saw on the phone?

3  A.  Yes, sir.

4  Q.  Of a BlackBerry with a Sky ECC message?

5  A.  Yes, sir.

6      MR. BILKOVIC:  Your Honor, at this time may we request

7  permission to admit Government's proposed Exhibit 2.4 and

8  request that it be published to the jury.

9      THE COURT:  Any objection?

10     DEFENDANT DIDANI:  No objection, your Honor.

11     THE COURT:  All right.  It's admitted, and you may

12  show it to the jury.

13     MR. BILKOVIC:  Can you zoom in on the top third

14  starting at the very top.

15  BY MR. BILKOVIC:

16  Q.  So the top line says what?

17  A.  The very top line says, "Sky ECC Sales."

18  Q.  Now, do you see what is below that?

19  A.  Yes.

20  Q.  What does that say?

21  A.  2q5.

22  Q.  No.  I'm talking the very top.

23  A.  The very top.  "Message destruction time 72 hours."

24  Q.  And then the next line you said the "Sky ECC Sales"?

25  A.  Yes, sir.

1  Q.   And is there a text message there?

2  A.   Yes.

3  Q.   Can you read that into the record?

4  A.   "2q5 with PR roaming six-month service is $1,850 each.  So

5  for two would be $3,700, plus shipping.  It's Easter weekend so

6  I could ship Tuesday and would be there Thursday or Friday at

7  latest."

8  Q.   So two for 1,850 each for six months?

9  A.   Correct.

10  Q.   When we say 1,850, we're talking $1,850?

11  A.   Yes.

12        MR. BILKOVIC:  Okay.  Can we zoom back out.  And can

13  we go down to the bottom half now.

14  BY MR. BILKOVIC:

15  Q.   And you know how BlackBerry phones worked back when they

16  were around?

17  A.   Yes.

18  Q.   Do you see a number there, the top line?

19  A.   Yes.

20  Q.   Could you read that into the record?

21  A.   "17735C@digitalmask.cc."

22  Q.   So is 17735C, would that be the person or the moniker for

23  the person that Sky ECC Sales was communicating with?

24  A.   Yes, sir.

25  Q.   How did that individual respond?

1    A.   "Okay.  I'll call my friend from there and let him know.

2    I'll call you probably."

3           MR. BILKOVIC:  Okay.  Can we zoom back out.  Now, can

4    you go back up on the first line under the "Sky ECC Sales" and

5    the text messaging.  Yes.  Do that and then get the first line.

6    BY MR. BILKOVIC:

7    Q.   You see the q5?

8    A.   Yes, sir.

9    Q.   Are you familiar with BlackBerry models?

10   A.   Yes, sir.

11   Q.   Was their a q5 BlackBerry model?

12   A.   Yes, sir.

13   Q.   Did you also find travel documents on Mr. Didani's phone?

14   A.   Yes, sir.

15   Q.   Can you look at Government's proposed Exhibit 2.5.

16   A.   Yes, sir.

17   Q.   And can you describe what that is?

18   A.   Yes, sir.  That is travel itinerary from Mr. Didani.

19           Do you want me to go through the itinerary?

20   Q.   Is that something that you located on the phone?

21   A.   It is.

22           MR. BILKOVIC:  Your Honor, at this time I would move

23   for admission into evidence of Government's proposed Exhibit

24   2.5 and request permission to publish to the jury.

25           THE COURT:  Any objection?

1          DEFENDANT DIDANI:  No objection, your Honor.

2          THE COURT:  Very well.  It's admitted as 2.5, and you

3    may show it to the jury.

4          MR. BILKOVIC:  And can we zoom in just on the top

5    there.

6    BY MR. BILKOVIC:

7    Q.   Now, do you see the top left-hand corner there's the word

8    "Viber"?

9    A.   Yes, sir.

10   Q.   Do you know what Viber is?

11   A.   Yes, sir.

12   Q.   What's Viber?

13   A.   It's another encrypted messaging app.

14   Q.   Do you see the words below that, "Dan-Dan"?

15   A.   Yes, sir.

16   Q.   Did you come across Dan-Dan during the investigation?

17   A.   Yes, sir.

18   Q.   Were you able to determine during the investigation who the

19   moniker, Dan-Dan, was?

20   A.   Yes, sir.

21   Q.   Who's that?

22   A.   Donald Larson.

23   Q.   And if you could read down, there's a trip locater here?

24   A.   Yes, sir.

25   Q.   And what is the name under the trip locater?

1   A.   Ylli Didani.

2   Q.   So this is -- is there flight information on here?

3   A.   Yes, sir.

4        MR. BILKOVIC:  Now, if we can go back out.

5   BY MR. BILKOVIC:

6   Q.   Does this show the final destination or is it cut off?

7   A.   It is cut off.

8        MR. BILKOVIC:  Okay.  If you could take that down.

9   BY MR. BILKOVIC:

10  Q.   And, Agent Bianchi, can you look at Government's proposed

11  Exhibit 2.6.  Do you recognize that?

12  A.   Yes, sir.

13  Q.   And what is that?

14  A.   That is another photo off of Mr. Didani's phone.  It

15  appears to be -- it is his itinerary for his flight back.

16  Q.   So the first exhibits that we looked at, the 2.5, those

17  were outgoing flights?

18  A.   Yes, sir.

19  Q.   And these are return flights depicted in 2.6?

20  A.   Yes, sir.

21       MR. BILKOVIC:  Your Honor, at this time I would move

22  for admission into evidence of Government's 2.6.

23       THE COURT:  Any objection?

24       DEFENDANT DIDANI:  No objection, your Honor.

25       THE COURT:  Very well.  They're admitted.

1              MR. BILKOVIC:  And may I publish it to the jury?

2              THE COURT:  Yes.

3              MR. BILKOVIC:  Can we go to the top third.

4    BY MR. BILKOVIC:

5    Q.   And on the itinerary does it show a departure date?

6    A.   Yes, sir.

7    Q.   And what does the departure date?

8    A.   June 2, 2015.

9    Q.   And does it show the airport being departed from?

10   A.   Yes, sir, Bogota Eldorado Airport.

11   Q.   Do you know where Bogota Eldorado Airport is?

12   A.   In Bogota, Colombia.

13              MR. BILKOVIC:  And if we can go to the very bottom.

14   Go back out of that and then go to the bottom.

15   BY MR. BILKOVIC:

16   Q.   And does this that we're looking here have the final

17   destination?

18   A.   I don't believe so.

19   Q.   Does it have a destination?

20   A.   It has a destination.

21   Q.   This is basically the second leg of the trip?

22   A.   Correct.  Well, third in this case.

23   Q.   Third leg of the trip.  And where is the arrival at?

24   A.   Rome.

25   Q.   I'm sorry.  The departure -- is it arrival or departure?

1   A.   I'm sorry.  Yes.  Departure.  Departs Rome, arrives in

2   Albania.

3   Q.   Tirana, Albania?

4   A.   Tirana.

5          MR. BILKOVIC:  Okay.  If we could take that down.

6   BY MR. BILKOVIC:

7   Q.   Did you see on the phone evidence that Mr. Didani had

8   filmed any individuals using suspected controlled substance?

9   A.   Yes, sir.

10  Q.   Have you had an opportunity to review Government's proposed

11  Exhibit 2.7?

12  A.   Yes, sir.

13  Q.   And was that a video that was found on the phone?

14  A.   Yes, sir.

15         MR. BILKOVIC:  Your Honor, at this time I would move

16  for admission into evidence of Government's proposed Exhibit

17  2.7.

18         THE COURT:  Any objection?

19         DEFENDANT DIDANI:  Your Honor, objection.  Was that

20  film from me or sent to me?  We have to be clear to that, your

21  Honor.

22         THE COURT:  Well, I think that probably goes to

23  cross-examination.

24         MR. BILKOVIC:  Maybe I'll clarify.

25

1    BY MR. BILKOVIC:

2    Q.  Do you know if that was something Mr. Didani was filming or

3    is he in the video?

4    A.  It appears that he's filming it.

5    Q.  How many people are depicted in the video?

6    A.  One.

7    Q.  And are there more than one voice in the video?

8    A.  Yes.

9    Q.  And how many voices are there?

10   A.  Two.

11   Q.  Is one of those Mr. Didani's?

12   A.  Yes.

13           MR. BILKOVIC:  Your Honor, at this time I would move

14   for admission into evidence of Government's proposed Exhibit

15   2.7.

16           THE COURT:  Any objection?

17           DEFENDANT DIDANI:  No objection, your Honor.

18           THE COURT:  Very well.  It's admitted.

19           MR. BILKOVIC:  Your Honor, I'm not going to play the

20   whole thing.  With the Court's permission, I was only going to

21   play the first 30 seconds or so, unless Mr. Didani wants the

22   whole thing played.

23           DEFENDANT DIDANI:  It don't matter.

24           THE COURT:  Mr. Didani, I didn't hear your answer.

25           DEFENDANT DIDANI:  No.  Thirty seconds is fine.

1              THE COURT:  Okay.

2              (Video played.)

3    BY MR. BILKOVIC:

4    Q.   Did you recognize one of the voices in the video?

5    A.   Yes, sir.

6    Q.   And who's that voice?

7    A.   Mr. Didani.

8    Q.   Do you know who the other individual in the video is?  And,

9    if you don't know, that's fine.

10   A.   I do.

11   Q.   Who is that?

12   A.   Mr. Kupinski, if I'm saying that correctly.

13   Q.   Do you know what his first name is?

14   A.   Gerald.

15   Q.   And is Gerald Kupinski a name that you came across during

16   the investigation?

17   A.   Yes, sir.

18   Q.   And do you know what state he was living in?

19   A.   Yes, sir.

20   Q.   Where?

21   A.   In Michigan.

22   Q.   In the Eastern District?

23   A.   Yes, sir, St. Clair Shores.

24   Q.   Now, you indicated at some point in time you had Mr. Didani

25   under physical surveillance?

1    A.   Yes, sir.

2    Q.   Now, is that something that you do by yourself or you would

3    do with other individuals?

4    A.   Other individuals.

5    Q.   Do you recall in August of 2015 whether there was a period

6    of time that you had Mr. Didani under surveillance?

7    A.   Yes, sir.

8    Q.   And did you describe some of the locations that you

9    observed him at?

10   A.   Yes, sir.  We initially observed Mr. Didani in West

11   Bloomfield at Piotr Synowiec's house.

12           THE COURT:  At who?

13           THE WITNESS:  Piotr Synowiec.

14   BY MR. BILKOVIC:

15   Q.   And Piotr Synowiec was the individual that we earlier

16   identified in Government's 1.3?

17   A.   Yes, sir.

18   Q.   The Cattleman's meat place?

19   A.   Correct.

20   Q.   And did you observe Mr. Didani in any other locations?

21   A.   Yes, sir.  The Oakland County International Airport with

22   Mr. Tibbitts.

23   Q.   With Martin Tibbitts?

24   A.   Yes, sir.

25   Q.   Any other individuals?

52

1   A.   Yes, sir.  Donald Larson.  At Donald Larson's residence in

2   Fraser on Woodbine.

3   Q.   At Donald Larson's residence on Woodbine in Fraser?

4   A.   Yes, sir.

5   Q.   And is Woodbine spelled W-O-O-D-B-I-N-E?

6   A.   Yes, sir.

7   Q.   And did the investigation continue into Mr. Didani during

8   2015?

9   A.   Yes, sir.

10  Q.   And did it continue into 2016?

11  A.   Yes, sir.

12  Q.   Now, you had indicated earlier you had an alert on to be

13  notified of when Mr. Didani would enter the United States?

14  A.   Yes, sir.

15  Q.   Did that alert stay active?

16  A.   Yes, sir.

17  Q.   So were you still receiving notifications?

18  A.   Yes, sir.

19  Q.   Did there come a point in time in August of 2016 that you

20  received an alert that Mr. Didani would be flying into Chicago

21  O'Hare?

22  A.   Yes, sir.

23  Q.   And how is it that you received that alert?

24  A.   Via E-mail.

25          MR. BILKOVIC:  Your Honor, may we approach for one

1    minute?

2                THE COURT:  Yes, you may.

3                (At 12:06 p.m., sidebar off the record, out of the

4                hearing of the jury, as follows:)

5                THE COURT:  Let's take a break.  The jurors may step

6    to the jury room.  Remember that you're not permitted to talk

7    about the case among yourselves of with anyone else until I

8    tell you it's time to deliberate, all right.  And you can let

9    me know about the climate in there when you come back, okay.

10               All right.  Please rise for the jury.

11               (The jury left the courtroom at 12:07 p.m.)

12               THE COURT:  You may step down during the break, sir,

13   but please don't discuss your testimony with anyone; all right?

14               THE WITNESS:  Yes.

15               THE COURT:  We'll take a break for ten minutes.

16               MR. FINK:  Thank you, your Honor.

17               MR. BILKOVIC:  Thank you, your Honor.

18               THE COURT:  All right.  You're welcome.

19               (At 12:07 p.m. a brief recess was taken.

20               Back on the record at 12:25 p.m.)

21               LAW CLERK:  All rise.  Court is back in session.

22               THE COURT:  You may bring the jury out.

23               (The jury entered the courtroom at 12:26 p.m.)

24               THE COURT:  Okay.  I'm satisfied the jurors are

25   present.  What about you?

1           MR. BILKOVIC:  Yes, your Honor.  The Government is

2    satisfied.

3           THE COURT:  Mr. Didani?

4           DEFENDANT DIDANI:  Yes, your Honor.

5           THE COURT:  Okay.  Very well.

6           You are still under oath; all right?

7           THE WITNESS:  Yes, ma'am.

8           THE COURT:  Okay.  You may proceed.

9           MR. BILKOVIC:  Thank you, your Honor.

10   BY MR. BILKOVIC:

11   Q.   I think when we left off, and I'm hoping I'm correct, we

12   were talking about you still had the alert out?

13   A.   Yes.

14   Q.   And in August of 2016, specifically August 6, 2016, were

15   you alerted again that Mr. Didani was traveling in the United

16   States?

17   A.   Yes, sir.  I was alerted before that date.

18   Q.   So you would get the alert ahead of time?

19   A.   Yes, sir.  Usually as soon as he makes the reservation.

20   Q.   Okay.  As soon as a person makes a reservation that's when

21   you're alerted?

22   A.   Yes, sir.

23   Q.   And so what did you do after you received that alert?

24   A.   At the time I was on leave, vacation.  I reached out to my

25   group supervisor and let him know what was happening and what

1   I'd like to do, and that was to have Mr. Didani interviewed and

2   searched again.  And then I reached out to HSI in Chicago,

3   whoever was in charge of Chicago O'Hare Airport.

