<pre>
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF MICHIGAN
 2                         SOUTHERN DIVISION

 3                           —   —   —

     UNITED STATES OF AMERICA,
 4
                 Plaintiff,
 5
       v.                               Case No. 21-20264
 6
     YLLI DIDANI,
 7
                 Defendant.
 8   _____/

 9              JURY TRIAL - VOLUME 3 - EXCERPT
              BEFORE THE HONORABLE DENISE PAGE HOOD
10                UNITED STATES DISTRICT JUDGE

11         Theodore Levin United States Courthouse
                 231 West Lafayette Boulevard
12                     Detroit, Michigan
                 Tuesday, February 18, 2025
13
     APPEARANCES:
14
      For the Plaintiff:      Mark Bilkovic
15                            Timothy McDonald
                              UNITED STATES ATTORNEY'S OFFICE
16                            211 W. Fort Street, Suite 2001
                              Detroit, Michigan  48226
17                            (313) 226-9623

18    For the Defendant:      Ylli Didani,
                              Appearing in Pro Se
19
                              Wade Fink
20                            WADE FINK LAW, P.C.
                              550 W. Merrill Street, Suite 100
21                            Birmingham, Michigan  48009
                              (248) 712-1054
22                            (Standby Counsel)

23    Also Present:          Special Agent Chad Hermans
                             Maria Dicarlo, Paralegal
24
           To obtain a copy of this official transcript, contact:
25               Sheila D. Rice  Official Court Reporter
              (313) 234-2610 • sheila_rice@mied.uscourts.gov
</pre>

1                     **TABLE OF CONTENTS**

2   MATTER _____ PAGE

3   **JURY TRIAL - VOLUME 3**

4   **Government's Case in Chief**

5   **JOSEPH BIANCHI (Continued)**

Cross-examination by Defendant Didani...............  6
6   Redirect examination by Mr. Bilkovic................ 100

7   Certificate of Court Reporter....................... 109

8

9

10

11

12

13

14                E X H I B I T   I N D E X

15

16   Exhibit No.          Description        Admitted

17   None

18

19

20

21

22

23

24

25

1    Detroit, Michigan

2    Tuesday, February 18, 2025

3    10:17 a.m.

4                              —   —   —

5            (Beginning of Excerpt.)

6            LAW CLERK:  All rise.

7            The United States District Court for the Eastern

8    District of Michigan is now in session, the Honorable Denise

9    Page Hood presiding.

10           Calling Case Number 21-20264, United States of America

11   versus Ylli Didani.

12           Appearances, please.

13           MR. BILKOVIC:  Good morning, your Honor.  Mark

14   Bilkovic and Timothy McDonald on behalf of the United States.

15           MR. McDONALD:  Good morning.

16           THE COURT:  Good morning.

17           DEFENDANT DIDANI:  Good morning, your Honor.  Ylli

18   Didani, and we have -- pro se.  And Wade Fink as standby.

19           THE COURT:  Good morning to all of you.

20           MR. FINK:  Good morning, Judge.

21           THE COURT:  You may all be seated.  Thank you.

22           You have somebody on the stand; is that right?

23           MR. BILKOVIC:  That's correct, your Honor.

24           THE COURT:  Have them step back up, please.

25           Are we ready to bring in the jury?

4

1              MR. BILKOVIC:  The Government is ready, your Honor.

2              THE COURT:  Mr. Didani, are you ready?

3              DEFENDANT DIDANI:  Yes, your Honor.

4              THE COURT:  Okay.  Very good.  Let's bring them in.

5              DEFENDANT DIDANI:  Your Honor, before we bring the

6      jury I have two things.  Can we -- if you don't mind.

7              THE COURT:  Are they having to do with this witness?

8              DEFENDANT DIDANI:  Well, no, your Honor.  It's -- I

9      want to bring forward a Brady violation.

10             THE COURT:  Okay.  With this witness?

11             DEFENDANT DIDANI:  No, it has nothing to do with --

12             THE COURT:  Okay.  Then I want to take this witness

13     while the jury is here, and we can do the Brady thing after we

14     have this witness; okay?

15             DEFENDANT DIDANI:  Okay, your Honor.

16             THE COURT:  All right.  Great.  Because I've already

17     lost 45 minutes of jury time, all right.

18             DEFENDANT DIDANI:  Yes, your Honor.

19             THE CLERK:  All rise for the jury.

20             (The jury entered the courtroom at 10:21 a.m.)

21             THE COURT:  You may all be seated.

22             Are you satisfied the jurors are present and properly

23     seated?

24             MR. BILKOVIC:  Yes, your Honor.

25             THE COURT:  Mr. Didani, what about you, are you

1   satisfied?

2           DEFENDANT DIDANI:  Yes, ma'am.

3           THE COURT:  Okay.  Very good.

4           You may be seated for a moment, sir, okay.

5           Okay.  So, you know, it's 10:25.  So I'm not going to

6   have you raise your hands and tell me who was late, okay, but

7   one of the things that the Government's counsel has said, that

8   we're ahead, we're probably not going to take the whole ten

9   weeks, but if you don't come on time it will take the whole ten

10  weeks, okay.  So everybody needs to come by -- what did

11  Ms. Saulsberry tell you, 9:00?

12          JURORS:  8:30.

13          THE COURT:  So you can be out here by 9:30, okay.  If

14  everybody's here before 8:30, I'll start -- I mean before nine

15  o'clock I'll start at nine o'clock, but if we don't get people

16  to come until ten o'clock we can't get started and it will take

17  us much longer, okay.  So come on time tomorrow, all right.

18  Okay.  Great.

19          Your witnesses is continued from last week.

20          You're still under oath.  You don't have any problem

21  if I continue him under oath, do you, Mr. Didani?

22          DEFENDANT DIDANI:  No, your Honor.

23          THE COURT:  Okay.  Very well then.  Just state your

24  name again for the record.

25          THE WITNESS:  Joshua Allen Bianchi.

```
 1                THE COURT:  Okay.  You may proceed.

 2                DEFENDANT DIDANI:  Good morning to all of you.

 3                JURORS:  Good morning.

 4                    CROSS-EXAMINATION (Continued)

 5   BY DEFENDANT DIDANI:

 6   Q.   Agent Bianchi, good morning.

 7   A.   Good morning.

 8   Q.   Agent Bianchi, I apologize, but we have to be -- I'm going

 9   to take my time, raise my questions.  I apologize to the jury

10   and to this Court.

11           Do you agree you're a big puzzle of this case, you

12   initiated this case, and one of the reasons I'm in front of

13   you, Agent Bianchi, is because of you; right?

14   A.   One of the reasons what?

15   Q.   That I'm here in this Court.

16   A.   Yes.

17   Q.   I just want to make clear, Agent Bianchi.  So --

18                THE COURT:  So go to a question, Mr. Didani.

19   BY DEFENDANT DIDANI:

20   Q.   Agent Bianchi, we left at -- the last time, do you remember

21   where we left it, or no?

22   A.   I do not.

23   Q.   All right.  So we left it in 2015.  We in 2015, right,

24   Agent Bianchi?  I just want to make sure that we're on the same

25   page; right?  Yes?
```

1   A.   Okay.

2   Q.   Agent Bianchi, after the encounter in Chicago O'Hare with

3   so-called associate, which was my fiancee, Flavia Djaloshi,

4   what did you do?  Did you come back in Detroit?

5   A.   I did.

6   Q.   Yes.  And you started investigating a lot of people?

7   A.   Yes.

8   Q.   Okay.  You never went to -- you know in Chicago I have a

9   family; right?

10  A.   I do.

11  Q.   Let me make it clear, Agent Bianchi.  At that time in 2015

12  I was living here in United States or somewhere in Europe?

13  A.   I do not know.

14  Q.   You didn't investigate if I was living in Europe or United

15  States?

16  A.   I did not know.

17  Q.   All right.  Fair enough, Agent Bianchi.  So you agree that

18  me and my fiancee at that time were visiting my mother, then we

19  came to visit some people, not only in Michigan, because you

20  the agent, but in Ohio, New York?  Do you agree with this, that

21  I came in Michigan to visit friends?

22  A.   Can you restate that?

23  Q.   That I was in Michigan -- in 2015 that I come in Michigan

24  to visit friends.  Do you remember that, Agent Bianchi?

25  A.   If you're talking about August of 2015, I do.

1    Q.   So I was in Michigan; right?  I came in Michigan from

2    Chicago go with my fiancee?

3    A.   How you got there, I do not know.  You were there August of

4    2015.

5    Q.   Okay.  So I was by myself or with my fiancee?

6    A.   With a female I'm assuming is your fiancee now that you're

7    saying that.

8    Q.   Yes, Flavia Djaloshi.  All right, Agent.  Let me go back a

9    little bit to 2015 encounter, all right, the time.  Agent,

10   there was a discussion in the airport about a coaling business,

11   right, and -- a company, a coaling business and that I was

12   doing business in Europe selling coal and I was visiting in

13   Turkey.  Do you remember this conversation?

14   A.   Yes.

15   Q.   And there is another business that I say to you is Michigan

16   Freight.  Do you remember that, Agent, transportation?

17   A.   I know the business.  I'm not sure if I remember it from

18   that conversation with you or from the investigation, but I

19   know what you're talking about.

20   Q.   All right.  Before we continue, I just want to make sure.

21        DEFENDANT DIDANI:  Can we go -- your Honor, can we go

22   to transcripts, Page 37, line from 4?  Mr. --

23        THE COURT:  37, line what?

24        DEFENDANT DIDANI:  From 4 all the way down to 20.

25        THE COURT:  And this is April 23rd or 4th?

| | |
|---|---|
| 1 | DEFENDANT DIDANI:  Yes.  Yes, your Honor, April 24, |
| 2 | 2023. |
| 3 | THE COURT:  April 24? |
| 4 | DEFENDANT DIDANI:  2023. |
| 5 | Do you want me read it or do you want him to read it? |
| 6 | Can you, Mr. Fink? |
| 7 | MR. FINK:  Yes, I can. |
| 8 | THE COURT:  You can take it up to him. |
| 9 | THE WITNESS:  Can you please repeat the line numbers? |
| 10 | BY DEFENDANT DIDANI: |
| 11 | Q.  Line 4 -- |
| 12 | THE COURT:  To the end of the page. |
| 13 | BY DEFENDANT DIDANI: |
| 14 | Q.  Can you please read that for the jury and the Court, |
| 15 | please. |
| 16 | THE COURT:  Do you want him to read it to himself or |
| 17 | do you want him to read it aloud? |
| 18 | DEFENDANT DIDANI:  Read it aloud, your Honor, please. |
| 19 | MR. BILKOVIC:  Judge, I would object.  I don't know |
| 20 | that -- I mean, he hasn't asked him a question that he was |
| 21 | impeaching or inconsistent.  He's simply asking him to read |
| 22 | testimony from a prior hearing. |
| 23 | DEFENDANT DIDANI:  Judge, I asked him a question if he |
| 24 | remember anything about those visits, and he doesn't remember, |
| 25 | your Honor. |

```
 1              THE COURT:  Is that right, you don't remember anything
 2    about those visits?
 3              THE WITNESS:  Which visits?
 4    BY DEFENDANT DIDANI:
 5    Q.   The coaling business, the coaling and mineral.
 6    A.   I do remember.  I said I did not remember where I heard
 7    MI Freight from, whether it was with our interview or prior
 8    reporting.
 9    Q.   Our interview -- Mr. Bianchi, listen.
10              THE COURT:  Excuse me.  Does that refresh -- will that
11    refresh his memory or impeach him about how he should remember
12    that company?
13    BY DEFENDANT DIDANI:
14    Q.   Agent Bianchi, let me rephrase one more time.
15              THE COURT:  No.  I'm asking you a question,
16    Mr. Didani.  Will it?  Because that's the objection that's
17    being raised.
18              Well, Counsel, do you think you have an objection now
19    having heard he doesn't remember how he remembers the freight
20    company?
21              MR. BILKOVIC:  I don't think that this question has
22    anything to do with that, but to speed things up I have no
23    objection to Agent Bianchi reading his answer.
24              THE COURT:  You can read it.  4 through 20.
25              This is your previous sworn testimony; right?
```

1                    THE WITNESS:  Yes, ma'am.

2                    THE COURT:  All right.

3                    THE WITNESS:  It's starting in the middle of an

4       answer, but I'll start with line number 4.

5                    "I had researched businesses that Didani might be

6       attached to, and he was not listed as any business owner in the

7       state of Michigan at the time.

8                    "So was that suspicious to you at all then?

9                    "It was.

10                   "Why?

11                   "Because he was obviously trying to cover up, one, his

12      home address and maybe how he was making money.

13                   "You said that he had indicated that he was part owner

14      of a coal mining business?

15                   "Yes, sir."

16                   MR. BILKOVIC:  Your Honor, could I stop it one second?

17      I think it might be helpful if the agent would indicate when a

18      question was asked and what the answer was.

19                   THE COURT:  Okay.  Just say when it's a question and

20      when it's an answer; okay?

21                   THE WITNESS:  Yes.

22                   THE COURT:  Thank you.

23                   THE WITNESS:  Question, "Was he asked further about

24      the coal mining business?"

25                   Answer, "He was."

1          Question, "And did he provide any details?"

2          Answer, "Mr. Fuentes asked him multiple details about

3    his travel to Istanbul, about the hotels he stayed in and when

4    he was trying to sell his coal and associates he met with, any

5    business cards, and Mr. Didani couldn't produce any of those

6    things.  He did produce a photo that he pulled up on his phone

7    and showed of a business associate he met with in Turkey."

8          Question, "I'll get to that in a minute.  You said he

9    was a co-owner.  Did you ask him about who the other owners of

10   this coal mining?"

11         And then that's the end.

12   BY DEFENDANT DIDANI:

13   Q.  All right.  Fair enough, Agent Bianchi.  Thank you.  The

14   question is -- we're going to continue.  Do you believe there

15   was a coal mining business somewhere in Europe or no, that I

16   was lying?  That statement I made to you in 2015, it was true

17   or false?

18   A.  I don't know.

19   Q.  But in your report, Agent Bianchi, it's all over that I was

20   making false claims.

21   A.   I don't know whether what you stated was true or untrue.

22   Q.  Agent Bianchi, you just said on that day they said

23   doesn't -- you know, pretty much you saying this coaling

24   business is to cover up -- to cover up, that I was saying that

25   just to cover up.  So basically what you saying, Agent Bianchi,

```
 1    you don't believe the business existed, either in Europe or
 2    either in Michigan; right?
 3    A.   Sir, I don't know for the -- what I was saying here, I can
 4    explain that you could not produce business cards, business
 5    associates' names.  When Mr. Fuentes asked you these things,
 6    you couldn't even tell him hotels outside of one that you were
 7    staying at.  Therefore, to me it was an indication that, yes,
 8    you were covering something up.
 9              THE COURT:  New question.
10    BY DEFENDANT DIDANI:
11    Q.   Agent Bianchi, so as an agent of the United States, right,
12    when citizen from another country travel to you in Mexico, you
13    don't check if those business exist or doesn't exist?
14    A.   That's not my job, sir.  I don't work at the port of entry.
15    Q.   So whose job is it?
16    A.   Mr. Fuentes who interviewed you.
17    Q.   But, Agent Bianchi, you came -- you drove 300 miles from
18    Detroit to O'Hare Airport to ask me a question, to investigate
19    this defendant, but it's not your job to confirm whether he was
20    telling the truth or not?
21    A.   That is my job, to conduct an investigation.
22    Q.   Okay.  Good.  So what did your investigation indicated,
23    conducted, that that company existed, all those companies
24    existed; yes or no?
25    A.   I do not know.
```

1    DEFENDANT DIDANI:  Your Honor, at this time I want to

2    enter something as exhibit, and I would like for Agent --

3    BY DEFENDANT DIDANI:

4    Q.  Can you, Agent Bianchi --

5    THE COURT:  Is it marked in any way so that we can

6    identify?

