1                   **UNITED STATES DISTRICT COURT**
                    **EASTERN DISTRICT OF MICHIGAN**
2                        **SOUTHERN DIVISION**

3                          —   —   —

   UNITED STATES OF AMERICA,
4
                 Plaintiff,
5
      v.                                   Case No. 21-20264
6
   YLLI DIDANI,
7
                 Defendant.
8   _____/

9                       **JURY TRIAL - VOLUME 2**
                **BEFORE THE HONORABLE DENISE PAGE HOOD**
10                   **UNITED STATES DISTRICT JUDGE**

11              Theodore Levin United States Courthouse
                    231 West Lafayette Boulevard
12                       Detroit, Michigan
                    Friday, February 14, 2025
13
    **APPEARANCES:**
14
     **For the Plaintiff:**        Mark Bilkovic
15                                 Timothy McDonald
                                   UNITED STATES ATTORNEY'S OFFICE
16                                 211 W. Fort Street, Suite 2001
                                   Detroit, Michigan  48226
17                                 (313) 226-9623

18   **For the Defendant:**        Ylli Didani
                                   Appearing in Pro Se
19
                                   Wade Fink
20                                 WADE FINK LAW, P.C.
                                   550 W. Merrill Street, Suite 100
21                                 Birmingham, Michigan  48009
                                   (248) 712-1054
22                                 (Appearing as standby counsel.)

23   **Also present:**             Agent Chad Hermans
                                   Maria Dicarlo, Paralegal
24
           *To obtain a copy of this official transcript, contact:*
25              *Sheila D. Rice  Official Court Reporter*
             *(313) 234-2610 • sheila_rice@mied.uscourts.gov*

| | |
|---|---|
| 1 | **TABLE OF CONTENTS** |
| 2 | MATTER                                                        PAGE |
| 3 | **JURY TRIAL - VOLUME 2** |
| 4 | **Government's Case in Chief** |

5  **DANIEL NUGENT**
   Direct examination by Mr. McDonald.................. 12
6  Cross-examination by Defendant Didani............... 25

7  **JOSHUA BIANCHI**

8  Direct examination by Mr. Bilkovic.................. 50
   Cross-examination by Defendant Didani.............. 140
9
   Certificate of Court Reporter...................... 188
10

11

12              E X H I B I T   I N D E X

13

14  Exhibit No.              Description              Admitted

    **Government's Exhibits**
15
    Government's 1.0      Photo of Eric Puzio             59
16  Government's 1.1      Photo of Donald Larson          60
    Government's 1.2      Photo of Martin Tibbitts        61
17  Government's 1.3      Photo of Piotr Synowiec         63
    Government's 2.0      Photo of Ylli Didani ID         80
18  Government's 2.1      Photo of prescription bottle    82
    Government's 2.2      Photo of Ylli Didani            83
19  Government's 2.3      Photo of Didani in front of     84
                          currency
20  Government's 2.4      Photo, SKY ECC Sales message    87
                          on BlackBerry
21  Government's 2.5      Mr. Didani flight itinerary     90
                          to Colombia
22  Government's 2.6      Mr. Didani flight itinerary     91
                          from Colombia
23  Government's 2.7      Video                           94
    Government's 5.0      Photo of BlackBerry            125
24  Government's 5.1      Photo, Martin Tibbitts and     107
                          Ylli Didani
25  Government's 5.2      Photo, Martin and Belinda      112
                          Tibbitts' residence

```
1    (Continued)
                      E X H I B I T   I N D E X
2

3    Exhibit No.              Description                  Admitted

4
     Government's 5.3         Photo, stacks of U.S. currency    113
5    Government's 5.4         Photo, stacks of U.S. currency    113
     Government's 5.5         Photo, stacks of U.S. currency    113
6    Government's 5.6         Photo, sealed bags of U.S.        117
                             currency
7    Government's 5.7         Photo, Piotr Synowiec bank        126
                             accounts
8    Government's 5.12        Photo of BlackBerry               119
     Government's 5.13        Photo, MI Freight and             109
9                            Donald Larson chat
     Government's 5.14        Video                             108
10   Government's 5.15        Video                             130
     Government's 5.16        Photo, Phantom Secure             131
11                           Subscription

12

13   Defendant's Exhibits

14   Defendant's A            Photo of containers               140

15

16

17

18

19

20

21

22

23

24

25
```

1    Detroit, Michigan

2    Friday, February 14, 2025

3    10:06 a.m.

4                                —   —   —

5              LAW CLERK:  All rise.

6              The United States District Court for the Eastern

7    District of Michigan is now in session, the Honorable Denise

8    Page Hood presiding.

9              Calling 21-20264, United States of America versus Ylli

10   Didani.

11             Appearances, please.

12             MR. BILKOVIC:  Good morning, your Honor.  Mark

13   Bilkovic and Timothy McDonald on behalf of the United States.

14             MR. McDONALD:  Good morning.

15             THE COURT:  Good morning.  You may be seated.  Welcome

16   to all of you.

17             DEFENDANT DIDANI:  Good morning, your Honor.

18             THE COURT:  Good morning, Mr. Didani.

19             DEFENDANT DIDANI:  Ylli Didani, and Wade Fink is my

20   standby counsel.

21             THE COURT:  Okay.  Very good.  We had some jurors that

22   were running behind.  And normally I would give them a lecture

23   on coming on time, but because of the snow and because I don't

24   have to transfer very far I'm not going to give them a lecture

25   today.  I'll wait for the next time that they're a little bit

1    tardy, okay.

2           Okay.  Are we ready to proceed?

3           MR. BILKOVIC:  The Government is.

4           THE COURT:  Who's your next witness?

5           DEFENDANT DIDANI:  Daniel Nugent.

6           THE COURT:  Very well.  You ready, Mr. Didani?

7           DEFENDANT DIDANI:  Your Honor, I wanted to bring a

8    small problem.  I just -- I'm not trying to be -- I need to

9    bring -- maybe you can help me on this situation if you don't

10   mind, your Honor.

11          THE COURT:  You want to bring a small problem to my

12   attention?

13          DEFENDANT DIDANI:  Yes.

14          THE COURT:  Okay.

15          DEFENDANT DIDANI:  Your Honor, before -- the day

16   before the opening, your Honor, for some reason in Milan I was

17   removed from my room and I was removed to another room.  So we

18   had to remove all these boxes.  What was the reason, it's

19   behind me.  We don't know.  That was the same room -- I was

20   sitting there for years.

21          I brought it to marshal's attention.  I didn't want to

22   bring this attention to you, your Honor, because we got bigger

23   things to worry about right now.

24          But yesterday after I was communicating with Mr. Fink

25   and what we have to prepare for today, magically, Mr. Fink send

1    me all the exhibits and the witnesses.  Somehow my cellie,

2    which has been there for years --

3              THE COURT:  Your what?

4              DEFENDANT DIDANI:  My cellie.  My cellie.  My

5    cellmate.

6              THE COURT:  Your cellmate?

7              DEFENDANT DIDANI:  Yes.

8              THE COURT:  Okay.

9              DEFENDANT DIDANI:  And another guy who is tooken from

10   their work.  I was -- FDC Milan right now has no idea why --

11   who take it.  It was a call behind there.  Both of them, they

12   was taken to other counties, one in the hole, another one to

13   the County.  That doesn't bother me if they did something

14   against the law.  So Milan they need to pay whatever they need

15   to be pay.

16             But what bother me, your Honor, I was locked out of my

17   room.  I could not get access to my stuff, nothing in the

18   transcripts, discovery.  I was locked out to another room

19   without anyone saying -- nobody knows what's going on.  The

20   whole mess, they locked down the unit.

21             Then after few hours the lieutenant come and he said

22   he received a call from higher-ups, we need to take your

23   bunkie's stuff and we need to shake down the room, magically,

24   right.  These things happening back to back right now, your

25   Honor, you know.

1           Just -- it's hard to be prepared for that kind of

2     trial like this, your Honor, you know.  Milan said -- the first

3     time Milan dropped the ball to marshals.  And I'm sure the

4     marshals -- I brought it to their attention.  It's like they're

5     playing the --

6           It's hard, your Honor, when you have a trial like

7     this, and magically from the day I denied the plea from the

8     Government -- I've been there four years, your Honor, almost

9     four years.  Magically, all these things happening right now,

10    and it's hard to be prepared mentally.

11          You know, I didn't want to bring it to your attention.

12    The first accident it was few days ago in front of -- they

13    removed me from my room of all my -- instead of me worrying

14    about the opening, I had to remove thousands of boxes,

15    paperwork, clothes, everything.  This is the day before my

16    opening, your Honor, all right.

17          And yesterday, here we go again.  No one knows where

18    my bunkie -- if my bunkie did something, your Honor, usually

19    when somebody does something SIS investigation.  They don't

20    lock down, they don't prevent you from entering that room, 15

21    minutes, they take them to the hole, take their stuff and

22    that's it.  Yesterday it was done a different way, which I

23    haven't seen in four years.

24          I'm just -- when all is said and done, the whole unit

25    has bad energy, all these new things happening, and it's hard

1    to prepare for that kind of trial, your Honor, you know.  I

2    just don't get it.  I just don't get it.  I just need a fair

3    fight.

4            Thank you, your Honor.

5            THE COURT:  Okay.  Is there anything -- are you asking

6    me to do anything, or you just want to make a record of it?

7            DEFENDANT DIDANI:  I just wanted to make a record.  If

8    it's something you can do, your Honor, to prevent this stuff

9    happening, I mean -- I understand all this time, all this

10   magically, you know.  I'm not trying to be here like conspiracy

11   theories.  I don't do that, your Honor.  It's just magically

12   constantly, constantly, it's mental abuse right now that I

13   start trial.

14           THE COURT:  Now, tell me, is this cell closer or

15   further away from where the computer operation is?

16           DEFENDANT DIDANI:  Your Honor, those cells, even

17   upstairs where I was, even the downstairs, it's the same way,

18   your Honor.  It's the same thing.

19           THE COURT:  Were you moved upstairs or downstairs?

20           DEFENDANT DIDANI:  Pardon me, your Honor?

21           THE COURT:  You were moved upstairs or downstairs?

22           DEFENDANT DIDANI:  I was removed from upstairs to

23   downstairs.

24           THE COURT:  And what day was that?

25           DEFENDANT DIDANI:  It was the day before our opening,

1   your Honor, which, your Honor, it's fine --

2          THE COURT:  And then your cellmate -- was this someone

3   in the cell with you actually like --

4          DEFENDANT DIDANI:  We both were removed to the new

5   room.

6          THE COURT:  The same cell?

7          DEFENDANT DIDANI:  Yes, your Honor.

8          THE COURT:  And now that person is removed?

9          DEFENDANT DIDANI:  That person yesterday was removed

10  and another friend of mine that staying close to me.  They both

11  was removed from FDC Milan, your Honor.  But, if they did

12  something and broke the laws of Milan, I'm fine with that, your

13  Honor.  I'm just not fine that you locking me out of my -- in

14  this time.

15          You know, these guys, you know, one of them is -- run

16  the kitchen for Milan.  The other one is a maintenance guy.  I

17  mean, these guys don't even bother a fly, you know.  And all

18  these problems becoming right now, you know, your Honor.

19  That's what I just wanted to bring to your attention, your

20  Honor.  I brought it to the marshal's attention, too.  You

21  know, it's no need for that.

22          THE COURT:  No need for them to be moved?

23          DEFENDANT DIDANI:  If they did something, there is no

24  need for me --

25          THE COURT:  But even if they don't do anything you

1    agree that the prison system has the right to assign people to

2    what they think are appropriate spaces; right?

3              DEFENDANT DIDANI:  Right, right, your Honor.  But, you

4    know, my whole point, your Honor, it's like -- my whole point,

5    I was locked out of my room for hours, your Honor.  I had no --

6              THE COURT:  How many hours?

7              DEFENDANT DIDANI:  A few hours, your Honor.

8              THE COURT:  "Few" has no meaning to me.

9              DEFENDANT DIDANI:  Four hours, your Honor.

10             THE COURT:  All right.  Does the Government want to be

11   heard on this?

12             MR. BILKOVIC:  Your Honor, the only concern that I

13   have is -- and I don't know if it's appropriate for me to ask

14   the Court, but I want to make sure that Mr. Didani feels that

15   he is ready to proceed today.  I don't want there to be a later

16   claim that he was to the prepared as a result of this.  This is

17   something between Milan and, you know, Mr. Didani.  I don't

18   think that the Government basically is involved in this.

19             THE COURT:  Okay.  So Mr. Bilkovic's question is are

20   you prepared to proceed today?

21             DEFENDANT DIDANI:  I want to proceed, your Honor.

22             THE COURT:  You want to proceed?

23             DEFENDANT DIDANI:  Yes, your Honor.

24             THE COURT:  That's not the question.  The question is

25   are you prepared to proceed today?

```
 1              DEFENDANT DIDANI:  With materials, yes.  Mentally --
 2              THE COURT:  With your what?
 3              DEFENDANT DIDANI:  With materials -- I'm prepared.  Go
 4    ahead, your Honor.  I'm prepared.
 5              THE COURT:  Okay.  Very good.  All right.  Let's do
 6    that.  I'm really ready to proceed also.
 7              THE CLERK:  All rise for the jury.
 8              (The jury entered the courtroom at 10:16 a.m.)
 9              THE COURT:  Good morning.
10              JURORS:  Good morning.
11              THE COURT:  You may all be seated.
12              Are you satisfied that the jurors are here and
13    properly seated?
14              MR. BILKOVIC:  Yes, your Honor.
15              DEFENDANT DIDANI:  Yes.
16              THE COURT:  Okay.  Thank you.
17              DEFENDANT DIDANI:  Thank you for coming.
18              THE COURT:  All right.  You may all be seated.
19              Is it cold in the jury room?
20              One yes and several nos.  Okay.  So I should tell the
21    "yes" to put more clothes on, right, put your coat back on.  I
22    can commiserate.  I had my coat on in my office yesterday, too.
23    But I just to know if it gets too cold back there let
24    Ms. Saulsberry know, okay.  Hopefully you won't be back there,
25    though, very long.
```

1          All right.  Very well.  Let's call your next witness

2    for the Government.

3          MR. McDONALD:  United States calls Daniel Nugent, your

4    Honor.

5          THE COURT:  Okay.  Very well.  He may step forward and

6    be sworn in.

7          (At 10:18 a.m., oath administered.)

8          THE COURT:  You may be seated.  When you're seated,

9    state your full name and spell your last name for the record.

10          THE WITNESS:  Daniel Nugent, N-U-G-E-N-T.

11          THE COURT:  All right.  You may proceed.

12          MR. McDONALD:  Thank you.

13                    *          *          *

14                         DANIEL NUGENT,

15          was called as a witness at 10:18 a.m. after having been

16          duly sworn to testify to the truth.

17                    *          *          *

18                    DIRECT EXAMINATION

19    BY MR. McDONALD:

20    Q.  Sir, will you tell the jury where you're currently

21    employed?

22    A.  I'm employed in Chicago, Illinois as a U.S. postal

23    inspector.

24    Q.  For how long have you been a U.S. postal inspector in

25    Chicago?

| | |
|---|---|
| 1 | A.   Approximately one and a half years. |
| 2 | Q.   Can you tell the ladies and gentlemen of the jury what your |
| 3 | duties are as a postal inspector? |
| 4 | A.   I investigate mail theft and financial fraud. |
| 5 | Q.   Prior to being employed as a postal inspector where were |
| 6 | you employed? |
| 7 | A.   I was employed at Chicago O'Hare International Airport as a |
| 8 | Homeland Security Investigations special agent. |
| 9 | Q.   For how long were you employed in that capacity? |
| 10 | A.   Between approximately 14 and 15 years. |
| 11 | Q.   Prior to Homeland Security Investigations were you employed |
| 12 | in a law enforcement capacity? |
| 13 | A.   Yes. |
| 14 | Q.   Where were you employed? |
| 15 | A.   I was employed at Chicago O'Hare International Airport as a |
| 16 | U.S. Customs and Border Protection officer. |
| 17 | Q.   How long were you a U.S. Customs and Border Protection |
| 18 | officer? |
| 19 | A.   Approximately five years. |
| 20 | Q.   I want to direct your attention to August 6, 2016.  Do you |
| 21 | recall that date? |
| 22 | A.   I do. |
| 23 | Q.   On that date, were you employed as a special agent with |
| 24 | Homeland Security Investigations? |
| 25 | A.   I was. |

1   Q.   And were you assigned to Chicago O'Hare?

2   A.   I was.

3   Q.   What were your duties on that particular day?

4   A.   I was the on-call duty agent for Chicago O'Hare Airport.

5   Q.   What does an on-call duty agent?  What is the

6   responsibilities of that position?

7   A.   So the responsibilities of the duty agent is to respond to

8   either Midway Airport, O'Hare Airport or the international mail

9   facility for seizures of drugs, respond to the airport for

10  calls from other offices to conduct inspections or coordinate

11  with CBP to coordinate inspections of individuals coming into

12  the country.

13  Q.   In the course of your career with Homeland Security

14  Investigations at O'Hare, how many times would you estimate you

15  responded to the airport from a call -- or based on a call from

16  another agency?

17  A.   Probably hundreds of times.

18  Q.   And how many times have you conducted border exams of

19  travelers who arrive at Chicago O'Hare based on requests from

20  other agencies?

21  A.   I would not conduct the inspections in general.  CBP would

22  conduct the inspections.  But it was a frequent ask of other

23  offices to have that done at O'Hare.

24          THE COURT:  CEP?

25          THE WITNESS:  CBP.

```
1                    THE COURT:  Meaning?
2                    THE WITNESS:  Customs and Border Protection.
3                    THE COURT:  Okay.
4    BY MR. McDONALD:
5    Q.   So, if you didn't conduct the exams, what were your duties
6    when you were on duty and you responded to Chicago O'Hare?
7    A.   I would -- if another office called me and said that they
8    would like to have a traveler coming in inspected, I would
9    coordinate with Customs and Border Protection at the airport,
10   at O'Hare or Midway, and ensure that the individual who was
11   under investigation was inspected.
12   Q.   Okay.  Now, prior to August 6 of 2016 did you have an
13   occasion to receive information from another agency by someone
14   by the name of Ylli Didani?
15   A.   Yes.
16   Q.   And do you know from whom you received that information?
17   A.   I believe it was from Josh Bianchi.
18   Q.   Do you know how Josh Bianchi is employed?
19   A.   I know that he's a Border Patrol agent, and I believe he
20   was assigned on a task force with HSI in Detroit at the time.
21   Q.   What was the nature of the information that Special
22   Agent -- not Special Agent, excuse me, Officer Bianchi gave to
23   you regarding Ylli Didani?
24   A.   As I recall, I was told that he was under investigation for
25   either drug smuggling or drug tracking.
```

1           DEFENDANT DIDANI:  Objection, your Honor.  It's

2     hearsay.

3           MR. McDONALD:  Your Honor, I'm not offering this

4     matter for the truth of the matter asserted.  I'm offering it

5     to show what the listener did after receiving it.

6           THE COURT:  And I'll allow it only for the purpose and

7     the jury will consider it only for that purpose, and your

8     objection is overruled.

9           DEFENDANT DIDANI:  Thank you, your Honor.

10          MR. McDONALD:  Thank you again.

11    BY MR. McDONALD:

12    Q.  So you said that you received information from Officer

13    Bianchi that Mr. Didani was what?

14    A.  Under investigation for either drug trafficking or drug

15    smuggling.

16    Q.  Were you told whether Mr. Didani was arriving into the

17    country at any particular point and at what particular date?

18    A.  I was told that he was arriving I believe on August 6 of

19    2016 from outside of the United States.

20    Q.  Okay.  And were you asked to do anything?  Did Officer

21    Bianchi ask you to do anything?

22    A.  He requested that CBP conduct an inspection of the goods

23    that Mr. Didani had as well as an interview as to what took him

24    out of the country.

25    Q.  Okay.  Was this request by Officer Bianchi unusual to you?

```
 1   A.   No.
 2   Q.   Have you received similar requests in your career from
 3   other agents around the world similar to Officer Bianchi's
 4   request?
 5   A.   Yes.
 6   Q.   On August 6, 2016, did you have an occasion to go to
 7   secondary inspection at the Chicago O'Hare Airport per Officer
 8   Bianchi's request?
 9   A.   Yes.
10   Q.   Do you remember what time you arrived?
11   A.   No.
12   Q.   Do you remember the time of day you arrived?
13   A.   No.  I believe possibly in the evening, but I'm not sure.
14   Q.   And this was ten years ago, almost ten years ago; is that
15   right?
16   A.   Yes.
17   Q.   When you arrived in secondary inspection, did you speak
18   with anyone?
19   A.   I believe I spoke to the officer, the Customs and Border
20   Protection officer, Matthew Parisi, who conducted the
21   inspection.
22   Q.   All right.  Did there come a time when you came in the
23   possession of Mr. Didani's cellular phones?
24   A.   Yes.
25   Q.   Do you know how many?
```

1    A.   I believe it was two.

2    Q.   And do you know what type?

3    A.   I don't recall.

4    Q.   If I showed you a report, would that refresh your

5    recollection?

6    A.   Yes.

7              MR. McDONALD:  Can I have one moment, your Honor?

8              THE COURT:  You may.

9              (Briefly off the record.)

10             MR. McDONALD:  For the record, I'm showing the report

11    to Mr. Didani.

12             (Briefly off the record.)

13             MR. McDONALD:  May I approach the witness?

14             THE COURT:  Yes, you may.

15   BY MR. McDONALD:

16   Q.   For the record, I just handed you a report.  I put it face

17   down.  Can you turn it over, review it, and let me know if it

18   refreshes your recollection on what type of phones you

19   received?

20   A.   Yes.

21   Q.   All right.  You can flip that back over.  What types of

22   phones did you receive from Mr. Didani?

23   A.   A BlackBerry phone and an iPhone 6.

24   Q.   And who did you receive the phones from?

25   A.   I believe they were given to me by Officer Parisi.

1  Q.   Do you know whether both of those phones were in working

2  order?

3  A.   I believe that the iPhone was in working order, and the

4  BlackBerry may not have been in working order.

5  Q.   When you say BlackBerry may not have been, what do you mean

6  specifically?

7  A.   I don't believe that I was able to turn on the phone.

8  Q.   Once you had both of these phones, what, if anything, did

9  you do with them?

10  A.   I did a cursory search of, I believe, the iPhone since it

11  was in working order.

12  Q.   Okay.  And what authority do you have to do a cursory

13  search of the iPhone?

14  A.   It can be searched --

15          DEFENDANT DIDANI:  Objection.

16          THE COURT:  What's your objection?

17          DEFENDANT DIDANI:  The relevance, your Honor.

18          THE COURT:  It's what?

19          DEFENDANT DIDANI:  Relevance, your Honor.

20          THE COURT:  I didn't hear you.

21          DEFENDANT DIDANI:  The relevance, your Honor.

22   Relevance.

23          THE COURT:  Oh.  The relevance of it?

24          DEFENDANT DIDANI:  Yes.

25          THE COURT:  It might be relevant.  Overruled.

```
1              THE WITNESS:  Can you repeat the question?
2    BY MR. McDONALD:
3    Q.   Yes.  What authority do you have to do a cursory search of
4    a phone at the Chicago O'Hare Airport?
5    A.   Border search authority.
6    Q.   All right.  Now, you said you think you did a manual search
7    of an iPhone; is that right?
8    A.   Yes.
9    Q.   All right.  Is it fair to say that you couldn't do a manual
10   search of the BlackBerry if it wouldn't turn on?
11   A.   That is fair to say.
12   Q.   Did you connect the phones to any computer software to
13   image them or did you just scroll through with your hand?
14   A.   I just scrolled through.
15   Q.   And when you say you did a manual search did you search the
16   iPhone's file settings on the videos?  What were you looking
17   at?
18   A.   I recall searching photographs, I believe.
19   Q.   Did you observe -- strike that.
20         Did anything -- did any image come to your attention
21   when you were conducting that manual search?
22   A.   Yes.
23   Q.   Can you describe the image?
24   A.   I recall there being an image of what appeared to be a
25   photograph of a hand-drawn picture of what I thought was a
```

1    shipping container with a raised floor.

2            DEFENDANT DIDANI:  Objection, your Honor.  That's

3    speculation.

4            THE COURT:  That's a stipulation?

5            DEFENDANT DIDANI:  Speculation.

6            THE COURT:  Speculation.

7            Do you want to respond to that?

8            MR. McDONALD:  I'm just simply asking him what he

9    observed and what he believed the image to be.

10           THE COURT:  I'm going to allow it.  You may

11   cross-examine on it.  Overruled.

12   BY MR. McDONALD:

13   Q.  So you believe you saw a hand drawing of a shipping

14   container with a raised floor?

15   A.  Yes.  And I believe there were some numbers written next to

16   the photo or under the photo -- or under the picture.  I'm

17   sorry.

18   Q.  There's a manila folder on your desk right in front of you.

19   Can you please open it and identify it for the record.

20   A.  I believe that is the photo I saw.

21   Q.  That's a picture.  Is it marked as an exhibit?

22   A.  Yes.

23   Q.  That would be Exhibit 4?

24   A.  4.0, yes.

25   Q.  Does it fairly and accurately depict the image that you

1    observed on 8-16?

2    A.   I believe so.

3         MR. McDONALD:  Move for admission of 4.

4         THE COURT:  Any objection?

5         DEFENDANT DIDANI:  None.

6         THE COURT:  Very well.  It's admitted as number 4.

7         MR. McDONALD:  May I publish to the jury?

8         THE COURT:  Yes.  Are you going to put it on the

9    screen?

10        MR. McDONALD:  I am going to put it on the screen.

11        THE COURT:  Okay.

12        MR. McDONALD:  Ms. Dicarlo, could you also zoom in on

13   the photo, please.  Thank you.

14        THE COURT:  Can everyone see those?  Jurors?  Yes?

15        JURORS:  Yes.

16   BY MR. McDONALD:

17   Q.  At that point once you observed this photo what, if

18   anything, did you do?

19   A.   Once I found the photo I stopped searching and --

20        THE COURT:  Is that going to be too dark for you,

21   Mr. McDonald?

22        MR. McDONALD:  It's not too dark for me, your Honor.

23        THE COURT:  But now there's nothing on the screen.

24   Are you going to put it back up?

25        MR. McDONALD:  Yes.  Could you republish Exhibit 4,

1       please.

2               THE COURT:  Can you see that, Mr. Didani?

3               DEFENDANT DIDANI:  Yes, your Honor.

4               THE COURT:  Okay.  Thank you.

5               Go ahead, Counsel.

6       BY MR. McDONALD:

7       Q.  At that point you stopped the search what, if anything, did

8       you do?

9       A.  After stopping the search, I contacted Agent Bianchi, and I

10      believe I sent via FedEx the phones up to him, up to Detroit.

