```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF MICHIGAN
 2                         SOUTHERN DIVISION

 3                            −   −   −

     UNITED STATES OF AMERICA,
 4
                    Plaintiff,
 5
       v.                                Case No. 21-20264
 6
     YLLI DIDANI,
 7
                    Defendant.
 8   _____/

 9               JURY TRIAL − VOLUME 7 − EXCERPT
               BEFORE THE HONORABLE DENISE PAGE HOOD
10                 UNITED STATES DISTRICT JUDGE

11            Theodore Levin United States Courthouse
                   231 West Lafayette Boulevard
12                      Detroit, Michigan
                     Monday, February 24, 2025
13

14   APPEARANCES:

15    For the Plaintiff:       Mark Bilkovic
                               Timothy P. McDonald
16                             UNITED STATES ATTORNEY'S OFFICE
                               211 W. Fort Street, Suite 2001
17                             Detroit, Michigan  48226
                               (313) 226-9623
18
      For the Defendant:       Ylli Didani
19                             Appearing in Pro Se

20                             Wade Fink
                               WADE FINK LAW, P.C.
21                             550 W. Merrill Street, Suite 100
                               Birmingham, Michigan  48009
22                             (248) 712-1054

23    Also Present:           Special Agent Chad Hermans
                              Maria DiCarlo, Paralegal
24
           To obtain a copy of this official transcript, contact:
25               Sheila D. Rice  Official Court Reporter
               (313) 234-2610 • sheila_rice@mied.uscourts.gov
```

1                        **TABLE OF CONTENTS**

2    MATTER _____ PAGE

3    **JURY TRIAL - VOLUME - EXCERPT**

4    **Government's Case in Chief - Continued**

5    **DOUGLAS AMMERMAN**

     Direct examination by Mr. McDonald.................  4
6    Cross-examination by Defendant Didani............... 28
     Redirect examination by Mr. McDonald............... 46
7    Recross examination by Defendant Didani............ 48

8    Certificate of Court Reporter...................... 50

9

10

11

12

13

14

15                    E X H I B I T   I N D E X

16

17   Exhibit No.      Description          Identified   Admitted

     None marked
18

19

20

21

22

23

24

25

1    Detroit, Michigan

2    Monday, February 24, 2025

3    9:24 a.m.

4                              _   _   _

5         (Beginning of excerpt.)

6         THE COURT:  Very good.  Who's your next witness,

7    please?

8         MR. McDONALD:  United States calls Douglas Ammerman.

9         THE COURT:  Right up here, sir, and raise your right

10   hand, okay.  Right there is fine.

11        (Oath administered.)

12        THE COURT:  All right.  You may be seated, and when

13   you're seated state your full name and spell your last name for

14   the record.

15        THE WITNESS:  My name is Douglas Ammerman spelled

16   A-M-M-E-R-M-A-N.

17        THE COURT:  Okay.  Is that loud enough for everyone at

18   counsel table to hear?

19        MR. McDONALD:  I think maybe if Mr. Ammerman could

20   pull the microphone just a little bit closer.

21        THE COURT:  Yeah.  The seat won't move.

22        THE WITNESS:  How does that sound?

23        MR. McDONALD:  Perfect.

24        THE COURT:  That's better, okay.

25        MR. McDONALD:  May I proceed, your Honor?

```
 1              THE COURT:  Yes, you may.
 2              MR. McDONALD:  Thank you.
 3                      *        *        *
 4                      DOUGLAS AMMERMAN,
 5          was called as a witness at 9:24 a.m. after having been
 6          duly sworn to testify to the truth.
 7                      *        *        *
 8                   DIRECT EXAMINATION
 9    BY MR. McDONALD:
10    Q.   Good morning.
11    A.   Good morning.
12    Q.   Can you tell the jury where you're currently employed?
13    A.   Currently I'm a freelance pilot.  I am self-employed, but I
14    fly a privately-owned aircraft for --
15              THE COURT:  You fly what?
16              THE WITNESS:  Privately-owned aircraft.  It's a small
17     private jet, nine passengers.
18    BY MR. McDONALD:
19    Q.   All right.  And how long have you been doing that?
20    A.   I've been doing this for the last three years.
21    Q.   Prior to becoming an independent pilot or subcontractor how
22    were you employed?
23    A.   So previous to this I did work for a charter company that
24    flew the same aircraft.  And then before that I worked for the
25    World Heritage Air Museum as an aircraft mechanic.
```

```
 1              THE COURT:  Your previous employment you said you
 2    worked with the same aircraft; is that right?
 3              THE WITNESS:  The same type airplane is what I --
 4              THE COURT:  What company was it?
 5              THE WITNESS:  The name of the company was Corporate
 6    Eagle Management Services.
 7              THE COURT:  And then you worked for the World what?
 8              THE WITNESS:  It's World Heritage Air Museum.
 9              THE COURT:  Where is it located?
10              THE WITNESS:  Located at Detroit City Airport.
11              THE COURT:  Go ahead.  I'm sorry for interrupting.
12              MR. McDONALD:  Thank you, your Honor.
13    BY MR. McDONALD:
14    Q.   How long have you been a pilot?
15    A.   I've been flying since I was 14, and I got my license at
16    17.
17    Q.   Okay.  And so more than 20 years?
18    A.   Yes.
19    Q.   Are you also a airline mechanic -- airplane mechanic?
20    A.   Yes.  I was dual enrolled in high school, and I have a
21    aircraft -- it's a airframe and power plant certificate that
22    allows me to work on aircraft as a mechanic.
23    Q.   How long have you been a airplane mechanic?
24    A.   For almost 20 years.
25    Q.   Do you have to get a certification for either a pilot
```

 1    license or a mechanic license?

 2    A.   Yes.  They're both separate.  Yes.  I'm certified in both.

 3    Q.   And how often do you fly?

 4    A.   Right now about once a week.

 5    Q.   All right.  And you don't own your own plane, you fly

 6    another company's plane?

 7    A.   I fly other people's planes, yes.

 8    Q.   Did you know someone by the name of Martin Tibbitts?

 9    A.   Yes.

10    Q.   How did you know Martin Tibbitts?

11    A.   Martin Tibbitts was the founder --

12         THE COURT:  Just one second, please.  You guys need to

13    turn off the mic if you're going to talk at counsel table,

14    okay, please.  Thank you.

15    BY MR. McDONALD:

16    Q.   Let me ask my question again, sir.  How did you know

17    someone by the name of Martin Tibbitts?

18    A.   Martin Tibbitts was the founder and owner of the World

19    Heritage Air Museum.

20    Q.   Can you tell the jury how you met Martin Tibbitts?

21    A.    I met Martin Tibbitts through Facebook where I saw that

22    there was a air museum at Detroit City Airport.  And I reached

23    out to the owner of the Facebook group, and then he invited me

24    to give me a tour of his air museum where he collected Cold War

25    jets.

1    Q.   You said the owner of a Facebook group.  Was that Martin

2    Tibbitts as you have come to find out?

3    A.   Yes.  Martin Tibbitts owned -- yeah.  He was the admin for

4    the Facebook group for this museum.

5    Q.   And when did you reach out to the owner of this Facebook

6    group?

