```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF MICHIGAN
 2                         SOUTHERN DIVISION

 3                              -  -  -

     UNITED STATES OF AMERICA,
 4
                 Plaintiff,
 5
       v.                              Case No. 21-20264
 6
     YLLI DIDANI,
 7
                 Defendant.
 8   _____/

 9             JURY TRIAL - VOLUME 4 - EXCERPT
            BEFORE THE HONORABLE DENISE PAGE HOOD
10               UNITED STATES DISTRICT JUDGE

11          Theodore Levin United States Courthouse
                 231 West Lafayette Boulevard
12                     Detroit, Michigan
                 Wednesday, February 19, 2025
13
     APPEARANCES:
14
      For the Plaintiff:       Mark Bilkovic
15                             Timothy P. McDonald
                               UNITED STATES ATTORNEY'S OFFICE
16                             211 W. Fort Street, Suite 2001
                               Detroit, Michigan  48226
17                             (313) 226-9623

18    For the Defendant:       Ylli Didani
                               (Appearing in Pro Se)
19
                               Wade Fink
20                             WADE FINK LAW, P.C.
                               550 W. Merrill Street, Suite 100
21                             Birmingham, Michigan  48009
                               (248) 712-1054
22                             (Appearing as Standby Counsel.)

23    Also Present:           Special Agent Chad Hermans
                              Maria DiCarlo, Paralegal
24
            To obtain a copy of this official transcript, contact:
25               Sheila D. Rice  Official Court Reporter
               (313) 234-2610 • sheila_rice@mied.uscourts.gov
```

| 1 | **TABLE OF CONTENTS** |
|---|---|

2  MATTER                                                    PAGE

3  **JURY TRIAL - VOLUME 4 - EXCERPT**

4  **Government's Case in Chief (Continued)**

5  **DEREK NEWSOME**
   Direct examination by Mr. Bilkovic................. 4

6  Certificate of Court Reporter...................... 41

7

8

9

10

11

12

13  E X H I B I T   I N D E X

| Exhibit No. | Description | Identified | Admitted |
|---|---|---|---|
| Government's 8.0 | Cert. of Authenticity | 25 | 26 |
| Government's 8.1 | Bank statement | 26 | |
| Government's 8.2 | Bank statement | 32 | |
| Government's 8.3 | Bank statement | 33 | |
| Government's 8.4 | Bank statement | 33 | |
| Government's 8.5 | Bank statement | 33 | |
| Government's 8.6 | Bank statement | 33 | |
| Government's 8.7 | Bank statement | 34 | |
| Government's 9.0 | Series of cashier's checks | 35 | 36 |
| Government's 10.0 | Series of cashier's checks | 37 | 38 |
| Government's 11.0 | Personal & cashier's checks | 39 | |

25

1   Detroit, Michigan

2   Wednesday, February 19, 2025

3   10:50 a.m.

4                                      –   –   –

5           (Beginning of Excerpt.)

6           MR. BILKOVIC:  Your Honor, the Government would call

7   Derek Newsome.

8           THE COURT:  You may step forward and be sworn in.

9   Come on right here to be sworn in.  Right there is good.  Raise

10  your right hand.

11          (Oath administered.)

12          THE COURT:  You may be seated.

13          State your full name and spell your first and last

14  name for the record.

15          THE WITNESS:  My name is Derek Newsome.  It's

16  D-E-R-E-K N-E-W-S-O-M-E.

17          THE COURT:  All right.  Thank you.

18          MR. BILKOVIC:  May I continue?

19          THE COURT:  You may proceed.

20          MR. BILKOVIC:  Thank you.

21                          *        *         *

22                       DEREK NEWSOME,

23       was called as a witness at 10:50 a.m. after having been

24       duly sworn to testify to the truth.

25                          *        *         *

```
 1                      DIRECT EXAMINATION
 2   BY MR. BILKOVIC:
 3   Q.   Sir, just make sure you speak into the mic.  There's also
 4   at times -- there's a mouse up there.  When I ask you to use
 5   the mouse, I'm going to -- make sure you don't click it.  Just
 6   scroll it, because if you click it then it's going to screw up
 7   our computer over here; fair enough?
 8   A.   Yes.
 9   Q.   Can you please tell the jury how you're employed?
10   A.   I'm a special agent with the Internal Revenue Service,
11   Criminal Investigation.
12   Q.   And how long have you been employed with the Internal
13   Revenue Service -- otherwise known as the IRS?
14   A.   Yes.
15   Q.   How long have you been employed with the IRS?
16   A.   Since September of 2009, so going on 16 years.
17   Q.   And was the entire time in the Criminal Investigation
18   Division?
19   A.   Yes.
20   Q.   What is your current assignment?
21   A.   I'm currently assigned to the Detroit field office at the
22   Southeast Michigan Organized Crime Drug Enforcement Strike
23   Force.
24   Q.   And what does that strike force do?
25   A.   The strike force is a multi-agency group that targets
```

 1   large-scale drug trafficking and money laundering

 2   organizations.

 3   Q.   What are some of the other organizations involved in the

 4   strike force?

 5   A.   Some of the major agencies, FBI, DEA, IRS, HSI.

 6         THE COURT:  I'm sorry.  FBI, DEA and who?

 7         THE WITNESS:  IRS, HSI.  There's multiple task force

 8    officers from various police departments, Postal Inspection,

 9    U.S. Marshals.

10   BY MR. BILKOVIC:

11   Q.   And what are your duties there?

12   A.   I assist in investigating financial crimes associated with

13   drug trafficking.

14   Q.   What types of financial crimes?

15   A.   Money laundering.

16   Q.   And how long have you been in the Detroit office?

17   A.   I began my career in the Detroit office for approximately

18   14 years.  And then last year, from approximately January of

19   '24 to January of '25, this year I was assigned to the Miami

20   field office.

