```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF MICHIGAN
 2                          SOUTHERN DIVISION

 3                             _   _   _

     UNITED STATES OF AMERICA,
 4
                 Plaintiff,
 5
       v.                              Case No. 21-20264
 6
     YLLI DIDANI,
 7
                 Defendant.
 8   _____/

 9              JURY TRIAL - VOLUME 5 - EXCERPT
            BEFORE THE HONORABLE DENISE PAGE HOOD
10                UNITED STATES DISTRICT JUDGE

11          Theodore Levin United States Courthouse
                 231 West Lafayette Boulevard
12                     Detroit, Michigan
                 Thursday, February 20, 2025
13
     APPEARANCES:
14
      For the Plaintiff:      Mark Bilkovic
15                            Timothy McDonald
                              UNITED STATES ATTORNEY'S OFFICE
16                            211 W. Fort Street, Suite 2001
                              Detroit, Michigan  48226
17                            (313) 226-9623

18    For the Defendant:      Ylli Didani
                              (Appearing in Pro Se)
19
                              Wade Fink
20                            WADE FINK LAW, P.C.
                              550 W. Merrill Street, Suite 100
21                            Birmingham, Michigan  48009
                              (248) 712-1054
22                            (Appearing as Standby Counsel.)

23    Also Present:          Special Agent Chad Hermans
                             Maria Cook
24
           To obtain a copy of this official transcript, contact:
25             Sheila D. Rice  Official Court Reporter
            (313) 234-2610 • sheila_rice@mied.uscourts.gov
```

```
 1                      TABLE OF CONTENTS

 2   MATTER                                          PAGE

 3   JURY TRIAL - VOLUME 5 - EXCERPT

 4   Government's Case in Chief - (Continued)

 5   DEREK NEWSOME (Continued)
```

```
     Direct examination by Mr. Bilkovic.................   4
 6   Voir dire examination by Defendant Didani...........  45
     Direct examination cont'd by Mr. Bilkovic...........  46
 7   Cross-examination by Defendant Didani...............  56

 8   Certificate of Court Reporter....................... 107
```

```
 9

10

11              E X H I B I T   I N D E X

12
```

| Exhibit No. | Description | Identified | Admitted |
|---|---|---|---|
| **Government's Exhibits** | | | |
| Government's 11.0 | Personal and cashier's checks | 5 | 9 |
| Government's 13.0 | Copy of personal check #1699 | 7 | 9 |
| Government's 14.0 | Copy of personal check #1902 | 9 | 10 |
| Government's 15.0 | Record of wire transfer | 11 | 13 |
| Government's 16.0 | Certification from JPMorgan | 15 | 16 |
| Government's 16.1 | Bank statement and signature card | 16 | 18 |
| **Defense Exhibits** | | | |
| Defense E | Bank statement | 95 | 96 |
| Defense E-2 | Bank statement | 95 | 96 |
| Defense E-3 | Bank statement | 95 | 96 |
| Defense E-4 | Bank statement | 95 | 96 |
| Defense E-5 | Bank statement | 95 | 96 |

1    Detroit, Michigan

2    Thursday, February 20, 2025

3    1:05 p.m.

4                              —   —   —

5              (Beginning of excerpt.)

6              THE COURT:  Mr. Newsome is somewhere nearby?

7         Come back up to the stand, please.

8              LAW CLERK:  Rise for the jury.

9              (The jury entered the courtroom at 1:06 p.m.)

10             THE COURT:  I'm satisfied all the jurors are present

11   and in their proper seats.

12             Are you satisfied, for the Government?

13             MR. BILKOVIC:  Yes, your Honor.

14             THE COURT:  How about for defense?

15             DEFENDANT DIDANI:  Yes, your Honor.

16             THE COURT:  Okay.  Very good.

17             I know that you've been sitting back there for a

18   while, and remember I gave you that instruction that sometimes

19   we have matters that we have to take up that have nothing to do

20   with the facts that you have to decide upon.  And we try not to

21   use your time to do that, but today we used some of your time

22   to do that.  And so to the extent that you're impatient I

23   apologize.  Don't hold it against the Government or the

24   defense, okay.  If you're going to be mad at somebody about

25   sitting back there --

```
 1            Is it cold back there?  No?  It's okay?

 2            Okay.  Well, I think our choice is either to be cold

 3     in here or warm back there, but they've been trying to fix that

 4     since I told them I had my coat on in my office, but so far I

 5     haven't had real good luck with it.  So we'll work on it, okay.

 6            All right.  You're still under oath.  Just state your

 7     name again for the record.

 8            THE WITNESS:  Derek Newsome.

 9            THE COURT:  Okay.  Thank you.

10                 DIRECT EXAMINATION (Continued)

11     BY MR. BILKOVIC:

12     Q.  Special Agent Nugent, I believe that when we left off

13     yesterday --

14            THE COURT:  Not Nugent.

15            MR. BILKOVIC:  I said Nugent.  Oh, I'm sorry.

16            THE COURT:  Yes.

17     BY MR. BILKOVIC:

18     Q.  Special Agent Newsome.  I would blame it on the morning and

19     I'm not awake yet, but I can't to that.

20            Special Agent Newsome, I believe that when we left off

21     yesterday we were just starting to go through Government's

22     proposed Exhibit 11; is that correct?

23     A.  Yes.

24     Q.  Okay.  So could we go back, and I think we were on the very

25     first check or it started into the second one, but my notes are
```

1    not clear.  So I'm just going to go --

2                 THE COURT:  Is this the one that has ten checks?

3                 MR. BILKOVIC:  Yes.

4                 THE COURT:  Okay.

5    BY MR. BILKOVIC:

6    Q.   So just real quickly I'm going to start at the very first

7    check.  Do you recognize -- first of all, you recognize the

8    exhibit -- Government's proposed Exhibit 11.0?

9    A.   Yes.

10   Q.   And those are a series of ten checks?

11   A.   Yes.

12   Q.   How many of those checks are personal checks?

13   A.   Five.

14   Q.   And they are written on whose account?

15   A.   A joint account of Martin Tibbitts and Belinda Tibbitts.

16   Q.   And then are those checks numbered?

17   A.   Yes.

18   Q.   What are the numbers of the personal checks?

19   A.   1900, 1901, 1903, 1904, and 1905.

20   Q.   Okay.  And are those checks dated?

21   A.   Yes.

22   Q.   And do they all have the same date or different dates?

23   A.   They're all dated 12-19, 2019.

24                 THE COURT:  I'm sorry.  They're dated what?

25                 THE WITNESS:  12-19, 2017.

1              THE COURT:  Okay.

2    BY MR. BILKOVIC:

3    Q.  And you indicated that there are five other checks.  What

4    type of checks are those?

5    A.  Cashier's checks.

6    Q.  And how do those relate to Martin Tibbitts?  These are

7    checks that you received when you requested Marty Tibbitts'

8    banking information?

9    A.  That's correct.

10   Q.  So how are these five checks related to Marty Tibbitts'

11   banking information if they're cashier's checks?

12   A.  These checks were purchased -- converted from the personal

13   checks.

14   Q.  And who are these cashier's checks made out to?

15   A.  The cashier's checks are made out to Donald Larson.

16   Q.  And what is the date on the five cashier's checks?

17   A.  12-19, 2017.

18            MR. BILKOVIC:  Your Honor, I would move for admission

19    into evidence of Government's proposed Exhibit 11.0.

20            THE COURT:  Any objection?

21            DEFENDANT DIDANI:  Objection, your Honor, irrelevant.

22            THE COURT:  What is your objection?

23            DEFENDANT DIDANI:  Those checks are not related to the

24    defendant, your Honor.

25            THE COURT:  They're not related to what?

1      DEFENDANT DIDANI:  To this defendant, your Honor.

2      THE COURT:  Okay.

3      MR. BILKOVIC:  If I can respond.

4      THE COURT:  You may respond.

5      MR. BILKOVIC:  My response is the agent will testify

6  that's kind of the point.  These are checks that were written

7  out to Donald Larson, cashier's checks to Donald Larson that

8  were eventually cashed, and that money was provided -- cash was

9  provided to the defendant.

10      THE COURT:  Can you tie that up?  That's overruled.

11  If you don't tie it up, I'll strike it, okay.

12      MR. BILKOVIC:  Thank you, your Honor.

13      THE COURT:  You're welcome.

14  BY MR. BILKOVIC:

15  Q.  Can you take a look -- we're going to jump ahead.  I know

16  there's a proposed Exhibit 12, but I'm not going to get into

17  that right now.  Can we go to Government's proposed Exhibit 13.

18  A.  Okay.

19  Q.  Can you tell me if you recognize that?

20  A.  Yes.

21  Q.  What is that?

22  A.  This is a personal check numbered 1699 drawn on account of

23  Martin J. Tibbitts, made payable to Tealstone Properties, LLC

24  in the amount of $100,000.

25  Q.  And during your investigation did you identify any

```
 1   information about Tealstone Properties?
 2   A.   Yes.  It was a company associated with Donald Larson.
 3            MR. BILKOVIC:  Your Honor, at this time I would move
 4   for --
 5   BY MR. BILKOVIC:
 6   Q.   I'm sorry.  What is the date on the check?
 7   A.   10-31, 2016.
 8            MR. BILKOVIC:  Your Honor, at this time I would move
 9   for admission into evidence of Government's proposed Exhibit
10   13.0.
11            THE COURT:  Any objection?
12            DEFENDANT DIDANI:  Objection, your Honor.
13            THE COURT:  And what's your objection to this?
14            DEFENDANT DIDANI:  It's irrelevant, your Honor, to
15   this defendant.
16            THE COURT:  How is it relevant, Counsel?
17            MR. BILKOVIC:  Same response, your Honor.  This is --
18            DEFENDANT DIDANI:  It has nothing to do with --
19            THE COURT:  You can't talk over him.  I'm sorry.  It's
20   his opportunity to talk.  If you want to talk again, I'll call
21   on you again.
22            Go ahead, Counsel.
23            MR. BILKOVIC:  This was a check that was cashed by
24   Donald Larson that was used as part of the conspiracy to
25   purchase drugs.  There will be testimony about that from
```

1    additional witnesses.

2           THE COURT:  Okay.  And I'm going to admit it.  And, if

3    it's not tied up, I'm going to strike it, and the same with

4    number 11.

5           Do you wish to say something else about it,

6    Mr. Didani?

7           DEFENDANT DIDANI:  No, your Honor.

8           THE COURT:  Okay.  Go to your next question, please.

9    BY MR. BILKOVIC:

10   Q.   Can you look at Government's proposed Exhibit 15.

11   Actually, let me back up for a second.  Can you look at

12   Government's proposed Exhibit 14.

13   A.   Okay.

14   Q.   And do you recognize that?

15   A.   I do.

16   Q.   And what is that?

17   A.   That is a personal check made payable to Donald Larson

18   drawn on a joint account of Martin Tibbitts and Belinda

19   Tibbitts.  A check number is 1902 dated December 2, 2017, in

20   the amount of $14,000.

21          MR. BILKOVIC:  Your Honor, at this time the Government

22   would move for admission into evidence of Government's proposed

23   Exhibit 14.

24          THE COURT:  Any objection?

25          DEFENDANT DIDANI:  Objection, your Honor.

```
 1              THE COURT:  What's your objection?
 2              DEFENDANT DIDANI:  It's irrelevant to this defendant,
 3    your Honor.
 4              THE COURT:  Do you want to respond to that?
 5              MR. BILKOVIC:  Yes, your Honor.  My response to this
 6    is a little different.  Later evidence will show that that was
 7    a check that was provided from Martin Tibbitts to Don Larson to
 8    assist Don Larson in his personal capacity, which would further
 9    show a relationship between the two of them.
10              THE COURT:  Between the two of --
11              MR. BILKOVIC:  Between Marty Tibbitts and Donald
12    Larson, a personal relationship between them.
13              THE COURT:  And that's going to be important
14    because ...
15              MR. BILKOVIC:  It will be important because the
16    allegations in this case is that both Don Larson, Marty
17    Tibbitts were also close personal friends of Ylli Didani and
18    that the three of them conspired to commit Count 1.
19              THE COURT:  Okay.  It's admitted as long as that's
20    tied up later.  Your objection is overruled.
21              You may go to your next question.
22              MR. BILKOVIC:  Thank you, your Honor.
23    BY MR. BILKOVIC:
24    Q.  In staying with the Comerica records, can you take a look
25    at Government's proposed Exhibit 15.
```

1    A.    Okay.

2    Q.    15.0.  I'm sorry.  And do you recognize that?

3    A.    I do.

4    Q.    And what is that?

5    A.    A wire -- record of a wire transfer dated 5-25, 2016.  It

6    is a wire with the originator of Martin Tibbitts with the

7    beneficiary -- actually, this one is a return of a wire that

8    was attempted by Martin Tibbitts.

9    Q.    Okay.  What page --

10            THE COURT:  I don't understand what you mean.

11            THE WITNESS:  Mr. Tibbitts attempted to wire funds.

12   However, he did not have the correct name associated with the

13   account number so the wire was returned.  This is documentation

14   of that.

15            THE COURT:  Okay.  Go ahead, Counsel.

16   BY MR. BILKOVIC:

17   Q.    That's on Page 1; correct?

18   A.    It's 15.0.

19   Q.    15.0 on the first page?

20   A.    Yes.

21   Q.    Can you look at the second page.

22   A.    Yes.

23   Q.    And do you recognize what that is?

24   A.    Yes.

25   Q.    What is that?

1   A.   This is a wire record dated 5-25-16.  This is the record

2   showing Martin Tibbitts attempted to wire $100,000 to a company

3   called Cattleman's.  This was a wire that was returned.

4   Q.   And then can you look at Page 3.

5   A.   Yes.

6   Q.   15-3.  And what is that?

7   A.   This is another record of a wire transfer dated 5-26, 2016.

8   This is a record of a hundred thousand-dollar wire transfer

9   from Martin Tibbitts to an individual named Piotr Synowiec.

10   This was a successful wire.

11   Q.   And how much was the wire?

12   A.   $100,000.

13          MR. BILKOVIC:  Your Honor, at this time the Government

14   would move for admission into evidence of Government's proposed

15   Exhibit 15.0.

16          THE COURT:  Any objection?

17          DEFENDANT DIDANI:  Objection, your Honor.

18          THE COURT:  What's your objection?

19          DEFENDANT DIDANI:  Irrelevant to the defendant, your

20   Honor.

21          THE COURT:  How is it relevant, Counsel?

22          MR. BILKOVIC:  Your Honor, Martin Tibbitts, at the

23   time this wire was made, the evidence will show that Martin

24   Tibbitts and Piotr Synowiec did not know each other.  Marty

25   Tibbitts wired the hundred thousand dollars to Piotr Synowiec

13

1    at the request of Ylli Didani.  Two weeks later, a couple weeks

2    later, Piotr Synowiec took out a hundred thousand dollars in

3    cash, provided money -- that money to Donald Larson who then

4    delivered that to Ylli Didani.

5            THE COURT:  And you're going to be able to show that?

6            MR. BILKOVIC:  Yes, your Honor.

7            THE COURT:  It's admitted.  If you fail to show it, I

8    will strike this document.

9            MR. BILKOVIC:  Thank you.  You will strike it if I

10   don't show that; correct?

11           THE COURT:  Right.

12   BY MR. BILKOVIC:

13   Q.   Okay.  I would like to turn our attention now to Piotr

14   Synowiec.  Are you familiar with that name?

15   A.   Yes.

16   Q.   And are you familiar with a business that Mr. Synowiec

17   owned?

