```
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF MICHIGAN
 2                        SOUTHERN DIVISION

 3                           —   —   —

    UNITED STATES OF AMERICA,
 4
                  Plaintiff,
 5
      v.                              Case No. 21-20264
 6
    YLLI DIDANI,
 7
                  Defendant.
 8    _____/

 9                JURY TRIAL - VOLUME 15 - EXCERPT
               BEFORE THE HONORABLE DENISE PAGE HOOD
10                  UNITED STATES DISTRICT JUDGE

11             Theodore Levin United States Courthouse
                  231 West Lafayette Boulevard
12                      Detroit, Michigan
                  Wednesday, March 12, 2025
13

14    APPEARANCES:

15     For the Plaintiff:        Mark Bilkovic
                                 Timothy McDonald
16                               UNITED STATES ATTORNEY'S OFFICE
                                 211 W. Fort Street, Suite 2001
17                               Detroit, Michigan  48226
                                 (313) 226-9623
18
       For the Defendant:        Ylli Didani
19                               Appearing in Pro Se

20                               Wade Fink
                                 WADE FINK LAW, P.C.
21                               550 W. Merrill Street, Suite 100
                                 Birmingham, Michigan  48009
22                               (248) 712-1054

23     Also Present:            Special Agent Chad Hermans
                                 Maria DiCarlo, Paralegal
24
            To obtain a copy of this official transcript, contact:
25                Sheila D. Rice  Official Court Reporter
               (313) 234-2610 • sheila_rice@mied.uscourts.gov
```

1               **TABLE OF CONTENTS**

2    MATTER                                              PAGE

3    **JURY TRIAL - VOLUME 15 - EXCERPT**

4    **Government's Case in Chief (Continued)**

5    <u>**DAVID PEDRINI**</u>

6    Direct examination by Mr. Bilkovic...................  4
     Cross-examination by Defendant Didani............... 49
7    Redirect examination by Mr. Bilkovic............... 98
     Recross examination by Defendant Didani............101

8
     Certificate of Court Reporter......................106

9

10

11

12                E X H I B I T   I N D E X

13

14   <u>Exhibit No.</u>        <u>Description</u>        <u>Identified</u>   <u>Admitted</u>

     **<u>Government Exhibits</u>**
15
     GX 45.0              Cocaine representative  44
16                        sample
     GX 46.0              Cocaine representative  48
17                        sample
     GX 47.0              Cocaine representative  48
18                        sample
     GX 54.0-54.13        Photographs             23          24
19   GX 55.0-55.14        Photographs             36          36
     GX 58.0              Photograph              19          20
20   GX 59.0-59.7         Photographs             31          31
     GX 78.17             Video                   74          75
21   GX 80.4              Video                   69          71
     GX 80.5              Video                   69          71
22
     **<u>Defendant's Exhibits</u>**
23
     Defendant's O        Dutch MLAT              65
24   Defendant's P        Bill of lading          80          81

25

 1   Detroit, Michigan

 2   Wednesday, March 12, 2025

 3   10:15 a.m.

 4                                    _   _   _

 5           (Beginning of excerpt.)

 6           MR. BILKOVIC:  Your Honor, the Government would call

 7   David Pedrini.

 8           THE COURT:  You may step forward and be sworn in,

 9   please.  Right over here by the court reporter to be sworn in.

10   Right there is fine.  Raise your right hand, please.

11           (Oath administered.)

12           THE COURT:  Okay.  When you're seated, state your full

13   name and spell your last name for the record.

14           THE WITNESS:  Sure.

15           THE COURT:  And you're going to speak into this part

16   of the mic.  The chair doesn't go forward.  So bring the --

17   very good.

18           MR. BILKOVIC:  You can move those bags if that will

19   help you, if those bags are in the way.  We'll get to those

20   later anyways.

21           THE WITNESS:  I'll do my best.

22           THE COURT:  That's great.  Now, spell your last name.

23           THE WITNESS:  It's keep falling.  That's okay.

24           THE COURT:  What keeps falling?

25           THE WITNESS:  The microphone.

```
 1            MR. BILKOVIC:  Your Honor, may I approach?
 2            THE COURT:  Yes, you may.
 3            THE WITNESS:  There we go.  Good morning, your Honor.
 4     Good morning.
 5            THE COURT:  Good morning.
 6            THE WITNESS:  My name is David Pedrini, D-A-V-I-D
 7     P-E-D-R-I-N-I.
 8                      *        *         *
 9                        DAVID PEDRINI,
10         was called as a witness at 10:17 a.m. after having been
11         duly sworn to testify to the truth.
12                      *        *         *
13                      DIRECT EXAMINATION
14     BY MR. BILKOVIC:
15     Q.  Sir, how are you --
16            MR. BILKOVIC:  I'm sorry, your Honor.  May I proceed?
17            THE COURT:  You may.
18            MR. BILKOVIC:  Thank you.
19     BY MR. BILKOVIC:
20     Q.  How are you employed?
21     A.  I'm a special agent with the Drug Enforcement
22     Administration, the DEA.
23     Q.  And how long have you been a special agent with the DEA?
24     A.  Since August of 1997.
25     Q.  So approximately 28 years?
```

1    A.   Almost, yes.

2    Q.   Prior to becoming a special agent with the DEA did you have

3    any other law enforcement experience?

4    A.   Yes.  I was a police officer for the Boston Housing

5    Authority police, and we were tasked with policing the public

6    housing developments in the city of Boston.

7    Q.   And what is your current assignment?

8    A.   I'm currently a staff coordinator supervisory special agent

9    at DEA Special Operations Division in -- outside of -- in

10   northern Virginia.

11           THE COURT:  In where?

12           THE WITNESS:  Northern Virginia.

13           THE COURT:  Northern Virginia, okay.

14   BY MR. BILKOVIC:

15   Q.   And how long have you had that assignment?

16   A.   Since July of 2024.

17   Q.   And that assignment has nothing to do with why you're here

18   today; is that correct?

19   A.   That's correct.

20   Q.   What assignments have you had with the DEA since you

21   started in 1997?

22   A.   So after graduating from the DEA, did the 18-week DEA

23   academy in Quantico, Virginia, I was assigned to the

24   Philadelphia field division in Philadelphia, Pennsylvania where

25   I spent almost 21 years.  And during that time I conducted

1    local impact investigations focusing on street corner drug

2    traffickers.  And then throughout my entire career in the

3    Philadelphia area I went from those kind of cases to large

4    international drug trafficking organization investigations.

5    Q.  And as far as the size of the Philadelphia DEA office,

6    approximately how many agents are there?

7    A.  It's one of DEA's smaller divisions, and approximately

8    right now maybe 50 agents total, and we cover the states of

9    Delaware and Pennsylvania.

10   Q.  And you said you were there until when?

11   A.  July of 2018.

12   Q.  And what happened in July of 2018?

13   A.  So in 2017, DEA -- just a real quick history of DEA.  DEA

14   is a single-mission agency --

15   Q.  Let me back you up a second.  I was going to get into that.

16   A.  Okay.  But I was just going to -- we have over 200 domestic

17   field offices in the United States, and DEA also has almost 90

18   offices in foreign territory.

19   Q.  Again, I'm going to get into that; okay?

20   A.  Okay.  So in 2017 --

21          THE COURT:  That means he wants you to wait for a

22    question.

23          THE WITNESS:  No problem.

24   BY MR. BILKOVIC:

25   Q.  That's the nice -- yeah, that's a nice way of saying it.

1              In 2018 did you start a new assignment?

2     A.   Yes.  I was selected to --

3     Q.   It's a yes or no.

4     A.   Yes.

5     Q.   Okay.  Where was that new assignment?

6     A.   In The Hague, the Netherlands.

7     Q.   How did that come about?

8     A.   In 2017, I applied for a position at our office in The

9     Hague, the Netherlands.  Through an interview process and

10    resume I was selected for that position.

11    Q.   And what was the position in The Hague?

12    A.   I was one of two special agents assigned to The Hague

13    country office, and we covered the country of the Netherlands.

14    Q.   And when we say The Hague where is the Hague and what is

15    The Hague?

16    A.   The Hague is a town or city in the Netherlands, the country

17    of the Netherlands.  And there's a U.S. embassy there, and

18    that's where the DEA office is located.

19    Q.   Is the Netherlands known by any other country name?

20    A.   It's also named Holland as well.

21    Q.   And you said that your office was at the U.S. embassy?

22    A.   Correct.

23    Q.   Is that also in The Hague?

24    A.   Yes.

25    Q.   And you briefly had touched on this, but how many DEA

1    employees were at The Hague when you were there?

2    A.   They're a total of -- well, they're two special agents, a

3    country attache who's a supervisory special agent, an

4    intelligence analyst, and at the time when I was there we had a

5    foreign service national investigator and a admin support

6    person.  So a total of six of us.

7    Q.   Were there other federal -- any other federal agencies that

8    were assigned also to the U.S. embassy in The Hague when you

9    were there?

10   A.   Yes.

11   Q.   What other agency?

12   A.   Secret Service has an office there, the FBI, Homeland

13   Security, CBP Customs and Border Protection, IRS.

14   Q.   And what was your purpose for being in The Hague?

15   A.   To work drug investigations, worldwide drug investigations

16   related to the DEA.

17   Q.   And the position that you got, was that a new position in

18   2018, or did DEA have a presence in the Netherlands prior to

19   2018?

20   A.   DEA has had a presence in the Netherlands for almost 50

21   years.

22   Q.   And so when you started your work at The Hague what type of

23   work were you doing?

24   A.   In addition to working bilateral investigations with the

25   National Police of the Netherlands, the Dutch National Police,

1    I also conducted large-scale investigations with our domestic

2    offices here in the States as well as foreign offices

3    throughout the world.

4    Q.   And why would you be in the Netherlands conducting

5    investigations having to do with the United States?

6    A.   A lot of domestic investigations here in the U.S. have ties

7    to the Netherlands.

8    Q.   And so is that something you did during the six years that

9    you were there?

10   A.   My entire six years, yes.

11   Q.   Now, I believe you said you worked with the Netherlands

12   National Police?

13   A.   Correct.

14   Q.   Can you describe briefly what the Netherlands National

15   Police are?

16   A.   Sure.  The Netherlands has a National Police force.  Rather

17   than having a state-by-state police force, they have a National

18   Police force that covers the entire country.

19   Q.   And did they have offices in The Hague?

20   A.   They did.  They have offices throughout the country.

21   Q.   Are you familiar with a law enforcement agency or subagency

22   in the Netherlands referred to as HARC?

23   A.   Yes.

24   Q.   And do you know what that stands for?

25   A.   Sure, yes.  HARC stands for the Hit-and-Run Cargo Team.

1  And that's basically a task force that's based in the Port of

2  Rotterdam that consists of the National Police of the

3  Netherlands, the sea port police, the Dutch version of the IRS

4  and Dutch Customs.

5  Q.  And is HARC -- is the abbreviation, is it H-A-R-C?

6  A.  Correct.

7  Q.  C standing for Customs?

8  A.  No, C standing for cargo.

9  Q.  Cargo.

10 A.  I'm sorry.  Hit-and-Run Cargo Team.

11 Q.  And why is there a law enforcement presence at the Port of

12 Rotterdam and the Netherlands?

13 A.  The Port of Rotterdam is the largest port in all of Europe

14 and one of the largest ports in the world.  It spans 26 miles.

15 It dates back to the 1400s.  And because of its central

16 location, the Netherlands is a hub for drug trafficking in all

17 of Europe.  And because the Port of Rotterdam is so large a lot

18 of container traffic comes from South America, and cocaine

19 trafficking is one of the -- that's -- the Port of Rotterdam is

20 a main hub for cocaine trafficking.

21 Q.  The agencies that you've mentioned, are those agencies that

22 you worked with when you were assigned to the Hague?

23 A.  The U.S. law enforcement and the --

24 Q.  I'm sorry.  The foreign law enforcement.

25 A.  Yes.

1   Q.   The Netherlands National Police, HARC team, things like

2   that.

3   A.   I worked with the HARC team on almost a daily basis.

4   Q.   And where were they located in relation to where you were

5   at at the embassy?

6   A.   So the embassy was probably 45 minutes to an hour from

7   their location down in Rotterdam.

8   Q.   And where did you spend most of your time during your work

9   hours?

10  A.   I traveled a lot to the different police stations that we

11  worked with, worked drug investigations with, but -- so I'd say

12  fifty-fifty was in the embassy 50 percent of the time and

13  traveling the other 50 percent.

14  Q.   Now, I believe you touched on this earlier, but do you know

15  if the Netherlands is the only place outside of the United

16  States where DEA has a presence?

17  A.   No.  Like I stated earlier, we have 90 -- almost 90 offices

18  in the foreign territories.

19  Q.   Where is the Port of Rotterdam in relation to the United

20  States embassy in the Netherlands?  Where is it in relation?

21  A.   It's about 45 minutes south of The Hague.

22  Q.   I want to take your attention back to November 21st of

23  2019.  Did you receive information from a DEA task force

24  officer in the Eastern District of Michigan by the name of

25  Brandon Leach?

1   A.   I did.

2   Q.   And can you generally describe what type of information you

3   received?

4   A.   Sure.  Task Force Officer Leach reached out to me and told

5   me that he was conducting an investigation here in Detroit on

6   an individual named Ylli Didani.  And during his --

7         DEFENDANT DIDANI:  Objection, your Honor.  It's

8   hearsay.

9         MR. BILKOVIC:  Judge, I'm not offering it for the

10  truth of the matter asserted.  I'm offering it to show what

11  information he had and then what he did with that information

12  and why he did it.

13        THE COURT:  Okay.  I'm going to allow it for that.

14  And the jury may not consider it for the truth of the matters

15  asserted, but just for the basis of which he took action.  Your

16  objection is noted and preserved for the record.

17        DEFENDANT DIDANI:  Thank you, your Honor.

18  BY MR. BILKOVIC:

19  Q.   In addition to providing a name, did Agent Leach, Task

20  Force Officer Leach, give you any specific information?

21  A.   Yes.  Task Force Officer Leach revealed to me that he had

22  uncovered some information related to drug trafficking and

23  uncovered some videos as well as photos related to cocaine

24  trafficking to be specific.

25  Q.   And did he send you the photographs and videos?

1   A.   He did.

2   Q.   Did you have an opportunity to review the videos?

3   A.   I did.

4   Q.   And what generally did the videos show?

5   A.   It showed cocaine bricks being co-mingled with banana bags

6   and packaging.  And I remember one of the bags of the banana

7   companies was -- the name of the company was by Bioexpor.

8            THE COURT:  Bio what?

9            THE WITNESS:  Xpor.  B-I-O-E-X-P-O-R, I believe.

10  BY MR. BILKOVIC:

11  Q.   Did Agent Leach, Task Force Officer Leach, you said that he

12  provided you the videos?

