1        **UNITED STATES DISTRICT COURT**
         **EASTERN DISTRICT OF MICHIGAN**
2              **SOUTHERN DIVISION**

                    —   —   —
3

UNITED STATES OF AMERICA,
4
              Plaintiff,
5
   v.                            Case No. 21-20264
6
YLLI DIDANI,
7
              Defendant.
8    _____/

9              **JURY TRIAL - VOLUME 8 - EXCERPT**
            **(Continued testimony of Brandon Leach)**
10       **BEFORE THE HONORABLE DENISE PAGE HOOD**
              **UNITED STATES DISTRICT JUDGE**
11
           Theodore Levin United States Courthouse
12              231 West Lafayette Boulevard
                     Detroit, Michigan
13              Tuesday, February 25, 2025
     **APPEARANCES:**
14
     **For the Plaintiff:**      Mark Bilkovic
15                               Timothy McDonald
                                 UNITED STATES ATTORNEY'S OFFICE
16                               211 W. Fort Street, Suite 2001
                                 Detroit, Michigan  48226
17                               (313) 226-9623

18   **For the Defendant:**      Ylli Didani,
                                 Appearing in Pro Se
19
                                 Wade Fink
20                               WADE FINK LAW, P.C.
                                 550 W. Merrill Street, Suite 100
21                               Birmingham, Michigan  48009
                                 (248) 712-1054
22                               (Appearing as Standby Counsel)

23   Also Present:              Special Agent Chad Hermans
                                Maria DiCarlo
24

25        *To obtain a copy of this official transcript, contact:*
              *Sheila D. Rice  Official Court Reporter*
            *(313) 234-2610 • sheila_rice@mied.uscourts.gov*

1        TABLE OF CONTENTS

2   MATTER_____PAGE

3   **JURY TRIAL - VOLUME 8 - EXCERPT**

4   **Government's Case in Chief (Continued)**

5   **BRANDON LEACH**
    Direct examination by Mr. Bilkovic.................   5
6   Cross-examination by Defendant Didani............... 112
    Certificate of Court Reporter....................... 143

7

8

9

10             E X H I B I T   I N D E X

11

    Exhibit No.            Description       Identified    Admitted
12
    Government's 1.4-1.8   Photographs            4           4
13  Government's 5.8       Text message image    37          40
    Government's 5.9       Test message image    37          40
14  Government's 5.10      Translation of message 37
    Government's 8.1-8.7   Bank statements        5           5
15  Government's 19.0      Copy of E-mail        76          77
    Government's 28.0      Certificate of        87          88
16                        Authenticity
    Government's 28.1      Excel spreadsheet     89          92
17  Government's 36.0      Excerpts Viber chat   45          46
    Government's 60.0      Rose-colored iPhone   21          22
18  Government's 60.1      Apple iPhone          22          22
    Government's 60.2      Samsung cell phone    22          22
19  Government's 61.0      Cellebrite message   105         106
                          thread
20  Government's 61.1-61.9 Photos               106         109
    Government's 62.0      Chat message         110         111
21  Government's 63.0      Chat message         110         111
    Government's 112.8     Screenshot of text    34          34
22

23

24

25

1   (Continued)

2                    E X H I B I T   I N D E X

3

    Exhibit No.              Description            Identified    Admitted
4
    Government's 115.1     Photo of Mr. Tibbitts        74           74
5                          and Mr. Didani
    Government's 115.2     Driver's license of         69           70
6                          Martin Tibbitts
    Government's 115.3     Passport of                 71           71
7                          Martin Tibbitts
    Government's 115.6     Photo of Mr. Tibbitts       72           72
8                          and Mr. Didani
    Government's 115.8     Copy of text messages       78           85
9   Government's 115.10    Photo of message thread     98           99
    Government's 115.15    Photo of BlackBerry        101          102
10                         phone
    Government's 115.16    Continuation of            103          103
11                         messages
    Government's 116.5     Photo of iPhone             94           95
12  Government's 126.1     Cert. of records            27           27
    Government's 126.3     Cert. of records            29           30
13  Government's 126.5     Declaration of Apple        30           31
    Government's 126.7     Declaration of Apple        32           32
14

15

16

17

18

19

20

21

22

23

24

25

 1   Detroit, Michigan

 2   Tuesday, February 25, 2025

 3   9:39 a.m.

 4                                    —   —   —

 5              (Beginning of excerpt.)

 6              THE COURT:  Okay.  Very good.  You're still under

 7   oath.  Please state your name again for the record.

 8              THE WITNESS:  Brandon Leach, L-E-A-C-H.

 9              MR. BILKOVIC:  May I proceed, your Honor?

10              THE COURT:  You may.

11              MR. BILKOVIC:  Your Honor, before I ask additional

12   questions, I would like to move -- I was advised that I did not

13   move all of these into evidence yesterday.  I would move to

14   admit Government's proposed Exhibits 1.4 through 1.8 into

15   evidence.  Those are the photographs that Agent Leach testified

16   and identified of Philip Daskal, Alexander Meskouris, Fatjon

17   Bajrami, Dayiberto Torres-Rosario and Thomas Sweeney.

18              THE COURT:  Any objection?

19              DEFENDANT DIDANI:  No, your Honor.

20              THE COURT:  Very well.  They're admitted as 1.4

21   through 1.8.

22              MR. BILKOVIC:  And, your Honor, I would also move -- I

23   believe that there initially was an objection, and the Court

24   took these conditionally.  When Agent Leach testified, there

25   were statements that I moved to introduce that the Court

1    reserved ruling on.  And I believe that those were statements

2    marked 8.1, 8.2, 8.3, 8.4, 8.5, 8.6 and 8.7.

3              Mr. Didani posed an objection, because there were some

4    of them that were redacted.  I ended up providing -- we ended

5    up providing unredacted statements to Mr. Didani, and he had

6    benefit of those for his cross-examination of Agent Newsome.

7    So I would move to admit those into evidence -- or readmit

8    those into evidence at this point.

9              THE COURT:  Any objection?

10             DEFENDANT DIDANI:  No objection, your Honor.

11             THE COURT:  All right.  They're admitted.

12             MR. BILKOVIC:  Thank you.

13                  DIRECT EXAMINATION (Continued)

14   BY MR. BILKOVIC:

15   Q.  Agent Leach, I believe when we left off yesterday I was

16   asking you about Mr. Didani and where he was living during the

17   investigation and whether he had family in the United States.

18   And I don't know if I asked you this or not, but if I did I

19   apologize.  But during the investigation did you observe

20   Mr. Didani in Michigan?

21   A.  Yes, I did.

22   Q.  And do you recall approximately when?  I'm not looking for

23   exact dates, but years and under what circumstances?

24   A.   It would have been late fall, early winter of 2018.

25   Q.   And was that -- did you have Mr. Didani under surveillance

1    at the time?

2    A.   Yes, we did.

3    Q.   Now, you're one of the lead case agents in this case?

4    A.   That's correct.

5    Q.   Are there other agents involved that you would describe as

6    lead case agents as well?

7    A.   Yes.

8    Q.   And who would those people be?

9    A.   Josh Bianchi of Border Patrol, as previously stated, and

10   IRS Criminal Investigator Derek Newsome along with Special

11   Agent Chad Hermans of the DEA.

12   Q.   And, as one of the lead case agents in this case, what were

13   your responsibilities in the case?

14   A.   Gathering intelligence and conduct investigations into the

15   background of the members that had been identified in the

16   organization, along with identifying other members of the

17   organization, domestic and abroad.

18   Q.   And how did you obtain this intelligence or information?

19   A.   Through numerous administrative subpoenas, search warrants,

20   surveillance.

21   Q.   And did you interview witnesses during the investigation?

22   A.   Yes, we did.

23   Q.   Did other agents interview witnesses as well?

24   A.   Yes.

25   Q.   You said that you executed search warrants.  Did you obtain

1    search warrants as well?

2    A.   Yes.

3    Q.   And there's been testimony about how to obtain a search

4    warrant that basically you -- I don't want to tell you how you

5    do it.  How do you obtain a search warrant?

6    A.   Sure.  So I will complete and author what's known as an

7    affidavit, basically me swearing that the information is true

8    that I'm putting on paper involving probable cause to obtain

9    whatever information I'm trying to obtain, and that information

10   is then put in front of a judge for authorization.  I swear to

11   that, and then it will bow sent off to whatever affiliation is

12   necessary that holds that information.

13   Q.   The search warrant affidavits, is that -- the information

14   you include in there, is that all information from your

15   personal knowledge or do you rely on information obtained from

16   other people as well?

17   A.   Some of it's personal information that I'm directly

18   knowledgeable of, and other is information provided to me by

19   other agents involved in the investigation.

20   Q.   And do you have an estimate as to how many search warrants

21   were obtained during the investigation?

22   A.   Dozens.

23   Q.   Did you have an estimate as to how many of those dozens you

24   would have been the affiant on?

25   A.   Well over 20.

1   Q.   Fair to say that you were the affiant on the most search

2   warrants as compared to other agents?

3   A.   Yes.

4   Q.   And what type of search warrants did you obtain?  What

5   types of information were you looking to obtain?

6   A.   I obtained search warrants for GPS tracker data.

7   Q.   What is GPS tracker data?

8   A.   Geo-positioning sensor.  It's basically something that we

9   can attach to vehicles that allows us to track a vehicle

10  electronically.  Also, electronic ping data, which is

11  relatively --

12           THE COURT:  Electronic what?

13           THE WITNESS:  Ping, P-I-N-G, which deals with cellular

14  tracking of a device.  So you provide that information to the

15  telephone company and they provide you the ping data.

16  BY MR. BILKOVIC:

17  Q.   And is that realtime ping data where you can tell where a

18  phone currently is located?

19  A.   Yes.

20  Q.   Now, are these search warrants, when you obtain a search

21  warrant for say tracker information on a vehicle or ping data

22  from a cell phone, is it for unlimited duration?

23  A.   No, it is not.

24  Q.   And why is that?  What happens and what is the period?

25  A.   It would be unconstitutional just to track somebody forever

1    without probable cause.  So you basically have to state within

2    your affidavit the reason that you're intending to need this

3    information and for the duration and why you need it for that

4    said duration.

5    Q.   And are there limits on that duration?

6    A.   Yes, there are.

7    Q.   What happens if at the end of that duration you don't have

8    any additional need for this information?

9    A.   If you've exhausted the extent of the search warrant and

10   you haven't built any additional probable cause, there won't be

11   any further search warrants issued.

12   Q.   If there is information that you believe that you still

13   need to obtain this information, then what do you have to do?

14   A.   Yes.  So, if you obtain a search warrant and then with the

15   information that is provided to you or that you gather

16   utilizing that information, you build more probable cause.  To

17   further your investigation, you then have to write an

18   additional search warrant utilizing your new probable cause

19   with the historical probable cause to essentially get a new

20   search warrant for further information.

21   Q.   Did you also obtain search warrants for electronic devices

22   in this case?

23   A.   Yes, I did.

24   Q.   And what about for residences, people's houses?

25   A.   Yes.

1   Q.   Now, is there some data, because I believe you mentioned

2   subpoenas, is there some type of data that you can obtain

3   without a search warrant?

4   A.   Yes.

5   Q.   What type of data is that?

6   A.   Basic subscriber information, account holder information,

7   stuff like that --

8   Q.   What do you mean subscriber?

9   A.   -- billing records.  Such as a phone.  You could send a

10  administrative subpoena to a phone company for a specific phone

11  number or a specific person's name, and if they hold an account

12  with that phone company they will send you basically basic

13  information such as when the phone was subscribed to that

14  person, address, name, date of birth, stuff like that.

15  Q.   And are these common techniques used by law enforcement in

16  investigations?

17  A.   Yes, they are.

18  Q.   Do you use these type of techniques in your role as a

19  detective with the Farmington Hills Police Department?

20  A.   Yes, I do.  Not administrative subpoenas, only search

21  warrants.  We don't have subpoena power.

22  Q.   In the state you do not have subpoena power?

23  A.   Correct.

24  Q.   Do you recall some of the categories of data you received

25  in this investigation in particular based on search warrants

1    and subpoenas that were issued?

2    A.   Yes.  I received information on multitude of different

3    phone subscriber information, iCloud information, WhatsApp PIN

4    registry information.

5    Q.   What is WhatsApp PIN registry information?

6    A.   WhatsApp messenger, if you're familiar with it, is an

7    encrypted application that you can download on your phone.

8    Instead of using your typical subscriber software to send

9    messages, you can download this app, which is encrypted end to

10   end.  This specific company is WhatsApp.

11   Q.   Now, in this case, are you aware of the cell phones that

12   were taken from Mr. Didani in Chicago in 2016 and then

13   subsequently seized and where a search warrant was obtained?

14   A.   Yes.

15   Q.   So this may be an obvious question, but the data that would

16   be extracted on that phone how far would that data go up to?

17   A.   However long that person has possessed that device and

18   stored information on that device.

19   Q.   So if the person -- if the phone was taken away from the

20   person on August 6, for example, of 2016, and then put into

21   airplane mode, would there be additional data that keeps coming

22   into that phone?

23   A.   No.  Once the phone cannot communicate with the cellar

24   carrier Wi-Fi there will be no more information updated.

25   Q.   Was there a way that you and other agents came up with to

 1   obtain information with respect to communications that

 2   Mr. Didani and other people may have been having with their

 3   cell phones after August 6 of 2016?

 4   A.   Yes.

 5   Q.   And what type of -- describe that?

 6   A.   So when a cellular phone extraction is done, depending on

 7   the software that's utilized to download that phone, not all

 8   information gets automatically extracted from the device.

 9   Sometimes you have to physically search the device.  Certain

10   applications don't download into the reader.  Therefore, we do

11   our due diligence and look for any sort of encrypted

12   applications that we know of are money movement applications

13   and try and investigate those physically on the device.

14   Q.   And did you do that in this case?

15   A.   Yes, we did.

16   Q.   Was there another method that law enforcement used to

17   obtain information with respect to iPhone data?

18   A.   Yes.

19   Q.   What was that?

20   A.   We subpoenaed accounts to Apple in regards to Mr. Didani

21   and phone numbers and also search warrants to Apple once we

22   obtained the subpoenaed subscriber information for those

23   accounts.

24   Q.   Search warrants for what?  What were you attempting to

25   obtain?

1    A.   ICloud data.

2    Q.   And did you obtain that data in this case?

3    A.   Yes, we did.

4    Q.   Did you issue more than one iCloud search warrant?

5    A.   Several.

6    Q.   Do you have approximately how many -- do you know

7    approximately how much you issued for Mr. Didani?

8    A.   13 to 14.

9    Q.   Now, when you received that information back, who reviews

10   it?

11   A.   Typically I would have the extraction processed by a tech

12   that was certified to do so, and then myself and the other

13   agents in the investigation would sift through the information

14   trying to identify anything that's pertinent.

15   Q.   So basically a team effort as far as reviewing the

16   information?

17   A.   Yes.

18   Q.   Would you describe the information that came back in, for

19   example, Mr. Didani's iCloud account information as a small

20   amount of information or a large amount of information?

21   A.   The iCloud storage information that was obtained, massive.

22   Q.   Do you recall -- did you author reports in this case?

23   A.   Yes, I did.

24   Q.   Approximately how many?

25   A.   Over a hundred.

```
 1   Q.   Do you remember every detail of those reports?

 2   A.   Not memorized, no.

 3   Q.   Do you remember specific dates on every event that took

 4   place during the investigation?

 5   A.   No.

 6            THE COURT:  What's the number of reports again?

 7            THE WITNESS:  Over a hundred.

 8            THE COURT:  Okay.

 9   BY MR. BILKOVIC:

10   Q.   Now, did you testify before the Grand Jury in this case?

11   A.   Yes, I did.

12   Q.   And do you remember every detail of your Grand Jury

13   testimony?

14   A.   No.

15   Q.   Was that recent or was it years ago?

16   A.   Years ago.

17   Q.   Now, we expect that you're going to testify more than one

18   time in this case.  Are you aware of that?

19   A.   Yes, I am.

20   Q.   And did you meet with me to go over the topics that we're

21   going to cover today?

22   A.   I did.

23   Q.   And did you review reports related to those topics?

24   A.   Yes, I have.

25   Q.   So, if I asked you today about a topic that we didn't
```

1   cover, would you be able to answer me?

2   A.   That depends.

3   Q.   Depends on what?

4   A.   My recollection and confidence to accurately depict that

5   information under oath.

6   Q.   And, if you were not able to remember, is there something

7   that you can utilize in order to refresh your memory if needed?

8   A.   Yes.

9   Q.   What would that be?

10  A.   Copies of my reports or search warrant affidavits.

11  Q.   Now, I'm going to move forward and go to March of 2021.  Do

12  you know what a criminal complaint is?

13  A.   I do.

14  Q.   And what is a criminal complaint?

15  A.   A criminal complaint is authorization to take somebody into

16  custody.

17  Q.   And did you or other agents do that in March of 2021?

18  A.   Yes, we did.

19  Q.   Do you recall approximately when that was?

20  A.   March 31st of 2021.

21  Q.   What was March 31, 2021?

22  A.   March 31, 2021 was the day that Mr. Didani flew into the

23  United States.  He was destined for Chicago.  His original port

24  of entry was Charlotte, North Carolina where he was catching a

25  connector to Chicago.

1    Q.   And what was your -- did you arrest Mr. Didani on that

2    date?

3    A.   Yes, we did.

4    Q.   Prior to --

5              THE COURT:   In Chicago?

6              THE WITNESS:   No, in Charlotte.

7              THE COURT:   Okay.

8    BY MR. BILKOVIC:

9    Q.   I'm going to get to the arrest in a second, but --

10   actually, in a couple minute.   Prior to arresting Mr. Didani,

11   did you obtain any legal process?

12   A.   Yes.

13   Q.   What was that?

14   A.   The criminal complaint.

15   Q.   And do you recall approximately when you obtained that?

16   A.   Two days prior, March 26.

17   Q.   March 26 of 2021?

18   A.   Yes.

19   Q.   Did you know at that time that Mr. Didani was going to be

20   flying into the United States on March 31st?

21   A.   I did not know.

22   Q.   Were you and other agents monitoring Mr. Didani's travel in

23   March?

24   A.   Yes, we were.

25   Q.   Is there a reason why the complaint was basically obtained

1   on March 26?

2   A.   So through the iClouds we were seeing information that

3   Mr. Didani was suggesting that he was planning on coming to the

4   United States fairly soon.  So preemptively we authored the

5   criminal complaint to have in hand just in case he did come

6   into the country.

7   Q.   And that criminal complaint, that's something that is

8   signed by a judge; correct?

9   A.   Yes, it is.

10  Q.   Or a magistrate judge?

11  A.   Yes.

12  Q.   And did there come a point in time where you received

13  information that Mr. Didani was going to be traveling to the

14  United States on March 31, 2021?

15  A.   Yes.

16  Q.   Do you recall approximately when you received that

17  information?

18  A.   The day prior, on March 30th.

19  Q.   Where were you when you received the information?

20  A.   Local, in Detroit.

21  Q.   And so what did you do upon receiving the information?

22  A.   I notified my group supervisor at the time, Chad Hermans,

23  and other members of the investigation that he was arriving in

24  Charlotte.

25  Q.   "He" being ...

1    A.   Mr. Didani.  I'm sorry.

2    Q.   And after advising individuals of that did you and other

3    agents develop basically a plan or course of action?

4    A.   Yes.

5    Q.   And what was that?

6    A.   That was to travel to Charlotte to the airport there and

7    intercept Mr. Didani after he cleared Customs to take him into

8    custody.

9    Q.   So did you travel to Charlotte, North Carolina?

10   A.   Yes.

11   Q.   Were you at the airport on March 31, 2021?

12   A.   Yes, I was.

13   Q.   Now, was it just federal agents from Detroit or did you

14   notify any law enforcement in Charlotte as well?

15   A.   We had contact with the DEA office in Charlotte notifying

16   them that we were coming into their region of jurisdiction,

17   which is typical protocol.

18   Q.   What about law enforcement at the airport?

19   A.   Yes.

20   Q.   They were notified as well?

21   A.   Yes.

22   Q.   And so on the 31st of March 2021, did you and other agents

23   go to the airport?

