1                  **UNITED STATES DISTRICT COURT**
                  **EASTERN DISTRICT OF MICHIGAN**
2                      **SOUTHERN DIVISION**

3                         —   —   —

UNITED STATES OF AMERICA,

4
               Plaintiff,

5
    v.                      Case No. 21-20264
6
YLLI DIDANI,

7
              Defendant.
8 _____/
          **JURY TRIAL - VOLUME 12 - EXCERPT**
9   **Testimony of Brandon Leach (Continued) and Belinda Tibbitts**
        **BEFORE THE HONORABLE DENISE PAGE HOOD**
10          **UNITED STATES DISTRICT JUDGE**

11       Theodore Levin United States Courthouse
         231 West Lafayette Boulevard
12            Detroit, Michigan
          Friday, March 7, 2025
13

 **APPEARANCES:**
14

 **For the Plaintiff:**     Mark Bilkovic
15                    Timothy McDonald
                   UNITED STATES ATTORNEY'S OFFICE
16                    211 W. Fort Street, Suite 2001
                   Detroit, Michigan  48226
17                    (313) 226-9623

18 **For the Defendant:**    Ylli Didani,
                   Appearing in Pro Se
19
                   Wade Fink
20                    WADE FINK LAW, P.C.
                   550 W. Merrill Street, Suite 100
21                    Birmingham, Michigan  48009
                   (248) 712-1054
22                    (Appearing as Standby Counsel)

23 **Also Present:**        Special Agent Chad Hermans
                   Maria DiCarlo, Paralegal
24

      *To obtain a copy of this official transcript, contact:*
25        *Sheila D. Rice  Official Court Reporter*
       *(313) 234-2610 • sheila_rice@mied.uscourts.gov*

1

## TABLE OF CONTENTS

2

MATTER                                                           PAGE

3

**JURY TRIAL - VOLUME 12 - EXCERPT**

4

**Government's Case in Chief (Continued)**

5

**BRANDON LEACH**
Continued cross-examination by Defendant Didani.....   3

6

Redirect examination by Mr. Bilkovic................  96
Recross examination by Defendant Didani............. 108

7

8

**BELINDA TIBBITTS**
Direct examination by Mr. Bilkovic.................. 115

9

Cross-examination by Defendant Didani.............. 148

10

Certificate of Court Reporter...................... 168

11

12

13

14

E X H I B I T   I N D E X

15

16

| Exhibit No. | Description | Identified | Admitted |
|---|---|---|---|
| Government's 6.0 | Martin Tibbitts' notebooks | 144 | 145 |
| Government's 112.10 | Photo of message thread | 103 | 104 |

17

18

19

20

21

22

23

24

25

1    Detroit, Michigan

2    Friday, March 7, 2025

3    9:57 a.m.

4                              —   —   —

5         (Beginning of Excerpt.)

6         THE COURT:  So we'll try to get going.  Mr. Leach is

7    still on the stand, and I'm going to tell him that he's still

8    under oath, and it's cross-examination by Mr. Didani.

9         Are we?  Is that where we are or not?

10        DEFENDANT DIDANI:  Yes, your Honor.

11        THE COURT:  Okay.

12        DEFENDANT DIDANI:  Good morning.  Good morning to all

13    of you.

14        JURORS:  Good morning.

15              CROSS-EXAMINATION (Continued)

16   BY DEFENDANT DIDANI:

17   Q.   Detective Leach, good morning.

18   A.   Good morning.

19   Q.   How are you, sir?

20   A.   I'm not bad.  Yourself?

21   Q.   Detective Leach, remember where we left the last time?

22   A.   You'll have to refresh my memory on that.

23   Q.   It was --

24        THE COURT:  Let's go to a question.  How about that?

25

1    BY DEFENDANT DIDANI:

2    Q.   We left --

3              THE COURT:  Prior listening, and I think we can catch

4    on to where you are, all right.

5    BY DEFENDANT DIDANI:

6    Q.   We left it to Washington, which was the first opportunity,

7    or how you want to call it, the first bite of the apple.  So,

8    to be sure, in Washington you had information about that I was

9    going to be in Washington.  You send a agent out there, but

10   this agent never followed me, would never receive any

11   information what I was doing in Washington with the money; is

12   that correct?

13   A.   At the time that we sent the agent there we were unaware

14   that there was money involved on that trip.

15   Q.   And last time you said something about that flying an

16   airplane at nighttime it was suspicious.  What's suspicious

17   about that, Detective Leach?

18   A.   Flying an airplane at nighttime by itself is not suspicious

19   on its own merits.

20   Q.   What was suspicious about Mr. Larson flying to Washington

21   that day?

22   A.   The suspicion upon our investigation with the information I

23   received later, not to be confused with the information that

24   the agent received in D.C. at that time, was the totality of

25   everything involved between Mr. Larson's money movements, the

1    text messages between him and yourself, him flying at night and
2    then the money being delivered.  That is suspicious.
3    Q.   Do you agree with me if it was -- if anyone -- if
4    Mr. Tibbitts wanted to hide something, he won't get those money
5    from his personal account?  Do you agree with me, or no?
6    A.   I'd say that depends.  In the fashion that he gave the
7    money, is that what you're asking, if that is suspicious?
8    Q.   Yeah.  Does it look suspicious?
9    A.   It looks -- it begs the reason why he wouldn't give the
10   money to someone directly and use a third party to then
11   transfer that money in that fashion.  That is suspicious to me
12   in my investigation.
13   Q.   You confirmed later on that Marty Tibbitts was outside --
14   was not even in the United States, didn't you, with Belinda?
15   A.   At that time?  Correct.
16   Q.   So there's no -- what I want to do -- you and Agent Newsome
17   verified that Marty Tibbitts had 30 accounts at Comerica Bank;
18   right?
19   A.   He had bank accounts at Comerica Bank, that is correct.
20   Q.   And you have verified, you and Agent Newsome, were both
21   together, you have verified that those monies was from
22   legitimate incomes; right?
23   A.   That is more on the Special Agent Newsome side that did the
24   verification, but yes.  What we believe was that money was
25   legitimate that was in the account at that time.

1  Q.  So taking $450,000 and going to Washington, what make you

2  think that was going to be used for drugs?

3  A.  As I was stating previously, it's not just the money being

4  taken out.  It's all the elements that surround it.  The text

5  messages back and forth, the money being transferred and checks

6  by Mr. Larson, and then converted to bulk currency and then

7  being flown out on a private airplane and handed off in a

8  duffle bag, and then moved out to potentially an Asian money

9  launderer in New York and then just disappears.

10 Q.  I'm going to go there, but when you say that money was

11 given, a check -- personal check to Donald Larson, do you agree

12 a big portion of that money was cashed in Marty Tibbitts' bank?

13 Do you remember that?

14 A.  Of that specific $450,000?

15 Q.  Yes, sir.

16 A.  Yes, part of that money was cashed at the bank.  Part of it

17 was converted to cashier's checks and done at one of the MBN

18 exchanges.

19 Q.  So, in your view, for somebody cashing personal checks from

20 his personal bank, in your view it's suspicious or something?

21 A.  I think there were techniques used such as layering

22 techniques that come off as suspicious, yes.

23 Q.  Can you explain to me some of those layering techniques,

24 Detective Leach?

25 A.  Sure.  For instance, instead of writing five checks why

1   wouldn't you write one check if it's all coming out of the same

2   bank account?  And, if the money is inevitably going to you,

3   why wouldn't he write the check to you?  Why would he write the

4   checks, make them out to Donald Larson, or have them converted

5   to cashier's check and then cashed at different multiple

6   locations just to be reconsolidated?  It's almost as if he's

7   trying to remove a connection between yourself and him.

8   Q.   All right.  Well, did you check in 2017 if I had any bank

9   accounts in United States?

10  A.   I don't recall you having any bank accounts.

11  Q.   Exactly.  So he cannot possibly write a check to me if I

12  don't have a bank account; right?

13  A.   Well, Mr. Larson also didn't deposit this into a bank

14  account.  It was converted to bulk cash.

15  Q.   Detective, so let's go -- okay.  You lost the first

16  opportunity in Washington.  Now, let's go to the second

17  opportunity of the money.  You said that money was left to an

18  Asian person; right?

19  A.   There was a recording on your phone of the money on a

20  counter, going through a money counter, with an individual with

21  an Asian inflect in his voice.  You cannot see that

22  individual's face at that time.

23  Q.   Did you ever discover the Asian guy?

24  A.   There were communications going back and forth between

25  yourself and an individual identified as Lin Bao Wang.

1    Q.  So you know his address, you know his house, you know his

2    business, you know his name, you know his last name?

3           MR. BILKOVIC:  Can we limit it to one question at a

4    time maybe?

5           DEFENDANT DIDANI:  Your Honor?

6           THE COURT:  That is a lot of questions.  Why don't you

7    just ask one of the things at a time.

8           DEFENDANT DIDANI:  I want to make sure, your Honor.

9           THE COURT:  That's okay.  You can ask all of them.

10   Just separate them so we'll --

11   BY DEFENDANT DIDANI:

12   Q.  Do you know everything about the Asian guy, his whereabouts

13   and where he lives, everything?

14   A.  That's on -- there was an address that was produced in the

15   chat between the two of you for Flushing, New York.

16   Q.  All right.  Agent Leach, you have his phone number, you

17   have his address.  I see it on your report.  Do you want me to

18   refresh your memory?

19   A.  I'm aware.

20   Q.  Okay.  Did you ever go visit this Asian guy?

21   A.  No.

22   Q.  Why not?

23   A.  I passed the intelligence after received to the

24   New York-based offices for an independent investigation.  I

25   don't recall receiving any return on that information regarding

1    that.  And we also have to remember that this isn't live time

2    that this was being discovered.  This was being discovered from

3    iCloud data in the very end of 2018, or the money transfer in

4    the end of '17.

5    Q.  So you saying that your witness, iPhone witness, that's

6    what you say, that you discovered it from iPhone two years

7    later?

8    A.  It was in 2018.

9    Q.  Over a year later or something?

10   A.  Sure.

11   Q.  Did you call -- did you write the iPhone the Miranda

12   Rights?

13            THE COURT:  Did you what now?

14   BY DEFENDANT DIDANI:

15   Q.  Did you read the Miranda Rights for the iPhone?

16   A.  No, no.

17   Q.  So, Detective Leach, you didn't want to find out where the

18   money go?  You had no interest to find out where the money go?

19   A.  Very strong intrigue to figure out where all this money was

20   going.

21   Q.  Is that Mr. Wee (ph) or something -- what's his name?  Is

22   he still in New York?

23   A.  Lin Bao Wang, I do not believe so.

24   Q.  So no agency, no agency, not you, not DEA, not New York, no

25   one knock on his door to ask where that money go?

1  A.  I don't recall receiving any follow-up from the New York

2  office, no.

3  Q.  So how you going to come four or five years later and say

4  this money was used for drugs?

5  A.  As I was saying earlier, it's the totality of the

6  circumstances between the money being layered, the text message

7  on the plane.  There's also photos of suspected kilograms of

8  cocaine within the timeframe of that money being moved and then

9  the money being moved to New York, ran through a money counter

10  and disappears.  This is indicative, in my experience as an

11  investigator, of money laundering and utilizing the money for

12  cocaine.

13  Q.  What about those photos?  Can you fill me in on -- can you

14  fill the jury in?  What about those photos, that you think

15  those photos, that money, was going to be used somehow for

16  those photos?  What about those?

17  A.  Which photos?  Are you speaking of the suspected cocaine?

18  Q.  Yes.

19  A.  There's two photos during the timeframe of your money

20  transfer.  One was of a large quantity of what appeared to be

21  kilogram quantities of cocaine with the ace of diamonds logo on

22  the top of each of the kilos.  And then there was another

23  additional image of a close-up of the kilo, what appeared to be

24  unwrapped, with the ace of diamonds stamped insignia printed on

25  the top of it.

1   Q.   So you don't know if those photos was tooken from internet

2   or was tooken from anywhere?  You have no intelligence on that?

3   A.   I'm telling you that there was two photos of an ace of

4   diamonds of kilograms on your phone.

5   Q.   So those photos, it was somewhere in December 2017; right?

6   And you discovered those photos, to be fair, on your report in

7   2019; right?

8   A.   2018, I believe.

9   Q.   All right.  So basically -- it sound like Philadelphia.  So

10  you went back all the way in 2018, you saw a photo somewhere in

11  December 2017, and here you go, the money is for drugs?  That's

12  what you think?

13  A.   There were numerous photos in your phones, in your iClouds,

14  regarding other images and text messages surrounding cocaine

15  trafficking.  That in totality makes me believe that that was

16  utilized as moving the money for the cocaine purchase.

17  Q.   But in Washington you lost your first bite of the apple.

18  You had all the time, all the time in the year from 2017, '18,

19  '19, '20, '21, after indictment, to go knock on this guy,

20  Mr. Wang in New York.  You had all opportunity.  You probably

21  still have opportunity to go knock on his door and ask did you

22  remember this guy dropped $450,000, and ask him if he remember

23  what was the money for and where the money go, but you never

24  did it?

25  A.   No, I directly did not do it.

1    Q.   And no other agency did it for you?

2    A.   Not to my knowledge.

3    Q.   Detective Leach, we need to stay on this part and speak

4    about Marty Tibbitts.

5    A.   Okay.

6    Q.   What did you think about Marty in your investigation?  What

7    did you think?  What kind of person he was?

8    A.   Through the optics of my investigation?

9    Q.   Yes, sir.

10   A.   I think he was an individual with a lot of ambition, that

11   started his own legitimate telecommunications companies and

12   where he became very successful.  I also think he had a need

13   for adrenaline.  And I think he got involved with you and made

14   some serious bad mistakes.

15   Q.   For that money, the 450,000?

16   A.   What's that?

17   Q.   It was a mistake for that money, the 450?

18   A.   That was one of the mistakes he made, yes.

19   Q.   You just testified you don't even know where the money.

20   You disappeared.  So how is that mistake?  You just testified

21   that -- how is that mistake?

22          THE COURT:  You've got a question pending.  Let him

23    answer the question.

24          THE WITNESS:  What was the question, Mr. Didani?  I'm

25    sorry.

```
 1            THE COURT:  How is it a mistake?
 2            THE WITNESS:  The money being moved, how is it a
 3   mistake?
 4   BY DEFENDANT DIDANI:
 5   Q.  Yes, sir.
 6   A.  Because our investigation yielded that that was for illegal
 7   activity.  I think that's a mistake.
 8   Q.  So you go back and forth with that, sir.  Your
 9   investigation, you had opportunity in Washington, you had
10   opportunity in New York, you still have opportunity, and you
11   say -- in your investigation did not conduct to find out where
12   the money go for.  Maybe it was for me and Joe Biden's son.
13   A.  We also interviewed other individuals that were involved
14   with that money transfer that corroborated that it was for the
15   purchase of cocaine.
16   Q.  Who is that individual, please?
17   A.  Mr. Larson.
18   Q.  We gonna go to Mr. Larson, and we go figure out if it was
19   -- because Mr. Larson got about 20 stories.  We'll see which
20   one is the real one.
21            So you had Mr. Tibbitts' computer on your possession
22   all the time.  You had my E-mails that I still haven't got them
23   yet.  Did you find out --
24            THE COURT:  Ask a question, because if it's not it's
25   stricken.
```

Jury Trial, Volume 12 - Excerpt - March 7, 2025

```
 1    BY DEFENDANT DIDANI:
 2    Q.   Did you find out that Mr. Tibbitts is involved in a lot of
 3    other business or prior -- did you find out?
 4    A.   That he's involved in a lot of businesses?
 5    Q.   Yes, sir.
 6    A.   I seen there was a lot of talked about and possibly
 7    attempted business ventures.
 8    Q.   Can you name some of them, you know, between -- that
 9    related to me and Mr. Tibbitts?
10    A.   There was talk of possibly conceptualizing an ATM business
11    in Albania.  There was talk of possibly trying to buy Black
12    Hawk helicopters.  There was talk about attempting to possibly
13    buy a restaurant, possibly a marijuana cultivation company.
14    Q.   In Nevada?
15    A.   Yes.
16    Q.   Construction business?
17    A.   I don't recall the construction business and Mr. Tibbitts.
18    I'm sorry.
19    Q.   Buying airplanes?
20    A.   Black Hawks.  I recall the Black Hawks.
21    Q.   Buying airplanes, World War II or Cold War airplanes?
22    A.   Yes.  There was talk about historic airplanes, yes.
23    Q.   You didn't find out that he bought a lot of airplanes in
24    Poland and Albania, MIG 15 and MiG 17?
25    A.   I don't recall ever verifying any purchase of physical
```

1    airplanes, no, not from there.

2    Q.   What about him being an ambassador?

3    A.   I don't ever think that came to fruition as well.

4             THE COURT:  I'm sorry.  What's your answer again?

5             THE WITNESS:  I said I don't believe that came to

6     fruition either.

7             THE COURT:  Okay.

8    BY DEFENDANT DIDANI:

9    Q.   You didn't find evidence that he was considered in 2016,

10   2017, he was considered for ambassador in a foreign country?

11   A.   There may have been early small discussions regarding it.

12   But again, nothing in our investigation led us to any of those

13   things coming to fruition.

14   Q.   What about buying Bitcoins?

15   A.   Yes, Mr. Tibbitts did buy some Bitcoin.  Let me clarify,

16   cryptocurrency.

17   Q.   Cryptocurrency?

18   A.   Yes.

19   Q.   What about Mr. Larson indicated that he cashed $300,000 in

20   cash to buy Bitcoins?  That's in your report.  Do you remember

21   that?

22   A.   He cashed how much to buy?

23   Q.   300,000.

24   A.   You'll have to show me the report.  I don't recall that

25   specifically.

 1   Q.   So you agree with me, Detective Leach, Marty had his hands
 2   everywhere?
 3   A.   Marty had his hands everywhere, yes.
 4   Q.   You agree with me that he was investing in company in Texas
 5   for flying cars?
 6   A.   I don't recall that company either.
 7   Q.   In 2016, 2017?
 8   A.   Flying cars?
 9   Q.   Yes.
10   A.   I do not recall that company.
11   Q.   Maybe I was going to use that for flying cars to move
12   cocaine, too, you know.
13   A.   Maybe.
14        MR. BILKOVIC:  Could we maybe ask --
15        THE COURT:  That's stricken, and the jury will
16   disregard it.
17        MR. BILKOVIC:  Thank you.
18        THE COURT:  Please stick to questioning the witness.
19        I'm sorry.  Who was speaking?  I cut you off.  Was
20   that Mr. Bilkovic?
21        MR. BILKOVIC:  No.  Thank you, your Honor.
22   BY DEFENDANT DIDANI:
23   Q.   There is indications on your investigation that Marty was
24   paying off foreign governments for -- to swing contracts on his
25   behalf?

1    A.   Paying governments to swing contracts?

2    Q.   Foreign governments, yes, sir.

3    A.   I don't recall that either.

4    Q.   You don't recall there was a pay of $700,000 to pay a

5    foreign government for the Black Hawks helicopters, do you?

6    A.   Again, I didn't see any money that solidified any of those

7    transfers.

8    Q.   Do you know how the -- Detective Leach, do you know how the

9    third countries work, or no, when they do contracts that they

10   get from the government?

11   A.   No.  Not in-depth, no.

12   Q.   Do you agree with me you have to pay to play in those

13   countries?

14   A.   I have no idea.

15   Q.   My question to you is, Detective Leach, there is other

16   thousand things that Marty was doing, and there's other things,

17   thousand other things, that money can be used for.  Why, and

18   only why, why, why you think that money was for drugs again?

19   A.   I'm not going to dispute with you that Martin Tibbitts on

20   face was attempting to spiderweb out into these different

21   fields, different ventures, if you will.  What I'm saying is I

22   don't see anything that solidified that any of these came to

23   fruition.  And then there's other elements that the Government

24   will produce regarding Marty Tibbitts, Mr. Tibbitts', knowledge

25   that he was assisting and financing cocaine organization.

1  Q.  And again, I'm asking you how is he financing a cocaine

2  organization, and you haven't given me the answer, sir,

3  Detective Leach?  So -- okay.  Here we go.  The floor is yours.

4  Tell me how is he financing a cocaine organization?

5  A.  As I stated, through layering techniques using Mr. Larson

6  to move the cocaine, through --

7  Q.  Okay.  Excuse me.

8  A.  I'm sorry.  Through -- money for cocaine.  Layering

9  techniques, interviews and verification from other witnesses.

10 There's texts back and forth between you and Mr. Tibbitts

11 regarding a news article of a seizure where you basically

12 stated you guys screwed up.  The Government will produce

13 information regarding a design of a parasitic device that was

14 going to be utilized for the transport of cocaine.

15 Q.  A torpedo?

16 A.  That is one reference of the name, yes.

17 Q.  Did you visit the gentleman who made the torpedo?

18 A.  Yes, I did.

19 Q.  What you thought about the torpedo?

20 A.  I thought that the idea, if given time, could have been

21 successful.  I think it was in its infancy in the design stage,

22 but I believe its intent was exactly what we're saying it was

23 for.

24 Q.  Did you ever see that drone yourself?  Did you see it?

25 A.  The physical prototype?

1   Q.   Yes.

2   A.   Only images.

3   Q.   Did you visit Mr. Chaumont in Canada?  Did you go, or not?

4   A.   Yes.

5   Q.   You had no interest to go see the drone?

6   A.   The drone was dismantled by that time.

7   Q.   It was dismantled by your request or he dismantle it?

8   A.   No.  They dismantled it for the parts.  The individual who

9   was investing -- or individuals who were investing in that

10  program were no longer financing it.  They could use the parts

11  for other endeavors, so that's what they did.

12  Q.   Oh.  So, if Mr. Carl Chaumont come here today and say that

13  he destroyed that because DEA told him, it would be false

14  information; right?  It would be false claim?

15  A.   He asked if he could utilize some of the parts for other

16  endeavors.

17  Q.   So that drone, that drone, it was just an idea?  Do you

18  agree with me?

19  A.   No, I don't agree with you.  It was not just an idea.  It

20  was an idea that took multiple steps to get to the beginning of

21  a prototype, the design, financing, purchasing parts for the

22  prototype and then conceptualizing the prototype.

23  Q.   Did that prototype ever left from his garage, or no?  Did

24  you know anything about it, or no?

25  A.   Did it -- I'm sorry.

1   Q.   Did it ever left from his garage?

2   A.   From Mr. Chaumont?

3   Q.   Yes.

4   A.   I don't believe so.  I believe it was always Peregrine

5   360's property until completion.

6   Q.   All right.  We're just going to move on.  So I want to go

7   back in 2017 when you entered this case, Agent Leach.  Did you

8   share information with Agent Bianchi?

9   A.   In what regard?

10  Q.   About this case.

11  A.   Once I started working the investigation?

12  Q.   Yes, sir.

13  A.   Yes.

14  Q.   Was that every day information sharing between each other,

15  or no?

16  A.   I wouldn't say every day, no.

17  Q.   It seems odd to me that one week Agent Bianchi will file

18  for a warrant, and the next week is you, and the next week

19  Bianchi, and the next -- for a whole like -- for over a few

20  years you was going back and forth with Agent Bianchi, the same

21  warrant.  Is that common working here in the Eastern District

22  of Michigan or what?

23  A.   As you're working on a task force and working as a group,

24  inevitably working on the same case, yes, it's quite frequent.

