1                    **UNITED STATES DISTRICT COURT**
                     **EASTERN DISTRICT OF MICHIGAN**
2                         **SOUTHERN DIVISION**

3                           —   —   —

UNITED STATES OF AMERICA,
4
              Plaintiff,
5
   v.                                    Case No. 21-20264
6
YLLI DIDANI,
7
              Defendant.
8    _____/

9                  **JURY TRIAL – VOLUME 14 – EXCERPT**
                  **Continued Testimony of Donald Larson**
10              **BEFORE THE HONORABLE DENISE PAGE HOOD**
                    **UNITED STATES DISTRICT JUDGE**
11
                  Theodore Levin United States Courthouse
12                   231 West Lafayette Boulevard
                          Detroit, Michigan
13                    Tuesday, March 11, 2025
     **APPEARANCES:**
14
     **For the Plaintiff:**        Mark Bilkovic
15                                 Timothy McDonald
                                   UNITED STATES ATTORNEY'S OFFICE
16                                 211 W. Fort Street, Suite 2001
                                   Detroit, Michigan 48226
17                                 (313) 226-9623

18   **For the Defendant:**        Ylli Didani
                                   (Appearing in Pro Se)
19
                                   Wade Fink
20                                 WADE FINK LAW, P.C.
                                   550 W. Merrill Street, Suite 100
21                                 Birmingham, Michigan 48009
                                   (248) 712-1054
22                                 (Appearing as Standby Counsel.)

23   **Also Present:**             Special Agent Chad Hermans
                                   Maria DiCarlo, Paralegal
24
          *To obtain a copy of this official transcript, contact:*
25            *Sheila D. Rice  Official Court Reporter*
            *(313) 234-2610 • sheila_rice@mied.uscourts.gov*

```
 1                    TABLE OF CONTENTS

 2   MATTER                                        PAGE

 3   JURY TRIAL - VOLUME 14 - EXCERPT

 4   Government's Case in Chief (Continued)

 5   DONALD LARSON

 6   Cross-Examination by Defendant Didani................ 5

 7   Certificate of Court Reporter.......................82

 8

 9

10

11

12

13                  E X H I B I T   I N D E X

14
     Exhibit No.        Description        Identified   Admitted
15

16   Defendant's Exhibits

17   Defendant's M    Proffer Agreement        65          66

18

19

20

21

22

23

24

25
```

1    Detroit, Michigan

2    Tuesday, March 11, 2025

3    10:20 a.m.

4                                –   –   –

5            (Beginning of excerpt.)

6            LAW CLERK:  All rise.

7            The United States District Court for the Eastern

8    District of Michigan is now in session, the Honorable Denise

9    Page Hood presiding.

10           Calling Case No. 21-20264, United States of America

11   versus Ylli Didani.

12           Appearances, please.

13           MR. BILKOVIC:  Good morning, your Honor.

14   Mark Bilkovic and Timothy McDonald on behalf of the

15   United States.  Also at the table is Maria DiCarlo and

16   Special Agent Chad Hermans.

17           MR. McDONALD:  Good morning, your Honor.

18           THE COURT:  Good morning, everyone.  And you may be

19   seated.

20           DEFENDANT DIDANI:  Good morning, your Honor.

21   Ylli Didani, as pro se, and Mr. Fink as a standby counsel.

22           THE COURT:  Okay.  Good morning to you.  And you may

23   be seated.

24           MR. FINK:  Good morning.

25           THE COURT:  I probably should tell you that I received

1    a pretty long e-mail from Mr. Fink; is that correct?  I'm not

2    the subject of it, it was to someone else.  But the Government

3    received it as well?

4              MR. McDONALD:  Yes, we did receive it.

5              THE COURT:  All right.  Very good.  Are we ready to

6    call Mr. Larson back up?

7              MR. McDONALD:  The Government's ready, your Honor.

8              THE COURT:  Okay.  Mr. Didani?

9              DEFENDANT DIDANI:  Yes, your Honor.

10             THE COURT:  Okay.  Very well.  Let's call him.  And

11   let's bring out the jury, please.

12             Did Ms. Daley already go back in?

13             MR. BILKOVIC:  I think so, your Honor.

14             THE COURT:  Okay.

15             LAW CLERK:  All rise for the jury.

16             (The jury entered the courtroom at 10:22 a.m.)

17             THE COURT:  Okay.  You may all be seated.

18             Is the Government satisfied the jurors are present and

19   in their proper seats?

20             MR. McDONALD:  Yes, your Honor.

21             THE COURT:  Mr. Didani?

22             DEFENDANT DIDANI:  Yes, your Honor.

23             THE COURT:  Okay.  Good morning.

24             JURORS:  (Collectively) Good morning.

25             THE COURT:  You know, I hate to admit it, but I'm the

1   reason you've been sitting back there, and everyone apparently

2   was here on time for 9:30.  And we discussed whether or not we

3   were going to start at 9:30 because of some other

4   circumstances, and determined it would be 10:00, and then

5   apparently Ms. Daley was in the jury room with you so she

6   didn't hear it, and I neglected to tell you that the time would

7   be 10:00 instead of 9:30.

8           So if you're going to be mad about sitting back there,

9   you can be mad at me but not at the parties who are here.

10  Okay.

11          All right.  Very good.

12          Mr. Larson, you're still under oath.

13          THE WITNESS:  Yes, ma'am.

14          THE COURT:  Okay.

15          DEFENDANT DIDANI:  May I approach, your Honor?

16          MR. McDONALD:  Your Honor, just for the record, I

17  finished my direct exam.  We have no further questions.

18          THE COURT:  Okay.  All right.  Very well.

19  Cross-examine.

20          DEFENDANT DIDANI:  Thank you, your Honor.

21          Good morning.

22          JURORS:  (Collectively) Good morning.

23                          CROSS-EXAMINATION

24  BY DEFENDANT DIDANI:

25  Q.  Good morning, Agent Larson -- strike that.  Mr. Larson,

 1   good morning.

 2   A.   Good morning.

 3   Q.   How are you, sir?

 4   A.   I couldn't sleep well.  I'm all right.

 5          THE COURT:  Okay.  You need to speak directly into the

 6   mic, okay.  Move it up if you need to, okay.

 7          All right.  You may proceed.  Go to your questions,

 8    please.

 9   BY DEFENDANT DIDANI:

10   Q.   A long time seeing you, huh?

11   A.   A long time.

12   Q.   Was it before Marty's death or after Marty's death?

13   A.   I'm not sure.  I think before.

14   Q.   So what you told the Government yesterday that you met me

15   after Marty's death to discuss the torpedo, it was not true;

16   right?

17   A.   Pardon me?

18   Q.   Yesterday you told Government that you met with me after

19   Marty's death to continue the torpedo, so that was false;

20   right?

21   A.    I didn't remember saying that.

22   Q.   Before we go anywhere, I wanted to -- remember in

23   Sterling Heights police report, right, the police video?  The

24   Government provide you with that video?

25   A.    The video?

```
 1   Q.   Yes.

 2   A.   Of my arrest?

 3   Q.   Yes.

 4   A.   I didn't see it.  I don't think so.

 5   Q.   They didn't provide it to you?

 6   A.   No.

 7   Q.   Well, they provide it to the defense.  Remember the --

 8   Mr. Larson, remember the -- to buy the first seat on the bus,

 9   do you remember that conversation from the agents?

10   A.   Can you repeat that?

11   Q.   Buying the first seat on the bus, do you remember that?

12   A.   The first --

13   Q.   Buying the first seat on the bus from the agent, to

14   cooperate you have to buy the first seat.  Do you remember that

15   conversation with the agents when they told you?

16   A.   When you went to Chicago?

17   Q.   No, no.  In Sterling Heights.  Between the conversation

18   between you -- the agents, Agents Leach, Newsome --

19   A.   Yes.

20   Q.   -- Tsouroullis?

21   A.   Okay.

22   Q.   You remember that conversation then; right?

23   A.   Vaguely, yeah.

24   Q.   Do you remember at the end they told you to buy the first

25   ticket on the bus, the bus, the seat?  Do you remember that?
```

1    A.   Buy the first ticket on the bus?

2    Q.   Yeah, the first seat on the bus, whoever comes first get

3    the treatment?

4    A.   I'm not following.

5              DEFENDANT DIDANI:  All right.  Your Honor, may I play

6    this video maybe, because before I want to cross-examine

7    this --

8              THE COURT:  I don't know whether or not you can play

9    the video or not.  It depends on if you can find the precise

10   place that you want to play on the video.

11             DEFENDANT DIDANI:  Yes.  Me and Mr. Fink --

12             THE COURT:  If not, you may not play it, but if you

13   can find the precise place you may play it.

14             DEFENDANT DIDANI:  Yes, your Honor.

15             Mr. Fink.

16             (Video played.)

17   BY DEFENDANT DIDANI:

18   Q.   Do you remember that, first bus?

19   A.   I remember being there, yeah.

20   Q.   But you remember that?  No?  Do you remember that?

21   A.   I don't remember what they said.

22             DEFENDANT DIDANI:  Okay.  One more time, Mr. Fink,

23   please.

24             (Video played.)

25

 1   BY DEFENDANT DIDANI:

 2   Q.   Do you remember that now?

 3   A.   Said something about appropriating funds.  It's garbled,

 4   sorry.

 5            DEFENDANT DIDANI:  Can you play it one more time,

 6   Mr. Fink, for Mr. Larson.

 7            (Video played.)

 8   A.   Okay.  He said the first person on the bus gets the best

 9   seat.

10   BY DEFENDANT DIDANI:

11   Q.   Yes.  My question to you, what they give you?  They give

12   you a business class, economy class or private jet, the

13   Government?

14   A.   In that meeting I was very evasive.  I didn't -- they

15   didn't give me anything.

16   Q.   I didn't ask you about that meeting.  After the meeting the

17   Government give you a business class, first seat or economy

18   class or a private jet?

19   A.   None of the above.

20   Q.   All right.  Mr. Larson, you took the Fifth, you evoked the

21   Fifth?

22            THE COURT:  I'm sorry.  I didn't hear that question.

23   Could you repeat it, please.

24   BY DEFENDANT DIDANI:

25   Q.   Before you come to the trial, to jury, did you invoke the

```
 1    Fifth?
 2    A.   I did.
 3    Q.   Why?
 4    A.   Because I didn't want to testify against myself.
 5    Q.   There was no other reasons?
 6    A.   The only reason.
 7    Q.   Well, testifying about -- testifying what about yourself?
 8    A.   Any involvement with you.
 9    Q.   And that's why you took the Fifth?
10    A.   Yes.
11    Q.   And then what happened?  They give you immunity?
12    A.   In here, yes.
13    Q.   Do you know what immunity is?
14    A.   Pardon me.
15    Q.   Did you know -- did your lawyer explain to you what
16    immunity means?
17    A.   Yes.
18    Q.   Can you tell us a little bit what he explained to you?
19    A.   He said if I tell the truth then there will be no charges
20    put against me.
21    Q.   So the Government had threatened you with charges?
22    A.   I'm exonerated from any charges, yes.
23    Q.   I didn't ask you that, Mr. Larson.  I asked, the Government
24    threatened you with any charges?
25    A.   They said they could if I didn't tell the truth and take
```

1    the stand.

