1
2
       **UNITED STATES DISTRICT COURT**
       **EASTERN DISTRICT OF MICHIGAN**
       **SOUTHERN DIVISION**

3
       —  —  —

UNITED STATES OF AMERICA,

4

       Plaintiff,

5

  v.              Case No. 21-20264

6
YLLI DIDANI,

7

       Defendant.

8
_____/

9
       **JURY TRIAL - VOLUME 16 - EXCERPT**
       **Continued Testimony of Donald Larson**
10
       **BEFORE THE HONORABLE DENISE PAGE HOOD**
       **UNITED STATES DISTRICT JUDGE**

11

12
       Theodore Levin United States Courthouse
       231 West Lafayette Boulevard
13
       Detroit, Michigan
       Thursday, March 13, 2025

14

15
**APPEARANCES:**

16
**For the Plaintiff:**    Mark Bilkovic
                   Timothy McDonald
17
                   UNITED STATES ATTORNEY'S OFFICE
                   211 W. Fort Street, Suite 2001
18
                   Detroit, Michigan 48226
                   (313) 226-9623
19

20
**For the Defendant:**    Wade Fink
                   WADE FINK LAW, P.C.
                   550 W. Merrill Street, Suite 100
21
                   Birmingham, Michigan 48009
                   (248) 712-1054

22

23
**Also present:**       Special Agent Chad Hermans
                   Maria DiCarlo, Paralegal

24

25
*   To obtain a copy of this official transcript, contact:*
*      Sheila D. Rice  Official Court Reporter*
*   (313) 234-2610 • sheila_rice@mied.uscourts.gov*

1                            **TABLE OF CONTENTS**

2    MATTER_____PAGE

3    **JURY TRIAL - VOLUME 13 - EXCERPT**

4    Government's Case in Chief (Continued)

5    **DONALD LARSON**

6    Cross-Examination (Continued) by Mr. Fink...........   3

7    Certificate of Court Reporter......................   56

8

9

10

11

12

13

14                    E X H I B I T   I N D E X

15
     Exhibit No.        Description          Identified    Admitted
16
     Defendant's L      Picture                 30            30
17   Defendant's M      Proffer Letter          41            42
     Defendant's R      Picture                 31            32
18   Defendant's S      Letter dated 9/17/2019  51            50
     Defendant's T      Letter dated 9/5/2019   51            53
19   Defendant's U      Dismissal Order         53            53

20

21

22

23

24

25

```
 1   Detroit, Michigan
 2   Thursday, March 13, 2025
 3   2:43 p.m.
 4                                    —    —   —
 5          (Beginning of excerpt.)
 6          THE COURT:  And, Mr. Larson, you're still under oath,
 7   but I'd ask you to state your name again for the record.
 8          THE WITNESS:  Donald Larson.
 9          THE COURT:  Okay.
10          MR. FINK:  Thank you, Judge.
11          Nice to meet you guys.
12                     CROSS-EXAMINATION (Continued)
13   BY MR. FINK:
14   Q.  Mr. Larson, my name is Wade Fink.  I might -- I'm going to
15   try very hard not to retread over some of the questions, but I
16   might need to reorient it with some of the questions you've
17   already been asked.  So forgive me if I need to do that.
18          Mr. Larson, you were asked some of this but to be
19   clear, you've been convicted previously of a drug crime,
20   correct?
21   A.  Yes.
22   Q.  That was in 1992; right?
23   A.  Yes.
24   Q.  And it was possession with intent to deliver over 650 grams
25   of cocaine; is that correct?
```

```
 1   A.   Yes.
 2   Q.   And one of the things I was a little unclear about is you
 3   said you got life.  Do you remember that?
 4   A.   Yes.
 5   Q.   Okay.  And you got out and paroled after a certain period
 6   of time; right?
 7   A.   Yes.
 8   Q.   Okay.  You remember when you were arrested on September
 9   10th of 2019, you explained to the agents that you were
10   interviewed, you saw some of those clips, you explained to them
11   that you got busted by the feds and because you couldn't help
12   them you ended up facing life in prison; right?
13   A.   Yes.
14   Q.   So they shipped you off to the state; right?
15   A.   Yes, sir.
16   Q.   Threw you to the wolves; right?
17   A.   Yes, sir.
18   Q.   That's what you said; right?
19   A.   Yeah, pretty much.
20   Q.   And I've got to imagine that experience left you bitter
21   towards the federal government; is that accurate?
22   A.   I was bitter at everything, but I got over it.
23   Q.   This time you had something to offer the federal
24   government; correct?
25   A.   Yes.
```

1    Q.   Were you aware of how long the federal government had been

2    investigating you with regard to this alleged activity?

3    A.   I did not.

4    Q.   Mr. Didani asked you a few questions about this, but to be

5    clear, you weren't aware that you were -- that Lisa Schmidt was

6    being followed, were you?

7    A.   No.

8    Q.   Who is Lisa Schmidt?

9    A.   She was a girl I dated -- a woman.

10   Q.   You're aware that there's dozens of pages of reports about

11   the various dates you would go on?

12   A.   I was not.

13   Q.   Did they tell you they were following your girlfriends?

14   A.   No.

15   Q.   Did they tell you they were following you to restaurants

16   with them?

17   A.   No.

18   Q.   Didn't tell you they weren't finding anything, they didn't

19   tell you at all; right?

20   A.   Right.

21   Q.   Some of their reports did they tell you -- I think

22   Mr. Didani asked you, you wear wearing a Tigers hat.  Did they

23   ever tell you they were watching what your clothing was?

24   A.   The only time I wore a Tigers hat was when I went to a

25   Tigers game.

1    Q.   Did they win?

2    A.   When I went to the Tigers game, that's the only time I --

3    Q.   Did they win that game?

4    A.   I don't -- probably not.  Back then I don't think so.

5    Q.   You -- they tell you they wrote reports about your parking

6    habits, whether you backed into a spot or pulled in frontwards?

7    A.   Not at all.

8    Q.   When you were pulled over, are you aware if the agents or

9    police that pulled you over found any contraband in your car?

10   A.   They didn't, no.

11   Q.   You didn't have any --

12   A.   No, I don't think they did no.  I didn't have anything.

13   Q.   You didn't have any narcotics in your car?

14   A.   No.  I was going to work.

15   Q.   Did you have any drug ledgers about your investments in

16   narcotics?

17   A.   No.

18   Q.   And after that interview that you had discussed, do you

19   recall that one of the agents that was present that you were

20   being released with the concurrence of United States Attorney

21   Mark Bilkovic, do you remember that?

22   A.   I was being released --

23   Q.   With the concurrence or the agreement of Mark Bilkovic, the

24   U.S. Attorney, the prosecutor.  Do you remember that?

25   A.   I'm not sure what -- where you're getting.

1   Q.   If you don't remember you don't remember.  Do you remember
2   being told generally that the reason you were being released is
3   because the prosecutors were okay with it?
4   A.   Yes.
5   Q.   Now during that first interview you recall Detective
6   Brandon Leach was present; right?
7   A.   Yes.
8   Q.   Detective -- well, it's Agent Derek Newsome, he was the one
9   in the middle.  Do you remember that?
10  A.   Yes.
11  Q.   And another agent, Agent Tsouroullis, he was sitting on the
12  left from your advantage point?
13  A.   If that was his name, I don't recall.
14  Q.   There was three of them.
15  A.   The white-haired guy?
16  Q.   Yes.
17  A.   Okay.  Yeah.
18  Q.   Well, Detective Leach, he was the one on the right.  Do you
19  remember the one on the right wearing a hat?
20  A.   Yes.
21  Q.   Do you remember he was the one who began the interview?
22  He's the one who started talking to you first.  Do you remember
23  that?
24  A.   Vaguely, yeah -- yes.
25  Q.   When the official interview began; right?

