1
2

                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MICHIGAN
                        SOUTHERN DIVISION

3
                            _   _   _

UNITED STATES OF AMERICA,

4
                    Plaintiff,

5
     v.                                Case No. 21-20264

6
YLLI DIDANI,

7
                    Defendant.

8
_____/

9
                    JURY TRIAL - VOLUME 17 - EXCERPT
            Continued Testimony of Donald Larson and Brandon Leach
10
                BEFORE THE HONORABLE DENISE PAGE HOOD
                    UNITED STATES DISTRICT JUDGE

11

12
                Theodore Levin United States Courthouse
                    231 West Lafayette Boulevard
                        Detroit, Michigan
13
                    Tuesday, March 18, 2025

14
**APPEARANCES:**

15
  **For the Plaintiff:**        Mark Bilkovic
16
                                Timothy McDonald
                                UNITED STATES ATTORNEY'S OFFICE
17
                                211 W. Fort Street, Suite 2001
                                Detroit, Michigan  48226
18
                                (313) 226-9623

19
  **For the Defendant:**        Wade Fink
20
                                WADE FINK LAW, P.C.
                                550 W. Merrill Street, Suite 100
                                Birmingham, Michigan  48009
21
                                (248) 712-1054

22
  **Also present:**             Special Agent Chad Hermans
                                Maria DiCarlo, Paralegal
23

24
        *To obtain a copy of this official transcript, contact:*
                *Sheila D. Rice  Official Court Reporter*
25
            *(313) 234-2610 • sheila_rice@mied.uscourts.gov*

1 **TABLE OF CONTENTS**

2   MATTER_____PAGE

3   **JURY TRIAL - VOLUME 17 - EXCERPT**

4   **Government's Case in Chief (Continued)**

5   **DONALD LARSON**
    Continued cross-examination by Mr. Fink.............   4
6   Redirect examination by Mr. McDonald................  28
    Recross examination by Mr. Fink.....................  37
7
    **BRANDON LEACH**
8   Direct examination by Mr. Bilkovic..................  42
    Voir dire examination by Mr. Fink...................  83
9   Direct examination continued by Mr. Bilkovic........  84

10  Certificate of Court Reporter...................... 136

11

12

13                       E X H I B I T   I N D E X

14

15  Exhibit No.         Description          Identified    Admitted

16  Government Exhibits
    GX 5.10          Translation of text         52          52
17  GX 5.17          Photograph of money         49          50
    GX 5.18          Photographs of money        54          54
18  GX 71.0          Phone extraction report     87          91
    GX 71.1          Video                       99          99
19  GX 71.2          Video                      101         102
    GX 71.5          Photo of Mr. Didani         90          97
20  GX 112.2         Photograph                  56          57
    GX 112.3         Photograph                  56          57
21  GX 112.4         Photo of E-mail            128         132
    GX 112.7         Photo of message thread    112         112
22  GX 112.9         Screenshot of message       60          66
    GX 112.10        Screenshot of message       69          70
23  GX 112.11        News article                71          71
    GX 112.12        Translation of news article 72          72
24  GX 112.13        Photograph                 105         108

25

1     (Continued)

2                    E X H I B I T   I N D E X

3

      Exhibit No.            Description        Identified   Admitted
4
      GX 114.0     Contact list, Didani iCloud  122          124
5     GX 115.12    Photograph              (Under advisement)
      GX 115.13    Photograph              (Under advisement)
6     GX 115.14    Photograph              (Under advisement)
      GX 115.22    Photograph                   76           75
7     GX 115.23    Photograph                   76           75
      GX 115.24    Google Map                   79           79
8     GX 115.25    Photograph                   80           75
      GX 115.26    Photograph                   81           75
9     GX 116.19    Photo of message thread     115          116

10    Defendant's Exhibits
      Defendant's N    Audio clip               20           21
11    Defendant's V    Egypt video              10           11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Detroit, Michigan

2    Tuesday, March 18, 2025

3    9:43 a.m.

4                               _   _   _

5         (Beginning of excerpt.)

6         THE COURT:  Okay.  You may all be seated.  Good

7    morning.

8         JURORS:  Good morning.

9         THE COURT:  And whoever went to Chicago, I heard that

10   the river really was green and that there were green things to

11   drink as well of various varieties.  And I don't know whether

12   anybody here drank anything green.  Green is not my food color

13   of choice, but, in any event, I welcome you back, okay.

14        Mr. Larson, you're still under oath, okay.

15        THE WITNESS:  Yes, ma'am.

16        THE COURT:  And just state your name again for the

17   record.

18        THE WITNESS:  Donald Larson.

19        THE COURT:  You may proceed, Counsel.

20        MR. FINK:  Thank you, your Honor.

21        Good morning.

22        JURORS:  (Collectively) Good morning.

23                    CROSS EXAMINATION (Continued)

24   BY MR. FINK:

25   Q.  Good morning, Mr. Larson.

1    A.   Good morning.

2    Q.   I'll try to go back where I left off in my outline,

3    Mr. Larson.  Forgive me if I repeat something.  But I believe

4    approximately where we left off, if you recall I showed you a

5    picture of Jeff Freeman.  Do you remember that?

6    A.   Yes.

7    Q.   It might still be up there actually.

8    A.   Yes, it is.

9    Q.   Okay.  We were talking about that in the context of the

10   first interview you gave in September 10th of 2019.  Do you

11   remember that?

12   A.   Yes.

13   Q.   Okay.  And you remember being shown that picture of Jeff

14   Freeman?

15   A.   Yes.

16   Q.   Do you remember being asked questions about Mr. Freeman?

17   A.   Yes.

18             THE COURT:  Tell me the date again.  September ...

19             MR. FINK:  10th of 2019, your Honor, the first

20   interview.

21             THE COURT:  Okay.

22   BY MR. FINK:

23   Q.   And what you shared with him, if you recall, was

24   Mr. Freeman was he did books, taxes, background checks and

25   things of that nature in his capacity as a lawyer.  Do you

1    recall that?

2    A.   Yes.

3    Q.   Okay.  Did it seem to you the Government was interested in

4    Jeff Freeman for some criminal purpose?

5    A.   I think so.

6    Q.   Did you know of any?

7    A.   Not criminality.  I know --

8    Q.   That's the question, criminality.

9    A.   Okay.

10   Q.   Do you recall then, in addition to Mr. Freeman, Detective

11   Leach asked you about Mr. Didani's parents?

12   A.   I don't remember that.

13   Q.   You don't remember them asking if you ever gave money to

14   them?

15   A.   No.

16   Q.   Or take money from them?

17   A.   No.

18   Q.   Did you?

19   A.   No.

20   Q.   Do you know of Mr. Didani's parents being involved at all?

21   A.   I do not.

22   Q.   Mr. Larson, one of the things that you said on direct

23   examination when asked about the overall conspiracy and to

24   distribute cocaine that everything Mr. Didani did involved

25   drugs or something of that nature.  Do you remember that?

1  A.   Yes.

2  Q.   And that was in response to a question about one of the

3  money transactions.  Do you recall that?

4  A.   Yes.

5  Q.   Potentially, if I understand understood you correctly, what

6  you were saying is whatever one transaction or another, all

7  generally this was related to the drug conspiracy; right?

8  A.   Yes.  Pretty much, yeah.

9  Q.   Because the Government was asking you about specific

10  transactions, what was this hundred dollars for, what was this

11  hundred thousand.  Do you remember that?

12  A.   Yes.

13  Q.   And your answer, well, generally it was all for a drug

14  conspiracy; right?

15  A.   Yes.

16  Q.   So while you might not recall what one particular

17  transaction or where it went and what particular drug purchase

18  it went to, that's why you gave that answer, because you might

19  not recall each specific transaction; right?

20  A.   Yes.

21  Q.   And you might not even know specifically where the money

22  went or where the cocaine was bought from; right?

23  A.   Correct.

24  Q.   Suffice it to say, your knowledge of the conspiracy is

25  based on the word of others that this was going on; is that

1   accurate?

2   A.   Yes.

3   Q.   Mr. Didani telling you that this is going on; right?

4   A.   Right.

5   Q.   Mr. Tibbitts telling you this is going on; right?

6   A.   Yes.

7   Q.   Or at least suggesting it; right?

8   A.   Right.

9   Q.   And never had to do with you connected to any sources of

10  cocaine; right?

11  A.   Correct.

12  Q.   You weren't calling down to South America or connected with

13  these folks that were allegedly involved in supplying the

14  cocaine; correct?

15  A.   Correct.

16  Q.   Do you recall when we were kind of discussing some of the

17  other -- I think I used the word "eclectic" taste of

18  Mr. Tibbitts, the other things he was involved with?  Do you

19  remember that?

20  A.   Yes.

21  Q.   We talked about nightclubs and restaurants in Albania;

22  right?

23  A.   Right.

24  Q.   And we talked about -- you gave us that story on direct

25  examination and to me about the tomb in Egypt.  Do you remember

1   that?

2   A.   Yes.

3   Q.   And I think, correct me if I'm wrong, you said that you

4   didn't actually go inside the house to see the Egyptian tomb,

5   but rather you were shown a video; correct?

6   A.   Yes.

7   Q.   Would you recognize that video if you saw it?

8   A.   Yes.

9           MR. FINK:  Your Honor, I can show him directly on the

10   computer to lay the foundation.  I guess the question is does

11   the Government have an objection it's from discovery?

12           MR. McDONALD:  I'm not exactly sure which video it is.

13           MR. FINK:  Sure.  I'll show the Government first, your

14   Honor.

15           THE COURT:  Okay.

16           MR. FINK:  Your Honor, the Government has indicated to

17   me that it has no objection to me publishing this.  So if I

18   could do that and lay the foundation.

19           THE COURT:  Okay.

20           MR. McDONALD:  That's accurate, your Honor.

21           THE COURT:  Okay.  Thank you, Mr. McDonald.

22           And is this marked proposed anything?

23           MR. FINK:  Let's mark this, your Honor, as Defendant's

24   S.

25           THE COURT:  Proposed S.

1            MR. FINK:  I believe that's what I'm at, as I continue

2     to struggle with my ABCs.

3            THE COURT:  Okay.

4            MR. McDONALD:  Our records show you're up to --

5            THE COURT:  Up to what?

6            MR. McDONALD:  To V as in Victor.

7            THE COURT:  I thought there was already T.

8            MR. FINK:  See how bad I am with that, Judge.

9            THE COURT:  All right.  V.

10           MR. FINK:  Okay.  So we're on V as in Victor?

11           THE COURT:  V as in Victor.

12           MR. FINK:  All right.  I'll get caught up.  Let's call

13    this then -- the Egypt video is Defendant's proposed V as in

14    Victor.

15    BY MR. FINK:

16    Q.   Mr. Larson, I'm going to play this video for you and then

17    ask you about it afterwards; okay?

18    A.   Yes.

19           (Video played.)

20    BY MR. FINK:

21    Q.   Mr. Larson, do you recognize that video?

22    A.   I don't.  I had a different one.

23    Q.   Okay.  Is that -- let me ask you this.  Is that video

24    consistent with the video that you had seen, the same artifacts

25    as far as you can tell?

1  A.   The one that I -- the one that I was sent was way more

2  elaborate than that.

3  Q.   Okay.  But I'm asking from your recollection, the artifacts

4  underneath the house that you described, does that look like

5  it's taken of the same location?

6  A.   I was never in there.

7  Q.   Okay.  It looks similar to that video in the sense that the

8  artifacts depicted in the video look similar to the ones that

9  you saw?

10  A.   The one I saw had a lot more gold in it.

11  Q.   All right.

12  A.   You know, it's basically consistent, yeah.

13  Q.   And what I'm asking is you saw artifacts in there, a tomb

14  and things like that.  Were those also -- even though there may

15  have been more video, were those represented in the other video

16  that you apparently saw?

17  A.   That seems like maybe the first minute of what I had.

18  Q.   Understood.  That makes sense.

19          MR. FINK:  Your Honor, I move to admit this as

20  Defendant's V as in Victor.

21          THE COURT:  Any objection?

22          MR. McDONALD:  No objection.

23          THE COURT:  Very well.  It's admitted.

24  BY MR. FINK:

25  Q.   Do you know the particulars of any of the business that

1    Mr. Didani and Mr. Tibbitts engaged in outside of alleged

2    cocaine dealing?

3    A.   I don't.

4    Q.   Are you aware of any contracts between the two of them?

5    A.   I'm not.

6    Q.   Are you aware of the locations and/or any of the specifics

7    about any bars or clubs that they built together?

8    A.   I was not.

9    Q.   Are you aware of anything like the Egyptian artifacts or

10   similar that Mr. Tibbitts purchased along with or through

11   Mr. Didani?

12   A.   I am not.

13   Q.   For all you know, those things could have happened;

14   correct?

15   A.   They could have.

16   Q.   Could have bought a restaurant in Albania?

17   A.   Yes.

18   Q.   Could have bought artifacts like this one or similar using

19   Mr. Didani's help and resources; right?

20   A.   Possible, yes.

21   Q.   Mr. Larson, you're testifying to these facts today -- when

22   I say today, I mean all of your testimony, the couple days that

23   you've been here.  The facts that you shared with us in court

24   today, you would agree with me -- and I know you have your

25   reasons for it, but you would agree with me they are

 1  fundamentally different than the first thing you told the
 2  Government on September 10, 2019; correct?
 3  A.   Yeah, yes, yeah.
 4  Q.   When I say fundamentally, I mean in significant material
 5  ways.  I mean, there was no mention of you knowingly being
 6  involved in a conspiracy to distribute cocaine the first time;
 7  right?
 8  A.   I never touched anything, yes.
 9  Q.   That's what I mean, just so I'm clarifying what I mean by
10  fundamentally different.  And the reason, correct me if I'm
11  wrong, that you're testifying in this case at all is because of
12  your grant of immunity; is that correct?
13  A.   From what the judge signed, yes.
14  Q.   Your understanding, and we'll talk about that, but your
15  understanding is that because you cannot -- this cannot be used
16  against you, you are immune from prosecution, that a criminal
17  charge won't be brought against you; correct?
18  A.   Yes.
19  Q.   Unless, of course, they can prove you're lying and they can
20  allegedly -- not allegedly, they will purportedly charge you
21  with perjury; right?
22  A.   Yes.
23  Q.   Now, the Government believes -- correct me if I'm wrong,
24  the impression you get from the Government in their questions
25  and the way that they've dealt with you is they very much

1   believe you're involved in the drug conspiracy; correct?

2   A.   Yes.

3   Q.   If you were to say otherwise on the stand today, you would

4   fear being charged with perjury, wouldn't you?

5   A.   Yes.

6   Q.   Whether you're telling the truth or not, that's what they

7   believe in your view; correct?

8   A.   Yes.

9   Q.   Now, after you testified the first time here, but with the

10  Government, that's direct testimony, that's why I call it

11  direct if that not clear, after you testified and I believe

12  after some cross by Mr. Didani, I think it was in-between those

13  two things, do you recall coming to the Court and expressing

14  some hesitance with giving your testimony?

15  A.   Under direct?

16  Q.   After your direct exam and after some of Mr. Didani's

17  cross-exam, you came in to give further testimony the last time

18  we were here, but before you testified you expressed to Judge

19  Hood, the Court, that you had some hesitance in continuing to

20  testify.  Do you remember that?

21  A.   When I talked to my attorney before she signed -- yes, yes.

22  Q.   You were at the podium with your attorney talking to the

23  court?

24  A.   Yes.

25  Q.   I'm not trying to trick you with words.  I'm just asking

1    broadly speaking --

2    A.   Yeah.  I was just trying to get what you were talking

3    about.

4    Q.   Of course, yes.  When you were standing here with your

5    attorney at the podium; correct?

6    A.   Right.

7    Q.   And, in fact --

8         MR. FINK:  Your Honor, I just wanted the Government to

9    know the next question I anticipate an objection.  That's all.

10   BY MR. FINK:

11   Q.   And, Mr. Larson, if you could hold the answer until the

12   Court's had an opportunity to resolve it.

13        You approached Judge Hood with a letter explaining

14   something to her about you hesitance; is that correct?

15        MR. McDONALD:  Objection, relevance.

16        THE COURT:  How is it relevant?

17        MR. FINK:  Your Honor, it is always relevant,

18   someone's motivation for testifying.  And I'm not going to get

19   into the details, because I want the Court to rule on

20   Mr. Larson to answer.  But you recall the details of the

21   discussion, and I think that bears on why, if and what he's

22   telling, if it's the truth, what his motivations are, and

23   that's always relevant.

24        THE COURT:  Mr. McDonald?

25        MR. McDONALD:  I think he can ask that question

1   without getting into the contents of the letter, your Honor.

2           THE COURT:  I think so, too.

3           MR. FINK:  I won't get into the contents, Judge, just

4   the fact of, if that's permissible.

5           THE COURT:  Okay.  All right.

6           MR. FINK:  Is that okay, your Honor?

7           THE COURT:  Yes.

8   BY MR. FINK:

9   Q.  Okay.  You did deliver a letter to Judge Hood expressing

10  generally, without saying what you said, some hesitance about

11  testifying?

12  A.  Yes.

13  Q.  And part of what you explained, not in the letter, in

14  Court, so we're not going to get into the contents of the

15  letter, a part of what you explained in Court was that you were

16  unsure if you really had anything to immunize or give an

17  immunity for; correct?

18          MR. McDONALD:  Again, I'm going to object.  I don't

19  know how this is relevant.  The Court has already made a

20  determination as to his -- compelling his testimony.

21          THE COURT:  I think it's a matter of law, Mr. Fink.

22  Why don't you?

23          MR. FINK:  I think that regardless of what the ruling

24  is, and they can redirect on this that he's been ordered to do

25  so, I think his understanding of why he's here the jury should

1    know and understand and make a judgment call on why he's saying

2    the things he's saying and why they're different from other

3    statements.  And this can shed light onto why he feels

4    obligated to testify one way or another.

5           THE COURT:  I think it's a matter of law.  The answer

6    that he would give is a matter of law that I've already ruled

7    on.  And I've already told the jury that I rule own the matter

8    of law and they consider the facts.

9           MR. FINK:  I will try to ask it a different way

10   without asking for a conclusion on immunity, if I'm

11   understanding your ruling, your Honor.

12          THE COURT:  Okay.

13   BY MR. FINK:

14   Q.  The Government has made you -- correct me if I'm wrong, the

15   Government has made you feel as though your testimony is

16   important in this case; correct?

17   A.  Yes.

18   Q.  In fact, you expressed that you were the only connection

19   between Mr. Didani and this district; is that accurate?

20   A.  I believe so, from what I know.

21   Q.  It can only be based on what you know, from your

22   representations and your understanding; is that accurate?

