```
 1                  UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF MICHIGAN
 2                       SOUTHERN DIVISION

 3                         —   —   —

     UNITED STATES OF AMERICA,
 4
                 Plaintiff,
 5
       v.                                Case No. 21-20264
 6
     YLLI DIDANI,
 7
                 Defendant.
 8   _____/

 9             JURY TRIAL - VOLUME 19 - EXCERPT
               Continued Testimony of Brandon Leach
10         BEFORE THE HONORABLE DENISE PAGE HOOD
                  UNITED STATES DISTRICT JUDGE
11
              Theodore Levin United States Courthouse
12               231 West Lafayette Boulevard
                       Detroit, Michigan
13               Thursday, March 20, 2025

14
     APPEARANCES:
15
     For the Plaintiff:       Mark Bilkovic
16                            Timothy McDonald
                              UNITED STATES ATTORNEY'S OFFICE
17                            211 W. Fort Street, Suite 2001
                              Detroit, Michigan  48226
18                            (313) 226-9623

19   For the Defendant:       Wade Fink
                              WADE FINK LAW, P.C.
20                            550 W. Merrill Street, Suite 100
                              Birmingham, Michigan  48009
21                            (248) 712-1054

22   Also present:           Special Agent Chad Hermans
                              Maria DiCarlo, Paralegal
23

24        To obtain a copy of this official transcript, contact:
               Sheila D. Rice  Official Court Reporter
25           (313) 234-2610 • sheila_rice@mied.uscourts.gov
```

**TABLE OF CONTENTS**

MATTER_____PAGE

**JURY TRIAL - VOLUME 19 - EXCERPT**

**Government's Case in Chief (Continued)**

**BRANDON LEACH**
Continued direct examination by Mr. Bilkovic........   4
Cross-examination by Mr. Fink......................  49
Voir dire examination by Bilkovic.................. 102
Continued cross-examination by Mr. Fink............ 103
Redirect examination by Mr. Bilkovic............... 123

Certificate of Court Reporter...................... 125

E X H I B I T   I N D E X

| Exhibit No. | Description | Identified | Admitted |
|---|---|---|---|

**Government's Exhibits**

| Government's 35.2 | Bulletproof Zone invoice | | |
| Government's 65.8 | Photo, Bulletproof Zone order | | |
| Government's 65.9 | Photo, Bulletproof Zone confirmation | | |
| Government's 65.11 | Video | | |
| Government's 65.12 | Video | | |
| Government's 65.15 | Photo, Bulletproof Zone order | | |
| Government's 65.16 | Photo, Bulletproof Zone order | | |
| Government's 65.18 | Video | | |
| Government's 65.18-A | Translation transcript for 65.18 | | |
| Government's 65.19 | Video | | |
| Government's 72.0 | Signal chat message thread | | |
| Government's 76.0 | Excerpts WhatsApp chat | | |
| Government's 76.2 | Photo | | |
| Government's 115.27 | Google Map lat/long | | |
| Government's 115.33 | Image from Mr. Didani's iCloud | | |
| Government's 115.33-A | Image identifier and metadata from 115.33 | | |
| Government's 115.33-B | Lat/long location of 115.33 | | |
| Government's 116.25 | Screenshot of phone | | |

1    (Continued)

2                    E X H I B I T   I N D E X

3

     Exhibit No.              Description          Identified    Admitted

4    **Defendant's Exhibits**

5
     Defendant's C           Albanian document from
6                            National Business Center
     Defendant's W-1,        Video clips
7    W-2, W-3 and W-4
     Defendant's X-1,        Video clips
8    X-2 and X-3
     Defendant's Y           Video clip
9    Defendant's Z           Video clip

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    Detroit, Michigan
 2    Thursday, March 20, 2025
 3    9:57 a.m.
 4                              —  —  —
 5         (Beginning of excerpt.)
 6         THE COURT:  Okay.  Very well.  Then let's begin.
 7         I should say that we're going to be off on Friday --
 8    Friday or Monday.  We're going to be off on Monday.  Actually,
 9    we're going to be off on Friday, too, but we're also going to
10    be off on Monday.  And then we added some hours to make up for
11    that during the week next week and I think during the week
12    following that as well.
13         Okay.  All right.  Great.  And, Mr. Leach, you're
14    still under oath.
15         THE WITNESS:  Yes, your Honor.
16         THE COURT:  Okay.  I'm ready to proceed.
17         MR. BILKOVIC:  Thank you, your Honor.
18                   DIRECT EXAMINATION (Continued)
19    BY MR. BILKOVIC:
20    Q.  Agent Leach, I just want to take care of a housekeeping
21    matter before I finish with the remainder of the questions.
22         Do you have Government's proposed Exhibit 115.27?  It
23    may be in the materials.  If not, I can bring it to you.
24         THE COURT:  What number is it again, 115.27?
25         MR. BILKOVIC:  115.27.
```

```
 1                THE COURT:  Okay.

 2                THE WITNESS:  Yes, I do.

 3   BY MR. BILKOVIC:

 4   Q.   Do you remember this?

 5   A.   I do.

 6   Q.   Do you remember that when we previously tried to admit this

 7   the latitude, longitude was off by one number?

 8   A.   Yes, I do.

 9   Q.   And is this the latitude and longitude markers that are

10   accurate as to where the photograph taken in Government's

11   Exhibit 115.25, the photograph of Mr. Didani with the money in

12   the hotel, is this now accurate?

13   A.   Yes, it is.

14   Q.   And does it still pin to the location at the JW Marriott in

15   Washington, D.C.?

16   A.   Yes, it does.

17                MR. BILKOVIC:  Your Honor, at this time I would move

18    for admission into evidence of 115.27.  The corrected version

19    has been tendered to defense counsel.

20                THE COURT:  Any objection?

21                MR. FINK:  No objection.

22                THE COURT:  Very well.  It's admitted.

23                (Government's Exhibit 115.27 received into evidence.)

24   BY MR. BILKOVIC:

25   Q.   Detective Leach, when we left off yesterday, we were
```

1  talking about the bulletproof jacket orders.  Do you have do

2  you recall that?

3  A.  Yes, I do.

4        MR. BILKOVIC:  If you could -- could we put back up on

5  the screen 35.1.  Can we just zoom in on the top half.

6  BY MR. BILKOVIC:

7  Q.  And you had talked yesterday about this order, the $3,132

8  for four bulletproof jackets?

9  A.  Yes.

10  Q.  Did you see references to any of that in Government's

11  Exhibit 65.0, the chat between Mr. Didani and Fatjon Bajrami?

12  A.  Yes, I did.

13  Q.  Can you please look at 65.8.

14  A.  Yes, I have it here.

15  Q.  And do you recognize that?

16  A.  Yes, I do.

17  Q.  And what is that?

18  A.  This is a screenshot that was within the message thread

19  between Mr. Didani and Fatjon Bajrami.

20  Q.  And does it appear to be a screenshot of that same

21  bulletproof jacket order?

22  A.  Yes, it does.

23        MR. BILKOVIC:  Your Honor, at this time I would move

24  for admission into evidence of Government's proposed Exhibit

25  65.8.

```
 1              THE COURT:  Any objection?

 2              MR. FINK:  No objection.

 3              THE COURT:  Very well.  It's admitted.

 4              (Government's Exhibit 65.8 received into evidence.)

 5              MR. BILKOVIC:  And may I publish it to the jury?

 6              THE COURT:  You may.

 7              MR. BILKOVIC:  Can we just zoom in on the top half.

 8      BY MR. BILKOVIC:

 9      Q.  And this appears to be the same screenshot from the 35.1

10      exhibit?

11      A.  Yes, it does.

12              MR. BILKOVIC:  Can we go down to the bottom half.  And

13      keep going -- I'm sorry.  Can you keep going to include the

14      date, Ms. DiCarlo.

15      BY MR. BILKOVIC:

16      Q.  And do you see down in the very bottom right-hand corner a

17      date?

18      A.  On the computer screen, yes.

19      Q.  And what is the date?

20      A.  February 13, 2019.

21      Q.  Can you go to 65.0, Page 10, the chat itself.

22              MR. FINK:  What number, Mark?

23              MR. BILKOVIC:  65.0, Page 10.

24      BY MR. BILKOVIC:

25      Q.  And tell me when you're there.
```

1  A.   Yes.

2  Q.   And do you see entry 769?

3  A.   Yes, I do.

4  Q.   And does that appear to be a message from Fatjon Bajrami to

5  Mr. Didani containing the attachment for Government's Exhibit

6  65.8, that bulletproof jacket order?

7  A.   Yes, it does.

8  Q.   And what was the date on that that it was sent?

9  A.   March 3, 2019.

10 Q.   Can you look at Government's proposed Exhibit 65.9.

11 A.   Yes.

12 Q.   Do you recognize that?

13 A.   Yes, I do.

14 Q.   And what is that?

15 A.   This is another photograph located within that message

16 thread.  It appears to be a confirmation of a purchase order

17 from Bulletproof Zone that a order was shipped.

18 Q.   Was it the same order number that we previously discussed

19 in the last couple of exhibits, BPZ4987?

20 A.   Yes, it is.

21      MR. BILKOVIC:  Your Honor, at this time I would for

22 admission into evidence of Government's proposed Exhibit 65.9.

23      THE COURT:  Any objection?

24      MR. FINK:  Objection to hearsay.

25      THE COURT:  Do you want to respond to that?

```
 1              MR. BILKOVIC:  I'm not sure how it's hearsay.  The

 2    records of Bulletproof Zone have been admitted, and now this is

 3    basically a confirmation from Bulletproof Zone, a screenshot

 4    that was forwarded from Mr. Bajrami to Mr. Didani for the same

 5    order.

 6              THE COURT:  Mr. Fink.

 7              MR. FINK:  It's an unknown phone number to a text

 8    message.  It's not a certified record of Bulletproof Zone

 9    purported to tell the truth of the matter that they were

10    delivered or shipped or what have you.  I think it's just --

11              MR. BILKOVIC:  That's not what I'm offering this

12    exhibit for.  I'm offering this exhibit to show that

13    Mr. Bajrami sent confirmation of a bulletproof order to

14    Mr. Didani.

15              MR. FINK:  I still think it's hearsay, Judge.  It's

16    for the truth of the matter.  That's the ultimate what they're

17    trying to show, the connection.

18              THE COURT:  That it was a confirmation?

19              MR. FINK:  That it was done, right.  That it was done

20    and done between them and it's from somebody else, so ...

21              MR. BILKOVIC:  Judge, we're going to be able to show

22    in a few minutes that it was actually done.  That's now why I'm

23    offering it.

24              THE COURT:  Okay.  If it's not being offered to show

25    that it was actually the confirmation, but some communication
```

```
 1   between them, I will allow that to be admitted for that
 2   purpose.
 3            MR. BILKOVIC:  Thank you, your Honor.
 4            THE COURT:  But not for the truth of the confirmation.
 5            MR. BILKOVIC:  That's fine.  Thank you, your Honor.
 6            THE COURT:  It's admitted as 65.9.
 7            (Government's Exhibit 65.9 received into evidence.)
 8            MR. BILKOVIC:  May I just publish it to the jury?
 9            THE COURT:  Yes.
10   BY MR. BILKOVIC:
11   Q.  And is that what we're talking about, that you just talked
12   about?
13   A.  Yes, it is.
14   Q.  And this was sent to Mr. Didani by Mr. Bajrami?
15   A.  Yes, it was.
16   Q.  Can you look at Government's Exhibit 65.0, Page 11.
17   A.  Yes, I have it.
18   Q.  And do you recognize the entry and message number 1091 on
19   Page 11?
20   A.  Yes, I do.
21   Q.  And is that basically the text --
22            MR. BILKOVIC:  Actually, can we bring that up?
23            THE COURT:  Is that admitted?
24            MR. BILKOVIC:  The chat itself has been admitted, yes,
25   your Honor.
```

```
 1              THE COURT:  It's part of 65.0?
 2              MR. BILKOVIC:  Yes, Page 11 of that exhibit.
 3   BY MR. BILKOVIC:
 4   Q.   And is message 1091 the message where the attachment that
 5   is in 65.9 was sent?
 6   A.   Yes.
 7   Q.   And what is the date that it was sent?
 8   A.   It was sent on March 14, 2019.
 9   Q.   And this is an incoming message; correct?
10   A.   Yes.
11   Q.   During the review of this chat, did you see any videos that
12   Mr. Bajrami sent to Mr. Didani?
13   A.   Yes, I did.
14   Q.   Did you see any videos that Mr. Bajrami sent to Mr. Didani
15   of him modeling and describing the bulletproof jackets?
16   A.   Yes, I did.
17   Q.   And are those exhibits contained in -- were those videos
18   contained in Exhibit 65.11 and 65.12?
19              Actually, there are going to be videos, so it might
20   help you instead, why don't you look at 65.0, Page 14.
21   A.   Yes, these are two of the videos.
22   Q.   And are those the videos that are reflected -- and you've
23   seen the exhibits prior to testifying today; correct?
24   A.   I have.
25   Q.   And those are the two videos, 6511 and 6512, that are
```

1  reflected in message 1681 and 1682 of that chat?

2  A.  Yes, they are.

3  Q.  And what day were those videos sent to Mr. Didani from

4  Mr. Bajrami?

5  A.  May 17, 2019.

6        MR. BILKOVIC:  Your Honor, at this time I would move

7  for admission into evidence of Government's proposed Exhibits

8  65.11 and 65.12.

9        THE COURT:  Those are the actual videos?

10        MR. BILKOVIC:  The actual videos themselves.

11        THE COURT:  Okay.  Any objection?

12        MR. FINK:  I have no objection to the video, Judge,

13  but this is my concern about the other exhibit is they appear

14  to be bomber jackets, which are trendy and could not

15  necessarily be what it's purported to be.  So that's why I have

16  a problem with using the other text, but no objection to these

17  specific videos, your Honor.  I just wanted to point that out.

18        THE COURT:  Okay.  So noted and preserved for the

19  record.  I think that's probably argument.  And 65.11 and 65.12

20  are admitted.

21        (Government's Exhibits 65.11 and 65.12 received into

22        evidence.)

23        MR. FINK:  Thank you, your Honor.

24        MR. BILKOVIC:  And I'm not going to publish both of

25  them, but can we publish 65.11 to the jury.

```
 1            THE COURT:  They aren't entitled "bomber jackets" in
 2   either one of these; right?  Is the word "bomber jacket" used?
 3            MR. FINK:  It's a phrase to a type of coat, your
 4   Honor, and I know it because I have one.
 5            THE COURT:  I'm asking is that particular phrase used?
 6   I know on the other ones it said "flight jacket."
 7            MR. FINK:  Yeah, that's another way to label a flight
 8   jacket.  That's correct.
 9            THE COURT:  Okay.
10            MR. FINK:  Like the movie "Top Gun."
11            THE COURT:  But my question is was that word used?
12            MR. FINK:  No, it was not.  I'm using it, your Honor.
13   Thanks for clarifying.  I apologize.
14            THE COURT:  Thank you.
15            Which one are you showing?
16            MR. BILKOVIC:  Just 65.11.
17            (Video is played.)
18   BY MR. BILKOVIC:
19   Q.  Can you turn to Government's Exhibit 35.2.
20   A.  Yes, I have it here.
21   Q.  And do you recognize that?
22   A.  Yes.
23   Q.  And what is 35.2?
24   A.  This is another order invoice from Bulletproof Zone
25   production that was produced from Bulletproof Zone.
```

1    Q.   Is it on a different day and a different order number than

2    35.1?

3    A.   Yes, it is.

4    Q.   And is there a shipping address on there?

5    A.   Yes, there is.

6    Q.   And who is the shipping address, the name and city?

7    A.   1921 Songsparrow Court, Schaumburg, Illinois.

8    Q.   What is the name of the individual?

9    A.   Fatjon Bajrami.

10              MR. BILKOVIC:  Your Honor, at this time I would move

11   for admission into evidence of Government's proposed Exhibit

12   35.2.

13              THE COURT:  Any objection?

14              MR. FINK:  No objection, your Honor.

15              THE COURT:  It's admitted.

16              (Government's Exhibit 35.2 received into evidence.)

17              MR. BILKOVIC:  And may I publish it to the jury?

18              THE COURT:  Yes, you may.

19              MR. BILKOVIC:  Can we start with the top half, the top

20    third.  That's good right there.

21   BY MR. BILKOVIC:

22   Q.   And again, is there an order number on here?

23   A.   Yes, there is.

24   Q.   And what is the order number?

25   A.   BPZ8336.

1    Q.   And what is the date of the order?

2    A.   September 26, 2019, from the online store.

3    Q.   Could you use the mouse and just kind of track where you're

4    going to.  And does it show whether the order was delivered?

5    A.   Yes, it does.

6    Q.   And where is that?

7    A.   Right here, Monday, October 29.

8    Q.   And what was it that was ordered?

9    A.   The one BulletBlocker Level IIIA lightweight bulletproof

10   flight jacket, navy in color, size extra large.

11   Q.   And does it show a price?

12   A.   It does.

13   Q.   And what is the price?

14   A.   Total of $800.40.

15   Q.   Can you point to the area that describes the shipping

16   address and who it was shipped to.  You don't have to repeat

17   it.  Just if you can just point to it.

18           You're pointing to the right-hand side of the screen?

19   A.   Yes, I am.

20           MR. BILKOVIC:  Judge, my book fell apart.  So I just

21   need a minute to find this.

22   BY MR. BILKOVIC:

23   Q.   Can you go to Government's proposed Exhibit 65 -- well,

24   yeah, 65.16.

25   A.   Yes.