4   Q.  And again, HSI is Homeland Security Investigations?

5   A.  Yes, sir.

6   Q.  Do you know who it is you spoke with at HSI?

7   A.  Initially, no.  I was directed to Special Agent Nugent.

8   Q.  I'm going to stop you for a second then.  You called

9   somebody from HSI?

10  A.  Correct.

11  Q.  And then they directed you to Special Agent Nugent?

12  A.  Correct.  Who is the duty person that day.

13  Q.  And is that the individual that testified earlier today?

14  A.  Yes.

15  Q.  And what did you -- what was the conversation -- don't tell

16  me exactly what was said, but what was the reason for the

17  conversation with Agent Nugent?

18  A.  I let him know a brief summary of our investigation

19  entailed, what I was looking for, and asked to search

20  Mr. Didani and interview him.

21  Q.  Basically the same as back in 2015?

22  A.  Yes, sir, except we had more information.

23  Q.  Okay.  You had gone through the 2015 phone?

24  A.  Correct.

25  Q.  And again, the items that you testified to were there other

1    similar items on that phone?

2    A.   Lots.

3    Q.   Okay.  And so did Agent Nugent agree to do that?

4    A.   Can you repeat that?

5    Q.   Did Agent Nugent agree to do that?

6    A.   Yes, sir.

7    Q.   And did you receive contact or did Agent Nugent or anybody

8    else contact you on August 6 or after August 6?

9    A.   Yes, sir.

10   Q.   And who was it that contacted you?

11   A.   Agent Nugent.

12   Q.   And do you know where Mr. Didani's ultimate destination was

13   when he flew into Chicago?

14   A.   Yes, sir.

15   Q.   Where was he going to?

16   A.   His final destination was Mexico City in Mexico.

17   Q.   So he was not staying in Chicago, it was basically a

18   stop-over or a layover or whatever?

19   A.   Yes, sir.  There was many connecting flights.

20          THE COURT:  There were many connecting flights?

21          THE WITNESS:  Yes, ma'am.

22          THE COURT:  What do you mean by that?

23          THE WITNESS:  If I remember correctly, he flew from

24   Albania to Rome to Chicago to Juarez, Mexico and final

25   destination Mexico City.

1              THE COURT:  Okay.

2    BY MR. BILKOVIC:

3    Q.   Now, during your investigation, did you receive alerts of

4    anyone else that was flying into Mexico City at the same time?

5    A.   Yes, sir.

6    Q.   And who was that?

7    A.   Eric Puzio.

8    Q.   That was the individual you identified in Government's

9    Exhibit 1.0?

10   A.   Yes, sir.

11   Q.   Was he on the same itinerary as Mr. Didani?

12   A.   No, sir.

13   Q.   Where was he traveling from?

14   A.   He was traveling from Detroit Metro to Juarez, Mexico,

15   final destination Mexico City.

16   Q.   And ultimately did you receive information as to the return

17   flights for both Mr. Didani and Mr. Puzio back from Mexico

18   City?

19   A.   Yes, sir.

20   Q.   And do you know approximately how long each one of them was

21   in Mexico City?

22   A.   Yes, sir.  Each one was there less than 40 hours.

23   Q.   Less than how many hours?

24   A.   40 hours.

25   Q.   Less than 40 hours.  So less than two days?

1  A.   Correct.

2  Q.   At some point in time, did you receive anything from the

3  Chicago office?

4  A.   Yes, sir.

5  Q.   What did you receive?

6  A.   I received a E-mail detailing the interview and report and

7  two cell phones.

8  Q.   And how did you receive the two cell phones?

9  A.   Via FedEx.

10 Q.   FedEx?

11 A.   Yes, sir.

12 Q.   So Federal Express?

13 A.   Yes, sir.

14 Q.   And what type of phones were those?

15 A.   An iPhone and a BlackBerry.

16 Q.   And what did you do when you received those items?

17 A.   I proceeded to get a search warrant through the Eastern

18 District of Michigan for both items.

19 Q.   And when you say you get a search warrant what do you mean

20 by that?

21 A.   In order to extract -- try to do an extraction of both cell

22 phones.

23 Q.   Who authorizes that search warrant?  Is that somebody from

24 your office, or who actually issues the search warrant allowing

25 you to go through those phones?

1   A.   The judge here in the Eastern District.

2   Q.   Okay.  Not anybody in your agency, you have to go to the

3   court?

4   A.   Correct.

5   Q.   And did you receive that search warrant authorizing you to

6   go through both of the phones?

7   A.   Yes, sir.

8   Q.   And was forensic downloads basically done of both of those

9   phones?

10  A.   Tried to.

11  Q.   When you say "tried to," what do you mean?

12  A.   The iPhone a forensic download was completed.  The

13  BlackBerry there was nothing on it to download.

14  Q.   And do you know why that is?

15  A.   It appeared to be wiped.

16  Q.   What do you mean it appeared to be wiped?

17  A.   Like if you're going to trade your phone in you are going

18  to erase all contacts.  It basically brings it back to when it

19  was brand new, and there's no content on the device.

20          DEFENDANT DIDANI:  Objection, your Honor.  That's pure

21   speculation.  He's not a technician.

22          THE COURT:  I'm sorry?

23          DEFENDANT DIDANI:  That's pure speculation.

24          THE COURT:  Do you want to respond to that?

25          MR. BILKOVIC:  I don't think he said -- I think all

```
 1    he's saying is there was no information on the -- it appeared
 2    to be a factory reset, there was no information on it.
 3              THE COURT:  Well, it was little bit more than that.
 4              MR. BILKOVIC:  Okay.  Well, let me --
 5              THE COURT:  No, I'm going to strike it.  You may ask
 6    him those questions.  How about that?
 7    BY MR. BILKOVIC:
 8    Q.  Were you able to obtain a forensic download of the
 9    BlackBerry?
10    A.  No, sir.
11    Q.  Are you aware whether there was information on the
12    BlackBerry?
13    A.  Yes.
14    Q.  At the time that they tried doing the forensic download?
15    A.  Yes.
16    Q.  Was there or no?
17    A.  No information besides the software for the phone.
18    Q.  And what about the iPhone?
19    A.  We were able to get an extraction off the iPhone, full
20    extraction.
21    Q.  Have you had an opportunity to review the iPhone
22    extraction?
23    A.  Yes, sir.
24    Q.  And we talked about iPhone extraction.  What volume of
25    information are we talking about?
```

1   A.   In this particular case, there was -- each case is

2   independent, but there was a lot of information.  We got chats,

3   text messages, photos, call logs, contacts.

4   Q.   What about videos?

5   A.   Videos.

6   Q.   And did you have an opportunity to go through that

7   material?

8   A.   Yes, sir.

9   Q.   And did you review photographs and videos?

10  A.   Yes, sir.

11  Q.   Was there any that basically were of interest to you in

12  your investigation?

13  A.   Yes, sir, a lot.

14  Q.   I'm going to have you take a look at -- I'm going to go out

15  of order a little bit here, but if you could start with

16  Government's proposed Exhibit 5.1, and I may ask you a couple

17  questions first.

18          Did you notice any photographs on the phone of

19  Mr. Didani?

20  A.   Yes, sir.

21  Q.   And did you notice photographs on the phone of him with

22  other individuals?

23  A.   Yes, sir.

24  Q.   Can we go to look at Government's proposed Exhibit 5.1 and

25  tell me if you recognize that?

1    A.   I do, sir.

2    Q.   And what is that?

3    A.   That is a photos of Mr. Didani standing next to

4    Mr. Tibbitts at Oakland International Airport.

5             MR. BILKOVIC:  Your Honor, at this time I would move

6    for admission into evidence Government's proposed Exhibit 5.1

7    and request permission to publish it to the jury.

8             THE COURT:  Any objection?

9             DEFENDANT DIDANI:  No objection, your Honor.

10            THE COURT:  Very well.  It's admitted, and you may

11    show it to the jury.

12   BY MR. BILKOVIC:

13   Q.   What are we looking at here?

14   A.   Mr. Didani on the right side and Mr. Martin Tibbitts on the

15   left side and standing in front of an airplane.

16            MR. BILKOVIC:  Okay.  If we can take that down.

17   BY MR. BILKOVIC:

18   Q.   Did you notice any -- locate any videos that had both

19   Mr. Didani and Donald Larson in them?

20   A.   Yes, sir.

21   Q.   Have you had an opportunity to review Government's proposed

22   Exhibit 5.14?

23   A.   Yes, sir.

24   Q.   Is that a video of Mr. Didani and Mr. Larson?

25   A.   Yes, sir.

1          MR. BILKOVIC:  Your Honor, at this time I would move

2    for admission into evidence of Government's proposed Exhibit

3    5.14 and request permission to publish to the jury.

4          THE COURT:  What number is it again?  5.14?

5          MR. BILKOVIC:  5.14.

6          THE COURT:  Any objection?

7          DEFENDANT DIDANI:  No objection, your Honor.

8          THE COURT:  Very well.  It's admitted, and you may

9    show it to the Government.

10          MR. BILKOVIC:  Your Honor, I would ask Mr. Didani's

11   permission where I was only going to play the first 20 seconds

12   or so.

13          DEFENDANT DIDANI:  That's fine.

14          THE COURT:  Is that all right?  It's a video?

15          MR. BILKOVIC:  Yes.

16          THE COURT:  Okay.

17          (Video played.)

18   BY MR. BILKOVIC:

19   Q.   Is that Mr. Larson on the right?

20   A.   Yes, sir.

21   Q.   And Mr. Didani on the left?

22   A.   Yes, sir.

23   Q.   Would it appear to you that they knew each other in that

24   video?

25   A.   Absolutely.

1    Q.   Did you find other items related to Mr. Larson?

2    A.   Yes, sir.

3    Q.   Can you look at Government's proposed Exhibit 5.13 and tell

4    me if you recognize that?

5    A.   Yes, sir.

6    Q.   And what is that?

7    A.   That is a screenshot of a message thread between Mr. Didani

8    and Donald Larson, or between MI Freight and Donald Larson.397.

9    Q.   And is this a photograph of a screenshot?

10   A.   Correct.

11   Q.   I mean, this is -- what we're about to look at, that's how

12   it appeared on the phone; correct?

13   A.   Correct.

14        MR. BILKOVIC:  Your Honor, at this time I would move

15   for admission into evidence of Government's proposed Exhibit

16   5.13 and request permission to publish to the jury.

17        THE COURT:  Any objection.

18        DEFENDANT DIDANI:  No objection, your Honor.

19        THE COURT:  Very well.  It's admitted, and you may

20   show it to the jury.

21        MR. BILKOVIC:  If we could just view the top three, or

22   start up there and go down to the first Donald Larson entry.

23   Keep going down.  Right there, that's good.

24   BY MR. BILKOVIC:

25   Q.   Do you see the MI Freight?

1    A.   Yes, sir.

2    Q.   And is that one of the people involved in the conversation?

3    A.   Yes, sir.

4    Q.   And then do you see an entry of Donald -- at the bottom

5    Donald.larson.397?

6    A.   Yes, sir.

7    Q.   Do you see the picture -- I know it's kind of small there,

8    but can you see the picture of the person associated with

9    Donald.larson.397?

10   A.   Yes, sir.

11   Q.   And do you know who is in that picture?

12   A.   Donald Larson.

13   Q.   Now the, picture next to the MI Freight M-I-F-R-E-I-G-H-T,

14   have you seen a larger picture of that same photograph in this

15   investigation?

16   A.   Yes, sir.

17   Q.   And who is that individual?

18   A.   Mr. Didani.

19        DEFENDANT DIDANI:  Objection, your Honor.  He

20   identified me through that picture?

21        MR. BILKOVIC:  Judge, I don't believe that's --

22        THE COURT:  That can be on cross-examination, okay.

23   BY MR. BILKOVIC:

24   Q.   Let me follow up with that.  The picture next to

25   Mr. Didani, did you see regular-sized versions of that same

1    image during this investigation?

2    A.   Yes, sir.

3    Q.   And who is the person in that picture?

4    A.   Mr. Didani.

5            DEFENDANT DIDANI:  Okay.

6    BY MR. BILKOVIC:

7    Q.   You may not necessarily be able to tell just from this;

8    correct?

9    A.   Correct.

10   Q.   Now, we've mentioned --

11           MR. BILKOVIC:  You can take it down.  Thank you.

12   BY MR. BILKOVIC:

13   Q.   You had mentioned -- we talked about Martin Tibbitts.  Did

14   you see any other information on Mr. Didani's phone related to

15   Martin Tibbitts?

16   A.   Yes, sir.

17   Q.   And again, we're not going through all the information;

18   correct?

19   A.   Correct.

20   Q.   Can you take a look at Government's proposed Exhibit 5.2.

21   A.   Yes, sir.

22   Q.   And can you tell the jury what 5.2 is?

23   A.   Yes, sir.  It's a photo of Mr. Martin Tibbitts' residence,

24   his backyard in the back of his home.

25   Q.   And this is the Grosse Pointe residence you discussed

 1   earlier?

 2   A.   Yes, sir.

 3            MR. BILKOVIC:  Your Honor, at this time I would move

 4   for admission into evidence of Government's proposed Exhibit

 5   5.2 and request permission to publish to the jury.

 6            THE COURT:  Any objection?

 7            DEFENDANT DIDANI:  No objection, your Honor.

 8            THE COURT:  Very well.  It's admitted, and you may

 9    show it to the jury.

10   BY MR. BILKOVIC:

11   Q.   And this was a photograph found on Mr. Didani's phone, the

12   2016 iPhone?

13   A.   Correct.

14            MR. BILKOVIC:  You may take that down.

15   BY MR. BILKOVIC:

16   Q.   Now, I'm next going to ask that you look at 5.3, 5.4 and

17   5.5, and tell me if you recognize those?

18   A.   Yes, sir.

19   Q.   And what are those?

20   A.   Large amounts of bulk U.S. currency.

21   Q.   And are they different photographs?

22   A.   They are.

23   Q.   Do they appear to show the same currency in the same

24   location?

25            THE COURT:  I don't understand that question.  Phrase

1    it again.

2    BY MR. BILKOVIC:

3    Q.   Do they appear to show the same currency all three

4    photographs?

5    A.   They do.

6    Q.   And do they appear to be taken in the same location, all

7    three photographs?

8    A.   They do.

9    Q.   Is it fair to say that some of the currency is stacked

10   differently in the photographs?