7    MR. FINK:  Your Honor, it will be marked Defendant's

8    proposed Exhibit C.

9    THE COURT:  All right.  Thank you.

10   MR. BILKOVIC:  Judge, can I ask what it is, because I

11   don't think I've ever seen this before?

12   THE COURT:  I'm going to show it to you.

13   MR. BILKOVIC:  Thank you.

14   MR. FINK:  Your Honor, the defendant asked me to

15   produce this to Agent Bianchi.  May I?

16   THE COURT:  Yes, you may.

17   BY DEFENDANT DIDANI:

18   Q.  Agent Bianchi --

19   THE COURT:  Wait a minute.  Counsel, you received a

20   copy of it, or at least reviewed it?

21   MR. BILKOVIC:  I reviewed it.  I would like a copy of

22   it, but I'll arrange that with Mr. Fink.

23   THE COURT:  Okay.  Very good.

24   BY DEFENDANT DIDANI:

25   Q.  Agent Bianchi, let me help you with this investigation as

```
 1   far as this company.  Can you please read the company's name,
 2   the date it was filed and the agent of the company, please.
 3              MR. BILKOVIC:  Judge, I'm going to object at this
 4   point.  I believe the document is hearsay.  I've never seen it
 5   before today.  I have no idea what it is, whether it's valid or
 6   anything.  This is the first time I've seen it.  It's hearsay.
 7              THE WITNESS:  It's not in English.
 8              DEFENDANT DIDANI:  No, it's in English.  It's
 9   translated.
10              Judge, under Rule 902.
11              THE COURT:  Respond to that.  I think the first
12   question is has he ever seen it before.
13   BY DEFENDANT DIDANI:
14   Q.  Have you ever seen it before, Agent?
15              THE COURT:  Or whether or not he can identify it.
16              THE WITNESS:  Not that I know of.  It doesn't look
17   familiar.
18              THE COURT:  What's your objection to the hearsay?
19              DEFENDANT DIDANI:  Your Honor, that is a document, you
20   know, from foreign country.  Rule 902 allows you to read
21   documents from a foreign country.  They all -- they stand
22   proper (Indiscernible) you know, it's all -- and I would like
23   for Agent Bianchi just to read for the jury the agent, the name
24   of the company, the business of the company and the agent
25   listed on there.  I think the jury should have the opportunity
```

 1    to hear it, your Honor.

 2            THE COURT:  Okay.  Do you have anybody else who's

 3    going to authenticate it?

 4            Do you all have another copy of it I could look it?

 5    How about that?  Maybe we can do it that way.

 6            DEFENDANT DIDANI:  So --

 7            THE COURT:  Do you have another copy the Court could

 8    look at?

 9            MR. FINK:  Do you want me to answer?

10            THE COURT:  I asked Mr. Didani.  Do you have another

11    copy that I could look at?

12            DEFENDANT DIDANI:  Not at this moment, your Honor, no.

13            THE COURT:  How about your copy?  How about that?

14            DEFENDANT DIDANI:  No -- yes, your Honor, a hundred

15    percent.

16            THE COURT:  Thank you.

17            (Briefly off the record.)

18            THE COURT:  The Government has never seen this before?

19            MR. BILKOVIC:  That's correct, your Honor.

20            THE COURT:  I'm going to --

21            DEFENDANT DIDANI:  Your Honor --

22            THE COURT:  You know, I think that I don't know

23    whether or not it can self-authenticate, because I haven't had

24    enough time to look at it, but there doesn't appear to be any

25    certification from a custodian of the record of that document.

1   So it can't come in under Rule 912.

2           So Mr. Bianchi is going to testify again, and if I

3   determine that it could be self-authenticating I'll permit it,

4   but right now I haven't had enough time to look at it.

5           Counsel, you saw that there was not only the -- not

6   only is the first half in a foreign language, the second half

7   is in English?

8           MR. BILKOVIC:  Correct.

9           THE COURT:  And it has a translator seal and

10  everything on it.  I just don't know whether or not the first

11  part of the document what those other seals mean and whether

12  they self-documented.  And they might, but, Mr. Didani, I

13  haven't had enough time to look at it.  So since this

14  witness --

15          This witness is coming back; right?

16          MR. BILKOVIC:  We can have him come back.  He's local.

17  We're not planning on calling him again, but he's available.

18          THE COURT:  This isn't the witness that you were going

19  to call several times?

20          MR. BILKOVIC:  No, but we can bring this witness back,

21  Judge --

22          THE COURT:  Oh, okay.  We can bring him back for this

23  then, all right.

24          DEFENDANT DIDANI:  Your Honor, just to make -- the

25  last page, that those are the certifications authentication.

1    THE COURT:  Certification on the last page?

2    DEFENDANT DIDANI:  Yes, your Honor.  Yes.

3    THE COURT:  As to the translation, but not -- I'm not

4    sure the certifications of the --

5    DEFENDANT DIDANI:  I was just using for impeachment,

6    your Honor, you know.

7    THE COURT:  Well, it's not his prior statement.  And,

8    if I said Rule 912, I meant Rule 902.  I thought I did say

9    that, but ...

10    I'll have him come back if I think it can be

11    self-authenticated, all right.

12    DEFENDANT DIDANI:  All right, your Honor.

13    THE COURT:  Go to a new question now, though.  And I

14    need a copy of it at the end of this proceeding.

15    MR. FINK:  I'll do that for you, your Honor.

16    THE COURT:  Okay.  Great.  At this time Exhibit --

17    Defendant's Exhibit C is under advisement, okay.

18    DEFENDANT DIDANI:  Thank you, your Honor.

19    THE COURT:  Go to a new question.

20    BY DEFENDANT DIDANI:

21    Q.   Agent Bianchi, did you check if there existed a company in

22    Michigan Freight over here in United States?

23    A.   I did.

24    Q.   It does exist?

25    A.   It had existed.

 1   Q.   Okay.  We'll go back to that farther.  I just want to make

 2   sure the other company existed, you know.

 3            So, Agent Bianchi, between 2015 to 2016, after you had

 4   a copy of this phone in the airport you started investigating a

 5   lot of people; is that true?

 6   A.   I'm sorry?

 7   Q.   You started investigating a lot of people, too many people;

 8   is that true, Agent Bianchi?

 9   A.   I investigated a lot of people during 2015, if that's what

10   you're asking, sir.

11   Q.   Yes.  You investigated, looking at your report, probably

12   20, 30, 40 other people that I have no idea who they are, you

13   know.  Did that have something to do with the investigation

14   that you was looking -- what you was looking for to all these

15   people?

16   A.   You have to be more specific, sir.

17   Q.   When you --

18            THE COURT:  You can answer what you were looking for

19    with the other witnesses.

20            THE WITNESS:  Okay.  It depends on the individual

21    you're talking about on what I was investigating into.

22   BY DEFENDANT DIDANI:

23   Q.   All right.  Let me get some names.  Eric Puzio.  Do you

24   remember Eric Puzio?

25   A.   Yes.

1    Q.   Is he a co-conspirator today?

2    A.   I don't know.

3              THE COURT:  Were you investigating him?

4              THE WITNESS:  Yes, ma'am.

5              THE COURT:  In relation to this case?

6              THE WITNESS:  Yes, ma'am.

7    BY DEFENDANT DIDANI:

8    Q.   What about Ivan Ivaskiv, do you remember that?

9    A.   I do.

10   Q.   You was investigating him?

11   A.   I'm sorry?

12   Q.   You was investigating in connection with me?

13   A.   Yes.

14   Q.   Okay.  Andrei Sweeney, you was investigating her, too?

15   A.   Say that again?

16   Q.   Andrei Sweeney.  Do you remember this in your report you

17   was investigating?

18   A.   I don't know.  I have to look at that one.  I don't

19   remember.

20   Q.   What about Nalia (ph)?  Nalia?

21   A.   I don't recall.  I'd have to look at my report, sir.

22   Q.   What about Dino Stathis?

23   A.   I remember that name.  That was part of --

24   Q.   Part of what?  Can you tell me?

25   A.   The investigation.

1  Q.   Okay.  And what do you remember about Dino Stathis?

2  A.   You're talking ten years go.  I would have to look back at

3  my reports.

4  Q.   Is he a co-conspirator today?

5  A.   I don't know.

6       MR. BILKOVIC:  Judge, I'm going to -- objection.  I

7  think that calls for a legal conclusion.

8       THE COURT:  It might, but I think in this particular

9  instance Mr. Didani is using that word in a more general sense,

10  and I think this witness can answer and the jury will not

11  consider it for the legal sense.

12       THE WITNESS:  What am I answering?

13       THE COURT:  Whether or not you were investigating him

14  and that he might be a co-conspirator.

15       THE WITNESS:  Dino?

16  BY DEFENDANT DIDANI:

17  Q.   Yes.

18  A.   He was part of the investigation.  I don't know if he's a

19  co-conspirator or not.

20  Q.   All right.  So apparently you remember there was a part of

21  the investigation.  Can you tell me what you investigated to

22  that gentleman?

23  A.   I cannot.  That was ten years ago.  I'd have to see my

24  reports to let you know.

25  Q.   Do you know Dino Stathis is an attorney?

1    A.   I'm sorry?

2    Q.   Do you know Dino Stathis is an attorney?

3    A.   No.

4    Q.   Agent, from 2015 to 2016 you got a spiderweb with people

5    and you investigated, and now you're telling me you don't even

6    know -- you don't even remember what you was investigating; is

7    that true?  Is that accurate?

8    A.   That was ten years ago.  I do not remember.  I investigate

9    a lot of investigations in the last ten years, sir.

10   Q.   Okay.  Agent Bianchi, what was odd for me and my fiancee

11   going to a airport with a car?  Do you remember in your report

12   that day I was going to a airport in Ann Arbor?  What was I

13   bringing from the trunk?  A bag of -- a bag, brown bag.  What

14   was bad about that, Agent?

15   A.   In Ann Arbor?

16   Q.   Yes, in the airport.

17   A.   I do not recall.

18   Q.   Do you recall about this investigation, Agent?

19   A.   Yeah.

20   Q.   Do you remember Ann Arbor airport?

21   A.   Ann Arbor, no.

22   Q.   Do you remember a private airport, Marty Tibbitts?

23   A.   Yes.

24   Q.   Oh, now you remember.

25   A.   That's not in Ann Arbor.

1  Q.  Where is that?  That's what your report's saying.

2          THE COURT:  Where is it?

3          THE WITNESS:  Oakland County International Airport, I

4  believe, your Honor.

5  BY DEFENDANT DIDANI:

6  Q.  Oakland County International Airport?

7  A.  I believe.  I don't --

8  Q.  Oakland County has a international airport?

9  A.  Yes.

10 Q.  All right, Agent.  Let's go back.  Let's move in 2016, all

11 right.  In August 4, Agent, do you remember August 4, 2016?

12 A.  No.

13 Q.  Do you remember you had a silent hit, it came to your

14 E-mail, and you said that Mr. Didani was traveling from Europe

15 transit to Juarez, Mexico?  Do you remember that, or no?  Do

16 you want me to refresh your report?

17 A.  In August of 2016?

18 Q.  August 4th, 2016, sir.

19 A.  Yes, I do remember that.

20 Q.  So you have a report over here, Agent, that you saying that

21 Mr. Didani -- did you notify the agents in Chicago?

22 A.  Yes.

23 Q.  What did you notify them?

24 A.  I called them up and stated you were traveling into the

25 country and asked for you to be interviewed and searched.

1    Q.  Did you tell them that I was traveling transit from Rome

2    to -- to O'Hare and Juarez, Mexico?

3    A.  I don't remember.

4    Q.  Okay.  We need the report so we can refresh your memory,

5    Agent.

6          MR. FINK:  Your Honor, may we approach?

7          THE COURT:  Yes, you may.

8          (At sidebar on the record out of the hearing of

9          the jury, as follows:)

10          MR. FINK:  So this is the issue with knowing

11   beforehand what was needed.  Now apparently there was an issue

12   with the E-mail server and they tried to tell me things to

13   print out.  So I don't have paper copies of what he's trying to

14   impeach with.

15          THE COURT:  Which is what?

16          MR. FINK:  Which is a couple Bates labels from the

17   report.  He has the page number.  I can get them.  I suppose I

18   could ask your staff to print them out, but I don't know if you

19   want to move while I do that or -- I just wanted to call to

20   your attention that --

21          THE COURT:  And these are his reports?

22          MR. FINK:  These are Agent Bianchi's reports that he'd

23   like to impeach with.

24          THE COURT:  Mr. Bilkovic, do you have them?

25          MR. BILKOVIC:  I don't know which one he's talking

1   about.

2            MR. FINK:  There's so many that I can't -- you know, I

3   got to know beforehand.

4            MR. BILKOVIC:  If he gave me the date of the --

5            MR. FINK:  I have the Bates label.  I just --

6            MR. BILKOVIC:  If you have the date or what it's

7   about --

8            MR. FINK:  I could find it.

9            MR. BILKOVIC:  -- I think I could pull it.

10           MR. FINK:  The paper copy?

11           MR. BILKOVIC:  I could pull mine and you can look at

12   it.  I may have it.

13           MR. FINK:  Okay.

14           DEFENDANT DIDANI:  That was an issue, and that's why I

15   want to bring it before this time.  My E-mail that we want to

16   coordinate, because me and Mr. Wade communicated it was locked

17   some way, somehow, I don't know, magically.  I cannot receive.

18   When Mr. Wade tried to --

19           MR. FINK:  I haven't received anything from him.

20   That's true.

21           DEFENDANT DIDANI:  And he send me a lot of e-mails,

22   too.

23           THE COURT:  And why is that happening?

24           DEFENDANT DIDANI:  I don't know.

25           MR. FINK:  It is actually strange, because in four

 1    years I've never had a problem communicating with him until

 2    this weekend.

 3              THE COURT:  It is magical that -- I don't usually

 4    think that it's magical.  So you guys see if you can work it

 5    out while you're here and then --

 6              MR. FINK:  Sure.

 7              THE COURT:  -- we'll find out why.

 8              MR. FINK:  Of course, Judge.  So I will see if I --

 9              THE COURT:  Go on to any other questions while he's

10    finding the report.

11              DEFENDANT DIDANI:  You know, your Honor, I can go, but

12    it's very important that --

13              THE COURT:  Okay.  We'll wait.

14              MR. FINK:  Okay.  Let's do it.

15              (End of sidebar.)

16              THE COURT:  The jury may step down.

17              (The jury left the courtroom at 10:54 a.m.)

18              THE COURT:  Okay.  I'm going to take a break.  When

19    you all find it.  And can you tell Mr. Fink all your upcoming

20    exhibits so we know we have a copy of everything and we don't

21    have to take a break to find something to determine whether or

22    not he told them the exact places that you were, okay.

23              THE WITNESS:  Your Honor?

24              THE COURT:  Yes.

25              THE WITNESS:  I still have this one, too.

1        THE COURT:  Well, I'm happy for the Government to come

2   up and see if Mr. Bianchi has the exact document that we're

3   looking for, and you can let us know that before I take my

4   break.  How about that?

5        MR. BILKOVIC:  He's showing the exhibit.  He's not

6   showing the document.

7        THE COURT:  You have Exhibit C?

8        THE WITNESS:  Yes, ma'am.

9        THE COURT:  Just hold on it until the break.

10       Okay.  We're going to take a break.

11       (At 10:56 a.m., a brief recess was taken.

12       Back on the record at 11:16 a.m.)

13       LAW CLERK:  All rise.  Court is back in session.

14       THE COURT:  Are you already to proceed?

15       MR. BILKOVIC:  Yes, your Honor.

16       DEFENDANT DIDANI:  Yes, your Honor.

17       THE COURT:  All right.  Very well.  Let's bring in the

18   jury.

19       LAW CLERK:  All rise for the jury.

20       (The jury entered the courtroom at 11:17 a.m.)

21       THE COURT:  Okay.  Thank you for coming back.  You may

22   all be seated.