11      Q.  I'm not sure you answered this question, but why did you

12      stop the search once you saw this photograph?

13      A.  I stopped the search because I found something that I

14      believe may involve illegal activity, and it was my general

15      practice to let the investigating office determine what steps

16      they wanted to take forward in order to further search the

17      phone.

18      Q.  And so you seized the phones at that point?

19      A.  I believe I detained the phones.

20      Q.  Okay.  And there's a difference in your mind?

21      A.  Yes.

22      Q.  Okay.  What's the difference?

23      A.  We can detain phones for I believe up to 30 days to review

24      them based on the level of suspicion that we have.

25              DEFENDANT DIDANI:  Objection, your Honor.  It's a

1    legal conclusion.  It's irrelevant.

2            THE COURT:  Do you want to respond to that?

3            MR. McDONALD:  I'm just asking the difference between

4    what detained phones means and what seized phone mean.  I'm not

5    asking for a legal conclusion.

6            THE COURT:  And the jury won't consider it as a legal

7    conclusion.  The jury will just consider it as this witness'

8    understanding, and based on that your objection is overruled.

9            DEFENDANT DIDANI:  Thank you, your Honor.

10   BY MR. McDONALD:

11   Q.   And the difference between detained and seized phones?

12   A.   I guess detained would just mean that we took them for a

13   certain amount of time from the traveler, and once evidence of

14   a crime is found we have the right to seize it once we find

15   contraband on there.

16   Q.   All right.  Now, you said you sent them to HSI Detroit?

17   A.   Yes.

18   Q.   Or to Officer Bianchi?

19   A.   I shipped them up to the HSI Detroit office, I believe.

20   Q.   Okay.  Beyond sending the phones, after that did you have

21   anything to do with this case?

22   A.   I've been to court a couple times, but --

23   Q.   Other than court?

24   A.   No.

25   Q.   Now, are you familiar with lookouts?

1   A.   Yes.

2   Q.   And the system TECS?

3   A.   Yes.

4   Q.   With respect to the 2016 encounter with Mr. Didani, do you

5   know if there was a lookout record placed into the system?

6   A.   I believe there was.

7   Q.   And do you know who placed that record?

8   A.   I believe it was Customs and Border Protection supervisor

9   Kelly Villa, V-I-L-L-A.

10  Q.   And she's located where?

11  A.   In Chicago.

12  Q.   Are you aware of whether or not there was another entry in

13  TECS for a lookout in 2015?

14  A.   I believe there was.

15  Q.   And do you know who placed that lookout?

16  A.   I believe it was Josh Bianchi.

17          MR. McDONALD:  Your Honor, may I have one moment?

18          THE COURT:  Yes.

19          MR. McDONALD:  No other questions.  Thank you, your

20   Honor.

21          THE COURT:  Very well.  You may examine the witness.

22                      CROSS-EXAMINATION

23  BY DEFENDANT DIDANI:

24  Q.   Agent Nugent, good morning.

25  A.   Good morning.  How are you?

```
1    Q.   Please, if you don't understand my words, ask me.  I want
2    you to understand what I'm asking you and the jury understand,
3    because I have a little -- not little, maybe a heavy accent.
4    So please understand my words, please.
5    A.   Sure.
6    Q.   Agent Nugent, in 2016 you said Agent Bianchi called you
7    from Detroit?
8    A.   I believe so.
9    Q.   And explain to the jury what they told you?
10   A.   From what I can recall, I was told that Mr. Didani was
11   under investigation for either drug smuggling or drug
12   trafficking.
13   Q.   Did he give you any details there is any drug smuggling
14   before or anything?
15   A.   I don't recall.
16   Q.   Did you check the system to see if Mr. Didani has any, any
17   drug activities with U.S. laws, United States laws?
18   A.   Can you repeat that question?
19   Q.   Did you check the records?  You probably have a record at
20   Homeland Security; right?
21   A.   We have a computer system with records in it.
22   Q.   I want the jury to understand that, right, and I want to
23   understand that, too.  When a agent from a different
24   jurisdiction, from Detroit, called you and say, hey, Agent
25   Nugent, I want you to investigate this guy, I want you to stop
```

1    this guy and investigate this guy because drug activity, drug

2    smuggling, drug everything, right, now do you take their words

3    or you do your own checkup?

4    A.   I normally would take them at their word.  Everybody who

5    comes into the country is subject to inspection.  We need no

6    level of suspicion to search.

7    Q.   That was not my question, Agent Nugent.  My question is

8    when Agent Bianchi told you this man coming from another

9    country, this man has been investigated for drug activities,

10   drug smuggling, did you took his word or you did your own

11   research?

12   A.   As far as I can remember, I took him at his word.

13   Q.   So any agent from United States that will call you, and you

14   as a agent of Chicago, you're not going to do your own

15   research, you're just going to take his word?

16   A.   Yeah.

17   Q.   All right.  So let's move on then.  So Mr. Didani landed,

18   right -- I'm sorry.  When did Mr. Bianchi call you?

19   A.   I don't recall the exact date, but it was prior to the

20   arrival.

21   Q.   Prior to arrival.  And I got another question before we go.

22   Did they notify you that Mr. Didani flew almost year and a half

23   before in Chicago to your jurisdiction to stop the same person;

24   right?  Did you got notified of that, or no?

25   A.   I don't know if I was notified of that before the arrival

```
 1   in 2016 or afterward, but at some point I was told, yes.  I'm
 2   not sure if it was before the 2016 arrival or after.
 3   Q.  And another question I want since you from Chicago,
 4   Mr. Nugent -- Agent Nugent, is that a common practice, you
 5   know, a agent from another jurisdiction come in and flying to
 6   -- 300 miles away from a different jurisdiction to pull over
 7   people?
 8   A.  I've seen it happen, yes.
 9   Q.  And what specifically -- if you seen it happen, is that
10   because of terrorism or -- is that something or just
11   investigating somebody?
12   A.  Investigating people for terrorism, drugs, child
13   pornography.  It was across the gambit of crimes.
14   Q.  So you often see that happened that agents from a different
15   jurisdiction flying and just --
16   A.  I don't know if I said "often."  If I did say "often," I
17   didn't mean often, but I've seen it happen, yes.
18   Q.  I'm sorry for my question.  I want the jury to understand
19   this -- what's really, you know, the whole dynamic.
20           Okay.  So he called you.  He told you take my word, we
21   have a drug dealer over here, a drug smuggler, we have to
22   investigate him, right.  Did you call Agent Parisi and tell him
23   stop Mr. Didani, for a lookout for Mr. Didani or what?
24   A.  I don't know if I talked to Officer Parisi.  I spoke to
25   somebody prior to the arrival and I said that Detroit would
```

1    like to have this individual inspected.

2    Q.   Okay.  Fair enough, Agent Nugent.  Now, Agent Parisi called

3    you, and he told you I got Didani, I got seven vials of unknown

4    substance right now, because that's what he -- human growth

5    hormones; right?  He has 3.7 milligrams, which is point, point,

6    point three percent of gram of this substance, and I got two

7    phones; right?

8              You took over the investigation at that point?

9    A.   Are you done?

10   Q.   Yes.

11   A.   I wouldn't call it an investigation.  I would call it an

12   inspection.  What was going on at the airport it was not an

13   investigation.  It was an inspection based on a referral of an

14   investigation being conducted by a different office.

15   Q.   And did Agent Parisi notify you that Mr. Didani was in

16   transit to Mexico?

17   A.   Can you repeat that for me?

18   Q.   Did Agent Parisi notify you that Mr. Didani was in transit

19   to Mexico from Italy?

20   A.   I don't recall.  I don't recall.

21   Q.   But you took the investigation; right?  You detained my

22   phones?

23   A.   I detained your phones knowing that you came from a place

24   outside the United States.

25   Q.   But you never bothered to see my tickets and you never

1   bothered to see that it was going -- its final destination, it
2   was just a transit and final destination was Mexico?
3   A.  I don't recall.
4         THE COURT:  You don't recall what, the final
5   destination or looking at his ticket?
6         THE WITNESS:  I don't recall where he was coming from,
7   where he was going.  I just knew that he was coming from
8   outside the United States to inside the United States.
9   BY DEFENDANT DIDANI:
10   Q.  Agent, can you explain to the jury what is a transit
11   between the foreign countries when you travel transit with
12   airplanes?  Can you explain how that works to the jury, please?
13   A.  To transit the United States?
14   Q.  Agent, it's fair enough to say that this defendant was
15   traveling from Rome transit to O'Hare and final destination to
16   Mexico?
17   A.  I don't recall what the travel itinerary was.  Like I said,
18   I knew that the traveler was coming from a place outside the
19   United States to a place inside the United States.  I don't
20   know where the traveler was going after that.
21   Q.  But there should be a -- it's there, it's got to be
22   somewhere in the computer, but you choose not to investigate;
23   right?
24   A.  I don't recall at this point in time whether I knew where
25   the traveler was coming from other than a place outside the

1   United States to a place inside the United States or where the

2   traveler was going after that.

3   Q.   All right.  I understand.  Agent Nugent, I want to ask you

4   another question, right.  I see a lot of reports.  If this

5   traveler in front of you, Mr. Didani, if he was traveling

6   transit in Italy, O'Hare, and the final destination it was --

7   the connecting flight, which was one hour to Mexico, do you

8   think Mr. Didani intended to bring in United States point,

9   point 003 percent of gram of human growth hormones?

10              MR. McDONALD:  Objection.

11              THE COURT:  What's your objection?

12              MR. McDONALD:  Objection is this witness -- he has not

13   laid a foundation that this witness would know what Mr. Didani

14   intended to or didn't intend to do.

15              THE COURT:  Okay.  Rephrase your question.

16              I think the objection is that this witness can't know

17   what was in your mind, at least not from the foundation that

18   you've laid so far.  And so just rephrase your question.

19   BY DEFENDANT DIDANI:

20   Q.   Mr. Didani had an intention to bring that substance into

21   the United States?

22   A.   Can you rephrase that?

23   Q.   Did Mr. Didani, this defendant here, did he have any

24   intention to bring that .0007 -- 3.7 grams of human growth

25   hormones to the United States?

1    A.   It was in the traveler's luggage.

2    Q.   How do you know it was in the traveler's luggage?

3    A.   Because I was told during the inspection that they found

4    it.

5    Q.   Okay.  So you took the investigation.  Mr. Nugent, you

6    detained my -- you detained this defendant's phones.  You're

7    saying that that .007 -- 3.7, whatever milligrams, it's not

8    even -- you're saying it's illegal.  Did you test whether the

9    substance was human growth hormones?

10   A.   Did I test it?

11   Q.   Yes.

12   A.   No.

13   Q.   But you took over the investigation from Agent Parisi, but

14   you never tested?

15   A.   I didn't take over any investigation.  It was an

16   inspection.

17   Q.   I'm sorry.  The inspection.  You detained my phones.  Do

18   you know where -- do you know where those phones are today?

19   A.   I believe they're probably somewhere here in the

20   courthouse.

21   Q.   So those phones basically was seized almost for ten years;

22   right?

23   A.   I don't know.  I detained them and sent them up to Detroit.

24   Q.   Did you do inspection of those vials, you personal

25   inspection?  Did you inspect it?

1  A.   No.

2  Q.   So how do you know it's human growth hormones?

3  A.   I don't know, and I don't know if that's that important to

4  this.

5  Q.   It's not important?

6  A.   I --

7        THE COURT:  Well, I don't think we really get into

8  whether or not it's important.  You have to answer the

9  questions.

10        Pose your question again, please.

11        The first question was did you inspect the vials?

12        THE WITNESS:  I don't believe I did.

13  BY DEFENDANT DIDANI:

14  Q.   So just like you took Agent Bianchi -- you took my -- you

15  believe that there was -- Agent Parisi told you that's human

16  growth hormones and that's what it is?  You never sent it to a

17  laboratory or nothing; right?

18  A.   I did not, no.

19  Q.   Okay.  So let's go.  Did you ever have those vials in your

20  hand, or no?

21  A.   I don't recall.

22  Q.   Do you remember having my phones in your hands?

23  A.   I do.

24  Q.   So what's the difference between recalling the phones, but

25  you don't recall the vials?

```
 1   A.   I recall the phone in my hand because of what I saw in the
 2   phone.
 3   Q.   All right.  So let's talk about this, right.  So you
 4   scrolling, you scrolling down.  Is that because the inspection
 5   that Mr. Bianchi from Detroit told you go find something, or
 6   it's just because you did it?
 7   A.   I don't recall if I was asked to inspect the phone by Agent
 8   Bianchi or if that was something I did on my own.  I don't
 9   recall.
10   Q.   All right.  So you explain to the jury you scrolled the
11   phone, you went all the way.  For how long?
12   A.   I don't recall how long it was.
13   Q.   But you -- sometime you find something that's supposed to
14   be a container, right, container, drug container?  That's what
15   you believe?
16   A.   That's what I believe, yes.
17   Q.   Why do you believe that?
18   A.   Based on my training and experience, I'm familiar with drug
19   smuggling and cargo containers.  And based on the totality of
20   the circumstances I believe that that's possibly what I saw.
21   Q.   Mr. Nugent, you just said you was working all the time in
22   O'Hare Airport; right?
23   A.   Yes.
24   Q.   They transport containers there in O'Hare?
25   A.   They transport containers through cargo facilities at
```

1    Chicago O'Hare.

2    Q.   What kind, 20 feet or 40 feet containers?

3    A.   I don't recall.

4    Q.   Agent, you just said they transport containers, but you

5    don't know what kind of containers they transport out there in

6    the cargo airplane?

7    A.   I don't recall.  We also have a rail facility in Chicago.

8    As an inspector, Customs inspector, I've also been involved in

9    inspecting cargo containers as well in the Chicago area.

10   Q.   Agent, right now your answer is about -- you talking about

11   -- we talking about the airport, Agent.

12   A.   Okay.

13   Q.   And you said that airplanes transport containers; right or

14   wrong?

15   A.   I mean, they have air containers that they ship.  I'm not

16   sure they ship 20 or 40-foot containers, but in Chicago I've

17   seen 20-foot and 40-foot containers.  I've seen large

18   containers in Chicago that have come from overseas.

19   Q.   With airplanes?

20   A.   No.  Not specifically with airplanes, no.

21   Q.   Well, how they come from overseas in the airport?

22   A.   I'm not saying they come from overseas in an airplane.

23   I've said they've come over in trains as well.

24   Q.   Agent, do you agree with me the airplanes they do not ship

25   containers, they ship pallets?

```
1   A.   Sure, I agree.
2   Q.   Thank you very much.  We will continue on that.  So I want
3   to explain so the jury can understand what's really going on
4   over here; right?
5            THE COURT:  All right.  Let's go to a question now.
6   BY DEFENDANT DIDANI:
7   Q.   My other question, Agent, so you got the phones, you got
8   the phones, you find the container.
9            DEFENDANT DIDANI:  Mr. Fink, please, I need a photo of
10  container, please, a real container so the jury can see the
11  real container.
12           Sorry, your Honor.
13           THE COURT:  It's okay.
14           MR. FINK:  Your Honor, I might have to toy with this
15   or use the Government's computer.
16           MR. BILKOVIC:  Your Honor --
17           Would you like Ms. Dicarlo's assistance?
18           MR. FINK:  I would love that.  Thank you.
19           MR. BILKOVIC:  Is that okay, your Honor?
20           THE COURT:  Yes, it's okay.
21           MR. FINK:  Ms. Dicarlo is going to play it on hers,
22   your Honor, and I'll figure it out during a break.
23           THE COURT:  Okay.
24           MR. FINK:  Thank you.
25           THE COURT:  Is it marked as an exhibit?
```

```
 1                    MR. FINK:  Do you want me to answer?
 2                    THE COURT:  Mr. Didani, is it marked as an exhibit
 3      what you want to show?
 4                    DEFENDANT DIDANI:  No, your Honor.
 5                    THE COURT:  You want to mark it as something if we're
 6      going to show it to the jury.  Why don't you just mark it
 7      something proposed, how about that?
 8                    MR. FINK:  Do you want me to assist, Judge?
 9                    THE COURT:  Do you already have exhibits numbered or
10      lettered?  Mr. Didani, do you already have --
11                    DEFENDANT DIDANI:  Exhibit Y.  Exhibit Y, your Honor,
12      would be all right.
13                    THE COURT:  What?
14                    DEFENDANT DIDANI:  Exhibit Y.
15                    THE COURT:  Exhibit what?
16                    MR. FINK:  Exhibit A.
17                    DEFENDANT DIDANI:  Oh.  Exhibit A.
18                    THE COURT:  A.  You don't have anything already as
19      proposed Exhibit A, okay.  Let's mark it proposed A, okay.
20                    The Government, do you have any objection to that?
21                    MR. McDONALD:  To marking it, no, I don't.
22                    THE COURT:  Okay.
23                    MR. McDONALD:  Thank you.
24                    (Briefly off the record.)
25                    DEFENDANT DIDANI:  Your Honor, I'm going to continue
```

```
 1    with the question.  When they get it, we can show, because I'd
 2    like for Mr. Nugent to answer a few questions as far as those
 3    containers and the jury to understand this.
 4              THE COURT:  You're going to come back to it?
 5              DEFENDANT DIDANI:  Yes, to the container photos.
 6    BY DEFENDANT DIDANI:
 7    Q.   Mr. Nugent, Agent Nugent -- am I saying your name right?
 8    A.   Nugent.
 9    Q.   Nugent.  I'm sorry.  I speak six languages.  So, I'm sorry,
10    I get confused.
11    A.   No problem.
12    Q.   Agent Nugent, so once you find these containers, right, you
13    decided to send to Detroit to Agent Bianchi?
14    A.   The telephone?
15    Q.   Yes, sir.
16    A.   Yes.
17    Q.   With the vials?
18    A.   I don't recall if I sent the vials.
19              THE COURT:  You don't recall if you sent the what?
20              THE WITNESS:  The vials of HGH.
21    BY DEFENDANT DIDANI:
22    Q.   Until today we don't know if it's HGH or might be something
23    substance you can lose weight or something?  No?
24    A.   I'm sorry.  Can you repeat that?
25    Q.   Until today, almost nine years later, no one knows if that
```

1    substance, 3.7 milligrams, is HGH; yes?  Yes or no?

2    A.   I don't know.

3    Q.   All right.  So you send both -- just the phones you

4    detained, you didn't send to Agent Bianchi those vials?  Let's

5    be clear, you know.  We have to hear that.

6         THE COURT:  He said he didn't know whether he sent the

7    vials.  Do you want to ask him again?

8    BY DEFENDANT DIDANI:

9    Q.   So you send both the phones.  On that day did you have any

10   coordination with Agent Bianchi that -- to seize those phones

11   and send them to Detroit?

12   A.   I don't recall if before the arrival of the passenger or

13   whether those phones were going to be taken or not, or

14   detained.

15   Q.   So, if there is a report from Agent Bianchi and it was

16   coordinated to seize those phones even before I got here, or I

17   got there, do you agree with that, or no?

18   A.   I don't recall.

19   Q.   You know, hold on a second.

20        DEFENDANT DIDANI:  Your Honor, can we go back to the

21   picture?

22        THE COURT:  Yes, you can.

23   BY DEFENDANT DIDANI:

24   Q.   Agent Nugent, does that look like a container to you?

25   A.   Yes.

1    Q.   Is that 20 foot or 40 foot?

2    A.   I don't know.

3    Q.   You think that container can be sent inside an airplane?

4    A.   No.

5            MR. McDONALD:  Judge, objection.  He's asked this a

6    couple times.  Agent Nugent has said that there were no

7    containers shipped by airplane.

8            THE COURT:  He has.  I agree.

9            Go to a new question.

10   BY DEFENDANT DIDANI:

11   Q.   Agent Nugent, is that a container?

12   A.   I believed at the time that what I was looking at was a

13   shipping container.

14   Q.   Can you explain --

15           THE COURT:  What is that that we're seeing up here?

16           DEFENDANT DIDANI:  It's supposed to be a container,

17   your Honor.

18           THE COURT:  Is it marked as an exhibit?

19           DEFENDANT DIDANI:  It's Government's Exhibit number 4,

20   your Honor.

21           THE COURT:  Okay.  That's all I'm asking.  All right.

22   So the jury will know what they're looking at.  All right.

23   Government's 4.

24   BY DEFENDANT DIDANI:

25   Q.   Can you explain to the jury what make you think that's a

```
1    container?  We trying to -- explain to the jury your thinking,
2    you know, why you think that's a container.
3    A.   At the time I don't recall exactly what I was -- well,
4    sitting here today, I don't know exactly what I was told about
5    the suspected activities relating to drugs of the traveler.  I
6    don't know if that led me to believe when I looked through the
7    phone that this was -- this could be a cargo container with a
8    raised floor.  That's all I can tell you.  Like at the time
9    that this happened I thought to myself this looks like a
10   cargo -- a drawing of a cargo container with a raised floor.
11   Q.   Thank you for your answer, Mr. Nugent.
12             On the hearing we had here in April 24 -- it was
13    April?  April 23, 2024.
14             MR. FINK:  23.
15   BY DEFENDANT DIDANI:
16   Q.   23.  April 23, 2024.  My lawyer at that time, Wade Fink,
17   asked you did you report this activity, drug or whatever
18   activity.  Did you report it to your jurisdiction?
19   A.   No, I did not.
20   Q.   Let me ask you a question.  The jurisdiction, federal
21   jurisdiction with Chicago and Detroit, is that the same?
22   A.   No.
23   Q.   The requirement, it's the same?
24   A.   What do you mean by requirement?
25   Q.   Requirement, the laws.  The laws are the same or what?
```

1    Each federal system got different laws or what?

2    A.   I don't want to answer that question unless you're more

3    specific about what laws we're talking about.

4    Q.   Let's say that you wanted to go get a warrant for those

5    phones so you can detain them and seize them.  Is that the

6    same?  The requirement in Chicago is the same requirement in

7    here?

8    A.   I don't know the answer to that.

9    Q.   I imagine, you know, the laws, federal laws are the same

10   for everywhere; right?

11   A.   Can you repeat that?  I'm sorry.

12   Q.   You don't think that a federal law is the same either if

13   you're in the Sixth District -- opinions might be different,

14   but the federal law it's the same, either you in Chicago,

15   either you in Detroit, either you in California, either you in

16   Miami or either you in New York?

17   A.   Different circuits -- different circuit courts have

18   different rules pertaining to border searches of electronics.

19   Q.   Agent, I'm not saying the ruling.  The law.  It's not the

20   same for each district?

21          MR. McDONALD:  Judge, objection, relevance.

22          THE COURT:  How is it relevant?  How is it relevant,

23   Mr. Didani?

24          DEFENDANT DIDANI:  I was going to go to that, your

25   Honor, because --

1         THE COURT:  Tell me now how it's relevant so I can

2  address the objection.

3         DEFENDANT DIDANI:  It's relevant because Mr. Nugent if

4  he see activity he could have pulled up a warrant out there in

5  Chicago instead of sending them to Detroit; right?

6         THE COURT:  You may ask him that question if you want.

7         DEFENDANT DIDANI:  Yes.

8         THE COURT:  The other question the Government's

9  objection is sustained.

10 BY DEFENDANT DIDANI:

11 Q.  Agent Nugent, on that hearing Mr. Fink, my attorney, asked

12 you did you notify your jurisdiction about these activities?

13        THE COURT:  You asked that question already.  Go to a

14 new one.

15 BY DEFENDANT DIDANI:

16 Q.  Why didn't you file for a warrant in that district?

17 A.  The traveler was under investigation in Detroit.  So I

18 forwarded it to Detroit to make a determination -- for them to

19 make a determination as to how often they wanted to proceed

20 with the search of the phone.

21 Q.  The answer on the hearing was all totally different.

22        DEFENDANT DIDANI:  Your Honor, can I refresh his

23 memory with his transcript?

24        THE COURT:  You can impeach him with it.  It's up to

25 you.

1              DEFENDANT DIDANI:  Yes, your Honor.

2              THE COURT:  Do you have a transcript?  And it's dated

3      April 23, '24; is that right?

4              DEFENDANT DIDANI:  Yes, your Honor.

5              THE COURT:  And what page are you on?

6              MR. McDONALD:  Judge, the hearing was in '23, just so

7      the record --

8              THE COURT:  '23.  I'm sorry.

9              DEFENDANT DIDANI:  April 24, 2023, your Honor.

10             MR. McDONALD:  Can I have the page that Mr. Didani --

11             THE COURT:  I just asked for the page, Counsel.

12             MR. McDONALD:  I'm sorry.

13             DEFENDANT DIDANI:  Page 287.

14             THE COURT:  Is that two pages?

15             MR. FINK:  It is, your Honor.

16             THE COURT:  And they're Page 2 what, 87, and what?

17             DEFENDANT DIDANI:  88.

18             THE COURT:  Okay.

19             MR. FINK:  May I approach, Judge?

20             THE COURT:  Yes, you may.  You can't talk to the

21      witness.

22             MR. FINK:  I was pointing out, Judge, that they're

23      double-sided, 87 and 88.  My apologies.

24             THE WITNESS:  Okay.

25             THE COURT:  Okay.  Come and get it, please, Mr. Fink,

 1    if you would.

 2              MR. FINK:  Yes, your Honor.

 3              THE COURT:  Mr. Didani and Mr. McDonald, I don't know

 4    if it's being offered to show that he didn't remember or that

 5    he gave a different answer at that time.  If he gave a

 6    different answer at that time --

 7              DEFENDANT DIDANI:  Yes, your Honor.

 8              THE COURT:  Let me finish, please.

 9              Mr. Didani is entitled to read the question and the

10    answer from the previous testimony.

11              MR. McDONALD:  Understood.  Thank you.

12              THE COURT:  Okay.  Do you wish to read the question

13    and the answer from the prior testimony?

14              DEFENDANT DIDANI:  Yes, your Honor.

15              THE COURT:  Okay.  You may.  Tell us what lines you're

16    reading.

17              DEFENDANT DIDANI:  Line 15.

18              THE COURT:  On what page?

19              DEFENDANT DIDANI:  Page 287.

20              THE COURT:  All right.  Go ahead.  You can read the

21    questions and the answers.

22    BY DEFENDANT DIDANI:

23    Q.   "Did you seek any warrant in this case yourself?"

24              Answer, "No, I did not.

25              Question, "Did not solicit an arrest warrant or

1    charges related to the steroids that was found?

2            "No.

3            "Did you share any information that you saw on this

4    form with a local law enforcement, your local U.S. Attorney's

5    Office or anyone in Illinois?

6            "No.

7            "In fact, you released Mr. Didani with the expectation

8    of detaining his cell phones?  He himself was released;

9    correct?

10           "Correct."