7    A.   It was late 2015.

8    Q.   And at that time where were you working?

9    A.   I was working for Quicken Loans.

10   Q.   Why did you reach out to Martin Tibbitts at the World

11   Heritage Museum?

12   A.   Because of my interest in wanting to be a pilot and my

13   passion for aviation.

14   Q.   All right.  And after you reached out to him did there come

15   a point in time where you met Martin Tibbitts?

16   A.   Yes.

17   Q.   And can you describe that for the jury.

18   A.   Well, he invited me to the air museum where I met him at

19   Detroit City Airport.

20   Q.   When you say "he" and "him," that's Martin Tibbitts?

21   A.   Correct.

22   Q.   Okay.

23   A.   Martin Tibbitts invited me to the airport and gave me a

24   personal tour of his collection of Cold War jets.

25   Q.   Okay.  And that's at the Detroit City Airport?

1    A.   Detroit City Airport, yes.

2    Q.   All right.  And after that initial meeting with Martin

3    Tibbitts at the Detroit City Airport did there come a point in

4    time when you started volunteering for the museum?

5    A.   Yes, I did.

6    Q.   And can you tell us how that came about?

7    A.   So he had a position open for a director of maintenance.

8    And I felt as if at the time that was more than I could handle,

9    but I told him that I would love to volunteer and be involved

10   in the museum on my own free time.

11   Q.   Okay.  Now, you said you went down, had a tour, and then

12   you started volunteering.  What's the time range in-between

13   those two events?

14   A.   A week.  Like I started volunteering like that weekend in

15   working with the guys that worked there.

16   Q.   Okay.  And when you say volunteering what were you doing at

17   the air museum?

18   A.   So first task there was a aircraft that the gear had

19   collapsed in the hanger.  And so we worked on getting the

20   landing gear operational and repairing the propeller and the

21   damage to the wings.

22   Q.   All right.  Fair to say that your volunteer work was just

23   airplane maintenance and repair?

24   A.   Yes.

25   Q.   Did there come a time that you took a full-time job with

1    the World Heritage Museum?

2    A.   Yes, I did.

3    Q.   When was that?

4    A.   That was January 1st of 2016.

5    Q.   What was the nature of your full-time position?

6    A.   I was a aircraft mechanic.

7    Q.   Anything besides being a mechanic?  Did you do anything

8    else for the museum?

9    A.   So I would volunteer fly missions to build flight hours,

10   but it was purely museum missions such as like following

11   aircraft to air shows, picking up parts needed for the aircraft

12   and things like that.

13   Q.   Please make sure you keep your voice up the best you can.

14   A.   Yes, sir.

15   Q.   Okay.  Thank you.  Can you describe your relationship with

16   Martin Tibbitts?

17   A.   My relationship was purely professional.

18   Q.   What do you mean by that?

19   A.   I mean, he was the owner and boss of the museum.  He gave

20   me directives, and I did the best I could to accomplish them.

21   Q.   Did you know how Martin Tibbitts was employed outside of

22   World Heritage Museum?

23   A.   I knew Martin Tibbitts had -- he was the CEO of a couple of

24   different companies.  I believe it was Clementine Live

25   Answering, and another one I remember is Back Office Supplies.

1   Q.   How did you know that?

2   A.   Just from conversation.

3   Q.   With Martin Tibbitts?

4   A.   With Martin Tibbitts, yes.

5   Q.   Now, you said your relationship was professional, it was

6   based around the museum.  Did you ever fly the planes at the

7   World Heritage Museum to log additional flight time?

8   A.   Yes.

9   Q.   Did you ever do anything else, work on the weekends?

10  A.   Yes.

11  Q.   Transport people, anything like that?

12  A.   So he -- we did air shows on the weekends, and so that was

13  standard during the summertime.  And then other than that there

14  was only one other flight that I flew somebody for him.

15  Q.   Okay.  We'll get to that in a minute.

16  A.   Okay.

17  Q.   Other than the -- other than you, were there any other

18  mechanics that were working for the World Heritage Museum?

19  A.   Yes.

20  Q.   Did you know any of their names?

21  A.   Yes.  There was Mark French, Brian Vernon and a gentleman

22  named TJ.

23          THE COURT:  And who?

24          THE WITNESS:  TJ.

25

```
1    BY MR. McDONALD:
2    Q.   What was TJ's responsibilities?
3    A.   TJ was not a certified aircraft mechanic, but he was a very
4    experienced auto mechanic and handyman.  And so he would assist
5    in the projects that we had going on at the museum.
6    Q.   All right.  Did you ever observe TJ working on anything
7    that you would characterize as unusual?
8    A.   There was -- at the end of my term there he was working
9    with a magnet, but I didn't see anything other than him just
10   kind of holding it and looking at it.  He was -- there was
11   nothing that he like installed it on or anything.
12   Q.   When you say working on a magnet, what do you mean?
13   Remotely operating it or turning it on and off?
14   A.   It was a magnet that was able to be turned on and off, but
15   it was mechanical.  It wasn't electromagnet.  It was just a
16   purely -- it was a mechanism that rotated.  It would attach
17   itself, and then you could rotate the mechanism and remove it.
18   Q.   And you say rotate it.  Was that with like a bar?
19   A.   It was a tee handle.
20   Q.   Okay.  Turn the tee handle and it attaches to something,
21   you turn it back and it releases the magnet?
22   A.   And it releases, correct.
23   Q.   Did you ever have a personal relationship with
24   Mr. Tibbitts?
25   A.   Not a personal relationship.  I was invited to a Halloween
```

1    party.  It was as personal as it ever got.

2    Q.   Where was the Halloween party?

3    A.   It was located at his home in Grosse Pointe.

4    Q.   Have you ever met Martin -- did you ever meet Martin

5    Tibbitts' spouse?

6    A.   Yes, I did meet Belinda.

7    Q.   Okay.  Now, did you routinely fly planes for Martin

8    Tibbitts or fly his -- Martin Tibbitts' associates?

9    A.   No.

10   Q.   I want to direct your attention to December of 2017.  Were

11   you employed with the World Heritage Museum during that date

12   and time?

13   A.   Yes.

14   Q.   I didn't tell you a time, but during that date, December of

15   2017?

16   A.   Yes, sir.

17   Q.   And do you recall being asked to fly one of Mr. Tibbitts'

18   associates somewhere?

19   A.   Yes.

20   Q.   Do you know at the time that you were asked to do that do

21   you know where Mr. Tibbitts was?

22   A.   No.  Well, let me rephrase it.  I don't recall.  I don't

23   remember.

24   Q.   Had you ever received a similar request like this from

25   Martin Tibbitts?

1   A.   No.

2   Q.   Did you find the request unusual?

3   A.   Yes.

4   Q.   Why did you find it unusual?

5   A.   Because it wasn't -- I wasn't normally involved in any type

6   of flying mission and knew the reason why.  This was a request

7   to fly somebody to a location and immediately turn around and

8   fly right back.

9   Q.   Okay.

10  A.   With no other information.

11  Q.   Okay.  So on December 2017, where did Mr. Tibbitts

12  initially ask you to fly someone?