21   Q.   And what did you do at the Miami field office?  Obviously

22   fairly obvious, but Miami, Florida?

23   A.   Correct.

24   Q.   And what did you do in the Miami field office for that

25   year?

1    A.   I was detailed to lead an investigative initiative

2    targeting international financial entities in Puerto Rico for

3    money laundering and bank integrity violations.

4    Q.   And, sir, to become a IRS agent in the Criminal Division

5    did you undergo any type of training?

6    A.   Yes.  We go to the Federal Law Enforcement Training Center

7    located in Glenco, Georgia for our basic training.

8    Q.   And when would you have done that?

9    A.   I began in September of 2009.

10   Q.   And what type of training was it?

11   A.   It's the standard law enforcement training, you know, on

12   criminal law and law enforcement techniques as well as

13   specifically how to conduct financial investigations.

14   Q.   And do you have any type of college degree?

15   A.   Yes.  I have a bachelor of science in business

16   administration with a major in accounting.

17   Q.   What year was that?

18   A.   2006.

19   Q.   Now, you indicated that you conduct financial

20   investigations with respect to drug trafficking?

21   A.   That's correct.

22   Q.   Is it fair to say that not all IRS agents sit in an office

23   and audit tax returns?

24   A.   That is correct.

25   Q.   Not something you do?

1   A.   Not something I do.

2   Q.   And how is it that there's like the coexistence between

3   money laundering and drug trafficking?

4   A.   Well, money laundering is a important part of drug

5   traffickers.  They make a lot of money from their illicit

6   activity, and they need to conceal that true source and nature

7   of that money in order to spend it or promote their drug

8   trafficking activities.

9   Q.   Now, you mentioned that the strike force has several

10  agencies, including the DEA and FBI.  When you do these

11  investigations, do you work with these other agencies?

12  A.   Yes.

13  Q.   Is that common?

14  A.   Yes, it is.

15  Q.   And was this one of those cases?

16  A.   Correct.

17  Q.   What agencies were you assisting in this case?

18  A.   DEA was the primary investigative agency.

19  Q.   And approximately how many financial investigations have

20  you been involved in with the IRS?

21  A.    I've probably been the case agent or the lead investigating

22  agent on 30 plus investigations and associated in some capacity

23  with another 75 to a hundred investigations.

24  Q.   Now, are these generally short-term investigations, by

25  meaning a matter of days, or the generally long term, a matter

1   of years?

2   A.   No.   Investigating drug trafficking organizations, these

3   cases typically take years to investigate.

4   Q.   And what type of investigations do you do?   What is it that

5   you're investigating?

6   A.   I am investigating the money laundering activity and

7   related financial crimes.

8   Q.   Are you familiar with the term "third-party money

9   laundering"?

10  A.   I am.

11  Q.   What is third-party money laundering?

12  A.   Third-party money launderer is basically a professional

13  money launderer.   They are not participating in the actual

14  underlying crime such as drug trafficking.   They simply

15  professionally launder the proceeds of the crime.

16  Q.   For the drug trafficker?

17  A.   Yes.

18  Q.   And so when you start an investigation, or a money

19  laundering investigation that is related to drug trafficking,

20  what is it that you do?   What is a general course of action

21  that you take?

22  A.   It could depend, but generally what you're trying to do is

23  follow the money, what is a drug trafficker doing with their

24  money.   It could be acquiring assets, it could be promoting the

25  activity of the drug trafficking such as using the proceeds of

 1    drug trafficking to purchase more drugs to sell to make more
 2    money.
 3    Q.   And are there things that you attempt to obtain during your
 4    investigation?
 5    A.   Yes.  You would attempt to obtain all financial records
 6    associated with a transaction.
 7    Q.   What type of financial records?
 8    A.   Bank records from financial institutions, you know, bank
 9    statements, records of wire activity --
10    Q.   I'm sorry.  Records of what?
11    A.   Of like wire transfer activity, business records associated
12    with businesses, tax returns, things like that.
13    Q.   And how is it that you're able to obtain these records?
14    A.   Several ways.  You can -- you use subpoenas to subpoena say
15    a bank for their records.  You can do a search warrant perhaps
16    to obtain records that way.  You can conduct interviews of
17    witnesses and simply ask for the records.
18    Q.   So if you wanted to obtain bank records you can't simply
19    just walk into a bank and say I want the records for this
20    person, you have to have some sort of process to do that?
21    A.   Yes.
22    Q.   Some sort of legal process to do that?
23    A.   Yes.
24    Q.   Are you familiar with an agency called FinCen?
25    A.   Yes.

1    Q.   Can you spell that?

2    A.   F-I-N-C-E-N.

3    Q.   And what is FinCen?

4    A.   FinCen stands for the Financial Crimes Enforcement Network.

5    It is an agency within the United States Department of the

6    Treasury that maintains a database of forms that are required

7    to be filed by certain entities, financial institutions and

8    businesses.

9    Q.   You said that these are forms.  They keep a database of

10   forms that are required to be filed?

11   A.   Correct.

12   Q.   Can you kind of walk the jury through that.  What types of

13   forms do entities need to file?

14   A.   For example, a financial institution would have to file a

15   form called a CTR, which stands for Currency Transaction

16   Report.  That documents cash transactions of over $10,000.

17   Q.   And so who ends up filing that?

18   A.   In that case, the bank.

19   Q.   So let's say -- explain -- give an example of how that

20   would work?

21   A.    If I were to walk into say Bank of America with $20,000 in

22   cash to deposit to my bank account, the bank would file the

23   form CTR identifying that it was me, the amount of money in

24   cash.