18   A.   Yes.  He's the owner of a business called Cattleman's.

19   It's a meat packing company.

20           THE COURT:  I didn't hear that.  Tell us that louder.

21           THE WITNESS:  Cattleman's.  It's like a butcher meat

22    company.

23   BY MR. BILKOVIC:

24   Q.   And I don't need like a specific address, but do you know

25   what state that business is located in?

1    A.   It's located in Michigan.

2    Q.   And do you know if it's located in the Eastern District?

3    A.   It is.

4              THE COURT:  It's located where?

5              MR. BILKOVIC:  In the Eastern District of Michigan.

6              THE COURT:  Okay.

7    BY MR. BILKOVIC:

8    Q.   Do you know the city, and if you don't it's okay, but do

9    you know the city?

10   A.   I believe there are two location.  One's downriver, one's

11   on the east side.

12             THE COURT:  Downriver meaning ...

13             THE WITNESS:  Taylor.  Taylor, Michigan, I think.  I

14    don't recall exactly the address.

15   BY MR. BILKOVIC:

16   Q.   In any event, are both locations located in the Eastern

17   District of Michigan?

18   A.   They are.

19   Q.   And did you attempt to obtain records related to Piotr

20   Synowiec and/or Cattleman's?

21   A.   Yes.

22   Q.   How did you do that?

23   A.   With a Grand Jury subpoena.

24   Q.   And who did you address the Grand Jury subpoena to?

25   A.   JPMorgan Chase Bank.

1    Q.   And how did you know to address the Grand Jury subpoena to

2    JPMorgan Chase Bank?

3    A.   I identified through FinCEN that Mr. Synowiec, due to

4    reporting in FinCEN, that he held accounts at JPMorgan Chase.

5    Q.   Can you take a look at Government's proposed Exhibit 16.0

6    and tell me if you recognize that?

7    A.   Yes.

8    Q.   And what is -- how do you recognize 16.0?

9    A.   This is the document from -- provided by JPMorgan Chase

10   from the subpoena.

11   Q.   Provided by the subpoena for Mr. Synowiec and/or

12   Cattleman's records?

13   A.   That's correct.

14   Q.   And what is the date on the certification?

15   A.   The certification is 9-22, 2021.

16          MR. BILKOVIC:  Your Honor, at this time the Government

17   would move for admission into evidence of Government's proposed

18   Exhibit 16.0.

19          THE COURT:  Any objection?

20          DEFENDANT DIDANI:  Objection, your Honor.  All these

21   documents are irrelevant to the defense, your Honor.

22          THE COURT:  Do you want to respond?

23          MR. BILKOVIC:  Your Honor, this is a certification for

24   business records.  Assuming the Court will allow this into

25   evidence, I am then going to have Agent Newsome testify about

1   reviewing certain records of Piotr Synowiec that show the one

2   hundred thousand-dollar wire transfer from Marty Tibbitts.

3           THE COURT:  Okay.  So noted for the record, and I will

4   admit it subject to you being able to tie it up.

5           MR. BILKOVIC:  Thank you.

6   BY MR. BILKOVIC:

7   Q.  Do you have Government's proposed Exhibit 16.1 in front of

8   you?

9   A.  Yes.

10  Q.  And what is -- do you recognize 16.1?

11  A.  Yes.

12  Q.  Are those records provided to you in response to your

13  subpoena from JPMorgan Chase?

14  A.  Yes.

15  Q.  And what specifically is 16.1?

16  A.  Bank statement for an account held by Piotr Synowiec at

17  Chase Bank.

18  Q.  And are you familiar with what a signature card is?

19  A.  Yes.

20  Q.  Is there a signature card included with this as well?

21  A.  Yes.

22  Q.  And is there an address of Mr. Synowiec included in this as

23  well?

24  A.  Yes, there is.  4870 Walnut Creek, West Bloomfield,

25  Michigan.

1    Q.   And that's on the signature card?

2    A.   Yes.  That would have been the address provided by

3    Mr. Synowiec at the time of opening the bank account.

4    Q.   And then if you could look at a page of that Exhibit

5    16.1-2.  Do you recognize that?

6    A.   Yes.

7    Q.   And what is that?

8    A.   That is a JPMorgan Chase Bank statement dated May 4th -- or

9    sorry, May 14, 2016, through June 14, 2016.  It is an account

10   held by Piotr Synowiec.

11   Q.   And what is the address?

12   A.   The address is 3824 Pine Lake Knoll Drive, West Bloomfield,

13   Michigan.  That would have been Mr. Synowiec's address at the

14   time of this bank statement.

15   Q.   And does that bank statement reflect or corroborate the

16   wire that you previously testified to that was sent by Marty

17   Tibbitts to Piotr Synowiec?

18   A.   Yes.

19        MR. BILKOVIC:  Your Honor, at this time I would move

20   for admission into evidence of Government's proposed Exhibit

21   16.1.

22        THE COURT:  Any objection?

23        DEFENDANT DIDANI:  Objection, your Honor, irrelevant

24   to the defense.

25        THE COURT:  Okay.  Would you like to respond to that,

1    please?

2             MR. BILKOVIC:  Your Honor, this is just basically, as

3    I indicated earlier, it's tying together the check that was --

4    the wire that was sent to Piotr Synowiec reflected in his

5    records.  And then I will have the agent testify later about

6    the one hundred thousand-dollar withdrawal that was made on

7    that account.  And there will be later testimony that that

8    $100,000 was provided to Donald Larson who then provided it to

9    Ylli Didani.

10            THE COURT:  Okay.  Your objection is overruled, and

11   it's admitted.

12   BY MR. BILKOVIC:

13   Q.   Are you familiar with a company called MoneyGram?

14            THE COURT:  Called what?

15            MR. BILKOVIC:  I'm sorry, your Honor.  I wasn't

16   speaking into the mic.

17   BY MR. BILKOVIC:

18   Q.   A company called MoneyGram?

19   A.   Yes.

20   Q.   And is that spelled how it sounds, M-O-N-E-Y-G-R-A-M?

21   A.   Correct.

22   Q.   What is MoneyGram?

23   A.   It's a money service business.  It's -- they offer

24   customers ability to transfer funds internationally.

25   Q.   And so how does that work?  If I wanted to use MoneyGram,

1    what would I be able to use it for?

2    A.   To transfer money, you can do international transfers.

3    They're generally service -- their primary customer is unbanked

4    individuals, meaning individuals that don't have bank accounts,

5    but they offer the service where you can bring cash to the

6    location, purchase a money order or conduct a wire transfer to

7    another individual somewhere in the world.  That individual

8    would then be able to physically go pick up those funds at a

9    physical location.  MoneyGram also offers direct transfer

10   services to bank account to bank account.

11   Q.   Did you have an opportunity to review Government's proposed

12   Exhibit 28.1 in this case?

13           THE COURT:  I'm sorry.  What is the number?

14   BY MR. BILKOVIC:

15   Q.   28.1, an Excel spreadsheet of payments.  You will not have

16   that there, because it was an Excel spreadsheet.  Do you

17   remember reviewing that document, though?

18   A.   I do.

19   Q.   Okay.  And do you know what that document is?

20   A.   Yes.

21   Q.   What is it?

22   A.   It is a record from MoneyGram of --

23   Q.   You don't have to give me amounts, but just generally what

24   it is?

25   A.   Transactions conducted by Ylli Didani to an individual

1    named Carl Chaumont in Canada.

2    Q.   And do you know who Carl Chaumont is as it relates to the

3    investigation?

4    A.   Yes.  He works for a company called Peregrine 360 in

5    Canada.

6    Q.   All right.  I want to back up now, and I'm going to

7    actually put some of these up on the -- some of these exhibits

8    up on the screen and kind of have you walk through them if we

9    could.

10           I'd like to start with Government's Exhibit 15 if we

11   could.

12   A.   15?

13   Q.   Yes.

14           MR. BILKOVIC:  And may I publish 15 to the jury, your

15   Honor?

16           THE COURT:  Yes.

17           MR. BILKOVIC:  Can we see that on the top?  Yeah, keep

18   going down.  Let's stop right there.  Kind of hard to -- I

19   don't know if we can double zoom.  Can we?

20           THE COURT:  Can you all see that?  Can you see this

21   one?  Not really.  Can everyone see the one over here?

22           Okay.  Ms. Daly, we will see if we can do one light or

23   two and maybe they can see it a little better.

24           MR. BILKOVIC:  May I approach the screen very quickly,

25   your Honor?

1           THE COURT:  Yes.

2           MR. BILKOVIC:  Ms. Cook, would it be possible to try

3    this again and only come to about right here and like cut it

4    off right here.

5           THE COURT:  Is that better?

6           JURORS:  Yes.

7           THE COURT:  Can the jurors see that better?

8           JURORS:  Yes.

9           THE COURT:  Okay.  Can the defense see it?

10          MR. FINK:  We have it on our computers, your Honor.

11          THE COURT:  Okay.

12          MR. FINK:  Thank you.

13   BY MR. BILKOVIC:

14   Q.  So can you take the mouse that you have there, that mouse

15   that's up there, and can you kind of just walk the jury through

16   what this document is.

17   A.  Sure.  So this is a record of a wire transaction.  You can

18   see the date here in the upper left, May 25, 2016.  This

19   document essentially has the information associated with the

20   wire transfer, but you can see right here.

21   Q.  That's where you're circling the "Martin J. Tibbitts"?

22   A.  Correct.  That is the originator, which means the

23   individual sending the wire.  In this case, right below it --

24   it's cut off on the screen.  Right below -- yeah.  Right here

25   you can see this is what I previously said about the wire being

1   returned.  It notes that the name on the account disagrees with

2   the account number.  So the name was incorrect as associated

3   with the account number.  So this wire was returned to

4   Mr. Tibbitts.

5   Q.   Can we go to Page 3.

6   A.   15.3?

7   Q.   Yes.

8   A.   Okay.

9   Q.   And again, what is this now?

10  A.   This is again a record of a wire transaction.

11  Q.   Using the red laser point there, it won't show up there,

12  but it will show up on this screen, what am I pointing at here?

13  A.   The date, May 26, 2016.

14  Q.   And then what am I pointing at here next to the debit

15  account and number?

16  A.   So it's the name "Martin J. Tibbitts" who is the

17  originator.

18  Q.   And the amount?

19  A.   Is $100,000.

20       MR. BILKOVIC:  And then could we zoom back out a bit

21  and go to the bottom half.

22  BY MR. BILKOVIC:

23  Q.   And does this show who the recipient or the beneficiary is?

24  A.   Yes.  The beneficiary or the receiver of this wire is Piotr

25  Synowiec.

1    Q.   And if you look at -- and I'm going to show it to the jury,

2    but if you look at Government's proposed Exhibit 8.2 --

3             MR. BILKOVIC:   We can take that down if we could.

4    BY MR. BILKOVIC:

5    Q.   Let me know when you're there.

6    A.   Okay.

7    Q.   Is Government's Exhibit -- again, just to speed things up,

8    is that Marty Tibbitts' bank statement from Comerica from

9    May 3, 2016 through June 13, 2016?

10   A.   May 13, 2016, to June 13, 2016.

11   Q.   And does that reflect the -- that statement reflect that

12   hundred thousand-dollar wire?

13   A.   Yes.  The bank statement shows the withdrawal for the one

14   hundred thousand-dollar wire to Piotr Synowiec.

15   Q.   And correspondingly is that -- can you go to 16.1.

16   A.   Okay.

17   Q.   And 16.1, this is again the Chase statement for Piotr

18   Synowiec?

19   A.   Yes.

20   Q.   And on Page 2 of that does that show the $100,000 wire

21   transfer?

22   A.   Yes.

23             MR. BILKOVIC:   Could we publish 16.1, Page 2 to the

24   jury, your Honor?

25             THE COURT:   Yes.

1           MR. BILKOVIC:  And can we go down to the bottom third

2     of that.

3           THE WITNESS:  But just above that.

4     BY MR. BILKOVIC:

5     Q.   I'm not going to the wire.  I'm asking you an additional

6     question.  Do you see a transaction that has the date of June 6

7     and then also a -- where it says description June 4th?

8     A.   Yes.

9     Q.   And can you just take your pointer and point to that.

10          Okay.  And what is the description of the transaction?

11    A.   Withdrawal.

12    Q.   And what is the amount?

13    A.   $100,000.

14    Q.   Does the account records that you're looking at, does it

15    show the beginning balance?

16          MR. BILKOVIC:  Could we zoom back out.

17    BY MR. BILKOVIC:

18    Q.   Does it show the beginning balance of that account before

19    the wire?

20    A.   Yes.  The beginning balance was $97.18.

21    Q.   And then what are the transactions that follow that for

22    that statement?

23    A.   There was the wire in deposit of $100,000, a withdrawal --

24    cash withdrawal of $100,000.

25    Q.   And an ending balance of ...

1  A.   It looks like there was a $25 fee and then an ending

2  balance of $72.48.

3         MR. BILKOVIC:  Can you go to Government's Exhibit

4  16.1-4, and could we publish that to the jury, your Honor?

5         Don't put it up yet.

6         Can we publish that to the jury?

7         THE COURT:  Yes.

8         MR. BILKOVIC:  Now can we put it up.  And can we just

9  zoom in on the top half.

10         DEFENDANT DIDANI:  Excuse me.  What was it?

11         MR. BILKOVIC:  16.1-4, Page 4.

12  BY MR. BILKOVIC:

13  Q.   And what are we looking at here?

14  A.   This is a withdrawal slip that shows that Piotr Synowiec

15  withdrew $100,000 in cash.

16  Q.   And what is the date?

17  A.   6-4-16.

18         MR. BILKOVIC:  Okay.  Can we take that down.

19  BY MR. BILKOVIC:

20  Q.   Now, I want to back up now and go through the checks that

21  you discussed earlier to Don Larson and Peter Tocco.  I want to

22  start with Government's Exhibit 9.0.

23         MR. BILKOVIC:  And can I publish 9.0 to the jury, your

24  Honor?

25         THE COURT:  Yes.

```
 1              MR. BILKOVIC:  Can we go to the top -- yeah, the front
 2    of the check.
 3    BY MR. BILKOVIC:
 4    Q.  And what are we looking at here?  And if you could use the
 5    laser pointer, just kind of walk the jury though what this is.
 6    A.  This is a cashier's check from Comerica Bank.  There's the
 7    check number right here in the upper right corner ending in
 8    6918.  Check is made payable to Donald A. Larson, in the amount
 9    of $50,000.
10    Q.  And this -- again, these are checks that we're going to go
11    through here.  These were checks that basically were converted
12    to cashier's checks from Marty Tibbitts' bank account?
13    A.  Yes.  These checks were purchased by Martin Tibbitts from
14    his bank account.
15              MR. BILKOVIC:  And can we go to the back of the check.
16    Could we zoom back out and go to the back of the check on the
17    right -- correct, right-hand side.
18    BY MR. BILKOVIC:
19    Q.  Now, can you tell from this -- and I know it's kind of
20    sideways, but can you tell from the back of this check where
21    this check was cashed?
22    A.  Yes.  If you look at this section right here, you can see
23    that it was cashed at Rose's Gold Exchange.
24    Q.  Rose's Gold Exchange?
25    A.  Yes.
```

Jury Trial, Volume 5 - Excerpt - February 20, 2025                    27

1    Q.   So it was not cashed at Comerica Bank?

2    A.   No.

3    Q.   It was not cashed in any other bank?

4    A.   No.  It was cashed at Rose's Gold Exchange.

5    Q.   And do you know whether or not there was -- Mr. Larson paid

6    a fee to have this check cashed?