13  A.   He did.

14  Q.   Did the videos show where these items were stored?

15  A.   It looked -- no, it didn't say specifically, but it looked

16  to me like it was a banana farm or a banana processing

17  location.

18  Q.   Did Agent Leach give you information with respect to the

19  container that the items may have been on?

20  A.   He did.

21  Q.   And how are containers identified?

22  A.   By specific numbers.

23  Q.   And did Agent Leach provide you with that container number?

24  A.   He did.

25  Q.   And what did you do with respect to that information then?

1  A.  So based on the information that was provided to me I

2  reached out to the Dutch National Police and asked if there had

3  been a seizure of cocaine related to the container number that

4  Agent Leach provided me.

5  Q.  And did you receive an answer back?

6  A.  I did.  The Dutch National Police told me that there was a

7  seizure that took place on August 12th of 2019, I believe, and

8  the seizure that took place consisted of 750 or so kilograms of

9  cocaine.  They then provided me with the report of that

10  seizure, and there were several arrests made as well.

11  Q.  Did you provide that information to Agent Leach -- or Task

12  Force Officer Leach?

13  A.  I did.  As soon as I got the report, I transferred that

14  report -- I sent that report to Task Force Officer Leach.

15  Q.  Did Task Force Officer Leach provide you the name of the

16  ship that he believed that cargo was going to be on?

17  A.  Yes.  And I believe it was the Anisha R.

18  Q.  The information that you received back from the Netherlands

19  counterparts, was the ship named the same and was the container

20  number the same as that provided to you by Agent Leach?

21  A.  Yes.

22  Q.  I'm going to move forward now to February 22nd of 2020.

23  You were still assigned to The Hague?

24  A.  Yes.

25  Q.  Approximately around February 18, 2020, did you again

1    receive information from Task Force Officer Leach?

2    A.   I did.

3    Q.   What type of information did you receive, and you can be

4    general?

5    A.   Okay.  I was in communication with Task Force Officer

6    Leach, and during our communication he sent me a video.

7    Q.   And did you review the video?

8    A.   I did.

9    Q.   And generally what did the video show?

10   A.   The video showed several individuals aboard a container

11   vessel loading numerous large duffle bags into a container.

12   Q.   In the video, could you tell what the container number was?

13   A.   Yes.  As the video was ending, the video showed the

14   container number on it.

15   Q.   And did Agent Leach provide you the name of the cargo ship?

16   A.   He did.

17   Q.   Do you remember the name of it?

18   A.   It was the Jean Gabriel.

19   Q.   J-E-A-N G-A-B-R-I-E-L?

20   A.   Yes.

21   Q.   What did you do with that information?

22   A.   So I immediately passed that information to the Dutch

23   National Police through our liaison bureau, who then passed

24   that information to the HARC team that I referenced earlier in

25   this conversation.

1   Q.   And again, are those agencies that you would work with on a
2   regular basis?
3   A.   Absolutely.  And the HARC team is the agency -- is the team
4   that handles every drug investigation in the Port of Rotterdam.
5   Q.   So after you provided that information to the Netherlands
6   authorities what happened?
7   A.   So I -- after I told them that that container was probably
8   loaded with cocaine and asked them to search it, I reached out
9   to the team leaders of the HARC team and asked if I could
10  participate in the search, or at least witness the search.
11  Q.   When you provided the information, had the containership
12  arrived yet?
13  A.   Not yet.
14  Q.   Was there a scheduled date for it to arrive?
15  A.   Yes.  It was supposed to arrive on either late evening on
16  Friday night, the 21st, or Saturday -- early Saturday morning
17  on the 22nd.
18  Q.   And we're talking the 21st and 22nd, we're still talking
19  February 2020?
20  A.   February 2020, yes.
21  Q.   So a couple of days after Agent Leach provided you the
22  information?
23  A.   Correct.
24  Q.   Did you end up going to the Port of Rotterdam?
25  A.   I did.

1   Q.   In relation to that?

2   A.   Yes.

3   Q.   Why?

4   A.   Because I had talked to Special Agent -- Task Force Officer

5   Leach, and he was conducting an investigation and this was part

6   of his investigation, and I wanted to witness the seizure of

7   the cocaine.

8   Q.   So what did you do?

9   A.   So I was in contact with the team leader who was overseeing

10  the search of that container and told that person that I would

11  like to participate.

12          The person said, "Yeah, no problem.  Are you aware

13  that the vessel's not going to be arriving until late Friday

14  night into Saturday?"

15          I said, "Yes, I'm very aware of that."

16          I continued to track the vessel on certain -- the Port

17  of Rotterdam has its own website.  So I was tracking the vessel

18  to see when it arrived.  I saw that it arrived around midnight

19  on Friday going into Saturday.

20          I hadn't heard from the team leader, so I reached out

21  to the team leader and said, "Hey, I'm seeing here on the

22  website that the vessel arrived."

23          And the team leader laughed and said, "You still want

24  to come down?  It's the middle of the night."

25          And I said, "Absolutely."

1          So he said, "Well, you're more than welcome to come

2     down."

3          I then picked up -- it was probably 12:30, one o'clock

4     on that morning on the 27th -- 22nd of February.  I then drove

5     -- on my way to the Port of Rotterdam, I picked up our foreign

6     service national investigator.  We then drove to the Port of

7     Rotterdam at the secure Dutch Customs facility, which is also

8     in the port, was met by the HARC team.

9          And at that point the container that was flagged for

10    inspection that was in the video was already at the location.

11    And the HARC team had already extracted the bags that I saw in

12    the video and were processing the cocaine that was in the bags.

13    Q.   Where was the container when you arrived at the port?

14    A.   It was -- the container had already been delivered to the

15    secure Dutch Customs location.

16    Q.   So is this within the Port of Rotterdam?

17    A.   Yes.

18    Q.   Is that a law enforcement secure facility?

19    A.   Absolutely.

20    Q.   And did you observe the appearance of the container?

21    A.   I did.

22    Q.   Did you compare the container number with the number that

23    was on the video that Task Force Officer Leach supplied you?

24    A.   I did, and they were a match.

25    Q.   Did you see the bags that were holding the cocaine?

 1  A.   I did.

 2  Q.   And did they look familiar to you?

 3  A.   They were a match to the bags that I saw in the video.

 4  Q.   You have a series of exhibits in front of you.  If you

 5  could open that book.

 6  A.   I'm just going to put these down.

 7          MR. BILKOVIC:  Your Honor, would it be possible for

 8  Mr. McDonald to dim the lights just a little bit for the

 9  exhibits?

10          THE COURT:  Yes.

11          MR. BILKOVIC:  Thank you.

12          THE COURT:  You know which light it is; right?

13          MR. McDONALD:  I do, your Honor.  Thank you.

14          MR. BILKOVIC:  Your Honor, may I just have one moment?

15          THE COURT:  Yes.

16          Is that all we're dimming?

17          MR. BILKOVIC:  That's all I need, I think.

18          THE COURT:  Okay.

19  BY MR. BILKOVIC:

20  Q.   Can you please take a look at -- do you see in that book a

21  proposed exhibit marked 58.0?

22  A.   Yes.

23  Q.   And what is that?

24  A.   That's a picture of myself and the foreign service national

25  investigator pictured behind all the kilograms of cocaine that

1    were seized on February 22nd.

2    Q.   And this photograph was taken where?

3    A.   At the Dutch Customs HARC team facility.

4    Q.   So the same location where the container was at?

5    A.   Yes.

6              MR. BILKOVIC:  Your Honor, at this time I would move

7    for admission into evidence of Government's proposed Exhibit

8    58.0.

9              THE COURT:  Any objection?

10             DEFENDANT DIDANI:  One second, your Honor.  Your

11   Honor, one second, please.

12             (Briefly off the record.)

13             DEFENDANT DIDANI:  No objection, your Honor.

14             THE COURT:  Any objection?

15             DEFENDANT DIDANI:  No objection, your Honor.  No.

16             THE COURT:  Very well.  It's admitted as 58.0.

17             MR. BILKOVIC:  And may I publish it to the jury?

18             THE COURT:  Yes.

19             MR. BILKOVIC:  And can we just zoom in on the

20   photograph area down to where the exhibit number starts.  No,

21   zoom back out.  Actually, just leave it like that for now.

22   BY MR. BILKOVIC:

23   Q.   So what are we looking at here?

24   A.   This is a picture of the kilograms of cocaine that were

25   seized on February 22nd based on the information that Task

1    Force Officer Leach provided to me and I provided to the Dutch

2    National Police, the HARC team.

3    Q.  Do you see the mouse up there?

4    A.  Yes.

5    Q.  I'm going to ask you to look at the screen, and I'm going

6    to ask you to point some items out.

7            You indicated that you're in this photograph?

8    A.  Yes.

9    Q.  Could you take the mouse and just kind of point to where

10   you are at.

11   A.  Right there.

12   Q.  The individual in the dark coat?

13   A.  The Red Sox hat, yes.

14   Q.  Do you see the bag that is next to you?

15   A.  This one, yes.

16   Q.  And what is that?

17   A.  That's one of the bags that was loaded on -- that I

18   observed that was loaded into the container that was in the

19   video.

20           MR. BILKOVIC:  And can we zoom in on the stack of

21   brown packages in front of that bag.

22   BY MR. BILKOVIC:

23   Q.  And what is that?

24   A.  Those are kilogram quantity bricks of cocaine.

25   Q.  Do you see a white object on top of that?

1    A.   Yes.  That's the number "1."

2    Q.   And do you know what the purpose of putting the number "1"

3    on top of that was?

4    A.   Yes.  The HARC team labeled each bag and counted each bag

5    that they took off the container.

6         MR. BILKOVIC:  Okay.  Can we zoom back out to where we

7    were before.

8    BY MR. BILKOVIC:

9    Q.   And do you see -- it's not easy to see, but do you see

10   basically white numbers on top of each of the stacks except for

11   the one in the bottom right-hand corner, or left-hand corner?

12   A.   Yes.

13   Q.   And so were those numbered 1 through 14?

14   A.   Correct.

15   Q.   Do you see the object on the top left side of the

16   photograph?

17   A.   Yes.  On the top left corner where it says -- there's a

18   sticker that says number "1."  That's a scale.

19   Q.   Okay.  And what is the number "1" there for?

20   A.   That's sample -- they're weighing the drugs that were

21   seized from the first bag.

22        MR. BILKOVIC:  Can we just zoom in on the scale.

23   BY MR. BILKOVIC:

24   Q.   And do you see the silver object sitting on the scale?

25   A.   Yes.

```
 1    Q.   Can you just point to it.  You're clicking.

 2    A.   No, I'm not.

 3    Q.   Are you sure?

 4    A.   Yes.

 5    Q.   Okay.  And what is that what you're pointing to?

 6    A.   That's one of the kilo bricks that was taken from the first

 7    bag.

 8              MR. BILKOVIC:  Okay.  Can we zoom back out.

 9    BY MR. BILKOVIC:

10    Q.   Can you take a look at Government's proposed Exhibit 54.0

11    to 54.13.

12    A.   Okay.

13    Q.   Hold on one second.

14              Do you recognize those?

15    A.   Yes.

16    Q.   Are those photographs that were taken at the secure area

17    after that container was taken there?

18    A.   Yes.

19    Q.   And they depict various stages of the unpacking and various

20    different photographs of the kilos?

21    A.   Yes.

22              MR. BILKOVIC:  Your Honor, at this time I would move

23    for admission into evidence of Government's proposed Exhibit

24    54.0 to 54.13.

25              THE COURT:  Any objection?
```

24

```
 1              DEFENDANT DIDANI:  No objection, your Honor.
 2              THE COURT:  Very well.  They're admitted.
 3              MR. BILKOVIC:  I'm not going to -- thank you, your
 4    Honor.  May I publish some of them to the jury?
 5              THE COURT:  Yes.
 6    BY MR. BILKOVIC:
 7    Q.  I'm not going to go through all of them, but I do want to
 8    go through a few of them with you.
 9              MR. BILKOVIC:  Could we put 54.0 on the screen.
10    BY MR. BILKOVIC:
11    Q.  And what are we looking at here?
12    A.  That's a picture of the container before it was opened once
13    it got to the Customs location.
14    Q.  And is this basically the rear of the container where you
15    would open and load items in?
16    A.  Yes.
17    Q.  And you indicated that there were a container number on the
18    container?
19    A.  Correct.
20    Q.  Where is that located here?
21    A.  It's up on the top right-hand corner of the container.
22    Q.  Can you just read the container number.
23    A.  Sure.  It's TTNU863852045R1.
24              MR. BILKOVIC:  And can we take that down and can we
25    publish 54.4.
```

1    BY MR. BILKOVIC:

2    Q.   And what is that?

3    A.   This is kind of a aerial picture of all the bags that were

4    seized from the container and the contents of those bags, which

5    is the kilograms of cocaine.

6    Q.   Is this similar to the depiction of the photograph that you

7    were in?

8    A.   Yes.

9    Q.   Is the scale in a different location in this photograph?

10   A.   Yes.  The scale is moved on to the side of the kilos.

11   Q.   And can we take a look at 54.3.  And what is that?

12   A.   That's a picture of all the duffle bags, the 14 duffle bags

13   that were taken off the container and before the kilograms of

14   cocaine were taken out of them.

15   Q.   And you see the white basically placards on each of the

16   bags?

17   A.   Yes.  Those are chronologically numbered related to the

18   number of bags that there were.

19   Q.   So 1 through 14?

20   A.   Correct.

21   Q.   The last photograph I'm going to show you -- actually, two

22   more.  Can you look at fifty --

23            MR. BILKOVIC:  Can we bring up 54.1.

24   BY MR. BILKOVIC:

25   Q.   And, Agent Pedrini, if you could look up on the screen.  I

1    just want to make sure we're looking at the same object; is

2    that okay?

3    A.   Yeah, no problem.

4    Q.   There's also a screen next to you if that's easier.

5    A.   I'm good with this.

6    Q.   Okay.  I know it's a little dark, but what are we looking

7    at there?

8    A.   Those are the bags that were loaded onto the container at

9    sea.  And that's the picture that was taken shortly after the

10   Dutch HARC team popped the -- or opened the container once it

11   got to the secure site.

12            MR. BILKOVIC:  Can we just zoom in on the bottom half

13   of that.

14   BY MR. BILKOVIC:

15   Q.   So what vantage point are we looking at here?

16   A.   So we're looking at the back of the container, and the

17   right door is opened, and they're looking at the container as

18   it just opened.

19   Q.   Can you see the bags in there?

20   A.   Yes.

21   Q.   Are those bags -- how do they appear in relation to the

22   bags that you saw being loaded on that container on the video

23   that TFO Leach sent you?

24   A.   The exact same.  The video shows the bags being loaded into

25   that void of the container.

1    MR. BILKOVIC:  The last photograph I'm going to show

2    you from this series, can we bring up 54.10.