24   A.   Yes, we did.

25   Q.   And what did you do when you got there?

1    A.   We waited for Mr. Didani's plane to arrive.  We stood in a

2    room to where we could view the Customs entry until Mr. Didani

3    cleared Customs in which we then identified ourselves.

4    Q.   And approximately how long -- well, did you eventually see

5    Mr. Didani at the airport?

6    A.   Yes, I did.

7    Q.   Where did you see him?

8    A.   In the Customs line.

9    Q.   And do you know approximately how long Mr. Didani was in

10   the Customs line?

11   A.   Well over an hour.

12   Q.   And do you know if he had any items on him?

13   A.   Yes.

14   Q.   What did he have?

15   A.   He had a couple of suitcases with him.  He had cash

16   currency.

17   Q.   Do you know approximately how much cash?

18   A.   Over $10,000.

19   Q.   Are you talking way over or slightly over?

20   A.   Slightly over.

21   Q.   Do you know what was done with that money?

22   A.   That money was seized by Customs and Border Protection.

23   Q.   Did you have or did Detroit DEA did that have anything to

24   do with you?

25   A.   No.

```
1    Q.  And did there come a point in time then that Mr. Didani
2    cleared Customs?
3    A.  Yes.
4    Q.  What happened after that?
5    A.  After he cleared Customs and grabbed his luggage, myself,
6    IRS Agent Derek Newsome and Dennis McCradey, who's also Customs
7    and Border Protection, but assigned to the Special Operations
8    Division in Washington, D.C., approached Mr. Didani.
9    Q.  And what happened when you approached Mr. Didani?
10   A.  I identified myself, showed him my credentials, and asked
11   him if he would walk with us, and we were trying to escort him
12   to a more private location.
13   Q.  And did he agree to do that?
14   A.  Yes.
15   Q.  And so what did you do?
16   A.  The three of us, Mr. Newsome, Mr. McCradey and myself
17   escorted Mr. Didani to closed quarters.
18          THE COURT:  To where?
19          THE WITNESS:  The private section only for law
20    enforcement, your Honor.
21   BY MR. BILKOVIC:
22   Q.  And was he taken to a room or was it an open area?  Where
23   was he taken to?
24   A.  Initially it was an open area.  Once we got him behind the
25   initial secured door, I explained to Mr. Didani that he wasn't
```

```
 1    going to be free to leave and we had a criminal complaint for
 2    his arrest, and then we moved into a secondary interview room.
 3    Q.   So basically he was placed under arrest?
 4    A.   Yes.
 5    Q.   When you moved him to the interview room, was anything
 6    recovered from him?
 7    A.   Yes.
 8    Q.   What?
 9    A.   A rose, gold-colored iPhone from his hoodie.
10          MR. BILKOVIC:  May I have just one moment, your Honor?
11          THE COURT:  Sure.
12          MR. BILKOVIC:  Your Honor, may I approach and hand
13     these to the witness?
14          THE COURT:  Yes.
15    BY MR. BILKOVIC:
16    Q.   If we could start with Government's proposed Exhibit 60.0.
17    Do you know recognize that?
18    A.   Yes, I do.
19    Q.   And what is that?
20    A.   This is the rose, gold-colored iPhone taken off of
21    Mr. Didani.
22    Q.   Did law enforcement recover any additional phones that
23    evening?
24    A.   Yes.  There were two other additional electronic devices in
25    his luggage.
```

1  Q.  And were those seized by law enforcement?

2  A.  Yes, they were.

3  Q.  Can you look at Government's proposed Exhibit 60.1 and tell

4  me if you recognize that?

5  A.  Yes, I do.

6  Q.  What is that?

7  A.  This is a second iPhone that was located.

8  Q.  Located where?

9  A.  In Mr. Didani's luggage.

10  Q.  And can you look at 60 point -- Government's proposed

11  Exhibit 60.2.  Tell me if you recognize that?

12  A.  Yes.  This is the second additional phone that was located

13  on Mr. Didani in his luggage.  This is a Samsung phone.

14  Q.  That's a Samsung phone?

15  A.  Yes.

16  Q.  So these phones, when you say located either on him or in

17  his luggage, that was from the arrest of March 31, 2021?

18  A.  Yes, it was.

19       MR. BILKOVIC:  Your Honor, at this time the Government

20  would move for admission into evidence of Government's proposed

21  Exhibit 60.0, 60.1 and 60.2.

22       THE COURT:  Any objection?

23       DEFENDANT DIDANI:  No objection, your Honor.

24       THE COURT:  They're admitted as 60.0, .1 and .2.

25       MR. BILKOVIC:  Thank you, your Honor.

```
 1   BY MR. BILKOVIC:
 2   Q.  Did you or other agents eventually obtain a search warrant
 3   for -- to go through those phones and pull extractions from
 4   those phones?
 5   A.  Yes, we did.
 6   Q.  And was that successful?  First of all, you got the search
 7   warrants?
 8   A.  The search warrants were authorized, extractions were
 9   attempted.  Both iPhones were successfully extracted.  The
10   Samsung was unable to be extracted.
11   Q.  Now, we talked about briefly -- I want to back up a little
12   bit.  We talked about Apple and the iCloud and how to obtain
13   the information.  You indicated that you had obtained multiple
14   iCloud search warrants in this case for Mr. Didani.  Why did
15   you need multiple, or why did you obtain multiple?
16   A.  The reason we obtained multiple, as I was explaining
17   previously to the jury, on needing subsequent probable cause
18   after receiving information from an initial search warrant.  So
19   when we obtained the initial search warrant that was authored
20   October 31st of 2018, there was a multitude of photographs and
21   messages that made us believe that Mr. Didani was involved in
22   criminal activity, more specifically drug trafficking.
23   Q.  So then what did you do after obtaining that information
24   and reviewing that information?
25   A.  We went through the information, disseminated the countries
```

1    that we believed were affiliated with that information, we

2    documented reports regarding the information we observed, and

3    then I utilized the information to further a second affidavit

4    for an additional iCloud after that.

5    Q.   So is it fair to say then that when you obtained the first

6    iCloud search warrant in October of 2018, the data you received

7    from Apple only went up to the date of that search warrant?

8    A.   That's correct.

9    Q.   So, if you wanted to obtain information that took place

10   after the date of that search warrant, what would you need to

11   do?

12   A.   I would have to author a second or additional search

13   warrant for the information from whatever date it was currently

14   back to the date of the previous search warrant conclusion.

15   Q.   And so, for example, if one of the iCloud search warrants

16   left off at January 1st of 2018, and you obtained another

17   search warrant in March of 2018, what information would that

18   additional search warrant, the March search warrant, include?

19   A.   That information would obtain any new -- let me rephrase

20   that.  Any collected information off that device that had been

21   saved up to the iCloud between those dates.  It doesn't

22   necessarily mean that the data that you're receiving is from

23   those dates, because, as an iCloud works, it restores

24   everything that's currently on that device, re-saves it to the

25   iCloud every time that it backs up.

1    Q.  And do you recall approximately when the last search

2    warrant you obtained from Mr. Didani's iCloud was?

3    A.  March 17, 2021.

4    Q.  And is there a reason that you didn't obtain any after

5    that?

6    A.  There is no further need once Mr. Didani was in custody and

7    we had possession of his physical devices.

8    Q.  And from his physical devices were you able to obtain

9    information from March 17 up to March 31st of 2021?

10   A.  Yes, we were.

11   Q.  Now, how long -- when you would send off a request, you get

12   a search warrant, and what do you do with that search warrant

13   if you're looking for iCloud information?  Who do you send it

14   to?

15   A.  We send it off to Apple.

16   Q.  And how long would it take once you sent the search warrant

17   off to Apple in the beginning?  How long was it taking for you

18   to get that data?

19   A.  It was five to six weeks for a turnaround.

20   Q.  And did that create a problem with the investigation?

21   A.  Yes.  With the information that we were observing within

22   Mr. Didani's iCloud, we were seeing documents that appeared to

23   be time sensitive that if we could get them in a faster manner

24   we could become proactive in the investigation instead of

25   responsive.

1   Q.  And so did there come a point in time where you started

2   receiving the iCloud data quicker than five to seven weeks or

3   six to seven weeks?

4   A.  Yes.

5   Q.  And how long did that timeframe change to?

6   A.  The duration of turnaround, is that what you're asking?

7   Q.  Yeah.  How long did it take -- did there come a point in

8   time where that five to seven weeks shortened?

9   A.  Yes.  Exponentially, actually.  So it got to the point

10  where I would typically swear to a warrant on a Monday, ship it

11  to Apple, and receive the return by that Friday.

12  Q.  So a matter of four or five days?

13  A.  Yes.

14  Q.  And did that timeframe then help you advance the

15  investigation?

16  A.  Yes, it did.

17  Q.  And we're going to get -- the next time you testify we're

18  going to get into specifically what we're talking about there;

19  okay?

20  A.  Okay.

21  Q.  I'd like you to -- I want to go through some of the Apple

22  records right now.  This will be fairly tedious, so I'll try to

23  go through it relatively quickly.

24          Can you take a look at Government's proposed 126.1.

25  A.  Would you like these exhibits back, by the way?

1    Q.   Yes.

2              MR. BILKOVIC:  May I retrieve those exhibits, Judge?

3    I'm not going to use them again?

4              THE COURT:  You may.

5    BY MR. BILKOVIC:

6    Q.   Take a look at Government's proposed 126.1 and tell me if

7    you recognize that?

8    A.   Yes, I do.

9    Q.   And what is that?

10   A.   This is a certification of records provided to me by Apple,

11   Incorporated regarding the initial search warrant for

12   Mr. Didani's iCloud.

13   Q.   And so what is this basically certifying?

14   A.   This is certifying that the production that Apple is

15   providing to me fulfills the requirements made upon them by the

16   details written in the search warrant.

17   Q.   And so this certificate would be attached with the iCloud

18   information they would provide you?

19   A.   Yes.

20             MR. BILKOVIC:  Your Honor, at this time I would move

21   for admission into evidence of Government's proposed 126.1.

22             THE COURT:  Any objection?

23             DEFENDANT DIDANI:  No objection, your Honor.

24             THE COURT:  Very well.  It's admitted as 126.1.

25             MR. BILKOVIC:  Thank you, your Honor.

```
 1   BY MR. BILKOVIC:
 2   Q.   And also is there a date on that that Apple certified it?
 3   A.   November 26, 2018.
 4   Q.   Now, you don't have it in front of you, because it's an
 5   Excel spreadsheet, but have you had an opportunity to review
 6   Government's proposed Exhibit 126.0?
 7   A.   Yes.
 8   Q.   And what is Government's proposed Exhibit 126.0?  Do you
 9   recognize that, or did you recognize that?
10   A.   I did.
11   Q.   And what was that?
12   A.   That was an Excel spreadsheet provided by Apple regarding
13   the subscriber information associated with the iCloud account.
14   Q.   And would that be basically something Apple would submit
15   when it submits the iCloud information?
16   A.   That's correct.
17   Q.   In that document were you able to review it?
18   A.   Yes, I was.
19   Q.   And do you know what E-mail address was associated with
20   that account?
21   A.   MIFreight@yahoo.com.
22   Q.   MIFreight@yahoo.com?
23   A.   Yes.
24   Q.   And was there a name contained in those records associated
25   with the account?
```

1    A.   Yes, there was.

2    Q.   And what was the name?

3    A.   Ylli Didani.

4    Q.   Was there an address listed?

5    A.   Yes.

6    Q.   You don't have to give an exact address, but do you recall

7    what city and/or state?

8    A.   It was the address in Elmwood Park, Illinois that's

9    associated with his parents' residence.

10   Q.   I'm going to have you turn to Government's proposed Exhibit

11   123.0.  Do you recognize that?

12         I'm sorry.  Yes, 126.3, not zero.  126.3.

13   A.   Yes, I do.

14   Q.   And what is that?

15   A.   This is a certification of records from Apple regarding a

16   search warrant from 2019, November.

17   Q.   And specifically does it indicate a date that the search

18   warrant was served on Apple?

19   A.   Yes.  It was served on October 7, 2019, and produced on

20   November 4, 2019.

21   Q.   And when is the certification signed?

22   A.   November 4, 2019.

23         MR. BILKOVIC:  Your Honor, at this point I would move

24   for admission into evidence of Government's proposed Exhibit

25   126.3.

 1              THE COURT:  Any objection?

 2              DEFENDANT DIDANI:  No objection, your Honor.

 3              THE COURT:  It's admitted as 126.3.

 4              MR. BILKOVIC:  Thank you, your Honor.

 5    BY MR. BILKOVIC:

 6    Q.   Can you turn to Government's proposed Exhibit 126.5?

 7    A.   Yes.

 8    Q.   Do you recognize that?

 9    A.   Yes, I do.

10    Q.   And what is that?

11    A.   This is a declaration of Apple from Mr. Sean Pinner

12    declaring his employment with Apple in his authorization.

13    Q.   And would that have been a certification for another iCloud

14    account?

15    A.   Yes, it is.

16    Q.   And would this be a certification for an iCloud account

17    that was produced to the DEA on February 18, 2020?

18    A.   Yes, that's accurate.

19    Q.   And what is the date on the certification?

20    A.   February 18, 2020.

21              MR. BILKOVIC:  Your Honor, at this time the Government

22    would move for admission into evidence of Government's proposed

23    Exhibit 126.5.

24              THE COURT:  Any objection?

25              DEFENDANT DIDANI:  Your Honor, one moment, please.  We

1    don't have it in our --

2              THE COURT:  You don't have the document?

3              MR. FINK:  Not electronically.

4              DEFENDANT DIDANI:  Not electronically, your Honor.

5              THE COURT:  Well, maybe you just want to look at it.

6    I'll have the Government --

7              Do you have a hardcopy to look at?

8              (Briefly off the record.)

9              THE COURT:  You have one out there to use?

10             MR. FINK:  Mr. Didani is using the Government's copy,

11   your Honor.

12             THE COURT:  Okay.

13             DEFENDANT DIDANI:  Yes, your Honor.

14             THE COURT:  Yes, what?

15             DEFENDANT DIDANI:  No objection, your Honor.

16             THE COURT:  It's admitted as 126.5; is that correct?

17             MR. BILKOVIC:  Yes, your Honor.

18             THE COURT:  Okay.

19   BY MR. BILKOVIC:

20   Q.  And can you look at Government's proposed Exhibit 126.7 and

21   tell me if you recognize that?

22   A.  Yes, I do.

23   Q.  And what is that?

24   A.  It's another certification of Apple records from the search

25   warrant that was authorized or submitted on January 25th of

1    2021, and produced on February 1, 2021.

2    Q.   So that's an example basically of the production being a

3    matter of a few days?

4    A.   Yes, it is.

5    Q.   And what is the date that that record was certified?

6    A.   January 25, 2021 -- I'm sorry, February 1, 2021.

7              MR. BILKOVIC:  Your Honor, at this time I would move

8    for admission into evidence of Government's proposed Exhibit

9    126.7.

10             DEFENDANT DIDANI:  No objection, your Honor.

11             THE COURT:  All right.  Very well.  It's admitted at

12   126.7.

13   BY MR. BILKOVIC:

14   Q.   Now, you indicated that you are aware of the iPhone that

15   was recovered from Mr. Didani back at Chicago O'Hare Airport on

16   August 6, 2006?

17   A.   Yes, I am.

18   Q.   Now, you did not prepare the search warrant for that?

19   A.   No, I did not.

20   Q.   Are you aware, though, that a search warrant was obtained?

21   A.   Yes.

22   Q.   And did you assist in, or at some point in time did you

23   review the extraction?

24   A.   Yes, I did.

25   Q.   And that was for the iPhone?

1    A.   Yes.

2    Q.   Now, there was also another phone.  Were you aware of

3    another phone that was also taken at the same time?

4    A.   Yes.  There's a BlackBerry that was also seized.

5    Q.   And do you know if that was extracted?

6    A.   It was not.

7    Q.   Do you know why not?

8    A.   From the reports that were provided to me, it indicated

9    that the BlackBerry -- Mr. Didani provided a pass code to that

10   phone, and upon opening that phone the phone was wiped.

11           THE COURT:  Was what?

12           THE WITNESS:  The phone was deleted from utilizing the

13    pass code provided from Mr. Didani.

14   BY MR. BILKOVIC:

15   Q.   So any information that was on that phone was lost

16   basically?

17   A.   Yes.

18   Q.   The Government could not obtain it?

19   A.   Correct.

20   Q.   During your extraction, or review of the extraction of that

21   photograph, do you recall reviewing a photograph of a text

22   message thread involving the phones?

23   A.   Yes, I do.

24   Q.   Can you take a look at Government's proposed Exhibit 112.8

25   and tell me if you recognize that?

1  A.   Yes, I do.

2  Q.   And what is that?

3  A.   This is a screenshot of a text message in Mr. Didani's

4  phone.

5  Q.   And the person that -- is there a description or a name of

6  the person that the text messages were being sent to?

7  A.   Yes.  The name identified on the top says "Jack Colombo."

8  Q.   Now, you don't know if that's actually a person named Jack

9  Colombo or just the contact information that was stored in the

10  phone; correct?

11  A.   That's correct.

12          MR. BILKOVIC:  Your Honor, at this time the

13  Government --

14          THE COURT:  Whose phone is this?

15          THE WITNESS:  This is from the Apple iPhone that was

16  seized from Mr. Didani in August of 2016 in Chicago at the

17  airport.

18          DEFENDANT DIDANI:  What was the number?

19          MR. BILKOVIC:  112.8.

20          THE COURT:  Any objection?  Is there any objection to

21  this?

22          DEFENDANT DIDANI:  No objection, your Honor.

23          THE COURT:  Very well.  It's admitted as 112.8.

24          MR. BILKOVIC:  And could I publish this to the jury,

25  your Honor?

```
 1                  THE COURT:  Yes, you may.
 2                  MR. BILKOVIC:  If we could zoom in on the top half
 3      where it goes down to the word "yeah."
 4      BY MR. BILKOVIC:
 5      Q.   So is this how that appeared in the phone?  This was a
 6      photograph in the phone?
 7      A.   Yes.
 8      Q.   And the person that is receiving the text, would they be
 9      the gray text or the blue text?
10      A.   The person -- the possessor of the text would be the blue
11      text.
12      Q.   The possessor of the device would be the blue text?
13      A.   Yes.
14      Q.   And again, this was on a device that was obtained from
15      Mr. Didani?
16      A.   Yes.
17      Q.   Can you read the person, purportedly Jack Colombo, the top
18      text message?
19      A.   "It is better that you send it back.  And he need to cross
20      over the border and send it as national parcel.  Yes.  He will
21      advise you."
22      Q.   I don't need you to read the next line, but the blue
23      response, the device holder response?
24      A.   All of it?
25      Q.   Don't read that, but there's a response in device holder?
```

1    A.   "My lawyer call for the" --

2    Q.   No, no, no.  What's up on the screen?

3    A.   "Cock suckers."

4    Q.   I said don't read it.  I wanted you to just say that he

5    responded.

6    A.   He responded.

7    Q.   Okay.  Could we go to the bottom half.

8    A.   Yes.

9            MR. BILKOVIC:  Could you display on that?  Thank you.

10   BY MR. BILKOVIC:

11   Q.   And what does the device holder send in the first blue box.

12   A.   "My lawyer call for the phones.  They got and they say he

13   can have the phone next week.  They didn't find any think."

14   Q.   And then the next box, blue box?

15   A.   "LO, LOL."

16   Q.   And how does the person, purportedly Jack Colombo, respond?

17   A.   "LOL.  Take them and throw them to river."

18           MR. BILKOVIC:  Okay.  We can take that down.

19   BY MR. BILKOVIC:

20   Q.   Do you recall when you went through that device seeing any

21   photographs of text message conversations with somebody with --

22   that was identified as Puzio?

23   A.   Yes.

24   Q.   Can you look at Government's proposed Exhibit 5.8, 5.9 and

25   5.10, and tell me when you're done reviewing those.

1   A.   I'm good.

2   Q.   Are you familiar with them?

3   A.   Yes, I am.

4   Q.   Starting with 5.8, can you describe what 5.8 is?

5   A.   Yes.  This is a message.

6   Q.   I'm sorry.  Without getting into the content of it, can you

7   just describe what it is that you're looking at there?

8   A.   Yes.  They're photographs of images of another phone

9   conversation on a separate device within a message thread with

10  an individual named -- listed as "Puzio" on the top.