25  Q.   And I want to ask you a question.  I'm not sure if this

1    Court will allow me.  The magistrate, do they ever ask you what

2    did you got -- why you keep on asking for warrant every week,

3    every week, every week, or no?  How that work?

4    A.    Technically they're asking through the production of your

5    affidavit, right.  So you're producing the probable cause for

6    another search warrant in regards to whatever you're

7    requesting, if that answers your question.

8    Q.    All right.  So in 2017, other than 3.7 unknown substance,

9    Kigtropin, because we don't know, other than that, a few photos

10   of so-called containers and money 2013, '14, '15, '16, '17,

11   other than those, did you have anything else -- Detective

12   Leach, did you find anything else on this organization here in

13   Detroit?

14   A.    In 2017 is whenever I was brought into the case.

15   Q.    All right.  So when Agent Bianchi brought you in the case,

16   he told you we investigating this guy from 2013, do you

17   remember that?

18   A.    Um-hmm.

19   Q.    That's when your Grand Jury transcript, too?

20   A.    Yes.

21   Q.    All right.  It say some crazy Polish people going from

22   St. Clair with jet skis to Canada and then come back.  You

23   remember that; right?

24   A.    Yes.

25   Q.    Anything happen there, or no?

1   A.   As I stated, I began this investigation 2017.  Anything

2   that happened prior to that was independent of my

3   investigation.  I have some background knowledge from that

4   time, but not enough to testify on without reviewing other

5   investigators' reports, which would not be my direct testimony.

6   Q.   Agent Leach, I'm just trying to figure out in 2008 to 2013,

7   it was another agency they say they had investigation on me.

8   Do you remember that or not?

9   A.   Vaguely.

10  Q.   And in 2013 to 2017, that's Agent Bianchi; right?

11  A.   Yes, he was one of the --

12  Q.   And then you entered -- is any time that -- as a agent say,

13  when is enough is enough?

14  A.   There was information brought to us in the brief by

15  Mr. Bianchi that there was newer intelligence that you were

16  trafficking cocaine and moving money.

17  Q.   Where I was trafficking cocaine?

18  A.   Mostly in Europe.

19  Q.   And what that has to do with -- especially with Detroit?

20  A.   The money was derived from Detroit along with --

21  Q.   But, Agent Leach, I just asked you --

22           MR. BILKOVIC:  Judge, I would ask that he allow the

23  witness to finish the answer.

24           THE COURT:  Yes, you should let the witness finish.

25           Were you finished with your answer?

```
 1              THE WITNESS:  I was also going to add, also there was

 2     also intent to build the parasitic devices, multiple elements

 3     to an organization, in a trafficking organization I should say,

 4     that do tie to this district, yes.

 5  BY DEFENDANT DIDANI:

 6  Q.   But, Agent Leach, I've been asking you.  We sitting over

 7  here over a hour, and I ask you about the $450,000 and you

 8  can't give me a right answer.

 9  A.   I've given you my answer.

10              THE COURT:  He has given you an answer, and it's been

11     asked and answered several times.  So go to a new question,

12     please.

13  BY DEFENDANT DIDANI:

14  Q.   And in 2017, I was living in this district?

15  A.   I would have to review my reports.  You were moving around

16  quite frequently back then, yes.

17  Q.   You agree with me that since 2013, I was just coming here

18  for a week and then leave to Europe or --

19  A.   I can't testify to the exact travel without looking at it,

20  but I do know that you were in and out of the United States,

21  yes.

22  Q.   And you know that I was visiting my mother in Chicago;

23  right?

24  A.   Some of the times, yes.

25  Q.   So I'm not even a resident of Michigan for a long time;
```

1    right?  Do you agree with me?

2    A.   Yes.

3    Q.   Let me go back, because we got another 450.  We'll go back

4    to 2016 and a hundred thousand dollars that was wired by Marty

5    Tibbitts to a gentleman, Pete Synowiec; right?

6    A.   Yes.

7    Q.   What about that money?

8    A.   We identified the money through interviews with other

9    individuals that that money was directly going to you.

10   Q.   For what?

11   A.   According to other individuals, for the purchase of

12   cocaine.

13   Q.   Okay.  So according to the other individuals -- according

14   to you, according to Detective Leach?

15   A.   Yes.

16   Q.   Did you see any solid evidence, any solid evidence that

17   that money was used to buy cocaine?

18   A.   Trying to direct $100,000 to an exact cocaine shipment, no.

19   Q.   Thank you, Agent.  We move from the time machine.  We gonna

20   move from 2017.  We're gonna go to 2018.  The investigation in

21   2018 got very extended.  Do you agree with me?

22   A.   What do you mean by extended?

23   Q.   More warrants?

24   A.   Yes.

25   Q.   iClouds.  It went from simple warrants, GPSs, all these

1    warrants, it went to iClouds.  Do you remember when you first

2    got your iCloud warrant?

3    A.   The first warrant was sworn to on October 31, 2018.

4    Q.   What you find out on the iCloud?

5    A.   Upon the return of the iCloud from Apple, there's

6    observation of, as the Government has shown previously, images

7    of other text message threads of other phones, located numerous

8    images on those phones regarding messages talking about large

9    scale money movement, cocaine shipments, images of cocaine,

10   bulk cocaine.  There was the message thread regarding you and

11   Larson with the money movement of Marty Tibbitts, Mr. Tibbitts'

12   money down to Washington, D.C. and the cover-up nights and that

13   there was a lot of police around so you guys had to be careful.

14   Q.   But you never see any in 2018?  You didn't find any

15   evidence that the 450,000 or the hundred thousand was used

16   other than what you think it was used for drugs; right?

17   A.   Directly associated with a specific shipment, no.

18   Q.   Okay.  Let's say the money went to buy drugs.  Where did

19   you think that money went to buy drugs?

20   A.   Inevitably it would have went down to South America.

21   Q.   Where in South America?

22   A.   Well, judging by our investigation, it went into Ecuador

23   and then into Colombia.

24   Q.   In 2017?

25   A.   In 2017, it ended up in Colombia for the purchase of

1    cocaine.  That is where the cocaine was being purchased.

2    Q.  So the $450,000 and the hundred thousand dollars in 2017,

3    it was in Colombia?

4    A.  You asked me where the money moved in -- for the purchase

5    of cocaine was going.

6    Q.  Yeah.

7    A.  Colombia is the final destination, yes.

8    Q.  That's where the money goes to, Colombia?

9    A.  That's where the cocaine is being purchased.

10   Q.  Cocaine can be purchased in Mexico, it can be purchased in

11   Honduras, in Guatemala, in Peru, in Colombia, in Ecuador --

12   A.  There's numerous --

13   Q.  -- in Brazil.

14   A.  There's numerous images --

15            THE COURT:  Wait a minute.  Is that a question?  Do

16    you want him to answer can it be purchased in those places?

17   BY DEFENDANT DIDANI:

18   Q.  Can it be purchased in those places, Detective Leach?

19   A.  It can be, but there are message threads within the iCloud

20   that show that you're dealing directly with Colombia.

21   Q.  And you don't -- other than the money disappearing in

22   Europe, you don't have any other thing, you know, any other way

23   to find out that money went to Colombia or anything?  That's

24   only just what you think; right?

25   A.  On that specific money transfer, correct.

 1   Q.   What do you think you can buy with $450,000 in Colombia,

 2   Detective Leach?

 3   A.   $450,000 in Colombia, I would imagine --

 4   Q.   What will it buy you?

 5   A.   What were you buying or --

 6   Q.   What's the $450,000 would buy you in Colombia?

 7   A.   Probably just about anything you can buy in Colombia with

 8   $450,000.

 9   Q.   You ever been in Colombia, Detective Leach?

10   A.   I have not.

11   Q.   So how do you know what you can buy in Colombia?

12   A.   $450,000 is a lot of money.

13   Q.   But how can possibly a detective from Farmington Hills can

14   know the prices in Colombia?

15   A.   We have intelligence to tell us what --

16          Are you talking specifically about how much cocaine

17   could you buy in Colombia --

18   Q.   Yes, yes.

19   A.   -- with $450,000?

20   Q.   Yes.

21   A.   It depends what level of the organization you are.  So if

22   you're a high end of the organization, 2,000 a kilo, if you're

23   lower, 5,000 up to maybe 10,000.

24   Q.   Ten thousand a kilo?  So you buy -- so let's say again

25   5,000.  So how many kilos are there, 50?

1    A.   If you're buying at 10,000?

2    Q.   On 10,000.

3    A.   35.

4    Q.   35.  And then send it where?

5    A.   Are we talking hypotheticals, or what are you asking me

6    here?

7    Q.   Out of your investigation, I'm trying to find out this

8    450,000.  I'm going what you say.

9    A.   I told you that we lost optics --

10   Q.   You're guessing, because we don't know.  We not for fact;

11   right?  Do you agree with me?

12   A.   I explained to you that we lost optics on the $450,000

13   after it went to New York.

14   Q.   We go to 2019, Detective.  You had the opportunity -- did

15   you arrested Donald Larson?

16   A.   Yes.

17   Q.   It was you with who?  How many people?

18   A.   Task force Officer George Tsouroullis was there.  Special

19   Agent Derek Newsome with the IRS was there.

20              THE COURT:  Anybody else?

21              THE WITNESS:  I don't remember all the additional

22   members at that time, your Honor.

23   BY DEFENDANT DIDANI:

24   Q.   How the conversation with Donald Larson went in 2019?

25   A.   Following his arrest?

1    Q.   Yes, sir.

2    A.   It went okay.

3    Q.   You think he was telling the truth or was lying?

4    A.   I think -- in the interview following his arrest, I think

5    he told us a lot of partial truths.  And I think he minimized a

6    lot of his statements at that time just because he was scared

7    and he didn't want to involve himself directly.

8    Q.   When you arrested Mr. Larson, did you have a warrant?

9    A.   Yes, we did.

10   Q.   And what was the warrant for?

11   A.   I believe it was an arrest for conspiracy to distribute

12   controlled substances.

13   Q.   Distribute where?

14   A.   And money laundering.  I would have to refer to the

15   document specifically.

16   Q.   Distribute where?  Substance, where?

17   A.   In the United States, Eastern District of Michigan.

18   Q.   From who?  From who?  Distributing with who and from who?

19   A.   It's a conspiracy charge.  So he conspired to distribute

20   cocaine while in the Eastern District of Michigan.

21   Q.   All right.  So from 2017 to 2019, you took over.  And

22   another 50 years with Agent Bianchi.  How many grams of cocaine

23   you have seized in Eastern District of Michigan?

24   A.   Zero grams.

25   Q.   What about to say how many grams you have seized in United

1   States of cocaine?

2   A.   Directly in this investigation with you?

3   Q.   In the United States.

4   A.   Zero grams.

5   Q.   And Donald Larson -- in your complaint with Donald Larson,

6   you didn't mention nothing about the $450,000, did you?

7   A.   I would have to review my affidavit for that complaint.

8   Q.   I review your affidavit, but you might not agree with me.

9   I asked for a copy, but I don't think you mentioned anything.

10  Is there any reason why you didn't mention the $450,000 on the

11  complaint of Donald Larson?

12  A.   I don't want to testify one way or another without being

13  able to review that, what specifically I detailed in that

14  affidavit.

15           DEFENDANT DIDANI:  Your Honor, may I have one second,

16  please?

17           (Briefly off the record.)

18           DEFENDANT DIDANI:  We'll go back, your Honor.  It's in

19  the computer.  We don't have a copy.

20           THE COURT:  Well, you do have a copy.  You just don't

21  have a paper copy; right?

22           DEFENDANT DIDANI:  Yes, your Honor.  The Government --

23  your Honor, the Government will get it in a break and we can go

24  back if you're okay with that.

25           THE COURT:  That's fine.

1    BY DEFENDANT DIDANI:

2    Q.  All right.  So I want to focus a little bit between you and

3    Donald Larson, 2019.  It's very important for this Court and

4    the jury to hear.

5              THE COURT:  Please go to your question, and don't

6    comment on all the testimony --

7              DEFENDANT DIDANI:  Yes, your Honor.

8              THE COURT:  -- as you ask the question.

9              DEFENDANT DIDANI:  Yes, your Honor.

10             Your Honor, I have some videos I want to play with

11   Mr. Fink who will help me.  It's during the interview between

12   Agent Bianchi and Donald Larson.  And I want to play this video

13   so I can ask questions what it doesn't mean, you know,

14   because --

15             THE COURT:  And these are interviews that Agent Leach

16   was in?

17             DEFENDANT DIDANI:  Yes, your Honor.

18             THE COURT:  Have you looked at them?

19             DEFENDANT DIDANI:  We have looked at -- with Mr. --

20             THE COURT:  Mr. Fink, have you looked at them?

21             MR. FINK:  I have looked at all of them, and I would

22   only ask for sidebar on one.

23             THE COURT:  Why doesn't the jury step down, please.

24             (The jury left the courtroom at 10:41 a.m.)

25             THE COURT:  You may all be seated.

1              Does the witness need to step out?

2              MR. FINK:  I don't think we have to discuss the

3     content other than one, Judge, on that.

4              THE COURT:  You may all be seated.  I'm happy to hear

5     it.

6              MR. FINK:  Just from my perspective, Judge, because we

7     discussed this the last time videos were played, and I think

8     it's probably best in my obligation to have reviewed them and

9     discuss the appropriateness.  I think of all the videos we're

10    going to play have bearing, some bearing on impeachment and

11    whether or not of this witness and another witness.

12             There is one that I would ask Mr. Didani bring to your

13    attention before it's played and his purpose for playing it,

14    but other than that I would represent to the Court that they're

15    not inappropriate and they have some, I would say, arguable

16    relevance for impeachment.

17             DEFENDANT DIDANI:  May I approach, your Honor?

18             THE COURT:  Yes, you may.

19             No, you don't need to approach.  Just tell me.  I

20    asked if you wanted the witness excused.

21             DEFENDANT DIDANI:  Other than every video I have, I

22    asked Mr. Fink, I wanted to -- it's just a conversation that

23    might be appropriate.  During the stop of Donald Larson they

24    seized a bottle of Cialis.

25             THE COURT:  A what?

 1            DEFENDANT DIDANI:  A bottle of Cialis.

 2            MR. FINK:  Cialis.

 3            DEFENDANT DIDANI:  And the thing is I wanted to --

 4            THE COURT:  It's about a bottle of Cialis?

 5            DEFENDANT DIDANI:  Yes.

 6            THE COURT:  Okay.  And what does that have to do with

 7   anything?

 8            DEFENDANT DIDANI:  Well, see, because from 2016, 2019,

 9   the only thing that -- you know, that's what I want to ask,

10   your Honor.  The only thing they have, 3.7 unknown substance of

11   HGH, human growth hormone, and a bottle of Cialis.  That's what

12   I want to ask.

13            MR. FINK:  May I, Judge, if I --

14            THE COURT:  You may.

15            MR. FINK:  I'm just reframing what I think is being

16   said as I understand it.  The purpose is to show that in the

17   entire investigation, lengthy and involved as it was, the only

18   actual findings of any sort of drug of any kind, whether legal

19   or illegal, was 3.7 milliliters of Kigtropin and a bottle of

20   Cialis on Donald Larson.  And I wanted him to bring it to your

21   attention given the -- what Cialis is for, and then I don't

22   want you to think that that is brought before the jury for any

23   improper purpose or having a chance to discuss it with

24   Mr. Didani.

25            THE COURT:  Is there any indication on video what it's

 1    for?

 2              DEFENDANT DIDANI:  No, your Honor.

 3              THE COURT:  Are you going to argue anything about what

 4    it's for?

 5              DEFENDANT DIDANI:  No, I'm not going to argue what --

 6              THE COURT:  Or you could just refer to it as --

 7              DEFENDANT DIDANI:  Exactly.  I'm just -- I'm not going

 8    to argue what's it for.  The only thing I'm going to argue that

 9    is in 2016 and 2019, three years, there's 3.7 milligrams of

10    unknown substance and a bottle of Cialis and a crazy

11    investigation.

12              MR. FINK:  I also am not sure that Detective Leach

13    would just admit that fact without the video.

14              THE COURT:  Okay.

15              MR. BILKOVIC:  Judge, the content of the Cialis,

16    that's not what bothers me or what concerns me.  My objection

17    is he's talking about he's going to use this video to impeach

18    Agent Leach and another witness.  Well, first of all, he can't

19    use this video to impeach another witness with Agent Leach.

20              And, number 2, he hasn't asked any questions where he

21    would be -- where Agent Leach is subject to impeachment.  He

22    hasn't made any offer of proof that there's areas on this video

23    that are different from what Agent Leach has testified to.

24              And what Mr. Didani is doing is when he doesn't like

25    the answers and he doesn't like the evidence he's hearing he

1    wants to couch this as the only evidence you have is 3.7 grams

2    of Kigtropin and a bottle of Cialis in 2019, and that's

3    absolutely not true.  It's not what Agent Leach testified to.

4         Mr. Didani is forgetting the Viber chat that Agent

5    Leach has already testified to from 2016 where Mr. Didani and

6    Mr. Larson were talking about moving seven more, that they've

7    already moved ten.  Mr. Didani is talking about cleaning money.

8    Mr. Didani sends Agent -- Mr. Larson a photograph of what

9    appears to be multiple wrapped packages, consistent with kilos

10   of cocaine, and tells him that's your house, delete that.  And

11   by 2019 when they arrest Mr. Larson they already have the

12   iCloud, which Agent Leach will testify at a later time, contain

13   multiple conversations with Mr. Didani and others about

14   cocaine, about distribution of cocaine, about money laundering

15   and et cetera.

16        So the way that he's asking these questions and the

17   way he wants to use this video is improper.

18        THE COURT:  Okay.  Relative to the proper use of the

19   video, you do have to ask him questions first.

20        DEFENDANT DIDANI:  Yes, your Honor.

21        THE COURT:  Do you want to say something?  Because I'm

22   getting ready to tell you something, okay.

23        You can't just throw the video up there and then ask

24   him about the video.  You have to ask him a question.  If he

25   answers differently, then you can impeach him with the video.

1          Mr. Fink, have you any difference in that?

2          MR. FINK:  No.  I agree, Judge, and I have done my

3    best law professor work on that topic.

4          THE COURT:  If you want to impeach him, that's how

5    impeachment goes, or if he doesn't remember then you can show

6    the video to see whether or not that helps him remember.

7          MR. FINK:  I've also explained that if there's content

8    that isn't necessarily impeachment that he wants to give for

9    evidentiary value he should ask Detective Leach, and then if

10   there's a memory recollection that needs to be refreshed or

11   anything like that there's other uses, but that it needs to be

12   asked first.

13         THE COURT:  Okay.  You understand that?

14         DEFENDANT DIDANI:  Yeah, your Honor.

15         THE COURT:  Okay.

16         (Briefly off the record.)

17         MR. FINK:  I just had a conversation, too, Judge,

18   guiding him on how to admit this stuff, and I think he'll do

19   his best.

20         THE COURT:  Okay.  Shall we bring the jury out?  Yes?

21         MR. BILKOVIC:  Yes, your Honor.  I'm sorry.

22         MR. FINK:  Judge, if I signal that -- if I just

23   mention this is what we discussed off the record, I will be

24   referring to that video.

25         THE COURT:  Well, I don't think as long as we don't

1    get into what it is that it's okay to say that's all that was

2    discovered.  He might say that.  I don't know.  I don't have

3    any problem with that, but I don't think we need to get into

4    what it is.

5              MR. FINK:  Understood, your Honor.

6              LAW CLERK:  All rise.

7              (The jury entered the courtroom at 10:49 a.m.)

8              THE COURT:  Okay.  You may all be seated.  I'm

9    satisfied the jury is present.  What about the Government?

10             MR. BILKOVIC:  The Government is satisfied, your

11   Honor.

12             THE COURT:  Mr. Didani?

13             DEFENDANT DIDANI:  Defense is satisfied, your Honor.

14             THE COURT:  All right.  Thank you.  You may continue.

15   BY DEFENDANT DIDANI:

16   Q.   Detective Leach --

17   A.   Yes.

18   Q.   -- so you had Donald Larson under custody.  I wanted to ask

19   you a specific and I wanted to understand after reviewing what

20   I was reviewing.  A few times you mentioned you told Donald

21   Larson that if Marty was alive he would be on that chair, not

22   you.  What do you mean by that?

23   A.   I mean that I believe the way my investigation -- or our

24   investigation was shaping up that approaching Mr. Tibbitts

25   would have been a better avenue to getting to the hierarchy of

```
1    the organization rather than Donald Larson, who appeared to be
2    a lower rung in the organization.
3    Q.   So, if Mr. Tibbitts was alive, Donald Larson will be in his
4    house right now?  He's in his house.  He would have never been
5    on that chair, interview chair?
6    A.   That's not what I stated.  I stated we would have
7    approached Mr. Tibbitts instead of Mr. Larson at that time.
8    Q.   And that's what I'm asking you, Detective Leach.  If
9    Mr. Tibbitts, he was alive, Donald Larson wouldn't be on that
10   chair; right?
11   A.   At that time, no.
12   Q.   At any time; right?
13   A.   I can't speak to that.
14   Q.   And by Mr. Tibbitts being dead your only alternative was
15   Mr. Larson; right?
16   A.   He was the next viable target, yes.
17   Q.   So when you questioned Mr. Larson what did he told you
18   about these transfers, the hundred thousand in 2016 and the
19   450,000 in Washington?  What did Mr. Larson told you?
20             MR. BILKOVIC:  Objection, hearsay.
21             THE COURT:  Do you want to respond to that?
22             DEFENDANT DIDANI:  Your Honor, I don't understand how
23    is it hearsay.  It's directed to Mr. Leach.
24             THE COURT:  Well, is it an out-of-court statement
25    offered to prove the truth of the matter asserted?
```

 1            DEFENDANT DIDANI:  Yes.  It was a statement offered to

 2    Mr. Leach, your Honor, to the investigation.

 3            THE COURT:  Mr. Bilkovic, do you want to respond?

 4            MR. BILKOVIC:  Yeah.  I think what he is trying to do

 5    is set up some impeachment, and I think the appropriate witness

 6    to do that would be Mr. Larson, not Agent Leach.

 7            DEFENDANT DIDANI:  Your Honor, Agent Leach, as he say

 8    when he start testimony, he's one of the main agents.  And, if

 9    we cannot question Agent Leach about Donald Larson, then who

10    will question him?

11            THE COURT:  Who will question him about Donald Larson?

12            DEFENDANT DIDANI:  You know --

13            THE COURT:  He's going to be a witness; right?

14            DEFENDANT DIDANI:  Yeah, he's going to be a witness,

15    but I think this defendant is -- has the right for Agent Leach

16    to respond to what he had -- the confrontation between him,

17    directly him, and Donald Larson.  It's not hearsay, your Honor.

18    It's a confrontation between Detective Leach and --

19            THE COURT:  Why don't you walk over to the table and

20    consult with your standby counsel.

21            (Briefly off the record.)

22            DEFENDANT DIDANI:  Your Honor, my question is -- my

23    question is directed to Detective Leach and what he concluded,

24    because that's not about Donald Larson.

25            THE COURT:  I know, but that's not how you phrased the

1    question.

2           I know you feel like you're jumping up and down, but

3    I'm going to send you back to the jury room for a moment.

4           (The jury left the courtroom at 10:54 a.m.)

5           THE COURT:  You can step down, sir.  Don't discuss

6    your testimony with anybody, please.