2    Q.   Take the stand where; right here or --

3    A.   Yes, in here.

4    Q.   But they threatened you before; right?  Did they threaten

5    you with your livelihood?

6    A.   No.  I mean, any time you go to prison your livelihood is

7    threatened, yes.

8    Q.   We're going to go back to that, Mr. Larson.  Since you say

9    about prison, you was in prison before?

10   A.   Yes.

11   Q.   What year was that?

12   A.   1992.

13   Q.   What was you in prison for?

14   A.   Cocaine possession.

15   Q.   How long you was in prison?

16   A.   Life.

17   Q.   And how many years you did?

18   A.   Eighteen.

19   Q.   In this case -- before you got to the state, that was a

20   federal case?

21   A.   It was.

22   Q.   And what happened?

23   A.   The police sold me two kilos of cocaine and I wouldn't

24   testify against the person they wanted me to, so they turned my

25   case over to the State of Michigan which carried a life

1   sentence.

2   Q.   So the federal Government when you didn't testify what they

3   want to hear they turned you to the state; right?

4   A.   Yes.

5   Q.   And the state give you -- basically they throw you to the

6   wolves; right?

7   A.   It was a mandatory life sentence.

8   Q.   They throw you to the wolves, right?

9   A.   Right.

10  Q.   And when you came out of prison what happened?

11  A.   I started working as a fitness trainer.  I was still on

12  parole for four years.

13  Q.   By the way, did you ever meet me in prison?

14  A.   What?  Pardon me.

15  Q.   Did you ever meet me in prison?

16  A.   I don't believe so.

17  Q.   That's not what your report saying that you said, but we go

18  over that later.  You said you meet me in prison.  So when did

19  you meet me?

20  A.   I think I met you at the gym.  Steve Elliott introduced us.

21  Q.   Steve Elliott?

22  A.   Yes.

23  Q.   When was the last time you talked to Steve?

24  A.   The last time?

25  Q.   Yes, sir.

1  A.  I was still a personal trainer at Powerhouse, and I'm very

2  gullible.  I loaned him $10,000, and he didn't repay me, so I

3  stopped talking to him.

4  Q.  He owed you money?

5  A.  Yes.

6  Q.  Why did you loan him money?

7  A.  I bought his story and I thought he was trustworthy.

8  Q.  Now we're gonna go back to that.  Don't worry about it.

9  Thank you.

10       But -- and then Steve met us, we met, right, me and

11  you?

12  A.  Yes.

13  Q.  And tell the jury what is our relationship?

14  A.  Just friends because we were all in prison, so you, Steve

15  and myself.

16  Q.  I was in prison with you?

17  A.  I said no.  We were all in prison.  We're all ex-convicts.

18  Q.  Oh.  Do you know why I went into prison?

19  A.  I wasn't exactly sure.

20  Q.  Was it drunk driving?

21  A.  Possibly, yes.

22  Q.  I was very young; right?  Do you remember that or no?

23  A.  Not really.

24  Q.  Then we grow up as friends; right?

25  A.  Yes.

```
 1    Q.   Did you visit me in me Egypt?

 2    A.   Pardon me.

 3    Q.   Did you visit me in Egypt -- in Egypt?

 4    A.   Adrian?

 5    Q.   Egypt.

 6    A.   Prison?

 7    Q.   No, no.  Egypt.

 8              MR. FINK:  Spell it.

 9              DEFENDANT DIDANI:  E-G-U -

10              JUROR:  Egypt.

11              DEFENDANT DIDANI:  Egypt.

12              THE COURT:  The jury doesn't get to participate in the

13     questions and answers.  Okay.  Thank you.

14    BY DEFENDANT DIDANI:

15    Q.   So when you meet me after we grow up a little bit as

16     friends; right?

17    A.   Yes.

18    Q.   Was the defendant in front of you living in Europe?

19    A.   You?

20    Q.   Yes, sir.

21    A.   Yeah, Albania.

22    Q.   All right.  So you come me in Egypt.  Why did you come in

23     Egypt?

24    A.   I went to -- I mean I went to Albania first.  Marty asked

25     me to go look at some jet airplanes.
```

```
1    Q.  All right.  Fine.  Let me pose a question because -- so
2    first you come meet me in Albania; right?
3    A.  Yes.
4    Q.  Who did you come with?
5    A.  I think I was by myself.
6    Q.  One mechanics?
7    A.  No.
8    Q.  Why did you come to meet me in Albania?
9    A.  Marty wanted me to look for a plane.  He bought war-era jet
10   airplanes.  He liked to fly them.  So, you know -- and so Lou
11   said there was a possibility that there's some planes for sale
12   for the Albanian Air Force.  So I went there to look at them,
13   but we never got to look at any flying planes that were for
14   sale.
15   Q.  But do you know those airplanes, they were World War II or
16   Cold War airplanes?
17   A.  Yeah.
18   Q.  You think they should be on flying -- just fly?
19              MR. McDONALD:  Objection, relevance.
20              THE COURT:  How's it relevant?
21              DEFENDANT DIDANI:  Relevant, you know, because the --
22              THE COURT:  Whether or not the planes could fly or not
23   is relevant?  I don't think so.  Sustained.  Go to another
24   question.
25
```

 1   BY DEFENDANT DIDANI:

 2   Q.   So what happened with the airplanes?  Did Marty bought

 3   anything?

 4   A.   He did not.

 5   Q.   You sure?

 6   A.   Not the ones -- anything that we went to see in Albania.

 7   Q.   Did Marty -- did Marty testify to you that he went back to

 8   Albania to see planes?

 9   A.   I knew he was there, but I didn't know why he went.

10   Q.   Did you know anything that Marty send any money in Albania

11   to buy airplanes?

12   A.   I didn't know that.

13   Q.   You not on the loop?

14   A.   I wasn't aware.

15   Q.   All right.  You're not aware.  This is in about 2015 or

16   something, 2016, before?

17   A.   It was after that, I believe.

18             THE COURT:  After --

19             THE WITNESS:  It was in my passport, the stamp from

20    Egypt.

21   BY DEFENDANT DIDANI:

22   Q.   No, Albania.  Albania.  We going to Egypt -- we going to go

23   to Egypt, but right now we're in Albania.

24   A.   Well, it was around the same time.  I'm really fuzzy with

25   dates.  That's what I said earlier, yesterday.

1    Q.   2015/2016?

2    A.   It could have been.

3    Q.   And then you left Albania and you came back here.  Then

4    Marty send you to Egypt; right?

5    A.   We went from Albania to Egypt.

6    Q.   Oh, we went together?

7    A.   Yes.

8    Q.   We flew together?

9    A.   Yeah.

10   Q.   Oh.  Do you have that on passport?

11   A.   That you were there with me?

12   Q.   No, no.  I'm not -- that we flew together, right?  Or you

13   flew by yourself?

14   A.   No.  We had a stopover in Istanbul, Turkey and then we went

15   to Egypt.

16   Q.   Why did you come to Egypt?

17   A.   Your friend, Tiku, told us there was a family in Egypt who

18   was building a house and going -- and they were building the

19   foundation and they ran into an Egyptian tomb.  And there was

20   supposedly a lot of golden artifacts that they were selling.

21   So we went to go look at it.

22   Q.   Did you see anything?

23   A.   We never went inside it, no.

24   Q.   Did you have videos of those?

25   A.   I've seen videos, yes.

1    Q.   You never went inside?

2    A.   No.

3    Q.   Do you remember what you told -- did you told Agent Leach,

4    Agent Newsome that you went inside?

5    A.   I don't recall that, no.

6    Q.   Did Marty did any business with that -- those antiques?

7    A.   Not that I know of.  I went there to because Belinda

8    thought he would get kidnapped, so he sent me to look.

9    Q.   So Belinda sent you or Marty sent you?

10   A.   Marty sent me.

11   Q.   Then what happened?  You see everything in Egypt, you came

12   back?

13   A.   I remember one night you and Tiku went to another place to

14   see artifacts yourselves, but you left me at the hotel.

15   Q.   So what happened?  What was the final word in Egypt?  Can

16   you describe?  Did you see everything and you left, or what?

17   A.   You and I went to a meeting with a bunch of Egyptians, and

18   they said they found another tomb, supposedly for the grandson

19   of Snefru who built the pyramids supposedly, and they said we

20   tried to get into look, and they said this isn't a museum.  Did

21   you bring a expert with you?  And we said no.  So they said we

22   can't let you in it.  And they showed us a video of a statue

23   of -- supposedly it was Isis and Osiris -- or Isis and Horus of

24   a depiction of a statue.  It was Horus was sitting on the lap

25   of his mother, and it had engravings all over it.  And this was

1   some proof supposedly, but we didn't have an expert, it was

2   supposed to be proof that they found this tomb.  And this

3   depiction, the earliest known depiction of this mother and son

4   on the lap was like 1500 B.C.  And this is what they were

5   telling me.  You know, I looked at it after that, but they said

6   this should prove that we have this tomb that we're -- they

7   were in control of it, they were protecting it.  And because

8   this supposedly -- that pharaoh was like 2600 or 2700 B.C.  So

9   predates what the earliest known depiction of that is by 12-,

10  1,300 years.

11  Q.   Did Marty ever send any money out there in Egypt?

12  A.   Not that I know.

13  Q.   Was Marty interested in buying that stuff?

14  A.   He was.

15  Q.   So you don't know if he sent money there or somewhere else

16  to buy that stuff, did you?

17  A.   No, I don't.

18  Q.   Do you think maybe Marty send money to buy stuff out there?

19  Do you believe so?

20  A.   Oh, it's possible.

21  Q.   It's possible?

22  A.   Yeah.

23  Q.   And you come back, you came back to Michigan; right?

24  A.   Yes.

25  Q.   Did you report it to Marty?

1    A.   I did.

2    Q.   What did you report it to Marty, that everything is cool?

3    A.   Well, everything that we seen that we did that transpired

4    on our trip I told him.

5    Q.   Okay.  And everything you did you deal with Marty; right?

6    A.   Yes.

7    Q.   Marty was a good friend of yours?

8    A.   He was.

9    Q.   What about Belinda, how long you know Belinda?

10   A.   I believe we met in the '80s but I don't remember it.  We

11   talked about it and she remembers me.  We were very young.  So

12   she was probably in her early 20s.  I was probably 27 or 28.

13   Q.   Where was she working?

14   A.   She was working at Tycoons.  It was a gentleman's club.

15   Q.   All right.  After Marty's -- after Marty's death, how's

16   your -- did you have a conversation with Belinda?