1    A.    Yes.

2    Q.    And do you recall that he talked for a few minutes before

3    you were asked any questions?

4    A.    No, I don't recall.

5    Q.    Let me see if this refreshes your recollection.  Do you

6    remember the first part of the interview explaining to you that

7    they wanted the people above you?  Do you remember that?

8    A.    Yes.

9    Q.    Do you remember him saying that you already got a second

10   chance rebuilding your life, you don't want to ruin that?

11   A.    Right, yes.

12   Q.    This was before you were asked a single question; right?

13   A.    Right.

14   Q.    You don't want to go back to prison until you're 80, you

15   remember that?

16   A.    After I saw the video, yes.

17   Q.    Now you remember that?

18   A.    Yes.

19   Q.    Do you remember the 270 K in back taxes?

20   A.    I don't remember that at all.

21   Q.    Before you answered a single question there was pressure

22   being applied to you to give them information; right?

23   A.    Yes.

24   Q.    That's how you perceived it, is it not?

25   A.    Of course, yes.

```
 1   Q.   The first thing you said when asked to waive certain rights
 2   and discuss them, do you remember this, you said I'm not going
 3   to sign anything.  You want to bullshit, we'll bullshit.  Do
 4   you remember saying that?
 5   A.   No, but it's probably something I would say.
 6   Q.   It sounds like you?
 7   A.   Yeah.
 8   Q.   All right.  That general response though, you recall saying
 9   you'd have a conversation, something of that nature?  Maybe not
10   those exact words.
11   A.   Yes, yes.
12   Q.   Do you recall early in the interview when you were asked
13   about your relationship with Mr. Tibbitts and Mr. Didani that
14   you said, quote, I didn't want to know anything, end quote.  Do
15   you remember that?
16   A.   Yes.
17   Q.   That was true; right?  You didn't want to know anything
18   about what they --
19   A.   I really didn't.  I was trying to be straight after I got
20   out of prison.  I was working hard.  I didn't want anything to
21   do with drugs.
22   Q.   In fact, you were asked about the alleged debt that
23   Mr. Didani owed.  Do you remember that thing about owing some
24   Mexicans?  Do you remember that discussion?
25   A.   Yes.
```

```
 1   Q.   In fairness, and this is not to place blame on you, but is
 2   it true the first thing you said you didn't want to know why he
 3   needed that money?  That's what you told agents the first time;
 4   right?
 5   A.   When I was being evasive, yes.
 6   Q.   Evasive or not, that's the first thing you told them;
 7   right?
 8   A.   Yes.
 9   Q.   I don't know why he needed that money.  He needed to know
10   someone with wealth, and I put him together with Mr. Tibbitts.
11   Is that accurate?  I'm paraphrasing.
12   A.   Probably, yeah.
13   Q.   Not probably.  Did you give them -- generally speaking, was
14   the answer to the question about what the connection between
15   Mr. Tibbitts, you, and Mr. Didani was, the initial answer was
16   Mr. Didani needed money and you put him together with
17   Mr. Tibbitts.  Is that generally accurate?
18   A.   Yes.
19   Q.   Okay.  But you didn't know why is what you said in the
20   first interview.
21   A.   It's what I said.
22   Q.   And you expressed some frustration in that interview,
23   correct, that you're helping out your friends and you're not
24   getting anything in return; right?
25   A.   Yes.
```

1    Q.  I think you said something along the lines of, "Dude, I got
2    no money, help me with something, a car payment"; right?
3    A.  Yes.
4    Q.  And you told agents in that first interview that your
5    instruction to Mr. Didani was not to tell me shit, he always
6    tried to tell me shit and I didn't want to know shit.  Do you
7    remember that?
8    A.  Yes.
9    Q.  And a lot of what Mr. Tibbitts and Mr. Didani were doing,
10   is it true, you actually found out from Belinda Tibbitts;
11   right?
12   A.  About the money, yes.
13   Q.  About everything that Mr. Tibbitts and Mr. Didani's
14   relationship you told agents you had found out from
15   Belinda Tibbitts; right?
16   A.  I knew some of it because we all got together.
17   Q.  Sure.
18   A.  Some of it from -- about the money, how much Marty sent
19   overseas and all that, that's when I found out from Belinda.
20   Q.  Originally when you were asked to cash checks for
21   Mr. Tibbitts, you told the agents that your only instruction
22   from Marty Tibbitts was just to give the money to Lou; right?
23   A.  Yes.
24   Q.  And you told agents you don't know what happened to the
25   money, right, in the first interview?

1    A.   Yes.

2    Q.   And you expressed some frustration to the agents that

3    Mr. Tibbitts wouldn't invest in you yet here he is sending

4    $500,000 to Albania; right?

5    A.   Yes.

6    Q.   And when you were pressed upon by Detective Leach, correct

7    me if I'm wrong, he said you're mitigating, Lou sent you -- Lou

8    being allegedly Mr. Didani -- sent photos of cocaine.  Do you

9    remember him pushing you on that?

10   A.   Vaguely, yes.

11   Q.   And you said all that about the money was before I got

12   these texts.  Do you remember that?

13   A.   No.

14   Q.   Do you remember receiving a check from Mr. Tibbitts for

15   Tealstone Properties?

16   A.   Yes.

17   Q.   That was the Government's Exhibit 13; right?  Of course,

18   you can look at it.

19          MR. BILKOVIC:  It's not 13 point anything or what?

20          THE COURT:  He has an exhibit book up here; is that

21   correct?

22          MR. McDONALD:  He has that exhibit book that I

23   prepared.  I don't believe that exhibit is in that book, but it

24   has been admitted.

25          THE COURT:  But 18 is admitted though; right?  Yeah.

 1    Okay.

 2            MR. FINK:  I should've asked you, Judge, but I just

 3    put 13 up.  Is that all right?

 4            THE COURT:  That's fine, yes.

 5    BY MR. FINK:

 6    Q.  Do you remember looking at this check, Mr. Larson?

 7    A.  What's the amount of --

 8    Q.  This is in the amount of $100,000, and in the memo line it

 9    says "gym investment" and in the "pay of the order to" line it

10    says "Tealstone Properties, LLC."  Do you see that?

11    A.  Yes.

12    Q.  Tealstone Properties, LLC, was that an entity associated

13    with you?

14    A.  Yes.

15    Q.  And it looks like that check is endorsed on the back by

16    yourself; correct?

17    A.  Yes.

18    Q.  On behalf of Tealstone Properties?

19    A.  Yes.

20    Q.  And with regard to that check, the Tealstone Properties

21    check, do you remember telling agents that that was initially

22    supposed to be an investment but because you couldn't get the

23    land you just gave the money back?  Do you remember that?