23   A.  Yes.

24   Q.  And you expressed that it's that link that could put a man

25   in prison.  Do you remember saying that?

1    A.   Yes.

2              MR. McDONALD:  Judge, I'd ask that be stricken.

3    Possible penalty is irrelevant to the jury's determination

4    here.

5              THE COURT:  Well, I don't -- well, Mr. Fink --

6              MR. FINK:  I don't think it's going to what the

7    possible short or length of the penalty is.  It goes to again

8    what his motivations are for testifying and what he's thinking

9    about in giving his testimony.

10             THE COURT:  I think it does, too, and the jury will --

11   I've already told them that they should not give any

12   consideration to what the penalties should be, because that's

13   not their job, that's mine, if they find the facts to be that

14   your client is proved guilty beyond a reasonable doubt based on

15   the presentations of the prosecution.

16             So you may not consider it for that, but I'm going to

17   allow you to answer the question.  You may answer the question,

18   but the jury may not consider it relative to anything having to

19   do with a sentence.

20             Do you want to pose --

21             THE WITNESS:  May I hear the question again?

22             MR. FINK:  Ms. Rice, do you have it so I don't say

23   something different.

24             (The record was read back as follows:

25             "Q: And you expressed that it's that link that could

1              put a man in prison.  Do you remember saying that?

2              "A: Yes.")

3  BY MR. FINK:

4  Q.   So I asked you if you expressed to the Court that it was

5  that link, you to linking Mr. Didani to this district, that's

6  what I meant by link, that could put a man in prison.  Is that

7  what you said?

8  A.   Yes.

9  Q.   Do you remember, Mr. Larson, in your direct examination a

10 mention of the alleged torpedo in this circumstance -- in this

11 case?

12 A.   I do.

13 Q.   Do you remember saying that it was to be built for -- to

14 carry 50 kilos I believe is what you said?

15 A.   Yes.

16 Q.   Mr. Larson, this started to be asked of you previously, and

17 I'm returning to it so we can finish the discussion.  Do you

18 recall receiving a telephone call from a private investigator

19 from the defense?

20 A.   Yes.

21 Q.   Do you remember returning that phone call?

22 A.   I do.

23 Q.   Okay.  Do you remember having a conversation with that

24 individual?

25 A.   I do.

1    Q.  Would you recognize that call, or to the extent it was

2    recorded would you recognize your voice and recognize that

3    call?

4    A.  Yes.

5            MR. FINK:  Your Honor, based on the previous

6    stipulation, I would purport to play -- I think we already

7    marked this as Defendant's Exhibit N as in Nancy I think is

8    what we -- that's what I have.

9            THE COURT:  Now, tell me what it is again?

10           MR. FINK:  Do you have that, too, Ms. DiCarlo?

11           THE COURT:  Tell me what it is again?

12           MR. FINK:  Your Honor, this is the telephone call

13   recorded between an investigator and Mr. Larson, and I believe

14   I previously marked it as Defendant's N.  And based on the

15   agreement of the parties we're going to play the clip in full

16   as opposed to pieces.

17           THE COURT:  Okay.  Is that the agreement of the

18   parties?

19           MR. McDONALD:  Yes, your Honor.

20           THE COURT:  Okay.

21           (Audio played.)

22   BY MR. FINK:

23   Q.  Mr. Larson, do you recognize that phone call?

24   A.  I do.

25   Q.  You recognize your voice?

1  A.   Yes.

2  Q.   And that was the phone call that you had with my

3  investigator?

4  A.   Yes.

5  Q.   Okay.  And do you believe anything material was omitted?

6  It sounds like the recording picked up a few seconds into your

7  discussion.  From your recollection, does it feel like anything

8  material was omitted from that audio?

9  A.   No.

10          MR. FINK:  Your Honor, I ask that this be entered as

11  evidence as Defendant's Exhibit 7 -- N.  Defendant's Exhibit N.

12          THE COURT:  I thought your stipulation was that it

13  could be played.  Is your stipulation on behalf of the

14  Government also that it could be admitted?

15          MR. McDONALD:  I don't have an objection to that.

16          THE COURT:  Okay.  It's admitted.

17          (Defendant's Exhibit N received into evidence.)

18          MR. FINK:  Thank you, your Honor.

19  BY MR. FINK:

20  Q.   Mr. Larson, you would agree with me that what you said in

21  that phone call regarding narcotics trafficking was different

22  than what you said on the stand in this case; correct?

23  A.   Not really.

24  Q.   Well, you heard my investigator ask you what the $450,000

25  in cash was for; right?

1    A.   Yes.

2    Q.   Your answer to that was you didn't know; correct?

3    A.   That's right.

4    Q.   What you said to this jury the first time that you

5    testified is that it was for the purchase of cocaine, did you

6    not?

7    A.   That's right.

8    Q.   Those are two different things, are they not?

9    A.   I said I didn't trust anybody.  I didn't know who that guy

10   was.  He's calling me on the phone.  I was just trying to

11   minimize --

12   Q.   I understand, and forgive me for interrupting you.  I

13   understand that you might have an explanation for why it's

14   different.

15        MR. McDONALD:  Judge, excuse me.  I'd ask Mr. Fink to

16   allow the witness to answer his question instead of cutting him

17   off.

18        MR. FINK:  Your Honor, I'm entitled to conduct my

19   examination, and that wasn't my question.  So I politely said

20   you can explain that, but I have a question.

21        THE COURT:  Okay.  So you can pose your question

22   again, and if you think it's not responsive then that's what

23   you tell the Court and then I'll strike it.

24        MR. FINK:  You've got it, Judge.  I was just trying to

25   be polite.

```
 1              THE COURT:  What's your question again?
 2              Answer his question directly.
 3   BY MR. FINK:
 4   Q.  My direct question is not why they might be different.  My
 5   question is a very simple one.  Those two statements, the one
 6   you said to my investigator, for whatever reason you said it,
 7   was different from what you said on the stand to this jury;
 8   correct?
 9   A.  Kind of.
10   Q.  And you said, in no uncertain terms, that you're going to
11   tell the truth; right?
12   A.  Yes.
13   Q.  And my investigator asked you and what is -- and the truth
14   is that you don't know what that money was for, and you said
15   that's correct.  Is that what that said?
16   A.  Yes.
17   Q.  Okay.  The fact is, Mr. Larson, that you have spoken about
18   this alleged transaction, the $450,000 going to D.C., with the
19   federal government several times; correct?
20   A.  Yes.
21   Q.  In this court now over a few days; correct?
22   A.  Yes.
23   Q.  To my investigator; correct?
24   A.  Yes.
25   Q.  In follow-up meetings with Special Agent Hermans and
```

1  Detective Leach; right?

2  A.   Yes.

3  Q.   And there have been multiple different times that you have

4  told multiple different stories; would you agree with me?

5          I'm not trying to trick you.

6  A.   No, no, not really.

7  Q.   You don't agree with me that you told multiple stories?

8  A.   I said I wasn't a hundred percent sure, but that's what I

9  was told by Lou.

10  Q.   Well, on September 10th it wasn't for drug trafficking;

11  right?  It was you were being evasive?

12  A.   The first meeting, yes.

13  Q.   You were being evasive; right?

14  A.   Yes.

15  Q.   And September 12th it was for drug trafficking, two days

16  later meeting with Mr. Bilkovic; correct?

17  A.   Yes.

18  Q.   And five days later the criminal complaint against you was

19  dismissed; right?

20  A.   Without prejudice.

21  Q.   Without prejudice meaning they can bring it again; right?

22  A.   They can.

23  Q.   But you weren't charged with a crime five days after

24  telling them that; correct?

25  A.   Right.

25

1    Q.   And you had multiple follow-ups with the Government after

2    that; right?

3    A.   Yes.

4    Q.   You testified in front of the Grand Jury that this was

5    generally drug trafficking; right?

6    A.   Yes.

7    Q.   And then you get a call from Mr. Menge, my investigator,

8    and you say you don't know what it was for; right?

9    A.   Right.

10   Q.   And then you come here and testify on direct examination

11   that it was definitely for drug trafficking; right?  That's

12   what you said on direct --

13   A.   I didn't say definitely.  I said I wasn't a hundred percent

14   sure.  I believe that's what I said.

15   Q.   So you're not a hundred percent sure that that money went

16   for drug trafficking?

17   A.   Only by what Lou told me.

18   Q.   So your contention is that the only way that you know it to

19   be for drug trafficking is because purportedly Mr. Didani told

20   you it was for drug trafficking?

21   A.   Yes.

22   Q.   What about Mr. Tibbitts?

23   A.   He didn't tell me anything.

24   Q.   And did you ever yourself, were you ever involved in

25   following that money to where it went?

1    A.    No.

2    Q.    Solely based on the word of Mr. Didani that he bought drugs

3    with it?

4    A.    Yes.

5    Q.    So, if Mr. Didani was lying to you or you misunderstood or

6    something that those words that were untrue, you're only as

7    good as that information; correct?  In other words, you have no

8    other way to corroborate that that went for drugs other than

9    that word?

10   A.    Yes.  I think I repeatedly said he could have been conning

11   me.

12   Q.    I do remember.  That was my next question.  You're a good

13   lawyer.  That's what I was going to ask you.  He could have

14   been conning us; right?

15   A.    Yes.

16   Q.    So anyway, I was asking you, and you told Mr. Menge what

17   you told him and then you came here and testified the way you

18   did, and in-between direct examination and cross-examination

19   you yet again raised the hesitancy with what you were saying by

20   telling the judge that, you know, you had hesitancy to continue

21   testifying; right?

22   A.    Yes.  Not that I continued to testify, that I --

23   Q.    But you should be.  Well, I don't want you to make a legal

24   conclusion, but you expressed for whatever reason, and the

25   Government can ask you what they want on direct, for whatever

1   reason that you had trouble with the overall testimony you were

2   giving; correct?

3   A.   Yes.

4   Q.   And one thing weighing on your conscious, correct me if I'm

5   wrong, because you expressed it to the Court, was sending a man

6   to prison; right?

7   A.   Yes.

8   Q.   And fundamentally, what we heard on that call and what

9   you've been -- one thing you've been consistent all along, is

10  the federal government doesn't care about you; right?  That's

11  your belief?

12  A.   That's my belief.

13  Q.   You didn't give them what they wanted in that first case,

14  and what did that do, they sent you to state for life in

15  prison, didn't they?

16  A.   The DEA busted me.  And I didn't cooperate so they turned

17  my case over to the State of Michigan, which had the harshest

18  drug law in the country, which was a natural life sentence.

19  Q.   And the reason they gave you to the State is because you

20  didn't given them anything in cooperation; right?

21  A.   Exactly.

22  Q.   They don't care, did they?

23  A.   They didn't.

24  Q.   It behooved you to give information this time, did it not?

25  A.   It did.

1    MR. FINK:  One moment, your Honor, if I may.

2        (Briefly off the record.)

3    MR. FINK:  Mr. Larson, thank you.  I appreciate it.

4  No further questions at this time.

5    THE COURT:  Redirect?

6    MR. McDONALD:  Yes, your Honor.

7                    REDIRECT EXAMINATION

8  BY MR. McDONALD:

9  Q.  Mr. Larson, do you know all of the evidence tying

10 Mr. Didani to the Eastern District of Michigan?

11 A.  I don't.

12 Q.  For example, have you seen the download of Mr. Didani's

13 phone?

14 A.  I have not.

15 Q.  Have you seen any of the downloads of his iCloud data?

16 A.  Just what our texts were.

17 Q.  Your own chats with Mr. Didani?

18 A.  Yes.

19 Q.  Now, you started to say it, but why did you -- strike that.

20        Did you know this private investigator?  Had you ever

21  met him prior to this phone call?

22 A.  I did not.

23 Q.  When the person told you that they were Brian Menge, did

24 you know that to be the fact, to be true?

25 A.  I did not, no.

1    Q.   Did you ever meet Mr. Menge any other time?

2    A.   I did not.

3    Q.   All right.  Why did you tell the investigator in your words

4    kind of something different?

5    A.   I just didn't want to involve myself in telling someone I

6    was involved with drugs.  I didn't know who this guy was.

7    Q.   And the 450,000, that was about drugs?

8            MR. FINK:  Objection, your Honor, leading.

9    BY MR. McDONALD:

10   Q.   Was the $450,000 about drugs?

11           THE COURT:  Sustained, but he rephrased.

12           Was the $450,000 about drugs?

13           THE WITNESS:  From what Lou told me, yes.

14   BY MR. McDONALD:

15   Q.   Now, you were asked by Mr. Fink about immunity, that you're

16   testifying under immunity; correct?

17   A.   Yes.

18   Q.   All right.  Do you understand what the immunity provision

19   here is involved with?

20           MR. FINK:  Your Honor, I've got an objection for

21   inquiring into this about what his understanding of immunity

22   was.  So I don't think it's fair that they get to inquire about

23   it.

24           MR. McDONALD:  No.  I think my objection, Judge, was

25   about the legal conclusion, about whether or not he had

1   immunity, not -- Mr. Fink spent a good five to ten seconds

2   about, you know, he won't be prosecuted if he testifies today.

3   I think this is fair for cross-examination.

4        MR. FINK:  As long as I can inquire into his

5   understanding and get into that whole concept that I was

6   precluded from doing, I'm okay with it.  But I tried to get

7   into what his understanding of his immunity was and now he is.

8        THE COURT:  Well, I think that I'm going to direct the

9   jury in the instructions on how they should consider this

10  testimony, but you sort of opened the door and, Mr. McDonald,

11  you objected so it sort of closed the door.  So maybe you want

12  to rephrase your question or ask something different.

13       MR. McDONALD:  I'm come back to it.

14       THE COURT:  As it's phrased, it's sustained.

15       MR. McDONALD:  I'll come back to it, your Honor.

16  BY MR. McDONALD:

17  Q.  When Mr. Didani came to you and approached you about this

18  $90,000 drug debt, can you describe his demeanor?

19  A.  He was very upset and crying pretty much.

20  Q.  Was he calm like you and I are talking today?

21  A.  He was not.

22  Q.  You said he was -- what did you say, crying?

23  A.  Yes.

24  Q.  I want to show you another picture.

25       MR. McDONALD:  Can you put up 36-9.

1   BY MR. McDONALD:

2   Q.  Mr. Larson, when Mr. Didani sent you a picture of these

3   yellow and red bricks, did he have to explain to you what it

4   was or did you already know?

5   A.   In my experience, it was packaged like cocaine.

6   Q.  Just listen to my question.  Did he have to explain what

7   you're talking about or did you already know what you were

8   talking about?

9            MR. FINK:  Objection, your Honor, to asking him to

10   speculate.  He can ask him what his feelings were or what his

11   thought, but assuming that it is what it is it's just asking

12   him to speculate.

13            THE COURT:  I'm going to allow this question.

14            MR. FINK:  Thank you, your Honor.

15            THE COURT:  But -- okay.

16            MR. FINK:  Thank you, Judge.

17            MR. McDONALD:  Would you like me to ask the question

18   again, your Honor?

19            THE COURT:  I would like you to identify the exhibit

20   again.

21            MR. McDONALD:  The exhibit is 36-9.

22            THE COURT:  Okay.  Yes.  Ask the question again.

23   BY MR. McDONALD:

24   Q.  Mr. Larson, when Mr. Didani sent you a photograph of yellow

25   and red bricks, did he have to explain to you what it was or

 1   did you already know?

 2   A.   I mean, I said that through my experience it was packaged

 3   like cocaine.

 4   Q.   When Mr. Didani told you that he had a big load that was

 5   very good --

 6        MR. McDONALD:  Can you put up 61-2, please.  And can

 7   you zoom in on the very bottom.

 8   BY MR. McDONALD:

 9   Q.   When Mr. Didani told you that he had a big load that was

10   very good, did he have to explain to you what that meant or did

11   you know what that meant?

12   A.   I knew.

13        MR. McDONALD:  All right.  Can you put up 61-3,

14   please.  The very top can you zoom in on, please.

15   BY MR. McDONALD:

16   Q.   When Mr. Didani told you that he had three back to back,

17   did he have to explain that to you or did you already know what

18   he meant?

19   A.   I already knew.

20        THE COURT:  What exhibit is that?

21        MR. McDONALD:  61-3, your Honor.

22   BY MR. McDONALD:

23   Q.   Now, Mr. Fink, I think the last time we were here, so last

24   Thursday, asked you about pressure being applied to you by

25   agents during your initial interview.  Do you remember that?

1   A.   Yes.

2   Q.   At the time of that interview you were -- were you involved

3   with Mr. Didani's cocaine operation?

4   A.   Not handling, no.

5             THE COURT:  Not what?

6             THE WITNESS:  Not handling cocaine.

7   BY MR. McDONALD:

8   Q.   I didn't ask about handling.  You testified earlier that

9   you were partners, you invested some money, and you were the

10  go-between; right?

11  A.   Yes.

12  Q.   And you knew all that when you sat down with DEA agents?

13  A.   Yes.

14  Q.   Mr. Fink also asked you about agents conducting

15  surveillance of you.  Do you remember those questions?

16  A.   Yes.

17  Q.   Do you ever read the surveillance reports about you that

18  were sent to your lawyer?

19  A.   No.

20  Q.   Mr. Fink asked you about the 270,000 IRS bill.  Do you

21  remember that?

22  A.   Yes.

23  Q.   Did you ever get a bill for 270,000?

24  A.   I did not.

25  Q.   Do you recall telling the agents in the first interview

1    that it was Peter Tocco who brought up the whole thing about

2    taxes?

3    A.   I can't recall.

4    Q.   If I -- would it refresh your recollection if I showed you

5    that portion of the video, the interview?

6    A.   Yeah, yes.

7              MR. FINK:  No objection, your Honor.

8              THE COURT:  Very well.

9              MR. FINK:  I haven't seen it, but I trust that it's

10   clips to the appropriate part.

11             THE COURT:  I trust that it's a clip to the

12   appropriate part, too.

13             MR. McDONALD:  It is, your Honor.  I've

14   double-checked.

15             I asked Ms. DiCarlo just to start over because we were

16   having some difficulty.

17             (Videotape played.)

18   BY MR. McDONALD:

19   Q.   Does that refresh your memory as to what you said?

20   A.   Yeah.  It kind of was a long time ago.

21   Q.   All right.

22             THE COURT:  What exhibit is the video?

23             MR. McDONALD:  The exhibit is not marked as an

24   exhibit.  It's probably a defense exhibit, I think.

25             THE COURT:  It's marked.  I know it's proposed, but

 1    it's okay.  I'll find it.

 2    BY MR. McDONALD:

 3    Q.  Do you recall the fact that Peter Tocco was the one that

 4    brought up paying taxes on that money after looking at that

 5    video?