```
 1   Q.   Do you recognize that?

 2   A.   Yes, I do.

 3   Q.   And what is it that you're looking at?

 4   A.   This is a photograph that was located within the message

 5   thread between Mr. Didani and Mr. Bajrami.

 6   Q.   And was this a photograph pertaining to that bulletproof

 7   order?

 8   A.   Yes, it is.

 9         MR. BILKOVIC:  Your Honor, at this time I would move

10   for admission into evidence of Government's proposed Exhibit

11   65.16.

12         THE COURT:  Any objection?

13         MR. FINK:  No objection, your Honor.

14         THE COURT:  It's admitted as 65.16.

15         (Government's Exhibit 65.16 received into evidence.)

16         MR. BILKOVIC:  Can we publish it to the jury?

17         THE COURT:  Yes.

18   BY MR. BILKOVIC:

19   Q.   And do you see the dollar amount on here?

20   A.   Yes, I do.

21   Q.   And what is the dollar amount?

22   A.   $800,40.

23   Q.   And is that the same as the last exhibit that you testified

24   about?

25   A.   Yes, it is.
```

```
 1    Q.   Which would be 35.2.  And do you see a name here anywhere
 2    thanking the person for the order?
 3    A.   "Thank you, Fatjon."
 4    Q.   "Thank you" who?
 5    A.   Fatjon.
 6    Q.   Can you spell that?
 7    A.   F-A-T-J-O-N.
 8    Q.   That's Mr. Bajrami's first name?
 9    A.   Yes, it is.
10    Q.   Can you go to Government's Exhibit 65.0, Page 26.
11    A.   Yes.
12    Q.   And do you see entry in the message thread 3224?
13    A.   Yes, I do.
14    Q.   Is that the message thread that this photograph in 65.16
15    was sent by Mr. Bajrami to Mr. Didani?
16    A.   Yes.
17    Q.   And what was the date that was sent?
18    A.   September 26, 2019.
19    Q.   Can you turn to Government's Exhibit 35.3.
20              THE COURT:  35.3?
21              MR. BILKOVIC:  Yes, 35.3.
22              THE WITNESS:  Yes, I have it here.
23    BY MR. BILKOVIC:
24    Q.   And what is 35.3?
25    A.   35.3 is another invoice from Bulletproof Zone confirming a
```

1    purchase of four BulletBlocker Level IIIA lightweight jackets.

2              MR. BILKOVIC:  Your Honor, I believe this was admitted

3    yesterday when I moved the group of 35.0 to 35.6 in.  With that

4    being the case, I would ask to publish Page 1 of this exhibit

5    to the jury.

6              THE COURT:  Any objection?

7              MR. FINK:  No objection.

8              THE COURT:  Very well.  You may.

9              MR. BILKOVIC:  And can we just go to the top half.

10   BY MR. BILKOVIC:

11   Q.   And could you walk the jury with the mouse through this as

12   well starting with the order number and the date.

13   A.   Order number is at the top, BPZ8337.

14   Q.   What's the date of the order?

15   A.   September 26, 2019, from the online store.

16   Q.   And does it show whether or not these items were delivered?

17   A.   Yes, it does.

18   Q.   And can you -- what was the delivery date?  Can you slide

19   the mouse over to where it shows that.

20   A.   Delivered on October 31, 2019.

21   Q.   And what was in this order?

22   A.   Purchase of four BulletBlocker Level IIIA lightweight

23   bulletproof flight jackets, one size 3XL, two size XL, one size

24   small.

25   Q.   And what was the customer's name on this order?

1    A.    Customer's name was Fatjon Bajrami.

2    Q.    And can you just indicate the shipping address with the

3    name of the person as well as the city and state?

4    A.    Shipping address is Fatjon Bajrami, 1921, Songsparrow

5    Court, Schaumburg, Illinois.

6    Q.    Can we go to the bottom half.  And does it show a billing

7    address?

8    A.    Yes, it does.

9    Q.    And what is the city of the billing address?

10   A.    Hoffman Estates.

11   Q.    And what is the name attached to the billing address?

12   A.    Raheel Ali.

13   Q.    And what is the dollar figure that was paid by the

14   customer?

15   A.    $3,362.60.

16   Q.    Can you go to 65.0, Page 25.

17   A.    Yes.

18   Q.    I'm sorry.  I meant Page 24.

19   A.    Okay.

20   Q.    And do you recognize the messages in that portion of the

21   chat message 3219 and 3220?

22   A.    Yes, I do.

23          MR. BILKOVIC:  Can you bring those up, Ms. DiCarlo,

24   starting with --

25          THE COURT:  3219 and 3220?

```
 1              MR. BILKOVIC:  Those are not exhibit numbers, your
 2    Honor.  Let me make --
 3              THE COURT:  I know.  I know.  They're message numbers.
 4              MR. BILKOVIC:  Yeah, that's correct.
 5              THE COURT:  Are those the right ones?
 6              MR. BILKOVIC:  They are.  3219 and 3220.  I'm going to
 7    start with 3219, and that is on Exhibit 65.0, Page 24.
 8              THE COURT:  All right.  Thank you.
 9    BY MR. BILKOVIC:
10    Q.  And message 3219, is that a message sent from Mr. Bajrami
11    to Mr. Didani?
12    A.  Yes, it is.
13    Q.  And what is the date on the message?
14    A.  September 25, 2019.
15    Q.  And can you read the body of message?
16    A.  "Hermano so one small, 3XL, 1XXL."
17    Q.  And can you read -- go back.  Can you read that?
18              MR. BILKOVIC:  Can we put up the next one, 3220.
19              THE WITNESS:  The "Body" states "Correct."
20    BY MR. BILKOVIC:
21    Q.  And who is that from?  Is that an incoming?
22    A.  That's an incoming message.
23    Q.  From Mr. Bajrami again?
24    A.  Yes.
25              MR. BILKOVIC:  You can take it down.  Thank you.
```

```
 1   BY MR. BILKOVIC:
 2   Q.   Can you look at Government's Exhibit 35.4.
 3   A.   What was the last part?
 4   Q.   35.4.
 5           THE COURT:  Mr. Fink and Mr. Didani, make sure the mic
 6    is out of the your way when you're speaking, okay.
 7           MR. FINK:  Yes, your Honor.
 8           THE WITNESS:  I have the exhibit in front of me.
 9   BY MR. BILKOVIC:
10   Q.   And what is that exhibit?
11           Actually, we can put it up.  It's been admitted.
12           MR. BILKOVIC:  If we can publish Page 1 of the
13    exhibit, 35.4.  And if we can zoom in on the top half.
14   BY MR. BILKOVIC:
15   Q.   And what is this?
16   A.   This is an E-mail correspondence between an individual that
17    lists himself as Fatjon Bajrami and Bulletproof Zone support.
18   Q.   And what is the date?
19   A.   October 2, 2019.
20   Q.   And can we go to Page 2 of that exhibit, 35.4 -- or Page 2.
21    And what are we looking at here?
22   A.   This is an Illinois driver's license of an individual named
23    Raheel Ali.
24   Q.   And is that a photograph that Mr. Bajrami sent to
25    Bulletproof Zone?
```

1   A.   Yes, it is.

2   Q.   And was Ali Raheel the basically billing person on the last

3   order that you talked about?

4   A.   Yes, it was.

5   Q.   Can you go to Exhibit 65.15.  Tell me when you're there.

6   A.   I'm here.

7   Q.   Do you recognize that?

8   A.   Yes, I do.

9   Q.   And what is that?

10  A.   This is another photograph shared between Mr. Bajrami and

11  Mr. Didani and the message thread.

12          MR. BILKOVIC:  Your Honor, at this time I would move

13   for admission into evidence of Government's proposed Exhibit

14   65.15.

15          THE COURT:  And it's a message between who again?

16          MR. BILKOVIC:  Mr. Bajrami and Mr. Didani.

17          THE COURT:  Okay.  Any objection?

18          MR. FINK:  You said 65.15?

19          MR. BILKOVIC:  Yes.

20          MR. FINK:  69.0 dash?

21          MR. BILKOVIC:  No, 65.15.

22          THE COURT:  If you have it there, could you pass it to

23   him, or are you finding it okay?

24          MR. FINK:  I think I'm seeing the wrong thing, Mark.

25          (Briefly off the record.)

```
 1              MR. FINK:  No objection, your Honor.
 2              THE COURT:  Very well.  It's admitted as 65.15.
 3              (Government's Exhibit 65.15 received into evidence.)
 4              MR. BILKOVIC:  And may we publish it to the jury?
 5              THE COURT:  Yes.
 6              MR. BILKOVIC:  If we can zoom in on the top half.
 7   BY MR. BILKOVIC:
 8   Q.  And do you recognize this?
 9   A.  Yes, I do.
10   Q.  This is the -- basically this was an attachment that
11   Mr. Bajrami sent to Mr. Didani?
12   A.  Yes, it was.
13   Q.  And is it basically the description of the order that was
14   in Government's Exhibit 35.3?
15   A.  Yes.
16   Q.  And do you see the "thank you" name on it?
17   A.  "Thank you, Raheel."
18   Q.  Which would be Raheel -- with reference to Raheel Ali?
19   A.  Yes, it is.
20   Q.  And can you look at Exhibit 65.0, Page 25.
21              THE COURT:  25?
22              MR. BILKOVIC:  Yes.  65.0, Page 25.
23              THE WITNESS:  Yes, I have it here.
24   BY MR. BILKOVIC:
25   Q.  And does that appear to be the message where Mr. Bajrami
```

1    sent that photograph depicted in 65.15?

2    A.   Yes, it is.

3    Q.   And what date did he send that?

4    A.   September 26, 2019.

5    Q.   Did you see any videos after this in the message thread

6    that related to bulletproof jackets?

7    A.   Yes, I did.

8    Q.   Can you turn to Government's Exhibit 65.0, Page 30.

9    A.   Yes.

10   Q.   And do you see a message 3572 from Mr. Didani to

11   Mr. Bajrami on November 11, 2019?

12   A.   Yes, I do.

13   Q.   And does that message contain a video?

14   A.   It does.

15   Q.   Do you see also following that a message 3573 on the same

16   date, November 11, 2019, from Mr. Didani to Mr. Bajrami that

17   contains a video?

18   A.   Yes, I do.

19   Q.   And are those videos depicted in Government's Exhibit --

20   proposed Exhibit 65.18 and 65.19?

21        THE COURT:   65.18 and 19?

22        MR. BILKOVIC:   65.18 and 65.19.

23   BY MR. BILKOVIC:

24   Q.   Have you seen those videos?

25   A.   I've seen those videos.  Yes, they are.

```
 1              MR. BILKOVIC:  Your Honor, at this time I would move
 2    for admission into evidence of Government's proposed Exhibits
 3    65.18 and 65.19.
 4              THE COURT:  Any objection?
 5              MR. FINK:  No objection, your Honor.
 6              THE COURT:  All right.  They're admitted as 65.18 and
 7    65.19.
 8              (Government's Exhibits 65.18 and 65.19 received into
 9              evidence.)
10              MR. BILKOVIC:  Correct, your Honor.
11              MR. FINK:  To be clear, your Honor, there is a
12    stipulation Mr. Didani entered into, the same one that we've
13    been discussing previously on the translations, and we stand by
14    that translation.
15              THE COURT:  And the translation is going to be read?
16              MR. FINK:  I think Mr. Bilkovic told me they put it in
17    the video.
18              MR. BILKOVIC:  Yes, your Honor.
19              THE COURT:  They put it in the video?
20              MR. BILKOVIC:  Yes, your Honor.
21              THE COURT:  Okay.
22              MR. BILKOVIC:  May I have one moment?
23              (Briefly off the record.)
24              MR. FINK:  Your Honor, the discussion at counsel table
25    is just about making sure that Mr. Didani was comfortable with
```

1    the translations.  There was a discussion about one of them.

2    Mr. Bilkovic has resolved that issue.  He's going to play a

3    certain one now and deal with --

4            THE COURT:  All right.  Very well.  What's it being

5    translated from?

6            MR. BILKOVIC:  The translation, Judge, there's a

7    stipulation that the translation in 65.18 is from -- an

8    accurate translation from Spanish to English.

9            THE COURT:  Okay.  And is that also for 65.19?

10           MR. BILKOVIC:  Yes, but I'm not going to play that

11   right now, because I want to make sure that we have the correct

12   version in there.

13           THE COURT:  All right.  That's fine.

14           MR. BILKOVIC:  Could we just publish 65.18.

15           (Video is played.)

16           MR. BILKOVIC:  Judge, I stand corrected.  I thought

17   the translations were in the video.  They're not.

18           At this time I would move for admission the

19   Government's proposed Exhibit 65.18-A.

20           THE COURT:  And is that the translation?

21           MR. BILKOVIC:  Yes.

22           THE COURT:  Do you have any objection to that?

23           MR. FINK:  A, we don't have an objection to.  That was

24   discussed in front of Mr. Didani at counsel table.  That one is

25   acceptable.

```
 1              THE COURT:  All right.  You can read it then.  It's
 2   admitted.
 3              (Government's Exhibit 65.18-A received into evidence.)
 4   BY MR. BILKOVIC:
 5   Q.  First of all, do you recognize the voice of the person
 6   speaking in the video?
 7   A.  Yes, I do.
 8   Q.  Who's that voice?
 9   A.  Mr. Didani.
10   Q.  And in 65.19 did you also hear a voice in the video?
11   A.  Yes, I did.
12   Q.  And did you recognize that voice?
13   A.  Also Mr. Didani.
14              MR. BILKOVIC:  Can we just put up the transcript for
15   65.18-A.
16   BY MR. BILKOVIC:
17   Q.  And can you just read what he was saying.
18   A.  "Carefully, bro.  Carefully, okay.  Nothing, nothing,
19   nothing, nothing, nothing.  F'ing nothing."
20   Q.  And on the same day can you go back to 65.0, Page 31,
21   message 3574.
22              THE COURT:  I'm going to 65.0, page what?
23              MR. BILKOVIC:  65.0, Page 31.
24              THE COURT:  All right.  Thank you.
25              MR. BILKOVIC:  And that would be message 3574.  No,
```

```
 1    the top message.  I'm sorry.
 2    BY MR. BILKOVIC:
 3    Q.  So after those videos were sent to Mr. Didani on
 4    November 11, 2019, does this -- I'm sorry.  After Mr. Didani
 5    sent those videos to Mr. Bajrami on November 11, 2019, did he
 6    follow that with a text message?
 7    A.  Yes, he did.
 8    Q.  Is this one of the text messages?
 9    A.  Yes, it is.
10    Q.  And what message number is it?
11    A.  3574.
12    Q.  And again, this is from -- it's an outgoing.  So that's
13    from Mr. Didani to Mr. Bajrami?
14    A.  Correct.
15    Q.  And the date is ...
16    A.  November 11, 2019.
17    Q.  And what is the body?
18    A.  "Well done, brother."
19          MR. BILKOVIC:  Your Honor, at this time I am going to
20    -- they checked.  The 65.19 does not have the translation in
21    the video.  So I would move to play that to the jury at this
22    time.
23          THE COURT:  It what?
24          MR. BILKOVIC:  It does not have the words in the
25    video.  It's just the video itself.  I would move to play that
```

1   at this point.

2            THE COURT:  Is that agreeable to the defense?

3            MR. FINK:  Yes.  We can figure out --

4            THE COURT:  It's not going to be a translation that's

5   offered?

6            MR. FINK:  Yeah.  We can figure out the translation,

7   so ...

8            (Briefly off the record.)

9            MR. FINK:  Yes, we resolved the translation.  What

10   Mr. Bilkovic is going to admit -- or read is the correct --

11   Mr. Didani says the correct translation that was agreed to.

12            THE COURT:  Okay.  And are you going to show it as

13   well?

14            MR. BILKOVIC:  I'm going to show the video, if the

15   Court allows me to, and then I'm going to put up the

16   translation following the video.

17            THE COURT:  That's fine.  You're going to do that now?

18            MR. BILKOVIC:  If I could.

19            (Video is played.)

20            MR. BILKOVIC:  And, Judge, I believe there's a

21   stipulation to Government's proposed Exhibit 65.19-B.

22            THE COURT:  Dash what, A?

23            MR. BILKOVIC:  I'm sorry.  65.19-B.

24            THE COURT:  Well, now it's going to be B rather than

25   A?

1          MR. BILKOVIC:  Correct.

2          THE COURT:  The other one is 65.18-A?

3          MR. BILKOVIC:  Yes, and this is 65.19-B.  The reason

4   that we change it is, A, there was a issue with the translation

5   and we agreed to the version in B.

6          THE COURT:  I know, but why wouldn't it be 65.19-A?

7          MR. BILKOVIC:  We could make it 65.19-A.  That's fine.

8          THE COURT:  Yeah.  And that we way we don't think

9   about whether or not there was an A to 65.19.

10          MR. BILKOVIC:  We will change the number then to A and

11   I will move to admit this as A.

12          THE COURT:  Okay.  Any objection to that, Mr. Fink?

13          MR. FINK:  No, your Honor.

14          THE COURT:  All right.  Very well.

15   BY MR. BILKOVIC:

16   Q.  I don't necessarily think that we need to play it.

17   Basically they're talking about hitting it low and the gun

18   jamming; correct?

19   A.  That's correct.

20   Q.  Okay.

21          THE COURT:  Are you going to read it or --

22          MR. BILKOVIC:  I wasn't going to.  I just asked him to

23   summarize it.  I can.

24          THE COURT:  No, I think you ought to read it.

25          MR. BILKOVIC:  Okay.  Let's put it back up on the