11   A.   Yes, sir.

12          MR. BILKOVIC:   Your Honor, at this time I would move

13   for admission into evidence of Government's proposed Exhibit

14   5.3, 5.4 and 5.5, and I would request only permission at this

15   time to publish 5.5 to the jury.

16          THE COURT:   Any objection?

17          DEFENDANT DIDANI:   No objection.

18          THE COURT:   Very well.   They are admitted, and you may

19   publish 5.5.

20   BY MR. BILKOVIC:

21   Q.   And what is it we're looking at here?

22   A.   Large amounts of U.S. currency wrapped up.

23   Q.   And what denominations do you see in the photograph?

24          MR. BILKOVIC:   Could we just zoom in on the currency

25   itself.

```
 1              THE WITNESS:  Mainly hundreds.  The far right side
 2    appears to be $20 bills.
 3    BY MR. BILKOVIC:
 4    Q.  And again, the stacks of hundreds, each stack --
 5    A.  Was 10,000.
 6    Q.  Do you know where that photograph was taken?
 7    A.  I do.
 8    Q.  Where was that photograph taken?
 9              Well, let me ask you this.  How do you know that?
10    A.  The photo was geotagged to a location.
11              THE COURT:  Excuse me?
12              THE WITNESS:  The photo was geotagged to a location.
13    BY MR. BILKOVIC:
14    Q.  So explain that to the jury.  How does that work?
15    A.  The best I can, if your location services are on and you
16    take a photo, it will take the GPS coordinates of where you are
17    at at that moment when you take the photo.
18    Q.  And is that --
19              DEFENDANT DIDANI:  Objection, your Honor.  He's not an
20     expert.
21              MR. BILKOVIC:  Judge, I don't believe he needs to be
22    an expert to testify to that.  I would ask to be able to
23    conditionally ask the question, receive the answer.  We will be
24    having a witness --
25              THE COURT:  But also ask him how he knows.
```

1              MR. BILKOVIC:  I will.

2    BY MR. BILKOVIC:

3    Q.   Okay.  How do you know that?

4    A.   In the software, when you're looking at the photo

5    extraction that you are given from the forensic team, there is

6    a location icon.  If one is given next to it, you can click on

7    that, and it will pull a map up and show you where it was

8    taken.

9              DEFENDANT DIDANI:  Objection, your Honor.  It's either

10   hearsay or he's got to be an expert.

11             MR. BILKOVIC:  I'm not done with my --

12             THE COURT:  First of all, let him ask the rest of his

13   question.  He already said he was going to bring in an expert

14   to tell us more about that, but he can ask this witness how he

15   knows that.

16   BY MR. BILKOVIC:

17   Q.   So is that something that is within the download itself

18   that you receive?

19   A.   Yes, sir.

20   Q.   You received that information as well?

21   A.   Yes, sir.

22   Q.   And so is that how you were able to determine where this

23   photograph was taken according to the software?

24   A.   Yes, sir.

25   Q.   And where was this photograph taken?

1    A.   Donald Larson's residence on Woodbine in Fraser, Michigan.

2    Q.   On Woodbine in Fraser, Michigan?

3    A.   Yes, sir.

4            THE COURT:  And that's subject to you tying it up with

5    an expert, okay.

6            MR. BILKOVIC:  Thank you, your Honor.

7            THE COURT:  All right.

8    BY MR. BILKOVIC:

9    Q.   And can you look at 5.6, Government's proposed Exhibit 5.6.

10   A.   Yes, sir.

11   Q.   And do you recognize that?

12   A.   Yes, sir.

13   Q.   And what is that?

14   A.   Large amounts of U.S. currency that is wrapped and put into

15   what appears to be vacuum-sealed bags.

16   Q.   What's a vacuum-sealed bags?

17   A.   Cellophane.  It sucks the air out of the bag and conceals

18   it tightly.

19   Q.   And this was also a photograph found in the 2016 iPhone

20   extraction?

21   A.   Yes, sir.

22           MR. BILKOVIC:  Your Honor, at this time I would move

23   for admission into evidence of Government's proposed Exhibit

24   5.6 and request permission to publish to the jury.

25           THE COURT:  Any objection?

1              DEFENDANT DIDANI:  No objection, your Honor.

2              THE COURT:  Very well.  It's admitted, and you may

3    show it to the jury.

4              MR. BILKOVIC:  Can we just zoom in on the bags.

5    BY MR. BILKOVIC:

6    Q.   And what is it that we're looking at here?

7    A.   Bulk currency wrapped in money wraps, which are placed

8    inside what appears to be cellophane and vacuum-sealed shut.

9    Q.   Did you say cellophane?

10   A.   Yes.

11   Q.   Are those bags?

12             THE COURT:  What are you looking at now, the photo?

13             THE WITNESS:  Yes, ma'am.

14             THE COURT:  Okay.

15             THE WITNESS:  It appears to be vacuum-sealed bags.

16             MR. BILKOVIC:  Okay.  If we could go back out.

17   BY MR. BILKOVIC:

18   Q.   And do you see the top left-hand corner of the photograph?

19   A.   Yes, sir.

20             MR. BILKOVIC:  Zoom in on that.

21             THE WITNESS:  Yes, sir.

22   BY MR. BILKOVIC:

23   Q.   And what does that appear to be?

24   A.   The vacuum-sealed bags.

25   Q.   Ziploc bags?  Does that appear to be a package of Ziploc

1    bags, the top -- I just want you to look up here right now,

2    Agent Bianchi.

3    A.    Yes.

4    Q.    What's depicted on the screen?  What does that appear to

5    be?

6    A.    Ziploc bags.

7    Q.    Okay.  Do you know what a false floor is?

8    A.    Yes, sir.

9    Q.    What is a false floor?

10   A.    A false floor would be when somebody goes into somewhere

11   and sees a floor and it's essentially not the correct floor.

12   There's a void underneath it where the real floor is under the

13   floor that appears to them as the floor.  And it's used to, for

14   instance, hide contraband and to be smuggled across the border.

15   Q.    So basically there's a floor underneath the floor?

16   A.    The floor.

17   Q.    And that's a void area?

18   A.    Yes.

19   Q.    Is that something that is -- you come across in drug

20   trafficking cases before?

21   A.    Yes.

22   Q.    I want to have you take a look at Government's proposed

23   Exhibit 5.12.  And do you recognize that?

24   A.    Yes, sir.

25   Q.    And what is that?

74

1   A.   A message, a photo of what appears to be a BlackBerry again

2   and a message between two individuals.

3   Q.   And this was found on the 2016 iPhone?

4   A.   Yes, sir.

5         MR. BILKOVIC:  Your Honor, at this time I would move

6   for admission into evidence of Government's proposed Exhibit

7   5.12.

8         THE COURT:  Any objection?

9         DEFENDANT DIDANI:  No objection, your Honor.

10        THE COURT:  No objection?

11        DEFENDANT DIDANI:  No.

12        THE COURT:  Okay.  It's admitted, and you may show it

13   to the jury.

14        MR. BILKOVIC:  Can we zoom in on the top third,

15   starting up to the very top, down to the bottom of the first

16   message.  Yes.  No, go up higher.  Actually, that's fine.  Go

17   there.

18   BY MR. BILKOVIC:

19   Q.   Okay.  Does this appear to be a conversation -- a text

20   message conversation between two people?

21   A.   Yes, sir.

22   Q.   Do you see the mouse up there?  Can you click on it.  You

23   say it appears to be two people.  Can you take the mouse and

24   put it on what the first person is.

25   A.   This would be the first person.

1  Q.  That's basically the identifier of one of the two

2  individuals involved in the text message?

3  A.  Yes, sir.

4  Q.  And what is that individual's basically screen name?

5  A.  Sorry.  My eyes are bad.  35E6CF@blacksecure.com.

6  Q.  Okay.  And do you see a blue box below that?

7  A.  Yes, sir.

8  Q.  And what does that say?

9  A.  "One hour and 59 minutes remaining."

10  Q.  And if you could read that text message into the record

11  what it says.

12  A.  It says, "I send you," and then you can't read finish that

13  sentence, "of container.  Back wall of the box hold 150 units,

14  floor hold 600 units."

15  Q.  And then the next person, what can you see from their

16  screen name?

17  A.  A-N-C-O.

18  Q.  And how do they respond?

19  A.  "I see the pic."

20  Q.  Now, do you have Government's Exhibit 4.0 in front of you?

21  A.  Yes, sir.

22  Q.  And have you seen that before, that's already been admitted

23  into evidence?

24  A.  Yes, sir.

25           MR. BILKOVIC:  Would it be possible to do a

1  side-by-side of Government's 4.0 and Government's 5.12?

2  BY MR. BILKOVIC:

3  Q.  Now, during your investigation did you make note of these

4  two images?

5  A.  Yes, sir.

6  Q.  Why?

7  A.  Because they appear to correlate with each other.

8  Q.  In what ways?

9           DEFENDANT DIDANI:  Objection, your Honor.

10           THE COURT:  What's your objection?

11           DEFENDANT DIDANI:  My objection is it's pure

12  speculation, your Honor.

13           THE COURT:  I'm sorry?

14           DEFENDANT DIDANI:  It's pure speculation.

15           THE COURT:  What is speculation?  That me made a note

16  of the two?

17           DEFENDANT DIDANI:  Exactly, your Honor.

18           THE COURT:  He can answer if he made a note of the

19  two.  It might be speculation what he made a note of, but he

20  can answer if he made a note of the two.

21           Did you?

22           THE WITNESS:  Yes.

23           THE COURT:  Okay.

24  BY MR. BILKOVIC:

25  Q.  Were there similarities between these two?

1   A.   Yes.

2   Q.   What were the similarities?

3   A.   May I use the mouse again?

4   Q.   Yes.

5   A.   It says, "Back wall of the container hold 150."  This

6   picture shows a container door, and I'm assuming that's the

7   back wall since --

8   Q.   Don't assume.

9   A.   Okay.  It's the opposite --

10          DEFENDANT DIDANI:  Objection, your Honor.  That's pure

11   speculation.

12          THE COURT:  It is if he assumes, Mr. --

13          MR. BILKOVIC:  I agree, but there is a door.

14          THE WITNESS:  There is a door.  The back of the

15   container --

16          THE COURT:  Well, but is that a question?

17          MR. BILKOVIC:  Let me rephrase.

18          THE COURT:  It doesn't sound like a question to me.

19          MR. BILKOVIC:  Let me rephrase it.

20          DEFENDANT DIDANI:  Your Honor, the exhibit speaks for

21   themself, your Honor.

22          THE COURT:  Well, exhibits do speak for themselves,

23   but we have been going over all the exhibits so that he can

24   state how he used them, if at all, in his investigation.

25

1    BY MR. BILKOVIC:

2    Q.  Do you see any other similarities between the two?

3    A.  Yes, sir.

4    Q.  And what are those similarities?

5    A.  The "600."

6    Q.  What do you see about the "600"?

7    A.  They have "600" right next to the floor on the picture on

8    the left.

9    Q.  And what about on the right?

10   A.  It shows floor holds 600 units.

11        MR. BILKOVIC:  Okay.  Can we take 4.0 down and leave

12   5.12 up.

13   BY MR. BILKOVIC:

14   Q.  We talked earlier about Sky ECC.  Do you see any references

15   or indicators of "Sky" on this?

16   A.  Yes, sir.

17   Q.  And can you please take the mouse and point to that.

18        DEFENDANT DIDANI:  Objection, your Honor.

19        THE COURT:  What's your objection?

20        DEFENDANT DIDANI:  There's no reference to Sky ECC in

21    there.

22        MR. BILKOVIC:  What is there -- I'm sorry.  What --

23        THE COURT:  Well, what is your question again?

24        MR. BILKOVIC:  My question was there a reference to

25    Sky ECC on there.  I can rephrase the question.

1          THE COURT:  He can answer that question if he knows

2    the answer, because your objection that you don't see it on

3    there is -- I'm not sure that's an objection.

4          DEFENDANT DIDANI:  It is an objection, your Honor,

5    because there is -- Mr. Bilkovic is saying "Sky ECC."  There is

6    "Sky."  It's a whole different -- it's going to be pure

7    speculation.

8          THE COURT:  Overruled.

9          You may answer if you see --

10         What was your question again so it will be clear what

11   we're answering?

12   BY MR. BILKOVIC:

13   Q.  Do you see any references to -- I'll rephrase the question.

14   Do you see any references on 5.12 to "Sky"?

15   A.  Yes, sir.

16   Q.  And where is that?

17   A.  Right here.

18   Q.  Down in the middle on the right-hand side?

19   A.  Yes, sir.

20   Q.  And can we go to Government's proposed Exhibit 5.0.  Do you

21   recognize that?

22   A.  Yes, sir.

23   Q.  What is that?

24   A.  Another photo of a BlackBerry with a message on it again.

25   Q.  And was this also found on Mr. Didani's phone?

1    A.   Yes, sir.

2            MR. BILKOVIC:  Your Honor, at this time I would move

3    for permission to publish 5.0 to the jury -- or move for

4    admission and then permission to publish.

5            THE COURT:  Any objection?

6            DEFENDANT DIDANI:  No objection, your Honor.

7            THE COURT:  It's admitted, and you may show it to the

8    jury.

9            MR. BILKOVIC:  Thank you, your Honor.

10           Can we zoom in on the message.  Keep going down.

11   Right there.

12   BY MR. BILKOVIC:

13   Q.   And again, do you see the Sky box on here in the same

14   location as the last one?

15   A.   Yes, sir.

16   Q.   And the identifier of the person involved in this would be

17   what?

18   A.   The identifier is 35E6CF@blacksecure.com.

19   Q.   And again, there is a message destruction on here?

20   A.   Yes, sir, two hours.

21   Q.   Can you please read the text messages to the jury.

22   A.   Yes, sir.  It states, "Good, you need to be 100 percent

23   focus.  That is good.  This project will give us wings and sky

24   is the limit.  Soon that first load is done and everybody will

25   be paid.  Huge responsibility.  Let's do this right."

```
 1              MR. BILKOVIC:  You can take that down.
 2   BY MR. BILKOVIC:
 3   Q.  Did you see items on the phone related to Piotr Synowiec?
 4   A.  Yes, sir.
 5   Q.  If you can look at 5.7 and -- Government's proposed Exhibit
 6   5.7 and tell me if you recognize what that is?
 7   A.  Yes, sir.  It's a photo of what appears to be Piotr
 8   Synowiec's bank accounts.
 9   Q.  It's a screenshot?
10   A.  Screenshot or photo.
11              MR. BILKOVIC:  Okay.  Your Honor, at this time I would
12   move for admission into evidence of Government's proposed
13   Exhibit 5.7 and ask permission to the publish to the jury.
14              THE COURT:  Any objection?
15              DEFENDANT DIDANI:  No objection, your Honor.
16              THE COURT:  Very well.  It's admitted, and you may
17    show it to the jury.
18   BY MR. BILKOVIC:
19   Q.  Are your eyes clear enough to look at the top and read the
20   name next to "Welcome" and then the E-mail address below?
21   A.  Yes, sir.
22   Q.  And would you use the pointer so the jury knows where
23   you're going to here.
24   A.  So I have to read it off this paper.  I'm going to point to
25   it first.
```

1          THE COURT:  And is the paper the same as what's on the

2    screen?