23       Is the Government satisfied that the jurors are

24   present and in their proper seats?

25       MR. BILKOVIC:  Yes, your Honor.

```
 1              THE COURT:  How about you, Mr. Didani?
 2              DEFENDANT DIDANI:  Yes, your Honor.
 3              THE COURT:  And did you find your document that you
 4    were looking for?
 5              DEFENDANT DIDANI:  I did, your Honor.
 6              THE COURT:  Okay.  You're still under oath, sir.
 7              You may proceed.
 8              Do we want the witness to have the document or not?
 9              DEFENDANT DIDANI:  I don't know.
10              THE COURT:  Do we want the witness to have the
11    document or not?
12              DEFENDANT DIDANI:  Oh.  Yes, your Honor.  Yes.
13              Wade.
14              MR. FINK:  May I, Judge?
15    BY DEFENDANT DIDANI:
16    Q.  So the question was, Mr. Bianchi --
17              THE COURT:  Mr. Didani, you have to call him
18    "Mr. Fink" in open court, okay.
19              Yes, I'm ready.
20              THE COURT:  All right.  Pose your question,
21    Mr. Didani.
22    BY DEFENDANT DIDANI:
23    Q.  Agent Bianchi, so you was notified by this E-mail -- the
24    silent hit that I was traveling from Europe via O'Hare to
25    Juarez; is that true?
```

```
 1   A.   Yes.
 2   Q.   Did you notify the agents in Chicago?
 3   A.   Yes.
 4   Q.   So, if the agents in Chicago hypothetically come tomorrow
 5   and testify that, they would never testify, it would be a lie;
 6   right?
 7   A.   Can you repeat that?
 8   Q.   If the agents that you notify in Chicago, Agent Nugent, you
 9   just said right now that you notified that I was flying transit
10   to Mexico.
11           THE COURT:  Wait.  I don't think that question was
12   clear, okay.  You asked if he notified them.  Now, what I
13   thought you were going for was whether he notified them
14   precisely of your itinerary.  Is that where we are?
15           DEFENDANT DIDANI:  Your Honor, he already answered.
16           THE COURT:  I'm asking is that where we are?
17           DEFENDANT DIDANI:  Yes, your Honor.
18           THE COURT:  Okay.  Then ask him that question.  The
19   question that we stopped on was whether or not he notified them
20   that you were traveling from Rome to Chicago to Juarez, Mexico;
21   isn't that right?
22           DEFENDANT DIDANI:  Juarez, Mexico, your Honor.
23           THE COURT:  Yes.  Did you notify them of that?
24           THE WITNESS:  I notified him that you were flying in.
25   I do not remember the exact words that were spoken over the
```

 1    phone then.
 2              THE COURT:  Okay.  Now you may go to your next
 3     question or to the document.
 4    BY DEFENDANT DIDANI:
 5    Q.   All right.  So, Agent Bianchi, the day that I flew in
 6    O'Hare do you remember if you was working or what?
 7    A.   Which time?
 8    Q.   August 6, 2016.
 9    A.   Okay.  No, I wasn't there.
10    Q.   I know you was not there, Agent.  You was working, you was
11    in your office or home?
12    A.   Where was I working?
13    Q.   Yes, sir.
14    A.   I don't know.
15    Q.   You was in your office working?  Do you work on the field
16    or you work in the office or what do you do?
17    A.   I work in all the above.
18    Q.   Okay.  All right.  So let me making sure.  That day you was
19    on leave or you was on duty?
20    A.   Which day?  The day you actually flew in?
21    Q.   Exactly.
22    A.   I don't know.  I'd have to go back and look.
23    Q.   Let me refresh your memory, Agent.
24              MR. FINK:  Agent Bianchi, which page number do you
25    have in front of you?

1           Judge, I'm sorry.  I asked the question of what he has

2    in front of him.

3           THE WITNESS:  Page 37.

4           DEFENDANT DIDANI:  Judge, can you strike Page 37.

5    It's Page 143, please, from April 24, 2023 transcript.

6           THE COURT:  Do you have that, sir?

7           THE WITNESS:  No, ma'am.

8           MR. FINK:  May I, Judge?

9           THE COURT:  Yes.

10          What line, Mr. Didani?

11          DEFENDANT DIDANI:  Judge, Agent Bianchi got the page,

12   but it's -- the line.

13          THE COURT:  Okay.  It's highlighted?

14          DEFENDANT DIDANI:  Yes, it's highlighted.

15          THE COURT:  Okay.  Read the highlighted part for us.

16          THE WITNESS:  "I was going to be on leave, or I was on

17   leave at the time.  So I reached out to an HSI agent at Chicago

18   O'Hare Airport to see if he could handle everything for me."

19   BY DEFENDANT DIDANI:

20   Q.  You was on leave or you don't remember?

21   A.  Again, to be precisely honest, I'd have to go look.

22   Q.  All right.  We'll pass.  Okay, Agent Bianchi.  So the day

23   Agent Nugent called you and said I have two phones I'm sending

24   to you; is that correct?

25   A.   I don't remember how that went down to be honest with you.

1   Q.  There is a report that you was coordinating the seizure of

2   those phones with Agent Nugent.  Do you want me to remind you?

3   A.  Can you repeat that?

4   Q.  There is a report that you was coordinating the seizure of

5   those phones with agent in Chicago.  Do you remember that,

6   Agent?

7   A.  I would actually deny that, because I didn't know anything

8   about the phones until after I had gotten back to the office.

9   Q.  All right.  Agent, can you please read this.  It's your

10  report.

11          MR. FINK:  May I, your Honor?

12          THE COURT:  Yes.  Is this his report?

13          DEFENDANT DIDANI:  Yes, your Honor.

14  BY DEFENDANT DIDANI:

15  Q.  Can you read this to the jury and the judge, please, and

16  the Court.

17  A.  The whole report?

18          THE COURT:  No.

19  BY DEFENDANT DIDANI:

20  Q.  The coordination.

21          THE COURT:  Not the whole report.

22          DEFENDANT DIDANI:  No, no.

23          THE COURT:  What part of the report do you want him to

24   read to himself to see if it refreshes his recollection or

25   impeaches him?

1              DEFENDANT DIDANI:  Yes.  Yes, your Honor.

2              THE COURT:  Is there a highlighted portion of the

3      report?

4              THE WITNESS:  No, ma'am.

5              THE COURT:  Okay.  Mr. Fink, pass it back to

6      Mr. Didani and then he can tell us what part of the report he

7      wants read; okay, please?

8              MR. FINK:  Yes, your Honor.

9              THE WITNESS:  May I?  This is just --

10             THE COURT:  You may not.  Mr. Fink will pass it to him

11     and Mr. Didani will tell us what information he hopes we will

12     receive.

13             DEFENDANT DIDANI:  Number 3, your Honor.

14             MR. FINK:  May I again, Judge?

15             THE COURT:  Yes, you may.

16             The Government has this report, no doubt; right?

17     What's it dated?

18             THE WITNESS:  The date of the report, your Honor?

19             THE COURT:  Yes.

20             THE WITNESS:  2-20 of 2020.

21             THE COURT:  Okay.  Thank you.

22     BY DEFENDANT DIDANI:

23     Q.  Can you please, Agent, read for the jury and the Judge

24     number 3, please, of the report.

25     A.  "On August 6, 2016, Homeland Security investigations Task

1    Force Agent Josh Bianchi, in coordination with HSI Special

2    Agent Daniel Nugent, detained Ylli Didani's iPhone in order to

3    do a comprehensive border search after discovering 3.7

4    milligrams of steroids during Didani's entry into the United

5    States at Chicago O'Hare International Airport located in

6    Chicago, Illinois."

7    Q.   So, Agent, now that your memory is refreshed, right, do you

8    agree that you that day was not on leave, but you was working

9    hand to hand with Agent Nugent to detain those phones in

10   Chicago?

11   A.   No.  That's -- no.

12   Q.   Okay, Agent.  All right, Agent Bianchi.  We going to go --

13   and then they send you the phones.  How long they took them to

14   get them in your hands once they send them from Chicago?

15   A.   I don't remember how long it took.  If I remember

16   correctly, again I think I was on leave.  I did not get them

17   until I returned back to the office, but the chain of custody

18   would tell you when I actually received them.

19   Q.   With your memory, two weeks, three weeks?

20   A.   I have no idea.

21   Q.   Did you have a warrant to receive those?

22   A.   I'm sorry?

23   Q.   Did you have a warrant to seize those phones?

24   A.   I did have a warrant for those phones.

25   Q.   Agent, so you had a warrant, you send it to Agent Nugent,

1    here's the warrant, I need those phones?

2    A.   No.

3    Q.   So when did you get a warrant?

4    A.   I would have to go back and look at the date, but it was in

5    August, I believe, that I got a warrant for those phones.

6    Q.   So the phones was detained in August 6; right?  You agree

7    with that?

8    A.   I'm not going to agree to any particular dates.

9         Actually, yes, I do agree to that, because it's right

10   here in my report.  Yes, I agree.

11   Q.   In the warrant -- the warrant that was issued for those

12   phones was on August 17.  Do you agree with this?

13   A.   I agree it was after that date.

14   Q.   Right.  Let's go to the warrant, Agent.  Did you notify the

15   Government about those phones?

16   A.   Yes.

17   Q.   Do you remember who was the prosecutor on that warrant?

18   A.   Prosecutor?

19   Q.   Yes, on that warrant.

20   A.   Would it be Mr. Bilkovic?

21        THE COURT:  Is that a question or is that --

22        THE WITNESS:  I would have to look at the warrant.

23    I'm sorry.

24   BY DEFENDANT DIDANI:

25   Q.   All right.  We're going to look at the warrant, because it

1    seems like you don't remember nothing from the investigation,

2    Agent.

3                THE COURT:  That's stricken, because you're not

4    permitted to comment on the testimony until your closing

5    argument.

6                DEFENDANT DIDANI:  All right, your Honor.

7    BY DEFENDANT DIDANI:

8    Q.  Do you remember who was the judge on that warrant?

9    A.  No, sir.

10               DEFENDANT DIDANI:  Wade, please, can we show that

11   to -- yes.

12               Your Honor, please.

13               MR. FINK:  May I, Judge?

14               THE COURT:  Yes, you may.  Mr. Fink, you may approach

15   the witness.

16               MR. FINK:  Okay.  Can I have standing permission?

17               THE COURT:  Yes.  The Government has no objection;

18   right?

19               MR. BILKOVIC:  No, your Honor.

20               THE COURT:  Pose a question, please.

21               DEFENDANT DIDANI:  I was making sure his memory got

22   back, your Honor.

23   BY DEFENDANT DIDANI:

24   Q.  Tell me when you're ready, Agent Bianchi.  I'm waiting on

25   you.

1    A.   I've read it.  What would you like me to look at?

2    Q.   Okay.  First I want to see --

3    A.   From page -- the application for the search warrant?

4         THE COURT:  So his question was whether or not you

5    remembered who the judge was or the prosecutor.  So does that

6    refresh your memory about either one of those?

7         THE WITNESS:  Yes, on both.  And it's Mr. Bilkovic and

8    Judge Steven Whalen, if I'm pronouncing that correctly.

9    BY DEFENDANT DIDANI:

10   Q.   So, Agent Bianchi, so do you agree right now the phones was

11   seized in Chicago in August 6?  In August 17 -- until August 17

12   those phones was -- you filed for warrant in two thousand -- in

13   2016, August 17; is that accurate?

14   A.   No, they were not seized on August 6.  They were detained

15   until they were seized on August 17.

16   Q.   What's the difference between detained and seized?

17   A.   One is detained and one is seized.

18   Q.   All right.  So can you -- so the prosecutor on that case,

19   who was that, Mark Bilkovic?

20   A.   Mr. -- yes, Mark Bilkovic.

21   Q.   Bilkovic.  Is he here today?

22   A.   Yes.

23   Q.   Can you identify him for the jury, please?

24   A.   Right there raising his hand.

25   Q.   So Mr. Bilkovic is a lead prosecutor in this case to your

1    knowledge?

2    A.   Can you say that one more time?

3    Q.   Is he a lead prosecutor on this case to your knowledge?

4    A.   Yes.

5    Q.   All right.  Fair enough.  Let's go over that warrant,

6    Agent.  Do you remember the probable cause that you told Judge

7    Whalen, Judge, I need a warrant to seize those two phones;

8    right?  Do you remember the probable cause why you needed those

9    -- why you needed a warrant to seize those phones?

10   A.   Actual -- everything, no.  I would have to look at my

11   affidavit.

12   Q.   If I claim -- Agent Bianchi, if I claim that the only

13   probable cause was 3.7 milligrams of human growth hormones, do

14   you agree with me?

15   A.   I don't know.  I would have to look at my affidavit.

16          DEFENDANT DIDANI:  All right.  Wade, please.

17          MR. BILKOVIC:  Judge, I'm going to object to this.  I

18   think, number one, it's irrelevant.  The Court has already had

19   a hearing with respect to this, and there's been determinations

20   the search warrant was valid.  I think this is irrelevant.

21          THE COURT:  How is it relevant?

22          DEFENDANT DIDANI:  Judge, avail me.  I'm impeaching

23   this witness here.  It's very relevant, and they will connect.

24          THE COURT:  By showing that he doesn't remember?

25          DEFENDANT DIDANI:  No, your Honor.  I just -- you

1   know, because this is a continual of the case, you know.  This

2   is --

3          THE COURT:  The validity of the search warrant is not

4   at issue.  So how is it relevant?

5          DEFENDANT DIDANI:  Well, it's relevant because the

6   probable cause, your Honor, you know.  I think the jury is

7   entitled to hear --

8          THE COURT:  The jury doesn't determine the probable

9   cause for the warrant.  That's the whole point of the

10  objection.  That is not relevant to the facts that the jury is

11  going to find.  And it may be relevant to the credibility of

12  the witness, but right now that's maybe not -- maybe you're

13  finished with that, frankly, but how else is it relevant?

14         It's relevant to the probable cause of the warrant.

15  You already have that in the record, and that's already been

16  taken care of and preserved for you.  And so that's not an

17  issue before the jury.

18         DEFENDANT DIDANI:  Your Honor, that might not be an

19  issue, but -- there's a issue because the whole case --

20         THE COURT:  It's not an issue.  The probable cause of

21  the warrant is not an issue, and unless you can tell me how you

22  think it relates to the things that the jury is to decide --

23         DEFENDANT DIDANI:  Well --

24         THE COURT:  That's already taken care of, and I'm

25  ready for you to go to another question that relates to the

1  elements of the offenses that are charged in this particular

2  proceeding.

3          DEFENDANT DIDANI:  Yes, your Honor.  But again, you

4  know, that goes to the credibility of the witness, your Honor,

5  you know, but --

6          THE COURT:  That he doesn't remember?

7          DEFENDANT DIDANI:  Not only that he doesn't remember,

8  your Honor, you know, but --

9          THE COURT:  Okay.  The credibility of the witness

10  relative to the investigation?

11          DEFENDANT DIDANI:  Yes.

12          THE COURT:  Okay.  I'll allow for that.

13          DEFENDANT DIDANI:  Thank you, your Honor.

14          THE COURT:  Your objection is noted and preserved for

15  the record.

16          But we are not here to litigate the propriety of the

17  warrant, all right, Mr. Didani.  Well, maybe not all right, but

18  we're not here to do it.

19          Now, you want him to what, read his affidavit?

20          DEFENDANT DIDANI:  The affidavit, number 10.

21          THE WITNESS:  Out loud or --

22          THE COURT:  You may read the whole affidavit if you

23  like and then you can read paragraph 10.

24          THE WITNESS:  I only have one page, your Honor.

25

1    BY DEFENDANT DIDANI:

2    Q.   Number 10.  Number 10, Agent Bianchi.

3            THE COURT:  You want the whole affidavit?

4            THE WITNESS:  No.  I'm fine with just number 10,

5    ma'am.  Okay.