11           And Page 288, answer, "I believe it was --"

12           THE COURT:  What line on 288?

13           DEFENDANT DIDANI:  1.  Line 1, your Honor.

14           MR. McDONALD:  Judge, I'm going to object.  If he is

15   trying to impeach the witness with a prior statement, he can

16   read the question and read the answer, but he can't just read

17   the entire transcript, which is what he's doing, on Pages 287

18   and 288.

19           THE COURT:  I agree, but I don't know what's on Page

20   287 and 288.  So you think what he's going to read on 288 is

21   not pertinent?

22           MR. McDONALD:  It's not that it's not -- it's not that

23   it's not pertinent.  It's just not inconsistent with what he's

24   testified to.  So he's not properly impeaching the witness.

25           THE COURT:  So he hasn't said anything different, is

1   that your argument?

2            MR. McDONALD:  Yes.

3            THE COURT:  Okay.  Mr. Didani, do you think he says

4   something different on Page 288?

5            DEFENDANT DIDANI:  In his testimony, yes, your Honor.

6            THE COURT:  From the testimony that he gave here

7   today, is that transcript different?

8            DEFENDANT DIDANI:  Yes, your Honor.  It's something

9   different.  That's why I need to get it clear.

10           THE COURT:  Okay.  Walk over to Mr. McDonald -- or,

11  Mr. McDonald, you walk up let him point to you what he thinks

12  is different.

13           MR. McDONALD:  Yes, your Honor.

14           (Briefly off the record.)

15  BY DEFENDANT DIDANI:

16  Q.  Agent Nugent, I'm going to ask you a question.  Is there

17  any reason you didn't report that in your jurisdiction?

18           THE COURT:  Is this a question not from the

19  transcript?  This is just a question that you're asking?

20           DEFENDANT DIDANI:  Yes, your Honor.

21           THE COURT:  Okay.

22  BY DEFENDANT DIDANI:

23  Q.  Any reason why you didn't report this in your jurisdiction?

24  A.  I didn't believe that that was something that would get

25  charged in the Northern District of Illinois.  I used my

1    discretion to not make a phone call to the prosecutors.

2    Q.   Okay.  Fair enough, Mr. Nugent.  Fair enough.  And I just

3    want to make it clear.  That day you was not in communication

4    -- you was in communication with Agent Josh Bianchi to detain

5    those phones?

6    A.   Can you repeat that question, please?

7    Q.   I just want to make sure.  On that day prior to my arrest

8    you was in communication with Agent Bianchi about detaining

9    those phones, yes or no?

10   A.   I don't understand the question.

11   Q.   Did you have a communication detaining those phones with

12   Agent Bianchi that day?

13   A.   I don't recall.

14          DEFENDANT DIDANI:  Fair enough, Mr. Nugent.  Thank

15   you.

16          THE COURT:  Do you have any additional questions of

17   this witness?

18          MR. McDONALD:  I do not, no.

19          THE COURT:  No, no.  I'm asking Mr. Didani.  I don't

20   know if he was just taking the computer over to the table and

21   coming back or not.

22          DEFENDANT DIDANI:  No, no additional questions.  No

23   further additional questions, your Honor.

24          THE COURT:  Okay.  Very good.  Mr. McDonald, how about

25   you?

```
 1                    MR. McDONALD:  No further questions.
 2                    May the witness be dismissed?
 3                    THE COURT:  Yes.  You may step down.  Thank you for
 4        coming.
 5                    (At 11:13 a.m., the witness was excused.)
 6                    THE COURT:  You may call your next witness.
 7                    MR. BILKOVIC:  Your Honor, the Government would call
 8        Joshua Bianchi.  And, your Honor, may I -- I have some exhibits
 9        I'm going to go through with him.  Can I set them up with
10        the --
11                    THE COURT:  Yes, you may.  I kind of cut you off, but
12        you were going to ask could you put them up here at the witness
13        box; right?
14                    MR. BILKOVIC:  Yes, your Honor.
15                    THE COURT:  Okay.  You may step forward, sir, and be
16        sworn in.  Raise your right hand, please.
17                    (Oath administered.)
18                    THE COURT:  All right.  You may be seated, and when
19        you're seated state your full name and spell your last name for
20        the record.
21                    (Briefly off the record.)
22                    MR. BILKOVIC:  Has he be sworn?
23                    THE WITNESS:  Yes.
24                    THE COURT:  Did you state your name?
25                    THE WITNESS:  I did not.
```

```
 1              THE COURT:  State your name and spell your last name.
 2              THE WITNESS:  My full name is Joshua Allen Bianchi.
 3     My last name is Bianchi, B-I-A-N-C-H-I.
 4              THE COURT:  Now you may proceed.
 5              MR. BILKOVIC:  Thank you, your Honor.
 6                       *          *          *
 7                       JOSHUA BIANCHI,
 8          was called as a witness at 11:15 a.m. after having been
 9          duly sworn to testify to the truth.
10                       *          *          *
11                       DIRECT EXAMINATION
12     BY MR. BILKOVIC:
13     Q.  Sir, how are you employed?
14     A.  I'm with the United States Border Patrol.
15     Q.  How long have you been employed by the United States Border
16     Patrol?
17              THE COURT:  Okay.  One second.
18              Mr. Didani and Mr. Fink, turn off your mic.  Do you
19     know how to do that?
20              MR. FINK:  Yeah.  It's the button in front of
21     Mr. Didani.  We'll make sure to do that, your Honor.
22              THE COURT:  Yes, turn it off, because otherwise we can
23     hear you whispering at the --
24              MR. FINK:  I'm not sure if we can permanently turn it
25     off, if there's a way to do that, but we'll press the button
```

1    and we'll do that.  Thank you, your Honor.

2            THE COURT:  And check with Ms. Saulsberry during the

3    break to make sure you can do both; okay?

4            MR. FINK:  We will, Judge.  Thank you.  Sorry.

5            THE COURT:  It's okay.

6            Go ahead.  Pose your question again.

7            How long has he been with Border Patrol?

8            MR. BILKOVIC:  Correct.

9            THE COURT:  Okay.

10           THE WITNESS:  Since July of 2003.  So approximately

11   just shy of 22 years.

12   BY MR. BILKOVIC:

13   Q.   And what is it that you do with United States Border

14   Patrol?

15   A.   I'm a intelligence agent.

16   Q.   How long have you been an intelligence agent with Border

17   Patrol?

18   A.   Since 2017.

19   Q.   And what did you do with Border Patrol prior to becoming an

20   intelligence agent?

21   A.   Prior to becoming an intelligence agent I was on the HSI

22   task force.

23           THE COURT:  You were on the what?

24           THE WITNESS:  HSI task force.

25           THE COURT:  And what is that, HSI?

```
 1              THE WITNESS:  It's Homeland Security Investigations.
 2   BY MR. BILKOVIC:
 3   Q.   Now, did you work for Homeland Security Investigations or
 4   were you kind of just on loan to them?
 5   A.   Kind of on loan to them.
 6   Q.   Is that something that's common where agents basically are
 7   on loan to other federal agencies?
 8   A.   Yes, sir.
 9              THE COURT:  And you said it was a task force?
10              THE WITNESS:  Yes, ma'am.
11              THE COURT:  Does that mean people were on it from
12   other agencies?
13              THE WITNESS:  Yes, ma'am, and local police
14   departments.
15              THE COURT:  Like who?
16              THE WITNESS:  My co-case agent was from Farmington
17   Hills Police Department.
18              THE COURT:  Any other agencies?
19              THE WITNESS:  DEA.  Well, HSI was the agency.  There
20   was also Troy Police Department, Sterling Heights Police
21   Department.
22              THE COURT:  Okay.  Thank you.
23              Counsel, if I raise a question and Mr. Didani and you
24   think it's objectionable, you should say so for the record.
25   Otherwise, your objection will be waived.
```

```
 1              Do you have any objection to the question I just
 2    raised?
 3              MR. BILKOVIC:  No, your Honor.
 4              THE COURT:  What about you, Mr. Didani?
 5              DEFENDANT DIDANI:  No, your Honor.
 6    BY MR. BILKOVIC:
 7    Q.   I may have asked you this.  How long have you been with
 8    United States Border Patrol?
 9    A.   Just shy of 22 years.
10    Q.   And when you started with Border Patrol what did you start
11    as?
12    A.   I started as a regular Border Patrol agent.  I worked -- my
13    first assignment was in Ajo, Arizona on the southwest border.
14    Q.   And how long did you work as a Border Patrol agent?
15    A.   Up until -- technically up until 2017 when I became an
16    intel agent.
17    Q.   So when you were working in Arizona -- I want to go through
18    some of the duties you had as a border patrol agent.  So when
19    you started what was it that you did?
20    A.   Basically I would track and follow people that were
21    sneaking into the country at places other than illegal port of
22    entry.
23    Q.   So did you work at this basically Arizona/Mexico border?
24    A.   Yes, sir.
25    Q.   And have there been other borders that you have worked at
```

1    during your career as a Border Patrol agent?

2    A.   Yes, the northern border here in Canada and U.S.

3    Q.   And how long did you work at the Canada/United States

4    borders?

5    A.   I've been there since 2007.

6    Q.   So since 2007 to when then?

7    A.   Current, present day.

8    Q.   And what were your general duties as a Border Patrol agent?

9    A.   The same duties as the southwest border, except a major

10   difference was the entire border here in our area was water.

11   So a lot of it was being done on boats.

12   Q.   A lot of what was being done on boats?

13   A.   Patrolling the area, making sure nobody was trying to sneak

14   in or smuggle any contraband into the United States.

15   Q.   So is that what you would do then, you would be basically

16   looking out for things like that?

17   A.   Yes, sir.

18   Q.   Now, you indicated that you worked for a Homeland Security

19   Investigation task force from 2014 to 2017?

20   A.   Yes, sir.

21   Q.   And where was that located?

22   A.   In Detroit.

23   Q.   And approximately how many members were there on that task

24   force?

25   A.   Very drastically throughout the three years, I would say on

1    average between six and ten.

2    Q.   And the agencies that you listed for Judge Hood a few

3    minutes ago, is that what you were talking about?

4    A.   Yes, sir.

5    Q.   And what type of a task force was it?

6    A.   It was -- initially it was a guns task force.  So we would

7    investigate crimes that related to guns, whether it's violent

8    crimes, drug smuggling, money laundering.  All of those usually

9    involved guns.

10   Q.   So guns and crimes related to guns?

11   A.   Correct.

12   Q.   And when you went to Homeland Security Investigations from

13   Border Patrol were you basically assigned cases?

14   A.   Yes, either assigned cases by my group supervisor or I

15   bring cases over from my home agency or the United States

16   Border Patrol.  At that time, my home agency was the Detroit

17   station downtown.

18   Q.   And from 2007 -- at some point in time did you leave the

19   HSI task force?

20   A.   Yes, during 2017.

21   Q.   And where did you go in 2017?

22   A.   After I left in 2017, there was a period of about three to

23   six months I was at my station, which is when I became an intel

24   agent, and then I was reassigned to DEA task force.

25   Q.   You say you went back to your station.  What do you mean

```
 1   you went back to your station?
 2   A.   To Detroit Border Patrol station.
 3   Q.   You said that was approximately three to six months?
 4   A.   Somewhere around there, approximately.
 5   Q.   And then you were assigned where after that?
 6   A.   The Detroit DEA Group 6.
 7   Q.   DEA is the Drug Enforcement Administration?
 8   A.   Yes, sir.
 9   Q.   And you said Group 6.  What does that mean?
10   A.   They have different task forces within DEA, and we were --
11   the 6 group would be my best guess.  Other than that, I'm not
12   sure.
13   Q.   You were assigned to what was called Group 6?
14   A.   Yes, sir.
15   Q.   And at that time you said you were as task force officer?
16   A.   Yes, sir.
17   Q.   Were there other task force officers?
18   A.   Yes, sir.
19   Q.   Were there DEA agents in that group?
20   A.   Yes, sir.
21   Q.   And did you work with them on investigations?
22   A.   Yes, sir.
23   Q.   What were your duties and responsibilities when you were a
24   DEA task force officer?
25   A.   To investigate drug-related crimes and money laundering.
```

```
 1   Q.  I want to take your attention back to your time with
 2   Homeland Security Investigation.  In February of 2015, did you
 3   open up an investigation into Ylli Didani?
 4   A.  Yes, sir.
 5          THE COURT:  What's the date again, February when?
 6   BY MR. BILKOVIC:
 7   Q.  In February of 2015, did you open up an investigation into
 8   Ylli Didani?
 9   A.  Yes, sir.
10          MR. BILKOVIC:  Am I talking loud enough in the
11   microphone?  I can't tell if it's amplifying.
12          THE COURT:  It's just that I didn't hear it.  I'm
13   sorry.
14          MR. BILKOVIC:  Oh, okay.
15   BY MR. BILKOVIC:
16   Q.  And why did you open up an investigation into Mr. Didani?
17   A.  Due to reporting that I had received from Detroit Border
18   Patrol station involving suspicious travel and across border
19   possible marijuana or drug smuggling and money laundering.
20   Q.  Okay.  So is that an investigation then that you brought
21   with you?
22   A.  Yes, sir.
23   Q.  Had you been investigating Mr. Didani prior to February of
24   2015 as well?
25   A.  Yes, sir.
```

1  Q.  And do you see Mr. Didani in Court today?

2  A.  Yes, sir.

3  Q.  Can you please point to him and tell the jury what he's

4  wearing.

5  A.  He is wearing a suit with no tie and first button's undone.

6        MR. BILKOVIC:  Your Honor, can the record reflect

7  identification of the defendant, Ylli Didani?

8        THE COURT:  Any objection?

9        DEFENDANT DIDANI:  No objection, your Honor.

10       THE COURT:  So identified for the record.

11       MR. BILKOVIC:  Thank you, your Honor.

12  BY MR. BILKOVIC:

13  Q.  During the investigation of Mr. Didani, did you also come

14  across individuals associated with Mr. Didani?

15  A.  Yes, sir.

16  Q.  You have a book up there that has exhibits in there.  Could

17  you please open it.  And I want to start with Government's

18  proposed Exhibit 1.0.  Do you see that?

19  A.  Yes, sir.

20  Q.  And is that -- what is that that you're looking at?

21  A.  I'm looking at a picture of -- a picture of Eric Puzio, an

22  associate of Ylli Didani.

23  Q.  Is that something that you came across during your

24  investigation?

25  A.  Yes, sir.

```
 1              MR. BILKOVIC:  Your Honor, at this time I would move
 2   for admission into evidence of Government's proposed Exhibit
 3   1.0 and request permission to publish it to the jury.
 4              THE COURT:  Any objection?
 5              DEFENDANT DIDANI:  No objection, your Honor.
 6              THE COURT:  Very well.  It's admitted as Government's
 7   1.  You may show it to the jury.
 8   BY MR. BILKOVIC:
 9   Q.  You indicated that's Mr. Puzio?
10   A.  Yes, sir.
11   Q.  When you were investigating Mr. Didani, do you know if
12   Mr. Puzio was living -- where Mr. Puzio was living?  And I
13   don't mean address.  I mean basically start with country and
14   then we'll go to state.
15   A.  Yes.  United States, Michigan, in the Detroit area,
16   Hamtramck area I should say.
17              MR. BILKOVIC:  Okay.  Can you take that down.
18   BY MR. BILKOVIC:
19   Q.  And we're going to move to Government's proposed Exhibit
20   1.1.  Do you see that?
21   A.  Yes, sir.
22   Q.  And do you recognize that individual?
23   A.  Yes, sir.
24   Q.  And is that a photograph of somebody?
25   A.  Yes.  That's a photograph of Donald Larson, another
```

```
 1    associate to Mr. Didani.
 2              MR. BILKOVIC:  Your Honor, at this time I would move
 3    for admission into evidence of Government's proposed Exhibit
 4    1.1 and request permission to the publish it to the jury.
 5              THE COURT:  Any objection?
 6              DEFENDANT DIDANI:  No objection, your Honor.
 7              THE COURT:  Very well.  It's admitted as 1.1, and you
 8     may show it to the jury.
 9    BY MR. BILKOVIC:
10    Q.   You indicated that is Donald Larson?
11    A.   Yes, sir.
12    Q.   Have you ever had contact with Mr. Larson during this
13    investigation?
14    A.   Yes, sir.
15    Q.   At some point in time was Mr. Larson arrested as a result
16    of this investigation?
17    A.   Yes, sir.
18    Q.   I don't want to get into what was said, but at some point
19    in time did you participate in an interview with him?
20    A.   Yes.
21    Q.   Following his arrest?
22    A.   Correct.
23    Q.   I don't mean the same day, but some point after he was
24    arrested?
25    A.   Correct.
```

1    Q.   Okay.  If we can take that down and if you can look at

2    Government's proposed Exhibit 1.2, Mr. Bianchi?

3    A.   Yes, sir.  It's a photo of another associate of Mr. Didani,

4    Martin Tibbitts.

5    Q.   And can you spell Tibbitts?

6    A.   T-I-B-B-I-T-T-S, I believe.

7         MR. BILKOVIC:  Your Honor, at this time I would move

8    for admission into evidence of Government's proposed Exhibit

9    1.2 and request permission to publish it to the jury if the

10   Court permits it.

11        THE COURT:  Any objection, Mr. Didani?

12        DEFENDANT DIDANI:  No objection, your Honor.

13        THE COURT:  Very well.  It's admitted as 1.2, and you

14    may show it.

15   BY MR. BILKOVIC:

16   Q.   Now, during your investigation when you were investigating

17   Mr. Didani, were you also at some point in time investigating

18   Mr. Tibbitts?

19   A.   Yes, sir.

20   Q.   And do you know what state Mr. Tibbitts was living in at

21   the time that you were investigating him?

22   A.   Yes, sir.  Michigan.

23   Q.   Do you know what city?

24   A.   Grosse Pointe Park.

25   Q.   Was that in the Eastern District of Michigan?

```
1    A.   Yes, sir.

2    Q.   Did there come a point in time where you stopped

3    investigating Mr. Tibbitts?

4    A.   Yes, sir.

5    Q.   And do you recall approximately when that was?

6    A.   I believe that was July 20th, 2018 when Mr. Tibbitts was

7    killed in a plane crash.

8              MR. BILKOVIC:  We can take that down.

9    BY MR. BILKOVIC:

10   Q.   We're going to go through just one more.  Can you take a

11   look at Government's proposed Exhibit 1.3 and tell me if you

12   recognize that?

13   A.   Yes, sir.

14   Q.   And what is that?

15   A.   That is a picture of another associate of Mr. Didani, Piotr

16   Synowiec.

17             THE COURT:  How do you spell that last name?

18             THE WITNESS:  Synowiec is S-Y-N-O-W-E-I-C, I believe.

19             MR. BILKOVIC:  Actually, I think it's I-E-C.

20             THE WITNESS:  Is it I-E-C?  And --

21             MR. BILKOVIC:  Hold on one second.

22             Your Honor, would the Court like me to spell it for

23   the court reporter?

24             THE COURT:  I just was hoping that --

25             MR. BILKOVIC:  The first name is actually P-I-O-T-R,
```

```
 1    and the last name is spelled S-Y-N-O-W-I-E-C.
 2              THE COURT:  This is 1.3?
 3              MR. BILKOVIC:  This is 1.3.  And, your Honor, I move
 4    for admission into evidence of Government's proposed Exhibit
 5    1.3, and if the Court admits it I would request permission to
 6    publish it to the jury.
 7              THE COURT:  Any objection?
 8              DEFENDANT DIDANI:  No objection, your Honor.
 9              THE COURT:  Very well.  It's admitted and you may show
10    it to the jury.
11    BY MR. BILKOVIC:
12    Q.  Now, Mr. Synowiec -- do you know back when you were
13    investigating Mr. Didani do you know what Mr. Synowiec did for
14    a living?
15    A.  Yes, sir.  He worked at Cattleman's.
16    Q.  Pardon me?
17              THE COURT:  What?
18              THE WITNESS:  Cattleman's.
19    BY MR. BILKOVIC:
20    Q.  What is Cattleman's?
21    A.  It's like a meat market, meat distributor.
22    Q.  And do you know what state that was located in?
23    A.  In Michigan.
24    Q.  Do you know whether that was located in the Eastern
25    District of Michigan?
```

1   A.   It was.

2   Q.   And at the time was Mr. Synowiec living in the Eastern

3   District of Michigan?

4   A.   He was.

5             MR. BILKOVIC:   All right.   We can take that down.

6   BY MR. BILKOVIC:

7   Q.   Now, when you were investigating Mr. Didani back in two

8   thousand -- beginning of 2015, do you know where he was living?

9   A.   Precisely, no.   I have my assumptions, but --

10  Q.   I don't want you to assume.

11  A.   He was traveling between -- no, I do not know where he was

12  living.

13  Q.   Were you monitoring his travel?

14  A.   Yes.

15  Q.   And do you know basically countries that he was traveling

16  from and countries he was traveling to?

17  A.   Yes.

18  Q.   And what were some of the countries he was traveling to?

19  A.   Albania; Istanbul, Turkey; Germany, Italy.

20  Q.   What about the United States?

21  A.   United States.

22  Q.   Did you ever have Mr. Didani or did you ever participate in

23  surveilling Mr. Didani, having him under surveillance?

24  A.   Yes, sir.

25  Q.   Was this something that you physically participated in?

1   A.   Yes, sir.

2   Q.   And we'll get into the specific time period later, but

3   would this have been sometime in 2015?

4   A.   Yes, sir.

5   Q.   And what state would that have been in?

6   A.   In Michigan.

7   Q.   And what city would that have been in?

8   A.   Multiple cities around Detroit and Detroit metro area.

9   Q.   Can you name a couple of the cities?

10   A.   West Bloomfield, Fraser, Oakland County.

11   Q.   And these were cities -- and you said Oakland County.

12   Those are in the Eastern District of Michigan?

13   A.   Yes, sir.

14   Q.   Are these locations that you physically observed Mr. Didani

15   while you had him under surveillance?

16   A.   Yes, sir.

17   Q.   Now, you indicated earlier that you were monitoring

18   Mr. Didani's travel?

19   A.   Yes, sir.

20   Q.   Are we talking -- what type of travel are we talking?

21   A.   Just international travel, flight reservations.  I would

22   get an E-mail alerted as soon as there was a flight reservation

23   for Mr. Didani to fly into or out of the United States.

24   Q.   And was there an interest that you had in Mr. Didani when

25   he traveled into the United States?

1    A.    There was.

2    Q.    What was that interest?

3    A.    To be able to have him interviewed and searched.

4    Q.    By who?

5    A.    By Customs and Border Protection or myself if possible.

6    Q.    And is that something that you had authority to do as a

7    Border Patrol agent?

8    A.    Yes.

9    Q.    I want to take your attention to July of 2015.  Is there a

10   database?  You said you were monitoring his travel.  How is it

11   you're able to do that?  International travel, how are you able

12   to do that?

13   A.    I can create an alert within that database.  This is not a

14   database like that you can look at.  I just create an alert in

15   there, and from my alert I would get an E-mail whenever

16   somebody on my alert would make reservations.

17   Q.    Is this a law enforcement database?

18   A.    Yes, sir.

19   Q.    So you would -- would you put, for example, Mr. Didani's

20   name in it?

21   A.    Yes, sir.

22   Q.    And would you put other identifying identification about

23   Mr. Didani in there?

24   A.    Yes, sir.

25   Q.    And what was the purpose of you doing that?

1   A.   In order to be notified of his travel into or out of the

2   United States.

3   Q.   And so if Mr. Didani were going to travel into the United

4   States after you put this alert on what would happen?

5   A.   I would get an E-mail stating the date and flight

6   information that Mr. Didani had reserved.  Basically the

7   itinerary.

8   Q.   And at some point in time in 2015 did you receive such an

9   alert?

10  A.   I did.

11  Q.   What type of an alert did you receive?

12  A.   That Mr. Didani was flying into Chicago O'Hare.

13  Q.   And do you know where he was flying from?  If you don't,

14  it's okay.  Was it another country?

15  A.   It was another country.

16  Q.   And do you recall approximately when Mr. Didani was

17  supposed to be flying?

18  A.   Meaning the time?

19  Q.   Dates wise -- date wise.

20  A.   Date wise?  I know it was July.  I want to say July 30th.

21  Q.   Of 2015?

22  A.   Of 2015.

23  Q.   And so what did you do when you received that alert?

24  A.   As soon as I received an alert I reached out to my current

25  group supervisor and asked if it was okay, since it was

```
 1   Chicago, close by, if I went there to help interview and do an
 2   interview of him.  I got permission to do that.  So I reached
 3   out to Chicago O'Hare and spoke with somebody at CBP and
 4   requested that he be interviewed and searched.  I created
 5   another alert.
 6   Q.  I'm going to stop you for a second.
 7   A.  Okay.
 8   Q.  I want to break this down a little more.  You said you
 9   called somebody in Chicago?
10   A.  Yes, sir.
11   Q.  What law enforcement agency?
12   A.  Customs and Border Protection.
13   Q.  And do you know who it is you spoke to?
14   A.  I don't, sir.
15   Q.  And did you make any request of them?
16   A.  I did.
17   Q.  And what was that request?
18   A.  First and foremost that Mr. Didani be interviewed and
19   searched, and secondly if they would mind if I came there to
20   stand in or be part of that interview.
21   Q.  And was there any objection to that?
22   A.  No, sir.
23   Q.  Did there -- did you go there right away or did you wait
24   for a certain time period?
25   A.  I waited for a certain time period.  I waited until I knew
```

1    Mr. Didani had boarded the plane.

2    Q.   How would you get that information?

3    A.   Via law enforcement databases.

4    Q.   And so when you received an alert that Mr. Didani had

5    boarded the plane what did you do?

6    A.   I drove to Chicago.

7    Q.   When you got to Chicago, what did you do?

8    A.   I was introduced to a CBP officer, Mr. Fuentes.

9    Q.   I'm sorry.  What was that name?

10   A.   Fuentes.

11   Q.   Do you know how to spell that last name?

12   A.   I don't.  It was George Fuentes.  I do not know how to

13   spell the last name.

14         MR. BILKOVIC:  Your Honor, I can -- I believe I know

15   what the spelling is.  I can either -- would you like me to

16   spell it?

17         THE COURT:  Yes.  Do you have any objection to that,

18   Mr. Didani.

19         DEFENDANT DIDANI:  No, your Honor.  No.

20         THE COURT:  Very well.

21         MR. BILKOVIC:  F-U-E-N-T-E-S.

22         THE COURT:  Okay.  You may proceed.

23   BY MR. BILKOVIC:

24   Q.   And where did you meet Mr. Fuentes?

25   A.   In secondary inspection at the international terminal of

1    the airport.