13  A.   It was in the New York area he requested.

14  Q.   And did Mr. Tibbitts tell you the name of the person that

15  you were going to fly?

16  A.   I don't recall.

17  Q.   Okay.  Did you, in fact, fly this person to New York?

18  A.   No.

19  Q.   Why not?

20  A.   I believe it was weather related.

21  Q.   Okay.  And so did you cancel that flight?

22  A.   Yes.

23  Q.   Did you reschedule?

24  A.   Yes.

25  Q.   How long after the planned trip to New York did you

1   reschedule this flight?

2   A.   I don't recall.

3   Q.   Okay.  Was it more than a month?

4   A.   No.

5   Q.   Was it more than three weeks?

6   A.   It was within a few weeks, but, yeah, I don't know the

7   exact timeframe.

8   Q.   Did you, in fact, reschedule the trip?

9   A.   I did.

10  Q.   And where were you -- were you flying back to New York this

11  time?

12  A.   No.  The location had changed to they wanted me to go to

13  D.C.

14  Q.   When you say "they," who wanted you to go to D.C.?

15  A.   Marty.  Martin Tibbitts wanted me to go to D.C.

16  Q.   When you say D.C., that's Washington, D.C.?

17  A.   Washington, D.C., correct.

18  Q.   All right.  And were you told how many people you were

19  transporting to Washington, D.C. or New York?

20  A.   I don't recall if I was told, but I know there was only one

21  person that I took.

22  Q.   And do you know the name of the person that you took?

23  A.   Yes.  His name was Don Larson.

24  Q.   All right.  There's a manila folder on your desk there.

25  Hold on just a second.  Don't open it yet.

1           How long did you spend with Mr. Larson during this

2    trip to D.C. would you say?

3    A.  I only spent the flight time with him there and back, which

4    was around six hours, six and a half hours or something.

5    Q.  All right.  And during the flight and back did you have an

6    opportunity to speak with him or talk to him or chat with him

7    throughout the trip?

8    A.  I did, yeah.  We were sitting right next to each other and

9    nobody else to talk to.

10   Q.  Okay.  All right.  Can you open that folder and identify

11   what it is for the record?

12   A.  This is a photograph of Don Larson.

13   Q.  Is there an exhibit sticker on the bottom?

14   A.  It is.  It says, "Exhibit 1.1."

15   Q.  And that photo fairly and accurately depicts what Don

16   Larson looked like?

17   A.  Yes.

18           MR. McDONALD:  All right.  Can I publish 1.1?  It's

19   already been admitted.

20           THE COURT:  It's already admitted; is that correct?

21           MR. McDONALD:  It is, your Honor.

22           THE COURT:  Okay.

23   BY MR. McDONALD:

24   Q.  All right.  This is a person on the screen that you flew to

25   Washington, D.C. in December of 2017?

1   A.   Yes.

2   Q.   Okay.  Thank you.  Do you remember the date of the flight?

3   A.   No.

4   Q.   But it was in December of 2017?

5   A.   Correct.

6   Q.   Is there anything that would refresh your recollection on

7   the date of the flight?

8   A.   I have a pilot logbook that I track my flight hours in.

9          MR. McDONALD:  For the record, I'm showing Mr. Didani.

10         DEFENDANT DIDANI:  Yes.

11         MR. McDONALD:  May I approach?

12         THE COURT:  Yes, you may.

13  BY MR. McDONALD:

14  Q.   If I showed you your flight logbook, would that refresh

15  your recollection on the date?

16  A.   Yes.

17  Q.   Just take a look at these two items, read them to yourself,

18  and I'll ask you a question.

19         THE COURT:  Well, it doesn't look like a book to me.

20   So you just passed him some pages from a book, or that's --

21         MR. McDONALD:  Did I say book?

22         THE COURT:  I think you said flight logbook.

23         THE WITNESS:  I said flight log.

24         THE COURT:  You said that?

25         THE WITNESS:  Yes.

```
 1              THE COURT:  Good.  I'm glad I didn't say it.
 2              MR. McDONALD:  Judge, for the record --
 3              THE COURT:  So it's not a book?
 4              MR. McDONALD:  It is not a book.  For the record, it
 5     is two separate pieces of paper from Mr. Ammerman's flight
 6     book.
 7              THE COURT:  Okay.
 8     BY MR. McDONALD:
 9     Q.   Have you had a chance to look at that, Mr. Ammerman?
10     A.   Yes.
11     Q.   And does that refresh your recollection on the date of the
12     flight?
13     A.   It does.
14     Q.   What was the date of the flight?
15     A.   December 21st.
16     Q.   You can just turn your logbook over.
17              THE COURT:  Now, you did call it a book then, but it's
18     okay.  It's marked as what, Exhibit -- it's just used to
19     refresh?
20              MR. McDONALD:  Yes, your Honor.
21              THE COURT:  But does it have a proposed number?
22              MR. McDONALD:  No.  Just simply used to refresh his
23     recollection.
24              THE COURT:  Okay.  Are the pages numbered or are they
25     just by date?
```

1          MR. McDONALD:  They're just by date.

2          THE WITNESS:  They're just by date.

3          THE COURT:  Okay.

4    BY MR. McDONALD:

5    Q.  I'm sorry.  Can you again state the date and year of the

6    flight?

7    A.  Yes.  It was December 21st of 2017.

8    Q.  Okay.  All right.  I want to talk about the specifics of

9    this flight to Washington, D.C.  Where did you meet Mr. Larson

10   on that date?

11   A.  At the Detroit City Airport.

12   Q.  And when he arrived did he have any large forms of luggage

13   or anything?

14   A.  No luggage, no.

15   Q.  Do your recall if he had anything on him?

16   A.  I don't recall if he had anything else, but he didn't have

17   anything that weighed a significant amount that I would be

18   concerned with for weight and balance calculations for the

19   flight, safety of the flight.

20   Q.  If someone had a backpack or a handbag, would the concern

21   you?

22   A.  No.  But like a roller board luggage that might weigh 50

23   pounds, that's going to something I'm going to consider into

24   the calculations.

25   Q.  All right.  And so he met you at Detroit City Airport;

1    right?

2    A.   Correct.

3    Q.   And you flew to where?

4    A.   We flew to an airport in the D.C. area.  I couldn't get

5    clearance -- security clearance to fly into D.C. itself.  The

6    airport identifier or -- it's like a small municipal county

7    airport in that area.

8    Q.   Do you know the name of it?

9    A.   Montgomery County Airport.

10   Q.   All right.  And is that in Washington, D.C.?

11   A.   It's in the metro area of Washington, D.C.

12   Q.   Do you remember what time this flight occurred?

13   A.   I don't recall the exact time, but I know it was past

14   sunset, our departure.

15   Q.   How long does it take to get from Detroit to Montgomery

16   city airport?

17   A.   About two and a half hours, I believe, on that leg.  The

18   logbook reflects the exact flight time.

19   Q.   Okay.  Would it refresh your recollection if you looked at

20   the pages from your logbook?

21   A.   It would, yes.

22   Q.   All right.  You can go ahead and flip that over.  Read it

23   to yourself and let me know when you're done.