25   Q.   And then what would be done with that form?

1    A.   It would be filed in FinCen.

2    Q.   And who has access to FinCen?

3    A.   Law enforcement.

4    Q.   Is that a agency that you have access to records from?

5    A.   Yes, I do.

6    Q.   And do you utilize those records during investigations?

7    A.   Yes.

8    Q.   Are you familiar with a 8300 form?

9    A.   Yes, I am.

10   Q.   What is that?

11   A.   Form 8300 is similar to a CTR, but it's not for financial

12   institutions.  It would be more for certain businesses like say

13   a car dealership or an attorney, for example, a jewelry store,

14   a pawn shop, but it's the same thing, transactions of over

15   $10,000 in cash.  Say you're purchasing a car and you put

16   $20,000 cash down, then the car dealership would file a form

17   8300.

18   Q.   They would file that and it would go to FinCen?

19   A.   It would.

20   Q.   And I believe you indicated that part of it -- or some of

21   the things that you do are conduct interviews?

22   A.   Correct.

23   Q.   And I believe you also indicated you obtain search

24   warrants?

25   A.   Yes.

1    Q.   How do you obtain a search warrant?

2    A.   In order to obtain a search warrant, you draft what's

3    called an affidavit identifying your probable cause for the

4    search warrant.  A judge will review that, and you will swear

5    that document out and obtain a search warrant.

6    Q.   If the judge approves it?

7    A.   If the judge approves it.

8    Q.   Now, at some point in time did you get involved in an

9    investigation involving Ylli Didani?

10   A.   I did.

11   Q.   Do you recall approximately when that was?

12   A.   I believe it was sometime in 2017.

13   Q.   And how was it that you got involved in that investigation?

14   A.   At that time I was working on a -- with a DEA task force

15   group.  And Border Patrol Agent Josh Bianchi had reached out

16   through one of this colleagues assigned to that task force to

17   ask some questions about some of the financial activity that he

18   had seen in his investigation.  And at that point he asked if I

19   would assist with the investigation.

20   Q.   And so did you agree to do so?

21   A.   I did.

22   Q.   And have you been assisting in that investigation since

23   2017?

24   A.   Correct.

25   Q.   And did you work with -- other than Agent Bianchi did you

1   work closely with other agents?

2   A.   Yes, agents with the DEA.

3   Q.   And who were a couple of the agents, two or three of the

4   agents that you worked closely with?

5   A.   Lead investigators were Task Force Officer Brandon Leach

6   and Special Agent Chad Hermans.

7   Q.   And Agent Hermans is seated at counsel table?

8   A.   He is.

9   Q.   And in order to familiarize yourself with the investigation

10  up until 2017 did you do anything?

11  A.   Yes.  I would have had the conversation with Agent Bianchi

12  as well as possibly review some of his reports that he had

13  prepared.

14  Q.   Now, I'm going to go back to money laundering.  Obviously

15  this is what you do, investigate money laundering crimes?

16  A.   Yes.

17  Q.   What is money laundering?

18  A.   Basically money laundering is taking proceeds -- illicit

19  proceeds from a crime and trying to conceal the true source and

20  nature of those proceeds in an attempt to make it look like

21  it's from a legitimate source.

22  Q.   Are you familiar with the term "trade-based money

23  laundering"?

24  A.   Yes.  That is one method of laundering money.

25  Q.   What is trade-based money laundering?

```
 1    A.   Trade-based money laundering can be complicated, but it's
 2    essentially using international trade to transfer value.
 3    Q.   What do you mean transfer value?
 4    A.   Essentially you can launder -- you can take illicit
 5    proceeds and make it look like it's derived from some sort of
 6    trade.  There are many methods for that, but one might be
 7    over-invoicing, for example, saying the value of goods are
 8    worth more than they actually are than having a payment for
 9    that stated value.
10    Q.   What other type of money laundering are there?
11    A.   Proceeds can be laundered in many ways such as bulk cash
12    smuggling.
13    Q.   Explain that.  What is bulk cash smuggling?
14    A.   Bulk cash smuggling is simply taking bulk cash and
15    transporting it across the border.  You can -- there can be use
16    of what's called nominees to acquire assets or --
17    Q.   I'm sorry.  The use of what?
18    A.   Nominees.
19    Q.   Nominees?
20    A.   Um-hmm.
21    Q.   Okay.  Explain that.
22    A.   Nominee would be like a third party.  For example, if I
23    wanted to buy a car, but I didn't want it in my name and I used
24    my brother, my brother would be the nominee for that.  He's on
25    the paper for that vehicle, but it's really mine.
```

1    Q.   And why would somebody want to do that?

2    A.   To distance themselves from that transaction.

3    Q.   Is there any type of money laundering that deals with

4    legitimate funds?

5    A.   Yes.  For example, taking, you know, money derived from

6    legitimate business activity and purchasing drugs, for example,

7    would be a violation of money laundering.

8    Q.   I'm going to ask you some terms and ask you if you've heard

9    the terms before in your experience as a IRS agent.  And, if

10   you have, I'd like you to kind of define what the terms are.

11            Are you familiar with the term layering?

12   A.   Layering, yes.

13   Q.   What is layering?

14   A.   Layering is a process, a stage in the money laundering

15   process.  It simply means to conduct a series of transactions

16   to create layers in-between the source of money.  So, if I were

17   to take say some cash, deposit into my bank account and then

18   transfer that cash to five different bank accounts creating

19   five additional layers, it's five degrees of separation from

20   the original transaction.

21   Q.   Are you familiar with the term "structuring"?

22   A.   Yes.

23   Q.   What is structuring?

24   A.   Structuring is a form of money laundering where you take

25   bulk cash and structure it or break it down into amounts less

1   than $10,000 to avoid those reporting requirements I previously

2   discussed.

3   Q.  Is there an amount of money that a person can possess when

4   they come basically into the United States without declaring

5   it?