7    A.   Yes.

8    Q.   And how is it that you're able to determine that?

9    A.   Through FinCEN filing of the Currency Transaction Report.

10   When Rose's Gold Exchange cashed this check and gave Mr. Larson

11   cash, they would file the CTR that I discussed previously

12   indicating that there's a cash transaction of over $10,000.  It

13   identified Mr. Larson as the person cashing that check as well

14   as the amount that they gave him, which was $49,000.  So he was

15   charged a fee of $1,000 to cash that check.

16   Q.   And can you go to Page 2, please.

17               THE COURT:  Page 2 of --

18               MR. BILKOVIC:  I'm sorry.  Page 2 of Exhibit 9.0.  Can

19    we go to the front of the check.

20   BY MR. BILKOVIC:

21   Q.   And what are we looking at here?

22   A.   Again, this is a cashier's check from Comerica Bank payable

23   to Donald A. Larson, dated 6-9, 2016, in the amount of $50,000.

24   Q.   And can we go to the next page, the check on Exhibit 9.3 --

25   Exhibit 9.0, Page 3.  And what are we looking at here.

1   A.  Cashier's check from Comerica Bank, this time made payable

2   to Peter Tocco.  Again, same date, 6-9, 2016, in the amount of

3   $50,000.

4           MR. BILKOVIC:  And can we look at the backside of that

5   check and zoom in on the right-hand side.

6   BY MR. BILKOVIC:

7   Q.  And does this indicate where that check was cashed?

8   A.  It does.  The stamp right here indicates it was cashed at

9   Rose's Gold Exchange.

10  Q.  And can we go to Exhibit 9.0, Page 4.

11  A.  Okay.

12          MR. BILKOVIC:  And can we go to the front of the

13  check.  Zoom in on the front.

14  BY MR. BILKOVIC:

15  Q.  What are we looking at here?

16  A.  Again, this is a cashier's check from Comerica Bank made

17  payable to Peter Tocco, the same date of 6-9-16, amount of

18  $50,000.

19  Q.  And can we go to the back of the check.  Again, does that

20  indicate where the -- the back of the check indicate where that

21  check was cashed?

22          I'm sorry.  We might be on the wrong page.

23  A.  Yeah, that's the wrong check.

24  Q.  I'm sorry.  9.4, the back of 9.4.

25  A.  Yeah.  So you can see this check was cashed at a different

1    location called Harper Pawn Shop.

2    Q.   And do you know based on your research in this case whether

3    fees were charged to cash each one of those checks?

4    A.   Yes.  A fee would have been charged for all these checks in

5    the amount of $1,000.

6    Q.   So for a total of $4,000?

7    A.   For all four checks, yes.

8    Q.   Can we go to Exhibit 10.0.  And can we start with the first

9    check on 10.0.

10             MR. BILKOVIC:  May I publish it, your Honor, to the

11   jury?

12             THE COURT:  Yes.

13             MR. BILKOVIC:  If you'll zoom in to the front of the

14    check.

15   BY MR. BILKOVIC:

16   Q.   And what are we looking at here?

17   A.   A cashier's check from Comerica Bank dated 3-24, 2017, made

18   payable to Donald Larson in the amount of $50,000.

19   Q.   And what is the check number?  Can you see what it ends in?

20   A.   It ends in 4587.

21   Q.   You may have said it already, but what is the date on the

22   check?

23   A.   3-24, 2017.

24   Q.   And were these cashier's checks again that were in Exhibit

25   10, these were provided to you by Comerica as being associated

1   with Martin Tibbitts' accounts?

2   A.   Correct.

3   Q.   Okay.  Can we go to the bottom of the check.  And what are

4   we looking at here?

5   A.   Again, this shows you again that this check was cashed at

6   Rose's Gold Exchange.

7   Q.   Okay.  And do you know like the other ones whether there

8   was a thousand-dollar fee?

9   A.   There was.

10  Q.   And again, Government's Exhibit 10 -- I'm not going to go

11  through every check on there, but Government's Exhibit 10.0 I

12  believe you testified that there were four checks made payable

13  to Donald Larson?

14  A.   That's correct.

15  Q.   And were they all made payable -- are they all written on

16  -- issued on March 24, 2017?

17  A.   Yes.

18  Q.   And were they all in the amount of $50,000?

19  A.   Yes.

20  Q.   And then you also indicated that there were two additional

21  checks in there payable to Peter Tocco?

22  A.   That's correct.

23  Q.   And what are the amounts of those two checks?

24  A.   They were both $50,000.

25  Q.   And where were they cashed?  If you could look at

```
 1   Government's Exhibit 10.0, Page 5 and Page 6.
 2   A.   They were both cashed at Harper Pawn Shop.
 3   Q.   And again, were they a thousand-dollar fee to cash each one
 4   of those checks?
 5   A.   Yes.
 6   Q.   If I have a -- do you know if I have a cashier's check from
 7   Comerica and I go to Comerica can I cash that check there?
 8   A.   You can.
 9   Q.   Would I be paying a thousand dollars for $50,000?
10   A.   No.
11   Q.   Am I paying anything close to that?
12   A.   No.  They probably wouldn't charge you.
13            DEFENDANT DIDANI:  Objection, your Honor, lack of
14    foundation.
15            THE COURT:  What's your objection?  That he lacks
16    foundation with his answer?
17            DEFENDANT DIDANI:  Lack of foundation.
18            THE COURT:  You need to lay a foundation why he'd know
19    that.
20   BY MR. BILKOVIC:
21   Q.   Is part of your duties and responsibilities as a IRS agent
22   in the Criminal Division to investigate money laundering
23   specifically as it relates to banks?
24   A.   Yes.
25   Q.   And based on that have you had training and learned how
```

1   banks operate and -- banks in the United States operate and how
2   they conduct transactions?
3   A.   Yes.
4   Q.   Do you know how banks generally process checks?
5   A.   Yes.
6   Q.   Do you know how banks generally process cashier's checks?
7   A.   Yes.
8   Q.   Do you know how banks generally, based on your training and
9   experience, how banks process checks that are drawn on that
10  bank?
11  A.   Yes.
12  Q.   Do you know how banks generally process checks drawn on
13  another bank, but if the person cashing that check has an
14  account -- let me back this up.  That's confusing.  Let me ask
15  you this:
16          Do you know how it would work if I don't have a
17  Comerica account, but let's say I have a National City account
18  and I have a check from Comerica?  Do you know generally how my
19  bank would operate, National City, in cashing that check?
20  A.   Yes.
21          MR. BILKOVIC:  Your Honor, I believe I've established
22  the sufficient foundation to ask him this question.
23          THE COURT:  Do you want to voir dire on foundation?
24          DEFENDANT DIDANI:  No, your Honor.
25          THE COURT:  Very well.  You may answer.

33

 1   BY MR. BILKOVIC:

 2   Q.   Do you know generally if banks where checks are drawn will

 3   charge somebody to cash the check?

 4   A.   Yes.  Banks will generally charge a person to purchase a

 5   cashier's check or an official check.  They do not charge you

 6   to cash that check.

 7   Q.   And what about my bank, if I took a Comerica check and I

 8   went to my bank at let's say National City and cashed it, would

 9   I be charged if I had an account at National City?

10   A.   No.

11            THE COURT:  I'm sorry?

12            THE WITNESS:  No.

13   BY MR. BILKOVIC:

14   Q.   I want to turn to Government's Exhibit 11 if we could.

15   Again, I'm not going to go through all of these, but I am going

16   to go through the first two.  I'm going to ask you some

17   questions about those.

18            THE COURT:  What is the number?

19            MR. BILKOVIC:  It's Government's Exhibit 11.  This is

20    the ten-page exhibit with ten checks, your Honor.

21            THE COURT:  Okay.

22   BY MR. BILKOVIC:

23   Q.   And again, these are all checks related to Martin Tibbitts'

24   account?

25   A.   That's correct.

```
 1              MR. BILKOVIC:  If we could -- your Honor, could I
 2    publish Page 111.0, the very first page?
 3              THE COURT:  Yes.
 4              MR. BILKOVIC:  Can we zoom in on the top half.
 5    BY MR. BILKOVIC:
 6    Q.   And what are we looking at here?
 7    A.   This is a personal check from a joint account of Martin
 8    Tibbitts and Belinda Tibbitts.  It is dated 12-19, 2017.  It's
 9    made payable to Donald Larson in the amount of $100,000.
10    Q.   And can we look at the bottom of that check.  What are we
11    looking at here?
12    A.   This just shows the back of the check showing an
13    endorsement signed by Donald Larson.  And it indicates a
14    cashier's check ending in 148 that this check was used to
15    purchase that cashier's check.
16    Q.   How do you know that?
17    A.   I subpoenaed Comerica Bank.
18              MR. BILKOVIC:  Can we then go to Page 2, 11.0, Page 2.
19    Can we go to the top of this.
20    BY MR. BILKOVIC:
21    Q.   And what are we looking at here?
22    A.   This is a cashier's check ending in 148 made payable to
23    Donald Larson in the amount of $100,000.  It is dated 12-19,
24    2017.
25    Q.   And was this related then to the hundred thousand-dollar
```

1    personal check from Martin Tibbitts?

2    A.   That's correct.

3    Q.   Now, if we could go to the bottom -- well, let me ask you

4    if we could go to the bottom of this, bottom third, was this

5    check then cashed at Comerica by Donald Larson?

6    A.   No.   This check was cashed by Donald Larson at Rose's Gold

7    Exchange.

8    Q.   And do you know what the fee was with respect to this

9    check?

10   A.   Check for a hundred dollars the fee was a total of $2,000.

11   Q.   And we don't need to publish it, but if we could -- I'm

12   just going to have you walk it through.

13           MR. BILKOVIC:   Actually, I am going to have you

14   publish it.   If we could publish page 11.3.

15   BY MR. BILKOVIC:

16   Q.   And what are we looking at here?

17   A.   This is a personal check on a joint account of Martin

18   Tibbitts and Belinda Tibbitts, check number 1901 dated 12-19,

19   2017, made payable to Donald Larson in the amount of $80,000.

20   Q.   And is there a corresponding cashier's check for the same

21   amount?

22   A.   That's correct.

23   Q.   And then could we go to Government's Exhibit 11.0, Page 5.

24   What are we looking at here?

25   A.   Personal check number 1903 drawn on a joint account of

1    Martin Tibbitts and Belinda Tibbitts dated 12-19, 2017, made

2    payable to Donald Larson in the amount of $100,000.

3    Q.  And again, is there a corresponding cashier's check for

4    $100,000 on the same date made payable to Donald Larson?

5    A.  That's correct.

6    Q.  All right.  Can we go to Government's Exhibit 11.0, Page 7.

7    What are we looking at here?

8    A.  It's a personal check, number 1904, drawn on joint account

9    Martin Tibbitts, Belinda Tibbitts, dated 12-19, 2017, payable

10   to Donald Larson in the amount of $70,000.

11   Q.  And is there a corresponding cashier's check to Donald

12   Larson on the same day for the same amount?

13   A.  There is.

14   Q.  Can we go to Government's Exhibit 11.0, Page 9.  And what

15   are we looking at here?

16   A.  Personal check 1905 drawn on joint account of Martin

17   Tibbitts and Belinda Tibbitts dated 12-19, 2017, payable to

18   Donald Larson in the amount of $100,000.

19   Q.  And again, is there a corresponding cashier's check for the

20   same amount, the same date, made payable to Donald Larson?

21   A.  Yes.

22   Q.  And those corresponding cashier's checks are also contained

23   in Government's Exhibit 11.0?

24   A.  Correct.

25   Q.  So you had an opportunity then to review the Martin

1   Tibbitts and Don Larson transactions?

2   A.   Yes.

3   Q.   And did you have an opinion as to whether or not any of

4   those transactions were consistent with money laundering?

5   A.   Yes, they are.

6   Q.   Why?

7   A.   There's no legitimate business reason to conduct

8   transactions in that way.

9   Q.   In what way?

10  A.   To me it looks like they're layer transactions, and they

11  additionally use a nominee, the nominee being Donald Larson, as

12  the third party who is taking checks from Tibbitts and

13  converting them to cash paying unnecessary fees at check

14  cashing businesses when that is unnecessary.

15  Q.   You mentioned layering.  What do you mean by layering?

16  A.   As I previously explained, layering is a part of the money

17  laundering process where you conduct a series of transactions

18  to create layers between the original transaction.

19  Q.   So in this case you have -- let's go with the December

20  transactions.  How much were those in total, the personal

21  checks of Martin Tibbitts?

22  A.   The total is 450,000.

23  Q.   So instead of one check for 450,000 there's a total of five

24  checks that the denominations add up to 450,000?

25  A.   Correct.

38

1   Q.   Is that consistent with layering?

2   A.   Yes.

3   Q.   Okay.  I want to switch gears a little bit.  Are you

4   familiar with a company during your investigation called INKAS

5   Armored Car Manufacturing?

6   A.   Yes, I am.

7            THE COURT:  Are you going to use the --

8            MR. BILKOVIC:  Oh.  No, I'm not.  I think we can turn

9   the lights back on.

10            THE COURT:  Thank you.  And what is the name of this

11   company, INKAS what?

12            MR. BILKOVIC:  INKAS Armored Car Manufacturing.

13            THE COURT:  Okay.  Thank you.

14            And what's your answer?

15            THE WITNESS:  I'm familiar with that company, yes.

16   BY MR. BILKOVIC:

17   Q.   How is it -- are you familiar with that company as it

18   relates to this investigation?

19   A.   I am.

20   Q.   How?

21   A.   I am aware that the defendant purchased customized armored

22   vehicles from this company.

23   Q.   And based on your investigation, do you know how those

24   vehicles were paid for?

25   A.   In part, yes.

```
1    Q.   Okay.  What part do you --

2              THE COURT:  What?

3              THE WITNESS:  In part, yes.

4    BY MR. BILKOVIC:

5    Q.   The part that you know, what do you know?

6    A.   I know that there was a combination of wire transfers that

7    originated in Dubai, United Arab Emirates, as well as what we

8    call cash money drops or a money drop where an individual

9    dropped cash to that business.

10   Q.   I want to talk about the wire for a second.  Do you know if

11   any of these wire transactions were in United States dollars?

12   A.   Yes, some were.

13   Q.   And the ones that were in United States dollars do you know

14   if to get from Dubai to Canada do you know whether or not those

15   wire transfers passed through the United States banking system

16   to the corresponding bank?

17   A.   Yes.  Those transactions were -- utilized corresponding

18   banks located in the United States.

19             DEFENDANT DIDANI:  Objection, your Honor.  Can he be

20    more specific the banking system?

21             THE COURT:  You can ask him that on cross-examination.

22   BY MR. BILKOVIC:

23   Q.   Now, in one of the things that you did, you mentioned tax

24   returns, that you will sometimes obtain a person's tax returns?

25   A.   That's correct.
```

1    Q.   How is it that you do that?

2    A.   In a non-tax investigation such as a money laundering

3    investigation we get a court order authorizing the production

4    of the civil side of the IRS to produce tax records.

5    Q.   And were you able to do that with respect to Mr. Didani?

6    A.   Yes.

7    Q.   And did you make a certain request with respect to those

8    records?  Like is there a timeframe that you look for?

9    A.   I believe at the time I requested 2013 to 2017.

10   Q.   And did you receive records back?

11   A.   Yes.

12   Q.   And in those records how many years did Mr. Didani file tax

13   returns?

14   A.   For the years 2015 and 2016.

15   Q.   And do you recall what he listed as his address?

16   A.   It was the same address of the residence of Piotr Synowiec.

17   Q.   Would that be the Pine Lake Knoll address?

18   A.   Yes, that's correct.

19   Q.   And do you recall approximately how much income Mr. Didani

20   declared each year?