3    BY MR. BILKOVIC:

4    Q.   And what are we looking at here?

5    A.   That's a picture of one of the kilograms of cocaine that

6    was seized during the operation.  And you can see that the

7    weight of the cocaine brick is 1,205 grams.  That's because

8    typically kilograms are a thousand grams, but because of the

9    packaging they used to wrap the kilograms it adds a little bit

10   of weight.  And then a lot of times kilograms are packaged with

11   a label, just like a shoe, like Nike or Asics or Brooks.  They

12   label -- they have certain markings on them.  And this has a

13   picture of a rifle.

14   Q.   So that photograph of the rifle, or the depiction of the

15   rifle on the package, that's not something law enforcement did,

16   that was basically part of the packaging?

17   A.   Correct.

18        MR. BILKOVIC:  Okay.  Can we take that down.

19   BY MR. BILKOVIC:

20   Q.   And are you aware of what was done with the suspected

21   cocaine that was seized from that container?

22   A.   Yes.  After the drugs are processed, the HARC team then

23   takes those drugs to a nearby incinerator and destroys them.

24   But prior to destroying them they keep representative samples

25   just in case there's an ongoing investigation that they are

1    needed at.

2    Q.   What is a representative sample?

3    A.   It depends on the size of the -- it's a small amount of

4    cocaine that represents the larger seizure.

5    Q.   And so approximately how many packages were there?

6    A.   644.

7    Q.   And so would the representative sample just come out of one

8    of the packages?

9    A.   No.  They probably took maybe five representative samples

10   from five different bags.

11   Q.   And is that something that's done commonly?

12   A.   All the time, yes.

13   Q.   And what was -- do you know who it was that took the

14   representative samples?

15   A.   It was members of the HARC team.  I don't know specifically

16   who took those, though.

17   Q.   And what is done with representative samples once they are

18   taken?

19   A.   They're sent to the Dutch National Police or the Dutch

20   Customs lab where the samples are analyzed.

21   Q.   And is that a secure law enforcement facility as well?

22   A.   Yes.  There's at least two of them in the Netherlands.

23   Q.   I'm going to move forward to April 6 of 2020.  On that day,

24   were you still working at The Hague?

25   A.   I was.

1    Q.   And did you receive information on approximately April 6,

2    2020, again from TFO Leach?

3    A.   Yes, and same way as I received the information in February

4    18th.  Task Force Officer Leach reached out to me and sent me a

5    video of again another container being loaded with bags at sea.

6    Q.   In that video, was there a container number?

7    A.   Yes.

8    Q.   And how did you see that?

9    A.   You could see it in the video after the -- before the

10   container was opened and the bags were placed on it, you could

11   see the container number as well as after the bags were placed

12   on the container the container number was shown in the video.

13   Q.   Did you do anything with that information?

14   A.   Yes.  As soon as I received that information, I passed that

15   information on the container that it was probably loaded with

16   cocaine to the Dutch National Police and eventually to the HARC

17   team, and again reached out to the HARC team and asked if I

18   could witness the searching of the container.

19   Q.   When TFO Leach provided you that information, had the

20   containership arrived in the Port of Rotterdam yet?

21   A.   I'm not sure, but I do know it was close to arriving.

22   Q.   Do you remember the name of the ship?

23   A.   Yeah.  It was the Cartagena Express.

24            THE COURT:  The what?

25            THE WITNESS:  Cartagena Express.

1          MR. BILKOVIC:  Would you like me to spell it, your

2     Honor?

3          THE COURT:  No.

4          MR. BILKOVIC:  Okay.

5          THE COURT:  Thank you, though.

6          MR. BILKOVIC:  You're welcome.

7     BY MR. BILKOVIC:

8     Q.   When you passed that information on, what happened?

9     A.   The HARC team took that information and controlled -- or

10    seized that container once the vessel arrived at the Port of

11    Rotterdam.  And then just like what happened in February, they

12    controlled the container, meaning that they had -- they

13    followed it as it went to the Customs facility in the Port of

14    Rotterdam.

15         And the same thing happened.  They searched the

16    container in that secure location, the Dutch Customs location.

17    And myself and my supervisor, country attache, Joseph Benson,

18    were at that seizure as well.

19    Q.   So again, at the same location?

20    A.   Correct.

21    Q.   Did you arrive there the day that the items were seized?

22    A.   We did.

23    Q.   And when you arrived there did you see the container that

24    had the same container number that Agent Leach had supplied

25    you?

1    A.   I did, yes.

2    Q.   And where was that at?

3    A.   At the Dutch Customs facility in the Port of Rotterdam.

4    Q.   Can you take a look -- did you take photographs that day?

5    A.   I did.

6    Q.   Can you take a look at Government's proposed Exhibit 59.0

7    to 59.7.

8    A.   Okay.

9    Q.   And do you recognize those photographs?

10   A.   Yes.  Those are photos I took on April 7, the day of the

11   seizure.

12   Q.   And do those depict basically the items that you saw when

13   you arrived at the Port of Rotterdam that dealt with this

14   specific container number?

15   A.   Yes.

16        MR. BILKOVIC:  Your Honor, at this time I would move

17   for admission into evidence of Government's proposed Exhibit

18   59.0 through 59.7.

19        THE COURT:  Any objection?

20        DEFENDANT DIDANI:  No objection, your Honor.

21        THE COURT:  Very well.  59.0 through 59.7 are

22   admitted.

23        MR. BILKOVIC:  And may I publish some of them to the

24   jury, your Honor?

25        THE COURT:  You may.

1    BY MR. BILKOVIC:

2    Q.   Can we start with 59.0.  And what are we looking at here?

3    A.   That's the back of the container that's backed into the

4    Dutch Customs facility.

5    Q.   The void area of the top of the container where it's almost

6    like a white border, what is that?

7    A.   That's the outside.

8    Q.   Okay.  And then what is the top above the white area?

9    A.   Oh.  Like the top of the garage.

10   Q.   Okay.  So this is backed up to the garage?

11   A.   Into a bay, yes.

12           MR. BILKOVIC:  Can we just zoom in on the top half.

13           Your Honor, may we have a moment to figure out where

14    our loose connection is?

15           THE COURT:  Yes.

16           (Briefly off the record.)

17           THE COURT:  Does the jury need a break?

18           Yes, okay.  You may step down.

19           Please rise for the jury.

20           (The jury left the courtroom at 10:54 a.m.)

21           THE COURT:  You may all be seated.

22           (At 10:55 a.m., a brief recess was taken.

23           Back on the record at 11:05 a.m.)

24           THE COURT:  Okay.  Are we ready to bring out the jury?

25           LAW CLERK:  All rise for the jury.

 1              (The jury entered the courtroom at 11:05 a.m.)

 2              THE COURT:  I'm satisfied the jurors have returned.

 3              And is the Government satisfied?

 4              MR. BILKOVIC:  Yes, your Honor.

 5              THE COURT:  What about Mr. Didani?

 6              DEFENDANT DIDANI:  Yes, your Honor.

 7              THE COURT:  Very well.  You may all be seated.

 8              And, sir, you're still under oath.

 9              THE WITNESS:  Yes, your Honor.

10              THE COURT:  We think we have it fixed, but we have our

11    wonderful IT department here for a few minutes just in case,

12    and I thank you.

13              You may continue.

14              MR. BILKOVIC:  Thank you, your Honor.

15              Can we republish 59.0, please.  And can you zoom in on

16    the top half.

17    BY MR. BILKOVIC:

18    Q.   Do you see the container number here?

19    A.   I do.

20    Q.   And the container number, if you could just read it into

21    the record.

22    A.   Sure.  It's HLXU675640345R1.

23    Q.   And is that the same container number that you saw in the

24    video that TFO Leach supplied you?

25    A.   Yes.

```
 1              MR. BILKOVIC:  And can we go to 59.1.  And can we just
 2   zoom in on the bags and the packaging, please, or the kilos,
 3   please.
 4   BY MR. BILKOVIC:
 5   Q.  And what are we looking at here?
 6   A.  That's a picture that I took of the kilos after they were
 7   taken from the bags.  And you can see that the bags are all in
 8   a pile on the top left corner of the picture.
 9   Q.  I hesitate to ask you to do this, but could you take the
10   pointer and just scroll over to where the bags are located.
11   A.  Right there?
12   Q.  Yes.  Is that where the bags were?
13   A.  Yes.
14              MR. BILKOVIC:  And can we go to 59.3.  And can we zoom
15   in on the bottom, that group right there.
16   BY MR. BILKOVIC:
17   Q.  And what are we looking at here?
18   A.  That's another picture that I took, and that's the
19   kilograms that were taken from one of the bags.  And you can
20   see that the kilograms of most of them are packaged in black
21   tape, and I think six of them are packaged in a different
22   color, lighter tape.
23   Q.  Can you take a look, because it's a little hard to see
24   here, but the book -- can you take a look at the -- 59.3 on the
25   book.
```

1    A.   Yes.

2    Q.   And do you see in the three packages that appear to be a

3    similar color in the middle of the one row?

4    A.   Yes.

5    Q.   And can you just point to those.

6         And what color do they appear to be?

7    A.   Gray.

8    Q.   And then do you see the top four on the right-hand side?

9    A.   Yeah.  The top four on the right-hand side appear to be

10   green.

11   Q.   Now, the photograph you have the color's a little clearer?

12   A.   Correct.

13   Q.   So basically three different color packaging?

14   A.   Yes.

15        MR. BILKOVIC:  And if we could just go to 59.7.

16   Actually, no, that's okay.  We don't need to do that.  We'll

17   move on.

18        THE COURT:  And so can I let my IT people go?

19        MR. BILKOVIC:  I have more exhibits, but I think it's

20   working so I think we're okay.

21        THE COURT:  We'll call you if we have a problem.

22   Thank you for being willing to stay.

23   BY MR. BILKOVIC:

24   Q.   Can you take a look at Government's proposed Exhibit 55.0

25   to 55.14.

 1    A.   Okay.

 2    Q.   And do you recognize those?

 3    A.   Yes.

 4    Q.   And what are those?

 5    A.   Those are pictures taken by the HARC team as they were

 6    processing the evidence on April 7, 2020.

 7    Q.   And some of those pictures basically show the same thing

 8    that your photographs show?

 9    A.   Yes.

10    Q.   And are there additional details in some of these?

11    A.   Yes.  Some of the photos are taken of the bags as they were

12    still on the container on top of these green drums that were

13    the legitimate load of that container.

14         MR. BILKOVIC:  Your Honor, at this time I would move

15    for admission into evidence of Government's proposed Exhibits

16    55.0 to 55.14.

17         THE COURT:  Any objection?

18         DEFENDANT DIDANI:  No objection.

19         THE COURT:  Very well.  They're admitted as 55.0

20     through 55.14.

21    BY MR. BILKOVIC:

22    Q.   I'm not going to go through all of them with you, but I'd

23    like to go through a few.

24         MR. BILKOVIC:  Can you publish 55.0, please.

25

```
 1   BY MR. BILKOVIC:
 2   Q.  And what are we looking at here?
 3   A.   That's a picture of the back of the container.
 4   Q.  And does that appear to be basically the same as the
 5   photograph you took?
 6   A.   Yes.
 7           MR. BILKOVIC:  Can we publish 55.1.
 8   BY MR. BILKOVIC:
 9   Q.  And what are we looking at here?
10   A.   That's a picture of the container just after it was opened,
11   and the picture is of the bags from the video that were placed
12   on top of the green drums.
13   Q.  And do you know what was in the green drums?
14   A.   Some sort of fruit pulp, I think.
15   Q.  So that's not related to the case; right?
16   A.   Correct.  That's a legitimate load that was being
17   transported to Europe.
18   Q.  And does this photograph appear to be similar to what was
19   depicted in the video that TFO Leach sent you?
20   A.   Yes.
21           MR. BILKOVIC:  Can you put up 55.14.  And can we just
22   zoom in on the -- basically the -- start up there and go down
23   to -- yeah, right there.  Thank you.
24   BY MR. BILKOVIC:
25   Q.  What are we looking at here?
```

1    A.   So those are cloned seals that were in a black plastic bag

2    that was attached -- that black plastic bag was attached to the

3    one of the bags that was thrown in the container.

4    Q.   What do you mean by cloned seals?

5    A.   So in order to open the container obviously you have to pop

6    open the container seals, and each container is sealed.

7    Basically it's a lock, for lack of a better term.

8    Q.   I'm going to stop you for a second, because it might be

9    obvious to you, but it's not obvious to us.

10   A.   Yeah.

11   Q.   When a container is loaded before it goes onto a ship, is

12   there something that is done to that container to secure it?

13   A.   Yes.

14   Q.   What is done to it?

15   A.   Sorry.  It's sealed with these seals.  So the container

16   doors are locked, closed and locked, and there's holes on the

17   container doors' handles that you place these seals into and

18   they marry up.  Basically the long part marries up with the

19   short part and they seal them.  And then there's another wire

20   seal that you can see in the circle in that photo that's also

21   attached to further secure the container.

22   Q.   Do you see numbers and letters on these seals?

23   A.   Yes.  Each seal has a unique number and letter to it.

24   Q.   And do you know what a bill of lading is?

25   A.   Yes.

1    Q.   And what is a bill of lading?

2    A.   A bill of lading shows the sender and receiver and all the

3    information related to the container.  And the seal numbers are

4    on those container, bills of lading.

5    Q.   And so when you said that these were cloned seals what do

6    you mean by that?

7    A.   Drug trafficking organizations have access to devices or

8    machines that can clone these seals.  And oftentimes --

9              DEFENDANT DIDANI:  Objection, your Honor, lack of

10   foundation.

11             THE COURT:  Lay a foundation for it, Counsel, how he

12   knows this.

13             MR. BILKOVIC:  I will.

14   BY MR. BILKOVIC:

15   Q.   Have you ever seen a cloned seal before?

16   A.   Yes.

17   Q.   Approximately how many times have you seen cloned seals?

18   A.   Numerous times.

19   Q.   And in what way have you seen those?

20   A.   In videos, in real life and from also based on my training

21   and experience in dealing in the Port of Rotterdam.

22   Q.   Have you seen cloned seals during your investigations?

23   A.   Yes.

24   Q.   During drug trafficking investigations?

25   A.   Yes.

1   Q.  And have you basically come across other agents that have

2   seen these as well?

3   A.  Yes.

4   Q.  And in the video that you observed that Agent Leach sent

5   you was there anything that you saw being --

6           DEFENDANT DIDANI:  Your Honor -- he's directing the

7   witness, your Honor.

8           THE COURT:  He's what?  He's doing what?

9           DEFENDANT DIDANI:  He's leading the witness.

10          THE COURT:  I don't know that you're completely

11  suggesting the answer, but --

12          MR. BILKOVIC:  I'll rephrase it.

13          DEFENDANT DIDANI:  Thank you.

14  BY MR. BILKOVIC:

15  Q.  Was there anything of importance on the video that you saw

16  relating to seals?