11  Q.   And what is the date on the text message thread?

12  A.   June 17, 2016.

13  Q.   Can you look at Government's proposed Exhibit 5.9 and tell

14  me what that is?

15  A.   This is a closer-up view of the previous image and the

16  message thread, the picture of another phone conversation on

17  another device.

18  Q.   Now --

19  A.   Appearing to be in another language.

20  Q.   It will make more sense once I show them, but basically 5.9

21  is that something that the Government or that you enlarged in

22  order to be able to read it?

23  A.   Yes.

24  Q.   And then Government's 5.10, what is that?

25  A.   This is the translation of the previous photograph of the

1   message thread.

2   Q.   And that was translated by a company that did the

3   translations for us?

4   A.   Correct.

5   Q.   Now, did you also do anything to try and attempt to

6   translate that message?

7   A.   I did.  When we originally found the message, I utilized

8   Google translate to provide me with a loose translation of what

9   the message said.

10  Q.   And does the translation in Government's 5.10 that was done

11  by a translation company mirror basically the translation that

12  you did with Google?

13  A.   Yes, it does.

14         MR. BILKOVIC:  Your Honor, at this time I would move

15  for admission into evidence of Government's proposed Exhibit

16  5.8, 5.9 and 5.10.  If the Court wishes to admit 5.10

17  conditionally, I would indicate to the Court that if there is

18  not a stipulation we will have a witness later to testify about

19  the accuracy of the translation.

20         THE COURT:  Any objection to --

21         DEFENDANT DIDANI:  Objection, your Honor.  This is --

22         THE COURT:  Wait.  I don't have my question out yet.

23         DEFENDANT DIDANI:  Oh.

24         THE COURT:  Is there any objection to 5.8, 5.9 or

25  5.10?

```
 1              DEFENDANT DIDANI:  Yes, your Honor.  It's pure
 2   speculation, and there's no foundation about Polish --
 3              THE COURT:  There's no foundation about what?
 4              DEFENDANT DIDANI:  Polish.  It is Polish language,
 5   speaking Polish.
 6              THE COURT:  Okay.  Is 5.8 in Polish?
 7              MR. BILKOVIC:  Yes, your Honor.  I was going to ask
 8   that before I published it.
 9              THE COURT:  Is 5.9 in Polish?
10              MR. BILKOVIC:  Yes.  Those are the same messages.
11   It's just 5.9 is an enlarged version of 5.8.  And then 5.10 is
12   the translation of 5.9 and 5.8.
13              THE COURT:  Okay.  It's reserved until you have the --
14   on speculation, that's overruled.  I assume you're saying that
15   the words are speculation.  Is that what you're saying?
16              DEFENDANT DIDANI:  Yes, your Honor.
17              THE COURT:  That's overruled.
18              MR. BILKOVIC:  I know the Court is reserving.  Does
19   that mean the Court does not want me to get into the
20   translation at this point?
21              THE COURT:  I don't.
22              MR. BILKOVIC:  Okay.  Let's at least go through 5 --
23   what about 5.8 and 5.9, your Honor, the actual photographs from
24   the phone?
25              THE COURT:  Are they in Polish?
```

1          MR. BILKOVIC:  They are in Polish.

2          THE COURT:  Any objection to them being shown in

3   Polish, other than speculation?

4          DEFENDANT DIDANI:  No, your Honor.  No.

5          THE COURT:  Very well.  5.8 and 5.9 are admitted.

6          MR. BILKOVIC:  And can we publish 5.8 to the jury?

7          THE COURT:  Yes.

8          MR. BILKOVIC:  Thank you, your Honor.

9          And can we zoom in just on the top, starting at the

10   very top of the phone down to the end -- no, top of the phone

11   down to the end of the first message.  All the way down, the

12   end of the first message.  Keep going higher where we capture

13   the whole phone.  Okay.

14   BY MR. BILKOVIC:

15   Q.  Now, you can't read necessarily the writing there; correct?

16   A.  Correct.

17   Q.  Now, do you have the laser pointer -- or not the laser

18   pointer, but the pointer?

19   A.  Yes.

20   Q.  Can you just please point to what we're looking at here,

21   though.  You had indicated there was a contact with a person by

22   the name of Puzio?

23   A.  Yes.  This is a message thread that was located within the

24   device.  At the top here you can see the name "Puzio" at the

25   top.  And then this is an image sent by the sender, or the user

1   of the phone.  And this appears to be a picture of a BlackBerry

2   cell phone with that message thread on the screen.

3   Q.  And the date on that is ...

4   A.  The message thread is June 17, 2016, of the iPhone thread

5   to clarify.

6           MR. BILKOVIC:  And do you see -- if we could zoom in

7   on --

8           Can I have one moment, your Honor?

9           THE COURT:  Yes.

10          (Briefly off the record.)

11  BY MR. BILKOVIC:

12  Q.  It's going to be tough to tell, but right there where the

13  laser pointer is do you see the blurred box?

14  A.  I do.

15  Q.  Can you put the laser pointer in the middle of the blurred

16  box, right there?

17  A.  Yes.

18  Q.  Do you know what that is?

19  A.  It says "Sky."

20          MR. BILKOVIC:  And can we take that down and can we

21  put up 5.9, please.

22  BY MR. BILKOVIC:

23  Q.  And what are we looking at here.

24          MR. BILKOVIC:  And can we just zoom in on the message.

25  Thank you.

1    BY MR. BILKOVIC:

2    Q.   What are we looking at 5.9?

3    A.   This is a zoomed-in image of the photograph of the

4    BlackBerry message thread.

5    Q.   And is -- the top line, is that in English?

6    A.   Yes, it is.

7    Q.   What does the top line indicate?

8    A.   It says, "Message destruction time two hours."  And then it

9    follows it up with, "35E6CF@blacksecure.com.

10   Q.   Are you familiar with what Black Secure is?

11   A.   It's an encrypted software program.

12        MR. BILKOVIC:  Okay.  Can you take that down.

13   BY MR. BILKOVIC:

14   Q.   Now, you said this was dated June 17, 2016?

15   A.   Yes.

16   Q.   Are you aware of aspects of the financial investigation in

17   this case?

18   A.   Yes, I am.

19   Q.   Are you aware of the evidence of Don Larson cashing

20   approximately $200,000 in checks from Martin Tibbitts on

21   June 9, 2016, a week before that message?

22   A.   Yes, I am.

23        DEFENDANT DIDANI:  Objection, your Honor.  He's

24    leading the witness.

25        THE COURT:  It was suggesting the answer, yes.

1    BY MR. BILKOVIC:

2    Q.  Are you aware of any financial transactions between Martin

3    Tibbitts and Don Larson in this investigation?

4    A.  Yes, I am.

5    Q.  More than one or just one?

6    A.  Several.

7    Q.  And do you recall the approximate months and years of

8    those?

9    A.  Yes.

10   Q.  What are the months and years, the best of your

11   recollection?

12   A.  From June of 2016 to December of 2017.

13   Q.  And there was -- so was there a series of transactions in

14   June of 2016?

15   A.  Yes, there were.

16   Q.  Can you take a look at Government's proposed Exhibit 3.0.

17   Tell me if you recognize that -- I'm sorry, not 3.0.  I'll back

18   up.  I'm sorry.

19        The phone you indicated, the iPhone, that was seized

20   from Mr. Didani in Chicago?

21   A.  Yes.

22   Q.  You said that you did an extraction of that?

23   A.  Physical extraction.

24   Q.  That you reviewed a physical extraction?

25   A.  Yes.

1   Q.   Did you or other agents -- actually, you.  Did you become

2   aware that there were items on that phone that did not get

3   extracted in that physical -- or in that electronic extraction?

4   A.   Yes.

5   Q.   Can you explain that to the jury?

6   A.   I was notified by Border Patrol Officer Josh Bianchi that

7   there's a Viber application insignia on Mr. Didani's iPhone.

8   Q.   What is Viber?

9   A.   Viber is an encrypted messaging application similar to

10  WhatsApp, as I previously explained.

11  Q.   And so what did you do when you received that information?

12  A.   We physically went through the Viber thread on Mr. Didani's

13  phone.

14  Q.   Was the Viber thread in the extraction?

15  A.   It was not.

16  Q.   Did you locate a Viber thread on the phone when you

17  physically went through the phone?

18  A.   Yes, we did.

19  Q.   And was there a way that you documented that?

20  A.   Yes.  Agent Bianchi took physical photographs of all the

21  messages on the phone.

22  Q.   Page by page?

23  A.   Of the Viber thread, to clarify, yes.

24  Q.   And can you take a look at Government's proposed Exhibit

25  36.0.

1    A.   Yes.

2    Q.   And tell me if you recognize that?

3    A.   This is the beginning of the Viber chat between Mr. Didani

4    and an individual listed as "Dan Dan" on the top.

5    Q.   And that was the Viber chat that was taken directly from

6    the iPhone, Government's Exhibit 3, that was recovered from

7    Mr. Didani in Chicago in August of 2016?

8    A.   That's correct.

9    Q.   And have you reviewed this chat?

10   A.   I have.

11   Q.   Now, this chat that you have in front of you is

12   approximately how many pages?

13   A.   37.

14   Q.   Is this the entire chat or was there other portions of the

15   chat?

16   A.   No, this is not the entire chat.

17   Q.   Have you reviewed the other portions?

18   A.   Yes, I have.

19   Q.   So this is basically an excerpt from that chat?

20   A.   Yes.

21        MR. BILKOVIC:  Your Honor, at this time I would move

22   for admission into evidence of Government's proposed Exhibit

23   36.0.  I would also let the record reflect that Government's

24   proposed Exhibit 36.3, which I'm not moving to mark, I just

25   want to make sure the Court is aware that that is the full

 1   nonredacted chat and that has been provided to Mr. Didani.

 2           THE COURT:  All right.  Any objection to 36.0?

 3           DEFENDANT DIDANI:  No objection, your Honor.  No

 4    objection.

 5           THE COURT:  Very well.  It's admitted.

 6           MR. BILKOVIC:  Can we publish it to the jury, your

 7    Honor?

 8           THE COURT:  Yes, you may.

 9   BY MR. BILKOVIC:

10   Q.  Now, I'm going to ask you some questions off of this, and

11   I'm going to go page by page with the dates.

12           MR. BILKOVIC:  If we could basically start and zoom in

13   on the top starting with the time, 11:37 a.m., and go down to

14   where -- the very bottom right there.  Keep going.  Right

15   there.

16   BY MR. BILKOVIC:

17   Q.  So you indicated that this is a chat with a person by the

18   name of Dan Dan?

19   A.  Yes.

20   Q.  Can you see -- so if we're looking at the blue boxes and

21   the white boxes what do the blue boxes signify?

22   A.  The blue boxes indicate the user of the phone.

23   Q.  And in this case that phone was the phone taken from Ylli

24   Didani?

25   A.  That is correct.

1   Q.   Now, do you see a photograph next to all of the blue boxes?

2   A.   Yes.

3   Q.   To the right of the blue boxes?

4   A.   Yes.

5   Q.   Now, I know it's a small photograph, but do you know who's

6   in that photograph?

7   A.   It's Mr. Didani.

8   Q.   And how do you know that?

9   A.   I've seen his photo at other times within the iCloud.

10  Q.   An enlarged version?

11  A.   Yes.

12  Q.   And do you know in next to the white boxes who the

13  individual depicted in that photograph is?

14  A.   That is an image of Donald Larson.

15  Q.   And if you could look at the middle text.  And when I do

16  that I want to make sure we're talking about the same one.  So

17  take the pointer every time I ask you to look at a text.  Could

18  you take the laser pointer and focus it on the middle text in

19  the middle of the page.  And don't say -- I don't want you to

20  say the "F" word, but is there a discussion in there about

21  Viber?

22  A.   Yes.  It states that Viber was not working.

23  Q.   Okay.  Thank you.  "Viber now was not working"?

24  A.   Correct.

25  Q.   And the date of that is ...

1    A.   July 5th of 2016.

2              MR. BILKOVIC:  And can we go to the next page, 36.0-2,

3    Page 2.  And can we zoom in just on the top half.

4    BY MR. BILKOVIC:

5    Q.   And what is the date?

6    A.   July 13, 2016.

7    Q.   And just to make sure we're clear so I don't have to ask

8    you on every page, this chat, all the chat messages here, are

9    between the person that has the image of Mr. Didani as well as

10   Mr. Larson; correct?

11   A.   That's correct.

12             THE COURT:  What is the date again?

13             MR. BILKOVIC:  July 13, 2016.

14             THE COURT:  Okay.

15             MR. BILKOVIC:  And could we zoom back out and go to

16    the bottom half.

17   BY MR. BILKOVIC:

18   Q.   And if we could just -- if you could read to the jury the

19   top three blue messages.

20   A.   "Just got here today and is on the office down."

21   Q.   Go to the next one.

22   A.   "Office open tom," presumably tomorrow, "morning."

23   Q.   And the next one?

24   A.   "Done."

25   Q.   Now, the "Office open tom morning," what time is that?

1    A.   12:52 p.m.

2    Q.   And the "Done," what time is that?

3    A.   7:01 p.m.

4    Q.   And is the "Done" followed by anything?

5    A.   Four emojis of a smiley face or grin face.

6           MR. BILKOVIC:   Okay.  Can we go to the next page.

7    Okay.  Could we zoom on the top half.

8    BY MR. BILKOVIC:

9    Q.   And again, this is -- we're still on the same date, the

10   July 13 of 2016?

11   A.   Yes.  These four emojis at the top are an overlap from the

12   previous page showing continuation.

13   Q.   And when you and/or Agent Bianchi did this did you do that

14   intentionally to show basically that there was no gap

15   in-between?

16   A.   That's correct.

17   Q.   So basically the last bottom message on one page would also

18   be at the top of the next page?

19   A.   Yes.

20   Q.   And does Mr. Larson respond to -- or does Dan Dan respond

21   to the emojis?

22   A.   He does.  He states, "Great" in all caps.

23   Q.   I don't want you to read the profanity, but what is the

24   response from the blue taking out the profanity?

25   A.   "I can sleep good tonight," with three smiley face emojis.

```
 1            MR. BILKOVIC:  Okay.  Can we zoom back out, and can we
 2    go to the bottom portion.
 3            THE WITNESS:  Do you want Mr. Larson's or
 4    Mr. Didani's?
 5    BY MR. BILKOVIC:
 6    Q.   I want you to take the laser, the pointer, and I want you
 7    to go to every message so the jury can follow along where
 8    you're reading from.  Keep going at the top.
 9    A.   Mr. Didani stated, "Okay, brother.  I'm going to sleep.
10    Talk to you tom."
11    Q.   Followed by ...
12    A.   Three smiley face emojis.
13    Q.   And then we move to July 14, the next day?
14    A.   That's correct.  The next day, July 14, 2016, Mr. Larson
15    replies, "That 5Gs extra from yesterday can pay back Flavia's
16    mom."
17    Q.   And the Didani photograph replies?
18    A.   "A ready, dit that, brother."
19    Q.   Go to the next page.
20            MR. BILKOVIC:  And, Judge, could you ask the jury if
21    they can see all the writing on there or do I need to keep
22    doing half at a time?  I just want to make sure that if I read
23    it like this the jury can see it.
24            THE COURT:  Can you see that on the screen?  Yes?
25            And then some are looking at the screen over here.
```

1            MR. BILKOVIC:  Okay.

2            THE COURT:  Okay.

3   BY MR. BILKOVIC:

4   Q.   After the "Already did that, brother" and "cool" does the

5   Didani photograph respond?

6   A.   Yes.  He asked the question, "Do you have the other phone

7   with you?"

8   Q.   I need you to take your mouse and follow.

9   A.   "Do you have the other phone with you," question mark.  He

10  then states, "I need to register that as Signal."

11  Q.   Are you aware what Signal is?

12  A.   Yes.

13  Q.   What is Signal?

14  A.   Signal is an encrypted software.

15  Q.   And how does Mr. Larson respond?

16  A.   "Burnout cell?  No."

17  Q.   Now, are you familiar with the phrase "burnout cell"?

18  A.   I'm familiar with the term "burner cell."

19  Q.   What is a burner cell?

20  A.   Burner cell is typically defined as a throwaway phone.

21  It's anonymous with the user.

22            THE COURT:  It's a what?

23            THE WITNESS:  Like a phone that you can throw away.

24            THE COURT:  What word did you use?

25            THE WITNESS:  Burner.  I'm sorry, your Honor.

```
 1                    THE COURT:  You said what with a user?

 2                    THE WITNESS:  Anonymous from the user.

 3                    THE COURT:  Okay.

 4                    MR. BILKOVIC:  If we can go to 36.0-5.  And can we go

 5       to the bottom half.  I'm going to go to the bottom half of

 6       this.

 7       BY MR. BILKOVIC:

 8       Q.  And this is a continuation of July 14, 2016?

 9       A.  Yes, it is.

10       Q.  Let me ask you this.  You've reviewed this exhibit prior;

11       correct?

12       A.  Yes.

13       Q.  If we are changing dates, will there be a screenshot in

14       there signifying that we are now on a new date?

15       A.  Correct.

16       Q.  And are there gaps between some of the dates?

17       A.  Absolutely.

18       Q.  What are we looking at from the top of this from Mr. Larson

19       on down?

20       A.  So this is Mr. Larson responding to Mr. Didani.  He

21       provides an address of 18642 Woodbine Road, Fraser, Michigan

22       48026.

23       Q.  Are you familiar with that address?

24       A.  That is an address that Mr. Larson was residing at during

25       that timeframe.
```

1    Q.   Okay.  Can you continue?

2    A.   Mr. Larson continues, "You gonna send me something today?

3    I don't have $45 to even put minutes on that phone."

4    Q.   And how does the phone holder respond?

5    A.   Mr. Didani states, "I try the latest tomorrow.  I'm

6    waiting on" --

7    Q.   Hold on.  I'm going to stop you for a second.  You've got

8    to read it verbatim.

9    A.   "I try the latest tom.  I'm waiting on someone to get clean

10   money and send the order."

11   Q.   I want you to read it again, because you missed a word.

12   A.   "I try the latest tom.  I'm waiting on someone to get clean

13   that money and send the order."

14   Q.   And how does Mr. Larson respond?

15   A.   "You can send me cash in FedEx packet inside magazine."

16            MR. BILKOVIC:  And can we go to the next page -- I'm

17   sorry, not the next page -- yes, the next page.  Go back.  I'm

18   sorry.  This is Government's Page 6 of the exhibit.  If we

19   could zoom in on the top half.  Go right to there.

20   BY MR. BILKOVIC:

21   Q.   This again contains the last message from Mr. Larson, "You

22   can send me cash in FedEx packet inside magazine"?

23   A.   Yes.

24   Q.   How does the phone holder respond?

25   A.   He replies "Yesss," with three Ss.  "I will, brother."

1    Q.   And how does Mr. Larson respond?

2    A.   "Okay, LMK.  It's all starting to work out, brother," two

3    exclamation marks.

4              MR. BILKOVIC:  If we could take that down.  And can we

5    go to Page 7, 36.0-7.  If you could zoom in on the bottom half.

6    BY MR. BILKOVIC:

7    Q.   Starting at 12:06, is there a text message from Mr. Larson?

8    A.   Yes.

9    Q.   And what does it say?

10   A.   06 he says, "Okay."

11   Q.   And what is that followed by?

12   A.   A photograph of an individual.

13   Q.   Do you know who that individual is?

14   A.   Yes, I do.  It's Martin Tibbitts.

15             MR. BILKOVIC:  Could we go to the next page, 36.8.

16   And can we go to the top half and keep going down.  Right

17   there.

18   BY MR. BILKOVIC:

19   Q.   And is there a text -- again, is this the photograph of

20   Martin Tibbitts at the top page?

21   A.   Yes, it is.

22   Q.   Is there a text message underneath that photograph from

23   Mr. Larson?

24   A.   Yes.  He attached the text, "C," as in the letter, "if this

25   works."

1   Q.  And then is there a text message from the device holder

2   with Mr. Didani's photograph?

3   A.   Yes.

4   Q.   And what is the text message?

5   A.   The message is "MIFreight@yahoo.com."

6   Q.   And again, that is that an E-mail address that you're

7   familiar with?