7           THE WITNESS:  Yes, your Honor.

8           THE COURT:  We're supposed to break now, because I

9    have another thing, but I'm going to just take a short break to

10   see if I can get out of it.  And, if I can, we'll just come

11   back, okay.

12          So this is your time to use the facilities if you want

13   to, and I'll be back in ten minutes.  You guys come back in ten

14   minutes, too; okay?

15          MR. FINK:  Yes, your Honor.

16          DEFENDANT DIDANI:  Yes, your Honor.

17          THE COURT:  All right.  Thank you.

18          (At 10:55 a.m., a recess was taken.

19          Back on the record at 12:42 p.m.)

20          LAW CLERK:  All rise.  The Court is back in session.

21          THE COURT:  Okay.  Thank you very much.  I had in the

22   schedule that I needed to take a break then, and I got out of

23   the last part of it, but I had to go ahead and take care of the

24   first part.

25          You may all -- well, don't be seated yet, but,

1    Mr. Didani, the objection of the Government is going to be

2    sustained, although I'll allow you to pose a new question;

3    okay?

4              DEFENDANT DIDANI:  Thank you, your Honor.

5              THE COURT:  You're welcome.  You can bring them back

6    in.

7              THE CLERK:  All rise for the jury.

8              (The jury entered the courtroom at 12:43 p.m.)

9              THE COURT:  Okay.  You may all be seated.

10             Are you satisfied the jurors are present?

11        MR. BILKOVIC:  Yes, your Honor.

12        DEFENDANT DIDANI:  Yes, your Honor.

13             THE COURT:  Okay.  Very well.  You may continue your

14   cross-examination.

15             Mr. Leach, you're still under oath.

16             THE WITNESS:  Yes, your Honor.

17             THE COURT:  I sustained the objection.  Mr. Didani is

18   going to a new question.

19             DEFENDANT DIDANI:  Your Honor, can I -- if you allow,

20   can I go back to the complaint I have?  Mr. Fink, he provide me

21   with a copy of the complaint.  It's very important, because

22   it's connected --

23             THE COURT:  You want to show ...

24             DEFENDANT DIDANI:  To Detective Leach.

25             THE COURT:  It's the complaint?

1          DEFENDANT DIDANI:  Of Donald Larson, the complaint of

2   Donald Larson, the warrant.

3          THE COURT:  Oh.  Yeah, you can.

4          DEFENDANT DIDANI:  Yes.  May I?

5          THE COURT:  Is it in evidence?  I don't think so.  It

6   was just used to either refresh or impeach; right?

7          DEFENDANT DIDANI:  Refresh and impeach, your Honor.

8          MR. FINK:  May I approach, Judge?

9          THE COURT:  Yes.

10  BY DEFENDANT DIDANI:

11  Q.   Detective Leach, can you please on your -- when you refresh

12  your memory, is that a complaint of Donald Larson?

13  A.   Yes, it is.

14  Q.   And how many days before Donald Larson's arrest it was

15  issued, a complaint?

16  A.   This complaint was issued on September 5th of 2019, and he

17  was arrested on September 10th of 2019.

18  Q.   So, to be fair, it's almost a week after the complaint was

19  issued Donald Larson was arrested?

20  A.   Correct.

21  Q.   All right.  You indicated early that in 2018 you, from the

22  iCloud that you received, you have information about the 450 --

23  Detective Leach, I'm sorry.  Let me --

24          DEFENDANT DIDANI:  Your Honor, I'm sorry.

25

BY DEFENDANT DIDANI:

Q.  Let me -- let's be clear here.  On your superseding indictment, do you know the pillars of this indictment, the first indictment, April 21, 2021, it was the money in Washington, the hundred thousand dollars from Marty Tibbitts to Pete Synowiec and the 450,000 in Washington?  Are you agree with me?

A.  Your affidavit for your arrest complaint?

Q.  The indictment, April 21, 2021 indictment.  Did you remember that?

A.  Yes, those elements were used.

Q.  So those are the only two elements was used -- so I want to be clear -- are the hundred thousand in 2016 and 450,000 in 2017; yes, sir?

A.  There was -- all the money combined from Mr. Tibbitts that was moved through Mr. Larson was referenced.

Q.  Detective, we're going to go to what's referenced on the indictment.  It's only two, two thousand --

THE COURT:  You're asking the question and you're telling him --

THE WITNESS:  You handed me a complaint for Mr. Larson and --

DEFENDANT DIDANI:  Right.  We go --

THE WITNESS:  I'm sorry, your Honor.

THE COURT:  Excuse me.

```
 1                THE WITNESS:  I'm sorry.

 2                THE COURT:  You asked him a question.  Let him answer.

 3           DEFENDANT DIDANI:  Yes, your Honor.

 4                THE COURT:  And then if he doesn't give the answer

 5      that you think is appropriate you can do something different.

 6      Pose a question again, then you may answer.

 7      BY DEFENDANT DIDANI:

 8      Q.   The indictment, those reference on the indictment, April

 9      '21, April 20, '21, the reference on the indictment is two

10      activities, 2016, a hundred thousand, in 2017, 450?

11                MR. BILKOVIC:  Judge, at this point I'm going to

12      object.  He's asking questions about the first indictment.

13      That is not something offered by Agent Leach.  There was also a

14      superseding indictment.  So I don't know what the relevance is

15      of this.

16           DEFENDANT DIDANI:  I will go to that, Judge, your

17      Honor.

18                THE COURT:  I know.  But what is the relevance?

19           DEFENDANT DIDANI:  I want to agree that on those

20      indictment and the superseding indictment that Detective Leach

21      -- that the 450,000 it's a very -- a pillar to this indictment,

22      your Honor.

23                THE COURT:  Well, if you want to speak to that on the

24      indictment that's pending against you now, you can.  The other

25      indictment's no longer of any relevance to this proceeding.
```

1          DEFENDANT DIDANI:  All right, your Honor.

2    BY DEFENDANT DIDANI:

3    Q.  Do you -- Detective Leach, did you have an opportunity to

4    read the superseding indictment?

5    A.  Yes.

6    Q.  So in the superseding indictment the overt act in the

7    United States do you agree with me is a hundred thousand and

8    $450,000 in Washington?

9    A.  Yes.

10   Q.  All right.  Now, on that complaint that you and

11   Mr. Bilkovic in September 5, 2019, you indicated early that you

12   had information the $450,000 that Donald Larson brought to me

13   in Washington?  Did you indicated that in 2018?

14   A.  Yes.

15   Q.  And my question is why it's not mentioned anything about

16   the $450,000 in Washington when Donald Larson complained in

17   2019?

18   A.  It's very simple.  We don't utilize everything we have in

19   an investigation in a complaint.  This is specifically enough

20   probable cause so that this arrest complaint can get issued.

21   Q.  So you don't think the $450,000 was a probable cause for

22   Donald Larson to get a complaint?

23   A.  I definitely think that it was probable cause, but that

24   probable cause was not necessary to enact the complaint that we

25   needed to receive.

1    Q.   So how is it necessary in my indictment, sir, if it's not

2    necessary on his indictment?

3    A.   Well, to be fair, this wasn't an indictment.

4    Q.   What was that, a warrant?

5    A.   A criminal complaint, yes.

6    Q.   And a warrant; right?

7    A.   Yes, yes.  An arrest warrant was authorized off of this

8    criminal complaint.

9    Q.   Detective, I went back to the cell --

10             THE COURT:  Go back to where?

11   BY DEFENDANT DIDANI:

12   Q.   I went back to the cell.  I'm trying to wrap this head

13   around that -- because the whole argument, do you agree with

14   me, is about this 450,000 in Washington, right, one of the

15   biggest argument here in the United States?  Do you agree with

16   me; yes?

17   A.   The $450,000 is part of the conspiracy, yes.

18   Q.   Right.  And I went back and I'm trying to wrap the head

19   around that you had the opportunity, or this Mr. Wang in New

20   York, to find out where the money go, or did you find out and

21   you didn't like the answer?

22   A.   No, we did not find out.  And there's also additional

23   reasons why we don't always directly encounter other suspects

24   of an organization.

25   Q.   Well, the biggest reason, you know, you don't agree with me

1  to find out where the money -- to follow the money to find out

2  whether the money was used for drugs or not.  Do you agree with

3  me?

4  A.  As I stated, I passed that information along, and also to

5  directly try and question Mr. Wang at that time could

6  potentially cause issues in our investigation moving forward.

7  If he leaks the intelligence that we've interrogated or

8  interviewed him regarding money that was moved from you and

9  your organization, that could make you aware that we are

10  investigating you as a target.

11  Q.  So you basically -- you swiped -- you wrote the truth --

12  you didn't want to find out the truth, and you go ahead with

13  the investigation and you arrested Donald Larson?

14      THE COURT:  Is that a question?

15  BY DEFENDANT DIDANI:

16  Q.  You arrested Donald Larson then?  The next man is Donald

17  Larson?

18  A.  September 10, 2019, we arrested Donald Larson.

19      THE COURT:  Okay.  Go to a new question.  I think

20  we've exhausted that area.

21  BY DEFENDANT DIDANI:

22  Q.  What happened with Donald Larson that day?

23  A.  He was arrested and transported to the Sterling Heights

24  Police Department for an interview.

25  Q.  After the interview, Donald Larson went home or went to

1  jail?

2  A.   Yes.   A mag waiver was signed, and he was released pending

3  investigation at that time.

4  Q.   You didn't arrest Donald Larson that day?

5  A.   That's incorrect.  We did arrest Mr. Larson.  He was then

6  released pending investigation.

7  Q.   You was investigating.  What did you indicated -- what did

8  you find out on that interview between you and Donald Larson?

9  What did you find out about the 450,000 as an investigator?

10 A.   We learned that the $450,000 was received by Mr. Larson

11 then, that he flew it on a private plane down to Washington,

12 D.C.

13 Q.   Did he told you why he flew the money in Washington, D.C.

14 and what the money was used for?

15 A.   Not on that day, no.

16 Q.   What did he told you that day?

17 A.   On that day he said that he was instructed to transport

18 $450,000 in bulk currency from the Detroit city airport on a

19 plane to Washington, D.C. and turn it over to an individual.

20 Q.   Did he indicated to you what the money was going to be used

21 for?

22 A.   No, not on that date.

23 Q.   What did he say to you that day?

24 A.   He stated that it was unknown.

25 Q.   Some point did you told Mr. Larson on that day that you are

```
 1   50 years old right now and you will come home 80 or 90 years
 2   old?  Did you told that to Mr. Larson that day?
 3   A.  I don't think those are my exact words verbatim, but
 4   something along that lines.
 5   Q.  You want me to refresh your memory?
 6   A.  Sure.
 7   Q.  Yes.
 8           DEFENDANT DIDANI:  Your Honor, at this point can we
 9   play a part of the video?
10           THE COURT:  Where it's going to say this only?
11           DEFENDANT DIDANI:  Yes, only that, your Honor.
12           THE COURT:  Okay.  Do you have any objection on behalf
13    of the Government?
14           MR. BILKOVIC:  No, your Honor.
15           THE COURT:  And this is Mr. Leach's statement; right?
16           DEFENDANT DIDANI:  Yes, your Honor.
17           (Video is played.)
18   BY DEFENDANT DIDANI:
19   Q.  You refresh your memory, Detective Leach?
20   A.  Yes.
21   Q.  Is that the kind of method you use to scare people up or
22   what?
23   A.  I'm not trying to scare anybody.  I was simply explaining
24   the gravity of the situation to Mr. Larson and what he was
25   looking at potentially.
```

1   Q.   So he was looking at 30 years?

2   A.   Possibly.

3   Q.   Based on your complaint, the complaint that you have there

4   in front of Mr. Larson, this few hundred thousand dollars,

5   Mr. Larson was looking at 30 years?

6   A.   There's also a conspiracy to distribute controlled

7   substances on here as well.

8   Q.   Controlled substance where?  In 2019 where?

9   A.   I'm stating this is part of the conspiracy.  The conspiracy

10  that he was involved with happened in the Eastern District of

11  Michigan.

12  Q.   And again, Detective Leach, I'm asking you.  You say -- you

13  keep saying that.  I'm asking you the conspiracy.  You know, in

14  your complaint there it's about a few, 2-, $300,000 in the

15  complaint of Donald Larson.  And I'm asking you where is the

16  conspiracy of Donald Larson of distributing cocaine?  Where?

17  A.   It was part of the Viber thread that we showed previously

18  during testimony showing the suspected kilograms of cocaine and

19  the text messages surrounding.

20  Q.   How do you know it's cocaine?

21  A.   I'm going off of the text message thread and by my prior

22  experience in law enforcement dealing with controlled

23  substances.

24  Q.   On that picture, can you see what the substance is in

25  there?

1    A.   Yeah.

2    Q.   So how do you know it's cocaine?

3    A.   It's indicative of packaging of controlled substances.

4    Q.   So on that picture, we not going to look, because I'm not

5    trying to waste the jury's time.  Somebody took a picture, took

6    another picture, right, that picture you talking about, it was

7    tooken from another phone, send it to another man, send it to

8    another man.  So you agree with me on that picture it was about

9    three or four people involved?

10   A.   There was a photo of an encrypted phone that you sent to

11   Mr. Larson.

12   Q.   And that photo was taken from another photo, right, from

13   your number 1 snitch, iPhone; right?

14   A.   Correct.

15   Q.   So let me comprehend.  So this iPhone, your number 1, took

16   another photo, and on that photo it was sent from another phone

17   to Mr. Larson, and this is a conspiracy in your books?

18   A.   Yes, that with the surrounding context.

19   Q.   Let's say Donald Larson it was follow-up, here's the

20   conspiracy, the bag, the picture.  Do you have any laboratory

21   to see what substance is in there, or no?

22   A.   If we had the physical cocaine?

23   Q.   Yes.

24   A.   Yes, we have a laboratory.

25   Q.   But on the photo?

1    A.   Do I have the cocaine from that photo?

2    Q.   When you take a suspect in jail, right, you take him to

3    jail, you charge him with a conspiracy.  The only thing that

4    you have with Donald Larson is a photo.

5         Now, if Donald Larson follow up with a trial, what you

6    gonna present to the trial?  You gonna present just a photo?

7    A.   If we had the cocaine, no.

8    Q.   But you didn't have no cocaine.  That's what I'm asking.

9    A.   Yes.  We will provide the photo and the context

10   surrounding --

11   Q.   Well, how do you know what's in there?

12        THE COURT:  You can't cut him off until he finishes

13    his statement.

14        Finish your statement so we can hear it.

15        THE WITNESS:  Thank you, your Honor.  I believe I

16    definitively stated that I do not 100 percent know what is in

17    those, but from my experience and the context surrounding this

18    investigation we believe them to be a controlled substance,

19    most likely cocaine.

20        THE COURT:  Pose another question.

21   BY DEFENDANT DIDANI:

22   Q.   And you believe that Donald Larson was going to get 30

23   years for that, or that was one of your methods to scare him?

24        THE COURT:  That's been asked and answered.  Go to a

25    new question.

```
1    BY DEFENDANT DIDANI:
2    Q.   What about -- and I'm not go play it, but maybe you can
3    help me out.  What does it mean, the first ticket on a bus?  Do
4    you remember that, the first ticket on a bus, whoever get the
5    first ticket get the privilege, on Donald Larson?
6    A.   I told him that he was the first individual that we had
7    spoken to and that he was in a good position, yes.
8    Q.   And what's that first ticket on a bus mean?
9    A.   It means that he's going to get the potential to explain
10   his part of the organization and possibly cooperate.
11   Q.   You didn't thought that was -- he explained very well for
12   three hours?  You didn't thought he explained it very well what
13   he was doing with Marty Tibbitts, or you didn't like it?
14   A.   It wasn't that I didn't like it.  It was that I already had
15   background knowledge -- factual background knowledge that -- of
16   what was happening and that he was minimizing during his
17   interview certain parts.  So again, I was bringing the reality
18   of the situation to the forefront, letting him know that I
19   already know that he's not being completely truthful in his
20   explanations.
21   Q.   And 30 years and the first ticket to the bus, it will get
22   you somewhere; right?
23   A.   I said this was an opportunity for him, yes.
24   Q.   An opportunity.  And what did you seize that day, do you
25   remember?
```

1    A.   We seized some cell phones.

2    Q.   What else?

3    A.   I don't recall everything from the exhibit list that was

4    seized during the search warrants.

5    Q.   Did you seize a bottle of pills in there?

6    A.   Yes.

7    Q.   What kind of pills are they?

8    A.   I believe they were pharmaceutical pills.

9    Q.   How they -- what's the name of the pills?

10   A.   Cialis.

11   Q.   So basically in 2008, 2013, we got some crazy guys going

12   with the jet skis.  In 2016, we got 3.7 milligrams of human

13   growth hormones.  We don't know, because you don't have --

14   nobody has a photo, nobody has a laboratory --

15          MR. BILKOVIC:  Is there a question --

16   BY DEFENDANT DIDANI:

17   Q.   And then in 2019 --

18          MR. BILKOVIC:  Excuse me.  I'd object.

19          THE COURT:  There is probably a question coming.

20          DEFENDANT DIDANI:  Yes.

21          THE COURT:  But, Mr. Didani, it needs to come a little

22    faster.

23   BY DEFENDANT DIDANI:

24   Q.   And then 2019, you got a bottle of Cialis.  So in seven

25   years that's what you -- the best of the best, that's what we

 1   have, 3.7 milligrams and a bottle of Cialis?

 2   A.   Physical exhibits seized in this district at that time,

 3   yes.

 4   Q.   There is no cocaine, there is no marijuana, there is no

 5   heroin, there is no methamphetamine, there's nothing?

 6           THE COURT:  Is that a question?

 7           DEFENDANT DIDANI:  Yes.

 8           THE WITNESS:  No.

 9   BY DEFENDANT DIDANI:

10   Q.   Agent, I want to talk to you a little bit about these

11   iClouds.  Do you remember -- you have a report on iCloud on

12   February 6.  Do you have that report in front of you?

13           MR. BILKOVIC:  What year?

14           DEFENDANT DIDANI:  2020.

15           THE COURT:  Well, he doesn't need to have the report

16    for you to ask him a question.  He might know the answer.

17   BY DEFENDANT DIDANI:

18   Q.   Do you remember the iCloud was returned back to you on

19   February 12th?

20   A.   From Apple?

21   Q.   Yes, sir.

22   A.   Yes.

23   Q.   Do you remember anything about that specific iCloud, that

24   date in specific?

25   A.   The date that I received the iCloud, do I remember things

1   specific about it?

2   Q.  Yes, about these specific dates.

3   A.  I guess in what regard?  What's the question?

4   Q.  Did you think that this iCloud, this date, it was very

5   important for you, Detective Leach, the exhibit -- Exhibit 51?

6   Do you remember that, February 12th?

7               DEFENDANT DIDANI:  Your Honor, can you please --

8               THE COURT:  Do you want him to look at 51?

9               DEFENDANT DIDANI:  Yes.

10              THE COURT:  Okay.

11              DEFENDANT DIDANI:  Can you please show him, Mr. Wade.

12              THE COURT:  It's admitted; right?

13              MR. BILKOVIC:  He's talking about a DEA exhibit, not

14   like a trial exhibit.

15              THE COURT:  Oh, okay.  And you want him to look at it

16   because ...

17              DEFENDANT DIDANI:  Yes, your Honor.

18              THE COURT:  But why do you want him to look at it?

19              DEFENDANT DIDANI:  I just want to confirm the days,

20   your Honor.  There's --

21              THE COURT:  It's February 6th and February 12th?

22              DEFENDANT DIDANI:  Yes, your Honor.

23              THE COURT:  And so why do you need the report?  Does

24   the report say that or something different?

25              DEFENDANT DIDANI:  No.  I just want to --

```
 1   BY DEFENDANT DIDANI:
 2   Q.  Do you remember the report say -- on your report everywhere
 3   it was February 12th; right?
 4   A.  That I received the iCloud or --
 5   Q.  Yes.
 6   A.  Yes.
 7   Q.  Do you want to look at the report before we -- are we sure
 8   for this?
 9   A.  Yeah.  I'll look at the report, please.
10           THE COURT:  No, we won't look at the report.  Pose a
11   question.
12           DEFENDANT DIDANI:  The question is --
13           THE COURT:  Excuse me.
14           DEFENDANT DIDANI:  All right, your Honor.
15           THE COURT:  We just don't look at the report and read
16   the report.  You ask a question.  The report is used for
17   specific purposes, okay.
18           DEFENDANT DIDANI:  All right.
19           THE COURT:  So pose a question.
20   BY DEFENDANT DIDANI:
21   Q.  My question is are you sure that you received that on
22   February 12th?
23   A.  I will need to refresh my memory from the report.
24           DEFENDANT DIDANI:  Your Honor, may I?
25           THE COURT:  Yes, you may now.
```

```
 1                   THE WITNESS:  Thank you.

 2                   Yes, February 12th, 2020.

 3   BY DEFENDANT DIDANI:

 4   Q.   During the examination, Exhibit 126.5 --

 5                   THE COURT:  Is that an exhibit in evidence?

 6                   DEFENDANT DIDANI:  Yes, your Honor.

 7                   THE COURT:  Okay.  Go ahead.

 8                   DEFENDANT DIDANI:  Mr. Fink, please.

 9                   THE COURT:  Go ahead and pose your question.

10   BY DEFENDANT DIDANI:

11   Q.   Who's telling the truth, you or Apple?  Because Apple

12   saying 18, you saying 12, and there's a big gap out there,

13   one-week gap.

14                   MR. FINK:  May I, your Honor?

15                   THE COURT:  Yes, you may.

16                   MR. FINK:  I've shown it to the Government.

17                   THE WITNESS:  It states February 8, 2020 for ...

18   BY DEFENDANT DIDANI:

19   Q.   18.

20   A.   February 18th of 2020 for this declaration of Apple from

21   Mr. Sean Pinner.

22   Q.   You don't think it's a week difference between having a

23   iCloud in 12 and sending -- and Apple send it to you in 18?

24                   And my next question going to come how you had access

25   to if Apple saying they didn't send it to you a week later?
```

1    A.   I'm telling you I received the package from Apple, and

2    according to my records it was February 12, 2020.

3    Q.   Detective Leach, this exhibit is Government's exhibit.

4    It's not my exhibit.  And this is what Apple say.  You saying

5    12, Apple saying 18.  And do you agree with me there is a big

6    gap of one week?

7    A.   Six days, correct.

8    Q.   Almost -- six days.  I'm sorry.  So I want to -- for this

9    jury and for this Court, I want to find out who's telling the

10   truth and who's lying, you or Apple?

11   A.   All I have to rely on is the report that I documented that

12   states February 12, 2020, I received it from Apple iCloud,

13   relative to Exhibit N51, our internal exhibits.

14   Q.   So Apple is lying?

15   A.   As I'm stating, all I can reference is what I typed,

16   February 12, 2020.

17   Q.   Detective Leach, it's very important, that date.

18           THE COURT:  That's stricken, because it's not a

19    question.  Go to a new question.

20   BY DEFENDANT DIDANI:

21   Q.   You indicated before it was taking you four to five weeks

22   to get the iClouds, and then later come to a day or two days,

23   few days or a week.  Why?  Why is that?

24   A.   Why did they become more frequent?

25   Q.   Yes, sir.

1   A.   Because through the U.S. Attorney's Office, in

2   communication with people in D.C. and then directly with Apple,

3   we were able to get a direct line of communication in order to

4   get these requests expedited.