17   A.   After his death, yes.

18   Q.   Did you invite her in Denver?

19   A.   Invite her where?

20   Q.   In Denver.

21   A.   I did.

22   Q.   You had any intimate things with Belinda?

23   A.   No.

24           MR. McDONALD:  Objection, relevance.

25           THE COURT:  It's not relevant and it's stricken.

```
 1   BY DEFENDANT DIDANI:
 2   Q.   Did you send any photos to Belinda?
 3           MR. McDONALD:  I don't know how that's relevant
 4    either.  Objection.
 5           THE COURT:  That might be relevant.
 6           THE WITNESS:  I don't recall.
 7           THE COURT:  Tread lightly.
 8           THE WITNESS:  I don't recall.
 9   BY DEFENDANT DIDANI:
10   Q.   You was not exchanging photos with Belinda?
11   A.   I think she sent me some, yeah.
12   Q.   What kind of photos?
13           MR. McDONALD:  Objection, relevance.
14           THE COURT:  How is that relevant, Mr. Didani?
15           DEFENDANT DIDANI:  I'll strike it, your Honor.
16           THE COURT:  All right.  It's stricken, and the jury
17    will disregard it.
18   BY DEFENDANT DIDANI:
19   Q.   All right.  So we're going to go back when it's relevant.
20           You come back to Michigan, Mr. Larson, and then what?
21   Me and you was talking on the phone all the time?
22   A.   We exchanged phone calls when you weren't in town, yes.
23   Q.   So when I come in town it's fair to say that I was coming
24   to Chicago first because my mother lives there; right?
25   A.   Your family, yes.
```

1   Q.   Then I come visit you; right?

2   A.   Yes.

3   Q.   And then I'll go to New York, right, maybe New York, Miami

4   or --

5   A.   Yeah, wherever you went.  I don't know.  I wasn't privy to

6   a lot of it.

7   Q.   So, just to be fair, I was not living in Michigan since

8   2014; right?  Just to visit -- I come to visit; right?

9   A.   Yes.

10  Q.   But I was living in Europe, right?

11  A.   Yes.

12  Q.   All right.  As a matter of fact, when I was coming to visit

13  here we was staying together, right?

14  A.   Yes.

15  Q.   We was good friends?

16  A.   Yes.

17  Q.   We eat from the same plate?

18  A.   Same table, yes.

19  Q.   And the same plate?

20  A.   Yes.

21  Q.   Tell me a little bit -- as you indicated yesterday when the

22  Government was asking you questions, I asked you that my family

23  had a problems or I had problems and I needed $90,000; right?

24  A.   Yes.

25  Q.   What kind of problems?

 1   A.   You told me that a deal went bad and you needed $90,000 to

 2   save your family.

 3   Q.   You know, my family, Mr. Larson, live in the same place for

 4   30 years, right, in Chicago?

 5   A.   I don't know how long, but, yeah, I knew they lived in

 6   Chicago.

 7   Q.   You know they don't even close the door there?  They

 8   stay -- they keep -- you know?

 9   A.   Pardon me?

10   Q.   You know they don't even lock the doors in there?

11   A.   I didn't know that.

12   Q.   Do you think that my family ever been in any kind of threat

13   from anyone in the world?

14   A.   In a war?

15   Q.   Do you think my family has been threatened from anyone

16   around the world?  Do you think so?

17   A.   That's what you told me.

18   Q.   And I had a debt with who?

19              THE COURT:  You what?

20              DEFENDANT DIDANI:  I had a debt -- Mr. Larson just

21    indicated that I had a debt, I had to pay a debt.

22              THE COURT:  Okay.

23   BY DEFENDANT DIDANI:

24   Q.   A debt with who?

25   A.   With the Colombians you said.

1    Q.   What Colombians?

2    A.   I never met them.

3    Q.   You never talked to them?

4    A.   No.

5    Q.   Never see them?

6    A.   Never.

7    Q.   Never talk in a message?

8    A.   Never.

9    Q.   I said I got a debt with Colombians and that was it?

10   A.   Yeah.

11   Q.   Is that -- but you indicated nothing before when they

12   arrested you in '19 you didn't say nothing about the

13   Colombians; right?

14   A.   The first meeting -- or the first time they arrested me?

15   Q.   The first meeting, yes.

16   A.   No, I was very evasive.

17   Q.   Yeah.  And then later the story changed, the Colombians

18   come in the picture; right?

19   A.   Yes.

20   Q.   But you personally haven't met no Colombians?  You haven't

21   seen anyone?

22   A.   Never.

23   Q.   You haven't seen -- Mr. Larson, I want to go a little bit

24   with a few messages that you went through with Mr. McDonald

25   yesterday and so we can have an understanding.

```
 1              DEFENDANT DIDANI:  Mr. Fink, can you pull
 2    Exhibit 36.21, please.
 3              MR. FINK:  36-21?
 4              DEFENDANT DIDANI:  Yes, sir.
 5              THE COURT:  This is already admitted?
 6              DEFENDANT DIDANI:  Yes, your Honor.  It's admitted
 7    by -- by the Government.
 8              THE COURT:  All right.
 9              DEFENDANT DIDANI:  Mr. Fink, can you go to --
10    BY DEFENDANT DIDANI:
11    Q.  All right.  To be fair, Mr. Larson, the white -- the white
12    is you?
13    A.  Yes.
14    Q.  And the blue is me; right?
15    A.  Yes.
16    Q.  "No.  I can get a loan, call Pol.  Do you want me to call
17    Pol?  Need to move last 7."
18              All right.  Do you remember who is Pol?
19    A.  Pol?
20    Q.  Yes, sir.
21    A.  No.
22    Q.  Do you remember Pol was a mortgage guy, do you remember?
23              MR. McDONALD:  He said he didn't remember.
24              THE COURT:  He asked him if he knew he was a mortgage
25    guy.  He can ask that.  Overruled.
```

```
 1              Do you know that he was a mortgage guy?

 2              THE WITNESS:  That's fuzzy.  No, I don't remember

 3     that.

 4              THE COURT:  Okay.  Go to your next question.

 5     BY DEFENDANT DIDANI:

 6     Q.   "Need to move last 7."  Is that your text?

 7     A.   Yes.

 8     Q.   What do you mean "need to move last 7"?

 9     A.   I believe we had a conversation and you said you needed to

10     move 7 more to sell them all.

11     Q.   I needed?

12     A.   Yes.

13     Q.   Or is "need to move last 7," or is it you need to move last

14     7?

15     A.   I never touched cocaine after I got out of prison.

16     Q.   Did you ever see me touching cocaine?

17     A.   Never.

18     Q.   Did you ever see me selling any cocaine in Michigan or

19     anywhere in the United States?

20     A.   Never.

21     Q.   Did you ever sit on somebody, have a conversation between

22     me, a cocaine dealer and you?

23     A.   No.

24     Q.   Yesterday you indicated that need to move last 7, it was

25     kilos.  Is that kilos, it can be animal?  It can be human
```

1    growth; right?

2    A.   Not from what you said.

3    Q.   What did I say?  I'm trying to figure out.

4    A.   We had other conversations without --

5    Q.   We're going to go to that, but I'm just trying to get

6    there.

7    A.   Yeah.  From right here, yeah.

8    Q.   Yes, we're going to go to that.  "Need to move last 7."

9           When me and you had this conversation, where did

10   Mr. Didani was?

11   A.   I'm not sure.

12   Q.   In United States or Europe?

13   A.   Probably Europe.

14   Q.   So "need to move last 7" hypothetically let's say kilos

15   because that's what the Government told you all day, kilos,

16   that's what they tell you on your head?

17           MR. McDONALD:  Objection.  That's a

18   mischaracterization.

19           THE COURT:  And not only that, it's commenting on the

20   testimony --

21           DEFENDANT DIDANI:  I apologize.

22           THE COURT:  -- and, therefore, it's stricken, and the

23   jury will disregard it.

24           And you may state your question again properly.

25           DEFENDANT DIDANI:  I apologize, your Honor.

1    BY DEFENDANT DIDANI:

2    Q.   So you don't believe that this -- that I was anywhere

3    around Michigan, right, in that time?

4    A.   I don't think so.

5    Q.   You don't believe that I was anywhere around even in United

6    States around that time?

7    A.   You could have been in Chicago but I'm not sure.

8    Q.   Do you believe that I was selling cocaine in Chicago?

9    A.   I know -- well, you told me you were picking some up there,

10   but I don't know if you were selling it there.

11   Q.   Picking what?

12   A.   Cocaine.

13   Q.   From who?

14   A.   Mexicans.

15   Q.   Yesterday you indicated there was money given to Mexicans.

16   You didn't indicate nothing about cocaine, Mr. Fink --

17   Mr. Larson.

18          THE COURT:  Is that a question?

19   BY DEFENDANT DIDANI:

20   Q.   Did you -- yesterday --

21   A.   Yesterday, yeah.

22   Q.   -- you told the Government that I took money there; right?

23   A.   Yes.

24   Q.   And I took money to pay a debt; right?

25   A.   You took money to pay your debt from the cocaine deal that

```
 1  got busted, that's what you told me.
 2  Q.  Okay.  Where was the cocaine deal that got busted?
 3  A.  I don't know.
 4  Q.  So you didn't ask me where's this cocaine deal got busted?
 5  A.  No.
 6  Q.  You was not curious to know where?
 7  A.  No.
 8  Q.  So you just give me money; right?
 9  A.  I gave you money because you said your family was in
10  danger.
11  Q.  So, Mr. Larson, so you just said that -- did you ever -- do
12  you believe I ever sold any cocaine in the United States?
13  A.  I don't know.  I know that was Marty's main -- main thing.
14  He didn't want anything to do with anything in the United
15  States.
16  Q.  Mr. Larson, I didn't ask what Marty's thing is.  I asked
17  you, this defendant in front of you, and you believe -- did you
18  ever think this defendant sold cocaine in United States?
19  A.  I have not -- no, I don't know for sure.
20  Q.  Mr. Larson -- your Honor, we gonna show Exhibit 36.1-9?
21          THE COURT:  36.1-9?
22          DEFENDANT DIDANI:  Yes, your Honor.
23          THE COURT:  Okay.
24          MR. McDONALD:  I think he means Exhibit 36-9.
25          MR. FINK:  No.  I think it's --
```

1              DEFENDANT DIDANI:  36.1-9.

2              THE WITNESS:  36-9?  That's the picture up there.

3              THE COURT:  Now, what exhibit does the Government

4    think that is?

5              MR. McDONALD:  I think we're looking at the same

6    thing.  I think it's 36-9.

7              DEFENDANT DIDANI:  That's what I said, 36.1-9.

8              THE COURT:  The Government thinks it's what?

9              MR. McDONALD:  I think it's the same exhibit.  It's

10   just they're different numbers.

11             THE COURT:  No, they're not going to be different

12   numbers.  I already told you guys that more than a month ago.

13             MR. McDONALD:  Your Honor, we'll bring up 36-9.  It's

14   the same photo, right, Mr. Didani?

15             DEFENDANT DIDANI:  Yes, sir.  Yes, sir.

16             THE COURT:  Okay.  So it's coming up as 36-9.  It's

17   the same as what you're claiming it is, 36.1-9?

18             DEFENDANT DIDANI:  Yes, your Honor.

19             THE COURT:  Okay.  So you know they're only have one

20   exhibit number?

21             DEFENDANT DIDANI:  Yes, your Honor.

22             THE COURT:  Okay.

23   BY DEFENDANT DIDANI:

24   Q.  Mr. Larson --

25   A.  Yes.

1    Q.   -- to be clear, Mr. Didani is blue and you are Mr. Larson,

2    you're white; right?

3    A.   Yes.

4    Q.   And then there's a picture sent from a different phone;

5    right?

6    A.   Yes.

7    Q.   What was the picture about?

8    A.   This picture?

9    Q.   Yes, sir.

10   A.   It looks like kilograms.

11   Q.   Kilograms of what?  Do you ever have --

12   A.   No, but I know how they're packaged.

13   Q.   But you never asked me what kind of -- what are those;

14   right?