24            MR. McDONALD:  Judge, objection.  Can Mr. Fink

25    identify when Mr. Larson alledgedly said what he just said?

```
1              THE COURT:  Yes.  Can you do that?

2              MR. FINK:  Sure.

3   BY MR. FINK:

4   Q.   We've only been talking about the first interview so far;

5   right?

6   A.   Right.

7   Q.   So I'm still referring to the first interview, September

8   10th, 2019.  Okay?

9   A.   Yes.

10  Q.   All right.  Do you recall discussing that with agents in

11  that first interview, September 10th, 2019, that that money

12  from Government's Exhibit 13 was initially supposed to be at a

13  gym but because you couldn't get land you returned the money to

14  Mr. Tibbitts?  Do you remember telling the agents that?

15  A.   IT'S possible I did tell him that but I'm not for sure a

16  hundred percent.

17  Q.   Well, it was for a gym involvement, was it not, that

18  Tealstone Properties?

19  A.   That -- I started that LLC to build a gym in Frisco, Texas,

20  and I didn't want him to give me a check directly in the bank

21  that I had, and I believed that I was trying to hide it kind

22  of.  You know what I mean?

23  Q.   So what you told to the agents about not being able to get

24  land, you're saying that's not true?

25  A.   It wasn't enough money, yes.
```

```
 1   Q.   And the part about returning that money to Mr. Tibbitts,

 2   that wasn't true either?

 3   A.   I never gave him money back, no.

 4   Q.   You do recall telling agents that?

 5   A.   I don't.

 6   Q.   Do you want to watch it, would that help?

 7   A.   I just don't remember it.

 8        MR. FINK:  Judge, I'm a one-man band so if you'll give

 9   me one moment.

10        THE COURT:  Right, because that's the tape that you

11   need to be very careful about what you show.

12        MR. FINK:  I certainly will, and I have the numbers

13   written so it shouldn't be an issue just other than time.  Bear

14   with me.  I apologize.

15        Your Honor, what I propose to play is intended to

16   refresh recollection.  I suppose I could do it with just the

17   witness, but if the Government has no objection I would just

18   play it for his benefit.

19        THE COURT:  Do you have any objection?

20        MR. McDONALD:  I don't have any objection.

21        (Video played.)

22   BY MR. FINK:

23   Q.   Does that refresh your recollection, Mr. Larson, about that

24   Tealstone Properties check?  Do you remember?

25   A.   Kind of but I was being evasive, yes.
```

1    Q.  I understand that's your position.  I'm just asking about

2    what you said.  Do you remember it now?

3    A.  Yes.

4    Q.  Okay.  And what you said was I couldn't get land; right?

5    A.  Right.

6    Q.  For that gym?

7    A.  Right.

8    Q.  Now, you went through these various checks in the process

9    of cashing them with the Government on direct examination.  Do

10    you recall that, talking about each check?

11    A.  Yes.

12    Q.  Okay.  Went through -- you went through the whole process

13    with Mr. McDonald?

14    A.  Yes.

15    Q.  Do you remember that?

16    A.  Yes.

17    Q.  If you want me to put one of these on the screen I will.

18    I'm going to ask general questions.

19    A.  Yes.

20    Q.  But if you want me to put one on the screen, I will do

21    that.

22    A.  You don't need to do that.

23    Q.  Okay.  Mr. Larson, one of the checks was June of 2016.  I

24    think that was actually the first alleged check cashing.  Do

25    you remember that being June of 2016?

```
 1   A.   I don't remember dates.  How much --

 2   Q.   I remember you said that you're bad with dates.  Two

 3   $50,000 checks for you and two $50,000 checks for Mr. Tocco.

 4   Do you remember that?

 5   A.   Yes.

 6   Q.   And in that first interview, September 10th of 2019, you

 7   were asked about those checks.  Do you remember that?

 8   A.   Yes.

 9   Q.   And you told the agents that you took that cash to your

10   home to Didani, but from there you don't know what happened to

11   it.  Do you remember that?

12   A.   Yes.

13   Q.   And you didn't know what it was for, right, at that --

14   during that interview?

15   A.   Yes, that's true.

16   Q.   Thank you.

17             And then you were asked about a $110,000 check in

18   October of 2016.  Do you remember that amount?

19   A.   One hundred ten?

20   Q.   Maybe -- this is Government's 13 -- oh, that's the

21   Tealstone check.

22             So the Tealstone check, my apologies, the one that we

23   put up, Government's 13, was $100,000.  That was to the

24   Tealstone Properties.  Do you remember that?

25   A.   Yes.
```

1    Q.  And that's the one that you told agents that you returned

2    to Marty; correct?

3    A.  Yes.

4    Q.  And then in March of 2017, this was Government's Exhibit

5    10, again unless you need it, tell me, this was several $50,000

6    checks to you and another couple checks to Mr. Tocco for

7    $50,000.  These were the ones that were cashed at both

8    Comerica, Harper's and Rose Gold Exchange.  Do you remember

9    that set of checks?

10   A.  Yes.

11   Q.  Okay.  And do you remember saying as to those set of checks

12   in Government's 10 that you gave the money back to Marty, not

13   to Didani, and it might have been at Mr. Tibbitts' house.  Do

14   you remember that?

15   A.  Yes.

16   Q.  And then there was a $14,000 check that the Government

17   showed you was in their Exhibit 14 from December of 2017.  Do

18   you remember that $14,000 check?

19          MR. McDONALD:  Objection.  I did not show him a

20    $14,000 check.

21   BY MR. FINK:

22   Q.  Do you recall --

23          THE COURT:  I honestly don't recall, so rephrase it.

24          MR. FINK:  I sincerely apologize.  I'm Taking over

25    here.  I've got to get myself organized.

```
 1  BY MR. FINK:
 2  Q.  Do you recall that there was a check for $14,000 that was
 3  given -- that was shown to you during that interview?
 4  A.  Yes.
 5          MR. FINK:  Okay.  Do you have any objection to 14?
 6          MR. McDONALD:  I don't have any objection.
 7          MR. FINK:  You admitted it already?
 8          MR. McDONALD:  Yes.
 9          MR. FINK:  Pull up 14.
10          THE COURT:  Does it have an exhibit number?
11          MR. FINK:  This is Government's Exhibit 14, Judge.
12   It's already admitted.  Do you mind if I publish it?
13          THE COURT:  No.
14          MR. FINK:  I see what Mr. McDonald was saying, Judge.
15   He was saying that he admitted it through another witness, but
16   it is Government's 14.
17  BY MR. FINK:
18  Q.  Do you recognize this, Mr. Larson?
19  A.  Is that the $14,000?
20  Q.  It is.  If you can't see it, you can get up.  Can you see
21  it from where you're sitting?
22  A.  Yeah.  I mean, my vision is not that great.
23  Q.  Well --
24          THE COURT:  Well, can you see it or not?  If you can't
25   see it --
```

1    A.   Yeah.  From Marty Tibbitts, yeah, I see it.

2    BY MR. FINK:

3    Q.   You see that it says 14,000, right?

4    A.   Yes, from Marty.

5           MR. FINK:  Judge, can I stand over here for a moment?

6           THE COURT:  Yes.

7    BY MR. FINK:

8    Q.   And you see that it's made out from Martin and Belinda

9    Tibbitts; right?

10   A.   Yes.

11   Q.   And do you see the memo line or the for line in the corner?

12   A.   Yes.

13   Q.   It says, "gym investment"?

14   A.   Yes.

15   Q.   When being asked about this by agents, do you remember

16   telling the agents at that initial interview that you gave it

17   back to Marty, but you don't really remember it?  Do you

18   remember that?

19   A.   That's accurate.

20          MR. FINK:  You can take that down.

21   BY MR. FINK:

22   Q.   Now, this last batch of checks was December of 2017.  And I

23   have a feeling you remember that date, December of 2017; right?

24   That time period; right?

25   A.   Yes.

1   Q.   This is the flight to Washington.

2   A.   Right.

3   Q.   You met a shadowy figure at the airport; right?

4   A.   I met Lou at the airport.

5   Q.   At first it was a shadowy figure, was it not?

6   A.   Is that what I said in the first interview?

7   Q.   I'm asking you.  Did you?

8   A.   I could have.

9   Q.   Do you recall saying that?

10  A.   No.

11  Q.   Do you recall saying that it was dark, and the person just

12  told you to drop the bag on the ground?