 6    A.  I think he mentioned it.

 7    Q.  Now, do you recall testifying under oath in the Grand Jury

 8    on August 19, 2021?

 9    A.  Yes.

10    Q.  At that time did you testify truthfully in front of the

11    Grand Jury?

12    A.  I did.

13    Q.  Do you recall being asked in the Grand Jury about the

14    $450,000?

15    A.  Yes.

16    Q.  And do you remember what you told the Grand Jury in

17    response to that?

18    A.  Not exactly.

19            MR. McDONALD:  For the record, I've shown defense

20    counsel a portion of the Grand Jury transcript, Page 19.

21            May I approach the witness?

22            THE COURT:  Yes, you may.

23            MR. FINK:  Simply being used for his recollection;

24     correct?

25            MR. McDONALD:  Yes, your Honor.

1              THE COURT:  Yes.

2    BY MR. McDONALD:

3    Q.   Mr. Larson, take a look at lines 18 to 23 and let me know

4    if that refreshes your recollection?

5    A.   Yes.

6    Q.   All right.  What did you tell the Grand Jury about the

7    $450,000.  I don't want you to read it.  From your

8    recollection, please.

9    A.   It's the same thing that I said under direct.

10   Q.   Which is what?

11   A.   That Marty directed me to take the money to Lou in

12   Washington, D.C.

13   Q.   For ...

14   A.   For cocaine.

15   Q.   Is that what you told the Grand Jury?

16   A.   Yes.

17   Q.   You said that it was for cocaine?

18   A.   Yes.

19   Q.   You can put that down Mr. Larson.

20             THE COURT:  Maybe you should retrieve it, Counsel.

21             MR. McDONALD:  Yes, your Honor.

22             May I approach the witness?

23             THE COURT:  Yes.

24   BY MR. McDONALD:

25   Q.   For the record, Mr. Larson, I'm showing you Exhibit 112.9.

1    Do you recognize that?

2    A.   I don't recall this.

3    Q.   You can just set it down.

4             MR. McDONALD:  May I have one moment?

5             THE COURT:  Yes.

6             (Briefly off the record.)

7             MR. McDONALD:  Thank you.  No further questions.

8             THE COURT:  Anything else of this witness?

9             MR. FINK:  A very few, Judge, just on that redirect.

10            THE COURT:  You may.

11                        RECROSS EXAMINATION

12   BY MR. FINK:

13   Q.   Mr. Larson, I just want to make sure it's clear so it's not

14   lost in the back and forth.  My investigator called you and

15   left a message; is that correct?

16   A.   Yes.

17   Q.   You called him back; is that accurate?

18   A.   Yes.

19   Q.   And then that discussion that we heard was had; right?

20   A.   Right.

21   Q.   My investigator didn't say anything to you like you must

22   call me back or something like that; right?

23   A.   He did not.

24   Q.   You were shown some conversations allegedly with Mr. Didani

25   about loads and three back to back.  Do you remember just

1  seeing that a moment ago?

2  A.  Yes.

3  Q.  You cannot testify or tell this jury that any action you

4  took was related to any of those alleged loads that he was

5  talking about, if indeed that was even drugs?  You don't have

6  any connection to what money went to those particular loads; is

7  that correct?

8  A.  Yes.

9  Q.  What I'm saying is correct when you say "yes"?

10  A.  Correct.

11  Q.  So you don't know; right?

12  A.  Right.

13  Q.  Since you were released from prison, even all through this,

14  have you ever handled a speck of cocaine at all?

15  A.  I have not.

16  Q.  In any of your dealings with Mr. Tibbitts, Mr. Didani or

17  anyone that the Government mentions, have you ever seen them

18  handle a speck of cocaine in the United States?

19  A.  I have not.

20  Q.  You ever had cocaine in your presence when you were with

21  Mr. Didani?

22  A.  I wouldn't allow it, no.

23  Q.  You ever have cocaine in your presence when you were with

24  Mr. Tibbitts?

25  A.  Never.

1  Q.  After you cooperated with the Government back in September

2  of 2019, you had follow-ups with the agents thereafter;

3  correct?

4  A.  Yes.

5  Q.  You would tell them any updates that you had with your

6  conversations with Mr. Didani; is that accurate?

7  A.  Yes.

8  Q.  Any of those times, did you handle any cocaine or see any

9  cocaine in Mr. Didani's -- let me ask that in a better way.

10         Were you ever in the presence of any cocaine during

11  those follow-up cooperation with the Government?

12  A.  I was not.

13         (Briefly off the record.)

14  BY MR. FINK:

15  Q.  During these follow-ups with the agents you had after that

16  September 12, 2019, meeting, I'll call them debriefings that

17  you would have with the agents, you reached out to them,

18  correct, or did they reach out to you?

19  A.  They reached out to me.

20  Q.  So they wanted to know if you had any updates; is that

21  correct?

22  A.  Yes.

23  Q.  And do you recall during that follow-up being in touch with

24  Mr. Didani?

25  A.  Yes.

```
 1   Q.   He invited you to Dominican Republic, do you remember that,

 2   to meet his girlfriend, if you recall?

 3   A.   I went to Dominican Republic with my family, but I don't

 4   know if it was -- I was going to meet Lou there.  I don't

 5   remember that part.

 6   Q.   In any of those follow-ups, did he ask you to be involved

 7   with any loads or any drugs?

 8   A.   No.

 9   Q.   At one point, I think you said you were struggling and had

10   a negative bank balance and needed to make bills.  Do you

11   remember that?

12   A.   Yes.

13   Q.   And he sent you $3,000?

14   A.   Yes.

15   Q.   To your knowledge, that wasn't related to drugs?

16   A.   That was for paying me back for like all the rental cars I

17   had for him and stuff like that.

18   Q.   Understood.

19            MR. FINK:  Thank you, Mr. Larson.

20            THE COURT:  Anything else?

21            MR. McDONALD:  Nothing else for me, no.  Thank you.

22            THE COURT:  All right.  Is this witness excused?

23            MR. McDONALD:  Yes, your Honor.

24            MR. FINK:  Yes, your Honor.

25            THE COURT:  You may step down, sir.  Thank you for
```

1    coming.

2              THE WITNESS:  Thank you.

3              (End of excerpt at 10:37 a.m.)

4         THE COURT:  You may call your next witness.

5         MR. FINK:  Judge, may I have five minutes?

6         THE COURT:  Sure.  You may.

7         The jury may step down.  Remember, you're not

8    permitted to talk about the case among yourselves during the

9    break, okay.

10             (The jury left the courtroom at 10:37 a.m.)

11        THE COURT:  Okay.  Who is your next witness?

12        MR. BILKOVIC:  Detective Leach for the second time.

13        THE COURT:  All right.

14        MR. FINK:  Thank you, Judge.

15        MR. BILKOVIC:  Just to give you a heads-up, I think

16   that Agent Leach will go well into tomorrow also.

17             THE COURT:  All right.  That's fine.  Let's take a

18   break.

19        MR. FINK:  Thank you, your Honor:

20             (At 10:38 a.m., a brief recess was taken.

21        Back on the record at 10:51 a.m.)

22        LAW CLERK:  All rise.  Court is back in session.

23        THE COURT:  Okay.  Mr. Leach can come up.  He's

24   already been on the stand; right?

25             MR. BILKOVIC:  That's correct, your Honor.

1          THE COURT:  Is this your second time?

2          THE WITNESS:  Yes, your Honor.

3          LAW CLERK:  All rise.

4          (The jury entered the courtroom at 10:53 a.m.)

5          THE COURT:  I'm satisfied the jurors are back.

6          Is the Government satisfied?

7          MR. BILKOVIC:  Yes, your Honor.

8          THE COURT:  How about defense?

9          MR. FINK:  Yes, your Honor.

10         DEFENDANT DIDANI:  Yes, your Honor.

11         THE COURT:  Okay.  Very well.  Mr. Leach, you've been

12   called again and you are still under oath.

13         THE WITNESS:  Yes, your Honor.

14         THE COURT:  Mr. Fink, do you want him re-sworn?

15         MR. FINK:  No, Judge.

16         THE COURT:  Very good.

17         State your name again for the record, please.

18         THE WITNESS:  Brandon Leach, L-E-A-C-H.

19         THE COURT:  Okay.  You may proceed, Counsel.

20         MR. BILKOVIC:  Thank you, your Honor.

21                     DIRECT EXAMINATION

22   BY MR. BILKOVIC:

23   Q.  Detective Leach, I want to start and clarify something that

24   happened the last time with respect to the iCloud data from

25   Apple.  Do you recall that?

1    A.   Yes, I do.

2              MR. BILKOVIC:  Can you put up 126.5, please.

3              This is an exhibit that's already been admitted, your

4    Honor.

5              THE COURT:  Okay.

6              MR. BILKOVIC:  And could we zoom in just on paragraph

7     1.

8    BY MR. BILKOVIC:

9    Q.   And was this the Apple certification about the records that

10   Apple indicated were produced on February 18, 2020?

11   A.   Yes, it is.

12             MR. BILKOVIC:  Okay.  If we could take that down.

13   BY MR. BILKOVIC:

14   Q.   And did you receive data from Apple?

15   A.   Yes.

16   Q.   Do you recall when you first received data for that search

17   warrant?

18   A.   For that specific search warrant, the first time that I

19   received data was on February 12, 2020.

20   Q.   And I believe -- could you bring the mic a little closer,

21   either that or lean forward.  You have a hesitancy to move

22   back.

23             THE COURT:  The chair doesn't move forward.

24             THE WITNESS:  I'll move forward, your Honor.

25             THE COURT:  Speak loudly.

1           I'm sorry, Counsel.

2  BY MR. BILKOVIC:

3  Q.  You indicated you --

4           MR. BILKOVIC:  Thank you, your Honor.  Can I continue?

5           THE COURT:  Yes.

6  BY MR. BILKOVIC:

7  Q.  You had just indicated you had received the information on

8  February 12th?

9  A.  That is correct.

10  Q.  And do you recall Mr. Didani asking you who's lying, you,

11  Detective Leach or Apple?

12  A.  I do recall.

13  Q.  And what is the answer to that?

14  A.  The answer to that is neither of us were lying.

15  Q.  Explain that.

16  A.  So in addition to the full production request, we had been

17  in touch with a representative of Apple, Mr. Pinner.  We

18  explained to him the necessity of trying to receive these

19  productions in an expedited fashion.  He informed us that it

20  may be beneficial to us if we had a smaller timeframe instead

21  of the full production.

22           So, with that in mind, we requested what we call a

23  date-bound request.  So instead of the full date range of the

24  search warrant, which was over several years, we requested

25  information that was uploaded to Mr. Didani's iCloud from

 1    January 1st of the 2020 through February 6 of 2020, which is

 2    the day of the search warrant that was signed.

 3    Q.   So you're talking about this time?

 4    A.   Yes.

 5    Q.   Had you previously -- was this the first search warrant for

 6    the Apple iCloud information?

 7    A.   No, it was not.

 8    Q.   The first search warrant, the data that you received back,

 9    approximately how many years did that cover of data?

10    A.   Several years.

11    Q.   And so when you got this search warrant did you make a

12    request to Apple again for the full production of several years

13    along with what you called date-bound material?

14    A.   Yes, we did.

15    Q.   So basically two separate requests?

16    A.   Correct.

17    Q.   And in the date-bound material approximately how many days

18    of the data was that?

19    A.   From January 1st of 2020 through February 6.  So 30 plus

20    days, 37, I think.

21    Q.   And is that the material that you received on February

22    12th?

23    A.   Yes, it is.

24    Q.   And so was Apple able to get you that quicker than the

25    production that would encompass several years?

1    A.   Yes, they were.

2    Q.   And that would be the production from February 18, the full

3    production?

4    A.   The full request from that search warrant, that is correct.

5    Q.   Would the date-bound material also be contained in that

6    full production?

7    A.   Yes, it would.

8    Q.   And did you do this with respect to other productions as

9    well?

10   A.   Yes.

11   Q.   Now, are you aware of the $200,000 in cashier's checks that

12   Marty Tibbitts had written to Don Larson and Mr. Larson cashed

13   on June 9, 2016?

14   A.   Yes.

15   Q.   Did the investigation reveal where that money was taken?

16   A.   Yes, it did.

17   Q.   Was there any evidence that you found in the 2016 iPhone of

18   Mr. Didani's that was recovered during the border search?

19   A.   Yes.

20        MR. BILKOVIC:  Can we put up 5.5, which has been

21   previously admitted.

22   BY MR. BILKOVIC:

23   Q.   Do you recognize this?

24   A.   I do.

25   Q.   And what is this?

```
 1              Actually, hold on one second.

 2              (Briefly off the record.)

 3  BY MR. BILKOVIC:

 4  Q.   Do you recognize this?

 5  A.   Yes, I do.

 6  Q.   And what is this?

 7  A.   This is a photo that was extracted from Mr. Didani's iPhone

 8  from the seizure of 2016.  The picture is geolocated at

 9  Mr. Larson's home.

10  Q.   Do you recall what street that was on?

11  A.   Woodbine Street in Fraser, Michigan.

12  Q.   And do you recall what date this was?

13  A.   June 9, 2016.

14              MR. BILKOVIC:  Can we put up 5.6, please, which has

15  also been previously admitted.

16  BY MR. BILKOVIC:

17  Q.   Do you recognize this?

18  A.   Yes, I do.

19  Q.   And what is this?

20  A.   This is another photo located in Mr. Didani's cell phone,

21  geotagged at the same location after the time of the previous

22  photo that was just shown.

23              MR. FINK:  Your Honor, this foundation may have been

24  laid during the first direct, but I would just ask a foundation

25  for the geotag and how he knows that.
```

```
 1              THE COURT:  Lay a foundation.
 2   BY MR. BILKOVIC:
 3   Q.   How do you know the geotag location data?
 4   A.   Through -- one, through the physical phone shows that these
 5   photos that the geolocation data was turned on during the time
 6   these photos were taken, and also in the Cellebrite extraction,
 7   which is the software utilized used to download the phone.  It
 8   also parses out the date and timestamp and geolocation of these
 9   photos associated.
10   Q.   So did you have an opportunity -- you gave us two examples.
11   One is from the Cellebrite extraction?
12   A.   Yes.
13   Q.   Which gives you that information?
14   A.   Correct.
15   Q.   But did you also look at the phone physically and scroll
16   through some of the photographs?
17   A.   Yes.
18   Q.   And when you did that did you come across these
19   photographs?
20   A.   Yes, I did.
21   Q.   When you would come across these photographs, would there
22   be anything on the photograph in addition to just what we see
23   here?
24   A.   Yes.  So a feature on Apple devices, if you do have your
25   geolocation data on, is whenever you take a photo and it's
```

```
 1    saved to your library and you bring that photo back up it will
 2    show the generalized location that that photo was taken.  In
 3    this instance, the top of the photo showed Fraser, Michigan.
 4    Q.  Does it also give you the date?
 5    A.  It does.
 6    Q.  So are there two basically ways that you know this?
 7    A.  Yes.
 8    Q.  Did the download of the phone basically correlate or match
 9    what you had seen when you looked at the physical photographs?
10    A.  Yes, it did.
11    Q.  And again, this photograph was taken on what day?
12    A.  June 9, 2016.
13         THE COURT:  Is this 5.6?
14         MR. BILKOVIC:  This is 5.6.
15         THE COURT:  Okay.
16    BY MR. BILKOVIC:
17    Q.  Do you have your book in front of you?
18    A.  I do.
19    Q.  Can you please take a look at Government's proposed Exhibit
20    5.17, and tell me if you recognize that?
21    A.  Yes, I do.
22    Q.  And just generally what is that?
23    A.  This is a photograph of what appears to be the same
24    heat-sealed money.
25    Q.  And was this photograph also found on Mr. Didani's 2006
```

1  iPhone from the border search?

2  A.  Yes, it was.

3        MR. BILKOVIC:  Your Honor, at this time I would move

4  for admission into evidence of Government's proposed Exhibit

5  5.17.

6        THE COURT:  Any objection?

7        I'm sorry?  Do you have it?

8        MR. FINK:  I will in a moment, Judge.  I've seen it

9  before.

10        No objection, your Honor.

11        THE COURT:  Very well.  It's admitted as 5.17.

12        (Government's Exhibit 5.7 received into evidence.)

13        MR. BILKOVIC:  And may I publish it to the jury, your

14  Honor?

15        THE COURT:  Yes.

16  BY MR. BILKOVIC:

17  Q.  And what are we looking at here?

18  A.  It appears to be the same heat-sealed packages of money

19  laying on top of what appears to be a sheet.

20  Q.  When you say the same heat-sealed packages, are you still

21  talking about the same heat-sealed packages that were in

22  Exhibit 5.6 that we just looked at?

23  A.  Yes, I am.

24  Q.  And did this photograph have geolocation data as well?

25  A.  Yes, it did.

1   Q.   And what was that geolocation data?

2   A.   This geolocation data showed that it was also taken on

3   June 9, 2016, in the late evening hours in Elmwood Park,

4   Illinois.

5   Q.   Elmwood Park, Illinois?

6   A.   Yes.

7   Q.   And do you know who lives -- anybody related to this

8   investigation that lives in Elmwood Park, Illinois?

9   A.   Mr. Didani's parents.

10  Q.   You said this was taken in the later evening hours?

11  A.   Yes.

12  Q.   Do you recall approximately how long after the previous

13  photographs were taken that this photograph was taken?

14  A.   Five to six hours.

15  Q.   Now, last time you testified we had -- we were talking

16  about Government's Exhibit 5.8, which has been previously

17  admitted.

18          MR. BILKOVIC:  Can we bring that up?

19          May I have one moment again, your Honor?

20          THE COURT:  Yes.  That exhibit that's up, what number

21   is that?

22          MR. BILKOVIC:  5.8.

23          THE COURT:  Okay.

24          MR. BILKOVIC:  And can we just zoom in on the phone,

25   the entire phone.

1    BY MR. BILKOVIC:

2    Q.   And what are we looking at here?

3    A.   This is a photograph of Mr. Didani's 2016 seized iPhone.

4    And on that iPhone is a message thread to a gentleman addressed

5    as Puzio.

6    Q.   And obviously it's fairly small.  Can you see the writing

7    from there?  I don't want you to read what it --

8    A.   I can see that is -- the first message appears to be a

9    picture of a picture of a BlackBerry cell phone with a message

10   thread on it.

11          MR. BILKOVIC:  And can we bring up 5.9, which has

12   previously been admitted.