```
 1    board.  Don't show the bottom half, because that's going to
 2     show the ...
 3    BY MR. BILKOVIC:
 4    Q.  And can you just read through and for every sentence
 5    indicate -- the names are not in there, but that it's a
 6    different person.  If you could read it verbatim what it says
 7    on the screen.
 8    A.  Yes.  "Man 1:  Wait, wait, wait, wait, wait, wait, bro.
 9    Man 2:  Hit that low.  Man 3:  Let me know.  Man 1:  C'mon,
10    c'mon.  Man 2:  Wait, wait, it jammed.  Man 1:  That's not
11    good, bro.  That's not good.  You want -- that's not good.  Man
12    2:  You have to put it on one side, over here.  It's that it's
13    one -- one."
14            THE COURT:  Okay.  Thank you.
15    BY MR. BILKOVIC:
16    Q.  Now, we had talked a little bit about different nicknames
17    that you found that Mr. Didani utilizes.  Do you remember that?
18    A.  Yes, I do.
19    Q.  Can you look at Government's proposed Exhibit 116.25.
20    A.  Yes.
21    Q.  And do you recognize that?
22    A.  I do.
23    Q.  And what is that?
24    A.  It is a screenshot of a phone located in Mr. Didani's
25    seized iPhone from March 31, 2021.
```

```
 1   Q.  And does it have a name on it?
 2   A.  It does.
 3   Q.  And does it have a basically identification number at the
 4   bottom?
 5   A.  Yes, it does.
 6         MR. BILKOVIC:  Your Honor, at this time I would move
 7   for admission into evidence of Government's proposed Exhibit
 8   116.25.
 9         THE COURT:  Any objection?
10         MR. FINK:  No objection, your Honor.
11         THE COURT:  Very well.  116.25 is admitted.
12         (Government's Exhibit 116.25 received into evidence.)
13         MR. BILKOVIC:  Thank you, your Honor.  And may I
14   publish it to the jury?
15         THE COURT:  You may.
16   BY MR. BILKOVIC:
17   Q.  And you said that there was a name on here.  Can you look
18   at the name?
19   A.  Yes.  Pancho.
20   Q.  Just take the mouse and show it, because I don't know how
21   clear it is for the jury.
22         THE COURT:  And it's what again?
23         THE WITNESS:  Pancho.
24   BY MR. BILKOVIC:
25   Q.  Can you spell that?
```

1   A.   P-A-N-C-H-O.

2   Q.   And is there a number -- what's the next line on there?

3   A.   "It's available."

4   Q.   And then what is the next entry?

5   A.   It is a PIN number.

6   Q.   Can we take the mouse and point to the PIN number.

7        What is the PIN number?

8   A.   BTJ56N.

9   Q.   Do you see in front of you Government's proposed Exhibit

10  76?  It might be in the new materials.

11  A.   76?

12  Q.   Yes, 76.0.

13  A.   Yes, I do.

14  Q.   And do you recognize that?

15  A.   Yes, I do.

16  Q.   What is that?

17  A.   This is a WhatsApp message thread between Amandip Sahota

18  and Mr. Didani.

19  Q.   And Amandip Sahota in the message thread is referred to as

20  who?

21  A.   Endi, as in E-N-D-I, last of Sky.

22  Q.   And Endi Sky, was that -- just to link it for the jury, was

23  that the same number and name saved in Mr. Didani's iCloud

24  contacts as exhibit -- in Exhibit 114.0?

25  A.   Yes, it was.

```
 1   Q.  And what was it that -- did you investigate Mr. Sahota's
 2   background?
 3   A.  Yes.
 4   Q.  What was it that he did?
 5   A.   He was a cell phone distributor out of Vancouver, Canada
 6   that specialized in Sky ECC phones.
 7           THE COURT:  Do you know how to spell his name again?
 8   I know I asked that --
 9           THE WITNESS:  Amandip Sahota, A-M-A-N-D-I-P.
10           THE COURT:  Thank you.
11           THE WITNESS:  You're welcome.
12   BY MR. BILKOVIC:
13   Q.  Can you turn to 76.0, Page 12.
14   A.  Yes.
15           MR. BILKOVIC:  Actually, Judge, did I move to admit
16   76.0 yet?
17           THE COURT:  I don't think so.
18           MR. BILKOVIC:  Your Honor, at this time I would move
19   to admit 76.0 into evidence.
20           THE COURT:  Any objection?
21           MR. FINK:  I have the same objection that I previously
22   made, Judge, about foundation just showing that this is either
23   the co-conspirator exception of the hearsay rule and the same
24   response to the position the Government has taken about
25   contextualizing other text messages.  I think it's hearsay.
```

```
 1              THE COURT:  Okay.  So noted and preserved for the
 2   record, and it's admitted.
 3              (Government's Exhibit 76.0 received into evidence.)
 4              MR. BILKOVIC:  Thank you, your Honor.
 5   BY MR. BILKOVIC:
 6   Q.  Can we go to 76.0, Page 12.
 7   A.  Yes.
 8              MR. BILKOVIC:  And can we zoom in on the top bubble.
 9   BY MR. BILKOVIC:
10   Q.  And do you see a date on the bottom right-hand corner?
11   A.  Yes, I do.
12   Q.  And what is the date?
13   A.  August 21, 2019.
14   Q.  And is there a status on the left-hand side?
15   A.  Yes, there is.
16   Q.  And what is the status?
17   A.  "Sent."
18   Q.  So this again would be from Mr. Didani's device to this
19   individual?
20   A.  Correct.
21   Q.  And is there an attachment there?
22   A.  There is.
23   Q.  Can you look at 76.2 -- proposed 76.2 and tell me if you
24   recognize that?  And, if not, I have a copy.  I could approach
25   and show you.  It might be quicker.
```

1          MR. BILKOVIC:  May I approach, your Honor, with a
2    copy?
3          THE COURT:  Yes, you may.
4          MR. BILKOVIC:  Thank you.
5    BY MR. BILKOVIC:
6    Q.   Do you recognize that?
7    A.   Yes, I do.
8    Q.   Is that the attachment that Mr. Didani sent on August 21,
9    2019?
10   A.   Yes, it is.
11         MR. BILKOVIC:  Your Honor, at this time I would move
12   for admission into evidence of Government's proposed Exhibit
13   76.2.
14         THE COURT:  Subject to your same objection?
15         MR. FINK:  Yes, your Honor.
16         THE COURT:  All right.  And I will relate to that
17   co-conspirator issue later, and it's admitted.
18         (Government's Exhibit 76.2 received into evidence.)
19         MR. BILKOVIC:  May I publish it to the jury?
20         THE COURT:  Yes, you may.
21   BY MR. BILKOVIC:
22   Q.   What are we looking at here?
23   A.   This is a screenshot of another phone showing a user's
24   account.
25         MR. BILKOVIC:  And could we just zoom in on the phone

1    itself.

2    BY MR. BILKOVIC:

3    Q.   And do you see basically underneath -- or next to the

4    photograph of the individual, what are the words there?

5    A.   "Change."

6    Q.   Then underneath that is there a name?

7    A.   Yes, there is.

8    Q.   What is the name?

9    A.   "Panco backup."

10   Q.   How do you spell Panco?

11   A.   P-A-N-C-O.

12   Q.   And underneath that to the right is there a box with a

13   word?

14   A.   Yes.

15   Q.   And what does that say?

16   A.   It states, "Available."

17          MR. BILKOVIC:  Can you go to 7 -- actually, can we put

18   up 76.0, Page 13.  And can we zoom in on that box right

19   there -- no, the bottom one.  The bottom message, green

20   message.

21   BY MR. BILKOVIC:

22   Q.   And again, is this a message that was sent?

23   A.   Yes.

24   Q.   To Mr. Didani?

25   A.   Sent by Mr. Didani.

1    Q.   And what is the date?

2    A.   The date is August 21, 2019.

3    Q.   And what is the body in the message?

4    A.   "I need my Sky."

5    Q.   Do you have Government's proposed Exhibit 71.0 -- I'm

6    sorry, no.  Government's Exhibit 71.0 was admitted previously.

7    That was a message thread between Mr. Didani and Mr. Synowiec?

8    A.   Yes.

9    Q.   Were there additional message threads between Mr. Didani

10   and Mr. Synowiec?

11   A.   Yes, there were.

12   Q.   Do you have Government's proposed Exhibit 72.0 in front of

13   you?

14           MR. FINK:  72.0?

15           MR. BILKOVIC:  72.0.

16           THE WITNESS:  I do not believe I have 72.0.

17           MR. BILKOVIC:  May I approach, your Honor?

18           THE COURT:  Yes, you may.

19   BY MR. BILKOVIC:

20   Q.   Do you recognize that?

21   A.   Yes, I do.

22   Q.   And what is that?

23   A.   This is a message thread taken out of Mr. Didani's iPhone,

24   a Signal message thread.

25   Q.   And this is obviously -- is this an excerpt, an edited

1   version?

2   A.   Yes, it is.

3   Q.   And what is the start of that message thread?

4   A.   12-26, 2019.

5   Q.   And what is the date of the last message in that thread?

6   A.   9-24, 2020.

7           MR. BILKOVIC:  Your Honor, at this time I would move

8   for admission into evidence of Government's proposed Exhibit

9   72.0.

10          THE COURT:  Any objection?

11          MR. FINK:  Same objection previously, as previously

12  with these conversations, Judge.

13          THE COURT:  And this is a message thread that is

14  purported to be with Mr. Synowiec?

15          MR. BILKOVIC:  Correct.

16          THE COURT:  Okay.  Subject to my same ruling, it's

17  admitted.

18          (Government's Exhibit 72.0 received into evidence.)

19  BY MR. BILKOVIC:

20  Q.   And do you see the very last entry in that message thread

21  on September 24, 2020?

22  A.   Yes, I do.

23  Q.   And just to frame the time, that was approximately two days

24  after the 1,200 kilo seizure in the Port of Dover?

25  A.   That's correct.

```
 1   Q.   In that last entry --
 2              MR. BILKOVIC:  Actually, could we put up that last
 3   entry, 72.0.  Unfortunately, I don't have the page.
 4              It would be Page 73.
 5   BY MR. BILKOVIC:
 6   Q.   And what message number is this?
 7   A.   Message number 437.
 8   Q.   And is this an outgoing from Mr. Didani or incoming?
 9   A.   Outgoing message.
10   Q.   And what is the body?
11   A.   The body is an online website link going to a news article.
12   Q.   Are you familiar with what the content of the news article
13   is about?
14   A.   Yes, I am.
15   Q.   What was it about?
16   A.   It is about an approximate 1,200-kilo seizure that took
17   place in the Port of Dover, England.
18              MR. BILKOVIC:  Your Honor, I believe that we have
19    fixed the issue with Government's proposed Exhibit 115.11
20    yesterday.  I would ask to be able to play that at this time.
21              THE COURT:  And that is what?
22              MR. BILKOVIC:  It is a screenshot of a text message
23    thread.
24              THE COURT:  Okay.  Is it already admitted?
25              MR. BILKOVIC:  It was -- the content was admitted, but
```

1    we had to edit the exhibit.

2            THE COURT:  A photograph?

3            MR. BILKOVIC:  Yes.

4            THE COURT:  Okay.  You've seen this editing?

5            MR. FINK:  I have, your Honor, yes.  No objection.

6            THE COURT:  And can you provide the Court with a new

7    copy?

8            MR. BILKOVIC:  Yes.

9            THE COURT:  I don't need it now.  Just eventually.

10           MR. BILKOVIC:  Okay.

11           THE COURT:  And put a sticker on it as well.

12           MR. BILKOVIC:  Very well, your Honor.

13           And can I publish 115.11 to the jury?

14           THE COURT:  Yes.  And did you also edit 11 --

15   115.11-A?

16           MR. BILKOVIC:  All 11-A was was the metadata.  So, no,

17   we didn't do any -- oh, yes, we did.  We --

18           THE COURT:  There's a photo attached to my copy.

19           MR. BILKOVIC:  You are correct.  We edited that as

20   well.

21           THE COURT:  Okay.  I need then a copy of each of

22   those; okay?

23           MR. BILKOVIC:  Yes, your Honor.  And may I publish

24   115.11-A to the jury?

25           THE COURT:  Okay.

```
 1            MR. BILKOVIC:  I'm sorry, 11 to the jury.
 2            THE COURT:  Yes.
 3   BY MR. BILKOVIC:
 4   Q.   And could you just read -- zoom in on the messages and can
 5   you just read them and the date.
 6   A.   The top line states, "For 1T it is almost 20 feet long,"
 7   dated June 3, 2018, followed by a response of, "No, brother."
 8   On the same date, June 3, 2018, followed by response from the
 9   initial messenger stating, "Ok, brother.  Then I'm not gonna
10   worry about that part.  Whole thing gonna be 20X5X2 feet.
11   Huge."  Then he responds, "Like a boat."  All dated June 3,
12   2018.
13            THE COURT:  And I also think you are going to edit
14   115.12 and 115.12-A; is that right?
15            MR. BILKOVIC:  Mr. McDonald is checking, your Honor.
16            THE COURT:  It's the last two sentences.
17            MR. BILKOVIC:  What exhibit number, Judge?
18            THE COURT:  115.12 and 115.12-A.  Do you see under the
19   gray area?  I don't think we need those two things.  At
20   5:32 p.m.
21            MR. BILKOVIC:  Yes, we can take that full bottom part
22   out.
23            THE COURT:  And it's on the next page, 115.12-A also,
24   okay.
25            MR. BILKOVIC:  We'll take that out, your Honor.
```

```
 1              THE COURT:  All right.  Great.  And give me another
 2    copy of those two, please, eventually.
 3              MR. BILKOVIC:  Very well.
 4              THE COURT:  Okay.
 5    BY MR. BILKOVIC:
 6    Q.  Yesterday we talked about a text message BlackBerry thread
 7    between somebody Marco CDN and the PIN 6F3C35.  Do you remember
 8    that?
 9    A.  Yes, I do.
10    Q.  That was in Exhibit 116.24.  Was that the only text
11    message, BlackBerry message, that you saw between Marco CDN and
12    6F3C35?
13    A.  No, it was not.
14    Q.  Can you look at Government's proposed Exhibit 115.33 and
15    115.33-A.
16    A.  Yes.
17    Q.  And starting with 115.33, do you recognize that?
18    A.  Yes, I do.
19    Q.  What is that?
20    A.  This is an image that was located in Mr. Didani's iCloud.
21    Q.  And is -- what is Government's proposed Exhibit 115.33-A?
22    A.  This is that same image with the image identifier and the
23    metadata attached.
24              MR. BILKOVIC:  Your Honor, at this time I would move
25    for admission into evidence of Government's proposed Exhibit
```

1    115.33 and 115.33-A.

2            THE COURT:  Any objection?

3            MR. FINK:  Same objection about hearsay and

4    foundation, your Honor.

5            THE COURT:  Okay.  I don't have those.

6            MR. BILKOVIC:  I believe that -- maybe you might have

7    them up at your --

8            THE COURT:  I might have them where?

9            MR. BILKOVIC:  Maybe Ann.

10            THE COURT:  Oh, sorry.  Okay.  Thank you.

11            MR. BILKOVIC:  Do you want me to say the numbers

12    again, Judge?  115.33 and 115.33-A.

13            THE COURT:  Yes.

14            Okay.  Same objection?

15            MR. FINK:  Yes, your Honor.

16            THE COURT:  Relative to the co-conspirator issue?

17            MR. FINK:  And the contextualizing as hearsay.

18            THE COURT:  Okay.  Very well.  So noted and preserved

19    for the record and admitted at this time.

20            (Government's Exhibits 115.33 and 115.33-A received

21            into evidence.)

22            MR. BILKOVIC:  Thank you, your Honor.

23            Can we start with -- publish 115.33-A.  Just go to the

24    bottom half with the metadata.

25

1    BY MR. BILKOVIC:

2    Q.   And what is the capture time?

3    A.   Capture time is January 12, 2017.

4    Q.   And what is the device?

5    A.   Apple iPhone 6 Plus.

6    Q.   Now, in this metadata is there latitude and longitude

7    contained?

8    A.   Yes, there is.

9    Q.   Can you look at Government's proposed Exhibit 115.33-B.

10   A.   Yes.

11   Q.   And do you recognize that?

12   A.   Yes, I do.

13   Q.   And what is that?

14   A.   This is the latitude, longitude location listed in the

15   metadata of the previous photo of where it was captured.

16         MR. BILKOVIC:  Your Honor, at this time I would move

17    for admission into evidence of 115.33-B.

18         MR. FINK:  Same objection.

19         THE COURT:  All right.  So noted and preserved for the

20    record, and 115.33-B is admitted.

21         (Government's Exhibit 115.33-B received into

22         evidence.)

23         MR. BILKOVIC:  And may we publish it to the jury?

24         THE COURT:  Yes.

25

1    BY MR. BILKOVIC:

2    Q.   Does the red pin signify where the device was that took

3    this photograph?

4    A.   Yes, it does.

5           MR. BILKOVIC:  And can you just do a block around that

6    device -- or around the pin.  Go there all the way to where the

7    golf course holes appears to be.

8    BY MR. BILKOVIC:

9    Q.   Are familiar with this area?

10   A.   Yes, I am.

11   Q.   And the pin, is that in the area of Detroit near the Grosse

12   Pointe border?

13   A.   Yes, it is.

14          MR. BILKOVIC:  Can we publish 115.33?

15          THE COURT:  Yes.

16          MR. BILKOVIC:  Thank you, your Honor.

17          And can we zoom in on the --

18   BY MR. BILKOVIC:

19   Q.   Actually, first of all, the very top is there a message

20   destruction time?

21   A.   Yes, there is.

22   Q.   And what is that?

23   A.   It's message destruction time two hours.

24          MR. BILKOVIC:  Actually, can we start up there and

25   then go down to the bottom part of the keypad.  Perfect.

1    BY MR. BILKOVIC:

2    Q.   And does this also have a "Sky" notation on it?

3    A.   Yes, it does.

4    Q.   Now, can you see the very top message that does not have a

5    user attributed to it?

6    A.   Yes.

7    Q.   And can you read there.

8    A.   It appears to say "From Holland."

9    Q.   And then there's a message from Marco CDN?

10   A.   Yes.

11   Q.   Can you read that.

12   A.   "Cool, keep me posted, how that go.  I told you I can pick

13   up that $$ from USA."

14   Q.   And how does 6F35C7 respond?

15   A.   "Let U know, brother."

16   Q.   Now, Agent Leach, you testified about chats involving

17   articles and things that Mr. Didani sent after some of these

18   seizures.  Did you also in the investigation discover chats

19   that had evidence of Mr. Didani and others planning these

20   shipments that were seized?

21   A.   Yes.

22   Q.   And did you recover those chats?

23   A.   Yes.

24   Q.   And do those chats contain photographs and videos as well?

25   A.   Yes, they do.