3          THE WITNESS:  Yes, ma'am.

4          THE COURT:  Okay.

5    BY MR. BILKOVIC:

6    Q.   Okay.  Does that help or no?

7    A.   No.  I'm sorry.

8    Q.   Can you look at -- you have a paper copy of exhibits?

9    A.   Yes.

10   Q.   What is the E-mail address?

11   A.   It says PSCattlemans@hotmail.com.

12   Q.   And is there a last log-on date and time?

13   A.   Yes, sir.

14   Q.   And what is that?

15   A.   1:47 p.m. eastern time on May 25th, 2016.

16   Q.   And could you just take the laser pointer and just kind of

17   show the jury where that is at in case the jurors are having a

18   difficult time seeing that.  Just show the log-in time as

19   you're scrolling right there.

20   A.   Yes.  The log-in time is 1:47 p.m., eastern time, May 25th,

21   2016.

22   Q.   And where is the E-mail address?

23         Okay.  And then can we just go on the bottom portion

24   of it.  It appears to be that there's two accounts listed

25   there?

1   A.   Yes, sir.

2   Q.   What are the balances on those accounts -- I'm sorry, the

3   first account?

4   A.   97.18.

5   Q.   97 what?

6   A.   I'm sorry.  $97.18.

7   Q.   What about the second one?

8   A.   $332.86.

9          MR. BILKOVIC:  Okay.  We can take that down.

10  BY MR. BILKOVIC:

11  Q.   And did you see any videos of what appeared to be packages

12  of cocaine?

13  A.   Yes, sir.

14         MR. BILKOVIC:  Your Honor, at this time I would move

15  for admission into evidence of Government's proposed Exhibit

16  5.15.

17         THE COURT:  Any objection?

18         DEFENDANT DIDANI:  Objection, your Honor, because

19  Mr. Bilkovic saying appears to be a package of cocaine.  That's

20  pure speculation, your Honor.

21         THE COURT:  Well, you should rephrase that.

22         MR. BILKOVIC:  It's a fair point.

23         THE COURT:  I agree.  It's stricken, and pose a new

24  question.

25

1   BY MR. BILKOVIC:

2   Q.   Was there any videos that attracted your attention based on

3   the packaging?

4   A.   Yes, sir.

5   Q.   Is 5.15 one of those videos?

6   A.   Yes, sir.

7            MR. BILKOVIC:   Your Honor, at this time I would move

8   for admission into evidence of 5.15 and request permission to

9   publish it to the jury.

10           THE COURT:   Any objection now?

11           DEFENDANT DIDANI:   Yes, your Honor.   Objection.

12   Mr. Bilkovic named it as a package of cocaine, and it should

13   not be entered to the jury.

14           THE COURT:   Well, I told the jury I was striking it,

15   and they'll disregard his remark that it was cocaine, which is

16   the normal way of proceeding in a matter like this, Mr. Didani,

17   all right.

18           And so the jury will totally disregard it, even though

19   I'm going to tell you later that the questions of the lawyers

20   are not evidence, only the answers of the witnesses are

21   evidence.

22           Do you have any objection?

23           DEFENDANT DIDANI:   No objection.

24           THE COURT:   Okay.   And, if that was the objection,

25   it's overruled.

1            And you may have it admitted into evidence, 5.15, and

2    you may show it to the jury.

3            MR. BILKOVIC:  Can you pause it?

4    BY MR. BILKOVIC:

5    Q.   What is it that we're looking at here?

6    A.   A BlackBerry phone with a picture on it of a duffle bag and

7    individually-wrapped packages.

8    Q.   What color are the individual-wrapped packages?

9    A.   Red and yellow.

10   Q.   And is there more than two of them?

11   A.   Yes.

12   Q.   Several?

13   A.   Yes.

14   Q.   And do you see any human body parts in that video?

15   A.   No.

16   Q.   If you could look again and tell me.

17   A.   I'm sorry, yes.

18   Q.   What do you see?

19   A.   A foot.

20           MR. BILKOVIC:  Okay.  You can pull that down.

21           THE COURT:  Is that 5.15?

22           MR. BILKOVIC:  That was 5.15.

23           THE COURT:  Okay.

24   BY MR. BILKOVIC:

25   Q.   And could you look at Government's proposed Exhibit 5.16.

1   A.   Yes, sir.

2   Q.   And if you can tell me what that is?

3   A.   That is a -- appears to be a screenshot that was then a

4   photo on Mr. Didani's iPhone in 2016.

5   Q.   And is that a photograph of encrypted software?

6   A.   Yes, sir.

7          MR. BILKOVIC:  Your Honor, at this time I would move

8   for admission into evidence of Government's proposed Exhibit

9   5.16 and request permission to publish to the jury.

10          THE COURT:  Any objection?

11          DEFENDANT DIDANI:  No objection.

12          THE COURT:  Very well.  It's admitted.

13          MR. BILKOVIC:  And can we publish?

14          THE COURT:  Yes.

15          MR. BILKOVIC:  Thank you.

16   BY MR. BILKOVIC:

17   Q.   And what is it that we're looking at here?

18   A.   A screenshot or photo that was on Mr. Didani's phone of

19   Phantom Secure, which is an encryption software.  And it shows

20   subscription renewal of 1,300 for six months.

21          MR. BILKOVIC:  You can take that down.

22   BY MR. BILKOVIC:

23   Q.   Now, you indicated that Martin Tibbitts died in a plane

24   crash in July of 2018?

25   A.   Yes, sir.

1    Q.   Do you know if he was married at the time?

2    A.   Yes.

3    Q.   And do you know who he was married to?

4    A.   Yes, Belinda Tibbitts.

5    Q.   In 2019, April of 2019, do you know where Ms. Tibbitts was

6    living?

7    A.   Yes, in Grosse Pointe Park.

8    Q.   Do you know whether or not at any point in time she moved

9    out of Michigan?

10   A.   Yes.  After -- shortly after his death she moved to

11   Pleasanton, which is outside of San Francisco, California.

12             THE COURT:  She was where?

13             THE WITNESS:  Pleasanton, California.

14             THE COURT:  Flexington?

15             THE WITNESS:  Pleasanton.

16             THE COURT:  You'll have to spell it.

17             MR. BILKOVIC:  I could spell it.  Would the Court like

18    me to?

19             THE COURT:  Okay.

20             MR. BILKOVIC:  P-L-E-A-S-A-N-T-O-N.

21   BY MR. BILKOVIC:

22   Q.   Correct?

23   A.   Yes, sir.

24   Q.   Pleasanton with a P?

25   A.   Correct.

```
1    Q.   Okay.  That's a suburb of California?

2    A.   A suburb of San Francisco.

3    Q.   I'm sorry.  A suburb of San Francisco.

4         In April of 2019, did you go to Ms. Tibbitts'

5    residence in Pleasanton, California?

6    A.   Yes, sir.

7    Q.   What was the purpose of you going there?

8    A.   To serve a search warrant.

9    Q.   A search warrant for what?

10   A.   To execute a search warrant for electronics and paperwork,

11   financial statements for Martin Tibbitts' things.

12   Q.   Where at?

13   A.   At her home.

14   Q.   A home in Pleasanton?

15   A.   Yes.

16   Q.   And did you go there -- were there other law enforcement

17   members that were there?

18   A.   Yes, sir.

19   Q.   What other law enforcement members were there?

20   A.   DEA, San Francisco agents were there, Pleasanton police

21   officers were there, and myself and my co-case agent, Task

22   Force Officer Brandon Leach.

23   Q.   And when you arrived there --

24        THE COURT:  Wait.  Wait just a second.

25        MR. BILKOVIC:  I'm sorry, your Honor.
```

```
 1              THE COURT:  You said the Pleasanton Police Department,
 2      DEA agents from San Francisco?
 3              THE WITNESS:  Yes, ma'am.
 4              THE COURT:  And who else?
 5              THE WITNESS:  And my co-case agent, Brandon Leach.
 6              THE COURT:  Okay.  You may proceed.
 7      BY MR. BILKOVIC:
 8      Q.  And was Ms. Tibbitts home?
 9      A.  Yes, sir.
10      Q.  And did you and Agent Leach meet with her?
11      A.  We did.
12      Q.  Did any other agents meet with her or was it primarily you
13      and Agent Leach?
14      A.  It was primarily me and Agent Leach.
15      Q.  Was the residence searched?
16      A.  It was.
17      Q.  And did law enforcement recover items in the residence?
18      A.  Yes, sir.
19      Q.  Did Ms. Tibbitts give you any items while you were there?
20      A.  Yes, sir.
21      Q.  What sorts of items?  I know you detailed, but just general
22      description.
23      A.  Electronics, financial documents, paperwork, notebooks, all
24      belonging to Mr. Tibbitts.
25      Q.  And at some point in time did you also obtain a search
```

1  warrant for the Tibbitts residence in Grosse Pointe?

2  A.  Yes, sir.

3          THE COURT:  Before or after the San Francisco search

4  warrant?

5          THE WITNESS:  We executed the search warrant after.

6          THE COURT:  Which search warrant was executed first?

7          THE WITNESS:  San Francisco one.

8          THE COURT:  Okay.  Go ahead, Counsel.

9  BY MR. BILKOVIC:

10 Q.  Now, did you end up executing the search warrant in Grosse

11 Pointe?

12 A.  Yes, sir.

13 Q.  When you did that, who was there?

14 A.  Ms. Tibbitts, Belinda Tibbitts, and her attorney and myself

15 and my co-worker, Chris Young.

16 Q.  And was Ms. Tibbitts aware -- did you make arrangements

17 with her and her attorney on a specific date to go there?

18 A.  We did, because of living in San Francisco.  When we talked

19 to her there, she made arrangements to meet us at the house so

20 we could get in and not have to damage the home.

21 Q.  And did she provide you items during the search warrant?

22 A.  She did.

23 Q.  Now, I'm going to take your attention to --

24          THE COURT:  I have a question first.  Did you conduct

25 a search warrant then?

```
 1                THE WITNESS:  Yes.
 2                THE COURT:  Did you conduct a search?
 3                THE WITNESS:  Yes, ma'am.
 4                THE COURT:  You and one other person?
 5                THE WITNESS:  Myself and my co-worker, yes.
 6                THE COURT:  Okay.
 7                THE WITNESS:  With Ms. Tibbitts and her attorney.
 8     BY MR. BILKOVIC:
 9     Q.   At some point in time -- I'm going to take your attention
10     to September of 2019.  You indicated that you were
11     investigating Mr. Larson as well?
12     A.   Yes, sir.
13     Q.   Was Mr. Larson arrested on that date?
14     A.   Yes, sir.
15     Q.   And were you present when he was arrested?
16     A.   No.
17     Q.   Did you have anything to do with Mr. Larson or anything
18     related to Mr. Larson on the day he was arrested?
19     A.   Yes, sir.
20     Q.   What was that?
21     A.   Execute a search warrant at his residence.
22     Q.   And who did you execute that with?
23     A.   Mr. Leach, Brandon Leach.
24     Q.   Anyone else?  If you don't remember, that's fine.
25     A.   And Donald Larson.  I don't remember everybody that was
```

1    there.

2    Q.   Were there other agents --

3    A.   There were other agents, yes.

4    Q.   Let me finish the question, okay.  Were there other agents

5    there other than you and Brandon Leach?

6    A.   Yes, sir.

7    Q.   And was Mr. Larson released from custody that day?

8    A.   Yes, sir.

9    Q.   And did he subsequently agree to be interviewed by the

10   Government?

11   A.   Yes, sir.

12   Q.   Now, did you at some point stop working on this

13   investigation?

14   A.   Yes, sir.

15   Q.   When was that?

16   A.   I was notified that I would be coming off of the DEA task

17   force in December of 2020.  And I started making my transition

18   -- I believe the last time I was there was February of 2021.

19   Q.   And did other agents take over basically the investigation?

20   A.   Yes, sir.

21   Q.   And did other agents continue on it that were working on it

22   when you were working on it?

23   A.   Yes, sir.

24   Q.   Now, the investigation spanned how many years roughly as

25   far as you were concerned, your involvement?

1   A.   Ten -- eight.

2   Q.   Do you remember every detail of every report you've

3   written?

4   A.   No.

5   Q.   Every date?

6   A.   No.

7   Q.   Every photo or video that you've reviewed?

8   A.   No.

9          MR. BILKOVIC:  Your Honor, may have I have one moment?

10         THE COURT:  You may.

11         (Briefly off the record.)

12         MR. BILKOVIC:  I have nothing further.

13         THE COURT:  Okay.  Can we -- can you have

14   cross-examination after the lunch break?

15         DEFENDANT DIDANI:  Yes, your Honor.

16         THE COURT:  Okay.  I'm going to send you to lunch.

17   Remember that you're not permitted to talk about the case among

18   yourselves or with anyone else.  And come back in an hour.

19         So it's, I think, ten after; is that right, Ms. Daley,

20   ten after?  Come back at ten after 2:00, okay.

21         All right.  You may step down.

22         Please rise for the jury.

23         (The jury left the courtroom at 1:10 p.m.)

24         THE COURT:  Okay.  You may step down, but you may not

25   discuss your testimony with anyone else until the

 1    cross-examination and the redirect are finished; okay?

 2              THE WITNESS:  Yes.

 3              THE COURT:  Okay.  Thank you.  You may step down.

 4              Counsel, yes?

 5              MR. BILKOVIC:  Oh, nothing.  I'm just standing here.

 6    I'm sorry.

 7              THE COURT:  Okay.  Let's take a lunch break, okay.

 8              (At 1:11 p.m., a brief for lunch was taken.