6    BY DEFENDANT DIDANI:

7    Q.   Can you please read to the jury one of the probable cause.

8    A.   Can you repeat that?

9    Q.   Can you read that to the jury, please.

10   A.   Just number 10?

11   Q.   Yes, sir.

12   A.   "CBP Officer Matthew Parisi conducted the secondary

13   inspection.  During an examination of Didani's luggage, seven

14   vials of 3.7 milligrams of Kigtropin, a human growth hormone,

15   HGH were found.  When questioned about the vials, Didani stated

16   that a friend of his in Albania sold him the HGH."

17   Q.   Agent, so I want to focus a little bit on that 3.7

18   milligram or vials.  Hypothetically, if this judge decide right

19   now, stop, Honorable Denise Hood stopped the proceedings right

20   now and want to see this 3.7 milligrams of this substance,

21   human growth hormone, do you have it?

22   A.   No.  And this wasn't me either.  This was Customs.

23   Q.   Customs where?

24   A.   In Chicago O'Hare.

25   Q.   Why they didn't file for a warrant then?  Why do you have

```
 1   to file?

 2   A.   I'm sorry?

 3   Q.   Why they didn't file a warrant?  Why didn't they request a

 4   warrant and why you have to request a warrant for those 3.7

 5   milligrams?

 6   A.   I'm not sure I understand your question.

 7            THE COURT:  Why didn't the Chicago authorities file

 8    for a warrant?

 9            THE WITNESS:  I would have to guess to tell you that

10    reason.

11            THE COURT:  And it's speculation, which you don't need

12    to do.

13            THE WITNESS:  Right.

14            THE COURT:  Go to a new question.  He doesn't know.

15   BY DEFENDANT DIDANI:

16   Q.   Agent, you don't know what kind of -- do you have a

17   laboratory test about this substance?

18   A.   Do I?

19   Q.   Yes, yes.

20   A.   We have a lab that we send substances to.

21   Q.   But do you have -- for that substance, the 3.7 milligrams,

22   did you have a test from a laboratory?

23   A.   I was not there.

24   Q.   Agent, hypothetically if the judge stops all the

25   proceedings right now and we have a hearing about this 3.7, you
```

43

 1    don't have nothing, you don't have a picture, you don't have

 2    nothing, you don't have no laboratory?

 3    A.  I do have a laboratory as I just --

 4         THE COURT:  No, that's not the question.  The question

 5    is do you have any laboratory report about the human growth

 6    hormone?

 7         THE WITNESS:  Okay.  No, I do not.

 8         THE COURT:  All right.  Go to a new question.

 9    BY DEFENDANT DIDANI:

10    Q.  So you just went and told Judge Whalen, Judge, give me a

11    warrant, there is some kind of substance exist somewhere in the

12    world and just give me a warrant, that's what you told the

13    judge?

14    A.  No.  I listed a bunch of probable cause in my affidavit.

15    Q.  The other probable cause, Agent, is about traveling to

16    Mexico, that's it, you know.  But we don't want to go --

17         THE COURT:  Are you posing that as a question?  This

18    is not your time to testify.  This is your time to pose a

19    question.  So is that posed as a question?

20         DEFENDANT DIDANI:  Yes.

21    BY DEFENDANT DIDANI:

22    Q.  What is your other probable cause, Agent?

23    A.  I would have to see my full affidavit.

24         THE COURT:  Now, Mr. Didani, I don't think it's

25    appropriate for the full affidavit to be read into the record.

1   So, if you want him to use that to refresh his recollection,

2   I'm happy for you to do that.

3        DEFENDANT DIDANI:  Yes, your Honor, he can use it to

4   refresh his recollection.

5        MR. FINK:  Your Honor, I'm standing at the witness box

6   just trying to organize this.

7        THE COURT:  You can review the whole affidavit and

8   then tell us what you think the other probable causes were.

9   You can tell us whether it refreshes your recollection about

10  the other probable causes and then you can tell us those.

11       THE WITNESS:  Okay.

12  BY DEFENDANT DIDANI:

13  Q.  So other than those two -- the substance, 3.7 milligrams

14  that doesn't exist --

15  A.  I'm sorry?

16  Q.  Other than these -- the 3.7 milligrams of that human --

17  quote/unquote human growth hormones that doesn't exist, because

18  you don't know, you have no picture, you don't have it under

19  evidence, you don't have it on laboratory, you have nothing

20  about the substance, other than that --

21       THE COURT:  Mr. Didani, that's argumentative.  Now

22  pose your question, which is you want to know what other

23  probable cause he has.

24       DEFENDANT DIDANI:  Yes, your Honor.  Yes, your Honor.

25       THE WITNESS:  About your prior interview in 2015, your

1    travel to multiple countries.  Paragraph 11 is about your

2    business trips where you couldn't provide any proof of

3    existence for business cards or companies that you visited.

4    You have the HGH, which was seized in 2016 at the airport.  You

5    have the interview, both in 2015 and in 2016, by Mr. Nugent or

6    Officer Personett and Matthew Parisi, if I'm pronouncing that

7    correctly.  And then all your international travel.

8            And you could not recall any or provide any evidence

9    of doing business with anyone at the time.  All of this built

10   up, as well as your travels with Eric Puzio to Mexico.

11           And at the time you stated that Mr. Puzio was getting

12   married, you were going down for Mr. Puzio's wedding, in which

13   case I had already known that Mr. Puzio was married.  And

14   Mr. Puzio was interviewed by CBP on his way back stating that

15   he was going down there to meet you, his friend, to start a

16   liquor business.

17           That would be all the probable cause I had in this

18   affidavit.

19   BY DEFENDANT DIDANI:

20   Q.  Okay.  So now we're clear.  That's only the traveling,

21   international traveling, apparently those companies that you

22   never -- you never checked to see if existed --

23           DEFENDANT DIDANI:  I'm sorry, your Honor.

24   BY DEFENDANT DIDANI:

25   Q.  And the ghost 3.7 milligrams, because you don't have it.

1  So are we clear on that?  This is everything, the totality of

2  circumstances, are we clear for seizing those phones; right?

3  That's it?  Anything else you want to add to the jury?

4  A.  Just that the 3.7 milligrams I had nothing to do with.  I

5  was not there.  I wasn't even in the same state.

6         THE COURT:  Okay.  Go to a new question not related to

7  the search warrant.

8  BY DEFENDANT DIDANI:

9  Q.  All right, Agent.  Let me -- now we clear.  We all clear.

10  Do you remember those phones -- so you got on your hands a few

11  weeks -- you got on your hands two phones.  Do you remember

12  those phones was encrypted, both the phones was encrypted?

13  A.  I don't know.

14  Q.  All right, Agent.  You know, because to refresh your memory

15  I want you to read ...

16         MR. FINK:  May I approach the witness, Judge?  I

17  believe he already has what Mr. Didani is --

18         THE COURT:  Okay.

19         MR. FINK:  I thought that was an exception to my

20  standing permission.

21         Your Honor, the witness was already in possession of

22  this.  So I'm going to return it to him.

23  BY DEFENDANT DIDANI:

24  Q.  Agent Bianchi, can you please read it.  It's assigned there

25  that -- do you agree that you reported those both phones,

1   iPhone and the BlackBerry, because it was encrypted and you

2   cannot get into them?  What do you mean by encrypted?

3   A.   Encrypted meaning there were certain things we couldn't get

4   to on the phone.  If I recall, you gave Mr. Nugent the password

5   to your iPhone.

6   Q.   Okay.  So to cut time, is it that you had the code of the

7   phone, the iPhone; right?

8   A.   I'm sorry?

9   Q.   To cut time so we don't have to look for report, do you

10  agree with me that you had the pass codes for the phone?

11  A.   Yes.

12  Q.   Okay.  So when you get the pass code on iPhone you enter

13  the codes, whichever they are, you cannot enter to all the

14  programs in the phone, or what do you mean it's encrypted?

15  A.   So there could have been multiple things that were

16  encrypted on that phone, and your iCloud could be encrypted.

17  You have WhatsApp.  Maybe you had to input a separate password

18  to get into WhatsApp.  That could be encrypted.  Many other

19  things.  I don't know if that answers your question.

20  Q.   All right.  All right, Agent.  You know, we're going to

21  pass that, and then we're going to go back a little bit with

22  the time machine in 2015, Agent.  You said something about

23  Michigan Freight that at that time you -- you know, we already

24  went through this, we already read it, but you said that

25  Michigan Freight do not exist.  But a few days later in 2016

1    you filed a warrant in front of another judge about Michigan

2    Freight, me and Mr. Bhullar.  Do you remember that?

3    A.   A separate warrant for Michigan Freight?

4    Q.   It was about Mr. Bhullar.

5    A.   Mister who?

6            THE COURT:  What are you referring to, Mr. Didani?

7            DEFENDANT DIDANI:  Right here, your Honor.  I have it

8     right here.  Page 01511.

9            THE COURT:  And you're asking him if he filed a

10    warrant against Michigan Freight and another person?

11           DEFENDANT DIDANI:  Both of us, your Honor, Mr. Bhullar

12    and me.

13   BY DEFENDANT DIDANI:

14   Q.   Do you remember that, Mr. Bianchi, please?

15   A.   No, I do not remember that.

16   Q.   That's your report, Mr. Bianchi?

17   A.   Yes.

18   Q.   Can you please read for the jury what the report says?

19   A.   About -- the whole thing?

20   Q.   Yes, on the top, please.

21           THE COURT:  Not the whole report.  What part of the

22    report do you want him to read?

23           DEFENDANT DIDANI:  On the top, your Honor, the

24    connection between me, the company, Michigan Freight and two

25    agents registered on that company, me and Mr. Bhullar.

1   BY DEFENDANT DIDANI:

2   Q.   Do you remember that, sir?

3   A.   Yes.  I believe what he is asking me to read is it says,

4   "Michigan Freight, LLC, address 47536 River Woods Drive,

5   Canton, Michigan 48188, registered agents, Ylli Didani," and

6   another individual's name that I cannot pronounce.

7            THE COURT:  Spell it.

8            THE WITNESS:  First name is H-A-R-M-A-N-P-R-E-E-T.

9   And last name is B-H-U-L-L-A-R.  And it says, "No vehicles or

10  assets are registered to the company."

11           Is that what you would like?

12  BY DEFENDANT DIDANI:

13  Q.   Yes, sir.  So are we agreeing that now the Michigan -- we

14  agreeing that exist, Michigan Freight exists; right?

15  A.   Yes.  I always said it existed.

16  Q.   Well, you just said before that it doesn't existed.  In

17  that transcript you said that at that time in 2015 you did a

18  checking and you couldn't find any company; is that right,

19  Agent?

20  A.   I don't know.  I'd have to look at my reports.  What I was

21  saying is that it was closed at whatever time I looked that up

22  at.

23  Q.   Agent, we just read together about the U.S. mineral, about

24  a company, coal company, in Michigan, that was on the same

25  page.  You read that to the jury, Agent, that you said that at

```
1    that time you don't remember those companies existed.  You

2    didn't know anything that Michigan Freight existed or not.

3            THE COURT:  The jury will remember the testimony.  Go

4     to a new question.

5    BY DEFENDANT DIDANI:

6    Q.  All right.  So, Agent, so let's go back.  Now, you got the

7    report.  We agreeing that Michigan Freight exist, me and

8    Mr. Bhullar exist; right?

9    A.  Yes.

10   Q.  All right.  Good.  Good enough.  Then you filed a few days

11   later in -- I'm sorry, about a month later, October 6, this is

12   your first warrant that you filed in front of Judge Anthony

13   Patti; right?  Do you want me to remind you?

14   A.   Sure.  Is there anything specific you want me to look at?

15   Q.   Is that your warrant, Agent Bianchi?

16   A.   Yes.

17   Q.   Okay.  We can take our time or we can -- maybe from your

18   memory, Agent Bianchi.  On that warrant, you specifically asked

19   Judge Patti to give you a warrant, tracking warrant, to

20   investigate Mr. Bhullar, because he goes in and out from Canada

21   52 times in the last 18 months; right?  And you was

22   investigating across borders from Canada to United States drug

23   and money laundering; right?  Is that your investigation;

24   right?

25   A.   Correct.
```

1  Q.  Then you asked Judge Patti to give you a warrant to track

2  him, his trucks and his wife.  Do you remember that, or do you

3  want to read all that warrant?

4  A.  No.

5  Q.  But do you agree with me, Agent?

6  A.  No.

7  Q.  Okay.  Then read the warrant then, because seems like you

8  don't remember nothing from this investigation.

9  A.  Okay.  So that was for that vehicle that we were tracking.

10  Q.  Okay.  So you was tracking that vehicle, you was tracking

11  his wife; right?  Do you remember those?

12  A.  We were tracking that vehicle.

13  Q.  Why you was tracking that vehicle, sir?

14          MR. BILKOVIC:  Objection, Judge.  Relevance.

15          THE COURT:  How is it relevant?

16          DEFENDANT DIDANI:  It's relevant to this

17  investigation, your Honor.  I'm going to get to that point.

18          THE COURT:  In what way?  How is it relevant to the

19  investigation?

20          DEFENDANT DIDANI:  I will get to that point in a few

21  seconds, your Honor.

22          THE COURT:  You have to get to the point now.  You

23  have to tell me now so I can tell whether or not it's relevant.

24          DEFENDANT DIDANI:  There is all these people, you

25  know, the gentleman that Agent Bianchi investigated, your

1    Honor, and we need to hear why I was investigated.  It's

2    relevant to this investigation, your Honor.

3            THE COURT:  No, I'm not hearing why it's relevant.  So

4    the objection is sustained and you may go to a new question.

5    BY DEFENDANT DIDANI:

6    Q.  All right.  So what did you find out about Mr. Bhullar?

7            MR. BILKOVIC:  Objection, relevance.

8            THE COURT:  I will allow you to ask him whether he

9    found out anything about this individual in relation to the

10   investigation of you.

11           DEFENDANT DIDANI:  Okay.

12           THE WITNESS:  Nothing.

13           THE COURT:  Did you find out anything about this

14   individual in relation to Mr. Didani?

15           THE WITNESS:  Other than them owning the same business

16   together, no, your Honor.

17           THE COURT:  Okay.

18   BY DEFENDANT DIDANI:

19   Q.  All right, Agent.  So that was one of your first warrants.

20   After the phone one that was one of the first warrants that you

21   investigate in this trucking company; right?  We agree on this;

22   right?

23   A.  Okay.

24   Q.  Yes or no?  Okay or -- yes or no?

25   A.  What is the question?

1    Q.   That that was one of the first warrants, the first

2    companies, trucking company that you was investigating, right,

3    and that belonged to me; right?

4    A.   Yes.

5    Q.   Do you agree that me and Mr. Bhullar we partners?

6    A.   You what?

7    Q.   Me and Mr. Bhullar we partners, you agree on that; right?

8    A.   I'm sorry.  I can't understand you.

9            THE COURT:  Are you partners?  Was he partners with

10    that individual?

11           THE WITNESS:  Oh.  They were both registered agents.

12           THE COURT:  Okay.

13   BY DEFENDANT DIDANI:

14   Q.   All right.  Mr. Bianchi, on Bates 0049 -- I'm sorry.  I got

15   the wrong one.  In 2018, Agent Bianchi, I want to show you

16   this.  There is a report two years later that after you track

17   all these people, their life, there is a report, a small report

18   on that discovery that's saying information reported that

19   Michigan Freight is registered both in Didani's and

20   Mr. Bhullar, that information is incorrect.  Can you please

21   read that to the jury.

22           THE COURT:  Your question is is that information

23    correct or you reported that that information is incorrect?

24           DEFENDANT DIDANI:  I'll ask Mr. Bianchi if that

25    information is correct or not.

 1              THE WITNESS:  Okay.

 2  BY DEFENDANT DIDANI:

 3  Q.   You agree with me that Mr. Bhullar is not my partner?

 4  A.   I don't know whether he was your partner or not.  I'm just

 5  stating here that MI Freight was not -- that you were the

 6  registered agent of Michigan Freight, LLC located at 26300 Van

 7  Born Road, Dearborn Heights, Michigan 48125.

 8  Q.   Do me a favor, Agent, because it seems like your memory is

 9  not thinking that well.  Can you read the specific -- read that

10  to the jury so they can understand exactly what's going on.