2    Q.   This is at Chicago O'Hare?

3    A.   Yes, sir.

4    Q.   And what happened when you met with Officer Fuentes?

5    A.   We went over -- basically he had questions for me on what I

6    would like him to ask during the interview of Mr. Didani and

7    what questions I had.  We basically went over the investigation

8    up until that point.

9    Q.   I don't want you to say what you said, but you basically

10   filled him in on what your interest was?

11   A.   Yes, sir.

12   Q.   And so what happened after you met with Officer Fuentes and

13   had that conversation?

14   A.   After that we just stood by for Mr. Didani's plane to

15   arrive.

16   Q.   And did it?

17   A.   It did.

18   Q.   What happened after the plane with Mr. Didani arrived?

19   A.   Another CBP officer was escorting Mr. Didani into secondary

20   when Mr. Fuentes started beginning the process -- the interview

21   process and the searching of the luggage and whatnot.

22   Q.   Were you present for that?

23   A.   I was.

24   Q.   Did the two of you eventually sit down and have a

25   conversation with Mr. Didani?

```
 1   A.   We had a conversation.  We were all standing.  There was no
 2   seats at the time, but yes.
 3   Q.   The area that you were at, you said it was secondary
 4   inspection?
 5   A.   Yes, sir.
 6   Q.   Can you describe that?
 7   A.   There was multiple podiums and with tables next to it and
 8   like rollers where people could set their luggage on the roller
 9   and roll it off to the table so that their luggage could be
10   searched there.  And the individual being interviewed would go
11   up to the podium and be interviewed there.
12   Q.   Was there more than one podium?
13   A.   Yes.
14   Q.   Was it kind of an open area?
15   A.   Yes, sir.
16   Q.   And so you and Officer Fuentes were at one podium?
17   A.   Yes, sir.
18   Q.   And you were there with Mr. Didani?
19   A.   Yes, sir.
20   Q.   Were there other people in there at other podiums as well?
21   A.   Initially, yes.
22   Q.   Okay.  At some point no?
23   A.   At some point, no.  Mr. Didani was there for a while and
24   that cleared out.
25   Q.   So were these all people that had come off of that same
```

1   plane?

2   A.  Yes, sir.

3   Q.  And what was Mr. Didani's demeanor like when you were

4   talking to him?

5   A.  Very good, laid back, relaxed, joking around with us.

6   Q.  Cordial conversation?

7   A.  Cordial conversation.

8   Q.  And who asked the questions during the interview?

9   A.  Mainly Mr. Fuentes.  I did ask some questions.

10   Q.  And during the interview was Mr. Didani asked where he

11   lived?

12   A.  Yes.

13   Q.  And do you recall what he said?

14   A.  Yes.  In Fraser, Michigan, Sabre Lane Road, I believe.

15   Q.  Would that be S-A-B-R-E?

16   A.  Correct.

17   Q.  And then Lane?

18   A.  Yes, sir.

19   Q.  And was Mr. Didani asked about his travel history?

20   A.  Yes, sir.

21   Q.  Was that something you wanted to ask?

22   A.  Yes, sir.

23   Q.  Why did you want Officer Fuentes to ask Mr. Didani about

24   his travel history?

25   A.  Multiple reasons, for the areas and the frequency that he

1    had traveled to.  For instance, Istanbul nine times.  He made

2    multiple reservations to fly back into the United States, but

3    didn't board a lot of them.

4             DEFENDANT DIDANI:  Objection, your Honor.  That's

5     irrelevant.

6             THE COURT:  How is it relevant, Counsel?

7             MR. BILKOVIC:  I just asked him as to why he was

8     interested in this travel.  I can move on.

9             THE COURT:  Okay.  Move on.  Sustained.

10   BY MR. BILKOVIC:

11   Q.   Was Mr. Didani asked about any businesses that he may have

12   owned?

13   A.   He was asked after he said he just started his own coal

14   mining business with his uncle, I believe.

15   Q.   And where did he say that coal mining business was?

16   A.   In Albania.

17   Q.   Was he asked about any businesses in Michigan?

18   A.   Yes.

19   Q.   And what did he say?

20   A.   He was part owner of a car wash, DES Detailing in Fraser,

21   Michigan.

22   Q.   And at some point in time did you conduct a search to see

23   if there were any businesses in Michigan in Mr. Didani's name?

24   A.   Yes, sir.

25   Q.   Were there?

1    A.   No.

2    Q.   And we mentioned Mr. Puzio who was the first picture that

3    we showed the jury.  Did you ask Mr. Didani about Mr. Puzio and

4    what he did for a living, or did Officer Fuentes?

5    A.   Neither.  He -- again, he just gave that information

6    freely.  He said this was his --

7    Q.   Who gave that information?

8    A.   Mr. Didani.

9    Q.   What did he say?

10   A.   That his friend, Eric, owned the trucking company with six

11   or seven trucks.

12   Q.   And had you at some point conducted a search of Mr. Puzio

13   to see if he owned any trucking company with six or seven

14   trucks?

15   A.   Yes.

16   Q.   And did he?

17   A.   No.

18   Q.   Now, you said that Mr. Didani talked to you about a coal

19   mining business with his uncle.  What else did he say about

20   that?

21   A.   That he was traveling a lot overseas to Istanbul and

22   Germany trying to sell the coal for that business.  He had said

23   that Germany was their big supplier, but because of the

24   financial crisis they were looking at other people to buy the

25   coal.

```
1   Q.   And did he did -- did you at some point during the
2   interview learn who his business partner was, who his uncle
3   was?
4   A.   I did not.
5   Q.   Did Mr. Didani have any phones in his possession?
6   A.   Yes, sir.
7   Q.   What type of a phone?
8   A.   An iPhone.
9   Q.   And was that something that you allowed him to hold onto
10  when you were questioning him?
11  A.   Yes, sir.
12  Q.   And was he utilizing the phone at all during the interview?
13  A.   Yes, sir, quite a bit.
14  Q.   In what way?
15  A.   In my opinion, he was trying --
16  Q.   Not in your opinion.  What was he doing?
17  A.   He was trying to validate, as we were asking him questions,
18  his answers by showing us pictures of what he did in those
19  various places.
20  Q.   So was he scrolling through the phone and then showing you
21  photographs?
22  A.   Yes, sir.
23  Q.   Can you give the jury an example of something that he
24  showed you?
25  A.   Yes, sir.  He said he was trying to sell his coal in
```

```
 1    Istanbul, Turkey and he had a business associate there.  He
 2    pulled up a picture of a meeting they had together.  He also
 3    showed me a picture of his friends in a bar in Albania.  There
 4    were various other pictures.
 5    Q.  Did you say he showed you a photograph of his business
 6    partner?
 7    A.  Not business partner.  I don't know that it was his
 8    business partner.  I just know it was a person he was in a
 9    business meeting with to sell coal to.
10    Q.  Gotcha.  Did you recognize the person in that photograph?
11    A.  I did.
12    Q.  And how did you recognize that person?
13    A.  As a person that was under investigation in a previous drug
14    trafficking case.
15    Q.  Do you know that individual's name?
16    A.  Yes.
17    Q.  What is it?
18    A.  If I'm pronouncing it correctly, Adriatik Sheko.
19         MR. BILKOVIC:  Your Honor, I'm going to have to get
20    the spelling for the Court on that one.  If I can do that on a
21    break, I will get the spelling for the court reporter.
22         THE COURT:  Okay.  You can.
23         MR. BILKOVIC:  Thank you.
24    BY MR. BILKOVIC:
25    Q.  At some point in time did you or Officer Fuentes look at
```

1    the phone?

2    A.   Yes, sir.

3    Q.   How did that come about?

4    A.   Mr. Fuentes asked if he minded if he looked through his

5    phone.

6    Q.   He asked who?

7    A.   Mr. Didani.   Sorry.

8    Q.   How did Mr. Didani reply to that?

9    A.   Sure, handed him his phone.

10   Q.   And what did Officer Fuentes do?

11   A.   Officer Fuentes started going through the pictures on

12   Mr. Didani's phone.

13   Q.   And where were you in relation to Officer Fuentes?

14   A.   Maybe a couple feet next to him.

15   Q.   Were you also looking at the phone as Officer Fuentes

16   scrolled through it?

17   A.   Not the complete time he was looking at it, but yes.

18   Q.   At times?

19   A.   At times.

20   Q.   And when Officer Fuentes was scrolling through the phone

21   did you see any photographs that alerted your attention?

22   A.   Absolutely.

23   Q.   What type of photographs did you see?

24   A.   Photos of guns, large bulks of currency, U.S. currency.

25   There was even a picture of a bag of what appeared to be white,

```
 1    powdery substance.
 2    Q.   Were you able to go through all the photographs?
 3    A.   There at the airport?
 4    Q.   Yes.
 5    A.   No.
 6    Q.   Why not?
 7    A.   There's thousands -- over 10,000 photographs.
 8    Q.   So what did you do?
 9    A.   So I requested Mr. Fuentes to see if CBP had the correct
10    equipment to make a phone extraction of that phone.
11    Q.   What does that mean to make a phone extraction?
12    A.   Basically a digital copy of what's on that phone so that we
13    can give the phone back to Mr. Didani.
14    Q.   And was somebody from CBP able to do that extraction?
15    A.   Yes, sir.
16    Q.   And what happened with the phone after that?
17    A.   We gave it back to Mr. Didani.
18    Q.   And why did you want to give the phone back to Mr. Didani?
19    A.   Mr. Didani had a connecting flight, and we were just trying
20    to get him out of there at the time.
21    Q.   Do you know where his connecting flight was to?
22    A.   Detroit.
23    Q.   And was that the final destination?
24    A.   Yes, sir.
25    Q.   And so was Mr. Didani given the phone back?
```

1    A.   Yes, sir.

2    Q.   Do you know whether or not he made his flight?

3    A.   He did not.

4    Q.   Was it because of the phone extraction?

5    A.   No, sir.

6    Q.   Why?  What was the reason that he missed his flight?

7    A.   CBP's records systems were down.  They were waiting for

8    them to come back online so that they could clear him to leave

9    secondary.

10   Q.   And did that eventually happen?

11   A.   It did.

12   Q.   And after the forensic download of the phone was done did

13   you have an opportunity to review it?

14   A.   Yes, sir.

15   Q.   Did you review the photographs on the phone?

16   A.   Yes, sir.

17   Q.   The videos on the phone?

18   A.   Yes, sir.

19   Q.   Was there anything any photographs or videos on that phone

20   that attracted your attention?

21   A.   Yes, sir.

22   Q.   Now, you said there was approximately how many photographs?

23   A.   Over 10,000.

24   Q.   We're going to go through some of them.  Obviously we're

25   not going to go through all of them, but we're going to go

1    through some of them.  If you could look at --

2              Were there any photographs on the phone tying the

3    phone to Mr. Didani?

4    A.   Yes, sir.

5    Q.   Any personal identifying information?

6    A.   Yes, sir.

7    Q.   Can you look at Government's proposed Exhibit 2.0.

8    A.   Yes.

9    Q.   And do you recognize that?

10   A.   Yes.  That is an identification card, a Michigan

11   identification card of Mr. Ylli Didani.

12   Q.   And was that one of the photographs that was on the phone?

13   A.   Yes, sir.

14             MR. BILKOVIC:  Your Honor, at this time I would move

15   for admission into evidence of Government's proposed Exhibit

16   2.0 and request permission to publish it to the jury?

17             THE COURT:  Any objection?

18             DEFENDANT DIDANI:  No objection, your Honor.

19             THE COURT:  It's admitted as 2.0, and you may show it

20    to the jury.

21             MR. BILKOVIC:  Can we just zoom in on the license

22    part.

23   BY MR. BILKOVIC:

24   Q.   And so what is this?  I said license, but what is this?

25   What is this?

1    A.   This is a Michigan identification card.

2    Q.   And the photograph there is ...

3    A.   Of Mr. Didani, which shows his address and DOB, date of

4    birth.

5    Q.   And what is the address?

6    A.   The address is 15843 Sabre Lane, Fraser, Michigan.

7    Q.   Sabre Lane or Sabre Line?

8    A.   Sabre Line.  I'm sorry.

9    Q.   L-I-N-E?

10   A.   Yes.

11   Q.   And does it show what date that that was issued?

12   A.   It does.  July 10, 2014.

13        MR. BILKOVIC:  Okay.  We can take that down.

14   BY MR. BILKOVIC:

15   Q.   Agent Bianchi, if you could look at Government's proposed

16   Exhibit 2.1.  Do you recognize that?

17   A.   Yes, sir.

18   Q.   And what is that?

19   A.   That is a prescription bottle with Mr. Didani's name on it

20   and address.

21   Q.   And this was also a photograph that was found on the phone?

22   A.   Yes, sir.

23        MR. BILKOVIC:  Your Honor, at this time I would move

24    for admission into evidence of Government's proposed Exhibit

25    2.1 and request permission to publish to the jury.

```
1              THE COURT:  Any objection?

2              DEFENDANT DIDANI:  No objection, your Honor.

3              THE COURT:  Very well.  It's admitted, and you may

4    show it to the jury.

5              MR. BILKOVIC:  Thank you, your Honor.

6              And could we just go on the top third starting there

7    and captioning the address.  Go up a little, yes.

8    BY MR. BILKOVIC:

9    Q.   And again, the name here is -- on the prescription pill

10   bottle is who?

11   A.   Ylli Didani.

12   Q.   And the address?  You might not be able to read the

13   numbers, but the street?

14   A.   The street is Sabre in Fraser, Michigan.

15             MR. BILKOVIC:  You can take that down.

16   BY MR. BILKOVIC:

17   Q.   You indicated that you also noticed a -- back in Chicago

18   photographs of bulk U.S. currency?

19   A.   Yes.

20   Q.   Did you notice -- when you had an opportunity to look

21   through the full phone, did you notice additional -- or

22   pictures of currency or videos of bulk currency?

23   A.   Yes, sir.

24   Q.   Now, have you seen the video that is Government's proposed

25   Exhibit 2.2?
```

1    A.   Yes, sir.

2    Q.   And is that a video that was located on the phone from

3    2015?

4    A.   Yes, sir.

5         MR. BILKOVIC:  Your Honor, at this time I would move

6    for admission into evidence of Government's proposed Exhibit

7    2.2 and request permission to publish it to the jury.

8         THE COURT:  Any objection to 2.2?

9         DEFENDANT DIDANI:  No objection, your Honor.

10        THE COURT:  Very well.

11        MR. BILKOVIC:  Can I have one minute, your Honor, just

12   one minute to confer with Mr. Didani briefly?

13        THE COURT:  Okay.

14        (Briefly off the record.)

15        MR. BILKOVIC:  Thank you, your Honor.

16        THE COURT:  Okay.  It's admitted since there's no

17   objection, and you may show it to the jury.

18        MR. BILKOVIC:  Okay.  Thank you, your Honor.

19        (Video played.)

20   BY MR. BILKOVIC:

21   Q.   Do you recognize the voice of the person talking in the

22   video?

23   A.   Yes, sir.

24   Q.   Whose voice is that?

25   A.   Mr. Didani's.

1   Q.  Can you look at Government's proposed Exhibit 2.1 -- I'm

2   sorry, not 2.1.  2.3.

3   A.  Yes, sir.

4   Q.  And what is that?

5   A.  A photo of Mr. Didani standing over a large amount of

6   currency and the -- what appears to be soft-sided cooler or bag

7   right next to it.

8   Q.  And was this again a photograph found on the phone?

9   A.  Yes, sir.

10          MR. BILKOVIC:  Your Honor, I would move for admission

11  into evidence of Government's proposed Exhibit 2.3 and request

12  permission to publish to the jury.

13          THE COURT:  Any objection to 2.3?

14          DEFENDANT DIDANI:  No objection, your Honor.

15          THE COURT:  Very well.  2.3 is admitted, and you may

16   show it to the jury.

17          MR. BILKOVIC:  Thank you.

18  BY MR. BILKOVIC:

19  Q.  And what are we looking at here?

20  A.  Mr. Didani standing with large amounts of currency wrapped

21  in front of him on the counter.

22          MR. BILKOVIC:  Can we zoom in on the bottom portion,

23  just the currency itself.

24  BY MR. BILKOVIC:

25  Q.  Kind of hard to tell from there, but can you see the types

1    of denominations?

2    A.   Yes, sir.

3    Q.   Starting on this side, I guess, which would be the right

4    side, what denominations are those?

5    A.   The first four stacks are one hundred-dollar bills.

6    Q.   And do you know -- you see -- is there an item basically

7    wrapped around them?

8    A.   Yes.

9    Q.   What is that?

10   A.   It's stating that there's $10,000 in each stack.

11   Q.   Okay.  And you said the first four are one hundred-dollar

12   bills?

13   A.   Yes, sir.

14   Q.   What about the last ones?

15   A.   The last four are fifty-dollar bills.

16   Q.   And how much is in each one of those?

17   A.   $5,000.

18   Q.   According to the wrapper?

19   A.   According to the wrapper.

20   Q.   So a total of $60,000 if my math is correct?

21   A.   Yes, sir.

22        MR. BILKOVIC:  Okay.  We can take that down.

23   BY MR. BILKOVIC:

24   Q.   Are you familiar with phone encryption?

25   A.   Yes, sir.

1   Q.   What is phone encryption?

2   A.   It is -- it's a way to encrypt a message to send or receive

3   messages so that basically nobody else can see it, but you and

4   the other party.

5   Q.   Are there -- is there software that people can buy or

6   obtain or put on their phone in order to be able to encrypt

7   messages?

8   A.   Yes, sir.

9   Q.   Had you ever heard of Sky ECC?

10  A.   Yes, sir.

11  Q.   And generally what is Sky ECC?

12  A.   Encryption software or phone that you can buy from them to

13  encrypt messages.

14  Q.   When you say you can buy from them, you can buy from who?

15  A.   From the company, Sky ECC.

16  Q.   Did you see any evidence relating to Sky ECC on the 2015

17  phone?

18  A.   Yes, sir.

19  Q.   If you can look at Government's proposed Exhibit 2.4 and

20  tell me if you recognize that?

21  A.   Yes, sir.

22  Q.   And what is that?

23  A.   That is a photo of what appears to be a BlackBerry and a

24  message from Sky EE -- or I'm sorry, Sky CC Sales to another

25  person that is 177 --

1   Q.   I'm sorry.  You don't have to get into that detail.

2   Basically this is a photograph that you saw on the phone?

3   A.   Yes, sir.

4   Q.   Of a BlackBerry with a Sky ECC message?

5   A.   Yes, sir.

6        MR. BILKOVIC:  Your Honor, at this time may we request

7   permission to admit Government's proposed Exhibit 2.4 and

8   request that it be published to the jury.

9        THE COURT:  Any objection?

10        DEFENDANT DIDANI:  No objection, your Honor.

11        THE COURT:  All right.  It's admitted, and you may

12    show it to the jury.

13        MR. BILKOVIC:  Can you zoom in on the top third

14    starting at the very top.

15   BY MR. BILKOVIC:

16   Q.   So the top line says what?

17   A.   The very top line says, "Sky ECC Sales."

18   Q.   Now, do you see what is below that?

19   A.   Yes.

20   Q.   What does that say?

21   A.   2q5.

22   Q.   No.  I'm talking the very top.

23   A.   The very top.  "Message destruction time 72 hours."

24   Q.   And then the next line you said the "Sky ECC Sales"?

25   A.   Yes, sir.

1    Q.   And is there a text message there?

2    A.   Yes.

3    Q.   Can you read that into the record?

4    A.   "2q5 with PR roaming six-month service is $1,850 each.  So

5    for two would be $3,700, plus shipping.  It's Easter weekend so

6    I could ship Tuesday and would be there Thursday or Friday at

7    latest."

8    Q.   So two for 1,850 each for six months?

9    A.   Correct.

10   Q.   When we say 1,850, we're talking $1,850?

11   A.   Yes.

12        MR. BILKOVIC:  Okay.  Can we zoom back out.  And can

13   we go down to the bottom half now.

14   BY MR. BILKOVIC:

15   Q.   And you know how BlackBerry phones worked back when they

16   were around?

17   A.   Yes.

18   Q.   Do you see a number there, the top line?

19   A.   Yes.

20   Q.   Could you read that into the record?

21   A.   "17735C@digitalmask.cc."

22   Q.   So is 17735C, would that be the person or the moniker for

23   the person that Sky ECC Sales was communicating with?

24   A.   Yes, sir.

25   Q.   How did that individual respond?

1    A.    "Okay.  I'll call my friend from there and let him know.

2    I'll call you probably."

3              MR. BILKOVIC:  Okay.  Can we zoom back out.  Now, can

4    you go back up on the first line under the "Sky ECC Sales" and

5    the text messaging.  Yes.  Do that and then get the first line.

6    BY MR. BILKOVIC:

7    Q.    You see the q5?

8    A.    Yes, sir.

9    Q.    Are you familiar with BlackBerry models?

10   A.    Yes, sir.

11   Q.    Was their a q5 BlackBerry model?

12   A.    Yes, sir.

13   Q.    Did you also find travel documents on Mr. Didani's phone?

14   A.    Yes, sir.

15   Q.    Can you look at Government's proposed Exhibit 2.5.

16   A.    Yes, sir.

17   Q.    And can you describe what that is?

18   A.    Yes, sir.  That is travel itinerary from Mr. Didani.

19              Do you want me to go through the itinerary?

20   Q.    Is that something that you located on the phone?

21   A.    It is.

22              MR. BILKOVIC:  Your Honor, at this time I would move

23   for admission into evidence of Government's proposed Exhibit

24   2.5 and request permission to publish to the jury.

25              THE COURT:  Any objection?

1          DEFENDANT DIDANI:  No objection, your Honor.

2          THE COURT:  Very well.  It's admitted as 2.5, and you

3   may show it to the jury.

4          MR. BILKOVIC:  And can we zoom in just on the top

5   there.

6   BY MR. BILKOVIC:

7   Q.   Now, do you see the top left-hand corner there's the word

8   "Viber"?

9   A.   Yes, sir.

10  Q.   Do you know what Viber is?

11  A.   Yes, sir.

12  Q.   What's Viber?

13  A.   It's another encrypted messaging app.

14  Q.   Do you see the words below that, "Dan-Dan"?

15  A.   Yes, sir.

16  Q.   Did you come across Dan-Dan during the investigation?

17  A.   Yes, sir.

18  Q.   Were you able to determine during the investigation who the

19  moniker, Dan-Dan, was?

20  A.   Yes, sir.

21  Q.   Who's that?

22  A.   Donald Larson.

23  Q.   And if you could read down, there's a trip locater here?

24  A.   Yes, sir.

25  Q.   And what is the name under the trip locater?

1    A.   Ylli Didani.

2    Q.   So this is -- is there flight information on here?

3    A.   Yes, sir.

4         MR. BILKOVIC:  Now, if we can go back out.

5    BY MR. BILKOVIC:

6    Q.   Does this show the final destination or is it cut off?

7    A.   It is cut off.

8         MR. BILKOVIC:  Okay.  If you could take that down.

9    BY MR. BILKOVIC:

10   Q.   And, Agent Bianchi, can you look at Government's proposed

11   Exhibit 2.6.  Do you recognize that?

12   A.   Yes, sir.

13   Q.   And what is that?

14   A.   That is another photo off of Mr. Didani's phone.  It

15   appears to be -- it is his itinerary for his flight back.

16   Q.   So the first exhibits that we looked at, the 2.5, those

17   were outgoing flights?

18   A.   Yes, sir.

19   Q.   And these are return flights depicted in 2.6?

20   A.   Yes, sir.

21        MR. BILKOVIC:  Your Honor, at this time I would move

22   for admission into evidence of Government's 2.6.

23        THE COURT:  Any objection?

24        DEFENDANT DIDANI:  No objection, your Honor.

25        THE COURT:  Very well.  They're admitted.

```
1              MR. BILKOVIC:  And may I publish it to the jury?
2              THE COURT:  Yes.
3              MR. BILKOVIC:  Can we go to the top third.
4   BY MR. BILKOVIC:
5   Q.   And on the itinerary does it show a departure date?
6   A.   Yes, sir.
7   Q.   And what does the departure date?
8   A.   June 2, 2015.
9   Q.   And does it show the airport being departed from?
10  A.   Yes, sir, Bogota Eldorado Airport.
11  Q.   Do you know where Bogota Eldorado Airport is?
12  A.   In Bogota, Colombia.
13             MR. BILKOVIC:  And if we can go to the very bottom.
14  Go back out of that and then go to the bottom.
15  BY MR. BILKOVIC:
16  Q.   And does this that we're looking here have the final
17  destination?
18  A.   I don't believe so.
19  Q.   Does it have a destination?
20  A.   It has a destination.
21  Q.   This is basically the second leg of the trip?
22  A.   Correct.  Well, third in this case.
23  Q.   Third leg of the trip.  And where is the arrival at?
24  A.   Rome.
25  Q.   I'm sorry.  The departure -- is it arrival or departure?
```

1    A.   I'm sorry.  Yes.  Departure.  Departs Rome, arrives in

2    Albania.

3    Q.   Tirana, Albania?

4    A.   Tirana.

5           MR. BILKOVIC:  Okay.  If we could take that down.

6    BY MR. BILKOVIC:

7    Q.   Did you see on the phone evidence that Mr. Didani had

8    filmed any individuals using suspected controlled substance?

9    A.   Yes, sir.

10   Q.   Have you had an opportunity to review Government's proposed

11   Exhibit 2.7?

12   A.   Yes, sir.

13   Q.   And was that a video that was found on the phone?

14   A.   Yes, sir.

15          MR. BILKOVIC:  Your Honor, at this time I would move

16   for admission into evidence of Government's proposed Exhibit

17   2.7.

18          THE COURT:  Any objection?

19          DEFENDANT DIDANI:  Your Honor, objection.  Was that

20   film from me or sent to me?  We have to be clear to that, your

21   Honor.

22          THE COURT:  Well, I think that probably goes to

23   cross-examination.

24          MR. BILKOVIC:  Maybe I'll clarify.

25

1   BY MR. BILKOVIC:

2   Q.   Do you know if that was something Mr. Didani was filming or

3   is he in the video?

4   A.   It appears that he's filming it.

5   Q.   How many people are depicted in the video?

6   A.   One.

7   Q.   And are there more than one voice in the video?

8   A.   Yes.

9   Q.   And how many voices are there?

10  A.   Two.

11  Q.   Is one of those Mr. Didani's?

12  A.   Yes.

13          MR. BILKOVIC:  Your Honor, at this time I would move

14  for admission into evidence of Government's proposed Exhibit

15  2.7.

16          THE COURT:  Any objection?

17          DEFENDANT DIDANI:  No objection, your Honor.

18          THE COURT:  Very well.  It's admitted.

19          MR. BILKOVIC:  Your Honor, I'm not going to play the

20  whole thing.  With the Court's permission, I was only going to

21  play the first 30 seconds or so, unless Mr. Didani wants the

22  whole thing played.