24   A.   I'm done.

25   Q.   Does that refresh your memory on how long the flight was

```
 1    from Detroit to Montgomery Airport?
 2    A.   Yes.  It was two and a half hours.
 3              THE COURT:  And does that logbook say when the flight
 4    started?
 5              THE WITNESS:  It does not record the departure time.
 6              THE COURT:  Okay.
 7    BY MR. McDONALD:
 8    Q.   Can you tell the jury what happened when you landed in
 9    Montgomery Airport?
10    A.   After landing, we both exited the aircraft.  I stayed by
11    the aircraft to monitor the refueling process, and
12    Mr. Larson -- I don't recall where he went, but he went
13    somewhere.  And then I proceeded to go inside the aircraft --
14    or the airport office.  I sat down and I ate a sandwich that I
15    brought along with me.  And then before I finished the sandwich
16    Mr. Larson reappeared.  And when I was done eating we hopped
17    back in the airplane and flew back to Detroit.
18    Q.   Okay.  Can you estimate how long Mr. Larson was gone?
19    A.   We were there around 30 minutes to an hour.
20    Q.   Okay.  But do you know of that 30 minutes to an hour how
21    long you did not see Mr. Larson after he got out of the plane?
22    A.   I don't recall.
23    Q.   Okay.  But it wasn't five or ten minutes; fair?
24    A.   Maybe 10 to 15.  It wasn't very long.
25    Q.   All right.  And do you know if there was a parking lot near
```

1    where you landed?

2    A.   There should be a parking lot, yes.  I never exited the

3    office, so I didn't go into that parking lot, but there should

4    be one there.

5    Q.   Do you know how long -- strike that.

6         Does your flight log tell you how long you are on the

7    ground at Montgomery County?

8    A.   No, I did not record that.

9    Q.   Now, you said that you were eating a sandwich in the office

10   and at some point Mr. Larson came into the office with you?

11   A.   Yes.

12   Q.   And how long were you in the office before you got back

13   onto the plane, do you know?

14   A.   Just probably five to ten minutes.  Not very long.

15   Q.   All right.  And did you get back on the plane together,

16   both of you at the same time?

17   A.   Yeah, we both got back on the aircraft at the same time.

18   Q.   And you said you returned back to Detroit?

19   A.   Yes.

20   Q.   And where did you fly into Detroit?

21   A.   Detroit City Airport.

22   Q.   Same place you left from?

23   A.   The same place we left from.

24   Q.   What happened or -- strike that.

25        What, if anything, did Mr. Larson do when you arrived

1   in Detroit?

2   A.   Exited the aircraft and then left.

3   Q.   In a car or was he picked up, do you know?

4   A.   I don't recall.  I was putting the airplane back in the

5   hanger at the time and said our goodbyes and he went his own

6   way.

7           MR. McDONALD:  Okay.  May I have one moment, your

8   Honor?

9           THE COURT:  Yes.

10          MR. McDONALD:  Thank you.

11          (Briefly off the record.)

12  BY MR. McDONALD:

13  Q.   Mr. Ammerman, did you know anything about Mr. Larson's

14  background?

15  A.   Only from the small-talk we had in the aircraft.  I

16  discovered that he was a personal trainer.

17  Q.   Okay.  And do you know whether he had any relationship as a

18  physical trainer to Belinda Tibbitts?

19  A.   That's how he told me he met Marty was he was Belinda's

20  personal trainer, and she introduced him to Martin Tibbitts.

21  Q.   Now, during the trip, did Mr. Larson tell you why he was

22  going to D.C.?

23  A.   No.

24  Q.   Did you ask him?

25  A.   Yes.

1   Q.   And do you recall what he said?

2   A.   He said that Marty --

3           DEFENDANT DIDANI:  Objection, your Honor.  It's all

4   hearsay.

5           MR. McDONALD:  Judge, this is a co-conspirator's

6   statement under 801(d)(2)(E) if it's Mr. Larson's statement.

7           DEFENDANT DIDANI:  He hasn't laid a foundation, your

8   Honor.

9           THE COURT:  Well, you maybe need to at least say what

10  foundation you think you've laid, okay.  But, in addition, I do

11  think it's because you need to show certain items, don't you

12  agree?

13          MR. McDONALD:  Sure.

14          THE COURT:  Okay.  So tell us about your foundation.

15  BY MR. McDONALD:

16  Q.   Mr. Ammerman, this was in December of 2017?

17  A.   Yes.

18  Q.   And again, you were transporting Mr. Larson from one place

19  to another on a flight that you thought was unusual; correct?

20  A.   Correct.

21  Q.   And statements made by Mr. Larson, were they made in

22  response to your questioning?

23  A.   Yes.

24  Q.   What, if anything, did Mr. Larson tell you about why he was

25  going?

 1                DEFENDANT DIDANI:  Objection, your Honor.  It's

 2       hearsay.

 3                THE COURT:  Well, he can have it in if he can show

 4       that it's a statement of a co-conspirator.  And so far he has

 5       laid some foundation, but --

 6                You can just -- now that you've asked the witness the

 7       questions, you can just tell us what foundation you think

 8       you've laid.

 9                MR. McDONALD:  Well, Judge, I think we've laid a

10       significant foundation through the first six witnesses in this

11       trial that Mr. Larson transported money from a place in Detroit

12       to Washington, D.C. ultimately to give to Mr. Didani.  And by

13       doing so he is a co-conspirator of Mr. Didani in the charged

14       indictment.  And, therefore, his statements that are in

15       furtherance of it and in the course of it, this was in December

16       of 2017, during an act that's in furtherance of the conspiracy,

17       and a statement that he made to Mr. Ammerman during that time.

18                THE COURT:  Okay.

19                DEFENDANT DIDANI:  Your Honor, I object to it.  As of

20       right now, with six witness, they haven't shown anything about

21       this money is tied to any conspiracy, so --

22                THE COURT:  Okay.  The jury may step down for a

23       moment, please.

24                (The jury left the courtroom at 9:49 a.m.)

25                THE COURT:  In order for a co-conspirator's statement

1   -- you may all be seated -- to come in, the Government does

2   have to show a number of things.  One is that there's a

3   conspiracy taking place.  Number 2, that the people -- the

4   person making the statement is someone involved in it.  And

5   number 3 -- I think they're four, but number 3 is that it's in

6   furtherance of the conspiracy.

7           And I don't know that yet.  So I guess I should hear

8   from this witness so I can decide whether or not it's a

9   statement made in furtherance of a conspiracy.

10          So you can answer.

11  BY MR. McDONALD:

12  Q.  Do you remember the question, Mr. Ammerman?

13  A.  I do.  The question was I asked Don Larson what we were

14  doing in D.C. and why he was doing this flight for Marty.  And

15  he had stated that Marty trusts him to -- and I don't remember

16  the exact words, but I remember he told me that Marty trusts

17  him.

18          THE COURT:  And that was his reason for going to D.C.?

19          THE WITNESS:  Yes.

20          THE COURT:  I didn't hear the first part of your

21  answer.  What was the first part of your answer?

22          THE WITNESS:  I just kind of prefaced the question

23  again, which was why were we going to D.C.  And he just told me

24  that Marty trusts him, something along the line of trusts him

25  to carry out tasks or something, but I don't remember the exact

1    verbiage.