6   A.  Without declaring?  Again, it would be an amount less than

7   $10,000.

8   Q.  So in a hypothetical if I had $50,000 and I was in another

9   country and wanted to bring that money into the United States,

10  but didn't want to declare it, is there a way that I could

11  structure that to bring that in?

12  A.  You could structure a series of financial transactions

13  through financial institutions, but if you have that money on

14  your person the only way to do it would be to separate that

15  money amongst multiple individuals.

16  Q.  Let's say I was traveling with six people.

17  A.  Um-hmm.

18  Q.  I'm sorry.  You can't say "um-hmm."  You've got to --

19  A.  Yes.

20  Q.  What would I do then if I wanted to bring that money into

21  the United States and have it not be detected?

22  A.  You would break the currency down into amounts less than

23  $10,000 and give it to each person to carry across the border.

24  Q.  So they would then not have to declare that?

25  A.  Correct.

Jury Trial, Volume 4 - Excerpt - February 19, 2025

```
1    Q.   Are you familiar with something called SWIFT?
2    A.   Yes.
3    Q.   S-W-I-F-T?
4    A.   Yes.
5    Q.   What is SWIFT?
6    A.   SWIFT is a international communication system amongst
7    financial institutions.  It communicates electronic
8    transactions such as wires between banks.  It's essentially
9    instructions on the transaction.
10   Q.   And you said basically -- you had mentioned wire transfers.
11   What are wire transfers?
12   A.   Wire transfers is a form of electronic payment.
13   Q.   Can you break it down any more than that?
14   A.   If you want to send somebody typically a large amount of
15   funds, you could initiate a wire transaction at your bank, and
16   depending on the relationship of the banks it could go directly
17   to the bank or it may go through a series of intermediary or
18   correspondent banks.
19   Q.   So let's say I wanted to wire you money and you were in
20   Florida and I was in Michigan.  What would I have to do?
21   A.   You would just put the request in at your bank to send it
22   to my bank.
23   Q.   Okay.  And what if I was in Michigan and you were in say
24   Mexico, what would I have to do?
25   A.   Same thing.  You would go to your bank with -- you know,
```

1    you need certain types of codes.  You would get the wire

2    information from the receiving bank.  You would provide that

3    information to your bank to conduct that transaction.

4    Q.  And who determines what -- you know, if I'm transferring

5    from the United States to say Mexico, who determines what type

6    of currency that's going to be in?  By I mean that, are we

7    talking Mexican currency or United States currency?  Who makes

8    that determination?

9    A.  The person sending the money would determine what they want

10   to send.

11   Q.  So let's say I wanted to send you -- in Michigan I wanted

12   to wire you pesos in Mexico.  Would I be able to use my bank to

13   do that?

14   A.  Possibly.  There would have to be a conversion of the

15   currency, but you could.

16   Q.  And what if I wanted to transfer you United States currency

17   to Mexico?

18   A.  That would be no problem.

19   Q.  Now, what if I was in -- over in Europe and I wanted to

20   transfer U.S. dollars to Mexico or Canada, is that possible?

21   A.  It is possible, yes.

22   Q.  How do you do that?

23   A.  Similar fashion.  You previously mentioned SWIFT.  SWIFT is

24   the largest organization internationally for sending electronic

25   payments or wire transfers.

19

1              So member banks have -- you know, there's SWIFT code,

2      there's SWIFT ID.  So you would have to get that information

3      from the receiving bank, and then you would go to your

4      financial institution say in Europe, initiate that wire

5      transfer with that information.

6              And, if you're sending U.S. dollars, it can get a

7      little technical, but banks, in order to send money to each

8      other, need to have some sort of direct relationship.  And, if

9      they don't, then they use what's called a correspondent bank.

10     A correspondent bank would be here in the United States.

11             So, if you're sending U.S. dollars, the bank in Europe

12     would have their own bank account, a bank account for the bank

13     at the bank in the United States.  And then the receiving bank,

14     say the bank in Mexico, would have, you know, an account at

15     that same bank in the United States or potentially another bank

16     in the United States.

17             Ultimately the funds would get settled between the

18     financial institutions and the correspondent accounts, and then

19     the money would be cleared in the account, and in this case in

20     Mexico.

21     Q.   So, if I wanted to send U.S. dollars from Europe to Mexico,

22     to do that generally would that money go through -- if I want

23     to do it with a wire through a bank, would that money generally

24     go through a corresponding U.S. bank?

25     A.   It would.

1    Q.   And did you come across evidence of that in this

2    investigation?

3    A.   Yes.

4    Q.   We'll get to that in a little bit.

5             So somebody that is making large amounts of money in

6    drug trafficking, do those people generally file tax returns

7    where they declare that money?

8    A.   No.

9    Q.   Why not?

10   A.   Because that would indicate, you know, unexplainable income

11   to the Internal Revenue Service.

12   Q.   So then what do drug traffickers do then in order to

13   explain that income, the common methods that drug traffickers

14   use?

15   A.   Well, they'll often just launder the money to make it seem

16   like it's from a legitimate source that may or may not involve

17   claiming that, you know, legitimate money on a tax return, but

18   often the money will be laundered through any number of ways

19   and then not claimed at all.

20   Q.   Okay.  What about using legitimate businesses?

21   A.   That is one method of money laundering.

22   Q.   And how does that assist somebody to launder money?  Like I

23   have a legitimate business, but I'm also a drug trafficker.

24   How am I able to do that then?

25   A.   You can take proceeds of drug trafficking and funnel it

1    through your business to make it appear as if it's generated

2    from your legitimate business activity.

3    Q.   Are you familiar with common money laundering techniques

4    used by drug traffickers to collect drug proceeds?