21   A.   Approximately $20,000.

22   Q.   And what were the two years?

23   A.   2015 and 2016.

24   Q.   In any of those tax returns did he list a business that was

25   related to a car wash?

1   A.   I believe the business was identified as a transportation

2   broker.

3   Q.   A transportation broker?

4   A.   Yes.

5   Q.   No car washes?

6   A.   Not that I recall.

7   Q.   Any other returns for the time period you requested?

8   A.   No.  He was a nonfiler for those other years.

9   Q.   I want to back up.  There was a couple of things going back

10  to basically your training and experience and things that you

11  investigate with respect to money laundering.  I don't think I

12  asked it yesterday and I meant to.

13        I think you briefly mentioned.  I asked you what is

14  specified illegal activity?

15  A.   Specified unlawful activity.

16  Q.   I'm sorry.  Specified unlawful activity.  What is specified

17  unlawful activity?

18  A.   Specified unlawful activity, or an SUA, is -- what we refer

19  to as an SUA, is essentially the --

20        DEFENDANT DIDANI:  Your Honor, objection.  It's a

21   legal conclusion.

22        MR. BILKOVIC:  I don't believe --

23        THE COURT:  Do you want to respond to that?

24        MR. BILKOVIC:  Yeah.  I don't believe it's a legal

25   conclusion.  I think it goes part of what he investigates and

1    why he investigates.

2            THE COURT:  And I'll allow it for that purpose, but

3    the jury may not consider it for a legal conclusion.

4            Your objection is overruled.

5            THE WITNESS:  So SUA is basically the underlying

6    criminal activity that produces the funds that are ultimately

7    laundered.  So it's the crime that the funds are laundered for,

8    in this case drug trafficking.

9    BY MR. BILKOVIC:

10   Q.  And so example if -- can you use lawful funds, like

11   legitimate funds, to engage in specified unlawful activity?

12   A.  You can.  If you use legitimate funds to purchase say drugs

13   outside of the United States, that is a violation of money

14   laundering.

15   Q.  Now, you said --

16           THE COURT:  That is a what?

17           THE WITNESS:  Violation of money laundering.

18   BY MR. BILKOVIC:

19   Q.  So when you -- you said to purchase outside of the United

20   States?

21   A.  That's correct.

22   Q.  So does the legitimate money, in order to further the

23   unspecified unlawful activity, does that money have to go

24   outside the United States?

25   A.  It does.

```
 1    Q.   So, for example, if I got my paycheck and I decided to
 2    purchase in Michigan a hundred dollars of marijuana in Ohio, is
 3    that what you're talking about here, or no?
 4         DEFENDANT DIDANI:  Objection, your Honor.  Outside the
 5    United States with Ohio it's a whole different suggestion.
 6         THE COURT:  This is a different question.
 7         DEFENDANT DIDANI:  I see, your Honor.
 8         THE COURT:  You may pose this question.
 9    BY MR. BILKOVIC:
10    Q.   So, if I do that, take my paycheck in Michigan and
11    basically send money to Ohio to purchase marijuana, is that
12    what we're talking about here?
13    A.   That's not what we're talking about.
14    Q.   Money has to go outside of the United States?
15    A.   That is correct.
16    Q.   And I don't have in my notes that I asked you this
17    yesterday, and if I did I apologize, but are you familiar with
18    the term "shell company"?
19    A.   Yes.
20    Q.   What is a shell company?
21    A.   A shell company is essentially a company that conducts no
22    business activity.  It just exists on paper.  It is often used
23    in money laundering to kind of justify -- you know, to conceal
24    the fact that, you know, illicit proceeds are, you know, the
25    true source and nature of the proceeds.  So money can go
```

1   through a shell company to make it look like that company may

2   have business activity when they really don't.

3   Q.  And you mentioned yesterday that one of the ways that money

4   launderers basically disguise proceeds and launder money is

5   through legitimate businesses?

6   A.  Yes.

7   Q.  What type of legitimate businesses are common for somebody

8   to own if they want to launder money?

9   A.  Drug traffickers are people involved in illicit activity,

10  and money launderers typically prefer cash-based businesses.

11  Q.  I don't know how many "Breaking Bad" fans we have here, but

12  what about like a car wash?

13  A.  Yes, car wash.

14  Q.  What about a marijuana dispensary?

15  A.  Yes.  Even legal marijuana businesses are very cash

16  intensive.  Legal marijuana businesses have very --

17          DEFENDANT DIDANI:  Your Honor, objection.  It's

18   irrelevant.  It's speculation.

19          THE COURT:  I don't know if it's speculation or not,

20   but maybe you should lay a little bit of foundation for this.

21  BY MR. BILKOVIC:

22  Q.  As part of your training and experience, do you look into

23  types of businesses that money launderers use?

24  A.  Yes, I'm aware.

25  Q.  And are there distinct characteristics of those businesses?

Jury Trial, Volume 5 - Excerpt - February 20, 2025                45

1    A.   Yes.

2    Q.   Is one of those businesses' types of characteristics a

3    cash-based business?

4    A.   It is.

5    Q.   In your training and experience, are medical marijuana or

6    marijuana basically dispensaries in Michigan or the United

7    States, are those cash-based businesses?

8    A.   Very often, yes.

9              DEFENDANT DIDANI:  Objection, your Honor.  What

10    training and experience he has with marijuana dispensary?  He's

11    an IRS agent.

12             THE COURT:  You may voir dire him about that.  Do you

13    want to voir dire him about that?

14             DEFENDANT DIDANI:  Yes.

15                        VOIR DIRE EXAMINATION

16   BY DEFENDANT DIDANI:

17   Q.   Agent Newsome, how are you, sir?

18   A.   Very well, sir.  How are you?

19   Q.   Yesterday you concluded all the training and experience you

20   had, and we didn't hear nothing about marijuana.  Do you have

21   training and experience about dispensaries?

22   A.   Yes.  I have experience in investigations that involve

23   marijuana dispensaries, and additionally I'm aware of, you

24   know, the various banking issues that dispensaries have.

25   Q.   I didn't hear that yesterday.

1    A.   Banking issues that marijuana businesses have.

2            THE COURT:  Okay.  That's based on your --

3            THE WITNESS:  My experience.

4            THE COURT:  In investigating them?

5            THE WITNESS:  Yes.

6            THE COURT:  Okay.  Go ahead.

7            DEFENDANT DIDANI:  No further questions, your Honor.

8            THE COURT:  Okay.  Thank you.  Overruled.

9            You may answer the questions that are posed relative

10   to this, if you have any additional ones.

11           MR. BILKOVIC:  Just briefly, and then I think I'm

12    done.

13                   DIRECT EXAMINATION (Continued)

14   BY MR. BILKOVIC:

15   Q.   You had mentioned -- I think you had just indicated to

16   Mr. Didani you're also aware of banking regulations or bank

17   rules relating to marijuana dispensaries and medical marijuana

18   businesses?

19   A.   Yes.  Because marijuana is still illegal according to the

20   federal government, they have many issues banking at

21   traditional banks.  Those banks will not accept those

22   businesses as customers.  Therefore, by nature medical

23   marijuana and recreational marijuana and dispensaries are, you

24   know, heavily relying on cash.

25           MR. BILKOVIC:  May I have one moment, your Honor?

```
 1                THE COURT:  I'm sorry?

 2                MR. BILKOVIC:  May I have one moment?

 3                THE COURT:  Yes.

 4                MR. BILKOVIC:  Nothing further.

 5                THE COURT:  All right.  Very well.

 6          Does the jury need a break?  No?

 7          How about just stand up and stretch.  Were you saying

 8    yes?

 9                A JUROR:  Yes.

10                THE COURT:  All right.  You may step down.  Let's take

11    a short break.

12                Please rise for the jury.

13                (The jury left the courtroom at 1:59 p.m.)

14                THE COURT:  You may step down during the break, but

15    please don't discuss your testimony with anybody.  All right.

16    Thank you.

17          Does anybody else -- does the defendant need to go for

18    a break?

19                MR. FINK:  Your Honor, I would like the defendant to

20    review the unredacted bank records that were given to me today

21    in advance of this cross-examination.  I'll just represent to

22    you I think there's some relevance for cross-examination.  So I

23    think he should take the time to do that if that's all right

24    with the Court.

25                THE COURT:  And how much time do you think you need?
```

1          MR. FINK:  We don't need more than ten --

2          DEFENDANT DIDANI:  Ten, 15 minutes, your Honor.  I

3    will be -- I will be ...

4          THE COURT:  Okay.

5          MR. FINK:  And, Judge, there should be -- just trying

6    to facilitate here for the Court, because these are unredacted

7    and the exhibits that were entered were redacted, there

8    probably needs to be some resolution about how these questions,

9    if any, are asked.

10         MR. BILKOVIC:  Judge, I have no objection to --

11         THE COURT:  What kind of resolution are you looking

12    for?

13         MR. FINK:  I just don't want Mr. Didani to

14    unintentionally reveal information that otherwise shouldn't

15    come in because they were redacted.  I, as an officer of the

16    Court, think there is relevance to a couple unredacted portions

17    in those bank statements that I've discussed after being asked

18    by Mr. Didani to discuss it with him, but I want the Court to

19    make sure you give guidance or Mr. Didani is clear on what he

20    can and cannot do with otherwise redacted information.

21         MR. BILKOVIC:  Judge, I have no objection to him

22    asking any questions about the records.  If I think he's

23    getting into areas that I think are personal that do not belong

24    in this trial, I will object appropriately.  My big --

25         THE COURT:  Has this witness seen the unredacted

 1  record?

 2          MR. BILKOVIC:  No, but I have a copy.  I could give it

 3  to him to have up there with him so he can follow along if he

 4  needs them.  I have no objection to that.  My concern is I just

 5  don't want these records floating out, you know, somebody's

 6  private banking individuals, especially one of the individuals

 7  is still alive.  I just don't want it floating out everywhere,

 8  so -- okay.  Thank you.

 9          THE COURT:  Then let's take a ten or 15-minute break

10  and then we'll come back.

11          MR. FINK:  Thank you, your Honor.

12          THE COURT:  Thank you.

13          (At 2:02 p.m., a brief recess was taken.

14          Back on the record at 2:23 p.m.)

15          LAW CLERK:  All rise.  Court is back in session.

16          THE COURT:  Let's see.  Did you have enough time to go

17  over the documents?

18          DEFENDANT DIDANI:  Yes, your Honor.  I looked at the

19  documents.

20          THE COURT:  Okay.  Let's bring out the jury.

21          DEFENDANT DIDANI:  Your Honor, before we bring the

22  jury out, I wanted to ask you about -- I already asked Agent

23  Hermans.  I was asking your Honor for --

24          THE COURT:  You already asked who?

25          DEFENDANT DIDANI:  I'm asking the Court for Agent

1   Hermans to be removed from this courtroom, your Honor.

2            THE COURT:  To be removed?  And why is that?

3            DEFENDANT DIDANI:  Because Agent Hermans is going to

4   be testifying as an expert on this case and is going to testify

5   about international narcotics, money laundering, money

6   containership.  There is basically -- looking at Agent Hermans'

7   cases, the cases are based here in Detroit.

8            And I do not want to reveal a lot of stuff as far as

9   my defense, my -- as far as maritime containers or money

10  laundering from Dubai, and then we got Agent Hermans coming

11  later on testifying, your Honor.  I'm fine to consider anyone

12  else, but Agent Hermans, no.

13           THE COURT:  Okay.  Because you think he will be

14  influenced in what way?

15           DEFENDANT DIDANI:  His testimony, your Honor.  His

16  testimony.  By getting information --

17           THE COURT:  From the people that will be testifying?

18           DEFENDANT DIDANI:  No.  Agent Hermans will testify.

19           THE COURT:  I know that.  And so you want him removed

20  for what reason?

21           DEFENDANT DIDANI:  And the reason I said, your Honor,

22  those reasons, this trial I will ask some questions that has to

23  do with international money laundering.  And also when Agent

24  Leach will testify about containership, if you allowed it,

25  about the containerships, international drug trafficking.

1          And I don't think it's proper for Agent -- so Agent

2     Hermans need to testify from his own experience or with

3     everything that he has got experience through his life.  I

4     think it will be prejudice to the defendant that Agent Hermans

5     will sit here and listen to all this, how the international

6     containerships or money laundering international and then come

7     testify back to it.

8          THE COURT:  Okay.  Do you want to respond to that?

9          MR. BILKOVIC:  Judge, I would object.  I would ask

10    that Agent Hermans be allowed to remain in the Court.  This is

11    the first I've heard of this.  I've not had a chance to

12    research, but I know it is common practice in this Court to

13    allow a case agent to remain in trial.  I've never had a case

14    agent that has been removed.  I've tried multiple RICO cases in

15    this Court where the case agent testified during trial multiple

16    times.

17         And while it's true Agent Hermans will be offering

18    expert or opinion testimony relating to drug trafficking and

19    international drug trafficking, one of the things that an

20    expert is allowed to rely on is information that they glean

21    from multiple sources.

22         So the fact that he is in Court and may hear testimony

23    is not anything that should result in him being excluded from

24    the courtroom.  If Mr. Didani believes that he is offering

25    testimony or opinions based on what he hears during the trial,

1    Mr. Didani can certainly explore that during cross-examination,

2    but I don't think it's appropriate to remove Agent Hermans from

3    the courtroom.  He has been the main primary case agent on this

4    case since 2019.  We rely on -- we rely on him here.  When the

5    Court asks questions of me, I have to ask him.  He is

6    instrumental in organizing exhibits for us and witnesses, and I

7    would ask that he be allowed to remain in the courtroom.

8              THE COURT:  And tell me this.  He is -- is he going to

9    be a witness -- he's going to be a witness, but he's only going

10   to testify one time; is that right?

11             MR. BILKOVIC:  One time.  One time.  And largely in

12   relation to the Sky messages that were obtained, but he is also

13   going to -- we provided Rule 16 notice a while back detailing

14   that his testimony will focus on drug trafficking,

15   international drug trafficking, ways that drugs are trafficked

16   and things of that nature.

17             I can provide the Court a copy of the Rule 16 notice

18   when we're done today if the Court wants to have that.  But

19   again, I certainly think that Mr. Didani can explore that for

20   cross-examination if he wants if he somehow thinks that Agent

21   Hermans' testimony is going to be influenced based on what he

22   hears in Court.

23             THE COURT:  Okay.

24             DEFENDANT DIDANI:  Your Honor, can I respond, please?

25             THE COURT:  You may.

1          DEFENDANT DIDANI:  So I understand -- I agree with

2    Mr. Bilkovic that he prosecuted a RICO case from Seven Mile

3    Blood, whatever is that, you know.  And now this is not a Seven

4    Mile Blood case, your Honor.  This is --

5          THE COURT:  Who prosecuted that, the Government's

6    attorneys?

7          DEFENDANT DIDANI:  Mr. Bilkovic, you know.

8          THE COURT:  Okay.  And what does that have to do with

9    this case?

10          DEFENDANT DIDANI:  Well, that's what I'm saying to

11    Mr. Bilkovic, because Mr. Bilkovic brought that -- the agent on

12    that case was not -- it was a RICO, it was this.  This is not

13    -- has nothing -- this case has nothing --

14          THE COURT:  In that case an agent was permitted at the

15    table; right?

16          DEFENDANT DIDANI:  Right.

17          THE COURT:  And almost always.

18          DEFENDANT DIDANI:  Right, your Honor, but this is a

19    case --

20          THE COURT:  It is common, not only in the Federal

21    Court in Detroit, but in the State Courts in Detroit for the

22    case agent, unless they're engaged in bad behavior, to be

23    seated at the table.  And I think in the entire time I've been

24    a judge I maybe removed one case agent because I thought they

25    were interfering with the witness, but I haven't had that

1    problem here yet.