17  A.  Yes.  In the video, after the bags were placed on the --

18  into the container, the individuals who put the bags onto the

19  container then sealed the container with seals similar to that.

20  Q.  And so in order to get into the container what would they

21  have had to have done?

22  A.  You have to pop the seal in order to get into the

23  container, break the seal off.

24          MR. BILKOVIC:  Your Honor, I believe I've established

25  a sufficient foundation.  I would ask that the witness be

1    allowed to answer the initial question that I asked.

2          THE COURT:  Do you want to ask any other questions --

3          DEFENDANT DIDANI:  No, your Honor.

4          THE COURT:  -- subject to foundation?

5          DEFENDANT DIDANI:  No, your Honor.

6          THE COURT:  I'm satisfied.  You may have the question.

7    BY MR. BILKOVIC:

8    Q.  I think the question was is there something close to it.

9    What do you mean by a cloned seal?  What is a cloned seal?

10   A.  A cloned seal is a seal that looks exactly like the

11   original seal.  And after the drugs are put -- or after the

12   drugs are placed into a container, in order to make it look

13   like the container wasn't tampered with the cloned seals are

14   placed on the container to show that it wasn't tampered with.

15   Q.  So if I were to break into a container and put a seal --

16   reseal the container, but put on like different container

17   number and different serial number on the seal, would that

18   cause any issues?

19   A.  Yes.  That's going to raise red flags, because you can

20   match -- with the bill of lading, you can match the seal

21   numbers with the bill of lading.  And, if the seal numbers

22   don't match, then that's going to raise suspicion with law

23   enforcement.

24   Q.  And you indicated that these items were found where?

25   A.  In a small, black plastic bag that was fastened to one of

1    the bags that was placed inside the container.

2    Q.   And are you aware of what was done with the suspected

3    cocaine that was recovered?

4    A.   Yes.  After the cocaine was processed as evidence, it was

5    then taken to an incinerator by the HARC team and destroyed.

6    Q.   Do you know approximately how many packages there were --

7    A.   I believe it was --

8    Q.   Let me finish my question.  Do you know approximately how

9    many packages, individual packages, there were?

10   A.   In the seizure, I think it was a thousand.

11   Q.   And you indicated before, same process before it was

12   destroyed?

13   A.   Yes.

14   Q.   And were representative samples obtained?

15   A.   Yes.

16   Q.   Are you familiar with a phrase "MLAT"?

17   A.   Yes.

18   Q.   And what is MLAT?

19   A.   An MLAT is a legal -- it's an agreement between countries

20   where you will support law enforcement investigations, and

21   you'll provide support whether it be an undercover meeting,

22   provide evidence.  And we have an agreement, mutual legal

23   assistance treaty it's called, with many countries throughout

24   the world.

25   Q.   And pursuant to the MLAT process, in October of 2020, were

1  you requested to do anything?

2  A.   Yes.

3  Q.   What were you requested to do?

4  A.   The team in Detroit reached out to me and said that they

5  were going to put together an MLAT, and based on the MLAT they

6  wanted some information related to the three seizures that we

7  just talked about.

8         So I was able to talk with the agents in Detroit and

9  provided them with the information related to the seizures,

10  their specific case names that the HARC team uses for the

11  seizures and case numbers.  So they were able to then put those

12  -- that information into their request to the Dutch National

13  Police, which helped get the evidence.

14  Q.   And what was the request generally for?

15  A.   For evidence and reports related to the seizures.

16  Q.   What about any of the cocaine itself?

17  A.   Yes.  Samples of the cocaine that were seized on those

18  three dates.

19  Q.   So did you attempt to do that, obtain samples of the

20  cocaine?

21  A.   I did.

22  Q.   And how did you do that?

23  A.   I met with a liaison officer from the Dutch National Police

24  who's assigned to the cocaine unit.  His name is Hans Zegelaar.

25  I met him in Amsterdam, at one of the labs in Amsterdam.  And

1   he gave me three of the samples from the seizures that took

2   place.

3   Q.   Can you say that last name again slowly if you could.

4   A.   Zegelaar.

5   Q.   Do you know how to spell it?

6   A.   I'll do my best.  Z-E-G-E-L-A-A-R.

7   Q.   And is that somebody that you worked with on a regular

8   basis during your time at The Hague?

9   A.   I did.

10  Q.   And so where did you meet him?

11  A.   I met him at one of the Dutch Customs labs, drug labs.

12  Q.   And what happened when you got there?

13  A.   It was in Amsterdam.  I met Hans Zegelaar in the lobby,

14  then we went to where the exhibits were being held.  The

15  chemist who had the samples turned them over to Hans Zegelaar

16  who then turned the exhibits over to me.

17  Q.   Do you see three packages in front of you, or up there by

18  you?

19  A.   I do.

20  Q.   Can we start with Government's proposed Exhibit 45.0.

21  A.   Okay.

22  Q.   And do you recognize that?

23  A.   I do.

24  Q.   What is that?

25  A.   This is one of the samples that was given to me by Hans

 1   Zegelaar in Amsterdam.

 2   Q.   One of the samples from the --

 3   A.   From the seizures -- one of the three seizures that took

 4   place.

 5   Q.   And is there anything on that package to signify that you

 6   had ever been in possession of that?

 7   A.   Yes.  This is my handwriting on the DEA evidence bag.

 8   Q.   And does that tie to one of the three seizures that you've

 9   talked about today?

10   A.   It is.

11   Q.   Do you know which one?

12   A.   Off the top of my head, I forget, but if I could refresh my

13   memory looking at my paperwork I could remember, but I know

14   it's one of the three.

15   Q.   Is there an exhibit -- is there a DEA exhibit number on

16   there as well?

17   A.   Yes.  The DEA exhibit number is Exhibit number 6.

18   Q.   And, if you were to look at that, look at a report, would

19   it refresh your memory as to what DEA 6 was -- DEA Exhibit 6

20   was?

21   A.   Yes.

22        MR. BILKOVIC:  Okay.  Your Honor, could he take a look

23   at his report to see if that would refresh his memory?

24        THE COURT:  Do you have your report up there with you?

25        THE WITNESS:  I think so, your Honor.

```
 1              THE COURT:  Okay.  Look at it, put it away, and then
 2     we'll get a question.
 3              THE WITNESS:  Actually, I don't have my reports in
 4     front of me.  I think I handed them to --
 5              THE COURT:  You what?
 6              THE WITNESS:  As I was walking up here, I think I
 7     handed my reports to Special Agent Hermans, I think.
 8              THE COURT:  Do you want to check and see if you have
 9     them out there?
10              MR. BILKOVIC:  Your Honor, may I approach the witness?
11     May I approach the witness?
12              THE COURT:  You may.
13              THE WITNESS:  Okay.
14     BY MR. BILKOVIC:
15     Q.  Please take a look at that report, and when you're done
16     looking at it tell me if it refreshes your memory?
17     A.  Yes, it does.
18     Q.  And is that a report that you prepared?
19     A.  Yes.
20     Q.  Was the report prepared in relation to obtaining the
21     samples?
22     A.  Yes.
23              THE COURT:  And can you tell us the date so we'll be
24     able to identify it later?
25              THE WITNESS:  The date of the report?
```

```
 1              THE COURT:  Yes, please.

 2              THE WITNESS:  10-26 of 2020.

 3              THE COURT:  Okay.  All right.  Very well.

 4   BY MR. BILKOVIC:

 5   Q.  And so you're looking at Government's proposed Exhibit

 6   45.0?

 7   A.  Yes.

 8   Q.  And what DEA number was that from?

 9   A.  DEA Exhibit number 7 -- I'm sorry, Exhibit number 6.

10   Q.  And does your report refresh your memory as to what seizure

11   that was from?

12   A.  It does.

13   Q.  And what was that?

14   A.  That was from the August 12 seizure of the 752 kilograms.

15   Q.  That would be the first one that you were not present at?

16   A.  Correct.

17   Q.  And can you take a look at Government's proposed Exhibit

18   46.0.

19              THE COURT:  46.0?

20              MR. BILKOVIC:  46.0.

21              DEFENDANT DIDANI:  46.0.

22              THE COURT:  Do you have it?

23              MR. BILKOVIC:  Judge, it's the physical exhibit.  I've

24    shown these to Mr. Didani and Mr. Fink prior.

25              THE COURT:  All right.
```

|      |                                                                        |
|------|------------------------------------------------------------------------|
| 1    | DEFENDANT DIDANI:  Yes, your Honor.  I see it.                          |
| 2    | THE COURT:  Okay.                                                       |
| 3    | BY MR. BILKOVIC:                                                        |
| 4    | Q.   And do you recognize that?                                        |
| 5    | A.   I do.                                                              |
| 6    | Q.   And what is that?                                                  |
| 7    | A.   This is a sample from the seizure that was -- took place on        |
| 8    | February 22, 2020.                                                     |
| 9    | Q.   And that would have been the first one that you were at?           |
| 10   | A.   Correct.                                                           |
| 11   | Q.   And is there anything on that packaging that reflects that         |
| 12   | you were in possession of it at one point?                             |
| 13   | A.   Yes.  This is my handwriting in the middle of the bag, and         |
| 14   | then on the top left-hand corner of the bag is my signature            |
| 15   | after it was sealed.                                                   |
| 16   | Q.   And can you take a look at Government's proposed Exhibit            |
| 17   | 47.0.                                                                   |
| 18   | A.   Yes.                                                               |
| 19   | Q.   And do you recognize that?                                        |
| 20   | A.   Yes.                                                               |
| 21   | Q.   And what is that?                                                  |
| 22   | A.   This is Exhibit number 5.                                          |
| 23   | Q.   DEA Exhibit number 5.  And that was from what?                     |
| 24   | A.   And this was taken from the April 7th seizure of the               |
| 25   | thousand kilograms.                                                    |

1    Q.   And that would be the second one that you attended?

2    A.   Correct.

3    Q.   And is there any writing or any markings on that package to

4    show that it was at one time in your possession?

5    A.   Yes.  Again, that's my handwriting in the middle of the bag

6    and then my signature on the top left-hand corner.

7    Q.   What did you do with those items after you received them?

8    A.   After I received them, I processed them as evidence and

9    sent them to our special testing lab in Virginia.

10   Q.   And I'll back up just briefly.  One thing I forgot to ask

11   you about the seals.  Once a seal is removed from a container

12   can that be used again?

13   A.   No.  It's a one-time use.

14           MR. BILKOVIC:  May I have a moment, your Honor?

15           THE COURT:  Yes.

16           (Briefly off the record.)

17           MR. BILKOVIC:  No further questions at this time.

18    Thank you.

19           THE COURT:  Okay.  Do you want to cross-examine him?

20           DEFENDANT DIDANI:  Yes, your Honor.

21           DEFENDANT DIDANI:  Good morning.

22           JURORS:  Good morning.

23                         CROSS-EXAMINATION

24   BY MR. BILKOVIC:

25   Q.   Good morning, Agent Pedrini.

1    A.   Good morning.

2    Q.   Pedrino (ph) or Pedrini?

3    A.   Pedrini.

4    Q.   Pedrini.  I'm sorry.  My name is Ylli Didani.  Do you know

5    me?

6    A.   I do not, no.

7    Q.   You ever investigated me?

8    A.   I'm sorry?

9    Q.   Did you ever investigated me?

10   A.   Yes.

11   Q.   But you don't know me?

12   A.   Correct.

13   Q.   Agent Pedrini, you said that you started in Hague in 2018?

14   A.   Correct.

15   Q.   And that's Amsterdam?

16   A.   I'm sorry?

17   Q.   Amsterdam or Hague or Amsterdam --

18   A.   In The Hague.

19   Q.   Holland?

20   A.   In the Netherlands, yes.

21            DEFENDANT DIDANI:  Your Honor, can I put a map for the

22   jury so we can have a understanding?

23            THE COURT:  Is this the same map we've used before?

24            DEFENDANT DIDANI:  Yes, your Honor.

25            THE COURT:  Yes.  Does the Government have any

1     objection?

2              MR. BILKOVIC:  No, your Honor.

3              THE COURT:  All right.

4     BY DEFENDANT DIDANI:

5     Q.  So, to be clear, is that Port of Rotterdam?

6              THE COURT:  Can you see that?

7              THE WITNESS:  Not yet I can't, no.

8     BY DEFENDANT DIDANI:

9     Q.  Rotterdam, Holland?

10    A.  Yes.

11    Q.  And that is located where?

12    A.  In the Netherlands.

13    Q.  Europe?

14    A.  In Europe.

15    Q.  With another continent?

16    A.  Yes.

17             THE COURT:  Another continent from North America?

18             DEFENDANT DIDANI:  Yes.  Yes, your Honor.

19             THE COURT:  Okay.

20    BY DEFENDANT DIDANI:

21    Q.  Roughly how many miles is it away from Detroit?

22    A.  4,000 maybe.

23    Q.  And was that in kilometers?

24    A.  No, miles.

25    Q.  How about in kilometers?

1    A.   I have no idea.

2    Q.   How far it took you to fly from -- to fly from Rotterdam to

3    Detroit?

4    A.   I've never done that flight before, but flying from

5    Amsterdam to Virginia takes about eight hours.

6    Q.   I don't know where -- so, to be fair, it's about eight,

7    nine hours away?

8    A.   Sure.

9    Q.   Agent Pedrini, you indicated that you entered this case in

10   2019?

11   A.   Yes.

12   Q.   And how did you got -- how did you enter this case?

13   A.   Through a phone call from Task Force Officer Leach.

14   Q.   And Officer Leach, or Detective Leach, all the time it was

15   communicating with phone calls with you?

16   A.   And text messages, yes.

17   Q.   You still have those text messages?

18   A.   I don't think so.

19   Q.   What about E-mails?

20   A.   Some E-mails, too, yes.

21   Q.   You still have those E-mails?

22   A.   I should, yes.

23   Q.   It wouldn't be no problem if you provide them to the

24   defense; right?

25   A.   No, I don't think so.

1   Q.   So what -- DEA Hague, what is your occupation out there, to

2   investigate what?

3   A.   Drug trafficking organizations throughout the world.

4   Q.   From where?

5   A.   All over.

6   Q.   And what is your assignment?

7   A.   I'm sorry?

8   Q.   Your specific assignment?

9   A.   My specific assignment is to work large drug investigations

10  throughout the world and bring to justice the members of these

11  investigations in the U.S. and abroad.

12  Q.   Bring to justice?

13  A.   Yes.

14  Q.   Those drug traffickers?

15  A.   Yes.

16  Q.   In Holland or U.S.?

17  A.   Both.

18  Q.   And this specific case, Agent, you entered in 2019; yes?

19  A.   Correct.

20  Q.   Can you tell me why did you enter in that case?  Why?

21  A.   Like I said earlier, I received a phone call, and I was in

22  communication with Task Force Officer Leach.