8   A.   Yes, it is.

9   Q.   Is that the E-mail address that was tied to the Apple

10  iCloud accounts registered to Mr. Didani?

11  A.   Yes.

12          MR. BILKOVIC:  Okay.  You can take that down.  And

13  could we go to 36.9.

14          THE COURT:  36.9 or --

15          MR. BILKOVIC:  I'm sorry.  36.0, Page 9.

16          THE COURT:  Okay.

17          MR. BILKOVIC:  And can we go to the bottom of that.

18  BY MR. BILKOVIC:

19  Q.   And again, this is still a continuation from July 14, 2016?

20  A.   Yes, it is.

21  Q.   And on this does the device holder with Mr. Didani's

22  photograph send anything?

23  A.   It sends a photograph.

24          Would you like me to describe the photograph?

25  Q.   Please.

1    A.   In that photograph it appears he took a photo of another

2    phone, a BlackBerry device.  And on that phone is a picture of

3    a red duffle bag on the ground containing rectangular-shaped

4    packages in red packaging and yellow packaging.

5    Q.   And in your training and experience have you seen packaging

6    like this before?

7    A.   Many times.

8    Q.   In what way?

9    A.   During the execution of search warrants and acquisition of

10   illegal narcotics.

11   Q.   Specifically what type?

12   A.   Typically packaging like this is consistent with heroin and

13   cocaine.

14          DEFENDANT DIDANI:  Objection, your Honor.  That's

15   speculation.

16          THE COURT:  I'm sorry?

17          DEFENDANT DIDANI:  It's speculation, your Honor.

18          THE COURT:  Do you wish to respond?

19          MR. BILKOVIC:  Judge, I believe that he can offer in

20   his training and experience what this is consistent with.  If

21   Mr. Didani wants to cross-examine him on it, he certainly can.

22          THE COURT:  I am going to -- it's overruled.  You can

23   take it up on cross-examination.

24   BY MR. BILKOVIC:

25   Q.   And does Mr. Didani follow that with anything?

1   A.   He text, "Delete that."

2        MR. BILKOVIC:  Okay.  Can we go to the next page.  And

3   can we go to the bottom half.

4   BY MR. BILKOVIC:

5   Q.   And is there a blue text from Mr. Didani?

6   A.   Yes.

7   Q.   What does that say?

8   A.   At 4:14?

9   Q.   Yes.

10  A.   At 4:14 he texts, "That's your house."

11  Q.   How does Mr. Larson respond?

12  A.   "I did not get an E-mail from you."

13  Q.   Mr. Didani, does he respond?

14  A.   "Just send it now."

15  Q.   Mr. Larson?

16  A.   "Yahoo," question mark.

17  Q.   Mr. Didani?

18  A.   "Yes."

19  Q.   If we can go to the next page.  That would be 36.0-11.  And

20  can you just go to the top half.  And does Mr. Larson -- after

21  Mr. Didani says "Yes" does Mr. Larson respond?

22  A.   He responds with, "Got it."

23  Q.   And ...

24  A.   "I looked and deleted.  LMAO.  Get some sleep."

25       MR. BILKOVIC:  Can we go to 36.0-13, and can we zoom

1   in just on the top half.

2   BY MR. BILKOVIC:

3   Q.  And is there a date on this?

4   A.  July 22, 2016.

5   Q.  And does Mr. Larson send a text message?

6   A.  He does.

7   Q.  And what is the text message say?

8   A.  "Protonmail.com.  It's a secure E-mail account.  Set one up

9   and M will send you completed ATM bus. plan.  Protonmail.com."

10  Q.  And are you familiar with what Proton.com is, or Proton

11  E-mail is?

12  A.  Yes.  It's a E-mail software with built-in encryption.

13  Q.  And a dumb question, but what does Marty -- Martin

14  Tibbitts' first name start with?

15  A.  M.

16  Q.  And are you aware during the investigation whether or not

17  Martin Tibbitts used Proton mail?

18  A.  Yes.

19  Q.  And did he?

20  A.  Yes.

21  Q.  Can we go to Page 36.0-14.  And again, we're continuing on

22  the same day?

23  A.  Yes, we are.

24  Q.  And does Mr. Larson send a text?

25  A.  He does.

1    Q.   And what does the text say?

2    A.   "How can M get a PGP," Paul, George, Paul, "cell?"

3    Q.   Are you familiar with what a PGP cell is?

4    A.   PGP typically stands for Pretty Good Privacy, which is an

5    encrypted software.

6    Q.   And how does Mr. Didani respond?

7    A.   "Give me address and figure everything."

8    Q.   And how does Mr. Larson respond?

9    A.   "Whose address?"

10            MR. BILKOVIC:  Can we go to the next page.  And can we

11   zoom in just on the top half going down to the address.  Keep

12   going, okay.

13   BY MR. BILKOVIC:

14   Q.   And what does Mr. Larson say there?

15   A.   Starting at the top?

16   Q.   Yes.

17   A.   "Whose address?  Send it to me."

18   Q.   Mr. Didani responds?

19   A.   "I'm gone call the jacks people and they will send it."

20   Q.   Mr. Larson responds?

21   A.   "Okay."

22   Q.   And Mr. Didani responds?

23   A.   "Send me thw adr."

24   Q.   And how does Mr. Larson respond?

25   A.   "18642 Woodbine Road, Fraser, Michigan 48026."

1    Q.   And again, that was Mr. Larson's address?

2    A.   Yes, it was.

3              MR. BILKOVIC:  Can we go to Page 36-16.  Can we go to

4    the bottom.

5    BY MR. BILKOVIC:

6    Q.   And is there a date on this?

7    A.   July 24, 2016.

8    Q.   And what is depicted in this?

9    A.   This is a photograph of three cell phones, which appear to

10   be all BlackBerry.

11   Q.   Do they appear to be different types of BlackBerrys?

12   A.   Different models, correct.

13   Q.   And if we go to the next page, 36.0-17.  And can we go to

14   the top half.  And again, we show the photograph.  Do you see

15   the photograph?

16   A.   I do see the photograph, same photograph from the previous

17   exhibit.

18             MR. BILKOVIC:  Could we go back out and just start

19   after that and just review the text.  Enlarge the text from the

20   rest of the page down.

21   BY MR. BILKOVIC:

22   Q.   Mr. Didani responds -- you might need to use the laser

23   pointer here, because that's a little difficult to see with the

24   mouse.  Can you use the mouse?

25   A.   Yes.  So directly --

```
 1              Do you want me to read this?
 2   Q.  Yes.
 3   A.  Directly under the image of the three BlackBerry phones
 4   Mr. Didani text, "Classic, Q10, Q5," followed by, "The one in
 5   the middle is Q10 and the best one."
 6   Q.  Mr. Larson responds?
 7   A.  "The best one is the choice."
 8   Q.  And Mr. Didani responds?
 9   A.  "The middle, Q10."
10              MR. BILKOVIC:  Okay.  Can we go to the next page,
11   36.18.  And just zoom in on the text if we can.
12   BY MR. BILKOVIC:
13   Q.  And we are still on the same page, is that correct,
14   July 24, 2016?
15   A.  Yes, we are.
16   Q.  All right.  Can we start with Mr. Didani's text, the first
17   blue text.
18   A.  "Okay.  I have it ready by next week."
19   Q.  Mr. Larson responds?
20   A.  "Cool."
21   Q.  Mr. Didani responds?
22   A.  "I'm gone pay that from your money."
23   Q.  And Mr. Larson responds?
24   A.  "Okay, three months?"
25   Q.  Mr. Didani responds?
```

1    A.   "Six."

2    Q.   Now, these cell phones, these encrypted cell phones, were

3    you aware of whether or not when someone gets one is it

4    unlimited or is there a subscription that they have to have?

5    A.   No.  It's typically a subscription.

6    Q.   And are we talking like $20 a month or is it more than

7    that?

8    A.   No.  It's much more than that.

9    Q.   And are there actually exhibits that you came across during

10   the investigation that advertised the price of the

11   subscriptions?

12   A.   Yes.

13   Q.   Okay.  And can we go to 36.0, Page 19.  Can we just go to

14   the top portion.  And what date are we on now?

15   A.   July 29, 2016.

16   Q.   And can we go to the next page, 36.0-20.  And can we go

17   down to the bottom half.  Now, is there a text message from

18   Mr. Larson at 4:08 p.m.?

19   A.   Yes.  It states, "Getting pre-approved for a home loan.  He

20   said I have to pay off my credit card, nine grand, plus taxes,

21   8,500, et cetera.  I can get this house on water canal."

22   Q.   How does Mr. Didani respond?

23   A.   "Nice one," followed by four question marks.

24        MR. BILKOVIC:  Can we go to the next page, 36.0-21,

25   and can we zoom in on the top half.

1    BY MR. BILKOVIC:

2    Q.   And after the question marks that were from the previous

3    page does Mr. Didani send a text?

4    A.   Yes, he does.

5    Q.   What is that?

6    A.   "We gone pay all that."

7    Q.   Mr. Larson?

8    A.   "Fixer upper.  I can get it cheap."

9    Q.   And can we go to the bottom half.  Can we start with the

10   first text from Mr. Didani.

11   A.   "Call POL."

12   Q.   Next line?

13   A.   "Do you want me to call POL?"

14   Q.   And does Mr. Larson respond?

15   A.   He does.  He states, "Need to move last seven."

16   Q.   And how does Mr. Didani respond?

17   A.   "I know."

18   Q.   Mr. Larson, does he respond?

19   A.   He responds with, "Need," followed by three money signs.

20   Q.   And does he follow with anything after that?

21   A.   "I don't wanna miss out on this house."

22          MR. BILKOVIC:  Can we move to 36.0, Page 24.  And can

23   we zoom in on the bottom half with the date.

24   BY MR. BILKOVIC:

25   Q.   And again, we're moving forward now to another date?

1  A.  Yes, August 1, 2016.

2  Q.  And can we go to 36.0, Page 27.  And again, we're staying

3  on the same date, August 1, 2016?

4  A.  Yes, we are.

5  Q.  We'll go to the top half.  And does Mr. Larson send a text

6  message?

7  A.  He does.  It states, "Is other package gone yet?"

8  Q.  Mr. Didani responds?

9  A.  "Looking for ticket.  Is ready for shipment."

10  Q.  And does Mr. Larson respond to that?

11  A.  He does.  "Nice.  So Turk may happen this week before you

12  leave for Mex?"

13  Q.  Can we go to the bottom half.  And can you read the text

14  messages here starting with the top one and who it's from?

15  A.  Yes.  There's sequential messages from Mr. Didani here

16  stating, "I'm trying, but with same guy.  The other guy I was

17  looking for is not moving for few weeks.  We need the money.

18  House.  Tickets.  Lots of expenses."

19        MR. BILKOVIC:  And can we go to 36.0, Page 28, and

20  could we zoom in on the top half.

21  BY MR. BILKOVIC:

22  Q.  After the "lots of expenses" that Mr. Didani sent that's

23  also on the previous page, does Mr. Larson respond?

24  A.  Yes, he did.  He responded with, "Yes, I have so many

25  bills, plus I'm buying that house."

1   Q.   And Mr. Didani, does he respond?

2   A.   He responds with, "Hotel.  That's what I'm saying."

3   Q.   And Mr. Larson, does he respond?

4   A.   He does with, "If you do that, I need at least 30K."

5   Q.   And can we go to the bottom half.  And does Mr. Didani

6   respond to the "I need 30K"?

7   A.   He responds with, "I know, brother."

8   Q.   Okay.  Can we go to 36.0, Page 30.  And again, just on the

9   top, what is the date here?

10  A.   August 2, 2016.

11  Q.   Okay.  So the following text messages until we come to

12  another date will be from August 2, 2016?

13  A.   Yes.

14  Q.   Can we go to 36.0, Page 32, and can we go to the bottom

15  half.  We'll start with the white text message from Mr. Larson

16  at 3:14 p.m.  Do you see that?

17  A.   I do.

18  Q.   Can you read that?

19  A.   "Okay.  I will leave a note on door in case.  Don't tell M

20  anything about Turkey.  We will pay him back everything on

21  other end.  We need that money."

22  Q.   And does Mr. Didani respond?

23  A.   He responds with, "Okay.  You need to tell me what to say."

24       MR. BILKOVIC:  And can we go to the next page,

25  36.0-33, and can we zoom in on the top half.

1   BY MR. BILKOVIC:

2   Q.  And so we have the top message from Mr. Didani, "Okay, you

3   need to tell me what to say" from the previous page.  Does

4   Mr. Larson respond?

5   A.  He responds with, "I gotta get this house.  I'm gonna make

6   it bad ass."

7   Q.  And does Mr. Larson continue to send another text?

8   A.  Mr. Larson sends another text.  It states, "He knows we

9   moved 10.  Leave it at that.  He keeps asking about drone

10  engineer."

11  Q.  And can we go to the bottom half.  How does Mr. Didani

12  respond to that message about "He knows we moved 10, he keeps

13  asking about the drone engineer"?

14  A.  At 3:16 he replied, "I had meeting today."

15  Q.  Can we go to 36.0-34.  And we're still on August 3, 2016?

16  A.  Yes.

17  Q.  And can you read basically the -- go to the top half, and

18  starting up with Mr. Larson.

19  A.  "What's up brotha."

20  Q.  Mr. Didani, does he respond?

21  A.  "The phone?"

22  Q.  Mr. Larson?

23  A.  "Been at gym all day.  Going home in one hour."

24  Q.  And Mr. Didani?

25  A.  "Okay.  Let me know."

1    Q.   Mr. Larson?

2    A.   "I will."

3    Q.   Can we go to the bottom half.  Does Mr. Didani start this

4    text message?

5    A.   Yes.  It states, "Let me know when you get it and I need a

6    code from there."

7    Q.   Mr. Larson respond?

8    A.   Yes.  He responds with, "Is the code in packing envelope?"

9    Q.   And does Mr. Didani respond?

10   A.   Yes, with, "Is on the phone when put in PN."  And then he

11   changed it to "on" with and asterisk following that.

12   Q.   Can we go to the 36.0, Page 35.  Can we go to the top half.

13   Mr. Larson's first text message?

14   A.   "K."

15   Q.   And Mr. Didani?

16   A.   "K."

17   Q.   And Mr. Larson?

18   A.   "Got it, turning it on."

19   Q.   And was this the text message that followed the discussion

20   of a phone?

21   A.   Yes, it was.

22   Q.   Can we go to the bottom half.  Now, you see series of out

23   coming and -- outgoing and incoming calls?

24   A.   Yes.

25   Q.   And you don't have content for those; correct?

1   A.   That's correct.

2   Q.   All right.  What does Mr. Didani text here?

3   A.   At 2:20 p.m. he text, "Turn the phone on."

4   Q.   And how does Mr. Larson respond?

5   A.   "I did."

6   Q.   And how does Mr. Didani respond?

7   A.   "Go to Sky ECC."

8        MR. BILKOVIC:  And can we go to 36.0-36.  And again,

9   don't zoom in yet.

10  BY MR. BILKOVIC:

11  Q.   The top is just the "go to Sky ECC"; correct?

12  A.   Yes.

13  Q.   It says, "Continuation."  Now, is there another date that

14  we move on to another date here?

15  A.   Yeah, August 4, 2016, about halfway down the page.

16       MR. BILKOVIC:  Can we zoom in on that.

17  BY MR. BILKOVIC:

18  Q.   And is there a text message that Mr. Larson sends?

19  A.   Yes.  At 10:32 a.m. he texts, "Call when you can.  M can't

20  fig out how to access encrypted messaging, et cetera."

21       MR. BILKOVIC:  Okay.  You can take that down.  Thank

22  you.

23  BY MR. BILKOVIC:

24  Q.   Now, based on your investigation and the evidence you

25  uncovered, did it appear that Mr. Didani and Mr. Tibbitts were

1   close to each other?

2   A.   Yes.

3   Q.   Did you see evidence of Mr. Tibbitts in Mr. Didani's iCloud

4   productions?

5   A.   Yes, I did.

6   Q.   Did you see evidence of Mr. Tibbitts in Mr. Didani's cell

7   phone?

8   A.   Yes.

9   Q.   I'm going to take you to -- have you go to Government's

10  proposed Exhibit 115.2, and tell me if you recognize that?

11  A.   I do.

12  Q.   And is that a photograph taken off one of Mr. Didani's

13  iCloud accounts?

14  A.   Yes, it is.

15  Q.   And who is the photograph of?

16  A.   Mr. Martin Tibbitts and Mr. Ylli Didani.

17  Q.   I'm sorry.  What number are you looking at?

18  A.   115.1.

19  Q.   I'm sorry.  115.2.

20  A.   I'm sorry.  115.2 is a Michigan enhanced driver's license

21  of Martin J. Tibbitts.

22  Q.   And this was found in Mr. Didani's iCloud, this photograph?

23  A.   That's correct.

24          MR. BILKOVIC:  Your Honor, at this time I would move

25  for admission into evidence of Government's proposed Exhibit

1      115.2.

2                  THE COURT:  Any objection?

3                  DEFENDANT DIDANI:  No objection, your Honor.

4                  THE COURT:  Very well.  It's admitted.

5                  MR. BILKOVIC:  And can I publish it to the jury?

6                  THE COURT:  You may.

7      BY MR. BILKOVIC:

8      Q.   Now, there's information redacted out on here, correct,

9      personal identifying information?

10     A.   Yes.

11     Q.   But who is this a driver's license for?

12     A.   Martin J. Tibbitts.

13     Q.   And this was a photograph again on the iCloud of

14     Mr. Didani?

15     A.   Yes, it was.

16     Q.   Is there an issue date on the driver's license?

17     A.   The issue date is November 5, 2015.

18     Q.   And is there an expiration date?  I know part of it's

19     blacked out, but is there an expiration year?

20     A.   Yes.  The year is 2019.

21                 MR. BILKOVIC:  Can we take that down.

22     BY MR. BILKOVIC:

23     Q.   Detective Leach, can you look at Government's proposed

24     Exhibit 115.3.  Do you recognize that?

25     A.   Yes.

1    Q.   And what is that?

2    A.   This is a United States passport for Martin Tibbitts.

3    Q.   And this is a photograph of a passport?

4    A.   Yes, photograph of the passport.

5    Q.   And this photograph was found in Mr. Didani's iCloud?

6    A.   Yes, it was.

7            MR. BILKOVIC:  Your Honor, at this time I would move

8    for admission into evidence of Government's proposed Exhibit

9    115.3.

10           THE COURT:  Any objection?

11           DEFENDANT DIDANI:  No objection, your Honor.

12           THE COURT:  Very well.  115.3 is admitted.

13           MR. BILKOVIC:  May I publish it to the jury?

14           THE COURT:  You may.

15   BY MR. BILKOVIC:

16   Q.   And again, this is a passport from Martin Tibbitts?

17   A.   Photograph of the passport, yes.

18   Q.   And is there a date -- issuance date and expiration date on

19   the passport?  I know it's kind of small, but --

20   A.   Date of issue was September 4, 2009, with an expiration of

21   September 3, 2019.

22   Q.   Now, do you know from your review of Mr. Tibbitts' iCloud,

23   could you tell whether or not Mr. Didani and Mr. Larson ever

24   traveled together, traveled to the same locations?

25   A.   Mr. Didani and Mr. Larson?

1    Q.   I'm sorry.  Mr. Didani and Mr. Tibbitts.

2    A.   Yes.

3    Q.   Can you take a look at Government's proposed Exhibit 115.6.

4    Can you tell me if you recognize that?

5    A.   I do.

6    Q.   And what is that that you're looking at there?

7    A.   This is a photograph of Mr. Tibbitts and Mr. Didani.

8    Q.   And this was found on the iCloud?

9    A.   That's correct.

10   Q.   Mr. Didani's iCloud?

11   A.   Yes.

12           MR. BILKOVIC:  Your Honor, I would move for admission

13   into evidence of Government's proposed Exhibit 115.6.

14           THE COURT:  Any objection?

15           DEFENDANT DIDANI:  No objection, your Honor.

16           THE COURT:  Okay.  It's admitted.

17           MR. BILKOVIC:  And can we publish it to the jury?

18           THE COURT:  Yes, you may.

19           MR. BILKOVIC:  And can why just zoom in on the --

20    maybe an inch, from there down to the bottom.

21   BY MR. BILKOVIC:

22   Q.   And the person on the left if you're looking at the

23   photograph is who?