5   Q.   And those requests are true?

6   A.   The requests are what?

7   Q.   They all true?  They are --

8   A.   To have them expedited, yes.

9   Q.   So I'm gonna go back to the iCloud in 2019.  Do you

10  remember that, in December?  Did you remember that?

11  A.   Which iCloud?

12  Q.   In 2019, November.  Do you remember?

13  A.   I remember doing an iCloud in 2019, yes.

14  Q.   And we going to go back to those iClouds, because that's

15  another issue, but let's go back.  Then with Donald Larson, you

16  told Donald Larson go ahead, go home, peace out.  Then what

17  happened with Donald Larson?

18  A.   We had another meeting with Donald Larson later on.

19  Q.   How many days after that?

20  A.   Two days.

21  Q.   So what happened in the second meeting now after -- you let

22  him know that you come home 90s, 90 years old.  What happened

23  now?

24  A.   He had a couple nights to sleep on it, and he decided he

25  wanted to come in.

```
 1   Q.   He decided he wanted to tell the truth?
 2   A.   You can ask Mr. Larson that.
 3   Q.   And what did you got out of the second meeting between you
 4   and Mr. Larson?
 5   A.   A lot of the same facts from the first meeting, except
 6   additional details and less minimization in the second
 7   interview.
 8   Q.   Okay.  So was any agreement between you and Mr. Larson that
 9   day?
10   A.   There was an agreement between the U.S. Attorney's Office
11   and Mr. Larson.
12   Q.   What kind of agreement was that, sir?
13   A.   An agreement for him to tell the truth.
14   Q.   And what did -- Mr. Larson would benefit from that?
15   A.   Possibly, yes.
16   Q.   For his ticket?  For his ticket on the bus?
17   A.   Yes.
18   Q.   And what Mr. Larson told you about the money in Washington?
19   A.   The same thing he told me two days ago, except for this
20   time that the money was going to you and not an unknown
21   individual.
22   Q.   And what the money was going to be used for?
23   A.   Cocaine.
24   Q.   And why -- did you ask Donald Larson since you was in
25   charge, did you ask him why he didn't told you the truth the
```

1    first time and now he's telling the truth, or why -- did you

2    ask him?

3    A.   He was scared.

4    Q.   Scared of who?

5    A.   Being held responsible, being charged by the Government.

6    He was taken by surprise on the 10th.

7    Q.   So he was scared from the Government?

8    A.   He was scared of being charged as I showed him on the date

9    of his arrest what he was being arrested for, the charges.

10   Q.   And then his memory came back; right?

11   A.   You'll have to ask Mr. Larson.

12   Q.   Out of your investigation, did you -- what you thought --

13   did he told you where the money -- did you ask him where the

14   money go?

15   A.   Yes.  He said all the money that he derived in bulk

16   currency went to you.

17   Q.   But did you ask him where the money go?

18   A.   Yes.

19   Q.   Where?

20   A.   Certain times the money was given to you, and you took it

21   to Chicago to give to what he defined as Colombians.  And other

22   times money was given to you to take abroad to purchase

23   cocaine.

24   Q.   Did he told you what country I was buying the cocaine, sir?

25   A.   I don't recall if he said which country you were buying the

1    cocaine from directly.

2    Q.  You didn't have a interest to find out where I was buying

3    the cocaine, Detective Leach?

4            MR. BILKOVIC:  That's not what he said.  He said he

5    didn't recall.

6            THE COURT:  He said he didn't recall, so go to a new

7    question.  Sustained.

8            DEFENDANT DIDANI:  Thank you, Judge.

9    BY DEFENDANT DIDANI:

10   Q.  And what else did you ask him?  Did you ask him about the

11   restaurant Marty was buying in Albania?

12   A.  Yes.

13   Q.  What did he told you?

14   A.  He said that there was money being sent over to possibly

15   purchase a restaurant in Albania, and he believed that that was

16   also a front.

17   Q.  Did you -- oh, he believed it.  I'm sorry.  Did you verify

18   the money was going to Albania to buy a restaurant?

19   A.  Yes, we verified money went to Albania.

20   Q.  Do you remember who the gentleman it was going to in

21   Albania?

22   A.  Amarildo Ademi I believe it was.

23   Q.  Did you verify if Mr. Ademi had a restaurant?

24   A.  Only off of social media.  I don't have any official record

25   showing ownership, no.

1   Q.  So you didn't verify whether there was a restaurant or just

2   only in social media?

3   A.  Yes, it was a restaurant.

4   Q.  Oh.  And to be exact here, did Mr. Tibbitts had a contract

5   with Mr. Ademi?

6   A.  There was copies of a contract that was not completed in

7   Mr. Tibbitts' Surface Pro.

8   Q.  On his computer?

9   A.  Yes.

10  Q.  So there is agreement between Mr. Ademi and Mr. Tibbitts to

11  buy a restaurant, oral agreement?

12  A.  Yes.

13  Q.  Do you know how much money he sent to Mr. Ademi?

14  A.  Over a million dollars.

15  Q.  And he send this through what?

16  A.  Wire transfers.

17  Q.  Through banks?

18  A.  Yes.

19  Q.  And then the money he used to send those to buy this

20  restaurant, it was legitimate money?

21  A.  It came from his Comerica Bank account, yes.

22  Q.  So the money went through -- got out from federal

23  government, got out from federal government and went out to

24  Albania and went to Mr. Ademi's account; right?

25  A.  Wire transfer.

```
 1   Q.   And do you know what's going on with Mr. Ademi today?
 2   A.   I do not.
 3   Q.   Do you remember you and Agent Tsouroullis in 2017 called
 4   DEA Greece to notify Albanian government that something foul
 5   play is there?  Do you remember that, sir?
 6   A.   I don't remember offhand, no.
 7             DEFENDANT DIDANI:  Your Honor, one moment.
 8             (Briefly off the record.)
 9             DEFENDANT DIDANI:  Your Honor, can I show Mr. Fink?
10             THE COURT:  You may.
11   BY DEFENDANT DIDANI:
12   Q.   Did you receive any information, Detective Leach?  Did you
13   receive any information what happened to those business in
14   Albania?
15   A.   I do not know the current status of the restaurant in
16   Albania, no.
17   Q.   You believe it was seized, or no?
18             THE COURT:  I didn't hear the last part.
19             THE WITNESS:  I do not know the status of the
20    restaurant, your Honor.
21             THE COURT:  Okay.
22   BY DEFENDANT DIDANI:
23   Q.   You believe those business was all seized?
24   A.   The restaurant?
25   Q.   Yes.
```

1    A.   I have no idea if the restaurant was seized.

2    Q.   I want to go back to iCloud in November 2019.

3              DEFENDANT DIDANI:  Your Honor, may I approach for one

4    second, your Honor?

5              THE COURT:  Relative to ...

6              DEFENDANT DIDANI:  The iCloud.  It's something I want

7    to talk.  May I approach?

8              THE COURT:  Okay.

9              (At 1:22 p.m., sidebar on the record, out of the

10             hearing of the jury, as follows:)

11             DEFENDANT DIDANI:  Your Honor, getting to the stage in

12   2019 iCloud, your Honor, Mr. Leach had -- it was a load seized,

13   753 kilos of -- Detective Leach.  And I would like -- Mr. Fink

14   made a request.  I would like to mention it to you as the

15   certificates if you allow me, your Honor.

16             MR. FINK:  That was the notice.  You remember you had

17   me file in writing what he said on the record that -- because

18   you were excluding the underlying evidence derived from the

19   certificates that they then wanted to use the certificates

20   themselves, if you recall, and I put that in the notice.

21             THE COURT:  Do you have any objection?

22             MR. BILKOVIC:  I don't have any objection.  The only

23   thing that I would pose, is this appropriate for this area of

24   the cross-examination, because it's not anything that he's

25   testified to under direct yet before the seizures.

```
 1              THE COURT:  Is he going to testify --
 2              MR. BILKOVIC:  He's going to on the other times --
 3              THE COURT:  Can you wait until then or --
 4              DEFENDANT DIDANI:  There will be so many -- at least
 5    to the one there will be, because there will so many.  It will
 6    be in Holland, it will be in Spain.  Mr. Leach is involved
 7    and --
 8              THE COURT:  He's going to come back two more times.
 9    This wasn't in the direct.  Why don't you take it up when we go
10    to the seizures.
11              You're going to talk about the seizures; right?
12              MR. BILKOVIC:  Yes.
13              THE COURT:  Take it up then.
14              DEFENDANT DIDANI:  All right, your Honor.
15              THE COURT:  Okay.
16              (End of sidebar.)
17   BY DEFENDANT DIDANI:
18   Q.  Detective Leach, when was the last time you spoke to Donald
19   Larson?
20   A.  A few days ago.
21   Q.  Pardon me?
22   A.  A few days ago.
23   Q.  About what?  What was the conversation about?
24   A.  It was preparation for trial.
25   Q.  You was preparing --
```

```
 1                    THE COURT:  I'm sorry.  I didn't hear.
 2                    THE WITNESS:  Preparation for trial, your Honor.  I'm
 3       sorry.  I'll scoot the mic closer.
 4    BY DEFENDANT DIDANI:
 5    Q.  You was preparing him to testify?
 6    A.  I was sitting in on the preparation with the U.S.
 7    attorneys, yes.
 8    Q.  When you say preparation for trial, Detective Leach, what
 9    do you mean, because it's very important to have the whole nine
10    yards with the whole big picture?  When you say preparation for
11    trial --
12                    THE COURT:  Okay.  That's a question.
13    BY DEFENDANT DIDANI:
14    Q.  -- what do you mean?
15                    THE COURT:  What's the answer to that question?
16                    THE WITNESS:  What we were doing is going over
17       documents and statements that he had previously made during
18       interviews with the investigators during this investigation.
19    BY DEFENDANT DIDANI:
20    Q.  What statement?  All the statement or the statement that
21    you wished to from the Government?
22    A.  The meeting was ran by the U.S. Attorney's Office.  I was
23    just sitting in on it.  They were reviewing different documents
24    regarding to Mr. Larson's association with this organization.
25    Q.  What, you was teaching Mr. Larson how to answer?
```

1    A.   No, I did not.

2    Q.   You was refreshing his memory?

3    A.   That's what the documents are for.

4    Q.   What about -- what about the gentleman, Eric Puzio?  Who is

5    Eric Puzio?

6    A.   Eric Puzio is an associate of yours living in -- was living

7    in the Eastern District of Michigan.

8    Q.   When you say associate of mine, what do you mean?

9    A.   Friend, acquaintance.  That definition is up to how you

10   determine it, I suppose, your relationship.

11   Q.   Eric Puzio charged with anything?

12   A.   No.

13   Q.   He is a co-conspirator or anything?

14   A.   Not at this juncture.

15   Q.   What do you mean by not at this juncture?

16   A.   I mean during the investigation at some points names of

17   people changed from being suspected of or co-conspirator or

18   facilitator, but as the investigation progresses the role that

19   these individuals play within the organization comes to light

20   with a little more evidence that you obtain.

21   Q.   What about Pete Synowiec?  What about -- who is Pete

22   Synowiec?

23   A.   Also a friend of yours from the Eastern District of

24   Michigan.

25   Q.   And Pete Synowiec you indicated in Grand Jury that he was a

1    second -- a supplement financier to buy cocaine?  He was giving

2    me money to buy cocaine?

3    A.    Yes.

4    Q.    Is that something Mr. Synowiec indicated to you?

5    A.    Mr. Larson indicated that to us.

6    Q.    I didn't ask -- that was not the question.  The question is

7    is Mr. Pete Synowiec -- did he indicated to you that he gave me

8    any money to buy cocaine?

9    A.    No.

10   Q.    That was the question.

11            What about Alex Meskouris?  What about him?

12   A.    Real estate agent based out of New York that you had

13   dealings with.

14   Q.    What kind of dealings?

15   A.    Attempt to purchase real estate.

16   Q.    Purchase real estate where?

17   A.    Dominican Republic.

18   Q.    Dominican Republic is United States?

19   A.    No.

20   Q.    And did you meet with Mr. Alex Meskouris?

21   A.    Yes, I have.

22            THE COURT:  Mister who?

23            DEFENDANT DIDANI:  Alex Meskouris.

24            THE COURT:  Okay.

25

```
 1   BY DEFENDANT DIDANI:
 2   Q.   Did he indicated that he had any drug dealing with me?
 3   A.   Dealing drugs directly with you, no, he did not.
 4   Q.   He indicated that what, I was buying property?
 5   A.   He indicated that he received money from you for the
 6   purchase of a property, yes.
 7   Q.   How much he received from me, sir?
 8   A.   A little over $200,000 down payment.
 9   Q.   It was cash or bank?
10   A.   This was a cash money drop.
11   Q.   Can you explain to me how it was dropped to him?
12   A.   Absolutely.  You explained to Mr. Meskouris that you'd like
13   to put a down payment onto the property in the Dominican.  You
14   then coordinated movement of your money to be moved from a
15   Chinese money launderer in Ecuador for a percentage of which he
16   would take a cut to move that money.  That said, Chinese money
17   launderer then coordinated with Mr. Meskouris to have that
18   money dropped by other individuals of that organization to him
19   directly in New York.
20   Q.   And that money was to buy property; right?
21   A.   Yes, it was.
22   Q.   So based on your experience, those Chinese people they can
23   be used for any kind, buy property, buy cars, do you agree with
24   me?
25   A.   They can move -- their sole purpose is to move money, no
```

1   matter what the purpose, yes.

2   Q.   But the purpose can be not -- it can be properties, it can

3   be cars, it can be anything; right?

4   A.   Yes.

5   Q.   So let me go back to 2017.  Why you don't think the

6   $450,000 is to buy a property in Albania?

7   A.   I seen no property purchased from you in Albania.

8   Q.   But you see me investing; right?

9   A.   I see Mr. Tibbitts investing.

10  Q.   But the money was Mr. Tibbitts'; right?

11  A.   $450,000 in New York?  That money, yes.

12  Q.   Yes.

13  A.   Yes.

14  Q.   It was legitimate; right?

15  A.   It came from his Comerica Bank account, yes.

16  Q.   Legitimate money; yes or not?

17  A.   Yes.

18  Q.   So what make you -- since these Chinese people they can be

19  used for all kind of stuff, why you don't think that money was

20  to buy something or invest in another business?

21  A.   Due to the context of the text messages and the images

22  surrounding that money transfer.

23  Q.   What about Philip Daskal?  What about him?

24  A.   Vice president for INKAS Armored Manufacturing in Toronto,

25  Canada.

1    Q.   And he's located where, in Canada?

2    A.   That is correct.

3    Q.   What about Philip Daskal?  You met with him in Chicago

4    airport?

5    A.   Yes, I did.

6    Q.   And what he say to you?

7    A.   He told me that he --

8              MR. BILKOVIC:  Objection, hearsay, Judge.

9              THE COURT:  Yes, it sounds like hearsay to me.

10   BY DEFENDANT DIDANI:

11   Q.   And from your meeting with Mr. Daskal, what your

12   investigation is?

13   A.   With Mr. Daskal, our investigation led that he was

14   receiving bulk currency from you to purchase armored cars to

15   send down to Dominican Republic and to Ecuador.

16   Q.   Not to United States; right?

17   A.   No.

18   Q.   So again, it was using the same methods?

19   A.   There were multiple methods used for the purchase of those

20   vehicles.

21   Q.   Tell me the methods?

22   A.   One method was you contacted an individual that you called

23   "Uncle" and requested that he transfer money to INKAS Armored

24   Manufacturing.  This individual is located in the Middle East.

25   He coordinated sending wire transfers through basically

 1    third-party shell companies over to Mr. Daskal's account.

 2              And then on two other occasions you orchestrated money

 3    movement through the Chinese money launderer in Ecuador, two

 4    Chinese money launderers in the Toronto area, who

 5    hand-delivered the bulk currency in Canadian dollars to

 6    Mr. Daskal.

 7    Q.   So to agree with me, we have a Chinese to buy a property,

 8    we have a Chinese to buy cars, but for some reason this

 9    $450,000 is for drugs; right?  Is that correct?

10    A.   Yes.

11    Q.   Detective Leach, can you explain to me one more time,

12    because I was not clear about it.  You made a request in

13    iCloud, Apple, that from five to six weeks a return come -- a

14    request was made by you and by the government in Washington to

15    be in three days, few days, a week; right?

16    A.   Yes.

17    Q.   And why is that?  Can you explain to me one more time,

18    because I'm kind of --

19    A.   Why?  The reasoning behind that?

20    Q.   Yes, sir.

21    A.   So the information that we were obtaining off of your

22    iCloud data showed movements of cocaine being shipped out of

23    South America over to Europe utilizing commercial maritime

24    ships.  Along with that, we were also noticing called bills of

25    lading, which are receipts basically showing container movement

1   on those such ships, starting designation, final destination,

2   integrated with large bulk cocaine pictures and messaging chats

3   about the movement of cocaine.

4           So what we noticed is with the delay in the iCloud

5   being received we were missing these potential loads that were

6   arriving prior to us getting the delayed information from

7   Apple.  It was determined if we could get this information in a

8   more expedited manner that we could become proactive instead of

9   reactive and, therefore, we could get ahead of some of these

10  shipments prior to them landing and potentially get large

11  cocaine seizures.

12  Q.  And, Detective, to be clear, did this $450,000 have to do

13  anything with the shipment from 2017 to 2020?

14  A.  I don't know where that $450,000 went after it left New

15  York.

16  Q.  So those shipments, everything, all those shipments,

17  everything that you see, we gonna get to other different days

18  about those shipments, but you didn't find no evidence that

19  this defendant in front of you had even thoughts to send any

20  shipment in United States, did you?

21  A.  Cocaine directly to the United States?

22  Q.  Yes, sir.

23  A.  No.

24  Q.  We're not talking about planning.  We're talking thoughts,

25  thoughts.  Because you said your best plan is your iPhone, it's

1    my iPhone, your best --

2              THE COURT:  Now, is that a question?

3    BY DEFENDANT DIDANI:

4    Q.  Did you find any thoughts ever in any -- all these years,

5    did you find any thoughts that this defendant had any thoughts

6    to send any substance from South America to United States?

7    A.  We did not capture any thoughts in the iCloud, but what we

8    did capture none of that information showed that the cocaine

9    was destined for the United States directly.

10   Q.  Did you work hand to hand with those authorities to seize

11   -- the Dutch authorities or English authorities or Spain

12   authorities, did you work hand to hand?

13   A.  I worked directly with our DEA agents that are assigned to

14   those jurisdictions.  That's who I passed my intelligence to.

15   They work hand in hand with those individuals.

16   Q.  And I don't want to go to much details, because the scope

17   of what -- did you have time -- you indicated you had time that

18   a lot of those loads was not seized because of you or your

19   intelligence?

20   A.  Of the five shipments that the Government is presenting?

21   Q.  Yes, sir.

22   A.  Two of them were directly initiated from the information

23   from the iClouds, yes.

24   Q.  And what about the other loads?

25   A.  The other ones are all directly tied to you through the

1    iCloud.

2    Q.   So everything, Detective -- everything, Detective Leach, is

3    what you see on iPhone.  Did you have anybody come in here and

4    testify from South America?  Did you talk to anyone in South

5    America?

6    A.   Outside of our agents, no.

7    Q.   Did you talk to anyone in Europe outside of your agency,

8    anyone, anyone, you personally?

9    A.   As in members of your organization, or I guess I don't

10   know --

11   Q.   Detective, right now we don't even know where the money go.

12   So we can't call it organization.  Do you agree with me?

13   A.   Did I talk to any members that I associated with you?

14   Q.   Yes.  Any members, any members out there in Europe.

15   A.   No.

16   Q.   So other than the iPhone that you never read the Miranda

17   Rights, you don't have nobody else to come testify and support

18   your argument?  Did you have anyone?

19   A.   I believe we've already had testimony from members of the

20   agencies where the seizures were seized and potential witnesses

21   that are going to speak further in this trial regarding --

22   Q.   Are those our witness or --

23        MR. BILKOVIC:  I'm going to object.  He's not letting

24   him finish his answer.

25        THE COURT:  You weren't letting him finish his answer.

```
 1              THE WITNESS:  People directly tied to those seizures
 2   where the shipments landed are testifying in this court.
 3   BY DEFENDANT DIDANI:
 4   Q.   And where those shipments landed, sir, do you remember?
 5   A.   They landed in the Netherlands, they landed in Dover,
 6   England, they landed in Bilbao, Spain.
 7   Q.   What about the Dover, England, the gentleman that was here
 8   testifying?  Is that intelligence that was offered from you?
 9   A.   Intelligence associated with the companies, yes.
10   Q.   Not the companies.  What about the intelligence with the
11   seizure in Dover, it was offered by you?
12   A.   Directly, no.
13   Q.   Do you remember -- Detective, do you remember March 31,
14   2021; right?
15   A.   I didn't catch the date.  March ...
16   Q.   March 31, 2021.
17   A.   Yes, I remember that day.
18   Q.   Was that the day that you arrested me?
19   A.   Yes, it was.
20   Q.   Do you remember one question I asked you all that few
21   hours?
22   A.   What question?
23   Q.   It was only one question, Detective.
24   A.   You asked if you could call your mother during that
25   interview.
```

```
 1   Q.   That's the only question.  How can you arrest somebody when
 2   you don't even know the intelligence in Dover, but take
 3   somebody's life, and you don't even let him call his mother?
 4   You think is that fair?
 5   A.   Due to your history with your phones, yes.  Unfortunately,
 6   that is going to be our safety protocol, to make sure that
 7   nothing is getting -- no evidence is getting erased or that
 8   you're not going to communicate with somebody else
 9   unfortunately.
10   Q.   You didn't have your own phone there, Detective?
11   A.   I did.
12   Q.   You couldn't offer me your own phone?
13   A.   I don't speak Albanian.  I can't let you communicate to
14   somebody without us understanding what you're saying at that
15   time.  It's unfortunate, but that is protocol.
16   Q.   And on March 29 you indicated on that hearing that I was
17   getting charged under maritime drug laws; right?  Do you
18   remember the hearing, or no?
19   A.   Do I remember the hearing for the complaint?
20   Q.   No, the conversation that we have --
21   A.   Yes.
22   Q.   That was you, it was Agent Hermans, it was -- do you
23   remember what you told me?  You said I will charge you, it
24   doesn't matter if the cocaine is in another planet, I'm still
25   going to charge you here in United States?  Do you remember
```

1    that?

2    A.   I was trying to -- you couldn't wrap your head around the

3    cocaine not coming into the United States, and I was trying to

4    explain to you how a conspiracy is defined by the government.

5    Q.   All right.  So you trying to define a conspiracy of the

6    MDLEA, remember that, maritime drug laws?  Do you remember

7    that, Detective?

8    A.   Yes.

9    Q.   Define for this jury the maritime drug laws conspiracy?

10           MR. BILKOVIC:  Judge, I'm going to object for two

11   reasons.  One, it's basically asking for a legal conclusion.

12   And, number 2, this is well beyond the scope of my initial

13   direct.  If this is relevant, it should come at a later time.

14           THE COURT:  Do you want to speak to the objection,

15   Mr. Didani?

16           DEFENDANT DIDANI:  No, your Honor.  I'll pass.  I'll

17   pass the question, your Honor.

18           THE COURT:  Okay.  Because I'm going to sustain it,

19   because I think it calls for a legal conclusion.  And later on

20   I will tell the jury what the law is that they are to apply in

21   this case.

22           And it is going to be the subject of another recall of

23   this witness.  And there may be an opportunity for you to ask

24   something relative to that if you want at this time.