15   A.   Right.

16   Q.   You don't know if it's cocaine or anything; right?

17   A.   It could have been heroin.  I don't know.

18   Q.   Exactly.  So you and me, we never have a discussion what is

19   that; right?

20   A.   No.

21   Q.   And Exhibit 36-10, please.

22        And in those photos that's your house; right?

23   A.   Yes.

24   Q.   That's your house?

25   A.   Yes.

1    Q.   And that was sent by this defendant; right?

2    A.   Yes.

3    Q.   And what does that mean?

4    A.   I took it to mean that you were going to sell those and pay

5    for my house in Texas.

6    Q.   But we're not talking anything about selling there; right?

7    You don't even know what's in there; right?

8    A.   I don't know what's in the bag, you mean?

9    Q.   Yes.

10   A.   No.  For sure, no.

11   Q.   And to be fair, at this time I was in Europe; right?

12   A.   Most likely.

13   Q.   There was nowhere near your house?

14   A.   No, it wasn't at my house.

15   Q.   Not in your gym?

16   A.   No.

17   Q.   I just wanted to make it clear because yesterday when the

18   Government when it was asking you, we want to make clear that

19   that's not near Michigan or United States to begin with; right?

20   A.   I didn't think so, no.

21   Q.   So we got a photo of bag of something, it can be bag of --

22   I don't want to say the word here because the Judge is going to

23   throw me out.

24            THE COURT:  For the record, I am not going to throw

25   you out, but you will act appropriately as the representative

 1    of yourself in this court.

 2            DEFENDANT DIDANI:  Yes, your Honor.

 3    BY DEFENDANT DIDANI:

 4    Q.  So to be clear, Mr. Larson, you had no idea what the bag

 5    was, for just a comparison, there was no drugs or nothing;

 6    right?

 7    A.  I know the way it was packaged, that's all I know.

 8    Q.  Mr. Larson, my question is:  You had no idea what was on

 9    those packages?  And to be clear, Mr. Larson, there is not near

10    Michigan or let alone the United States; right?

11    A.  Possible, yes.

12    Q.  Thank you.

13            Mr. Larson, I want to make it clear to the jury and to

14    this court.  From 2014 to Marty's death, we don't go to step by

15    step, me and you here this day in front of the jury, but -- and

16    we go talk about all this money.

17            THE COURT:  Well, it would be good if you posed a

18     question.

19    BY DEFENDANT DIDANI:

20    Q.  But -- but you never seen me doing any drug dealing in the

21    United States or Michigan to begin with; right?

22    A.  Correct.

23    Q.  Mr. Larson, from 2014 to 2018 until Marty Tibbitts die,

24    there was never any conversation you as Mr. Larson, as Don, you

25    never sit at any table and discuss any shipment of cocaine, did

1    you?

2    A.   Us three together?

3    Q.   No.  With any other drug dealers or anything.

4    A.   Just about the torpedo, that's it.

5    Q.   So just to be clear, Mr. Larson, you have -- from '14 to

6    '18 you have no idea of any involvement you as person or any

7    planning or any discussion about shipping cocaine from

8    South America to anywhere, did you?

9    A.   Just some of the links you sent me of deals that went bad

10   or something like that.

11   Q.   Mr. Larson, those are in 2020.

12   A.   Yeah.

13   Q.   My question is from 2014 until Marty died.  We're gonna to

14   go there, Mr. Larson.  We have all day.

15        There was never -- to be clear from the jury and for

16   this Court, you never did any planning, dealing, selling,

17   buying or anything; right?

18   A.   Correct.

19   Q.   Mr. Larson, did you remember -- let me go to -- in 2016,

20   you met a gentleman, Pete Synowiec; right?

21   A.   Yes.

22   Q.   How many times you met Pete?

23   A.   The first time with you, but I don't know exactly how many

24   times after that.

25   Q.   To be fair, did you go to Pete's office a few times?

 1   A.   I did.

 2   Q.   Because you needed some money to pay your bills; right?

 3   Yes?

 4   A.   I'm not sure if I went to get a couple thousand dollars at

 5   your direction maybe, yes.

 6   Q.   Well, to be fair I was in Europe or wherever I was; right?

 7   Not in Michigan?

 8   A.   Yes.

 9   Q.   And not in United States to begin with.  You text me, and

10   you say, hey, brother, I got -- I need some money; right?

11   A.   Yes.

12   Q.   To be fair, did you go to Pete for a few thousand dollars

13   to pay your bills, did you?  Do you remember that?

14   A.   I didn't ask him personally.  You --

15   Q.   No, I didn't say you asked him personally.

16   A.   Yeah.

17   Q.   But do you remember this event?

18   A.   I believe so.

19   Q.   So and then you met Pete one time to pick up what?

20   A.   A hundred thousand dollars.

21   Q.   Where was the money sent from?

22   A.   Say again, please.

23   Q.   Where -- from where those money was sent from?

24   A.   Out of Pete's safe at the --

25   Q.   No.  Who send to Pete?  You took just -- Marty send it to

1    you?

2    A.   No.  You told me to go there.

3    Q.   I told you to go there?

4    A.   Yes.

5    Q.   To pick up a hundred thousand?

6    A.   I don't know if Marty knew Pete.

7    Q.   So you just pick up a hundred thousand from Pete?

8    A.   Yes.

9    Q.   And what did you do with the money?

10   A.   I brought it back to my house.

11   Q.   And then what happened?

12   A.   And then I called you and told you I had the money.

13   Q.   And then what happened?

14   A.   I gave you the money.  You came over.

15   Q.   All right.  So did you know what happened with that money?

16   A.   I do not.

17   Q.   You think that money was used to by cocaine?

18   A.   I assumed it was.

19   Q.   But you don't know?

20   A.   No, I don't.

21   Q.   But you told the Grand Jury that money was to buy cocaine,

22   though, do you remember?

23   A.   I do.

24   Q.   So you lied to the Grand Jury?

25   A.   I did not lie.

1    Q.   I'm asking you today in front of the jury right here what

2    was the money for?

3    A.   You had a one-track mind, Lou.

4    Q.   What was my track mind?

5    A.   You wanted to be a drug dealer.

6    Q.   I wanted to be a drug dealer?

7    A.   Yes.

8    Q.   Mr. Larson, my question to you was to you, the hundred

9    thousand dollars, do you for fact know that money was for drugs

10   or not?

11   A.   We talked about but I'm not a hundred percent sure that's

12   what it was for.

13   Q.   You might say to the jury what my track mind is but you're

14   not in my mind, do you?  Are you in my mind?

15   A.   No, but we had a lot of discussions.

16   Q.   So it was not always about drugs; right?

17   A.   Right.

18   Q.   It was about a lot of stuff; right?

19   A.   Sure.

20   Q.   It was about life; right?

21   A.   Oh, yeah.

22   Q.   It was about friendship?

23   A.   It was.

24   Q.   A real one, that's what I thought.

25            But my question is you're not for sure and in front of

```
 1    this jury right now you're not for sure that hundred thousand
 2    dollars was -- was for drugs?
 3    A.   I can't be a hundred percent sure, no.
 4    Q.   Marty didn't told you what was that money for, no?  Pete
 5    didn't told you?  Pete?
 6    A.   No, he didn't.
 7    Q.   I didn't told you?
 8    A.   No.
 9    Q.   So why did you go in front of the Grand Jury and you say
10    that money was for drugs?
11    A.   Because that was the main -- I was like a middleman moving
12    money for you.
13    Q.   Mr. Larson, please.  I know you didn't sleep well
14    yesterday.  I'll ask you very straightforward question.  I
15    didn't told you what the money was for.  Pete didn't told you
16    what the money was for.  You never know what the money was for.
17    Why did you told the Grand Jury the money was for drugs?
18    A.   Because that's what I thought it was for.
19    Q.   Mr. Larson, I know the Government took your life 18 years.
20    Does it satisfy you to take somebody's life?
21             MR. McDONALD:  Objection.
22    A.   It does not.
23             MR. McDONALD:  Objection.
24             THE COURT:  What's your objection?
25             MR. McDONALD:  Argumentative.
```

```
1              THE COURT:  Argumentative.  Go to a new question.  In
2    fact, that question may be in a different form allowed, but in
3    that form it's argumentative, and that objection is sustained.
4    BY DEFENDANT DIDANI:
5    Q.  Let's be clear on that hundred thousand dollars, and that's
6    the last time I'm going to ask you that question.
7              THE COURT:  No.  If it's the same question, you're not
8    going to ask it again because we've heard the answer.  If you
9    want to rephrase the question, you can, but we're not going to
10   keep having the same question and the same answer.
11             DEFENDANT DIDANI:  No, your Honor, I'm not asking the
12   same question.
13             THE COURT:  Okay.  Pose a new one.
14   BY DEFENDANT DIDANI:
15   Q.  The new question, I want it to be clear, that you didn't
16   know what the money was -- the hundred thousand dollars was
17   for; right?  In front of this jury, you said -- you just -- are
18   we clear for that, you didn't know what the money was for?
19   A.  Not a hundred percent, no.
20   Q.  Let's move on.  I want to go back to a little bit with
21   Belinda.  The day after Marty's death; right?
22   A.  Yes.
23   Q.  You told Belinda that --
24             THE COURT:  You know, Mr. Didani, I've asked you a
25   couple times to call people by their last names, all right.
```

```
 1              DEFENDANT DIDANI:  Oh, I'm sorry, your Honor.
 2   BY DEFENDANT DIDANI:
 3   Q.   Mrs. Tibbitts.  You told Mrs. Tibbitts that Marty gave you
 4   300,000 -- it's about $300,000.  Do you remember that?
 5   A.   I think it was more than that; right?
 6   Q.   I can't -- it's the 300,000 that you told Belinda about the
 7   Bitcoins.  Do you remember that?
 8   A.   I don't remember anything about Bitcoin.
 9   Q.   Do you want me refresh your --
10   A.   I don't remember Bitcoin.
11   Q.   If I show you a report, maybe it can refresh your memory,
12   please.
13   A.   You can show me.  I don't really remember that.
14              DEFENDANT DIDANI:  I'll show it to the --
15              THE COURT:  I'm sorry?
16              DEFENDANT DIDANI:  Your Honor, I showed the Government
17    this report.  Now I need Mr. Fink to --
18              THE COURT:  Yes.
19              MR. FINK:  May I, Judge?
20              THE COURT:  Yes.
21              MR. McDONALD:  Just for the record, can Mr. Didani
22    identify what type of report it is for the record?
23              THE COURT:  Yes.
24              DEFENDANT DIDANI:  Agent Bianchi report.
25    Agent Bianchi.
```

```
 1              THE COURT:  And do you know the date of it?

 2              DEFENDANT DIDANI:  It's 5/15/2019, your Honor,

 3    Agent Bianchi.

 4              THE COURT:  Okay.

 5    BY DEFENDANT DIDANI:

 6    Q.  Mr. Larson --

 7    A.  Yeah.  I want to read it first so I know what I'm

 8    answering.

 9    Q.  Yes, sir.

10    A.  Okay.

11    Q.  Mr. Larson, do you remember that?

12    A.  I never said --

13              THE COURT:  Does that refresh his recollection first.

14    BY DEFENDANT DIDANI:

15    Q.  Does that refresh your recollection?

16    A.  It does not.  I knew nothing about Bitcoin.

17    Q.  Do you remember those $300,000?

18    A.  No, I didn't -- when I came back from Denver I didn't want

19    to be a personal trainer anymore.  So that's not true either.

20    Q.  So Belinda lying -- Mrs. Tibbitts --

21              MR. McDONALD:  Judge, objection.  First of all,

22    Mr. Didani attempted to refresh the recollection with an

23    interview of Mrs. Tibbitts.  It's not even Mr. Larson's

24    statements.  He's asked him the question if he remembers it.

25    Mr. Larson said he doesn't.
```

```
 1              THE COURT:  Go to a new question.  That's sustained.
 2              DEFENDANT DIDANI:  Mr. Fink, please.
 3              MR. FINK:  May I retrieve it, your Honor?
 4              THE COURT:  Yes.
 5  BY DEFENDANT DIDANI:
 6  Q.  Mr. Larson, I want to go back a little bit in 2015.  When
 7  you -- 2016.  When you returned from Egypt, did the CBP,
 8  Customs, pull you over in a airplane?
 9  A.  Yes.
10  Q.  Did they took your phones?
11  A.  Yes.
12  Q.  Did they make copy of your phones?
13  A.  Probably.
14  Q.  Did you ever ask for those copies?
15  A.  They gave me my phone back.
16  Q.  Did the Government notify you they made copies of those
17  phones?
18  A.  They did not.
19  Q.  Did the Government provide you with those copies?
20  A.  They did not.
21  Q.  Do you know those exist, those copies; right?
22  A.  Did I know what?  Pardon me.
23  Q.  Those copies exist; right?
24  A.  I don't.
25  Q.  When they took your phone, did you ask them for a warrant?
```

```
 1   A.   No.
 2   Q.   So you have no idea.  Did your lawyer notify you there's
 3   copies of your phone?
 4           MR. McDONALD:  Objection.  He's asking him to
 5   speculate what his lawyer knew.
 6           DEFENDANT DIDANI:  I'm asking --
 7           THE COURT:  He's not asking him to speculate what his
 8   lawyer said, but the conversations between him and his lawyer
 9   he does not have to testify to, but he can if he chooses.
10           So what's your objection?
11           MR. McDONALD:  My objection is he's asking him to
12   speculate.  He asked the witness if his lawyer knew why they
13   took the phones.
14           THE COURT:  Oh, I'm sorry.  I thought he asked the
15   question if his lawyer told him they took the phones.
16           DEFENDANT DIDANI:  Exactly, your Honor.  It was
17   what -- that's why I asked.
18           THE COURT:  But he can't tell us what his lawyer knew,
19   but he can tell us whether or not --
20           THE WITNESS:  I did have a lawyer for that incident.
21           DEFENDANT DIDANI:  What about --
22           THE COURT:  That answers that question.  Go to a new
23   one.
24   BY DEFENDANT DIDANI:
25   Q.   Do you know you was being chased behind?
```