13  A.   Probably right.

14  Q.   And when you were asked by agents about the trip to

15  Washington, D.C., do you recall telling them that you didn't

16  know what the money was for?

17  A.   Yes.

18  Q.   You told agents that you were told to fly to D.C., you

19  didn't ask any questions, and you went back; right?

20  A.   Right.

21  Q.   In fact, when you were asked who you met, you told agents

22  you went there to meet a guy.  Do you remember that?

23  A.   Yes.

24  Q.   Now previously with regard to the checks from June of 2016,

25  that was the first set of checks that me and you talked about.

1    Okay.

2    A.   Okay.

3    Q.   That was the two $50,000 checks to you and two $50,000

4    checks to Mr. Tocco the first time.  That's what I'm talking

5    about.

6    A.   Okay.  I got it.

7    Q.   Okay.  You told the agents that you took that cash to Lou;

8    right?

9    A.   Yes.

10   Q.   He took it; right?

11   A.   Yes.

12   Q.   And you didn't know what happened thereafter; correct?

13   A.   Yes.

14   Q.   So you identified Mr. Didani as taking that first batch of

15   cash; right?

16   A.   Right.

17   Q.   The same interview seven minutes later in your trip to

18   D.C., you didn't identify Didani as the person you took the

19   money to, just a guy; right?

20   A.   Right.

21   Q.   So you identified him in one instance but didn't identify

22   him in another; correct?

23   A.   Right.

24   Q.   But you're saying that's not true, that it was him in D.C.

25   you came to tell us later; right?

1    A.   Yes.

2    Q.   Now, the agents at some point -- you guys were -- would it

3    be fair to say you were collegial with each other; you were

4    getting along in the interview for a period of time?  Collegial

5    being you were friendly; you were speaking casually.  Is that

6    fair?

7    A.   The first interview?

8    Q.   In the first interview, September 10th of 2019.

9    A.   I was acting calm.

10   Q.   Well, the atmosphere was light, was it not?  I mean, you

11   were talking about your personal life; correct?

12   A.   Yes.

13   Q.   And they were talking about their personal lives; correct?

14   A.   I don't recollect but okay.

15   Q.   And at some point Detective Leach, after asking you these

16   questions and you giving these answers, turns to tone to

17   suggest to you that he doesn't believe you.  Do you remember

18   that?

19   A.   Yes.

20   Q.   And they started pressing you on where this money went.  Do

21   you remember?

22   A.   Not clearly but okay.

23   Q.   Generally speaking.

24   A.   Yes.

25   Q.   I mean, you remember the tone shifts in the conversation.

1    A.   Okay.  Yes.

2    Q.   And one of the things you told Agent -- Detective Leach in

3    response to these questions about, you know, suggesting we

4    don't believe you is that Mr. Tibbitts told you he was buying a

5    restaurant or a bar in Albania.  Do you remember telling him

6    that?

7    A.   Yes.

8    Q.   Do you remember what the bar or restaurant was called?

9    A.   No.

10   Q.   Does Tiku and Matu sound familiar?

11   A.   I don't speak Albanian, but...

12   Q.   Well, did you go to it when you were ever in Albania?

13   A.   No.

14   Q.   You also told the agents what you told the jury last time

15   about the pharaoh ruins.  Do you remember telling the agents

16   about that as well?

17   A.   Yes.

18   Q.   And in that context you explained to the agent, correct me

19   if I'm wrong, that Marty Tibbitts had really varied interests

20   in the world, did he not?

21   A.   Yes.

22   Q.   From pharaoh ruins to World War II airplanes; right?

23   A.   Yes.

24   Q.   He spent money on a lot of interesting things, did he not?

25   A.   Yes.

1    Q.   He had an eclectic interest in expensive things; right?

2    A.   Yes, he did.

3    Q.   And he liked to share information about those things or

4    talk about those interests, did he not, Mr. Tibbitts?

5    A.   Marty was very precise on what he wanted people to know.

6    Q.   Well, I ask that because you knew quite a bit about the

7    pharaoh ruins, did you not?

8    A.   Yeah, from our trip, yes.

9    Q.   And the purpose of it was to see if Marty could acquire it;

10   right?

11   A.   Right.

12   Q.   Do you know if the world of drug trafficking, narcotic

13   dealing, has changed since the 1990s when you were first

14   convicted of that crime?

15   A.   I mean, I didn't keep up with it because I didn't want

16   anything to do with it.

17   Q.   That's what I'm asking.

18   A.   Yeah, I don't --

19   Q.   In other words, your knowledge of that world may be from an

20   earlier time; correct?

21   A.   Yes.

22   Q.   Like, for example, you can't tell me the current prices for

23   a kilo, could you?

24   A.   Oh, no.

25   Q.   Okay.

```
 1              THE COURT:  I'm sorry.  I didn't hear the answer.
 2   A.   I said no.
 3   BY MR. FINK:
 4   Q.   You can't tell me the current prices for a kilo is what I
 5   asked; right?
 6   A.   Right.
 7   Q.   And you cannot?
 8   A.   No.
 9   Q.   You couldn't tell me what the purchase price is or what the
10   retail price is; right?
11   A.   I could not.
12   Q.   Now you, yourself, have raised money in your life
13   particularly with trying to build gyms; is that an accurate
14   statement?
15   A.   I -- yeah, yes.
16   Q.   For example, I believe it's true, is it not, that you
17   raised $80,000 from friends and family to open your gym?
18   A.   Yes.
19   Q.   So 50 from one and 10, 10 and 10 from three others;
20   correct?
21   A.   Correct, yes.  I thought it was 90, but that's pretty
22   close.
23   Q.   I could be imprecise.  But generally speaking what I said
24   is accurate, you raised money from friends and family for your
25   gym; right?
```

1   A.   Right.

2   Q.   And you've had people to go to for legitimate investment,

3   and that's one example of it; right?

4   A.   Yes.

5   Q.   You told the agents about that, that's the only reason I

6   know about it.  Do you remember telling the agents about that

7   investment in your gym?

8   A.   The initial?

9   Q.   Yeah.

10  A.   My first --

11  Q.   I'm sorry.  Yes, the September 10th, 2019.

12  A.   Yes.

13  Q.   So you start giving these explanations, Mr. Larson, and if

14  you recall, tell me is it true, is it not, Detective Leach

15  continued to increase the pressure on you to tell him things

16  that he thought you weren't telling him.  Do you remember that?

17  A.   Yes.

18  Q.   In fact, he took out a packet and put it on the table and

19  said I have all your Viber chats right here.  Do you remember

20  that or something similar to that?

21  A.   Yes.

22  Q.   He put his finger on it and pointed at certain things;

23  right?

24  A.   Yes.

25  Q.   It was a different tone then the first part of the

1    interview?

2    A.   Yes.

3    Q.   He started kind of blowing off the things you were telling

4    him about Egypt and knowing about your investments, and he

5    really wanted to cut to the chase.  Is that an accurate

6    representation?

7    A.   Yes.

8    Q.   Do you recall being told by Detective Leach in this context

9    that I'm describing, "You can talk to me about other players.

10   You can have your lawyer contact us.  Or there is going to be

11   something much heavier coming down the pipeline."  Do you

12   remember that?

13   A.   That's the end of the first interview?

14   Q.   Yeah, toward the end of the first interview.

15   A.   Yes.

16   Q.   How did that make you feel?

17   A.   Nervous.

18   Q.   Pressure; right?

19   A.   Right.

20   Q.   He had just smacked the photo of the Viber thread, right,

21   with his finger; right?