13   BY MR. BILKOVIC:

14   Q.   And is that basically an enlargement of 5.8?

15   A.   Yes, it is.

16          MR. BILKOVIC:  And then I believe last time -- we're

17   going to get into the translation, but at the time we were not

18   able to.  At this time, your Honor, I believe that there's a

19   stipulation for admission into evidence of Government's

20   proposed Exhibit 5.10, which is the translation from Polish to

21   English of this message.  I would move at this time for

22   admission of that into evidence.

23          THE COURT:  Any objection?

24          MR. FINK:  Correct, and no objection.

25          THE COURT:  All right.  It's admitted as 5.10.

 1              (Government's Exhibit 5.10 received into evidence.)

 2              MR. BILKOVIC:  Would it be possible to bring up 5.10

 3   next to 5.9?

 4   BY MR. BILKOVIC:

 5   Q.  And can you read the English translation of that message.

 6   You can leave out the first word.

 7   A.  "Lots of problems.  No one would pay in Colombia for your

 8   product or to put it in a container.  People wake up.  I made a

 9   mistake in opening my mouth to the boss."

10              MR. BILKOVIC:  And can we go back to 5.5, please --

11   I'm sorry, 5.8, please.  And can we zoom in on the top half,

12   which shows the date that this message was sent.

13   BY MR. BILKOVIC:

14   Q.  Do you see the date there?

15   A.  Yes.

16   Q.  And read the date.

17   A.  June 17, 2016.

18   Q.  Now, in scrolling through the phone, or in looking through

19   the phone, did you see messages that were prior to that

20   message, immediately prior to that message?

21   A.  Yes.

22   Q.  Do you have Government's proposed Exhibit 5.18 in front of

23   you?

24   A.  Yes, I do.

25   Q.  And do you recognize that?

1    A.   I do.

2    Q.   And what is that?

3    A.   These are photographs of the $200,000 that was previously

4    shown from Mr. Larson's house on Woodbine.

5         MR. BILKOVIC:  Your Honor, at this time I would move

6    for admission into evidence of Government's proposed Exhibit

7    5.18.

8         THE COURT:  Any objection?

9         MR. FINK:  Although this wasn't on the exhibit list,

10   Judge, it was in discovery, and I don't feel that it's

11   prejudicial because it's been reviewed, so no objection.

12        THE COURT:  Very well.  It's admitted as 5.18.

13        (Government's Exhibit 5.18 received into evidence.)

14        MR. BILKOVIC:  Thank you, Mr. Fink.

15        And can we publish this to the jury?

16        THE COURT:  Yes.

17        MR. BILKOVIC:  Thank you.

18        MR. BILKOVIC:  If we can just go to the top half, the

19   top two photographs -- with the name.  I'm sorry.

20   BY MR. BILKOVIC:

21   Q.   And what are we looking at here?

22   A.   These are two messages sent from Didani to a gentleman

23   named Puzio, and they are photographs of the bulk currency at

24   Mr. Larson's house on June 9, 2016.

25        MR. BILKOVIC:  Okay.  We can take that down.

1              Now, I want to keep the exhibit up, but I wanted to

2    zoom in on the bottom half.

3    BY MR. BILKOVIC:

4    Q.   And so is the bottom half of the text message in Polish

5    that we just talked about?

6    A.   Yes.  It is the very immediately next posted image

7    following those two pictures of the money.

8    Q.   So eight days after the photographs of the money were

9    taken?

10   A.   Correct.

11   Q.   Are you familiar with the $300,000 in checks that were

12   written to -- by Marty Tibbitts to Donald Larson and Peter

13   Tocco and cashed on January 24, 2017?

14   A.   On March 24, 2017?

15   Q.   Yes.

16   A.   Yes, I am.

17   Q.   Were you able to go through the 2016 border search phone

18   and determine where Mr. Didani was around March 24, 2017?

19   A.   Not from his phone that was seized in 2016, no.

20   Q.   That's right, because we're in 2017.

21   A.   Correct.

22   Q.   From the iCloud search warrants that you received back,

23   were you able to determine that?

24   A.   Yes.

25   Q.   And was there any location data in Mr. Didani's phone from

1    March 23rd of 2017?

2    A.   Yes, there was.

3    Q.   And where did that show that he was at?

4    A.   It showed that he was at the Powerhouse Gym in St. Clair

5    Shores, Michigan.

6    Q.   Is that a Powerhouse Gym that Don Larson had worked at?

7    A.   Yes, it was.

8    Q.   If you could look at -- do you have in front of you

9    Government's proposed Exhibit 112.2?  And take a look -- you

10   could look at that, and take a look at Government's 112.3 also,

11   and let me know when you'd reviewed both of those.

12   A.   Yes, I've seen both of these.

13   Q.   And do you recognize those?

14   A.   Yes, I do.

15   Q.   Are those photographs that were recovered from Mr. Didani's

16   iCloud account pursuant to a search warrant in this case?

17   A.   112.2 is a still shot of a video that was --

18   Q.   I'm not asking what's in them.  I'm just asking are they

19   photographs --

20   A.   Yes.

21   Q.   -- that were recovered from one of the iCloud search

22   warrants in this case?

23   A.   Yes.

24            MR. BILKOVIC:  Your Honor, at this time I would move

25   for admission into evidence of Government's proposed Exhibit

1   112.2 and 112.3.

2            THE COURT:  Any objection?

3            MR. FINK:  No objection.

4            THE COURT:  Very well.  They're admitted as 112.2 and

5    112.3.

6            (Government's Exhibits 112.2 and 112.3 received into

7            evidence.)

8            MR. BILKOVIC:  Thank you.

9   BY MR. BILKOVIC:

10  Q.  Other than March 23, 2017, was there any data on

11  Mr. Didani's phone that showed where he was in the days after

12  that?

13  A.  Yes, there was.

14  Q.  And could you briefly talk about that to the jury.

15  A.  On March 27, there's geolocation data showing that he was

16  again on Woodbine Street in Fraser, Michigan, and there was

17  also data on March 29 showing that he was in Elmwood Park,

18  Illinois.

19  Q.  All right.  So --

20            THE COURT:  Was in where?

21            THE WITNESS:  Elmwood Park, Illinois.

22  BY MR. BILKOVIC:

23  Q.  You keep moving back and you're getting away from that

24  microphone.  So if you can still pull it closer to you.

25            MR. BILKOVIC:  If we could bring up 112.2.

1   BY MR. BILKOVIC:

2   Q.   And do you recognize that?

3   A.   Yes, I do.

4   Q.   What is that?

5   A.   This is the video taken from Mr. Didani's iCloud.

6   Q.   Is this a video or is this a screen shot of a video?

7   A.   Screenshot of a video.

8   Q.   The video was taken -- this is a screenshot of a video from

9   Mr. Didani's iCloud?

10  A.   That is correct.

11  Q.   Do you know the date the video was taken?

12  A.   March 27, 2017.

13  Q.   And did you look for the geotag location information?

14  A.   Yes, I did.

15  Q.   And where did this geotag to?

16  A.   Woodbine Street in Fraser, Michigan.

17         MR. BILKOVIC:   And could you take a look at -- can we

18  bring up Government's proposed Exhibit 112.3.

19  BY MR. BILKOVIC:

20  Q.   And what are we looking at here?

21  A.   This is a large bulk currency lying on a bed next to a

22  BlackBerry cell phone.

23         MR. BILKOVIC:   And the front stack of -- can we just

24  zoom in on the currency itself.

25

1    BY MR. BILKOVIC:

2    Q.   And what do the denominations appear to be?

3    A.   One hundred-dollar bills.

4    Q.   And do you know how much is in each stack according to the

5    markings on those packages?

6    A.   It's $10,000 according to the packages.

7    Q.   And do you know approximately how many -- there's one that

8    appears at the top that's kind of sealed; is that accurate?

9    A.   Yes.

10   Q.   Approximately how many are there that are not sealed?

11   A.   19 to 20.

12   Q.   Plus the ones that are sealed?

13   A.   Plus the ones that are sealed.  Typically the bank seals

14   those in packs of ten.

15   Q.   So would that represent approximately $300,000 then?

16   A.   Yes, it does.

17   Q.   And did you have geolocation data for this photograph?

18   A.   Yes.

19   Q.   And what was the geolocation data?

20   A.   This was date stamped March 29, 2017, at Elmwood Park,

21   Illinois.

22   Q.   During your investigation, did you come across additional

23   screenshots?  Like did you come across screenshots of text

24   messages in the iCloud and in the phone?

25   A.   Yes.

1    Q.   In the iCloud, did you recall coming across a screenshot of

2    a text with somebody by the name of Dan Dan?

3    A.   Yes.

4    Q.   And have you been able to determine who Dan Dan is?   I

5    believe you testified to this last time.

6    A.   Yes.

7    Q.   Who is Dan Dan?

8    A.   Identified as Donald Larson.

9    Q.   Can you take a look at Government's proposed Exhibit 112.9

10   and tell me if you recognize that?

11   A.   Yes, I do.

12   Q.   And what is that?

13   A.   This is a screenshot of a text message thread presumably

14   between Mr. Didani and Donald Larson.

15   Q.   Now, the only identifier is Dan Dan at the top; correct?

16   A.   Yes.

17   Q.   But this is a screenshot that was found in Mr. Didani's

18   iCloud?

19   A.   Yes, it is.

20        MR. BILKOVIC:  Your Honor, at this time I would move

21   for admission into evidence of Government's proposed Exhibit

22   112.9.

23        THE COURT:  Any objection?

24        MR. FINK:  Judge, I think as to Mr. -- as to the text

25   messages purportedly in gray and blue, one, lack of foundation

1    and, two, hearsay for as to its truth.

2              THE COURT:  Okay.  Do you want to lay a better

3    foundation?

4              The foundation objection is to what?

5              MR. FINK:  As to how we know who is in the blue and

6    who is in the gray and how we know that.

7              THE COURT:  Okay.  Do you want to lay a foundation for

8    that, please?

9              MR. BILKOVIC:  Yes.

10   BY MR. BILKOVIC:

11   Q.   Did you testify -- did you go through and see other

12   references to Dan Dan throughout the iCloud account and items

13   found in Mr. Didani's phone?

14   A.   Yes.

15   Q.   At times was there a phone number attached to the number of

16   Dan Dan, either a photograph or a picture of the person

17   identified as Dan Dan?

18   A.   Yes.

19   Q.   And the phone number would have belonged to who?

20   A.   Donald Larson.

21   Q.   And the picture was of who?

22   A.   Donald Larson.

23   Q.   And in this case have you come across other instances where

24   Mr. Didani was taking screenshots of text message threads that

25   he was sending and receiving from other individuals?

```
1    A.   Yes.
2    Q.   And is this a screenshot of a text message thread that you
3    located in Mr. Didani's iCloud with Dan Dan who has also been
4    identified by you as Donald Larson?
5    A.   Yes, it is.
6         MR. BILKOVIC:  Your Honor, at this time I believe I've
7    established a sufficient foundation, and I would ask again to
8    have this admitted into evidence.
9         THE COURT:  Lay a foundation as to the gray and blue.
10   BY MR. BILKOVIC:
11   Q.   Okay.  So you see the person on the gray?
12   A.   Yes, I do.
13   Q.   The gray would be the receiver or the sender?
14   A.   That would be the receiver of the messages.
15   Q.   So in the gray in this instance would be who?
16   A.   Donald Larson.
17   Q.   So that would be Dan Dan?
18   A.   Correct.
19   Q.   And the person in the blue, do you know exactly who the
20   person is?  If you don't, it's okay.
21   A.   The person would be the user of the device in hand.
22   Q.   And this was a photograph taken from Mr. Didani's iCloud?
23   A.   Yes, it was.
24        MR. BILKOVIC:  Your Honor, I believe at this time I've
25   established sufficient foundation with respect to this,
```

1     identifying the person in the gray as Mr. Larson and the person

2     in the blue as the user of the device.  And I believe that

3     based on the fact that this was found within Mr. Didani's

4     iCloud that there's been a sufficient foundation laid that this

5     is Mr. Didani.  Even if it is not, I can still offer this as a

6     co-conspirator statement made by Mr. Larson because of the

7     content of what they're talking about.

8              THE COURT:  Now, as to foundation are you satisfied?

9              MR. FINK:  I'm not satisfied as to foundation of the

10    receiver of this text, because if you have a screenshot, your

11    Honor, it means you're taking a picture of a phone, or it could

12    have received a picture from another phone.  So we don't know

13    that it's out -- that those blue bubbles are being sent from

14    that phone.  It's not like you extracted the actual text from

15    that phone.

16             So I don't know that there's a sufficient foundation

17    to identify it that way.  And the problem is you really can't

18    do the co-conspirator analysis without that foundation so -- or

19    the timing or what the discussion, whether it's in response to

20    a co-conspirator statement or not, unless you make that

21    conclusion.

22             So I think screenshots, where we don't know the users,

23    as opposed to other exhibits that have been admitted into

24    evidence where you've extracted the chats actually from the

25    phone, would be different.  So I stand by my foundation

1    objection, hearsay.

2         THE COURT:  Do you want to respond to that anymore,

3    Mr. Bilkovic?

4         MR. BILKOVIC:  If I could ask one more question.

5         THE COURT:  Yes.

6    BY MR. BILKOVIC:

7    Q.  Have you seen screenshots in both Mr. Didani's phone and in

8    his iCloud accounts?

9    A.  Yes.

10   Q.  And in some of those screenshots can you see the reflection

11   of the person that is taking the photograph?

12   A.  Yes, you can.

13   Q.  Can you see those in some or all?

14   A.  Some.

15   Q.  In the ones that you can see the reflection, is there

16   anybody else in the reflection other than Mr. Didani?

17   A.  Not that I can recall.

18        MR. BILKOVIC:  Your Honor, again I believe I've

19   established a sufficient foundation, and I would ask to admit

20   this into evidence.

21        THE COURT:  I think there's sufficient foundation by

22   inference to allow this into evidence, and I'm going to allow

23   it on foundation.

24        Now, since there's foundation, do you continue with

25   the hearsay objection?

1    MR. FINK:  Yes, your Honor.  I think they have to

2  establish the timing and that this is in, you know, some link

3  to the conspiracy to be a statement of a co-conspirator.

4    THE COURT:  Okay.  So you want him to establish a

5  further foundation as to the timing of these photos?

6    MR. FINK:  As to the exception, yes, your Honor.

7    THE COURT:  All right.  Very well.  Establish a

8  foundation as to the timing of these photos.

9  BY MR. BILKOVIC:

10  Q.  Where was this photograph found?

11  A.  This was located in Mr. Didani's iCloud.

12  Q.  And the content of what they're discussing, does it have to

13  do -- without getting into specifics, does it have to do with

14  things that you were investigating in this conspiracy?

15  A.  Yes, it does.

16    MR. BILKOVIC:  Your Honor, I believe that I've laid a

17  sufficient foundation.

18    THE COURT:  How about a date?

19  BY MR. BILKOVIC:

20  Q.  Did you know the date of this?

21  A.  I do not recall the date offhand.

22  Q.  Do you recall approximately how far back the text messages

23  between Dan Dan and Mr. Didani went?  Did they go past 2014

24  that you're aware of?

25  A.  Not that --

1          THE COURT:  "Past" meaning before or after?

2   BY MR. BILKOVIC:

3   Q.   Earlier than 2014?

4   A.   No, I do not believe so.

5   Q.   Do you know if they went earlier than 2015?

6   A.   Not that I recall.

7          MR. BILKOVIC:  Your Honor, I would again move for

8    admission into evidence of 112.9.

9          THE COURT:  I think that's sufficient, too, and I'm

10   going to allow it.

11          (Government's Exhibit 112.9 received into evidence.)

12          MR. FINK:  Thank you, your Honor.

13          MR. BILKOVIC:  Can we publish it to the jury?

14          THE COURT:  112.9 is admitted, and it may be published

15   to the jury.

16          MR. BILKOVIC:  Thank you.

17          And if we could go down to the bottom half that starts

18   with -- the gray box saying "Lebanese banker said no way," down

19   to the bottom.

20   BY MR. BILKOVIC:

21   Q.   So the gray box, that's Mr. Larson; correct?

22   A.   That is correct.

23   Q.   I want you to go down what the gray box says and then what

24   the blue box says and just go all the way down, starting with

25   the top gray box.

1    A.   "Lebaese banker said no way."

2    Q.   And the blue box response?

3    A.   "I send it to someone, danger."

4    Q.   And the gray box response?

5    A.   "F.  Tried though."

6    Q.   Blue box?

7    A.   "That's ok we gone find way."

8    Q.   And then the gray box?

9    A.   "What about 4 people flying into Monaco.  Gambling and

10   partying for 4 days.  Flying back into the U.S. we declare

11   bringing in more than 10 grand each?  Like we won it?"

12   Q.   Asking question marks?

13   A.   Yes.

14   Q.   So is it basically a discussion about trying to bring money

15   back into the United States?

16   A.   That is what it appears.

17   Q.   Now, are you aware of what the reporting requirements are

18   for bringing money into the United States?

19   A.   Yes.  $10,000.

20   Q.   Per person?

21   A.   Per person.

22   Q.   And, if you're going to bring in less than that, do you

23   have to declare it?

24   A.   No, you do not.

25   Q.   If you're going to bring in more than that, do you have to

1    declare it?

2    A.   Yes, you do.

3    Q.   And does this talk about bringing in less or more than ten

4    grand each?

5    A.   Bringing in more than 10,000 each.

6    Q.   With how many people?

7    A.   Four.

8              MR. BILKOVIC:  I want to go to -- if we could bring up

9    112 -- actually, I'm not sure if this has been admitted.  We

10   have a discrepancy on our side, your Honor, 112.10 and 112.11.

11   So I was just going to go through the foundation again with him

12   if that's okay.

13             THE COURT:  Okay.  Do you have anything that would so

14   indicate, Mr. Fink?  I don't have it either.

15             MR. FINK:  I'm so sorry, Judge.  My client was passing

16   me a note.  What did you ask me?

17             THE COURT:  112.10 and 112.11, do you have whether or

18   not they're admitted?

19             MR. FINK:  My list is completely unreliable, but I do

20   not have them as admitted.

21             THE COURT:  Okay.  Then lay a foundation.

22   BY MR. BILKOVIC:

23   Q.   Going to -- can you look at 112.10.

24   A.   I do not have 112.10.

25   Q.   Do you have 112.11?

1   A.   I have 112.9 and 112.13.

2           MR. BILKOVIC:  So may I approach, your Honor?

3           THE COURT:  Yes, you may.

4           You have these, Mr. Fink?

5           MR. FINK:  Yes, I do.  I have 110 and -- I have them,

6   your Honor.

7           MR. BILKOVIC:  May I approach, your Honor?

8           THE COURT:  You may.

9   BY MR. BILKOVIC:

10  Q.   Do you recognize Government's proposed Exhibit 112.10?

11  A.   Yes, I do.

12  Q.   And what is that?

13  A.   This is a message thread that was located in Mr. Didani's

14  iCloud.