```
1    Q.   Now, you'll be testifying one more time in this case?
2    A.   Yes, I will.
3    Q.   And we will present that testimony the next time you
4    testify; fair enough.
5    A.   Yes.
6              MR. BILKOVIC:  Judge, I don't believe I have any
7    further questions at this time.
8              THE COURT:  All right.  Very well.
9              Do you wish to cross-examine at this time?
10             MR. FINK:  I do, Judge.  I would request a short
11   break.
12             THE COURT:  All right.  Very well.  The jury may step
13   down during the break.
14             (The jury left the courtroom at 10:58 a.m.)
15             THE COURT:  Okay.  You may step down during the break.
16             About ten minutes, gentlemen?  Ten minutes, gentlemen?
17             MR. FINK:  Oh, yes, yes.  Thank you, your Honor.
18             MR. BILKOVIC:  Thanks, Judge.
19             (At 10:59 a.m., a brief recess was taken.
20             Back on the record at 11:15 a.m.)
21             LAW CLERK:  All rise.  Court is back in session.
22             THE COURT:  Okay.  Are we ready?
23             MR. FINK:  Yes, your Honor.
24             THE COURT:  Okay.  Let's bring out the jury.
25             LAW CLERK:  All rise for the jury.
```

```
 1                   (The jury entered the courtroom at 11:16 a.m.)
 2                   THE COURT:  All right.  You may all be seated.
 3               You're still under oath, Agent Leach.
 4                   THE WITNESS:  Yes, your Honor.
 5                   THE COURT:  I think you're ready to go.
 6                   MR. FINK:  Thank you, your Honor.
 7                             CROSS-EXAMINATION
 8    BY MR. FINK:
 9    Q.   Detective Leach, good morning.
10    A.   Good morning.
11    Q.   You are employed at the Farmington Hills Police Department;
12    is that correct?
13    A.   That is correct.
14    Q.   Your office is where?
15    A.   31655 West Eleven Mile, Farmington Hills, Michigan.
16    Q.   Is that the Farmington Hills Police Department?
17    A.   It is.
18    Q.   And in this case you were, correct me if I'm wrong,
19    designated as a task force officer; is that correct?
20    A.   Yes, it is.
21    Q.   And the idea behind that is when federal agents need
22    additional resources they can -- this might be the wrong use of
23    the word, but deputize or otherwise ask for help from state or
24    local law enforcement; correct?
25    A.   Yes.
```

1    Q.   Okay.  You undergo any specialized training to be a task

2    force officer?

3    A.   Yes.

4    Q.   What kind of specialized training?

5    A.   There's a task force officer basic training school that's

6    put on through the division, so on and so forth like that.  And

7    then there's independent trainings outside of just the Drug

8    Enforcement Administration you can be sent to as an optional

9    training.

10   Q.   How long is the general training that you described?

11   A.   They vary.  I believe it about a week.

12   Q.   And have you done any of the optional trainings?

13   A.   Yes.

14   Q.   How many of those have you done?

15   A.   I've been to the basic and advanced narcotics and covert

16   surveillance trainings with Fortis Group.  I've been to DEA

17   cartel workshops, domestic gang-related trainings, digital

18   forensics training, a few others in there, but that's --

19   Q.   I know this may not be precise, but how many hours of

20   training related to your task force officer duties do you think

21   you've done?

22   A.   Hundreds.

23              THE COURT:  Hundreds?

24   BY MR. FINK:

25   Q.   Of hours you said?  Two hundred, 300?  I know this is not

1    perfect, just an idea.

2    A.   Yeah, let's go 300.

3    Q.   And how many years have you been in law enforcement in

4    general?

5    A.   Almost 19 years.

6    Q.   And how long of those 19 years have you been -- I

7    understand it comes and goes, or maybe investigations can be

8    certain timeframes, but generally speaking -- I guess when was

9    the first time you were a task force officer?  That will answer

10   the question.

11   A.   I was sent to the Drug Enforcement Administration in

12   January of 2016.

13   Q.   Okay.  So the first time you were a task force officer was

14   2016?

15   A.   Yes.

16   Q.   If my math is correct, that's about a decade into your

17   career?

18   A.   Yes.

19   Q.   And how many investigations have you participated as a task

20   force officer in total?

21   A.   Dozens.

22   Q.   How many times have you testified in Federal Court?

23   A.   This time.

24   Q.   It's the only time?

25   A.   Yes.

1    Q.   Otherwise, you've only testified in state cases?

2    A.   Correct.

3    Q.   How often have you testified in state cases?  If there's

4    too many to count, that's okay, too.  I don't know the answer.

5    A.   Dozens is the only answer I can give you.

6    Q.   Okay.  Have you testified ever in misdemeanor cases?

7    A.   Yes.

8    Q.   Have you testified in felony cases?

9    A.   Yes, I have.

10   Q.   Before you were a detective at Farmington Hills, what was

11   your role at the Farmington Hills Police Department?

12   A.   I was a patrol officer.

13   Q.   And after that?

14   A.   Currently assigned as a detective.

15   Q.   Are you in a particular unit at Farmington Hills Police

16   Department?

17   A.   Our Detective Bureau, which is part of our investigations.

18   Q.   I should be more specific.  As a detective, do you get

19   assigned certain types of cases or do you generally get

20   assigned as just the unit gets assigned an investigation?

21   A.   Our Detective Bureau, as it's set up currently,

22   investigates a vast array of all crimes that come in.

23   Q.   So you could be doing violence to fraud to all kinds of

24   things at Farmington Hills?

25   A.   That's correct.

 1    Q.   Not necessarily just drugs?

 2    A.   No.

 3    Q.   Detective Leach, personally or for pleasure, have you ever

 4    been to Europe?

 5    A.   Yes, I have.

 6    Q.   Have you been to South America?

 7    A.   Yes, I have.

 8    Q.   Have you been to Ecuador?

 9    A.   Yes, I have.

10    Q.   Have you been to Chile?

11    A.   No, I have not.

12    Q.   Have you been to any of the countries that are the alleged

13    suppliers of cocaine, which I believe there are three

14    traditionally; correct?

15    A.   Correct.  Traditionally, no, I have not.

16    Q.   Did you ever go to Europe or South America in relation to

17    this investigation?

18    A.   Yes.

19    Q.   What were --

20         THE COURT:  One or the other?

21         THE WITNESS:  Both.

22         MR. FINK:  Thank you, your Honor.

23    BY MR. FINK:

24    Q.   In relation to this investigation, which countries did you

25    visit?

1    A.   Ecuador and South America, the Netherlands, Spain and the

2    United Kingdom.

3    Q.   Do you remember approximately the time that you visited the

4    Netherlands and Spain in this investigation?  It doesn't have

5    to be perfect, but --

6    A.   Yes.  I recall when we went to the Netherlands and Spain.

7    Q.   Year wise or month and year, if you do remember?

8    A.   Netherlands would have been February of 2020, and Spain

9    would have been December of 2024.

10   Q.   When you went to the Netherlands in February of 2020, what

11   was the purpose of that?

12   A.   Coordination meeting with our DEA office and some of the

13   counterparts.

14   Q.   Was this after any particular seizure?

15   A.   This was directly after the seizure of February 22, 2020.

16   Q.   So after the seizure had occurred in February 22 of 2020,

17   you went to the Netherlands to have a debriefing or meeting

18   with your counterparts over there?

19   A.   Correct.

20   Q.   Now, correct me if I'm wrong, the seizure in February of

21   2020 had occurred prior to your obtaining information about the

22   alleged load arriving in the Netherlands; is that correct?

23   A.   You're stating the seizure happened prior to us having

24   intelligence regarding it?

25   Q.   Correct.

1    A.   That would be inaccurate.

2    Q.   Explain why that's inaccurate.

3    A.   We received information directly from the iCloud search

4    warrants pertaining to information that was provided to the

5    Netherlands country office in relation to that seizure prior to

6    it being seized.

7    Q.   Do you believe the seizure in the Netherlands, in February

8    of 2020, was a result of your intelligence?

9    A.   One hundred percent.

10   Q.   What was the purpose of your visit to Spain in 2024 I think

11   you said?

12   A.   Yes.  It was to trial prep with witnesses.

13   Q.   Detective Leach, I recall you saying in direct examination,

14   I think you used the word "literally," but you said, "I

15   literally have a chart of all the players and everything in

16   this case."  Do you recall that?

17   A.   Yes.

18   Q.   You know, the typical thing has strings going to one person

19   and pins in it?

20   A.   Not quite that old school, but yes.

21            THE COURT:  Not quite that what?

22            THE WITNESS:  Not quite that old school.  It's a

23   digital form chart with lines and boxes and targets of

24   investigation, yes.

25

```
 1   BY MR. FINK:
 2   Q.   The idea being to try to somewhat put into organization the
 3   players and people that you're interested in; correct?
 4   A.   Yes.
 5   Q.   When did you, to the best of your recollection, enter this
 6   investigation?
 7   A.   The end of November in 2017.
 8   Q.   And you had taken over for another agent; is that correct?
 9   A.   Not taking over, but working alongside.
10   Q.   Well, eventually some of the other agents kind of phased
11   out of the investigation; is that accurate?
12   A.   Yes, it was an ever-evolving investigation.
13   Q.   And at the time you took over the investigation this had
14   been after the seizures of the cell phones, which you had
15   talked about at the border in 2015 and 2016; is that correct?
16   A.   Correct.
17   Q.   When did you first become aware of Mr. Tibbitts' purported
18   involvement in this investigation or this alleged conspiracy?
19   A.   I became aware of the money transactions between him and
20   Mr. Larson early on in the investigation.  That is about the
21   only involvement at that time other than having knowledge from
22   other investigators that Mr. Martin Tibbitts had been seen with
23   Mr. Didani previously.
24   Q.   And did there come a point where you became more interested
25   in investigating Mr. Tibbitts' role?
```

1    A.   Yes.

2    Q.   And when was that?

3    A.   That would be after we started receiving iCloud data that

4    started to put pieces of the puzzle together related to the

5    money movements and him having knowledge of some of the other

6    illicit activity.

7    Q.   So initially your general awareness of Mr. Tibbitts'

8    involvement was based on these checks and some money movement;

9    is that an accurate summary?

10   A.   Yes.

11   Q.   But there wasn't really a deep dive into his involvement

12   until there was more support for that when you said out of the

13   iClouds; is that also fair?

14   A.   Yes.

15   Q.   And when you began to understand the background of

16   Mr. Tibbitts and who he was what did you find?

17   A.   Do you want to be more specific or do you just want me to

18   generalize?

19   Q.   Well, he was a businessman; right?

20   A.   Correct.

21   Q.   Graduated from Stanford?

22   A.   Yes.

23   Q.   Those kind of things.  What did you find about his

24   background and his businesses and education, just generally?

25   A.   Yes, he graduated from Stanford.  He was a self-made

```
 1    entrepreneur that, like I said, started up his own
 2    telecommunications and answering system companies local.  And
 3    he was fairly wealthy and well off.
 4    Q.   Did you know these things initially when you saw the money
 5    movement early on in '17 and '18?
 6    A.   Yes.  I mean, there were some Google searches done by me,
 7    and there was public articles regarding Mr. Tibbitts.  And
 8    speaking with investigators that had been on the case
 9    previously.
10    Q.   So you learned some of these background items earlier on as
11    well?
12    A.   Yes.
13    Q.   And his interest in airplanes and -- I've called it in the
14    past his eclectic taste; right?
15    A.   Very.
16    Q.   And your suspicions or your more detailed investigation
17    weren't triggered until you saw some direct conversations, is
18    that correct, about this alleged conspiracy; is that accurate?
19    A.   Deeper suspicion, yes.
20    Q.   Well, I asked that -- you know, you said to Mr. Larson, did
21    you not, that you really can't wrap your head around someone
22    like Mr. Tibbitts would be involved in something like this;
23    right?
24    A.   Yes.
25    Q.   And the reason for that, correct me if I'm wrong, is you
```

1   have this Stanford grad with all of these legitimate pursuits

2   and businesses and tastes for the finer things in life, and

3   suddenly he's involved in a drug conspiracy.  Is that what you

4   meant by that?  Is that a fair characterization?

5   A.   Yes.  It is perplexing.

6   Q.   Are you aware that Mr. Tibbitts had political ambitions?

7   A.   I am aware of messages that I seen regarding with

8   Mr. Tibbitts possibly considering an ambassadorship overseas.

9   Q.   I'm going to show you what is admitted as Government's

10  112.5, if technology doesn't fail me.  Ignoring the Adobe tabs

11  and stuff, do you see this exhibit that's marked as

12  Government's 112.5?

13  A.   Yes, I do.

14  Q.   Okay.  Do you remember this E-mail?

15  A.   Yes.

16  Q.   And this is allegedly from Dale Johnson who you believe was

17  -- to be Martin Tibbitts; correct?

18  A.   Yes, it is.

19  Q.   And Panco who you believe to be Mr. Didani?

20  A.   Yes.

21  Q.   And in this E-mail, correct me if I'm wrong, the second

22  paragraph -- feel free to contextualize it if you like with the

23  first, but the second paragraph says, "Not sure, brother.

24  Talking to another ambassador.  He says it is a lot of work and

25  doesn't see how I'd be able to be back and forth every two

1    weeks.  Let's talk."  Do you see that?

2    A.    I do.

3    Q.    Is that consistent with some of the materials you found in

4    this investigation suggesting Mr. Tibbitts' interest in being

5    in politics?

6    A.    Yes.

7    Q.    Suggesting he was at least considering investigating

8    whether he could handle the role; correct?

9    A.    Yes.

10   Q.    Did you investigate that any further?  Did you talk to

11   anyone else about his pursuits?

12   A.    Just his wife, Mrs. Tibbitts.

13   Q.    And did she corroborate the idea that he had those

14   ambitions?

15   A.    She stated that Mr. Tibbitts had numerous ambitions.  She

16   was not able to corroborate anything as far as him becoming an

17   ambassador overseas.

18   Q.    Did you speak to anyone in Washington, D.C. with the

19   political party or otherwise, the committees, about his

20   involvement or his seeking an ambassadorship?

21   A.    No.

22   Q.    Detective Leach, the -- part of the -- a central part of

23   the allegation here you'll recall is the $450,000 allegedly

24   from the Eastern District of Michigan that went to D.C. to

25   Mr. Didani.  Obviously, you recall that part of the

1    investigation; correct?

2    A.   Yes, I do.

3    Q.   And do you recall as part of your investigation what you

4    believed to have happened to that $450,000 after it was

5    allegedly taken to Mr. Didani in Washington, D.C.?

6    A.   After it was delivered to Mr. Didani, yes, I do recall

7    that.

8    Q.   What happened to the money afterwards?

9    A.   The money was driven to New York and then disappeared.

10   Q.   And what information did you have that it was driven to New

11   York?

12   A.   There was a text message thread and phone calls between

13   Mr. Didani and an individual listed as China New York in his

14   phone.  There was a screenshot of -- Mr. Didani allegedly took

15   that was captured in his iCloud of him sitting in traffic on

16   the expressway that he sent to Mr. China New York after sending

17   him a Google Map screenshot showing a route of his current

18   position, which was near Philadelphia outside of D.C., with an

19   end destination in New York stating that he was stuck in

20   traffic.

21        Mr. China New York also provided Mr. Didani a address

22   in Flushing, New York that said, "Please call tomorrow before 6

23   when we're closing."

24        So these were all indicators that Mr. Didani was

25   headed to New York, along with Wi-Fi connections of Mr. Didani