 9              Back on the record at 2:26 p.m.)

10              LAW CLERK:  All rise.  The Court is back in session.

11              THE COURT:  You may all be seated.

12              All right.  Are you ready to bring back out the jury?

13              MR. BILKOVIC:  The Government is ready, your Honor.

14              DEFENDANT DIDANI:  Yes, your Honor.

15              THE COURT:  Okay.  Let's do that.

16              DEFENDANT DIDANI:  Your Honor, can I submit an

17    exhibit?

18              THE COURT:  Can you what?

19              DEFENDANT DIDANI:  Can I submit it?

20              THE COURT:  Can you submit it now?

21              DEFENDANT DIDANI:  Admit.  Admit.

22              MR. FINK:  Admit Exhibit A.

23              DEFENDANT DIDANI:  Admit as Exhibit A, your Honor.

24              MR. FINK:  The Government doesn't have any objection.

25              MR. BILKOVIC:  Your Honor, I believe he wants to admit

1    Exhibit A.  The Government has no objection.

2            THE COURT:  That you used before?

3            DEFENDANT DIDANI:  Yes, your Honor.

4            THE COURT:  Do you have any objection on behalf of the

5    Government?

6            MR. BILKOVIC:  No, your Honor.

7            THE COURT:  Okay.  Then it's admitted as Exhibit A.

8            THE CLERK:  All rise.

9            (The jury entered the courtroom at 2:27 p.m.)

10           THE COURT:  I'm satisfied the jurors are present.

11           Are you on behalf of the Government?

12           MR. BILKOVIC:  Yes, your Honor.

13           THE COURT:  What about you, Mr. Didani?

14           DEFENDANT DIDANI:  Yes, your Honor.

15           THE COURT:  All right.  Very good.  Thank you for

16   coming back.

17           You're still under oath, sir, and just state your name

18   again for the record, okay.

19           THE WITNESS:  Yes, ma'am.  It's Joshua Allen Bianchi.

20           THE COURT:  Okay.  You may proceed.

21                          CROSS-EXAMINATION

22   BY DEFENDANT DIDANI:

23   Q.  Agent Bianchi.

24   A.  Yes, sir.

25   Q.  Good afternoon, sir.

1    A.   Good afternoon.

2    Q.   Good to see you again.  If you don't understand my

3    questions, please ask me.

4            Agent Bianchi, you are the investigator opened this --

5    you are the agent that opened this investigation; right?

6    A.   Yes, sir.

7    Q.   There is no other one, it's just Agent Bianchi, right, you?

8    A.   Correct.

9    Q.   So you are the agent who I met in 2015; right?

10   A.   Yes, sir.

11   Q.   At O'Hare Airport; right?

12   A.   Correct.

13   Q.   Okay.  Agent Bianchi, I want you to explain to the jury the

14   reason you came to the airport.  Give me one, two, three

15   reasons that you drove to airport, to Chicago O'Hare, from

16   Detroit?  And then we'll go more details.  I just want those

17   suspicions that you said before.

18           THE COURT:  In 2015?

19           DEFENDANT DIDANI:  Yes, your Honor.

20           THE COURT:  Okay.

21           THE WITNESS:  Why I went to the airport to interview

22   you?

23   BY DEFENDANT DIDANI:

24   Q.   Yes.  Yes, Agent.

25   A.   So that I could be present during the interview.  So -- go

1    ahead.

2    Q.   The reasons, the reasons that you have?

3              THE COURT:  Do you want him to answer the three

4    reasons?

5              DEFENDANT DIDANI:  Yes, your Honor.

6              THE COURT:  Okay.  Tell us three reasons.

7              THE WITNESS:  Three suspicions I had to have you

8    stopped and interviewed -- I'm not quite sure I understand the

9    question.

10   BY DEFENDANT DIDANI:

11   Q.   All right.  Let me help you a little bit, okay, Agent

12   Bianchi.  On the hearing over here in 2024, April 23, you said

13   there was three reasons that you flew all the way -- you drove

14   all the way from here to Chicago.  One was 2008, a company, ANR

15   Express with Adriatik Sheko; right?  Is that correct?

16   A.   Those were not the reasons why I drove to the airport,

17   though.

18   Q.   What was the reason?

19   A.   To interview you and to search and to answer some questions

20   I had.

21   Q.   For what?  Interview me for what?

22   A.   Why I wanted to --

23   Q.   No.  You said to interview me, and I'm asking you interview

24   me for what?

25   A.   For your travel history, your companions you had and --

1   basically your travel history with Eric Puzio.

2              THE COURT:  Your travel history and what?

3              THE WITNESS:  His travel history with Eric Puzio and

4   his travel history in general to all the various outlying

5   countries he had been to.  He also made many reservations and

6   did not board the plane.  I had questions about that, and that

7   was the gist of it.

8   BY DEFENDANT DIDANI:

9   Q.  Agent, when we had a hearing over here -- I'm trying to

10  make -- so we can be clear over here.  When we had the hearing

11  over here, you said the reason was suspicious  --

12             THE COURT:  What hearing are you referring to?

13             DEFENDANT DIDANI:  On April ...

14             THE COURT:  23rd?

15             DEFENDANT DIDANI:  April 24, 2023, your Honor.

16             THE COURT:  Okay.

17  BY DEFENDANT DIDANI:

18  Q.  There is an activity on St. Clair Shore Marina.  That's

19  what you told the judge, one, remember, four people going with

20  jet skis, going to Canada coming back, you had a report?

21  A.  Yes.  My station gave me a report about suspicious activity

22  at a marina.

23  Q.  That was one reason; right?  Is that accurate?

24  A.  That is -- that is true.  I don't know what you're

25  referencing that to.

1   Q.   I'm just -- Agent, you know --

2              THE COURT:  Phrase a question to him.

3              DEFENDANT DIDANI:  Pardon me, your Honor?

4              THE COURT:  Phrase a question to him.

5   BY DEFENDANT DIDANI:

6   Q.   I want to know the reasons that you had come to -- traveled

7   all the way to Chicago, just the same reason that you told this

8   Court in April 24, 2023, if there is accurate reasons can you

9   tell the jury the same reasons, or no?

10  A.   The same thing I just said, and that was to find out about

11  your travel history to all the various countries that you were

12  going to, the reason why you didn't -- you booked I think it

13  was six reservations within a span of seven months.  You didn't

14  board the plane except for twice.  And where you were traveling

15  with Mr. Puzio.  Those were the reasons why I traveled to

16  Chicago O'Hare to interview you.

17  Q.   So the reasons that you told Judge Hood that was not the

18  same reason, because it's totally different?

19             MR. BILKOVIC:  Judge, can he cite me to a page of what

20  he's --

21             THE COURT:  Well, you can ask him if it's the same

22  reason, but you can't comment that they're totally different.

23  If you want to point to something in the transcript, you're

24  welcome to do that.  You just need to let the Government know

25  the date of the transcript and the page number.

1   BY DEFENDANT DIDANI:

2   Q.   Okay.  We're going to go back to that.

3          Okay.  Agent Bianchi, do you know what's a silence

4   hit?

5   A.   A silent hit?

6   Q.   Yes.

7          THE COURT:  A what?

8          DEFENDANT DIDANI:  A silent hit.

9          THE WITNESS:  A silent hit.

10         THE COURT:  A silent what?

11         THE WITNESS:  A silent hit.

12         THE COURT:  A silent hit.  Is that what you mean?

13         DEFENDANT DIDANI:  Yes, your Honor.

14         THE COURT:  Okay.  Do you know what that is?

15         THE WITNESS:  I do.

16  BY DEFENDANT DIDANI:

17  Q.   Can you explain that to the jury, please?

18  A.   A silent hit is, for example, I had an alert on Mr. Didani

19  when he flies into or out of the country.  When he were to fly

20  into the country, Customs at the port of entry did not see that

21  hit, but I got a E-mail about it.  It was silent to the people

22  at the port, but not silent to the case agent or whoever put

23  that hit on.

24  Q.   And in order to have the silent hit do you have to have a

25  federal report, Agent Bianchi?

1    A.   No.

2    Q.   So you can put that silent hit to everybody, anyone you

3    wishes to?

4    A.   I can, with reasonable suspicion, which you document in the

5    silent hit.

6    Q.   Do you have the documentation why you put a silent hit on

7    Mr. Didani, on this defendant?

8    A.   Yes.  You have all my reports, sir.

9    Q.   So it's a federal report?

10   A.   I'm sorry?

11   Q.   So in order to obtain that you have to have a federal

12   report, you have to report it; right?

13   A.   I have to report what?

14   Q.   You have to make a report why -- what's the reason you made

15   a silent hit; right?

16   A.   No.

17   Q.   Explain to me.

18   A.   What is it that you want me to explain?

19   Q.   What report you need to have.  Do you need to have or -- do

20   you need to have a report or you don't need to have a report to

21   have a silent hit?

22   A.   You don't need to have a report.

23   Q.   So you can put a silent hit to any citizen of the world to

24   United States on any citizen of the world?  If you think

25   somebody might tell you, okay, Didani -- I saw Didani with a

 1  weapon and you can put a silent hit?

 2  A.  Yes, sir.

 3  Q.  Is that something regular that federal government is doing

 4  or something?

 5  A.  Yes.

 6  Q.  Without -- so you trying -- let me get this clear right

 7  now.  Somebody can tell you Mr. Wade Fink left from the casino

 8  with a bag of money, and if you wish to investigate and put a

 9  silent hit because Mr. Fink traveled outside you can do that?

10  A.  I'm not understanding what you're saying.

11        THE COURT:  I think he wants to know if the individual

12  came out of the casino with a bag of money and you thought that

13  was suspicious you could put a silent hit on them.

14        Is that what you want to know?

15        DEFENDANT DIDANI:  Yes, your Honor.

16        THE WITNESS:  Is that individual crossing the

17  international border?

18        THE COURT:  Does that matter?

19        THE WITNESS:  It would, because the hit pertains to

20  crossing the international border.

21        THE COURT:  Okay.  So, if he just came out of a casino

22  in Detroit and went to his home with this bag of money, you

23  wouldn't be able to put a silent hit on it?

24        THE WITNESS:  No, ma'am.

25        THE COURT:  So do you understand that, Mr. Didani?

1          DEFENDANT DIDANI:  Yes.  Yes, your Honor.  Yes.

2          THE COURT:  All right.

3   BY DEFENDANT DIDANI:

4   Q.   Agent Bianchi, your first report, do you remember your

5   first report open in my name?

6   A.   I know I wrote it, but do I remember it, no.

7   Q.   Other than my name, the report is titled in my name,

8   Didani, does that have to do anything with Mr. Didani, this

9   defendant?

10  A.   I believe I remember this from prior testimony, and I don't

11  think it -- it has other suspicions that lead to you.

12         THE COURT:  "It" meaning your report?

13         THE WITNESS:  Yes, ma'am.

14         THE COURT:  Okay.

15  BY DEFENDANT DIDANI:

16  Q.   So let me be clear.  So other than my name to tie to Didani

17  that report has nothing to do with Mr. Didani; right?

18  A.   That is not correct, because it all leads to you.

19         DEFENDANT DIDANI:  Okay.  All right.  Your Honor, I'd

20  like to get the transcripts from -- please, so I can refresh

21  his memory and we can --

22         THE COURT:  Yes you can.

23         DEFENDANT DIDANI:  Thank you.

24         MR. FINK:  Judge, I'm going to approach the podium

25   just if he needs me to take something off of it.

1              THE COURT:  Okay, yes.

2    BY DEFENDANT DIDANI:

3    Q.  Agent, do you want me to pass it to refresh your memory or

4    do you want me to --

5    A.  Sure.

6              MR. FINK:  May I, your Honor?

7              THE COURT:  Yes.  What's the page, Mr. Didani?

8              DEFENDANT DIDANI:  It's Page 67, line 21, 22, 23.

9              THE WITNESS:  Okay.  What's the question?  What am I

10   looking for?

11   BY DEFENDANT DIDANI:

12   Q.  The question was whether this report, the opening report,

13   other than my name, the title name, Didani, has nothing to do

14   with Mr. Didani?

15   A.  Okay.  So that is correct.

16   Q.  That is correct.  But today's answer was kind of different.

17   I just want to make sure, right.  So the opening report has

18   nothing to do with this defendant; right?

19   A.  Correct.  Associations to you.

20   Q.  That's not what you answered there.  This question --

21             THE COURT:  Okay.  If you want, you can read what his

22   answer was.  So you can give the question and the answer if

23   you'd like to do that.

24             MR. FINK:  May I?

25             THE COURT:  Yes.  Do you know where he is on the

1    transcript, Counsel?

2              MR. BILKOVIC:  Do I?

3              THE COURT:  Yes.

4              MR. BILKOVIC:  Yes, I do.

5              THE COURT:  Okay.

6    BY DEFENDANT DIDANI:

7    Q.   Let's do this again, all right.

8              "So Didani's opening report has nothing to do with

9    Ylli Didani; is that accurate?"

10             Your answer is, "That's correct."

11   A.   That is correct.

12   Q.   Fair enough.  So now you're armed with the report?

13   A.   I'm sorry?

14   Q.   Now you're armed with the report.  You have a report titled

15   "Mr. Didani"; right?

16   A.   Correct.

17   Q.   Does that give you the right to go to a -- now apparently

18   that give you the right to go visit Mr. Didani in O'Hare

19   Airport, right, to travel?

20   A.   So -- I don't need a right.  It's my job.  And then,

21   secondly, there was multiple things, multiple things as we've

22   discussed, on why I went to the airport, enough -- not really

23   to do with that report.

24   Q.   Okay.  So let's go back to the question.  Multiple things,

25   you know.  There was what, St. Clair Shores, jet skis going --

1   flying all over to Canada coming back, right, your information?
2   Do you remember that?
3   A.   I remember the information, sir, but it had nothing to do
4   with me going to Chicago O'Hare Airport.
5   Q.   All right.  Before we go to Chicago, do you remember that I
6   was being investigated in 2008 with a gentleman, Adriatik
7   Sheko, and a company, ANR Express?
8   A.   Did I know that before going to Chicago, is that what
9   you're asking?
10  Q.   Yes.
11  A.   Yes, sir.
12  Q.   Did you remember you told Judge Hood -- do you remember you
13  told Judge Hood right here in this courtroom, the same
14  courtroom we're sitting at right now, that that was one of the
15  reasons, probable cause, to go investigate Mr. Didani 2008 with
16  Adriatik Sheko, the company from ANR Express?
17        MR. BILKOVIC:  Mr. Didani, can you just tell me what
18  page you're on?
19        DEFENDANT DIDANI:  That's a question.  I'll get to
20  that page.
21        MR. BILKOVIC:  Judge, he's --
22        THE COURT:  Yeah, you've got to get to the page.
23        MR. FINK:  Judge, I'm being asked a question.  That's
24  why I'm approaching the podium.
25        THE COURT:  Okay.  But don't speak into the mic,

1    gentlemen.