11  Read that, please.

12              THE COURT:  And this is from what, a 2018 report?

13              DEFENDANT DIDANI:  Yes, your Honor.

14              THE COURT:  Of this agent?

15              DEFENDANT DIDANI:  Yes, your Honor.

16              THE WITNESS:  Is it okay to go ahead and read?

17              THE COURT:  Go ahead, please.

18              THE WITNESS:  "Analysis note.  Information in the

19  reference report states that MI Freight is registered by both

20  Didani and" -- it's redacted -- "that information is incorrect.

21  The following is the correct information:

22              "Didani was the registered agent of Michigan Freight,

23  LLC located at 26300 Van Born Road, Dearborn Heights, Michigan

24  48125, that has not been in good standing since 2008."  Another

25  name I assume is redacted, "is the registered agent for

1  Michigan Freight, LLC that was started in 2015, located at" --

2  a redacted address -- "Canton, Michigan, that is currently in

3  good standing.  These businesses have no current connection at

4  this time."

5  BY DEFENDANT DIDANI:

6  Q.  So, Agent, so with few words you was investigating wrong

7  people?

8  A.  Could have been.  That happens a lot.

9  Q.  Agent, be more clear.  Yes or no?

10  A.  If you're saying Bhullar, then yes.

11  Q.  I'm not saying.  That's what you reported, Agent.  I'm not

12  saying that.

13  A.  Okay.

14  Q.  That's your report, Agent.

15  A.  No, because all this was investigating you.

16  Q.  But --

17  A.  That's what led me to this.

18        THE COURT:  Okay.  Go to a new question.

19  BY DEFENDANT DIDANI:

20  Q.  Agent, did you notify Mr. Bhullar and his wife that they

21  was being investigated and you sorry about it, snooping on

22  their lives?

23  A.  Me personally, no.

24  Q.  Did you notify the Government?

25  A.  Yes.

1    Q.   You told Mr. Bilkovic that that was a mistake?

2    A.   He has my reports.

3              THE COURT:   I think it's probably easy to answer

4    whether or not you told him it was a mistake.

5              THE WITNESS:   Oh.  That it was a mistake?  No.

6              THE COURT:   Okay.  Go to a new question.

7    BY DEFENDANT DIDANI:

8    Q.   All right, Agent.  So now we got the whole picture, you

9    know.  I'm trying -- Agent, you know, I'm sorry for my

10   question, but I'm trying to --

11             THE COURT:   Don't be sorry for your questions.  You

12   have the right, Mr. Didani, to ask the questions, so ask one,

13   okay.

14             DEFENDANT DIDANI:   All right then.

15             THE COURT:   You don't have to apologize about asking

16   the questions, but you do have to ask them, okay.

17             DEFENDANT DIDANI:   All right, your Honor.  Okay.

18   Thank you, your Honor.

19   BY DEFENDANT DIDANI:

20   Q.   Agent Bianchi, looking at your report, you know, you went

21   from cross border, gun task force to 841, 846 to being --

22   knowing about money laundering, to Chapter 333.

23             What's Chapter 333, Agent?

24   A.   I don't know.  I'd have to see it.

25   Q.   In all of your reports, you said that you have done your

 1    training through Chapter 333.  You don't know where you did

 2    your training, Agent?

 3    A.   I'm not sure what you're talking about, sir.

 4    Q.   All right.  We're going to take our time and find out.

 5              THE COURT:  What are we passing him?

 6              MR. FINK:  This is an exhibit marked Bates label 1069

 7    I've shown to the Government, the search warrant.

 8              Mr. Didani, I believe you're calling attention to --

 9    I'm showing the witness 1070.

10              THE WITNESS:  Thank you, sir.

11              THE COURT:  And this is a search warrant; is that

12    right?  This is a search warrant?

13              DEFENDANT DIDANI:  That's a search warrant, your

14    Honor.  I just wanted to ask him about the Chapter 333.

15              THE COURT:  Okay.  Ask him.

16    BY DEFENDANT DIDANI:

17    Q.   What is Chapter 333, Agent?

18              THE COURT:  So he already said he didn't know what it

19    was.  So now he's looking at this document to refresh his

20    memory or impeach him about that; is that right?

21              DEFENDANT DIDANI:  Yes.  That's right, your Honor.

22              THE WITNESS:  It's under Title 21, USC 841 and Chapter

23    333 of the Michigan Health Code.

24    BY DEFENDANT DIDANI:

25    Q.   All right, Agent.  So can you explain what's Chapter 333?

1   A.   I would have to look it up to give you the definition, sir.

2   Q.   But you're claiming that you did training on Chapter 333.

3   You don't remember your training, Agent?

4   A.   I've had tons of training, sir.  But to testify as to that,

5   I do not know.

6   Q.   There is -- on that same page you said that you was trained

7   to see drugs in sight.

8   A.   To see what?

9   Q.   Drugs or a substance on-site through the color and their

10  look; is that true?

11  A.   I have.

12  Q.   All right.  Agent --

13          DEFENDANT DIDANI:  Wade.

14          Your Honor, I want to put a demonstrative on the

15  screen.  It's not evidence.  I just want to put it.

16          THE COURT:  And what is it?  You want to ask about it?

17          DEFENDANT DIDANI:  Yes, your Honor.

18          THE COURT:  Have you shown it to the other side?

19          DEFENDANT DIDANI:  No.

20          THE COURT:  Well, let's show it to the other side.

21          MR. FINK:  The Government looked over my shoulder at

22  the computer, Judge.

23          MR. BILKOVIC:  I've had an opportunity to review it,

24  Judge.

25          THE COURT:  You what?

```
 1            MR. BILKOVIC:  I've had an opportunity to review it.
 2            THE COURT:  All right.  Let's show it.
 3  BY DEFENDANT DIDANI:
 4  Q.  Agent, since you -- what does that look like?
 5            THE COURT:  Can you see it okay?
 6            THE WITNESS:  Good enough.  I would say it looks like
 7  marijuana.  But again, that would -- your sight is only used to
 8   try to recognize something before you test it.
 9  BY DEFENDANT DIDANI:
10  Q.  All right.  We're not testing it.  So it looks like
11  marijuana to you?
12  A.  It's a plant-based substance.  It would have to be tested
13  to see exactly what it is.
14  Q.  All right.  What about -- what about this, Agent?
15  A.  A white, powdery substance, which again we would have to
16  test it.
17  Q.  You know, you said you can see.  What does that look like?
18  A.  White, powdery substance.
19  Q.  What kind of substance it looks like?
20  A.  It could be anything.  I don't know what you want me to
21  tell you.
22  Q.  But, Agent, you said you were trained, you know, and I want
23  to know does that look like cocaine to you, or no?
24  A.  It could be cocaine.
25  Q.  Really?
```

1    A.   It could be salt.

2    Q.   No.  It's baby powder, Agent.  It looks like baby powder.

3    A.   That would be baby powder?  That's why we test things.

4    Q.   But you said you got training.  That's why I'm asking.

5    We'll go forward, Agent.

6         THE COURT:  Yes.  Let's go to your next question.

7    BY DEFENDANT DIDANI:

8    Q.   Agent, you know, I want to go back.  Something had bothered

9    me for -- since -- in April, in April 24, 2023, it had bothered

10   me a lot, and maybe that's my opportunity to understanding what

11   do you mean by that.  And I will pass it to Mr. Wade and I want

12   you to read this.

13        THE COURT:  You have to pose a question.

14   BY DEFENDANT DIDANI:

15   Q.   The question.  Well, I want to know what do you mean,

16   Agent, when you testify in front of this court that you was

17   going to get to my phone no matter what, either with warrant or

18   without a warrant?  What do you mean by that, Agent?

19   A.   I'd have to read the whole sentence to get the context.

20   Q.   Okay.  We're going to give it to you right now, sir.

21        THE COURT:  And this is his transcript from that day;

22   is that correct?

23        DEFENDANT DIDANI:  Yes, your Honor.

24        THE COURT:  And what page are we on?

25        DEFENDANT DIDANI:  157, your Honor.  Line 6 to 10.

```
 1            THE COURT:  You can read before that and after if you
 2    need the context to know what you meant.
 3            THE WITNESS:  Thank you, ma'am.
 4            Okay.  Would you like me to read it out loud?
 5    BY DEFENDANT DIDANI:
 6    Q.  Yes, please.
 7    A.  Question, "Do you think perhaps maybe it's safer, better
 8    safe than sorry?  Is that an element or the reason you sought a
 9    warrant?
10            Answer, "No.  We were going to search the phone, no
11    matter what.  It would have been searched whether we had a
12    search warrant or not."
13    Q.  So, Agent, can you please explain to the jury, and me
14    first, because that's very personal, and jury, what do you mean
15    you was going to get to my phones no matter what, you have a
16    warrant or not?  What do you mean by that, Agent?
17    A.  When somebody such as yourself is entering the United
18    States, there's what is called border search authority.  You
19    have no reasonable expectation of privacy for many things that
20    we do not need a warrant for with such suspicion, and in some
21    cases no suspicion at all.  But that is what I meant.  Because
22    you were trying to make entry into this country, we are going
23    to look at it no matter what.
24            THE COURT:  Go to a new question.
25
```

1    BY DEFENDANT DIDANI:

2    Q.  During this investigation, other than -- since you was

3    investigating me and other people, do you remember how many

4    people you seized their phones or made a copy of their phones

5    without a warrant?  Do you remember during this investigation?

6            MR. BILKOVIC:  Objection, Judge, relevance.

7            THE COURT:  Not relevant.  Go to a new question.

8    BY DEFENDANT DIDANI:

9    Q.  All right, Agent.  Who's Belinda Tibbitts?

10           THE COURT:  Who's what?

11   BY DEFENDANT DIDANI:

12   Q.  Belinda Tibbitts.

13   A.  Martin Tibbitts' wife -- late wife -- or he's late, so his

14   widower.

15   Q.  During this investigation, what did you got in 2016, 2017?

16   A.  I'm sorry?

17   Q.  During this investigation, what did you see?  What bother

18   you that you said was a crime here in the United States?  What

19   did you see?

20   A.  I saw lots of things.  I'd have to look at my -- all my

21   reports for 2016.

22           THE COURT:  Well, tell us anything that you remember.

23           THE WITNESS:  Didani -- the defendant's phone,

24   narcotics, photos of narcotics, photos of what appeared to be

25   narcotics, large amounts of money, cash, suspicious travel

```
1    history, suspicious associates, all associates, every -- maybe
2    not every single person, but all of them had history of drug
3    charges, even trafficking charges.  There was a whole bunch of
4    suspicion during that time, sir.
5    BY DEFENDANT DIDANI:
6    Q.   Okay.  So let me ask you a question.  How many tons of
7    cocaine you seized in the United States from this defendant?
8    A.   None.
9    Q.   How many kilos?
10   A.   I just said none.
11   Q.   How many grams?
12   A.   None.
13   Q.   You indicated -- so you know Belinda Tibbitts; right?
14   A.   I know of her.  I've met her.  I'm not sure what you're
15   asking, if I personally know her or ...
16   Q.   Did you think this defendant here have any contact with
17   Belinda Tibbitts?
18   A.   I'm sorry?
19   Q.   Did you think the defendant in front of you have any
20   conversation or phone conversation with Belinda after Marty's
21   death?
22   A.   I'm sure.  Yes.
23   Q.   With me?
24   A.   Belinda and you have a phone conversation?
25   Q.   Yes.
```

1    A.   I would assume, yes.

2         Sorry, I can't assume.  I'd have to go back in my

3    report to see when you guys actually talked.  I believe it was

4    after his death.

5    Q.   Okay.  So you saying there is a report exist I, with

6    Belinda Tibbitts, we had a conversation after Marty Tibbitts'

7    death?  That's what you're claiming?

8    A.   I don't know.  I'd have to look at my reports.

9    Q.   But you just said there is an existence of conversation

10   between me and Belinda Tibbitts; right?

11   A.   That there was a conversation between you and Belinda

12   Tibbitts?

13   Q.   Yes, yes.

14   A.   I don't know.

15   Q.   All right.  And, Agent, what did you see so suspicious

16   between me and Marty Tibbitts?

17   A.   I'm sorry?

18   Q.   What did you see suspicious about me and Marty Tibbitts?

19   A.   I guess I'm not -- I don't understand the question.

20   Q.   Agent, through your reports you said there's a lot of

21   suspicion, all right.  And I'm still trying to understand what

22   are those suspicions, the relationship between me and Marty

23   Tibbitts.  What did you find out, Agent?  It seems like -- did

24   you find out anything or what?

25   A.   Yeah.  But, if I can see my reports, I would gladly tell

1   you.

2   Q.  So you don't remember nothing from your memory, Agent?

3   A.   Ten years ago what I wrote, no.

4           THE COURT:  How many reports do you have?

5           THE WITNESS:  Lots, ma'am.

6           THE COURT:  That doesn't tell me anything.

7           THE WITNESS:  I don't know.

8           THE COURT:  Do you have more than ten?

9           THE WITNESS:  Much more.

10          THE COURT:  Okay.  So you need to look at all those

11  reports to be able to answer what you found suspicious between

12  him and Mr. Tibbitts?  That's his question, what did you find

13  suspicious between Mr. Didani and Mr. Tibbitts.

14          THE WITNESS:  Okay.

15          THE COURT:  Do you know if you can answer that without

16  looking at your reports?

17          THE WITNESS:  I would have to look at reports for the

18  messages sent back and forth.

19          THE COURT:  Okay.

20          DEFENDANT DIDANI:  Your Honor --

21          THE COURT:  Do you want him to look at those reports?

22          DEFENDANT DIDANI:  Your Honor, this --

23          THE COURT:  Mr. Didani, do you want him to look at

24  those reports?

25          DEFENDANT DIDANI:  Of course, your Honor, because

1    there are questions --

2         THE COURT:  Let me ask you another question.  Do you

3    have other questions besides what was suspicious between

4    yourself and Mr. Tibbitts to ask him today?

5         DEFENDANT DIDANI:  There is questions between

6    Mr. Tibbitts, the connection between me and Mr. Tibbitts.

7    There's a lot of reports.

8         THE COURT:  Right.  And I will let him look at his

9    reports and come back and answer that question for you.

10        DEFENDANT DIDANI:  The connection between --

11        THE COURT:  Do you have any other questions to ask him

12   other than that?

13        DEFENDANT DIDANI:  The connection between Belinda

14   Tibbitts and I.

15        THE COURT:  Okay.  Do you need to refresh your

16   recollection relative to that, too?

17        THE WITNESS:  Between Belinda Tibbitts and him?

18        THE COURT:  And Mr. Didani.

19        THE WITNESS:  What about ...

20        THE COURT:  Was there anything suspicious that drew

21   your attention to their interaction?

22        THE WITNESS:  No, ma'am.

23        THE COURT:  Okay.  That's an answer to that.  Do you

24   have any other questions?

25

1   BY DEFENDANT DIDANI:

2   Q.  But let me ask you something, Mr. Bianchi.  You're sure

3   that I had a conversation with Belinda Tibbitts?

4   A.  I don't remember.

5           THE COURT:  All right.  He already said that.  So now

6   tell me do you have any other questions other than your

7   question about you and Marty Tibbitts --

8           DEFENDANT DIDANI:  Your Honor --

9           THE COURT:  -- to this witness, because you should go

10  to that question; okay?

11          DEFENDANT DIDANI:  Your Honor, I've got questions

12  about Marty Tibbitts, it's other people, but it seems like he

13  cannot answer no questions.

14          THE COURT:  Yes.  Ask them.  We can't answer the

15  question about Marty Tibbitts today, but you can ask him other

16  questions that you have, so please go to them.