23          DEFENDANT DIDANI:  It don't matter.

24          THE COURT:  Mr. Didani, I didn't hear your answer.

25          DEFENDANT DIDANI:  No.  Thirty seconds is fine.

```
 1              THE COURT:  Okay.
 2              (Video played.)
 3   BY MR. BILKOVIC:
 4   Q.  Did you recognize one of the voices in the video?
 5   A.  Yes, sir.
 6   Q.  And who's that voice?
 7   A.  Mr. Didani.
 8   Q.  Do you know who the other individual in the video is?  And,
 9   if you don't know, that's fine.
10   A.  I do.
11   Q.  Who is that?
12   A.  Mr. Kupinski, if I'm saying that correctly.
13   Q.  Do you know what his first name is?
14   A.  Gerald.
15   Q.  And is Gerald Kupinski a name that you came across during
16   the investigation?
17   A.  Yes, sir.
18   Q.  And do you know what state he was living in?
19   A.  Yes, sir.
20   Q.  Where?
21   A.  In Michigan.
22   Q.  In the Eastern District?
23   A.  Yes, sir, St. Clair Shores.
24   Q.  Now, you indicated at some point in time you had Mr. Didani
25   under physical surveillance?
```

```
 1    A.   Yes, sir.
 2    Q.   Now, is that something that you do by yourself or you would
 3    do with other individuals?
 4    A.   Other individuals.
 5    Q.   Do you recall in August of 2015 whether there was a period
 6    of time that you had Mr. Didani under surveillance?
 7    A.   Yes, sir.
 8    Q.   And did you describe some of the locations that you
 9    observed him at?
10    A.   Yes, sir.  We initially observed Mr. Didani in West
11    Bloomfield at Piotr Synowiec's house.
12              THE COURT:  At who?
13              THE WITNESS:  Piotr Synowiec.
14    BY MR. BILKOVIC:
15    Q.   And Piotr Synowiec was the individual that we earlier
16    identified in Government's 1.3?
17    A.   Yes, sir.
18    Q.   The Cattleman's meat place?
19    A.   Correct.
20    Q.   And did you observe Mr. Didani in any other locations?
21    A.   Yes, sir.  The Oakland County International Airport with
22    Mr. Tibbitts.
23    Q.   With Martin Tibbitts?
24    A.   Yes, sir.
25    Q.   Any other individuals?
```

1    A.   Yes, sir.  Donald Larson.  At Donald Larson's residence in

2    Fraser on Woodbine.

3    Q.   At Donald Larson's residence on Woodbine in Fraser?

4    A.   Yes, sir.

5    Q.   And is Woodbine spelled W-O-O-D-B-I-N-E?

6    A.   Yes, sir.

7    Q.   And did the investigation continue into Mr. Didani during

8    2015?

9    A.   Yes, sir.

10   Q.   And did it continue into 2016?

11   A.   Yes, sir.

12   Q.   Now, you had indicated earlier you had an alert on to be

13   notified of when Mr. Didani would enter the United States?

14   A.   Yes, sir.

15   Q.   Did that alert stay active?

16   A.   Yes, sir.

17   Q.   So were you still receiving notifications?

18   A.   Yes, sir.

19   Q.   Did there come a point in time in August of 2016 that you

20   received an alert that Mr. Didani would be flying into Chicago

21   O'Hare?

22   A.   Yes, sir.

23   Q.   And how is it that you received that alert?

24   A.   Via E-mail.

25        MR. BILKOVIC:  Your Honor, may we approach for one

1  minute?

2          THE COURT:  Yes, you may.

3          (At 12:06 p.m., sidebar off the record, out of the

4          hearing of the jury, as follows:)

5          THE COURT:  Let's take a break.  The jurors may step

6  to the jury room.  Remember that you're not permitted to talk

7  about the case among yourselves of with anyone else until I

8  tell you it's time to deliberate, all right.  And you can let

9  me know about the climate in there when you come back, okay.

10         All right.  Please rise for the jury.

11         (The jury left the courtroom at 12:07 p.m.)

12         THE COURT:  You may step down during the break, sir,

13 but please don't discuss your testimony with anyone; all right?

14         THE WITNESS:  Yes.

15         THE COURT:  We'll take a break for ten minutes.

16         MR. FINK:  Thank you, your Honor.

17         MR. BILKOVIC:  Thank you, your Honor.

18         THE COURT:  All right.  You're welcome.

19         (At 12:07 p.m. a brief recess was taken.

20         Back on the record at 12:25 p.m.)

21         LAW CLERK:  All rise.  Court is back in session.

22         THE COURT:  You may bring the jury out.

23         (The jury entered the courtroom at 12:26 p.m.)

24         THE COURT:  Okay.  I'm satisfied the jurors are

25 present.  What about you?

1          MR. BILKOVIC:  Yes, your Honor.  The Government is

2    satisfied.

3          THE COURT:  Mr. Didani?

4          DEFENDANT DIDANI:  Yes, your Honor.

5          THE COURT:  Okay.  Very well.

6          You are still under oath; all right?

7          THE WITNESS:  Yes, ma'am.

8          THE COURT:  Okay.  You may proceed.

9          MR. BILKOVIC:  Thank you, your Honor.

10   BY MR. BILKOVIC:

11   Q.   I think when we left off, and I'm hoping I'm correct, we

12   were talking about you still had the alert out?

13   A.   Yes.

14   Q.   And in August of 2016, specifically August 6, 2016, were

15   you alerted again that Mr. Didani was traveling in the United

16   States?

17   A.   Yes, sir.  I was alerted before that date.

18   Q.   So you would get the alert ahead of time?

19   A.   Yes, sir.  Usually as soon as he makes the reservation.

20   Q.   Okay.  As soon as a person makes a reservation that's when

21   you're alerted?

22   A.   Yes, sir.

23   Q.   And so what did you do after you received that alert?

24   A.   At the time I was on leave, vacation.  I reached out to my

25   group supervisor and let him know what was happening and what

```
 1    I'd like to do, and that was to have Mr. Didani interviewed and
 2    searched again.  And then I reached out to HSI in Chicago,
 3    whoever was in charge of Chicago O'Hare Airport.
 4    Q.  And again, HSI is Homeland Security Investigations?
 5    A.  Yes, sir.
 6    Q.  Do you know who it is you spoke with at HSI?
 7    A.  Initially, no.  I was directed to Special Agent Nugent.
 8    Q.  I'm going to stop you for a second then.  You called
 9    somebody from HSI?
10    A.  Correct.
11    Q.  And then they directed you to Special Agent Nugent?
12    A.  Correct.  Who is the duty person that day.
13    Q.  And is that the individual that testified earlier today?
14    A.  Yes.
15    Q.  And what did you -- what was the conversation -- don't tell
16    me exactly what was said, but what was the reason for the
17    conversation with Agent Nugent?
18    A.  I let him know a brief summary of our investigation
19    entailed, what I was looking for, and asked to search
20    Mr. Didani and interview him.
21    Q.  Basically the same as back in 2015?
22    A.  Yes, sir, except we had more information.
23    Q.  Okay.  You had gone through the 2015 phone?
24    A.  Correct.
25    Q.  And again, the items that you testified to were there other
```

1    similar items on that phone?

2    A.   Lots.

3    Q.   Okay.  And so did Agent Nugent agree to do that?

4    A.   Can you repeat that?

5    Q.   Did Agent Nugent agree to do that?

6    A.   Yes, sir.

7    Q.   And did you receive contact or did Agent Nugent or anybody

8    else contact you on August 6 or after August 6?

9    A.   Yes, sir.

10   Q.   And who was it that contacted you?

11   A.   Agent Nugent.

12   Q.   And do you know where Mr. Didani's ultimate destination was

13   when he flew into Chicago?

14   A.   Yes, sir.

15   Q.   Where was he going to?

16   A.   His final destination was Mexico City in Mexico.

17   Q.   So he was not staying in Chicago, it was basically a

18   stop-over or a layover or whatever?

19   A.   Yes, sir.  There was many connecting flights.

20            THE COURT:  There were many connecting flights?

21            THE WITNESS:  Yes, ma'am.

22            THE COURT:  What do you mean by that?

23            THE WITNESS:  If I remember correctly, he flew from

24   Albania to Rome to Chicago to Juarez, Mexico and final

25   destination Mexico City.

```
 1              THE COURT:  Okay.
 2   BY MR. BILKOVIC:
 3   Q.  Now, during your investigation, did you receive alerts of
 4   anyone else that was flying into Mexico City at the same time?
 5   A.  Yes, sir.
 6   Q.  And who was that?
 7   A.  Eric Puzio.
 8   Q.  That was the individual you identified in Government's
 9   Exhibit 1.0?
10   A.  Yes, sir.
11   Q.  Was he on the same itinerary as Mr. Didani?
12   A.  No, sir.
13   Q.  Where was he traveling from?
14   A.  He was traveling from Detroit Metro to Juarez, Mexico,
15   final destination Mexico City.
16   Q.  And ultimately did you receive information as to the return
17   flights for both Mr. Didani and Mr. Puzio back from Mexico
18   City?
19   A.  Yes, sir.
20   Q.  And do you know approximately how long each one of them was
21   in Mexico City?
22   A.  Yes, sir.  Each one was there less than 40 hours.
23   Q.  Less than how many hours?
24   A.  40 hours.
25   Q.  Less than 40 hours.  So less than two days?
```

```
 1    A.   Correct.
 2    Q.   At some point in time, did you receive anything from the
 3    Chicago office?
 4    A.   Yes, sir.
 5    Q.   What did you receive?
 6    A.   I received a E-mail detailing the interview and report and
 7    two cell phones.
 8    Q.   And how did you receive the two cell phones?
 9    A.   Via FedEx.
10    Q.   FedEx?
11    A.   Yes, sir.
12    Q.   So Federal Express?
13    A.   Yes, sir.
14    Q.   And what type of phones were those?
15    A.   An iPhone and a BlackBerry.
16    Q.   And what did you do when you received those items?
17    A.   I proceeded to get a search warrant through the Eastern
18    District of Michigan for both items.
19    Q.   And when you say you get a search warrant what do you mean
20    by that?
21    A.   In order to extract -- try to do an extraction of both cell
22    phones.
23    Q.   Who authorizes that search warrant?  Is that somebody from
24    your office, or who actually issues the search warrant allowing
25    you to go through those phones?
```

1    A.   The judge here in the Eastern District.

2    Q.   Okay.  Not anybody in your agency, you have to go to the

3    court?

4    A.   Correct.

5    Q.   And did you receive that search warrant authorizing you to

6    go through both of the phones?

7    A.   Yes, sir.

8    Q.   And was forensic downloads basically done of both of those

9    phones?

10   A.   Tried to.

11   Q.   When you say "tried to," what do you mean?

12   A.   The iPhone a forensic download was completed.  The

13   BlackBerry there was nothing on it to download.

14   Q.   And do you know why that is?

15   A.   It appeared to be wiped.

16   Q.   What do you mean it appeared to be wiped?

17   A.   Like if you're going to trade your phone in you are going

18   to erase all contacts.  It basically brings it back to when it

19   was brand new, and there's no content on the device.

20            DEFENDANT DIDANI:  Objection, your Honor.  That's pure

21    speculation.  He's not a technician.

22            THE COURT:  I'm sorry?

23            DEFENDANT DIDANI:  That's pure speculation.

24            THE COURT:  Do you want to respond to that?

25            MR. BILKOVIC:  I don't think he said -- I think all

```
 1    he's saying is there was no information on the -- it appeared
 2    to be a factory reset, there was no information on it.
 3              THE COURT:  Well, it was little bit more than that.
 4              MR. BILKOVIC:  Okay.  Well, let me --
 5              THE COURT:  No, I'm going to strike it.  You may ask
 6    him those questions.  How about that?
 7    BY MR. BILKOVIC:
 8    Q.  Were you able to obtain a forensic download of the
 9    BlackBerry?
10    A.  No, sir.
11    Q.  Are you aware whether there was information on the
12    BlackBerry?
13    A.  Yes.
14    Q.  At the time that they tried doing the forensic download?
15    A.  Yes.
16    Q.  Was there or no?
17    A.  No information besides the software for the phone.
18    Q.  And what about the iPhone?
19    A.  We were able to get an extraction off the iPhone, full
20    extraction.
21    Q.  Have you had an opportunity to review the iPhone
22    extraction?
23    A.  Yes, sir.
24    Q.  And we talked about iPhone extraction.  What volume of
25    information are we talking about?
```

1   A.   In this particular case, there was -- each case is

2   independent, but there was a lot of information.  We got chats,

3   text messages, photos, call logs, contacts.

4   Q.   What about videos?

5   A.   Videos.

6   Q.   And did you have an opportunity to go through that

7   material?

8   A.   Yes, sir.

9   Q.   And did you review photographs and videos?

10   A.   Yes, sir.

11   Q.   Was there any that basically were of interest to you in

12   your investigation?

13   A.   Yes, sir, a lot.

14   Q.   I'm going to have you take a look at -- I'm going to go out

15   of order a little bit here, but if you could start with

16   Government's proposed Exhibit 5.1, and I may ask you a couple

17   questions first.

18          Did you notice any photographs on the phone of

19   Mr. Didani?

20   A.   Yes, sir.

21   Q.   And did you notice photographs on the phone of him with

22   other individuals?

23   A.   Yes, sir.

24   Q.   Can we go to look at Government's proposed Exhibit 5.1 and

25   tell me if you recognize that?

1    A.   I do, sir.

2    Q.   And what is that?

3    A.   That is a photos of Mr. Didani standing next to

4    Mr. Tibbitts at Oakland International Airport.

5              MR. BILKOVIC:  Your Honor, at this time I would move

6    for admission into evidence Government's proposed Exhibit 5.1

7    and request permission to publish it to the jury.

8              THE COURT:  Any objection?

9              DEFENDANT DIDANI:  No objection, your Honor.

10             THE COURT:  Very well.  It's admitted, and you may

11    show it to the jury.

12   BY MR. BILKOVIC:

13   Q.   What are we looking at here?

14   A.   Mr. Didani on the right side and Mr. Martin Tibbitts on the

15   left side and standing in front of an airplane.

16             MR. BILKOVIC:  Okay.  If we can take that down.

17   BY MR. BILKOVIC:

18   Q.   Did you notice any -- locate any videos that had both

19   Mr. Didani and Donald Larson in them?

20   A.   Yes, sir.

21   Q.   Have you had an opportunity to review Government's proposed

22   Exhibit 5.14?

23   A.   Yes, sir.

24   Q.   Is that a video of Mr. Didani and Mr. Larson?

25   A.   Yes, sir.

```
 1              MR. BILKOVIC:  Your Honor, at this time I would move
 2   for admission into evidence of Government's proposed Exhibit
 3   5.14 and request permission to publish to the jury.
 4              THE COURT:  What number is it again?  5.14?
 5              MR. BILKOVIC:  5.14.
 6              THE COURT:  Any objection?
 7              DEFENDANT DIDANI:  No objection, your Honor.
 8              THE COURT:  Very well.  It's admitted, and you may
 9    show it to the Government.
10              MR. BILKOVIC:  Your Honor, I would ask Mr. Didani's
11   permission where I was only going to play the first 20 seconds
12    or so.
13              DEFENDANT DIDANI:  That's fine.
14              THE COURT:  Is that all right?  It's a video?
15              MR. BILKOVIC:  Yes.
16              THE COURT:  Okay.
17              (Video played.)
18   BY MR. BILKOVIC:
19   Q.   Is that Mr. Larson on the right?
20   A.   Yes, sir.
21   Q.   And Mr. Didani on the left?
22   A.   Yes, sir.
23   Q.   Would it appear to you that they knew each other in that
24   video?
25   A.   Absolutely.
```

1   Q.   Did you find other items related to Mr. Larson?

2   A.   Yes, sir.

3   Q.   Can you look at Government's proposed Exhibit 5.13 and tell

4   me if you recognize that?

5   A.   Yes, sir.

6   Q.   And what is that?

7   A.   That is a screenshot of a message thread between Mr. Didani

8   and Donald Larson, or between MI Freight and Donald Larson.397.

9   Q.   And is this a photograph of a screenshot?

10  A.   Correct.

11  Q.   I mean, this is -- what we're about to look at, that's how

12  it appeared on the phone; correct?

13  A.   Correct.

14          MR. BILKOVIC:  Your Honor, at this time I would move

15  for admission into evidence of Government's proposed Exhibit

16  5.13 and request permission to publish to the jury.

17          THE COURT:  Any objection.

18          DEFENDANT DIDANI:  No objection, your Honor.

19          THE COURT:  Very well.  It's admitted, and you may

20   show it to the jury.

21          MR. BILKOVIC:  If we could just view the top three, or

22   start up there and go down to the first Donald Larson entry.

23   Keep going down.  Right there, that's good.

24   BY MR. BILKOVIC:

25   Q.   Do you see the MI Freight?

```
 1    A.   Yes, sir.
 2    Q.   And is that one of the people involved in the conversation?
 3    A.   Yes, sir.
 4    Q.   And then do you see an entry of Donald -- at the bottom
 5    Donald.larson.397?
 6    A.   Yes, sir.
 7    Q.   Do you see the picture -- I know it's kind of small there,
 8    but can you see the picture of the person associated with
 9    Donald.larson.397?
10    A.   Yes, sir.
11    Q.   And do you know who is in that picture?
12    A.   Donald Larson.
13    Q.   Now the, picture next to the MI Freight M-I-F-R-E-I-G-H-T,
14    have you seen a larger picture of that same photograph in this
15    investigation?
16    A.   Yes, sir.
17    Q.   And who is that individual?
18    A.   Mr. Didani.
19         DEFENDANT DIDANI:  Objection, your Honor.  He
20     identified me through that picture?
21         MR. BILKOVIC:  Judge, I don't believe that's --
22         THE COURT:  That can be on cross-examination, okay.
23    BY MR. BILKOVIC:
24    Q.   Let me follow up with that.  The picture next to
25    Mr. Didani, did you see regular-sized versions of that same
```

1    image during this investigation?

2    A.   Yes, sir.

3    Q.   And who is the person in that picture?

4    A.   Mr. Didani.

5              DEFENDANT DIDANI:   Okay.

6    BY MR. BILKOVIC:

7    Q.   You may not necessarily be able to tell just from this;

8    correct?

9    A.   Correct.

10   Q.   Now, we've mentioned --

11             MR. BILKOVIC:   You can take it down.   Thank you.

12   BY MR. BILKOVIC:

13   Q.   You had mentioned -- we talked about Martin Tibbitts.   Did

14   you see any other information on Mr. Didani's phone related to

15   Martin Tibbitts?

16   A.   Yes, sir.

17   Q.   And again, we're not going through all the information;

18   correct?

19   A.   Correct.

20   Q.   Can you take a look at Government's proposed Exhibit 5.2.

21   A.   Yes, sir.

22   Q.   And can you tell the jury what 5.2 is?

23   A.   Yes, sir.   It's a photo of Mr. Martin Tibbitts' residence,

24   his backyard in the back of his home.

25   Q.   And this is the Grosse Pointe residence you discussed

```
 1   earlier?
 2   A.   Yes, sir.
 3           MR. BILKOVIC:  Your Honor, at this time I would move
 4   for admission into evidence of Government's proposed Exhibit
 5   5.2 and request permission to publish to the jury.
 6           THE COURT:  Any objection?
 7           DEFENDANT DIDANI:  No objection, your Honor.
 8           THE COURT:  Very well.  It's admitted, and you may
 9    show it to the jury.
10   BY MR. BILKOVIC:
11   Q.   And this was a photograph found on Mr. Didani's phone, the
12   2016 iPhone?
13   A.   Correct.
14           MR. BILKOVIC:  You may take that down.
15   BY MR. BILKOVIC:
16   Q.   Now, I'm next going to ask that you look at 5.3, 5.4 and
17   5.5, and tell me if you recognize those?
18   A.   Yes, sir.
19   Q.   And what are those?
20   A.   Large amounts of bulk U.S. currency.
21   Q.   And are they different photographs?
22   A.   They are.
23   Q.   Do they appear to show the same currency in the same
24   location?
25           THE COURT:  I don't understand that question.  Phrase
```

1  it again.

2  BY MR. BILKOVIC:

3  Q.   Do they appear to show the same currency all three

4  photographs?

5  A.   They do.

6  Q.   And do they appear to be taken in the same location, all

7  three photographs?

8  A.   They do.

9  Q.   Is it fair to say that some of the currency is stacked

10  differently in the photographs?

11  A.   Yes, sir.

12        MR. BILKOVIC:  Your Honor, at this time I would move

13  for admission into evidence of Government's proposed Exhibit

14  5.3, 5.4 and 5.5, and I would request only permission at this

15  time to publish 5.5 to the jury.

16        THE COURT:  Any objection?

17        DEFENDANT DIDANI:  No objection.

18        THE COURT:  Very well.  They are admitted, and you may

19  publish 5.5.

20  BY MR. BILKOVIC:

21  Q.   And what is it we're looking at here?

22  A.   Large amounts of U.S. currency wrapped up.

23  Q.   And what denominations do you see in the photograph?

24        MR. BILKOVIC:  Could we just zoom in on the currency

25  itself.

```
 1              THE WITNESS:  Mainly hundreds.  The far right side
 2   appears to be $20 bills.
 3   BY MR. BILKOVIC:
 4   Q.  And again, the stacks of hundreds, each stack --
 5   A.  Was 10,000.
 6   Q.  Do you know where that photograph was taken?
 7   A.  I do.
 8   Q.  Where was that photograph taken?
 9              Well, let me ask you this.  How do you know that?
10   A.  The photo was geotagged to a location.
11              THE COURT:  Excuse me?
12              THE WITNESS:  The photo was geotagged to a location.
13   BY MR. BILKOVIC:
14   Q.  So explain that to the jury.  How does that work?
15   A.  The best I can, if your location services are on and you
16   take a photo, it will take the GPS coordinates of where you are
17   at at that moment when you take the photo.
18   Q.  And is that --
19              DEFENDANT DIDANI:  Objection, your Honor.  He's not an
20    expert.
21              MR. BILKOVIC:  Judge, I don't believe he needs to be
22   an expert to testify to that.  I would ask to be able to
23   conditionally ask the question, receive the answer.  We will be
24   having a witness --
25              THE COURT:  But also ask him how he knows.
```

```
 1              MR. BILKOVIC:  I will.
 2   BY MR. BILKOVIC:
 3   Q.   Okay.  How do you know that?
 4   A.   In the software, when you're looking at the photo
 5   extraction that you are given from the forensic team, there is
 6   a location icon.  If one is given next to it, you can click on
 7   that, and it will pull a map up and show you where it was
 8   taken.
 9              DEFENDANT DIDANI:  Objection, your Honor.  It's either
10   hearsay or he's got to be an expert.
11              MR. BILKOVIC:  I'm not done with my --
12              THE COURT:  First of all, let him ask the rest of his
13   question.  He already said he was going to bring in an expert
14   to tell us more about that, but he can ask this witness how he
15   knows that.
16   BY MR. BILKOVIC:
17   Q.   So is that something that is within the download itself
18   that you receive?
19   A.   Yes, sir.
20   Q.   You received that information as well?
21   A.   Yes, sir.
22   Q.   And so is that how you were able to determine where this
23   photograph was taken according to the software?
24   A.   Yes, sir.
25   Q.   And where was this photograph taken?
```

1    A.   Donald Larson's residence on Woodbine in Fraser, Michigan.

2    Q.   On Woodbine in Fraser, Michigan?

3    A.   Yes, sir.

4           THE COURT:  And that's subject to you tying it up with

5    an expert, okay.

6           MR. BILKOVIC:  Thank you, your Honor.

7           THE COURT:  All right.

8    BY MR. BILKOVIC:

9    Q.   And can you look at 5.6, Government's proposed Exhibit 5.6.

10   A.   Yes, sir.

11   Q.   And do you recognize that?

12   A.   Yes, sir.

13   Q.   And what is that?

14   A.   Large amounts of U.S. currency that is wrapped and put into

15   what appears to be vacuum-sealed bags.

16   Q.   What's a vacuum-sealed bags?

17   A.   Cellophane.  It sucks the air out of the bag and conceals

18   it tightly.

19   Q.   And this was also a photograph found in the 2016 iPhone

20   extraction?

21   A.   Yes, sir.

22          MR. BILKOVIC:  Your Honor, at this time I would move

23   for admission into evidence of Government's proposed Exhibit

24   5.6 and request permission to publish to the jury.

25          THE COURT:  Any objection?

```
 1              DEFENDANT DIDANI:  No objection, your Honor.
 2              THE COURT:  Very well.  It's admitted, and you may
 3      show it to the jury.
 4              MR. BILKOVIC:  Can we just zoom in on the bags.
 5      BY MR. BILKOVIC:
 6      Q.   And what is it that we're looking at here?
 7      A.   Bulk currency wrapped in money wraps, which are placed
 8      inside what appears to be cellophane and vacuum-sealed shut.
 9      Q.   Did you say cellophane?
10      A.   Yes.
11      Q.   Are those bags?
12              THE COURT:  What are you looking at now, the photo?
13              THE WITNESS:  Yes, ma'am.
14              THE COURT:  Okay.
15              THE WITNESS:  It appears to be vacuum-sealed bags.
16              MR. BILKOVIC:  Okay.  If we could go back out.
17      BY MR. BILKOVIC:
18      Q.   And do you see the top left-hand corner of the photograph?
19      A.   Yes, sir.
20              MR. BILKOVIC:  Zoom in on that.
21              THE WITNESS:  Yes, sir.
22      BY MR. BILKOVIC:
23      Q.   And what does that appear to be?
24      A.   The vacuum-sealed bags.
25      Q.   Ziploc bags?  Does that appear to be a package of Ziploc
```

```
 1    bags, the top -- I just want you to look up here right now,
 2    Agent Bianchi.
 3    A.   Yes.
 4    Q.   What's depicted on the screen?  What does that appear to
 5    be?
 6    A.   Ziploc bags.
 7    Q.   Okay.  Do you know what a false floor is?
 8    A.   Yes, sir.
 9    Q.   What is a false floor?
10    A.   A false floor would be when somebody goes into somewhere
11    and sees a floor and it's essentially not the correct floor.
12    There's a void underneath it where the real floor is under the
13    floor that appears to them as the floor.  And it's used to, for
14    instance, hide contraband and to be smuggled across the border.
15    Q.   So basically there's a floor underneath the floor?
16    A.   The floor.
17    Q.   And that's a void area?
18    A.   Yes.
19    Q.   Is that something that is -- you come across in drug
20    trafficking cases before?
21    A.   Yes.
22    Q.   I want to have you take a look at Government's proposed
23    Exhibit 5.12.  And do you recognize that?
24    A.   Yes, sir.
25    Q.   And what is that?
```

1    A.   A message, a photo of what appears to be a BlackBerry again

2    and a message between two individuals.