2            THE COURT:  Mr. McDonald.

3            MR. McDONALD:  Judge, I would say Mr. Larson is

4    telling another witness that another co-conspirator asked him

5    to -- or trusts him to carry out tasks.  And that is certainly

6    a statement made by a co-conspirator made in furtherance of it,

7    because as he's telling him that statement he is doing an act

8    in furtherance of the conspiracy.  So I think it squarely falls

9    within 801(d)(2)(E).

10           THE COURT:  Mr. Didani.

11           DEFENDANT DIDANI:  Your Honor, it doesn't -- I'm not

12   trying to understand the task that the Government said, because

13   I don't see any --

14           THE COURT:  Well, you can voir dire the witness if you

15   want, but you're not required to, of course, because the

16   Government has the responsibility for laying the foundation.

17           DEFENDANT DIDANI:  I don't see the Government has laid

18   any foundation for those as a co-conspirator.

19           THE COURT:  Well then the Court is called upon to act

20   and, therefore, I find that the Government has, in its last few

21   witnesses, laid a foundation for -- from which the jury --

22   facts from which the jury could conclude that Marty Tibbitts is

23   a co-conspirator.  They've also laid, I think, a foundation of

24   facts from which a jury could conclude that Marty Tibbitts gave

25   money to David Larson (sic) and that they have presented

```
 1   evidence from which a jury could infer so far that David Larson
 2   gave cash to the defendant and that would -- and that all that
 3   money was going to be used to purchase drugs in South America.
 4        MR. McDONALD:  Thank you.  I don't mean to correct the
 5   Court, but I think the Court said "David Larson."  It's Donald
 6   Larson.
 7        THE COURT:  I'm sorry, Donald Larson.  And that that
 8   money was going to purchase drugs in South America.  And I
 9   think it's kind of -- it is not the usual what we would hear as
10   part of it, but the fact that he trusts him to carry out tasks
11   may go to some evidence that we've already heard that the money
12   was taken to D.C. and given to Mr. Didani.  And, therefore, I'm
13   going to allow it in.  And your objection is noted and
14   preserved for the record.
15        You may bring the jury back out.
16        LAW CLERK:  All rise for the jury.
17        (The jury entered the courtroom at 9:54 a.m.)
18        THE COURT:  I'm satisfied the jurors are present.
19        What about you, gentlemen?
20        MR. BILKOVIC:  Yes, your Honor.
21        DEFENDANT DIDANI:  Yes, Honor.
22        THE COURT:  Okay.  Very well.  You may be seated.
23        You may pose the question again, Mr. McDonald.  And
24   the Court will overrule the objection and allow the answer.
25        MR. McDONALD:  Thank you.
```

1   BY MR. McDONALD:

2   Q.   Mr. Ammerman, what, if anything, did Mr. Larson tell you

3   about why he was going to D.C.?

4   A.   He said that Marty Tibbitts trusted him to carry out tasks,

5   but didn't give me any details of what we were doing.

6          MR. McDONALD:  May I have one moment?

7          THE COURT:  Yes.

8          MR. McDONALD:  Nothing further.  Thank you.

9          THE COURT:  Very well.

10         Cross-examine.

11         DEFENDANT DIDANI:  Good morning.

12         JURORS:  Good morning.

13                        CROSS-EXAMINATION

14  BY DEFENDANT DIDANI:

15  Q.   Good morning, Mr. Ammerman.

16  A.   Good morning.

17  Q.   My name is Didani.  Thank you for coming.

18         Mr. Ammerman, before we start any questioning, do you

19   know me?

20  A.   No.

21  Q.   You ever see me?

22  A.   No.

23  Q.   You indicated that you worked with Marty Tibbitts since

24   when?

25  A.   I'm sorry.  I worked with Marty Tibbitts for what?

1   Q.   Since when?

2   A.   Oh.  Since 2016.

3   Q.   And you was -- again, can you -- you was in charge of what?

4   A.   Say that again?

5   Q.   You was in charge of what?

6   A.   I was a aircraft mechanic at his air museum.

7   Q.   Did Mr. Tibbitts have one location or two locations?

8   A.   He had two locations, Detroit City Airport and another

9   hanger at Oakland County Airport.

10   Q.   Did you work in Oakland County Airport?

11   A.   Yes.  I went back and forth between the two.

12   Q.   Okay.  Can you describe to me what he had in Oakland County

13   Airport, what kind of aircraft he had?

14   A.   He had Cold War jets.

15   Q.   Cold War jets?

16   A.   Cold War jets from all over the world.

17   Q.   He had a Russian L39?

18   A.   The Czechoslovakian L39, yes.

19   Q.   What kind of other aircraft he have?

20   A.   So the aircraft rotated back and forth.  So other airplanes

21   he had there was a L29, same manufacturer as the 39.  He had a

22   British Vampire, and there was a Temco Super Pinto.  Sometimes

23   there was a French Fouga Magister.

24   Q.   Where is -- Marty Tibbitts, where he was getting those

25   aircraft from?

1    A.   Where was he getting them from?

2    Q.   Yes.

3    A.   I was not involved with that, so I don't know.

4    Q.   Those aircraft was -- do you remember a bomber from

5    England, or no?

6    A.   I believe there was a English aircraft that was larger, but

7    it wasn't a bomber.  It was -- but that was after I had left

8    the museum.

9    Q.   When did you left the museum?

10   A.   In the spring of 2018.

11   Q.   That's before his death or after his death?

12   A.   Three months prior to his death.

13   Q.   So you basically -- most of the time you spend it in

14   Detroit airport, the one in Detroit airport location, or --

15   A.   Most of the time was spent in Detroit airport location.

16   Q.   What kind of aircraft he had in there in Detroit?

17   A.   The same -- we had many more aircraft that were nonflying,

18   but they were scheduled to be assembled.  We had MiG 15, a MiG

19   17.  There was de Havilland Venom and just -- there was all

20   kinds of airplanes, but those are just to name a few.

21   Q.   Mr. Ammerman, you indicated that you was in charge of all

22   the mechanics in the aircraft, Cold War aircraft.  You

23   indicated in 2016 and 2017?

24   A.   I started as a mechanic in 2016, and then I became the

25   director of maintenance and the manager of the museum shortly

 1    after.

 2    Q.   Let me ask you a question.  Did you travel to Europe?

 3    A.   No.

 4    Q.   Any other mechanics from your group travel to Europe?

 5    A.   Yes, but it was after my time.

 6    Q.   2016?

 7    A.   Not in 2016.

 8    Q.   2017?

 9    A.   I think it was early 2018 somebody went to Europe to

10    acquire a jet.

11    Q.   Where in Europe?

12    A.   I don't know the location.

13    Q.   So, if I show you evidence in 2016, 2017, that one of your

14    guys, group, they was in Albania taking photos of MiGs, old

15    cold MiGs, you don't remember that, Mr. Ammerman?

16    A.   No, I don't remember that.

17              And when you say from my group do you mean --

18    Q.   The mechanics.

19    A.   The mechanics, okay.

20    Q.   So you don't remember that?

21    A.   I don't recall that.

22    Q.   You don't recall they was sent to Albania, to Kosovo,

23    Macedonia, Poland?

24              MR. McDONALD:  Objection, asked and answered.  He

25     doesn't recall that.