5    A.   Yes.

6    Q.   And what are those methods or common methods?

7    A.   To collect drug proceeds, they could -- any number of ways.

8    You can use couriers.

9    Q.   What do you mean you can use couriers?

10   A.   Individuals that will go and collect the cash.

11   Q.   Any other ways you can think of?

12   A.   You can utilize the services of a professional third-party

13   money launderer.

14   Q.   Which you've already touched on?

15   A.   Yes.

16   Q.   What about common methods that are used to transfer drug

17   proceeds?

18   A.   Yes.

19   Q.   What are some of those methods?

20   A.   There are many.  You could again use a third-party money

21   launderer.  You could use shell companies to funnel proceeds

22   through.

23   Q.   Are you familiar with the token method?

24   A.   Yes.

25   Q.   What is a token method?

1    A.   Token is a system utilized for bulk cash money drops.  For

2    example, if I wanted to pay for something in another country, I

3    could enlist typically a third-party money launderer to do

4    what's called a cash drop, in which case a token is essentially

5    -- is typically a dollar bill or some form of paper currency

6    with a serial number.  And it allows the person who's dropping

7    the cash, who does not know who they're giving the cash to, to

8    authenticate that they're actually dropping the currency to the

9    intended recipient.

10   Q.   Let's say you were in another country and wanted to drop

11   money to me using the token method.  What would I have to do to

12   receive that money?

13   A.   You would have to provide the token, which is again

14   typically some form of paper currency with a serial number.

15   You would have to provide usually a photo of that to the money

16   launderer or the drug trafficker, whoever is coordinating the

17   transaction.  And then that person would relay that information

18   to their courier, or the person that's going to actually drop

19   the money.  The courier will then go to the recipient, verify

20   that he's in possession of that token.

21   Q.   I would have to produce the token when they come to me with

22   the money?

23   A.   You would have to produce the token in order to receive the

24   money.

25   Q.   And are there common methods utilized by drug traffickers

1    to spend drug proceeds?

2    A.   Yes.

3    Q.   What ways?

4    A.   Typically using a nominee, again putting assets and

5    acquiring assets in another individual's name.

6    Q.   What type of assets?

7    A.   Usually it could be high-end vehicles, real property such

8    as houses or property, jewelry.

9    Q.   And then I believe you earlier said they also can use those

10   proceeds to reinvest in additional drugs?

11   A.   Correct.

12   Q.   Now, I want to talk about -- switch over now and talk about

13   some of the factual things that you came across in this case,

14   okay, specifically.  Okay.  Did you obtain records in this

15   case?

16   A.   Yes.

17   Q.   And how did you obtain records in this case?

18   A.   With subpoenas.

19   Q.   What type of records did you subpoena?

20   A.   Bank records from financial institutions.

21   Q.   And did you also have an opportunity at times to review --

22   were there other agents that were also subpoenaing records?

23   A.   Yes.

24   Q.   Did you have an opportunity to review those records as

25   well?

1   A.   Yes.

2   Q.   Have you reviewed every single record in this case?

3   A.   I have not.

4   Q.   Have you reviewed all the financial records that you

5   obtained?

6   A.   Yes.

7   Q.   What type of bank -- or what type of records did you obtain

8   in this case?

9   A.   Traditional bank records such as bank statements, checks.

10  Q.   Did you obtain bank records for Martin Tibbitts?

11  A.   Yes.

12  Q.   And how did you do that?

13  A.   With a subpoena.

14  Q.   And who did you subpoena?

15  A.   Comerica Bank.

16  Q.   How would you know to subpoena Comerica Bank?

17  A.   There are transactions identified through FinCen, through

18  the reporting requirements, that identify that Martin Tibbitts

19  had accounts at Comerica Bank.

20  Q.   Okay.  So in order to determine where Martin Tibbitts had

21  accounts you basically ran his name through FinCen; is that

22  accurate?

23  A.   That's accurate.

24  Q.   And what did you do then to obtain the record from

25  Comerica?

1    A.   I served Comerica Bank with a Grand Jury subpoena.

2    Q.   And did you receive anything back from Comerica?

3    A.   Yes.

4    Q.   What did you receive back?

5    A.   I received all the records associated with accounts held by

6    Martin Tibbitts with Comerica Bank.

7    Q.   I'm going to have you -- if you could -- you have a book in

8    front of you that is some exhibits that I'm going to go through

9    with you, proposed exhibits I'm going to go through with you.

10   I'm going to go through some of them right now, and then I'm

11   going to come back in detail, assuming that they're admitted.

12   Now, I'm not going to put them up there.  I'm just going to go

13   through and try and admit some of these.

14            Do you recognize what 8.0 is?

15   A.   Yes.

16   Q.   What is 8.0?

17   A.   It is Certificate of Authenticity from Comerica Bank.

18   Q.   What is a Certificate of Authenticity?  What does that

19   mean?

20   A.   It's just a document provided by the bank that certifies

21   that the records are authentic and kept in the ordinary course

22   of business.

23   Q.   And what is the date on that certificate?

24   A.   August 18, 2021.

25   Q.   And does the certificate pertain to the bank records for

1    Martin Tibbitts that you requested?

2    A.   Yes.

3              MR. BILKOVIC:  Your Honor, at this time I would move

4    for admission into evidence of Government's proposed Exhibit

5    8.0.

6              THE COURT:  Any objection?

7              DEFENDANT DIDANI:  No objection, your Honor.

8              THE COURT:  All right.  It's admitted as 8.0.

9              It contains numerous documents or just that

10   certificate?

11             MR. BILKOVIC:  Just that one.  I'm going to go through

12   additional documents one by one.  I'm not going to show them to

13   the jury right now.  I'm just going to move to admit them.

14             THE COURT:  Okay.

15   BY MR. BILKOVIC:

16   Q.   Let's go to Exhibit -- proposed Exhibit 8.1.  Do you

17   recognize that?