2          I don't see that he's going to be tainted -- well, he

3    might be tainted by what he hears, and you will be able to say

4    on cross-examination you've been sitting, did you get any of

5    this from hearing about the case.  But I presume since he's a

6    case agent he's had access probably to everything that's going

7    to be presented in the case.

8          DEFENDANT DIDANI:  But, as you hear from Mr. Bilkovic,

9    your Honor, that he's helping, and it's kind of bothering me

10   right now that Mr. Hermans is helping how the witness will come

11   forward.  It's a strategy.  And Mr. Hermans cannot hear

12   everything that we do --

13         THE COURT:  I didn't hear what you said?  It's a what?

14         DEFENDANT DIDANI:  It's like a strategy.  Mr. Bilkovic

15   said that Mr. Hermans is the one who decide the exhibits, who

16   decide these witnesses, how to come -- and that's what I'm

17   saying, your Honor.  Mr. Hermans can --

18         THE COURT:  I think the word he used was "assist,"

19   wasn't it?

20         DEFENDANT DIDANI:  Assist with the witness, okay.

21   Assist.  I think it's -- Mr. Hermans doesn't have to assist

22   with the witness at all, your Honor, you know, if he's going to

23   -- especially when he's going to testify himself here, you

24   know.  This is very -- this case, it's very -- very -- it's not

25   been brought before in this Federal Court, in Sixth District

1    court.

2             THE COURT:  How do you know that for sure?  Because

3    you've reminded us of that several time and we're aware of

4    that.

5             And your objection to the agent sitting at the table

6    is denied.  If you think he's going to be tainted by something

7    that he hears, you can take that up on cross-examination about

8    whether or not there's anything that came out in the trial that

9    influenced his testimony or added to his knowledge in any way.

10   Otherwise, I think it's a common practice for the agent to sit

11   at the table who's the case agent for the case.

12            Now, Counsel, you know, sometimes the Government wants

13   somebody else to sit there, because the person is unavailable

14   or they're sick or something like that.  And, if you get

15   somebody else, they cannot be a person that's been

16   participating in the case, okay, just so you know.

17            MR. BILKOVIC:  Understood.

18            THE COURT:  You don't get more than one case agent;

19   okay?

20            MR. BILKOVIC:  Yes.

21            THE COURT:  All right, great.

22            Your objection is noted and preserved for the record

23   so it can be taken up on appeal if you choose.

24            Let's bring the jury out, please.

25            The record should also reflect relative to that that

1    he's been sitting here through how many witnesses?  Three?

2            MR. BILKOVIC:  I believe we're on the fourth witness.

3    We just completed direct of the fourth witness.

4            THE COURT:  And the record should also reflect that I

5    excused all your other witnesses during opening statements so

6    that they would not be tainted, just so it doesn't look like

7    I'm being inconsistent.

8            LAW CLERK:  All rise.

9            (The jury entered the courtroom at 2:32 p.m.)

10           THE COURT:  Are you satisfied the jurors are present

11   and in their proper seats?

12           MR. BILKOVIC:  Yes, your Honor.

13           THE COURT:  For the defense, are you satisfied?

14           DEFENDANT DIDANI:  Yes, your Honor.

15           THE COURT:  Okay.  You may cross-examine.  You're

16   still under oath, sir.  You're still under oath.

17           And state your name again for the record, please.

18           THE WITNESS:  Derek Newsome.

19           THE COURT:  You may proceed.

20                        CROSS-EXAMINATION

21   BY DEFENDANT DIDANI:

22   Q.   Agent Newsome, good afternoon.

23   A.   Good afternoon.

24   Q.   As you know, my name is Ylli Didani.

25           You seem very well-spoken, Agent.

1    A.   Thank you.

2    Q.   Agent Newsome, you say that you're a IRS agent?

3    A.   Yes, sir.

4    Q.   You specialize in money laundering?

5    A.   Yes, sir.

6    Q.   In United States and international?

7    A.   Correct.

8    Q.   Before we started, Agent, when did you get into this case?

9    When you was brought in in this case?  Do you remember that,

10   Agent?

11   A.   In 2017.

12   Q.   And by who, Agent?

13   A.   The first person I spoke with was Agent Josh Bianchi.

14   Q.   Okay.  And then you spoke to the Government lawyer or just

15   the agent?

16   A.   At that time it was just the agent.

17   Q.   All right.  So at that time your agency was IRS agency or

18   what?

19   A.   Who did I work for?

20   Q.   Yes.

21   A.   Yes.  IRS Criminal Investigations.

22   Q.   Right.  And how old are you, Agent?

23   A.   How old am I?

24   Q.   Yes, sir.

25   A.   I am 40 years old.

1    Q.   40 years old.  And you've been with the IRS since what

2    year?

3    A.   2009.  So almost 16 years.

4    Q.   So 24 years old; right?  You started 24?

5    A.   I was 25.

6    Q.   25 years old.  Good.  Agent, can you -- you said you was in

7    Miami, too?

8    A.   Yes.

9    Q.   What is a strike force?

10   A.   A strike force is a group like a task force of

11   multi-agencies that exist to investigate specific matters.

12   Q.   Okay.  A strike force is how many agencies together?

13   A.   I'm not sure how many agents there are.  I can estimate

14   maybe 50 plus agents.

15   Q.   From different agencies; right?

16   A.   Yes, sir.

17   Q.   All the agencies, FBI, DEA, all of you?

18   A.   Most.  The major ones, yes.

19   Q.   What did you do in Miami?  What did you do in Miami?

20   A.   In Miami, I was on a yearlong detail to lead what we call

21   an investigative initiative into a specific area.  In this

22   case, I was in Miami to investigate what are known as

23   international financial entities, which are Puerto Rican

24   financial institutions.

25   Q.   It's a Puerto Rican -- is Puerto Rico international or it's

 1   United States or it's domestic?

 2   A.   It's a territory of the United States.  They're subject to

 3   the U.S. law.

 4   Q.   But you can't call that international; right?  It's a

 5   domestic; right?

 6   A.   Fair.

 7   Q.   What circuit is that, Puerto Rico?  Do you know that?

 8   A.   Pardon me?

 9        THE COURT:  What?

10   BY DEFENDANT DIDANI:

11   Q.   What circuit?  What circuit belong to Puerto Rico, like

12   federal circuit?

13   A.   I don't know off the top of my head.

14   Q.   Maybe one?

15   A.   I don't know.

16   Q.   Okay.  Fair enough.  So in 2017, Agent Bianchi came to you

17   and said -- say what?

18   A.   I don't remember his exact words, but he -- I recall him

19   telling me that he was involved in an investigation of some

20   individuals and had identified some transactions through FinCEN

21   that he wanted me to take a look at.

22   Q.   And when he brought this investigation to you, Agent, did

23   you check his work, the investigation, or no, just specifically

24   for that?  Did he ask you specifically for the transaction or

25   for anything else?

 1    A.    Initially it was those transactions, but then I joined the
 2    investigation.
 3    Q.    So when you joined the investigation -- I'm just trying to
 4    get it clear, so be patient with me, all right.  When you
 5    joined the investigation, do you go through -- like let's say
 6    Agent Bianchi, right.  Do you go through with everything that
 7    he has investigated, or no?
 8    A.    Do I go through everything that he has?
 9    Q.    Yes.
10    A.    No.
11    Q.    So you don't investigate or you don't go through to see
12    what he has -- why you joined the investigation?
13    A.    To -- I joined the investigation to focus on the financial
14    aspect of the investigation.
15    Q.    All right.  But you don't know -- tell me a little bit
16    about what he told you, the investigation.  When you entered
17    this investigation, what did he told you, what it was all
18    about, everything, just not --
19    A.    I can't remember exactly what he said.  I believe that he
20    had identified some individuals he was looking into, yourself,
21    Martin Tibbitts, Donald Larson.  He had identified through
22    FinCEN some reporting of financial transactions that I had just
23    discussed, and he asked my opinion and to join the
24    investigation to take a look at the financial aspect.
25    Q.    All right.  So I'm just trying to make sure.  When that

1  investigation -- or Agent Bianchi was the task force for

2  Homeland Security, you are IRS; right?  Is that correct?

3  A.  Yes.

4  Q.  When you joined the investigation, do you look what Agent

5  Bianchi investigation had gotten or if everything was proper or

6  not, or no?

7  A.  I have conversations -- generally speaking, when I join an

8  investigation, I'll have a conversation with the case agent if

9  they brought it to me.  I may review some evidence that they

10  already have.  But do I investigate the agent, I do not.

11  Q.  Not investigate.  Investigate, reviewing -- maybe I

12  misspoke.  Reviewing his reports or reviewing everything, do

13  you do that, or no?

14  A.  I may review reports, yes.

15  Q.  Did anything come to you that was something odd or bad

16  or --

17  A.  No.

18  Q.  Everything in that investigation was -- anything come to

19  you that maybe this is wrong, this is wrong or this is good, or

20  no?

21  A.  No.

22  Q.  So basically in your experience everything Agent Bianchi

23  presented to you it was everything A-1; right?

24  A.  Yes.

25  Q.  Agent, let me ask you, do you remember -- do you remember

1   9-11?

2   A.   Yes.

3   Q.   How old are you?

4   A.   17.

5   Q.   Do you believe that was a sad day for -- not only for

6   United States and for the world?

7           MR. BILKOVIC:  Your Honor, I would object to this as

8   relevance.

9           THE COURT:  How is it relevant?

10          DEFENDANT DIDANI:  Your Honor, I'm getting to the

11  investigation, showing the investigation, your Honor.

12          THE COURT:  But how is this relevant?

13          DEFENDANT DIDANI:  I was going -- the next question

14  will be the committee, what they find out, the mistakes from

15  one agency not sharing the proper information with other

16  agency, your Honor.

17          THE COURT:  And how is that relevant to this

18  investigation?

19          DEFENDANT DIDANI:  Because Agent Bianchi share

20  information with Agent -- and that is very -- to know what --

21          THE COURT:  I don't think it's relevant, and it's

22  overruled.  Go to another question.

23  BY DEFENDANT DIDANI:

24  Q.   All right.  Agent, yesterday when you was asked about

25  Government, the word "SWIFT," okay, what do you know about

1    SWIFT?

2    A.   SWIFT?  SWIFT is an organization.  SWIFT is an acronym.  It

3    stands for the Society of Worldwide Interbank Financial

4    Telecommunications.  It is a member-owned co-op, meaning it is

5    owned by its members, which are banks and financial

6    institutions.  It's based in Belgium.  It's -- again, it's a

7    communication system.  It sends communications between banks.

8    Q.   We talking about SWIFT; right?

9    A.   SWIFT, yes.

10   Q.   Let me go -- yesterday -- before we get back to this, I

11   just want to make sure.  Yesterday when the Government asked

12   you, you said you, as the agent, you follow the money; right?

13   If I have a question to find out where the money go, are you

14   the agent to find out where the money go, sir?

15   A.   Yes.

16   Q.   All right.  Good.  So we in the --

17          All right.  So let's go back to SWIFT.  Can you

18   explain to the jury how SWIFT works?  Let's say I'm in Dubai

19   and I want to send money to Canada.

20   A.   Yes.

21   Q.   Can you please explain to the jury?

22   A.   United States dollars?

23   Q.   Canadian dollars.

24   A.   Okay.  So you're in Dubai.  Generally speaking, a customer

25   in Dubai that wants to send Canadian dollars to a bank in

```
 1   Canada will approach their bank in Dubai, and it will initiate
 2   that transaction into Canadian dollars.
 3         Typically a SWIFT transaction, which is a
 4   communication, it will be communicated based on information of
 5   the beneficiary bank in Canada.  They'll be a SWIFT code.  It's
 6   an identification number.  You'll fill out the form, or
 7   whatever procedure the bank has, and then the transaction will
 8   be initiated and essentially SWIFT is used.  The instructions
 9   will be sent to the participating banks on, you know, basically
10   the debits and credits that happened to move that money.
11   Q.  All right, Agent.  So let me make -- I think we on the same
12   page over here, Agent.  So let me say if I have a company in
13   Dubai, right, do you know the currency Dubai has?
14   A.  Arab Emirates Dirhams, I believe, AED.
15   Q.  Yes, sir.  Very good.  Yes.  And Canadian dollars, do you
16   remember -- do you know Canadian dollars; right?
17   A.  Yes.  CAD, yes.
18   Q.  So it's fair to say, Agent, if I'm the sender from Dubai to
19   Canada, I can have an account with Dubai currency, and the
20   SWIFT, the banking, that's automatic when you say the sender --
21   what the sender wants, American dollars or Canadian dollar;
22   right?  It does it automatically in the system; right?
23   A.  The bank will have it processed to calculate a conversion.
24   Q.  So the bank calculates it; right?
25   A.  I believe so.
```

1    Q.   All right.  Now, let's say a customer in Africa want to

2    send money in Mexico through SWIFT.  Can you explain to the

3    jury how this process is?

4    A.   The same as I just explained.  They'll go to their bank in

5    Africa with the beneficiary details, and SWIFT will be used to

6    transmit the information needed to conduct that transaction to

7    the participating banks.

8    Q.   So, Agent Newsome, you agree with me that SWIFT is used as

9    we speak right now by all the banks around the world?

10   A.    No, I can't say it's used by all of the banks.  You must be

11   a member of SWIFT.  SWIFT is definitely the most used

12   internationally.

13   Q.   So it's the most used.  What is other way to send money

14   through banks, Agent?

15   A.    In the United States we use Fedwire.  It operates in a

16   similar fashion through the Federal Reserve Bank of New York.

17   Those are typically domestic wires.

18            There's another system called CHIPS.  I think it

19   stands for Clearing House International Payments, but it works

20   in a similar fashion to do wires, typically with U.S. dollars.

21   Q.    In this investigation, other than SWIFT, did you find out

22   any other transaction from Dubai to Canada done by this alleged

23   defendant?

24   A.    Other than SWIFT?

25   Q.    Yes.

1    A.   Not that I can recall.

2    Q.   So -- all right.  Let's say I'm in Italy and I want to send

3    money in Ecuador through SWIFT.  Is that the same process?

4    A.   Yes.

5    Q.   Let's say I'm in England and I want to send money in

6    Colombia through SWIFT.  Is that the same process?

7    A.   Yes.

8    Q.   Is that illegal?

9    A.   To wire money?

10   Q.   In your view, is that illegal to send money through SWIFT?

11   A.   No.

12   Q.   Okay.  Agent, you mentioned a company in Canada, INKAS.

13   Where INKAS in Canada is located?

14   A.   I believe it's in Ontario.

15   Q.   And you mentioned this defendant ordered some armored

16   vehicles; right?

17   A.   Yes.

18   Q.   Where are those armored vehicles was sent?

19   A.   I'm sorry.  Can you repeat that?

20   Q.   Where are those armored vehicles that was sent?

21   A.   Where were they sent?

22   Q.   Yes.

23   A.   I believe to the Dominican Republic.  Other agents would

24   have direct knowledge of that.