23  Q.   Okay.  Did you receive a phone call about what?

24  A.   He told me that he was conducting a drug investigation.

25  Q.   And drug investigating who and what?

1    A.    A large-scale cocaine trafficking organization that had

2    ties to the United States and all over the world.

3    Q.    From where?  And what ties to United States?

4              THE COURT:  Wait a minute.  That's two questions.

5              DEFENDANT DIDANI:  I'm sorry.

6              THE COURT:  You want to know from where first?

7    BY DEFENDANT DIDANI:

8    Q.    Yes.  From where?

9    A.    These organizations that we work have ties all over the

10   world, depending on the size of the investigation.

11   Q.    All right.  And in the specific investigation what ties --

12   these organizations, where they had ties?

13   A.    Colombia, Ecuador, Mexico, the United States and Europe.

14   Q.    And you say these organizations were sending cocaine in the

15   United States?

16   A.    Yes.

17   Q.    Yes?  Is that what your investigation show?

18   A.    That's -- yes.  These organizations not only send cocaine

19   to Europe, they also send cocaine and drugs to the United

20   States.

21   Q.    Agent Pedrini, the specific investigation that Detective

22   Leach called you, this organization, because you agree with me

23   they're a thousand organizations; right?  This specific

24   organization, you said they were sending cocaine in United

25   States?

1   A.   This investigation and this organization was responsible

2   for sending drugs to Europe and the United States.

3   Q.   So, hypothetically, if Detective Leach said this

4   organization never send any cocaine to United States, it would

5   be false or true?

6   A.   I don't -- I can't speak for Detective Leach.

7   Q.   All right.  Let's speak about you, Agent Pedrini.  Did you

8   catch anything in United States, any cocaine shipments?

9   A.   Did I, no.

10  Q.   So how do you know this organization shipping in United

11  States?

12  A.   Because I know through my 27 years of DEA that drug

13  trafficking organizations based in South America send drugs all

14  over the world, including Europe and the United States.

15  Q.   Again, that's from your experience; right?

16  A.   Yes.

17  Q.   Specifically on this organization, specifically on this

18  defendant, you claiming right now in front of the jury that

19  this defendant was sending cocaine to the United States?

20  A.   This organization was.

21  Q.   Do you know the name of the organization?

22  A.   No, not off the top of my head.

23  Q.   So how do you know sending cocaine to the United States?

24  A.   As I just said, based on my 27 years of experience, I know

25  the drug trafficking organizations based in South America send

1    cocaine all over the world to include Europe and the United

2    States.

3    Q.  All right, Agent.  We'll go back to that question.

4             In 2019, November, Detective Leach called you and said

5    what?

6    A.  He told me he was working a drug investigation here in

7    Detroit, and he had identified that this investigation was

8    sending cocaine to Europe.

9    Q.  All right.  And did he told you who he is investigating

10   here in Detroit?

11   A.  He did.

12   Q.  Who?

13   A.  Yourself, Ylli Didani.

14   Q.  I was living here in Detroit in 2018, or '19?

15   A.  You were the focus of his investigation.  I don't know if

16   you were living here or not.

17   Q.  Agent, I'm asking you a question.

18            THE COURT:  He answered the question.  Go to a new

19    one.

20   BY DEFENDANT DIDANI:

21   Q.  And he notify you about a load of 753 kilos; right?

22   A.  He did.

23   Q.  Can you tell the jury where the load was leaving from?

24   A.  Where it came from?

25   Q.  Yes, sir.

1    A.   I believe Ecuador.

2              DEFENDANT DIDANI:  Your Honor, can we show the jury

3    where is Ecuador, please?

4              THE COURT:  You want to put the map back up?

5              DEFENDANT DIDANI:  Yes, your Honor.

6              THE COURT:  You may.

7    BY DEFENDANT DIDANI:

8    Q.   Is that Ecuador?

9    A.   Can you zoom in a little bit more?  Yes.

10   Q.   Do you know the port that it left from Ecuador?

11   A.   I do not know, no.

12   Q.   And this load left a straight line to Rotterdam, the 753

13   kilos, from Ecuador to Holland?

14   A.   I don't know where the vessel stopped on the way.

15   Q.   Do you have information where the vessel stopped?

16   A.   No, I don't.

17   Q.   Do you think that vessel stopped anywhere in United States?

18   A.   I'm not sure.

19   Q.   So, to be fair, the vessel left Ecuador and went straight

20   line to Rotterdam, because you don't know; right?

21   A.   Correct.

22   Q.   All right.  And what happened there in Rotterdam?

23   A.   I'm sorry.  Can you say that again?

24   Q.   What happened in Rotterdam, in the port, what happened?

25   A.   The cocaine was seized.

1    Q.   It was seized by who?

2    A.   The Dutch National Police.

3    Q.   And do you know -- do you remember when it was seized, or

4    no?  Do you remember the date, or no?

5    A.   Yes.  It was August 12th of 2019.

6    Q.   All right.  So when did you find out that that load it was

7    seized?

8    A.   When I spoke to Task Force Officer Leach.

9    Q.   And when did you spoke to Task Force Leach?

10   A.   In November.

11   Q.   So that's -- to be fair, it was August, September, October,

12   November -- four months?

13   A.   Correct.

14   Q.   Is that four months after the load was seized?

15   A.   Correct.

16   Q.   So basically, to be clear over here for the jury and the

17   Court, you had no idea about the load; right?

18   A.   I was not aware of the load, no, until I spoke to Task

19   Force Officer Leach.

20   Q.   Do you know if -- it might be hearsay, but did Detective

21   Leach inform you that he had no idea about that load either?

22   A.   He told me -- he's the one who alerted me about the load.

23   Q.   Alerted to seize the load or what?

24   A.   Correct.  He didn't know about it once it -- when it took

25   place, but he learned about it after the fact.

1   Q.  So United States has nothing to do with that load that was

2   seized?

3   A.  At that time, no.

4   Q.  And then why I'm being charged for it?

5           MR. BILKOVIC:  Judge, objection.  Calls for a legal

6   conclusion.

7           THE COURT:  It does.  Go to a new question.

8   Sustained.

9   BY DEFENDANT DIDANI:

10  Q.  So, Agent Pedrini, if someone claims that that load was

11  seized as a result of United States DEA office 6 and United

12  States office, is that false or true?

13  A.  I'm sorry.  Can you repeat the question?

14  Q.  If someone claims -- if someone claims that that load, the

15  752 kilos or 753 kilos, it was seized as a result of DEA office

16  and U.S. Attorney, Mr. Bilkovic, you think it's true or false?

17  A.  That the load was seized based off this investigation?

18  Q.  Based off this attorney's office and Detective Leach.

19          THE COURT:  So Detective Leach and the United States

20  Attorney's Office in the Eastern District of Michigan, is that

21  what you're asking?

22          DEFENDANT DIDANI:  Yes, your Honor.  Thank you.

23  BY DEFENDANT DIDANI:

24  Q.  Do you think that would be true or false?

25  A.  That it's related to this investigation, then it's true.

1  Q.  That the load was seized because of United States office,

2  Eastern District?

3  A.   No.  The load was seized prior to my conversation with

4  Detective Leach.

5  Q.  All right, Agent.  Let me put --

6          DEFENDANT DIDANI:  Your Honor, I would like to put a

7  -- at this moment maybe you can -- maybe Agent Pedrini can help

8  us out or maybe he can get a understanding.  I would like to

9  put a certificate over here of Commander Ian Starr.

10          THE COURT:  A what?

11          DEFENDANT DIDANI:  Of a specific load.

12          THE COURT:  A what?

13          DEFENDANT DIDANI:  On a specific load.

14          THE COURT:  What would you like to do with it?

15          DEFENDANT DIDANI:  I would like to share it with

16  Mr. Pedrini.  Maybe he can give me an understanding about this

17  load, whether it was seized as a result of this office or this

18  office has --

19          THE COURT:  Maybe not that question.  If you want to

20  ask him a different question, you can.

21          Do you have any objection to him showing him the

22  certificate?

23          MR. BILKOVIC:  I do for this purpose, your Honor.  He

24  didn't write the certificate.  He has nothing to do with the

25  certificate.

1                    THE COURT:  And so what -- why do you want to show the

2      certificate?  It will help him remember something or what?

3                    DEFENDANT DIDANI:  Agent Pedrini -- it was the breach

4      between Dutch authorities and this office.  Agent Pedrini knows

5      very well who seized that load.

6                    THE COURT:  Well then ask him the question first, and

7      then perhaps you can show him the certificate.

8      BY DEFENDANT DIDANI:

9      Q.   Is this load, the 753 kilos, Agent Pedrini, it was seized

10     as a result of United States sharing information with you or it

11     was seized just the Dutch authorities?

12     A.   It was seized by the Dutch authorities.

13     Q.   So United States doesn't have nothing to do with this load

14     seized?

15     A.   Now they do.

16     Q.   Agent Pedrini, my question to you is not what they have

17     nothing to do now.  My question is when the load was seized on

18     August 12, 2019 -- Agent Pedrini, please, if you don't

19     understand my English, I will clear it for you.  In August 12,

20     2019, this load was seized because the Dutch authorities or

21     United States authorities --

22     A.   I believe because of the Dutch authorities.

23     Q.   So, to be clear, United States has nothing to do with that

24     load; right?

25     A.   At that time, correct.

1    Q.   Thank you.

2              THE COURT:  Now, let me ask you a question.  The 750

3     some kilos, is that from April 12th?

4              THE WITNESS:  No, August 12th.

5              THE COURT:  August 12th, okay.

6              THE WITNESS:  Of 2019.

7              THE COURT:  Got it.  All right.  Go to a new question.

8    BY DEFENDANT DIDANI:

9    Q.   So basically we go go with Detective -- that was a question

10   for Detective Leach.  Basically Detective Leach called you in

11   November and notified you about this specific load?

12   A.   Yes.

13   Q.   All right.  So United States has nothing to do with that

14   until November?

15   A.   Correct.

16   Q.   What did you find out about the load, sir?  Once you

17   find -- once you got the information from Detective Leach four

18   months later then you called the Dutch authorities?

19   A.   Yes.

20   Q.   What did you ask them?

21   A.    If there was a seizure made related to that information.

22   Q.   And did you ask them about -- specifically about the

23   company?

24   A.   Yes.

25   Q.   And what company they told you?

1  A.   The one company that I can remember off the top of my head

2  was Bioexpor, because that was on the videos that I saw, some

3  of the bags.

4  Q.   And what the Dutch authorities say about this company?

5           THE COURT:   What did who?

6  BY DEFENDANT DIDANI:

7  Q.   The Dutch authorities said about this company?

8  A.   I learned that Bioexpor had been on the Dutch National

9  Police radar for quite some time.

10  Q.   I want to stay a little bit -- so you familiar with MLAT;

11  right?

12           THE COURT:   Familiar with what?

13           DEFENDANT DIDANI:   MLAT, M-L-

14           THE WITNESS:   MLAT?

15  BY DEFENDANT DIDANI:

16  Q.   MLAT.

17  A.   Yes.

18  Q.   The Dutch authorities, the specific company and this

19  company, right, let's say this company, Bioexpor; right?

20  Bioexpor?  Is that --

21  A.   That's one of the companies that was identified in this

22  investigation.  There were several others.

23  Q.   No.  We staying on this company for a moment, Agent

24  Pedrini.

25           So, to be fair, once the company been investigated all

1    the time, right, the Dutch authorities do they have this
2    company on alert all the time?
3    A.   Sometimes, yes.
4    Q.   So either after -- four or five months later after the
5    seizure of 752 kilos, Dutch authorities always had that company
6    on alert; right?
7    A.   Like I said, sometimes.
8    Q.   Do you know something -- the specific company, it was two
9    more loads seized in Vlissingen, Holland?
10   A.   Yes.  V-L-I-S-S-I-N-G-E-N, Vlissingen.
11   Q.   So the same company was involved in a lot of other
12   transports; right?
13   A.   Yes.
14   Q.   What about those two loads?  This defendant is charged in
15   those two loads?
16   A.   I'm not sure.  The seizures that took place in Vlissingen,
17   I'm not sure.
18   Q.   Why not?
19             MR. BILKOVIC:  Objection.
20             THE COURT:  "Why not" meaning why not is he sure?
21             DEFENDANT DIDANI:  Yes, your Honor, why not he's not
22    sure.
23             THE WITNESS:  I'm here to testify to the three
24    seizures that I was part of.
25             THE COURT:  Go to your question.

 1              DEFENDANT DIDANI:  Your Honor, I want to show Agent

 2     Pedrini a page from MLAT.  Your Honor, if you allow --

 3              THE COURT:  You want to show what?

 4              DEFENDANT DIDANI:  It's a page MLAT of other loads

 5     that specifically Mr. Pedrini -- Agent Pedrini --

 6              THE COURT:  Specifically what?

 7              DEFENDANT DIDANI:  A few more loads, Agent Pedrini

 8     asked through MLAT those two loads that he say.

 9              MR. FINK:  Your Honor, I'm going to mark this page as

10     Defendant's proposed O.  It's a page of the Dutch MLAT.

11              THE COURT:  Okay.  Has the Government seen it?

12              MR. BILKOVIC:  I have, your Honor.

13              THE COURT:  Okay.

14              MR. FINK:  May I, Judge, approach?

15              THE COURT:  Yes.

16     BY DEFENDANT DIDANI:

17     Q.  Agent Pedrini, do you remember that?

18     A.  Yes.

19     Q.  You requested Dutch authority MLAT, you requested more

20     loads, right, samples for more loads?

21     A.  Correct.

22     Q.  Do you know if you pay attention to Vlissingen; right?

23     Vlissingen?

24              THE COURT:  Wait.  Are you asking him to listen?

25              DEFENDANT DIDANI:  No, no.  No, no, I'm not.

```
1              THE WITNESS:  Port of Vlissingen.
2              THE COURT:  Oh, okay.  All right.
3              DEFENDANT DIDANI:  It's the Port of Vlissingen.
4    BY DEFENDANT DIDANI:
5    Q.   You requested samples for those loads, but you don't know
6    if I'm charged with those loads or not?
7    A.   Correct.  I'm not aware.
8    Q.   Do you know why I haven't got charged with those loads?
9    A.   I don't.
10             MR. BILKOVIC:  Objection, your Honor.  First of all,
11   he said he doesn't know if he is charged, so he couldn't
12   possibly know why he hasn't been charged.  So I think it's been
13   basically asked and answered.
14             DEFENDANT DIDANI:  I'll pass, your Honor.
15             THE COURT:  Okay.  Very good, because I think that's
16   sustained.
17             How do you spell this place again, V-L-S-S-I-N-G --
18             THE WITNESS:  V-L-I-S-S-I-N-G-E-N, Vlissingen.
19             THE COURT:  Okay.
20   BY DEFENDANT DIDANI:
21   Q.   How many times you been at Rotterdam port?
22   A.   How many times have I?
23   Q.   Yes, sir.
24   A.   In the course of six years, probably a hundred.
25   Q.   And you have seized a lot of drugs there?
```

1    A.   Dutch authorities seized a lot of cocaine.

2    Q.   And why you participated on those in Dutch authorities?

3    A.   Like I said earlier, the DEA does drug investigations that

4    are worldwide.  And in my time in The Hague I was always

5    getting leads from our offices worldwide related to cocaine

6    shipments that were being delivered to the Port of Rotterdam.