24   A.   Martin Tibbitts.

25   Q.   The person on the right?

 1   A.   Ylli Didani.

 2   Q.   Do you know when this photograph was taken?

 3   A.   I do.

 4   Q.   Where was it taken?

 5   A.   Antwerp, Belgium.

 6   Q.   And how do you know that?

 7   A.   Geotag location data from the photo.

 8            THE COURT:  And it's where again?

 9            THE WITNESS:  Antwerp, Belgium.

10   BY MR. BILKOVIC:

11   Q.   Do you know where Belgium is in relation to the

12   Netherlands?

13   A.   I do.

14   Q.   Where is it in relation to the Netherlands?

15   A.   Southeast.

16   Q.   Is it a bordering country, do you know?

17   A.   It is a foreign country.

18   Q.   I'm sorry.  A bordering country.

19   A.   Yes.

20            THE COURT:  Is it a what?

21            MR. BILKOVIC:  Bordering country.

22            THE COURT:  What main country?

23   BY MR. BILKOVIC:

24   Q.   I'll ask it a different -- a better way.  Does Belgium

25   border the Netherlands?

1    A.   Yes.

2    Q.   Do they share a border?

3    A.   Yes.

4    Q.   And can you take a look at Government's proposed Exhibit

5    115.1.  Tell me if you recognize that?

6    A.   115.1 is a photograph of Martin Tibbitts and Ylli Didani

7    sitting in a vehicle.

8    Q.   Also from Mr. Didani's iCloud?

9    A.   Yes.

10          MR. BILKOVIC:  Your Honor, at this time I would move

11   for admission into evidence of Government's proposed Exhibit

12   115.1.

13          THE COURT:  Any objection?

14          DEFENDANT DIDANI:  No objection, your Honor.

15          THE COURT:  It's admitted.

16          MR. BILKOVIC:  And can I just briefly publish it to

17    the jury?

18          THE COURT:  You may.

19   BY MR. BILKOVIC:

20   Q.   And again, Mr. Tibbitts would be where in this photograph?

21   A.   Looking at the photo, he is the gentleman on the left in

22   the blue shirt.

23   Q.   Mr. Didani is on the right?

24   A.   Correct.

25          MR. BILKOVIC:  Okay.  Take that down.

```
 1   BY MR. BILKOVIC:
 2   Q.   Are you familiar with a company in your investigation
 3   called Peregrine 360?
 4   A.   Yes, I am.
 5   Q.   And how is it that you're familiar with that company?
 6   A.   Through multiple identifiers through Mr. Didani's iCloud
 7   during the duration of this investigation.
 8   Q.   And are you aware -- have you met with anybody from
 9   Peregrine 360 during your investigation?
10   A.   Yes.  One of the co-owners when the business was active.
11   Q.   And are you aware what Peregrine 360 was doing as it
12   relates to this investigation?
13   A.   Yes.
14   Q.   What were they doing?
15   A.   They are a design prototype and engineering company, and
16   they were tasked with designing a drone for an individual named
17   under the name of Dale Johnson.
18   Q.   During your investigation, did you learn who Dale Johnson
19   was?
20   A.   Yes.
21   Q.   And who is that?
22   A.   Martin Tibbitts was utilizing the pseudo name Dale Johnson.
23   Q.   How do you know that?
24   A.   Through E-mail and Skype communications between the person
25   utilizing Dale Johnson and Peregrine 360 that we received from
```

1    the company, and also communications with that same Skype

2    moniker and message thread located in a Surface Pro owned by

3    Martin Tibbitts.

4           MR. BILKOVIC:  If I could just have one moment, your

5    Honor.

6           (Briefly off the record.)

7    BY MR. BILKOVIC:

8    Q.  Can you take a look at Government's proposed Exhibit 115.8.

9           Actually, I'm going to back you up a second.  I'm

10   going to have you look at something different first.  Can you

11   look at Government's proposed Exhibit 19.0.  Tell me if you

12   recognize that?

13   A.  Yes, I do.

14   Q.  I know the writing is small, but is that a E-mail that you

15   received from Peregrine 360, a copy of an E-mail, as well as an

16   E-mail that you located in Mr. Didani's iCloud information?

17   A.  Yes, it is.

18   Q.  And what is the date on the top of the E-mail?

19   A.  The copy of the E-mail chain starts on May 4, 2017, in this

20   photo.

21   Q.  And is there a person that the -- is there the content of

22   the E-mail?

23   A.  Yes.  It appears a gentleman by the name of Zaid Lattouf is

24   sending an E-mail addressed to a Dale Johnson.

25   Q.  And what how does he greet Dale Johnson, the top line?

1    A.   "Hello Dale."

2             MR. BILKOVIC:  Your Honor, at this time I would move

3    for admission into evidence of Government's proposed Exhibit

4    19.0 and request permission to publish it to the jury.

5             THE COURT:  Any objection?

6             DEFENDANT DIDANI:  No objection, your Honor.

7             THE COURT:  All right.  It's admitted as 19.0.

8             MR. BILKOVIC:  Thank you.  And can I publish it to the

9    jury, your Honor?

10            THE COURT:  You may.

11            MR. BILKOVIC:  Can we zoom in on just the top half.

12   Go down to -- that's enough.  Go actually up higher.  That's

13   good.  Thank you.

14   BY MR. BILKOVIC:

15   Q.   You said Zaid Lattouf.  Do you know who Zaid Lattouf is?

16   A.   Yes.  He's also one of the founders of Peregrine 360.

17   Q.   And you indicated this E-mail was an E-mail from May 4,

18   2017?

19   A.   Yes, it is.

20   Q.   And can you read the top half of the E-mail that Zaid

21   Lattouf sent to Dale.

22   A.   Yes.  From Mr. Larson it states, "Hello, Dale.  Please send

23   it to my colleague, Carl.  His information is here.  Name Carl

24   Chaumont.  Phone number +1514618099.  Country, Canada, state

25   Province, Quebec, Address 2820 Rue des Francs-Bourgeois,

1    Boisbriand, QC," for Quebec, "JTH 1M9."

2    Q.  I'm going to have you stop right there.

3            Can you take a look at Government's proposed Exhibit

4    115.8.

5    A.  Yes.

6    Q.  And what is -- do you recognize that?

7    A.  I do.

8    Q.  And what is Government's proposed Exhibit 115.8?

9    A.  This is a photograph of a message thread located in the

10   iCloud of Mr. Didani.  A message thread on the top is addressed

11   -- or with phone number +13136703334.

12   Q.  And do you know whose phone number that is?

13   A.  Yes.

14   Q.  And whose phone number is that?

15   A.  Martin Tibbitts.

16   Q.  And is there a message on that document or on that

17   photograph from Martin Tibbitts to Mr. Didani on May 4, 2017,

18   at 1:57 p.m.?

19   A.  Yes, there is.

20   Q.  Is that the same date, but later in the day from when the

21   E-mail was sent front Zaid Lattouf to Dale Johnson?

22   A.  Yes.

23           MR. BILKOVIC:  Your Honor, at this time I would move

24   for admission into evidence of Government's proposed Exhibit

25   115.8.

1          THE COURT:  Any objection?

2          DEFENDANT DIDANI:  Your Honor, at this time I'm going

3    to object, because now it's coming to hearsay.  Actually, Marty

4    is dead and he's not -- Mr. Bilkovic has not laid a foundation

5    as a co-conspirator.  So at this point we -- it's going to be

6    all hearsay, your Honor.

7          THE COURT:  Okay.  Did you go over that relative to

8    Mr. Tibbitts yesterday?

9          MR. BILKOVIC:  We went over it relative with

10   Mr. Larson, which I would argue the same evidence applies with

11   respect to Mr. Tibbitts, because he was actually the one that

12   funded the checks.

13         I would also indicate to the Court that I believe that

14   we had a pretrial ruling on this, or discussion on this, that

15   the Court would consider taking things conditionally upon

16   establishing the conspiracy during the trial.  I believe that

17   we have established evidence that there was the conspiracy for

18   the foundation for the exhibit.

19         But I would also add one more thing, that this is

20   actually a conversation between Marty Tibbitts and Ylli Didani,

21   and Ylli Didani's responses are relevant and they are

22   admissible.

23         And as an additional basis for the admission of Martin

24   Tibbitts' statements, those are also admissible in addition to

25   being co-conspirator statements.  They are admissible in order

 1    to put Mr. Didani's replies in context.

 2            The Court:  Do you want to respond?

 3            DEFENDANT DIDANI:  Your Honor --

 4            THE COURT:  Why don't you think he put the elements

 5    that I put forth yesterday?

 6            DEFENDANT DIDANI:  Well, there is no --

 7            THE COURT:  Hold on for a second.

 8            The jury may step down.  Please rise for the jury.

 9            (The jury left the courtroom at 11:13 a.m.)

10            THE COURT:  You may all be seated.

11            Yesterday I outlined for you what the Government had

12    to show to have such a co-conspirator statement admitted.  Why

13    don't you think they haven't met that relative to Mr. Tibbitts?

14            DEFENDANT DIDANI:  Well, your Honor, as far as the

15    messages the Government -- I don't see any element of the

16    conspiracy.  The Government has not established foundation that

17    any conspiracy even exists over here as far as right now.

18            And unfortunately Mr. Tibbitts is not here to ask or

19    cross-examine what the Government trying to portray and lay in

20    front of the jury, your Honor.

21            THE COURT:  Trying to portray what?

22            DEFENDANT DIDANI:  That a conspiracy existed.  As a

23    moment right now, the Government is about two hours away here

24    with Detective Leach.  He said --

25            THE COURT:  Two hours away?

1           DEFENDANT DIDANI:  They sitting away two hours, your

2     Honor.  They hasn't laid no foundation for conspiracy, your

3     Honor.

4           THE COURT:  Okay.  You can respond to that.  That's

5     one of the elements.

6           MR. BILKOVIC:  Your Honor, I believe that it's not

7     just with Agent Leach.  It's with all of the testimony in this

8     case.  The Court has heard testimony that Mr. Tibbitts wrote

9     approximately a million dollars in checks to Donald Larson who

10    instead of cashing those majority of those checks at the bank

11    took them to a check cashing place on three different dates

12    where he paid a fee.

13          There was further testimony that a pilot flew

14    Mr. Larson to Washington, D.C., and the evidence will show in

15    this trial and it will show it shortly because there is an

16    offer of proof, there are photographs of Mr. Didani in

17    Washington, D.C. with that money.  There is a text message

18    string between Mr. Larson and Mr. Didani while Mr. Larson was

19    in the air and Mr. Didani alerting him to be careful when he

20    lands because D.C. is crawling with police.

21          There will be additional evidence presented in the

22    case that Mr. Didani then took that money and, as Agent Newsome

23    testified already, took that money to New York where he gave it

24    to a money launderer.

25          This Court has also heard text messages -- or seen

1    text messages where in June of 2016, approximately a few weeks

2    after the initial $200,000 transaction, Mr. Larson was telling

3    Mr. Didani that he needed money.  Mr. Didani responded by

4    sending him a duffle bag with what appears to be several

5    packages that were packaged like cocaine along with the text

6    message, "Delete that."  And then telling Mr. Larson, "That's

7    your house."

8         So I believe at this point that we have established

9    basically that a conspiracy existed.  I would also indicate

10   that these two exhibits themselves tie into the conspiracy,

11   because the evidence has been produced -- starting to produce

12   that Peregrine 360 was designing a torpedo that would hold

13   cocaine via magnets and basically go across the ocean carrying

14   cocaine where it would be then detached and the cocaine would

15   be picked up.

16        When Mr. Tibbitts was having that communication with

17   Peregrine, he used an alias, Dale Johnson.  What this exhibit

18   is going to show is that on the exact same day that Zaid

19   Lattouf sent Mr. Tibbitts, or Dale Johnson, an E-mail about

20   payment, Mr. Tibbitts copied and pasted that exact E-mail, and

21   the exhibit I'm trying to get in, he then sent that to

22   Mr. Didani instructing him about the payment, which then ties

23   together that Dale Johnson was, in fact, Marty Tibbitts.

24        THE COURT:  Is there any other of the requirements for

25   a co-conspirator statement to come in that you think the

1    Government has not met?

2         DEFENDANT DIDANI:  Your Honor, as Mr. Bilkovic is

3    speaking, as Agent Newsome testified or -- Mr. Tibbitts cash

4    out these checks, give it to Don Larson.  That's a story.  Don

5    Larson give it back, some of it he cash it.

6         We first heard right now that from Agent Newsome, and

7    we gonna hear from Detective Leach, that the money it was not

8    only went to Washington, but the money somehow was moved to New

9    York.

10        So basically other than Donald Larson saying what the

11   Government wants them to say, there is no foundation for

12   conspiracy, your Honor.  There is not even an element.  There

13   is no conversation, just, oh, "That can be your house."  What

14   is that supposed to mean, your Honor?  Is that a conspiracy?

15   Or, here go a bag, a bag what looks like it can be anything,

16   anything.  There is no -- no agent to experience -- to say

17   what's in those bags, is it marijuana, is it heroin, is it

18   cocaine.  It's something we don't even know.

19        And, if Mr. Bilkovic think that sending this bag --

20   well, this bag can be your house, if Mr. Bilkovic think that

21   this -- it's a element of the conspiracy, then okay.

22        THE COURT:  Okay.  Your objection is noted for the

23   record.  It's overruled.  And I think that I can let it in for

24   Mr. Bilkovic to tie it up if he wants to, but right now I'm

25   going to permit it.  So your objection is overruled.

1              DEFENDANT DIDANI:  Thank you, your Honor.

2              THE COURT:  Do you all want to break now or later?

3              MR. BILKOVIC:  I think it would be a good time to take

4       one, because I don't have that much more.  Probably about 10,

5       15 more minutes more, but I think now would be a good time.

6       We've been going almost two hours.

7              THE COURT:  Mr. Fink?

8              MR. FINK:  I can wait those 10 or 15 minutes, but I do

9       need one at some point.  So whichever you prefer.

10             THE COURT:  Let's take it now, ten minutes, all right.

11             MR. FINK:  Thank you.

12             MR. BILKOVIC:  Thank you, your Honor.

13             (At 11:19 a.m., a brief recess was taken.

14             Back on the record at 11:38 a.m.)

15             LAW CLERK:  All rise.  Court is back in session.

16             THE COURT:  Let's bring out the jury.

17             LAW CLERK:  All rise for the jury.

18             (The jury entered the courtroom at 11:39 a.m.)

19             THE COURT:  All right.  You may all be seated.

20             Are you satisfied the jurors are present and in their

21      proper seats?

22             MR. BILKOVIC:  Yes, your Honor.

23             DEFENDANT DIDANI:  Yes, your Honor.

24             THE COURT:  Very good.  I am, too.

25             Mr. Leach, you're still under oath.

1           THE WITNESS:  Yes, your Honor.

2           THE COURT:  Mr. Didani, your objection is overruled at

3   this time.

4           You may proceed.

5           MR. BILKOVIC:  Your Honor, has 115.8 been admitted?

6           THE COURT:  Yes.

7           MR. BILKOVIC:  And can I publish it to the jury?

8           THE COURT:  Yes.

9           MR. BILKOVIC:  Please publish 115.8.  And just do the

10   top half so we get basically the top third.

11   BY MR. BILKOVIC:

12   Q.   And so this was the photograph of the text message that was

13   located in Mr. Didani's iCloud?

14   A.   That's correct.

15   Q.   And the phone number again at the top, the 313 670-3334,

16   you identified that as whose phone number?

17   A.   That is subscribed to Martin Tibbitts.

18   Q.   And the text messages here, the different colors, the gray

19   and the blue, who would be the gray and who would be the blue?

20   A.   The gray would be Mr. Tibbitts, and the blue would be the

21   user of this phone.

22   Q.   And again, the user of the iCloud account, this is

23   registered to Ylli Didani?

24   A.   That's correct.

25   Q.   And can you go to the text message on the bottom, May 4,

1  2017, at 1:57.  What does Mr. Tibbitts text?

2  A.   "Hey, brother."

3  Q.   No, the bottom.

4  A.   I'm sorry.

5  Q.   The last one.

6  A.   "Okay.  Got E-mail from engineer.  Send to this guy

7  instead."

8  Q.   And then could we go to the bottom half.  Just that portion

9  right there.  Just there.

10  A.   "Name, Carl Chaumont, phone number +15146188099."

11  Q.   I'm going to stop you for a second.  I don't need you to

12  read the whole thing, but is this the same information that was

13  sent hours earlier from Zaid Lattouf to Dale Johnson?

14  A.   That's correct.

15         MR. BILKOVIC:  And, Ms. DiCarlo, would you be able to

16  put up 119.0, the relevant portion, and 115.8 side-by-side?

17         THE COURT:  What is the exhibit number of the other

18   one?

19         MR. BILKOVIC:  Well, the first one is 19.0.

20         THE COURT:  Okay.

21         MR. BILKOVIC:  The E-mail.  And the other one is

22  115.8.  And can we zoom in just on the address section.  Yeah.

23  Start with the "Carl Chaumont," the name.  Yeah.  And then

24  could we just zoom in on the box.

25

1    BY MR. BILKOVIC:

2    Q.   And so the one on the left is from the E-mail, the one on

3    the phone is from Mr. Didani's iCloud; correct?

4    A.   Yes.

5    Q.   The content, is it identical?

6    A.   Yes, it is.

7    Q.   And sent hours apart?

8    A.   Yes.

9         MR. BILKOVIC:   Okay.   We can take that down.

10   BY MR. BILKOVIC:

11   Q.   Now, during the investigation, did you request any

12   documentation or receive any documentation from Peregrine 360?

13   A.   Yes.

14   Q.   Can you take a look at 28.0 and tell me if you recognize

15   that, or do you have that with you?   Is that in the book?

16   A.   28.0, yes.

17   Q.   It is in there?

18   A.   Yes.

19   Q.   And can you tell the jury what that is?

20   A.   This is a Certificate of Authenticity for a MoneyGram

21   subpoena that was served upon MoneyGram.

22   Q.   And when is that dated?

23   A.   March 2, 2022.

24   Q.   And how is this information obtained?

25   A.   This was obtained after I served MoneyGram with an

1   administrative subpoena for records of MoneyGram payments made

2   to the company.

3   Q.   And did they provide you those records?

4   A.   Yes, they did.

5   Q.   Did they provide you those records under the certification?

6   A.   Yes.

7         MR. BILKOVIC:  Your Honor, at this time I would move

8   for admission into evidence of Government's proposed Exhibit

9   28.0.

10        THE COURT:  Any objection?

11        DEFENDANT DIDANI:  No objection.

12        THE COURT:  It's admitted.

13   BY MR. BILKOVIC:

14   Q.   And as part of that certification did MoneyGram also send

15   you a letter?

16   A.   Yes, they did.

17   Q.   And can you look at Government's proposed Exhibit 28.2.

18   A.   Yes.

19   Q.   Tell me if you recognize that?

20   A.   I do.

21   Q.   What is that?

22   A.   This is MoneyGram's response to my administrative subpoena

23   that I served upon them.

24   Q.   And have you had an opportunity -- it's an Excel

25   spreadsheet.  So at this point in time I'm not going to publish

1    it to the jury, but have you had an opportunity to review

2    Government's proposed Exhibit 28.1?

3    A.   Yes, I have.

4    Q.   And what is 28.1?

5    A.   28.1 was an Excel spreadsheet showing two MoneyGram

6    transactions between Mr. --

7    Q.   I don't want you to get to the content yet.

8    A.   Okay.

9    Q.   Just showing two transactions?

10   A.   Yes.

11   Q.   MoneyGram transactions?

12   A.   Yes.

13   Q.   And were those transactions related to your request?

14   A.   Yes, they were.

15   Q.   And did they pertain to this case?

16   A.   They did.

17   Q.   And that was basically information provided by MoneyGram

18   pursuant to the subpoena that was certified by MoneyGram?

19   A.   Correct.

20        MR. BILKOVIC:  Your Honor, at this time I would also

21   move for admission into evidence of Government's proposed

22   Exhibit 28.1, the Excel spreadsheet from MoneyGram, as well as

23   28.2, the letter from MoneyGram to Detective Leach.