25           And the Government's objection is sustained at this

1   time.  Go to a new question.

2   BY DEFENDANT DIDANI:

3   Q.  Agent, I want to go back in 2015.  I know you was not on

4   the case, but did you verify the phones in 2015?  Did you have

5   an opportunity to review those phones?

6   A.  Photos from those phones, yes.

7   Q.  What about videos?

8   A.  I'd have to see the specific video.  I looked at videos and

9   photos back in --

10  Q.  Did you see any evidence of a coaling business?

11          THE COURT:  Of a what?

12  BY DEFENDANT DIDANI:

13  Q.  Coaling business, coaling, minerals.  Did you see any

14  evidence?

15  A.  There was, I think, a bill of lading for minerals and maybe

16  some equipment -- photos taken of equipment.

17  Q.  So if the other agent -- so if the other -- if any other

18  agent come here and testify that a coaling business and mineral

19  business in Albania didn't exist, it would be false; right?

20  A.  That you owned?

21  Q.  Yes, sir.

22  A.  They may exist.  I don't know of any directly that you own.

23  Q.  But during your investigation you never checked?

24  A.  We didn't receive any official documents from Albania.

25  Q.  What about Belinda Tibbitts?  Did you met with Belinda?

1    A.   Yes.

2              THE COURT:  Refer to her as Mrs. Tibbitts in open

3     court, please.

4              DEFENDANT DIDANI:  Pardon me, your Honor?

5              THE COURT:  Refer to her as Mrs. Tibbitts in open

6     court, please.

7              DEFENDANT DIDANI:  Oh, Mrs. Tibbitts.  Yeah,

8     Mrs. Tibbitts.

9    BY DEFENDANT DIDANI:

10   Q.   When first you met with her?

11   A.   April of 2019.

12   Q.   And what you indicated -- what was the -- what you got from

13   her?

14   A.   We executed a search warrant at her residence in

15   Pleasanton, California, and then subsequently another search

16   warrant was executed at her residence here in Eastern District

17   of Michigan.

18   Q.   And I want to go back to Belinda.  Do you think me --

19             THE COURT:  It's not Belinda.

20             DEFENDANT DIDANI:  Mrs. Belinda -- I'm sorry, your

21    Honor.

22   BY DEFENDANT DIDANI:

23   Q.   You indicated she bought a house in California?

24   A.   Yes.

25   Q.   Did she bought that in cash?

1    A.   I don't recall if she paid cash or financed it.

2    Q.   It's one of your reports, 1.7 million?  Does that come to

3    your memory?

4    A.   Yes, that sounds accurate.

5    Q.   And during the investigation did you find out anything

6    about any foul play with that 1.7 million that she bought in

7    California house?

8    A.   In our background investigation into Belinda Tibbitts, we

9    did not find anything directly affiliating her with any illegal

10   activity.

11   Q.   Did you -- during your investigation, did you find out

12   anything that Mrs. Tibbitts had any contact -- after Marty's

13   death had any contact with me?

14   A.   Yes.

15   Q.   You did?

16   A.   Yes.

17   Q.   That I have contact with her?

18   A.   With Mrs. Tibbitts after Marty's death -- or after

19   Mr. Tibbitts' death, yes.

20   Q.   Me and Belinda?

21   A.   Yes.

22   Q.   Can you show me one of your reports or anything to indicate

23   that I have any contact with her?

24   A.   There was call detail records from you to her very shortly

25   and briefly after his death, and we verified this communication

1    with Mrs. Tibbitts in her interview.

2    Q.   Where was I, do you remember?  What was -- is that some

3    kind of message or something or E-mail?

4    A.   I can tell you what she said, but she is also planning on

5    testifying in this case to give her own statement.

6    Q.   I'm not asking about Mrs. Tibbitts.  I'm asking about you

7    through your investigation.  Did you see any E-mails or any

8    messages, or did you -- did the iPhone show you any contacts?

9    A.   Directly with you and Mrs. Tibbitts?

10   Q.   Yes.

11   A.   No.

12   Q.   That's what I was asking you, sir.  So there is no

13   indication that I had any contact with her directly, right,

14   Mrs. Tibbitts?

15   A.   Other than those call detail records that show the short

16   phone calls right after Marty's death -- Mr. Tibbitts' death.

17   Q.   When you see her in California, what did you receive from

18   her?  Did you receive any evidence?

19   A.   We received evidence related to Mr. Tibbitts that she had

20   saved and transported out there with her when she moved from

21   the Eastern District of Michigan to Pleasanton, California.

22   Q.   Can you describe what kind of evidence, what kind of --

23   what did you receive there in California, sir?

24   A.   There were some cell phones, a couple small Surface Pro

25   laptop-style computers and some large, I guess, note keeping

1    books, a black and a blue one.

2              THE COURT:  A what?

3              THE WITNESS:  Like notebooks.

4    BY DEFENDANT DIDANI:

5    Q.  What about those cell phones?  Whose cell phones are they?

6    A.  There was a cell phone that -- on Ms. Tibbitts' own

7    explanation stated that she labeled the back of the phones, one

8    of which she put your name on.  Another one was --

9    Mr. Tibbitts' name was on another, I believe.

10   Q.  So one of the cell phones it was mine?

11   A.  According to the sticker that she put onto the back of it.

12   Q.  Did you access the phone?

13   A.  Did I ask what?

14   Q.  Did you access the phone, that phone, to verify if it was

15   mine?

16   A.  I believe we attempted extractions on all the devices.  I

17   don't recall getting into that device specifically.

18   Q.  And you indicated that computers, too; right?

19   A.  Microsoft Surface Pro, yes.

20   Q.  How long you had that computer in your office?

21   A.  Not in my office.  It's kept in the evidence.

22   Q.  Did you go through all that evidence on the computer and

23   Marty's phone?

24   A.  The Surface Pro extraction was completed and a copy -- yes,

25   we have a working copy of it to review.

1   Q.   Did you review it all?  Everything; right?

2   A.   I reviewed it.  I can't say that I went through all of it.

3   It is an extremely large file.

4   Q.   There is on that -- on that computer is a lot of private

5   stuff on Marty's business and everything; right?  Do you agree

6   with me?

7   A.   There is business-affiliated documents and E-mails on

8   there, yes.

9   Q.   Did you find any evidence that Marty was planning any drugs

10  on those computers or phones or anything, any evidence that

11  Marty was planning any drugs or any shipment of drugs, or no?

12  Did you find any?

13  A.   Plan any shipment of drugs?

14  Q.   Yes.

15  A.   Directly, no.

16  Q.   So Marty -- so, to be clear, you didn't find on all those

17  computers, phones and everything, you didn't find no evidence

18  that Marty Tibbitts was planning any shipment of cocaine;

19  right?

20  A.   There was planning on the movement, a device used to move

21  cocaine, but specific cocaine movement, no.

22  Q.   Cocaine movement with containerships?

23  A.   Utilizing a containership.

24  Q.   Marty?

25  A.   As a travel courier, yes.

1    Q.   Marty?  I'm talking about Marty right now.

2    A.   Mr. Tibbitts.

3    Q.   Mr. Tibbitts.  You find evidence that he was planning to

4    utilize containers, containerships?

5    A.   Containerships, yes.

6    Q.   No, no.  Containers, containers.

7    A.   No.

8    Q.   Did you find any evidence that Marty was utilizing any

9    company or anything to move cocaine, companies?  No?

10   A.   No.

11   Q.   Did you find any evidence that Marty was planning to move,

12   with all his airplanes that he had, to move any cocaine with

13   those airplanes?

14   A.   No.

15   Q.   So do you agree with me, Detective Leach, if Marty was a

16   drug dealer he would have somewhere evidence of shipment of

17   cocaine; right?

18   A.   We're not alleging that Mr. Tibbitts was the drug dealer.

19   Q.   What was Mr. Tibbitts?

20   A.   Mr. Tibbitts was a financier and conspirator that helped in

21   the design of the parasitic device to help transport cocaine.

22   Q.   Agent Leach, we've been sitting over two hours here, and

23   I'm asking you what did he finance or what did he finance or

24   what country he finance, and you cannot give me an answer.  So

25   how is he a financier?

1  A.   The money that was given to Donald Larson was utilized to

2  purchase cocaine.

3  Q.   And that's not because of your investigation, that's

4  because Donald Larson said; right?  The second time or the

5  third time; right?

6  A.   All with all the surrounding context, images, messages and

7  your phone.

8  Q.   Did you find any -- okay.  Did you find any planning that

9  this defendant had with Mr. Donald Larson, any planning to ship

10  any cocaine anywhere from South America to let's say Asia?

11  A.   You two together?

12  Q.   Yes, sir.

13  A.   No.

14  Q.   No?

15  A.   No.

16  Q.   So there is no evidence that Donald Larson ever

17  participated in any planning or anything, anything has to do

18  with cocaine from South America to anywhere, any country;

19  right?

20  A.   I don't know where the cocaine that the image was derived

21  from in the Viber thread that you were specifically speaking

22  about and moving and selling off.  So, therefore, I cannot

23  testify to the origins of that package.

24  Q.   All right.  So we put that package on the side.  I'll leave

25  that package to the Government.  Let's put that on the side.

Jury Trial, Volume 12 - Excerpt - March 7, 2025

1    What I'm asking, other than that package, whatever, that photo,

2    there is no planning between this defendant and Mr. Donald

3    Larson, there is no planning of any cocaine shipment from South

4    America to Europe or to Asia or Africa?

5    A.   No.

6    Q.   During the Government's -- what about this Fatjon

7    Tony (ph), Fatjon?  Who's Fatjon?

8            THE COURT:  I'm sorry?

9    BY DEFENDANT DIDANI:

10   Q.   F-A-T-J-A-M (sic), Tony, Fatjon.  Bajrami; right?

11   A.   Mr. Bajrami?

12   Q.   Bajrami.

13   A.   Bajrami?  I'm sorry.  Mr. Bajrami.

14   Q.   What about him?

15   A.   He is an associate of yours that lives in the area of

16   Chicago.

17   Q.   And he's a co-conspirator or a unindicted co-conspirator?

18   A.   Yes.

19   Q.   Yes, what?

20   A.   Yes, unindicted co-conspirator.

21   Q.   Unindicted co-conspirator.  Did you ever talk to him?

22   A.   Yes.

23   Q.   Directly?

24   A.   Yes.

25   Q.   So Mr. Fatjon made what you call a proffer?

```
 1   A.   You asked me if I spoke with him.  The answer was yes.

 2           THE COURT:  Well, did he make a proffer?

 3           THE WITNESS:  There was not a proffer.

 4           THE COURT:  Okay.  Go to your next question.

 5   BY DEFENDANT DIDANI:

 6   Q.   What you spoke about with him?  Can you -- tell me a little

 7   bit, because that's new to me.

 8   A.   We attempted to speak with him as he landed on an inbound

 9   flight from out of country.

10           THE COURT:  Inbound to where?

11           THE WITNESS:  To Chicago, your Honor.

12           THE COURT:  Okay.

13           THE WITNESS:  After he exited the plane and was in the

14   public area, we identified ourselves and stated that we wished

15   to speak with him.  The conversation was brief, and that was

16   about all we had.

17           THE COURT:  Did you speak with him in the open area?

18           THE WITNESS:  After they were -- yes.  After they were

19   exited from the plane it was out in the public area.

20           THE COURT:  Go ahead.  I'm sorry for interrupting you.

21   BY DEFENDANT DIDANI:

22   Q.   And what did you guys speak about?  What did you spoke?

23   What kind of question you ask Mr. Fatjon?

24   A.   We wanted to ask him questions with his involvement and how

25   he knew you and his background to your relationship and what he
```

1    knew about any of your activity.

2    Q.   And did he answer truthfully?

3    A.   He said that he didn't wish to speak with us at that time.

4    Q.   Did you enter a report about this?  Did you make a federal

5    report about Mr. Fatjon Bajrami?  Did you make a federal report

6    that you attempted to speak to him?

7    A.   I don't recall if there was a report written on that or

8    not.

9    Q.   If there was a report, do you think this defendant is

10   entitled?

11   A.   Yes.

12   Q.   And what was his involvement on this conspiracy?

13   A.   We identified Mr. Bajrami and you --

14   Q.   Yes.

15   A.   -- as you would text back and forth about different seizure

16   -- cocaine seizures that had been taking place, how much money

17   you were making.  At one time you requested that he purchase

18   bulletproof jackets for you.  He went ahead and did that on

19   multiple occasions, which were turned over to you.

20   Q.   When you say that we have a conversation back and forth

21   about seizure, did this defendant with Mr. Fatjon Bajrami have

22   any conversation about shipping cocaine together?

23   A.   Together, no.

24   Q.   And there's no thoughts or any conversations shipping any

25   cocaine in the United States; right?

```
 1    A.   There was requests by him in the message thread to help be

 2    a bigger part in the organization with you.

 3    Q.   And what did I told him?  What was the answer?

 4    A.   I believe you stated that you weren't in the weed business.

 5    Q.   Is that illegal, to buy bulletproof vest, Agent Leach?

 6              THE COURT:  Is what now?

 7    BY DEFENDANT DIDANI:

 8    Q.   Illegal to buy bulletproof vest?

 9    A.   Kevlar reinforced jacket, no.

10    Q.   So the only part in this -- on this so-called conspiracy of

11    Mr. Fatjon Bajrami is buying bulletproof vest for this

12    defendant; right?

13    A.   There were also in-depth conversations with Mr. Bajrami and

14    you on attempting to move some of your proceeds into the United

15    States through him.

16    Q.   Any evidence through your investigation that any money

17    through this Mr. Bajrami enter the United States?

18    A.   Just the intent.  There was -- we did not seize any funds

19    directly affiliated with one of those money transfers.

20    Q.   So, if somebody lives in Brazil or lives in Iraq, if you

21    want to send money -- just intend, they want to send money to

22    -- intention, right, they want to send money to United States,

23    but he never planned, that's illegal?  Intention is illegal?

24    A.   Depends what that intent is for.

25    Q.   I got two million dollars, right, and I say, hey,
```

1    Detective, I'm sending you a million.  That's an intention, you

2    know.  Is that criminal?

3    A.   Without surrounding context of any illegal activity, if we

4    want to talk in hypotheticals.

5    Q.   But that's what I'm trying to figure out, is it illegal.

6    The intention, is it illegal to be in another foreign country

7    and having a conversation with somebody, maybe send a million

8    dollars or don't send?  Is this illegal?

9    A.   The intent is illegal if those proceeds are illegally

10   obtained.

11   Q.   Okay.  The intent?

12   A.   The intent to move those proceeds, yes.

13   Q.   And what kind of indictment is that?  Can you fill me in?

14   A.   Money laundering.

15   Q.   So even if this didn't turn out that's a crime?

16   A.   If the Government has solidified that the proceeds are from

17   illegal activity and you are conspiring with another individual

18   and there's intent there, then yes.

19          THE COURT:  Although the jury will remember that I

20   will instruct you on what the law is in that you can just use

21   this as this witness' understanding of it, okay.

22   BY DEFENDANT DIDANI:

23   Q.   And other than the attempt or the Caviar (ph) bulletproof

24   vest, there is nothing else surrounding this gentleman, Fatjon

25   Bajrami, to anything with me; right?

1   A.   Just your direct talk with him about your cocaine

2   shipments.

3   Q.   Is that a crime?

4   A.   Talking about cocaine shipments, no, it is not.

5   Q.   So let me go a little bit detail with this Pete Synowiec.

6   You had opportunity to talk to Pete; right?

7   A.   Yes, I have.

8   Q.   Did you threaten Pete?

9   A.   No.

10  Q.   So, hypothetically, if Pete comes tomorrow and say you

11  threatened him with his business, would that be false?

12  A.   Yes.  There was no threats made.

13  Q.   And this Pete got two meat markets; right?

14  A.   Yes.

15  Q.   He indicated to you that he was friend of mine; right?

16  A.   Yes, close friend.

17  Q.   Close friend.  He indicated to you that there's no cocaine

18  dealing ever?

19          MR. BILKOVIC:  Judge, objection, hearsay.

20  BY DEFENDANT DIDANI:

21  Q.   Out of your investigation.

22          THE COURT:  I'm sorry?  You may rephrase your

23  question, but that is sustained.

24  BY DEFENDANT DIDANI:

25  Q.   Out of your investigation, did you find out any foul play

1    between this defendant and Mr. Pete Synowiec?

2    A.    No.

3    Q.    Did Mr. Pete Synowiec in your investigation, on your

4    iPhone, did it indicated that Mr. Synowiec visit me in South

5    America?

6    A.    Yes, it did.

7    Q.    And visit me for what?

8    A.    It appears that he visited you to possibly get involved in

9    a shrimping company venture between South America and his meat

10   markets.

11   Q.    And did you -- Pete indicated that he sold shrimp farms?

12   A.    Yes.  Yes, he did.

13          THE COURT:  He sold what?

14          DEFENDANT DIDANI:  Farms.  Shrimp farms, your Honor.

15   BY DEFENDANT DIDANI:

16   Q.    So there is existing?

17   A.    Yes.

18   Q.    Is that illegal?

19   A.    No.

20   Q.    In your investigation, did you find out any deposit that

21   this defendant gave to Mr. Pete Synowiec on his accounts?  Did

22   you find out any, any evidence that I deposit any money on his

23   accounts?

24   A.    No.

25   Q.    So any indication that I, Mr. Didani, deposit any cash

 1   money on Mr. Pete Synowiec's business would be false?

 2   A.   That's accurate that you did not deposit any money into his

 3   accounts.

 4            DEFENDANT DIDANI:  Appreciate, your Honor.  And for

 5   the moment, your Honor, I have no -- I have no further

 6   questions for the moment, your Honor, at this moment for

 7   this ...

 8            THE COURT:  Okay.  You don't have any further

 9   questions at this time?

10            DEFENDANT DIDANI:  At this time, your Honor.

11            THE COURT:  Okay.  Very well.

12            Not yet.  We have to see if the Government has

13   redirect, and it appears they do.

14            MR. BILKOVIC:  I do, your Honor, just on the topics

15   that we addressed today.

16                      REDIRECT EXAMINATION

17   BY MR. BILKOVIC:

18   Q.   You're going to testify two more times; correct?

19   A.   Yes.

20   Q.   Are there chats between Mr. Didani and Mr. Synowiec that

21   you're whatever of?

22   A.   Yes, there are.

23   Q.   Do those chats, some of them involve this shrimp farm

24   visit?

25   A.   Yes.

1   Q.  And in one of those chats, and again we'll get into these

2   later, but I just want to go into them generally, is there a

3   reference from Mr. Didani telling Mr. Synowiec that he wants to

4   do something clean with him?

5   A.  Yes, there is.

6   Q.  Mr. Didani gave you an example of two million dollars if he

7   wanted to send a million to you, and you said basically in that

8   context number is illegal.  But what if that money are drug

9   proceeds?

10  A.  That would make it illegal.

11  Q.  And in your -- again, we will be getting into the Fatjon

12  Bajrami chats later; correct?

13  A.  Yes.

14  Q.  In those chats, were there requests from Mr. Didani for

15  Mr. Bajrami to send him tokens, photographs of dollar bills?

16  A.  Yes, there were.

17  Q.  And did Mr. Bajrami do that?

18  A.  He did.

19  Q.  When you were going through -- reviewing Mr. Tibbitts'

20  Surface Pro, did you find anything related to money laundering?

21  A.  Yes.

22  Q.  What did you find?

23  A.  There was a article on there specifically titled with the

24  word "money laundering" in it -- words "money laundering" in

25  it.

1   Q.   When you were looking during your investigation, the

2   Chinese money launderers that you came upon, did you also find

3   evidence that they were being used to basically fund and pay

4   for cocaine purchases by people in this conspiracy?

5   A.   Yes.  Not only were they sending money out, but they were

6   also receiving money.

7   Q.   I want to talk briefly about the meeting with Mr. Larson

8   the other day.  Do you recall who was there?

9   A.   Myself, Special Agent Chad Hermans, Mr. Bilkovic and

10  Mr. McDonald.

11  Q.   Was I there the whole time or was I gone during periods of

12  it?

13  A.   You stepped out.

14  Q.   And did Mr. Larson have an attorney there?

15  A.   Yes, he did.

16  Q.   And is that the attorney that is representing him in this

17  case?

18  A.   Yes, it is.

19  Q.   And during that interview -- or during that meeting did

20  Mr. McDonald basically go through with him things that he's

21  going to ask him at trial?

22  A.   Yes, he did.

23  Q.   Is that normal in your experience when the Government

24  prepares for cases going to trial?

25  A.   Yes, it is.

1      DEFENDANT DIDANI:  Objection, your Honor, irrelevant.

2      THE COURT:  What's your objection?

3      DEFENDANT DIDANI:  It's irrelevant, your Honor.

4      THE COURT:  I'm going to instruct the jury later that

5  it's appropriate for an attorney to meet with a witness to find

6  out what the witness' testimony will be at court.  And I don't

7  think that's a valid objection whether or not it's relevant.

8      DEFENDANT DIDANI:  Thank you, your Honor.

9  BY MR. BILKOVIC:

10  Q.  In the interview that you had with Mr. Larson, Mr. Didani

11  asked you some questions about it, and I want to make sure that

12  my math is accurate.  The question that he asked you was did

13  you tell Mr. Larson that he was 50 years old and he would not

14  get out until he was 80 or 90?  Do you remember that question

15  that he asked you?

16  A.  Yes.

17  Q.  And do you remember your response was, "I did not say that

18  verbatim, but I said something along those lines"?

19  A.  Yes.

20  Q.  And in that interview how old did Mr. Larson tell you he

21  was?

22  A.  50.

23  Q.  Did he say 50 or did he say 58?

24  A.  58.

25  Q.  And did you use the word "80" or "90"?

1    A.   I don't recall offhand.

2    Q.   We'll let the tape speak for itself then.

3              And when you said that to Mr. Larson did you have a

4    belief at that point that he was not being truthful with you on

5    some aspect?

6    A.   Yes, I did.

7              DEFENDANT DIDANI:  Objection, your Honor.

8              THE COURT:  What's your objection?

9              DEFENDANT DIDANI:  His opinion whether he said the

10   truth is irrelevant, your Honor.

11             THE COURT:  Well, actually you're leading the witness.

12             MR. BILKOVIC:  I'll withdraw the question.

13             THE COURT:  He can answer.  And even though that's not

14   the objection, I will allow that objection, and rephrase your

15   question.

16             MR. BILKOVIC:  I will.

17   BY MR. BILKOVIC:

18   Q.   Is there a reason that you made that statement to

19   Mr. Larson about, you know, you don't -- do you want to get

20   out, you know, when you're so many years old?  Is there a

21   reason you said that to him?

22   A.   Yes.

23   Q.   What was the reason?

24   A.   I wanted to bring the gravity of the situation to him that

25   do you really want to go through this, do you basically enjoy

1    freedom, and essentially that's what you could be facing.

2    These are serious offenses is what I was basically trying to

3    get across to him.

4    Q.   And the Viber chat where -- that the jury has already saw

5    where there's talk about moving the last seven and "Marty

6    already knows we moved ten," did you show portions of that at

7    that point to Mr. Larson?

8    A.   Yes, we did.

9            THE COURT:  Was this the first or the second time?

10           THE WITNESS:  The September 10th meeting.

11           THE COURT:  Is that the first or the second?

12           THE WITNESS:  The first.  I'm sorry, your Honor.

13           THE COURT:  Thank you.

14   BY MR. BILKOVIC:

15   Q.   So the clip that Mr. Didani showed you, was that in the

16   very beginning of the interview or had Mr. Larson talked to you

17   for a while at that point?