1   A.   Can you repeat that, please?

2   Q.   Do you know you was being chased for years?

3   A.   That I was being watched?

4   Q.   Yes.

5   A.   I told you, you were being watched.  I didn't know I was.

6   Q.   You didn't know you was being in 2015?

7   A.   When I came back from Florence, Italy?

8   Q.   2016.

9   A.   Is that Florence, Italy?  When I got pulled over by the DEA

10  at the airport?

11  Q.   Well, I don't know that.  That's something new.

12  A.   But that's the question you were asking.

13  Q.   No.  That was when you were coming from Egypt.  Thank you

14  for telling me that, though.  I didn't know that you got pulled

15  over by DEA.

16  A.   I called you.  I called you.

17  Q.   Oh, we going to go there.  Thank you for informing me that.

18       When you got back from Egypt, right, you have no idea

19  they made copy of your phones, nothing of that.  Do you know

20  that you was being followed all the time?

21  A.   I didn't.

22  Q.   No?

23  A.   That I was being followed?

24       THE COURT:  You did or did not?  Did you know you were

25  being following?

 1              THE WITNESS:  No.
 2    BY DEFENDANT DIDANI:
 3    Q.   The Government didn't -- didn't notify you that you was
 4    being followed for years?
 5    A.   No.
 6    Q.   They even followed -- do you know they even followed your
 7    girlfriends?  No?
 8    A.   The government was following me you said?
 9    Q.   Your girlfriends, either.  No?
10    A.   My girlfriend was following me?
11    Q.   No.  The government was following your girlfriends, too.
12    Do you know that?
13    A.   Which girlfriend?
14              DEFENDANT DIDANI:  Your Honor, may I --
15              Mr. Fink, I would like to put this in evidence.
16              THE COURT:  If it's not marked -- is it marked?
17              MR. FINK:  Not yet, your Honor.
18              DEFENDANT DIDANI:  I'd like to propose that, your
19    Honor, as an exhibit.
20              THE COURT:  I think you're at L.
21              DEFENDANT DIDANI:  Your Honor, this is Defendant's
22    proposed L exhibit.
23              THE COURT:  And are you showing it to the Government?
24              MR. McDONALD:  I had an opportunity to see it.  Thank
25    you.

```
 1                 THE COURT:  Okay.  All right.
 2   BY DEFENDANT DIDANI:
 3   Q.  Mr. Larson, can you --
 4                 MR. FINK:  May I, Judge?
 5                 THE COURT:  Yes, you may.
 6   BY DEFENDANT DIDANI:
 7   Q.  Do you remember her, Mr. Larson?
 8   A.  Yeah.
 9   Q.  Is she your friend or your girlfriend?
10   A.  She was a friend.
11   Q.  You was meeting her at Starbuck's in Royal Oak?
12   A.  This was a while ago.  I don't remember that.
13   Q.  Do you know how I got those; right?
14   A.  No.
15   Q.  The Government -- Government's -- Government discovery.
16   A.  Discovery from the Government, okay.
17   Q.  Yes.
18   A.  Okay.
19   Q.  Do you know you was being followed, you and your --
20   everybody?
21   A.  No.
22   Q.  Who's Catherine Davis (ph)?
23                 THE COURT:  Who's what?
24   BY DEFENDANT DIDANI:
25   Q.  Catherine Davis.
```

1    A.   She's a woman I knew.

2    Q.   Do you know she was being followed too?

3    A.   I do not.

4    Q.   The Government didn't notify you they was following all of

5    these people?

6    A.   No.

7    Q.   When you was going to the gym, remember what you was

8    wearing all the time?  Was it a Tiger hat?

9    A.   Powerhouse clothes.

10   Q.   What about a hat?

11   A.   Me?

12   Q.   Yes, you.

13   A.   I hardly ever wear ball caps.

14   Q.   That's what the Government indicated here.

15              THE COURT:  By here you mean on the document or --

16              DEFENDANT DIDANI:  On the document.

17              THE COURT:  -- proposed L?

18              DEFENDANT DIDANI:  No, not yet, your Honor.

19              THE COURT:  No, but what are you referring to?

20              DEFENDANT DIDANI:  The discovery, your Honor.  I'm

21   referring to Mr. Larson, he's being followed all this time and

22   he has no idea.

23              THE COURT:  Well, we're hearing the answer, but you

24   said something and maybe I misunderstood it.

25

```
 1    BY DEFENDANT DIDANI:
 2    Q.  So I want to go back to the $300,000, Mr. Larson.  Where is
 3    that $300,000?
 4    A.  I have no idea.
 5    Q.  Yesterday you mentioned from the Government when the
 6    Government was asking you about $300,000 was given to me.  Do
 7    you know where?
 8    A.  200,000.
 9    Q.  No, the 300,000.
10    A.  I don't remember that.
11    Q.  Did you ever give me 300,000?
12    A.  No.
13    Q.  Who's Pete Tocco?
14    A.  A friend of mine.
15    Q.  Did he help you out and cash out checks?
16    A.  Did he help me what, cash checks?
17    Q.  Yes.
18    A.  Yes, he did.
19    Q.  He's a suspect in this case?
20    A.  He what?
21    Q.  If you know, he's a suspect in this case?
22    A.  He's not.  I don't get my friends involved in stuff.
23    Q.  In what stuff?
24    A.  Illegal things.  If I don't want them to know I don't tell
25    them so they're not involved.
```

1    Q.   But did you ask him to cash out checks for you?

2    A.   He was with me, yes.

3    Q.   And where did he cash out those checks?

4    A.   Pardon me?

5    Q.   Where did you guys cash the checks out?

6    A.   At a check cashing business.

7    Q.   Whose business?

8    A.   Whose?

9    Q.   Yes.

10   A.   A friend of mine, Larry.

11   Q.   Larry.  Has Larry been indicted?

12   A.   No.

13   Q.   All those checks you took, 50,000, 100,000, those are from

14   Marty's personal account?

15   A.   Yes.

16   Q.   Do you know anything about that money that Marty had in the

17   account?  Is that drug money?

18   A.   No, no.

19   Q.   Where that money was come from?

20   A.   Say that again, please.

21   Q.   Where Marty's money was coming from?

22   A.   Legitimate sources.  He was a -- he had a call center in

23   Oklahoma state prisons.

24   Q.   To be clear, every money that Marty wrote it was from his

25   personal accounts?

1   A.   Yes.

2   Q.   And to be clear, every check that Marty wrote to you have

3   nothing to do with drug proceeds, right?

4   A.   Marty directed me to cash the checks as a friend, so I did,

5   and he said to give it to you when I see you.

6   Q.   My question -- Mr. Larson, my question was that money;

7   right?

8   A.   Yeah.

9   Q.   Those moneys that Marty give you from his personal account,

10  those money -- that money was not drug proceeds, right?

11  A.   Right.

12  Q.   That was from legitimate business; right?

13  A.   Yes.

14  Q.   Do you believe Marty was -- Marty had any bank accounts or

15  drug proceeds or anything shady?

16  A.   I don't think he did, no.

17  Q.   You indicated that Marty, when we start -- he was trying to

18  open a cash -- a ATM cash in Albania?

19  A.   Yes.

20  Q.   And we told you -- so what make you think that opening an

21  ATM cash is to wash money?

22  A.   We were together when you discussed it -- we all discussed

23  it.

24  Q.   I did?

25  A.   Yes.

1    Q.   And what did I say to you?

2    A.   You told me that there wasn't hardly any ATMs, if they were

3    gambling in a casino they would have to leave the casino and go

4    to a bank to retrieve cash to go back to the casino, and it was

5    very inconvenient.

6    Q.   They -- you never mentioned that business in any reports.

7    You met with DEA probably how many times, ten times?

8    A.   No, not that many, no.

9    Q.   How many times you spoke with them on the phone?

10   A.   With who?

11   Q.   With agents.

12   A.   Never on the phone.

13   Q.   Never?

14   A.   No.

15   Q.   Oh, we going to go back to that.  In your reports, either

16   before and after, either before when you have a economy seat

17   and after when you took a business seat -- first it was

18   economy, then it was business.  You didn't mention nothing

19   about this idea, did you?

20   A.   I don't think so.

21   Q.   Is that because you mentioned -- is that because a few

22   weeks ago you had a meeting with the Government?  Yes?