22   A.   I guess so.

23   Q.   And now he's telling you something much heavier is coming

24   down the pipeline; right?

25   A.   Right.

```
 1   Q.   Do you remember him asking if you had a normal attorney
 2   that you dealt with?
 3   A.   I do.
 4   Q.   Do you remember him telling you and steering you
 5   potentially away from certain attorneys?
 6   A.   I don't remember that.
 7   Q.   Do you remember him saying that, you know, some people will
 8   point you in a different direction than others.  Do you
 9   remember any of that conversation?
10   A.   No.  Sorry.
11   Q.   That's okay.  Do you remember him saying, "If they are
12   paying for it, it's usually for a reason."  Do you remember
13   that?
14         If they are paying for it, and "they" I can't define
15   for you any more than that.  Do you remember him saying, "If
16   they are paying for it, it usually is for a reason."  It being
17   a lawyer.  Do you remember them saying that?
18   A.   I don't.
19   Q.   What does that mean to you just hearing it?  If they are
20   paying for it, it's usually for a reason.  How does that strike
21   you?
22   A.   In a criminal proceeding?
23   Q.   In that context, if a detective in an interview says to you
24   if they're paying for it, it's usually for a reason, how do you
25   interpret that?
```

1   A.   Like you have something to hide maybe.

2   Q.   Like he's steering you toward a specific attorney or away

3   from certain attorneys; right?

4   A.   Well, I have attorneys.  I know attorneys.

5   Q.   Okay.  Now, you remember the picture of Lisa Schmidt;

6   right?

7   A.   Yes.

8   Q.   You were able to identify that picture?

9   A.   Yes.

10           MR. FINK:  Your Honor, proposed L from when Mr. Didani

11   was doing his cross-examination.

12           THE COURT:  L?

13           MR. FINK:  L as in Lawrence or Lauren.

14           I'd ask that this be admitted into evidence as

15   Defendant's L.

16           THE COURT:  Any objection?

17           MR. McDONALD:  No objection.

18           THE COURT:  Very well.  Defendant's L is admitted.

19           (Defendant's Exhibit L received into evidence.)

20   BY MR. FINK:

21   Q.   I'm going to show you, Mr. Larson, what I'm marking as

22   Defendant's R.

23           MR. FINK:  May I approach, Judge?

24           THE COURT:  You may.

25   A.   I know who it is.

 1  BY MR. FINK:

 2  Q.   Let me do it the right way, but I know you know.  Thank

 3  you.  Mr. --

 4  A.   Oh, I thought you were giving me a different picture.

 5  Q.   Mr. Larson, do you recognize that picture, of who's in that

 6  picture?

 7  A.   It's been a long time.

 8  Q.   Do you recognize him, though?

 9  A.   I recognize the face, but I don't remember which name it

10  was.

11  Q.   Okay.  Do you know what his profession is?  If you don't,

12  you don't.  It's okay.

13  A.   No, I don't.

14  Q.   Do you recall having a conversation with the agents in that

15  September 2019 interview about a lawyer named Jeff Freeman?

16  A.   Oh, yes.

17  Q.   Do you remember that conversation?

18  A.   Yes.

19  Q.   Now that I've told you that name, does that face now match

20  with that name?

21  A.   I needed -- I needed a name, yes.

22  Q.   Okay.  I know you're fuzzy with dates and names, but I want

23  to make sure that it's not just you.  It's your recollection

24  that you recognize that face now.

25  A.   Yes, I remember.

1    Q.   Okay.  That's Jeff Freeman?

2    A.   Yes.

3    Q.   And he's a Michigan attorney?

4    A.   Yes.

5         MR. FINK:  Judge, I'd like to admit that as

6    Defendant's R.

7         MR. McDONALD:  No objection.

8         THE COURT:  Any objection?

9         MR. McDONALD:  No objection.

10        THE COURT:  Very well.  R is admitted.

11        (Defendant's Exhibit R received into evidence.)

12   BY MR. FINK:

13   Q.   Do you remember being asked a bunch of questions in that

14   interview about Jeff Freeman, that first interview of

15   September 10th?

16   A.   I don't remember the question about him, no.

17   Q.   You don't remember them asking about book writing and taxes

18   and his background checks.  Do you remember that?

19   A.   Yeah, I remember all that.

20   Q.   So that topic came up?

21   A.   Yeah.

22   Q.   Michigan tax lawyer; right?

23   A.   Right.

24   Q.   Okay.  Did you ever meet Mr. Didani's parents?

25   A.   No.

1    Q.   Did he talk about them?

2    A.   Not really.

3    Q.   You know they live in Chicago?

4    A.   Yes.

5    Q.   You know they're elderly?

6    A.   Yes.

7    Q.   Do you remember the agents and detective in that interview

8    asking about his parents?

9    A.   I do not.

10   Q.   Do you remember them asking you if they were somehow

11   involved in this?

12   A.   I don't.

13   Q.   Do you know if there's an elderly woman with cancer?  Are

14   you aware of that?

15   A.   I knew she was sick.  He never really went into it.  He got

16   choked up when he talked about his mom.

17   Q.   Understood.  Do you remember being asked -- you discussed

18   this a little bit with Mr. Didani -- about the pills in your

19   car?

20   A.   Yes.

21   Q.   Those weren't narcotics, were they?

22   A.   Someone planted them in there.  Yes, they were.

23   Q.   They were narcotics?

24   A.   Yes -- well, they were like steroids, I think.

25   Q.   Oh, okay.  So you're saying that the bag you identified had

1    steroids in it?

2    A.   We might be talking about two different situations.

3    Q.   Well, I don't know if you're talking about a prior arrest.

4    Tell me what you mean by that.

5    A.   Oh, Steve Elliott that introduced me to Lou, he played a

6    con game on me and said he ran into a guy that he didn't know,

7    but he actually did know him from a long time ago.  So he said,

8    hey, I think I overheard this guy saying he planted something

9    in your car, and he was going to have you pulled over in

10   Grosse Pointe and they were going to find it.

11   Q.   All right.  So that has nothing to do with your

12   September 10th arrest?

13   A.   No.

14   Q.   Okay.  So I confused you.  My apologies.

15   A.   Yeah.  You had -- I didn't know what -- like, that's the

16   only thing I remember of something being in my car.

17   Q.   That was not my intention.  My apologies.  What I was

18   asking about is you had a few Cialis pills on you; correct?

19   A.   Oh, possibly.

20   Q.   And that was on the day of your arrest?

21   A.   Possibly.

22   Q.   And I don't mean that to embarrass you.

23   A.   No.

24   Q.   I mean to --

25   A.   No, not at all.

| | |
|---|---|
| 1 | THE COURT REPORTER:  One at a time. |
| 2 | MR. FINK:  That's my fault, Ms. Rice.  I'm sorry. |
| 3 | BY MR. FINK: |
| 4 | Q.  I don't mean that to embarrass you, Mr. Larson.  I'm asking |
| 5 | if they asked you about threes pills to identify them; correct? |
| 6 | A.  Yes. |
| 7 | Q.  The suggestion being that they didn't know if they were |
| 8 | legal or not; correct? |
| 9 | A.  Right. |
| 10 | Q.  You talked to the agents kind of about Mr. Didani's |
| 11 | lifestyle.  Do you remember that? |
| 12 | A.  Vaguely. |
| 13 | Q.  You said he liked to party; right? |
| 14 | A.  Yes. |
| 15 | Q.  I think you said -- one of the quotes, correct me if I'm |
| 16 | wrong, do you remember saying, "Lou was a kid."  Do you |
| 17 | remember saying that? |
| 18 | A.  No. |
| 19 | Q.  And you were talking about that in the context of him |
| 20 | liking to go out to clubs.  Do you recall that? |
| 21 | A.  Yes. |
| 22 | Q.  Does that sound familiar now? |
| 23 | A.  Yes. |
| 24 | Q.  Women, drinking, clubs, that kind of stuff; right? |
| 25 | A.  Yes. |

1  Q.   He liked to spend money doing that?

2  A.   Right.

3  Q.   In fact, Marty Tibbitts likes being involved in that

4  lifestyle too, correct?