15  Q.   And is there a name identified on the message thread as to

16  who one of the parties is?

17  A.   The top reads "Marty Tibbitts."

18  Q.   And is there a date on the message thread?

19  A.   November 16, 2017.

20          MR. BILKOVIC:  Your Honor, at this time I would move

21  for admission into evidence of Government's proposed Exhibit

22  112.10.

23          THE COURT:  Any objection?

24          MR. FINK:  Same foundational objection of the last

25  screenshot.

1            THE COURT:  And is that to 112.10 and 11?

2            MR. FINK:  That would be to 112.10.

3            THE COURT:  Okay.

4            MR. BILKOVIC:  And, your Honor, my response is it

5     would be basically the same as the last one.

6            THE COURT:  Overruled.  And 112.10 is admitted.

7            (Government's Exhibit 112.10 received into evidence.)

8            MR. BILKOVIC:  And could we publish 112.10?

9            THE COURT:  Yes.

10    BY MR. BILKOVIC:

11    Q.   And would Marty Tibbitts again then be the person in the

12    gray?

13    A.   Yes, he would.

14    Q.   All right.  So if we could start at the top and do the top

15    half first, going down to where it says, "We will fix,

16    brother."  Could you start with the gray on the top.

17    A.   "Hmm.  Let's talk when u get back.  Ha Stark."

18    Q.   And how did the blue respond?

19    A.   "Not sure, brother.  Yep, brother, ur.  We just F'd up."

20    Q.   And how did the gray respond?

21    A.   "We will fix, brother."

22    Q.   And can we go to the bottom half.

23            And what is the blue?  Start with the blue.

24    A.   "Not like this, brother, we need to clear heads."

25    Q.   And the gray?

 1   A.   "Yes, definitely.  Ok, brother, talk to you later."

 2   Q.   And there's a date and a time there of November 16, 2017,

 3   at 10:25 in the morning?

 4   A.   Correct.

 5   Q.   And the gray responds?

 6   A.   "Ok, brother."

 7   Q.   And the blue responds?

 8   A.   With a internet hyperlink to a news article.

 9   Q.   Can you look at Government's proposed Exhibit 112.11, and

10   tell me if you recognize that?

11   A.   Yes, I do.

12   Q.   And what is that?

13   A.   When typing in that internet link, it takes you to this

14   news article.

15          MR. BILKOVIC:  Your Honor, at this time I would move

16   for admission into evidence of Government's proposed Exhibit

17   112.11.

18          THE COURT:  Any objection?

19          MR. FINK:  None other than before, Judge.  No further

20   objections.

21          THE COURT:  Okay.  I assume you have the same

22   response?

23          MR. BILKOVIC:  Yes, your Honor.

24          THE COURT:  Okay.  It's overruled, and 112.11 is

25   admitted.

1           (Government's Exhibit 112.11 received into evidence.)

2           MR. BILKOVIC:  And, your Honor, I also believe that

3     there is a stipulation to Government's proposed Exhibit 112.12,

4     which is a translation from Albania to English of the headline

5     of that article, the headline and the date.

6           THE COURT:  Is that correct?

7           MR. FINK:  Mr. Bilkovic, that's the written objection,

8     correct -- or I'm sorry, the written stipulation that was

9     entered?

10          MR. BILKOVIC:  Correct.

11          MR. FINK:  Your Honor, my client entered a written

12    stipulation.  He speaks Albanian and stipulated to the

13    translation in 112.12.  I obviously do not, but I'm relying on

14    my client's stipulation from -- before that my signature and

15    his signature are on.

16          THE COURT:  Okay.  Very good.  It's admitted as

17    112.12.

18          (Government's Exhibit 112.12 received into evidence.)

19          MR. BILKOVIC:  And may I publish the translation of

20    the headline of the article for the jury?

21          THE COURT:  Yes.

22          MR. BILKOVIC:  And can you zoom in on the top.

23    BY MR. BILKOVIC:

24    Q.  Detective Leach, if you could read what the headline is.

25    A.  Yes.  It states that -- this is Albanian, and the headline

 1    reads "Drug trafficking, six Albanian citizens and one Polish

 2    citizen are arrested.  This is what was found from the Dutch

 3    police."

 4    Q.  And there's a date of the article?

 5    A.  November 16, 2017.

 6    Q.  Now, are you also familiar with the $450,000 in checks that

 7    Marty Tibbitts wrote to Don Larson in December of 2017?

 8    A.  Yes.

 9    Q.  And during your investigation did you and other agents find

10    evidence showing what was done with that money?

11    A.  Yes, we did.

12    Q.  And what did that evidence show was done with the money?

13    A.  The evidence --

14    Q.  After it was cashed.

15    A.  After the money was cashed, evidence showed that Mr. Larson

16    flew on a private airplane owned by Martin Tibbitts to

17    Washington, D.C. and delivered that money to Mr. Didani.  That

18    money was then driven to New York.

19    Q.  You said that the money was given to Mr. Didani.  Did you

20    recover evidence in the iCloud showing where Mr. Didani was on

21    December 21, 2017?

22    A.  Yes, we did.

23    Q.  What type of evidence did you find?

24    A.  Multiple photos showing geolocation data.

25    Q.  Did you see any text message strings between Mr. Didani and

1    Mr. Larson on that date?

2    A.   Yes.

3    Q.   Where was it that you believe Mr. Didani was based on the

4    evidence?

5    A.   It appeared Mr. Didani was staying at the JW Marriott.

6    Q.   In Washington, D.C.?

7    A.   In Washington, D.C., yes.

8    Q.   The text message string between Mr. Didani and Mr. Larson,

9    what date was that on?

10   A.   December 21, 2017.

11   Q.   And what is the general discussion -- who is basically

12   communicating?

13   A.   Mr. Larson and Mr. Didani.

14   Q.   And what is basically the general nature of the

15   communication?

16   A.   General nature was Mr. Didani requesting what time they

17   were taking off, Mr. Larson was taking off from here, what time

18   the arrival was going to be, that they had to be careful

19   because there were police everywhere, and just trying to

20   coordinate a time to hand the money off.

21   Q.   And did that text message string continue while Mr. Larson

22   was in flight?

23   A.   Yes, it did.

24   Q.   Could you look at Government's proposed Exhibits 115.22 --

25   well, first of all, do you have them there?  115.22, 115.23,

1    115.24, 115.25, 115.26, and 115.27.

2    A.   Yes, I have all of those.

3    Q.   And do you recognize those?

4    A.   I do.

5    Q.   Are those items detailing how it is that you were able to

6    determine that Mr. Didani was at the JW Marriott on January 21,

7    2017?

8    A.   Yes, it is.

9         MR. BILKOVIC:  Your Honor, at this time I would move

10   for admission into evidence of Government's proposed Exhibits

11   115.22 through 115.27.

12        THE COURT:  Do you have any objection?

13        MR. FINK:  I only have an objection to 115.27 and

14   115.24 for foundation as to what we're looking at in these,

15   because I don't think these are from the phone.

16        THE COURT:  So 22 and 23 you have no objection?

17        MR. FINK:  And 25 and 26, if that's what you said,

18   Mr. Bilkovic.

19        THE COURT:  Yes, 25 and 26.  I'm admitting those.  And

20   let's hear your objection to 24 and 27 -- or, better yet, lay a

21   foundation.

22        (Government's Exhibits 115.22, 115,23, 115.25 and

23        115.26 received into evidence.)

24        MR. BILKOVIC:  How about if I go through the first two

25   and then come back to those; is that okay?  I can do it.  I

1   mean, I can lay the foundation.  I just think it might make

2   more sense to go through the first --

3           THE COURT:  All right.

4           MR. BILKOVIC:  -- two exhibits and then lay the

5   foundation for the third one, but they're all related.

6           THE COURT:  All right.  Do you have any objection to

7   that, Mr. Fink?

8           MR. FINK:  No, Judge.

9           THE COURT:  Very well.  Do it that way.

10          MR. BILKOVIC:  Can we publish 115.22, please.

11  BY MR. BILKOVIC:

12  Q.  And what are we looking at here?

13  A.  This is a photograph located in Mr. Didani's iCloud of bulk

14  currency laying on a bed.

15  Q.  And was there metadata showing when this photograph was

16  taken?

17  A.  Yes, there was.

18          MR. BILKOVIC:  Can we go to 115.23, and can we zoom in

19  on the top half.

20  BY MR. BILKOVIC:

21  Q.  And what are we looking at here?

22  A.  This is metadata from that picture.

23  Q.  So this would have been recovered from where?

24  A.  Mr. Didani's iCloud.

25  Q.  So basically along with the photograph there's also

1   metadata for the photograph?

2   A.   Correct.

3          MR. BILKOVIC:  Can we go to the bottom half, starting

4   where it says "Metadata" all the way down.  All the way down.

5   BY MR. BILKOVIC:

6   Q.   And what are we looking at here?

7   A.   This is a continuance of the metadata for that specific

8   image.

9   Q.   And does it show the capture time of the image?

10   A.   Yes, it does.

11   Q.   And what time is that?

12   A.   It's 7:37 p.m.

13   Q.   On what date?

14   A.   The 21st of December, 2017.

15   Q.   Now, on the bottom it appears there's writing that says

16   "Map" and "Position."  Are you familiar with that?

17   A.   Yes, I am.

18   Q.   What is that?

19   A.   These are latitude and longitude coordinates for where the

20   photo was captured.

21   Q.   And have you come across those in other photographs in this

22   case?

23   A.   Yes.

24   Q.   Have you come across this type of material in other

25   investigations that you've done as well?

1  A.   Yes.

2  Q.   Are there ways -- common ways for anybody to take

3  coordinates, latitude and longitude coordinates, and basically

4  figure out from that where the photograph was taken?

5  A.   Yes.

6  Q.   Or where the latitude and longitude where it puts you?

7  A.   Yes.

8  Q.   And how is it that you can do that?  What are some of the

9  ways?

10  A.   You can do it on a physical map that has latitude and

11  longitude lines laid out, or the easier way nowadays is to type

12  it into an online search map engine such as Google Maps.

13  Q.   And has that been done in this case?

14  A.   Yes, it has.

15  Q.   And did you do it in other investigations?

16  A.   Yes.

17  Q.   Have you ever had a time where you've put latitude and

18  longitude in on, for example, Google Maps and it's given you

19  something that's totally incorrect?

20  A.   Only if it was inputted incorrectly.

21  Q.   Are there times where you will put latitude and longitude

22  in on an area where you know where the area is?

23  A.   Yes.

24  Q.   Has that ever come back and given you a different area?

25  A.   No.

1    Q.   And you said this is a common feature of Google?

2    A.   Yes.

3    Q.   Are there other websites as well that do this?

4    A.   Yes, Apple Maps as well.

5             MR. BILKOVIC:  Your Honor, at this time I would

6    move --

7    BY MR. BILKOVIC:

8    Q.   And is that what basically 115.2 -- Exhibit 24 shows?

9    A.   Yes, it is.

10            MR. BILKOVIC:  Your Honor, at this time I believe I've

11   laid a sufficient foundation.  I would move for admission into

12   evidence of Exhibit 115.24, which is a Google Map.

13            THE COURT:  Any objection?

14            MR. FINK:  No, your Honor.

15            THE COURT:  Okay.  So 115.24 can also be admitted?

16            (Government's Exhibit 115.24 received into evidence.)

17            MR. FINK:  Yes, your Honor.

18            THE COURT:  Okay.

19            MR. BILKOVIC:  And can I -- I'm sorry.  I should have

20   asked him questions about it before I asked the Court that, but

21   it's been admitted so can we publish it to the jury?

22            THE COURT:  Yes.

23            MR. BILKOVIC:  Thank you.

24   BY MR. BILKOVIC:

25   Q.   And what are we looking at here?

1  A.   This is a satellite image overhead of where the geolocation

2  latitude and longitude coordinates land from the previously

3  associated photo.

4  Q.   And can we -- do you see the --

5       MR. BILKOVIC:  Can you circle in or just zoom in on

6  the area with the red pin in the center.

7  BY MR. BILKOVIC:

8  Q.   And do you see the red pin?

9  A.   Yes, I do.

10  Q.   What does that signify?

11  A.   It signifies that that photo was taken while at the

12  JW Marriott, Washington, D.C.

13  Q.   Is the red pin basically the latitude and longitude of that

14  photograph?

15  A.   Yes, it is.

16       MR. BILKOVIC:  And can you take that down and can we

17  bring up Government's Exhibit 115.25.

18  BY MR. BILKOVIC:

19  Q.   Do you recognize this?

20  A.   Yes, I do.

21  Q.   And what is that?

22  A.   This is another photograph taken and located in

23  Mr. Didani's iCloud.

24  Q.   And did you recover the metadata from that photograph?

25  A.   Yes, we did.

1    Q.   Is that depicted in Government's Exhibit 115.26?

2    A.   That's correct.

3            MR. BILKOVIC:  And could we publish 115.26, please.

4            THE COURT:  I think that -- is 115.26 one of your

5    objections, Mr. Fink?

6            MR. FINK:  Yeah -- yes, it is, your Honor, but I --

7            MR. BILKOVIC:  I believe his objection was to 115.27.

8            THE COURT:  I'm sorry, that is correct.

9            MR. FINK:  Mr. Bilkovic is right.  And I was looking

10   at the wrong one.  So, no, I didn't have an objection to that

11   one.

12           THE COURT:  Okay.  All right.  You may show it then.

13           MR. BILKOVIC:  Thank you, Judge.

14           Again, can we just zoom in on the top half.

15   BY MR. BILKOVIC:

16   Q.   And what are we looking at there?

17   A.   This is that same photo with the image identifier for that

18   image.

19   Q.   And can we look at the bottom half.  And what are we

20   looking at here?

21   A.   The metadata specific to that image.

22   Q.   And does it show a capture time?

23   A.   Yes, it does.

24   Q.   And the capture time is ...

25   A.   7:37 p.m.

1    Q.   On what date?

2    A.   The 21st of December 2017.

3    Q.   And are there latitude, longitude coordinates on this as

4    well?

5    A.   Yes, there are.

6    Q.   And could you look at Government's proposed Exhibit 115.27.

7            MR. BILKOVIC:  Don't publish that, though.

8    BY MR. BILKOVIC:

9    Q.   And do you recognize that?

10   A.   Yes, I do.

11   Q.   And what is that?

12   A.   This is the location of those latitude, longitude

13   coordinates from the previous photo.

14   Q.   Similar to what was depicted in the Google photograph on

15   115.24?

16   A.   Correct.

17           MR. BILKOVIC:  Your Honor, at this time I would move

18   for admission into evidence of Government's proposed Exhibit

19   115.27.

20           THE COURT:  Any objection?

21           MR. FINK:  May I voir dire on --

22           THE COURT:  Yes, you may.

23           MR. FINK:  -- 115.

24           THE COURT:  115.27?

25           MR. FINK:  Yes, and its relationship to 115.26.

```
 1              THE COURT:  Yes.
 2              MR. FINK:  Ms. DiCarlo, can you put up 115.26.
 3              Judge, may I come over to the --
 4              THE COURT:  Yes, you may.
 5              MR. FINK:  It's easier for me than to see on my
 6   computer.
 7                      VOIR DIRE EXAMINATION
 8   BY MR. FINK:
 9   Q.  Detective Leach, the latitude on 115.26 ends in 469;
10   correct?
11   A.  On latitude, yes.
12   Q.  Okay.  Can you go to 115.27.  That won't be published, but
13   just so you can see it.
14              THE COURT:  We're looking at what now, 115 --
15              MR. FINK:  Detective Leach is now going to look at the
16   unadmitted one.
17              THE COURT:  I know, but this one is --
18              MR. FINK:  This is 115.26, and my question to
19   Detective Leach was this 469.
20              THE COURT:  Okay.
21   BY MR. FINK:
22   Q.  The latitude on 115.27, the last three numbers are
23   different; is that correct?
24   A.  It appears there's one digit difference, yes.
25              MR. FINK:  Okay.  Thank you.
```

1          Your Honor, I object to 115.27, because it was entered

2     differently.

3          MR. BILKOVIC:  Your Honor, there's one number

4     differently.  Because of that, I will seek to admit this at a

5     later time.  I'll withdraw the move for admission of 115.27.

6          THE COURT:  Okay.  Very well.  Not admitted at this

7     time.

8                    DIRECT EXAMINATION (Continued)

9     BY MR. BILKOVIC:

10    Q.  Did you go through the metadata in Mr. -- or the location

11    data in the iCloud, Mr. Didani's iCloud, to determine where he

12    was on December 17, 2017?

13    A.  Yes.

14    Q.  And could you tell -- did you recover anything that showed

15    that?

16    A.  Yes.

17    Q.  What type of items did you recover?

18    A.  There was photographs of Mr. Larson and Mr. Didani

19    together.  There was a image of Mr. Tibbitts' house.  There's

20    also --

21    Q.  Could you speak up a little bit?

22    A.  There's also images of Mr. Didani riding around with

23    Mr. Synowiec.

24          THE COURT:  Riding around what?

25          THE WITNESS:  Driving around with Mr. Synowiec.

1            THE COURT:  Okay.

2   BY MR. BILKOVIC:

3   Q.  So let's start with the photograph.  You said there was a

4   photograph of Mr. Didani and Mr. Larson?

5   A.  Yes.

6   Q.  And could you tell from the photograph where that

7   photograph was taken?

8   A.  Yes, we could.

9   Q.  Where was it taken?

10  A.  It was taken at a Starbucks in the Eastern District of

11  Michigan.

12  Q.  And was there data as to the date that that was taken?

13  A.  Yes.

14  Q.  And what was the date?

15  A.  December 17.

16  Q.  And was there geolocation data?

17  A.  Yes, there was.

18  Q.  Where did that show the photograph was taken?

19  A.  At the Starbucks on Kercheval, and I forget the cross

20  street.

21  Q.  Do you know what city?

22  A.  I believe -- I don't want to misspeak.

23  Q.  Was it in the Eastern District of Michigan?

24  A.  Yes, it was.

25  Q.  Now, you also indicated there was a photograph of the

 1   exterior of Mr. Tibbitts' house?

 2   A.   Yes.

 3   Q.   Are you talking about the Grosse Pointe house on Grand

 4   Marais?

 5   A.   That is correct.

 6         MR. FINK:  Your Honor, I'm sorry.  I don't mean to

 7   interrupt the flow.  If Mr. Bilkovic is intending to admit or

 8   show these, then so be it, but I don't think it's appropriate

 9   to just summarize when we have the best evidence allegedly,

10   which would be the pictures.