```
 1   at the Trump Tower hotel.
 2   Q.   You had a lot of information that that money, or at least
 3   Mr. Didani purportedly with that money, went to New York;
 4   correct?
 5   A.   Yes.
 6   Q.   Do you know who China New York is?
 7   A.   It was suspected to be an individual known as Lin Bao Wang.
 8   Q.   Do you know where he is today?
 9   A.   I do not.
10   Q.   Did you ever talk to him?
11   A.   I did not.
12   Q.   Did you ever try to talk to him?
13   A.   I passed the information along to our AOR that covers that
14   region, and no contact was made.
15   Q.   When you say no contact was made, do you have any evidence
16   that they tried?
17   A.   I do not.
18   Q.   Did you have a report anywhere that they followed up on
19   your request?
20   A.   Not that I have knowledge on.
21   Q.   Let me understand this.  You think that a Stanford business
22   grad with millions of dollars took $450,000 through a conduit
23   to Ylli Didani in Washington, D.C. who drove that money to New
24   York to buy drugs using China New York, and you never made sure
25   that China New York got a visit?
```

```
 1   A.   You have to remember that when I became aware of these
 2   transactions and the route that was taken I did not receive
 3   this information until late fall of 2018.  So almost a year
 4   after the fact that the money was moved through Mr. Didani's
 5   iCloud information.  I did not have live time information other
 6   than the fact that Mr. Didani was in Washington, D.C. in
 7   November of 2017.
 8   Q.   Well, you could have talked to him in 2018, could you not?
 9   A.   Yes.
10   Q.   Would that be preferable to have talked to him?  Would you
11   agree with me on that?
12   A.   Possibly.
13   Q.   Would you like to be able to say to me, yes, I talked to
14   him and he didn't answer any of my questions or, yes, he told
15   us everything?  Would that be preferable?
16   A.   It would be preferable not to compromise the investigation
17   if that individual still had external communications with the
18   organization.
19   Q.   Okay.  Well, that's different.  So you didn't want to flag
20   attention to him?  You didn't want to talk to him?
21   A.   At a later date possibly.  At that time the information was
22   passed to conduct possible physical survey or gather other
23   intelligence on this individual, not necessarily make contact.
24   Q.   Well, I've got to understand, Detective Leach, because your
25   first answer to me was, well, I gave it to someone else to
```

1    follow up on and no contact was made.  That was your first

2    answer.  So that suggests to me that you tried to make contact;

3    correct?

4    A.   I'm not going to speak for the agents down there, because I

5    did not make contact or attempt to make contact personally.

6    Q.   Did you make a conscious decision now you're saying not to

7    do that?

8    A.   I'm saying I passed the information that I obtained that

9    this is a possible money launderer and that AOR, area of

10   responsibility.

11   Q.   I know this seems like repetitive, but it's very hard for

12   me to square those two concepts.  On the one hand, you're

13   saying you passed information and no contact was made.  On the

14   other hand, sometimes we don't want to flag individuals that

15   we're onto them; right?  You said those two things.

16   A.   Why can't those two things go hand in hand?

17   Q.   Well, because on the one hand you said that you passed

18   information for him to be talked to, which would be

19   fundamentally different from not trying to make him aware of

20   the investigation.  So I'm just trying to understand what your

21   process was.

22   A.   Sure.

23   Q.   Did you want him spoken to or not?

24   A.   Not at that time.

25   Q.   So your position is you intentionally did not want him

```
 1   spoken to for fear of compromising your investigation?
 2   A.   At that time, yes.
 3   Q.   Well, at any time, or did that change?
 4   A.   We never made contact with him, if that is your question.
 5   Q.   That's what I'm asking.  I mean, did you call him last
 6   week?
 7   A.   No.
 8   Q.   Have you tried to find him in the seven years since 2018?
 9   A.   No.
10   Q.   I mean, if that money went through China New York, that's
11   what you think happened; right?
12   A.   Yes.
13   Q.   China New York then presumably knows the purpose and/or can
14   provide some important context to that money, can he not?
15   A.   If he could possibly recall that specific transaction, yes.
16   Q.   Is he on your strings and pins board?
17   A.   We had numerous target charts.  I'm sure at one point he
18   was on one of them, yes.
19   Q.   Picture of him?
20   A.   Yes.
21   Q.   I started to ask you, Detective Leach, about the
22   investigation that you had taken over when you joined in 2017.
23   And at that point you were taking in information that had been
24   done before by Agent Bianchi and others; is that correct?
25   A.   Yes.
```

1    Q.   And presumably you read their reports and their information

2    to date when you entered?

3    A.   Some of them, yes.

4    Q.   Familiarized yourself with what had happened in the

5    investigation to date?

6    A.   Some of it, yes.

7    Q.   So the best you can, if I take you back to 2016, 2017 and

8    what you knew at that time, do you recall what the top of your

9    list -- what some of your suspicions were or what the

10   suspicions were that Mr. Didani was involved in drug

11   trafficking?  This is obviously before the iClouds started to

12   come in.

13   A.   The suspicions were that he was receiving bulk currency of

14   U.S. currency in the states to support a cocaine trafficking

15   organization abroad.

16   Q.   So it was money based is what the chief suspicion was?

17   A.   Yes.

18   Q.   And what was the evidence when you first came in that

19   suggesting those things?  Where did it come from?

20   A.   There were photographs previously of Mr. Didani's phones

21   and message threats from his seized phone in 2016 that were

22   indicative of him trafficking cocaine and having large scale

23   amounts of money.

24   Q.   Do you recall Mr. Didani being interviewed at the border

25   twice, once in 2015 and once in 2016?

```
1    A.   Yes.
2    Q.   Do you recall him being asked about the pictures in his
3    phone and his travels and things of that nature?
4    A.   Some of them, yes.
5    Q.   Do you recall him stating he had various businesses,
6    investments, and discussions about that?
7    A.   Yes.
8    Q.   And do you believe those to be true?
9    A.   We have not received any official documentation that we
10   could solidify any formal businesses that he was a part of, no.
11   Q.   Do you remember him mentioning that he was in the coal
12   business?
13   A.   It mentioned in the report that he was in the coal
14   business, yes.
15   Q.   Do you know if there was any follow-up as to whether he
16   actually did have a coal business or was somehow involved in
17   one?
18   A.   Not by myself, no.
19   Q.   I mean -- go ahead.
20   A.   I don't recall reading any other investigator's reports
21   referencing follow-up on a coal business, no.
22   Q.   I'm not aware of any.  It's not a trick.  I ask you if to
23   date you -- I'll ask you.  Obviously you can't speak for
24   others.  But you personally did no follow-up on whether or not
25   there's actually a coal business; correct?
```

1    A.   No.

2    Q.   Do you know anything about how the coal business works in

3    Albania and surrounding countries?

4    A.   I do not.

5              (Briefly off the record.)

6              MR. FINK:  Your Honor, I was having a conversation

7    with Government's lawyer about the exhibits that I have.

8              I'm going to lay a foundation and then see if Mr. --

9    Detective Leach can recognize these exhibits and, if not, me

10   and counsel will figure out if we can stipulate.

11   BY MR. FINK:

12   Q.   Detective Leach, do you recall reviewing the -- in the

13   course of your investigation the phone dumps from 2015 and 2016

14   from Mr. Didani's phone?

15   A.   Yes, yes.

16   Q.   Lots of videos, lots of pictures; correct?

17   A.   Yes, there were.

18             MR. FINK:  Your Honor, I'm going to, with the Court's

19   permission, and the Government's attorney indicated that he is

20   okay with this procedure, I think I'm on V -- T, U, V ...

21             THE COURT:  You've done T.

22             MR. FINK:  I'm on W, I believe, your Honor.

23             THE COURT:  Yeah, I think so, too.

24             Was there W?  I don't think there's been W.

25             MR. FINK:  I have a U and a V.  V is the Egypt video.

```
 1              THE COURT:  Okay.  W.
 2              MR. FINK:  What I'd like to do, your Honor, is there's
 3    four video clips, and label these W-1, 2, 3, 4.
 4              THE COURT:  Okay.
 5              MR. FINK:  And I'm going to lay some foundation here,
 6    play them with the Government's permission, and then ask
 7    Detective Leach some questions about them.
 8              THE COURT:  You've seen them before; right?
 9              MR. FINK:  I have, your Honor, yes.  There is a
10    foreign language in it, but it's more so for the visual
11    than ...
12              THE COURT:  Do my jurors need to stand up and stretch?
13    A couple maybe.  Stand in solidarity.  How about that?
14              You guys at the table, stand up, too, and that way
15    they won't feel like they're alone.
16              MR. FINK:  Can I sit down while they stand?
17              THE COURT:  No.  You're stuck standing.
18              Okay.  Let me know if you need a break, okay.
19              All right.  Go ahead.  You may all be seated.
20              MR. FINK:  You make me feel like I'm boring, Judge.
21              THE COURT:  No, I wasn't saying you're boring.  I
22    think everybody's just -- you know, it's Thursday.
23              MR. FINK:  I say that with a smile on my face.  Thank
24    you, Judge.
25              THE COURT:  All right.
```

1    BY MR. FINK:

2    Q.   Detective Leach, I was asking you do you recall there was

3    -- Mr. Didani's phone was taken in 2015 during a border search.

4    Do you recall that generally?

5    A.   Yes.

6    Q.   Okay.  And that phone was copied, dumped is the word I

7    commonly use, but basically a capture of how that phone existed

8    at the time was done by law enforcement; correct?

9    A.   Yes.

10   Q.   Same thing in 2016?

11   A.   Yes.

12   Q.   And there were lots of videos, lots of pictures, messages,

13   all kinds of things that any person may have on their phone;

14   correct?

15   A.   Yes.

16   Q.   Did you go through that as best you could given the

17   quantity to review that material?

18   A.   I did not go through the '15 phone nearly as in-depth as

19   the other phone, no.

20   Q.   Okay.  What I'm going to play for you is videos that I am

21   offering from the 2015 phone dump and the Government and I

22   talked about.  I'm going to ask if you recognize them and

23   perhaps a few questions about them, but I'm going to play them

24   first and then we can go from there.

25              THE COURT:  And the Government agrees with proceeding

1    in that fashion?

2              MR. BILKOVIC:  Yes, your Honor.

3              THE COURT:  Okay.  Now, is there -- okay.  They're

4    marked as separately as exhibits; right?

5              MR. FINK:  I did them as four clips, Judge, if that's

6    okay with you, W-1, 2, 3, 4, and I'll just play them back to

7    back to back.  They're not that lengthy.

8              THE COURT:  That's fine.

9              (Video is played.)

10             MR. FINK:  I'm going to play W-2 now, your Honor.

11             (Video is played.)

12             MR. FINK:  W-3.

13             (Video is played.)

14             MR. FINK:  And W-4, your Honor.

15             (Video is played.)

16   BY MR. FINK:

17   Q.   Detective Leach, do you recognize those videos?

18   A.   I do not.

19   Q.   Never saw them as far as you can recall?

20   A.   Not to my recollection, no.

21   Q.   What do they appear to be?

22   A.   I would presume that that's a coal mine business.

23   Q.   Looks like several videos of equipment and digging and

24   related to coal?

25   A.   Yes.

1   Q.  You saw a conveyor belt of coal and workers doing whatever

2   they do with coal, I certainly don't know what, but that's what

3   it appeared to show?

4   A.  Yes.

5           MR. FINK:  Judge, I would ask these be admitted as

6   Defendant's W-1, 2, 3 and 4.  I would need probably the

7   Government's stipulation.  Otherwise, I'd have to do it a

8   different way.

9           THE COURT:  Any objection?

10          MR. BILKOVIC:  No, your Honor.

11          THE COURT:  Very well.  They're admitted as W-1, 2, 3

12   and 4.

13          (Defendant's Exhibits W-1, 2, 3 and 4 received into

14          evidence.)

15          MR. FINK:  Thank you, your Honor.

16   BY MR. FINK:

17   Q.  Talking further about those interviews in 2015 and '16,

18   about questions that were being asked of Mr. Didani about the

19   pictures of money and stuff in his phone, do you recall

20   discussion by Mr. Didani about nightclubs?

21   A.  Vaguely, yes.

22   Q.  And then later in your investigation do you recall various

23   parts of your investigation, whether corroborated or not, but

24   at least suggestion of building a restaurant or club in

25   Albania?  Do you recall that discussion?

```
 1   A.   I recall discussions about the possible purchase of a
 2   restaurant.  I don't recall them building a --
 3   Q.   And that portion of the investigation centered around the
 4   suggestion that perhaps Mr. Tibbitts would go into business
 5   with Mr. Didani to purchase or operate a restaurant in Albania?
 6   A.   Yes.
 7   Q.   Did you ever do any follow-up investigation on whether that
 8   had any merit?
 9   A.   Yes.  We did follow up with the banking financial showing
10   money going over to Albania.
11           THE COURT:  I'm sorry.  Tell me that again.
12           THE WITNESS:  We did financial follow-up with showing
13    money transfers to Albania from Mr. Martin Tibbitts.
14   BY MR. FINK:
15   Q.   The money that you're referring to, Detective Leach, is the
16   $500,000 transfer to an Albanian bank.  Is that what we're
17   talking about?
18   A.   That is one of them, yes.
19   Q.   Are you familiar with a restaurant, Tiku and Matu?
20   A.   Yes.
21   Q.   What is Tiku and Matu?
22   A.   A restaurant in Albania.
23   Q.   What's its relationship to this case?
24   A.   It was owned by a associate of Mr. Didani's that was
25   presumably being purchased by Mr. Tibbitts.
```

1    Q.   And do you know the location of Tiku Matu?  Was there one,

2    more than one?

3    A.   I do not recall that.

4    Q.   You ever visit the restaurant?

5    A.   No.

6    Q.   Did you know whether Mr. Didani, with Mr. Tibbitts or

7    otherwise, even without Mr. Tibbitts, was involved in any other

8    business ventures?

9    A.   Mr. Didani specifically?

10   Q.   Yes.

11   A.   He made mention of being -- or trying to be partial owner

12   of a car dealership in Dubai at one point.

13   Q.   Any other business ventures that came up in this

14   investigation of Mr. Didani?

15   A.   There was a possible medical marijuana dispensary business

16   that was drawn up off rough drawings of a potential business

17   plan, and an ATM venture, I believe.

18   Q.   Do you know if Mr. Didani ever took part in any

19   construction of a nightclub and/or restaurant?

20   A.   I do not know if he took part of a construction.  I believe

21   he was actually part of a business construction group, too, but

22   I don't recall the name.  I just vaguely remember seeing

23   documents in an early iCloud.

24   Q.   That's helpful.  I appreciate that.  Did you do any

25   follow-up into the legitimacy of that venture?

1  A.   There were communications through channels in Albania that

2  we did not receive through formal documents.

3  Q.   So whether or not he actually was involved in the

4  construction and building you can't say?

5  A.   I can say that there was a document located in iCloud with

6  his name on a construction group that we have, but the rest I

7  cannot speak on.

8          MR. FINK:  Your Honor, I want to mark X-1, 2 and 3.

9  Defendant's X-1, 2 and 3 are going to be three video clips.

10  I'm going to call them the construction clips.  The Government

11  has agreed to do the same procedure here with regard to those

12  clips if that's okay with the Court.

13          THE COURT:  That's fine with me.

14          And you have no objection to these clips on behalf of

15  the Government?

16          MR. BILKOVIC:  No, your Honor.

17          THE COURT:  All right.  Are you going to show them?

18          MR. FINK:  I am, your Honor.

19          THE COURT:  And so you're asking that they be

20  admitted?

21          MR. FINK:  I guess I could do that now.  Could we

22  admit them as Defendant's X-1 --

23          THE COURT:  X-1, 2 and 3?

24          I think the Government is agreeing; is that right?

25          MR. BILKOVIC:  Yes, your Honor.

```
 1              THE COURT:  All right.  They're admitted.
 2              (Defendant's Exhibits X-1, 2 and 3 received into
 3         evidence.)
 4              MR. FINK:  Thank you, your Honor.
 5              And thank you, Mr. Bilkovic.
 6              (Video is played.)
 7              MR. FINK:  That was X-1.  Now, your Honor, I'm going
 8    to play X-2.
 9              (Video is played.)
10   BY MR. FINK:
11   Q.   Detective Leach, I'm just going to back up in this video to
12   call your attention to the person with the backwards hat and
13   the long white T-shirt there, and then I'll go to the next one.
14              (Video is played.)
15              MR. FINK:  And this will be X-3, your Honor.
16              (Video is played.)
17   BY MR. FINK:
18   Q.   Do you recall seeing any of those videos, Detective Leach?
19   A.   I do not.
20   Q.   What do they appear to show?
21   A.   They appear to show Mr. Didani walking around a site that's
22   under construction.
23   Q.   At least in the two clips we can see what we think is
24   Mr. Didani; is that correct?
25   A.   Yes.
```

1    Q.   It's more clear in the X-3; right?

2    A.   Yes.

3    Q.   It appears to be some sort of entertainment construction.

4    There were tables and perhaps a dance floor.  Although, we're

5    just basing that on what we're looking at; correct?

6    A.   Yes.

7              THE COURT:  In number 3?

8              MR. FINK:  Correct.  Thank you, your Honor, for

9     clarifying that.

10   BY MR. FINK:

11   Q.   Do you know if Mr. Didani was involved with any other

12   companies, whether charitable or for profit in food

13   distribution?

14   A.   I recall seeing videos of him either in the Dominican

15   Republic or in Ecuador, I believe, possibly providing food and

16   shelter building services to what appeared to be people in

17   poverty.

18             MR. FINK:  I'm going to mark what's Y -- there's only

19   one clip, your Honor, so it would be Defendant's Y.  The video

20   he's describing is what I would play.  So I'd ask just to admit

21   it as Y, with Government's permission, or I could show him at

22   the witness stand, whatever the Government's preference.

23             MR. BILKOVIC:  I have no objection.  If Mr. Fink could

24    at least indicate what iCloud this came from and what the date

25    was.

1              THE COURT:  Okay.

2              MR. FINK:  My offer of proof for representation to the

3    Court is this came from a folder marked as 2015 iPhone dump

4    from Didani in discovery.

5              THE COURT:  Okay.  Is that sufficient, Counsel?

6              MR. BILKOVIC:  That's fine.

7              THE COURT:  All right.  Any objection to it?

8              MR. BILKOVIC:  No, your Honor.

9              THE COURT:  Then it's admitted.

10             (Defendant's Exhibit Y received into evidence.)

11             MR. FINK:  Judge, I want to correct myself to make

12   sure I'm precise.  This might be from a different dump.  Let me

13   check really quickly, please.  And I can come back to this if I

14   need more than ...

15             (Briefly off the record.)

16             MR. FINK:  Your Honor, I'm actually fairly certain

17   that it came from a 2020 phone dump, not 2016.  What I can say

18   for absolute certain is it came from discovery and from the

19   dump.  So the Government is comfortable with the representation

20   to be sufficient and play it.  I can check for the Court at

21   a --

22             THE COURT:  And I'd like you to identify it a little

23   bit better than that, but -- you can play it, but I want you to

24   come back and identify it a little bit better.

25             MR. FINK:  Absolutely, your Honor.