2         DEFENDANT DIDANI:  Your Honor, Page 177.  The question

3    was -- it was asked by the Government, Mr. Bilkovic, to Agent

4    Bianchi.

5    BY DEFENDANT DIDANI:

6    Q.  And the question is Mr. Bilkovic, the Government, "And I'll

7    ask you this.  The one report from 2008, was that -- don't look

8    like this right now -- was the only report you reviewed prior

9    to 2015 in details with the investigation with Mr. Didani in

10   2008?"

11        And you say, "Absolutely not."

12        Do you remember having this conversation about this

13   company in 2008?

14   A.  I did not understand that.

15        THE COURT:  Okay.  Maybe we should pass it up so he

16   can see it.

17        MR. FINK:  Sure.  You can hold onto that, Mr. Didani.

18   The Government has offered me their copy.

19        THE COURT:  And this is Page 177; is that correct?

20        DEFENDANT DIDANI:  Correct, your Honor.

21        THE WITNESS:  Thank you, sir.

22        THE COURT:  And what lines do you want him to read?

23        DEFENDANT DIDANI:  Line 12, your Honor.

24        THE COURT:  Line 12 to what?  Just line 12?

25        DEFENDANT DIDANI:  And 15.

```
 1              THE COURT:  To 15?

 2              DEFENDANT DIDANI:  Yes, your Honor.

 3              THE COURT:  Mr. Bilkovic, do you have any problem if

 4    the witness reads it?

 5              MR. BILKOVIC:  No, I don't, your Honor.

 6              THE COURT:  Could you read it aloud, please, those

 7    lines 12 through 15.

 8              THE WITNESS:  Sure.  I'm going to start with line 11

 9    so we know who's saying it.

10              By Mr. Bilkovic, "I'll ask you this.  The one report

11    from 2008 was that -- don't look at those right now -- was that

12    the only report that you reviewed prior to July 2015 that dealt

13    with this investigation into Mr. Didani in 2008?"

14              And my answer, "Absolutely not."

15              And, I'm sorry, I don't understand the question then.

16              THE COURT:  Which question?

17              THE WITNESS:  Whichever one Mr. Didani is asking me.

18              THE COURT:  He's going to pose a new question to you.

19              Okay.  Pose a new question.

20    BY DEFENDANT DIDANI:

21    Q.  Mr. Bianchi, do you remember the investigation of 2008 or

22    not?

23    A.  Partially.  I would probably have to look back at my

24    reports.  I was not part of that investigation.

25              THE COURT:  Okay.  What do you want to ask him about
```

1    it, without him digging out the report?  See if he remembers.

2    BY DEFENDANT DIDANI:

3    Q.  Do you remember a gentleman, Adriatik Sheko, Tiku?

4    A.  Yes, sir.

5    Q.  Did you remember that Tiku was involved in an investigation

6    in 2008?

7    A.  Yes, sir.

8    Q.  With his trucking company, ANR Trucking Company; right?

9    A.  Yes, sir.

10   Q.  And that you stated in this court, you testified under oath

11   with this court that I was involved in 2008 with that same

12   company; right?

13   A.  No, with that investigation.  You were involved --

14           MR. BILKOVIC:  I think at this point I'm going to

15   object.  I don't see what the relevance is of any of this.

16           THE COURT:  If might be relevant, because it seems

17   like he is testing how he got involved in the investigation.

18   So I'm going to allow it.

19           Your objection is noted and preserved for the record.

20           MR. BILKOVIC:  Thank you, your Honor.

21           THE COURT:  And overruled.

22           So tell us what you mean by he was involved in the

23   investigation, but not with ANR Trucking?

24           THE WITNESS:  I do not recall whether Mr. Didani was

25   or was not involved with AR Trucking.  I just know he was

```
 1    involved in the investigation into that company.
 2            THE COURT:  Okay.  Go to a new question.
 3    BY DEFENDANT DIDANI:
 4    Q.   In 2008; right?
 5    A.   Yes, sir.
 6    Q.   With the gentleman, Adriatik Sheko; right?
 7    A.   Yes, sir.
 8            DEFENDANT DIDANI:  Your Honor, can you give me -- I
 9    need to find the transcript, because I'm a hundred percent sure
10    that he testified to you under oath the same thing that I'm
11    saying.  I just want to make it clear that we're on the same
12    page with Mr. Bianchi.
13            THE COURT:  So you need to find something in the
14    transcript, is that what you're telling me?
15            DEFENDANT DIDANI:  Yes, your Honor.
16            THE COURT:  And how long do you need to do that?
17            DEFENDANT DIDANI:  A few minutes, your Honor, if I --
18    a minute.
19            THE COURT:  A few is five, ten?
20            DEFENDANT DIDANI:  Two minutes I will find out.
21            THE COURT:  All right.
22            MR. FINK:  Do you want me to help you look?
23            DEFENDANT DIDANI:  Yes.
24            THE COURT:  Okay.  Do you need him to come to the
25    table with you?
```

1            MR. FINK:  He has a copy, Judge.  I will assist on my

2    computer.

3            Mr. Didani, try Page 40.

4            DEFENDANT DIDANI:  Your Honor, it's Page 40 from line

5    1 to line 6, your Honor.

6            THE COURT:  Now, can you show that to him?

7            DEFENDANT DIDANI:  Pardon me, your Honor?

8            THE COURT:  Can we show a copy of that to the witness,

9    please?

10           DEFENDANT DIDANI:  Yeah, sure.

11           MR. FINK:  May I, Judge?

12           THE COURT:  Yes.

13           THE WITNESS:  Can you repeat the line numbers, please?

14           THE COURT:  1 through 6.

15           THE WITNESS:  1 through 6.

16           DEFENDANT DIDANI:  1 through 6.

17           THE COURT:  Read it to yourself.  Then you can pose a

18   question, Mr. Didani.

19           THE WITNESS:  Okay.

20           THE COURT:  Okay.  Pose the question.

21   BY DEFENDANT DIDANI:

22   Q.  So, Agent Bianchi, so you testified in front of this Court

23   that in two thousand -- Adriatik Sheko -- I was involved in

24   2008 with Adriatik Sheko with that company; right?  Yes or no?

25   A.   I testified in this Court that Adriatik Sheko was the owner

1    of a trucking company being investigated in, in which you were

2    part of that investigation.

3    Q.   Okay.  Agent Bianchi, when you testified under oath, do you

4    understand what under oath means?

5    A.   Absolutely.

6         THE COURT:  Yes, he does.  And you may go to a new

7    question.  And the jury will decide the credibility of the

8    witnesses.

9    BY DEFENDANT DIDANI:

10   Q.   Agent Bianchi, if I tell you Mr. Sheko in 2008 and his

11   company they didn't even existed, is that accurate?

12   A.   I don't know.  I did not look that up.

13   Q.   You never look it up, ANR Express?

14   A.   I did not.  It was not my investigation.

15   Q.   Agent Bianchi, in 2018 you investigated the same person,

16   Adriatik Sheko, and there is a report.  It's a report with your

17   name, stamped with your name.  You knew very well that that

18   company didn't exist in 2008, not even -- Mr. Sheko didn't even

19   live in the United States, but you choose to lie to this judge?

20        MR. BILKOVIC:  Judge, I would object.  First of all, I

21   think it's argumentative.  Second of all, I would ask that he

22   ask questions instead of making speeches.

23        THE COURT:  Yes, you're making a speech.  Pose a

24   question.  Although, it was kind of posed as a question, at

25   least by his tone it was posed as a question, but pose it as a

1   question.

2          The question was you knew that the company didn't

3   exist and that Mr. Sheko didn't live in the United States in

4   2008.  I think that's your question, is it not?

5          DEFENDANT DIDANI:  Yes, your Honor.

6          THE COURT:  Okay.  Did you know that in 2008?

7          THE WITNESS:  I did not.  I did not --

8          THE COURT:  Did you know it in 2018?

9          THE WITNESS:  About 2008?

10         THE COURT:  In 2018, did you then know that this

11  gentleman and his company -- his company did not exist in 2008

12  and that he didn't live in the United States in 2008?  Did you

13  know all of that by 2018?

14         THE WITNESS:  I did not.  I only knew what was in the

15  reports that I read of that prior investigation.

16  BY DEFENDANT DIDANI:

17  Q.  Agent Bianchi, so we're talking about 2008, '15.  Then your

18  testimony it was in 2023, April 24, okay.  So I'm going to

19  refresh your memory with a page and I want you, please, to read

20  that to the jury, please.

21         MR. FINK:  Explain what it is.

22         Your Honor, I was asked a question.  I'm sorry.  I

23  don't mean to involve myself --

24         THE COURT:  If it's going to be taken to the witness,

25  you can do that, too, please.

1           MR. FINK:  You got it, Judge.

2    BY DEFENDANT DIDANI:

3    Q.  Agent Bianchi, over here we have a warrant which was issued

4    by you in February 20, 2018.

5           THE COURT:  What is the date again?

6           DEFENDANT DIDANI:  A warrant.

7           THE COURT:  What's the date?

8           DEFENDANT DIDANI:  February 20, 2018, your Honor.

9           THE COURT:  Okay.

10           DEFENDANT DIDANI:  It was signed by Honorable Anthony

11    Patti and issued by Judge Bianchi.

12           THE COURT:  I don't think issued by Judge Bianchi.

13           DEFENDANT DIDANI:  Oh.  Issued as the agent.

14           THE COURT:  Okay.  He's the agent on it, and Judge

15    Patti is the one who issued it, okay.

16           DEFENDANT DIDANI:  Your Honor, I will show it to the

17    Government first.

18           THE COURT:  Okay.  Is it marked so we'll be able to

19    see it again?  So it's a proposed exhibit something?

20           DEFENDANT DIDANI:  Yes, your Honor.

21           THE COURT:  And what is that?

22           DEFENDANT DIDANI:  Exhibit B.

23           THE COURT:  Proposed B?

24           DEFENDANT DIDANI:  Proposed B, your Honor.

25           MR. FINK:  Judge, I'm going to approach the witness

1    now.

2              THE COURT:  And you want to show him this and have him

3    look at it and then you want to pose a question; is that right?

4              DEFENDANT DIDANI:  I want him to have a look at it,

5    and I want him to read that to the jury, please, your Honor.

6              THE COURT:  The whole warrant?

7              DEFENDANT DIDANI:  No, not the whole warrant.  It's a

8    part where there was -- about this investigation, 2008

9    investigation, and the gentleman, Adriatik Sheko.

10             THE WITNESS:  The part that is circled; correct?

11   BY DEFENDANT DIDANI:

12   Q.   Yes.

13             DEFENDANT DIDANI:  Your Honor, he's reading Page 803.

14             THE WITNESS:  That's the correct page; right?

15   BY DEFENDANT DIDANI:

16   Q.   Yes, sir.

17   A.   Okay.

18   Q.   Agent Bianchi, can you please read this to the jury, that

19   part.

20   A.   That paragraph?

21   Q.   Yes, sir.

22   A.   Do you want me to read starting on that page or go back to

23   the beginning of the paragraph?

24   Q.   The beginning of the paragraph with the one I circled,

25   Agent Bianchi.

1  A.  "The previous investigation lists both Didani and Sheko as

2  part of a drug trafficking organization.  During that

3  investigation, multiple narcotic and money seizures were

4  conducted, some of which were seized from tractor trucks that

5  were being driven by AR Express truck drivers.  Since the

6  seizures, Sheko sold ANR Express and moved.  It is believed

7  that in 2007 Sheko moved to Istanbul, Turkey.  From 2007 until

8  March of 2016, Sheko has only spent a few weeks a year inside

9  the U.S."

10  Q.  So with few words, Agent Bianchi, Mr. Sheko cannot possibly

11  be here in United States in 2008?

12  A.  Okay.

13  Q.  Yes or no?

14  A.  Sure.

15  Q.  He's not?  He's in the United States or in Turkey?  Where

16  he live?

17  A.  I would have to check my records.

18  Q.  That was not your record, Agent Bianchi?

19  A.  This is not records, but my report.  And according to my

20  report I would agree with my report 100 percent.

21  Q.  So, Agent Bianchi, to me it looks like a fake report.

22          MR. BILKOVIC:  Objection, Judge.

23          THE COURT:  It looks like a what?

24          MR. BILKOVIC:  A fake report.  Objection.  It's

25  argumentative.

```
 1            THE COURT:  You want to respond to -- what is your
 2   objection relative to it being a fake report?
 3            MR. BILKOVIC:  My objection is that it's not a
 4   question.  He's telling the witness what it looks like to him.
 5            THE COURT:  Okay.  You're saying what -- okay.  That's
 6   sustained.
 7            DEFENDANT DIDANI:  Judge, the Government didn't let me
 8   finish the whole sentence.
 9            THE COURT:  Okay.  That's fine.  Finish the whole
10   sentence.
11            DEFENDANT DIDANI:  And then Mr. Agent Bianchi can
12   answer and they can object.
13            THE COURT:  Excuse me?
14            DEFENDANT DIDANI:  The Government can object or
15   Mr. Bianchi --
16            THE COURT:  It sure sounded like you had finished, but
17   go ahead and finish.
18   BY DEFENDANT DIDANI:
19   Q.  So we have a report from 2008 from ANR Express, and we have
20   some people going with jet skis in Canada.  We don't know who
21   they are.
22            THE COURT:  I'm waiting for a question.
23   BY DEFENDANT DIDANI:
24   Q.  Is that a -- that's the totality that you have to travel in
25   Chicago?  Is that all that you had the probable cause that you
```

1    had to travel to Chicago to meet this defendant?

2             THE COURT:  "Is that all" meaning the jet skis and

3    that report --

4             DEFENDANT DIDANI:  Yes, yes, yes.

5             THE COURT:  Okay.

6             THE WITNESS:  Again, that is not why I traveled to

7    Chicago.  I traveled to Chicago about your suspicious travel,

8    your travel with Mr. Puzio, your -- the reason for not boarding

9    your reservations, and various other things to do with this

10   report.  Just because Mr. Sheko might not have been here does

11   not mean the investigation was closed.  I'm reading reports

12   from a prior investigation.

13   BY DEFENDANT DIDANI:

14   Q.  Mr. Bianchi, you just testified a few minutes ago you have

15   no idea about the report.  Now you're getting a memory of this

16   report.  I'm confused right now.