17  BY DEFENDANT DIDANI:

18  Q.  Okay.  So what about Donald Larson?  Do you remember Donald

19  Larson?

20  A.  Yes, sir.

21  Q.  What is the suspicion between -- the connection between me

22  and Donald Larson?

23  A.  Your travel, lots of financial transactions going from

24  Tibbitts to Larson to you.  I'm talking over millions of

25  dollars in some cases, not all going through Larson, but from

1    Tibbitts to you.  That is the biggest -- to answer your
2    question on Martin Tibbitts and Donald Larson, I'm just going
3    to say that is the biggest suspicion when somebody is giving
4    you over a million dollars in cash, or how about over half a
5    million dollars in several different cashier's checks where you
6    go and cash them for $50,000 at pawn shots or whatnot and then
7    stuff them in a bag.  That is suspicion.
8    Q.  All right.  So just give me -- you said a million dollars.
9    Give me -- since you was one of the agents that investigated,
10   you know, you're a big puzzle to this conspiracy theory, you're
11   a big puzzle, so give me facts, you know.  What is -- just show
12   me -- all right.  Give me -- the million dollars you said.
13   Where?  Tell me about -- be more specific with me and the jury
14   to the million dollars.
15   A.   I can't be more specific without having the dates and
16   denominations and stuff right in front of me, which are in my
17   reports if you'd like to give me that.
18        MR. BILKOVIC:  Judge, I don't know if it will help,
19   but that information, along with the dates, will be covered
20   with the next witness that we plan on calling.
21        DEFENDANT DIDANI:  Your Honor, this -- Agent Bianchi
22   is a big puzzle to this investigation, your Honor, and they
23   have a different view to each other.  I know who he's
24   referring, the agent, but I want to see the view of
25   Mr. Bianchi.  It appears that Mr. Bianchi doesn't even remember

1    nothing from this investigation.

2           THE COURT:  He may, and so I'll have him look at his

3    reports and you can ask him after he's looked at his reports,

4    okay.

5    BY DEFENDANT DIDANI:

6    Q.   Agent Bianchi, did you testify to the Grand Jury?

7    A.   To the Grand Jury?

8    Q.   Yes.

9    A.   Yes.

10   Q.   Do you remember what did you testify?

11   A.   Word for word?

12   Q.   No.  Do you remember -- just give me a little bit the sense

13   of what you testified?

14   A.   I would have to look at my testimony.

15   Q.   All right.  We're going to get our testimony of the Grand

16   Jury.

17          DEFENDANT DIDANI:  Your Honor, we need to pull up his

18   Grand Jury transcript of Mr. Bianchi.

19          THE COURT:  And so you would like me to do what?

20          DEFENDANT DIDANI:  Just give me a minute, because I

21   have give them to -- I told Mr. Fink --

22          MR. FINK:  Do you want me to speak, Mr. Didani?

23          DEFENDANT DIDANI:  Yes.

24          MR. FINK:  Judge, we'll probably need a few minutes to

25   print that out.  This was printed before, but I'm not sure what

1    the location of it is.

2            THE COURT:  Okay.  Let's have the jury step down,

3    please.

4            (The jury left the courtroom at 12:28 p.m.)

5            THE COURT:  You may all be seated.  I'm going to ask

6    this witness some questions.  If you disagree with my questions

7    or object to them, you should say so for the record.

8    Otherwise, your objection is waived.

9            Does the Government understand that?

10           MR. BILKOVIC:  Yes, your Honor.

11           THE COURT:  Mr. Didani, do you understand that?

12           DEFENDANT DIDANI:  Yes, your Honor.

13           THE COURT:  Okay.  Did you review anything to prepare

14   for your testimony today?

15           THE WITNESS:  Yes, ma'am.

16           THE COURT:  What did you review?

17           THE WITNESS:  A lot of my reports during the --

18           THE COURT:  How many?  "A lot" doesn't tell me

19   anything.

20           THE WITNESS:  I have a binder full, ma'am.

21           THE COURT:  Okay.  And so you reviewed those?

22           THE WITNESS:  Yes.

23           THE COURT:  And is that -- is there more than one

24   binder full?

25           THE WITNESS:  Of just my reports?

1           THE COURT:  Just your reports.

2           THE WITNESS:  No.

3           THE COURT:  But you just reviewed your reports to

4    prepare, some of them to prepare for today?

5           THE WITNESS:  Yes, ma'am.

6           THE COURT:  Did you reviewed your Grand Jury

7    testimony?

8           THE WITNESS:  I did not.

9           THE COURT:  All right.  You may step down, and I'd

10   like you to wait outside the door for a moment; okay?

11          THE WITNESS:  Yes, ma'am.

12          THE COURT:  Thank you.  And don't discuss your

13   testimony with anyone, please.

14          THE WITNESS:  Okay.  Am I waiting outside to come back

15   in, ma'am?

16          THE COURT:  Yes, you're waiting outside to come back

17   in.

18          DEFENDANT DIDANI:  Your Honor, may I?

19          THE COURT:  Mr. Didani, I know that you're being held

20   in an institution, okay.  I also know that I offered you to be

21   represented by an attorney and that you wanted to represent

22   yourself, and I know I've appointed a standby attorney.  And I

23   know that I told you you would be held to the rules of evidence

24   and rules of procedure just as if you were a lawyer, okay.  And

25   I've given you a lot of leeway, all right.

```
 1            DEFENDANT DIDANI:  Yes, your Honor.

 2            THE COURT:  But I am not going to stop trial every few

 3   minutes for you to find documents, okay, because if you were an

 4   attorney I would not permit that.  I would expect that you

 5   would be prepared with your documents when you came to court.

 6            Now, I know you have a thousand reasons, including

 7   that you're being held and you can't get your E-mail and you

 8   are too far from the computer room and you can't have all your

 9   documents.  I know you have a lot of reasons why you might be

10   in that position, okay, but not every day.  I'm not going to do

11   this every day, just so you know.  I'm going to expect you to

12   be more prepared with what documents you're going to use so we

13   don't have to send the jury, who's already late coming, out

14   every 15 minutes to get stuff, okay.

15            And I'm not attempting to be harsh, but you've got to

16   be a little bit better.  And I know that's going to be

17   difficult, but --

18            And to the extent that the Government has any of those

19   things that they're ready, I'd like you to like offer them.

20            MR. BILKOVIC:  Judge, I --

21            THE COURT:  You're not required to do that.  I'd just

22   like it, okay.

23            MR. BILKOVIC:  I have --

24            THE COURT:  If it would move things along so you won't

25   have a jury that's already coming late be here for maybe more
```

1      than ten weeks, okay.

2              And then the other thing I'd like is that the witness

3      who was just in here I want him to go through his reports.

4              And how many binders full does he have?

5              MR. BILKOVIC:  Judge, he has --

6              THE COURT:  Does he have more than the five binders I

7      have here of reports?

8              MR. BILKOVIC:  He has one binder.  Part of the problem

9      is Mr. Didani is asking him questions about information that he

10     was told by other agents that summarized, but those agents were

11     the ones that actually did that work.  For example, the

12     financial stuff in this case.  So he's not going to be able to

13     give you the details.  He knows about it, but he can't give you

14     details about it whether he reads his reports or not.

15             THE COURT:  But that's not what he's answering, okay.

16     And so tomorrow -- well, whenever he returns to testify, I want

17     him to bring all his reports.

18             MR. BILKOVIC:  He has them.  He has it all.

19             THE COURT:  And I want him to have them up here on the

20     stand with him.

21             MR. BILKOVIC:  I can tell him now --

22             THE COURT:  And I want him to know where to look to

23     find the answer.

24             MR. BILKOVIC:  Very well, your Honor.

25             THE COURT:  Okay.

```
 1              MR. BILKOVIC:  Yes.

 2              THE COURT:  And I don't want to sit here while he

 3     leafs through finding the answer.  I want him to have reviewed

 4     them so he'll know the answer; okay?

 5              MR. BILKOVIC:  Yes.

 6              THE COURT:  And not "I don't remember, it would be in

 7     my report."  If he weren't saying "it's in my report," I

 8     wouldn't do this.  We would just be left with the answer, "I

 9     don't remember."  But because he said, "I will have to look at

10     my report," then he'll have to do that.

11              MR. BILKOVIC:  Sure.

12              THE COURT:  Okay.

13              DEFENDANT DIDANI:  Your Honor --

14              THE COURT:  Now, who's going to print out this Grand

15     Jury testimony?

16              MR. FINK:  Well, first I'd need help locating it, but

17     other than that, Judge, the only thing I can do is impose on

18     your staff or I can send it to another lawyer and I'll do my

19     best.  I would be doing this earlier if I could.

20              THE COURT:  I know.  You're not required to do any of

21     it, frankly.

22              Mr. Didani, yes.

23              DEFENDANT DIDANI:  Your Honor, I just want to be

24     clear, you know.  Everything that I'm asking him Mr. Bianchi

25     has nothing to do with reports from other agents.  It's
```

 1    everything what Mr. Bianchi had put up in every report.  I'm

 2    following his report.  I'm following his warrant.  I'm

 3    following --

 4         THE COURT:  I'm going to tell you something,

 5    Mr. Didani.  Having signed numerous search warrants in my

 6    history on the bench, the search warrant affidavit is not all

 7    to the personal knowledge of the agent signing the affidavit.

 8    Sometimes it's based on knowledge received from other reports

 9    and other statements of other agents.  It isn't things that

10    they've discovered firsthand, okay.  And so you might not

11    remember, okay, but I'm going to have him look at his report so

12    he can tell you the answers, okay.

13         Now, do you have any other questions to ask him that

14    don't -- you know, that don't require him to look at his

15    reports?

16         DEFENDANT DIDANI:  Your Honor, I mean, I'm fine.  I

17    just want to go to jury transcript and then tomorrow --

18         THE COURT:  Okay.  I'll tell you this.  I'm not going

19    to -- how long is this Grand Jury transcript?  It's got to be

20    what?

21         MR. BILKOVIC:  Judge, my recollection, and

22    unfortunately I left it back at my office over the weekend, my

23    recollection is it is a few pages, like ten pages, because what

24    he generally did was re-read the testimony of a prior agent

25    that had testified who was unavailable.

1          THE COURT:  Okay.  All right.

2          MR. BILKOVIC:  If I could -- can I add one more thing?

3          I can do it at the end of today.  We don't have to

4     waste the jury's time right now.  There's just one more thing I

5     want to add to the Court, but I can do it when we're done.

6          THE COURT:  Okay.

7          MR. FINK:  Judge, I need the Government's assistance

8     locating it in a timely fashion.

9          THE COURT:  How much time is that going to take?

10         MR. FINK:  I think Mr. McDonald and I can work on it,

11    but if you want to --

12         THE COURT:  No, no.  That didn't tell me anything.

13         MR. FINK:  I don't know the answer to that.

14         THE COURT:  Maybe you can't be that precise, but, you

15    know, a lot, several, many --

16         MR. FINK:  I can't imagine with us --

17         THE COURT:  -- have no meaning to me.  So you need to

18    tell me how long you expect it will take.  I'm not going to

19    hold you prisoner to that, okay, but you need to give me an

20    idea.

21         MR. FINK:  Three lawyers screwing in a light bulb, I'd

22    say ten minutes, Judge.

23         THE COURT:  Great.  We'll take a recess, and I'll come

24    back.  You guys let me know when you're ready, okay.

25         Who's your next witness, by the way?

```
1               MR. BILKOVIC:  Derek Newsome from the IRS.

2               THE COURT:  You all know that we're only here -- we

3    have a witness who early on -- a juror who early on told us he

4    had a root canal, okay.  And they have been assuming that I was

5    going to stop at the time I said I was going to stop, but we're

6    probably being to stop at noon tomorrow.  You all know that;

7    right?

8               MR. BILKOVIC:  Yes.

9               THE COURT:  Can you be here by 9:00?

10              MR. BILKOVIC:  Yes.  The Government can, yes.

11              THE COURT:  What about Mr. Didani, can he be here by

12   9:00?

13              MR. FINK:  What time can you get here?

14              DEFENDANT DIDANI:  8:30.  They usually bringing me

15   here by 8:30, your Honor.

16              THE COURT:  Okay.  All right.  Very good.  Let's take

17   10 minutes.

18              (At 12:37 p.m., a brief recess was taken.

19              Back on the record at 12:52 p.m.)

20              LAW CLERK:  All rise.  Court is back in session.

21              THE COURT:  Okay, everybody.  Are we ready to proceed?

22              MR. BILKOVIC:  The Government is ready, your Honor.

23              DEFENDANT DIDANI:  Defendants are ready.

24              THE COURT:  All right.  Let's bring out the jury.

25              THE CLERK:  All rise.
```

```
 1              (The jury entered the courtroom at 12:54 p.m.)
 2              THE COURT:  You may all be seated.
 3              Are you satisfied the jury is present and properly
 4   seated?
 5              MR. BILKOVIC:  Yes, your Honor.
 6              THE COURT:  Mr. Didani?
 7              DEFENDANT DIDANI:  Yes, your Honor.
 8              THE COURT:  All right.  Thank you.
 9              You're still under oath, sir.
10              THE WITNESS:  Thank you, ma'am.
11              THE COURT:  You may proceed, Mr. Didani.
12   BY DEFENDANT DIDANI:
13   Q.  Agent Bianchi, I wanted to ask you one more question about
14   -- as far as Belinda Tibbitts.  Do you agree there's a report
15   in one of your warrants that you say until Marty Tibbitts'
16   death I have multiplied contacts directly with Belinda
17   Tibbitts?  Would you agree with that?
18   A.  According to -- there is in my reports about you having
19   contact with Belinda Tibbitts.  Whether it was before his death
20   or after, I do not recall.
21   Q.  All right.  Mr. Fink is going to --
22              DEFENDANT DIDANI:  Mr. Fink.
23              Your Honor, we show the Government -- it's Bates 1095,
24   please.
25              THE COURT:  1095?
```

1        DEFENDANT DIDANI:  Yes, your Honor.

2        THE COURT:  That doesn't tell me anything about what

3   it is except that it has a Bates stamp on it of 1095.  It has

4   to be more accurately identified.

5        DEFENDANT DIDANI:  It's actually a search warrant,

6   your Honor.  It's Bates 1095.

7        THE COURT:  Is it a report?

8        DEFENDANT DIDANI:  A search warrant, your Honor.

9        THE COURT:  It's a search warrant affidavit?

10       DEFENDANT DIDANI:  Yes, your Honor.

11       THE COURT:  And what is the date of it?

12       DEFENDANT DIDANI:  April 3rd, 2019, your Honor.

13       THE COURT:  April what?

14       DEFENDANT DIDANI:  3, 2019.

15       THE COURT:  All right.  You want to show that to him?

16       MR. FINK:  Your Honor, I'm going to approach with an

17   electronic copy that I showed the Government.  I don't believe

18   they have any objection, but doing some of this on the fly.

19       THE COURT:  Does the Government have any objection?

20       MR. BILKOVIC:  No objection, your Honor.

21       THE COURT:  All right.

22       MR. BILKOVIC:  What number, Mr. Didani, 10 --

23       DEFENDANT DIDANI:  1095.

24       MR. FINK:  I'm going to stand with the witness and

25   scroll, Judge, but I'm not making any suggestions of what to

1    read or not.  I was asked what it's from.  So I'm going to go

2    to the top of the warrant like I would with a hardcopy, your

3    Honor.

4              THE COURT:  All right.

5              MR. BILKOVIC:  Judge, I'll stipulate that that was an

6    affidavit written by Agent Bianchi if that will speed things

7    up.

8              THE COURT:  That's fine.  Then let's go to Page 1095.

9              MR. FINK:  1095, Mr. Bianchi.  I'm going to leave this

10   computer with you on that page.

11             THE WITNESS:  Thank you, sir.

12             THE COURT:  And so now what do you want him to answer?

13   BY DEFENDANT DIDANI:

14   Q.  What kind of conversation -- based on your reports, do you

15   remember what --

16             THE COURT:  It's not a report.  It's a search warrant

17    affidavit; right?