3    Q.   And this was found on the 2016 iPhone?

4    A.   Yes, sir.

5            MR. BILKOVIC:  Your Honor, at this time I would move

6    for admission into evidence of Government's proposed Exhibit

7    5.12.

8            THE COURT:  Any objection?

9            DEFENDANT DIDANI:  No objection, your Honor.

10           THE COURT:  No objection?

11           DEFENDANT DIDANI:  No.

12           THE COURT:  Okay.  It's admitted, and you may show it

13    to the jury.

14           MR. BILKOVIC:  Can we zoom in on the top third,

15    starting up to the very top, down to the bottom of the first

16    message.  Yes.  No, go up higher.  Actually, that's fine.  Go

17    there.

18    BY MR. BILKOVIC:

19    Q.   Okay.  Does this appear to be a conversation -- a text

20    message conversation between two people?

21    A.   Yes, sir.

22    Q.   Do you see the mouse up there?  Can you click on it.  You

23    say it appears to be two people.  Can you take the mouse and

24    put it on what the first person is.

25    A.   This would be the first person.

1   Q.   That's basically the identifier of one of the two

2   individuals involved in the text message?

3   A.   Yes, sir.

4   Q.   And what is that individual's basically screen name?

5   A.   Sorry.  My eyes are bad.  35E6CF@blacksecure.com.

6   Q.   Okay.  And do you see a blue box below that?

7   A.   Yes, sir.

8   Q.   And what does that say?

9   A.   "One hour and 59 minutes remaining."

10  Q.   And if you could read that text message into the record

11  what it says.

12  A.    It says, "I send you," and then you can't read finish that

13  sentence, "of container.  Back wall of the box hold 150 units,

14  floor hold 600 units."

15  Q.   And then the next person, what can you see from their

16  screen name?

17  A.   A-N-C-O.

18  Q.   And how do they respond?

19  A.   "I see the pic."

20  Q.   Now, do you have Government's Exhibit 4.0 in front of you?

21  A.   Yes, sir.

22  Q.   And have you seen that before, that's already been admitted

23  into evidence?

24  A.   Yes, sir.

25            MR. BILKOVIC:  Would it be possible to do a

```
 1   side-by-side of Government's 4.0 and Government's 5.12?
 2   BY MR. BILKOVIC:
 3   Q.   Now, during your investigation did you make note of these
 4   two images?
 5   A.   Yes, sir.
 6   Q.   Why?
 7   A.   Because they appear to correlate with each other.
 8   Q.   In what ways?
 9            DEFENDANT DIDANI:  Objection, your Honor.
10            THE COURT:  What's your objection?
11            DEFENDANT DIDANI:  My objection is it's pure
12    speculation, your Honor.
13            THE COURT:  I'm sorry?
14            DEFENDANT DIDANI:  It's pure speculation.
15            THE COURT:  What is speculation?  That me made a note
16    of the two?
17            DEFENDANT DIDANI:  Exactly, your Honor.
18            THE COURT:  He can answer if he made a note of the
19    two.  It might be speculation what he made a note of, but he
20    can answer if he made a note of the two.
21            Did you?
22            THE WITNESS:  Yes.
23            THE COURT:  Okay.
24   BY MR. BILKOVIC:
25   Q.   Were there similarities between these two?
```

1    A.   Yes.

2    Q.   What were the similarities?

3    A.   May I use the mouse again?

4    Q.   Yes.

5    A.   It says, "Back wall of the container hold 150."  This

6    picture shows a container door, and I'm assuming that's the

7    back wall since --

8    Q.   Don't assume.

9    A.   Okay.  It's the opposite --

10            DEFENDANT DIDANI:  Objection, your Honor.  That's pure

11   speculation.

12            THE COURT:  It is if he assumes, Mr. --

13            MR. BILKOVIC:  I agree, but there is a door.

14            THE WITNESS:  There is a door.  The back of the

15   container --

16            THE COURT:  Well, but is that a question?

17            MR. BILKOVIC:  Let me rephrase.

18            THE COURT:  It doesn't sound like a question to me.

19            MR. BILKOVIC:  Let me rephrase it.

20            DEFENDANT DIDANI:  Your Honor, the exhibit speaks for

21   themself, your Honor.

22            THE COURT:  Well, exhibits do speak for themselves,

23   but we have been going over all the exhibits so that he can

24   state how he used them, if at all, in his investigation.

25

```
 1   BY MR. BILKOVIC:
 2   Q.   Do you see any other similarities between the two?
 3   A.   Yes, sir.
 4   Q.   And what are those similarities?
 5   A.   The "600."
 6   Q.   What do you see about the "600"?
 7   A.   They have "600" right next to the floor on the picture on
 8   the left.
 9   Q.   And what about on the right?
10   A.   It shows floor holds 600 units.
11           MR. BILKOVIC:  Okay.  Can we take 4.0 down and leave
12   5.12 up.
13   BY MR. BILKOVIC:
14   Q.   We talked earlier about Sky ECC.  Do you see any references
15   or indicators of "Sky" on this?
16   A.   Yes, sir.
17   Q.   And can you please take the mouse and point to that.
18           DEFENDANT DIDANI:  Objection, your Honor.
19           THE COURT:  What's your objection?
20           DEFENDANT DIDANI:  There's no reference to Sky ECC in
21    there.
22           MR. BILKOVIC:  What is there -- I'm sorry.  What --
23           THE COURT:  Well, what is your question again?
24           MR. BILKOVIC:  My question was there a reference to
25    Sky ECC on there.  I can rephrase the question.
```

```
 1              THE COURT:  He can answer that question if he knows
 2    the answer, because your objection that you don't see it on
 3    there is -- I'm not sure that's an objection.
 4              DEFENDANT DIDANI:  It is an objection, your Honor,
 5    because there is -- Mr. Bilkovic is saying "Sky ECC."  There is
 6    "Sky."  It's a whole different -- it's going to be pure
 7    speculation.
 8              THE COURT:  Overruled.
 9              You may answer if you see --
10              What was your question again so it will be clear what
11    we're answering?
12    BY MR. BILKOVIC:
13    Q.  Do you see any references to -- I'll rephrase the question.
14    Do you see any references on 5.12 to "Sky"?
15    A.  Yes, sir.
16    Q.  And where is that?
17    A.  Right here.
18    Q.  Down in the middle on the right-hand side?
19    A.  Yes, sir.
20    Q.  And can we go to Government's proposed Exhibit 5.0.  Do you
21    recognize that?
22    A.  Yes, sir.
23    Q.  What is that?
24    A.  Another photo of a BlackBerry with a message on it again.
25    Q.  And was this also found on Mr. Didani's phone?
```

1   A.   Yes, sir.

2         MR. BILKOVIC:  Your Honor, at this time I would move

3   for permission to publish 5.0 to the jury -- or move for

4   admission and then permission to publish.

5         THE COURT:  Any objection?

6         DEFENDANT DIDANI:  No objection, your Honor.

7         THE COURT:  It's admitted, and you may show it to the

8   jury.

9         MR. BILKOVIC:  Thank you, your Honor.

10         Can we zoom in on the message.  Keep going down.

11   Right there.

12   BY MR. BILKOVIC:

13   Q.   And again, do you see the Sky box on here in the same

14   location as the last one?

15   A.   Yes, sir.

16   Q.   And the identifier of the person involved in this would be

17   what?

18   A.   The identifier is 35E6CF@blacksecure.com.

19   Q.   And again, there is a message destruction on here?

20   A.   Yes, sir, two hours.

21   Q.   Can you please read the text messages to the jury.

22   A.   Yes, sir.  It states, "Good, you need to be 100 percent

23   focus.  That is good.  This project will give us wings and sky

24   is the limit.  Soon that first load is done and everybody will

25   be paid.  Huge responsibility.  Let's do this right."

```
 1              MR. BILKOVIC:  You can take that down.
 2   BY MR. BILKOVIC:
 3   Q.   Did you see items on the phone related to Piotr Synowiec?
 4   A.   Yes, sir.
 5   Q.   If you can look at 5.7 and -- Government's proposed Exhibit
 6   5.7 and tell me if you recognize what that is?
 7   A.   Yes, sir.  It's a photo of what appears to be Piotr
 8   Synowiec's bank accounts.
 9   Q.   It's a screenshot?
10   A.   Screenshot or photo.
11              MR. BILKOVIC:  Okay.  Your Honor, at this time I would
12   move for admission into evidence of Government's proposed
13   Exhibit 5.7 and ask permission to the publish to the jury.
14              THE COURT:  Any objection?
15              DEFENDANT DIDANI:  No objection, your Honor.
16              THE COURT:  Very well.  It's admitted, and you may
17    show it to the jury.
18   BY MR. BILKOVIC:
19   Q.   Are your eyes clear enough to look at the top and read the
20   name next to "Welcome" and then the E-mail address below?
21   A.    Yes, sir.
22   Q.   And would you use the pointer so the jury knows where
23    you're going to here.
24   A.   So I have to read it off this paper.  I'm going to point to
25    it first.
```

```
 1              THE COURT:  And is the paper the same as what's on the
 2    screen?
 3              THE WITNESS:  Yes, ma'am.
 4              THE COURT:  Okay.
 5    BY MR. BILKOVIC:
 6    Q.  Okay.  Does that help or no?
 7    A.  No.  I'm sorry.
 8    Q.  Can you look at -- you have a paper copy of exhibits?
 9    A.  Yes.
10    Q.  What is the E-mail address?
11    A.  It says PSCattlemans@hotmail.com.
12    Q.  And is there a last log-on date and time?
13    A.  Yes, sir.
14    Q.  And what is that?
15    A.  1:47 p.m. eastern time on May 25th, 2016.
16    Q.  And could you just take the laser pointer and just kind of
17    show the jury where that is at in case the jurors are having a
18    difficult time seeing that.  Just show the log-in time as
19    you're scrolling right there.
20    A.  Yes.  The log-in time is 1:47 p.m., eastern time, May 25th,
21    2016.
22    Q.  And where is the E-mail address?
23              Okay.  And then can we just go on the bottom portion
24    of it.  It appears to be that there's two accounts listed
25    there?
```

1    A.   Yes, sir.

2    Q.   What are the balances on those accounts -- I'm sorry, the

3    first account?

4    A.   97.18.

5    Q.   97 what?

6    A.   I'm sorry.  $97.18.

7    Q.   What about the second one?

8    A.   $332.86.

9         MR. BILKOVIC:  Okay.  We can take that down.

10   BY MR. BILKOVIC:

11   Q.   And did you see any videos of what appeared to be packages

12   of cocaine?

13   A.   Yes, sir.

14        MR. BILKOVIC:  Your Honor, at this time I would move

15   for admission into evidence of Government's proposed Exhibit

16   5.15.

17        THE COURT:  Any objection?

18        DEFENDANT DIDANI:  Objection, your Honor, because

19   Mr. Bilkovic saying appears to be a package of cocaine.  That's

20   pure speculation, your Honor.

21        THE COURT:  Well, you should rephrase that.

22        MR. BILKOVIC:  It's a fair point.

23        THE COURT:  I agree.  It's stricken, and pose a new

24   question.

25

1    BY MR. BILKOVIC:

2    Q.   Was there any videos that attracted your attention based on

3    the packaging?

4    A.   Yes, sir.

5    Q.   Is 5.15 one of those videos?

6    A.   Yes, sir.

7          MR. BILKOVIC:  Your Honor, at this time I would move

8    for admission into evidence of 5.15 and request permission to

9    publish it to the jury.

10          THE COURT:  Any objection now?

11          DEFENDANT DIDANI:  Yes, your Honor.  Objection.

12    Mr. Bilkovic named it as a package of cocaine, and it should

13    not be entered to the jury.

14          THE COURT:  Well, I told the jury I was striking it,

15    and they'll disregard his remark that it was cocaine, which is

16    the normal way of proceeding in a matter like this, Mr. Didani,

17    all right.

18          And so the jury will totally disregard it, even though

19    I'm going to tell you later that the questions of the lawyers

20    are not evidence, only the answers of the witnesses are

21    evidence.

22          Do you have any objection?

23          DEFENDANT DIDANI:  No objection.

24          THE COURT:  Okay.  And, if that was the objection,

25    it's overruled.

```
 1            And you may have it admitted into evidence, 5.15, and
 2    you may show it to the jury.
 3            MR. BILKOVIC:  Can you pause it?
 4    BY MR. BILKOVIC:
 5    Q.   What is it that we're looking at here?
 6    A.   A BlackBerry phone with a picture on it of a duffle bag and
 7    individually-wrapped packages.
 8    Q.   What color are the individual-wrapped packages?
 9    A.   Red and yellow.
10    Q.   And is there more than two of them?
11    A.   Yes.
12    Q.   Several?
13    A.   Yes.
14    Q.   And do you see any human body parts in that video?
15    A.   No.
16    Q.   If you could look again and tell me.
17    A.   I'm sorry, yes.
18    Q.   What do you see?
19    A.   A foot.
20            MR. BILKOVIC:  Okay.  You can pull that down.
21            THE COURT:  Is that 5.15?
22            MR. BILKOVIC:  That was 5.15.
23            THE COURT:  Okay.
24    BY MR. BILKOVIC:
25    Q.   And could you look at Government's proposed Exhibit 5.16.
```

1   A.   Yes, sir.

2   Q.   And if you can tell me what that is?

3   A.   That is a -- appears to be a screenshot that was then a

4   photo on Mr. Didani's iPhone in 2016.

5   Q.   And is that a photograph of encrypted software?

6   A.   Yes, sir.

7          MR. BILKOVIC:  Your Honor, at this time I would move

8   for admission into evidence of Government's proposed Exhibit

9   5.16 and request permission to publish to the jury.

10          THE COURT:  Any objection?

11          DEFENDANT DIDANI:  No objection.

12          THE COURT:  Very well.  It's admitted.

13          MR. BILKOVIC:  And can we publish?

14          THE COURT:  Yes.

15          MR. BILKOVIC:  Thank you.

16   BY MR. BILKOVIC:

17   Q.   And what is it that we're looking at here?

18   A.   A screenshot or photo that was on Mr. Didani's phone of

19   Phantom Secure, which is an encryption software.  And it shows

20   subscription renewal of 1,300 for six months.

21          MR. BILKOVIC:  You can take that down.

22   BY MR. BILKOVIC:

23   Q.   Now, you indicated that Martin Tibbitts died in a plane

24   crash in July of 2018?

25   A.   Yes, sir.

1   Q.  Do you know if he was married at the time?

2   A.  Yes.

3   Q.  And do you know who he was married to?

4   A.  Yes, Belinda Tibbitts.

5   Q.  In 2019, April of 2019, do you know where Ms. Tibbitts was

6   living?

7   A.  Yes, in Grosse Pointe Park.

8   Q.  Do you know whether or not at any point in time she moved

9   out of Michigan?

10   A.  Yes.  After -- shortly after his death she moved to

11   Pleasanton, which is outside of San Francisco, California.

12           THE COURT:  She was where?

13           THE WITNESS:  Pleasanton, California.

14           THE COURT:  Flexington?

15           THE WITNESS:  Pleasanton.

16           THE COURT:  You'll have to spell it.

17           MR. BILKOVIC:  I could spell it.  Would the Court like

18   me to?

19           THE COURT:  Okay.

20           MR. BILKOVIC:  P-L-E-A-S-A-N-T-O-N.

21   BY MR. BILKOVIC:

22   Q.  Correct?

23   A.  Yes, sir.

24   Q.  Pleasanton with a P?

25   A.  Correct.

1    Q.   Okay.  That's a suburb of California?

2    A.   A suburb of San Francisco.

3    Q.   I'm sorry.  A suburb of San Francisco.

4         In April of 2019, did you go to Ms. Tibbitts'

5    residence in Pleasanton, California?

6    A.   Yes, sir.

7    Q.   What was the purpose of you going there?

8    A.   To serve a search warrant.

9    Q.   A search warrant for what?

10   A.   To execute a search warrant for electronics and paperwork,

11   financial statements for Martin Tibbitts' things.

12   Q.   Where at?

13   A.   At her home.

14   Q.   A home in Pleasanton?

15   A.   Yes.

16   Q.   And did you go there -- were there other law enforcement

17   members that were there?

18   A.   Yes, sir.

19   Q.   What other law enforcement members were there?

20   A.   DEA, San Francisco agents were there, Pleasanton police

21   officers were there, and myself and my co-case agent, Task

22   Force Officer Brandon Leach.

23   Q.   And when you arrived there --

24        THE COURT:  Wait.  Wait just a second.

25        MR. BILKOVIC:  I'm sorry, your Honor.

1          THE COURT:  You said the Pleasanton Police Department,

2     DEA agents from San Francisco?

3          THE WITNESS:  Yes, ma'am.

4          THE COURT:  And who else?

5          THE WITNESS:  And my co-case agent, Brandon Leach.

6          THE COURT:  Okay.  You may proceed.

7     BY MR. BILKOVIC:

8     Q.   And was Ms. Tibbitts home?

9     A.   Yes, sir.

10    Q.   And did you and Agent Leach meet with her?

11    A.   We did.

12    Q.   Did any other agents meet with her or was it primarily you

13    and Agent Leach?

14    A.   It was primarily me and Agent Leach.

15    Q.   Was the residence searched?

16    A.   It was.

17    Q.   And did law enforcement recover items in the residence?

18    A.   Yes, sir.

19    Q.   Did Ms. Tibbitts give you any items while you were there?

20    A.   Yes, sir.

21    Q.   What sorts of items?  I know you detailed, but just general

22    description.

23    A.   Electronics, financial documents, paperwork, notebooks, all

24    belonging to Mr. Tibbitts.

25    Q.   And at some point in time did you also obtain a search

1    warrant for the Tibbitts residence in Grosse Pointe?

2    A.   Yes, sir.

3            THE COURT:  Before or after the San Francisco search

4    warrant?

5            THE WITNESS:  We executed the search warrant after.

6            THE COURT:  Which search warrant was executed first?

7            THE WITNESS:  San Francisco one.

8            THE COURT:  Okay.  Go ahead, Counsel.

9    BY MR. BILKOVIC:

10   Q.   Now, did you end up executing the search warrant in Grosse

11   Pointe?

12   A.   Yes, sir.

13   Q.   When you did that, who was there?

14   A.   Ms. Tibbitts, Belinda Tibbitts, and her attorney and myself

15   and my co-worker, Chris Young.

16   Q.   And was Ms. Tibbitts aware -- did you make arrangements

17   with her and her attorney on a specific date to go there?

18   A.   We did, because of living in San Francisco.  When we talked

19   to her there, she made arrangements to meet us at the house so

20   we could get in and not have to damage the home.

21   Q.   And did she provide you items during the search warrant?

22   A.   She did.

23   Q.   Now, I'm going to take your attention to --

24           THE COURT:  I have a question first.  Did you conduct

25   a search warrant then?

```
 1              THE WITNESS:  Yes.
 2              THE COURT:  Did you conduct a search?
 3              THE WITNESS:  Yes, ma'am.
 4              THE COURT:  You and one other person?
 5              THE WITNESS:  Myself and my co-worker, yes.
 6              THE COURT:  Okay.
 7              THE WITNESS:  With Ms. Tibbitts and her attorney.
 8   BY MR. BILKOVIC:
 9   Q.   At some point in time -- I'm going to take your attention
10   to September of 2019.  You indicated that you were
11   investigating Mr. Larson as well?
12   A.   Yes, sir.
13   Q.   Was Mr. Larson arrested on that date?
14   A.   Yes, sir.
15   Q.   And were you present when he was arrested?
16   A.   No.
17   Q.   Did you have anything to do with Mr. Larson or anything
18   related to Mr. Larson on the day he was arrested?
19   A.   Yes, sir.
20   Q.   What was that?
21   A.   Execute a search warrant at his residence.
22   Q.   And who did you execute that with?
23   A.   Mr. Leach, Brandon Leach.
24   Q.   Anyone else?  If you don't remember, that's fine.
25   A.   And Donald Larson.  I don't remember everybody that was
```

1   there.

2   Q.   Were there other agents --

3   A.   There were other agents, yes.

4   Q.   Let me finish the question, okay.  Were there other agents

5   there other than you and Brandon Leach?

6   A.   Yes, sir.

7   Q.   And was Mr. Larson released from custody that day?

8   A.   Yes, sir.

9   Q.   And did he subsequently agree to be interviewed by the

10  Government?

11  A.   Yes, sir.

12  Q.   Now, did you at some point stop working on this

13  investigation?

14  A.   Yes, sir.

15  Q.   When was that?

16  A.   I was notified that I would be coming off of the DEA task

17  force in December of 2020.  And I started making my transition

18  -- I believe the last time I was there was February of 2021.

19  Q.   And did other agents take over basically the investigation?

20  A.   Yes, sir.

21  Q.   And did other agents continue on it that were working on it

22  when you were working on it?

23  A.   Yes, sir.

24  Q.   Now, the investigation spanned how many years roughly as

25  far as you were concerned, your involvement?

1    A.    Ten -- eight.

2    Q.    Do you remember every detail of every report you've

3    written?

4    A.    No.

5    Q.    Every date?

6    A.    No.

7    Q.    Every photo or video that you've reviewed?

8    A.    No.

9              MR. BILKOVIC:  Your Honor, may have I have one moment?

10             THE COURT:  You may.

11             (Briefly off the record.)

12             MR. BILKOVIC:  I have nothing further.

13             THE COURT:  Okay.  Can we -- can you have

14    cross-examination after the lunch break?

15             DEFENDANT DIDANI:  Yes, your Honor.

16             THE COURT:  Okay.  I'm going to send you to lunch.

17    Remember that you're not permitted to talk about the case among

18    yourselves or with anyone else.  And come back in an hour.

19             So it's, I think, ten after; is that right, Ms. Daley,

20    ten after?  Come back at ten after 2:00, okay.

21             All right.  You may step down.

22             Please rise for the jury.

23             (The jury left the courtroom at 1:10 p.m.)

24             THE COURT:  Okay.  You may step down, but you may not

25    discuss your testimony with anyone else until the

```
 1    cross-examination and the redirect are finished; okay?
 2              THE WITNESS:  Yes.
 3              THE COURT:  Okay.  Thank you.  You may step down.
 4              Counsel, yes?
 5              MR. BILKOVIC:  Oh, nothing.  I'm just standing here.
 6    I'm sorry.
 7              THE COURT:  Okay.  Let's take a lunch break, okay.
 8              (At 1:11 p.m., a brief for lunch was taken.
 9              Back on the record at 2:26 p.m.)
10              LAW CLERK:  All rise.  The Court is back in session.
11              THE COURT:  You may all be seated.
12              All right.  Are you ready to bring back out the jury?
13              MR. BILKOVIC:  The Government is ready, your Honor.
14              DEFENDANT DIDANI:  Yes, your Honor.
15              THE COURT:  Okay.  Let's do that.
16              DEFENDANT DIDANI:  Your Honor, can I submit an
17    exhibit?
18              THE COURT:  Can you what?
19              DEFENDANT DIDANI:  Can I submit it?
20              THE COURT:  Can you submit it now?
21              DEFENDANT DIDANI:  Admit.  Admit.
22              MR. FINK:  Admit Exhibit A.
23              DEFENDANT DIDANI:  Admit as Exhibit A, your Honor.
24              MR. FINK:  The Government doesn't have any objection.
25              MR. BILKOVIC:  Your Honor, I believe he wants to admit
```

1    Exhibit A.   The Government has no objection.

2              THE COURT:  That you used before?

3              DEFENDANT DIDANI:  Yes, your Honor.

4              THE COURT:  Do you have any objection on behalf of the

5    Government?

6              MR. BILKOVIC:  No, your Honor.

7              THE COURT:  Okay.  Then it's admitted as Exhibit A.

8              THE CLERK:  All rise.

9              (The jury entered the courtroom at 2:27 p.m.)

10             THE COURT:  I'm satisfied the jurors are present.

11             Are you on behalf of the Government?

12             MR. BILKOVIC:  Yes, your Honor.

13             THE COURT:  What about you, Mr. Didani?

14             DEFENDANT DIDANI:  Yes, your Honor.

15             THE COURT:  All right.  Very good.  Thank you for

16   coming back.

17             You're still under oath, sir, and just state your name

18   again for the record, okay.

19             THE WITNESS:  Yes, ma'am.  It's Joshua Allen Bianchi.

20             THE COURT:  Okay.  You may proceed.

21                              CROSS-EXAMINATION

22   BY DEFENDANT DIDANI:

23   Q.   Agent Bianchi.

24   A.   Yes, sir.

25   Q.   Good afternoon, sir.

1    A.   Good afternoon.

2    Q.   Good to see you again.  If you don't understand my

3    questions, please ask me.

4         Agent Bianchi, you are the investigator opened this --

5    you are the agent that opened this investigation; right?

6    A.   Yes, sir.

7    Q.   There is no other one, it's just Agent Bianchi, right, you?

8    A.   Correct.

9    Q.   So you are the agent who I met in 2015; right?

10   A.   Yes, sir.

11   Q.   At O'Hare Airport; right?

12   A.   Correct.

13   Q.   Okay.  Agent Bianchi, I want you to explain to the jury the

14   reason you came to the airport.  Give me one, two, three

15   reasons that you drove to airport, to Chicago O'Hare, from

16   Detroit?  And then we'll go more details.  I just want those

17   suspicions that you said before.

18        THE COURT:  In 2015?

19        DEFENDANT DIDANI:  Yes, your Honor.

20        THE COURT:  Okay.

21        THE WITNESS:  Why I went to the airport to interview

22   you?

23   BY DEFENDANT DIDANI:

24   Q.   Yes.  Yes, Agent.

25   A.   So that I could be present during the interview.  So -- go

1    ahead.

2    Q.  The reasons, the reasons that you have?

3            THE COURT:  Do you want him to answer the three

4     reasons?

5            DEFENDANT DIDANI:  Yes, your Honor.

6            THE COURT:  Okay.  Tell us three reasons.

7            THE WITNESS:  Three suspicions I had to have you

8     stopped and interviewed -- I'm not quite sure I understand the

9     question.

10   BY DEFENDANT DIDANI:

11   Q.  All right.  Let me help you a little bit, okay, Agent

12   Bianchi.  On the hearing over here in 2024, April 23, you said

13   there was three reasons that you flew all the way -- you drove

14   all the way from here to Chicago.  One was 2008, a company, ANR

15   Express with Adriatik Sheko; right?  Is that correct?

16   A.  Those were not the reasons why I drove to the airport,

17   though.

18   Q.  What was the reason?

19   A.  To interview you and to search and to answer some questions

20   I had.

21   Q.  For what?  Interview me for what?

22   A.  Why I wanted to --

23   Q.  No.  You said to interview me, and I'm asking you interview

24   me for what?

25   A.  For your travel history, your companions you had and --

1    basically your travel history with Eric Puzio.