1          THE COURT:  Well, he's asked a lot of places now.  You

2     can answer that.  Overruled.

3          THE WITNESS:  I do not recall and I don't -- I'm not

4     aware of that going on, not one of my guys, not from the

5     museum.

6     BY DEFENDANT DIDANI:

7     Q.  All right, Mr. Ammerman.  Can you answer a question.  Maybe

8     it's a little personal.  Which one of your group had drinking

9     problems?

10          MR. McDONALD:  Objection, relevance.

11          THE COURT:  How is it relevant?

12          DEFENDANT DIDANI:  Your Honor, it is -- it is because

13     I'm -- the gentleman here -- I know one of the groups had a

14     drinking problem.  So I need to lay a foundation --

15          THE COURT:  How is that relevant to the facts of --

16          DEFENDANT DIDANI:  To the --

17          THE COURT:  You didn't let me finish my question, and

18     if you don't there won't be a good record.

19          How is that relevant to any of the facts that are

20     going to be shown in this case?

21          DEFENDANT DIDANI:  I'll pass, your Honor.  That's

22     fine.

23          THE COURT:  All right.  You may.  And since there's no

24     reason given for why it's relevant the objection of the

25     Government is sustained.  And you may go to a new question.

1    BY DEFENDANT DIDANI:

2    Q.   Mr. Ammerman, so Marty Tibbitts he never came up to you and

3    was willing -- and was buying jets from foreign countries, MiG

4    17, MiG 15 and MiG 21?

5    A.   Marty talked about buying jets from many places.  I can't

6    recall him -- any specifics, but he was a big dreamer and he

7    loved to buy things.  And any airplane he could get his hands

8    on he'd buy it as long as it was cheap.

9    Q.   But -- so you would be the person in charge if Marty

10   Tibbitts wanted to know about the engines or -- engines of MiG

11   15s or 17s?  You would be the people -- you would be the person

12   in charge?

13   A.   He did not use my -- me in the purchasing process.  He --

14   it only became my problem when it was delivered to the airport

15   and the museum.

16   Q.   Did you -- did you find out how Marty die?

17            THE COURT:  Did you find out what?

18   BY DEFENDANT DIDANI:

19   Q.   How Marty die, whether it was a problem with his aircraft?

20   A.   I am aware of how Marty died, yes.

21   Q.   What was the problem with the aircraft?  Can you explain to

22   the jury, please, that --

23   A.   Well, my personal opinion with my experience does not agree

24   with the official report.  I think Marty's crash was due to the

25   aircraft was -- he wasn't capable of flying that advanced model

1   of aircraft, and it was pilot error.

2   Q.   Do you agree that Marty had more than 20 years flying

3   aircraft, flying jets?

4   A.   I'm not aware.

5   Q.   Let me ask you something.  Did you ever -- the injection

6   seat, you know what's the injection seat on aircraft; right?

7   A.   I'm familiar.

8   Q.   Did Marty Tibbitts have a injection seat on that aircraft?

9   A.   I don't recall on that aircraft.  I know many of the

10   aircraft in the museum we disabled it due to cost of

11   maintenance and how dangerous they are.  Like if an injection

12   seat accidentally goes off with someone sitting in the seat in

13   the hanger, it would kill them.  So we disabled those.

14   Q.   Will it be danger if you're flying without that, too,

15   right, without injection seat; right?

16   A.   It is an added risk.

17   Q.   All right.  So you indicated that you went to a party,

18   Marty Tibbitts; right?

19   A.   Yes.

20   Q.   And you meet who all there?

21   A.   I met many people.  I don't remember any specific names or

22   faces.

23   Q.   What do you know about Mr. Don?  Don.

24   A.   Don Larson?

25   Q.   Don Larson.

1   A.   I met him once, and he told me that he was a personal

2   trainer.  And that's all I know about Don.

3   Q.   You met him only one time?

4   A.   Only one time.

5   Q.   And you remember his last name?

6   A.   Yes.

7   Q.   Fair enough.  And did you -- in January 21, 2025, you met

8   with Agent Hermans?

9   A.   Yes.

10   Q.   Do you know who's Agent Hermans?

11   A.   Yes.

12   Q.   Is he here today?

13   A.   Yes.

14   Q.   Can you point him for the jury.

15          THE COURT:  Do you want a record of who he pointed at?

16          DEFENDANT DIDANI:  Yes.

17          THE COURT:  Okay.  So can you stipulate that he's

18    pointing to --

19          MR. BILKOVIC:  Yes, Judge.  We'll stipulate that Agent

20    Hermans is seated at the end of counsel table.

21          THE COURT:  Okay.

22   BY DEFENDANT DIDANI:

23   Q.   Do you know anything about why it took so long, about

24   seven, eight years to come talk to you?

25   A.   I don't know why.

```
 1   Q.   They never contacted you before?

 2   A.   No.

 3   Q.   They never contact you after Marty's death; no?

 4   A.   No.

 5   Q.   So they didn't contact you in 2021?

 6   A.   No.

 7   Q.   2022?

 8   A.   No.

 9   Q.   '23?

10   A.   No.

11   Q.   '24?

12   A.   No.

13   Q.   So they just contact you right now in '25; right?

14   A.   Yes.

15   Q.   And from 2017 to 2025, how many years is the difference?

16          MR. McDONALD:  I'll stipulate it's eight years.

17          THE COURT:  Are you prepared to stipulate to that

18    being eight years?

19          DEFENDANT DIDANI:  Yes, your Honor.

20          THE COURT:  Okay.  So stipulated.

21   BY DEFENDANT DIDANI:

22   Q.   Did you ask the agent why he never came to talk to you in

23    seven, eight years?

24   A.   I did not ask why.  That's a great question, though.

25   Q.   Great question.  It didn't seem odd to you?
```

1    A.   I figured it was going to happen one day, though.

2    Q.   Why did you figure that?

3    A.   After reading an article in 2021, I read that Marty

4    Tibbitts made a flight to D.C. with -- to deliver money.  And I

5    assumed that that was not Marty flying, that was actually me on

6    that flight.  And so after that I realized that one day

7    somebody is going to knock on my door and ask me more

8    questions.

9    Q.   Mr. Ammerman, when you read this article, why didn't you

10   call DEA or the agents in charge, it was numbers everywhere,

11   why you didn't call and tell them, hey, it was me?  Why didn't

12   you call and tell them that "it was me flying, not Marty"?

13   A.   I didn't think that was my responsibility.

14   Q.   How was Marty to you?  He was a good employer?

15   A.   He was fair.

16   Q.   You say -- you indicated to Agent Hermans -- with Agent

17   Hermans that he was odd.  What do you mean by he was odd?

18   A.   He was socially awkward.  Like you would feel nervous when

19   talking to him.  He would leave long pauses in the

20   conversation, and you would want to fill them in, which made

21   you feel odd.