18   A.   Yes.

19   Q.   And what is that?

20   A.   It is a bank statement for an account of Martin Tibbitts

21   and Belinda Tibbitts dated March 12th of '16 to April 13, '16.

22             THE COURT:  Tell me the date again.

23             THE WITNESS:  It is March 12, 2016 to April 13, 2016.

24             THE COURT:  Okay.

25

1  BY MR. BILKOVIC:

2  Q.  And is there an account number on that?

3  A.  There is.

4  Q.  And what is the account number?

5  A.  6823089831.

6          THE COURT:  Okay.  Do it again.  682 ...

7          THE WITNESS:  6823089831.

8  BY MR. BILKOVIC:

9  Q.  And that is -- is that a statement that you received in

10  response to the subpoena that you sent?

11  A.  It is.

12          MR. BILKOVIC:  Your Honor, at this time I would move

13  for admission into evidence of Government's proposed Exhibit

14  8.1.

15          THE COURT:  Any objection?

16          DEFENDANT DIDANI:  Yes, your Honor.

17          THE COURT:  What's your objection?

18          DEFENDANT DIDANI:  I -- this account I'm looking at

19  it's completely wiped out, your Honor.

20          THE COURT:  What do you mean?

21          DEFENDANT DIDANI:  Redacted.  Completely redacted.

22          THE COURT:  Is your copy completely redacted?

23          MR. BILKOVIC:  The personal information is redacted,

24  and transactions that do not have anything to do with this case

25  have been redacted.

1        THE COURT:  Okay.  Show him your copy so that he can

2    see what's --

3        DEFENDANT DIDANI:  Your Honor, how do we know that

4    that has nothing to do with this?  It's all --

5        HE COURT:  Excuse me?

6        DEFENDANT DIDANI:  How do we know this transaction has

7    nothing to do with this, the other transaction has nothing to

8    do with this case?

9        THE COURT:  Well, I guess you'll ask him that

10   question, won't you, Counsel, how it got redacted?

11   BY MR. BILKOVIC:

12   Q.  Were there other transactions that were in these records

13   other than the ones that we're going to be going through?

14   A.  Yes.

15   Q.  The ones that have been redacted as part of the

16   investigation, do they have anything to do with this case?

17   A.  Not to my knowledge.

18       DEFENDANT DIDANI:  Your Honor, I must object on

19   admitting this evidence, your Honor.

20       THE COURT:  And what's your objection now?

21       DEFENDANT DIDANI:  Objection, your Honor, because

22   there -- as we say, you know, this account is totally redacted.

23   There can be --

24       THE COURT:  Wait a minute.  Is it totally redacted?

25   There's nothing on it?

1          MR. BILKOVIC:  No, that's not true, your Honor.

2          THE COURT:  Did you look at it, sir?

3          DEFENDANT DIDANI:  I'm looking right now, your Honor,

4   all this --

5          THE COURT:  Well, look at the one that counsel has in

6   his hand to see if they're any transactions that are not

7   redacted.

8          MR. BILKOVIC:  Your Honor, I know what we can do, if

9   we could speed this up.  What I can do, if the Court is okay

10  with that, is I can move -- go through each one of these, move

11  to admit them, but then I will also provide Mr. Didani and

12  Mr. Fink an unredacted copy as long as I get that unredacted --

13  Mr. Fink can retain it and I can get it back at the end of the

14  case.

15         THE COURT:  Okay.  You all will agree to that; right?

16         And maybe you can look at the unredacted version,

17  Mr. Didani, and see if there's anything that you think the

18  agent should have looked at.

19         DEFENDANT DIDANI:  Well, your Honor, my only -- my

20  only -- that I worry about it, so we admit those as evidence,

21  we proceed -- we proceed with his testimony, and then later

22  on -- it's just it's going to confuse -- if there's something

23  unredacted, then it's going to confuse the jury, your Honor,

24  that's all.  Maybe the jury doesn't understand the terms of all

25  these accounts and money laundering that Agent --

1           THE COURT:  They've been explained.  And I think the

2     jury, if they don't understand, they can raise that question

3     later.

4           Here's what I'm going to do.  We can go through all of

5     them.  I'll take them under advisement.  You provide him an

6     unredacted copy.  They can look at it before you have further

7     explanation on it.

8           MR. BILKOVIC:  Okay.  And I will have those for them

9     tomorrow morning.

10          THE COURT:  Okay.

11          MR. FINK:  Your Honor, as to your question to me, I

12    will keep them as the custodian of Mr. Bilkovic.

13          THE COURT:  And no copy can be made of them.

14          MR. FINK:  I will honor that order, Judge.

15          THE COURT:  Go ahead.  It's under advisement, number

16    8.1.

17          MR. BILKOVIC:  Thank you.

18          THE COURT:  Wait a minute.  Mr. Didani, you agree that

19    it's not completely redacted; right?  Well, why would he be

20    admitting it if it's completely redacted?

21          Well, better yet, I could find it, Counsel.  Why don't

22    you pass me your copy so I can decide whether I think it's

23    completely redacted.

24          MR. BILKOVIC:  May I approach, your Honor?

25          THE COURT:  Yes.  I know I have it in here, and I'll

1   get them out for later.  I'll look.

2           MR. BILKOVIC:  Okay.

3           THE COURT:  Thank you.  Don't go far.  It's not going

4   to take me that long to look.

5           Okay.

6           MR. BILKOVIC:  May I proceed, your Honor?

7           THE COURT:  Yes.  8.1 is under advisement.

8   BY MR. BILKOVIC:

9   Q.  So, for example, in bank records do you also get, you know,

10  ATM transactions?

11  A.  Yes.

12  Q.  And was there another person's name on this account?

13  A.  Yes.

14  Q.  Who were the names on the account?

15  A.  This is a joint account with Martin J. Tibbitts and Belinda

16  G. Tibbitts.

17  Q.  So, for example, if Belinda Tibbitts were using her ATM to

18  make personal purchases, would those be contained here?