25              THE COURT:  I'm sorry.  I didn't hear your answer.

67

| | |
|---|---|
| 1 | THE WITNESS:  I believe they were -- to my |
| 2 | recollection, some of them at least were sent to the Dominican |
| 3 | Republic, but there are other investigators that will have |
| 4 | direct knowledge of that. |
| 5 | BY DEFENDANT DIDANI: |
| 6 | Q.  It was another country, South American country probably? |
| 7 | A.  Probably. |
| 8 | THE COURT:  I didn't hear that. |
| 9 | THE WITNESS:  Possibly, yes. |
| 10 | BY DEFENDANT DIDANI: |
| 11 | Q.  Okay.  Agent, did you check on this company, INKAS? |
| 12 | A.  Repeat that. |
| 13 | Q.  Did you check they're legitimate as a company, INKAS |
| 14 | company in Ontario? |
| 15 | A.  Yes.  They're a company that manufactures armored vehicles. |
| 16 | Q.  And they send armored vehicles all over the world? |
| 17 | A.  I believe so. |
| 18 | Q.  Is that illegal to send armored vehicles from Canada to the |
| 19 | Dominican Republic? |
| 20 | A.  Based on just that, no. |
| 21 | Q.  Is that illegal to send armored vehicles from Canada to |
| 22 | Africa? |
| 23 | A.  No. |
| 24 | Q.  So the company was legit, legit company; right? |
| 25 | A.  They are a real company, yes. |

1    Q.   You know the owner of the company?

2    A.   I believe it's a family business.  I'm aware of an

3    individual named Philip Daskal.

4              THE COURT:  Phil what?

5              THE WITNESS:  Philip Daskal.

6              THE COURT:  D-A-S-K-O?

7              THE WITNESS:  I believe it's D-A-S-K-A-L.  I'm not a

8    hundred percent certain.

9    BY DEFENDANT DIDANI:

10   Q.   I'm sorry.  You said Philip Daskal is the owner of the

11   company?

12   A.   Part owner.  It's a family business.  I'm not sure what his

13   ownership is.

14   Q.   If I said that his mother is married to a Russian guy, you

15   agree with me, or no?

16   A.   I have no knowledge of that.

17   Q.   Okay.  So I just want to understand this concept of SWIFT.

18   Can anybody -- by just using SWIFT, can anybody be prosecuted

19   in the United States in your knowledge, in your experience?

20   A.   Just for using SWIFT?

21   Q.   Yes.

22   A.   There would need to be more facts.

23   Q.   Just for using -- let's say person Y, person S, buying

24   armored vehicles through SWIFT, paying from bank in Dubai to

25   Canada.  Just focus on that, right.  Is that illegal, or no?

1   A.   Not inherently, unless it was say drug proceeds that were

2   used to make that purchase.

3   Q.   All right.  That's fair enough.  That's fair.  And, Agent,

4   you enter in 2017 on this case, then you investigated.  Can you

5   name the people that you investigated as far as you being an

6   IRS agent, special agent?  Can you name, please, the people --

7   do you remember from the investigation who are the people that

8   you investigated?

9   A.   The primary individuals I investigated were yourself.

10  Q.   Okay.

11  A.   Martin Tibbitts.

12  Q.   Okay.  Is Marty Tibbitts today here?

13  A.   Pardon me?

14  Q.   Marty.  Where is Marty at?

15  A.   He's deceased.

16  Q.   Okay.  Who else?

17  A.   Donald Larson.

18  Q.   Okay.  Who else?

19  A.   Those are the primary targets of my investigation.

20  Q.   You mentioned another person, Pete Synowiec?

21  A.   Yes.

22  Q.   Is that primary target in your investigation?

23  A.   He was not a target in my investigation.  He was associated

24  with transactions involving targets of the investigation.

25  Q.   A hundred thousand?

1    A.   Yes, sir.

2    Q.   Wired from Marty Tibbitts to him?

3    A.   That's correct.

4    Q.   All right.  Let's say on that hundred thousand, what do you

5    think was bad about that hundred thousand, wired a hundred

6    thousand?

7    A.   What was bad, I know that that money was withdrawn in cash,

8    and there's -- evidence will show that that money was used to

9    purchase cocaine.

10   Q.   The evidence will show that it was to purchase cocaine?

11   A.   Yes.

12   Q.   Where?

13   A.   Other agents will be able to testify as to the facts of

14   that.

15   Q.   All right.  We'll go to that.  What about Marty?  You

16   investigated Marty?

17   A.   Mr. Tibbitts was a target of the investigation, yes.

18   Q.   How many accounts Marty Tibbitts have?

19   A.   A lot.  I don't recall.  Maybe 20.

20   Q.   Maybe 30?

21   A.   I don't recall exactly.  He had a lot of accounts.

22   Q.   Maybe 30?

23   A.   It could be.

24   Q.   All right.  There is a report that Marty Tibbitts had only

25   in Comerica more than 30 accounts.  Do you agree with me,

1    Agent Newsome, or no?

2    A.   I don't know the exact amount, but it's very possible that

3    it was 30.

4    Q.   And we go go to that.  Did you say that -- something about

5    offshore accounts, shell accounts, right, did you find with

6    Marty Tibbitts?

7    A.   I don't believe I testified to that.

8    Q.   Did you find out any offshore accounts, Marty Tibbitts?

9    A.   Yes, I'm aware that he had some offshore accounts.

10   Q.   Is that illegal?

11   A.   Not inherently, no.

12   Q.   Having a offshore account in Panama or Belize or Dubai, is

13   that illegal, Agent?

14   A.   Not inherently.

15   Q.   Did you find out anything illegal from Marty Tibbitts

16   having accounts -- offshore accounts?

17   A.   Did I find anything illegal related to his offshore

18   accounts?

19   Q.   Yes, sir.

20   A.   I don't recall those accounts being used for really

21   anything.  I believe he passed away shortly after they were

22   created, the ones I'm aware of anyways.

23   Q.   So if the Government or anyone -- I'm sorry.  If anyone

24   comes here and say that Marty Tibbitts had offshore accounts to

25   use for money laundering or personal money laundering with me

1    or drug proceeds, that would not be correct what you saying;

2    right?

3    A.   I believe there are evidence -- there's evidence that

4    suggests that those accounts were set up to launder proceeds of

5    drug trafficking, yes.

6    Q.   Agent, there is evidence or not evidence.  I'm asking you

7    those accounts, offshore accounts, do you think in your

8    experience or in your investigation that those accounts from

9    Belize or Dubai that Mr. Tibbitts opened, do you believe that

10   those accounts was used to wash money?

11   A.   Do I believe they were actually used to launder money?

12   Q.   Actually was used.

13   A.   Actually used, no, I do not.

14   Q.   Okay.  Fair enough.  Fair enough, Agent.  So my

15   understanding is there's nothing wrong having a offshore

16   account; right?

17   A.   Not inherently.

18   Q.   You ever heard of Panama Papers?

19        THE COURT:  I'm sorry?

20   BY DEFENDANT DIDANI:

21   Q.   Panama Papers?

22   A.   I've heard of it.

23   Q.   Do you remember what was that about?  No?

24   A.   Do I remember what?

25   Q.   What the Panama Papers was about?

 1   A.   Panama Papers was a leak of some sort.  I know nothing

 2   about Panama Papers.

 3   Q.   Because you've been an IRS agent, international

 4   investigator would have been triggering to you, you know.

 5   There was thousands and thousands U.S. citizens --

 6             MR. BILKOVIC:  Judge, I'm going to ask is Mr. Didani

 7    testifying or is he posing a question?

 8             DEFENDANT DIDANI:  No.  I was just --

 9             THE COURT:  Pose a question.  Mr. Didani, pose a

10    question.

11   BY DEFENDANT DIDANI:

12   Q.   The question was on those papers do you know there was a

13   lot of American citizens having accounts in Panama?

14   A.   I don't know the details of what was in those documents.

15   I'm aware, I believe, that agents are not allowed to view or

16   have any interaction with documents from that leak.  I've never

17   seen any documents from that and I know nothing about it.

18   Q.   Agent, can I ask you a question?  If the Government claims

19   that it was 11 million in cash seized here in the United States

20   during this investigation, do you agree with that, or no?

21   A.   Repeat the question.

22   Q.   Eleven million in cash.

23   A.   What about it?

24             THE COURT:  Eleven million what?

25

1    BY DEFENDANT DIDANI:

2    Q.   In cash, 11 million dollars.  If the Government claims

3    there was 11 million dollars in cash seized here in United

4    States, drug proceeds of Mr. Didani, the defendant you see, do

5    you agree with that claim, or no?

6    A.   Eleven million dollars in cash seized in the United States?

7    Q.   Yes, sir.

8    A.   I don't believe it was 11 million dollars.

9    Q.   The reason I'm asking those questions to you, you claim

10   that you follow the money.  You're the right person to find out

11   those money.  So if the Government -- if there is paperwork

12   right now that U.S. government claims that they seized 11

13   million in proceeds here in United States, do you believe that

14   is true or not?

15   A.   There was a significant amount of seizures in this

16   investigation.  I don't remember the exact amount, but I don't

17   believe there's 11 million dollars in cash seized inside the

18   United States.

19   Q.   What kind of -- what do you believe it was?

20   A.   I know there were cash seizures.

21   Q.   Can you explain it, please?  Do you mean a hundred

22   thousand, 200,000?

23   A.   I don't remember the exact amount.

24   Q.   It's very important to know from hundred thousand to 200 to

25   11 million.  That's what I'm asking you, Agent.  What do you

```
 1    think it is?  You know, what do you -- what do you think it is,
 2    Agent?
 3    A.  Are you asking funds that are directly seized from your
 4    organization?
 5    Q.  Here in United States, yes.
 6    A.  I can't remember the exact amount.  There may be other
 7    agents that can testify to that.  There were seizures, I know
 8    that.
 9    Q.  400,000?
10            THE COURT:  All right.  He said he doesn't know.  Go
11     to a new question.
12    BY DEFENDANT DIDANI:
13    Q.  So 11 million dollars is absurd; right?
14    A.  Other agents can testify with the DEA, who was the seizing
15    agency on most of that money.
16    Q.  The reason I'm asking this question, Agent, because you
17    said you're the man, you follow the money.  So I'm trying to
18    find out all the money, you know.  All right.  We'll go back to
19    that.
20            How much did you investigated Marty Tibbitts?
21    A.  I investigated primarily transactions that we discussed
22    previously.
23            THE COURT:  I'm sorry?
24            THE WITNESS:  The transactions that we discussed
25     previously in my testimony.
```

1    BY DEFENDANT DIDANI:

2    Q.   So basically your investigation it was set only for the

3    hundred thousand dollars wired, it was done by Marty Tibbitts

4    to Piotr Synowiec; yes?

5    A.   That's part of it.

6    Q.   Okay.  And there is another investigation of $450,000 in

7    Washington; right?

8    A.   I didn't testify to that, but I'm aware that the cash went

9    to Washington, yes.

10   Q.   You didn't testify in Grand Jury?

11   A.   Oh.  In Grand Jury, sure.

12   Q.   Okay.

13   A.   That's not what I was asked.

14   Q.   And there was some checks, Government Exhibit 11, all those

15   exhibits, made by Marty Tibbitts to Donald Larson and to Pete

16   Tocco; right?

17   A.   Checks to Donald Larson and Pete Tocco, correct.

18   Q.   So your investigation is just from 2016, 2017, or how far

19   your investigation goes to Marty Tibbitts?

20   A.   I was involved in the investigation since 2017, but as an

21   investigator, especially investigating money laundering

22   targeting drug trafficking organizations, you look for specific

23   evidence of money laundering, direct evidence.  This is what we

24   refer to these checks as direct evidence.  That is what I'm

25   testifying to today.

1   Q.  You testifying just to that, you testified today, or you

2   don't want to testify no more?

3   A.  I'll testify to whatever you ask, but the questions asked

4   was related to these checks and the wire transaction.

5   Q.  Since you are specialized IRS agent, did you investigate

6   Marty's life or his business?

7   A.  I'm aware of Mr. Tibbitts' business activity.

8   Q.  Okay.  Can you name some of them?

9           THE COURT:  Wait a minute.  You are aware of what?

10          THE WITNESS:  Mr. Tibbitts' business activity.

11          THE COURT:  Okay.

12  BY DEFENDANT DIDANI:

13  Q.  Can you name some of them?

14  A.  Sure.  He used Clementine.  It was a live answering

15  service.  Back Office Support.  He had a museum, like an

16  airplane museum, and several other businesses.

17  Q.  Just in Michigan; right?  Did you investigated Mr. Tibbitts

18  if he had any business outside the United States?

19  A.  I'm not aware of Mr. Tibbitts' businesses outside the

20  United States.

21  Q.  Agent, do you remember Mr. Tibbitts wire money outside the

22  United States?

23  A.  I recall wire transactions outside the United States, yes.

24  Q.  Okay.  So you, the agent, follow the money.  Did you follow

25  the money?

1   A.   Can you give me a specific transaction you're referring to?

2   Q.   Specifically, there is a transaction of 500 -- 330 to a

3   person, Amarildo Ademi in Albania.  Do you remember that?

4   A.   I'm aware of that.

5   Q.   Do you remember what was that all about it, or no?

6   A.   No.  So in order to obtain records from a foreign country

7   we have to do what's called an MLAT.  It's a treaty.  We do not

8   have -- United States does not have a treaty -- this treaty

9   with Albania.  Therefore, I'm unable to obtain official records

10  to use in court really from Albania.

11        So, to answer your question, I see wire transfers

12  going over there, but I can't testify as to what that was for.

13  Q.   You're sure that United States with Albania doesn't have a

14  treaty, MLAT treaty?

15  A.   An MLAT, I don't believe so.

16  Q.   And how did you obtain the records from those banks,

17  Raiffeisen Bank, from Albania?

18  A.   I did a request called an Egmont request.  Egmont is a --

19  it's called Egmont Group, and they oversee what's called FIUs,

20  Financial Intelligence Units, which are units that exist for

21  global cooperation to share financial intelligence.  You can

22  put requests in.  Each country is different in what they

23  provide.  However, those documents, information provided, are

24  not allowed to be used -- they're not certified, and they can't

25  be used in official proceedings.

1    Q.  All right, Agent.  Let me ask you a question.  Can you

2    explain to the jury exactly the process to wire money from

3    Comerica Bank, Michigan to Albania, another bank in Albania?

4    Can you explain to the jury with details to wire that money

5    where that money going through first?

6    A.  How to wire money from the United States to Albania?

7    Q.  Yes, sir.

8    A.  The same as I previously explained.  You go into your bank

9    with the necessary details of the beneficiary bank and request

10   a wire.

11   Q.  Is that money going -- let me ask you.  Maybe I can help

12   you out a little bit over here.  Before they leave United

13   States, did that money go to the Department of Treasury,

14   federal bank?

15   A.  I don't know what you're asking.  Which money?

16   Q.  The wire money, the wire money that you asked someone --

17   you said it was MLAT.  Now you find another back door to find

18   out information about those banks.  Those wire money that you

19   received, that information, do you know how that money was

20   wired from here to Albania?  Do you know the process, Agent?

21   A.  It would come from the bank that you requested from, go

22   through the network of banks, if necessary, to end up at the

23   bank in Albania.

24   Q.  All right, Agent.  Do you agree with me Comerica Bank send

25   that money -- before it goes anywhere send that request to

1    Department of Treasurer, the federal bank of United States?

2    A.   Comerica, as a major bank, probably has an account with the

3    fed, yes.

4    Q.   You agree with me every money that -- every money that you

5    wire from United States that have to be checked by the Federal

6    Reserve, Department of Treasury?

7    A.   It has to be checked?  I don't understand what you mean by

8    that.

9    Q.   It has to be -- see where the money come from, everything.

10   It's specific things, you know.  You just not -- you agree with

11   me you can't just wire money like this half a million dollars,

12   Agent?

13   A.   You can just wire money.  Every single -- there are

14   millions of wire transactions, maybe billions of wire

15   transactions every single day.  There's not an investigation

16   into every single transaction.  It is the bank's

17   responsibility, and banks have compliance departments.  It's

18   their responsibility to conduct due diligence on their

19   customers.