7    And, like I said earlier, these same organizations are

8    responsible for sending drugs to the United States.

9    Q.   But you're not sure if this -- you keep saying that, but I

10   asked you if this organization send any cocaine to the United

11   States, but you can't --

12           MR. BILKOVIC:  Objection, asked and answered.  We've

13    already gone over this.

14           THE COURT:  Asked and answered.  Go to a new question.

15   BY DEFENDANT DIDANI:

16   Q.   You had opportunity to see the superseding indictment?

17   A.   No.

18   Q.   Do you think this defendant is charged with any shipment of

19   cocaine to the United States?

20   A.   I have no idea.

21   Q.   Does the Dutch investigators have their own investigation?

22   A.   I'm sorry?

23   Q.   Dutch authorities, do they have their own investigation on

24   that 753 kilos?

25   A.   They did.  They arrested five individuals.

 1   Q.   Did you follow up with that investigation?

 2   A.   I did not, no.

 3   Q.   Did Dutch authorities know anything about me?

 4   A.   About you?

 5   Q.   Yes, sir.

 6   A.   Yes, they do.

 7   Q.   Are they having a case against me?

 8   A.   They did.

 9   Q.   So I'm still wanted in Holland?

10   A.   I didn't say you were wanted.  I said they had an

11   investigation on you.

12   Q.   And from your knowledge, since you work hand to hand with

13   the Dutch authorities, is Dutch authorities going to prosecute

14   me for those loads?

15               MR. BILKOVIC:  Objection, relevance.

16               THE COURT:  How is it relevant?

17               DEFENDANT DIDANI:  Your Honor --

18               THE COURT:  It's not relevant to whether or not you're

19    being prosecuted in the United States, and that's sustained.

20   BY DEFENDANT DIDANI:

21   Q.   Let's go to the load, 644 kilos.

22   A.   Okay.

23               THE COURT:  What's the date on that one?

24               DEFENDANT DIDANI:  According to --

25               THE WITNESS:  February 22nd.

```
 1              THE COURT:  Okay.
 2   BY DEFENDANT DIDANI:
 3   Q.   2020?
 4   A.   Correct.
 5   Q.   And where the load originated from?
 6   A.   Ecuador.
 7   Q.   From Ecuador?
 8   A.   Yes.
 9   Q.   And you say that load -- you mentioned earlier that that
10   load was loaded in the sea?
11   A.   Yes.
12   Q.   Where in sea?
13   A.   I have no idea.
14   Q.   How do you know it's at sea?
15   A.   You could tell by the video.
16              DEFENDANT DIDANI:  Does the Government have the
17   exhibit?
18              MR. BILKOVIC:  We're going to admit it through another
19   witness.
20              DEFENDANT DIDANI:  Your Honor, can this defendant
21   admit this video now so I can understand where, since Agent
22   Pedrini is testifying that it was at sea, through the video?
23   Can we enter the video, your Honor?
24              THE COURT:  Well, I guess you need to ask the
25   Government.  They are -- you would normally have them lay a
```

```
 1   foundation for the video, and if you're happy for them to lay

 2   the foundation later and you want to show it so he can say how

 3   he knows it's at sea you may ask them.  They're right behind

 4   you.  Just ask them.

 5           MR. BILKOVIC:  I have no objection.

 6           DEFENDANT DIDANI:  They have no objection, your Honor.

 7           THE COURT:  Okay.

 8           MR. FINK:  What number, Mark?

 9           Do you know what number, Mr. Didani?

10           THE COURT:  Is it marked as an exhibit on behalf of

11   the Government?

12           DEFENDANT DIDANI:  Yes, your Honor.

13           THE COURT:  Okay.  All right.  Someone from the

14   Government --

15           MR. BILKOVIC:  I think I know what it is, your Honor.

16   I just want to check one thing to make sure.

17           (Briefly off the record.)

18           THE COURT:  Are you going to tell the Court what

19   exhibit number it is?

20           DEFENDANT DIDANI:  It's exhibit -- your Honor --

21           MR. FINK:  Mark, what was it again?

22           MR. BILKOVIC:  80.4 and 80.5.

23           DEFENDANT DIDANI:  80.4 and 80.5, your Honor.

24           THE COURT:  Okay.  And so does the Government have any

25   objection so I can just admit those?
```

    1            MR. BILKOVIC:  No objection, your Honor.

    2            THE COURT:  You're going to show him; right?

    3            DEFENDANT DIDANI:  Yes, your Honor.

    4            THE COURT:  All right.  Then they're admitted.

    5            MR. FINK:  Judge, Government's 80.4 -- Government's

    6    exhibits on those two numbers.

    7            THE COURT:  They're Exhibit numbers 80.4 or 84?

    8            MR. BILKOVIC:  80.4.

    9            THE COURT:  And 80.5; right?

   10            MR. BILKOVIC:  Correct.

   11            MR. FINK:  Correct, Judge.  Thank you.

   12            THE COURT:  Okay.  Thank you.  Which one is up there

   13    now?

   14            MR. FINK:  This is 80.4.

   15            THE COURT:  Okay.

   16            MR. FINK:  If it doesn't have sound, I might --

   17            THE COURT:  Is there sound?

   18            DEFENDANT DIDANI:  There is sound, your Honor, on

   19    those videos.

   20            THE COURT:  Well, are you going to play the sound,

   21    too?

   22            MR. FINK:  Ms. DiCarlo, do you have them handy with

   23    your sound --

   24            MS. DICARLO:  Yes.

   25            THE COURT:  Can you show them so we can hear the

1    sound, please.

2              (Briefly off the record.)

3              THE COURT:  Don't show it until we can show it with

4    the sound.

5              The jury may step down.

6              (The jury left the courtroom at 11:57 a.m.)

7              THE COURT:  Do you all need help figuring out the

8    sound?

9              MR. McDONALD:  No.  I just think we were unprepared.

10   We did not know Mr. Didani wanted to --

11             THE COURT:  I'm not holding you accountable, but you

12   certainly couldn't be prepared for that.  I'm just wondering if

13   you need assistance relative to --

14             MR. McDONALD:  We do not need assistance.  We have a

15   speaker.  We're getting it ready, your Honor.

16             THE COURT:  All right.  Everyone may be seated while

17   we're waiting for this to happen.

18             DEFENDANT DIDANI:  Your Honor, I apologize for this.

19             THE COURT:  It's your responsibility, Mr. Didani,

20   because you're the one who wants to show it as a representative

21   of yourself.

22             DEFENDANT DIDANI:  Yes, your Honor, but --

23             THE COURT:  But nothing.

24             DEFENDANT DIDANI:  I was just saying, your Honor, I

25   was not expecting Agent Pedrini to testify there was loads in

 1    the sea, you know, when Agent Pedrini is only in Rotterdam.

 2    That's why we --

 3              THE COURT:  So are you working on the sound?

 4              No, no, I didn't mean you.  I meant Mr. Didani.

 5    You're asking the Government to work on the sound for you, is

 6    that correct, so the record will be clear?

 7              DEFENDANT DIDANI:  Yes.

 8              MR. McDONALD:  So that the record is clear, Mr. Didani

 9    wants to show three videos.  We have those videos.  We're

10    locating -- we've located them.  We're just working on the

11    sound.

12              THE COURT:  I am not criticizing the Government

13    relative to these exhibits in any way.

14              MR. McDONALD:  I know you're not, your Honor.

15              THE COURT:  I was just making a point about the

16    representation.

17              MR. McDONALD:  I know you're not.  I was just making

18    the record clear as to what's going on.  We're just working on

19    the sound right now.

20              THE COURT:  So I only have three, 80.4 and 80.5.

21    There's a third one?

22              MR. BILKOVIC:  There's one other one, your Honor,

23    78.17 -- I'm sorry, your Honor.  78.18.

24              THE COURT:  78.18.

25              MR. BILKOVIC:  And the order and the sequence in which

1    they will be played if Mr. Didani wants them played from start

2    to finish is 80.4, 78.17 -- I'm sorry.

3              THE COURT:  18?

4              MR. BILKOVIC:  I'm sorry.  17, Judge.  I'm sorry.  I

5    screwed up again.  80.4, then 78.17 and then 80.5.

6              THE COURT:  Okay.

7              MR. BILKOVIC:  Judge, I screwed up one more time.

8    This time I have it, I'm positive.  80.5 will go first.

9              THE COURT:  80.5 and then what?

10             MR. BILKOVIC:  And then 78.17 and then 80.4.

11             THE COURT:  Okay.  Do you want to try them out ahead

12   of time?

13             MR. BILKOVIC:  Yes, please.

14             THE COURT:  When you're ready.

15             (Briefly off the record.)

16             THE COURT:  Now, let me just ask, Mr. Didani, do you

17   want to show all three of the videos and then ask questions, or

18   how do you want to do this?

19             DEFENDANT DIDANI:  My question was if it was at sea,

20   and that's why we're showing the videos.  I mean, if the Court

21   doesn't want -- all three videos --

22             THE COURT:  Do you know what, it's not what the Court

23   wants.  My question is do you want me to show -- have them show

24   all three videos and then you question the witness, or do you

25   want to show one and then question the witness and then this

1    next one and then question the witness and then the third one

2    and question the witness?

3              DEFENDANT DIDANI:  Yes, your Honor.

4              THE COURT:  The second way?

5              DEFENDANT DIDANI:  The second way, every video.

6              THE COURT:  All right.  You've got that over there at

7    the Government's table; right?

8              MR. BILKOVIC:  Yes, Judge.

9              THE COURT:  Okay.  Let's bring out the jury.

10             LAW CLERK:  All rise for the jury.

11             (The jury entered the courtroom at 12:04 p.m.)

12             THE COURT:  Okay.  I'm satisfied the jurors are all

13   present.

14             Are you satisfied, gentlemen?

15             MR. BILKOVIC:  Yes, your Honor.

16             DEFENDANT DIDANI:  Yes, your Honor.

17             THE COURT:  Okay.  Well, everyone may be seated.

18             And, sir, you're still under oath.

19             THE WITNESS:  Yes, your Honor.

20             THE COURT:  I have admitted exhibits.  They're labeled

21   Government Exhibits 80.5, 80.4 and 78.17, and they're going to

22   be shown in the following order I think:  80.5, 78.17 and 80.4;

23   is that correct?

24             MR. BILKOVIC:  That's correct, your Honor.

25             THE COURT:  Okay.  And following each -- and I'm

1    admitting all of them.  And following each Mr. Didani is going

2    to ask some questions.

3                So you may proceed?

4                Can you see that?

5                THE WITNESS:  I can, yes.

6                (Video played.)

7    BY DEFENDANT DIDANI:

8    Q.   Agent Pedrini, do you see anywhere sea there?

9    A.   I'm sorry?

10   Q.   Does this video indicate anything was around the sea or

11   anything?

12   A.   Just based on the noise and the close proximity of all the

13   people involved, I believe the container was on a vessel at

14   sea.

15   Q.   So the Spiderman; right?  We go call that individual the

16   Spiderman; right?

17   A.   Sure.

18   Q.   Who is he?

19   A.   I have no idea.

20   Q.   Is he maybe a corrupt crew member?

21   A.   Maybe.

22   Q.   You indicated in your report there was corrupt crew

23   members; right?  And then this crew member, the Spiderman,

24   belongs to the CMA; right?

25   A.   Belongs to the what?  I'm sorry.

1   Q.   To the vessel, CMA vessel, Jean Gabriel.

2   A.   Probably, yes.

3          DEFENDANT DIDANI:  Can we go to the video number 2.

4          (Video played.)

5   BY DEFENDANT DIDANI:

6   Q.   Agent Pedrini, one more time, the video, do you see

7   anywhere that it was a sea around, or no?

8   A.   No, but in that video it's really clear that you could see

9   that it was on a vessel based on the white bar, that they

10  couldn't open the door fully, that white bar.  And then there

11  was a framed out metal pod that you could tell.  And then there

12  was a hallway that was really narrow.  And you saw that they

13  removed the pallet of produce to put the bags on.  In that

14  video, you could really tell that the container was on a

15  vessel.

16  Q.   All right.  But you said it was loaded at sea.  Where at

17  sea?

18  A.   I have no idea, but I know it was on a vessel.  It could

19  have been off the coast of Ecuador, which most likely was the

20  case, or even at port in Ecuador.

21  Q.   When you say coast of Ecuador, you saying international

22  waters?  Would that be fair?

23  A.   No, I'm not even sure.  It could have been maybe a few

24  hundred yards off the coast of the port in Ecuador.

25  Q.   When you say the coast of Ecuador, could it be the ship was

1  moving at that time?

2  A.  Again, I'm not positive, but I know that it was at sea,

3  because we can tell from the videos that the container was on

4  the vessel, and the vessel was in the water.

5  Q.  Well, the vessel is in the water, Agent.

6  A.  Correct.

7  Q.  It can't be on the land; right?

8  A.  Right.

9  Q.  So we're just trying to figure out -- I'm trying to ask you

10  the questions whether -- where at sea?

11  A.  That I don't know, but the vessel was on sea, correct.  So

12  I said that the vessel was -- the bags were placed at sea.

13        DEFENDANT DIDANI:  Can we play video number 3, your

14  Honor, please?

15        THE COURT:  Yes, you may.

16        (Video played.)

17  BY DEFENDANT DIDANI:

18  Q.  So to be clear for the jury, we don't know if it was a port

19  or if it was the sea or anything?

20  A.  It was on the vessel, and the vessel was at sea, on the

21  ocean.

22  Q.  So the vessel -- when you say on the ocean, so we can

23  understand, the jury, we say in international waters; right?

24  A.  No, I will not say that.  We can't tell where the vessel

25  was loaded.

1   Q.  Well, how do you know it was loaded on the ocean?

2   A.  Because the vessel -- you can tell 100 percent that the

3   container was on the vessel.

4   Q.  All right.

5   A.  It was on the hallway.  And the bar, the white bar that

6   they can't open the door all the way, and the little porthole

7   that -- the porthole that you can see the container from.  And

8   based on the noise also you can tell that the container is on

9   the vessel.  And in that video also you can see the seals being

10  placed on the doors that we talked about earlier.

11  Q.  All right.  So we can leave the container for a second.

12  The vessel -- the vessel is located in port or international

13  waters?

14  A.   I don't know.  I just know that that container was loaded

15  on the vessel, and the vessel was at sea, or on the sea.

16  Q.  Well, when you say in sea, we have to have clear --

17          MR. BILKOVIC:  Objection.  He's asked this, he's

18   answered it.