24        THE COURT:  28.1 and .2.  The letter is .2?

25        MR. BILKOVIC:  Yes.

1          THE COURT:  Any objection?

2          DEFENDANT DIDANI:  Your Honor, I object to -- I'm

3    sorry.  28.2 --  I object to both of them, because I'm not

4    seeing in the letter -- the MoneyGram letter, that say that --

5    the recipient, but that's not saying the sender on the

6    MoneyGram.  So it will be hearsay, your Honor.

7          THE COURT:  The letter is the certificate?

8          DEFENDANT DIDANI:  Yes, your Honor.  It does say who's

9    the receiver on the letter, explaining who's receiving, but not

10   saying on the certificate who is the sender.  And it was only

11   made by Excel.  So I'm not sure about that, your Honor.

12         THE COURT:  Do you want to respond?

13         MR. BILKOVIC:  Your Honor, I'm not sure exactly what

14   he's arguing, if he's arguing 28.1, which is the spreadsheet.

15   28.0 is the certification from MoneyGram.  28.2 is simply the

16   accompanying letter responding to Agent Leach.

17         And I guess I can withdraw.  I don't need 28.2.  I'll

18   pull back my moving to admit that, but 28.1 is the Excel

19   spreadsheet produced by MoneyGram that was sent to Agent Leach

20   in response to his subpoena, along with the certification that

21   those were accurate business records.

22         So I believe I've established the foundation, and the

23   Excel spreadsheet.  28.1 should come into evidence.

24         THE COURT:  Any objection to the spreadsheet?

25         DEFENDANT DIDANI:  Yes.  I object to the spreadsheet,

1    your Honor, because as the Government put 28.2, 28.1, it seems

2    odd that on 28.2 there is the recipient name and not the sender

3    name, but it's odd on Excel that MoneyGram send it, but that's

4    not certified, Excel.  That is -- any name can be put in there.

5    So I object to the both of them, your Honor.

6              THE COURT:  I don't have the Excel spreadsheet.  I

7    have 28.2, which is the letter.  And your claim is that it's

8    not addressed to anyone?

9              DEFENDANT DIDANI:  The letter, your Honor.

10             THE COURT:  28.2?

11             DEFENDANT DIDANI:  28.2.  MoneyGram has certified the

12   recipient party, but I don't see no name who the sender.  And

13   the MoneyGram certified both of them.

14             THE COURT:  28.2?

15             DEFENDANT DIDANI:  Yes, your Honor.

16             THE COURT:  There's a name at the bottom of the

17   letter.  It's just one page; right?

18             MR. BILKOVIC:  That's correct.

19             Your Honor, may I have one moment?  I want to make

20   sure that he's talking about the same exhibit.  Can I have one

21   moment?

22             DEFENDANT DIDANI:  That's what I'm having there.

23             (Briefly off the record.)

24             MR. BILKOVIC:  Your Honor, I believe that Mr. Didani

25   -- actually, I'll let Mr. Didani speak for himself.

1    Basically what I am seeking to admit is the Excel

2    spreadsheet, which is a record kept in the ordinary course of

3    business of MoneyGram that they then certified that that was a

4    record kept in the ordinary course of business showing certain

5    payments to Peregrine 360 and/or Carl Chaumont.

6            THE COURT:  Okay.  So are you asking that 28.0 be

7    admitted?

8            MR. BILKOVIC:  That's the certification.  I'm asking

9    that that be admitted along with 28.1, which is the MoneyGram

10   Excel spreadsheet.

11           THE COURT:  And your objection to the spreadsheet is

12   that it doesn't have names?

13           DEFENDANT DIDANI:  No, your Honor.  The spreadsheet is

14   not certified.  The spreadsheet is just basically Excel.

15   Anyone can go change the names and put the names how they want.

16           In 28.2, the MoneyGram, the only thing is certified

17   the receiving, which is odd.  If they going to certify, they

18   have to certify even the sender and the receiver, and that's

19   what I'm saying, your Honor.  So it should not be admitted to

20   evidence.

21           THE COURT:  Well, 28.0 is the certification for 28.1.

22   I'm admitting both of those.

23           28.2, do you want to respond to that?

24           MR. BILKOVIC:  I'm going to withdraw 28.2.  I don't

25   need to move 28.2 in.

 1              THE COURT:  All right.  Very well.  So .0 and .1 are

 2    admitted.

 3              MR. BILKOVIC:  Thank you, your Honor.

 4    BY MR. BILKOVIC:

 5    Q.   So I'm going to get a format where we can view that later.

 6    I don't want to spend time doing that today, but basically have

 7    you had an opportunity to review that Excel spreadsheet?

 8    A.   Yes, I have.

 9    Q.   And does that Excel spreadsheet show any payments to

10    Peregrine 360 and/or Carl Chaumont?

11    A.   Yes, it does.

12    Q.   Do you know approximately how many payments there were?

13    A.   Two.

14    Q.   And do you know what the dates were on those?

15    A.   I know the months.

16    Q.   Okay.  When?

17    A.   May of 2017, and June of 2017.

18    Q.   And do you know who made the payments, who -- do the

19    records list who made the payment?

20    A.   They do.

21    Q.   And who made the payment?

22    A.   The sender was listed as Ylli Didani.

23    Q.   And do you know approximately in Canadian dollars how much

24    was sent?

25    A.   Approximately $5,000 Canadian per payment.

1   Q.   So each payment was $5,000?

2   A.   Yes.

3   Q.   Now, during your investigation, did you locate screenshots

4   that discussed using a drone or a torpedo to transport drugs?

5   A.   Numerous.

6   Q.   Pardon me?

7   A.   Numerous.

8   Q.   I'm not going to go through all of them today, but the

9   messages, were they BlackBerry messages?

10  A.   Some.

11  Q.   So the ones that were BlackBerry messages, were these ones

12  that were set to self-destruct after a period of time?

13  A.   Depends on how the user of that device had his settings

14  set, but typically, yes.

15  Q.   Were there any ones that you were able to recover even

16  though the self-destruction date had passed?

17  A.   Yes.

18  Q.   And how was it that you were able to do that?

19  A.   Due to the fact that they were preserved by Mr. Didani

20  taking photos of the encrypted phone, which then got backed up

21  to the iCloud.

22  Q.   So can you explain that, break that -- let me do this.  I

23  want to show you -- are you familiar with Government's proposed

24  Exhibit 116.5, which is a photograph from the rose, gold iPhone

25  taken from Mr. Didani on his arrest on March 31, 2021?

1    A.   Yes.

2    Q.   Do you recognize that?

3    A.   I do.

4    Q.   And what is that?

5    A.   This is a photograph of another phone displaying and

6    EncroChat message thread.

7    Q.   And so basically is the photograph -- actually, I'm not

8    going to do it that way.  It's too hard to describe.

9         Do you see the person taking the photograph of the

10   phone?  Do you see the person's reflection in the background?

11   A.   Yes, I do.

12   Q.   And who is that person in the background?

13   A.   The reflection appears to be Mr. Didani.

14        MR. BILKOVIC:  Your Honor, at this time I would move

15   for admission into evidence of Government's proposed Exhibit

16   116.5.

17        THE COURT:  Any objection?

18        DEFENDANT DIDANI:  No objection, your Honor.

19        THE COURT:  Very well.  It's admitted.

20        MR. BILKOVIC:  And can we publish to the jury, your

21   Honor?

22        THE COURT:  You may.

23        MR. BILKOVIC:  Thank you.

24        Can you zoom in on the top half.

25

1   BY MR. BILKOVIC:

2   Q.   And the conversation is with an individual that is named on

3   the phone as who?

4   A.   Toni Stark.

5   Q.   And did you determine in this investigation who Toni Stark

6   was?

7   A.   Yes.  Mr. Tibbitts -- Martin Tibbitts was referred to as

8   Toni Stark.

9   Q.   And so was there a photograph then that was taken of this

10  text message string with Toni Stark?

11  A.   Yes.

12  Q.   Do you see the entry -- if you take your pointer to make

13  sure we're on the same area, the 4-12-18, 6:17 p.m. the very

14  top one.  Keep going up.  Do you see that, the date?

15  A.   Yes.

16  Q.   Do you she the word "1d" and then a fire emoji next to

17  that?

18  A.   Yes.

19  Q.   Do you know what that means?

20  A.   It means they're set to destruct after one day.

21  Q.   And this was captured then on another device?

22  A.   Yes, it was.

23  Q.   And you said -- you indicated that you see a person in the

24  background, a reflection in the background?

25  A.   Yes, I do.

1    Q.   And who do you believe that to be?

2    A.   Ylli Didani.

3    Q.   What does Mr. Didani appear to be holding?

4    A.   Appears to be a cellular device.

5    Q.   And so basically taking a picture of the message that was

6    going to destruct in a day?

7    A.   Yes.

8    Q.   Did you see that numerous times in this case?

9    A.   Yes.

10   Q.   And did you see numerous times were there was also

11   Mr. Didani's reflection?

12   A.   Yes.

13   Q.   Fair to say not always?

14   A.   No, not always.

15          MR. BILKOVIC:  If we can take that down.

16   BY MR. BILKOVIC:

17   Q.   And going back to some exhibits from 115, the iCloud, did

18   you see any other -- I believe I asked you about text messages

19   relating to this torpedo or drone, or whatever it was?

20   A.   Correct.

21   Q.   Would you look at 115.10, which is from the iCloud.

22   A.   I'm there.

23   Q.   Do you recognize that?

24   A.   I do.

25   Q.   And what is that?

1   A.   This appears to be another photo of a message thread on

2   another device being captured by a picture.

3   Q.   And again, this was from Mr. Didani's iCloud?

4   A.   It was.

5   Q.   And who is this between?

6   A.   This is an EncroChat message thread between Toni Stark and

7   presumably Mr. Didani.

8   Q.   Whoever is in possession of the BlackBerry?

9   A.   Yes.

10         MR. BILKOVIC:  Your Honor, at this time I would move

11   for admission into evidence of Government's proposed Exhibit

12   115.10.

13         THE COURT:  Any objection?  Do you have any objection

14   to 115.10, Mr. Didani?  Mr. Didani, do you have any objection

15   to Exhibit 115.10?

16         DEFENDANT DIDANI:  Yes, I object, your Honor.  It

17   still -- it will come again to a stage that it will be all

18   hearsay.  Marty Tibbitts is not here to confirm what's all

19   these messages, your Honor.

20         THE COURT:  So noted for the record and preserved.  I

21   think your objection is that his statement can't come in; is

22   that right?

23         DEFENDANT DIDANI:  Yes, your Honor.

24         THE COURT:  And I've already spoken to that, and it's

25   overruled.

1              You may proceed.

2              MR. BILKOVIC:  Is 115.10 admitted, your Honor?

3              THE COURT:  I'm getting ready to say that.

4              MR. BILKOVIC:  I'm sorry.  I know, I'm talking too

5    fast.

6              THE COURT:  Exhibit 115.10 is admitted.

7              MR. BILKOVIC:  And may I publish it to the jury?

8              THE COURT:  You may.

9    BY MR. BILKOVIC:

10   Q.  And can we just go to the top half, the top third

11   basically.  And again, the message is between who?

12   A.   Toni Stark and the user of the device.

13             MR. BILKOVIC:  We're going to zoom back out, because

14   part of that cut off, so let's try this again.

15   BY MR. BILKOVIC:

16   Q.  Before we do that, is there an area there that you see the

17   same thing with the letter -- or the number 7 and the letter D

18   with a fire emoji?

19   A.   Yes.

20   Q.  Can you take the pointer and point to an example of that.

21   A.   So here you'll see these messages have a 7d with a fire

22   emoji next to it.

23   Q.  And is there also a message down below that corresponds to

24   that at the end of the message thread?

25             Keep going.

1    A.   Here?

2    Q.   No, keep going.  The white area.

3    A.   Oh, I'm sorry.  Yes, right here.

4    Q.   What does that say?

5    A.   This says, "Secure" -- well, it has the fire emoji, same as

6    after all the text messages, and then it says, "Secure burn in

7    seven days."

8    Q.   And can you basically -- what is the date that these

9    messages are being sent?

10   A.   June 3, 2018.

11   Q.   And could you read the messages starting with the first

12   one.  I believe there's three.

13           And again, the ones on the left-hand side would be

14   from Toni Stark?

15   A.   Correct.

16   Q.   And the one on the right-hand side would be the holder of

17   the device?

18   A.   Yes.

19   Q.   And could you read the messages?

20   A.   First message from Mr. Stark would be -- states, "Perfect,"

21   followed by, "You have any word about size of drone" -- I'm

22   sorry, "You have any worry about size of drone and getting it

23   into water quietly?"  He then follows it with a statement, "For

24   1T it is almost 20 feet long."

25   Q.   Are you aware of the unit of measurement that starts with a

1    letter T?

2    A.   Tons.

3    Q.   And is there a response?

4    A.   Yes.  The bottom, the user of the device states, "No

5    brother."

6    Q.   And can we go to Government's proposed Exhibit 115.5 and

7    tell me if you recognize that?  I'm sorry.  115.15.

8    A.   This is another photograph of a BlackBerry phone located in

9    Mr. Didani's iCloud.

10   Q.   Same type of thing where it appears to be a photograph that

11   was taken by another device of the BlackBerry text messages?

12   A.   Correct.

13   Q.   And does this further discuss the torpedo?

14   A.   It does.

15           MR. BILKOVIC:  Your Honor, at this time I would move

16   for admission into evidence of Government's proposed Exhibit

17   115.15.

18           THE COURT:  Any objection?

19           DEFENDANT DIDANI:  Objection, your Honor.  It's all

20    going to be hearsay.

21           THE COURT:  I will allow you to have a continuing

22   objection relative to that if you like, Mr. Didani.  Is that

23   what you'd like?

24           DEFENDANT DIDANI:  Yes, your Honor.

25           THE COURT:  Okay.  And it's overruled at this time.

1    And 115.15 is admitted.

2              MR. BILKOVIC:  And may I publish it to the jury?

3              THE COURT:  Yes.

4    BY MR. BILKOVIC:

5    Q.   Again, can you tell from the photo what type of message

6    this is?

7    A.   Yes.  This is a Sky message.

8    Q.   And how do you know that?

9    A.   Due to the Sky insignia button in the white task bar right

10   above the keys.

11   Q.   And what type of phone is this on?

12   A.   BlackBerry.

13   Q.   And again, it's hard to see there, but do you see some

14   fingers on the right-hand side of the photograph holding the

15   phone?

16   A.   Yes, yes.

17   Q.   So does this again appear to be a photograph of a

18   BlackBerry phone taken by another device?

19   A.   Correct.

20   Q.   And is that photograph then uploaded to Mr. Didani's

21   iCloud?

22   A.   That is accurate.

23   Q.   Can you read the text message starting with the full one at

24   3:53 from D4C99E@blacksecure.com?

25   A.   "I will get all info when I'm there.  We have other boats

 1   as well that coming here.  And I have fishing boat here that we

 2   unlock the torpedo 100 miles offshore.  Here."

 3   Q.  Can you turn to Government's proposed Exhibit 116 -- I'm

 4   sorry, 115.16.  And do you recognize that?

 5   A.  Yes, I do.

 6   Q.  Does that appear to be a continuation of the previous

 7   message that ended with "here"?

 8   A.  Correct.

 9        MR. BILKOVIC:  Your Honor, at this time I would move

10   for admission into evidence Government's proposed Exhibit

11   115.16 and request to publish it to the jury.

12        THE COURT:  You have a continuing objection to this,

13   Mr. Didani?

14        DEFENDANT DIDANI:  Yes, your Honor.

15        THE COURT:  So noted and preserved for the record, and

16   115.16 is admitted.

17        MR. BILKOVIC:  Thank you, your Honor.  May I publish

18   it to the jury?

19        THE COURT:  You may.

20   BY MR. BILKOVIC:

21   Q.  And again, do you see where the letter "Here" -- the word

22   "Here" is in the top message?

23   A.  Yes.

24   Q.  Okay.  And then does that person send another message?

25   A.  Following the word "Here" there is another user of the

1    blacksecure.com that replies.

2    Q.  So a different number, 6F35C7@blacksecure.com?

3    A.  Yes.

4            MR. BILKOVIC:  Can we zoom in on that.

5    BY MR. BILKOVIC:

6    Q.  And can you just read that.  Can you read the text message

7    to the jury.

8    A.  "My man, my guy, will me happy when he hears about the boat

9    and we can pull that stuff before it gets to the shore."

10   Q.  Now, were these only a couple of the messages that you

11   found relating to Peregrine?

12   A.  Yes.

13   Q.  And you're going to be testifying later and we'll go

14   through additional messages later?

15           MR. BILKOVIC:  You can pull that one down.

16   BY MR. BILKOVIC:

17   Q.  You'll be testifying about additional things having to do

18   with the Michigan drug conspiracy?

19   A.  Yes, I will.

20   Q.  And during this time that the Peregrine was being designed

21   was Mr. Didani spending time in the Eastern District of

22   Michigan?

23   A.  Yes, he was.

24   Q.  And was Mr. Tibbitts living in the Eastern District of

25   Michigan?

1    A.   Yes, he was.

2    Q.   I want to turn now -- if you could go to that big book, the

3    white one right there.  It's down there under the TV.  I'm just

4    going to have you gp through -- I'm not going to go through

5    chats.  I'm just going to have you -- ask you some questions

6    about some chats and move for their admission, and we will get

7    into the content of them later.

8           But did you read and review the Cellebrite extraction

9    report from the rose iPhone that was recovered from Mr. Didani

10   on March 20, '21 -- March 31, 2021?

11   A.   March 31, 2021, yes, I did.

12   Q.   And did you find any chats in there between Donald Larson

13   and Ylli Didani?

14   A.   Yes.

15   Q.   Can you look at 61.0 and tell me if you recognize that?

16   A.   I do.

17   Q.   And what is that?

18   A.   This is a Cellebrite extraction of a message thread between

19   an individual with a moniker P and two participants listed as

20   Dan Dan with a phone number.

21   Q.   And the phone number belongs to who?

22   A.   Donald Larson.

23   Q.   And this was pulled from Mr. Didani's iPhone?

24   A.   Yes.

25   Q.   And is it fair to say that that is an excerpt of a chat?

 1    A.   Yes.

 2    Q.   And are there portions of it that are redacted?

 3    A.   Yes.

 4         MR. BILKOVIC:  Your Honor, at this time I would move

 5    for admission into evidence of Government's proposed Exhibit

 6    61.0.

 7         THE COURT:  Any objection?

 8         DEFENDANT DIDANI:  No objection to it.

 9         THE COURT:  Very well.  It's admitted.

10         MR. BILKOVIC:  Thank you, your Honor.

11    BY MR. BILKOVIC:

12    Q.   Are there various photographs and other items that were

13    contained within that chat that were being sent back and forth

14    between those individuals?

15    A.   Yes.

16    Q.   And have you had an opportunity to review Government's

17    proposed Exhibits 61.1 and 61.9?

18    A.   61.1 and 61.9.

19    Q.   Through 61.9.

20    A.   Oh.  Through 61.9.  Yes, I have.

21    Q.   And are those various photographs that were exchanged

22    between Mr. Larson and the person identified as P?

23    A.   Yes.

24         MR. BILKOVIC:  Your Honor, at this time I would move

25    for admission into evidence of Government's proposed Exhibit

```
 1    61.1 to 61.9.

 2              THE COURT:  It's 61.1 through 61.9?

 3              MR. BILKOVIC:  Correct.

 4              THE COURT:  Do you have any objection?

 5              DEFENDANT DIDANI:  Your Honor, I'm -- 61.1, 61.2 --

 6    what I have over here is different.  It have nothing to do with

 7    Mr. Larson, so I'm a little confused.  This on my screen.

 8              THE COURT:  You say that it's not text messages

 9    between Mr. Larson and someone else?  Is that your objection?

10    I'm not sure.  What's your objection?

11              DEFENDANT DIDANI:  Your Honor, it's objection because

12    Mr. Bilkovic is talking about -- I'm having on there -- on

13    their USBs there is no -- it has nothing to do with Mr. Larson.

14    That's why I'm confused.

15              MR. BILKOVIC:  Judge, I'm sorry if I --

16              THE COURT:  61 -- you're referring to 61.1 through

17    61.2?

18              MR. BILKOVIC:  Your Honor, I might be able to clarify

19    and maybe make the Court more informed.  I should have asked

20    better questions.  The images are not -- these are images, 61.1

21    to 61.9.  Several of them involve -- they are photographs of

22    conversations that Mr. Didani or other people were having that

23    Mr. Didani then took screenshots and sent those to Mr. Larson.

24    That's what they are.  They're not -- the photographs are not

25    conversations with Mr. Larson.  They are photographs of
```

1    conversations Mr. Didani had with others that he was sending to

2    Mr. Larson.

3            THE COURT:  Okay.  But I haven't heard that from the

4    witness.