18   A.   That we were into the interview quite a ways.

19   Q.   And Mr. Didani has asked you about cocaine being seized in

20   the United States and cocaine being seized in the Eastern

21   District.  Are you aware of whether Mr. Didani is charged with

22   substantive counts of possession or distribution or is he

23   charged with conspiracy?

24   A.   He's being charged with conspiracy.

25   Q.   And during your investigation did you uncover acts that

1    Mr. Didani and others took that occurred in the United States?

2    A.   Yes, I did.

3    Q.   Did you uncover acts that occurred in the Eastern District

4    of Michigan?

5    A.   Yes, I did.

6    Q.   The drone that Mr. Didani brought up that was destroyed --

7    A.   Yes.

8    Q.   -- was that the actual final product or was that the

9    prototype?

10   A.   It was not.  It was the very first prototype.

11   Q.   Are there more text messages that we are going to get into

12   the next time that you testify that deal with the drone or the

13   torpedo?

14   A.   Yes.

15   Q.   There was a question Mr. Didani asked about you had no

16   evidence other than 3.7 grams of Kigtropin that there was

17   anything having to do with anything illegal other than -- and

18   then went into the $450,000.  Do you remember that?

19   A.   Yes.

20   Q.   The $450,000 was when?

21   A.   In December of 2017.

22            MR. BILKOVIC:  Can we bring up Government's Exhibit

23   112.10, please.

24            Actually, I'm going to stop for a second.  Has that

25   been admitted yet?

1              THE COURT:  Is it in?  I don't have my list out here.

2    I should have brought my list out.

3              MR. BILKOVIC:  Apparently it is not.

4              May I approach the witness, your Honor?

5              THE COURT:  You may.

6              MR. FINK:  What's the number, please?

7              MR. BILKOVIC:  112.10.  I'm going to show it to you

8    first.

9    BY MR. BILKOVIC:

10   Q.  Do you recognize that?

11   A.  Yes, I do.

12   Q.  And what is that?

13   A.  This is a photo of a message thread captured in

14   Mr. Didani's phone.

15   Q.  And who is that photograph of a message thread between?

16   A.  The top reads "Marty Tibbitts," and we presume the other

17   half is Mr. Didani.

18   Q.  And that's because it was found on his phone?

19   A.  Correct.

20   Q.  Do you recall whether or not it was also found on his

21   iCloud?

22   A.  Yes, it was.

23              MR. BILKOVIC:  Your Honor, at this time I would for

24   admission into evidence of Government's proposed Exhibit

25   112.10.

```
 1            THE COURT:  Any objection?
 2            DEFENDANT DIDANI:  No objection, your Honor.
 3            THE COURT:  Very well.  It's admitted as 112.10.
 4            MR. BILKOVIC:  And may I publish it to the jury?
 5            THE COURT:  You may.
 6            MR. BILKOVIC:  May we go on the top half, please.
 7   BY MR. BILKOVIC:
 8   Q.   And Mr. Tibbitts would be in the blue or the gray?
 9   A.   The gray.
10   Q.   And could you just kind of read that from start to finish
11   as to whether it's the gray text speaking, or texting, or the
12   blue text speaking.
13   A.   Yes.
14   Q.   Go from top to bottom.
15   A.   It starts with the gray text, which would be Mr. Tibbitts,
16   stating, "Hmm.  Let's talk when you get back."  Followed by,
17   "Ha, Stark."
18   Q.   And then what does the blue text respond with?
19   A.   Blue text states, "Not's sure, brother.  Yep, brother, you
20   are.  We just" explicitory (ph) "up."
21   Q.   "We just F'd up"?
22   A.   Yes.
23   Q.   And does Mr. Tibbitts respond?
24   A.   With, "We will fix, brother."
25   Q.   Can we go to the bottom half.  And does the blue respond?
```

1    A.   Yes, it does.  It states, "Not like this, brother.  We need

2    to clear heads."  Responded by Mr. Tibbitts of, "Yes,

3    definitely."  Followed by blue text of, "Okay, brother.  Talk

4    to you later."  Then Mr. Tibbitts responds with, "Okay,

5    brother."

6    Q.   And then do you see the text message on the bottom that is

7    dated November 16, 2017, at 10:40 a.m.?

8    A.   Yes.

9    Q.   And what is that?

10   A.   That is a hyperlink to a news article on the internet.

11   Q.   And were you able to pull that article?

12   A.   Yes.

13          MR. BILKOVIC:  And, your Honor, we'll be admitting it

14   later the next time he testifies.

15   BY MR. BILKOVIC:

16   Q.   But generally what is that article about?

17   A.   It was about the arrest of --

18          THE COURT:  If we're going to do it the next time,

19    let's do it then.

20          MR. BILKOVIC:  Okay.  May I approach the witness

21    again?

22          THE COURT:  You may.

23          This an exhibit?

24          MR. BILKOVIC:  Yes, your Honor.

25          Let the record reflect I've shown the witness

1   Government's proposed Exhibit 112.11, if I could question him

2    on it.

3            THE COURT:  Yes.

4            Have you seen this, Mr. Didani?

5            DEFENDANT DIDANI:  I just see it, your Honor.

6            THE COURT:  Okay.  Go ahead, please.

7   BY MR. BILKOVIC:

8   Q.   And are you familiar with that?

9   A.   Yes, I am.

10  Q.   And what is that?

11  A.   This is the front page that that hyperlink takes you to.

12           THE COURT:  This is the front page of what?

13           THE WITNESS:  The hyperlink stated in the last text

14   message of that picture that was just on the screen.

15           DEFENDANT DIDANI:  Objection.  We said we're going to

16   do that next time.

17           THE COURT:  Yeah, we did just say we're going to do

18   that the next time, because you said you were going to get more

19   into it then; right?

20           MR. BILKOVIC:  Yes, but then you asked me to do it

21   now.

22           THE COURT:  Get more into it next time.

23           MR. BILKOVIC:  Yeah, but then you asked me to do it

24   now, I thought.

25           THE COURT:  If I did, I didn't mean that.

```
 1              MR. BILKOVIC:  Okay.  All right.

 2              THE COURT:  I'm sorry.  I think if we're going to get

 3    into --

 4              MR. BILKOVIC:  We'll come back to it.

 5              THE COURT:  It sounded like you wanted him to

 6    summarize it.  We're going to hear it again the next time.  It

 7    defeats the purpose of calling him these numerous times.

 8              MR. BILKOVIC:  We'll come back to it.

 9              THE COURT:  Thank you.

10              MR. BILKOVIC:  Your Honor, then I think it would make

11    sense then instead of going through items that came up on

12    redirect I will just wait -- or on cross -- I will just wait

13    until Mr. Leach's next time he testifies.  And I can go through

14    those items as well as the next segment of his testimony if

15    that would help speed things up.

16              THE COURT:  All right.

17              DEFENDANT DIDANI:  Your Honor, may I please?

18              THE COURT:  You have more questions?

19              DEFENDANT DIDANI:  Based on Mr. -- based on a few

20    questions that Mr. Bilkovic --

21              THE COURT:  Right, but not anything that's going to

22    come up the next time, because it defeats the purpose.

23              DEFENDANT DIDANI:  Just two seconds, your Honor.

24              THE COURT:  You may.  You don't have to have two

25    seconds, because it will have already passed.  Go ahead,
```

1    please.

2                        RECROSS EXAMINATION

3    BY DEFENDANT DIDANI:

4    Q.   Agent Leach, I asked you early about a seizure in Albania;

5    right?

6              THE COURT:  About a what?

7    BY DEFENDANT DIDANI:

8    Q.   A seizure of money, bank account in Albania.  And it seems

9    like you didn't have no memory.  But then the Government comes

10   here, and as soon as he told you about the seizure of 660,000

11   your memory click up; is that true?

12   A.   I believe you asked me about the seizure of the --

13   Q.   Did you know anything about the seizure?

14             THE COURT:  You didn't even let him get the answer

15    out, and it won't create a good record if you do that.

16             Please state your -- succinctly your answer.

17             THE WITNESS:  Thank you.  The question you asked me

18    earlier, I thought, was distinctly towards the seizure of the

19    restaurant, which I said I have no information regarding that

20    seizure.

21   BY DEFENDANT DIDANI:

22   Q.   The 660 -- the seizure that Mr. Bilkovic just said it to

23   you, it's the same thing, it's the same seizure in 2017?

24             THE COURT:  Are you asking him if it's --

25             DEFENDANT DIDANI:  Are you --

```
 1              THE COURT:  Excuse me.  Are you asking him if it's the
 2    same seizure, because it sounds like you're testifying?  Are
 3    you asking him a question about it?
 4              DEFENDANT DIDANI:  Yes.
 5              THE COURT:  Okay.  Pose it as a question, please.
 6    BY DEFENDANT DIDANI:
 7    Q.   What about the 660,000?  What do you know about that
 8    seizure?
 9    A.   I know that there was a seizure of $660,000 prior to me
10    coming onto the investigation, to my knowledge, that was
11    possibly associated with you and some other individuals in
12    Albania.
13    Q.   And that was transported from -- that money was wired by
14    Mr. Tibbitts to Albania; right?
15    A.   I have no idea where that $660,000 was seized from.
16    Q.   You indicated that when Mr. Bilkovic asked you that the
17    conspiracy -- I'm trying to figure out.  You say the acts was
18    done in Eastern Michigan.  What are those acts of a conspiracy?
19              THE COURT:  What are the what?
20              DEFENDANT DIDANI:  Mr. Bilkovic said there is acts,
21    acts that --
22              THE COURT:  Acts of conspiracy?
23              DEFENDANT DIDANI:  Yes, your Honor.
24              THE COURT:  Okay.
25
```

1    BY DEFENDANT DIDANI:

2    Q.   So what are those acts in the conspiracy in the Eastern

3    District of Michigan?

4    A.   One was the compiling of all of the bulk cash that was

5    moved from Mr. Tibbitts to Donald Larson and gave directly to

6    you for the purchase of cocaine.  There was also message

7    threads corroborating that the currency was going to be used

8    for the sale of cocaine.  There was also the parasitic device,

9    or drone or torpedo, that was being designed here in the

10   Eastern District of Michigan by one of the other

11   co-conspirators with your knowledge and input.

12   Q.   Agent, I spent four hours with you, and I asked you about

13   the bulk of cocaine, you know, that money, and your answer is

14   on that money you don't even know where that money go.  So how

15   is it you know right now you know it's to buy cocaine?  How?

16            THE COURT:  He's answered that question on numerous

17    occasions, and he's given the same answer every time.  You may

18    go to a new question if you like.

19   BY DEFENDANT DIDANI:

20   Q.   In the photo, in Exhibit 1 --

21            DEFENDANT DIDANI:  What was the exhibit?

22            MR. FINK:  112.1.

23            DEFENDANT DIDANI:  112.1, please.

24            MR. FINK:  Ms. DiCarlo, would you mind, or do you want

25    me to --

```
 1              Thank you very much.  112.1 that Mr. Bilkovic --
 2              MR. McDONALD:  He didn't show 112.1.
 3              MR. FINK:  112.10.  I'm sorry, 1-0.  My fault.
 4    BY DEFENDANT DIDANI:
 5    Q.  This photo is out of your best witness, iPhone?
 6    A.  This photo is in the iPhone, yes.
 7    Q.  What's bad about it, in your experience?
 8    A.  Which part specifically?
 9    Q.  All the texts.  In your experience, I want to figure out on
10    this text, in your experience as an agent, as a detective,
11    what's wrong with it?
12    A.  Just take it on its word for what it says.  You yourself
13    say, "We just F'd up."  Mr. Tibbitts replies with, "We will
14    fix.  Not like this brother, clear our heads."  And then you
15    send him the hyperlink related to this, which we have not
16    covered yet and we're going to cover on ...
17    Q.  And how do you know -- how do you know what this brain it
18    was saying?
19    A.  I'm reading it from the text message, and it's due to my
20    knowledge and experience in drug organizations.
21    Q.  Did anybody other than -- did Marty confirm that to you
22    when he was alive, or no?
23    A.  No.
24    Q.  So Marty cannot confirm what me and him saying; right?
25    A.  No.
```

1  Q.   Detective, do you know what my mind saying right now?

2           MR. BILKOVIC:  Objection, relevance.

3           THE COURT:  I don't know what the question is.  Say

4   your question again.  What is your question again?

5  BY DEFENDANT DIDANI:

6  Q.   There can be other -- Detective, can there be other --

7           THE COURT:  Excuse me.  What is your question again?

8           Never mind.

9           Could you read it back to me, please.

10          (The pending question was read back by the Court

11          Reporter.)

12          THE COURT:  All right.  Go ahead.

13          THE WITNESS:  No.

14  BY DEFENDANT DIDANI:

15  Q.   And you cannot possibly know what I meant on that message

16  either; right?

17  A.   I can interpret the message, because I can physically read

18  it, unlike your mind.

19  Q.   And that message, it can be thousand interpretation.  This

20  jury over here can have their own interpretation.  Do you agree

21  with me?

22  A.   Yes.

23          DEFENDANT DIDANI:  No further questions.

24          THE COURT:  You don't have anymore questions today, do

25   you?

1          MR. BILKOVIC:  I do, but I'll ask no more today.

2          THE COURT:  Okay.  Please don't discuss your testimony

3     with anybody; okay?

4          THE WITNESS:  Yes, your Honor.

5          THE COURT:  Thank you.  You may step down.

6          (End of excerpt at 2:27 p.m.)

7                         —   —   —

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Jury Trial, Volume 12 - Excerpt - March 7, 2025

```
 1                      *         *         *
 2              (Beginning of excerpt of witness, Belinda Tibbitts.)
 3              MR. BILKOVIC:  Your Honor, the Government would call
 4    Belinda Tibbitts.
 5              THE COURT:  Right up here on the other side of the
 6    court reporter to be sworn in, okay.  Right there is good.
 7    Raise your right hand.
 8              (Oath administered.)
 9              THE COURT:  All right.  You may be seated.  When
10    you're seated, speak into this part of the microphone loudly.
11    So, if you're going to turn and face the jury, move the
12    microphone over that way, and because the chair doesn't go far;
13    okay?
14              THE WITNESS:  Okay.  Thank you.
15              THE COURT:  But that's too soft.
16              THE WITNESS:  Okay.  Thanks.
17              THE COURT:  That's much better.  Now, move it a little
18    bit toward that way.
19              THE WITNESS:  Okay.
20              THE COURT:  Now, state your full name for the record
21    and spell your last name.
22              THE WITNESS:  Belinda Gay Tibbitts.  It's
23    T-I-B-B-I-T-T-S.
24              MR. BILKOVIC:  May I proceed, your Honor?
25              THE COURT:  Yes.
```

1          MR. BILKOVIC:  Thank you.  If you'd keep your voice

2     like that with the mic, that will be perfect, okay.

3                        *         *         *

4                         BELINDA TIBBITTS,

5          was called as a witness at 2:47 p.m. after having been

6          duly sworn to testify to the truth.

7                        *         *         *

8                      DIRECT EXAMINATION

9     BY MR. BILKOVIC:

10    Q.   Ms. Tibbitts, where do you live?  What state?

11    A.   California.

12    Q.   How long have you lived in California?

13    A.   On and off for the last like 24 years.

14    Q.   And you say on and off.  Is there another place that you

15    lived other than California?

16    A.   Michigan.

17    Q.   Where at specifically in Michigan?

18    A.   In Grosse Pointe Park.

19    Q.   When did you live in Grosse Pointe Park?  Do you recall the

20    years?

21    A.   Starting around 2009, '08.

22    Q.   And are you familiar with a residence located at 714 Grand

23    Marais in Grosse Pointe, I believe, Park?

24    A.   Yes.

25    Q.   And how is it that you're familiar with that residence?

1    A.    That's my house.

2    Q.    How long did you live there at the Grand Marais residence?

3    A.    I still have that home.  And we moved in in 2009 -- wait,

4    2014.  I'm sorry.

5    Q.    2014?

6    A.    Yeah.  We owned the home, but we moved in in 2014.

7    Q.    When you say "we," who are you talking about?

8    A.    My deceased husband.

9    Q.    And what was your deceased husband's name?

10   A.    Martin Tibbitts.

11   Q.    What year were you and Mr. Tibbitts married?

12   A.    2010.

13   Q.    And how long were you married?

14   A.    Until he died in 2018.

15   Q.    Do you recall the date that he died?

16   A.    July 19 or 20th.  I'm unsure right now, because I'm

17   nervous.

18   Q.    Okay.  Calm down and relax.  Do you want some water?

19   A.    No, I'm okay.

20   Q.    Okay.  And do you know where Mr. Tibbitts was when he

21   passed away?

22   A.    I do.

23   Q.    Where?

24   A.    He was in Wisconsin practicing for an air show.

25   Q.    Were you there during that time or no?

1    A.   I was not.

2    Q.   So you and Mr. Tibbitts were married for approximately

3    eight years?

4    A.   Yes.

5    Q.   Do you know what he did for a living?

6    A.   I do.

7    Q.   What did he do for a living?

8    A.   He was an entrepreneur, and he owned several businesses.

9    Q.   What type of businesses were you aware that he owned?

10   A.   The main business was call centers and also Back Office

11   Support.

12   Q.   Do you remember the names of either -- you said Back Office

13   Support.  Was that the name of the company?

14   A.   It was called Back Office Support Systems, or BOSS for

15   short.

16   Q.   And you also said there was a call center company?

17   A.   Yeah.  It was called Clementine.

18   Q.   And do you recall where his office was?

19   A.   It was in Harper Woods.

20   Q.   And did he work there by himself or did he have employees?

21   A.   He had employees.

22   Q.   Approximately how many?

23   A.   Maybe 30.

24   Q.   Okay.  The business that was at Harper Woods, was that both

25   of these that he worked out of there?

1    A.   Yes.

2    Q.   Did you work there?

3    A.   No.

4    Q.   What type of a person was he?  And by that I mean -- I'm

5    trying to figure out a way to delicate way to ask this, but was

6    he a smart person?

7    A.   Very.

8    Q.   How would you describe him in that manner?

9    A.   Marty was a genius I could say with certainty.

10   Q.   Why do you say that?

11   A.   He was just always learning something new.  He spoke like

12   four languages and taught himself how to play the banjo, and he

13   flew all of these planes.  He was just very brilliant, and he

14   was also a good businessman.

15   Q.   You said he flew all of these planes.  What type of planes

16   are you talking about?

17   A.   He flew vintage jets.

18   Q.   And do you know how that came about?

19   A.   He got his pilot's license and then became interested in

20   these war birds, which are the old planes.

21   Q.   Where would he find these planes to fly?

22   A.   Everywhere.  He started -- he opened an air museum and

23   started acquiring these old planes.

24   Q.   You said he opened an air museum?

25   A.   Yes.

1    Q.   What was the air museum?

2    A.   It was called the World Heritage Air Museum.

3    Q.   Where was that located?

4    A.   Detroit City Airport.

5    Q.   And you said that he would buy planes?

6    A.   Well, the museum.  Yeah, he would, then the museum would.

7    Q.   Do you recall approximately how many planes that he had

8    purchased?  If you don't know, it's okay.

9    A.   I'm not sure of the exact number.

10   Q.   I guess what I'm trying to get at is are we closer to like

11   five or are we closer to like a hundred?

12   A.   Maybe 15.

13   Q.   Were you aware prior to his death of any other businesses

14   that he had?

15   A.   No.

16   Q.   Were you aware of whether he owned any buildings?  Did he

17   own the business in Harper Woods?

18   A.   Yes.

19   Q.   Did he own that building?

20   A.   Yes.

21   Q.   Are you aware of whether he owned any other buildings?

22   A.   No.

23   Q.   Are you aware of prior to his death whether he owned any

24   other houses other than the Grosse Pointe house, and did he own

25   a California house also?

1   A.   No.  I rented a house in California.

2   Q.   Are you aware of whether he owned any other houses other

3   than the Grosse Pointe house?

4   A.   No.

5   Q.   Do you know an individual by the name of Donald Larson?

6   A.   Yes.

7   Q.   How is it that you know Mr. Larson?

8   A.   He was my trainer at the gym.

9   Q.   What gym was that?

10  A.   Powerhouse in St. Clair Shores.

11  Q.   And do you recall approximately when it was that you met

12  Mr. Larson?

13  A.   I'd say around 2008, '07.

14  Q.   Is that an estimate then, I take it?

15  A.   Yes.

16  Q.   And did you meet him at the gym?

17  A.   I did.

18  Q.   And you said that he became your personal trainer?

19  A.   Yes.

20  Q.   How often were you training with him?

21  A.   Twice a week.

22  Q.   Did Mr. Tibbitts work out there as well?

23  A.   Yes.

24  Q.   Did there come a point in time that Mr. Larson began

25  training Mr. Tibbitts as well?

1    A.   Yes.

2    Q.   Who did Mr. Larson begin training first, you or your

3    husband?

4    A.   Me.

5    Q.   And so how -- do you know how your husband met Mr. Larson?

6    A.   I introduced them.

7    Q.   And did you become friends with Mr. Larson?

8    A.   Yes.

9    Q.   Did your husband become friends with Mr. Larson?

10   A.   Yes.

11   Q.   And by friends would you do things with Mr. Larson outside

12   of the gym, you and your husband?

13   A.   Yeah, occasionally.

14   Q.   I'm going to show you some photographs that are going to

15   pop up on the screen, and I just want you to tell me whether or

16   not you recognize the person depicted in each photograph.

17          If we could start with Government's Exhibit 1.0, do

18   you recognize that individual?

19   A.   No.

20   Q.   Is that somebody that you ever remember seeing your husband

21   with?

22   A.   No.

23          MR. BILKOVIC:  Okay.  Can we go to 1. -- Government's

24   Exhibit 1.3.

25

1    BY MR. BILKOVIC:

2    Q.   Do you recognize that individual?

3    A.   No.

4          MR. BILKOVIC:  And can we go to Government's Exhibit

5    1.6.

6    BY MR. BILKOVIC:

7    Q.   Do you recognize that individual?

8    A.   No.

9    Q.   Do you know an individual by the name of Ylli Didani?

10   A.   Yes.

11   Q.   Do you see him in court today?

12   A.   I do.

13   Q.   Can you please point to him and tell me an article of

14   clothing he's wearing?

15   A.   He's right there in a blue shirt.

16          MR. BILKOVIC:  Your Honor, may the record reflect that

17   the witness has pointed to and identified the defendant, Ylli

18   Didani.

19          THE COURT:  Any objection?

20          DEFENDANT DIDANI:  No objection, your Honor.

21          THE COURT:  Very well.  So identified.

22   BY MR. BILKOVIC:

23   Q.   When did you meet Mr. Didani?

24   A.   Around 2008.

25   Q.   And again, is this an estimate?

1    A.   Yes.

2    Q.   Did you mark it on a calendar at any point in time?

3    A.   No.

4    Q.   How was it that you met Mr. Didani?

5    A.   At the gym.

6    Q.   At what gym?

7    A.   At Powerhouse.

8    Q.   And was he just there or did someone introduce you to him?

9    A.   He was friends with Don.

10   Q.   Don Larson?

11   A.   Yes.

12   Q.   Did Mr. Larson introduce you to him?

13   A.   Yes.

14   Q.   And did he go by any other names that you're aware of?

15   A.   Lou.

16   Q.   Lou?

17   A.   Yes.

18   Q.   And when you met Mr. Didani do you know what he did for a

19   living?