23   A.   And they implanted that in my mind or something?

24   Q.   I don't know.  You tell me.

25   A.   No.

1    Q.   Did you meet with the Government a few weeks ago?

2    A.   A couple times, yeah.  I don't know if it was -- yeah, it

3    might have been, yes.

4    Q.   Did you meet with the Government?  It was Agent Leach.  Who

5    else was in the room?

6    A.   Who's Agent Lee?

7    Q.   Leach.  Agent Leach.  Detective Leach.  Leach.

8    A.   I didn't know their names.

9    Q.   The one who has --

10   A.   The taller guy.

11   Q.   Not the taller guy.  The one who says he has a room full of

12   evidence to you.  Remember the guy, the agent, who told you,

13   you gonna come out 80 years old?  No?  Agent Leach.

14   A.   That I'm going to come out 80 years old?

15   Q.   Yes.  Do you remember that guy?  I'm going to refresh your

16   memory.

17   A.   Okay.

18   Q.   All right.  So tell me, a few weeks ago, tell us, you met

19   with the Government; right?

20   A.   Yes.

21   Q.   What was the meeting about?

22   A.   It was about my -- what transpired between you, myself and

23   Marty.

24   Q.   But you already had made that clear to Grand Jury; right?

25   A.   Yes.

1    Q.   You had made it clear to Sterling Heights police; yes?

2    A.   What did I make clear?

3    Q.   What transpired, right.  What transpired between us.  You

4    made it clear a few times; right?

5    A.   Yes.

6    Q.   Now, a few weeks ago, again you have to make it again, what

7    transpired?  Or you was going through the questions with the

8    Government?

9    A.   I was being shown the transcripts of our texting.

10   Q.   What else you was shown out there in that meeting with the

11   Government, you and the Government two weeks ago?

12   A.   Okay.

13   Q.   Everything that happened, what happened?  Tell me.

14   A.   We went over transcripts of our conversation.

15   Q.   The transcripts when you say Grand Jury transcripts?

16   A.   What transcripts?

17   Q.   Grand Jury.  Mr. Larson --

18   A.   Yes.

19   Q.   -- do you remember you testified in front of the Grand

20   Jury?

21   A.   Yes.

22   Q.   Again, a few weeks ago you went again through what -- the

23   same questions that you testify in Grand Jury; right?

24   A.   Yes.

25   Q.   You went with those same questions, you and the Government,

1    DEA and you were in the same room; right?

2    A.   Yes.

3    Q.   And they teach you how to respond; right?

4    A.   No.

5    Q.   What, did they refresh your memory?  What you doing there?

6    A.   Yeah.  I had to look at this stuff just like I looked at

7    what you had to refresh my memory because I don't remember a

8    lot of that stuff.  I remember situations more than anything

9    else.

10   Q.   So the Government did not threaten you or any kind of way

11   for this testimony, did they?

12   A.   No.

13   Q.   The Government never pressured you in any kind of way for

14   this testimony; right?

15   A.   They didn't pressure me.  They said if I don't testify then

16   they could charge me with the same crime you're being charged

17   with.

18   Q.   And when they told you that?

19   A.   From the very beginning.

20   Q.   I want to go back to the 450,000, Mr. Larson.

21   A.   Yes.

22   Q.   Did you ever have a chance to review my superseding

23   indictment?

24   A.   Review...

25   Q.   My superseding indictment.

1    A.   No, I didn't.

2    Q.   Can you tell me a little bit about this $450,000 in

3    Washington?

4    A.   Marty directed me to cash checks.  He was out of town.  So

5    he left some checks on his desk in his house.  I had the code.

6    He gave me the code.  I went up to the office, it was on the

7    second floor, and grabbed the checks off the desk and filled

8    them out because he just left them blank.

9    Q.   You filled them out?

10   A.   I didn't sign it.  He had it signed, but everything else

11   was blank.  The date, who was cash -- and I put my name on

12   there, the amount.

13   Q.   Where was Marty at that time, do you remember?

14   A.   He was not in town.

15   Q.   Where was he?  He didn't told you?

16   A.   I don't know.  I'm not sure.

17   Q.   So he just called you?

18   A.   Yes.

19   Q.   And he told you to go get the checks?

20   A.   Yes.

21   Q.   And he told you to go cash them?

22   A.   Yes.

23   Q.   Where did you cash the checks?

24   A.   At the check cashing -- I went to take the checks, but they

25   didn't take personal checks.  So I had to take them back to the

1    bank.  I called Marty and said they wouldn't take them back to

2    the bank -- or they wouldn't take them at the check cashing

3    place.  He called the bank and they instructed me to go turn

4    them in for cashier's checks.

5    Q.   So the money was from his personal account?

6    A.   Yes.

7    Q.   And most of them it was -- to be fair, it was cash from his

8    bank, right?

9    A.   Yes.

10   Q.   Did you think there's anything illegal with that?

11   A.   No, not his bank accounts, no.

12   Q.   What about the money?

13   A.   He said deliver it to you.

14   Q.   Yeah, but do you think it was -- the money taken from his

15   account, do you think that is illegal?

16   A.   I wasn't privy to your two conversations.  At first, I was

17   like a middleman and then later on you two discussed a lot of

18   things, but he told me to fly it to Washington, D.C.

19   Q.   All right.  We gonna go there, Mr. Larson.  I just wanted

20   to make sure for the jury so they can hear in this court that

21   that money was nothing illegal or that was not from Marty's

22   proceeds money, right?

23   A.   Not from Marty's hand, no.

24   Q.   So if you wanted to take that money and go to the casino

25   and spend it all -- you gamble, right?

```
 1              MR. McDONALD:  Objection, relevance.
 2              THE COURT:  How is it relevant?
 3              DEFENDANT DIDANI:  I'll strike it, your Honor.
 4    BY DEFENDANT DIDANI:
 5    Q.   So if you wanted to spend that money any way, you could
 6    spend it; right?  It's not illegal; right?
 7    A.   I wouldn't because that's not the kind of person I am.
 8    Q.   No, but what I'm saying though since the money was not --
 9    you can buy anything, you can spend anything, you can do
10    anything with that money; right?
11    A.   Right, because it was from a legitimate bank.
12    Q.   You don't have to be scared, that's what I'm trying to get
13    from you.
14    A.   Yeah.
15    Q.   You got it from a bank account, you can go anywhere and
16    spend it; right?
17    A.   Yes.
18    Q.   That's all I'm saying.  Now, you flew to Washington; right?
19    A.   Yes.
20    Q.   Who told you to fly to Washington?
21    A.   You -- well, him and you because he had to have his pilot
22    fly me there.
23    Q.   And you delivered the money.  Do you know what the money
24    was for?
25    A.   He told me that the gentleman that you were meeting
```

1    wouldn't drive up to Michigan to pick up the cash, so I had to

2    fly it down to Washington, D.C.

3    Q.   What gentleman?

4    A.   I never met him.

5    Q.   And do you know what the money was for?

6    A.   I assumed it was cocaine.

7    Q.   So, Mr. Larson, I never told you what was the money for;

8    right?

9    A.   I don't recollect that for sure, no.

10   Q.   So you don't know what the money was for, right, either?

11   A.   I believe you told me the guy wouldn't come up to Michigan

12   to deliver the drugs, so that's what I remember.

13   Q.   Deliver what?

14   A.   The drugs.

15   Q.   Where?

16   A.   He wouldn't come up to Michigan to pick up the money.

17   Q.   Hold on a second.  Wait, wait, wait.

18        Mr. Larson, you said drugs.  Deliver drugs where, in

19   Michigan?

20   A.   He wouldn't come up to Michigan.  He want to stay I guess

21   where his home base was at.

22   Q.   And the guy is from Washington?

23   A.   I believe so.  I'm not sure where he was from.

24   Q.   So you don't know for sure what the money was for; right?

25   A.   I'm not a hundred percent but I'm just -- what you told me.

1   You could have been conning me.  I don't know.

2   Q.  I never told you the money was to buy cocaine; right?

3   A.  I believe you did.

4   Q.  You believe or not?

5   A.  I believe you did but, like I said, you could have been

6   conning me.  How did Marty give you all this money.  He

7   wouldn't even lend me money for a gym.  And you conned him out

8   of millions.

9   Q.  So now you saying that it was not for cocaine, so I conned

10  him, right?

11  A.  I didn't say that.

12  Q.  What did you say?

13  A.  I said you told me it was for that, but that could not have

14  been true -- that might not have been true.

15  Q.  Do you remember I told you -- you indicated to the

16  Government that Marty was paying some people in -- bribing some

17  people?

18          MR. McDONALD:  Excuse me.  I didn't hear what he said.

19          DEFENDANT DIDANI:  Bribing.

20          THE WITNESS:  I know what he said.

21  BY DEFENDANT DIDANI:

22  Q.  Yes.

23  A.  Well, Marty sent you $500,000 to Albania, wired it, and you

24  told me that the government confiscated it.

25  Q.  Yes.

1   A.   Right.   And that you had to pay off some government

2   official to get the money back.

3   Q.   You know that money if it's confiscated until today?

4   A.   I don't know.   Not at all.

5   Q.   Do you know why that money was confiscated?

6   A.   They assumed it was for illegal activity because the

7   amount.

8   Q.   If I say that DEA from United States called, you probably

9   believe it?

10   A.   I have no idea.   I thought the Albanian government did it.

11   Q.   Let's go back to the $450,000, Mr. Larson.   You indicated

12   in Sterling Heights when it was an interview between you,

13   Agent Newsome, Agent Leach, Agent Tsouroullis, you didn't know

14   nothing about the money, did you?

15   A.   I didn't mention it.   You're talking about the first time?

16   Q.   The first time.   They asked you what was the money for?

17   A.   I was very evasive in the first interviews.

18   Q.   Did you tell them the money was not for drugs?

19   A.   I don't remember what I said.   I don't remember -- I

20   remember being very evasive because I didn't want to implicate

21   myself in any crime.

22          DEFENDANT DIDANI:   Your Honor, can we play a video so

23   maybe we can -- to refresh Mr. Larson's memory on this 450,000?