5  A.   Not really.

6  Q.   You didn't tell agents that he wanted to be part of that?

7  That was attractive to him?

8  A.   Well, that's the only thing reason I can think that he got

9  involved with Lou is -- you know, like, rich people, they want

10  to like climb mountains when they have too much money in the

11  freezing cold and possibly die.  I want to drink a Piña Colada

12  on beach; I don't want to get stung by a manta ray.  You know

13  what I mean?

14        So he just had, like, you know, he wanted -- I guess

15  they wanted to do live on the edge.  I don't get it.

16  Q.   I understand.

17  A.   That's the way Marty was.  That's why he flew those planes.

18  Q.   That was the explanation behind the suggestion that

19  Mr. Tibbitts had an interest in that lifestyle, is that what

20  you're saying now?

21  A.   Well, yes, but he wasn't like -- I don't know.  He hid

22  things that he didn't want anyone to know about.  Like, you

23  know, say, for instance, Lou and him were in Albania, and after

24  Marty died Belinda told me about these escapades with other

25  women while she was in California.  And I told Lou, and he goes

1    there's no way, I don't believe that.  And I said Belinda sent

2    me the e-mails.  Because when Marty was in Albania Lou tried to

3    set him up with an Albanian -- a beautiful Albanian woman, and

4    Marty --

5    Q.   Let's not go down too far -- I think the point is taken by

6    the jury.

7    A.   Okay.

8    Q.   Let me ask you this.  Is it fair to say that Marty Tibbitts

9    compartmentalized parts of his life?

10   A.   Oh, yes.

11   Q.   From different people?

12   A.   Oh, yes.

13   Q.   All right.  So you have this first interview, September

14   10th of 2019, and that interview ends with agents telling you

15   you're free to go; right?

16   A.   Yes.

17   Q.   And the instruction for them was if you want to tell us

18   something and stay out of trouble you know how to contact us is

19   essentially what they said; right?

20   A.   Yes.

21   Q.   And you did that, didn't you?

22   A.   Yes.

23   Q.   Two days later, right, September 12th of 2019.  Does that

24   sound right?

25   A.   Yes.

 1  Q.   Okay.  Now, previously -- and this might have to do just

 2  with your fuzziness with dates.  You had mentioned that you had

 3  an attorney at this second meeting, September 12th of 2019.

 4  A.   Yes, he was court appointed.

 5  Q.   Are you certain that you're not conflating that with

 6  another meeting that at that initial meeting with the

 7  government that you may not have had an attorney there, or you

 8  are not sure?

 9            MR. McDONALD:  Hold on one sec.

10            THE COURT:  I'm not sure I understand your question.

11            MR. FINK:  Your Honor, if the Court's willing the

12  parties have a factual stipulation that at that initial

13  meeting, he did not have an attorney present.

14            THE COURT:  And that's 9/10?

15            MR. FINK:  That is 9/12 of 2019.  I said initial but

16  this was the second meeting.  This was 9/12/2019.  I'll get

17  into who was there, your Honor, but the factual stipulation is

18  Mr. Larson did not have an attorney at that meeting.

19            THE COURT:  On 9/12?

20            MR. FINK:  On 9/12/2019.

21            THE COURT:  Okay.

22            MR. McDONALD:  I agree.

23            MR. FINK:  Mr. McDonald said he agrees.

24            THE COURT:  So noted for the record, and they jury may

25  consider that as evidence in the case.

```
 1              MR. FINK:  Thank you, your Honor.
 2   BY MR. FINK:
 3   Q.  And, Mr. Larson, that's not to say you're being misleading,
 4   it's just there's several meetings probably and they get
 5   conflated.
 6              At this first meeting, if you think back to it, do you
 7   recall having a meeting where it was the prosecutors, you and
 8   agents and no attorney?  Do you recall a meeting?
 9   A.  Right.
10              MR. McDONALD:  Judge, objection.
11              I'm sorry, Mr. Fink, but again he's not being clear
12    about which meeting.  In his initial question here he just said
13    at that first meeting.
14              THE COURT:  Right.
15              MR. McDONALD:  So I'd ask Mr. Fink to be a little more
16    specific for the witness.
17              MR. FINK:  He's right.  I'll --
18              THE COURT:  It sounds like you're referring to the
19    9/10 meeting.
20              MR. FINK:  I'm being imprecise, Judge.  Let me
21    rephrase it, if I can?
22              THE COURT:  You may.
23   BY MR. FINK:
24   Q.  On September 12th, the second meeting, two days after that
25   arrest date where you met with agents, there was a second
```

1   meeting.  Do you remember that?

2   A.   I don't.

3   Q.   How about this:  Do you recall that there was a meeting,

4   regardless of the date or how far it was from the first

5   meeting, do you recall that there was another meeting where you

6   met these two gentlemen that I'm pointing to right now,

7   Mr. Bilkovic and Mr. McDonald, and agents?  Do you recall that?

8   Or at least Mr. Bilkovic was present.  Do you remember that?

9   A.   No.  I remember that I thought I wasn't going to say

10  anything without an attorney, so I thought everything after the

11  first meeting I did have a court-appointed attorney.  That's

12  what my recollection is.  So I'm not too -- I'm really fuzzy on

13  the second meeting if I didn't have an attorney there.

14  Q.   I understand, and I don't want you to say anything that you

15  don't remember.  Regardless of the attorney's presence, do you

16  remember meeting Mr. Bilkovic for the first time?

17  A.   I do.

18  Q.   There was a meeting with Mr. Bilkovic being present, among

19  others; correct?

20  A.   Yes.

21  Q.   Okay.  And that was shortly after the 9/0 initial meeting

22  following your arrest; right?

23  A.   Yeah, I -- I'm fuzzy on that date too.

24  Q.   Totally fine.  But within days of that first meeting;

25  right?

1    A.   Yes.

2            MR. FINK:  All right.  Your Honor, previously marked

3    was Defendant's proposed M, which has been taken to the

4    witness.  Can I approach with it and lay a little more

5    foundation on it?

6            THE COURT:  Yes.

7            MR. BILKOVIC:  Can you identify with him?

8            MR. FINK:  I sure can.

9            May I, Judge?

10           THE COURT:  Yes.

11   BY MR. FINK:

12   Q.   Mr. Larson, do you remember briefly looking at this earlier

13   on cross?

14   A.   Yes.

15   Q.   This is the one that was doubled-sided.  You had to

16   double-check; remember?

17   A.   All right.

18   Q.   Do you remember it now?

19   A.   Yes.

20   Q.   And that is a letter addressed to you; correct?

21   A.   Yes.

22   Q.   And at the top it is identified as being from the United

23   States Attorney's Office for the Eastern District of Michigan;

24   is that correct?

25   A.   Yes.

1   Q.   And it is dated September 12th of 2019; correct?

2   A.   Yes.

3   Q.   And do you have any reason to believe that's not the same

4   exact letter that received that day?