11         MR. BILKOVIC:  I wasn't planning on it, but I can.  I

12   don't have them with me now.  I don't think that I'm limiting

13   to asking him just questions about exhibits that we're going to

14   admit.  I can ask him other questions about what happened

15   during the investigation.

16         THE COURT:  Are there photographs that show this?

17         MR. BILKOVIC:  Yes.

18         THE COURT:  And are they admitted?

19         MR. BILKOVIC:  They are not admitted.

20         MR. FINK:  I think the geolocations and things like

21   that, you know, they're documents that speak for themselves.

22   I'm not sure both foundationally, best evidence, and maybe even

23   hearsay, can have it without the actual evidence.

24         THE COURT:  Well, it might be nice to have the best

25   evidence, Mr. Bilkovic.

```
 1            MR. BILKOVIC:  All right.  I'm going to -- can I ask
 2   one more question about one of these and then I'll move on to
 3   another topic?
 4            THE COURT:  Yes.
 5   BY MR. BILKOVIC:
 6   Q.  With respect to the photograph of Mr. Tibbitts' house, can
 7   you tell from the photograph where that photograph was taken?
 8   A.  Yes.  From the street right directly in front of the
 9   residence.
10            MR. FINK:  Objection to foundation on all of this.  I
11   mean, we're without any evidence and we're just asking him
12   these questions based on his investigation.
13            THE COURT:  He's going to bring in the best evidence.
14            MR. FINK:  Okay.  Thank you, Judge.
15   BY MR. BILKOVIC:
16   Q.  Do you have in front of you Government's proposed Exhibit
17   70?
18            THE COURT:  70?
19            MR. BILKOVIC:  Yes, 70.0 -- I'm sorry, 71.0.
20            THE WITNESS:  Yes, I do.
21   BY MR. BILKOVIC:
22   Q.  And do you recognize that?
23   A.  Yes.
24   Q.  And what is that?
25   A.  This is an extraction of one of Mr. Didani's cell phones of
```

1  a message thread.

2  Q.  Was this an extraction that was taken from the rose iPhone,

3  I believe that was Government's Exhibit -- I believe it's 60.0,

4  but I don't want to misspeak.  The rose iPhone that was

5  recovered from Mr. Didani at the Charlotte Douglas Airport on

6  March 31, 2021, Exhibit 60.  Is this an extraction of a chat

7  from that device?

8  A.  Yes, it is.

9          THE COURT:  When you say rose iPhone, you mean rose

10  colored?

11          MR. BILKOVIC:  Rose-colored iPhone.

12          THE COURT:  Okay.

13          MR. BILKOVIC:  Thank you.

14  BY MR. BILKOVIC:

15  Q.  And is there a phone number -- well, let me ask you this:

16          Does this appear -- you said this is a chat?

17  A.  Yes.  This is identifying a message thread between two

18  individuals.

19  Q.  And do you see on Page 1, 71, on the first page, is there a

20  section that indicates from the very first line, the first

21  entry?

22  A.  Yes.

23  Q.  And are you familiar with -- is there a phone number there?

24  A.  There is.

25  Q.  Are you familiar with who belongs to that phone number?

1    A.   Yes.

2    Q.   And who is that?

3    A.   Mr. Didani.

4    Q.   And is there basically information below there that

5    indicates an abbreviation for the owner of that phone?

6    A.   Yes.

7    Q.   And next on the "To" line is there a phone number there?

8    A.   There is.

9    Q.   And are you familiar with that phone number?

10   A.   Yes, I am.

11   Q.   I believe there's been testimony previous in this case

12   about that phone number, but do you know who that phone number

13   belongs to?

14   A.   Yes, I do.

15   Q.   And who is that?

16   A.   Peter Synowiec.

17   Q.   And the -- this chat, this is basically excerpts of a

18   longer chat; is that correct?

19   A.   Correct.

20           THE COURT:  That being Exhibit 71.0?

21           MR. BILKOVIC:  Yes, your Honor.

22           THE COURT:  Okay.

23   BY MR. BILKOVIC:

24   Q.   And 71.0, this is basically an excerpt of the full chat,

25   which was 71.7; is that correct?

1   A.   Yes.

2   Q.   In addition to the phone number, you recognize the phone

3   number as belonging to Mr. Didani, this chat was also found on

4   his actual cell phone?

5   A.   Yes.

6   Q.   Now, when you would go through these chats or go through

7   his phone, you would come across chats, would you look for

8   evidence trying to show basically who the user was, in addition

9   to the information that you had?

10  A.   Yes.

11  Q.   Was there any evidence other than what you've already

12  talked about the phone number and things like that, that this

13  was a chat involving Mr. Didani from his device?

14  A.   Yes.

15  Q.   Can you look at Government's proposed Exhibit 71.5.  And do

16  you recognize that?

17  A.   Yes, I do.

18  Q.   And is that a photograph that was within this chat?

19  A.   71-5?

20  Q.   Yes.

21  A.   That appears to be another extended excerpt from the same

22  message thread.

23          MR. BILKOVIC:  Your Honor, at this time I would move

24  for admission into evidence of Government's proposed Exhibit

25  71.0.

 1              THE COURT:  Any objection?

 2              MR. FINK:  No objection, your Honor.

 3              THE COURT:  Very well.  It's admitted as 71.0.

 4              (Government's Exhibit 71.0 received into evidence.)

 5              MR. BILKOVIC:  And could we just publish the first

 6   page, the top half of the first page.

 7              THE COURT:  Of 71.0?

 8              MR. BILKOVIC:  Yes.

 9              THE COURT:  Okay.

10              MR. BILKOVIC:  Can we get that, but go -- I'm sorry.

11   Go over to the far left.

12   BY MR. BILKOVIC:

13   Q.  So do you see on the far left side there's the top bar, the

14   gray bar?

15   A.  Yes.

16   Q.  What is the gray bar?

17   A.  The gray bar is giving you the identifiers of the

18   information below in that column.

19   Q.  So on the far left in the gray bar what does that box say,

20   or have?  What is the symbol there?  Can you tell?

21   A.  Number sign.

22   Q.  I'm sorry?

23              THE COURT:  I'm sorry?

24              THE WITNESS:  Number sign.

25

1    BY MR. BILKOVIC:

2    Q.   A number sign?

3    A.   Top left gray box?

4    Q.   Yeah.

5            MR. BILKOVIC:  Can we zoom in on the top two left.

6    BY MR. BILKOVIC:

7    Q.   Are you saying the number sign?

8    A.   Yes.

9    Q.   And then in the first box underneath that do you see the

10   number "1"?

11   A.   I do.

12   Q.   What does that signify or represent?

13   A.   One message.

14   Q.   Okay.  Are the messages then numbered sequentially

15   throughout the chat starting with 1 going down?

16   A.   Yes.

17           MR. BILKOVIC:  Can we go back out.

18   BY MR. BILKOVIC:

19   Q.   And the reason I'm going to ask you this is we're going to

20   look at other chats as well; correct?

21   A.   Yes.

22   Q.   And do they a lot of times have the same format as this

23   one?

24   A.   Yes, they do.

25           MR. BILKOVIC:  So could we go starting with the "From"

1    box, Ms. DiCarlo, all the way over to the right.

2    BY MR. BILKOVIC:

3    Q.   And do you see the "From" box on the far left now?

4    A.   Yes, I do.

5    Q.   And what information would be contained there?

6    A.   The phone number and the identifier that's typed in for

7    that device, for that number -- associated with that number.

8    Q.   And the "To" number would be what?

9    A.   That would be who the owner of the device is sending

10   messages to.

11   Q.   Now, do you see under the -- and then there's a timestamp?

12   A.   Yes.

13   Q.   And the timestamp gives what information?

14   A.   The date and time that the message was sent.

15   Q.   Now, do you see the "9:22 49 a.m. UTC-4"?

16   A.   Yes.

17   Q.   Are you familiar with what UTC is?

18   A.   Yes.

19   Q.   What is UTC?

20   A.   UTC is a time zone in the Mid-Atlantic that's basically a

21   common referred to time zone for all of the cell phone

22   distributors.

23   Q.   And with Michigan are you aware how far Michigan is behind

24   UTC time?

25   A.   Depends on if we're on a daylight savings time or not.

94

```
 1    It's either four or five hours behind.
 2    Q.  So does the UTC-4 then mean -- basically coordinate to the
 3    time that would be in the eastern time zone?
 4    A.   Yes.
 5    Q.  And then you see under the "Direction," do you see content
 6    -- the gray box content?
 7    A.   Yes.
 8            MR. BILKOVIC:  Can we just circle that box and what
 9    goes underneath it.  Okay.  That's good.
10    BY MR. BILKOVIC:
11    Q.  So content, do you see the word "Direction" underneath?
12    A.   I do.
13    Q.  And then underneath that it says what?
14    A.   "Outgoing."
15    Q.  So in this message thread were there both outgoing and
16    incoming messages?
17    A.   Yes.
18    Q.  Because this is Mr. Didani's device, if the message says
19    outgoing, who is sending it, the device or the person that's
20    being talked to?
21    A.   The device.
22    Q.  And, if the message is incoming, what does that mean?
23    A.   The device is receiving a message.
24    Q.  So in this case if it said "Incoming" it would be a message
25    incoming from Mr. Synowiec?
```

1    A.   Correct.

2    Q.   And, if it said "Outgoing," it would be a message going out

3    to Mr. Synowiec; is that fair?

4    A.   Yes.

5    Q.   If you could go to 71.0-9, or Page 9.  Do you have that?

6    A.   71-9?

7    Q.   Yes.

8    A.   Yes.

9    Q.   And do you see entry 49, entry number 49?

10   A.   Yes, I do.

11   Q.   And is that a photograph that you talked about that is also

12   in Government's proposed Exhibit 71.5?

13   A.   Yes.

14   Q.   And is that --

15        MR. BILKOVIC:  Can we go to Page 71.9 and can we zoom

16   in on --

17        THE COURT:  71.9 or --

18        MR. BILKOVIC:  I'm sorry, 71.0, Page 9.

19        THE COURT:  Okay.

20        MR. BILKOVIC:  And can we just zoom in on that.  Could

21   we zoom back out.  I'm sorry.  I want to get whether it's an

22   outgoing or incoming.

23   BY MR. BILKOVIC:

24   Q.   And is this an outgoing message?

25   A.   This is an outgoing message.

1    Q.  So again, just to basically beat a dead horse, this is a

2    message then being sent from the device to Peter Synowiec?

3    A.  That is correct.

4           MR. BILKOVIC:  And can we go to Exhibit 71.5 and can

5    we publish that.

6           I'm sorry, your Honor.  That has not been admitted

7    yet, so ...

8           THE COURT:  No, it has not.

9           MR. BILKOVIC:  I'm sorry.  At this time I would move

10    for admission --

11   BY MR. BILKOVIC:

12   Q.  Is 71.5 an enlarged version of the photograph that is on

13   the screen there?

14   A.  My 71-5 is another excerpt from this message thread.

15   Q.  71.5, a photograph.

16           MR. BILKOVIC:  Your Honor, may I approach the witness?

17           THE COURT:  Yes, you may.

18   BY MR. BILKOVIC:

19   Q.  Is 71.5 basically the enlarged version of what we're

20   looking at here?

21   A.  Yes, it is.

22           THE COURT:  What you're looking at there is 71.0,

23    Page 9?

24           MR. BILKOVIC:  Correct.

25           THE COURT:  Okay.  And 71.5 you say -- you're asking

 1      is it an enlargement of the photo in 71.0 Page 9?

 2               MR. BILKOVIC:  Yes.

 3               THE COURT:  Okay.  Do you know the answer to that?

 4               THE WITNESS:  Yes, it is, your Honor.

 5               THE COURT:  Okay.

 6               MR. BILKOVIC:  Your Honor, at this time I would move

 7      for admission into evidence of 71.5.

 8               THE COURT:  Any objection?

 9               MR. FINK:  I thought it had already been admitted or

10      asked about, but no objection, Judge.

11               THE COURT:  It had been asked about, but it had not

12      been admitted.

13               MR. FINK:  Understood.  No objection, your Honor.

14               THE COURT:  All right.  It's admitted as 71.5.

15               (Government's Exhibit 71.5 received into evidence.)

16               MR. BILKOVIC:  Can we zoom in on that again, just

17      to --

18               THE COURT:  Now, which exhibit is this?

19               MR. BILKOVIC:  This is going to be 71 -- the same one,

20      71.0, Page 9 still.

21               THE COURT:  Okay.

22               MR. BILKOVIC:  I'm only going to go through this one

23      time, your Honor, just to explain how we're getting these

24      photographs.

25

1    BY MR. BILKOVIC:

2    Q.  So do you see under the photograph there's -- where the

3    words "IMG-4844.JPG"?

4    A.  Yes.

5    Q.  And then underneath that do you see the blue writing?

6    A.  Yes, I do.

7    Q.  What is that blue writing?

8    A.  This is where the attachment is located within the library

9    of the iCloud, or device in this instance.

10   Q.  So, if you were to be reviewing this through Cellebrite and

11   you were to click on that blue area, where would that take you?

12   A.  That would take you to the direct image.

13   Q.  Which would in this case is 71.5?

14   A.  Yes, it is.

15   Q.  So throughout your testimony then when we go to the larger

16   images is that how you got to them?

17   A.  Yes.

18           MR. BILKOVIC:  And, your Honor, at this time I would

19   move -- I would ask to publish 71.5 to the jury.

20           THE COURT:  You may.

21   BY MR. BILKOVIC:

22   Q.  And what does that appear to be?

23   A.  Photograph of Mr. Didani at the gym.

24           MR. BILKOVIC:  Okay.  We can take it down.

25

1    BY MR. BILKOVIC:

2    Q.   If you could go to 71.0-2, or Page 2, and look at message

3    11.  Do you recognize that?

4    A.   Yes, I do.

5    Q.   And is that basically the link to a video that Mr. Didani

6    sent to Mr. Synowiec?

7    A.   Yes, it is.

8    Q.   And is there a date on that video?

9    A.   December 18, 2017.

10             THE COURT:  Tell me the date again.

11             THE WITNESS:  December 18, 2017.

12             THE COURT:  Okay.  Thank you.

13   BY MR. BILKOVIC:

14   Q.   And have you had an opportunity to review Government's

15   proposed Exhibit 71.1, which is the link to that video?

16   A.   Yes, I have.

17             MR. BILKOVIC:  Your Honor, at this time I would move

18   for admission into evidence of Government's proposed Exhibit

19   71.1.

20             THE COURT:  Any objection?

21             MR. FINK:  No objection, your Honor.

22             THE COURT:  All right.  71.1 is admitted.

23             (Government's Exhibit 71.1 received into evidence.)

24             MR. BILKOVIC:  Okay.  And again, you said -- I'm

25   sorry, your Honor.  I didn't mean to interrupt you.

```
 1              THE COURT:  Go ahead.

 2              MR. BILKOVIC:  Was the Court finished?

 3              THE COURT:  Yes.

 4   BY MR. BILKOVIC:

 5   Q.  Okay.  You said this was a video that Mr. Didani sent to

 6   Mr. Synowiec on December 18, 2017?

 7   A.  Yes.

 8              MR. BILKOVIC:  And could we publish 71.1.

 9              (Video played.)

10   BY MR. BILKOVIC:

11   Q.  Were you able to look -- have you looked at that video

12   before?

13   A.  Yes, I have.

14   Q.  Are you able to see from the logo on the steering wheel the

15   type of vehicle that is?

16   A.  Yes.

17   Q.  What type of vehicle is that?

18   A.  A Porsche.

19              THE COURT:  Tell me this.  You said it was 71.1.  Is

20    that what we just saw, or 71.2?

21              MR. BILKOVIC:  71.1.

22              THE COURT:  All right.  Go ahead.

23              MR. BILKOVIC:  Did I misspeak, your Honor?  If I did,

24    I apologize.

25              THE COURT:  No, you didn't.  I just have it marked
```

1    differently.

2            Okay.  Go ahead.  He identified the vehicle.  What's

3    your next question?

4    BY MR. BILKOVIC:

5    Q.   If you could go to 71.0, Page 3, and look at entry 12.  Do

6    you recognize that?

7    A.   Yes, I do.

8    Q.   And again, what is this that we're looking at in general,

9    without the description of the attachment, but what is this

10   that we're looking at?

11   A.   An incoming message from Mr. Synowiec to Mr. Didani.

12   Q.   And what is the date of this message?

13   A.   December 18, 2017.

14   Q.   And have you seen this video before?

15   A.   Yes, I have.

16   Q.   And is it the video that is depicted in Government's

17   proposed Exhibit 71.2?

18           You won't have the video up there.  This is a video

19   you looked at?  Did you look --

20   A.   I have looked at this video, yes.

21   Q.   Is this the video that you reviewed that was sent by

22   Mr. Synowiec to Mr. Didani on December 18, 2017?

23   A.   Correct.

24           MR. BILKOVIC:  Your Honor, at this time I would move

25   for admission into evidence of Government's proposed Exhibit

```
 1    71.2.

 2              THE COURT:  Any objection?

 3              MR. FINK:  No objection, your Honor.

 4              THE COURT:  Very well.  It's admitted as 71.2.

 5              (Government's Exhibit 71.2 received into evidence.)

 6              MR. BILKOVIC:  And can we publish it to the jury?

 7              THE COURT:  Yes, you may.

 8              (Video played.)

 9              MR. BILKOVIC:  Can we pause it.

10    BY MR. BILKOVIC:

11    Q.  Do you see a note in the video, a handwritten note?

12    A.  Yes, I do.

13    Q.  And were you able to make out what that handwritten note

14    says?

15    A.  Yes.

16    Q.  What does it say?

17    A.  It says, "12-18-2017."  And under that it says, "D + M."

18    Q.  And next to that is what?

19              THE COURT:  D + ...

20              THE WITNESS:  M.

21    BY MR. BILKOVIC:

22    Q.  And next to that appears to be what?

23    A.  Large bulk currency.

24              MR. BILKOVIC:  Can we finish playing the video.

25              (Video played.)
```

1   BY MR. BILKOVIC:

2   Q.   The denominations in the video were what denominations?

3   A.   One hundred-dollar bills.

4            MR. BILKOVIC:  Can we go back in the video and just

5   pause it.  Can you just pause it right there.

6   BY MR. BILKOVIC:

7   Q.   And stacks of how much?

8   A.   Those are ten thousand-dollar bands.

9   Q.   And do you recall approximately how many bands are in the

10  video?

11  A.   Approximately 15.

12  Q.   After sending that video did Mr. Synowiec follow it up with

13  a text message?

14  A.   Yes, he did.

15           MR. BILKOVIC:  Can we go back to 71.0, Page 3.

16  BY MR. BILKOVIC:

17  Q.   The video was on the very top; correct?

18  A.   Yes.

19           MR. BILKOVIC:  And could we go to the middle message,

20  the middle one.