```
 1                 What did we say this was, Judge?  This is --
 2                 THE COURT:  Y.
 3                 (Video is played.)
 4   BY MR. FINK:
 5   Q.   Other than a LeBron James jersey in Ecuador, what else did
 6   you see depicted in that video?
 7   A.   It appeared to be packages being handed out to others.
 8   Q.   You described the Dominican Republic, a video as well with
 9   children.  Do you remember that?
10   A.   Yes.
11   Q.   Would you recognize that one if you saw it?
12   A.   Yes.
13                 MR. FINK:  I'll mark this as Z, and this is the same
14   thing, Judge.  I'm certain it's from a phone dump on -- close
15   to certain that it's from 2020.
16                 THE COURT:  All right.  Well, please let us know for
17   sure a little bit later, okay.
18                 MR. FINK:  Yes, your Honor, as long as Mr. Bilkovic
19   doesn't have an objection to admitting that as Z and playing it
20   for Detective Leach.
21                 THE COURT:  Any objection?
22                 MR. BILKOVIC:  No, your Honor.
23                 THE COURT:  It's admitted.
24                 (Defendant's Exhibit Z received into evidence.)
25                 (Video is played.)
```

1   BY MR. FINK:

2   Q.   Is that the video that you recalled seeing previously,

3   Detective Leach?

4   A.   Yes, it is.

5   Q.   And what does that appear to depict?

6   A.   It appears to be them hanging out food and supplies.

7   Q.   Detective Leach, do you remember going through Marty

8   Tibbitts' notebooks that were given to you by -- or given to

9   investigators by Belinda Tibbitts?

10  A.   Yes.

11  Q.   Did you look through them?

12  A.   I did.

13  Q.   In fact, on direct examination you went through some of the

14  pages that were purportedly related to the torpedo?

15  A.   That's correct.

16  Q.   This is Government's 6 that I'm holding in my hand,

17  Mr. Tibbitts' notebooks.  In those notebooks, some

18  decipherable, some not, but there's quite a few ideas in there,

19  are there not?

20  A.   Yes.

21  Q.   Technological; right?

22  A.   Mechanical I would say.

23  Q.   Okay.  That's fair.  Mechanical; correct?

24  A.   Yes.

25  Q.   Business ideas; correct?

1    A.   Yes.

2    Q.   Notes and reminders to himself related to those two

3    different things; right?

4    A.   Yes.

5    Q.   Do I need to ask this person for X, Y and Z, for example?

6    A.   Yes.

7    Q.   Is there any mention in those books about checks to Donald

8    Larson or $450,000 or anything of that nature?

9    A.   Not that I recall offhand, no.

10            MR. FINK:  Your Honor, I'm going to get into a new

11   area.  I don't know with your schedule if you wanted -- I can

12   keep going, or I thought I'd offer this as going to kind of

13   shift a little bit.

14            THE COURT:  I think a little bit more.

15            MR. FINK:  Sure.

16            THE COURT:  Unless you all feel like you're fading and

17    you want lunch now.  Give me a sign.  No one cares?

18            Okay.  Go ahead then.

19            MR. FINK:  Yes, your Honor.

20   BY MR. FINK:

21   Q.   This investigation, Detective Leach, I'm going to use the

22   word -- you can characterize it a different way, but it's

23   sprawling, is it not?

24   A.   Yes.

25   Q.   And it has reached into different countries and lots of

1    different players; correct?

2    A.  Yes.

3    Q.  When you were asked the first time you testified by

4    Mr. Didani about receiving his iCloud return in February of

5    2020, do you remember that discussion?

6    A.  I do.

7    Q.  And you were asked about the discrepancy between your

8    having received the iCloud on February 12th, but Apple

9    certifying that the iCloud wasn't sent until February 18th.  Do

10   you remember that discussion?

11   A.  Yes.

12   Q.  And when you were speaking with Mr. Didani you couldn't

13   really explain it, said it may have been an error or something,

14   but you really didn't have an explanation; correct?

15   A.  My explanation was I received it on February 12th in which

16   I did not waiver.

17   Q.  And you couldn't explain the discrepancy, though?

18   A.  Yes.

19   Q.  If I'm being imprecise, I'm not accusing you of being

20   dishonest.  I'm saying you didn't know why Apple said

21   February 18th; right?

22   A.  Correct.

23   Q.  And then when you came back on redirect you did have an

24   explanation for that; correct?

25   A.  Yes.

1    Q.   And that was the explanation about allegedly being date

2    bound; correct?

3    A.   Yes.

4    Q.   And then yesterday on voir dire I asked you about longitude

5    and latitude of a picture; right?

6    A.   Yes.

7    Q.   It seemed to be a digit off; right?

8    A.   Yes.

9    Q.   And today you came back and you corrected that; right?

10   A.   Yes.

11   Q.   Minor or major, I mean in an investigation so sprawling

12   mistakes are made; correct?

13   A.   Possibly, yes.

14   Q.   They could be minor.  I'm not saying that that's a huge

15   thing, but that happens, does it not?

16   A.   Yes.

17   Q.   I want to talk about the CMA Jean Gabriel for a moment,

18   Detective Leach; okay?

19   A.   Yes.

20   Q.   Sa-am-ma (ph), as my client called it, CMA.

21          This was the seizure that occurred in Holland in

22   February of 2020; is that correct?

23   A.   Yes.

24   Q.   And, correct me if I'm wrong, but your testimony to the

25   Grand Jury was that 644 kilos were seized; is that accurate?

1    A.   That's what was relayed to us, yes.

2    Q.   And you also testified that some of the videos that we saw,

3    you remember the guy with the mask, you testified about a text

4    message about 657 kilos.  Do you recall that?

5    A.   I do.

6    Q.   Have you seen --

7              MR. FINK:  Your Honor, and we can do this at sidebar.

8    I want to ask about the certificates.  This is the motion that

9    was withdrawn when Mr. Didani was representing himself.

10             THE COURT:  Okay.

11             MR. FINK:  Do you want to discuss it or sidebar or can

12   I proceed?

13             THE COURT:  Well, Mr. Bilkovic, what -- do you want to

14   discuss it at sidebar?

15             MR. BILKOVIC:  I might object as to (Indiscernible)

16             THE COURT:  And I want you to go to another area.

17             MR. FINK:  Sure.

18             THE COURT:  Make a record of it later, okay, of the

19   certificate issue.

20             MR. FINK:  I mean, your Honor, frankly I could do

21   everything about foreign seizure if Mr. Bilkovic is okay with

22   it and it will give me some latitude.  I can do everything

23   about the foreign seizures and ships in the last testimony of

24   Mr. Leach and we could deal with this issue.

25             THE COURT:  Well, it doesn't matter, but I want to

1   deal with the certificates later.

2        MR. FINK:  That's what I'm saying, Judge.  They're

3   tethered kind of to a lot of these questions that I'm going to

4   ask.  So that would be one way I could do it, if that's okay

5   with Mr. Bilkovic.

6        THE COURT:  Do you want to do it that way,

7   Mr. Bilkovic?

8        MR. BILKOVIC:  That's fine.

9        THE COURT:  Okay.

10        MR. FINK:  So even though just some of those direct

11   questions might have been asked this time I'll inquire into

12   them next time.

13        THE COURT:  Okay.

14        MR. FINK:  Judge, I'm going to show what's already

15   been admitted as Government's Exhibit 5.18.

16        THE COURT:  5.18?

17        MR. FINK:  Yes, your Honor.

18        THE COURT:  Okay.

19        MR. FINK:  And Ms. DiCarlo is kind enough to publish

20   that for me.

21   BY MR. FINK:

22   Q.  Do you remember this exhibit, Detective Leach, Government's

23   Exhibit 5.18?

24   A.  Yes.

25   Q.  Can you just reorient us what we're looking at?

1    A.   This is a photograph of the phone that was seized from

2    Mr. Didani in 2016 displaying a message thread between the

3    owner of the device presumably and an individual named Puzio at

4    the top.

5    Q.   And who is Puzio, do you know?

6    A.   Eric Puzio.

7    Q.   Is he local?

8    A.   He is.

9    Q.   And there's a message at the bottom there, correct, too, as

10   well; right?

11   A.   Yes.

12   Q.   And that was the one that we translated?

13   A.   Correct.

14   Q.   Do you have any indications in your investigation why these

15   pictures were sent to Mr. Puzio?

16   A.   Directly, no.

17   Q.   Do we know if any money was delivered to Mr. Puzio?

18   A.   No, we do not.

19   Q.   Do you we know if Mr. Puzio made any investments or any

20   money?

21   A.   No.

22   Q.   What was the purpose of showing this, if you know?

23   A.   This was to show the context of the message thread that is

24   in Polish.  Presumably that is why it is sent to Mr. Puzio, who

25   is also Polish, to possibly provide him with a translation.

1    Q.   Of what the message says?

2    A.   Yes, which is in context regarding drug trafficking.

3    Q.   But we don't have any reason to believe or certainly no

4    evidence that that money went to Mr. Puzio; right?

5    A.   No, we do not.

6    Q.   In fact, that money, I believe you said, was driven to

7    Elmwood, Chicago; right?

8    A.   Yes.

9    Q.   Okay.  Mr. Puzio is here in Detroit?

10   A.   That's correct.

11        MR. FINK:   Thank you, Ms. DiCarlo.

12   BY MR. FINK:

13   Q.   Detective Leach, at the beginning of  your investigation in

14   2017, '18, I guess that's beginning and as it progressed, you

15   conducted surveillance; is that correct?

16   A.   Yes.

17   Q.   You participated in some of that surveillance; right?

18   A.   I did.

19   Q.   And that surveillance was of several people, was it not?

20   A.   Yes.

21   Q.   Do you remember some of the people you surveilled?

22   A.   Mr. Larson, Mr. Synowiec, Mr. Didani, Mr. Puzio.  Locally

23   that's all I can recall currently.

24   Q.   Surveillance, when I say that I'm referring to, you know,

25   either following them in a car or GPS tracker.  Is there any

```
 1    other type of surveillance that I'm missing that was conducted?
 2    A.   Regarding physical surveillance or with the assistance of
 3    an electronic surveillance, correct.
 4    Q.   Maybe -- certainly many times you would rely on a GPS
 5    tracker's ping say to Mr. Larson and then you would follow up
 6    about where he went or didn't go; correct?
 7    A.   Yes.
 8    Q.   In any of that surveillance of any of those people, did you
 9    ever observe a drug transaction?
10    A.   No.
11    Q.   Did you ever observe large bulk currency?
12    A.   No.
13    Q.   Did you ever observe narcotics of any kind?
14    A.   No.
15    Q.   Did you ever observe -- I know that you had an
16    investigation and suspicion.  So I'm certainly not talking
17    about that.  But, in the moment, did you ever observe any
18    criminal activity by any of those individuals?
19    A.   No.
20    Q.   How many hours would you say you spent surveilling?
21    A.   Eighty to a hundred.
22    Q.   Within that surveillance in the investigation, we'll take
23    Mr. Larson as an example, when you would follow and see where
24    he would go or what his routine was, you also would come across
25    other parties or third parties in your investigation that you
```

1    would then vet; correct?

2    A.   I would say it depends.

3    Q.   Well, for example, I think -- I guess you weren't in the

4    courtroom for it, but I showed Mr. Larson a picture of a female

5    that her Jeep was parked at his apartment.  Do you remember

6    that in your investigation?

7    A.   I do recall that, yes.

8    Q.   And her picture was in one of your reports; correct?

9    A.   Yes.

10   Q.   So my question was you would vet people or associates that

11   you would see associating with these folks; is that correct?

12   A.   Yes.  We would try and identify them to see if they were

13   somehow tied in with the criminal organization.

14   Q.   And that happened many times over the course of your

15   investigation, there would be people that you would vet to see

16   if that had any involvement; correct?

17   A.   Yes.

18   Q.   And many of those people had nothing to do with the

19   investigation and your suspicions; correct?

20   A.   Yes, but not all.

21   Q.   I understand that, but there's certainly some that don't;

22   right?

23   A.   Yes.

24   Q.   Do they know that they're in a federal -- well, let me ask

25   this.  What's a DEA-6 form?

1    A.   That is our official report writing documentation, the

2    number assigned to it.

3    Q.   Do these people no, like Ms. Schmidt, Mr. Larson -- she was

4    at his house.  Do these folks know that they were investigated

5    by the DEA for being involved in a drug conspiracy?

6    A.   No.

7    Q.   Never contacted them?

8    A.   No.

9    Q.   Never said, hey, just a heads-up, you know, there's

10   something going on, but you're not accused of wrongdoing, none

11   of that?

12   A.   No.  That would not be typical.

13   Q.   Do you remember an individual, last name Bhullar,

14   B-H-U-L-L-A-R?

15   A.   Not offhand, no, I do not.

16   Q.   Anything to do with -- would it refresh your recollection

17   if I said he was involved in a company called Michigan Freight?

18   A.   I recall the company name, yes.

19   Q.   Do you recall that there was more than one Michigan

20   Freight?

21   A.   Yes.

22   Q.   And do you recall that one of the Michigan Freights in the

23   Michigan directory or list of business entities was associated

24   with a Mr. Bhullar, B-H-U-L-L-A-R; correct?

25   A.   Yes.

1   Q.   Mr. Bhullar's picture is in one of your reports; correct?

2   A.   Not in one of my reports.

3   Q.   You're right.  Have you seen that in any reports in this

4   investigation?

5   A.    I don't recall the exact photo, but I do recall his name

6   being associated with the company.

7   Q.   The reason that he was looked into is because it was a

8   different Michigan Freight; correct?

9   A.   Yes.

10  Q.   Turns out he's just a truck driver with his CDL who has

11  nothing to do with anything; right?

12  A.   Yes.

13  Q.   Was he on the web, the bulletin board that you have

14  electronically?

15  A.   No.

16  Q.   Ms. Schmidt?

17  A.   No.

18  Q.   Any of Mr. Larson's other girlfriends?

19  A.   No.

20  Q.   Am I?

21  A.   No.

22  Q.   Do you recall discussing with Mr. Bilkovic the prototype,

23  the drone torpedo?  Do you remember that discussion?

24  A.   Yes.

25  Q.   And you went through a number of exhibits, including the

1    E-mail I showed; correct?

2    A.   Yes.

3    Q.   And these discussions and the exhibits that attended them,

4    this discussion about the prototypes stretched all the way back

5    to 2016; is that correct?

6    A.   Yes.

7    Q.   And then there was some discussion in 2017; right?

8    A.   Yes.

9    Q.   And then Mr. Chaumont and others become involved in 2018;

10   correct?

11   A.   Mister who?  I'm sorry.

12   Q.   Maybe I'm saying his name, the French name, Peregrine,

13   Mr. Carl Chaumont.

14   A.   Carl Chaumont.  Yes, sorry.

15   Q.   And they become in later years all the way through 2018?

16   A.   Yes.

17   Q.   Do you know when Mr. Tibbitts made those notes in his

18   notebooks?

19   A.   I do not.

20   Q.   There's no date on them; right?

21   A.   There was not.

22   Q.   This was a discussion and mention in various capacities,

23   messages, pictures and otherwise over several years; correct?

24   A.   I can't speak to the years in any of the pages unless there

25   was a specific --

1    Q.   I'm sorry.  That was bad.  I'm not referring to the

2    notebooks.  I just asked if that had any dates on it separate

3    from that question.

4           This discussion of the prototype drone torpedo, that

5    discussion and various text messages, pictures, the things that

6    you went through with Mr. Bilkovic, stretches a number of

7    years; correct?

8    A.   Yes.

9    Q.   Some of those messages we can see E-mails, for example,

10   Dale Johnson, and we can see have dates on them like 2016;

11   right?

12   A.   Correct.

13   Q.   Or the MoneyGram that has a date on it of 2017; right?

14   A.   Correct.

15   Q.   Or Peregrine documents that are 2018; correct?

16   A.   Yes.

17   Q.   I'm only asking that because we have varied documents that

18   show these several years of this discussion; right?

19   A.   Yes.

20   Q.   Never came to fruition in terms of building a workable

21   torpedo as far as you know; correct?

22   A.   Correct.

23   Q.   Based on your investigation and how you see the discussions

24   now through these exhibits and otherwise, do you believe that

25   was even mechanically or technologically feasible?

1    A.   I'm not an engineer.  I think the idea was a practical

2    idea.  I don't know how it would evolve into a physical realm.

3    Q.   Detective Leach, do you remember discussing your interview,

4    your initial interview with Don Larson and then the follow-up

5    interviews, do you remember discussing that on direct

6    examination?

7    A.   Yes.

8    Q.   And Mr. Bilkovic asked you some questions about the

9    dismissal of the criminal complaint.  Do you remember that?

10   A.   Yes.

11   Q.   Do you recall the discussion about why that criminal

12   complaint was dismissed?

13   A.   The discussion with who?

14   Q.   With Mr. Bilkovic.

15   A.   Yes.

16   Q.   What do you remember telling him on direct examination

17   about why the complaint was dismissed?

18   A.   So that the information would not become known to the

19   public.

20   Q.   And your purported reason for doing that was not as a

21   benefit to Mr. Larson, but rather as a benefit to your

22   investigation; is that a fair characterization?

23   A.   The benefit was to both.

24   Q.   So it did serve a benefit to Mr. Larson as well; correct?

25   A.   Yes.

1    Q.   And your worry from your perspective, correct me if I'm

2    wrong, was should that complaint become public, right, or

3    should that complaint be an indictment or otherwise public,

4    then perhaps other targets of the investigation will then be on

5    notice; is that correct?

6    A.   Yes.

7    Q.   And part of the reason you wanted to dismiss it, so that

8    didn't happen; right?

9    A.   That's correct.

10   Q.   Arresting Mr. Larson runs that risk, too, does it not?

11   A.   Yes, potentially.

12   Q.   You have to trust Mr. Larson; correct?

13   A.   Yes.

14   Q.   The guy that lied to you on September 10th; right?

15   A.   Partially.

16   Q.   And told a different story on September 12th?

17   A.   Partially as well.

18   Q.   Different story to my investigator; right?

19   A.   I don't know what he said to your investigator.

20   Q.   You haven't heard that tape yet?

21   A.   I have not.

22   Q.   Your reliance is on Mr. Larson not to tell anyone that he'd

23   been arrested; right?

24   A.   That would behoove him, yes.

25   Q.   You also have to make sure that you're not unlucky and

1   someone see him getting arrested; right?

2   A.   Yes.

3   Q.   Or him confiding in someone who spills it to someone else

4   and all of a sudden it's out; right?

5   A.   Yes.  These are all plausible possibilities, yes.

6   Q.   You took that risk, though, to still arrest him, because

7   that was important to the case and you felt that it needed to

8   be done; right?

9   A.   At that juncture, yes.

10              THE COURT:  Okay.  Let's take a break here.  All

11   right.  I'm going to let the jury step down.

12              I'll give you an hour for lunch, okay, and then come

13   back.  Remember that you're not permitted to talk about the

14   case among yourselves or with anyone else.

15              Ms. Daley, are they going to report back to the fifth

16   floor?

17              LAW CLERK:  Yes.

18              THE COURT:  And wait there and we'll come and get you,

19   okay.

20              All right.  You may step down.  Thank you.

21              (The jury left the courtroom at 12:30 p.m.)

22              THE COURT:  Mr. Leach, you may step down.

23              THE WITNESS:  Thank you, your Honor.

24              THE COURT:  Come back in an hour, okay.

25              Do you want to talk a little about that issue now or