17   A.  I have no idea about what report?

18   Q.  The 2008 report.

19            THE COURT:  Wait, wait.  What report were you

20   referring to when you just spoke?

21            THE WITNESS:  The 2008 report.

22            THE COURT:  Okay.  All right.

23            THE WITNESS:  From a prior investigation.

24            THE COURT:  What was your question, Mr. Didani?

25            DEFENDANT DIDANI:  We'll move forward.

```
 1              THE COURT:  Well, I'm not cutting you off.  I just
 2   think if I don't know which report he's referring to it might
 3   be likely that others don't.
 4   BY DEFENDANT DIDANI:
 5   Q.   The 2008 report; right?
 6   A.   Correct.
 7              THE COURT:  Okay.  Now pose a question.
 8   BY DEFENDANT DIDANI:
 9   Q.   Okay, Agent Bianchi.  So now you in Chicago; right?  You
10   traveled 300 miles due to those reasons.  You go and see
11   Mr. Didani.  You want to talk to Mr. Didani; right?  Is that
12   true?
13   A.   Yes, sir.
14   Q.   A lot of your reports you saying that Didani was traveling
15   with a associate.  What do you mean by with an associate?
16   A.   I guess it depends on which travel time you are talking
17   about.
18   Q.   2015, sir.
19   A.   In 2015?
20   Q.   Yes, that's what we're talking.  Agent Bianchi, please bear
21   with me.  I'm trying to -- I'm trying for us to get the truth
22   out.
23              THE COURT:  Okay.  He understands all of that.  What
24   we need is a question, and I think the issue is are you talking
25   about his travel to O'Hare in 2015 or 2018?
```

1          DEFENDANT DIDANI:  2015, your Honor.

2          THE COURT:  Okay.  Pose a question then.

3     BY DEFENDANT DIDANI:

4     Q.   In your report, you're saying that I was traveling with a

5     associate.  What do you mean with associate and who was that

6     associate?

7     A.   In none of my reports do I ever recall you traveling -- me

8     writing that you were traveling with an associate in 2015 when

9     I came there to interview you.  I would be glad to see it and

10    recall my memory.

11         MR. FINK:  Judge, can we approach for a moment?

12         THE COURT:  Yes.

13         MR. FINK:  Thank you.

14         (At sidebar on the record out of the hearing of

15          the jury, as follows:)

16         MR. FINK:  The only concern I have is I want to do

17    what I was supposed to do as standby counsel.  A lot of this

18    stuff has come to me on the fly that I don't know what exactly

19    I'm looking for.  I don't want to make it look like I'm the

20    lawyer.  I don't want to take too much time.  I'm not doing

21    that for my own -- it's just the time it might take me.  It's

22    not like, you know, this is prepared.  He wants me to find the

23    stuff, and I'm happy to help because I'm happy to have that

24    role.

25         But that's why some of this is a little -- I'm caught

```
 1    flat-footed.  I don't mean to make too much time for the jury
 2    or seem like, you know, I'm imposing my will or anything.  So I
 3    just wanted to make that clear that that's kind of why this is
 4    going that way.
 5              Thank you, your Honor.
 6              DEFENDANT DIDANI:  Thank you, your Honor.
 7              THE COURT:  Okay.
 8              (End of sidebar.)
 9              THE COURT:  You may continue.  I'm ready.
10              DEFENDANT DIDANI:  Yes, your Honor.
11    BY DEFENDANT DIDANI:
12    Q.  Did you remember you came to airplane to pick me up on that
13    day in 2015 or to the gate?
14    A.  I'm sorry?
15    Q.  Did you come to airplane -- in door airplane that day or
16    you came to the gate?  Do you remember anything about it that
17    day, or no?
18    A.  I do remember, and I didn't go to either.  I was already in
19    secondary.
20    Q.  Okay.  We're going to pass -- and you think I was there by
21    myself; right?
22    A.  No, I know you weren't.
23    Q.  So I had associate then?
24    A.  Correct.
25    Q.  Who was my associate?
```

1    A.   Your girlfriend, I believe.

2    Q.   Thank you.  And that's what I'm asking.  So that's what I

3    was asking.  I was traveling with associate; right?  So it's my

4    girlfriend; right?  It was my fiancee?

5    A.   Okay.

6    Q.   Do you remember her name?

7    A.   I never met her, sir.

8    Q.   But you have her name on the report?

9    A.   Okay.  No.

10   Q.   Flavia Djaloshi?

11   A.   Yes, I remember that.

12   Q.   Because I want to make sure clear when you say associate,

13   girlfriend or associate, business associate, you know, what

14   you're referring to it.

15              THE COURT:  Is that a question?

16              DEFENDANT DIDANI:  I'm trying to understand what he

17   refers when he say "associate."  A business associate?

18              THE COURT:  Well then ask him what did he mean by

19   "associate."

20              DEFENDANT DIDANI:  I've been trying, your Honor.

21              THE WITNESS:  It depends.  An associate to what or to

22   who or when?  Was it an associate you were traveling with that

23   day, was it an associate that you traveled with in prior

24   travel, was it an associate that you had in the United States?

25   I don't know what you're saying.

BY DEFENDANT DIDANI:

Q.   Agent Bianchi, in a lot of your reports you say that I was traveling in 2015 with an associate of mine, all right.  And that's what -- and I'm trying to figure out when you say an associate of mine do you mean my associate business, supposedly they connected to me through your conspiracy theory, or my associate, my family or my family associate.  That's what I'm trying to understand.

A.   I don't remember putting that in any of the reports for July --

Q.   Oh --

A.   Hang on.  For July of 2015.  However, if I did and you two were on the same travel itinerary, I was probably referring to her.

Q.   Okay.  Good enough.  Good enough answer.

       Agent Bianchi, do you know I have a family in Chicago?

A.   Yes, sir.

Q.   Who lives in Chicago?

A.   I'm not quite sure exactly who, but I know your parents live there.

Q.   And you don't know where I live in Chicago?

A.   The address is in my reports.  I would have to look it up.

Q.   That day that I was traveling, Agent, I was going to Chicago with my fiancee to visit my mother or traveling somewhere else?

1    A.   To Detroit, if I recall.  Your final destination was to

2    Detroit.

3    Q.   Did you have the tickets or -- how did you know I was final

4    destination to Detroit?

5    A.   I looked it up.

6    Q.   And I don't see it nowhere in the reports.

7              THE COURT:  Is that a question, because --

8    BY DEFENDANT DIDANI:

9    Q.   You don't think, Agent --

10             THE COURT:  Excuse me.  If it's a question, it should

11   be posed as did you write that in any of the reports.

12   BY DEFENDANT DIDANI:

13   Q.   Did you write that in any other reports?

14   A.   I don't know.  I do not recall.  That was ten years ago.

15   Q.   Okay.  And you said we had a laid-back conversation?

16   A.   Yes, sir.

17   Q.   And you testified that Agent Fuentes scrolled over my

18   phone; right?

19   A.   Yes, sir.

20   Q.   And somehow now we're going to say because -- how long you

21   detain me that day, do you remember?

22   A.   I did not detain you, sir.  CBP detained you, and it was a

23   long time.  I do not remember how long it was.

24   Q.   But CBP detained me on your call; right?

25   A.   On my recommendation, yes.

```
 1    Q.   Exactly.  Do you agree with me you testified that you
 2    detained me for seven hours?
 3    A.   Again, I do not remember the exact timeframe.
 4    Q.   In the hearing we have over here you said I was detained
 5    for seven hours.
 6    A.   If I said you were detained for seven hours in a report,
 7    then I will believe that.
 8    Q.   Okay.  Thank you.  And during this time you asked me
 9    questions about my travel; right?
10    A.   Yes, sir.
11    Q.   What did you see suspicious about my answers, do you
12    remember?
13    A.   I remember a little bit of them, which we've gone over.
14    Q.   About what?  What was suspicious?
15    A.   Making several reservations, flying to the United States,
16    not boarding them, making reservations the day before -- four
17    days before, a short time to go to Colombia.  And then flying
18    to Colombia, landing in Colombia, and turning around and flying
19    back from Colombia the same day while your travel associate,
20    Mr. Puzio, who was on your itinerary stayed for a week.
21              There was a bunch of different questions.  Your
22    frequent travel to Istanbul, Turkey, then Germany, then Malta
23    Island, all within one year is a lot of travel.  There's a
24    bunch of different stuff, which you can find in my reports.
25    Q.   Agent Bianchi, let's go back to Colombia.  Thank you for
```

1    reminding me.  Do you remember why I returned right back that

2    day from Colombia to Miami?

3    A.   I do.

4    Q.   Why?

5    A.   Because you were denied entry into Colombia.

6    Q.   So I never made it inside in Colombia; right?

7    A.   Correct.

8    Q.   So I cannot possibly have talked to anybody in Colombia,

9    did any business or anything that day or that flight; right?

10   A.   That I do not know, sir.

11   Q.   You just said I was turned back.

12   A.   You were.

13   Q.   Exactly.  So it's not possible to have any conversation

14   with any suspicious -- why it look suspicious traveling so

15   much, Agent?

16          THE COURT:  That's too many questions.  Pick one.  Do

17    you want him to say could you have had any contact with anyone,

18    or the second question?

19   BY DEFENDANT DIDANI:

20   Q.   Agent, so could I have had contact that day with anyone,

21   with any associate, imaginary associate?

22   A.   I will give you two different scenarios.  The scenario I

23   knew before I talked to you, which was you flew into Colombia,

24   eight hours later you flew back.  And I'm not sure if it was

25   quite eight hours, but it was a couple hours later you flew

1    back.

2              In that scenario, I didn't know.  Maybe you met

3    somebody, maybe you talked to somebody, maybe you did things.

4    Then I interviewed you, which is why I wanted to interview you

5    to find out what was going on, and found out that you told me

6    that you were denied entry into Colombia and then turned back.

7    Q.   Did you ever verify that with Colombia, Agent Bianchi?

8    A.   No, I did not.

9    Q.   Okay.  So you had your suspicious -- you know, me traveling

10   to Turkey, me traveling to Colombia -- I never made it to

11   Colombia, but to Germany.  Those are the suspicions, missing

12   flights.  All those are suspicions of yours, you know, so ...

13             Agent Fuentes took my phone and scrolled all over the

14   phone; right?

15   A.   Yes, sir.

16   Q.   He went all through the phone; right?

17   A.   Yes, sir.

18   Q.   And they saw a picture of what?  Tell the jury.

19   A.   I cannot testify to what Mr. Fuentes saw, sir.

20   Q.   What did you see on that day on that phone?

21   A.   I will say again I saw pictures of you with a pistol on

22   your hip.  I saw pictures of you holding what appeared to be an

23   AR-style rifle.  I saw pictures of bulk currency, cash, U.S.

24   currency.  I saw pictures of what appeared to be a small bag of

25   what I thought was cocaine or a white, powdery substance.  I

1    saw pictures of you and your friends at the bar.  I saw

2    pictures of you in vacation, which you had said was the -- I

3    believe it was the Maltese Islands.  You showed me personally

4    pictures of you at the Drake concert.

5    Q.   In Dubai.

6    A.   In Dubai, okay.  That is what I saw.

7    Q.   Okay, Agent.  Let's go to the first pictures.  Having a

8    picture with a pistol, is that illegal?

9              MR. BILKOVIC:  Judge, can we approach the bench?

10             THE COURT:  Yes, you can.

11             (At sidebar on the record out of the hearing of

12             the jury, as follows:)

13             MR. BILKOVIC:  I'm worried about the answer here,

14   because he was a convicted felon and not allowed to be in

15   possession of firearms.  And, if he pursues that line of

16   questioning with Agent Bianchi, my concern is Agent Bianchi is

17   going to respond that way.

18             DEFENDANT DIDANI:  He can respond that way, your

19   Honor.

20             THE COURT:  Otherwise, that could come in.

21             DEFENDANT DIDANI:  That's fine.  He can --

22             MR. FINK:  It's going to be a criminal history and

23   that you had a felony in the past.  They're going to know that.

24   I'm just making sure you understand.

25             DEFENDANT DIDANI:  That was a drug driving.  As I told

```
 1   you, I wanted to --
 2              MR. FINK:  That's fine.  That's the prior felony --
 3              DEFENDANT DIDANI:  Yes, yes.
 4              THE COURT:  That's the prior what?
 5              MR. FINK:  That's the prior felony --
 6              MR. BILKOVIC:  Prior drunk driving.
 7              MR. FINK:  -- and I'm sure I did not know about
 8   something else.
 9              THE COURT:  All right.
10              (End of sidebar.)
11   BY DEFENDANT DIDANI:
12   Q.  Agent Bianchi.
13   A.  Yes, sir.
14   Q.  Is that illegal to have a photo with a gun?
15   A.  It depends.
16   Q.  What do you mean it depends?
17   A.  If you are a felon, you are not allowed to carry a firearm.
18   Q.  Okay.  So explain to the jury the felon.  Do you know if I
19   was a felon in that time, or no?
20   A.  Depending on the date of the photo, and I don't know the
21   date of the photo, but at the time I knew you had felonies.
22   Q.  What kind of felonies I had, Agent Bianchi?
23   A.  DUIs.
24   Q.  DUI, drunk driving?
25   A.  Yes.
```

1    Q.   I'm not allowed to take a picture of a gun if you have a

2    DUI?

3    A.   I don't know the answer to that, sir.

4    Q.   But you're the agent.

5            THE COURT:  But that's a comment.  It's not a

6     question.

7    BY DEFENDANT DIDANI:

8    Q.   So I'm not allowed to have a picture of a gun?

9    A.   Of a guy?

10   Q.   A gun.  A gun picture, with a DUI.

11   A.   Again, this depends.  If you're asking if you can just have

12   a picture of a gun, sure.  Anybody could have a picture of a

13   gun.

14   Q.   Okay.  Thank you.  That's what I wanted to make sure.

15   A.   But this was a picture of a gun on your hip and you holding

16   an AR-15, or what looked to be like an AR-15, and you were a

17   felon.

18   Q.   Well, Mr. President is a felon, he's around guns.  So what

19   are we doing right now?

20           THE COURT:  Now, I'm not sure what that question is.

21    What is that question?

22           Okay.  It's stricken.  Go to another question.

23   BY DEFENDANT DIDANI:

24   Q.   Okay.  So is that illegal to have money, cash money, sir?

25   A.   I would say no, but again it depends on the situation, sir.

1    Q.   The money that the Government showed the exhibits, they

2    show each of us -- that was on the table, the money, is that

3    illegal to have cash money in the United States?