18             DEFENDANT DIDANI:  Yes.

19   BY DEFENDANT DIDANI:

20   Q.  So based on that search warrant affidavit you agree that

21   according to you and to your investigation that I had

22   conversation after Marty Tibbitts' death with Belinda Tibbitts;

23   yes?

24   A.  Yes.

25             THE COURT:  Okay.  Go to a new question.

```
 1              MR. FINK:  May I retrieve that, your Honor?
 2              THE COURT:  Yes, you may.
 3    BY DEFENDANT DIDANI:
 4    Q.  Agent, since now your memory is refreshed, do you remember
 5    any conversation I had with me and Belinda?
 6    A.  I'm sorry.  Do I remember?
 7    Q.  Do you remember any conversation -- the conversation, what
 8    it was all about?
 9    A.  Between you and Belinda?
10    Q.  Yes, sir.
11    A.  No, I did not listen to your conversation.
12    Q.  Agent, if I tell you that me and Belinda we never spoken or
13    any phone conversations, is that -- you think -- is that true
14    or false?
15    A.  Going by the investigation, I would say false.
16    Q.  Okay, Agent.
17    A.  I would believe it to be false.
18              THE COURT:  I'm happy to come back to that, but we
19     took a break so that we could use the Grand Jury testimony, I
20     believe; right?
21              DEFENDANT DIDANI:  Yes, your Honor.
22              THE COURT:  Okay.  We are going to get to that?
23              DEFENDANT DIDANI:  Yes, your Honor.
24              THE COURT:  All right.  Go ahead with your question.
25
```

1    BY DEFENDANT DIDANI:

2    Q.   Agent, can you show me any reports about me -- this

3    defendant having with Belinda?

4    A.   Can I show you reports about what?

5    Q.   About this defendant having a conversation with Belinda

6    Tibbitts.   Does it exist?

7    A.   I don't know.

8    Q.   Agent, what do you know about your investigation?  Do you

9    know anything?

10           MR. BILKOVIC:   Judge, for like the fifth time, he

11   keeps doing that.  I would object to it.  I would ask him to

12   ask better questions to whether he's asking about whether it's

13   in this agent's report, somebody else's report, whether it's

14   phone records and that's why they made the assumption that

15   there was communication between them.  Part of the problem is

16   the questions are very open-ended.

17           THE COURT:   Well, that question has been asked and

18   answered, so you can go to a new one.

19   BY DEFENDANT DIDANI:

20   Q.   All right, Agent.  Do you remember -- you testified in

21   front of the Grand Jury?

22   A.   Yes, sir.

23   Q.   Do you remember when?

24   A.   No.

25   Q.   What year?

```
 1   A.   No.
 2             THE COURT:  Well, we know the date; right?  Let's say
 3    the date, and then you can ask him if he remembers if it's that
 4    date; right?
 5   BY DEFENDANT DIDANI:
 6   Q.   Do you remember August 19th?
 7   A.   Of ...
 8   Q.   Grand Jury testimony.
 9   A.   August 19th of what year?
10   Q.   Of 2021, sir.
11   A.   Okay.
12   Q.   How many Grand Jury testimony you do a year?
13   A.   How many Grand Juries?
14   Q.   Yes.
15   A.   Not many.
16             THE COURT:  I'm sorry.  I don't think I have the
17    accurate date of the Grand Jury testimony.  Is it August 19?
18             DEFENDANT DIDANI:  2021, your Honor.
19             THE COURT:  2021?
20             DEFENDANT DIDANI:  Yes, your Honor.
21   BY DEFENDANT DIDANI:
22   Q.   Agent, you don't have any problem -- I'm sorry.  I'm not
23    trying to be -- you don't have any problem with remembering
24    things, do you?
25   A.   No.
```

```
 1              THE COURT:  I think you asked that, too.
 2    BY DEFENDANT DIDANI:
 3    Q.  All right, Agent Bianchi.  Do you remember anything about
 4    the testimony of the Grand Jury?
 5    A.  Just that I was reading it for -- reading it line for line
 6    for my co-case agent back in -- before I left the task force.
 7    Q.  Agent, there was nothing about the Grand Jury that was
 8    anything to do with your personal investigation that you had
 9    over this defendant?
10    A.  It was -- it was a transcript from my co-case agent reading
11    it in prior testimony.  That is what I gave.
12    Q.  All right, Agent.  You know, I would like for you to read
13    that.  I'm going to -- so you can refresh, and the question is
14    going to go out there.
15              DEFENDANT DIDANI:  Mr. Fink, can you, please.
16              Your Honor, Page 5.
17              THE COURT:  Wait a minute.  What are we refreshing
18     about?
19              DEFENDANT DIDANI:  About his testimony, your Honor.
20              THE COURT:  About whether or not he testified?
21              DEFENDANT DIDANI:  No.  What he testified, what it was
22     all about.
23              THE COURT:  We're not going to read the Grand Jury
24     testimony.
25              DEFENDANT DIDANI:  No.  It's just a line, your Honor.
```

1    It's just a line.

2              THE COURT:  So you need to ask him a question about it

3    and then he can look at it and see whether or not it refreshes

4    or impeaches, okay.

5    BY DEFENDANT DIDANI:

6    Q.   You only testified what the agent -- Agent Leach said?

7    A.   I believe so, yes.

8    Q.   And your answer was what Agent Leach answered?

9    A.   I was reading his transcript from prior testimony.  So like

10   what you have in your hand right there, I had his and I was

11   reading it to the Grand Jury.

12   Q.   So basically your answer it was the same one that Agent

13   Leach was giving that day, right, to the Grand Jury; right?

14   A.   At a prior time and date, yes.

15   Q.   Yes.  Okay.  And then it was another question about -- from

16   the Grand Jury.  Do you remember that question or no, Agent?

17             THE COURT:  I don't understand your question.

18   BY DEFENDANT DIDANI:

19   Q.   It was a question done to you about the connection -- how

20   do you connect Marty Tibbitts with Mr. Didani.  Do you remember

21   that?

22             MR. BILKOVIC:  What page, Mr. Didani?

23             DEFENDANT DIDANI:  Page 7, number -- line 20.

24   BY DEFENDANT DIDANI:

25   Q.   Do you remember it was a question done to you how did you

1    connect a phone number of Mr. Tibbitts to me?  Do you remember

2    that, or no?

3    A.   No.

4    Q.   Okay.  Let me ask you without the Grand Jury.  How do you

5    connect the phone number that existed to Marty Tibbitts to me?

6    A.   Through -- so to you do you mean to your phone number or to

7    your phone or to your person?  I would say through text

8    messages, through banking records, through associations,

9    through you sending him objects in the mail, all of those

10   things.

11   Q.   All right.  Well, I don't see none of those answers done to

12   the Grand Jury.

13        THE COURT:  Which is a question or not?

14   BY DEFENDANT DIDANI:

15   Q.   Agent Bianchi, so let's --

16        DEFENDANT DIDANI:  Your Honor, I would like for Agent

17   Bianchi to hopefully he get -- there's a lot of questions

18   Mr. Bianchi doesn't remember, your Honor.  So I want to call

19   that witness back tomorrow if it's possible, your Honor.

20        THE COURT:  Are you going to ask him anything about

21    the Grand Jury testimony?  We just know that he was reading

22    someone else's testimony?

23        DEFENDANT DIDANI:  Yeah, he was reading someone else's

24   testimony, your Honor.

25        THE COURT:  Okay.  You don't have anymore questions

1   for him?

2           DEFENDANT DIDANI:  No more questions as today, your

3   Honor, because --

4           THE COURT:  Well, why don't you ask your other

5   questions so we know whether or not he remembers or not, okay.

6   If he doesn't remember, he's going to come back tomorrow with

7   all his reports.

8           DEFENDANT DIDANI:  Your Honor --

9           THE COURT:  But at least he'll know what questions

10  you're looking for, okay.

11          DEFENDANT DIDANI:  The connection between me and Marty

12  Tibbitts.

13          THE COURT:  Okay.  What's your next question?

14          THE WITNESS:  I can answer that, your Honor.

15          THE COURT:  Go ahead and answer it.

16  BY DEFENDANT DIDANI:

17  Q.  Answer it.

18  A.  As I just went through the same connections, multiple

19  transactions of cash done in very suspicious ways, text

20  messages, mailing items back and forth, traveling to different

21  countries to meet each other, connecting in Canada to have a,

22  quote, torpedo built to smuggle cocaine in.  Your connections

23  to Canadians who have -- at the time when I was looking into

24  this had been recently arrested for trafficking cocaine into

25  Canada.  Sky messages that we've seen on the film.

```
 1   Q.  All right.  Since your memory got back, let's start a
 2   little bit with the financial stuff.  What was suspicious about
 3   the financial stuff?
 4           MR. BILKOVIC:  Judge, I believe he's already asked
 5    this.
 6           THE COURT:  I think he's already answered that.
 7   BY DEFENDANT DIDANI:
 8   Q.  Let's get at suspicion.  You --
 9           THE COURT:  He already answered what was suspicious
10    about the financials.  You have a new question?
11           DEFENDANT DIDANI:  Okay.  Your Honor --
12   BY DEFENDANT DIDANI:
13   Q.  Agent Bianchi, can you be specific for one transaction, one
14   transaction that was -- that looked suspicious to you, one
15   transaction?  Can you be specific?
16   A.  I can be specific on how it was that it was suspicious to
17   give you the actual dollar amounts.  Although, I want to say it
18   was like 400 some thousand dollars where fifty thousand-dollar
19   checks were written to Mr. Larson from Mr. Tibbitts.
20   Mr. Larson goes to various check cashing locations, cashes
21   those checks, gets cash, goes back to his house where you were
22   at, where you took pictures of the cash, seals it up in
23   cellophane or vacuum-sealed bags or Ziploc bags, whatever you
24   want to call it, and then you stuff them in a duffle bag.  To
25   me that's pretty suspicious.
```

1    Q.   You're talking about the amount 450,000.  Where was that

2    amount given to me?

3    A.   The actual location that you took it?  I don't know.

4    Q.   That was here in Michigan or it was in another state, it

5    was in another country?  Where was that amount?

6    A.   I don't know.

7    Q.   So all those that you described right now to the jury it

8    was through the phone; right?

9    A.   No.

10   Q.   Where was it?  Where was it through?

11   A.   What was what to?

12   Q.   You described that money was -- you described how the money

13   was packed, how it was -- that was through the phones or

14   through your interaction as a person, as a agent?

15   A.   Law enforcement databases shown checks written.  I cannot

16   testify to the amounts and the exact transactions.  I believe

17   the IRS guy on our team at the time will do that, but us

18   working together those were the suspicions we had.

19   Q.   Did you seize any money, Agent Bianchi?

20   A.   Me personally?

21   Q.   Yes, sir.

22   A.   No.

23   Q.   What did you think the money was used for?

24   A.   What do I think which money was used?

25   Q.   The money that you just said right now, the 400, the

1    checks.

2    A.   Sure appeared to be like drugs.

3    Q.   Where?

4    A.   Where?

5    Q.   Yes, sir.

6    A.   Where were the drugs?

7    Q.   Yes.

8    A.   Colombia.

9    Q.   Colombia?

10   A.   Yes.

11   Q.   Is this guessing or --

12   A.   You wrote it down for us in your text messages.

13   Q.   I wrote it down for you in text message?

14   A.   Yes.

15   Q.   So I wrote down that that money I got from this person,

16   this person, I wrote down that this money was going to go to

17   Colombia?

18   A.   Essentially, yes.  You had to get Colombians money.

19   Q.   I had to what?

20   A.   Get the Colombians money.

21   Q.   Is that something that you think or is that -- or was is

22   that?  Do you think that or what?

23   A.   Photos from your phone, sir.

24   Q.   What photos?  This is what I'm trying to get clear, because

25   I'm not understanding, Agent Bianchi.  You saying that you see

1   money, you see this, and I'm asking you where the money go.

2   You saying somewhere in Colombia.

3   A.   During the direct, the evidence was shown of text messages

4   off of your phone.   Those messages.

5   Q.   How many times I've been in Colombia, Mr. Bianchi, Agent

6   Bianchi?

7   A.   To my knowledge, one time.

8   Q.   I went to -- how?   How did I got in Colombia?

9   A.   You flew.

10  Q.   And I got where, in Colombia?

11  A.   I'm sorry?

12  Q.   Inside in Colombia?

13  A.   I assume you flew into Bogota where they told you you

14  couldn't come into the country, and you turned around and you

15  flew back.

16  Q.   So I never made it to Colombia; right?   I just made it to

17  international?

18  A.   Is Bogota Colombia?

19  Q.   Agent, so I never -- it was in international airport,

20  right, or did I go inside in Colombia?

21  A.   I wasn't there.   I don't know.   Your itinerary shows you

22  flew into Bogota, Colombia.

23  Q.   Yes.   But, Agent, you just say I flew -- do you agree with

24  me, Agent, that I never made it to Colombia, I was turned down

25  because I didn't have no visa?

1    A.   I believe you did not -- correct.

2    Q.   So basically that's what I'm saying.  So basically I never

3    went inside to Colombia, Bogota?

4    A.   Sure.

5    Q.   I never walked -- these feet never walked the streets of

6    Colombia; yes or no?

7    A.   Okay, correct.

8    Q.   All right.  So you just saw money on somebody's kitchen;

9    right?  That's what you're saying right now; right?

10   A.   No.  There's many things.  Text messages --

11   Q.   All right.  These many things --

12        MR. BILKOVIC:  Judge, he's cutting the witness off.  I

13   would ask --

14        THE COURT:  You are cutting the witness off.

15        THE WITNESS:  Text messages between you and Puzio

16   trying to meet a Colombian down in Mexico.  It's multiple,

17   multiple probable cause scenarios, which I'm sure everybody

18   will see throughout this trial.

19   BY DEFENDANT DIDANI:

20   Q.   All right.  So text messages between me and Puzio that I

21   was meeting what?

22   A.   An unknown Colombian or Mexican -- no, Colombian in Mexico.

23   Q.   So you don't know if it was me or not then, right, in

24   Mexico?

25   A.   Outside of Eric Puzio?

1   Q.   Yes.

2   A.   No.

3   Q.   You have no idea if it was Colombian, Mexican, or it can be

4   a Caledonian, it can be Albanian, European, African, you have

5   no idea who I was meeting there?

6   A.   I'm pretty sure you text a Colombian, but I would actually

7   have to look at my pictures to give you an honest answer to

8   that.

9   Q.   So how did I transfer the money to Colombia then?

10  A.   You would have somebody drive it down there for you.

11  Q.   Okay.  Who is that somebody?

12  A.   Who?

13  Q.   Yes.  Who is that somebody?

14  A.   I do not know.

15  Q.   But, Agent, you just said that you have all these thousand

16  things on the phone, messages, connections.  Now you say -- so

17  you don't know who is driving the money for me in Colombia?

18  A.   That part of the investigation was after I had left, sir.

19  You'd have to ask somebody else.

20  Q.   Agent, we're talking about 2016 right now, Agent.  You was

21  well in charge in this investigation in 2016.

22  A.   What was 2016?

23  Q.   Eric Puzio, the Mexico, the Colombian, the whoever, that

24  was in 2016; yes or not, Agent?

25  A.   I would agree.

1   Q.   Do you agree with me that 2016 you was the only agent on

2   this case --

3   A.   No, I wasn't the only agent assigned to this case.

4   Q.   Exactly.  So I'm asking you, you just said you find on this

5   phone all these messages, cash money.  I'm asking you, Agent,

6   since you find you got -- who drove the money to Colombia?

7   A.   In 2016, I did not have an answer to that.

8   Q.   What about 2017?

9   A.   I never found the answer to that, but my co-case agents

10  did.

11  Q.   What about 2018?

12  A.   I just said I never found the answer to that, but my

13  co-case agents did.

14  Q.   So basically what you testifying right now some money, some

15  way, somehow got to Colombia and no one knows how?