2              THE COURT:  Your travel history and what?

3              THE WITNESS:  His travel history with Eric Puzio and

4    his travel history in general to all the various outlying

5    countries he had been to.  He also made many reservations and

6    did not board the plane.  I had questions about that, and that

7    was the gist of it.

8    BY DEFENDANT DIDANI:

9    Q.  Agent, when we had a hearing over here -- I'm trying to

10   make -- so we can be clear over here.  When we had the hearing

11   over here, you said the reason was suspicious  --

12             THE COURT:  What hearing are you referring to?

13             DEFENDANT DIDANI:  On April ...

14             THE COURT:  23rd?

15             DEFENDANT DIDANI:  April 24, 2023, your Honor.

16             THE COURT:  Okay.

17   BY DEFENDANT DIDANI:

18   Q.  There is an activity on St. Clair Shore Marina.  That's

19   what you told the judge, one, remember, four people going with

20   jet skis, going to Canada coming back, you had a report?

21   A.  Yes.  My station gave me a report about suspicious activity

22   at a marina.

23   Q.  That was one reason; right?  Is that accurate?

24   A.  That is -- that is true.  I don't know what you're

25   referencing that to.

1   Q.   I'm just -- Agent, you know --

2            THE COURT:  Phrase a question to him.

3            DEFENDANT DIDANI:  Pardon me, your Honor?

4            THE COURT:  Phrase a question to him.

5   BY DEFENDANT DIDANI:

6   Q.   I want to know the reasons that you had come to -- traveled

7   all the way to Chicago, just the same reason that you told this

8   Court in April 24, 2023, if there is accurate reasons can you

9   tell the jury the same reasons, or no?

10  A.   The same thing I just said, and that was to find out about

11  your travel history to all the various countries that you were

12  going to, the reason why you didn't -- you booked I think it

13  was six reservations within a span of seven months.  You didn't

14  board the plane except for twice.  And where you were traveling

15  with Mr. Puzio.  Those were the reasons why I traveled to

16  Chicago O'Hare to interview you.

17  Q.   So the reasons that you told Judge Hood that was not the

18  same reason, because it's totally different?

19            MR. BILKOVIC:  Judge, can he cite me to a page of what

20  he's --

21            THE COURT:  Well, you can ask him if it's the same

22  reason, but you can't comment that they're totally different.

23  If you want to point to something in the transcript, you're

24  welcome to do that.  You just need to let the Government know

25  the date of the transcript and the page number.

```
1    BY DEFENDANT DIDANI:

2    Q.   Okay.  We're going to go back to that.

3              Okay.  Agent Bianchi, do you know what's a silence

4    hit?

5    A.   A silent hit?

6    Q.   Yes.

7              THE COURT:  A what?

8              DEFENDANT DIDANI:  A silent hit.

9              THE WITNESS:  A silent hit.

10             THE COURT:  A silent what?

11             THE WITNESS:  A silent hit.

12             THE COURT:  A silent hit.  Is that what you mean?

13             DEFENDANT DIDANI:  Yes, your Honor.

14             THE COURT:  Okay.  Do you know what that is?

15             THE WITNESS:  I do.

16   BY DEFENDANT DIDANI:

17   Q.   Can you explain that to the jury, please?

18   A.   A silent hit is, for example, I had an alert on Mr. Didani

19   when he flies into or out of the country.  When he were to fly

20   into the country, Customs at the port of entry did not see that

21   hit, but I got a E-mail about it.  It was silent to the people

22   at the port, but not silent to the case agent or whoever put

23   that hit on.

24   Q.   And in order to have the silent hit do you have to have a

25   federal report, Agent Bianchi?
```

1    A.   No.

2    Q.   So you can put that silent hit to everybody, anyone you

3    wishes to?

4    A.   I can, with reasonable suspicion, which you document in the

5    silent hit.

6    Q.   Do you have the documentation why you put a silent hit on

7    Mr. Didani, on this defendant?

8    A.   Yes.  You have all my reports, sir.

9    Q.   So it's a federal report?

10   A.   I'm sorry?

11   Q.   So in order to obtain that you have to have a federal

12   report, you have to report it; right?

13   A.   I have to report what?

14   Q.   You have to make a report why -- what's the reason you made

15   a silent hit; right?

16   A.   No.

17   Q.   Explain to me.

18   A.   What is it that you want me to explain?

19   Q.   What report you need to have.  Do you need to have or -- do

20   you need to have a report or you don't need to have a report to

21   have a silent hit?

22   A.   You don't need to have a report.

23   Q.   So you can put a silent hit to any citizen of the world to

24   United States on any citizen of the world?  If you think

25   somebody might tell you, okay, Didani -- I saw Didani with a

1    weapon and you can put a silent hit?

2    A.   Yes, sir.

3    Q.   Is that something regular that federal government is doing

4    or something?

5    A.   Yes.

6    Q.   Without -- so you trying -- let me get this clear right

7    now.  Somebody can tell you Mr. Wade Fink left from the casino

8    with a bag of money, and if you wish to investigate and put a

9    silent hit because Mr. Fink traveled outside you can do that?

10   A.   I'm not understanding what you're saying.

11           THE COURT:  I think he wants to know if the individual

12   came out of the casino with a bag of money and you thought that

13   was suspicious you could put a silent hit on them.

14           Is that what you want to know?

15           DEFENDANT DIDANI:  Yes, your Honor.

16           THE WITNESS:  Is that individual crossing the

17   international border?

18           THE COURT:  Does that matter?

19           THE WITNESS:  It would, because the hit pertains to

20   crossing the international border.

21           THE COURT:  Okay.  So, if he just came out of a casino

22   in Detroit and went to his home with this bag of money, you

23   wouldn't be able to put a silent hit on it?

24           THE WITNESS:  No, ma'am.

25           THE COURT:  So do you understand that, Mr. Didani?

```
 1              DEFENDANT DIDANI:  Yes.  Yes, your Honor.  Yes.
 2              THE COURT:  All right.
 3   BY DEFENDANT DIDANI:
 4   Q.  Agent Bianchi, your first report, do you remember your
 5   first report open in my name?
 6   A.  I know I wrote it, but do I remember it, no.
 7   Q.  Other than my name, the report is titled in my name,
 8   Didani, does that have to do anything with Mr. Didani, this
 9   defendant?
10   A.  I believe I remember this from prior testimony, and I don't
11   think it -- it has other suspicions that lead to you.
12              THE COURT:  "It" meaning your report?
13              THE WITNESS:  Yes, ma'am.
14              THE COURT:  Okay.
15   BY DEFENDANT DIDANI:
16   Q.  So let me be clear.  So other than my name to tie to Didani
17   that report has nothing to do with Mr. Didani; right?
18   A.   That is not correct, because it all leads to you.
19              DEFENDANT DIDANI:  Okay.  All right.  Your Honor, I'd
20   like to get the transcripts from -- please, so I can refresh
21   his memory and we can --
22              THE COURT:  Yes you can.
23              DEFENDANT DIDANI:  Thank you.
24              MR. FINK:  Judge, I'm going to approach the podium
25   just if he needs me to take something off of it.
```

 1            THE COURT:  Okay, yes.

 2  BY DEFENDANT DIDANI:

 3  Q.  Agent, do you want me to pass it to refresh your memory or

 4  do you want me to --

 5  A.  Sure.

 6            MR. FINK:  May I, your Honor?

 7            THE COURT:  Yes.  What's the page, Mr. Didani?

 8            DEFENDANT DIDANI:  It's Page 67, line 21, 22, 23.

 9            THE WITNESS:  Okay.  What's the question?  What am I

10  looking for?

11  BY DEFENDANT DIDANI:

12  Q.  The question was whether this report, the opening report,

13  other than my name, the title name, Didani, has nothing to do

14  with Mr. Didani?

15  A.  Okay.  So that is correct.

16  Q.  That is correct.  But today's answer was kind of different.

17  I just want to make sure, right.  So the opening report has

18  nothing to do with this defendant; right?

19  A.  Correct.  Associations to you.

20  Q.  That's not what you answered there.  This question --

21            THE COURT:  Okay.  If you want, you can read what his

22  answer was.  So you can give the question and the answer if

23  you'd like to do that.

24            MR. FINK:  May I?

25            THE COURT:  Yes.  Do you know where he is on the

```
 1    transcript, Counsel?
 2            MR. BILKOVIC:  Do I?
 3            THE COURT:  Yes.
 4            MR. BILKOVIC:  Yes, I do.
 5            THE COURT:  Okay.
 6    BY DEFENDANT DIDANI:
 7    Q.  Let's do this again, all right.
 8            "So Didani's opening report has nothing to do with
 9    Ylli Didani; is that accurate?"
10            Your answer is, "That's correct."
11    A.  That is correct.
12    Q.  Fair enough.  So now you're armed with the report?
13    A.  I'm sorry?
14    Q.  Now you're armed with the report.  You have a report titled
15    "Mr. Didani"; right?
16    A.  Correct.
17    Q.  Does that give you the right to go to a -- now apparently
18    that give you the right to go visit Mr. Didani in O'Hare
19    Airport, right, to travel?
20    A.  So -- I don't need a right.  It's my job.  And then,
21    secondly, there was multiple things, multiple things as we've
22    discussed, on why I went to the airport, enough -- not really
23    to do with that report.
24    Q.  Okay.  So let's go back to the question.  Multiple things,
25    you know.  There was what, St. Clair Shores, jet skis going --
```

```
 1   flying all over to Canada coming back, right, your information?
 2   Do you remember that?
 3   A.   I remember the information, sir, but it had nothing to do
 4   with me going to Chicago O'Hare Airport.
 5   Q.   All right.  Before we go to Chicago, do you remember that I
 6   was being investigated in 2008 with a gentleman, Adriatik
 7   Sheko, and a company, ANR Express?
 8   A.   Did I know that before going to Chicago, is that what
 9   you're asking?
10   Q.   Yes.
11   A.   Yes, sir.
12   Q.   Did you remember you told Judge Hood -- do you remember you
13   told Judge Hood right here in this courtroom, the same
14   courtroom we're sitting at right now, that that was one of the
15   reasons, probable cause, to go investigate Mr. Didani 2008 with
16   Adriatik Sheko, the company from ANR Express?
17           MR. BILKOVIC:  Mr. Didani, can you just tell me what
18    page you're on?
19           DEFENDANT DIDANI:  That's a question.  I'll get to
20    that page.
21           MR. BILKOVIC:  Judge, he's --
22           THE COURT:  Yeah, you've got to get to the page.
23           MR. FINK:  Judge, I'm being asked a question.  That's
24    why I'm approaching the podium.
25           THE COURT:  Okay.  But don't speak into the mic,
```

1    gentlemen.

2             DEFENDANT DIDANI:  Your Honor, Page 177.  The question

3    was -- it was asked by the Government, Mr. Bilkovic, to Agent

4    Bianchi.

5    BY DEFENDANT DIDANI:

6    Q.  And the question is Mr. Bilkovic, the Government, "And I'll

7    ask you this.  The one report from 2008, was that -- don't look

8    like this right now -- was the only report you reviewed prior

9    to 2015 in details with the investigation with Mr. Didani in

10   2008?"

11            And you say, "Absolutely not."

12            Do you remember having this conversation about this

13   company in 2008?

14   A.  I did not understand that.

15            THE COURT:  Okay.  Maybe we should pass it up so he

16   can see it.

17            MR. FINK:  Sure.  You can hold onto that, Mr. Didani.

18   The Government has offered me their copy.

19            THE COURT:  And this is Page 177; is that correct?

20            DEFENDANT DIDANI:  Correct, your Honor.

21            THE WITNESS:  Thank you, sir.

22            THE COURT:  And what lines do you want him to read?

23            DEFENDANT DIDANI:  Line 12, your Honor.

24            THE COURT:  Line 12 to what?  Just line 12?

25            DEFENDANT DIDANI:  And 15.

```
 1                  THE COURT:  To 15?

 2                  DEFENDANT DIDANI:  Yes, your Honor.

 3                  THE COURT:  Mr. Bilkovic, do you have any problem if

 4    the witness reads it?

 5                  MR. BILKOVIC:  No, I don't, your Honor.

 6                  THE COURT:  Could you read it aloud, please, those

 7    lines 12 through 15.

 8                  THE WITNESS:  Sure.  I'm going to start with line 11

 9    so we know who's saying it.

10                  By Mr. Bilkovic, "I'll ask you this.  The one report

11    from 2008 was that -- don't look at those right now -- was that

12    the only report that you reviewed prior to July 2015 that dealt

13    with this investigation into Mr. Didani in 2008?"

14                  And my answer, "Absolutely not."

15                  And, I'm sorry, I don't understand the question then.

16                  THE COURT:  Which question?

17                  THE WITNESS:  Whichever one Mr. Didani is asking me.

18                  THE COURT:  He's going to pose a new question to you.

19                  Okay.  Pose a new question.

20    BY DEFENDANT DIDANI:

21    Q.   Mr. Bianchi, do you remember the investigation of 2008 or

22    not?

23    A.   Partially.  I would probably have to look back at my

24    reports.  I was not part of that investigation.

25                  THE COURT:  Okay.  What do you want to ask him about
```

1    it, without him digging out the report?  See if he remembers.

2    BY DEFENDANT DIDANI:

3    Q.  Do you remember a gentleman, Adriatik Sheko, Tiku?

4    A.  Yes, sir.

5    Q.  Did you remember that Tiku was involved in an investigation

6    in 2008?

7    A.  Yes, sir.

8    Q.  With his trucking company, ANR Trucking Company; right?

9    A.  Yes, sir.

10   Q.  And that you stated in this court, you testified under oath

11   with this court that I was involved in 2008 with that same

12   company; right?

13   A.  No, with that investigation.  You were involved --

14          MR. BILKOVIC:  I think at this point I'm going to

15   object.  I don't see what the relevance is of any of this.

16          THE COURT:  If might be relevant, because it seems

17   like he is testing how he got involved in the investigation.

18   So I'm going to allow it.

19          Your objection is noted and preserved for the record.

20          MR. BILKOVIC:  Thank you, your Honor.

21          THE COURT:  And overruled.

22          So tell us what you mean by he was involved in the

23   investigation, but not with ANR Trucking?

24          THE WITNESS:  I do not recall whether Mr. Didani was

25   or was not involved with AR Trucking.  I just know he was

1    involved in the investigation into that company.

2            THE COURT:  Okay.  Go to a new question.

3    BY DEFENDANT DIDANI:

4    Q.  In 2008; right?

5    A.  Yes, sir.

6    Q.  With the gentleman, Adriatik Sheko; right?

7    A.  Yes, sir.

8            DEFENDANT DIDANI:  Your Honor, can you give me -- I

9    need to find the transcript, because I'm a hundred percent sure

10   that he testified to you under oath the same thing that I'm

11   saying.  I just want to make it clear that we're on the same

12   page with Mr. Bianchi.

13           THE COURT:  So you need to find something in the

14   transcript, is that what you're telling me?

15           DEFENDANT DIDANI:  Yes, your Honor.

16           THE COURT:  And how long do you need to do that?

17           DEFENDANT DIDANI:  A few minutes, your Honor, if I --

18   a minute.

19           THE COURT:  A few is five, ten?

20           DEFENDANT DIDANI:  Two minutes I will find out.

21           THE COURT:  All right.

22           MR. FINK:  Do you want me to help you look?

23           DEFENDANT DIDANI:  Yes.

24           THE COURT:  Okay.  Do you need him to come to the

25   table with you?

```
 1              MR. FINK:  He has a copy, Judge.  I will assist on my
 2    computer.
 3              Mr. Didani, try Page 40.
 4              DEFENDANT DIDANI:  Your Honor, it's Page 40 from line
 5    1 to line 6, your Honor.
 6              THE COURT:  Now, can you show that to him?
 7              DEFENDANT DIDANI:  Pardon me, your Honor?
 8              THE COURT:  Can we show a copy of that to the witness,
 9    please?
10              DEFENDANT DIDANI:  Yeah, sure.
11              MR. FINK:  May I, Judge?
12              THE COURT:  Yes.
13              THE WITNESS:  Can you repeat the line numbers, please?
14              THE COURT:  1 through 6.
15              THE WITNESS:  1 through 6.
16              DEFENDANT DIDANI:  1 through 6.
17              THE COURT:  Read it to yourself.  Then you can pose a
18    question, Mr. Didani.
19              THE WITNESS:  Okay.
20              THE COURT:  Okay.  Pose the question.
21    BY DEFENDANT DIDANI:
22    Q.  So, Agent Bianchi, so you testified in front of this Court
23    that in two thousand -- Adriatik Sheko -- I was involved in
24    2008 with Adriatik Sheko with that company; right?  Yes or no?
25    A.  I testified in this Court that Adriatik Sheko was the owner
```

1   of a trucking company being investigated in, in which you were

2   part of that investigation.

3   Q.   Okay.  Agent Bianchi, when you testified under oath, do you

4   understand what under oath means?

5   A.   Absolutely.

6            THE COURT:  Yes, he does.  And you may go to a new

7    question.  And the jury will decide the credibility of the

8    witnesses.

9   BY DEFENDANT DIDANI:

10  Q.   Agent Bianchi, if I tell you Mr. Sheko in 2008 and his

11  company they didn't even existed, is that accurate?

12  A.   I don't know.  I did not look that up.

13  Q.   You never look it up, ANR Express?

14  A.   I did not.  It was not my investigation.

15  Q.   Agent Bianchi, in 2018 you investigated the same person,

16  Adriatik Sheko, and there is a report.  It's a report with your

17  name, stamped with your name.  You knew very well that that

18  company didn't exist in 2008, not even -- Mr. Sheko didn't even

19  live in the United States, but you choose to lie to this judge?

20           MR. BILKOVIC:  Judge, I would object.  First of all, I

21   think it's argumentative.  Second of all, I would ask that he

22   ask questions instead of making speeches.

23           THE COURT:  Yes, you're making a speech.  Pose a

24   question.  Although, it was kind of posed as a question, at

25   least by his tone it was posed as a question, but pose it as a

1    question.

2             The question was you knew that the company didn't

3    exist and that Mr. Sheko didn't live in the United States in

4    2008.  I think that's your question, is it not?

5             DEFENDANT DIDANI:  Yes, your Honor.

6             THE COURT:  Okay.  Did you know that in 2008?

7             THE WITNESS:  I did not.  I did not --

8             THE COURT:  Did you know it in 2018?

9             THE WITNESS:  About 2008?

10            THE COURT:  In 2018, did you then know that this

11   gentleman and his company -- his company did not exist in 2008

12   and that he didn't live in the United States in 2008?  Did you

13   know all of that by 2018?

14            THE WITNESS:  I did not.  I only knew what was in the

15   reports that I read of that prior investigation.

16   BY DEFENDANT DIDANI:

17   Q.  Agent Bianchi, so we're talking about 2008, '15.  Then your

18   testimony it was in 2023, April 24, okay.  So I'm going to

19   refresh your memory with a page and I want you, please, to read

20   that to the jury, please.

21            MR. FINK:  Explain what it is.

22            Your Honor, I was asked a question.  I'm sorry.  I

23   don't mean to involve myself --

24            THE COURT:  If it's going to be taken to the witness,

25   you can do that, too, please.

```
1              MR. FINK:  You got it, Judge.
2    BY DEFENDANT DIDANI:
3    Q.   Agent Bianchi, over here we have a warrant which was issued
4    by you in February 20, 2018.
5              THE COURT:  What is the date again?
6              DEFENDANT DIDANI:  A warrant.
7              THE COURT:  What's the date?
8              DEFENDANT DIDANI:  February 20, 2018, your Honor.
9              THE COURT:  Okay.
10             DEFENDANT DIDANI:  It was signed by Honorable Anthony
11    Patti and issued by Judge Bianchi.
12             THE COURT:  I don't think issued by Judge Bianchi.
13             DEFENDANT DIDANI:  Oh.  Issued as the agent.
14             THE COURT:  Okay.  He's the agent on it, and Judge
15    Patti is the one who issued it, okay.
16             DEFENDANT DIDANI:  Your Honor, I will show it to the
17    Government first.
18             THE COURT:  Okay.  Is it marked so we'll be able to
19    see it again?  So it's a proposed exhibit something?
20             DEFENDANT DIDANI:  Yes, your Honor.
21             THE COURT:  And what is that?
22             DEFENDANT DIDANI:  Exhibit B.
23             THE COURT:  Proposed B?
24             DEFENDANT DIDANI:  Proposed B, your Honor.
25             MR. FINK:  Judge, I'm going to approach the witness
```

```
 1    now.
 2              THE COURT:  And you want to show him this and have him
 3    look at it and then you want to pose a question; is that right?
 4              DEFENDANT DIDANI:  I want him to have a look at it,
 5    and I want him to read that to the jury, please, your Honor.
 6              THE COURT:  The whole warrant?
 7              DEFENDANT DIDANI:  No, not the whole warrant.  It's a
 8    part where there was -- about this investigation, 2008
 9    investigation, and the gentleman, Adriatik Sheko.
10              THE WITNESS:  The part that is circled; correct?
11    BY DEFENDANT DIDANI:
12    Q.  Yes.
13              DEFENDANT DIDANI:  Your Honor, he's reading Page 803.
14              THE WITNESS:  That's the correct page; right?
15    BY DEFENDANT DIDANI:
16    Q.  Yes, sir.
17    A.  Okay.
18    Q.  Agent Bianchi, can you please read this to the jury, that
19    part.
20    A.  That paragraph?
21    Q.  Yes, sir.
22    A.  Do you want me to read starting on that page or go back to
23    the beginning of the paragraph?
24    Q.  The beginning of the paragraph with the one I circled,
25    Agent Bianchi.
```

1    A.   "The previous investigation lists both Didani and Sheko as

2    part of a drug trafficking organization.   During that

3    investigation, multiple narcotic and money seizures were

4    conducted, some of which were seized from tractor trucks that

5    were being driven by AR Express truck drivers.   Since the

6    seizures, Sheko sold ANR Express and moved.   It is believed

7    that in 2007 Sheko moved to Istanbul, Turkey.   From 2007 until

8    March of 2016, Sheko has only spent a few weeks a year inside

9    the U.S."

10   Q.   So with few words, Agent Bianchi, Mr. Sheko cannot possibly

11   be here in United States in 2008?

12   A.   Okay.

13   Q.   Yes or no?

14   A.   Sure.

15   Q.   He's not?   He's in the United States or in Turkey?   Where

16   he live?

17   A.   I would have to check my records.

18   Q.   That was not your record, Agent Bianchi?

19   A.   This is not records, but my report.   And according to my

20   report I would agree with my report 100 percent.

21   Q.   So, Agent Bianchi, to me it looks like a fake report.

22          MR. BILKOVIC:  Objection, Judge.

23          THE COURT:  It looks like a what?

24          MR. BILKOVIC:  A fake report.  Objection.  It's

25   argumentative.

```
 1              THE COURT:  You want to respond to -- what is your
 2   objection relative to it being a fake report?
 3              MR. BILKOVIC:  My objection is that it's not a
 4   question.  He's telling the witness what it looks like to him.
 5              THE COURT:  Okay.  You're saying what -- okay.  That's
 6   sustained.
 7              DEFENDANT DIDANI:  Judge, the Government didn't let me
 8   finish the whole sentence.
 9              THE COURT:  Okay.  That's fine.  Finish the whole
10   sentence.
11              DEFENDANT DIDANI:  And then Mr. Agent Bianchi can
12   answer and they can object.
13              THE COURT:  Excuse me?
14              DEFENDANT DIDANI:  The Government can object or
15   Mr. Bianchi --
16              THE COURT:  It sure sounded like you had finished, but
17   go ahead and finish.
18   BY DEFENDANT DIDANI:
19   Q.  So we have a report from 2008 from ANR Express, and we have
20   some people going with jet skis in Canada.  We don't know who
21   they are.
22              THE COURT:  I'm waiting for a question.
23   BY DEFENDANT DIDANI:
24   Q.  Is that a -- that's the totality that you have to travel in
25   Chicago?  Is that all that you had the probable cause that you
```

 1    had to travel to Chicago to meet this defendant?

 2              THE COURT:  "Is that all" meaning the jet skis and

 3     that report --

 4              DEFENDANT DIDANI:  Yes, yes, yes.

 5              THE COURT:  Okay.

 6              THE WITNESS:  Again, that is not why I traveled to

 7     Chicago.  I traveled to Chicago about your suspicious travel,

 8     your travel with Mr. Puzio, your -- the reason for not boarding

 9     your reservations, and various other things to do with this

10     report.  Just because Mr. Sheko might not have been here does

11     not mean the investigation was closed.  I'm reading reports

12     from a prior investigation.

13    BY DEFENDANT DIDANI:

14    Q.  Mr. Bianchi, you just testified a few minutes ago you have

15    no idea about the report.  Now you're getting a memory of this

16    report.  I'm confused right now.

17    A.  I have no idea about what report?

18    Q.  The 2008 report.

19              THE COURT:  Wait, wait.  What report were you

20     referring to when you just spoke?

21              THE WITNESS:  The 2008 report.

22              THE COURT:  Okay.  All right.

23              THE WITNESS:  From a prior investigation.

24              THE COURT:  What was your question, Mr. Didani?

25              DEFENDANT DIDANI:  We'll move forward.

```
 1              THE COURT:  Well, I'm not cutting you off.  I just
 2   think if I don't know which report he's referring to it might
 3   be likely that others don't.
 4   BY DEFENDANT DIDANI:
 5   Q.   The 2008 report; right?
 6   A.   Correct.
 7              THE COURT:  Okay.  Now pose a question.
 8   BY DEFENDANT DIDANI:
 9   Q.   Okay, Agent Bianchi.  So now you in Chicago; right?  You
10   traveled 300 miles due to those reasons.  You go and see
11   Mr. Didani.  You want to talk to Mr. Didani; right?  Is that
12   true?
13   A.   Yes, sir.
14   Q.   A lot of your reports you saying that Didani was traveling
15   with a associate.  What do you mean by with an associate?
16   A.   I guess it depends on which travel time you are talking
17   about.
18   Q.   2015, sir.
19   A.   In 2015?
20   Q.   Yes, that's what we're talking.  Agent Bianchi, please bear
21   with me.  I'm trying to -- I'm trying for us to get the truth
22   out.
23              THE COURT:  Okay.  He understands all of that.  What
24   we need is a question, and I think the issue is are you talking
25   about his travel to O'Hare in 2015 or 2018?
```

1              DEFENDANT DIDANI:  2015, your Honor.

2              THE COURT:  Okay.  Pose a question then.

3    BY DEFENDANT DIDANI:

4    Q.   In your report, you're saying that I was traveling with a

5    associate.  What do you mean with associate and who was that

6    associate?