22   Q.   You say that -- you indicated that there was a flight in

23   New York, but it was cancelled?

24   A.   Yeah.

25   Q.   Who was supposed to fly on that flight?

1    A.   I was supposed to fly.

2    Q.   Who was supposed to be the passenger on that flight?

3    A.   I don't know if I knew who the passenger was at the time.

4    Q.   So Marty never told you that it was going to be Joe come

5    and flying to New York?

6    A.   I don't recall.

7    Q.   And what about December 2017, it was Marty personally

8    called you or anyone else?

9    A.   I don't remember how he informed me.

10   Q.   Well, who called you to inform take this passenger, this

11   gentleman, and send him to Washington?  It was Marty or

12   somebody else?

13   A.   It was Marty.

14   Q.   So it wouldn't be nobody else other than Marty?

15   A.   No.  Marty owned the aircraft, and I wouldn't have done any

16   flying in his airplane unless it came directly from him.

17   Q.   Directly from him.  Fair enough.  Did Marty have a private

18   jet, big private jets?

19   A.   Not that I'm aware of.

20   Q.   Not in the airport in Oakland or in Detroit; right?

21   A.   When you say private jet, you're talking about like

22   something that would transport people?

23   Q.   Yes, like transport people, things.

24   A.   Not that I'm aware of.

25   Q.   Heavy stuff?  No?

 1   A.   Not that I'm aware of.

 2   Q.   I'm just trying to figure out, you know, if there was any

 3   jets.  So there was no jets transporting people or heavy stuff,

 4   only that you had, probably to be fair, it was a two-seater;

 5   right?  What kind of airplane was that?

 6   A.   Can you be more specific?

 7   Q.   The two-seater that you flew, what kind of airplane was

 8   that?

 9   A.   Are you talking about the one I flew to D.C.?

10   Q.   Yes.  Yes, sir.

11   A.   It was a Cirrus SR20, and it had four seats.

12   Q.   It has four seats?

13   A.   Yeah.

14   Q.   Okay.  Fill me in.  How many hours you flew with this

15   gentleman, Don Larson?

16   A.   It's just over six hours roundtrip.

17   Q.   Roundtrip.  And what did you guys talk about six hours?

18   A.   Don had lots of stories, most of them I just thought he was

19   bullshitting.  I don't recall exact specifics.

20            DEFENDANT DIDANI:  Excuse me.

21            (Briefly off the record.)

22   BY DEFENDANT DIDANI:

23   Q.   So you don't remember the conversation, what it was about,

24   for six hours?

25   A.    I mean, he informed me that he was a personal trainer and

1    that he was -- Belinda was one of his clients, and then that's

2    how he met Marty was Belinda introduced him to Marty.  So I

3    knew he was a personal trainer into fitness from that

4    conversation.

5    Q.  You indicated that when the Government asked you that

6    Larson told you what?  Larson told you -- the Government asked

7    you a question as far as the transport with Larson.  You

8    indicated that Larson told you what?  Can you repeat that to

9    the jury?

10   A.  That Marty Tibbitts trusted him, is that what you're

11   referring to?

12   Q.  Trusted him what?

13   A.  To do tasks.  I don't recall the exact verbiage, and he did

14   not elaborate as to any specifics.

15   Q.  What kind of tasks?

16   A.  He did not say.

17   Q.  When you had the interview with Mr. Hermans, Agent Hermans,

18   you didn't indicate that to Agent Hermans, did you?

19   A.  It wasn't asked.  So I did not say --

20           He was talking about this exact quote from this

21   question?

22   Q.  It was not asked about -- Agent Hermans, in the interview

23   that you did in 1-21, 2025, the only interview that you had

24   after eight years, you didn't indicated that Don Larson told

25   you that "I'm a trustworthy guy"; right?

1   A.   No, we did not.

2   Q.   You don't provide that information to him; right?

3   A.   I'm sorry?

4   Q.   You didn't provide that information?

5   A.   No.

6   Q.   Why not?

7   A.   I wasn't asked.  I answered every question he asked me.

8   That wasn't the topic.

9   Q.   You don't think that should be the topic?

10  A.   I don't think I'm the right person to ask that -- answer

11  that.

12  Q.   But you say that you -- you said that you read the news and

13  you knew they was coming to you one day; right?

14  A.   I did, yeah.

15  Q.   You don't believe that topic -- when Agent Hermans was

16  asking you, you don't believe that topic was important, or just

17  today?

18  A.   I don't know how to answer your question.

19  Q.   Fair enough.  So you arrive in D.C.; right?

20  A.   Yeah.

21  Q.   Then what happened there?

22  A.   Like I stated previously, we both got out of the airplane.

23  Mr. Larson went -- he disappeared, and I continued to work on

24  the aircraft.  And then I ate a sandwich in the office and then

25  he reappeared.  We got back into the aircraft together, and we

1    departed to Detroit city.

2    Q.   When you say he disappeared, what do you mean he

3    disappeared?

4    A.   What I mean is we parted ways and I continued to do my

5    tasks, and I stopped -- I didn't monitor what he did.

6    Q.   He indicated nothing when he returned?

7    A.   No.  He was just like, you know, "Ready to go?  Whenever

8    you are," you know.  I don't remember exactly what he said,

9    small-talk.

10   Q.   Small-talk.  You say it's small-talk?

11   A.   Yeah.

12   Q.   I thought you said for six hours he was talking a lot of

13   BS, and now you say small-talk, but anyways ...

14          Mr. Ammerman, who's TJ?

15   A.   TJ worked at the air museum.

16   Q.   Working on what?

17   A.   He assisted us with working on the aircraft and, you know,

18   building different things that helped us work on aircraft such

19   as engine stands or, you know, different stuff like that.

20   Q.   So Mr. Larson in six hours, just to be clear, he never told

21   you anything?

22   A.   No.  He was very careful about how he answered any

23   questions and what he talked about.  I got the feeling he

24   didn't want me to be more involved than I had to be.

25   Q.   Very careful in the questions you say?

```
 1   A.   He was very careful at what he said and answering
 2   questions.
 3   Q.   Well, what kind of questions you ask him?
 4   A.   Of course I asked him what he did, what he's doing, what
 5   we're doing, and he didn't tell me what we were doing.
 6   Q.   Did you see anything odd, or no?
 7   A.   Other than the fact that we flew to an airport and then
 8   flew right back and I didn't see why we were doing that, I
 9   thought the whole thing was odd.
10   Q.   You never flew before like that?
11   A.   I'm sorry?
12   Q.   You never had flights like that before?
13   A.   Not -- no.
14   Q.   You said -- are you flying right now?  Who you flying right
15   now for?
16   A.   I fly a number of very wealthy people.  And I can't
17   disclose who, because I've signed nondisclosure agreements.
18   Q.   That's fine.  But you don't have those flights back and
19   forth?
20   A.   We do a lot of flights, but they have -- and I'm not
21   involved with what their business is either.
22   Q.   I didn't ask you that.  I asked you, you don't see anything
23   odd when you work for people flying from one side to another
24   side?
25   A.   I don't find anything odd, no.
```

1   Q.   What was odd about this then?

2   A.   What was odd about this was I normally only flew missions

3   for the air museum.   This mission was a personal request of

4   Marty's, Marty Tibbitts, and it seemed to me like it had no

5   real mission.