19  A.  That would be reflected, yes.

20  Q.  And would that be some of the information that is redacted

21  out?

22  A.  Yes.

23  Q.  If we could go to Government's proposed Exhibit 8.2, do you

24  recognize that?

25  A.  Yes.

1    Q.   And what is that?

2    A.   It's a Comerica Bank statement from Martin Tibbitts and

3    Belinda Tibbitts for May 13, 2016 to June 13, 2016.

4    Q.   And is that for the same account?

5    A.   Yes.

6    Q.   And the exhibits I'm going to be asking about, 8.1, 8.2 up

7    to 8.7, are those all for the account 642 -- I'm sorry,

8    6823089831?

9    A.   Yes.

10   Q.   And do some of them also include an additional checking

11   account number 6824068362?

12   A.   Yes.

13   Q.   Basically we're talking about -- the next questions I'm

14   going to ask you for these exhibits are all the same account

15   belonging to Martin Tibbitts and Belinda Tibbitts.

16   A.   Yes.

17   Q.   If we could go to 8.3.

18        DEFENDANT DIDANI:  Your Honor, I have the same

19   objection on 8.2.  It's all -- the same --

20        THE COURT:  I'm letting him go through.  He's not

21   testifying to the substance of them yet until you have a chance

22   to look at the unredacted copy.  They're under advisement.

23        DEFENDANT DIDANI:  Thank you, your Honor.

24   BY MR. BILKOVIC:

25   Q.   Can you look at Government's proposed Exhibit 8.3.

1    A.   Yes.

2    Q.   And what is that?

3    A.   That's a joint bank statement from Comerica Bank dated

4    October 15, 2016 to November 14, 2016.

5    Q.   Same bank account belonging to Martin Tibbitts and Belinda

6    Tibbitts?

7    A.   Yes.

8    Q.   And can you go to Government's proposed Exhibit 8.4.

9    A.   Yes.

10   Q.   Do you recognize that?

11   A.   Yes.  A Comerica Bank statement for Martin Tibbitts and

12   Belinda Tibbitts dated March 14, 2017 to April 13, 2017.

13   Q.   Again, can you look at Government's proposed Exhibit 8.5.

14   A.   Yes.

15   Q.   What is that?

16   A.   That's a bank statement from Comerica Bank from Martin

17   Tibbitts and Belinda Tibbitts dated August 12, 2017 to

18   September 14, 2017.

19   Q.   And can you go to Government's proposed Exhibit 8.6.

20   A.   Okay.

21   Q.   What is that?

22   A.   Comerica Bank statement from Martin Tibbitts and Belinda

23   Tibbitts dated November 14, 2017 to December 13, 2017.

24   Q.   And can you turn to Government's proposed Exhibit 8.7.

25   A.   Okay.

1    Q.   And what is that?

2    A.   Comerica Bank statement for Martin Tibbitts and Belinda

3    Tibbitts dated December 14, 2017, to January 12, 2018.

4    Q.   And again, these exhibits -- proposed Exhibits 8.1 to 8.7

5    are statements you received as a result of the subpoena to

6    Comerica?

7    A.   That's correct.

8    Q.   And as we've gone through these exhibits, some of the

9    transactions are redacted out; correct?

10   A.   Correct.

11        MR. BILKOVIC:  And, your Honor, I understand the Court

12   is going to make a ruling later and reserve, but I would move

13   to admit Government's proposed Exhibits 8.1 to 8.7, and we'll

14   wait on the Court's ruling until I furnish the documents to

15   Mr. Fink and Mr. Didani.

16        THE COURT:  Thank you, and they're under advisement.

17        MR. BILKOVIC:  Thank you.

18   BY MR. BILKOVIC:

19   Q.   Can you go to Government's proposed Exhibit 9.0.

20   A.   Okay.

21   Q.   And do you recognize Government's proposed Exhibit 9.0?

22   A.   I do.

23   Q.   And what -- are these also records that you received from

24   Comerica in response to the subpoena?

25   A.   Yes.

1    Q.   And what are these?

2    A.   These are cashier's checks.

3    Q.   How many cashier's checks?

4    A.   There are four.

5    Q.   And what are the denominations on the cashier's checks?

6    A.   They are each for $50,000, and they are all dated June 9,

7    2016.

8    Q.   And is there a person who these checks were made payable

9    to?

10   A.   Yes.  Two of the checks are made payable to Donald Larson,

11   and two of the checks are made payable to Peter Tocco.

12              MR. BILKOVIC:  Your Honor, at this time I would move

13   for admission into evidence of Government's proposed Exhibit

14   9.0.

15              THE COURT:  Any objection?

16              DEFENDANT DIDANI:  Yes, your Honor, objection.  These

17   checks is irrelevant, your Honor.

18              THE COURT:  I'm sorry?

19              DEFENDANT DIDANI:  These checks are irrelevant.

20              THE COURT:  Are what?  I'm not understanding.

21              MR. FINK:  He's looking to me, Judge.  I think he's

22   trying to say irrelevant.