20   Q.   Yes, Agent.  But there is the Department of Treasury, too.

21   Federal bank has to go through those money before they go

22   outside the United States.

23           Do you agree with me that that money goes through

24   Department of Treasury, federal bank; yes or no, Agent?

25   A.   Every single transaction, I don't think so.

1    Q.  Half a million-dollar transaction?

2    A.  I don't know the route of that money specifically.

3    Q.  Agent, you just received -- you said you received a request

4    for half a million dollars there in Albania.  Now you don't

5    know.

6            All right.  So apparently -- and then when you list --

7    the federal government from here, when it leaves from here,

8    where the money go?  Do you agree with me they go to European

9    bank?

10   A.  I don't know where it went.  It would depend on the banking

11   relationships.

12   Q.  Agent, it's not about banking relationships.  There is a

13   way you have to wire money, Agent.  And there is no other way.

14   You should know that.

15           MR. BILKOVIC:  Judge, again, this is not a question.

16   He's testifying.  I would ask --

17           THE COURT:  It's not a question.  It's not a question.

18    You may pose it as a question, but it's not right now.  And

19    it's stricken and the jury will disregard it.

20   BY DEFENDANT DIDANI:

21   Q.  Do you believe that money before when it leaves from

22   federal government here will go to a European bank?

23   A.  That when money leaves the United States it goes to a

24   European bank?

25   Q.  Yes, European, central bank.

1    A.   If it's going to Europe, it might.  It may.  And it would

2    probably have to go through a bank that has a regulated bank

3    and European based on their regulations with their central

4    bank.

5    Q.   And then from central bank after they do their research it

6    goes to the bank of that country; right?

7    A.   I don't know what you mean by research.

8    Q.   You don't think the banks research -- they do their own

9    research when you see amounts of half a million dollars or a

10   million dollars, Agent?

11   A.   You would have to ask each specific banks' compliance

12   department about their procedures for analyzing transactions

13   and doing their KYC, means know your customer, and their due

14   diligence.  I can't speak to the compliance department of every

15   single bank in the world.

16   Q.   So, with a few words, there was no problem from Department

17   of Treasury from federal government sending money from Marty

18   Tibbitts to Albanian?  There was no problem there?

19   A.   I am aware that the transaction occurred.

20   Q.   In order for a transaction to occur, what that mean?  That

21   mean that money was clean?

22   A.   That means the money arrived at its destination.

23   Q.   And that money that left the destination, the destination

24   was very good, in good standing; right?

25   A.   Can you repeat the question?

1  Q.  The destination where the money left from was in good

2  standing; right?

3  A.  I don't know what you mean by that.

4  Q.  There was no investigation against Marty Tibbitts; right?

5  A.  By whom?

6  Q.  By any of you, the federal government.  Otherwise, you

7  wouldn't let the money leave; right?

8  A.  If the bank determines -- again, I don't know exactly what

9  the bank did as far as their due diligence of that transaction.

10  I have no idea.  You'd have to ask the bank.

11  Q.  I thought you the man that follow the money, Agent, you

12  know, and that's why I'm asking you this question.  Based on

13  your experience that you say you fighting money laundering,

14  international money laundering, you should know those answers,

15  Agent.  That's what I'm saying to you.

16        THE COURT:  Okay.  Well, that's testimony.  So if

17   you'd like to go to a question I'm happy for you to do that.

18   Later on you'll be able to argue the credibility of the

19   witness.  And that statement is stricken and the jury will not

20   regard it as evidence in this case.

21  BY DEFENDANT DIDANI:

22  Q.  All right, Agent.  Let's follow the money then.  You

23  indicated that Marty Tibbitts wired to Pete Synowiec a hundred

24  thousand dollars; right?

25  A.  Correct.

```
1    Q.   And what happened with that money?

2    A.   The money was withdrawn in cash by Piotr Synowiec.

3    Q.   And then what?

4    A.   Well, I know from testimony of your co-conspirator that it

5    was given to Donald Larson who then gave it to you.

6    Q.   Which testimony, Agent?

7         THE COURT:  I'm sorry.  What's the answer -- what's

8    the question?

9    BY DEFENDANT DIDANI:

10   Q.   What's the testimony?  Testimony of Sterling Heights police

11   or testimony in Grand Jury testimony or Donald Larson?

12   A.   Donald Larson will have to speak for himself.

13   Q.   Agent, you was not there?

14   A.   I was at the interview with Donald Larson.

15   Q.   So you have no experience from your interview?  I'm asking

16   you from your experience.

17   A.   I told you what he told me.

18   Q.   He told you in that -- and I'm asking you.  He told you

19   that hundred thousand dollars in the Sterling Heights Police

20   when you arrested him or he told you after you threatened him

21   with 30 years of prison?

22   A.   I didn't threaten Mr. Larson with anything.

23   Q.   You sure?

24   A.   I am positive I did not.

25   Q.   So, if I play the video from the Sterling Heights Police,
```

1    there is no threat done by you and Mr. Leach out there to

2    Donald Larson?

3    A.   I didn't make any threats.

4    Q.   All right.  So that day he told you what now?  The hundred

5    thousand dollars went to who?

6    A.   A hundred thousand dollars in cash went to Donald Larson

7    and to you.

8    Q.   And what year was that?

9    A.   That was May of 2016.

10   Q.   And where the money -- let's say that you the man that

11   follow the money.  Do you think I went to a casino or something

12   to play with that money?  What did I do with that money?

13   A.   I don't know what you did with that money.  I know what the

14   witnesses involved in the transaction testified to.

15   Q.   What the witness testify, Agent?

16         MR. BILKOVIC:  Judge, objection.  I would say hearsay.

17    I think that's better left to the actual witnesses.

18         THE COURT:  I think so, too.  Sustained.

19         Go to another question.

20   BY DEFENDANT DIDANI:

21   Q.   So you don't know where the hundred thousand dollars went;

22   right?

23   A.   No.

24   Q.   But you just said it early that there's evidence that money

25   went to buy cocaine?

1   A.   There are witnesses that will testify to that.

2   Q.   You can't testify on that, Agent?

3   A.   I cannot.

4   Q.   Why not?  You the agent on --

5          MR. BILKOVIC:  Judge, because it's hearsay, I would

6   object.

7          THE COURT:  Well, because he doesn't necessarily have

8   personal knowledge of whether or not it went for cocaine.  So

9   go to a new question, please.

10  BY DEFENDANT DIDANI:

11  Q.   Then you -- we pass on the hundred thousand dollars.  The

12  Government indicated in 2016 --

13          Agent, let me ask you something.  Did you ever -- did

14  you see the superseding indictment?

15  A.   I don't recall.  I may have.

16  Q.   I want to ask you a specific.  The superseding indictment

17  it names two activities.  One activity is hundred thousand and

18  another one activity is in Washington 450,000 given by Marty

19  Tibbitts to Donald Larson and allegedly given to me; right?

20  For those two activities, any pawn shop was used, or no?

21          THE COURT:  Any what was used?

22  BY DEFENDANT DIDANI:

23  Q.   Pawn shops.  Gold and pawn shops, or no?

24  A.   In which instance?

25  Q.   A hundred thousand.  There is no pawn shops on a hundred

1   thousand; right?

2   A.   The wire transactions?

3   Q.   Yes.

4   A.   The Piotr Synowiec?

5   Q.   Yes.

6   A.   Correct.

7   Q.   Correct.  And then 450?

8   A.   Yes.

9   Q.   There's pawn shops in there?

10   A.   There were.

11   Q.   So if this -- do you have any knowledge of where this money

12   was taken from, that was cashed out of the bank, Comerica Bank,

13   that 450,000, or no?

14   A.   Do I have any knowledge of ...

15   Q.   Those money.

16   A.   Where it went?

17   Q.   That was cashed out in Comerica Bank.

18   A.   Yes.  The money was cashed and converted to cash, yes.

19   Q.   In Comerica Bank or pawn shops?

20   A.   Both.

21   Q.   All right.  So there is amount of 450.  Which one was in

22   pawn shops and which one was -- how much was in Comerica Bank?

23   A.   I don't recall the exact split.  I believe the final two

24   checks, two or three checks, were converted at Comerica Bank.

25   Q.   So it's not all like the superseding indictment, because I

1   don't see anything in the superseding indictment.  It doesn't

2   say anything about Comerica Bank.

3           Do you believe that this defendant in front of you

4   knew anything about those activities, if it was Comerica Bank

5   or a pawn shop or wire or anything?  No?

6   A.   Do I believe so, yes.

7   Q.   You have evidence for it?

8   A.   Yes.  There is testimony, and other agents will have

9   evidence of your involvement in that.

10  Q.   All right.  There's testimony.  All right, Agent.  So did

11  you ever have a conversation with Comerica Bank, the manager,

12  for the $450,000?

13  A.   Did I have a conversation with the manager?

14  Q.   Yes.

15  A.   No.

16  Q.   You never tried to ask him to find out -- follow the money

17  to see if he called a armored vehicle to give that money to Don

18  Larson?

19  A.   I don't know if there was an armored vehicle.

20  Q.   You didn't follow the money?  You didn't follow -- no?

21  A.   The money was cashed and from cashier's checks.

22  Q.   So let me understand that.  So the money was checks from

23  Comerica Bank; right?  To begin with; right?  The money; right?

24  A.   The -- in December of '17?

25  Q.   Yes.

1    A.  It was the personal checks that we discussed that were

2    converted to cashier's checks.  And then they were cashed at

3    the various pawn locations and Comerica Bank.

4    Q.  In the same bank, right, or a different Comerica Bank?  The

5    same bank?

6    A.  I don't recall if they were one branch or multiple.

7    Q.  Did you see anything illegal in this from Marty Tibbitts

8    writing from -- if somebody wanted to hide something, I don't

9    think they would be writing from his personal check; right?

10   A.  Do I see anything illegal with this?  Yes, I do.

11   Q.  What is illegal in this, sir?

12   A.  The agreement between you and your co-conspirators was to

13   use that money to purchase cocaine.

14   Q.  I didn't even ask you where the money.  I'm -- what I asked

15   you, the process, only the process right there in the bank.

16   Marty Tibbitts from his personal check -- he pull out his

17   personal check, right, wrote his personal check, here you go,

18   $450,000.  Do you see -- just in there, do you think it's

19   something illegal in there?

20   A.  The intention of the money was to be used to purchase

21   cocaine, yes.

22   Q.  I'm not even asking you the intentions, Agent Newsome.  I'm

23   being very specific.  Forget the intentions.  We're going to go

24   through the intentions, please.  Bear with me.

25           From Marty Tibbitts writing from his personal -- do

```
 1    you have a checking account?
 2   A.   Yes.
 3   Q.   Do you have a personal checking account?
 4   A.   Sorry.  What?
 5   Q.   Personal checking account?
 6   A.   Sure.
 7   Q.   So, if you write a check $200 to me and I say I need $200,
 8   right, and you write a check, is that illegal?
 9   A.   No.
10   Q.   That's what I was getting.  So Marty Tibbitts writing
11   $450,000, a personal check, just that, we're going to go to the
12   intentions, don't worry about it, just that part there, is that
13   illegal or money laundering?
14   A.   Just based on the transaction alone, no.
15   Q.   Thank you.  Thank you, Agent Newsome.  All right.
16           So, Agent Newsome, did you check every property Marty
17   had here in Detroit or -- is that your job, property, business,
18   if he had a marijuana business, buildings, had 12 -- did you
19   check to see if he was buying a marijuana business, medical
20   marijuana?
21   A.   I'm not familiar with that, but it wouldn't surprise me.
22   Q.   All right.  And as far as business around the world, are
23   you familiar what kind of business Marty had around the world,
24   or no?
25   A.   No.
```

1    Q.   Agent, during this investigation, did you ever have --

2    since you the money man, did you ever have access to his

3    computer, personal?

4    A.   Did I have access to it?

5    Q.   Yes.

6    A.   I believe there were devices seized belonging to Martin

7    Tibbitts during this investigation.  Those devices were

8    reviewed by other investigators.

9    Q.   There is other investigator?  That was not sent to you,

10   Agent Newsome, to be reviewed to maybe follow the money?

11   A.   I may have seen items that came from those devices.

12   Q.   From your memory, what kind of items you see, Agent?

13   A.   I don't recall specifically.  You'd have to be more

14   specific.

15   Q.   This computer has probably thousand business all over the

16   world.  So I'm trying to see what kind of items that was sent

17   to you to review.

18   A.   I can't recall what was given to me from his devices.

19   Q.   So you never had the pleasure to pick up his devices to

20   look everything, to look his computer, to look?  As a IRS

21   investigator, a money laundering investigator, you never had

22   the pleasure to have that computer and check everything from A

23   to Z on that computer?

24   A.   Did I do that, no.

25   Q.   Did you request to do that?

1   A.   No.

2   Q.   It was not offered to you?

3   A.   It would have been made available.  It was in evidence, I

4   suppose.

5   Q.   You don't think it would have been helpful as a IRS agent,

6   money laundering international, this computer would have been

7   very helpful so you can have access?  So you the expert on this

8   case; right?

9   A.   I know they're investigators involved in the case.  There's

10  a team of investigators.  It's not just me.

11  Q.   Right.  I understand you, Agent, but that's what the

12  Government, when they ask you questions, you the agent in

13  charge, I believe, as far as the money -- international money

14  laundering or taxes; right?  You're the agent?

15  A.   I'm an agent with the IRS Criminal Investigations Division

16  if that's your question.

17  Q.   Right.  But in this case are you the expert in this case as

18  far as international money laundering?

19  A.   Yes.

20  Q.   Why was the computer never offered to you?

21  A.   Again, it's very common amongst a team of investigators to

22  share investigative duties.  Investigators you rely on your

23  coinvestigators to investigate the case.  It's incredibly

24  common.

25  Q.   Agent, did you have -- did you have the opportunity to

1    check those -- the bank account, few bank accounts that was

2    offered to defense?  Did you have opportunity to see those?

3    A.   The Comerica Bank account I discussed today?

4    Q.   Yes.

5    A.   Yes.

6    Q.   Did you see another name on those bank accounts?

7    A.   Yes.  It was a joint account with Martin Tibbitts and

8    Belinda Tibbitts.

9    Q.   And those transfers was done in 2016, right, in 2017?  You

10   agree with me?

11   A.   Yes.

12   Q.   So do you think Belinda Tibbitts knew about all those

13   transactions?

14   A.   I don't know what Belinda Tibbitts knew or did not know.

15   Q.   If she had access to -- if she had access to accounts, she

16   will know; right?

17   A.   If she reviewed the account, she could.

18   Q.   If it's a joint account -- explain a joint account.  It's

19   the same for both, right, or no?  How does it work?

20   A.   She would have access, but you'd have to ask her if she

21   reviewed those documents or not.  I don't know.

22   Q.   All right.  Agent, did you have the opportunity to see a

23   lot of wiring 200,000, 250,000 in that accounts, or no?

24   A.   Could you repeat the question?

25   Q.   Did you have the opportunity to review those accounts that

| 1 | was wiring in multiply places 200,000, 250,000 in different |
|---|---|

1    was wiring in multiply places 200,000, 250,000 in different

2    other directions?  Did you have the opportunity to review

3    those?