19          THE COURT:  He has, and he's answered whether it was

20   in international waters at least three times.  Go to a new

21   question, please.

22  BY DEFENDANT DIDANI:

23  Q.  And where the container originated from?  You say Ecuador?

24  A.   It came from Ecuador, but there's only three source

25  countries that produce cocaine, and they're Bolivia, Peru and

 1   Colombia.

 2           DEFENDANT DIDANI:  Your Honor, I want to enter -- I

 3   want to enter the bill of lending (sic) for this container.

 4           MR. BILKOVIC:  So you're no longer objecting to this,

 5   because initially you were objecting to this?

 6           DEFENDANT DIDANI:  No, no.

 7           (Briefly off the record.)

 8           MR. FINK:  Judge, I've marked what Mr. Didani is

 9   discussing as Defendant's Exhibit proposed P, as in Paul.

10           THE COURT:  Okay.

11           MR. FINK:  It's been shown to the Government, and

12   Mr. Didani asked me to give it to the witness.

13           Mr. Didani.

14           DEFENDANT DIDANI:  Yes.  Your Honor, can I please --

15           Mr. Fink.

16           MR. FINK:  Thank you, Judge.

17   BY DEFENDANT DIDANI:

18   Q.   Is that -- Agent Pedrini, is that the bill for that load,

19   644?

20           THE COURT:  The what?

21           THE WITNESS:  The bill of lading.

22           DEFENDANT DIDANI:  Bill of lending, your Honor.

23           THE COURT:  For what shipment?

24           DEFENDANT DIDANI:  The shipment we just saw, the 644

25   -- the shipment that originated from Ecuador.

1          THE WITNESS:  Yes.

2          DEFENDANT DIDANI:  Your Honor, at this point I want to

3   post that to the jury for the jury to see it.

4          THE COURT:  You want it admitted?

5          DEFENDANT DIDANI:  Admitted.

6          THE COURT:  Does the Government have any objection?

7          MR. BILKOVIC:  Your Honor, I don't, but I want to just

8   make sure we're clear on something.  This was an exhibit also

9   the Government had marked as 41.0 that Mr. Didani did pose an

10  objection to prior to trial, and that issue has not been

11  resolved yet.  So to that extent that he's withdrawing his

12  objection, then I have no objection.

13         THE COURT:  Are you withdrawing your objection?

14         DEFENDANT DIDANI:  Yes, your Honor.

15         THE COURT:  All right.  It's withdrawn, and it will

16  now be Defendant's Exhibit --

17         And you haven't used 41.0; right?

18         MR. BILKOVIC:  No, but I will eventually.  So I don't

19  need it --

20         THE COURT:  Okay.  And so now it's P, okay.

21  Defendant's P is admitted.

22         DEFENDANT DIDANI:  Thank you, your Honor.

23         THE COURT:  You may show it to the jury.

24         DEFENDANT DIDANI:  Can we show it to the jury?

25         MR. FINK:  Judge, just to be clear, I'm going to use

 1    the Government's 41.0 for ease of electronic showing, but it is

 2    identical to Defendant's P.

 3              THE COURT:  Okay.

 4              DEFENDANT DIDANI:  Can you zoom in, please, Mr. Fink.

 5              MR. FINK:  Mr. Didani, you've got to tell me what you

 6    want to do.  Give me specifics and I'm happy to help.

 7    BY DEFENDANT DIDANI:

 8    Q.   Agent Pedrini, you indicated to the jury that this

 9    container was originated from Ecuador?

10    A.   That's what I thought, yes, but I obviously misspoke.  The

11    container originated out of Chile.

12    Q.   So the container is originated from Chile, Peru; right --

13    Chile -- San Antonio, Chile?

14    A.   San Antonio, Chile, yes.

15    Q.   So Ecuador with San Antonio, Chile is two different

16    countries; right?

17    A.   Correct.

18              DEFENDANT DIDANI:  Mr. Fink, can you put where San

19    Antonio, Chile is, please.

20              THE COURT:  You want to show the map?

21              DEFENDANT DIDANI:  The map, your Honor, please.

22              No objection?  Any objection?

23              MR. BILKOVIC:  No objection.

24              DEFENDANT DIDANI:  Can you show Ecuador, Mr. Fink,

25    please.

1    BY DEFENDANT DIDANI:

2    Q.   So Ecuador is between Colombia and Peru; right?

3    A.   Correct.

4    Q.   San Antonio, Chile is down there, it's about four or 5,000

5    miles away?

6    A.   Correct.

7    Q.   So that container not originated from Ecuador?

8    A.   You're right.  You're right.  I made a mistake, but the

9    vessel, Jean Gabriel, probably stopped on its way to Europe at

10   several other ports in South America.

11   Q.   Agent Pedrini, so we got a load, the 752 kilos that DEA and

12   this office, United States, Eastern District of Michigan had no

13   idea, they find out four months later.  Now we have another

14   load --

15            MR. BILKOVIC:  Hold on.  I'm going to object.  I would

16   ask that he ask a question instead of making comments about

17   previous testimony and the Government's theory of the case.

18            THE COURT:  Well, I have instructed the jury that they

19   are to ignore the comments that he makes on the testimony,

20   because only his questions are permitted and just the answers

21   are the testimony.

22            So pose a question and try not to comment on the

23   testimony, or give any while you're asking a question.

24            What's your question?

25

```
 1   BY DEFENDANT DIDANI:
 2   Q.  So basically, Agent Pedrini, that container not originated
 3   from Ecuador?
 4   A.  Correct.  It originated in Chile.
 5   Q.  And that Chile with Ecuador is like 5,000 miles away;
 6   right?
 7   A.  That's correct.  But, like I said, the Jean Gabriel, that
 8   vessel, must have -- did make numerous stops in South America
 9   before heading to Europe.
10   Q.  Mr. Pedrini -- Agent Pedrini, to be fair ...
11           THE COURT:  Is that a question?
12   BY DEFENDANT DIDANI:
13   Q.  To be fair, you don't know for sure?
14   A.  I do.
15   Q.  Right now?
16   A.  Yes.  That vessel definitely stopped at other ports in
17   South America.  That's my educated guess.
18   Q.  All right.  So now we have it clear.  And then February --
19   Detective Leach called you and he gave you those information;
20   right?
21   A.  Correct.
22   Q.  And he told you he got this information from where?
23   A.  He obtained those videos.
24   Q.  Obtained them from where?  Did he give you information from
25   where, or no?
```

1    A.    I believe your iCloud account.

2    Q.    Did he told you that there was a Dutch number send those

3    videos to my iCloud, or no?

4    A.    I'm sorry?

5    Q.    Did he told you that there was a Dutch number send those

6    to -- from a Dutch number went to supposedly, allegedly, to my

7    iCloud; right?

8    A.    I think it might have been the other way around that those

9    videos were sent to a Dutch phone number.  I'm not sure.  I

10   don't know off the top of my head, but there was a Dutch number

11   involved for sure.

12   Q.    Did you ever ask Dutch authorities if there was a Dutch

13   number involved and the Dutch number send it to allegedly my

14   number or my number to the Dutch?

15   A.    No.  Any Dutch number that I received I provided to the

16   Dutch National Police.

17   Q.    Did you ever investigated that Dutch number, Agent Pedrini?

18   A.    I believe the Dutch police did, yes.  I don't know the

19   outcome, though.

20   Q.    I have a report here.  So maybe you can -- because it's

21   very important.

22          DEFENDANT DIDANI:  Your Honor, if you'll allow me.

23   It's a report between Agent Leach, Pedrini and Dennis McCradey,

24   all three of them.

25          THE COURT:  And you want to do with it -- what with

 1   it?

 2           DEFENDANT DIDANI:  To refresh his memory, whether it

 3   was my iCloud, alleged iCloud number send it to the Dutch or

 4   the Dutch send it to me.

 5           THE COURT:  That's fine.  And you're showing him a

 6   report of Mr. Leach on what date?

 7           DEFENDANT DIDANI:  It's Page 00194, your Honor.

 8           THE COURT:  What date?

 9           DEFENDANT DIDANI:  The date is 3-12, 2020.

10           THE COURT:  All right.

11           MR. FINK:  Judge, may I?

12           THE COURT:  Yes, you may.

13           MR. FINK:  I'm taking a whole binder, but I'm going to

14   point to the portion Mr. Didani is going to ask questions about

15   from what he identified, Judge.

16           THE COURT:  All right.  Thank you.

17   BY DEFENDANT DIDANI:

18   Q.  Agent Pedrini.

19   A.  Yes.

20   Q.  There was a Dutch number sent those videos to alleged -- my

21   iCloud?

22           THE COURT:  Well, first ask if it refreshes his

23   recollection.

24           DEFENDANT DIDANI:  Okay.

25           THE COURT:  Can you ask that first?

1  BY DEFENDANT DIDANI:

2  Q.   Did you refresh your recollection, Agent Pedrini?

3  A.   Well, I didn't write this report.  So this is my first time

4  seeing this, but can you direct me to which paragraph I'm

5  looking at?

6          THE COURT:  Mr. Fink, you can step back up.

7          MR. FINK:  Thank you, your Honor.

8          THE COURT:  And even if it's not your report we want

9  to know if it refreshes your recollection and makes you

10  remember.

11          THE WITNESS:  Right.

12          MR. FINK:  I'm pointing to paragraph 4.  That's what

13  was pointed out by Mr. Didani, Judge.

14          THE COURT:  Thank you.

15          THE WITNESS:  I'm sorry.  This doesn't recall my

16  memory at all, because I had nothing to do with this report.

17  It just says --

18          THE COURT:  You don't need to tell us what it says.

19          THE WITNESS:  Okay.

20          MR. FINK:  Can I retrieve it, Judge?

21          THE COURT:  Yes.

22          MR. FINK:  Thank you.

23          THE COURT:  It doesn't refresh his memory.  You can go

24  to a new question.

25

1    BY DEFENDANT DIDANI:

2    Q.   Agent Pedrini, you indicated that Dutch authorities seized

3    a load in February 22?

4    A.   Yes.

5    Q.   You was there?

6    A.   I was.

7    Q.   You waited for the ship to come?

8    A.   I'm sorry?

9    Q.   Did you waited for the ship --

10   A.   At my house I waited for it to come.

11   Q.   You was not there in the port?

12   A.   No.

13   Q.   When you got to the port, when did you arrive?

14   A.   Not until the container was controlled and brought to the

15   Dutch Customs facility.

16   Q.   When you say Dutch Customs facility, that's a warehouse?

17   A.   It's a little bit more than a warehouse, but yes.  It's a

18   facility for Dutch Customs offices.

19   Q.   So you don't have no picture -- let me ask you a question.

20   I'm sorry.  Strike that.

21        Let me ask you a question, Agent Pedrini.  According

22   to MLAT, did you have the opportunity to look at the MLAT?

23   A.   The MLAT?

24   Q.   Yes.

25   A.   Yes.

1  Q.  Did you have the opportunity to see that I was investigated

2  for maritime drug laws?

3  A.  I'm sorry.  Can you say that one more time?

4  Q.  Did you have the opportunity -- MLAT from Eastern District

5  of Michigan, that I was investigated for maritime drug laws?

6        MR. BILKOVIC:  Judge, I would object.  I don't know

7  what that has to do with this witness' testimony and how that

8  would impact his testimony at all.  It's irrelevant.

9        THE COURT:  How is it relevant?

10       DEFENDANT DIDANI:  Well, my next question will be

11  relevant, your Honor, to his testimony, your Honor.  That's

12  what -- I just wanted to --

13       THE COURT:  How is it relevant?  If you have an

14  objection, you have to tell us how it's relevant.

15       DEFENDANT DIDANI:  Strike that.

16       THE COURT:  Sustained.  Go to a new question.

17  BY DEFENDANT DIDANI:

18  Q.  Agent Pedrini, when you got the information from Detective

19  Leach, you knew the load it was in the ship; right?

20  A.  Correct.

21  Q.  Did you call the Coast Guard to stop the ship?

22  A.  No.

23  Q.  Why not?

24  A.  I called the Dutch authorities.

25  Q.  Why you didn't call the Coast Guard?

1    A.   That's not our protocol.

2    Q.   What is your protocol?

3    A.   To notify the Dutch National Police who then notify the

4    HARC team who then control -- once the vessel arrives in the

5    Port of Rotterdam, they control the container and conduct a

6    search.

7    Q.   Would it not be better for U.S. authorities to seize it?

8    What do you think?

9    A.   Not necessarily.

10   Q.   And you said that container was seized in February 22?

11   A.   Correct.

12   Q.   There is a report from MLAT from Dutch authorities that the

13   container was seized on February 21?

14   A.   Right.  And remember when I was talking about when the

15   container arrived the vessel didn't arrive until after

16   midnight?  So it arrived right at midnight.  They may have

17   controlled the container before midnight of the 21st, and then

18   it rolled into the early morning hours of the 22nd and that's

19   when I arrived.  So it was the 21st and the 22nd of February.

20   Q.   Do you agree with me that container in 22nd, 7 a.m., it was

21   in a warehouse company?

22   A.   It may have been.

23   Q.   When did you took the photos, the same day or that same

24   night?

25   A.   On the 21st/22nd.

1    Q.   Okay.  Agent Pedrini, either 21st or 22nd.  Which one --

2    A.   It was the 22nd then, because the vessel arrived late in

3    the evening on the 21st.  I didn't arrive until the early

4    morning hours, like I said, between one, two o'clock in the

5    morning on the 22nd.  That's when I took those photos.

6              So could that container have arrived at its final

7    destination by seven o'clock, certainly.

8    Q.   Did you follow with the investigation with that load, or

9    not?

10   A.   I did not, no.

11   Q.   Why not?

12   A.   That's not my -- I don't have that authority in my position

13   in the Netherlands.

14   Q.   And then a month later, so April 7 or April 6?

15   A.   Yes.

16   Q.   Detective Leach called you again?

17   A.   Again, yes.

18   Q.   He told you what?

19   A.   Almost the same scenario as what happened in February.  He

20   sent me a video of a container being loaded.  This time it was

21   in a different container obviously.  It had the green drums of

22   fruit pulp in it, and it showed me the video of the container

23   being loaded with bags.

24              I then passed that container information to the Dutch

25   National Police who passed it to the HARC team.  They conducted

```
1    a search in the evening hours of April 7th.
2    Q.   How did you pass the information to the Dutch team?
3    A.   Through the liaison bureau that we pass all -- the same way
4    that we pass all of our information through.
5    Q.   Through E-mail?
6    A.   Yes.
7    Q.   Does this E-mail exist?
8    A.   Yes.
9    Q.   You think I'm entitled to those E-mails?
10   A.   Yes.  It's actually a form that we send via E-mail.
11   Q.   And that load was seized in 2020?
12   A.   2020, correct.
13   Q.   And, to be fair, in your report where that load originated
14   from?
15   A.   Is this the one that originated from Chile?
16   Q.   No.  The one from Chile, we passed that.
17   A.   Okay.
18   Q.   The one we talking right now with the drums.
19   A.   Off the top of my head, I don't know where it originated
20   from.
21   Q.   Did it originated from Ecuador?
22   A.   I'm not sure.
23   Q.   What about Peru?
24   A.   Maybe.
25   Q.   You never did the report to it?  Did you made a report over
```

1   that load?