5            MR. BILKOVIC:  Okay.

6            THE COURT:  Do you want to ask the witness those

7    questions?

8            MR. BILKOVIC:  Yes.  Let's -- for example, if we

9    could --

10           THE COURT:  Because that was not clear.

11   BY MR. BILKOVIC:

12   Q.   Let's start with 16.1 (sic).  Do you recognize that?

13   A.   16 --

14   Q.   61.1.

15   A.   I don't have .1.  I have 61.O and 61-2.

16   Q.   You don't have photographs at the end of 61?

17           MR. BILKOVIC:  May I approach, your Honor?

18           THE WITNESS:  I'm sorry.  I'm sorry.  I'm mistaken.  I

19   was in the wrong place.

20   BY MR. BILKOVIC:

21   Q.   Okay.

22   A.   Yes.

23   Q.   And 61.1, do you recognize that?

24   A.   Yes, I do.

25   Q.   And what is that?

1  A.  This is again a photograph of another message thread on an

2  additional cellular device that had been captured.

3  Q.  And is that a photograph then that Mr. Didani sent to

4  Mr. Larson?

5  A.  Yes.

6  Q.  And is the same with photographs in 61.2, .3 and .4?

7  A.  Yes.

8        THE COURT:  Now, do you have an objection to those now

9  that it's clear what they are?

10        DEFENDANT DIDANI:  Yes, your Honor.  I object because

11  there's no foundation to a conspiracy.

12        THE COURT:  Well, we spoke to that relative to

13  Mr. Larson yesterday.  Your objection is noted and preserved

14  for the record.  I believe we spoke to it relative to

15  Mr. Larson yesterday; is that correct?

16        MR. BILKOVIC:  Yes.  And I would also note that these

17  are statements by a party opponent as well of Mr. Didani.

18        THE COURT:  All right.  They're admitted, and your

19  objection is noted and preserved for the record.

20        MR. BILKOVIC:  Thank you.

21        THE COURT:  For the reasons stated yesterday.

22        MR. BILKOVIC:  And I'm not going to go through them

23  right now, your Honor.  I'll do that next time the agent

24  testifies.  I just want to get some of the foundation out of

25  the way.

1    BY MR. BILKOVIC:

2    Q.  If you could look at 62.0, Government's proposed Exhibit

3    62.0, and tell me if you recognize that?

4    A.  Yes, I do.

5    Q.  And is that a chat message between Don Larson and

6    Mr. Didani that was pulled from the extraction of the rose

7    iPhone?

8    A.  Yes, it is.

9    Q.  And again, is that an excerpt of a chat message?

10   A.  Correct.

11   Q.  And --

12            MR. FINK:  What number?

13            MR. BILKOVIC:  62.0.

14            MR. FINK:  Thank you.

15            THE COURT:  It's from what phone?

16            MR. BILKOVIC:  The rose-colored iPhone --

17            THE COURT:  No.  I'm asking the witness.

18            MR. BILKOVIC:  Oh, I'm sorry.

19            THE WITNESS:  This is the rose, gold-colored iPhone

20    that was taken off of Mr. Didani in the Charlotte airport.

21            THE COURT:  Okay.

22   BY MR. BILKOVIC:

23   Q.  And that is an excerpt of the full chat message?

24   A.  An excerpt of the chat, yes.

25   Q.  And are there portions of it that are redacted?

1    A.   Correct.

2    Q.   And can you look at 63.0.

3    A.   Yes.

4    Q.   Tell me if you recognize that?

5    A.   This is an additional message thread between Mr. Larson and

6    Mr. Didani.

7    Q.   Also pulled from the rose iPhone extraction?

8    A.   Yes, it is.

9              MR. BILKOVIC:  Your Honor, at this time the Government

10   would move for admission into evidence of Government's proposed

11   Exhibits 62.0 and 63.0.

12             THE COURT:  Any objection?

13             DEFENDANT DIDANI:  No objection, your Honor.

14             THE COURT:  All right.  They're admitted.

15   BY MR. BILKOVIC:

16   Q.   And I'm going to stop now, but you are familiar with other

17   aspects of this investigation?

18   A.   Yes.

19   Q.   And we've not obviously gone through all of those right

20   now?

21   A.   No, we have not.

22   Q.   We'll do those at a later time; correct?

23   A.   Yes.

24             MR. BILKOVIC:  I have nothing further at this time,

25   your Honor.

```
 1              THE COURT:  Very well.  Do you wish to cross-examine,
 2   or do you wish to wait until he's given all his testimony?
 3              DEFENDANT DIDANI:  No.  I can do it right now, your
 4   Honor.
 5              THE COURT:  You can what?
 6              DEFENDANT DIDANI:  I can start right now, your Honor.
 7              THE COURT:  All right.  Very well.  You may.
 8                          CROSS-EXAMINATION
 9   BY DEFENDANT DIDANI:
10   Q.   Good morning -- or good afternoon, Detective Leach.
11   A.   Good afternoon.
12   Q.   It's been four years we didn't see each other?
13   A.   March 31st.
14   Q.   How are you, sir?
15   A.   I'm well.  Thanks.
16   Q.   Detective Leach -- am I saying your last name right?
17   A.   Leach, correct.
18   Q.   Leach.
19   A.   Thank you.
20   Q.   I'm sorry.
21   A.   No.  You got it.
22   Q.   Detective Leach, can you please tell me where do you work
23   right now?
24   A.   I'm employed for the Farmington Hills Police Department,
25   Farmington Hills, Michigan.
```

1    Q.   And what is your job there?

2    A.   To investigate crimes from misdemeanors through felonies

3    basically.

4    Q.   For Farmington Hills?

5    A.   That's one of my objections, yes -- objectives.

6    Q.   Do you work for any other agency right now, Detective

7    Leach?

8    A.   Do I work for another agency?

9    Q.   Yes, sir.

10   A.   Yes.  I'm still federally sworn as a task force officer as

11   well.

12   Q.   But you're still task force with DEA?

13   A.   I'm still a federally sworn task force officer with the

14   DEA, that is correct.

15   Q.   And in Farmington Hills can you tell me -- so can you tell

16   me, fill me in a little bit, what kind of cases you get,

17   Detective?

18   A.   As I've explained twice already, anywhere from low-level

19   misdemeanors such as like frauds or retail frauds through

20   mid-level misdemeanors and low-level felonies like larceny from

21   vehicles through armed robberies, through home invasions,

22   through stabbings, through shootings, through child abuse

23   through rape, through drug trafficking, so on, so forth.

24   Q.   What kind of cases you get in drug trafficking, Agent

25   Leach, in Farmington?

1   A.   They vary.

2   Q.   Like what?

3   A.   A lot of them stem from traffic stops that are brought to

4   me on arrest, and then I'll do interviews or I'll submit it to

5   the prosecutor's office for charges.

6   Q.   Do you have -- when you say narcotics, these narcotics

7   basically in Farmington or outside of Farmington?

8   A.   My investigations?

9   Q.   Yes, sir.

10   A.   Well, my investigations with Farmington Hills Police

11   Department start in the city of Farmington Hills where I have

12   venue.

13   Q.   How many investigations from Farmington Hills you had as

14   far as international narcotics other than Mr. Didani who's in

15   front of you?

16   A.   Through Farmington Hills international narcotics

17   investigations?

18   Q.   Yes, sir.

19   A.   None.

20   Q.   So it would be fair that other than Mr. Didani you have no

21   other experience as far as international narcotics; yes, sir?

22   Is that fair?

23   A.   That is inaccurate.

24   Q.   Okay.  Well, how many others?

25   A.   I've been a federal task force officer since 2016, where I

1    investigated numerous major narcotics trafficking organizations

2    that stemmed from this district back to other large cities,

3    domestically and into Mexico.

4    Q.   Did you ever investigated narcotics in Europe?

5    A.   First time.

6    Q.   You ever in South America?

7    A.   No.

8    Q.   So that's your first time with the defendant that's sitting

9    in front of you, right, Agent?

10   A.   You're asking if this is the first investigation that I

11   investigated that dealt with Europe and South America?

12   Q.   Yes, sir.

13   A.   Yes, this is the first one.

14   Q.   Now, after this investigation did you have another one?

15   A.   Not that I can think of offhand, no.

16   Q.   I'm trying to get your training and experience.  That's

17   what I'm trying to get out here, sir.  So when --

18           THE COURT:  You can go to a question.

19   BY DEFENDANT DIDANI:

20   Q.   When you was brought in on this case?

21   A.   I didn't understand the question.

22   Q.   When you was brought in in this case?

23   A.   When was I brought into the investigation?

24   Q.   Yes, sir.

25   A.   I was originally briefed in November of 2017.

1    Q.   And briefed from who?  From the Government or other agents?

2    A.   From Border Patrol Officer Josh Bianchi.

3    Q.   So, to be fair, you entered this case in 2017; right?

4    A.   That's correct.

5    Q.   And, to be fair, you testified in front of Grand Jury that

6    I was -- that I was being investigated since 2013; right?

7    A.   Yes.  There was previous federal -- you were under other

8    federal investigations since then.

9    Q.   Okay.  Do you remember anything about 2013, sir,

10   investigation?

11   A.   Not offhand.

12   Q.   Fill me in how this works.  When another agent comes to

13   you, Agent Bianchi, who comes to you and he says, Detective

14   Leach, I need your help, come and help me out for what?

15   A.   It's very typical for agencies to work together and

16   collaborate on large-scale investigations.  So there was new

17   information that was brought to Mr. Bianchi's attention, and he

18   wanted to bring it back to the -- to our group.  And we kind of

19   evaluated the situation and figured that this case had some

20   meat on the bone and that it would be a good case to

21   investigate.

22   Q.   So basically what you said right now, Agent Bianchi brought

23   the case to you, so pretty much you investigated what Agent

24   Bianchi had done before from this case?

25   A.   Yes.  Some of the facts from Mr. Bianchi were shared with

1    me, that is correct.

2    Q.  All right.  So in your memory -- let's go to 2013.  What

3    facts was that?

4    A.   What facts were what?

5    Q.  Agent Bianchi shared with you in 2013.

6    A.   I don't recall the facts from 2013.  As I stated, my

7    primary focus of this investigation started in 2017, with more

8    recent information from the 2015 and '16 phones and the money

9    transactions conspiring within the Eastern District of

10   Michigan.

11   Q.  Agent, you didn't mention nothing about 2015 phones, but

12   since you opened it right now what do you know about 2015

13   phones?

14   A.   I know that they were seized at the Chicago O'Hare Airport

15   whenever you came -- or they were extracted whenever you came

16   into the airport during an international flight.  And there was

17   evidence on there that was suspicious activity such as bulk

18   money and you in possession of firearms.

19   Q.  Do you know if they had a warrant for those 2015?

20           THE COURT:  They have what?

21           DEFENDANT DIDANI:  A warrant, your Honor.

22   BY DEFENDANT DIDANI:

23   Q.  Agent Bianchi, did he share that information with you?

24   A.   I believe there was multiple phones.

25   Q.  In 2015?  Do you have an extraction in 2015?  Did you ever

1   look at it, yourself personally?

2   A.   I don't recall reviewing the 2015 full extraction, no.

3   Q.   But did you review it any time, or no?

4   A.   I just said I don't recall reviewing an extraction, a 2015

5   phone in totality, no.

6   Q.   You were not interested to investigate 2015?

7   A.   As I stated, when I came on in 2017, we were focussing from

8   '15 to '16 with the newer phones, the money transaction in the

9   Eastern District of Michigan.  So my goal is to investigate

10  recent activity to try and become proactive and identify the

11  active members of the organization.

12  Q.   What organization?

13  A.   The transnational drug trafficking organization that you're

14  associated in.

15  Q.   So in 2017, there was a transnational crime organization?

16  A.   I started in November of 2017.  And, yes, the information

17  on your August 2016 phone and information that we received in

18  the iCloud data that went back into those dates was

19  indicative -- that showed evidence that was indicative of

20  international drug trafficking.

21  Q.   So the only thing that you claiming right now, 2015, 2016,

22  is a iPhone, that's it?  That's your best witness?

23  A.   You're my best witness.

24  Q.   I didn't ask you about me.  I asked you about the iPhone,

25  sir.  I know you don't like me, but I'm asking you.  I asked

1    you about the iPhone.

2    A.   Mr. Didani, you asked me if that was my best piece of

3    evidence.

4    Q.   If you going to answer --

5         THE COURT:   Excuse me.   You all can argue about --

6    back and forth about who likes who and the like, but that does

7    not advance the trial.   Pose a question that advances the

8    trial.

9         DEFENDANT DIDANI:   Your Honor.   I pose a question

10   about is that your best witness, the iPhone, and Mr. --

11   Detective Leach --

12        THE COURT:   Go to a new question.

13   BY DEFENDANT DIDANI:

14   Q.   Let me go back.   2013.   Did you ask Mr. Bianchi what he was

15   investigating?

16   A.   I had spoken with Mr. Bianchi about the earlier parts of

17   the investigation in 2013.   I do not recall specifics about.

18   Q.   Do you remember in 2014?

19   A.   I recall reviewing the images from the 2015 phone.   The

20   specific dates on those phones, I cannot tell you.

21   Q.   Did you review my fiancee's images too, naked images?

22   A.   If your fiancee was naked on the iPhone, then I looked at

23   all images on the iCloud and iPhone, yes.

24   Q.   Did you ask Mr. Bianchi if he had a warrant for that that

25   you reviewed?

```
 1              MR. BILKOVIC:  Judge --

 2              THE WITNESS:  A warrant for what?  Which devices I'm

 3    asking?

 4              MR. BILKOVIC:  Judge, at this point I'm going to pose

 5    an objection as to relevance.  The Court has already gone

 6    through this with other witnesses.  They had a warrant for the

 7    '16 phone, not the '15 phone.  The Court's ruled on this.

 8              THE COURT:  He asked him if he reviewed it.  I'm going

 9    to allow him to ask if he reviewed it.

10              He wants to know if you reviewed the warrant for that

11    phone.

12              THE WITNESS:  For the 2016 phone?

13    BY DEFENDANT DIDANI:

14    Q.   2015, sir.

15    A.   2015 phone, no.

16    Q.   Did you ask Agent Bianchi for 2013, 2014, 2015, until you

17    got investigation 2017?  Did you ask Agent Bianchi, being

18    curious, did you ask him if he got anything what he was

19    investigating, both cross boarding, Canada, trucks, semi trucks

20    and everything?  Did you ask him?  You was curious to find out,

21    or no?

22              THE COURT:  Okay.  It's really compound.  Break down

23    what you want to ask him.

24    BY DEFENDANT DIDANI:

25    Q.   Did you ask Mr. Bianchi about the alleged TCO?  Did you ask
```

```
 1    Mr. Bianchi in four years what he had got, what he had got
 2    other than pictures of money and weapons on a phone, posing
 3    with a weapon?
 4    A.   In physical seizures, there were no physical seizures of
 5    narcotics at that point if that's what you're getting to.
 6    Q.   Yes, sir.
 7    A.   Yes.
 8    Q.   So Agent Bianchi in 2013, 2014, 2015, 2016, and almost
 9    2017, almost five years, Agent Bianchi had not provided not
10    even one evidence that it was any narcotics or money laundering
11    or anything here in the United States?
12    A.   I'm not testifying as Agent Bianchi, though.
13                THE COURT:  Are you aware?
14                THE WITNESS:  Am I aware?
15                THE COURT:  Of anything.
16                THE WITNESS:  No, no physical drug evidence.  No.
17                THE COURT:  Go to your next question.
18    BY DEFENDANT DIDANI:
19    Q.   All right, Agent.  So, Detective, 2017, you come in with a
20    different set of eyes.  Who is Eric Puzio?
21    A.   Eric Puzio is an associate of yours that lived in
22    Hamtramck, Michigan at the time.
23    Q.   Is he a co-conspirator?
24    A.   At this point, no.
25    Q.   Donald Larson, who is he?
```

1    A.   He is also an associate of yours, an unindicted

2    co-conspirator in this case.

3    Q.   He was never indicted?

4    A.   He was never indicted.

5    Q.   He was never arrested with a complaint, federal complaint?

6    A.   Yes, he was.

7    Q.   Did he ever made it to jail, or no?  Did you ever send him

8    to jail?

9    A.   Sentenced to jail, I don't do the sentencing, but he was

10   arrested.

11   Q.   Did you let him go home or did you let him -- what

12   happened?

13   A.   He was released from detainment, yes.

14   Q.   Marty Tibbitts.  What kind of person is Marty Tibbitts,

15   Detective Leach?

16   A.   I don't know Marty Tibbitts personally.

17   Q.   No?

18   A.   I didn't.  Sorry.

19   Q.   But you had all his iClouds, E-mails, computers, the whole

20   nine yards.  You don't know -- did you build any profile on

21   Marty Tibbitts?

22   A.   Yes.

23   Q.   What kind of person is Marty Tibbitts?

24   A.   Are you asking for my personal opinion?

25   Q.   Yes, yes.

1  A.   Based on the evidence that I located during this

2  investigation?

3  Q.   Based on what -- going through to his life, snooping all

4  over his life, based going to ever corner and ever inch that

5  Marty Tibbitts had, what kind of profile -- what kind of

6  personality Marty Tibbitts is?

7  A.   Well, it appeared that Martin Tibbitts was a self-made

8  entrepreneur with many upstanding businesses in the local

9  Detroit area with telecommunications and answering services.

10 It also appeared that he liked adrenaline.  He was also a pilot

11 and flew old historical war craft.  It also appeared that he

12 was into new cutting-age technology things and cryptocurrency.

13 Q.   What about Pete Synowiec?  Pete Synowiec?

14 A.   Yes.  Also an entrepreneur in the Eastern District of

15 Michigan that opened up two businesses.

16 Q.   What about Alex Meskouris?

17 A.   He's a real estate agent out of New York.

18 Q.   I'm asking a question so I can confirm myself.  I'm sorry.

19 A.   Sure.  That's okay.

20 Q.   Just like the Government asked you about these names, I'm

21 asking you, too, sir.

22 A.   I'm just trying to make sure that I'm providing you with an

23 answer.

24 Q.   What about Philip Daskal?

25 A.   Philip Daskal is vice president of INKAS Armored

1    Manufacturing out of Canada.

2    Q.   What about Fatjon Bajrami?

3    A.   Bajrami?

4    Q.   Yes.

5    A.   Associate of yours that lived in suburbs of Chicago.

6    Q.   When you say associate, what do you mean associate?

7    A.   I mean he was located in numerous communications with you

8    going back and forth involving business, illegal and legitimate

9    and family.

10   Q.   What about Loma, Thomas Sweeney?  What about him?

11   A.   What would you like about Mr. Sweeney?

12   Q.   I'm asking you.

13   A.   I know that he goes by the moniker "Loma."  I know he's a

14   British national.  I know he lives in Dubai, and I know he

15   finances substantial amounts of cocaine through your

16   organization.

17   Q.   He lives where?

18   A.   Dubai UAE.

19   Q.   Where is Dubai located?

20   A.   In the Middle East.

21   Q.   How far from United States?

22   A.   Across the ocean.

23   Q.   Detective, how many miles?

24   A.   I don't know.

25   Q.   To be fair, about 8,000 miles?

1    A.   I don't know.  Several thousand.

2    Q.   What about Dayiberto Torres?

3    A.   Yeah.  He's an import/export businessman that lives in the

4    Dominican and Guayaquil, Ecuador.

5              THE COURT:  I'm sorry.  What?

6              THE WITNESS:  Guayaquil, Ecuador and the Dominican

7     Republic.

8    BY DEFENDANT DIDANI:

9    Q.   Where is Ecuador?

10   A.   Ecuador is in South America.

11   Q.   How far is from Michigan?

12   A.   Several thousand miles.

13   Q.   To be fair, about 5,000 miles, sir?

14   A.   I'm not going to put a number on it.

15   Q.   All right.  Fair enough, Detective Leach.  You indicated

16   how many warrants you have -- how many iClouds did you got?