20   A.   I have no idea.

21   Q.   Do you know what type of car he had?

22   A.   No.

23   Q.   Do you know if he had a car?

24   A.   I don't.

25   Q.   Did there come a point in time that your husband met

1    Mr. Didani?

2    A.   Yes.

3    Q.   Do you know how that came about?

4    A.   I don't.

5    Q.   And do you know whether or not they eventually became

6    friends?

7    A.   They did.

8    Q.   How do you know that?

9    A.   Because he would start talking about doing things with Lou.

10   Q.   Who would say that?

11   A.   Marty would talk about Lou.

12   Q.   Do you know whether or not the two of them ever traveled

13   together?

14   A.   Yes, they did.

15   Q.   Do you know whether they ever traveled outside of the

16   country together?

17   A.   They did.

18   Q.   Would you go with them when they did that?

19   A.   No.

20   Q.   Do you know approximately how many times that happened?  If

21   you don't, it's okay.

22   A.   I don't, no.

23   Q.   More than once?

24   A.   I know of one time for sure.  I don't really remember if

25   there was another specific time.

1    Q.   The one time for sure, do you know where that was?

2    A.   They went to Albania.

3    Q.   Do you know what the purpose of that trip was?

4    A.   Yes.

5    Q.   What has that for?

6    A.   Marty was looking into starting some businesses there.

7    Q.   What type of businesses?

8    A.   One was ATM machines, and the other one was

9    over-the-counter medication distribution, like Tylenol or

10   Advil.

11   Q.   And do you know whether or not he ever actually started

12   those businesses?

13   A.   Not to my knowledge, no.

14   Q.   Did Mr. Didani have any nicknames for your husband?

15   A.   I don't know.

16   Q.   Did you ever hear the name Tony Stark?

17            DEFENDANT DIDANI:  Objection, your Honor.  He's

18    leading the witness.

19            MR. BILKOVIC:  It's not leading.  She can say she's

20    heard of it or she hasn't.

21            THE COURT:  She can say she heard it or not.

22            THE WITNESS:  I did hear it.  Sorry.

23            MR. BILKOVIC:  I'm sorry.  You have to wait until

24    she's done.  That's okay.

25            THE COURT:  Overruled.  You may answer.

```
 1                  THE WITNESS:  I did hear it.
 2     BY MR. BILKOVIC:
 3     Q.   In what context?
 4     A.   Well, really I can't remember if it was before or after
 5     Marty died, but I heard him being referred to that way.
 6     Q.   You heard who being referred to that way?
 7     A.   Marty.  Sorry.
 8     Q.   Being referred to as Tony Stark?
 9     A.   Yes.
10     Q.   And do you know who Tony Stark is?
11     A.   I'm assuming it's the Marvel character.
12     Q.   Are you aware of a Marvel character by the name of Tony
13     Stark?
14     A.   Yes.
15     Q.   Now, you said that Mr. Didani and Mr. Tibbitts became
16     friends.  Were you friends with Mr. Didani?
17     A.   I knew him.
18     Q.   Did you socialize with him?
19     A.   No, not -- I think we went to dinner one time together.
20     Q.   Just the two of you?
21     A.   No, no, no.  With Marty.
22     Q.   So did you ever do anything with Mr. Didani without Marty?
23     A.   No, no, no.
24     Q.   Did you communicate with -- prior to Marty's death, would
25     you communicate with Mr. Didani on the phone?
```

```
 1    A.   No.

 2    Q.   Would you work out with him?

 3    A.   No.

 4    Q.   Would you text him?

 5    A.   No.

 6    Q.   Did you ever see Mr. Didani at the house on Grand Marais?

 7    A.   Yes.

 8    Q.   How often?

 9    A.   A few times.

10    Q.   Do you know whether or not he ever stayed there?

11    A.   He did.

12    Q.   And did you have any vehicles -- I'm going to take your

13    attention back to timeframe around 2017.  Did you have any

14    vehicles at that time?

15    A.   Yes.

16    Q.   What type of vehicles did you have?

17    A.   I had a Porsche Cayenne SUV.

18    Q.   And did Mr. Didani ever use your Porsche?

19    A.   Yes.

20    Q.   How often?

21    A.   I don't know.

22    Q.   And was that something that you would let him do?

23    A.   No.

24    Q.   How was it that he would use your Porsche?

25    A.   I lived in California half the month, and Marty would let
```

1    him use my car.

2    Q.   And is that something that you were okay with?

3    A.   No.

4    Q.   Why not?

5    A.   Because it always smelled like cologne when I got home, and

6    it made me really angry.

7    Q.   At that time do you know if Mr. Didani had any vehicles of

8    his own?

9    A.   I have no idea.

10   Q.   Did he ever drive up to your house in a car?

11   A.   I don't know.

12   Q.   Do you know at that point in time what he was doing for a

13   living?

14   A.   No.

15   Q.   Did he ever tell you what he did for a living?

16   A.   No.

17   Q.   Did he ever talk to you about owning a car wash?

18   A.   No.

19   Q.   Ever talk to you about owning a mineral company?

20   A.   No.

21   Q.   Was Mr. Didani and Mr. Tibbitts, were they friends until

22   Mr. Tibbitts' death?

23   A.   Yes.

24   Q.   Do you know whether or not Mr. Didani had family in the

25   United States?

```
 1    A.   No.

 2    Q.   No, you don't know?

 3    A.   I don't know.

 4    Q.   Again, this is going to be a personal question, but there's

 5    a reason I'm asking it.  At the time of Mr. Tibbitts' death how

 6    were you and Mr. Tibbitts doing financially?

 7    A.   Fine.

 8    Q.   And who handled the finances?

 9    A.   Marty did.

10    Q.   Do you know whether or not he had any bank accounts?

11    A.   He did.

12    Q.   Did he have more than one?

13    A.   Yes.

14    Q.   Did he have several?

15    A.   Yes.

16    Q.   Do you know what bank the accounts were at?

17    A.   Comerica Bank.

18    Q.   Who kept track of the bank accounts?

19    A.   Marty did.

20    Q.   And prior to Marty Tibbitts' death -- well, let me ask you

21    this:

22              Would Mr. Tibbitts receive bank statements?

23    A.   Yes.

24    Q.   Prior to his death, do you know where those bank statements

25    would go?
```

1    A.   They went to the office.

2    Q.   They did not go to the Grand Marais house?

3    A.   No.

4    Q.   Would you ever look at the bank statement?

5    A.   No.

6         MR. BILKOVIC:  If we could bring up, please,

7    Government's Exhibit 8.2.  And can we just enlarge the top

8    half.  Keep going down.  Right there.

9    BY MR. BILKOVIC:

10   Q.   Is this one of the -- a page of one of the statements for

11   an account that you and Mr. Tibbitts had?

12   A.   If it says 9831, then it is.

13   Q.   Okay.  Do you see the words "Platinum Circle Checking"?

14   A.   Yes.

15   Q.   And do you see an account number under that?

16   A.   I do.

17   Q.   Can you see that far?

18   A.   I see "9831" at the end.  So that's ...

19   Q.   Then you also see your name at the top?

20   A.   I do.

21   Q.   So fair to say this is one of the account statements for

22   you and Mr. Tibbitts?

23   A.   Yes.

24   Q.   And this is a statement -- do you see the date on it?

25   A.   May.

1    Q.   May 13, 2016, to June 13, 2016?

2    A.   Okay.

3    Q.   Do you see that, or no?

4    A.   I do.  It's small and I'm old.

5    Q.   How's that?

6    A.   That's much better.  Thank you.

7    Q.   And what is the date?

8    A.   May 13, 2016, to June 13, 2016.

9            MR. BILKOVIC:  Okay.  Can we go to Government's

10   Exhibit 8.2, Page 4, please.  And can we zoom in right there on

11   those transactions.

12   BY MR. BILKOVIC:

13   Q.   Do you see the two transactions there, or do we need to

14   enlarge that?

15   A.   No, I can see it.

16   Q.   Okay.  So do you see the $100,000 transaction on May 25th?

17   A.   Yes.

18   Q.   And the $100,000 transaction on May 26th?

19   A.   Yes.

20   Q.   Do you see the name of the top one?

21   A.   Cattleman's.

22   Q.   And is that anything you were familiar with?

23   A.   No.

24   Q.   Do you see the name on the bottom one?

25   A.   I can't read that one.  I don't know what that is.

```
 1   Q.   Okay.
 2            THE COURT:  Can you read it on that screen over there
 3    to your right?
 4            THE WITNESS:  It's easier here, I think.
 5            THE COURT:  Okay.
 6            THE WITNESS:  Thank you.
 7   BY MR. BILKOVIC:
 8   Q.  By saying you can't read it, are you familiar with that
 9   name?
10   A.   No, I have never seen that before.
11   Q.   And were you aware of these transactions prior to
12   Mr. Tibbitts' death?
13   A.   No.
14   Q.   Did he ever discuss them with you?
15   A.   No.
16            MR. BILKOVIC:  Can we go to Government's Exhibit 8.2,
17   Page 6.  And can we go right there on that June -- right there.
18   BY MR. BILKOVIC:
19   Q.   Do you see the transaction from June 9th?
20   A.   I do.
21   Q.   The $200,000?
22   A.   Yes.
23   Q.   Were you familiar with that?
24   A.   No.
25            MR. BILKOVIC:  And can we zoom back out.  And can we
```

1   go to the bottom.

2   BY MR. BILKOVIC:

3   Q.  And do you see the withdrawal there from June 9 for

4   $200,000?

5   A.  I do.

6   Q.  Were you familiar with that?

7   A.  No.

8   Q.  Were you aware that that money was turned into cashier's

9   checks?

10  A.  No.

11          MR. BILKOVIC:  Can we go to Government's Exhibit 8.4-5

12  -- or Page 5.  Can we zoom --

13          THE COURT:  I'm sorry.  Tell me the exhibit number

14   again?

15          MR. BILKOVIC:  8.4, Page 5.

16          THE COURT:  Okay.  Thank you.

17          MR. BILKOVIC:  And if we can go to the transaction on

18   May 24th and zoom in on that.

19  BY MR. BILKOVIC:

20  Q.  Do you see the March 24th transaction for $300,000?

21  A.  I do.

22  Q.  And was that something you were aware of prior to

23  Mr. Tibbitts' death?

24  A.  No.

25  Q.  Are you aware that that money was turned into cashier's

1   checks?

2   A.   No.

3         MR. BILKOVIC:  Zoom back out.  I want to get the date

4   on these.  The date on these, I indicated March 24, but can we

5   go to the top so we can get the year of the statement and zoom

6   in on that, please.

7         THE COURT:  March 24?

8         MR. BILKOVIC:  March 24th was the date of the

9   transaction that I asked her about, but I just want the very

10   top that indicates the date of the statement.

11   BY MR. BILKOVIC:

12   Q.   And that statement was from when?

13   A.   March 14, 2017 to April 13, 2017.

14         MR. BILKOVIC:  And can we go to Government's Exhibit

15   8.7 -- I'm sorry, 8.7 Page 3.  And could we zoom in on the

16   check transactions right there, all of them.

17   BY MR. BILKOVIC:

18   Q.   Do you see the check transactions marked with 1900, 1901,

19   1903, 1904, 1905?

20   A.   I do.

21   Q.   Do you see the amounts next to those?

22   A.   I do.

23   Q.   Ranging from $70,000 to $100,000?

24   A.   Yes.

25   Q.   Were you aware of those prior to Mr. Tibbitts' death?

 1    A.   Absolutely not.

 2              MR. BILKOVIC:  And can we go to Government's Exhibit

 3    11, please.  Can we just go to the top.

 4    BY MR. BILKOVIC:

 5    Q.   Do you recognize this?

 6    A.   I do, because you showed it to me.

 7    Q.   Prior to Mr. Tibbitts' death were you aware of this?

 8    A.   No.

 9    Q.   And do you see who the check is made out to?

10    A.   I do.

11    Q.   And is that check 1900 dated December 19, 2017, for

12    $100,000?

13    A.   Yes.

14    Q.   Do you recognize the signature?

15    A.   I do.

16    Q.   Whose signature is that?

17    A.   That's Martin Tibbitts' signature.

18    Q.   Were you familiar with Mr. Tibbitts' signature?  I should

19    have asked you that first.

20    A.   Yes.

21    Q.   And were you familiar during the time that you were married

22    to him basically his writing style?

23    A.   Yes.

24    Q.   The "Pay to the Order of" and the amount, is that

25    consistent with Mr. Tibbitts' handwriting?

1    A.   No.

2              MR. BILKOVIC:  And can we go to 1901 -- I'm sorry, not

3    1901.  Can we go to the next page, please.  Can we zoom in on

4    the top.

5    BY MR. BILKOVIC:

6    Q.   Do you see the cashier's check here to Mr. Larson?

7    A.   I do.

8    Q.   Was that anything that you were familiar with prior to

9    Mr. Tibbitts' death?

10   A.   No.

11             MR. BILKOVIC:  Can we go to the next page, please.

12   BY MR. BILKOVIC:

13   Q.   And what are we looking at here?

14   A.   Another check to Don.

15   Q.   And the check number is what?

16   A.   1901.

17   Q.   And whose signature is on it?

18   A.   Marty's.

19   Q.   And what is the date?

20   A.   December 19, 2017.

21   Q.   And the "Pay to the Order of" and the amount, is that

22   consistent with Martin Tibbitts' signature?

23   A.   It's not his handwriting, no.

24             MR. BILKOVIC:  And can we go to Page 5, that Exhibit

25   11.0, Page 5.

1    BY MR. BILKOVIC:

2    Q.   And do you recognize this?

3    A.   I do.

4    Q.   And what is the check number here?

5    A.   1903.

6    Q.   And again, the date?

7    A.   December 19, 2017.

8    Q.   Do you recognize the signature?

9    A.   I do.

10   Q.   And whose signature?

11   A.   Marty's signature.

12   Q.   Do you recognize the handwriting and the "Pay to the Order

13   of" and the amount?

14   A.   No, that is not his writing.

15           MR. BILKOVIC:  Okay.  And can we go to Page 7, 11.0,

16   Page 7.

17           THE COURT:  Tell me again.  11.2, Page 7?

18           MR. BILKOVIC:  11.0, Page 7.

19           THE COURT:  Okay.  Thank you.

20           MR. BILKOVIC:  Thank you, your Honor.

21   BY MR. BILKOVIC:

22   Q.   And this is check 1904?

23   A.   Yes.

24   Q.   And what is the date?

25   A.   December 19, 2017.

1    Q.   Do you recognize the signature?

2    A.   I do.

3    Q.   And whose signature is that?

4    A.   That's Marty's signature.

5    Q.   And do you recognize the writing in the "Pay to the Order

6    of" and the amount?

7    A.   No.

8    Q.   And the last one I'm going to go to would be Page 9, I

9    believe, 11.0, Page 9.  And again, I'm going to walk you

10   through it.

11          Do you recognize the signature?  This is check 1905.

12   A.   Yes.

13   Q.   Do you recognize the signature?

14   A.   I do.

15   Q.   Whose signature?

16   A.   Marty's.

17   Q.   And the date?

18   A.   December 19, 2017.

19   Q.   And do you recognize the handwriting and the "Pay to the

20   Order of" and the amount?

21   A.   No.

22   Q.   Do you know where you --

23          MR. BILKOVIC:  You can take it down.  Thank you.

24   BY MR. BILKOVIC:

25   Q.   Do you know where you and Mr. Tibbitts were around the time

1    these checks were purportedly written on December 19 of 2017?

2    A.   I do.

3    Q.   Where were you at?

4    A.   We were in China and Thailand.

5    Q.   And did anything unusual happen while you were in China or

6    Thailand?

7    A.   When we were in China, the bank called Marty and he was

8    annoyed.

9    Q.   He was annoyed?

10   A.   Yeah.

11   Q.   What do you mean he was annoyed?

12   A.   He was just on the phone with the lady at the bank telling

13   her to just do what he said.

14   Q.   And did you ask him about that?

15   A.   Not really.

16   Q.   Do you have people at the bank that you regularly dealt

17   with?

18   A.   He did.

19   Q.   Okay.  Do you know the name of that person?

20   A.   I think it was Anita.

21   Q.   If you don't, it's okay.

22   A.   I'm not sure at the time.

23   Q.   Was this somebody that you also at some point had contact

24   with?

25   A.   Yes.

1    Q.   And was that before or after Mr. Tibbitts' death?

2    A.   Both.

3    Q.   Okay.  So you knew who she was?

4    A.   I think so.  There were two people.

5    Q.   Okay.  Did you eventually find out about the checks that we

6    just went through, 1900 through 1905?  Did you eventually find

7    out about those?

8    A.   Yes.

9    Q.   How did you find out about those?

10   A.   The lady at the bank told me.

11   Q.   And was this before or after Mr. Tibbitts' death?

12   A.   After.

13   Q.   What did you do when you found out?

14   A.   There was really nothing I could do.

15   Q.   Did you talk to anybody about them?

16   A.   Don.

17   Q.   Don who?

18   A.   Larson.

19   Q.   Why did you talk to Don Larson about the checks?

20   A.   Because I was asking him why Marty would write him checks.

21   Q.   Did you happen to pay attention to the amounts, the sum

22   total of those checks?

23   A.   No.

24   Q.   If I told you they added up to $450,000, does that sound

25   about right?

1    A.   After seeing them, yes.

2    Q.   That's what I'm talking about, after seeing them.

3    A.   Yes.

4    Q.   And did Mr. Larson tell you why Mr. Tibbitts had written

5    those -- given him those checks?

6    A.   He was very vague, and he said he just wanted me to give

7    some money to some people.

8    Q.   Okay.  You indicated that Mr. Didani would drive your

9    Porsche when you were out of town?

10   A.   Yes.

11   Q.   Did there come a point in time that you received something

12   in the mail related to that?

13   A.   Yes.

14   Q.   And what was that?

15   A.   It was a toll ticket.

16   Q.   And do you recall when you received the ticket?

17   A.   It was in February of 2018.

18   Q.   That's the date you received the ticket?

19   A.   Yes.

20   Q.   And do you recall where the toll was from?

21   A.   Washington.

22   Q.   Washington, D.C.?

23   A.   Yes.

24   Q.   Now, have you had an opportunity prior to testifying today

25   to look at a short video clip that was marked Government's

1    Exhibit proposed Exhibit 71.1?

2    A.   I don't know.  I saw a video.

3    Q.   Okay.  The video that you saw, can you describe it?

4    A.   It was Lou in my car with his foot on the dash.

5    Q.   When you say Lou in your car, you're talking about your

6    Porsche?

7    A.   Yes.

8    Q.   When you say Lou, who are you talking about?

9    A.   Ylli.

10   Q.   Mr. Didani?

11   A.   Yes.

12   Q.   The transactions that I showed you, the hundred

13   thousand-dollar wires and all of the checks that were written

14   and the withdrawals in the accounts, were those anything that

15   you were familiar with prior to Mr. Tibbitts' death?

16   A.   No.

17   Q.   Is it anything he had ever discussed with you?

18   A.   No.

19   Q.   Would Mr. Tibbitts discuss all of his business dealings

20   with you?

21   A.   No.

22   Q.   I'm going to take your attention to April of 2019.  Were

23   you living in California at that time?

24   A.   Yes.

25   Q.   And do you recall a date in April of 2019 that agents

1   showed up at your house with a search warrant?

2   A.   I do.

3   Q.   And did you allow the agents in?

4   A.   I did.

5   Q.   And did you speak with them?

6   A.   Yes.

7   Q.   And did they search your house?

8   A.   Yes.

9   Q.   And at that point in time did you have a conversation with

10   the agents?

11   A.   Yes.

12   Q.   Did you tell them what you knew?

13   A.   Yes.

14   Q.   During -- on that date, did you provide the agents -- while

15   they were doing the search did you provide them with anything?

16   A.   I did.

17   Q.   What did you give them?

18   A.   I gave them all of Marty's notebooks and electronics.

19   Q.   When you say electronics, what are you talking about?

20   A.   I think it was a Surface and maybe a phone or two.

21         MR. BILKOVIC:  Your Honor, may I approach the witness?

22         THE COURT:  Yes, you may.

23         MR. BILKOVIC:  I forgot to leave this up there

24   earlier.

25

1    BY MR. BILKOVIC:

2    Q.   I'm showing you an envelope that is marked Government's

3    proposed Exhibit 6.0.  Do you recognize the contents of that

4    envelope?

5    A.   I do.

6    Q.   And what is that?

7    A.   They were notebooks that Marty kept.

8    Q.   And where did he keep those notebooks?

9    A.   Either in his office or in the living room.  He would work

10   in there.

11   Q.   Of where?  What house?

12   A.   In Grosse Pointe.

13   Q.   And did you ever -- how did you come across those

14   notebooks?

15   A.   After he died, I gathered up all of his things, and this

16   was among those items.

17   Q.   And what did you do with Government's proposed Exhibit 6?

18   A.   I put it in a box to go through later.

19   Q.   And did you take it to California with you?

20   A.   I did.  I took all of the things there so I could some day

21   go through and see what it was.

22   Q.   And did you give those two notebooks to the agents when

23   they were at your house in April of 2019?

24   A.   Yes.

25            MR. BILKOVIC:  Your Honor, at this time I would move

 1    for admission into evidence of Government's proposed Exhibit

 2    6.0.

 3              THE COURT:  Any objection?

 4              DEFENDANT DIDANI:  No objection, your Honor.

 5              THE COURT:  It's admitted as 6.0.

 6    BY MR. BILKOVIC:

 7    Q.   Did Mr. Tibbitts ever discuss with you going into business

 8    with Mr. Didani?

 9    A.   No, not really.

10    Q.   What do you mean "not really"?

11    A.   I mean.  He was doing something with Lou, but I didn't know

12    what.

13    Q.   He did not discuss it with you?

14    A.   No.

15    Q.   During the meeting when the agents were at your house in

16    April of 2019, when they were there with the search warrant, at

17    some point in time did they ask you about a device that they

18    believed that Mr. Tibbitts was involved in designing?

19    A.   Yes.

20    Q.   Had you heard anything about that prior to Mr. Tibbitts'

21    death?

22    A.   No.

23    Q.   Did you learn anything about it after Mr. Tibbitts' death?

24    A.   From you.

25    Q.   Do you recall after talking to -- was I there that day?

1    A.   Yes.

2    Q.   Okay.  Do you recall after that seeing anything in any of

3    Mr. Tibbitts' property or belongings related to this?

4    A.   Yes.

5    Q.   What did you see?

6    A.   There was something called the Remora Project.  I didn't

7    know what it was.

8    Q.   And where did you see that at?

9    A.   Just somewhere in his stack of stuff.

10   Q.   Do you know an individual by the name of Lawrence Palme?

11   A.   Yes.

12   Q.   And who is Lawrence Palme?

13   A.   He's my friend.

14   Q.   Is he also an accountant?

15   A.   He's a financial adviser.

16   Q.   Okay.  Where was he living back around the time that

17   Mr. Tibbitts passed away?

18   A.   San Diego.

19   Q.   And did you contact him after Mr. Tibbitts died?

20   A.   I did.

21   Q.   Why did you do that?

22   A.   Because I needed help with financial things.  I didn't know

23   what to do.

24   Q.   What sort of help?

25   A.   Just identifying accounts, figuring out how to move IRAs,

1   and just in general what to do.