24          THE COURT:   You can if you are playing the appropriate

25   parts of it.

```
 1              DEFENDANT DIDANI:  Yes, your Honor.
 2              Mr. Fink.
 3              THE COURT:  Does this have an exhibit number?
 4    Mr. McDonald, do you know if this has an exhibit number?
 5              MR. McDONALD:  Not a Government's Exhibit.
 6              THE COURT:  I think it does.  I'll find it later.
 7              MR. FINK:  I think it does, your Honor.  I'm not sure
 8    which --
 9              THE COURT:  Yeah, I have it written down on another
10    pad.  I'll find it so we can make sure we have a record of it.
11              MR. FINK:  Thank you, your Honor.
12              (Video played.)
13    BY DEFENDANT DIDANI:
14    Q.   You have no idea?
15    A.   I had no idea who it went to I said; right?
16    Q.   Yes.
17    A.   I think that's what I said, yeah.
18    Q.   But you don't know what the money was for; right?  That
19    time you didn't know?
20    A.   I knew what you told me at that time, yeah.  It was for a
21    guy in Washington, D.C. that wouldn't come up to Michigan.
22    That's what I knew.
23    Q.   But you didn't say nothing about -- but it was about -- do
24    you remember a conversation was about some government people,
25    no, maybe?
```

```
 1   A.   What do you mean?

 2   Q.   Bribing government people, no?

 3   A.   That was for Albania.

 4   Q.   The 450.

 5   A.   No, I don't know about that, no.

 6   Q.   You don't know nothing about the 450; right?

 7   A.   I don't know that it was for money for bribing, no.

 8   Q.   So you don't know --

 9   A.   The only bribes I knew about was Albania, that's it.

10             DEFENDANT DIDANI:  Your Honor, we want to play another

11    video.

12             THE COURT:  From the same --

13             MR. FINK:  Same interview, different clip, your Honor.

14    We can sort through the numbers.

15             THE COURT:  All right.  You may.

16             (Video played.)

17   BY DEFENDANT DIDANI:

18   Q.   So basically according to that video you didn't know

19    nothing about that money; right?

20   A.   I told you I wasn't implicating myself in anything.

21   Q.   In that video?

22   A.   Yeah.

23   Q.   And then in the same day Agent Leach told you that you'll

24    come out 80 years old.  Do you remember that?

25   A.   No.
```

```
 1              DEFENDANT DIDANI:  Your Honor, can we play another
 2    clip and refresh Mr. -- Mr. Larson's memory?
 3              THE COURT:  Yes.
 4              DEFENDANT DIDANI:  Thank you.
 5              Mr. Fink, please.
 6              THE COURT:  I can't tell.  Are you raising your hand
 7    for a break?
 8              A JUROR:  Yes.
 9              THE COURT:  You may.  Please rise for the jury and the
10    jury may step down and take a break.
11              (The jury left the courtroom at 11:48 a.m.)
12              THE COURT:  Mr. Larson, you may step down during the
13    break but please don't discuss your testimony with anyone
14    except your lawyer.
15              And we'll take ten minutes.
16              MR. FINK:  Thank you, your Honor.
17              THE COURT:  You're welcome.
18              (At 11:49 a.m., a brief recess was taken.)
19                              —   —   —
20              (Back on the record at 12:12 p.m.)
21              LAW CLERK:  All rise.  Court is back in session.
22              All rise.
23              (The jury entered the courtroom at 12:12 p.m.)
24              THE COURT:  Okay.  You may all be seated.
25              Are you satisfied that the jurors have returned and
```

1    are in their proper seats?

2            MR. McDONALD:  Yes, your Honor we are.

3            THE COURT:  What about you, Mr. Didani?

4            DEFENDANT DIDANI:  Yes, your Honor.

5            THE COURT:  All right.  Mr. Larson, you're still under

6    oath.

7            You may continue.

8    BY DEFENDANT DIDANI:

9    Q.  Mr. Larson, we left it to the 80 years old.  Does that

10   refresh your memory on the video?

11           DEFENDANT DIDANI:  Mr. Fink, please.

12           (Video played.)

13   BY DEFENDANT DIDANI:

14   Q.  Do you remember that, Mr. Larson?

15   A.  Now I do.

16   Q.  Remember the agent who told you that?

17   A.  Yes.

18   Q.  Fill me in what you talked about in that moment or after

19   you went home?  They let you go home that day?

20   A.  Yes.

21   Q.  What you thought about that?

22   A.  I was being evasive so I didn't know what they had, what

23   information they had.

24   Q.  You know about the coming home at 80 years old; right?  You

25   went home, sleeping, any thought about that or no?

```
1   A.   I don't remember my thoughts that day, but I was -- already
2   had one major felony.  If I had another one, they could throw
3   the book at me, yes.
4   Q.   And then you come -- decided two days later or about a week
5   later, September 12th, did you visit USA Attorney?
6   A.   Yes.
7   Q.   Who did you visit?
8   A.   They wanted me to ask -- they wanted to ask me more
9   questions.
10  Q.   No.  But what US Attorney, do you remember?
11  A.   Which ones?
12  Q.   Yes, prosecutor.
13  A.   The one sitting at the table.
14  Q.   In the middle or Mr. -- Mark Bilkovic?
15  A.   Mark Bilkovic.
16  Q.   On that day, September 12th, you signed a proffer
17  agreement?
18  A.   What does that mean?
19  Q.   A proffer agreement.
20  A.   What's that?
21  Q.   You entered an agreement with the Government; right?
22  A.   I had -- my lawyer had a -- I think they call it a Kastigar
23  letter where anything I say can't be used against me in that
24  meeting.
25           DEFENDANT DIDANI:  Your Honor, I want to approach
```

 1    Mr. -- proffer agreement.  Your Honor, may I?

 2              Mr. Fink.

 3              THE COURT:  Yes.

 4              DEFENDANT DIDANI:  And I'll put in it an exhibit,

 5    Defendant Exhibit M.

 6              MR. FINK:  May I, your Honor?

 7              THE COURT:  Yes, you may approach.

 8              Are you agreeing to the admission of this exhibit on

 9    behalf of the Government?

10              MR. McDONALD:  I don't have an objection to the

11    admission of it.

12              THE COURT:  I'm sorry.

13              MR. McDONALD:  I don't have an objection to the

14    admission of the exhibit, your Honor.

15              THE COURT:  Okay.  It's admitted.

16              (Defendant's Exhibit M received into evidence.)

17              THE COURT:  Are you going to ask him any questions

18    about this?

19              DEFENDANT DIDANI:  Yes, your Honor.  I'm just giving

20    him time to see if he sees those.

21              THE WITNESS:  Yeah, I didn't sign anything on this,

22    no, but they told me that whatever I say can't be used as

23    evidence.  They just wanted to see if I was going to be

24    truthful.

25

1     BY DEFENDANT DIDANI:

2     Q.   You took a lie detector that day?

3     A.   No.

4     Q.   And it seems like -- is that a business-class ticket?

5     A.   Is it what?

6     Q.   Business-class ticket?  No?

7     A.   No.

8     Q.   Mr. Larson, so from 30 years that you was threatened in

9     September 12th, all this time you signed an agreement with the

10    Government and you're going to say the truth -- this time

11    you're going to say the truth?

12    A.   I didn't sign anything.

13    Q.   That's not an agreement between you and the Government?

14    A.   No, I didn't sign this.

15    Q.   Who is that, your lawyer?

16    A.   No.

17    Q.   No?

18    A.   This is signed by --

19    Q.   Don't you see the name on the top?

20    A.   Yeah.  It's addressed to me.  It has my name on it.

21    Q.   You never signed it?

22    A.   I didn't sign anything, no.

23    Q.   You never signed anything with the Government?

24    A.   Not that I remember.  This is not signed.

25            DEFENDANT DIDANI:  May I approach, your Honor?

```
 1              THE COURT:  No.  Do you mean a sidebar?
 2              THE WITNESS:  Oh, wait.  Hold on.  You gave me -- all
 3    right.  I see it now.
 4    BY DEFENDANT DIDANI:
 5    Q.   You see it now?
 6    A.   They're in the back.
 7    Q.   They're in the back.
 8    A.   I only thought there was two pages.
 9              THE COURT:  Okay.  And you see a signature there now?
10              THE WITNESS:  My signature is on it.  I didn't take a
11    polygraph.
12    BY DEFENDANT DIDANI:
13    Q.   But did you sign it?
14    A.   Yeah, I signed it.
15              THE COURT:  Is that your signature?
16              THE WITNESS:  September 12th.
17    BY DEFENDANT DIDANI:
18    Q.   So to be fair now, you entered into an agreement with the
19    Government on that day?
20    A.   I just said that I'd be truthful.  I didn't sign any type
21    of agreement saying that I would testify against you.
22    Q.   Did your attorney explain to you what was that?  Did you go
23    there with an attorney?
24    A.   I went there with an attorney.
25    Q.   The first time?
```

1    A.   Yes.

2    Q.   You sure?

3    A.   I believe so.

4    Q.   Who was your attorney representing you at that time?

5    A.   Mr. Churikian, the same one.

6    Q.   In the back?

7    A.   Yes.

8    Q.   He never explained to you --

9    A.   They all --

10   Q.   -- the proffer agreement?

11   A.   They all explained what it was, but it wasn't on any kind

12   of agreement that I wouldn't be charged with anything.  They

13   were just saying that I -- that I would be truthful and exactly

14   what happened.  So I was more truthful on this day than I was

15   the first day I was arrested.

16   Q.   So the first day on those videos you was not truthful

17   there?

18   A.   I was evasive.

19   Q.   And then when they -- once the Government told you you'd

20   come home 30 years old, right -- 80 years old, now you decide

21   to be truthful?

22   A.   They wanted to do meet with me, and I wasn't under any

23   threat of -- I mean, I could have said, you know, I plead the

24   Fifth, I don't want to talk to you guys, and they would have

25   charged me exactly what they charged you with.  This is just --

1    this is just information that I was giving and it could not be

2    used against me.  That's why I signed it.

3    Q.  Well, that's an agreement.  Any information cannot be used

4    against you.  Don't you think that's an agreement with the

5    government, a proffer?

6    A.  It's not an agreement that I would be tried even after I

7    gave them this information.

8    Q.  But that was --

9    A.  And they still could have tried me but without using this

10   information.

11   Q.  I want to go back to -- did you remember on Sterling

12   Heights video, do you remember that Agent Newsome mentioned to

13   you because you spend all these checks, you cashed them, you

14   owe the IRS $270,000?

15   A.  I didn't know that.  Because I cashed the checks I was

16   responsible for --

17   Q.  270,000.  It's on your video.  Do you remember that?

18   A.  No, I don't.

19              DEFENDANT DIDANI:  Your Honor, can you --

20              THE COURT:  What do you want to do, sir?

21              DEFENDANT DIDANI:  I want to go to a video, your

22   Honor, that -- to refresh his memory, the $270,000 -- that

23   Agent Newsome mentioned that he owes $270,000.

24              THE COURT:  Okay.  Is this the same video that we're

25   dealing with?

1            DEFENDANT DIDANI:  Yes, your Honor.

2            MR. FINK:  Same interview, Judge, different video

3  clip.

4            DEFENDANT DIDANI:  Your Honor, one second, please.

5            (Video played.)

6  BY DEFENDANT DIDANI:

7  Q.   You still owe that money?

8  A.   I never received anything from the IRS back then about any

9  back taxes.

10 Q.   But now you refresh your memory?

11 A.   He said it, yeah.

12 Q.   You never?

13 A.   No.

14 Q.   And the Government just wiped out the 270?

15 A.   I Never received anything from them that I owed them that.

16 Q.   You don't think you and the Government made an agreement to

17 wipe out the bill?

18 A.   No, we did not.

19 Q.   So you still owe the 270?

20 A.   Not that I know of.  They never came at me with anything

21 like that.

22 Q.   So where the money go then?  If you --

23 A.   They could have been lying.  I don't know.

24 Q.   They could have been lying?

25 A.   They could have been trying to scare me.  I don't know.  I

 1  never received anything like that.

 2  Q.   You know, Uncle Sam won't let you own a dollar, you know

 3  that, right?

 4  A.   They want to --

 5           THE COURT:  Go to a new question, please.

 6  BY DEFENDANT DIDANI:

 7  Q.   So you're sure you haven't gotten in a conversation with

 8  the Government about wiping that bill out?

 9           MR. McDONALD:  Judge, objection.  He's asked this

10  question 400 times.