5   A.   It is the same.

6            MR. FINK:  Okay.  Judge, I'd asked that that be

7   entered as Defendant's M.

8            THE COURT:  Any objection?

9            MR. McDONALD:  I think it's already admitted, your

10   Honor.

11            THE COURT:  I'm sorry?

12            MR. McDONALD:  I think that exhibit has already been

13   admitted by Mr. Didani earlier.

14            THE COURT:  Well, there were some.  I know there was L

15   and M, and I have a note whether or not they were admitted or

16   he just proposed them.

17            MR. McDONALD:  Even if it's not admitted, no, I have

18   no objection.

19            THE COURT:  All right.  It's admitted.  It is admitted

20   as --

21            (Defendant's Exhibit M received into evidence.)

22            MR. FINK:  Thank you, your Honor.

23            May I publish it, Judge?

24            THE COURT:  Yes.

25            MR. FINK:  I'm sorry, your Honor.  I found it.  It was

```
 1    a little USB drive evading me.
 2   BY MR. FINK:
 3   Q.  Mr. Larson, I put up on the screen --
 4            Could you scroll to the top, Mr. Didani?
 5            I put on the screen this letter that we just admitted.
 6   Do you see that -- may I approach the -- to point, Judge?
 7            THE COURT:  You may.
 8            MR. FINK:  You know what, I think I actually have --
 9    to be cool like the Government, I think I have a laser.
10   BY MR. FINK:
11   Q.  Do you see up here this is the letter that we're talking
12   about from the Department of Justice, Mr. Larson?
13   A.  Yes.
14   Q.  And here where I'm pointing with the laser, it's addressed
15   to you?
16   A.  Yes.
17   Q.  And it's on September 12th of 2019, yes?
18   A.  Yes.
19   Q.  And it's from Mr. Mark Bilkovic, the U.S. Attorney in this
20   case; correct?
21   A.  Yes.
22   Q.  Okay.  And this letter begins by saying that you wish to
23   provide information to the government.  Do you see that in the
24   first sentence?
25   A.  In number 1, yes.
```

```
 1              Oh, the first sentence?  Yes.
 2  Q.  It says you have advised that you wish to meet with the
 3  United States Attorney's Office to provide information in a
 4  proffer.  Do you see that?
 5  A.  Yes.
 6              THE COURT:  Do you have the copy up there with you?
 7  A.  I do.
 8              THE COURT:  Okay.  All right.  Go ahead.
 9              MR. FINK:  Would you scroll down, Mr. Didani.  Okay.
10   Go back up to number 2.  Right there.
11  BY MR. FINK:
12  Q.  Do you see paragraph 2, Mr. Larson?
13  A.  Yes.
14  Q.  And the purpose of this meeting, and you can take your time
15  to read this, essentially is for you to provide information and
16  for the office to assess the credibility of that truthful
17  information and what they'll do with it should they decide to
18  use it in a certain way.  And you can take your time to read
19  it, but is that generally --
20  A.  I'm on it.
21  Q.  -- the promises?
22  A.  Yes.
23  Q.  And in number 3 do you see it says, "No promises or
24  favorable consideration."  Do you see that?
25  A.  Yes.
```

1    Q.   And at this time the government wasn't promising you

2    anything specific; is that accurate?

3    A.   Yes.

4    Q.   At least that's what purported in this letter?

5    A.   Yes.

6         MR. FINK:   Scroll down, Mr. Didani.   Right there is

7    good.   Stop right there.

8    BY MR. FINK:

9    Q.   Do you see number 7, Mr. Larson, is restrictions on the use

10   of your proffer statement.   Do you see that?

11   A.   Yes.

12   Q.   And what they define that to mean is, except as otherwise

13   written in this agreement, that they will not offer any

14   statements that you made to the office in their case in chiefs

15   in any criminal prosecution of you.   Do you see that?

16   A.   Yes.

17   Q.   Essentially we in the law like to call this king or queen

18   for a day.   Have you ever heard that phrase before?

19   A.   No.

20   Q.   Did you understand this to mean when you signed it that

21   anything you said to them couldn't be used against you?

22   A.   Yes.

23   Q.   And in the second paragraph there are some exceptions to

24   that, that if you are indeed prosecuted there's certain ways

25   which they can use the statements at sentencing but not to

 1   prove their case against you in a prosecution.  Does that sound
 2   like a fair explanation of what you understood?
 3   A.  Yes.
 4        MR. FINK:  Okay.  Scroll down, Mr. Didani.
 5   BY MR. FINK:
 6   Q.  Do you see paragraph 8-B, derivative use of information?
 7   A.  Yes.
 8   Q.  And that says there's no restriction on this office's use
 9   of any evidence derived directly or indirectly from your
10   proffered statements.  Do you see that?
11   A.  Yes.
12   Q.  Did you understand that to mean that whatever you told them
13   they could use it to go find more evidence; correct?
14   A.  I didn't know that.
15   Q.  That's okay.  What did you understand about what happened
16   if you didn't tell the truth?
17   A.  That -- that this agreement was null and void.
18   Q.  Now, do you see that --
19        MR. FINK:  Actually, Mr. Didani, I'm sorry to do this
20   to you.  Go up to where it says, "polygraph examination."  Keep
21   going.  Keep going.  Go back down.  There.  Paragraph 6.
22   BY MR. FINK:
23   Q.  Go to paragraph 6, if you don't mind, Mr. Larson.
24   A.  I'm on it.
25   Q.  "Obligations to submit to a polygraph examination."  Tell

1    me if I'm reading this correctly.  "At the option of this

2    office, that being the prosecutor, you will be given a

3    polygraph examination to verify the truthfulness and

4    completeness of any proffered statement.  The office shall have

5    the exclusive right to choose the examiner."  Do you see that?

6    A.   Yes.

7    Q.   Okay.  Without revealing any results, were you ever given a

8    polygraph?

9    A.   I was not.

10              MR. FINK:  Can you scroll down, Mr. Didani, back to

11   where we were?

12   BY MR. FINK:

13   Q.   Do you see paragraph 9-B?

14   A.   Yes.

15   Q.   "If the results of a polygraph examination or conversations

16   with the polygraph examiner indicate you have not been

17   truthful, then the office --" it says there are no restrictions

18   on the use of your proffered statement.  Do you see that?

19   A.   Yes.

20   Q.   In other words, if you fail the polygraph examination they

21   could revoke this deal; right?

22   A.   Yes.

23   Q.   But you never took one?

24   A.   I did not.

25              MR. FINK:  You can take that down, Mr. Didani.  You

1   can put that aside.

2   BY MR. FINK:

3   Q.   Thank you, Mr. Larson.

4        So you had this meeting with Mr. Bilkovic present and

5   agents on September 12th of 2019 --or -- yeah, '19; right?

6        MR. BILKOVIC:   Yeah.

7   BY MR. FINK:

8   Q.   2019; correct?

9   A.   Yes.

10  Q.   And in that meeting with the Government you told a much

11  different story; is that accurate?

12  A.   I probably did.

13  Q.   This time it was a lot of the things that you shared on

14  direct examination; correct?

15  A.   Yes.

16  Q.   Did they promise you that they would do anything for you --

17  A.   No.

18  Q.   Hold on.  Hold on.

19       Did they promise you they would do anything for you if

20  you gave them information on Mr. Didani?

21  A.   No.

22  Q.   Did you expect them to do something for you if you gave

23  information on Mr. Didani?