21  BY MR. BILKOVIC:

22  Q.   And what does Mr. Synowiec text Mr. Didani?

23  A.   "Good," question mark.

24  Q.   And that's under the body?

25  A.   Yes, it is.

1    Q.   And does Mr. Didani respond?

2    A.   He does.

3           MR. BILKOVIC:  Could we go to the bottom of the next

4    message.

5    BY MR. BILKOVIC:

6    Q.   And Mr. Didani, what date does he respond?

7    A.   12-18, 2017.

8    Q.   And again, the direction of this is ...

9    A.   Outgoing from device to Mr. Synowiec.

10   Q.   And how does Mr. Didani respond?

11   A.   "Yes, brother."

12          MR. BILKOVIC:  Could we go to 71 -- actually, could we

13   go to 71.0, Page 4, and can we zoom in on the top message.

14   BY MR. BILKOVIC:

15   Q.   Do you recognize this?

16   A.   Yes, I do.

17   Q.   And what is this?

18   A.   This is the continuation of that text thread.

19   Q.   And how many pages in the excerpt does this text thread go?

20   A.   How many pages does the excerpt go?

21   Q.   Yes.  I'm not going to go through the whole thing.  I just

22   want to know how many pages.

23   A.   Through Page 12.

24   Q.   Do you see Government's proposed Exhibit 112.13?

25   A.   Yes, I do.

1    Q.  And was that a photograph that was a screenshot located in

2    Mr. Didani's iCloud?

3    A.  Yes, it is.

4    Q.  And do you know what date that photograph -- the time that

5    that was captured, or the date that that was captured?

6    A.  December 19, 2017.

7    Q.  So a day after the video from Mr. Synowiec with the money?

8    A.  Yes.

9    Q.  And a day after Mr. Didani drove to Washington, D.C.?

10   A.  Correct.

11          MR. BILKOVIC:  Your Honor, at this time I would move

12   for admission into evidence of Government's proposed Exhibit

13   112.13.

14          THE COURT:  Any objection?

15          MR. FINK:  Your Honor, I don't -- other than the

16   timeframe, I don't see the relevance or connection to the other

17   exhibits.  So I don't think there's a foundation, and lack of

18   relevance.

19          MR. BILKOVIC:  Judge, may we approach?

20          THE COURT:  Yes, you may.

21          (At sidebar on the record out of the hearing of

22          the jury, as follows:)

23          MR. BILKOVIC:  I don't want to argue in front of the

24   jury, because I don't want to tell them what it is.  The Court

25   doesn't allow it.  But it's basically Mr. Didani the day after

 1    he receives that money taking a screenshot of a bunch of

 2    packages that appear consistent with kilograms of cocaine.

 3              MR. FINK:  So the purported foundation and relevance

 4    is that it coincides with the timeframe --

 5              MR. BILKOVIC:  With the timing that the money is

 6    being --

 7              MR. FINK:  As long as that's made clear, I'll withdraw

 8    the objection, not who took it, whose it is.  That was my

 9    concern with leaving that inference, but --

10              THE COURT:  Okay.  You can do that?

11              MR. BILKOVIC:  Yes.

12              THE COURT:  Okay.

13              MR. BILKOVIC:  And, your Honor, is there any way we

14    can take just a five-minute break?  (Indiscernible) If we

15    don't, that's fine.  I just --

16              THE COURT:  Yes, go ahead.  And then --

17              MR. BILKOVIC:  I may have to sit at some point.

18              THE COURT:  It's okay.  Let's do this and ...

19              (End of sidebar.)

20              THE COURT:  Okay.  It's my understanding that

21    Mr. Bilkovic is going to lay a little bit of foundation and you

22    withdraw your ...

23              MR. FINK:  Sorry, your Honor.

24              THE COURT:  Go ahead, and then I'll speak.  No, no,

25    you speak.  You guys speak, then I'll speak.

1            MR. FINK:  We're finished, your Honor.

2            THE COURT:  Okay.  So it's my understanding that

3    you're withdrawing your objection and Mr. Bilkovic is going to

4    lay a better foundation.

5            MR. FINK:  Yes.  Based on what we discussed at the

6    sidebar, yes, Judge.

7            THE COURT:  Okay.  Go ahead, Counsel.

8    BY MR. BILKOVIC:

9    Q.   Do you recognize 112.13?

10   A.   Yes, I do.

11   Q.   And is this a photograph of a screenshot that was contained

12   within Mr. Didani's device?

13   A.   Yes, it is.

14   Q.   And was there a time, date on the phone showing when the

15   photograph was taken?

16   A.   Yes.

17   Q.   And when was the photograph taken?

18   A.   December 19, 2017.

19   Q.   And when was this taken in relation to Mr. Didani driving

20   to Washington, D.C.?

21   A.   The day after.

22   Q.   When was this taken in relation to Donald Larson dropping

23   off $450,000 in Washington, D.C.?

24   A.   Two days prior.

25   Q.   And when was this taken in relation to Peter Synowiec?

1          THE COURT:  Two days prior the photo was taken?

2          THE WITNESS:  Yes.  The money arrived on December 21,

3   2017.  The photograph was taken on December 19, 2017.

4          THE COURT:  Okay.

5   BY MR. BILKOVIC:

6   Q.  And when was this photograph taken in relation to when

7   Mr. Synowiec sent Mr. Didani a video of approximately $150,000

8   with a note that had the date as well as "D + M"?

9   A.  This photograph was date-stamped one day after that video

10  was received.

11         MR. BILKOVIC:  Your Honor, at this time I would again

12  move for admission into evidence of Government's proposed

13  Exhibit 112.13.

14         THE COURT:  112.3 or 112 --

15         MR. BILKOVIC:  One, three.  I'm sorry, 112.13.

16         MR. FINK:  No objection, your Honor.

17         THE COURT:  All right.  Very well.  It's admitted.

18         (Government's Exhibit 112.13 received into evidence.)

19         Let's take a break.  And let's take about ten minutes

20   and then we'll be shortly back.

21         Please rise for the jury, and you may step down.

22         (The jury left the courtroom at 12:11 p.m.)

23         THE COURT:  Okay.  Ten minutes, gentlemen.

24         MR. FINK:  Thank you, your Honor.

25         (At 12:11 p.m., a brief recess was taken.

```
 1                Back on the record at 12:22 p.m.)
 2                LAW CLERK:  All rise.  Court is back in session.
 3                THE COURT:  Okay.  We can bring out the jury if you're
 4     ready.  Are you ready?
 5                MR. BILKOVIC:  Yes, your Honor.  Thank you.
 6                THE COURT:  Mr. Fink is almost ready as soon as he
 7     puts his phone up; right?
 8                MR. FINK:  Yes, your Honor.  I was approving another
 9     dose of Tylenol for my daughter.
10                THE COURT:  Okay.  But you're not leaving it out;
11     right?
12                MR. FINK:  No, your Honor.  I --
13                THE COURT:  But it's laying right there in plain view.
14                MR. FINK:  I'm going to put it right back in its
15     folder where it was.
16                THE COURT:  Soon.
17                MR. FINK:  Right now.
18                THE COURT:  Thank you.
19                MR. FINK:  Thanks, Judge.
20                LAW CLERK:  All rise for the jury.
21                (The jury entered the courtroom at 12:23 p.m.)
22                THE COURT:  I'm satisfied the jurors are present and
23     properly seated.  What about the Government?
24                MR. BILKOVIC:  Yes, your Honor, the Government is
25     satisfied.
```

 1              THE COURT:  Mr. Fink?

 2              MR. FINK:  Satisfied, Judge.  Thanks.

 3              THE COURT:  You may be seated.

 4         All right.  I'm ready to proceed.  You're still under

 5    oath.

 6              THE WITNESS:  Yes, your Honor.

 7              THE COURT:  Okay.  You may go ahead.

 8              MR. BILKOVIC:  Your Honor, I believe that the Court

 9    admitted Government's proposed Exhibit 112.13.  At this time --

10              THE COURT:  I think that I did that already, but I

11    have 112.13 is already admitted.

12              MR. BILKOVIC:  I think you admitted that and then we

13    took a break.

14              THE COURT:  Right.

15              MR. BILKOVIC:  May I publish that to the jury?

16              THE COURT:  Yes, you may.

17              MR. BILKOVIC:  And can we zoom in on the photograph.

18    BY MR. BILKOVIC:

19    Q.   And what does this photograph depict?

20    A.   It depicts approximately 190 rectangular-shaped kilograms

21    -- suspected kilograms of cocaine with the ace of diamonds on

22    the top.

23    Q.   Obviously you don't know what's inside of there; correct?

24    A.   No.

25    Q.   But have you seen photographs like that and have you seen

1    exhibits like that throughout this investigation?

2    A.   Yes, I have.

3    Q.   I want to switch gears.  When you testified last time, we

4    introduced, just talking about the BlackBerry text messages,

5    discussing the torpedo.  We just went through a couple of

6    those.  Do you recall that?

7    A.   Yes.

8    Q.   Were there additional ones other than the couple that we

9    went through the last time?

10   A.   Yes, there were.

11   Q.   Do you have Government's Exhibit -- or Government's

12   proposed Exhibit 112.7 in front of you?

13   A.   Yes.

14   Q.   Before we get to that, I want to ask you some questions.

15        When you went through Mr. Didani's iCloud accounts

16    from the search warrant, were you doing that by yourself or

17    were you doing it with other agents as well?

18   A.   Other agents.

19   Q.   And did you also review the download of the rose-colored

20   iPhone that was recovered from Mr. Didani when he was arrested

21   on March 31, 2021?

22   A.   Yes, I have.

23   Q.   And were there times where you saw the same photographs in

24   both the iCloud account and in the download?

25   A.   Yes.

1    Q.   Do you recognize Government's proposed Exhibit 112.7?

2    A.   Yes, I do.

3    Q.   And what is that?

4    A.   This is a photograph of another message thread of what

5    appears to be a BlackBerry cellular device.

6    Q.   And this was found in Mr. Didani's iCloud account?

7    A.   Yes, it was.

8              MR. BILKOVIC:  Your Honor, at this time I would move

9    for admission into evidence of Government's proposed Exhibit

10   112.7.

11             THE COURT:  Any objection?

12             MR. FINK:  No objection.

13             THE COURT:  Okay.  It's admitted, but tell me this.

14   You said it was a photo of a message thread on what?

15             THE WITNESS:  A photo of a message thread on another

16   cellular device, which appears to be a BlackBerry cell phone.

17             THE COURT:  Okay.  All right.  It's admitted as 112.7.

18             (Government's Exhibit 112.7 received into evidence.)

19             MR. BILKOVIC:  And may I publish it to the jury?

20             THE COURT:  Yes, you may.

21             MR. BILKOVIC:  And can we go to the top half down to

22   the bottom of the exhibit sticker.

23   BY MR. BILKOVIC:

24   Q.   Do you see the -- on the bottom area do you see the

25   reference to "Sky"?

1   A.   Yes, I do.

2   Q.   And then the top, this appears to be a text message thread

3   between how many individuals?

4   A.   Two.

5   Q.   And the top individual is identified by what moniker?

6   A.   Goodfella.

7   Q.   The second individual is identified by what moniker?

8   A.   Panco.

9           THE COURT:  What?

10          THE WITNESS:  Panco.

11  BY MR. BILKOVIC:

12  Q.   Panco, P-A-N-C-O?

13  A.   Correct.

14  Q.   Was that one of Mr. Didani's nicknames that you learned

15  through the investigation?

16  A.   Yes, it was.

17          MR. FINK:  Objection, lack of foundation.

18          THE COURT:  Would you like to lay a foundation for

19   that?

20          MR. BILKOVIC:  I believe it's been laid by him

21   previously as well as other witnesses, but I can do that.

22          THE COURT:  Yes.  Do it again then, please.

23          MR. BILKOVIC:  If we can take this down then for a

24   second -- no.  We can leave it up.

25

1    BY MR. BILKOVIC:

2    Q.   You indicated that that was -- you believe that that was a

3    nickname that Mr. Didani used?

4    A.   Yes, it was.

5    Q.   Was there evidence that you uncovered in the phone and in

6    the iCloud account during your investigation that led you to

7    believe that?

8    A.   Yes.

9    Q.   What type of evidence?

10   A.   There's multiple message threads where the person sending

11   the message referenced to the user as Panco and also the user

12   referencing himself as Panco.

13   Q.   And the user in those messages, was there a number

14   attributed to them in some of the messages, a phone number?

15   A.   Yes.

16   Q.   And was that phone number one of the numbers attributed to

17   Mr. Didani?

18   A.   Yes.

19   Q.   So basically he would refer to himself as Panco and other

20   people would refer to him as Panco as well?

21   A.   That's correct.

22          THE COURT:  All right.  Are you satisfied?

23          MR. FINK:  For now, your Honor, yes.  Thank you.

24          THE COURT:  Okay.  And he's -- okay.  Go ahead then.

25          MR. BILKOVIC:  Can we just zoom in on the top half

1    then up to the bottom of the exhibit sticker.

2    BY MR. BILKOVIC:

3    Q.  And starting with "Goodfella" can you read the text

4    message.

5    A.  "2 good news from you today, brother.  First that you enjoy

6    and second that you'll enjoy even more when prototype set of."

7    Q.  And the message under "Panco"?

8    A.  "Yes, prototype is gone, solve lots of" -- abbreviation for

9    problem -- "is getting close."

10   Q.  And instead of saying "abbreviation for problem" can you

11   spell what the letters are?

12   A.  P-R-B-L.

13   Q.  And can you turn to Government's -- do you have

14   Government's proposed Exhibit 116.19?

15   A.  Yes.

16   Q.  And do you recognize that?

17   A.  I do.

18   Q.  And what is that?

19   A.  This is the same image, but located in a different

20   location.

21           THE COURT:  Same image as what?

22           THE WITNESS:  Of the previous exhibit that was on the

23   screen of the messages on the BlackBerry device.

24   BY MR. BILKOVIC:

25   Q.  And 116.19, was that recovered from the rose-colored iPhone

1    recovered when Mr. Didani was arrested in March of 2021, at the

2    Charlotte Douglas Airport?

3    A.   Yes.

4            MR. FINK:  Objection, leading.

5            MR. BILKOVIC:  I think it's a direct question --

6            THE COURT:  I think you could ask him where it was

7     recovered from.

8    BY MR. BILKOVIC:

9    Q.   Okay.  Where was it recovered from?

10   A.   This was recovered from Mr. Didani's rose, gold iPhone on

11   March 31, 2021, Charlotte Mecklenburg Airport.

12   Q.   And there are a series of exhibits that are marked of --

13   that start with 116; correct?

14   A.   Yes.

15   Q.   And for all of those exhibits where were they recovered?

16   A.   These were all located out of the rose, gold iPhone

17   recovered -- or seized on March 31, 2021.

18           MR. BILKOVIC:  Your Honor, at this time I would move

19   for admission into evidence of Government's proposed Exhibit

20   116.19.

21           THE COURT:  Any objection?

22           MR. FINK:  No, your Honor.

23           THE COURT:  It's admitted as 116.19.

24           (Government's Exhibit 116.19 received into evidence.)

25           MR. BILKOVIC:  And can I publish that and can I place

1    that next to 112.7?

2              THE COURT:  You could.

3              MR. BILKOVIC:  Thank you, your Honor.

4              That's not it.

5    BY MR. BILKOVIC:

6    Q.  And is this an example of the same photograph being located

7    both on Mr. Didani's phone as well as in his iCloud account?

8    A.  Yes, it is.

9    Q.  Can you take a look at Government's proposed Exhibits

10   115.12, 13 and 14.

11             THE COURT:  115.12?

12             MR. BILKOVIC:  115.13 and 115.14.

13             THE COURT:  I'm sorry.  Also 115.12?

14             MR. BILKOVIC:  Yes.  I'm sorry.  Yes, your Honor.

15    115.12, 115.13 and 115.14.

16             THE COURT:  Okay.  Thank you.

17   BY MR. BILKOVIC:

18   Q.  Tell me when you're done with that.

19   A.  Yes, I'm ready.

20   Q.  Do you recognize those?

21   A.  I do.

22   Q.  And what are those?

23   A.  These are additional photographs that were located on

24   Mr. Didani's iCloud.

25   Q.  And are they photographs of a specific type of device?

1   A.   Yes.  They are pictures of what appear to be the encrypted

2   BlackBerry cell phone with a message thread portraying on them.

3   Q.   And I believe you testified last time that there was

4   evidence on the phone -- I'm going to introduce an exhibit --

5   where an iPhone and another device would be used to take these

6   photographs; is that correct?

7   A.   That's correct.

8   Q.   And is that what these appear to be?

9   A.   Yes, it is.

10  Q.   Do you recall approximately the timeframe that these were

11  taken?

12  A.   These were taken in the fall of 2016.

13       THE COURT:  Fall?

14       THE WITNESS:  Fall.  September through December 2016.

15  BY MR. BILKOVIC:

16  Q.   When you say "these," are you talking about just these

17  three or additional photographs that we're going to get to?

18  A.   These three and others.

19       MR. BILKOVIC:  Okay.  Starting with 115.12, your

20  Honor, at this time I would actually move for admission into

21  evidence of 115.12, 115.13 and 115.14.

22       THE COURT:  Any objection?

23       MR. FINK:  Yes, your Honor.  I don't think there is an

24  adequate foundation for what these are, who these conversations

25  are to, and because of that I don't think it can meet a hearsay

1    exception either.  There's no names attached to it, no numbers

2    and no foundation for how we're supposed to understand who it

3    is that's speaking, and certainly they're going to use it for

4    its truth.

5              MR. BILKOVIC:  Your Honor --

6              THE COURT:  You are going to point the truth?

7              MR. BILKOVIC:  Yes, your Honor.  And my response would

8    be --

9              THE COURT:  Yes, you may.

10             MR. BILKOVIC:  Oh, I'm sorry.  And my response would

11   be these are also in coordination with other evidence that the

12   Court has heard in this case.  These photographs all discuss

13   the designing of a torpedo, a prototype.  They are photographs

14   that were found in Mr. Didani's device.  They are encrypted

15   photographs.  Several of them are set to self-destruct.

16   There's discussions on here that relate specifically to the

17   torpedo and what its purpose is for.

18             And I will ask a question, too, of another number on

19   here, that there is one number that is similar in a lot of

20   these photographs, but it doesn't -- I don't have to show who

21   they belong to.  I have to show that basically these are

22   statements that are potentially co-conspirator statements

23   and/or statements of Mr. Didani.