```
 1   not?
 2              MR. FINK:  The iCloud date?  Oh, sure.
 3              THE COURT:  Were you going to take it up at the next
 4   time he comes?
 5              MR. FINK:  I was going to do it the next time he
 6   comes.  I'm going to do all the foreign seizures and all that
 7   discussion.
 8              THE COURT:  All right.  Then we can take it up then,
 9   okay.
10              MR. FINK:  Okay.  I'm just going to keep this tethered
11   to what happened here and those things.
12              THE COURT:  How much longer are you going to be with
13   him?
14              MR. FINK:  I don't think much more than an hour, if
15   that.
16              THE COURT:  Okay.  Then you'll have this other witness
17   ready for about an hour?
18              MR. BILKOVIC:  Yes.
19              THE COURT:  Okay.  You're sounding kind of fatigued
20   about it, but --
21              MR. BILKOVIC:  I'm just concerned we're not -- if we
22   needed to go like five minutes later today, would we be able to
23   do that, or no?
24              THE COURT:  Five minutes later than 3:30?
25              MR. BILKOVIC:  Yeah.  I want to make sure I get this
```

```
1    witness done, because he's unavail -- well, no.  He's going to
2    be coming back for cross-examination, so that's fine.  We're
3    good.  We're good.
4              THE COURT:  Now, it's going to be kind of tight around
5    3:30.  We can maybe do five minutes, but not much more.
6              MR. BILKOVIC:  Rethinking it, I'd rather be five
7    minutes early than five minutes late, so ...
8              THE COURT:  Okay.  Let's come back in an hour, okay.
9              All right.  Very good.  Court's in recess.
10             MR. BILKOVIC:  Thank you, Judge.
11             (At 12:31 p.m., a lunch recess was taken.
12             Back on the record at 1:46 p.m.)
13             LAW CLERK:  All rise.  Court is back in session.
14             THE COURT:  Okay.  Are we ready to proceed?
15             MR. FINK:  Yes, your Honor.
16             MR. BILKOVIC:  Yes, your Honor.
17             THE COURT:  Okay.  Very good.  Let's bring out the
18   jury, please.
19             LAW CLERK:  All rise for the jury.
20             (The jury entered the courtroom at 1:47 p.m.)
21             THE COURT:  Okay.  I'm satisfied they're present.
22   What about the Government?
23             MR. BILKOVIC:  Satisfied, your Honor.
24             THE COURT:  Defense?
25             MR. FINK:  Yes, your Honor.
```

```
1              THE COURT:  Very well.  You may all be seated.
2              Mr. Leach, you're still under oath.
3              THE WITNESS:  Yes, your Honor.
4         MR. FINK:  Your Honor, with the understanding that on
5    Mr. Leach's final appearance I'll be getting into the
6    international stuff and the portions of discovery that I have
7    yet to access we talked about --
8              THE COURT:  Yes.
9         MR. FINK:  -- with the understanding that I'll do that
10   next, I'm only going to do a few more things on the topics
11   today.
12             THE COURT:  Okay.  And, Mr. Bilkovic, you don't have
13   any problem with him taking up those matters on the next
14   appearance of Mr. Leach; is that correct?
15             MR. BILKOVIC:  No, your Honor.
16             THE COURT:  All right.  Very well.  Let's proceed.
17   BY MR. FINK:
18   Q.   Detective Leach, I'm going to go back, in no specific
19   order, to just a few more topics for this time around.
20             We talked a little bit about the other businesses that
21   Mr. Didani purportedly was involved in; correct?
22   A.   Yes.
23   Q.   And we looked at video of a potential coal business or at
24   least saw possibility of a coal operation; correct?
25   A.   Yes.
```

1    Q.   Okay.  And the context in which I raised that was that

2    Mr. Didani had cited that to law enforcement as one of his

3    sources of income; correct?

4    A.   Yes.

5            MR. FINK:  With the Government's permission who may,

6    your Honor, have some voir dire, and we may have a stipulation

7    to this after that voir dire, I'm going to approach with what's

8    marked as Defendant's Exhibit C.

9            THE COURT:  Okay.  And have you given it to the

10   Government already?

11           MR. BILKOVIC:  He's shown it to me.

12           MR. FINK:  And I'll make this representation, too.

13   This is a document that was taken from the Albanian

14   government's business resource, National Business Center's

15   website, which is a government website.  And I have verified

16   that that's where this came from and it's that document.  I'm

17   going to show it to Detective Leach and then have some

18   questions about it.

19           THE COURT:  Okay.

20           MR. FINK:  Thank you, your Honor.

21           Your Honor, I'm flipping through the pages at the

22   podium here just to show Detective Leach that there's an

23   Albania language and then a translation that is a few pages in.

24           THE WITNESS:  Okay.

25

```
 1   BY MR. FINK:
 2   Q.   Detective Leach, you haven't seen this document before,
 3   have you?
 4   A.   No, I don't believe I have.
 5   Q.   Okay.  It purports to be a document -- an Albanian
 6   government -- and take your time to look at is as I ask you
 7   these questions -- an Albanian government document showing a
 8   business entity.  Would that be a fair characterization of what
 9   it purports to be?
10   A.   Yes.
11   Q.   And among other things that Mr. Bilkovic may have asked you
12   about, does it purport to have a business called U.S. Mineral?
13   A.   Yes, it does.
14   Q.   And does it show one of the agents or shareholders to be
15   Ylli Didani?
16   A.   I see it shows him as -- listed as an administrator.
17   Q.   My apologies if I didn't know the category.  I don't have
18   it in front of me.  I gave you that copy.  So it lists him as
19   an administrator, Ylli Didani?
20   A.   Yes.
21   Q.   There's some association with him and this U.S. Mineral
22   document from -- purportedly from the Albanian government;
23   correct?
24   A.   Correct.
25   Q.   And you recall from your investigation a mention to another
```

1    agent of U.S. Mineral; is that correct?

2    A.   Yes.

3    Q.   Okay.  And you -- and whether it was your responsibility or

4    not, I'm not necessarily saying it was, but you personally did

5    not vet whether that U.S. Mineral business was true or not

6    true; right?

7    A.   Correct.

8              MR. FINK:  I would ask on my representation, Judge,

9    that this came from the National Business Center Albanian

10   government website that it be admitted as Exhibit C.

11             THE COURT:  C?

12             MR. FINK:  C.  We had -- Mr. Didani had marked it when

13    he was representing himself, but it was never admitted.

14             THE COURT:  Okay.  Does the Government have any

15    objection?

16             MR. BILKOVIC:  May I voir dire on it briefly?

17             THE COURT:  Yes, you may.

18             MR. BILKOVIC:  May I approach, Judge?

19             THE COURT:  Yes, you may.

20                      VOIR DIRE EXAMINATION

21    BY MR. BILKOVIC:

22    Q.   Agent Leach -- or, Detective Leach, what is the date of the

23    document as to when this company -- this paperwork was done?

24             THE COURT:  Excuse me.  Say your -- I'm so sorry.

25             MR. BILKOVIC:  Okay.

1          THE COURT:  Say your question again, please.

2     BY MR. BILKOVIC:

3     Q.   Does the document show a date as to when this was filed or

4     when this company began?

5     A.   Yes.  The date of constitution is listed as 11-3, 2013.

6     Q.   And are there any documents along with the document that

7     show basically proof of any revenue or employees or anything

8     like that?

9     A.   No.

10    Q.   Are you aware of any -- there have been any subsequent

11    documents that show the existence of this company, whether they

12    be in 2014, '15, '16, '17 or '18?

13    A.   No, not that I'm aware of.

14         MR. BILKOVIC:  Judge, I have no further questions.  I

15    don't have any objection to its admission.

16         THE COURT:  Very well.  It's admitted as C.

17         (Defendant's Exhibit C received into evidence.)

18         MR. FINK:  Thank you, your Honor.

19              CROSS-EXAMINATION (Continued)

20    BY MR. FINK:

21    Q.   Can put that aside Detective Leach.

22         Also, back at the genesis of this investigation that

23    you entered in 2017, do you recall testifying at another

24    hearing and explaining that the initial interest in Ylli Didani

25    revolved around a circumstance or some situation that occurred

1    on Lake St. Clair?

2    A.   I believe it was surrounding Mr. Puzio, the suspicious

3    activity on Lake St. Clair.

4    Q.   Do you recall giving testimony to the Grand Jury in this

5    case?

6    A.   Yes.

7    Q.   I think you gave two separate occasions, correct, or maybe

8    three actually?

9    A.   Three, I believe.

10   Q.   Your first one was September 9th of 2020.  Does that sound

11   right?

12   A.   Yes.

13   Q.   Do you recall being asked -- this is Page 6 of September

14   9th -- do you recall being asked, "Now, I want to take your

15   attention to roughly 2015.  Did there come a point in time in

16   2015 where law enforcement began looking into Mr. Didani?"

17            And your answer was, "Yes."

18            Do you recall that generally?

19   A.   Yes.

20            THE COURT:  What's the date of this, 9-20 or ...

21            MR. FINK:  The Grand Jury testimony that I'm referring

22    to, Judge, is September 9th of 2020.

23            THE COURT:  9.  September 9?

24            MR. FINK:  Yes, your Honor.

25            THE COURT:  Okay.  Great.  Okay.

1    BY MR. FINK:

2    Q.   After -- the very next line, Detective Leach, and, of

3    course, if you want to see this I'd be happy to show it to you.

4    But do you recall being asked, "And could you briefly summarize

5    why that is?"

6              And your answer was, "There was some suspicious

7    activity on Lake St. Clair just off the east coast of Michigan

8    involving an individual associated with Didani named Eric Puzio

9    by Border Patrol.  At that point, Puzio's travels were flagged,

10   and then all of a sudden Didani started traveling on these

11   short duration trips with Puzio to foreign countries and then

12   returning to the United States, which raised suspicions of

13   Border Patrol."

14             Do you recall that question and answer?

15   A.   Yes.

16   Q.   Okay.  So I don't think we were necessarily saying

17   different things, but the genesis of the Mr. Didani

18   investigation started with the situation on Lake St. Clair;

19   correct?

20   A.   That was one of the initial elements, yes, regarding

21   Mr. Didani.

22   Q.   And this activity was jet skis going back and forth between

23   a marina and in Canada was the allegation; correct?

24   A.   That is what I read, yes.

25   Q.   Okay.  You didn't actually do this part of the

1    investigation; right?

2    A.   No.

3    Q.   And can you tell us based on the information that you have

4    in your investigation whether or not there was any indication

5    that Mr. Didani was part of this activity on Lake St. Clair?

6    A.   I do not believe so, no.

7    Q.   Okay.  And it was really the connection to Eric Puzio who

8    had some connection to this Lake St. Clair activity; correct?

9    A.   Yes.  During that timeframe, yes.

10   Q.   Okay.  You told the Grand Jury a short time ago when we

11   looked at another exhibit that you don't have any evidence that

12   Mr. Puzio sent any money to Mr. Didani; correct?

13   A.   Correct.

14   Q.   Do you have any evidence that Mr. Puzio received any

15   narcotics or profits of narcotics from Mr. Didani or otherwise?

16   A.   No.

17   Q.   Do you know if Mr. Puzio is a witness for the Government in

18   this case?

19   A.   He is not.

20   Q.   That's because he can't really provide any useful

21   information to the case; correct?

22   A.   He's not a witness for the Government.

23   Q.   Do you recall, and forgive me for jumping around, Detective

24   Leach, but because I'm trying to bifurcate between testimonies

25   I know it's a little all over the place.  Do you recall your