4    A.   If you laundered that money or it was drug proceeds,

5    absolutely.

6    Q.   But, Agent, you just said that the only felony I have is

7    drunk driving.

8    A.   Okay.

9    Q.   So it's illegal for me to have a picture with money, or

10   videos with money?  It is illegal or not?

11   A.   I didn't say it was illegal to have a picture of money.

12   Q.   So it's illegal or not?

13   A.   I guess rephrase your question.

14   Q.   It is illegal to have picture of money, bunch of money or

15   video of money?

16   A.   To have the picture of money, I would say, no, it's not

17   illegal.  To possess that money under the circumstances I

18   stated is illegal.

19   Q.   All right.  Thank you.  With all the circumstances and all

20   these things happen, then explain to the jury what was the next

21   step?  You copied -- you extracted that phone; right?

22   A.   Did you say extracted the phone?

23   Q.   Yes.

24   A.   Yes, sir.

25   Q.   When you say extracted, let me make sure one more time,

1    remind the jury, that is almost 99 percent or hundred percent

2    extraction, whatever the content on the phone; right?

3    A.   That totally depends on the phone, the make, the model, the

4    software you're using.  In your case, depending on which year

5    we're talking about, and we're talking about 2015 --

6    Q.   2015.

7    A.   -- we did not get the full extraction.  We got the full

8    photos, we got the full videos.  I'd have to go back and look

9    and see everything we got, but it was not a full, complete

10   extraction.

11   Q.   You said on the hearing -- you just said to the Government

12   it's more than 10,000 photos and videos.

13   A.   And I just said we got the photos and we got the videos.

14   Q.   All the conversations, do you remember that during the

15   hearing?

16   A.   I would have to go back and look.  I can tell you for sure

17   we got a full extraction of your 2016 phone, but I cannot say

18   if we got a full extraction of the 2015.

19   Q.   Agent, so now you have a full extraction.  You let me go,

20   me and my fiancee.  We left, you know, to a destination that

21   you don't know really.  Now you have the phone.  You have a

22   copy of the phone; right?

23   A.   Yes, sir.

24   Q.   Now, you went back to the office in Detroit, right, with

25   that copy of the phone; right?

1   A.   Yes, sir.

2   Q.   And every day you took your time, start scrolling, watching

3   and comparing every picture; right?

4   A.   No.

5   Q.   No?

6   A.   No, not every day.

7   Q.   Well, did you watch everything, the content of the phone?

8   A.   I'm sorry?

9   Q.   Did you watch all the contents of that phone, the copy of

10  the phone?

11  A.   I'm sorry.  I don't understand you.

12  Q.   Agent, you have the copy of the phone.  You left from

13  Chicago with a copy of the phone in your pocket or whatever --

14  A.   Correct.

15  Q.   Did you check everything, the contents of that phone, all

16  the --

17  A.   Every single thing on that phone?

18  Q.   Yes.

19  A.   I'm sure I probably did not.

20            DEFENDANT DIDANI:  Your Honor, I need to remind him on

21  a hearing in April 24, 2023.  Can you please give me one

22  second?

23            THE COURT:  Yes.

24            DEFENDANT DIDANI:  Page 107.

25            THE COURT:  And this is the same April transcript?

```
 1              DEFENDANT DIDANI:  Yes, your Honor, April 24, 2023.
 2    It's Page 107, line 12, all the way to the end.
 3              THE COURT:  To the end of the page?
 4              DEFENDANT DIDANI:  Yes, your Honor.
 5              MR. FINK:  May I approach, your Honor?
 6              THE COURT:  Yes, you may.
 7              THE WITNESS:  Do I just read this to myself?
 8              THE COURT:  Read it to yourself first.
 9              THE WITNESS:  Starting on line ...
10              THE COURT:  12.
11              THE WITNESS:  Okay.
12    BY DEFENDANT DIDANI:
13    Q.   So, Agent Bianchi, do you agree with me based on that
14    testimony that you checked every corner of that phone?
15    A.   No.  If you refer to line -- well, let's start at line 22.
16              "And, like I said -- and like we said, everything that
17    was available was an exact copy of that phone from the day it
18    was taken; right?"
19              My response, "Not exactly, but most of it."
20              I cannot sit here and say that I've seen every single
21    thing that was on that phone.
22    Q.   Agent Bianchi, on that exact copy, that copy, you checked
23    every corner of that copy that you have; right?  Everything on
24    that copy existed on that copy?
25    A.   Again, not exactly, but most of it.
```

1             MR. FINK:  May I retrieve the exhibit from Mr. Didani?

2             THE COURT:  Yes.

3             MR. FINK:  Thank you, your Honor.

4             DEFENDANT DIDANI:  Your Honor, can I read line 18 from

5    transcript, 107?

6             THE COURT:  Yes, you can.

7    BY DEFENDANT DIDANI:

8    Q.   Question, "Did you search every corner over?"

9             Answer -- your answer, "Yes, sir."

10   A.   Keep going.

11   Q.   "All the apps, everything that was available."

12   A.   Keep going.

13   Q.   Like you said, everything that was available, it was exact

14   copy of that phone from the day it was taken; right?  Not

15   exact, but most of them; right?

16   A.   Say that one more time?

17   Q.   Not exactly, but most of it?

18   A.   Exactly.

19   Q.   So the exact copy; right?

20             That's fine, Agent.  Let me ask you something, 2015.

21   Can I ask you something?  What year is it right now, 2025?

22   A.   I didn't understand you.

23   Q.   Agent, today's day, what's today's day?

24   A.   Valentine's Day, February 14th.

25   Q.   Oh.  February 14th, today, 2025?

1    A.   Yes, sir.

2    Q.   And I'm going to ask you a specific question, Agent.   For

3    this specific copy from 2015 until today, which is almost ten

4    years, do you have a warrant for this specific copy?

5    A.   Do they what?

6    Q.   Do you have a warrant for this specific copy?

7    A.   No.

8    Q.   So you mean to tell me you have no warrant --

9    A.   I don't need one.

10   Q.   -- ten years later?  You don't need one?

11   A.   I don't need one, which we've already ...

12   Q.   Agent Bianchi, ten years later you don't have a warrant for

13   that copy exactly?  That's what you're trying to tell me?

14   A.   That is what I said.

15   Q.   Agent Bianchi, I'm going to ask you a personal question.

16   When you went through those photos, did you see my -- a naked

17   picture of my fiancee?

18   A.   Did I see naked photos, yes.  I'm not sure --

19   Q.   Of my fiancee, Agent.  Of my fiancee.

20   A.   I don't recall if it was your fiancee that it was -- that

21   was there or not.

22   Q.   Agent, can I ask you really do you think this is normal?

23            MR. BILKOVIC:  Judge, I'm going to --

24            THE COURT:  Do you think what is normal?

25

1   BY DEFENDANT DIDANI:

2   Q.   That ten years later you still don't have a warrant for

3   that copy?

4   A.   Absolutely.

5            MR. BILKOVIC:  I'm going to object at this point.

6   We've already had a hearing on this.  The Court has ruled that

7   he didn't need a warrant.

8            THE COURT:  We've already had a hearing on it, I

9   ruled.  And you may proceed, but not about the warrant.  Go to

10   another question.

11   BY DEFENDANT DIDANI:

12   Q.   All right, Agent.  Now you're armed with a copy of a phone

13   of somebody's life, personal life.

14            Let me go back.  Is that a practice you can do?  It

15   doesn't matter, all Americans, or all citizens of the world?

16   A.   It depends.

17   Q.   Only you need just somebody to say Mr. Wade Fink travel

18   with money from Greektown Casino to Canada, you can do that;

19   right?

20   A.   It depends.  When you travel into or out --

21            THE COURT:  There's no question posed to you right

22   now.

23            THE WITNESS:  Okay.

24            THE COURT:  Pose a new question.

25

1    BY DEFENDANT DIDANI:

2    Q.   All right, Agent.  So for all this time you're armed with

3    pictures, with photos with guns, photos with guns, some photos

4    to big substance, naked pictures, who knows what else, you

5    know, you did.

6            Now, here comes 2016, right, a year later.  Again, you

7    have a silent hit again about me, right, in 2016?

8    A.   Yes.  If you're talking about your travel, yes.

9    Q.   Yes.  So you got information that I was traveling from Rome

10   in transit to O'Hare to Mexico; right?

11   A.   Yes, sir.

12   Q.   Did you tell that -- then you contact Mr. Parisi or

13   Mr. Nugent.  You told them that Mr. Didani is flying from Rome

14   to O'Hare to Mexico; right?  That's what you told them, and

15   he's being investigated for drugs and money laundering; right?

16   A.   Along those lines, yes.

17   Q.   If those agents testified here they had no idea that I was

18   going to Mexico, is that true or false?

19           MR. BILKOVIC:  Objection, Judge.  I don't think he can

20   testify about what the other agents testified to and what they

21   would have known.

22           THE COURT:  You can maybe ask another question, but

23    not that one.  Go to a new one.

24   BY DEFENDANT DIDANI:

25   Q.   All right, Agent Bianchi.  So you called and you told --

1    you told Agent Nugent particularly what to do?

2    A.   Is that a question?

3    Q.   Yes.  What did you instruct him to do?  You called and you

4    say, Agent Nugent, I need you to --

5    A.   The particulars, that was nine years ago.  I do not recall.

6    I'm sorry.  We -- I can tell you we discussed the case, and I

7    asked him to search and interview you.

8    Q.   You never told him that -- seize his phones; right?

9    A.   No.

10   Q.   So who participate on seizing the phones?  You have nothing

11   to do with that?

12   A.   No, sir.  I was on vacation during that time.

13   Q.   Okay.  So in August 6 you saying that you was on vacation?

14   A.   Yes, sir.

15          DEFENDANT DIDANI:  Can you hold on a second?

16          (Briefly off the record.)

17          DEFENDANT DIDANI:  Your Honor, can we take a break?

18    It's very important I find that, because it was --

19          THE COURT:  We can take a break.

20          Remember that you're not permitted to talk about the

21   case among yourselves or with anyone else until I submit it to

22   you for your deliberations.

23          And you may step down and we'll take about ten

24   minutes, okay.

25          (The jury left the courtroom at 3:36 p.m.)

```
 1              THE COURT:  Do you all have any problem being here
 2    until 4:30?
 3              LAW CLERK:  Yes, Judge.
 4              THE COURT:  We do?  I do?
 5              THE CLERK:  Yes.
 6              THE COURT:  Oh, I do.  You're right.  I forgot, yeah.
 7    Okay.  Well, maybe we need to just send them home now.
 8              Do we need to do that for the marshals?
 9              MARSHAL:  That would be helpful, your Honor.
10              THE COURT:  Yeah.  Bring them back out, please.
11              (The jury entered the courtroom at 3:40 p.m.)
12              THE COURT:  Okay.  Don't get too comfortable, but you
13    may be seated.  All of you may be seated, too.
14              I'm going to send you home.  Remember that you're not
15    permitted to talk about the case among yourselves or with
16    anyone else.  I was going to send you for a break, but I think
17    when I bring you back we'll only have five minutes, so I might
18    as well let you go now.
19              I don't think it's snowing yet; right?  Tomorrow?
20    Yeah, four to seven; right?
21              THE CLERK:  Yes.
22              THE COURT:  Okay.  Well, we don't have court on
23    Monday, and so you're coming on Tuesday.  Come refreshed.  Come
24    on time if you can.  Hopefully the roads will be clear, okay.
25              You're going to leave your notes as Ms. Saulsberry
```

1    directs.  I think she has individual packets for you, and

2    she'll secure them so no one will have access to them.  And

3    remember don't use any social media or the internet or anything

4    to find out anything about anything related to this case, okay.

5            You may step down and have a good weekend.

6            Please rise for the jury.

7            (The jury left the courtroom at 3:41 p.m.)

8            THE COURT:  You may step down, sir.  You need to

9    return on Tuesday.

10           At 9:30?

11           MR. BILKOVIC:  We're 9:30 Tuesday.

12           THE COURT:  Okay.  Don't discuss your testimony with

13   anyone during that break; okay?

14           THE WITNESS:  Yes, your Honor.

15           THE COURT:  Okay.  You all may be seated.  I'm going

16   to send you all home as well.

17           But, Mr. Didani, you need to be ready with your

18   transcript pieces so that we don't have to take a break and

19   look for them, okay.  And you'll have, you know, the rest of

20   this weekend and Monday to do that; all right?

21           DEFENDANT DIDANI:  All right, your Honor.

22           THE COURT:  Okay.  Do we have anything else we need to

23   take up at this time?

24           MR. BILKOVIC:  No, your Honor.

25           THE COURT:  All right.  Very good.

1          MR. FINK:  Judge, any chance you could with the

2    benefit of the weekend look at one of the ex parte motions

3    filed, I'd be very grateful.

4          THE COURT:  I did --

5          MR. FINK:  There's another one that is pending.

6          THE COURT:  That's filed when?

7          MR. FINK:  A couple days ago, maybe two days ago --

8    two nights ago.  If not, I'll make sure --

9          THE COURT:  Do I have that?  We'll take care of it.

10         MR. FINK:  Oh, okay.  I've just got to get it -- got

11   it.  Understood.

12         THE COURT:  We already took care of if, but if we

13   didn't --

14         MR. FINK:  I really appreciate it, Judge.

15         THE COURT:  All right.  Everyone have a very good

16   weekend, and I will see you next week, okay.

17         MR. BILKOVIC:  You, too, Judge, you and your staff.

18   Thank you.

19         THE COURT:  See you next week.

20         MR. BILKOVIC:  Thank you.

21         (The proceedings were adjourned at 3:43 p.m.)

22         (End of Excerpt.)

23                              —    —   —

24

25

```
 1

 2

 3                  CERTIFICATE OF COURT REPORTER

 4

 5          I, Sheila D. Rice, Official Court Reporter of the

 6   United States District Court, Eastern District of Michigan,

 7   appointed pursuant to the provisions of Title 28, United States

 8   Code, Section 753, do hereby certify that the foregoing pages

 9   is a correct transcript from the record of proceedings in the

10   above-entitled matter.

11

12

13                       s/Sheila D. Rice
                         Sheila D. Rice, CSR-4163, RPR, RMR, FCRR
14                       Federal Official Court Reporter
                         United States District Court
15                       Eastern District of Michigan

16
     Date:  02/24/2025
17   Detroit, Michigan.

18

19

20

21

22

23

24

25
```