16  A.   No, they do.

17  Q.   They do, Agent?

18  A.   They do know how.  I can't testify to what they know,

19  though.

20  Q.   All right.  So when these other agents came in the case

21  then?

22  A.   I'm sorry?

23  Q.   These agents that know all this, when they enter the case?

24  A.   He entered the case right around 2017, I believe, 2018.

25  Q.   So '15, 2015, 2016, 2017, maybe 2018, almost for four

1    years, Agent, you have no idea how this money was getting from

2    this country to Colombia or where else?

3    A.   I do have an idea.

4    Q.   How.  Tell me.

5    A.   That it was driven down there by a Mexican.

6    Q.   In Colombia?

7    A.   Yes, yes.

8    Q.   Driving in Colombia?

9    A.   Yes.  Driving from Chicago to Mexico and eventually getting

10   the money to the Colombian cartel, yes.

11   Q.   Agent, do you know how far is Colombia, or no?

12   A.   Yes.

13   Q.   All right.  Fly time from Detroit to Bogota, how many hours

14   you need?

15          MR. BILKOVIC:  Objection, relevance, Judge.

16          THE COURT:  It might be relevant.

17          THE WITNESS:  I don't know.  I'd have to look it up.

18    Ten hour, guess.

19   BY DEFENDANT DIDANI:

20   Q.   Do you agree with me, Agent, if you need ten hours to fly

21   you probably need three days or four days to drive to Colombia?

22   A.   I would agree, yeah.

23   Q.   Do you know you have to pass Panama, Panama Canal?

24   A.   No.

25   Q.   Do you know where is Colombia?

1   A.   I do, but why --

2             THE COURT:   No.  He poses the question.

3             THE WITNESS:  Okay.  Sorry.

4             THE COURT:   What's the new question?

5   BY DEFENDANT DIDANI:

6   Q.   Do you have to pass through Panama Canal to get to

7   Colombia?

8   A.   It depends.

9   Q.   Agent --

10  A.   You can drive, you can fly, you can take a boat.

11  Q.   Do you pass Panama Canal to go to Colombia; yes or not?

12  Are you passing through?

13  A.   If you're driving by car, you would.

14  Q.   Agent, I'm trying to understand.  Three or four years you

15  was an Agent in charge, and you cannot give me or the jury or

16  this judge a straight answer where this money, who this money,

17  how they moved, you know, before any other agent enter in this

18  case?

19             We're not talking about the other agents, but we're

20  talking about Agent Bianchi who has thousands of reports, who

21  has thousands of claims, okay.  Agent Bianchi, you telling me

22  right now in three, four years you cannot name how the money

23  got to Colombia or any other country.  You cannot name any

24  person that drove that money to Colombia from Chicago to

25  Mexico, because you had access to all the phones?  You had all

1   the access for this conspiracy.

2            THE COURT:  It's getting too long a question.  Do you

3    want him to answer the question that you posed?

4   BY DEFENDANT DIDANI:

5   Q.  Can you name somebody in three years or four years'

6   investigation, can you name a sure way or name somebody how the

7   money got there?

8   A.  No.

9            THE COURT:  Go to a new question.

10  BY DEFENDANT DIDANI:

11  Q.  Agent, do you believe maybe it was not even a Colombian

12  guy, that's why you can't answer today?

13  A.  I can't answer because I don't know.

14  Q.  Agent, so in three, four years we made -- I made this

15  question early for you.  You don't believe the defendant here

16  ever saw any cocaine here in United States, do you?

17  A.  In the United States?

18  Q.  Yes.

19  A.  I don't know.

20  Q.  Yes or no, Agent?

21  A.  I don't know.

22  Q.  In three, four years' investigation, I'm asking you to be

23  clear.

24            MR. BILKOVIC:  Your Honor --

25            THE COURT:  Mr. Didani, he can answer "I don't know"

 1   if he doesn't know.  Now go to another question.

 2   BY DEFENDANT DIDANI:

 3   Q.  Do you believe any U.S. citizen, Agent Bianchi, ever bought

 4   any cocaine from me?

 5   A.  I don't know.

 6   Q.  In four years, Agent Bianchi, you answer early that it was

 7   not even one gram of cocaine in the United States; right?

 8   A.  I'm sorry?

 9   Q.  There was not even one -- you never seized not even a gram

10   of cocaine here in United States?

11   A.  Correct.

12   Q.  There was no United States -- any United States citizen

13   ever bought any drugs supposedly from this defendant?

14         THE COURT:  He answered that he didn't know.  Go to a

15    new question.

16   BY DEFENDANT DIDANI:

17   Q.  Agent, let me ask you a question, please.  Do you know

18   anything about Washington?

19   A.  Washington --

20         MR. BILKOVIC:  Ask for a little more specific question

21    than do I know anything about Washington.

22   BY DEFENDANT DIDANI:

23   Q.  Do you know anything about my -- between -- the

24   relationship between me and Marty Tibbitts and Washington?

25   Since you had those phones, Agent, do you know anything about

1    it?

2    A.   I know of a connection that you drove Martin Tibbitts' car

3    to Washington, D.C.

4    Q.   Okay.  That's fine.  That's fair, Agent.  Since you had

5    those phones and you snoop on this man's life, on everybody's

6    life, do you know that we met with Marty Tibbitts in

7    Washington?

8    A.   Do I know what?

9    Q.   That me -- that I met with Marty Tibbitts in Washington?

10   A.   No, I don't know.  No, I did not know that you met.

11   Q.   All right, Agent.  In that phone that you had, that phone

12   report that you had copies in 2016, in 2017, do you believe

13   there is photos out there that -- between me and Marty Tibbitts

14   in Washington?

15   A.   I don't know.

16           DEFENDANT DIDANI:  No further questions for this

17   witness, your Honor.  I would like for this witness to come

18   back to see his reports about Marty Tibbitts and maybe we can

19   get faster answers, your Honor, please.

20           THE COURT:  All right.  Do you have any questions you

21   want to ask at this time, Mr. Bilkovic?

22           MR. BILKOVIC:  I do, your Honor.

23           THE COURT:  You do?

24           MR. BILKOVIC:  Yes.

25           THE COURT:  Okay.  You may.

```
 1                      REDIRECT EXAMINATION
 2   BY MR. BILKOVIC:
 3   Q.   Early on, earlier today, Mr. Didani questioned you about an
 4   airport in Ann Arbor that you had followed -- or that you had
 5   seen him at.  Did you ever author a report about an airport in
 6   Ann Arbor?
 7   A.   Not to my knowledge.
 8   Q.   There was also a question about whether there was such
 9   thing as Oakland County International Airport.  Is there?
10   A.   Yes, sir.
11   Q.   Where is it located?
12   A.   Oakland County.
13   Q.   Oakland County, Michigan?
14   A.   Yes, sir.
15   Q.   And have you been there before?
16   A.   I haven't.
17   Q.   Have you been there on surveillance before?
18   A.   I have.
19   Q.   Did you see anybody when you were there on surveillance
20   related to this investigation?
21   A.   Yes, sir.
22   Q.   Who did you see?
23   A.   Mr. Didani and Mr. Tibbitts.
24   Q.   And would that have been in August of 2016?
25   A.   Yes, sir -- no, 2015.
```

1    Q.   August of 2015.  And there was questions about 40 people

2    that were mentioned in the reports that you've authored;

3    correct?

4    A.   Yes, sir.

5    Q.   Now, the fact that somebody's name is mentioned in a

6    report, does that mean that you opened an investigation into

7    them?

8    A.   Absolutely not.

9    Q.   Did you know all of the information about this case back in

10   2015 and 2016?

11   A.   Absolutely.

12   Q.   Were there other agents that were involved as well?

13   A.   Yes.

14   Q.   Were you still investigating and getting additional

15   information between 2016 and 2019?

16   A.   Yes.

17   Q.   And in 2019 is that when Donald Larson was arrested?

18   A.   Yes.

19   Q.   And was Donald Larson interviewed?

20   A.   Yes.

21   Q.   And did Donald Larson start cooperating?

22   A.   Yes.

23   Q.   There was discussions about the difference between detained

24   and seized.  Detained there's a length of time that you can

25   detain a phone; correct?

```
 1   A.   Yes, sir.
 2   Q.   And then after that period of time what do you have to do
 3   with the phone?
 4   A.   Either return it to the subject or get a search warrant.
 5   Q.   Okay.  So you can only detain it for a period of time?
 6   A.   Yes, sir.
 7           DEFENDANT DIDANI:  Your Honor.  Your Honor, objection.
 8    He's leading the witness, your Honor.
 9           MR. BILKOVIC:  I'll --
10           THE COURT:  Rephrase your questions.
11   BY MR. BILKOVIC:
12   Q.   What is the difference between a detained phone and a
13   seized phone?
14   A.   A seized phone the Government keeps the phone, and it can
15   be -- it's used for evidence until it's no longer needed and
16   it's either destroyed or returned to the subject.
17           A detained phone is kept for a specific -- not longer
18   than a specific number of days or time until it's returned to
19   the subject.
20   Q.   Now, Mr. Didani has shown you several affidavits, the
21   search warrants; correct?
22   A.   Yes, sir.
23   Q.   Approximately what is the range of pages in those search
24   warrants, like the total length, do you know?
25   A.   I don't.
```

1    Q.   Are they more than one page?

2    A.   Absolutely.

3    Q.   Are there several?

4    A.   Yes.  Yes.

5    Q.   And the facts that you put in there, are those facts that

6    you have personal knowledge to where you have investigated

7    everything, or is there also information in there that other

8    agents have provided you during the investigation?

9    A.   Both.

10   Q.   And the financial investigation in this case, is that

11   something that you are responsible for?

12   A.    Not directly, but I had some responsibility -- or I was

13   part of the initial check cashing with Donald Larson.

14   Q.   Okay.

15   A.   After that it got turned over to Mr. Newsome.

16   Q.   And that would be Derek Newsome from the IRS Criminal

17   Investigation Unit?

18   A.   Yes, sir.

19   Q.   And is he going to testify in this case to the best of your

20   knowledge?

21   A.   Yes, sir.

22   Q.   Now, one of the things that you had mentioned was one of

23   the suspicions you had was -- and I think you had mentioned

24   that Mr. Didani and Mr. Puzio gave different reasons as to why

25   they were in Mexico.  Do you remember that?

1    A.   Yes, sir.

2    Q.   What was the reason Mr. Didani gave as to why he was in

3    Mexico?

4    A.   He stated he was going to Mexico to -- for Eric Puzio's

5    wedding.

6    Q.   At that time did you know whether or not Eric Puzio was

7    married already?

8    A.   I did.

9    Q.   And was he?

10   A.   He was.

11   Q.   And did Mr. Puzio give the same reason or did he give a

12   different reason when he was interviewed?

13   A.   Completely different.

14   Q.   What was his reason?

15   A.   That he was meeting his friend, Mr. Didani, in order to

16   start a new liquor business.

17   Q.   Is it against the law to lie to Customs agents when you are

18   interviewed entering the United States?

19   A.   Yes.

20   Q.   Now, there was -- the thing about Michigan Freight, you had

21   indicated that at some point you had believed that Mr. Bhullar

22   and Mr. Didani were registered agents of the Michigan Freight?

23   A.   Yes, initially in my report.

24   Q.   And did you continue to investigate connections in this

25   case?

1    A.   Yes, sir.

2    Q.   Did there come a point in time that you realized that one

3    of the companies ceased to exist, the exact same name, in two

4    thousand --

5              DEFENDANT DIDANI:  Objection, your Honor.  He's

6    leading the -- your Honor, he's leading the -- he's leading

7    the -- it's leading.

8              THE COURT:  Why are you leading the witness?  Asked

9    and answered.

10             MR. BILKOVIC:  Okay.

11             THE COURT:  Rephrase.

12             DEFENDANT DIDANI:  He's telling him what to answer,

13   your Honor.

14             THE COURT:  I sustained your objection, Mr. Didani.

15             DEFENDANT DIDANI:  Thank you.

16   BY MR. BILKOVIC:

17   Q.   Did there come a point in time that you learned something

18   different about the two companies?

19   A.   Yes.

20   Q.   What was that?

21   A.   That Mr. Didani was not attached to one of the companies,

22   but he was attached to a very similar name of a different

23   company.

24   Q.   And when you realized that what did you do?

25   A.   I immediately ceased investigating Mr. Bhullar and

 1   continued on investigating Mr. Didani.

 2   Q.   And did you document that someplace?

 3   A.   Yes, as I read to the Court.

 4   Q.   And how did you document it?

 5   A.   In a report.

 6   Q.   The text messages that you mentioned, photographs of text

 7   messages, some of those we've introduced; right?

 8   A.   Yes, sir.

 9   Q.   Were there other ones as well that the jury has not seen

10   yet?

11   A.   Absolutely.

12   Q.   More than a couple?

13   A.   Absolutely.

14   Q.   And did those text messages discuss basically drug

15   trafficking?

16   A.   Yes.

17   Q.   In Colombia?

18   A.   Yes.

19          MR. BILKOVIC:  Nothing further.

20          DEFENDANT DIDANI:  Your Honor --

21          THE COURT:  No.  We're stopping for the day.  And you

22   need --

23          Do you want this witness to come back tomorrow or do

24   we need to take the next witness first?

25          MR. BILKOVIC:  I think it would be a good idea to take

1    the next witness first, and then if we need to come back to

2    Agent Bianchi we could at a later time.

3              THE COURT:  Okay.  Can we do that, Mr. Didani?

4              DEFENDANT DIDANI:  Your Honor, I just have two

5    questions.

6              THE COURT:  No, that wasn't my question to you,

7    though.  Can we bring this witness back after we hear the next

8    witness?

9              DEFENDANT DIDANI:  Well, your Honor, let me make it

10   clear, because I don't want the jury to be confused, you know.

11   This is a puzzle.  This case is a puzzle, your Honor.  If we

12   bring the next witness --

13             THE COURT:  Okay.  Can your next witness come on

14   Thursday?

15             MR. BILKOVIC:  Yes.

16             THE COURT:  Okay.  You may step down and come back

17   tomorrow and bring your reports, okay.

18             THE WITNESS:  Thank you, your Honor.

19             THE COURT:  All right.  You're welcome.

20             We're going to start at 9:30 promptly, okay.

21             THE WITNESS:  Your Honor?

22             THE COURT:  Yes.

23             THE WITNESS:  You said tomorrow, but you said

24   Thursday.

25             THE COURT:  No.  We're going to bring the next witness

1    on Thursday.

2            THE WITNESS:  Okay.

3            THE COURT:  We're coming back tomorrow, February --

4    what is that, 19th; right?

5            MR. BILKOVIC:  Yes.

6            THE COURT:  Thank you.  You may step down.

7            THE WITNESS:  Thank you.

8            THE COURT:  Please don't discuss your testimony with

9    anyone, but bring your reports, all right.

10           THE WITNESS:  Yes.  Thank you.

11           THE COURT:  Okay.  Please rise for the jury.

12           You may also step down, but remember what?  You're not

13   permitted to talk about the case with anyone, and anyone

14   includes anyone at all, okay.  And you're not to use any social

15   media to do any research or investigation or share any

16   information about the case.  And you're going to leave your

17   pads as Ms. Saulsberry directs.  And you're going to get here

18   tomorrow on time for us to hear the witness at 9:30, okay.

19           All right.  You may step down.  Have a good afternoon.

20           (The jury left the courtroom at 1:35 p.m.)

21           (End of Excerpt.)

22                         _   _   _

23

24

25

CERTIFICATE OF COURT REPORTER

I, Sheila D. Rice, Official Court Reporter of the United States District Court, Eastern District of Michigan, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing pages is a correct transcript from the record of proceedings in the above-entitled matter.

**s/Sheila D. Rice**
Sheila D. Rice, CSR-4163, RPR, RMR, FCRR
Federal Official Court Reporter
United States District Court
Eastern District of Michigan

Date:  02/24/2025
Detroit, Michigan.