7    A.   In none of my reports do I ever recall you traveling -- me

8    writing that you were traveling with an associate in 2015 when

9    I came there to interview you.  I would be glad to see it and

10   recall my memory.

11             MR. FINK:  Judge, can we approach for a moment?

12             THE COURT:  Yes.

13             MR. FINK:  Thank you.

14             (At sidebar on the record out of the hearing of

15             the jury, as follows:)

16             MR. FINK:  The only concern I have is I want to do

17   what I was supposed to do as standby counsel.  A lot of this

18   stuff has come to me on the fly that I don't know what exactly

19   I'm looking for.  I don't want to make it look like I'm the

20   lawyer.  I don't want to take too much time.  I'm not doing

21   that for my own -- it's just the time it might take me.  It's

22   not like, you know, this is prepared.  He wants me to find the

23   stuff, and I'm happy to help because I'm happy to have that

24   role.

25             But that's why some of this is a little -- I'm caught

```
 1    flat-footed.  I don't mean to make too much time for the jury
 2    or seem like, you know, I'm imposing my will or anything.  So I
 3    just wanted to make that clear that that's kind of why this is
 4    going that way.
 5            Thank you, your Honor.
 6            DEFENDANT DIDANI:  Thank you, your Honor.
 7            THE COURT:  Okay.
 8            (End of sidebar.)
 9            THE COURT:  You may continue.  I'm ready.
10            DEFENDANT DIDANI:  Yes, your Honor.
11    BY DEFENDANT DIDANI:
12    Q.  Did you remember you came to airplane to pick me up on that
13    day in 2015 or to the gate?
14    A.  I'm sorry?
15    Q.  Did you come to airplane -- in door airplane that day or
16    you came to the gate?  Do you remember anything about it that
17    day, or no?
18    A.  I do remember, and I didn't go to either.  I was already in
19    secondary.
20    Q.  Okay.  We're going to pass -- and you think I was there by
21    myself; right?
22    A.  No, I know you weren't.
23    Q.  So I had associate then?
24    A.  Correct.
25    Q.  Who was my associate?
```

1    A.   Your girlfriend, I believe.

2    Q.   Thank you.  And that's what I'm asking.  So that's what I

3    was asking.  I was traveling with associate; right?  So it's my

4    girlfriend; right?  It was my fiancee?

5    A.   Okay.

6    Q.   Do you remember her name?

7    A.   I never met her, sir.

8    Q.   But you have her name on the report?

9    A.   Okay.  No.

10   Q.   Flavia Djaloshi?

11   A.   Yes, I remember that.

12   Q.   Because I want to make sure clear when you say associate,

13   girlfriend or associate, business associate, you know, what

14   you're referring to it.

15           THE COURT:  Is that a question?

16           DEFENDANT DIDANI:  I'm trying to understand what he

17   refers when he say "associate."  A business associate?

18           THE COURT:  Well then ask him what did he mean by

19   "associate."

20           DEFENDANT DIDANI:  I've been trying, your Honor.

21           THE WITNESS:  It depends.  An associate to what or to

22   who or when?  Was it an associate you were traveling with that

23   day, was it an associate that you traveled with in prior

24   travel, was it an associate that you had in the United States?

25   I don't know what you're saying.

```
 1   BY DEFENDANT DIDANI:
 2   Q.   Agent Bianchi, in a lot of your reports you say that I was
 3   traveling in 2015 with an associate of mine, all right.   And
 4   that's what -- and I'm trying to figure out when you say an
 5   associate of mine do you mean my associate business, supposedly
 6   they connected to me through your conspiracy theory, or my
 7   associate, my family or my family associate.   That's what I'm
 8   trying to understand.
 9   A.   I don't remember putting that in any of the reports for
10   July --
11   Q.   Oh --
12   A.   Hang on.   For July of 2015.   However, if I did and you two
13   were on the same travel itinerary, I was probably referring to
14   her.
15   Q.   Okay.   Good enough.   Good enough answer.
16        Agent Bianchi, do you know I have a family in Chicago?
17   A.   Yes, sir.
18   Q.   Who lives in Chicago?
19   A.   I'm not quite sure exactly who, but I know your parents
20   live there.
21   Q.   And you don't know where I live in Chicago?
22   A.   The address is in my reports.   I would have to look it up.
23   Q.   That day that I was traveling, Agent, I was going to
24   Chicago with my fiancee to visit my mother or traveling
25   somewhere else?
```

```
1   A.   To Detroit, if I recall.  Your final destination was to

2   Detroit.

3   Q.   Did you have the tickets or -- how did you know I was final

4   destination to Detroit?

5   A.   I looked it up.

6   Q.   And I don't see it nowhere in the reports.

7            THE COURT:  Is that a question, because --

8   BY DEFENDANT DIDANI:

9   Q.   You don't think, Agent --

10           THE COURT:  Excuse me.  If it's a question, it should

11   be posed as did you write that in any of the reports.

12  BY DEFENDANT DIDANI:

13  Q.   Did you write that in any other reports?

14  A.   I don't know.  I do not recall.  That was ten years ago.

15  Q.   Okay.  And you said we had a laid-back conversation?

16  A.   Yes, sir.

17  Q.   And you testified that Agent Fuentes scrolled over my

18  phone; right?

19  A.   Yes, sir.

20  Q.   And somehow now we're going to say because -- how long you

21  detain me that day, do you remember?

22  A.   I did not detain you, sir.  CBP detained you, and it was a

23  long time.  I do not remember how long it was.

24  Q.   But CBP detained me on your call; right?

25  A.   On my recommendation, yes.
```

1   Q.   Exactly.  Do you agree with me you testified that you

2   detained me for seven hours?

3   A.   Again, I do not remember the exact timeframe.

4   Q.   In the hearing we have over here you said I was detained

5   for seven hours.

6   A.   If I said you were detained for seven hours in a report,

7   then I will believe that.

8   Q.   Okay.  Thank you.  And during this time you asked me

9   questions about my travel; right?

10  A.   Yes, sir.

11  Q.   What did you see suspicious about my answers, do you

12  remember?

13  A.   I remember a little bit of them, which we've gone over.

14  Q.   About what?  What was suspicious?

15  A.   Making several reservations, flying to the United States,

16  not boarding them, making reservations the day before -- four

17  days before, a short time to go to Colombia.  And then flying

18  to Colombia, landing in Colombia, and turning around and flying

19  back from Colombia the same day while your travel associate,

20  Mr. Puzio, who was on your itinerary stayed for a week.

21          There was a bunch of different questions.  Your

22  frequent travel to Istanbul, Turkey, then Germany, then Malta

23  Island, all within one year is a lot of travel.  There's a

24  bunch of different stuff, which you can find in my reports.

25  Q.   Agent Bianchi, let's go back to Colombia.  Thank you for

```
 1   reminding me.  Do you remember why I returned right back that
 2   day from Colombia to Miami?
 3   A.   I do.
 4   Q.   Why?
 5   A.   Because you were denied entry into Colombia.
 6   Q.   So I never made it inside in Colombia; right?
 7   A.   Correct.
 8   Q.   So I cannot possibly have talked to anybody in Colombia,
 9   did any business or anything that day or that flight; right?
10   A.   That I do not know, sir.
11   Q.   You just said I was turned back.
12   A.   You were.
13   Q.   Exactly.  So it's not possible to have any conversation
14   with any suspicious -- why it look suspicious traveling so
15   much, Agent?
16           THE COURT:  That's too many questions.  Pick one.  Do
17    you want him to say could you have had any contact with anyone,
18    or the second question?
19   BY DEFENDANT DIDANI:
20   Q.   Agent, so could I have had contact that day with anyone,
21   with any associate, imaginary associate?
22   A.   I will give you two different scenarios.  The scenario I
23   knew before I talked to you, which was you flew into Colombia,
24   eight hours later you flew back.  And I'm not sure if it was
25   quite eight hours, but it was a couple hours later you flew
```

1    back.

2          In that scenario, I didn't know.  Maybe you met

3    somebody, maybe you talked to somebody, maybe you did things.

4    Then I interviewed you, which is why I wanted to interview you

5    to find out what was going on, and found out that you told me

6    that you were denied entry into Colombia and then turned back.

7    Q.   Did you ever verify that with Colombia, Agent Bianchi?

8    A.   No, I did not.

9    Q.   Okay.  So you had your suspicious -- you know, me traveling

10   to Turkey, me traveling to Colombia -- I never made it to

11   Colombia, but to Germany.  Those are the suspicions, missing

12   flights.  All those are suspicions of yours, you know, so ...

13          Agent Fuentes took my phone and scrolled all over the

14   phone; right?

15   A.   Yes, sir.

16   Q.   He went all through the phone; right?

17   A.   Yes, sir.

18   Q.   And they saw a picture of what?  Tell the jury.

19   A.   I cannot testify to what Mr. Fuentes saw, sir.

20   Q.   What did you see on that day on that phone?

21   A.   I will say again I saw pictures of you with a pistol on

22   your hip.  I saw pictures of you holding what appeared to be an

23   AR-style rifle.  I saw pictures of bulk currency, cash, U.S.

24   currency.  I saw pictures of what appeared to be a small bag of

25   what I thought was cocaine or a white, powdery substance.  I

1   saw pictures of you and your friends at the bar.  I saw

2   pictures of you in vacation, which you had said was the -- I

3   believe it was the Maltese Islands.  You showed me personally

4   pictures of you at the Drake concert.

5   Q.   In Dubai.

6   A.   In Dubai, okay.  That is what I saw.

7   Q.   Okay, Agent.  Let's go to the first pictures.  Having a

8   picture with a pistol, is that illegal?

9              MR. BILKOVIC:  Judge, can we approach the bench?

10             THE COURT:  Yes, you can.

11             (At sidebar on the record out of the hearing of

12             the jury, as follows:)

13             MR. BILKOVIC:  I'm worried about the answer here,

14   because he was a convicted felon and not allowed to be in

15   possession of firearms.  And, if he pursues that line of

16   questioning with Agent Bianchi, my concern is Agent Bianchi is

17   going to respond that way.

18             DEFENDANT DIDANI:  He can respond that way, your

19   Honor.

20             THE COURT:  Otherwise, that could come in.

21             DEFENDANT DIDANI:  That's fine.  He can --

22             MR. FINK:  It's going to be a criminal history and

23   that you had a felony in the past.  They're going to know that.

24   I'm just making sure you understand.

25             DEFENDANT DIDANI:  That was a drug driving.  As I told

```
 1   you, I wanted to --

 2             MR. FINK:  That's fine.  That's the prior felony --

 3             DEFENDANT DIDANI:  Yes, yes.

 4             THE COURT:  That's the prior what?

 5             MR. FINK:  That's the prior felony --

 6             MR. BILKOVIC:  Prior drunk driving.

 7             MR. FINK:  -- and I'm sure I did not know about

 8   something else.

 9             THE COURT:  All right.

10             (End of sidebar.)

11   BY DEFENDANT DIDANI:

12   Q.  Agent Bianchi.

13   A.  Yes, sir.

14   Q.  Is that illegal to have a photo with a gun?

15   A.  It depends.

16   Q.  What do you mean it depends?

17   A.  If you are a felon, you are not allowed to carry a firearm.

18   Q.  Okay.  So explain to the jury the felon.  Do you know if I

19   was a felon in that time, or no?

20   A.  Depending on the date of the photo, and I don't know the

21   date of the photo, but at the time I knew you had felonies.

22   Q.  What kind of felonies I had, Agent Bianchi?

23   A.  DUIs.

24   Q.  DUI, drunk driving?

25   A.  Yes.
```

1   Q.   I'm not allowed to take a picture of a gun if you have a

2   DUI?

3   A.   I don't know the answer to that, sir.

4   Q.   But you're the agent.

5           THE COURT:  But that's a comment.  It's not a

6    question.

7   BY DEFENDANT DIDANI:

8   Q.   So I'm not allowed to have a picture of a gun?

9   A.   Of a guy?

10  Q.   A gun.  A gun picture, with a DUI.

11  A.   Again, this depends.  If you're asking if you can just have

12  a picture of a gun, sure.  Anybody could have a picture of a

13  gun.

14  Q.   Okay.  Thank you.  That's what I wanted to make sure.

15  A.   But this was a picture of a gun on your hip and you holding

16  an AR-15, or what looked to be like an AR-15, and you were a

17  felon.

18  Q.   Well, Mr. President is a felon, he's around guns.  So what

19  are we doing right now?

20          THE COURT:  Now, I'm not sure what that question is.

21   What is that question?

22          Okay.  It's stricken.  Go to another question.

23  BY DEFENDANT DIDANI:

24  Q.   Okay.  So is that illegal to have money, cash money, sir?

25  A.   I would say no, but again it depends on the situation, sir.

1    Q.   The money that the Government showed the exhibits, they

2    show each of us -- that was on the table, the money, is that

3    illegal to have cash money in the United States?

4    A.   If you laundered that money or it was drug proceeds,

5    absolutely.

6    Q.   But, Agent, you just said that the only felony I have is

7    drunk driving.

8    A.   Okay.

9    Q.   So it's illegal for me to have a picture with money, or

10   videos with money?  It is illegal or not?

11   A.   I didn't say it was illegal to have a picture of money.

12   Q.   So it's illegal or not?

13   A.   I guess rephrase your question.

14   Q.   It is illegal to have picture of money, bunch of money or

15   video of money?

16   A.   To have the picture of money, I would say, no, it's not

17   illegal.  To possess that money under the circumstances I

18   stated is illegal.

19   Q.   All right.  Thank you.  With all the circumstances and all

20   these things happen, then explain to the jury what was the next

21   step?  You copied -- you extracted that phone; right?

22   A.   Did you say extracted the phone?

23   Q.   Yes.

24   A.   Yes, sir.

25   Q.   When you say extracted, let me make sure one more time,

```
 1  remind the jury, that is almost 99 percent or hundred percent
 2  extraction, whatever the content on the phone; right?
 3  A.   That totally depends on the phone, the make, the model, the
 4  software you're using.  In your case, depending on which year
 5  we're talking about, and we're talking about 2015 --
 6  Q.   2015.
 7  A.   -- we did not get the full extraction.  We got the full
 8  photos, we got the full videos.  I'd have to go back and look
 9  and see everything we got, but it was not a full, complete
10  extraction.
11  Q.   You said on the hearing -- you just said to the Government
12  it's more than 10,000 photos and videos.
13  A.   And I just said we got the photos and we got the videos.
14  Q.   All the conversations, do you remember that during the
15  hearing?
16  A.   I would have to go back and look.  I can tell you for sure
17  we got a full extraction of your 2016 phone, but I cannot say
18  if we got a full extraction of the 2015.
19  Q.   Agent, so now you have a full extraction.  You let me go,
20  me and my fiancee.  We left, you know, to a destination that
21  you don't know really.  Now you have the phone.  You have a
22  copy of the phone; right?
23  A.   Yes, sir.
24  Q.   Now, you went back to the office in Detroit, right, with
25  that copy of the phone; right?
```

1    A.   Yes, sir.

2    Q.   And every day you took your time, start scrolling, watching

3    and comparing every picture; right?

4    A.   No.

5    Q.   No?

6    A.   No, not every day.

7    Q.   Well, did you watch everything, the content of the phone?

8    A.   I'm sorry?

9    Q.   Did you watch all the contents of that phone, the copy of

10   the phone?

11   A.   I'm sorry.  I don't understand you.

12   Q.   Agent, you have the copy of the phone.  You left from

13   Chicago with a copy of the phone in your pocket or whatever --

14   A.   Correct.

15   Q.   Did you check everything, the contents of that phone, all

16   the --

17   A.   Every single thing on that phone?

18   Q.   Yes.

19   A.   I'm sure I probably did not.

20            DEFENDANT DIDANI:  Your Honor, I need to remind him on

21   a hearing in April 24, 2023.  Can you please give me one

22   second?

23            THE COURT:  Yes.

24            DEFENDANT DIDANI:  Page 107.

25            THE COURT:  And this is the same April transcript?

1          DEFENDANT DIDANI:  Yes, your Honor, April 24, 2023.
2     It's Page 107, line 12, all the way to the end.
3          THE COURT:  To the end of the page?
4          DEFENDANT DIDANI:  Yes, your Honor.
5          MR. FINK:  May I approach, your Honor?
6          THE COURT:  Yes, you may.
7          THE WITNESS:  Do I just read this to myself?
8          THE COURT:  Read it to yourself first.
9          THE WITNESS:  Starting on line ...
10          THE COURT:  12.
11          THE WITNESS:  Okay.
12    BY DEFENDANT DIDANI:
13    Q.   So, Agent Bianchi, do you agree with me based on that
14    testimony that you checked every corner of that phone?
15    A.   No.  If you refer to line -- well, let's start at line 22.
16          "And, like I said -- and like we said, everything that
17    was available was an exact copy of that phone from the day it
18    was taken; right?"
19          My response, "Not exactly, but most of it."
20          I cannot sit here and say that I've seen every single
21    thing that was on that phone.
22    Q.   Agent Bianchi, on that exact copy, that copy, you checked
23    every corner of that copy that you have; right?  Everything on
24    that copy existed on that copy?
25    A.   Again, not exactly, but most of it.

1              MR. FINK:  May I retrieve the exhibit from Mr. Didani?

2              THE COURT:  Yes.

3              MR. FINK:  Thank you, your Honor.

4              DEFENDANT DIDANI:  Your Honor, can I read line 18 from

5    transcript, 107?

6              THE COURT:  Yes, you can.

7    BY DEFENDANT DIDANI:

8    Q.   Question, "Did you search every corner over?"

9              Answer -- your answer, "Yes, sir."

10   A.   Keep going.

11   Q.   "All the apps, everything that was available."

12   A.   Keep going.

13   Q.   Like you said, everything that was available, it was exact

14   copy of that phone from the day it was taken; right?  Not

15   exact, but most of them; right?

16   A.   Say that one more time?

17   Q.   Not exactly, but most of it?

18   A.   Exactly.

19   Q.   So the exact copy; right?

20              That's fine, Agent.  Let me ask you something, 2015.

21   Can I ask you something?  What year is it right now, 2025?

22   A.   I didn't understand you.

23   Q.   Agent, today's day, what's today's day?

24   A.   Valentine's Day, February 14th.

25   Q.   Oh.  February 14th, today, 2025?

1    A.   Yes, sir.

2    Q.   And I'm going to ask you a specific question, Agent.  For

3    this specific copy from 2015 until today, which is almost ten

4    years, do you have a warrant for this specific copy?

5    A.   Do they what?

6    Q.   Do you have a warrant for this specific copy?

7    A.   No.

8    Q.   So you mean to tell me you have no warrant --

9    A.   I don't need one.

10   Q.   -- ten years later?  You don't need one?

11   A.   I don't need one, which we've already ...

12   Q.   Agent Bianchi, ten years later you don't have a warrant for

13   that copy exactly?  That's what you're trying to tell me?

14   A.   That is what I said.

15   Q.   Agent Bianchi, I'm going to ask you a personal question.

16   When you went through those photos, did you see my -- a naked

17   picture of my fiancee?

18   A.   Did I see naked photos, yes.  I'm not sure --

19   Q.   Of my fiancee, Agent.  Of my fiancee.

20   A.   I don't recall if it was your fiancee that it was -- that

21   was there or not.

22   Q.   Agent, can I ask you really do you think this is normal?

23            MR. BILKOVIC:  Judge, I'm going to --

24            THE COURT:  Do you think what is normal?

25

BY DEFENDANT DIDANI:

Q.   That ten years later you still don't have a warrant for that copy?

A.   Absolutely.

            MR. BILKOVIC:  I'm going to object at this point. We've already had a hearing on this.  The Court has ruled that he didn't need a warrant.

            THE COURT:  We've already had a hearing on it, I ruled.  And you may proceed, but not about the warrant.  Go to another question.

BY DEFENDANT DIDANI:

Q.   All right, Agent.  Now you're armed with a copy of a phone of somebody's life, personal life.

            Let me go back.  Is that a practice you can do?  It doesn't matter, all Americans, or all citizens of the world?

A.   It depends.

Q.   Only you need just somebody to say Mr. Wade Fink travel with money from Greektown Casino to Canada, you can do that; right?

A.   It depends.  When you travel into or out --

            THE COURT:  There's no question posed to you right now.

            THE WITNESS:  Okay.

            THE COURT:  Pose a new question.

1    BY DEFENDANT DIDANI:

2    Q.   All right, Agent.  So for all this time you're armed with

3    pictures, with photos with guns, photos with guns, some photos

4    to big substance, naked pictures, who knows what else, you

5    know, you did.

6          Now, here comes 2016, right, a year later.  Again, you

7    have a silent hit again about me, right, in 2016?

8    A.   Yes.  If you're talking about your travel, yes.

9    Q.   Yes.  So you got information that I was traveling from Rome

10   in transit to O'Hare to Mexico; right?

11   A.   Yes, sir.

12   Q.   Did you tell that -- then you contact Mr. Parisi or

13   Mr. Nugent.  You told them that Mr. Didani is flying from Rome

14   to O'Hare to Mexico; right?  That's what you told them, and

15   he's being investigated for drugs and money laundering; right?

16   A.   Along those lines, yes.

17   Q.   If those agents testified here they had no idea that I was

18   going to Mexico, is that true or false?

19         MR. BILKOVIC:  Objection, Judge.  I don't think he can

20   testify about what the other agents testified to and what they

21   would have known.

22         THE COURT:  You can maybe ask another question, but

23   not that one.  Go to a new one.

24   BY DEFENDANT DIDANI:

25   Q.   All right, Agent Bianchi.  So you called and you told --

1    you told Agent Nugent particularly what to do?

2    A.   Is that a question?

3    Q.   Yes.  What did you instruct him to do?  You called and you

4    say, Agent Nugent, I need you to --

5    A.   The particulars, that was nine years ago.  I do not recall.

6    I'm sorry.  We -- I can tell you we discussed the case, and I

7    asked him to search and interview you.

8    Q.   You never told him that -- seize his phones; right?

9    A.   No.

10   Q.   So who participate on seizing the phones?  You have nothing

11   to do with that?

12   A.   No, sir.  I was on vacation during that time.

13   Q.   Okay.  So in August 6 you saying that you was on vacation?

14   A.   Yes, sir.

15        DEFENDANT DIDANI:  Can you hold on a second?

16        (Briefly off the record.)

17        DEFENDANT DIDANI:  Your Honor, can we take a break?

18    It's very important I find that, because it was --

19        THE COURT:  We can take a break.

20        Remember that you're not permitted to talk about the

21   case among yourselves or with anyone else until I submit it to

22   you for your deliberations.

23        And you may step down and we'll take about ten

24   minutes, okay.

25        (The jury left the courtroom at 3:36 p.m.)

1              THE COURT:  Do you all have any problem being here
2     until 4:30?
3              LAW CLERK:  Yes, Judge.
4              THE COURT:  We do?  I do?
5              THE CLERK:  Yes.
6              THE COURT:  Oh, I do.  You're right.  I forgot, yeah.
7     Okay.  Well, maybe we need to just send them home now.
8              Do we need to do that for the marshals?
9              MARSHAL:  That would be helpful, your Honor.
10             THE COURT:  Yeah.  Bring them back out, please.
11             (The jury entered the courtroom at 3:40 p.m.)
12             THE COURT:  Okay.  Don't get too comfortable, but you
13    may be seated.  All of you may be seated, too.
14             I'm going to send you home.  Remember that you're not
15    permitted to talk about the case among yourselves or with
16    anyone else.  I was going to send you for a break, but I think
17    when I bring you back we'll only have five minutes, so I might
18    as well let you go now.
19             I don't think it's snowing yet; right?  Tomorrow?
20    Yeah, four to seven; right?
21             THE CLERK:  Yes.
22             THE COURT:  Okay.  Well, we don't have court on
23    Monday, and so you're coming on Tuesday.  Come refreshed.  Come
24    on time if you can.  Hopefully the roads will be clear, okay.
25             You're going to leave your notes as Ms. Saulsberry

1    directs.  I think she has individual packets for you, and

2    she'll secure them so no one will have access to them.  And

3    remember don't use any social media or the internet or anything

4    to find out anything about anything related to this case, okay.

5         You may step down and have a good weekend.

6         Please rise for the jury.

7         (The jury left the courtroom at 3:41 p.m.)

8         THE COURT:  You may step down, sir.  You need to

9    return on Tuesday.

10        At 9:30?

11        MR. BILKOVIC:  We're 9:30 Tuesday.

12        THE COURT:  Okay.  Don't discuss your testimony with

13   anyone during that break; okay?

14        THE WITNESS:  Yes, your Honor.

15        THE COURT:  Okay.  You all may be seated.  I'm going

16   to send you all home as well.

17        But, Mr. Didani, you need to be ready with your

18   transcript pieces so that we don't have to take a break and

19   look for them, okay.  And you'll have, you know, the rest of

20   this weekend and Monday to do that; all right?

21        DEFENDANT DIDANI:  All right, your Honor.

22        THE COURT:  Okay.  Do we have anything else we need to

23   take up at this time?

24        MR. BILKOVIC:  No, your Honor.

25        THE COURT:  All right.  Very good.

```
 1          MR. FINK:  Judge, any chance you could with the
 2    benefit of the weekend look at one of the ex parte motions
 3    filed, I'd be very grateful.
 4          THE COURT:  I did --
 5          MR. FINK:  There's another one that is pending.
 6          THE COURT:  That's filed when?
 7          MR. FINK:  A couple days ago, maybe two days ago --
 8    two nights ago.  If not, I'll make sure --
 9          THE COURT:  Do I have that?  We'll take care of it.
10          MR. FINK:  Oh, okay.  I've just got to get it -- got
11    it.  Understood.
12          THE COURT:  We already took care of if, but if we
13    didn't --
14          MR. FINK:  I really appreciate it, Judge.
15          THE COURT:  All right.  Everyone have a very good
16    weekend, and I will see you next week, okay.
17          MR. BILKOVIC:  You, too, Judge, you and your staff.
18    Thank you.
19          THE COURT:  See you next week.
20          MR. BILKOVIC:  Thank you.
21          (The proceedings were adjourned at 3:43 p.m.)
22                        _   _  _
23
24
25
```

```
 1
 2
 3                    CERTIFICATE OF COURT REPORTER
 4
 5          I, Sheila D. Rice, Official Court Reporter of the
 6     United States District Court, Eastern District of Michigan,
 7     appointed pursuant to the provisions of Title 28, United States
 8     Code, Section 753, do hereby certify that the foregoing pages
 9     is a correct transcript from the record of proceedings in the
10     above-entitled matter.
11
12
13                         s/Sheila D. Rice
                           Sheila D. Rice, CSR-4163, RPR, RMR, FCRR
14                         Federal Official Court Reporter
                           United States District Court
15                         Eastern District of Michigan
16
       Date:  02/24/2025
17     Detroit, Michigan.
18
19
20
21
22
23
24
25
```