6   Q.   So Don Larson didn't indicated what he was doing, nothing,

7   who is he meeting?

8   A.   He did not indicate.

9   Q.   You didn't even see nothing?

10  A.   I -- I was made to -- I said plenty of things, but I never

11  got an answer.

12  Q.   Did you see any drugs on the airplane, or no?

13  A.   No drugs were on the aircraft that I was aware of.

14  Q.   Okay.

15  A.   It was a very small aircraft.   I would have known if

16  something was on, I think, you know, other than if it was

17  hidden inside the air frame or something I guess I wouldn't

18  know that, but not inside the cabin.

19  Q.   Let me ask you something.   So you didn't see nothing, no

20  big duffle bags, nothing?

21  A.   No big duffle bag, no roller board luggage, no.

22          THE COURT:   No what?   I didn't hear you.

23          THE WITNESS:   Roller board luggage like you would take

24  on a airliner, no.   I did not see luggage.

25

1    BY DEFENDANT DIDANI:

2    Q.   That's odd.  And these books, you hold these books?  Are

3    they yours?

4    A.   That's mine, yes.

5    Q.   You still have them?

6    A.   Yes.

7    Q.   Are you still working for Marty Tibbitts?

8    A.   No.

9    Q.   So why you have these books?

10   A.   This is my own personal logbook as a pilot.  So these are

11   my flight times that I'm recording for my own resume.

12   Q.   So you have a personal flight book?

13   A.   Correct.  That is -- these are not the aircraft logbooks.

14   Those are my personal pilot logbooks.

15   Q.   So where's the aircraft logbooks?

16   A.   That would be with the aircraft, and I believe the aircraft

17   has been sold.  I know it's not owned by Marty or Belinda

18   anymore.

19   Q.   This logbook has any aircraft number on there?

20   A.   Yes.

21   Q.   In the contract, when you have a contract, are you allowed

22   to keep personal logbooks?

23   A.   What contract are you talking?

24   Q.   When you fly -- like you said right now you flying for the

25   private owners and you cannot disclose.  Do they know that you

1    have a personal logbook?

2    A.   Yes.

3    Q.   So you have two logbooks; right?  One is theirs in the

4    aircraft and one is yours?

5    A.   Each aircraft would have its own flight logbook for

6    records, and then each pilot has his own logbook for his

7    records.

8    Q.   So other than that day with Mr. Larson you have no other

9    communication with Mr. Larson?

10   A.   No.

11   Q.   What about Marty's family?

12   A.   I continued to interact with Marty Tibbitts, because I

13   worked for an air museum that he owned.

14   Q.   After his death?

15   A.   After his death, no, I don't have communication with the

16   family.

17            DEFENDANT DIDANI:  All right.  Thank you.  Thank you,

18   sir.  Thank you.  No further questions, your Honor.

19            THE COURT:  Okay.  Thank you.

20            Redirect?

21            MR. McDONALD:  Very briefly.

22                         REDIRECT EXAMINATION

23   BY MR. McDONALD:

24   Q.   You said that you stopped working for Marty in the spring

25   of 2018?

```
 1    A.   Yeah.  It was approximately three months before his death.
 2    Q.   Why did you stop working for Marty?
 3    A.   His risk threshold was greater than mine.  And he wanted me
 4    to sign off on aircraft that I did not think were safe for
 5    flight.
 6    Q.   And you weren't willing to do that?
 7    A.   And as a certified mechanic I wasn't willing to put my name
 8    on an airplane that I thought might possibly crash and be
 9    investigated and come to find out that I knowingly approved an
10    aircraft for flight when I knew it wasn't safe for flight.
11    Q.   Okay.  Now, Mr. Didani asked you about small-talk and talk
12    on the plane.  Just so we're clear, when you were walking from
13    the office in D.C. to the plane, you had small-talk with
14    Mr. Larson?
15    A.   When Mr. Larson came back into the office and I was eating
16    a sandwich, you know, he said something along the lines of like
17    "let's go," and I referred to that as like small-talk.
18    Q.   Okay.  But you weren't talking about your conversation with
19    Mr. Larson during the six hours, that wasn't small-talk?  You
20    had a lengthier conversation?
21    A.   Yeah.  I thought it was mostly just him telling tall tales
22    really.
23              MR. McDONALD:  Okay.  Perfect.  Thank you.  No more
24    questions.
25              THE COURT:  All right.  You may step down.  Thank you
```

1    for coming.

2             DEFENDANT DIDANI:  Your Honor, I --

3             THE COURT:  You have additional questions?

4             DEFENDANT DIDANI:  Yes.

5             THE COURT:  I'm sorry, Mr. Didani.  Do you have --

6             DEFENDANT DIDANI:  Yes.

7             THE COURT:  Well, have them.

8                       RECROSS EXAMINATION

9    BY DEFENDANT DIDANI:

10   Q.  Agent -- Mr. Ammerman, you indicated that you wouldn't put

11   your name and certify these airplanes for Marty Tibbitts to

12   fly; right?

13   A.  Yeah.  I indicated that he wanted to fly an airplane that

14   needed work, and I wasn't allowed to finish the work on it.

15   And I wouldn't sign it off to be safe for flight until I

16   completed that work.

17   Q.  So there was no other reason?  You wouldn't be working for

18   Mr. Tibbitts -- if Mr. Tibbitts was a drug dealer, you wouldn't

19   be working for him; right?

20   A.  I -- what he did outside my employment was none of my

21   business.  I didn't know what he did and -- that was completely

22   separate from what I was doing.

23   Q.  So you have no idea, no indication, that Mr. Tibbitts was

24   any some kind of way involved in any drug dealing or money

25   laundering or anything; right?

1    A.   I was not aware of any of that, no.

2              DEFENDANT DIDANI:  All right.  No further questions.

3    Thank you.

4              THE COURT:  Does the Government have any further

5    questions?

6              MR. McDONALD:  I don't have any additional questions.

7    Thank you.

8              THE COURT:  All right.  You may step down now, sir.

9    Thank you for coming.

10             MR. McDONALD:  May the witness be excused?

11             THE COURT:  I did tell him he could step down and

12   thanked him for coming, but if you're asking me to tell him

13   that he doesn't have to come back at this time I don't see any

14   reason why he would have to come back.

15             MR. McDONALD:  Thank you.

16             (End of witness testimony at 10:28 a.m.)

17             (End of Excerpt.)

18

19

20

21

22

23

24

25

```
 1

 2                     CERTIFICATE OF COURT REPORTER

 3

 4          I, Sheila D. Rice, Official Court Reporter of the

 5   United States District Court, Eastern District of Michigan,

 6   appointed pursuant to the provisions of Title 28, United States

 7   Code, Section 753, do hereby certify that the foregoing pages

 8   is a correct transcript from the record of proceedings in the

 9   above-entitled matter.

10

11

12                          s/Sheila D. Rice
                            Sheila D. Rice, CSR-4163, RPR, RMR, FCRR
13                          Federal Official Court Reporter
                            United States District Court
14                          Eastern District of Michigan

15   Date:  02/28/2025
16   Detroit, Michigan.

17

18

19

20

21

22

23

24

25
```