23              DEFENDANT DIDANI:  Irrelevant.

24              THE COURT:  How are they irrelevant?  Mr. Didani, why

25   are they irrelevant?

```
 1              DEFENDANT DIDANI:  Because these checks, your Honor,
 2     they was given to the other person.  They have nothing to do
 3     with this case that we're here, your Honor.
 4              THE COURT:  Do you want to respond to that?
 5              MR. BILKOVIC:  Yes, your Honor.  The evidence is going
 6     to show that the money that was the subject of these checks
 7     were eventually trans -- they were cashed at various pawn shops
 8     and then the money was transferred to Mr. Didani.
 9              THE COURT:  All right.  That's overruled.  9.0 is
10     admitted.
11              MR. BILKOVIC:  Thank you, your Honor.
12     BY MR. BILKOVIC:
13     Q.  And are you familiar -- if you could look at Government's
14     proposed Exhibit 10.0.
15              THE COURT:  Before you -- they're made out to Donald
16     Larson and Peter who?
17              THE WITNESS:  Tocco, T-O-C-C-O.
18              THE COURT:  Okay.
19     BY MR. BILKOVIC:
20     Q.  Two of them are made out to Donald Larson and then two are
21     made out to Peter Tocco?
22     A.  That's correct.
23     Q.  All in the same day?
24     A.  Correct.
25     Q.  And can we go to Government's proposed Exhibit 10.0.  Do
```

1    you recognize that?

2    A.   I do.

3    Q.   And what is that?

4    A.   Again, these are a series of cashier's checks from Comerica

5    Bank.

6    Q.   And basically these are copies that Comerica Bank basically

7    gave you in response to your subpoena?

8    A.   Correct.

9    Q.   And the subpoena was in reference to Marty Tibbitts;

10   correct?

11   A.   Yes.

12   Q.   And the date -- are the checks all dated the same or are

13   they dated different dates?

14   A.   All the checks are dated March 24, 2017.

15   Q.   And all same denomination or different denominations?

16   A.   All the checks are in the amount of $50,000.

17   Q.   And, if we could start with the first check, who is it

18   payable to?

19   A.   Donald Larson.

20   Q.   Actually, let's do it this way.  How many of these checks

21   are payable -- we'll go through in detail later once they're

22   admitted and we'll put them on the board, but how many of these

23   checks are payable to Donald Larson?

24   A.   Four checks are made payable to Donald Larson.

25   Q.   And who are the other checks made payable to?

1  A.   Two checks are made payable to Peter Tocco.

2           MR. BILKOVIC:  Your Honor, at this time the Government

3  would move for admission into evidence of Government's proposed

4  Exhibit 10.0.

5           THE COURT:  Any objection?

6           DEFENDANT DIDANI:  Yes, your Honor, objection, again

7  and again.  These checks have nothing -- it's a theory of the

8  Government, your Honor.  So I object these checks even entering

9  and representing those checks to the jury.

10          THE COURT:  All right.  Do you want to respond to

11 that?

12          MR. BILKOVIC:  The response is the same.  The evidence

13 in this case is going to show that this money was basically

14 converted to cash and given to Mr. Didani.

15          THE COURT:  Okay.  That's overruled.  However, you

16 know, if you don't tie it up, I reserve the right to strike

17 them.

18          MR. BILKOVIC:  I understand, your Honor.  Thank you.

19          THE COURT:  Okay.

20 BY MR. BILKOVIC:

21 Q.   And can you go to Government's proposed Exhibit 11.0.

22 A.   Okay.

23 Q.   Do you recognize the documents in 11.0?

24 A.   I do.

25 Q.   And how many pages is 11.0?

1    A.   It's ten pages.

2    Q.   Okay.  And --

3              THE COURT:  What is it again?

4              MR. BILKOVIC:  How many pages?

5              THE COURT:  You're not there yet?

6              MR. BILKOVIC:  I'm not there yet.  I'm sorry, your

7     Honor.

8              THE COURT:  Okay.  Sorry.

9    BY MR. BILKOVIC:

10   Q.   I should have gone through that first, but it's ten pages;

11   correct?

12   A.   Correct.

13   Q.   And what do the ten pages consist of?

14   A.   These are a combination of personal checks from Martin

15   Tibbitts and cashier's checks.

16   Q.   Okay.  And fair to say is there one check per page?

17   A.   Yes.

18   Q.   Front and back?

19   A.   Yes.  Front and back of the check, yes.

20   Q.   Okay.  So I'm going to start with the 11.0, the first page.

21   What is -- well, let me ask you this:

22              What is -- no.  We're going to have to do it one by

23   one.  What is the date on this check?

24   A.   The date on this check is 12-19, 2017.  It is check number

25   1900.

1    Q.   And how much is the check for?

2    A.   $100,000.

3    Q.   And is this a personal check or a certified check?

4    A.   This is a personal check.

5    Q.   So it's handwritten?

6    A.   Correct.

7    Q.   And is this handwritten out of a specific account?

8    A.   Yes.  It's handwritten out of the joint account of Martin

9    Tibbitts and Belinda Tibbitts.

10   Q.   Which you've already talked about?

11   A.   Sure.

12   Q.   Did I ask you who it was made payable to?

13   A.   You did not.  It was made payable to Donald Larson.

14   Q.   Okay.  And if we could turn to Page 2.

15          THE COURT:  Is there ten of these?

16          MR. BILKOVIC:  There's going to be five personal and

17   five cashier's checks, your Honor.  Yes, ten total.

18          THE COURT:  Okay.  We're going to get to them

19   tomorrow, okay.  I know it's early, but you may step down.

20          (End of excerpt at 11:35 a.m.)

21                          —  —  —

22

23

24

25

CERTIFICATE OF COURT REPORTER

        I, Sheila D. Rice, Official Court Reporter of the

United States District Court, Eastern District of Michigan,

appointed pursuant to the provisions of Title 28, United States

Code, Section 753, do hereby certify that the foregoing pages

is a correct transcript from the record of proceedings in the

above-entitled matter.

                              **s/Sheila D. Rice**
                              Sheila D. Rice, CSR-4163, RPR, RMR, FCRR
                              Federal Official Court Reporter
                              United States District Court
                              Eastern District of Michigan

Date:  03/02/2025
Detroit, Michigan.