4    A.   I'd have to see the specific wire you're referring to.

5    Q.   Sure.

6            DEFENDANT DIDANI:  Your Honor, may I have Mr. Fink?

7            THE COURT:  He's going to walk up with the document?

8    That's fine.

9            DEFENDANT DIDANI:  Yes, your Honor.

10           Your Honor, that's Defendant's Exhibit proposed E.

11           MR. FINK:  May I, Judge?

12           THE COURT:  Yes.

13           DEFENDANT DIDANI:  Your Honor, that's Defendant

14   proposed E-2 exhibit.

15           THE COURT:  E-2?

16           DEFENDANT DIDANI:  Yes, your Honor.

17           And Defendant's proposed E-3.

18           MR. FINK:  May I again, Judge?

19           THE COURT:  Yes, you may.

20           DEFENDANT DIDANI:  Defendant's E-4.

21           THE COURT:  You have one marked proposed E-4?

22           DEFENDANT DIDANI:  Yes, your Honor.

23           MR. FINK:  One more time, Judge.

24           THE COURT:  Yes.

25           DEFENDANT DIDANI:  One more.

```
 1              MR. FINK:  Well, maybe two more times.
 2              DEFENDANT DIDANI:  One more.  Defendant's Exhibit E-5,
 3    your Honor.
 4              THE COURT:  Pose a question.
 5    BY DEFENDANT DIDANI:
 6    Q.  Agent, do you recognize those?
 7    A.  Yeah.
 8              DEFENDANT DIDANI:  Your Honor, can those be admitted
 9    as evidence?
10              THE COURT:  Not yet.  Well, do you have a question
11    about them?
12    BY DEFENDANT DIDANI:
13    Q.  Agent, you agree with me there was multiply -- from that
14    same account, do you agree with me and what you see there there
15    was multiply wires, 200, 300, $400,000 all over the place?
16              THE COURT:  Okay.  Wait.  You said did he recognize
17    them.  Now can we have them identified as what they are?  What
18    are they?
19              THE WITNESS:  They're bank statements from Comerica
20    Bank for joint account of Martin Tibbitts and Belinda Tibbitts.
21              THE COURT:  All of them?
22              THE WITNESS:  Yes.
23              THE COURT:  And are they for different dates?
24              THE WITNESS:  Yes.
25              THE COURT:  Okay.
```

96

```
 1            MR. BILKOVIC:  Your Honor, if it will help, these are
 2   the unredacted statements from what we earlier talked about.
 3   So, if it will speed things up, the Government will stipulate
 4   their admission into evidence.
 5            THE COURT:  Okay.  They're admitted and you may show
 6   them.
 7            So what do you want to show?  Are you showing E, E-2,
 8   E-3, E-4, E-5 or altogether?
 9            DEFENDANT DIDANI:  Yes, your Honor.
10            THE COURT:  Yes, which?  Are you going to show them
11   altogether or one at a time?
12            DEFENDANT DIDANI:  Oh.  One at a time, your Honor.
13            THE COURT:  Okay.  Then tell us what one you're going
14   to show now.
15            DEFENDANT DIDANI:  Your Honor, let me make it clear.
16   I was just asking questions about those, you know.
17            THE COURT:  You asked to show them, and so I said not
18   yet because they had not been identified what they were.  Do
19   you want to show them now or do you want to wait?
20            DEFENDANT DIDANI:  I want to wait, your Honor.
21            THE COURT:  Okay.  Fine.  You may pose questions then.
22   BY DEFENDANT DIDANI:
23   Q.   So, Agent Newsome, you testified in Grand Jury; right?
24   A.   Yes.
25   Q.   Do you remember when?
```

1    A.   I don't recall the date.

2              THE COURT:  What year was it?  Do you know that?

3              THE WITNESS:  I don't recall what year it was either.

4    BY DEFENDANT DIDANI:

5    Q.   If I say March 16, 2022, would you agree with me?

6    A.   That could be, yes.

7    Q.   Do you remember what you testified to the Grand Jury or do

8    I have to -- do you kind of remember?

9    A.   Generally, yes.

10   Q.   All right.  You testified to the Grand Jury that

11   specifically $450,000 was going to be to buy cocaine; is that

12   correct, Agent?

13   A.   The transactions from December of '17?

14   Q.   Yes, sir.

15   A.   That's correct.

16   Q.   During your investigation, Agent, did you find any evidence

17   that it was any cocaine -- it was any cocaine here in the

18   United States?

19   A.   Did you purchase cocaine inside the United States?

20   Q.   Yes.

21   A.   Not that I'm aware of.

22   Q.   So there is no evidence -- you the money man.  There is no

23   evidence I was purchasing any cocaine in the United States;

24   right?

25   A.   Inside the United States, no.

```
1    Q.   What about outside the United States, Agent?
2    A.   Yes.  Did you purchase cocaine outside the United States?
3    Q.   No.
4    A.   The answer is yes.
5    Q.   Okay.  So I purchased cocaine outside the United States?
6    You saying that; yes?
7    A.   Yes.
8    Q.   Where?
9    A.   Other agents with the DEA can testify directly to that.
10   Q.   But, Agent, you the money man; right?  So you don't know
11   whether I was purchasing cocaine?
12   A.   From the other agents, it was from Ecuador, South America.
13   Q.   In 2017?
14   A.   To my knowledge, you were purchasing your cocaine in South
15   America.
16   Q.   Where in South America, Agent?
17   A.   Those are direct questions that should be posed to other
18   investigators with the DEA.
19   Q.   So what make you think that -- all right.  So let's go.
20   The $450,000 in Washington, you said I received 450 in cash;
21   right?
22   A.   Correct.
23   Q.   What make you think that I was going to purchase cocaine?
24   From your investigation you said --
25               THE COURT:  Do you want him to answer that question?
```

```
 1              DEFENDANT DIDANI:  Yes, your Honor.

 2              THE COURT:  Okay.

 3              THE WITNESS:  From the information I received from the

 4   other investigators.

 5   BY DEFENDANT DIDANI:

 6   Q.   From the information that was furnished to you or from your

 7   personal investigation?

 8   A.   I'm aware of statements made by co-conspirators, and I'm

 9   aware of other information provided me from other investigators

10   in the investigation.

11   Q.   A statement made from who?

12   A.   Donald Larson, for one.

13   Q.   That he made a statement about what?  Because I'm not

14   aware.  What?

15   A.   Don Larson stated that he flew down to Washington, D.C. and

16   gave you that cash for the purpose of purchasing cocaine.

17   Q.   And he said that when?

18   A.   I don't recall the exact day.  It was during his interview.

19   Q.   It was a Sterling Heights interview or not?

20   A.   I believe it was -- I can't recall where we interviewed

21   him.  It was during one of his interviews.

22   Q.   Okay.  So let me refresh your memory.  It was you, Agent

23   Leach and some other agent.  I think it's -- it's a Greek last

24   name.  I can't say it.  It was three agents, you sitting in the

25   middle; is that correct?  It's in Sterling Heights Police?
```

1   A.   I recall that interview.

2   Q.   So in that interview Donald Larson told you that I was

3   going to purchase cocaine with that money?

4   A.   Donald Larson stated that, yes.

5   Q.   Agent, do you know you're under oath; right?

6          THE COURT:  He knows he's under oath.  Go to a new

7   question.

8          THE WITNESS:  Yes.

9          DEFENDANT DIDANI:  Can you excuse me for a second?

10          (Briefly off the record.)

11          DEFENDANT DIDANI:  Your Honor, at this point, it's

12   very important that we don't -- I would like to take a little

13   bit of time.  Me and Wade, we gonna download --

14          THE COURT:  Not "Wade."  It's "Mr. Fink" in open

15   court.

16          DEFENDANT DIDANI:  Okay.  Mr. Fink.  We want to

17   download the interview to see the part the $450,000 was used.

18          THE COURT:  And do you have that interview?

19          DEFENDANT DIDANI:  Yes, your Honor, we have it.

20          THE COURT:  And so what are you asking?  Are you

21   asking that I take a break so you can find it?

22          DEFENDANT DIDANI:  Yes, your Honor, please.

23          THE COURT:  Okay.  The jury may step down.

24          Please rise for the jury.

25          (The jury left the courtroom at 3:38 p.m.)

1           THE COURT:  Okay.  You all may be seated.

2           Help me out here.  You can't call each other by your

3    first names in open court, okay.

4           DEFENDANT DIDANI:  All right, your Honor.

5           THE COURT:  Refer to people as Mr. or Ms.  That's how

6    everybody's getting referred to in open court.  I don't care if

7    they're your best friend, okay.

8           All right.  How long is it going to take you to find

9    this information?

10          MR. FINK:  I think I can find it in ten minutes or

11   less to get it keyed up.  I just need to --

12          THE COURT:  Okay.  Let's take --

13          MR. BILKOVIC:  I would like to potentially pose an

14   objection here, though.  I don't think it's proper to play

15   another witness' interview.  The agent said that he was not

16   sure of the date or the time that this statement was made.

17   Donald Larson was interviewed twice.  One of the interviews, I

18   do not believe he mentioned this.  In the other interview, he

19   did.  And I think they're going to play the one that he didn't

20   mention it.

21          THE COURT:  That's what you think?

22          MR. BILKOVIC:  Yes.

23          THE COURT:  And you think there's one where he did?

24          MR. BILKOVIC:  There is another interview that he did.

25          THE COURT:  And do they have that?

1          MR. BILKOVIC:  They have the documents of it.  That

2    interview is not recorded, but they have the documents of it,

3    and they also have Donald Larson's Grand Jury testimony.

4          MR. FINK:  First of all, just for precision --

5          MR. BILKOVIC:  And I don't want to say "they."

6          MR. FINK:  For precision with the pronoun "they," I

7    will facilitate whatever is being asked to be played.  I wish I

8    knew some of the things and I'd be more helpful, but --

9          MR. BILKOVIC:  Mr. Didani has both the interview --

10   video interview --

11         THE COURT:  Counsel, he has an interview, and he said

12   he didn't remember if it was at the Sterling Heights interview.

13         MR. BILKOVIC:  Correct.  That's what I'm saying.

14         THE COURT:  Okay.  So they can show the video to show

15   it wasn't said then.

16         MR. BILKOVIC:  I'm saying the video -- the interview

17   is probably an hour long is what I'm telling the Court.

18         THE COURT:  We're not going to play a five-hour-long

19   interview, are we?

20         MR. BILKOVIC:  I said an hour long.

21         THE COURT:  An hour long.  Are we going to play an

22   hour --

23         DEFENDANT DIDANI:  No, your Honor.

24         THE COURT:  Excuse me.  You cannot interrupt me.  And

25   it's nothing personal, Mr. Didani.  It doesn't have to do with

```
1   you interrupting me.  It has to do with you making a very good
2   record so that when you go to the Court of Appeals you will
3   have a very good record, okay.  And, if you interrupt me, you
4   won't have a good record.
5          Now, are we going to need to listen to the entire
6   interview?
7          DEFENDANT DIDANI:  No, your Honor.
8          THE COURT:  What part are we going to listen to?
9          DEFENDANT DIDANI:  That's what I was trying to -- I
10  asked the agent, and I was very specific.  The day, the
11  interview day, it was Agent Leach and the Greek guy and he was
12  in the middle.  And he responded "yes" on that interview, which
13  is the Sterling Heights Police.  So in the Sterling Heights
14  Police we have it --
15         THE COURT:  I ruled just one second ago in favor of
16  you doing that.  I believe I did.
17         Is that what the Government thought?
18         MR. BILKOVIC:  Yes, your Honor.
19         THE COURT:  Okay.  I ruled in your favor on that.
20  What I want to know is do we need to listen to the whole
21  interview?
22         DEFENDANT DIDANI:  No.  I will guide Mr. Fink.  No,
23  it's not going to be --
24         THE COURT:  Okay.  That's all I ask.  So you guys find
25  it so we don't have to listen to the entire interview.
```

1    Segregate the place that you want to know.  That's all I'm

2    asking, because if we need to listen to the whole interview it

3    won't be today, okay.

4            DEFENDANT DIDANI:  No, your Honor.

5            THE COURT:  Okay.  Thank you.  Let's take a break.

6            Don't discuss your testimony with anyone during the

7    break, okay.

8            All right.  Let's take a break.

9            (At 3:42 p.m., a brief recess was taken.

10           Back on the record at 3:45 p.m.)

11           LAW CLERK:  All rise.

12           (The jury entered the courtroom at 3:45 p.m.)

13           THE COURT:  You may all be seated.

14           Are you satisfied the jurors are present and properly

15   seated, for the Government?

16           MR. BILKOVIC:  Yes, your Honor.

17           THE COURT:  What about for defense?

18           DEFENDANT DIDANI:  Yes, your Honor.

19           THE COURT:  Okay.  We need to take a break that's

20   going to take longer than the time that you're going to be

21   here.  So I'm going to send you home and you're coming back

22   tomorrow at what time?

23           JURORS:  9:30.

24           THE COURT:  Very good.  I'll see you then.

25           Now, remember what?  You're not permitted to talk

1    about the case among yourselves or with anyone else.  And you

2    can't use any social media to communicate anything about the

3    case or to find out anything about anybody involved in the

4    case, okay.  And you're welcome to finish your coffee in the

5    jury room if you want to, okay.

6              All right.  You may step down.

7              LAW CLERK:  All rise.

8              (The jury left the courtroom at 3:46 p.m.)

9              THE COURT:  Okay.  You may all be seated.

10             And come back tomorrow.  Mr. Didani needs to stay here

11   for a few minutes with Mr. Fink, and then you guys can take him

12   down and transport him.  We don't want him to be late, but

13   we're going to give him a chance to work on this video spot

14   first.

15             DEFENDANT DIDANI:  Your Honor, may I suggest that -- I

16   just told Mr. Fink that I'll go back tomorrow and I'll have

17   access to the computer right there.  And I will pick up the

18   time, the minutes, which one, so we don't have to even stay or

19   keep all the marshals here or anyone in this court.  And

20   tomorrow morning I'll have it ready, your Honor.

21             THE COURT:  Okay.  You should know that it has nothing

22   to do with me being in court.  I'm required to be in court for

23   other things other than your case actually, but if you want to

24   go ahead and go I don't have any problem, but it means that I'm

25   not going to take a break tomorrow for you to find it.

```
 1              DEFENDANT DIDANI:  That's fine.

 2              THE COURT:  Okay.

 3              DEFENDANT DIDANI:  That's fine.

 4              THE COURT:  And, if you think you're going to need to

 5    find it and some other materials, you should find that as well,

 6    okay, because I'm not going to take a break for you to find it

 7    tomorrow, okay.

 8              DEFENDANT DIDANI:  Sure, your Honor.

 9              THE COURT:  Okay.  Anything else today?

10              MR. BILKOVIC:  Nothing, your Honor.

11              THE COURT:  Very good.  We're in recess.  Have a good

12    evening.

13              DEFENDANT DIDANI:  Thank you, your Honor.

14              MR. FINK:  Thank you, your Honor.

15              (The proceedings were adjourned at 3:47 p.m.)

16              (End of Excerpt.)

17                              _   _   _

18

19

20

21

22

23

24

25
```

```
 1
 2
 3                    CERTIFICATE OF COURT REPORTER
 4
 5          I, Sheila D. Rice, Official Court Reporter of the
 6    United States District Court, Eastern District of Michigan,
 7    appointed pursuant to the provisions of Title 28, United States
 8    Code, Section 753, do hereby certify that the foregoing pages
 9    is a correct transcript from the record of proceedings in the
10    above-entitled matter.
11
12
13                         s/Sheila D. Rice
                           Sheila D. Rice, CSR-4163, RPR, RMR, FCRR
14                         Federal Official Court Reporter
                           United States District Court
15                         Eastern District of Michigan
16
      Date:  03/02/2025
17    Detroit, Michigan.
18
19
20
21
22
23
24
25
```