2   A.   I believe I did, yes, related to the seizure.

3   Q.   You don't have your report there in front of you?

4   A.   I don't.  Sorry.

5   Q.   What about the photos, you have in front of you?

6   A.   Yes.

7   Q.   Agent Pedrini, you got the photos, but you don't have the

8   report?

9   A.   Not in front of me, no.

10  Q.   You believe that load it was loaded in sea or in port?

11  A.   Again, I believe it was loaded on the vessel, and the

12  vessel was on the ocean.  Whether it was loaded on a port or at

13  sea, I'm not sure.

14  Q.   Again, you don't have no photos for the container coming

15  off the ship, do you?

16  A.   Say that again.  I'm sorry.

17  Q.   Do you have photos for those containers coming off the

18  ship, or no?

19  A.   No, no.

20  Q.   The only photos you have that's from HARC team, from Dutch

21  authorities, that was taking containers of their warehouses;

22  right?

23  A.   In my photos.

24  Q.   Yes.  You only took photos to the kilos, the photos that

25  you have in front of you?

```
 1   A.   And the container number.

 2   Q.   And the container number?

 3   A.   Yes.

 4   Q.   Do you think the Dutch authorities have a different

 5   investigation?  Did you follow up with them?

 6              MR. BILKOVIC:  Objection, relevance.

 7              THE COURT:  How is it relevant?

 8              DEFENDANT DIDANI:  Your Honor, on these reports -- and

 9   I'm going to -- he followed up with investigation, Agent

10   Pedrini, by putting GPSs on there.

11              THE COURT:  He did that?

12              DEFENDANT DIDANI:  That's what some of his reports

13   saying, your Honor.

14              THE COURT:  I'm going to allow the question.

15              THE WITNESS:  If the Dutch did a follow-up

16   investigation, I didn't put any GPS devices on the container.

17   The Dutch National Police would have.

18              THE COURT:  Did you follow the investigation?

19              THE WITNESS:  I did not.  After the cocaine was

20   seized, I did not follow up on what happened afterwards.

21              THE COURT:  Go to a new question.

22              This is overruled on the question of whether or not he

23   followed it up.

24   BY DEFENDANT DIDANI:

25   Q.   And the request, MLAT -- Agent Pedrini, your request, MLAT,
```

```
 1    it was for five different loads.  Do you remember that?
 2    A.  Yes.
 3    Q.  And you only got three different samples from three loads;
 4    right?
 5    A.  No.  I got all five samples.
 6    Q.  And what are the other samples?
 7    A.  I don't know.  I sent them to the special testing lab in
 8    Virginia.
 9    Q.  In Virginia, here in the United States?
10    A.  Yes.
11    Q.  So basically in your investigation the only person who
12    brought cocaine to the United States is you?
13    A.  I'm sorry?
14    Q.  The only person who brought cocaine in United States from
15    Holland is you?
16    A.  No, that's not true.
17    Q.  There is 45, 46, 47, the samples that Government show
18    you --
19              THE COURT:  Don't yell, please.
20              DEFENDANT DIDANI:  I'm sorry.  I'm sorry, your Honor.
21    BY DEFENDANT DIDANI:
22    Q.  Out of your investigation, the only person who brought
23    cocaine in United States --
24    A.  From Holland?
25    Q.  From Holland.
```

1   A.   Yes.

2   Q.   This defendant never brought any cocaine in the United

3   States; right?

4   A.   Who's that?

5   Q.   This defendant in front of you.

6   A.   Your organization did.

7   Q.   Do you have any proof to it, that organization brought it?

8   A.   I believe the prosecution team does.

9   Q.   The prosecution team has?  When was the last time you

10  followed up with the Dutch authorities, Agent Pedrini?

11  A.   When was the last time?

12  Q.   Yes.

13  A.   When I received the samples --

14  Q.   2020?

15  A.   I think -- yeah -- yes, 2020.

16  Q.   In your experience or your knowledge, do you think Dutch

17  authorities prosecuting this case in Holland?

18           MR. BILKOVIC:  Objection, relevance.

19           THE COURT:  How is it relevant?

20           DEFENDANT DIDANI:  Skip it, your Honor.  We'll skip

21   it.

22           THE COURT:  All right.  It's noted that it's

23   withdrawn.  Go to a new question.

24  BY DEFENDANT DIDANI:

25  Q.   You said the organization was bringing cocaine here, but

1    did you have the opportunity to check MLAT, the request from

2    Eastern District of Michigan of the prosecution team?

3    A.   The one to the Netherlands, yes.

4    Q.   Does it say anywhere on the MLAT that this organization

5    bringing any cocaine in the United States?

6    A.   I can't recall.

7    Q.   Can I refresh your memory?

8              THE COURT:  You can.

9              MR. BILKOVIC:  Judge, I don't know what relevance it

10   would be what the MLAT, which is a document between counsel,

11   has to do with this witness' testimony.

12             DEFENDANT DIDANI:  Your Honor, the relevance is --

13             THE COURT:  If he -- go ahead.  Go ahead, Mr. Didani.

14             DEFENDANT DIDANI:  The witness, Agent Pedrini, just

15   said that the Eastern District of Michigan they know that we

16   brought -- they got a investigation on a organization on a load

17   here.  And it should have been in MLAT, you know.  So in the

18   request to the Eastern District of Michigan if this

19   organization was bringing any cocaine it should be there on

20   that request.  And I'm refreshing Agent Pedrini from this

21   request that is done whether this organization brought

22   so-called any cocaine to the United States.  It should be on

23   MLAT, your Honor.

24             THE COURT:  Counsel?

25             MR. BILKOVIC:  Judge, Mr. Didani's opinion of what

1    should be in MLAT to the Netherlands when we are seeking

2    cooperation from the Netherlands is not in reality what should

3    be in the MLAT.  So the fact of whether that statement is or is

4    not in the MLAT is not relevant for trial and it's not relevant

5    for this witness.

6              THE COURT:  And would it be fair to say that nothing

7    in the indictment is charging him with bringing cocaine onto

8    United States soil; is that true?

9              MR. BILKOVIC:  Charging Mr. Didani, that is correct.

10   That's correct.

11             THE COURT:  Not relevant.  Go to a new question.

12             DEFENDANT DIDANI:  I have no further questions, your

13   Honor, for this agent.

14             THE COURT:  Very well.

15             Redirect?

16             MR. BILKOVIC:  Just briefly.

17                      REDIRECT EXAMINATION

18   BY MR. BILKOVIC:

19   Q.   Do you remember the videos that you saw?

20   A.   Yes.

21   Q.   Did you see something that was different from one of the

22   individuals than all of the other individuals?

23   A.   The one -- one was wearing a mask.

24   Q.   Did that strike you at all?  Did you pay attention to that

25   when you first noticed the video?

1   A.   Yes.

2   Q.   And did you form any opinion as to why that might be?

3   A.   My opinion was that the person was trying to hide his face

4   from the video.

5   Q.   Is that something that you might expect a crew member to do

6   to try and conceal their identity?

7   A.   Yes.

8   Q.   Do you consider -- you talked about the organization

9   supplying to the United States.  Do you consider the cartel

10  that directly is supplying this --

11          DEFENDANT DIDANI:  Objection, your Honor.

12          THE COURT:  What's your objection?

13          DEFENDANT DIDANI:  He's leading the witness.

14          THE COURT:  You are leading the witness, Counsel.

15  BY MR. BILKOVIC:

16  Q.   Do you know what a cartel is?

17  A.   I do.

18  Q.   What is a cartel?

19  A.   A cartel is an organization that deals in drug trafficking

20  all over the world.

21  Q.   And, if somebody wanted the 644 kilos, or whatever that was

22  on one of those videos, where would they have to get them from?

23  A.   From one of three source countries, Colombia, Peru or

24  Bolivia.

25  Q.   And where would they get them from one of those three

1   source countries?

2   A.   From the cartels.

3   Q.   And so if a cartel is supplying cocaine to somebody that

4   goes to Europe do you know whether or not those cartels also

5   supply cocaine to the United States?

6   A.   They do.

7            DEFENDANT DIDANI:  Objection, your Honor.  He's

8    leading the witness, your Honor.

9            THE COURT:  No, he's not suggesting the answer.  He's

10   asking if he knows.

11           THE WITNESS:  They do.  And, as I've been talking

12    about today, these drug trafficking organizations, the cartels,

13    send cocaine all over the world, to include Europe and the

14    United States.

15   BY MR. BILKOVIC:

16   Q.   Are you aware of any cartels that would be able to produce

17   the amount of cocaine you saw in that video that have a rule

18   that say I will supply to Europe, but I will not supply cocaine

19   to the United States?

20   A.   No.

21   Q.   If somebody were to purchase 644 kilograms of cocaine

22   directly to the cartel, is that done for money or is it usually

23   done for something else?

24   A.   Done for money.

25           DEFENDANT DIDANI:  Objection, your Honor.

1    Speculation, no foundation.

2            THE COURT:  Based upon his experience, I'm going to

3     allow it.

4    BY MR. BILKOVIC:

5    Q.  And when a cartel receives payment for let's say 644

6    kilograms, does that increase or decrease the cartel's

7    viability to continue?

8    A.  It increases.

9    Q.  And, if a cartel can increase its viability, what does that

10   do as far as production in the United States?

11   A.  It strengthens it.  It brings more product to the United

12   States.

13   Q.  Is that one of the reasons that we have 92 DEA offices

14   throughout the world?

15   A.  Yes.

16           MR. BILKOVIC:  Nothing further.

17           THE COURT:  Do you have any other --

18           DEFENDANT DIDANI:  Real quick --

19           THE COURT:  Excuse me.  Do you have any other

20    questions for this witness, Mr. Didani?

21           DEFENDANT DIDANI:  Yes, your Honor.

22                         RECROSS EXAMINATION

23   BY DEFENDANT DIDANI:

24   Q.  Agent Pedrini, you indicated -- the Spiderman in the

25   video --

1    A.    Yes.

2    Q.    -- you just said that it was a crew member?

3    A.    Could have been.

4    Q.    Could have been?

5    A.    Yes.

6    Q.    Now, Agent Pedrini, to be fair, that Spiderman it was CMA

7    Gabriel; right?

8              THE COURT:   It was what?

9    BY DEFENDANT DIDANI:

10   Q.    CMA Gabriel, right, the ship?

11   A.    The Jean Gabriel, yes.

12   Q.    And you had the information that cocaine was loaded; right?

13   A.    Yes.

14   Q.    By the Spiderman; right?

15   A.    Right, from the video.

16   Q.    Spiderman, because we don't -- do you know who he is?

17   A.    No.

18   Q.    All right.  So the load --

19             THE COURT:   Is this individual the one with the mask?

20             THE WITNESS:   Yes.

21             THE COURT:   Okay.

22   BY DEFENDANT DIDANI:

23   Q.    So the load and the Spiderman landed in Rotterdam; right?

24   A.    Yes.

25   Q.    Did you told the Dutch authorities to go get the Spiderman,

1    too?

2    A.   I did not.

3    Q.   Why not?

4    A.   Because it was an ongoing investigation.

5    Q.   You're not interested to find out if the Spiderman he was

6    involved and he was a crew member?

7    A.   Absolutely are.

8    Q.   Then why you -- you had the load.  Why you didn't get it?

9    A.   Because we were focussed on the entire investigation, not

10   Spiderman.

11   Q.   Okay.  So what's the entire investigation?

12   A.   As we talked about earlier, the entire organization sending

13   cocaine from all over the world.

14   Q.   Agent Pedrini, you was focused on this organization; right?

15   A.   Yes.

16   Q.   What's the name of the organization?

17            MR. BILKOVIC:  Asked and answered on first

18    cross-examination, your Honor.

19            THE COURT:  I don't know if he told him the name of

20    the organization.  I don't recall.  Although, the jury might

21    and, therefore, I'm going to allow it again.

22            Do you know the name of it?

23            THE WITNESS:  The name of the organization, no.  I

24    only know it's the Ylli Didani investigation.

25

1   BY DEFENDANT DIDANI:

2   Q.   So Ylli Didani doesn't belong to any cartel, right, as far

3   as --

4   A.   I don't know that.

5   Q.   So Ylli Didani, as far as your investigation with the Dutch

6   authorities, never send any cocaine to the United States, did

7   he?

8   A.   Ylli Didani?  Not that I know of.  Again, I was only

9   focussed on the shipments that are delivered to Rotterdam.

10  Q.   So it's unfair for you to come here and say this

11  organization --

12          THE COURT:  He doesn't get to say what's fair.  You

13   can rephrase it if you want to.

14  BY DEFENDANT DIDANI:

15  Q.   Do you think it's fair to say that this organization sent

16  cocaine to the United States?

17          MR. BILKOVIC:  Judge, objection.

18          THE COURT:  That's just another way of asking the

19   question that I just said you couldn't answer.  So, if you want

20   to rephrase it, because I don't think this witness decides

21   what's fair or not in this court.

22          Go to a new one, or you may rephrase it without using

23   the word "fair."

24          DEFENDANT DIDANI:  No, your Honor.  No further

25   questions for this witness.

```
1              THE COURT:  Okay.  Anything else of this witness?

2              MR. BILKOVIC:  No, your Honor.

3              THE COURT:  Okay.  Is this witness free to go?

4              For the Government, is this witness --

5              MR. BILKOVIC:  Oh, yes.  I'm sorry.  Yes, your Honor.

6              THE COURT:  What about for defense?

7              DEFENDANT DIDANI:  Yes, your Honor.

8              THE COURT:  All right.  You may step down.  Thank you

9      for coming.

10             THE WITNESS:  Thank you, your Honor.  Thanks.

11             (End of excerpt at 12:59 p.m.)

12                            —    —    —

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1
 2
 3                    CERTIFICATE OF COURT REPORTER
 4
 5          I, Sheila D. Rice, Official Court Reporter of the
 6   United States District Court, Eastern District of Michigan,
 7   appointed pursuant to the provisions of Title 28, United States
 8   Code, Section 753, do hereby certify that the foregoing pages
 9   is a correct transcript from the record of proceedings in the
10   above-entitled matter.
11
12
13                         s/Sheila D. Rice
                           Sheila D. Rice, CSR-4163, RPR, RMR, FCRR
14                         Federal Official Court Reporter
                           United States District Court
15                         Eastern District of Michigan
16
     Date:  03/16/2025
17   Detroit, Michigan
18
19
20
21
22
23
24
25
```