17   A.   Thirteen to 14 for your specific accounts.

18   Q.   Just one person's iCloud?

19   A.   Just your iCloud that many, yes.

20   Q.   It start from 2019?

21   A.   That was the initial iCloud search warrant, October 31,

22   2018.

23   Q.   How many cases you have that you have to pull out 18 -- 13

24   iClouds just from one person?

25   A.   Just this one.

1  Q.   And how many other people's iClouds you have gotten,

2  Detective Leach?

3  A.   In total?

4  Q.   In total, in this investigation.

5  A.   Oh.  In this investigation?

6  Q.   Yes.

7  A.   Just myself or the -- all the members?

8  Q.   Just yourself, Detective Leach.

9  A.   There are a few other iCloud accounts that I drafted

10  warrants for.

11  Q.   Do you remember which one?

12  A.   I do.

13  Q.   Can you please name those, please?

14  A.   Yushan Wang and Zulfigar Ali.

15  Q.   Yushan?

16  A.   Yushan Wang.

17  Q.   Who is Yushan?

18  A.   Yushan Wang, also know Chinola, is a Chinese national that

19  was living in Guayaquil, Ecuador laundering money for your

20  organization.

21  Q.   Living in Ecuador?

22  A.   Yes.

23  Q.   Does it seem odd that a detective from Detroit Farmington

24  pulling iCloud for someone who lives in Ecuador?

25  A.   Again, I'm acting in a capacity as a federally-sworn DEA

1    officer.

2    Q.  You was asked --

3    A.  These are federal search warrants that I was getting

4    authorization for, not state search warrants, not city search

5    warrants.

6          THE COURT:  Okay.  Let's take a minute and have the

7    jury stand up and stretch a little bit, okay.

8          Everybody over there all right?  Yes?

9          A JUROR:  Yes.

10          THE COURT:  Okay.  All right.  You may all be seated.

11   I remind you to pay careful attention, please.

12          Go to your next question.

13   BY DEFENDANT DIDANI:

14   Q.  You say Yushan; right?

15   A.  Yushan, correct.  Y-U-S-H-A-N.

16   Q.  And who's the other person?

17   A.  Zulfigar Ali.

18   Q.  Where is he located?

19   A.  Currently I do not know.  At the time he was located in

20   Dubai.

21   Q.  And what is occupation of Mr. Ali?

22   A.  Also a money launderer.

23   Q.  Money launderer, too.  For who?

24   A.  For your organization, among others.

25   Q.  Did Mr. Ali knew anything about Donald Larson?

1    A.   I have no information that shows that the two had knowledge

2    of each other, no.

3    Q.   Did Mr. Ali knows anything about Eric Puzio?

4    A.   I highly doubt it.

5    Q.   Excuse me?

6    A.   I have no information that shows the two are in

7    communication, no.

8    Q.   What about Pete?

9         THE COURT:   What about who?

10   BY DEFENDANT DIDANI:

11   Q.   Pete Synowiec?

12   A.   No.

13   Q.   Did Mr. Ali at any point was anywhere near Michigan,

14   Eastern District of Michigan?

15   A.   Not that I'm aware of.

16   Q.   Did Mr. Ali in any point from Dubai send any money to the

17   Eastern District of Michigan?

18   A.   He was -- yes.  There was direction that showed that he

19   sent money on order of you to INKAS in Canada, which goes

20   through the U.S. corresponding banks of United States.

21   Q.   Sir, sir, Detective, my question is the Eastern District of

22   Michigan.

23   A.   I'm sorry.  No.

24   Q.   We get to that.

25   A.   Okay.

```
 1   Q.  So what about Yushan, Chinola --
 2            DEFENDANT DIDANI:  Your Honor, I can't pronounce his
 3   name.  Can we call him Chinola?
 4            THE COURT:  How is it spelled?
 5            DEFENDANT DIDANI:  The --
 6            THE WITNESS:  This is a moniker known to Mr. Wang.
 7   Chinola, C-H-I-N-O-L-A.
 8            THE COURT:  Is that who you're talking about?
 9            DEFENDANT DIDANI:  Yeah.  I can't -- Chinola.  Your
10   Honor, can we say Chinola?
11            THE COURT:  Okay.  Ask your question about this
12   person.
13   BY DEFENDANT DIDANI:
14   Q.  You indicated that Chinola who is again helping the
15   organization to launder money; right?
16   A.  Yes.
17   Q.  Chinola ever send any money in the Eastern District of
18   Michigan?
19   A.  Not that I'm aware of.
20   Q.  Does he know where is Michigan?
21   A.  I can't speak for Mr. Wang.
22   Q.  You got his iCloud --
23            THE COURT:  Is that Mr. Chinola?  The name that he
24   goes by is Chinola, but that is Mr. Wang?
25            THE WITNESS:  That is Yushan Wang.  Yes, your Honor.
```

```
1              THE COURT:  Let's refer to him as Mr. Wang.
2              DEFENDANT DIDANI:  Mr. Wang, okay.
3    BY DEFENDANT DIDANI:
4    Q.  Does Mr. Wang have any idea where Michigan is, Eastern
5    Michigan?
6    A.  I can't speak for Mr. Wang if he knows where Michigan is
7    at.
8    Q.  But did you got these iCloud?
9    A.  Yes.
10   Q.  From the information of his iCloud, all the information,
11   I'm sure you went one by one, did you find any evidence that
12   Mr. Wang send any money to the Eastern District of Michigan?
13   A.  No, I did not.
14   Q.  All right.  We go back to time machine.  We go back to
15   2017.  Detective Leach, I want to talk to you about one of your
16   first reports, if you remember 12-27, 2017.
17   A.  Okay.
18   Q.  Do you remember that report was about?
19   A.  Can you read the title of the report?
20   Q.  "Return subpoena from JW Marriott, Washington, D.C."
21   A.  Yes.
22   Q.  Do you remember -- do you need the report or you can speak
23   from your memory?
24   A.  It depends on the question.
25   Q.  All right.  It's blacked out, but in December 19, 2017, it
```

1  was received some information.  Do you remember where you guys

2  received information that I was in Washington, D.C.?

3  A.   During 2017?

4  Q.   December 19.

5  A.   Yes.

6  Q.   I have a blackout.  Can you help me who informed you

7  guys --

8          MR. BILKOVIC:  Judge, I would object to that.  I would

9  ask that we approach?

10         THE COURT:  You may.

11         (At sidebar on the record out of the hearing of

12         the jury, as follows:)

13         MR. BILKOVIC:  The information was provided by a

14  confidential, unnamed source that is not testifying in this

15  case.  It is not required that we disclose that source unless

16  Mr. Didani has some type of information that this is

17  exculpatory, and it has not shown that.  So I would ask that he

18  not be allowed to ask this witness the name of who told him

19  that information.

20         DEFENDANT DIDANI:  Your Honor, it's -- the whole thing

21  in this conspiracy is Washington.  It's nothing else.

22         THE COURT:  Is what?

23         DEFENDANT DIDANI:  Washington.  So the whole center of

24  this conspiracy, your Honor, from the Government's allegations

25  is Washington.  There is nothing else, your Honor, $450,000 in

1    Washington.  So for the defense need to find out -- it's

2    appropriate for the defense to find out how the information

3    come and where they go, how did it -- and why did they follow

4    up with those information, your Honor.

5              THE COURT:  You can ask him those questions without

6    asking the name of the informant.

7              DEFENDANT DIDANI:  All right, your Honor.

8              (End of sidebar.)

9              THE COURT:  You may proceed as directed.

10   BY DEFENDANT DIDANI:

11   Q.   Detective Leach, so you -- you receive information that I

12   was in Washington?

13   A.   Yes.

14   Q.   What was all the information?  I don't need the name, just

15   basically the informant, what did they fill you in?  What kind

16   of information they give you?

17   A.   I received a folio from the JW Marriott Hotel for a

18   reservation for you.

19   Q.   Did you send a agent to that hotel in Washington?

20   A.   Yes.

21   Q.   To verify what?

22   A.   A copy of the folio and to see if there were any vehicles

23   associated.

24             THE COURT:  See if there were what?

25             THE WITNESS:  Any vehicles associated with the

 1    reservation.

 2    BY DEFENDANT DIDANI:

 3    Q.   So Agent -- Detective Leach, so in December 19, 2017, you

 4    knew that I was in Washington; right?

 5    A.   Yes.

 6    Q.   You notified the agents there in Washington to go check on

 7    this hotel and Mr. Didani; yes?

 8    A.   Yes.

 9    Q.   Did you notify those agents I need all eyes on Mr. Didani

10    to find out what he's doing there in Washington?

11    A.   No.

12    Q.   Why not, Agent?

13    A.   I was merely trying to confirm that you were in Washington,

14    D.C. at that time.  It was in the infancy stages of my personal

15    investigation and the new agents and officers that were on the

16    case.

17    Q.   You was investigating quote/unquote a international drug

18    dealer.  You was investigating quote/unquote international

19    money laundering.  You didn't have no interest to find out

20    what's going on?  Since you had the information, you didn't

21    have no interest to find out what Mr. Didani was doing in

22    Washington?

23    A.   As I stated, we started with the documentation that you

24    were in Washington, D.C. and what vehicle you were utilizing.

25    That is as far as we went at that point.

1   Q.   Why you didn't go farther?

2   A.   I don't know at this point.  Like I said, documentation and

3   then we had some money transactions we were trying to follow.

4   Q.   So you don't think you had the best opportunity, life, to

5   do all good police work in that time?  While Mr. Didani was in

6   that hotel, you don't think it was proper to do the good, good

7   whole police work, not relying only on iPhone, trying to stick

8   up, make up geo whatever, but you don't think it was the best

9   opportunity for you and your agency and for the government to

10  find out what Mr. Didani was doing in Washington?

11  A.    Mr. Didani, as I stated, it was in the infancy of the

12  investigation for me.  So, no, at that time I did not

13  understand the size of the conspiracy or organization yet.  And

14  we verified that your existence in Washington, D.C. at the

15  JW Marriott was valid and that as far as we needed to take it

16  at that time.

17  Q.   Detective Leach, you just testified that in 2016 and 2015

18  those phones had a gold mine as far as a TCO, transnational

19  crime organization.  But in 2017, you don't think it was proper

20  to investigate Mr. Didani what he was doing in Washington?  Is

21  that what you just testified right now, sir?

22  A.   Yes.

23  Q.   Since you've been snooping on my iClouds, do you know --

24           MR. BILKOVIC:  Judge, I would object to the question.

25  I believe --

```
 1              THE COURT:  Sustained.  Use a different word.
 2   BY DEFENDANT DIDANI:
 3   Q.  Do you know what Mr. Didani was doing in Washington all the
 4   time?
 5   A.  Not all the time, no.
 6   Q.  Did you see videos that I was with politicians there?
 7   A.  I don't recall every video or photo of who you were with.
 8   Q.  Did you have my Instagram account?
 9   A.  At one point, yes.
10   Q.  If I show you a photo from Instagram account, you think you
11   will identify these people in Washington?
12   A.  I don't know if I would be able to identify the politicians
13   by sight, no.
14   Q.  So you was not -- so your eye only, your eye, so your
15   vision of Mr. Didani is he's a bad dude and your mind is not
16   looking anywhere else, just this; is that right?
17   A.  Do I think you're a bad dude?  No.
18   Q.  I appreciate that.  So since you investigated these phones,
19   these iClouds, it is very important, Detective Leach, we talk
20   about this Washington thing.  It's very important, because
21   that's the center of conspiracy if you agree with me; right?
22   You don't know anything what Mr. Didani was doing out there in
23   Washington?
24   A.  No, that's not true.  I told you I didn't know what, if
25   any, politicians that you had met while you were down there.
```

1    Q.   Do you think I met a lot of politicians there?

2    A.   I can't testify to that.

3    Q.   Do you think I was with Marty there having a lot of dinners

4    with the politicians?

5    A.   During this specific trip, no, I do not.

6    Q.   How do you know, Agent?  You just said that you only send a

7    agent to verify if I was in hotel or not, and you didn't ask

8    no -- you didn't ask Agent -- the agent in Washington, D.C. to

9    even look farther; right?

10   A.   At that time I did not, no.

11   Q.   All right.  So let's go to your best witness, which is the

12   iPhone.  You didn't ever find out in iPhone in 2015, 2016, 2017

13   that Mr. Didani or Marty Tibbitts were having a lot of meetings

14   in Washington?

15   A.   I didn't say that you hadn't had meetings in Washington.  I

16   don't remember any specific dates of those meetings.  I'm

17   saying during this specific trip to Washington I did not find

18   any documentation of that.

19   Q.   What about your witness?  You didn't find any documentation

20   that I was in Washington holding a lot of meetings?

21   A.   In your iCloud?

22   Q.   Of course.  That's your witness.

23   A.   During this trip, I found numerous documentation of you

24   receiving -- I don't recall anything regarding any official

25   meetings, no.

1    Q.   What about the trip before that?  Do you think before that,

2    like a month before, two months before?

3    A.   I thought we were talking about the Washington, D.C. trip.

4         THE COURT:  Now he's talking about two months before

5    that.

6         THE WITNESS:  So what timeframe are you speaking of?

7    BY DEFENDANT DIDANI:

8    Q.   In Washington.  In Washington.

9         THE COURT:  Make the timeframe clearer.

10   BY DEFENDANT DIDANI:

11   Q.   In -- let's say in August in Washington.

12        THE COURT:  August of what year?

13        DEFENDANT DIDANI:  2017.

14        THE WITNESS:  I can't testify to that.  I do not have

15   recollection from your iCloud during that timeframe of

16   meetings, no.  That's not -- that was not the focus of my

17   investigation.

18   BY DEFENDANT DIDANI:

19   Q.   All right, Agent.  So we have to be -- let's focus.  We

20   have to be on the same page now.  All right.  So 2015 phone,

21   the extraction; right?  You had the extractions?  Did you check

22   those extractions?  I'm not tricking you.  Did you check all

23   the -- they're in 2015; right?

24   A.   I did not dissect the entire thing, no.

25   Q.   All right.  What about 2016 phones that you seized -- your

1    partner, Josh Bianchi, seized in Chicago?  You went, 11 days

2    later got a warrant.  You got a copy of those extractions in

3    2016?

4    A.   Yes.

5    Q.   All right.  So I want to be -- because -- I just want to

6    make sure and be clear for the Court here, because the only

7    informant that you have is the iCloud.  So we have to make sure

8    that you had all the --

9              Did you check all the iCloud from 2016, sir?

10   A.   It should have been captured in the initial iCloud, yes.

11   What was -- what would have still been preserved on your iCloud

12   at the time of my search warrant request.

13   Q.   When you got a copy, it was a hundred percent copy of that

14   phone in 2016, or no?

15   A.   I haven't compared them side-by-side.  So, like I said,

16   there are multiple overlaying things that are the same or very

17   similar, but I can't testify that everything was exactly the

18   same.

19   Q.   You didn't find any evidence that I was there in 2016?

20   A.   I'm not disputing that you had meetings with other

21   businessmen.  I've seen photos of that.  What I'm trying to

22   testify to is that I don't know the specific names of these

23   individuals, and I can't recall the exact dates and locations

24   off of memory.

25   Q.   All right.  So we agree -- now we agree, we're on the same

1    page, that it was a lot of meetings in Washington between 2016,

2    2017, between me and other people, Marty, other people?  Do you

3    agree with that, sir?  There is photos, videos, because that's

4    what we have right now.  That's the only thing we have here.

5    The number one informant.

6              THE COURT:  Do you want him to answer the question?

7              DEFENDANT DIDANI:  Yes, your Honor.

8              THE WITNESS:  I can't testify to specific locations

9    and time and dates, like I said, but I do recall seeing photos

10   of you dressed up with Martin dressed up and other unknown

11   individuals to me.

12             THE COURT:  Mr. Tibbitts you mean?

13             THE WITNESS:  Mr. Tibbitts.  I'm sorry.

14             THE COURT:  Thank you.

15   BY DEFENDANT DIDANI:

16   Q.  And now we coming to 2017, Detective Leach.  And I

17   appreciate for you saying that I'm not a bad person.  I really

18   appreciate that.  That means a lot.

19             THE COURT:  Go to a question.

20   BY DEFENDANT DIDANI:

21   Q.   We going to sit on 2017.  Did you have a chance to see --

22   of course you made the complaint.  The complaint was done by

23   you; right?

24   A.   Yes.

25   Q.   And by the prosecutor, Mr. Bilkovic?

1    A.   Reviewed by, yes.

2    Q.   We have to stay -- now we talking about this Washington

3    thing, the $450,000; right?  Did you have a chance to review

4    the superseding indictment?

5    A.   Yes.

6    Q.   And do you agree with me, part of me being in this Court

7    right now in front of you and in front of this jury and in

8    front of this judge, it was -- part of that is -- very

9    important part, the $450,000 in Washington?  Do you agree with

10   me?

11   A.   The $450,000 was flown from Detroit to Washington, D.C. is

12   an element of the local conspiracy, yes.

13   Q.   We going to get to that, you know, Detective Leach.  We

14   going to get to that.

15   A.   It's an element.  I wouldn't say it's the only part, no.

16   Q.   This one of the biggest part of this conspiracy that I'm

17   sitting over here right now.  That's where we started

18   everything, though; right?

19   A.   One of the factors, yes.

20   Q.   Because Agent Bianchi, 2013, 2014, 2015, 2016, all these

21   years, other than snooping on my phones he had nothing else;

22   right?

23   A.   There were no physical seizures made at that time, yes.

24   Q.   Right.  Now we got this 2017.  So, Detective Leach, you

25   have to be patient with me, because --

1          THE COURT:  Go to a question, please.

2    BY DEFENDANT DIDANI:

3    Q.  So what make you think this $450,000 was used to buy

4    cocaine?  What is your view on that?  I want to see your view.

5    What make you think this $450,000 was used to buy cocaine?

6    A.  Well, by the initial way that it was layered to get

7    converted from a bank account to cash in bulk currency, the

8    fact that it was flown down in secrecy in the middle of the

9    night to Washington, D.C. and hand delivered to you.  There was

10   text messages between you and Mr. Larson stating that "got to

11   be careful, there's a lot of cops around here at night, we got

12   to be discreet."

13          Then there was geotagged photos of you with the money

14   laid out on the bed.  You could do that for a multitude of

15   purposes, I suppose.  But then the next day you were in contact

16   with Chinese members of what -- in New York in which you then

17   transported the money to New York and recorded a video of the

18   money going through a money counter and then just disappearing.

19          So in my profession, in my professional opinion, this

20   is not indicative of legitimate money transfer.  There are much

21   simpler ways to move money legitimately if it's for a

22   legitimate purpose.  Once you start showing deceit and layering

23   techniques, it shows that the money is most likely used for

24   illegal activity.

25   Q.  That's your belief; right?  That's your belief?  That's not

1   a fact; right?

2           THE COURT:  You asked him his belief.

3           DEFENDANT DIDANI:  That's his belief?

4   BY DEFENDANT DIDANI:

5   Q.  All right.  So --

6           THE COURT:  You can continue with this witness

7   tomorrow.  Thank you.

8           DEFENDANT DIDANI:  Yes, your Honor.

9           THE COURT:  You may step down, sir.  Don't discuss

10  your testimony with anyone, and please come back tomorrow at

11  the appointed time; okay?

12          THE WITNESS:  Yes, your Honor.

13          (End of excerpt at 12:57 p.m.)

14                          _   _   _

15

16

17

18

19

20

21

22

23

24

25

```
 1
 2
 3                    CERTIFICATE OF COURT REPORTER
 4
 5          I, Sheila D. Rice, Official Court Reporter of the
 6    United States District Court, Eastern District of Michigan,
 7    appointed pursuant to the provisions of Title 28, United States
 8    Code, Section 753, do hereby certify that the foregoing pages
 9    is a correct transcript from the record of proceedings in the
10    above-entitled matter.
11
12
13                              s/Sheila D. Rice
                                Sheila D. Rice, CSR-4163, RPR, RMR, FCRR
14                              Federal Official Court Reporter
                                United States District Court
15                              Eastern District of Michigan
16
      Date:  04/11/2025
17    Detroit, Michigan.
18
19
20
21
22
23
24
25
```