2   Q.   Were you finding items that you were not aware existed

3   prior to Mr. Tibbitts' death?

4   A.   Yes.

5   Q.   And were some of these items related to Mr. Tibbitts'

6   finances?

7   A.   Yes.

8   Q.   And so did you exchange text messages and E-mails with

9   Mr. Palme about these items?

10  A.   I did.

11  Q.   And did you ever send him items that you were finding?

12  A.   I did.

13  Q.   Now, was Mr. Tibbitts -- was he a client of Mr. Palme's?

14  A.   No.

15  Q.   Did you ever have any contact with Mr. Didani after

16  Mr. Tibbitts passed away?

17  A.   Yes.

18  Q.   And how did that come about?

19  A.   He called me after Marty died.

20  Q.   Was this close in time or was it months later, years later?

21  A.   Within days.

22  Q.   And what do you remember about that?

23  A.   He was crying.

24  Q.   What do you mean he was crying?

25  A.   He was very upset.  He was like, "It can't be true, it

```
 1    can't be true."

 2    Q.   And how did you react to that?

 3    A.   I told him to calm down, and I got off the phone with him.

 4    Q.   Why did you get off the phone with him?

 5    A.   Because he was hysterical.

 6    Q.   Did you ever talk to him again after that?

 7    A.   No.

 8    Q.   Did he ever call you and say, hey, Mr. Tibbitts and I we

 9    had all this business, he owes me money, we've got all these

10    businesses going on?

11    A.   No.

12             MR. BILKOVIC:  Can I have one moment, your Honor?

13             THE COURT:  You may.

14             (Briefly off the record.)

15             MR. BILKOVIC:  Nothing further.

16             THE COURT:  You may cross-examine.

17                          CROSS-EXAMINATION

18    BY DEFENDANT DIDANI:

19    Q.   Good afternoon, Mrs. Tibbitts.  How are you?

20    A.   Great.  Thank you.

21    Q.   Good to see you again, Mrs. Tibbitts.

22    A.   I can't say likewise.

23    Q.   You indicated to the Government that you met with me first

24    time in 2008?

25    A.   Sometime around there, yes.
```

Jury Trial, Volume 12 - Excerpt - March 7, 2025

```
1    Q.   Are you sure?
2    A.   It was somewhere around there.  I don't know the exact
3    date.
4    Q.   And where -- where we meet in 2008?
5    A.   At the gym.
6    Q.   Are you sure in 2008?
7    A.   No.
8             MR. BILKOVIC:  She just said twice that she's not
9    sure.
10   BY DEFENDANT DIDANI:
11   Q.   Maybe it was 2013?
12   A.   I really don't know.
13   Q.   You know, in 2008, the Government informed me that in 2007
14   I was doing a drunk driving in prison.
15   A.   Okay.
16   Q.   So it cannot be me and you -- we never met in 2008.
17   A.   It was after you got out of prison, whenever that was.
18   Q.   And so you agree with me we met in 2013?
19   A.   I don't know the date, so ...
20   Q.   Five years after 2008?
21   A.   Okay.  If you say so.  I really don't know.
22            THE COURT:  Go to another question.
23   BY DEFENDANT DIDANI:
24   Q.   Mrs. Tibbitts, it's not easy, but how many times we met
25   together?
```

1    A.   I have no idea.  A handful, five, eight.  I didn't keep

2    track.

3    Q.   The last time when we met when was that, do you remember?

4    A.   I do not.

5    Q.   And you indicated that we only went one time for dinner,

6    me, you and Marty; right?

7    A.   Yes.

8    Q.   And what do you know about Marty and -- Marty and me?  What

9    do you know?

10   A.   Nothing really.

11   Q.   Nothing?

12   A.   No.  You were friends, and I thought you were introducing

13   him to some people in Albania.

14   Q.   All right.  So since you say about Albania, who Marty was

15   meeting in Albania?

16   A.   I have no idea.

17   Q.   He never talked to you about being ambassador?

18   A.   He mentioned it, but it was never confirmed.

19   Q.   As a matter of fact, it was one of his ex-workers.  I think

20   you met him.  He was being introduced to being an ambassador in

21   Albania.  Do you remember that, the president of his company,

22   Marty's company, or no?

23   A.   No.

24   Q.   And Marty was going to introduce -- do you know who we met

25   in Albania?

1    A.   No.  Lots of people.  I don't know specifically.

2    Q.   He never told you that he was meeting the president of

3    Albania?

4    A.   He sent me a video of himself running on a beach with the

5    president of Albania.

6    Q.   So he sent -- so to be fair, you know, he was meeting with

7    very powerful people there, government people; right?

8    A.   I suppose.

9    Q.   Did he ever told you why he was in Albania?

10   A.   No.

11   Q.   He was investing in Albania?

12   A.   Okay.

13          THE COURT:  Do you know that or not?

14          THE WITNESS:  He talked about it, but I didn't know

15    any details.

16          THE COURT:  Thank you.

17   BY DEFENDANT DIDANI:

18   Q.   But you indicated that he told you that he was investing in

19   ATM business; right?

20   A.   He said it was an idea.  It was one of the two things that

21   he mentioned possibly doing in Albania.

22   Q.   Marty was not telling you anything what he was doing in

23   Albania other than ATM business and the one video of him and

24   the president running?

25   A.   He also mentioned that it's difficult to get

 1   over-the-counter medication in Albania.  And he was trying to

 2   get licensing to sell things like ibuprofen and Tylenol in

 3   Albania, those two businesses.

 4   Q.   What about investing in military there in Kosovo and

 5   Albania?

 6   A.   No.

 7   Q.   He never told you?

 8   A.   No.

 9   Q.   Do you remember in 2016 did you come in Washington with

10   Marty?

11   A.   No, no.

12   Q.   When Marty flew there with his kids in Washington?

13   A.   He did.

14   Q.   And met who?

15   A.   I don't know.

16   Q.   He didn't tell you that he was meeting some politician out

17   there in Washington?

18   A.   I don't know who he met.  I wasn't there.  He said he was

19   going to Washington, but I don't know who he was meeting with.

20   Q.   He never explained to you who he was meeting?

21   A.   No.

22   Q.   What about New York?

23   A.   I don't really remember him going to New York.  If he did,

24   it would just have been another business trip.

25   Q.   But you was in charge of his reservations; right?

1    A.   Well, if he asked me to buy a plane ticket, I would buy a

2    plane ticket.

3    Q.   And, if he asked you about a hotel, you would buy the

4    hotel; right?

5    A.   Of course.

6    Q.   Do you know that he met with a politician in New York in

7    2016, '17?

8    A.   I do not.

9    Q.   Do you remember that you did a reservation E-mails, you did

10   the reservation of hotel out there in New York?  Do you

11   remember that?

12   A.   I don't remember specifically.  Marty traveled a lot.

13   Q.   What about Marty traveling in Holland?

14   A.   Where?

15   Q.   In Holland.

16   A.   Holland?

17   Q.   Yes.

18   A.   I don't remember that.

19   Q.   Did you guys got a mutual friend from Oman that he has a

20   hotel in Holland?

21   A.   I didn't know he had one in Holland.  I know he has one in

22   London.

23   Q.   Do you know the name of the hotel?

24   A.   The Sofitel in London, but I don't know anything about

25   other countries.

1   Q.   What about Sofitel Amsterdam?

2   A.   I don't know.

3   Q.   What about Sofitel in Belgium?

4   A.   Where?

5   Q.   Belgium.

6   A.   Oh, I don't know.

7   Q.   Marty never told you that he'd been out there in Holland?

8          MR. BILKOVIC:  Asked and answered, your Honor.

9   Objection.

10         THE COURT:  I'm going to allow it.

11         THE WITNESS:  I don't remember him going to Holland.

12  He may have, but it was a long time ago and I don't remember.

13  He traveled a lot.

14  BY DEFENDANT DIDANI:

15  Q.   Marty, every time he traveled, and to be sure, he will let

16  you know?  He will FaceTime you and let you know everywhere he

17  is; right?

18  A.   I don't think so, no, not knowing what I know now, of

19  course he wasn't telling me everywhere he went.

20  Q.   What do you know now about Marty?

21  A.   That he was apparently meeting politicians in Washington

22  according to you.  I don't know what he was doing.  He was

23  traveling.  I'm sure he didn't tell me everything.

24  Q.   Marty, he told you about the president in Albania; right?

25  A.   He sent me a video, yes.

1    Q.  He told you about other politician in Albania, right, in

2    Kosovo?

3    A.  No, not.

4    Q.  He didn't send you a picture of the president of Kosovo?

5    A.  I don't think so.  I don't remember if he did.

6    Q.  I want to go back to those accounts, Mrs. Tibbitts.  You

7    said you have no knowledge to any of those moments?

8    A.  No.

9    Q.  Do you know that you was a suspect before for money

10   laundering?

11   A.  Who?

12        THE COURT:  I'm sorry?

13   BY DEFENDANT DIDANI:

14   Q.  You was a suspect?

15   A.  Who, me?

16   Q.  Yes.

17   A.  No.

18   Q.  The Government never told you?

19   A.  No.

20   Q.  They never indicated that you was a suspect for money

21   laundering?

22   A.  Absolutely not.

23   Q.  Did you buy the house in California 1.7 million in cash?

24   A.  I did.

25   Q.  You didn't know that -- the Government never notify you

1    that you was a suspect for laundering money?

2    A.   No, they did not.

3    Q.   Where that money come from, Mrs. Tibbitts?

4    A.   It came from the business.

5    Q.   What business?

6    A.   I took the money from Cumulus Properties, which was a

7    property company.  And I needed to do that because I hadn't

8    worked and so I couldn't get a loan.  So I took money from the

9    business.

10           DEFENDANT DIDANI:  One moment.

11           (Briefly off the record.)

12   BY DEFENDANT DIDANI:

13   Q.   And since Marty's death you've been living in California?

14   A.   Mostly, yes.

15   Q.   What about Donald Larson?  What's going on with Donald

16   Larson?

17   A.   I have no idea.

18   Q.   After Marty's death, did you met with Donald Larson?

19   A.   He did come over one day.

20   Q.   He indicated to you that Marty give him 300,000 cash to buy

21   Bitcoins?

22   A.   No, he did not indicate that to me.

23   Q.   That's on the reports?

24           THE COURT:  Is that a question?  Is that a question,

25   Mr. Didani?

```
 1              DEFENDANT DIDANI:  Yes, your Honor.
 2              THE COURT:  You want to know if it's in the reports,
 3    and maybe you want to say what reports you're referring to.
 4    BY DEFENDANT DIDANI:
 5    Q.  Donald Larson asked you -- even after that he asked you for
 6    $10,000 after Marty's death, that Marty owed him $10,000, too?
 7    A.  He said Marty owed him money.
 8    Q.  But he didn't told you nothing about $300,000?
 9    A.  No, I don't -- I don't remember.  It's been so long.
10    Q.  Marty was involved in Bitcoins, buying Bitcoins?
11    A.  He did.
12    Q.  From what, people around?
13    A.  I don't know.  Wherever you buy Bitcoin.
14    Q.  Mrs. Tibbitts, after Marty's death you contact Mr. Palme;
15    right?
16    A.  Yes.
17    Q.  And you contact him to help you out on what?
18    A.  Just with financial matters in general.
19    Q.  To what point he helped you out?
20    A.  I'm not sure what you mean.
21    Q.  Did he figure out all the financial problems, all the
22    finances of Marty, or no?  Did he help you out?
23    A.  I mean, he just helped me organize everything.  There were
24    accounts that, you know, needed to be -- ownership needed to be
25    changed, IRAs, things like that.  He just helped me figure out
```

1    what was what in the paperwork, because I never did anything

2    with our finances before Marty died.

3    Q.   And then did you figure out all the accounts in Comerica

4    Bank of Marty's?

5    A.   The Comerica Bank accounts, yes.

6    Q.   Did you see a lot of movements out there?

7    A.   A lot of what?

8    Q.   Money movements, wiring.

9    A.   No.  I didn't look at old bank statements.  I was only

10   concerned with what was current.

11   Q.   There is a lot of bank statements, a lot of movement, half

12   a million dollars to other --

13          Marty was a YPO; right?

14   A.   He was.

15   Q.   Can you explain to the jury what's a YPO?

16   A.   It's the Young Presidents' Organization.  It's sort of like

17   a fraternity for people who run businesses or own businesses

18   that do over a certain amount of business, I guess.  You have

19   to be invited in.

20   Q.   And do you agree with me that those -- Marty had contacts

21   all over the world, right, through this YPO; right?

22   A.   He did.

23   Q.   And he was doing all kind of business around the world;

24   right?

25   A.   I don't think so, no.

```
 1   Q.  Mrs. Tibbitts, I want to -- if you don't --

 2             DEFENDANT DIDANI:  Your Honor, I want to --

 3   BY DEFENDANT DIDANI:

 4   Q.  I did ask you a question about $300,000 that Donald

 5   Larson -- Marty give cash to Donald Larson to buy Bitcoins, and

 6   you said you don't remember to this Court?

 7   A.  I said I didn't know.  I didn't say I don't remember.

 8   Q.  You didn't know nothing about it?

 9   A.  I did not know anything about it, no.

10   Q.  If I show you a report, that DEA report, do you mind -- can

11   you read it so I can refresh your memory, please?

12   A.  Sure.

13             DEFENDANT DIDANI:  Your Honor?

14             MR. FINK:  May I, your Honor?

15             THE COURT:  You may.

16             MR. FINK:  Judge, I'm going to point to paragraph 14

17   where the Government also referred me to just for the

18   convenience, but if she needs the whole thing obviously she

19   can.

20             THE WITNESS:  I don't have my glasses.  I can't see

21   that, literally.

22             THE COURT:  Well, what would you like to do about

23   that?  Would you like to have it read to her so she can see if

24   it refreshes her, or no?

25             MR. BILKOVIC:  I have reading glasses.  I could see if
```

```
 1   they work.
 2            THE COURT:  You can.
 3            MR. BILKOVIC:  Thank you.
 4            THE WITNESS:  Sorry.  I didn't know I would need them.
 5            THE COURT:  Does that help?
 6            THE WITNESS:  It does.  I can see it now.
 7            THE COURT:  Just read paragraph 14 to yourself and he
 8   can ask you a question.
 9            THE WITNESS:  Okay.
10            THE COURT:  Pose your question.
11   BY DEFENDANT DIDANI:
12   Q.  Does it refresh your memory that --
13   A.  It does refresh my memory that Don mentioned -- that was
14   when I asked Don why Marty was giving him money was after Marty
15   was dead, and I said, you know --
16   Q.  Giving who?
17   A.  Don money.
18   Q.  Oh, Don?
19   A.  Yes.
20   Q.  And then Don indicated what?
21   A.  He told me that Marty was giving him money to give to
22   someone else, and he indicated -- honestly, I'd forgotten this.
23   He indicated that it was to buy Bitcoin, and that's all I know.
24            MR. FINK:  May I retrieve it, your Honor?
25            THE COURT:  Yes, you may.
```

```
 1            MR. FINK:  Judge, I'm leaving Mr. Bilkovic's glasses
 2    up there just in case.
 3            THE COURT:  Do you have any objection to that?
 4            THE WITNESS:  Well, now he can't see.
 5            MR. BILKOVIC:  You know what, I can borrow
 6    Mr. McDonald's if I need to.
 7            MR. FINK:  I tried to gain an advantage, but --
 8            MR. BILKOVIC:  No.  Leave them there.  Leave them
 9    there.
10            THE WITNESS:  I should know better than to go anywhere
11    without my glasses.
12            THE COURT:  Well, I usually have another pair up here,
13    but I don't today.
14            JUROR:  I've got a pair, your Honor.
15            THE COURT:  No, you won't have to volunteer, but thank
16    you.
17            THE WITNESS:  Thank you.  I have two pairs in my
18    purse.
19            THE COURT:  Go ahead and pose a question, please.
20    BY DEFENDANT DIDANI:
21    Q.  So, Mrs. Tibbitts, what about the house?  You still have
22    the house in Detroit?
23    A.  In Grosse Pointe, yes.
24    Q.  Grosse Pointe?
25    A.  Yes.
```

```
 1    Q.   But you live in California; right?
 2    A.   I live in both places.  I mostly live in California.
 3    Q.   And you indicated that agents visit you in California;
 4    right?
 5    A.   Yes.
 6    Q.   And what they talk about?
 7    A.   You, quite frankly, and Marty.
 8    Q.   What they say about me?
 9    A.   That you and --
10              MR. BILKOVIC:  Objection, hearsay, your Honor.
11              THE COURT:  Why isn't it hearsay?
12              DEFENDANT DIDANI:  I was asking Mrs. Tibbitts, your
13     Honor.  How is that hearsay?
14              THE COURT:  I know, and I want to know why it isn't an
15     out-of-court statement offered to prove the truth of the matter
16     asserted.
17              DEFENDANT DIDANI:  I'll pass that, your Honor.  I'll
18     pass.
19    BY DEFENDANT DIDANI:
20    Q.   Tell me, Mrs. Tibbitts, do you remember what you give the
21    Government that day?
22    A.   For the most part, yes.
23    Q.   What was it, computers?
24    A.   Anything that I found of Marty's that was an electronic or
25    a notebook or a phone, I gave it all to them.
```

```
 1    Q.   What phone you talking, Mrs. Tibbitts?
 2    A.   There were multiple phones.
 3    Q.   What about a phone that -- you indicated there was a phone
 4    of mine?
 5    A.   There was.  You left it under the seat of my car.
 6    Q.   I left it under the seat?
 7    A.   Yes, you did.
 8    Q.   When did you find it?
 9    A.   My housekeeper found it after Marty died.
10    Q.   So the phone -- so Marty died in 2018?
11    A.   Yes.
12    Q.   So the phone was in your car for a year?
13    A.   I think you had been there.
14    Q.   For over a year?
15    A.   No.  The phone was in the car when Marty died, and my
16    housekeeper found it under the seat.
17    Q.   So how did you know it was my phone?
18    A.   Because I turned it on, and you didn't have a pass code on
19    it and I looked, because I thought it was one of Marty's
20    phones, but it was yours.
21         DEFENDANT DIDANI:  Your Honor, can I -- can I show
22    Mrs. Tibbitts a phone, because I think the phone is in here, so
23    she can verify that's the phone?
24         THE COURT:  Yes.
25         Do you all have the phone?  Is it marked as an
```

1    exhibit?

2            DEFENDANT DIDANI:  Yes, your Honor.

3            THE COURT:  No.  I'm asking the Government, is it

4    marked as a Government's exhibit?

5            MR. BILKOVIC:  Your Honor, we have it upstairs.  We

6    can go get it and have it down here in five minutes.

7            THE COURT:  Okay.

8            MR. BILKOVIC:  Can the agent leave to go do that?

9            THE COURT:  Yeah.

10            Go on with your questions until we get the phone.

11            Step lively, sir.

12    BY DEFENDANT DIDANI:

13    Q.   You indicated that phone has no pass code?

14    A.   Right.

15    Q.   And it was my phone?

16    A.   It was.

17    Q.   You opened it?

18    A.   Of course.

19    Q.   What did you find out?

20    A.   Nothing specific.  There were, you know, pictures.  I knew

21    it was your phone because of the photos and then the E-mail.

22    Q.   Oh.  So it had E-mails, it had phone -- everything on that

23    phone?

24    A.   Yes.

25    Q.   And when you give it to the Government, that phone, you

```
1   give it to -- like that, with pictures and everything?

2   A.   Well, I didn't erase the phone.  I gave them everything.

3   Q.   You don't think that that phone was a clone?

4   A.   A clone?  I have no idea.

5   Q.   So you indicated to the Government that -- the Government

6   show you a video of me being in your car.  Do you remember when

7   that video was?

8   A.   No.

9   Q.   Can I say 2017?

10  A.   I don't know when it was taken.  I've been shown the video,

11  but I don't know the date.

12  Q.   All right.  When did you got a ticket?

13  A.   You got a ticket.

14  Q.   Oh, I'm sorry.  Ms. Tibbitts, sorry.  When I got a ticket,

15  when was that ticket?

16  A.   I don't know the exact date.  It got mailed to the house in

17  February of 2018.

18  Q.   So it have to be 2017; right?

19  A.   It could have been in January.  So I guess it -- I don't

20  know what the date was.  Sorry.

21  Q.   From that time to 2017, until Marty died, who was using the

22  car?

23  A.   Apparently, you when I wasn't home, and me when I was home.

24  Q.   In two thousand -- where I was in 2018, if you know?

25  A.   I have no idea.
```

1   Q.   Do you agree in 2017 I took your car, I drove it?

2   A.   You did.

3   Q.   I'm not disputing that.  But when Marty died do you know

4   where I was?

5   A.   I think you -- well, you weren't in the country, but I

6   don't know where you were.  I don't think you were in the

7   country.  I have no idea.

8   Q.   So let's say I left the country from 2017 until Marty's

9   death.  Who was driving the Porsche after that?

10  A.   You weren't gone.  You were driving my car.  You were at my

11  house.  You apologized for driving my car to me.  You bought me

12  flowers.  You were definitely in my car in that year.  I don't

13  know what you're talking about.

14  Q.   I'm not disputing the 2017, Mrs. Tibbitts, all right.  I'm

15  talking about 2018.

16  A.   I don't know if you drove my car again between February and

17  July of 2018 when Marty died.  I do not know.

18  Q.   That's the time I'm asking you, Mrs. Tibbitts.

19  A.   I have no idea where you were or what you were doing.

20          THE COURT:  Approach at sidebar.

21          (At 3:47 p.m., sidebar held off the record.)

22          THE COURT:  I already told you from time to time we

23  were going to do that, and usually it has nothing to do with

24  anything that you are to decide in the case.  So don't worry

25  about it, okay.  Just enjoy the white noise.  I don't know

1   about the rest of you, but some people use it for the kids to

2   go to sleep at night, but it doesn't do anything to help me

3   sleep at night, so ...

4          All right.  We're going to ask you to come back on

5   Monday, and I was -- I sent your person on a wild goose chase

6   for the phone, but maybe you all can maintain it and bring it

7   with you on Monday morning.

8          MR. BILKOVIC:  We'll have it in the courtroom on

9   Monday.

10          THE COURT:  Okay.  Very good.  Then I'd ask that you

11   come back on Monday.  We start at 9:30; okay?

12          THE WITNESS:  Okay.

13          THE COURT:  Please don't discuss your testimony with

14   anybody involved in this case; okay?

15          THE WITNESS:  Okay.  I don't -- I don't --

16          THE COURT:  All right.  Thank you.  You may step down,

17   and we'll see you on Monday.

18          (End of excerpt at 3:49 p.m.)

19                     —   —   —

20

21

22

23

24

25

```
 1
 2
 3                   CERTIFICATE OF COURT REPORTER
 4
 5         I, Sheila D. Rice, Official Court Reporter of the
 6    United States District Court, Eastern District of Michigan,
 7    appointed pursuant to the provisions of Title 28, United States
 8    Code, Section 753, do hereby certify that the foregoing pages
 9    is a correct transcript from the record of proceedings in the
10    above-entitled matter.
11
12
13                         s/Sheila D. Rice
                           Sheila D. Rice, CSR-4163, RPR, RMR, FCRR
14                         Federal Official Court Reporter
                           United States District Court
15                         Eastern District of Michigan
16
      Date:  04/11/2025
17    Detroit, Michigan.
18
19
20
21
22
23
24
25
```