11           THE COURT:  No, he has not asked it 400 times.

12           MR. McDONALD:  Maybe not.

13           THE COURT:  But it has been asked more than one time,

14  and that's enough.  You may go to a new question.  And don't

15  keep asking the same questions over.

16           DEFENDANT DIDANI:  Maybe Mr. Larson doesn't understand

17  my English, your Honor.

18  A.   I got it.  I'm picking it up.  I'm picking it up.

19           THE COURT:  The jury may step down, please.

20           (The jury left the courtroom at 12:25 p.m.)

21           THE COURT:  You may all be seated.

22           Mr. Didani, Mr. McDonald did exaggerate by saying you

23  asked it 400 times, okay, but you have continually all day

24  asked the same questions over and over again, okay, as if you

25  expect to get a different answer.

1          The objection to that is that it's been asked and

2    answered, which I've sustained a few times.  But I do not

3    expect you to continue to do that and continue to tie up our

4    time in that way.  All right.

5          I also do not think this trial is a joke of any kind.

6    All right.  And so the comments that you make about the

7    testimony are also inappropriate.  And if you were an attorney

8    I'm sure the Government would be jumping up and down saying you

9    can't comment on the testimony.  So don't comment on the

10   testimony.  Okay.

11         DEFENDANT DIDANI:  All right, your Honor.

12         THE COURT:  It's enough.  I'm going to have to

13   instruct the jury more than I would usually that the comments

14   that people make about the testimony while they're taking the

15   testimony is not evidence.  Okay.  And I'm going to tell them

16   that when they come out because you've been doing it a lot.

17   It's taking up too much of the time for you to comment on every

18   answer the witnesses give.

19         Now I know that's my exaggeration too because you

20   haven't commented on every single one, but you are commenting

21   on it a lot, and I don't want the jury to be confused that your

22   comments on the other testimony or your little quips are

23   evidence in this case.  So I'd ask you to stop doing that.  All

24   right.

25         You may bring out the jury.

```
 1              LAW CLERK:  All rise for the jury.
 2              (The jury entered the courtroom at 12:29 p.m.)
 3              THE COURT:  I'm satisfied the jury is present.  You
 4      may all be seated.
 5              Are you satisfied on behalf of the Government?
 6              MR. McDONALD:  I am, your Honor.  Thank you.
 7              THE COURT:  What about you, Mr. Didani?
 8              DEFENDANT DIDANI:  I am, your Honor.
 9              THE COURT:  Okay.  I'm going to remind the jury that
10      earlier I told you that certain kind of things were evidence
11      and certain weren't.  So the testimony, the answers that the
12      witness gives, are the evidence in the case.  The questions of
13      the lawyers are not evidence.  And the comments of the lawyers,
14      either the Government's, but also Mr. Didani's comments on the
15      testimony are not evidence.  As he's representing himself and
16      so he's treated as if he were a lawyer representing himself and
17      held to the same standard.  So his comments on the testimony as
18      it is received is not evidence, okay, and you should not
19      consider it as such.
20              You're still under oath, Mr. Larson.
21              And you may proceed, Mr. Didani.
22      BY DEFENDANT DIDANI:
23      Q.  Mr. Larson, we left it to -- we left it to the day you went
24      back and you signed the proffer.  And now we agree that you
25      understand what's a proffer, right?
```

1   A.   Yes.

2   Q.   On that day you did -- on 9/11/2019, you met with -- when

3   you made the proffer, you had an attorney there?

4   A.   Yeah.  This is on the 12th.

5   Q.   On the 12th.  I'm sorry.  Did you have a -- you had your

6   attorney there, too?

7   A.   Yeah.  He's sitting back there.

8   Q.   And can you fill me up, what happened on that day with you

9   and a USA and the agents?

10  A.   They asked me questions pertaining to the case, and I

11  answered them the best I could.

12  Q.   All right.  And what did you say about the $450,000 in that

13  time?

14  A.   I said the same thing I said in court.

15  Q.   And what was that?

16  A.   That Marty directed me to fly the money down to Washington,

17  D.C. and give it to you.

18  Q.   But you don't know what the money was for; right?

19  A.   I'm only going by what you told me.

20  Q.   I told you?

21  A.   Yes.

22  Q.   How I told you by phone, or by message, or by what?

23  A.   I don't remember what mode of communication it was.

24  Q.   But I told you that I needed that money for drugs?

25  A.   You told me that the guy wouldn't come up to Michigan to

1    collect the money and -- yes.

2    Q.   Mr. Larson, I told you that I need that money for drugs, to

3    buy drugs?

4    A.   Yes.

5    Q.   But you didn't say that on the interview, did you?

6    A.   I believe I did.

7    Q.   We just played it a few times, the video.

8            MR. McDONALD:  Judge, excuse me.  That misrepresents

9    the evidence.  Mr. Didani is asking him about a meeting that

10   occurred on September 12th.  The video that Mr. Didani is

11   showing occurred on September 11th.

12           THE COURT:  Yeah, and you need to make that clear, and

13   we have been over this, and I'm ready to go to a new area.

14   BY DEFENDANT DIDANI:

15   Q.   Okay.  So you did not mention anything -- you did not say

16   anything on Sterling Heights police when you was questioned by

17   agents?

18   A.   Right.

19   Q.   You didn't say nothing what the money was for, right?

20           MR. McDONALD:  Your Honor, we've been over this.

21   Asked and answered.

22           THE COURT:  We have been over it.

23           DEFENDANT DIDANI:  But I'm being --

24           THE COURT:  Excuse me.  Go to another area, please.

25

```
 1    BY DEFENDANT DIDANI:
 2    Q.   What did you say -- then you testified in Grand Jury?
 3    A.   I testified at the Grand Jury, yes.
 4    Q.   What did you told the Grand Jury?
 5    A.   Many things.  What -- do you want to be specific?
 6    Q.   You told them about the hundred thousand?
 7    A.   From Pete?
 8    Q.   Yes.
 9    A.   Okay.
10    Q.   What did you tell to the Grand Jury about the hundred
11    thousand?
12    A.   That I picked it up from Pete and gave it to you.
13    Q.   For what?
14    A.   You told me it was for drugs.
15    Q.   I told you?
16    A.   Yes.
17    Q.   Today you just testified in front of the jury you didn't
18    know what the money was for?
19    A.   I couldn't be a hundred percent for sure.  You could be
20    conning me.  I don't know.  But that's what you said.
21    Q.   I said to you literally that I need this money for drugs?
22    A.   Everything you did was a one-track mind for furthering your
23    own ambitions, and you didn't care about any of your friends
24    and what they were going to do.
25    Q.   All right.  So that's your -- but not that I told you;
```

1    right?  That's your opinion?

2    A.   No.  You told me, but like I said you could have been

3    conning us all.  I don't know.  That's what you told me.

4    Q.   Well, Mr. Larson, I asked you earlier about the hundred

5    thousand dollars and you said you didn't know nothing.  And now

6    you saying that --

7    A.   No, I didn't say I didn't --

8             MR. McDONALD:  Judge, objection, asked and answered.

9             THE COURT:  Asked and answered.  Go to a new question.

10   BY DEFENDANT DIDANI:

11   Q.   Remember a few weeks ago you speak to -- you spoke to my

12   private investigator?

13   A.   Yes.

14   Q.   Do you know his name?

15   A.   No.

16   Q.   Did he come to your gym?

17   A.   No.

18   Q.   Did you call him?

19   A.   He called me on the phone.

20   Q.   He called you or you called him?

21   A.   I called him and then I called him back -- or he called me

22   and then I called him back.

23   Q.   Did you indicate that you was taking the Fifth --

24   A.   Yes.

25   Q.   -- in the gym?

1            Did you remember what you said to Mr. Brian Minter, to

2    the investigator?  Brian Minter?

3    A.   I received a phone call.

4    Q.   Did you talk to him?

5    A.   Yes.

6    Q.   Do you remember what you guys talk about it?

7    A.   He asked about the $450,000.

8    Q.   What did you told him?

9    A.   I told him I was going to take the Fifth.

10           DEFENDANT DIDANI:  Your Honor, at this time this

11   defendant would like to refresh his memory, and play the -- a

12   video, a recording between Mr. Larson under Rule of Evidence

13   613(b).

14           MR. McDONALD:  Judge, may we approach?

15           THE COURT:  You may.

16           (At 12:36 p.m., sidebar on the record, out of the

17           hearing of the jury, as follows:)

18           MR. McDONALD:  We've never heard of a recording.

19   We've never been provided a recording.  I have no idea where

20   it's from.  I have no idea of the authenticity of it.  I at

21   least should be allowed to hear it before he plays it.

22           MR. BILKOVIC:  And his attorney, I just checked, had

23   no knowledge of this also.  Mr. Larson's attorney has no

24   knowledge of this.

25           THE COURT:  Mister who?

1           MR. BILKOVIC:  Mr. Larson's attorney has no knowledge

2      of this either.  I just asked him.

3           DEFENDANT DIDANI:  You know, I don't have to reveal

4      that, but, yes, it's a conversation between Brian Minter, our

5      private investigator, which Mr. Larson called him.  And there

6      is another --

7           THE COURT:  Mr. Larson has testified he returned the

8      call of this gentleman, not that he initiated.  So don't make

9      it sound like he initiated it.

10          DEFENDANT DIDANI:  But Mr. Larson is not -- he didn't

11     say that he was --

12          THE COURT:  Well, what's your problem with playing it

13     for given the repetition relative to the video?  What's your

14     problem with playing it for the Government so they can hear it?

15          MR. FINK:  Do you want my advice?

16          DEFENDANT DIDANI:  Yes.  As long as they don't tell

17     the witness.

18          THE COURT:  Well, fine.

19          MR. BILKOVIC:  Judge, wait a second.  I don't think

20     that we're prohibited from doing it.  I don't mean to be short

21     with the Court, but if he's going to use it we're entitled to

22     have it.

23          THE COURT:  Well, he's going to play it for you.  Is

24     that sufficient for now?

25          MR. BILKOVIC:  Yeah, yeah, that's fine.

```
 1              THE COURT:  Okay.  Then that's what we're going to do.
 2              MR. BILKOVIC:  Okay.
 3          (End of sidebar.)
 4              THE COURT:  The jury may step down, please.
 5          (The jury left the courtroom at 12:39 p.m.)
 6              THE COURT:  Mr. Larson, you may step down as well, and
 7    you and your attorney may wait out in the hall for now, if you
 8    would, please.
 9              (End of excerpt at 12:39 p.m.)
10                              _  _  _
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1
 2
 3                      CERTIFICATE OF COURT REPORTER
 4
 5          I, Sheila D. Rice, Official Court Reporter of the
 6   United States District Court, Eastern District of Michigan,
 7   appointed pursuant to the provisions of Title 28, United States
 8   Code, Section 753, do hereby certify that the foregoing pages
 9   is a correct transcript from the record of proceedings in the
10   above-entitled matter.
11
12
13                              s/Sheila D. Rice
                                Sheila D. Rice, CSR-4163, RPR, RMR, FCRR
14                              Federal Official Court Reporter
                                United States District Court
15                              Eastern District of Michigan
16
     Date:  04/11/2025
17   Detroit, Michigan.
18
19
20
21
22
23
24
25
```