24  A.   At some point, yes.

25  Q.   Like, down the road?

```
 1   A.   Yes.

 2   Q.   How far down the road?

 3   A.   I don't -- I have no idea.

 4   Q.   Maybe if it resulted in a conviction or something?

 5   A.   There was no specifics.  I just -- you know, if I gave

 6   truthful information that it can't be used against me, so --

 7   Q.   You were hopeful for consideration though; right?

 8   A.   Yes.

 9   Q.   You wanted to not be in trouble, for lack of a better way

10   to phrase it; right?

11   A.   Yes.

12   Q.   So you're telling me on that date, September 12th, 2019, no

13   express promise was made to you?

14   A.   Right.

15        MR. FINK:  Judge, I'd like to approach with what I'm

16   marking Defendant's proposed S.

17        THE COURT:  Okay.

18        MR. FINK:  And Defendant's proposed -- I say my A, B

19   and Cs with my daughter every night but --

20        THE COURT:  T.

21        MR. FINK:  And Defendant's U.  May I, Judge?

22        THE COURT:  Yes.

23   BY MR. FINK:

24   Q.   All right.  Mr. Larson, I had to write on these so I'm

25   going to separate Defendant's S, Defendant's T and Defendant's
```

1    U.   Okay.  I'll ask about them one at a time.

2              Can you look at Defendant's S first?

3    A.   S?

4    Q.   Yes, S as in Sam.

5    A.   Yes.

6    Q.   Does that appear to be a letter addressed to you?  If you

7    remember it or not, that's okay.  I'm asking right now does it

8    appear to be a letter addressed to you?

9    A.   It's addressed to me, yes.

10   Q.   Does it have your correct address at the time listed on the

11   letter?

12   A.   Yes.

13   Q.   Okay.  And is it from the United States Attorney's Office?

14   A.   It is.

15   Q.   And you don't recall receiving this letter?

16   A.   I do not.

17             MR. FINK:  Judge, this being from discovery, I don't

18   know that I'll get an objection, but I'm asking this be

19   admitted as Defendant's S.

20             THE COURT:  Any objection?

21             MR. McDONALD:  No objection.

22             THE COURT:  Very well.  It's admitted as S.

23             (Defendant's Exhibit S received into evidence.)

24             MR. FINK:  May I publish it, Judge?

25             THE COURT:  Yes.

```
 1   BY MR. FINK:
 2   Q.   Mr. Larson, I recognize that you're saying that you don't
 3   necessarily remember it.  However, being admitted as Exhibit S,
 4   would you agree with me that this letter purports to tell you
 5   on September 17th of 2019 from Mr. Bilkovic that this letter
 6   says, "This is to inform you that the complaint and warrant
 7   against you in the above-captioned case has been dismissed
 8   without prejudice."  Do you see that sentence?
 9   A.   I do.
10   Q.   And it says, "I have enclosed a copy of the Government's
11   motion to dismiss the complaint and the order dismissing the
12   complaint without prejudice."  Do you see that?
13   A.   I do.
14          MR. FINK:  Unplug that for a second, Mr. Didani.
15   BY MR. FINK:
16   Q.   Now, go, if you could, Mr. Larson, to Defendant's proposed
17   T and U.
18   A.   T?
19   Q.   T and U.  I'm going to start singing the ABCs.  T and U.
20          Do you recognize Defendant's T, Mr. Larson?  The first
21   question is, do you personally recognize it?
22   A.   This was a week before the first meeting.
23   Q.   What's the date on it?
24   A.   The 5th of September 2019.
25          MR. FINK:  May I approach, Judge?
```

 1                THE COURT:  Yes.

 2   A.   Oh, it says a complaint was issued right here, September?

 3   BY MR. FINK:

 4   Q.   So, Mr. Larson, you just said something about September

 5   5th.  I believe you're reading the body of the exhibit.

 6   A.   Right.

 7   Q.   But, generally speaking, do you recognize this document?

 8   Let me start with that.

 9   A.   I really don't.

10   Q.   Okay.  Is the document labeled as a motion and brief to

11   dismiss a complaint without prejudice, something similar?

12   A.   Yes.

13   Q.   Okay.  And the date on the last page?

14   A.   The 18th.

15   Q.   It says September 18th; correct?

16   A.   Yes.

17   Q.   Now, it also says 2018; right?

18   A.   Yes.

19   Q.   But the front page where the caption of the case is starts

20   with the number 19; is that correct?

21   A.   Right.

22   Q.   Okay.  Now, look at Defendant's U.  You can set that down

23   and look at Defendant's U.  Do you recognize this document?

24   Start with that initial question if you recognize it.

25   A.   I don't remember seeing this.

1   Q.   Okay.  Does that appear to be an order from the Court

2   dismissing a criminal complaint without prejudice against you?

3   A.   Yes.

4   Q.   And what's the date of it?  It should be by the --

5   A.   September 29th, 2019.

6   Q.   Okay.  And signed by a judge?

7   A.   Yes.

8            MR. FINK:  Judge, I'd ask these be admitted as

9   Defendant's T and U.

10           MR. McDONALD:  No objection.

11           THE COURT:  All right.  They are admitted as T and U.

12           (Defendant's Exhibits T and U received into evidence.)

13           MR. FINK:  I'm going to put -- Judge, I'm going to put

14   up, with your permission, Defendant's U.  Is that okay, Judge?

15           THE COURT:  Yes.

16   BY MR. FINK:

17   Q.   This is Defendant's U that I showed you, Mr. Larson, on the

18   screen; right?

19   A.   Yes, sir.

20   Q.   And this shows that the complaint against you was

21   dismissed?

22   A.   Without prejudice, yes.

23   Q.   Okay.  Now, September 12th, 2019, was your meeting with

24   Mr. Bilkovic.  Do you agree with me on that?

25   A.   Yes.

1    Q.   Okay.  And the cover letter explaining to you from the

2    Government that they would be dimming this was what date?  That

3    was Defendant's S.  What's the date of Defendant's S?  That was

4    the first one.

5    A.   The first one?  September 17th, 2019.

6    Q.   Okay.  Five days after the meeting; right?

7    A.   Yeah.

8    Q.   All right.  So you're arrested on September 10th, 2019;

9    correct?

10   A.   Yes.

11   Q.   You meet with agents, and you give an interview; right?

12   A.   Yes.

13   Q.   Two days later you meet with the prosecutor and agents on

14   September 12th of 2019; right?

15   A.   Yes.

16   Q.   And you said you weren't promised anything; right?

17   A.   Yeah.  As far as -- as far as I remember --

18   Q.   It's just a yes or you don't remember being promised

19   anything; right?

20   A.   Right.

21   Q.   And then five days later a federal complaint for narcotics

22   complaint against you is dismissed; is that correct?

23   A.   From the paperwork, yes.  One thing I don't --

24   Q.   That's all I asked.  I appreciate it, Mr. Larson.

25   A.   Okay.

```
1              THE COURT:  Okay.  I think this is our stopping point.
2              MR. FINK:  Okay.
3              (End of excerpt at 3:48 p.m.)
4                            —  —  —
5
6
7
8                   CERTIFICATE OF COURT REPORTER
9
10             I, Sheila D. Rice, Official Court Reporter of the
11     United States District Court, Eastern District of Michigan,
12     appointed pursuant to the provisions of Title 28, United States
13     Code, Section 753, do hereby certify that the foregoing pages
14     is a correct transcript from the record of proceedings in the
15     above-entitled matter.
16
17
18                        s/Sheila D. Rice
                          Sheila D. Rice, CSR-4163, RPR, RMR, FCRR
19                        Federal Official Court Reporter
                          United States District Court
20                        Eastern District of Michigan
21
       Date:  04/11/2025
22     Detroit, Michigan.
23
24
25
```