24             And here they are found on his device, an encrypted

25   cell phone that he is taking photographs of, when the jury has

1    already heard evidence that he and Marty Tibbitts were

2    designing a prototype -- or had hired a company to design a

3    prototype to transport cocaine and that Mr. Didani had sent

4    payments for that prototype.

5              THE COURT:  Do you want to respond to that?

6              MR. FINK:  Yeah, your Honor, because it is -- he does

7    have to show these things, because in order to meet the

8    exception for the co-conspirator there has to be in this

9    conspiracy.  So, if we don't know who's talking, just because

10   there's someone else may be talking about using similar buzz

11   words, or whatever the content may be, we have no idea who's

12   talking and what conspiracy or other explanation it might be.

13   So that is a foundational requirement, that they are a

14   co-conspirator talking in furtherance of this conspiracy.

15             MR. BILKOVIC:  Your Honor, if I could just respond to

16   that?

17             THE COURT:  Okay.  Are these all photos or are they

18   also text messages?

19             MR. BILKOVIC:  They are photographs of text messages

20   on a BlackBerry device.  If the Court wants to, I can approach

21   and show the Court what one looks like so the Court knows what

22   we're looking at.

23             But I would also indicate by further argument that in

24   116.19 a discussion between Goodfella and Panco, one of

25   Mr. Didani's nicknames, talking about the prototype, there are

1    additional messages in here where Goodfella is one of the

2    participants.

3         THE COURT:  And are those already in evidence, or are

4    they going --

5         MR. BILKOVIC:  116.19 the jury has admitted -- the

6    Court has admitted into evidence.  There are additional

7    photographs or conversations involving Goodfella as well as

8    other numbers as well, all talking about the prototype, all

9    talking about -- I don't want to say too much in front of the

10   jury in case the Court rules against me, but topics that are

11   relevant to this investigation.

12        THE COURT:  Okay.  I'm going to look at them.  Do you

13   have another place that you can go while I consider them for

14   the next few minutes, because we're getting too close to the

15   time that I have to adjourn for another matter.

16        MR. FINK:  As you consider them, Judge, I want you to

17   note that there's no mention of Goodfella in the three that I'm

18   objecting to.

19        THE COURT:  What about 116.9?  You agree that it's in

20   there; is that correct?

21        MR. FINK:  And that one is admitted, yes, Judge.

22        THE COURT:  Okay.  Let's come back to those.  They're

23   under advisement.

24        MR. BILKOVIC:  Your Honor, what I would like to do

25   with the Court's permission is present all of them to the Court

1    to review tonight so the Court could look at them in

2    conjunction with each other.

3              THE COURT:  Okay.  115.12, 13 and 14?

4              MR. BILKOVIC:  There will be additional --

5              THE COURT:  Don't I have them up here?

6              MR. BILKOVIC:  Yes.  There will be additional ones

7    other than that, though.  I can give those numbers at the end

8    of the day.

9              THE COURT:  Okay.  That's great.

10             MR. BILKOVIC:  I'm going to spend some time on it,

11   your Honor.  If I could have one minute to kind of go back to

12   another area.

13   BY MR. BILKOVIC:

14   Q.  If you could go to -- do you have Government's proposed

15   Exhibit 114.0?

16   A.  Yes, I do.

17   Q.  And do you recognize that?

18   A.  This is a Cellebrite extraction out of Mr. Didani's iCloud.

19   Q.  And is it fair to say that the first page is completely

20   redacted?

21   A.  Yes, it is.

22   Q.  Can you look at the second page.

23   A.  Yes.

24   Q.  In looking at the second page, can you tell what this

25   appears to be, not the actual content there, but what this

1   exhibit appears to be, 114.0?

2   A.   Yes.

3   Q.   What is it?

4   A.   This is a contact list for Mr. Didani's iCloud.

5   Q.   You said this is a contact list?

6   A.   Yes.

7   Q.   What is a contact list?

8   A.   Contacts listed within the devices that are stored in the

9   iCloud.

10  Q.   So, if you have an iPhone and I have contacts in my iPhone,

11  is that considered my contact list?

12  A.   Yes, it is.

13  Q.   And so is this simply Mr. Didani's contact list from the

14  iCloud?

15  A.   Yes.

16          MR. BILKOVIC:  Your Honor, at this time --

17  BY MR. BILKOVIC:

18  Q.   And this is a redacted list; correct?

19  A.   Yes, it is.

20  Q.   This does not contain every number, every name that is in

21  his contact list?

22  A.   No, it does not.

23          MR. BILKOVIC:  Your Honor, at this time I would move

24  for admission into evidence of Government's proposed Exhibit

25  114.0.

 1          THE COURT:  Any objection?  You have the redacted

 2    copy, gentlemen?

 3          MR. FINK:  Yes, I have a copy, your Honor, and no

 4    objection.

 5          THE COURT:  All right.  It's admitted as 114.0.

 6          (Government's Exhibit 114.0 received into evidence.)

 7          MR. BILKOVIC:  Thank you, your Honor.

 8          I want to go through some of the contacts in here.

 9    Could we go to 114-2 -- or Page 2, entry 211.  And can we zoom

10    in on that.

11    BY MR. BILKOVIC:

12    Q.   What is the name?

13    A.   Dan Dan.

14    Q.   And what is the phone number?

15    A.   1 (586) 944-9669.

16    Q.   And during your investigation did you discover or learn who

17    that phone number was subscribed to?

18    A.   Yes.  That phone number was utilized by Donald Larson.

19    Q.   Can we go to Exhibit 114.0, Page 5.  And starting from the

20    left can we go through who this contact is and what the phone

21    number is?

22    A.   This contact is listed as Marty Tibbitts with phone number

23    (313) 670-3334.

24          MR. BILKOVIC:  Can we go to Exhibit 114.0, Page 8.

25    And could we go to the bottom entry.

1    BY MR. BILKOVIC:

2    Q.   And do you recognize that?

3    A.   Yes, I do.

4    Q.   And what is that?

5    A.   This is another insert into the contact list in

6    Mr. Didani's iCloud with the name listed as Toni Starks 2.

7    Q.   And what is the phone number?

8    A.   1 (313) 670-3334.

9    Q.   And do you recognize that number?

10   A.   Yes, I do.

11   Q.   And who does that number belong to or registered to?

12   A.   Mr. Martin Tibbitts.

13   Q.   And is that the same number that was in the contact list

14   that we just showed from Page 5 under Martin Tibbitts?

15   A.   Yes.

16   Q.   Can we go to 114.0, Page 6.  And starting from the left

17   could you go through who this contact is and what the phone

18   number is?

19   A.   The contact name is listed as Pit Puzio's with the phone

20   number of (734) 546-4345.

21   Q.   Do you know who that phone number is registered to?

22   A.   Peter Synowiec.

23   Q.   Can you go to 114.0, Page 7.  And do you recognize this?

24   A.   Yes, I do.

25   Q.   And starting from the left, the contact and the phone

1   numbers?

2   A.   Name is listed as Puzio.  Home phone number is listed as

3   1 (586) 457-7975.  Work phone number is listed as

4   48 575 042 692.

5   Q.   And can we go to Government's Exhibit 114.0, Page 4.

6   A.   Yes.

7         MR. BILKOVIC:  I'm sorry.  Can we zoom in on that.

8   BY MR. BILKOVIC:

9   Q.   And can you give the name and phone number there?

10  A.   Contact name is listed as Endi Sky with a phone number of

11  1 (604) 613-7151.

12  Q.   And during the investigation did you learn who that phone

13  number belonged to?

14  A.   Yes.  That was a phone number for Amandip Sahota.

15  Q.   And is Mr. Sahota still alive?

16  A.   He is not.

17  Q.   Do you know what Mr. Sahota did for a living?

18  A.   Yes.  He owned a cell phone dispersion company based out of

19  Vancouver, Canada that specialized in Sky ECC devices.

20  Q.   And can you look at Government's Exhibit 114.0.  Can we go

21  to Page 3.  You can look up here, Detective Leach.

22        THE COURT:  Can you see that?

23        MR. BILKOVIC:  I'm going to zoom in on the top one if

24   I could.

25

1    BY MR. BILKOVIC:

2    Q.   And do you see the name on the left and the phone number

3    attached to the name?

4    A.   Yes.  It states "Dino" with the phone number of

5    1 (708) 655-9228.

6    Q.   And can we go to the other number that was on this page.

7    And can we go to what the name and the number is.

8    A.   Dino Didani, phone number (708) 395-5552.

9    Q.   And do you know who Dino Didani is?

10   A.   This is reference to his father.

11   Q.   Whose father?

12   A.   Mr. Didani's.  I'm sorry.

13   Q.   Can we go back to Government's Exhibit 114.0, Page 8, and

14   go to the top number.

15            THE COURT:  114.0, Page 8?

16            MR. BILKOVIC:  Yes.

17   BY MR. BILKOVIC:

18   Q.   Can you start from the left with the name and the phone

19   number.

20   A.   The name is listed as Toni Chicago.  Phone number is

21   1 (224) 817-0239.

22   Q.   And during your investigation did you learn who that phone

23   number belonged to?

24   A.   Yes.

25   Q.   And who is that?

```
 1   A.   Fatjon Bajrami.
 2              THE COURT:  I'm sorry?
 3              THE WITNESS:  Fatjon Bajrami.
 4              MR. BILKOVIC:  And can we bring up Government's
 5    previously admitted 1.6.
 6   BY MR. BILKOVIC:
 7   Q.   And who is this individual?
 8   A.   That is Mr. Bajrami.
 9   Q.   The same person who that phone number referred to?
10   A.   Correct.
11   Q.   I'm sorry?
12   A.   Yes.
13   Q.   Now, during your investigation there's been testimony about
14   a company called Peregrine 360.  Are you familiar with that?
15   A.   Yes, I am.
16   Q.   Did you find any evidence in Mr. Didani's iCloud account
17   relating to Peregrine 360?
18   A.   Yes.
19   Q.   Do you have Government's proposed Exhibit 112.4 in front of
20   you?
21   A.   Yes, I do.
22   Q.   And what is Government's proposed Exhibit 112.4?
23   A.   This is a photograph of an E-mail going back and forth
24   between an individual listed as Dale Johnson and Panco.vila.
25   Q.   Panco dot what?
```

```
1    A.   Vila, V-I-L-A.

2              MR. BILKOVIC:  Your Honor, at this time I would move

3    for admission into evidence of Government's proposed Exhibit

4    112.4.

5              THE COURT:  Any objection?

6              MR. FINK:  Objection to foundation and hearsay, your

7    Honor.

8              THE COURT:  Do you want to respond to that?

9              MR. BILKOVIC:  Yes, your Honor.  There's been

10   testimony -- first of all, it's information that was found on

11   Mr. Didani's phone, or found in his iCloud account.

12             Second, it is an E-mail from Dale.Johnson.

13   Mr. Johnson has been previously identified in this case as

14   Martin Tibbitts.  And it is to an individual, Panco.vila, and

15   there's been testimony that one of Mr. Didani's nicknames was

16   Panco.

17             THE COURT:  How about the date?

18             MR. BILKOVIC:  And this is an E-mail.  The date is not

19   on here, but there's going to be a further exhibit that also

20   discusses this that does have the date on it.

21             THE COURT:  Okay.  As long as you tie that up, I'm

22   going to overrule the objection and admit it, but you need to

23   tie it up.

24             And what number will that be?

25             MR. BILKOVIC:  That was 112.4.
```

```
 1              THE COURT:  No, no.  I mean, what are you going to tie
 2    it up with, or is it just going to be testimony?
 3              MR. BILKOVIC:  Oh.  112.5?  Is that what you're asking
 4    me, Judge, or the date?
 5              THE COURT:  No.  I'm asking, you said there was going
 6    to be something to tie this up with the date.
 7              MR. BILKOVIC:  I will move on to that exhibit right
 8    now.  That will be 112.5.
 9              THE COURT:  Okay.
10    BY MR. BILKOVIC:
11    Q.  Can you look at Government's proposed Exhibit 112.5.
12    A.  Yes.
13    Q.  And what is that?
14    A.  Again, this is a screenshot of an E-mail message thread
15    between Dale Johnson and Panco.vila.
16    Q.  And is there a date on that?
17    A.  There is.
18    Q.  And what is that date?
19    A.  The date on the top is listed as February 20, 2017.
20    Q.  And are there additional dates contained in that exhibit?
21    A.  Yes, there are.  In the body of the E-mail it lists the
22    date of February 19, 2017.
23              THE COURT:  How does that tie it up?
24              MR. BILKOVIC:  I'm going to go back to the other one
25    now and ask questions about that.
```

1    BY MR. BILKOVIC:

2    Q.   Is this discussing the --

3              THE COURT:   Is what discussing it?

4    BY MR. BILKOVIC:

5    Q.   Let's go back a second.   The 112.4, is there a name in

6    there where information was sent?

7    A.   Yes.   This appears --

8    Q.   I don't want you to talk about what it is, but is there?

9    A.   Yes, there is.

10   Q.   And is there amounts in there?

11   A.   Yes, there are.

12   Q.   And are those amounts consistent with anything else that

13   you recovered in this investigation?

14   A.   Yes.

15   Q.   What?

16   A.   Payment transfers.

17   Q.   Payment transfers from who to who?

18   A.   From members of the organization to Peregrine 360.

19   Q.   And is there a name on here as to who had sent the

20   information at the bottom?

21   A.   Yes.

22   Q.   And that individual, do you know where that individual

23   worked at the time?

24   A.   I do.

25   Q.   Where was that?

1   A.   Peregrine 360.

2   Q.   And are you aware of whether or not -- or when Mr. Dale

3   Johnson contracted with Peregrine 360?

4   A.   May of 2016.

5   Q.   So is it fair to say that this invoice occurred after

6   May of 2016?

7   A.   Yes, it is.

8           THE COURT:  And the invoice is what?  112.4?

9           MR. BILKOVIC:  Correct.

10          THE COURT:  You may answer.  Is it fair to say it's

11   after that?

12          THE WITNESS:  Yes, it is.

13          MR. BILKOVIC:  Your Honor, at this time I would again

14   move for admission into evidence of 112.4.

15          THE COURT:  I think I -- okay.  Any objection now?

16          MR. FINK:  Same objection, your Honor.

17          THE COURT:  Which is -- the foundation is that there's

18   no date?

19          MR. FINK:  The foundation as to who's speaking, why

20   it's not hearsay, how it's in furtherance of the conspiracy,

21   your Honor.  I don't think it meets the hearsay exception, and

22   I mean that then bears on relevance as well.

23          THE COURT:  I think it does.  And you're overruled.

24          MR. FINK:  Thank you, Judge.

25          THE COURT:  112.4 is admitted.

```
 1              (Government's Exhibit 112.4 received into evidence.)
 2              MR. BILKOVIC:  May I publish it to the jury?
 3              THE COURT:  Yes.
 4              MR. BILKOVIC:  And could we go to the top half.
 5              THE COURT:  Are you showing 112.4?
 6              MR. BILKOVIC:  Right now, yes.
 7    BY MR. BILKOVIC:
 8    Q.   And what is the title at the very top?
 9    A.   "Invoice for Engineering Services."
10    Q.   And are you aware from the investigation as to what
11    Peregrine 360 was doing for Dale Johnson?
12    A.   Yes.
13    Q.   What were they doing?
14    A.   They were creating a parasitic device, underwater drone.
15    Q.   And this E-mail is from who?
16    A.   The E-mail is from Dale Johnson.
17    Q.   To ...
18    A.   Panco.vila.
19    Q.   And then the body of the E-mail indicates what?
20    A.   The body of the E-mail appears to be a forwarded body of
21    the breakdown of payments necessary to start or proceed with
22    the prototype.
23              MR. BILKOVIC:  Can we go back out and go back into the
24    bottom half starting -- up top.  Keep going.  "Amount we need
25    transferred to" -- "Hello, here is your invoice," down to the
```

1    bottom.

2    BY MR. BILKOVIC:

3    Q.   And could you go through this with the jury.

4    A.   Yes.  It states, "Hello, here is your invoice.  Amount we

5    need transferred to us."  With a breakdown of number 1,

6    milestone payment, $1,800 USD.  Number 2, prototype

7    manufacturing with the amount of 5,000 USD.  Number 3, further

8    deposit, 2,500 USD.  Total amount, 9,300 USD.  "Thanks."

9    Q.   I'm sorry?

10   A.   And then it finishes off with a regards of "Thanks, Zaid

11   Lattouf."

12   Q.   And is -- Zaid Lattouf I believe you indicated worked at

13   Peregrine?

14   A.   Correct.

15   Q.   And is there an address contained there?

16   A.   Yes, there is.

17   Q.   And what is that address of?

18   A.   That is the address of Peregrine 360.

19          MR. BILKOVIC:  May I have a moment, your Honor?

20          THE COURT:  Yes.

21          (Briefly off the record.)

22          THE COURT:  Are we going into another area?

23          MR. BILKOVIC:  Yes.

24          THE COURT:  Okay.  This is a good place to stop.  I'm

25   going to send the jury home.

1            Remember that you're not permitted to talk about the
2    case among yourselves or with anyone else until I submit it to
3    you for your deliberations.  And also remember that you're not
4    to use the internet or any social media of any kind to
5    communicate anything about the case or receive anything about
6    the case or post anything about the case, anyone involved in
7    the case or any place involved in the case.  And leave your
8    pads in the manner that you've been leaving them in the past.
9            And we're coming back tomorrow at what, 9:30?
10           JURORS:  Yes.
11           THE COURT:  9:30.  See you then.
12           Please rise for the jury, and you may step down.  Have
13   a good afternoon.
14           JURORS:  You, too.
15           (The jury left the courtroom at 12:57 p.m.)
16           THE COURT:  You may step down, Mr. Leach.  Please
17   don't discuss your testimony with anyone.  And you can leave
18   all those documents.  Unless you brought them up, you can leave
19   them there.
20           THE WITNESS:  Thank you, your Honor.
21           THE COURT:  Okay.  You're welcome.
22           (End of excerpt at 12:58 p.m.)
23                        —   —   —
24
25

```
1

2

3                    CERTIFICATE OF COURT REPORTER

4

5          I, Sheila D. Rice, Official Court Reporter of the

6    United States District Court, Eastern District of Michigan,

7    appointed pursuant to the provisions of Title 28, United States

8    Code, Section 753, do hereby certify that the foregoing pages

9    is a correct transcript from the record of proceedings in the

10   above-entitled matter.

11

12

13                         s/Sheila D. Rice
                           Sheila D. Rice, CSR-4163, RPR, RMR, FCRR
14                         Federal Official Court Reporter
                           United States District Court
15                         Eastern District of Michigan

16
     Date:  04/11/2025
17   Detroit, Michigan.

18

19

20

21

22

23

24

25
```