```
 1    interview or being present for an interview with Belinda
 2    Tibbitts?
 3    A.   Yes, I do.
 4    Q.   This is April 9th of 2019; correct?
 5    A.   Correct.
 6    Q.   You were one of -- I think it was you and another agent
 7    that were there for the interview?
 8    A.   Correct.
 9    Q.   And who is the other agent?
10    A.   It was Border Patrol Agent Josh Bianchi.
11    Q.   And during this interview do you remember where it was?
12    A.   It was at her residence in Pleasanton, California.
13    Q.   You traveled out there to interview her?
14    A.   Yes.
15    Q.   She know you were coming?
16    A.   She did not.
17    Q.   And during this interview, in addition to giving her
18    statement, did she also give you physical items?
19    A.   Yes.
20    Q.   Do you recall what those were?
21    A.   Those two physical black and blue books that were admitted
22    earlier today and then some digital evidence as well, cell
23    phones, Surface Pro.
24    Q.   How many cell phones, do you remember?
25    A.   I do not recall offhand.
```

1  Q.  Do you remember one cell phone in particular that said

2  "Didani phone"?

3  A.  "Ylli's phone" I believe it says.

4  Q.  Forgive me.  "Ylli's phone"?

5  A.  Yes.

6  Q.  It had a label like from a label maker on the back;

7  correct?

8  A.  Correct.

9  Q.  Okay.  And did she hand that directly to you?

10  A.  I don't recall if it was to me or Agent Bianchi directly.

11  Q.  What is the protocol when you receive a piece of evidence

12  directly yourself from a witness or otherwise in that

13  situation?

14  A.  Depends on what we plan on doing with it.  It would be

15  seized, placed into an evidence bag, and then transferred to

16  evidence eventually.

17  Q.  With cell phones in particular, do you have a protocol with

18  protecting the information on it?

19  A.  If possible, yes.  They'll go into either a mylar bag or a

20  bubble wrap bag.

21  Q.  A mylar bag or a bubble wrap bag is to block it from

22  getting outside signals; correct?

23  A.  Yes.

24  Q.  Do you have a procedure or policy or anything similar to

25  put the phone in airplane mode?

1    A.   Yes.

2    Q.   Okay.  Do you turn it off?

3    A.   No.  Typically you would not turn off a device if it's on,

4    and you would not turn on a device if it is off.

5    Q.   Okay.  Do you recall if it was on or off?

6    A.   I believe the device was off.

7    Q.   And so because it was off there was no need to place it in

8    airplane mode then; correct?

9    A.   Correct.

10   Q.   Do you remember if it was placed in the bags that you

11   described that protects against signals?

12   A.   At that time I do not recall if we had those with us or

13   not.

14   Q.   Once it's in your possession, sealed and otherwise

15   consistent with your protocols, then what happens to evidence?

16   A.   That evidence will be transferred and turned into our

17   non-drug evidence custodian.

18   Q.   And from there it's checked in or out based on need;

19   correct?

20   A.   That is correct.

21   Q.   Do you alter that phone in any way?

22   A.   No.

23   Q.   Did you turn it on?

24   A.   I do not believe so, no.

25   Q.   Did you observe Agent Bianchi turn it on?

1    A.   No, I do not believe he did.

2    Q.   Did you delete anything from that phone?

3    A.   No.

4    Q.   Did you observe Agent Bianchi delete anything from that

5    phone?

6    A.   No.

7    Q.   Did you observe Belinda Tibbitts delete anything from that

8    phone?

9    A.   No.

10   Q.   You were not present when Belinda Tibbitts testified;

11   correct?

12   A.   Correct.

13   Q.   Are you aware that Belinda Tibbitts said that that phone

14   contained a large amount of information on it?

15   A.   I recall her stating that she identified the phone as being

16   Mr. Didani's from where it was located and some identifiers

17   when the phone was on, yes.

18   Q.   Is that from your recollection of your interview with her

19   or just about what you've learned, you know, as this case has

20   progressed?

21   A.   Just my recollection of the interview with her.

22   Q.   Okay.  You would have no way of knowing is your testimony

23   because the phone was off; correct?

24   A.   Correct.

25   Q.   Do you know if anyone else in your knowledge, in your

1    investigation, turned the phone on and analyzed it at any other

2    point?

3    A.   At some point I believe an extraction may have been

4    attempted on the device.  I don't recall.

5    Q.   Do you recall when the extraction was attempted what the

6    state of the phone was in terms of its data or anything on it?

7    A.   I do not believe there was any data present on that device.

8    Q.   In fact, it's my understanding, correct me if I'm wrong, of

9    course, that when the phone was turned on it appeared as when

10   you get a new cell phone, welcome screen or whatever you would

11   call it appearing to be completely anew; is that accurate?

12   A.   Yes, in a restart mode.

13   Q.   But accepting as true that Ms. Tibbitts believed it did

14   have data on it, accepting that as true and then the result of

15   you opening the phone to it being blank, so to speak, or new,

16   you don't know how that would have occurred or how to square

17   those two things; correct?

18   A.   Correct.

19   Q.   Either someone's wrong or something happened that was

20   outside of your control?

21   A.   Correct.

22   Q.   Part of my theme of jumping around here, Detective Leach,

23   I'm going to show you what the Government admitted as Exhibit

24   116.4, okay.  Do you remember looking at this on direct

25   examination?

1   A.   Yes, I do.

2   Q.   Marty Tibbitts is on the left from our perspective;

3   correct?

4   A.   Yes.

5   Q.   And Mr. Didani is in the center?

6   A.   That's correct.

7   Q.   Do you know who the individual is on the right?

8   A.   I do not.

9   Q.   Did you look into his background or try to figure out who

10  he was?

11  A.   I do not recall.  If I did, I do not recall identifying

12  that individual.

13  Q.   You don't know if he's in politics, for example?

14  A.   I do not.

15          MR. FINK:  Thank you, Ms. DiCarlo.

16  BY MR. FINK:

17  Q.   I'm also going to show you 116.27.  Tell me if you

18  recognize that from -- do you recognize this from direct exam?

19  A.   Yes.

20  Q.   Okay.  And we see Ylli Didani there from our perspective on

21  the left; correct?

22  A.   Yes.

23  Q.   And a female on the right?

24  A.   Yes.

25  Q.   Do you know who that female is?

1    A.   I believe that is Morena Taraku (ph).

2    Q.   Do you know anything about Morena Taraku?

3           MR. BILKOVIC:  Can I make an inquiry?  I believe that

4    was objected to.  I don't believe it --

5           MR. FINK:  I have it conditionally admitted.

6           MR. BILKOVIC:  But the Court indicated we couldn't

7    show it to the jury.

8           THE COURT:  That's right.  I do think I did say you

9    couldn't show it to the jury.

10          MR. FINK:  My apologies.  Do you --

11          MR. BILKOVIC:  I have no objection if that's what

12   we're --

13          MR. FINK:  You conditionally admitted it, but you

14   wanted to decide whether to publish it later?

15          THE COURT:  Yes, I did.

16          MR. FINK:  Well, I've shown it so I have no problem

17   with admitting it.

18          THE COURT:  You have no further objection?

19          MR. FINK:  I'll withdraw my objection, Judge.

20          THE COURT:  Okay.

21          MR. FINK:  Thank you, Mr. Bilkovic.

22          THE COURT:  Tell me again.  Her name is what?

23          THE WITNESS:  Morena Taraku.

24   BY MR. FINK:

25   Q.   Do you know who Morena Taraku is now that you've had time

1    to research?

2    A.   No.  And I believe she's a Kosovo national, and she was in

3    some sort of dating relationship with Mr. Didani at one point.

4    Q.   Do you know anything about her background?

5    A.   No.

6    Q.   Do you know anything about her wealth or her financial

7    situation?

8    A.   No.

9    Q.   Did you look into it or you just don't know?

10   A.   I just don't know.

11   Q.   Do you recall -- and we started -- we put this up, one of

12   the E-mails.  But do you recall generally the Dale Johnson

13   E-mails?

14   A.   Yes.

15   Q.   And do you recall we looked at several screenshots of those

16   E-mails?

17   A.   Yes.

18   Q.   In fact, we've looked at quite a few screenshots of

19   different E-mails, not just Dale Johnson, but screenshots of

20   others; correct?

21   A.   Yes.

22   Q.   MoneyGram and other things like that?

23   A.   Yes.

24   Q.   Now, correct me if I'm wrong, these communications,

25   particularly those E-mails, the Dale Johnson E-mails, we're

1    relying on just those screenshots; correct?

2    A.   We're relying on them for what?

3    Q.   Let me rephrase.  It's a bad question.  Did you ever

4    subpoena or otherwise get the original E-mails from the servers

5    where those E-mails are hosted?

6    A.   Proton mail is encrypted E-mail software, and it will not

7    -- it states that their server does not record the E-mails.

8    Q.   So you didn't try?

9    A.   Based on our investigation, they stated that you cannot

10   receive those.  It's encrypted from end to end.

11   Q.   Let me ask you this.  Do you recall in this investigation

12   learning what Sky ECC was?

13   A.   Yes.

14   Q.   And what does Sky ECC market itself as?

15   A.   An encryption software.

16   Q.   Do we have Sky ECC materials here?

17   A.   So far introduced, yes, through iCloud data.

18   Q.   In your investigation, did you attempt -- and I know

19   there's some things that you are -- you know, different points

20   of your testimony, but did you attempt to obtain Sky ECC

21   information?

22   A.   Yes.  Investigators in this investigation did attempt to

23   obtain it.

24   Q.   All right.  And my point being not so much about when

25   you'll get into that.  I know you'll get into the substance of

1    it, but my point being sometimes end-to-end encryption is still

2    available; correct?

3    A.   If that company had been compromised, yes.

4    Q.   Okay.  But the Dale Johnson E-mails and other screenshots

5    that we saw from Proton mail and otherwise, we don't have the

6    originals, we just have to rely on the screenshots; correct?

7    A.   We have originals and other pieces of evidence from both

8    ends of those E-mails.

9    Q.   Well, the ones we've seen, right, are screenshots; right?

10   A.   Yes, yes.

11   Q.   And I'm not saying whether it was right or wrong.  I'm just

12   asking you.  There was no further attempt beyond what was

13   contained on Mr. Didani's phone or the cloud to get further

14   context or other E-mails or anything of that nature?

15   A.   Correct.

16   Q.   One thing I forgot to cover with you when we were talking

17   about Mr. Larson.  When Mr. Bilkovic asked you about the

18   atmosphere of that interview, do you remember that?

19   A.   His arrest interview?

20   Q.   Yeah -- sorry.  His September 10, 2019, the first

21   interview.

22   A.   Yes, I recall it.

23   Q.   And Mr. Bilkovic made a point to ask you, you know, that

24   there was joking going on; right?

25   A.   Yes.

```
 1   Q.   And there was?

 2   A.   Yes.

 3   Q.   "Cordial" and "jovial" are two words that were used.  Is

 4   that how you would describe some of the atmosphere of the

 5   interview?

 6   A.   At points.

 7   Q.   That's by design, is it not, Detective Leach?

 8   A.   Yes, it is.

 9   Q.   Because very quickly you can switch to a different mode as

10   a tactic or a strategy; correct?

11   A.   Yes.

12   Q.   In fact, you know, amongst the joking you told Mr. Larson

13   that, you know, his failure to be cooperative could result in

14   him being in prison until he was 80 years old; right?

15   A.   Yes.  I provided him the gravity of the situation what he

16   was looking at.

17   Q.   And again, I'm not opining on the strategy.  I'm just

18   asking factually.  I mean, you went from joking to saying also

19   cooperate with us or you'll be in prison until you're 80 with

20   the amount of weight we're talking about here; right?

21   A.   That is not what I said.

22   Q.   Okay.  Tell me what I'm wrong about in that representation?

23   A.   You said cooperate with us or else, and there was no "or

24   else."  It was not a do this or this is going to happen.  It

25   was simply providing him with the plausible amount of
```

1    sentencing he could be faced if he was charged and prosecuted

2    in a court of law for the crimes that were written on the

3    complaint.

4    Q.   I think sometimes we get caught up in cross-examination.

5    Let me be very clear.  You said to Donald Larson "I am

6    interested in the higher-ups"; correct?

7    A.   Yes.

8    Q.   "You are a lower level person to me"; right?

9    A.   Yes.

10   Q.   "I need to get up higher"?

11   A.   Correct.

12   Q.   "With the amount of weight we're talking about, does 80

13   sound good to you to get out of prison"?  You also said that

14   sentence as well, correct, or something similar to that?

15   A.   I asked him how old he was now, and then I threw out the

16   number "80," yes.

17   Q.   With the amount of weight being the amount of drugs; right?

18   A.   Yes.

19   Q.   You're not seriously going to contend that that wasn't a

20   coercive suggestion to get him to help you, was it not?

21   A.   Coercive, yes.  Threat, no.

22   Q.   You also put down a chat in front of him, correct, a Viber

23   chat?

24   A.   Yes, we did.

25   Q.   And you did that after this cordial, jovial situation where

1    he was telling you things that may have been, in your view,

2    untrue; right?

3    A.   I don't recall exactly what point, but, yes, it was

4    presented to him to read so that he would have --- understand

5    that we had factual basis for what we were there for that day.

6    Q.   Mr. Bilkovic also asked you and made a point to ask you

7    what "without prejudice" means.  Do you remember that?

8    A.   Yes.

9    Q.   What's "without prejudice" mean again?  Could you remind

10   us?

11   A.   That means that we may go back and seek to pursue those

12   charges again at a later date.

13   Q.   Now, the suggestion being, when that was explained on your

14   direct examination, was, you know, not necessarily a benefit

15   just for cooperating with us on September 12th, but that, you

16   know, we could bring these charges again; right?

17   A.   Yes.

18   Q.   This wasn't just like now it's over for you, thank you for

19   your information; right?

20   A.   Correct.

21   Q.   In other words, if he doesn't help you or if the

22   information turns out to be untrue or something else that's

23   unsatisfactory -- and it may be justified.  I'm not saying you

24   would do that on something trivial.  But, if something you were

25   unsatisfied with in his cooperation, you could have reinstated

1    those charges; right?

2    A.   I would not be --

3    Q.   And by "you" I mean the Government.

4    A.   The Government.  And I would not define it as unsatisfied.

5    If it comes out that he is withholding criminal activity or

6    attempting to purposely undermine the investigation then, yes.

7    Q.   He disappears, that might be one thing; right?

8    A.   Sure.

9    Q.   He lies; right?

10   A.   Depending on the lie, yes.

11   Q.   He tells half-truths; right?

12   A.   Possibly.

13   Q.   If he omits things that you know to be true or that you are

14   interested in; correct?

15   A.   Yes.

16   Q.   Or, if you feel as though his cooperation is not full to

17   the extent he knows -- he's sharing everything he knows; right?

18   A.   Possibly.

19          MR. FINK:  Just a moment, your Honor.  I'm skipping

20   through the international stuff here to make sure.

21   BY MR. FINK:

22   Q.   Are you familiar with Peter Synowiec?

23   A.   Yes, I am.

24   Q.   What's your familiarity with him?

25   A.   He was a good friend of Mr. Didani's.  He's also the owner

1    of Cattleman's Meat Market.

2    Q.   Could you remind us of the relevance of Cattleman's Meat

3    Market?

4    A.   The relevance is he's the owner, and Mr. Larson went there

5    on an occasion to pick up bulk currency.

6    Q.   Is there evidence to suggest that Peter Synowiec was aware

7    of the drug conspiracy that is being presented in this trial?

8    A.   Aware or involved?  Aware?

9    Q.   Aware.

10   A.   Yes.

11   Q.   How about involved?

12   A.   No.

13   Q.   Mr. Larson mentioned Colombia.

14          You know what, that's going to be on our next session.

15   Forgive me.  Strike that, please.

16          MR. FINK:  Let me just consult with my client, Judge.

17          THE COURT:  All right.

18          (Briefly off the record.)

19          MR. FINK:  I think I have just one more question,

20    Judge.  Bear with me.  I appreciate everybody's patience.

21   BY MR. FINK:

22   Q.   Now, I recognize things can change with new information and

23   evidence, Detective Leach, but let me ask you this.  I'm going

24   to return to your Grand Jury testimony from September 9th of

25   2020, okay.

1              MR. FINK:  And this is Page 13, Mr. Bilkovic, of that

2    testimony.

3    BY MR. FINK:

4    Q.   Do you recall in the Grand Jury being asked about Peter

5    Synowiec?

6    A.   Yes, I do.

7    Q.   And do you recall being asked the question, line 20 -- if

8    you want to see it, Detective Leach, please tell me.  I'm going

9    to ask if you remember first.  The question was, "Based on your

10   investigation, do you believe that Mr. Synowiec had a role in

11   this organization?"

12             And your answer was, "Yes, I do."

13             And the question, "And what do you believe that role

14   is?

15             Answer, "I believe he is a supplement financier for

16   the organization."

17             Question, top of 14, "And by financier, providing

18   money?"

19             Answer, interrupting, "Providing, yes."

20             Question, interrupting, "For the purchase of cocaine?"

21             Answer, "Bulk currency to the organization for the

22   purchase of the cocaine."

23             Do you remember that exchange?

24   A.   Yes, I do.

25             MR. FINK:  Judge, I'm going to reserve the balance for

1    the next time Detective Leach testifies.

2              THE COURT:  All right.  Thank you.

3              MR. FINK:  Thank you.

4              THE COURT:  Do you have redirect today?

5              MR. BILKOVIC:  Can I just do brief just on two topics?

6              THE COURT:  Yes, you may.

7                          REDIRECT EXAMINATION

8    BY MR. BILKOVIC:

9    Q.   The area that Mr. Fink just left off, when you testified

10   about Mr. Synowiec, that was in September of 2020?

11   A.   No, 2019.

12   Q.   I'm sorry.  2019?

13   A.   Yes.

14   Q.   Had you interviewed Mr. Synowiec at that point?

15   A.   No, we had not.

16   Q.   Did you subsequently interview him?

17   A.   Yes, I did.

18   Q.   And did you obtain a documentation from him related to that

19   interview?

20   A.   Yes, we did.

21   Q.   Did your opinion as to whether or not he was actively

22   involved in this change after that interview?

23   A.   Yes, it did.

24   Q.   And in what manner?  How did it change?

25   A.   After being able to interview him and reviewing some of the

1    documents and statements that he provided, we were able to

2    solidify that, yes, he did provide money inevitably to

3    Mr. Didani, but that it was not at that time known that it was

4    for the purchase of cocaine.

5    Q.   And was Mr. Synowiec ever charged in this case?

6    A.   No, he was not.

7    Q.   The phone that Mr. Didani -- or that Mr. Fink asked you

8    about, the Ylli phone from Belinda Tibbitts?

9    A.   Yes.

10   Q.   Now, you're aware of this investigation that Mr. Didani was

11   backing his iPhones up to the iCloud; right?

12   A.   That's correct.

13   Q.   So, if that phone was backed up to the iCloud and the phone

14   was subsequently deleted for whatever reason, that information

15   that was backed up to the iCloud would still be there; correct?

16   A.   Correct.

17            MR. BILKOVIC:  Thank you.  Nothing further.

18            THE COURT:  Anything else of this witness at this

19   time?

20            MR. FINK:  Not at this time, Judge.

21            THE COURT:  All right.  Very well.  You may step down,

22   sir.  Thank you.

23            THE WITNESS:  Thank you, your Honor.

24            (End of excerpt at 2:21 p.m.)

25                          —    —    —

```
 1
 2
 3                    CERTIFICATE OF COURT REPORTER
 4
 5          I, Sheila D. Rice, Official Court Reporter of the
 6    United States District Court, Eastern District of Michigan,
 7    appointed pursuant to the provisions of Title 28, United States
 8    Code, Section 753, do hereby certify that the foregoing pages
 9    is a correct transcript from the record of proceedings in the
10    above-entitled matter.
11
12
13                         s/Sheila D. Rice
                           Sheila D. Rice, CSR-4163, RPR, RMR, FCRR
14                         Federal Official Court Reporter
                           United States District Court
15                         Eastern District of Michigan
16
      Date:  04/11/2025
17    Detroit, Michigan.
18
19
20
21
22
23
24
25
```