1
          **UNITED STATES DISTRICT COURT**
          **EASTERN DISTRICT OF MICHIGAN**
2
            **SOUTHERN DIVISION**

3
             —   —   —

UNITED STATES OF AMERICA,
4

         Plaintiff,
5

  v.                    Case No. 21-20264
6

YLLI DIDANI,
7

         Defendant.
8
_____/

9
        **JURY TRIAL - VOLUME 20 - EXCERPT**
  **Testimony of Alexander Meskouris and Jason Willock**
10
    **BEFORE THE HONORABLE DENISE PAGE HOOD**
       **UNITED STATES DISTRICT JUDGE**
11

     Theodore Levin United States Courthouse
12
       231 West Lafayette Boulevard
           Detroit, Michigan
13
       Tuesday, March 25, 2025

14
**APPEARANCES:**
15

 **For the Plaintiff:**     Mark Bilkovic
16
                  Timothy McDonald
                  UNITED STATES ATTORNEY'S OFFICE
17
                  211 W. Fort Street, Suite 2001
                  Detroit, Michigan  48226
18
                  (313) 226-9623

19
 **For the Defendant:**     Wade Fink
                  WADE FINK LAW, P.C.
20
                  550 W. Merrill Street, Suite 100
                  Birmingham, Michigan  48009
21
                  (248) 712-1054

22
 **Also present:**        Special Agent Chad Hermans
                  Maria DiCarlo, Paralegal
23

24
    *To obtain a copy of this official transcript, contact:*
      *Sheila D. Rice  Official Court Reporter*
     *(313) 234-2610 • sheila_rice@mied.uscourts.gov*
25

| | |
|---|---|
| 1 | **TABLE OF CONTENTS** |

2  MATTER_____Page

3  **JURY TRIAL - VOLUME 20 - EXCERPT**

4  **Government's Case in Chief (Continued)**

5  **ALEXANDER MESKOURIS**
   Direct examination by Mr. McDonald.................   5
6  Cross-examination by Mr. Fink......................  74
   Redirect examination by Mr. McDonald............... 137
7  Recross examination by Mr. Fink.................... 141

8

9  **JASON WILLOCK**
   Direct examination by Mr. McDonald................. 144
   Voir dire examination by Mr. Fink.................. 181
10

   Certificate of Court Reporter..................... 186
11

12

13

14                  E X H I B I T   I N D E X

15

16  Exhibit No.          Description          Identified   Admitted

17  **Government's Exhibits**

18  Government's 68     Excerpts WhatsApp chat   11          13
    Government's 68.1   Survey of Cap Cana       16          17
19                      property
    Government's 68.2   Photo of Mr. Didani      18          18
20  Government's 68.3   Photo of cell phones     20          21
    Government's 68.4   Photo of text messages   29          30
21  Government's 68.5   Photo of one dollar bill 39          40
    Government's 68.6   Photo of one dollar bill 43          44
22  Government's 68.7   Video                    60          60
    Government's 69.0   Excerpts WhatsApp chat   64          64
23  Government's 69.4   Audio message            66          66
    Government's 69.5   Audio message            73          73

24

25

1     (Continued)

2                    E X H I B I T   I N D E X

3
     Exhibit No.          Description          Identified    Admitted
4

5   **Defendant's Exhibits**

6   Defendant's AA       Magazine article          90
    Defendant's BB       Magazine article          92
7   Defendant's CC       Proffer agreement         94          100
    Defendant's DD       WhatsApp messages        119          119
8   Defendant's EE       WhatsApp messages        130          131

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Detroit, Michigan

2    Tuesday, March 25, 2025

3    10:01 a.m.

4                                    —   —   —

5              (Beginning of excerpt.)

6              THE COURT:  Okay.  And now, sir, I'm going to ask you

7    to stand and raise your right hand.

8              (Oath administered.)

9              THE COURT:  You may be seated.  And I'm going to ask

10   you to state your name again for the record.

11             THE WITNESS:  My name is Alexander Meskouris.

12             THE COURT:  Okay.  You may be seated.

13             MR. McDONALD:  Judge, before I proceed, can the Court

14   advise the jury, or will it permit me to advise the jury, when

15   we last left off we were in the middle of another witness.  And

16   so just so the Court -- the jury understands that that witness

17   will be continued next week.

18             THE COURT:  And that's Mr. Synowiec?

19             MR. McDONALD:  Synowiec.  Correct, your Honor.

20             THE COURT:  Did I tell you that already?  I haven't

21   even said good morning yet, but I'll say good morning now so

22   that's kind of out of the way.

23             And so you know we had a witness on the stand,

24   Mr. Synowiec, and he's going to come back to the stand, but not

25   until what, next week?

```
 1              MR. McDONALD:  Next week, your Honor, yes.

 2              THE COURT:  Next week.  All right.  And the Government

 3   wasn't finished with him or --

 4              MR. McDONALD:  No, your Honor, we were not.

 5              THE COURT:  That's right.  And then we'll have the

 6   cross-examination.  But you've done that before so you can do

 7   that again; right?  Yes?

 8              JURORS:  (Collectively) Yes.

 9              THE COURT:  Okay.  All right.  Very good, so we're

10   going to have a new witness today and maybe a couple of others

11   before we have Mr. Synowiec come back, okay.

12              All right.  Great.  And I hope you all had a good

13   weekend.

14              All right.  I am ready.

15              MR. McDONALD:  Thank you.

16                        *         *         *

17                        ALEXANDER MESKOURIS,

18         was called as a witness at 10:02 a.m. after having been

19         duly sworn to testify to the truth.

20                        *         *         *

21                        DIRECT EXAMINATION

22   BY MR. McDONALD:

23   Q.  Sir, one more time.  Can you tell us your first and last

24   name?

25   A.  My first name is Alexander.  My last name is Meskouris.
```

1    Q.   And where do you live?

2    A.   New York.

3    Q.   New York City?

4    A.   In New York tri state area.

5    Q.   For how long have you lived in --

6    A.   My entire life.

7    Q.   Just please wait until I'm done with my question before you

8    answer, okay.

9            How long have you lived in the New York state area?

10   A.   My entire life.

11   Q.   All right.  Are you employed?

12   A.   Yes.

13   Q.   Where are you employed?

14   A.   I'm employed in the real estate and restaurant business.

15           THE COURT:  The real estate and what?

16           THE WITNESS:  Restaurant business.

17           THE COURT:  Okay.

18   BY MR. McDONALD:

19   Q.   So what types of things do you do in the real estate

20   business?

21   A.   Property management, buy and sell properties.

22   Q.   Where is that business located?

23   A.   New York.

24   Q.   And what types of property do you sell?

25   A.   Commercial and residential and private homes.

1    Q.   I want to ask you about a piece of property that was for

2    sale in 2020 in the Dominican Republic.  Are you familiar with

3    that?

4    A.   Yes.

5    Q.   And can you describe that piece of property?

6    A.   The piece of property was vacant land, beachfront property

7    in Dominican Republic.

8    Q.   Where in the Dominican?

9    A.   In an area called Cap Cana.

10   Q.   And did you own that property?

11   A.   My family owned it.

12   Q.   How long had your family owned that piece of property?

13   A.   Eight years.

14   Q.   When you say your family, is there anyone specific to your

15   family who owned it?

16   A.   My father and my uncle.

17   Q.   Your uncle?

18   A.   Yes, and my father.

19   Q.   Okay.  Make sure you speak into the mic.

20   A.   Sure.

21   Q.   So the person in the last seat back there can hear what

22   you're saying; okay?

23   A.   Got it.  How about now?  Can you hear me clear?

24   Q.   Perfect.

25   A.   Okay.

1    Q.   So you said your dad and your uncle own this piece of

2    property in the Dominican Republic?

3    A.   Correct.

4    Q.   How did you get involved in this piece of property?

5    A.   So we were trying to sell the property, and we kept getting

6    the runaround from different brokers down in Dominican

7    Republic.  They kept stealing our clients.  So I came forward

8    and I started marketing the property, kind of like similar to

9    the way I market properties in New York.  And I became a broker

10   in the Dominican Republic and I started marketing the property

11   myself.

12   Q.   All right.  I want to direct your attention to September of

13   2020.  Were you contacted by anyone who is interested in that

14   piece of property?

15   A.   Yes.

16   Q.   Who were you contacted by?

17   A.   By a broker.

18   Q.   A broker on behalf of whom?

19   A.   Of Didani, Ylli Didani.

20   Q.   And how did that person contact you initially?

21   A.   Through WhatsApp, my telephone number on WhatsApp.

22   Q.   All right.  And when you spoke with that person what was

23   the nature of that conversation?

24   A.   Basically they were interested in purchasing the property,

25   and he recognized my last name.  We started talking.

1    Q.   Who recognized your last name?

2    A.   Mr. Didani.

3    Q.   Well, you said you were originally contacted by a broker.

4    A.   A broker.  I guess they were together at the time.

5    Q.   Who was together at the time?

6    A.   Mr. Dildani (ph) and his broker.

7    Q.   Okay.

8    A.   And they called me up.  They started talking about a

9    property.  The broker didn't really speak English, and

10   Dildani (ph) came forward and we started talking.

11   Q.   Okay.  And so if I understand you correctly, when you got

12   this initial call from the broker, it was both the broker and

13   Mr. Didani on the phone?

14   A.   It was originally from the broker, and the broker didn't

15   really speak English that well.  Plus, I don't really speak

16   Spanish that well either.  And I guess me and him speak English

17   so it was easier for us to communicate directly.  So we started

18   communicating directly from the beginning.

19   Q.   And how did you communicate directly with Mr. Didani?

20   A.   Through WhatsApp.

21   Q.   WhatsApp?

22   A.   Yeah, WhatsApp instant messenger.

23   Q.   And did you chat or text on WhatsApp?

24   A.   We chatted, we text and we spoke.

25   Q.   Did you talk on the phone?

1    A.   Yes.

2    Q.   What about video calls or --

3    A.   Video calls, text message calls.

4    Q.   Have you ever personally met Mr. Didani?

5    A.   I did one time.

6    Q.   Do you see him in the courtroom?

7    A.   Yes.  He's right over there.

8    Q.   Can you tell me what he's wearing?

9    A.   Yeah.  He's wearing a jacket, shirt, blue shirt.

10            MR. McDONALD:  May the record reflect the witness has

11   identified the defendant?

12            THE COURT:  So noted for the record.

13   BY MR. McDONALD:

14   Q.   We'll talk about that meeting in just a bit, but first I

15   want to ask you about these WhatsApp chats with Mr. Didani.

16   Can you open the book in front of you to Exhibit 68.

17   A.   68.  Can you hear me?

18   Q.   68.0.  Do you recognize that?

19   A.   Yes, I see it.

20   Q.   And what is it?

21   A.   Number 1, it says --

22   Q.   I'm not asking you the content.  I'm asking you what is

23   Exhibit 68?

24   A.   68?

25   Q.   Yes.

1    A.   It looks like text messages between me and Mr. Dildani

2    (ph).

3    Q.   Okay.  And what number are you using?

4    A.   I'm using (917) 741-4296.

5    Q.   And what about Mr. Didani?

6    A.   He's using 1 (708) 400-1315.

7    Q.   All right.  And when does that message chat start, what

8    date?

9    A.   It starts 9-20, 2020.

10   Q.   And what about when is the last time in that exhibit is the

11   last chat?  So that would be on the last page of 68.

12   A.   What number would that -- 68 what?

13          THE COURT:  68.0.

14          MR. McDONALD:  68-76.

15          THE WITNESS:  68-76?

16   BY MR. McDONALD:

17   Q.   What would the last date be?

18          THE COURT:  Is that 68, Page 76 or 68.76?

19          MR. McDONALD:  It is 68, Page 76.

20          THE WITNESS:  So it's 68-76, the numbers 1141?  Is

21    that what you're referring to?

22   BY MR. McDONALD:

23   Q.   No.  I'm asking you on the very last chat of this exhibit.

24   A.   Of this exhibit.

25   Q.   On Page 68-76.

1   A.   68-76?

2   Q.   Yes.

3   A.   68-76.   68-76.

4   Q.   The very last chat, what is the date of that last chat?

5   A.   10-13, 2020.

6        MR. McDONALD:  All right.  Move for admission of 68.

7        THE COURT:  Any objection?

8        MR. FINK:  Judge, I don't have an objection with him

9   testifying if these are his text messages or not, but he's not

10  the witness who can say what this is, what phone it came from.

11  I'm not challenging the authenticity, but I would just ask that

12  the testimony be directed at he has knowledge of these text

13  messages being sent regardless of the format that they're in.

14       MR. McDONALD:  Judge --

15       THE COURT:  Do you want to respond to that?

16       MR. McDONALD:  He testified that this was a chat

17  between him and Mr. Didani.  He gave us the numbers and the

18  dates from WhatsApp, and that's --

19       THE COURT:  I think he could give us his own number

20  and probably the number for Mr. Didani that he received.

21       MR. FINK:  I agree with you, Judge.  I just don't

22  think he can verify a Cellebrite report, what format this is

23  in, how it was done.  I'm just being cautious and precise about

24  what exactly he has personal knowledge of.  If he can say that

25  he remembers those messages, then I think he can testify to

1    those, but not what this document is.

2             MR. McDONALD:  Okay.  I move for admission of 68 --

3             THE COURT:  I'm going to admit it, and you can -- if

4    you think he asks a question that goes into that, you can

5    object; okay?

6             (Government's Exhibit 68 admitted into evidence.)

7             MR. FINK:  Thank you, your Honor.

8             THE COURT:  All right.  You're welcome.

9    BY MR. McDONALD:

10   Q.   Mr. Meskouris, I want you to look at the very first page.

11   That's 68-1 -- excuse me.  68.0.  Do you see that?

12   A.   Yes, yes.

13   Q.   How were these chats broken up?  Are they numbered in any

14   way?

15   A.   Yes, they're numbered.

16   Q.   Where are they numbered, on which side of the page?

17   A.   The left-hand side.

18   Q.   And do they start with a number 1?

19   A.   They start with a number 1, that's correct.

20   Q.   I want you to look at chat number 2.

21   A.   I'm looking at it.

22   Q.   And is this -- who is this a chat from and who is it to?

23   A.   From Mr. Dildani (ph) to me.

24   Q.   All right.  And what does Mr. Didani say?

25   A.   "Hi, bro."

```
 1              MR. McDONALD:  May I publish 68.0, your Honor?
 2              THE COURT:  Yes.
 3              MR. McDONALD:  In the middle, please.
 4   BY MR. McDONALD:
 5   Q.  All right.  So this is a chat from Mr. Didani to you that
 6   says, "Hi, bro"; is that accurate?
 7   A.  That is correct.
 8   Q.  All right.  And what is the very next chat in box 3?
 9   A.  Box 3, from Mr. Dildani (ph) to me.  This is me.
10   Q.  All right.  Can you turn the page to 68.1.  And the first
11   chat in box number 4, can you tell us who's that a chat from
12   and to who?
13   A.  It's box number 4, Didani to me.  It says, "Ylli."
14              MR. McDONALD:  Can you publish dash 2.  And can you
15   zoom in on the very top message.
16   BY MR. McDONALD:
17   Q.  So this is a chat where Mr. Didani tells you "Ylli"; is
18   that accurate?
19   A.  That is correct.
20   Q.  Can you go to the next chat in 5.
21   A.  That number 5, Mr. Didani to me.  It says, "My personal
22   number."
23   Q.  All right.  And that was sent from again (708) 400-1315; is
24   that accurate?
25   A.  Yes, that is accurate.
```

1   Q.   All right.  Did you respond once Mr. Didani says this is

2   "my personal number"?

3   A.   Yes, number 6.

4   Q.   And how do you respond?

5   A.   "Okay, perfect."

6   Q.   And again, the date of this message when you say, "Ok

7   perfect," is what?

8   A.   9-20, 2020.

9   Q.   Is there a time listed on there?

10  A.   It says 9:08, 58 seconds?

11  Q.   a.m. or p.m.?

12  A.   p.m.

13  Q.   And there's something after p.m.  Do you know what that is?

14  A.   I don't know what that is.  It says, "UTC-4."

15  Q.   Okay.  After you tell Mr. Didani, "Ok, perfect," in box 4,

16  do you send him another message?

17  A.   Yes, I did.

18  Q.   And what did you say?

19  A.   In box 7 from Alex Meskouris to Mr. Didani, it says -- I

20  wrote, "I will use this."

21  Q.   You tell Mr. Didani you will use this.  What did you mean

22  by that?

23  A.   This is the telephone number.

24  Q.   Okay.  Now, at some point do you send Mr. Didani anything

25  related to the property?

 1   A.   You asked me did I send him anything?

 2   Q.   Yes, in this chat.

 3   A.   Yes.  I sent him a survey of the property.

 4   Q.   What's a survey of the property?

 5   A.   A survey is basically the outline of a property.  It tells

 6   you the length and the width, the square feet of the property.

 7   Q.   And how did you send that to him?

 8   A.   Through WhatsApp text messaging.

 9   Q.   You sent him a picture?

10   A.   A picture of the survey, yes.

11   Q.   Okay.  Are you on 68-3 now?

12   A.   No.  Let me go to 68-3.

13   Q.   I want you to look at box number 10, and can you describe

14   what box number 10 is?  Can you --

15   A.   Box number 10 is Alex Meskouris to Didani.  "I will send

16   you a photo of the property line."

17   Q.   All right.  And the very next message what happens?

18   A.   Box number 11 Alex Meskouris sends to Mr. Didani the survey

19   of the property.

20   Q.   All right.  Now, there's a small picture there.  Have you

21   seen a larger version of this?

22   A.   Yes, I have.

23   Q.   I want you to turn in your book to Exhibit 68.1.  Do you

24   recognize that?

25   A.   68.1, yes.  That's the survey of the property in Cap Cana

 1    Dominican Republic.

 2              MR. McDONALD:  Move for admission of 68.1.

 3              THE COURT:  Any objection?

 4              MR. FINK:  No objection, but I think it's mislabeled

 5    as 67.1 on mine, but no objection.

 6              THE COURT:  It's -- I thought it was 68.1.

 7              MR. McDONALD:  It is 68.1.  I believe the page number

 8    says 68.1, but the sticker says 67.1.  So we'll make that

 9    correction.

10              MR. FINK:  No objection to the admission of it.

11              THE COURT:  All right.  Very well.  It's admitted.

12              (Government's Exhibit 68.1 admitted into evidence.)

13              MR. McDONALD:  Can you pull 68.1.

14    BY MR. McDONALD:

15    Q.  Mr. Meskouris, do you see on the big screen 68.1?

16    A.  Yes, I'm looking at it.

17    Q.  All right.  This is what you sent Mr. Didani on what date?

18    A.  On 9-20, 2020, 9:11, 52 seconds p.m.

19    Q.  And is this a survey of the property you owned in the

20    Dominican Republic?

21    A.  Yes.  Yes, it is.

22    Q.  I want you to turn now to 68-4 in the chats.  Tell me when

23    you're there.

24    A.  I'm at 68-4.

25              THE COURT:  68-4?

```
 1              MR. McDONALD:  Yes, your Honor.
 2              THE COURT:  Okay.
 3   BY MR. McDONALD:
 4   Q.   In box number 60, do you recognize that chat?
 5   A.   Yes.  It's from Mr. Didani to me.  It's a photo.
 6   Q.   And have you seen a larger image of that photo?
 7   A.   Yes.
 8   Q.   What is that photo?
 9   A.   It's a photo of him.
10   Q.   He sent you a photo of himself?
11   A.   Yes, that is correct.
12              MR. McDONALD:  Move for admission of 68.2.
13              THE COURT:  Any objection?
14              Now, is it 68.4 or 68.2?
15              MR. McDONALD:  This is Exhibit 68.2.  That is on
16    Exhibit 68-4, which is a page number of the chat.
17              THE COURT:  Okay.
18              MR. FINK:  No objection to 68.2.
19              THE COURT:  All right.  It's admitted.
20              (Government's Exhibit 68.2 admitted into evidence.)
21   BY MR. McDONALD:
22   Q.   Mr. Meskouris, I want you to turn to 68-6.  On that page,
23   does Mr. Didani send you a series of messages?
24   A.   68-6, yes.
25   Q.   All right.  Can you look at the very first one in box
```

1    number 67.  Do you recognize that?

2    A.   Yes.  It's a text message.

3    Q.   Okay.  A text message between who and who?

4    A.   From Mr. Didani to me.

5    Q.   All right.  And on the date?

6    A.   The date -- the date is 9-20, 2020, 9:33.36 p.m.

7    Q.   What does Mr. Didani tell you?

8    A.   "We all very strong."

9    Q.   All right.  And does he send you a subsequent message on

10   the same page?

11   A.   On 68 it says a text message from Mr. Didani to me, "Are

12   base is Ecuador and Dubai."

13   Q.   And the next text message?

14   A.   The next text message is 69 from Didani to me, "But we have

15   very close circle."

16   Q.   At this point in time did you know what Mr. Didani was

17   talking about?

18   A.   I have no idea.

19   Q.   And is it common in real estate for individuals to tell you

20   things about themselves that you don't know?

21   A.   It's very common.  People tend to text and ramble on.

22   Q.   I want you to take a look at the next page, 68-7.

23   A.   I'm looking at 68-7, number 72.

24   Q.   All right.  And what is 68-7 in box 72?  What is that?

25   A.   It's a text message from Mr. Didani to me, and it looks

 1   like a photo.

 2   Q.   All right.

 3   A.   I'm looking at like a dark photo here.

 4   Q.   All right.  Can you see a photo on the screen?

 5   A.   I can't really see it from here.  If you zoom in maybe.

 6   No.  From here I can't really see it that well.

 7   Q.   There's a TV right next to you.  You can stand up.

 8           THE COURT:  Yes.  You may step down if you like.

 9   BY MR. McDONALD:

10   Q.   Do you recognize that photograph?

11   A.   Yes, I recognize.

12   Q.   And what is it a photograph of?

13   A.   It looks like cell phones.

14   Q.   Is this a photo that Mr. Didani sent you on September 20,

15   2020?

16   A.   Yes.

17   Q.   Have you seen a larger image of this photo?

18   A.   Can you repeat that?

19   Q.   Have you seen a larger image of this photo?

20   A.   Yes.  Yes, I have.

21   Q.   Can you turn to Exhibit 68.3.  Tell me when you're there.

22   A.   I'm here.

23   Q.   What is that?

24   A.   It looks like three cell phones on a desk.

25   Q.   Does that look like a larger image of the phone you just

1    saw on the --

2    A.   Yes, that's the image.

3              MR. McDONALD:  Move for admission of 68.3.

4              MR. FINK:  No objection.

5              THE COURT:  All right.  Very well.  It's admitted.

6              (Government's Exhibit 68.3 admitted into evidence.)

7    BY MR. McDONALD:

8    Q.   All right, Mr. Meskouris.  Can you go back to the chat.

9    You and I are going to have to do this, kind of go back and

10   forth between pictures and chats.

11   A.   Sure.  What number are we going back to?

12   Q.   We're going back to Page 68-8.

13   A.   Okay.  I'm on 68-8.

14   Q.   And take a look -- after Mr. Didani sends you a photo of

15   these phones, does he send you a text message?

16   A.   Yes.

17   Q.   And what does he say?

18   A.   Number 73.  It's a text message from Mr. Didani to me at

19   9-20, 2020, 9:35 p.m.  The text message reads, "I have three

20   more, LOL."

21   Q.   And did you know what he meant when he said, "I have three

22   more"?

23   A.   I have no idea what he's talking about.

24   Q.   Okay.  Well, he had sent you a picture of phones.

25   A.   I guess three --

1          MR. FINK:  Objection to leading and --

2          THE WITNESS:  Three more phones, I'm assuming.

3          MR. FINK:  -- suggesting what he should say.

4          THE COURT:  You are suggesting the answer,

5     Mr. McDonald.

6          MR. McDONALD:  I'll rephrase.

7     BY MR. McDONALD:

8     Q.  Did Mr. Didani's text here in box 72 have anything to do in

9     your opinion with the photograph that he sent you in --

10    A.  Yes.

11         MR. FINK:  Objection.

12         THE COURT:  What was your question again, please?

13    BY MR. McDONALD:

14    Q.  Did Mr. Didani's text that he sent you in box 73 have

15    anything to do in your opinion with the photo that he sent you

16    in 72?

17    A.  Yes.

18         MR. FINK:  Objection that his opinion is irrelevant.

19    And his first answer was "I don't know" before being told what

20    the answer was.

21         MR. McDONALD:  Judge --

22         THE COURT:  It did seem like that, Mr. McDonald.  Go

23    to a new question.

24    BY MR. McDONALD:

25    Q.  All right.  Can you look at box 74.

1   A.   Yes.

2   Q.   And can you tell us what box 74 is?

3   A.   Box 74.

4   Q.   On Page 68 dash --

5   A.   It's a text message from me to Mr. Didani.

6   Q.   Okay.  On what date?

7   A.   9-20, 2020, 9:35 p.m.

8   Q.   And what did you tell him?

9   A.   "You need them all."

10  Q.   And what were you asking?  What did you mean by that?

11  A.   The cell phones.

12  Q.   Can you go down to the next text, which would be box 73.

13  And can you describe that?

14  A.   Box 73?

15  Q.   Excuse me.  75.

16  A.   Box 75?  Box 75 is a text message from Mr. Didani to me, "I

17  have 2 more in room."

18  Q.   Okay.  And immediately after that does Mr. Didani send you

19  another text message in box 76?

20  A.   On number 76 Mr. Didani sends a text message to me, "LOL."

21  Q.   Can you turn to the next page to 68-9, and can you look at

22  box 78.

23  A.   Yes.

24  Q.   What is 78?

25  A.   Box 78, text from Mr. Didani to me at 9-20, 2020,

1    9:36 p.m., "They're all encrypted."

2    Q.  And does he send you a message immediately after that?

3    A.  Box number 79, Mr. Didani sends me a text message, 9-20,

4    9:36 p.m., "I can send you one of you want."

5    Q.  And what about immediately after that?  Is there a second

6    message or a third --

7    A.  Box number 80.  Box number 80.  Mr. Didani sends a text

8    message --

9    Q.  Mr. Meskouris --

10   A.  Sorry.

11   Q.  Just wait until I ask you a question.

12   A.  Oh, okay.  I thought you said go to the next one.

13           THE COURT:  The reason that he asks you to do that is

14    because the court reporter takes down a verbatim --

15           THE WITNESS:  I understand.  I'm sorry.

16           THE COURT:  But wait until I finish.

17           THE WITNESS:  I understand.  Sorry about that.

18           THE COURT:  She takes down a verbatim statement of

19    what we say, but she can only take one voice at a time.  We're

20    trying to make a good record; okay?

21           THE WITNESS:  My apologies.

22           THE COURT:  What was your question again?

23           MR. McDONALD:  Thank you.

24   BY MR. McDONALD:

25   Q.  Can you take a look at box number 80 on Page -- on Exhibit

1   68-9, and can you identify that for us, please?

2   A.   Box number 80.  Mr. Didani sends me a text message at 9-20,

3   2020, 9:36 p.m.

4   Q.   And it says what?

5   A.   It says, "Sky ECC phones."

6   Q.   At that time did you know what a Sky ECC phone is?

7   A.   No, I didn't know what it was.

8   Q.   The following page, 68-10, box 81, do you recognize what

9   that is?

10  A.   Box 81, Mr. Didani sends me a text message at 9-20, 2020,

11  9:37 p.m., "Very encrypted."

12  Q.   All right.  I'm going to ask you a series of questions on

13  the next three pages, starting with Page 68-11 -- or excuse me

14  12 -- or 11, sorry.  How many text messages are on that

15  particular page?

16  A.   68-11?

17  Q.   Yes.

18  A.   I see one number, 292, one text message.

19  Q.   Is that a text message from you or from Mr. Didani?

20  A.   It's a text message from Mr. Didani to me.

21  Q.   And what's the date?

22  A.   The date is 9-22, 2020, 2:58 p.m.

23  Q.   And what did Mr. Didani tell you?

24  A.   "Had some problem today in morning."

25  Q.   All right.  Can you turn to the next page, 68-12.  And look

1    at the very first message in box 293.

2    A.   Looking at box 293.

3    Q.   And what does that say?

4    A.   Box 293, it's a text message from Mr. Didani to me at 9-22,

5    2020, 2:58 p.m.  It says, "You deleted this message."

6    Q.   Did you know what he was talking about?

7    A.   No.

8    Q.   The next message, box 294?

9    A.   Box 294, text message from Mr. Didani to me, 9-22, 2020,

10   2:58, text message reads, "Lost 11 MIL."

11   Q.   All right.  So that last text message or chat was in box

12   294, and the body was "Lost 11 million"?  Is that what you

13   said?

14   A.   Yes.

15   Q.   At the time Mr. Didani told you he lost 11 million did you

16   know what he was talking about?

17   A.   No.

18   Q.   How about the next message, 295, box 295?

19   A.   Box 295, text message from Mr. Didani to me, "My cost" --

20   it was 9-22, 2020, 2:59 p.m., "My cost was 11."

21   Q.   All right.  And do you respond to that message?

22   A.   Box number 296.

23   Q.   Mr. Meskouris --

24   A.   Yes.

25   Q.   Did you respond to that message?

1    A.   Yes.

2    Q.   All right.  And I want you to look at box 296.  Is that

3    your response?

4    A.   Yes.

5    Q.   All right.  And that's a message from who to who?

6    A.   From me to Mr. Didani.

7    Q.   What do you say?

8    A.   "You have to have a strong stomach.  That's why most people

9    can't do what you do."

10   Q.   All right.  Now, if you didn't know what the 11 million was

11   about, why do you tell him that he has to have a strong

12   stomach?

13   A.   I was just figuring in business if you lose 11 million

14   dollars you have to have a strong stomach.

15   Q.   Okay.  And then you say, "That's why most people can't do

16   what you do"?

17   A.   That's correct.

18   Q.   All right.  And why did you say that?

19   A.   Because to lose 11 million dollars in one day you have to

20   have -- be a strong character, strong stomach.

21   Q.   Did you know at that time what Mr. Didani did?

22   A.   No.

23          MR. FINK:  Objection, your Honor.  It's suggesting

24    what he did as if that's not what we're here to decide.

25          MR. McDONALD:  I simply asked him if he knew what

1   Mr. Didani did.

2          THE COURT:  Right.  I don't think that's

3   objectionable.  Maybe he could have phrased it like did you

4   know what kind of work he was in or business he was in, but

5   what he did is sufficient and I'm going to allow it.

6          MR. FINK:  Thank you, your Honor.

7   BY MR. McDONALD:

8   Q.  Can you turn, Mr. Meskouris, to 68-13.

9   A.  68-13.

10  Q.  All right.  And at the very top is box 297; is that

11  accurate?

12  A.  Box 297, text message from Mr. Didani to me at 9-22, 2020,

13  3:04 p.m., "Not worry about that."

14  Q.  All right.  How about the next box in 298?

15  A.  Box 298, Mr. Didani to me, 9-22, 2020, 3:04 p.m., "Worry

16  about they people there."

17  Q.  All right.  Do you respond to Mr. Didani after he said

18  that?

19  A.  Yes.

20  Q.  And can you look at box 299.  What do you tell Mr. Didani?

21  A.  Box 299, I wrote to Mr. Didani at 9-22, 2020, 3:04 p.m.,

22  "Keep me posted."

23  Q.  Can you look at box 300.  What is that?

24  A.  Box 300, text message from Mr. Didani to me, 9-22, 2020,

25  3:04 p.m., "Someone make mistake."

1    Q.  All right.  If you turn the page now to 68-14, after

2    Mr. Didani tells you "someone made mistake" does he send you

3    anything?

4    A.  Yes.

5    Q.  What does he send you?

6    A.  301, Mr. -- box number 301.  Mr. Didani sends a text

7    message to me at 9-22, 2020, 3:04 p.m.

8    Q.  Okay.  And in the text message does he send you any photos

9    or videos?

10   A.  Looks like a photo.

11   Q.  All right.  Have you seen this photo before?

12   A.  Yes.

13   Q.  Have you seen a larger image of this photo before?

14   A.  Yes.

15   Q.  Can you turn to Exhibit 68.4.  Are you there?

16   A.  Yes.

17   Q.  And what is 68.4?

18   A.  Repeat that?

19   Q.  Can you identify what 68.4 is?

20   A.  68.4 is a photo of text messages between two people.

21   Q.  All right.  And that's what Mr. Didani sent you?

22   A.  Yes.

23           MR. McDONALD:  Move for admission of 68.4.

24           THE COURT:  Any objection?

25           MR. FINK:  No objection, your Honor.

```
 1              MR. McDONALD:  May I publish 68.4?
 2              THE COURT:  Yes.  It's admitted as 68.4.
 3              (Government's Exhibit 68.4 admitted into evidence.)
 4    BY MR. McDONALD:
 5    Q.  Now, this text message in 68.4, could you read it starting
 6    with the top bubble going down.
 7    A.  Yes.  So in blue it reads "12 hours they say."  And then
 8    there's a circle with an "N" in it.  It says, "No name, YH
 9    minimum."  And then the next one says, "No name, and company
10    got raided."  After that it says, "No name, different country."
11    Then in blue --
12    Q.  You don't have to say the word if you're not comfortable
13    with it.
14    A.  "F'ing crazy, bro."
15    Q.  All right.
16    A.  And then, "So was all plan.  PFFF.  Most of been watching
17    company guy a long time."
18    Q.  Okay.  Now, are you part of any of this text message?
19    A.  No.
20    Q.  Do you send any of these messages?
21    A.  I didn't send any of these messages.
22    Q.  This is a photograph of some other chat that Mr. Didani
23    sent to you; is that accurate?
24    A.  That is correct.
25    Q.  Okay.  You can close the book for a minute.  I'm going to
```

1   ask you some questions.

2          Did there come a time when Mr. Didani and you began to

3   negotiate a purchase price for this property in the Dominican

4   Republic?

5   A.   Yes, there was.

6   Q.   And what was the price?

7   A.   So the price for the beachfront property in Cap Cana on

8   Juanillo Bay, the selling price on that property was 2,775,000.

9   Q.   And can you identify how long this negotiation took place?

10  A.   From start to finish?

11  Q.   Yes.

12  A.   So the negotiation took place -- it took longer than

13  expected, because the property itself the title was in limbo

14  due to the country of the Dominican Republic.  They had

15  problems transferring the titles.  It was like a long process.

16  It's not like here in the United States where you can do a real

17  estate closing in a couple of weeks or a month or two.  Over

18  there it's a long, dragged out process.

19          And once we brought these titles to the table we

20  realized that the original titles, the names from the original

21  buyers weren't even transferred properly to us as the owners,

22  my family.  So I thought it was going to be like a, you know,

23  normal one to two-month real estate deal, but it ended up being

24  longer because we had to hire lawyers, go to their titling

25  agency and transfer all these documents properly, because they

1   were all done -- everything was upside down over there.

2   Q.   Okay.  And so how long would you say?

3   A.   Months.  Six to eight months.

4   Q.   During that negotiation, did there come a point where you

5   and Mr. Didani agreed to a purchase price?

6   A.   Yes.

7   Q.   And was that the two --

8   A.   So we -- he started off looking at the first lot.  We owned

9   two properties down there.  One was a beachfront property

10  located in Cap Cana in a area called Juanillo Bay.  Then the

11  second property was on the golf course.  That was called the

12  Golf Founders Lot.

13  Q.   I'm sorry.  Can you say that again.

14  A.   The second property was on a golf course, and the name of

15  that lot they would call it the Golf Founders Lot.

16  Q.   Okay.  And so my question was did you agree to a purchase

17  price on the property or properties?

18  A.   Yeah.  So the first price for the beachfront property was

19  2.7 million, 2,775,000, and the Golf Founders Lot was one

20  million -- I believe 1,050,000.  So a total was somewhere

21  around 3.8.

22  Q.   All right.  And did you discuss how Mr. Didani would pay

23  for that property?

24  A.   Yeah.  So moving forward to lock him in, like in any real

25  estate transaction, you need to give a deposit.

1  Q.   Okay.  But before we get to the deposit, were there any

2  discussions between you and him about how Mr. Didani would

3  only --

4  A.   Yeah.  I'm sorry.  You can repeat that one more time.

5  Q.   I said before we get to talking about the deposit my

6  question was did you have any discussions with Mr. Didani about

7  how he was going to pay for it?

8  A.   Yes.

9  Q.   And what did he tell you?

10  A.   A wire.  He was going to send a wire.

11  Q.   From where?

12  A.   Dubai.

13  Q.   What instructions, if any, did Mr. Didani give you about

14  the paperwork, the purchase paperwork?

15  A.   The purchase paperwork, he said he was going to purchase it

16  under a different company name, not his name.

17  Q.   Now, you said in any retail -- excuse me.  In any property

18  transaction there is a down payment in your opinion?

19  A.   Correct, a down payment.

20  Q.   Was there any discussions between you and Mr. Didani about

21  a down payment?

22  A.   Yeah.  So I told him that I need some kind of good faith

23  payment, some type of down payment, and we discussed a down

24  payment.

25  Q.   Did you discuss an amount or a percentage or anything like

1    that?

2    A.   We discussed a percentage.  It was anywhere between like

3    maybe six percent or ten percent at the time.

4    Q.   Ten percent of the total purchase price?

5    A.   Of the total purchase price, correct.

6    Q.   All right.  Did Mr. Didani tell you anything about his

7    ability to move money?

8    A.   Yeah.  He said, "I could get you a deposit in New York.  I

9    have a service, a guy, a Chinese guy that could bring you the

10   deposit."  It was -- this is around the time of coronavirus and

11   everything was shut down.  So he said he had a service,

12   somebody could bring me a deposit in New York, so I agreed to

13   it.

14   Q.   All right.  Prior to this deal, had you done real estate

15   for years prior?

16   A.   Yes, I had.

17   Q.   All right.  And had you ever received a cash down payment?

18   A.   No.

19   Q.   Did you find it unusual?

20   A.   I did.  I did find it unusual.

21   Q.   Okay.  But you agreed to it anyway?

22   A.   I agreed because of the circumstances of the time of how

23   the whole world was shut down and the coronavirus and

24   everything was shut down, so I agreed to it.

25   Q.   What, if anything, did Mr. Didani tell you about how, when

1  and where the deposit was going to be delivered to you?

2  A.   Repeat that.

3  Q.   What, if anything, did Mr. Didani tell you about how, when

4  and where the deposit was going to be delivered to you?

5  A.   He said somebody will contact me for the deposit.  And he

6  said something about like a token, some type of like

7  verification using the serial numbers from a dollar bill.

8  Basically like take a photo of a dollar bill, and then when you

9  meet the guy I guess the photo has to match to make sure, I

10 guess, that it's me, or something like that.

11 Q.   I want you to look back at the chat on Page 68-17.

12 A.   What chat are we looking at?

13 Q.   68-17.  I want you to look at box 446.  Do you recognize

14 that?

15 A.   446.

16 Q.   Yes.

17 A.   That's from me to Mr. Didani.

18 Q.   What day?

19 A.   It was 9-22, 2020, 3:54 p.m.

20 Q.   All right.  And what do you tell Mr. Didani?

21 A.   "Keep me posted when they call.  I'm around today."

22 Q.   When who calls?

23 A.   His -- the person that was going to drop off the deposit.

24 Q.   So on that day, the 22nd of September, were you awaiting a

25 phone call from somebody?

1   A.   Yes, I was.

2   Q.   Okay.  The next chat box in 447, do you recognize that?

3   A.   447, text message from Mr. Didani to me, 9-22, 3:54 p.m.,

4   "Ok soon the call me to confirm."

5   Q.   Is that from Mr. Didani to you?

6   A.   Um-hmm, yes.

7   Q.   I just want to back up one second to 446 and ask you a

8   question.  Do you tell Mr. Didani in 446, "Keep me posted when

9   they call"; right?

10  A.   Correct.

11  Q.   Who is "they"?

12  A.   The people that he had that were going to deliver his down

13  payment for the property.

14  Q.   Okay.  I may have asked you that twice.  If I did, I'm

15  sorry.  Can you look at Page 68-18.

16  A.   68-18?

17  Q.   Yeah, box number 451.

18  A.   Yes, I'm looking at it.

19  Q.   And in 451 what is that?  A message from who to who?

20  A.   Mr. Didani to me.

21  Q.   What does Mr. Didani say?

22  A.   "They will pass tomorrow."

23  Q.   Does he say "tomorrow"?

24  A.   It says "tom."  It says, "They they will pass tom."

25  Q.   And did you understand "tom" to mean anything?

 1   A.   Yeah.  It looks like tomorrow.

 2   Q.   The very next box, in 452, can you tell us what that says?

 3   A.   452, text message from Mr. Didani to me, it says, "Pass me

 4   token."

 5   Q.   When Mr. Tibbitts told you to "pass me a token," did you

 6   have any idea what he was talking about?

 7   A.   No, I've never done that before.

 8   Q.   All right.  After Mr. Didani tells you to pass him a token

 9   does he continue to describe what he wants you to do?

10   A.   Yes.

11   Q.   I want you to look at Page 68-19, box 453.  Can you

12   identify that?

13   A.   Box 453?

14   Q.   Yes.

15   A.   Yes, text message from Mr. Didani to me.

16   Q.   And what does he say?

17   A.   "Take pic of dollar."

18   Q.   All right.  And do you respond to that in 454?

19   A.   Yes.

20   Q.   What do you say?

21   A.   "Ok."

22   Q.   Take a look at 455.  Immediately after you say "ok" does

23   Mr. Didani tell you something?

24   A.   Yes.

25   Q.   And what's the date and time of that message?

1    A.   9-22, 2020, 5:44 p.m.

2    Q.   And which box are you looking at?

3    A.   455.

4    Q.   What does Mr. Didani tell you in 455?

5    A.   "And keep separate."

6    Q.   Okay.  Is there a message that follows that --

7    A.   Yes.

8    Q.   -- from Mr. Didani?  In 456?

9    A.   Yes.

10   Q.   What does 456 say?

11   A.   "One dollar bill."

12   Q.   All right.  So what's your understanding based on what

13   Mr. Didani has told you thus far what you're supposed to do?

14   A.   Basically send him a picture of a dollar bill that I had in

15   my pocket.

16   Q.   All right.  Can you turn to 68-20, box 457.  Do you

17   recognize that?

18   A.   Yes.

19   Q.   And what is that?

20   A.   It's a text message from Mr. Didani to me.  It says, "Or

21   5."

22   Q.   All right.  Do you respond to that?

23   A.   Yes.  I did respond to that.

24   Q.   And did you respond in box 458?

25   A.   Yes.

1   Q.   What did you say?

2   A.   "Now."

3   Q.   And did Mr. Didani respond to that?

4   A.   Yes.

5   Q.   And is that in 459?

6   A.   Yes.

7   Q.   What did he say?

8   A.   459, "Yes."

9   Q.   Okay.  So at this point what did you do now that he's asked

10  you to respond?

11  A.   What I did, I took a picture of a dollar bill and I sent it

12  to him.

13  Q.   Before you sent it to him did he send you an example?

14  A.   Yes.

15  Q.   All right.  Can you turn to 68-21 in box number 461.  What

16  is that?

17  A.   Box 461, it's a text message from Mr. Didani to me at 9-22,

18  2020, 5:45 p.m.  It looks like a picture of a $20 bill.

19  Q.   Have you seen a larger image?

20  A.   Yes.

21  Q.   Can you take a look at 68.5 and identify what that is?

22  A.   Yes.

23  Q.   What is that?

24  A.   It's a picture of a $20 bill.

25  Q.   The $20 bill that Mr. Didani sent you?

1    A.   Yes.

2              MR. McDONALD:  Move for admission of 68.5.

3              THE COURT:  Any objection?

4              MR. FINK:  No objection.

5              THE COURT:  Very well.  68.5 is admitted.

6              (Government's Exhibit 68.5 admitted into evidence.)

7              MR. McDONALD:  Thank you.  May I publish?

8              THE COURT:  Yes.

9              MR. McDONALD:  May I approach the witness?

10             THE COURT:  Yes.

11   BY MR. McDONALD:

12   Q.   I'm showing you what has been marked as Exhibit 68.5,

13   Mr. Meskouris.  Do you recognize what that is?

14   A.   Yes, I do.

15             MR. McDONALD:  It looks like we're having some

16   technical difficulties.  I don't know how the Court wants to --

17   if the Court wants to take a break, or I could publish this

18   photo to the jury?

19             THE COURT:  As in pass it to them?

20             MR. McDONALD:  Indeed.

21             THE COURT:  Do you have any objection?

22             MR. FINK:  No, that's fine, your Honor.

23             THE COURT:  You all can just pass it down so everyone

24    can see it.

25             It's 68.5; is that correct?

```
1              MR. McDONALD:  Yes, your Honor.
2    BY MR. McDONALD:
3    Q.  Now, Mr. Meskouris, in 68.5 is it a picture of the entire
4    $20 bill?
5    A.  No.
6    Q.  All right.  What is the picture of?  What part of the $20
7    bill?
8    A.  The serial number on the $20 bill.
9    Q.  Okay.  And why did you -- did you know why the serial
10   number was -- just the serial number picture was being sent?
11   A.  I'm guessing that's the token, the verification process.
12             MR. McDONALD:  Okay.  We went old school for a minute,
13   your Honor, but it appears we have got the overhead camera
14   working again.
15             THE COURT:  Okay.
16             MR. McDONALD:  Thank you for allowing me to do that.
17   BY MR. McDONALD:
18   Q.  Mr. Meskouris, after Mr. Didani --
19             THE COURT:  Are you all finished with it?
20             Okay.  You can retrieve it, please.  Thank you.
21   BY MR. McDONALD:
22   Q.  Mr. Meskouris, after Mr. Didani sends you that $20 bill
23   does he send you another text message immediately after in
24   68-21?
25   A.  68-21.  Just give me a second.  Hold on.  68-21, yes.
```

1    Q.   All right.  And what does he tell you there?

2    A.   "Like this."

3    Q.   And that's box 462?

4    A.   462.

5    Q.   All right.  And do you respond to that?

6    A.   "Ok."

7    Q.   And you responded "ok" in what box?

8    A.   I responded "ok" in box 463, 9-22, 2020, 5:45 p.m.

9    Q.   All right.  Please turn the page to 68-22.  After you

10   respond "ok" does Mr. Didani send you a text in box 464?

11   A.   Yes.

12   Q.   And what does he say?

13   A.   "And they will contact you on WhatsApp."

14   Q.   Okay.  And again, who is "they"?

15   A.   The people dropping off the deposit for the property that

16   was being sold.

17   Q.   Okay.  And this says "contact you on What's Up"?

18   A.   Correct.

19   Q.   Did you take that to mean something else, What's Up?

20   A.   And they contact me on WhatsApp.  Basically he's saying

21   they're going to contact me on WhatsApp messenger.

22   Q.   After that message did you send Mr. Didani a picture of a

23   dollar bill?

24   A.   Yes, I did.

25   Q.   And is it your understanding -- what is your understanding

1    of the purpose of this dollar bill?

2    A.   To verify who the receiver will be.

3    Q.   Okay.  You said something about a token.  Do you know is

4    the dollar bill a token?

5    A.   The dollar bill is supposed to be the token, like some type

6    of receipt.

7    Q.   Can you look at box 465.

8    A.   Box 465, yes.

9    Q.   And what is that?

10   A.   That's a message from me to Mr. Didani at 9-22, 2020,

11   5:47 p.m.  It's a photo of a dollar bill.

12   Q.   Can you turn to 68.6 -- well, strike that.

13          Have you seen a larger image of that particular photo?

14   A.   Yes.

15   Q.   Can you please turn to 68.6 in your folder.  Tell me when

16   you're there.

17   A.   I'm looking at it now.

18   Q.   Do you recognize the image in 68.6?

19   A.   Yes.

20   Q.   What is it?

21   A.   It's a photo of a dollar bill that I sent to Mr. Didani.

22          MR. McDONALD:  Move for admission of 68.6.

23          MR. FINK:  No objection, your Honor.

24          THE COURT:  All right.  It's admitted as 68.6.

25          (Government's Exhibit 68.6 admitted into evidence.)

```
 1   BY MR. McDONALD:
 2   Q.   Mr. Meskouris, how many tokens did you send Mr. Didani in
 3   total, if you recall?
 4   A.   If I recall, one.
 5   Q.   One different dollar bill?
 6   A.   Yes.
 7   Q.   The entire time?
 8   A.   Say that again.  I'm a little confused with it.
 9   Q.   My question is how many different times did you send
10   Mr. Didani a picture of a dollar bill throughout your
11   communication with him?
12   A.   Three times, I believe.
13   Q.   All right.  We'll get back to the token in just a minute,
14   but I want you to look at 68-26 in box 525.  Do you recognize
15   that?
16   A.   68-26, box 525?
17   Q.   Correct.
18   A.   I'm looking at it.
19   Q.   All right.  And can you identify it for the jury?
20   A.   Box 525, Mr. Didani sends me a message, a photo message.
21   Q.   All right.  And in the body of the message does he send you
22   anything?
23   A.   It looks like a newspaper article.
24   Q.   All right.  Up in the body, up towards the top, does
25   that -- what does that appear to be to you?
```

1    A.   Are you talking about where it says "Joint NCA"?

2    Q.   I'm talking about where it says "Body" at the top of the

3    box.

4    A.   Oh, "Body."

5    Q.   What does that say?

6    A.   "National Crime Agency."

7    Q.   What does that appear to be to you?

8    A.   A newspaper clipping of an article.

9    Q.   Okay.  A link to a computer article?

10   A.   A link, yeah, like a computer link to like some type of

11   article.

12   Q.   All right.  After Mr. Didani sends you this article does he

13   follow up with a text message in-box?

14   A.   Yes, he does.

15   Q.   What does he say?

16   A.   It says, "Delete after you see the news."

17   Q.   Can you turn to 68-27.

18   A.   I'm looking at it.

19   Q.   Box 527.  You don't have to say the curse word, but what is

20   527?

21   A.   Box 527, Mr. Didani sends a text message to me.  It says

22   "Stupid F," the F word.

23   Q.   Okay.  And did you respond to that?

24   A.   I responded, "Crazy."

25   Q.   In box what?

 1   A.   In box 528.

 2   Q.   All right.  And 529 does Mr. Didani send you another text

 3   message?

 4   A.   "LOL."

 5   Q.   And what's the date of that?

 6   A.   The date on that is 9-23, 2020.

 7   Q.   At the bottom of 68-27, box 530, can you identify what that

 8   is?

 9           THE COURT:  I'm sorry.  Tell me that number again, 68

10    point ...

11           MR. McDONALD:  This is box 530 on 68-27.

12           THE COURT:  Okay.  68-27, all right.

13           THE WITNESS:  The text message from me to Mr. Didani.

14    It says, "The China man never called."

15   BY MR. McDONALD:

16   Q.   Who is the China man?

17   A.   The guy that was supposed to -- I guess the guy or the

18   service that was supposed to give me the deposit.

19   Q.   The cash deposit?

20   A.   Correct.

21   Q.   Can you turn to 68-28, and specifically can you look at box

22   533.  Do you recognize that?

23   A.   Box 533?

24   Q.   Yes.

25   A.   It says, "I lost millions yesterday."

1   Q.   Is that a chat from you to Mr. Didani or --

2   A.   It's a chat from Mr. Didani to me.

3   Q.   And what's the date?

4   A.   9-23, 2020.

5   Q.   Turning to the next page, 68-29, starting with box 559.

6   A.   Do you want me to read that?

7   Q.   Is that a chat -- who's that a chat from?

8   A.   It's a chat from Mr. Didani to me.

9   Q.   And what does Mr. Didani tell you?

10  A.   "Man, I'm dealing with all king bull for 2 days"  --

11  "bullshit for 2 days."

12  Q.   Okay.  And the following message, box 60?

13  A.   Box 60, another text message he sends to me, "Stupid fucks

14  there, bro."

15  Q.   Okay.  And the date again on 560?

16  A.   9-23.

17  Q.   All right.  Can you look at 561, the next box down.

18  A.   561, text message from Mr. Didani to me.

19  Q.   Date?

20  A.   Date, 9-23, 2020.

21  Q.   What does Mr. Didani tell you?

22  A.   "Use system of phones I never approved."

23  Q.   Now, Mr. Didani thus far has sent you an article about drug

24  trafficking; correct?

25  A.   Correct.

1    Q.   And said that he lost millions?

2    A.   Correct.

3    Q.   Did you know what any of that was about?

4    A.   No, because I get a lot of messages throughout the day,

5    different people trying to buy properties, constant messages,

6    constant messages.  So, if it's not really referring to any

7    type of real estate or deal transaction, most of the time I

8    just delete it, because I have my phone at my house.  You know,

9    little kids look at it, you know, my wife looks at it.  So I

10   end up deleting most of the time.

11   Q.   Okay.  Can you look at 68-30.

12   A.   68-30.

13   Q.   In the first box, 562.  You don't have to say that word,

14   but ...

15   A.   562.

16   Q.   What is 562?

17   A.   562, text message from Mr. Didani to me.

18   Q.   And what does Mr. Didani say?

19   A.   "Cock suckers."

20   Q.   All right.  Did you respond to that?

21   A.   "Crazy."  I responded "crazy."

22   Q.   And that's box 563?

23   A.   563.  Correct.

24   Q.   And then does Mr. Didani -- after you say "crazy" does

25   Mr. Didani respond?

1   A.   "Now they have a big bill with me."

2   Q.   And the date?

3   A.   The date, 9-23, 2020.

4         MR. McDONALD:  May we have one moment, your Honor?

5         THE COURT:  You may.

6         (Briefly off the record.)

7         MR. McDONALD:  Thank you.

8   BY MR. McDONALD:

9   Q.   You said, Mr. Meskouris, for the last -- in 564, "Now they

10  have a big bill with me"?

11  A.   He sends a text message to me saying, "Now they have a bill

12  with me."

13  Q.   And how do you respond, or do you respond?

14  A.   I responded, "laughing out loud."

15  Q.   Why would you laugh out loud when someone says --

16  A.   I just -- like it's like ha-ha-ha, like you're sending me

17  this, okay.

18  Q.   Just wait until I ask the question.

19  A.   Okay.  No problem.

20  Q.   Because again, the court reporter --

21  A.   I understand.  You're right.  I get it.

22         THE COURT:  Go again, Mr. McDonald.

23         MR. McDONALD:  I will.

24  BY MR. McDONALD:

25  Q.   Why would you say "LOL" when Mr. Didani said, "They have a

1    big bill with me"?

2    A.   Just like a text message thing like, yeah, okay.

3    Q.   Now, on 566, the following message, can you identify that?

4    A.   566, I send a message to Mr. Didani, "Be careful with this

5    phone, it's a business line, used for real estate."

6    Q.   All right.  Why did you send that?

7    A.   I send that because I'm noticing like the text messages

8    have nothing to do with what we're talking about.  So I'm kind

9    of like in an indirect way, like a friendly way, saying like

10   hey, stop sending me this stuff.

11   Q.   I want you to turn to 68-34.  And the very top can you

12   identify what box that is?

13   A.   68-34?

14   Q.   Correct.

15   A.   578, "I hate losing like that."

16   Q.   Who said that, you or him?

17   A.   He sent that message to me.

18   Q.   And what was the date of that?

19   A.   9-23, 2020.

20   Q.   Okay.  And did you respond?

21   A.   I responded, "Crazy, man."

22   Q.   And in 580 can you identify the next message?

23   A.   Mr. Dildani writes to me, "I don't mind losing, bro."

24   Q.   The date?

25   A.   The date, 9-23, 2020.

1   Q.   And then the final message on that sheet, box 581?

2   A.   581, sent from Mr. Didani to me.

3   Q.   And what does Mr. Didani tell you?

4   A.   "But they were using system police broke in."

5   Q.   Can you turn the page to 68-35, and box 582, and can you

6   identify what that is?

7   A.   582 he sends a message to me, "I ask 100 times, they say

8   no."

9   Q.   Does Mr. Didani send you a text at 583?

10  A.   583, "They never use."

11  Q.   And then finally in 574, can you identify what that is?

12  A.   584, he sends another message, "Look at this shit now."

13  Q.   Okay.  Now, finally I want to ask you about 68-37.  Can you

14  turn to there.  And looking at box 655 can you identify what

15  that is?

16  A.   Box 655 he sends a message to me, "On phones we have

17  different names."

18  Q.   All right.  At some point on this page do you respond to

19  Mr. Didani?

20  A.   I wrote, "LOL."

21  Q.   All right.  And then looking at box 658?

22  A.   658, I send a message to him, "The guys never contacted me

23  today."

24  Q.   What guys?

25  A.   Waiting for the deposit for the real estate transaction.

1    Q.  All right.  Did you send him a subsequent message after you

2    told him the guys didn't contact you today?

3    A.  Repeat that one more time.

4    Q.  After you told Mr. Didani in 658 that guys never contacted

5    you today did you send him another message in 659?

6    A.  Yes.  I wrote, "I will wait another two more hours."

7    Q.  All right.  What date is that?

8    A.  9-23, 2020.

9    Q.  Now, does there come a point in time that you do receive a

10   phone call from somebody related to the cash down payment?

11   A.  Yes, there was.

12   Q.  And do you know when that would have been?

13   A.  The date, if you ask me exact date, I'm not going to

14   remember.

15   Q.  All right.  Timeframe, like how long after this you were

16   talking here on September 23, 2020, how long --

17   A.  I would say maybe weeks, couple of weeks.

18   Q.  Okay.

19   A.  Week or two.

20   Q.  And when that person contacted you what did the person say?

21   A.  What did the person say?

22   Q.  Yes.

23   A.  The person had a -- like a heavy accent, and they said

24   somebody's going to contact you, give them like an address

25   where to meet at.  They gave me like an address where to meet.

1   Q.   And were you, in fact, contacted by another person?

2   A.   Yes.

3   Q.   And what was the nature of those phone calls?

4   A.   We're going to meet.  They gave me a location where to meet

5   for the deposit.

6   Q.   All right.  And a date?

7   A.   Hmm?

8   Q.   And a date and time or --

9   A.   Date and time, yes.

10  Q.   So they gave you a date, time and location to do what?

11  A.   For them to meet for the deposit for the property.

12  Q.   Did you, in fact, meet somebody and receive cash?

13  A.   Yes, I did.

14  Q.   Where did you meet them?

15  A.   I met them -- the exact location?

16  Q.   Yes.

17  A.   It was a location in New York, Queens, New York.

18  Q.   What type of location?

19  A.   A CVS parking lot.

20  Q.   And when you met -- how many times did you meet with a

21  person at the CVS?

22  A.   Three times.

23  Q.   And how many times did those people give you money?

24  A.   Three times.

25  Q.   And what was this money again for?

54

```
 1    A.   This money was for the good faith payment for the deposit
 2    of the property in Dominican Republic, Cap Cana.
 3    Q.   A good faith payment by whom?
 4    A.   By Mr. Ylli Didani.
 5    Q.   All right.  Now, when you met with the person in the CVS
 6    parking lot, can you tell us about what happens?  Why don't you
 7    start with the first time.
 8    A.   So basically it was -- remember, it was, you know,
 9    coronavirus time.  Everybody was wearing masks and stuff like
10    that.  So I was waiting in the parking lot and a car came.  I
11    showed them the dollar bill, and they just gave me a deposit
12    and they left.
13    Q.   How did they give you the deposit?
14    A.   Like a bag, you know, like some kind of like duffle bag,
15    wrapped up.  It was money inside.
16    Q.   Can you describe the person that you met with?
17    A.   Well, they had -- female, Hispanic.
18    Q.   All right.  And you said you met three times.  Did you meet
19    with a person on three times in the same day or a different
20    day?
21    A.   Different days.
22    Q.   Okay.  And each time did you meet with the same female,
23    Hispanic person?
24    A.   Yes.
25    Q.   When you received the first payment, did you know how much
```

1    money you received?

2    A.   I just looked at the number.  I don't remember exactly what

3    the number was.  It was like written on there somewhere.

4    Q.   Okay.  And you ultimately meet a second time?

5    A.   Yes.

6    Q.   Same location?

7    A.   Same location.

8    Q.   All right.  Do you remember if it was that day or another

9    day?

10   A.   It was another day.

11   Q.   Okay.  Are you sure it was another day?

12   A.   I'm not a hundred percent positive.

13   Q.   All right.  And each time -- strike that.

14         What did you provide this Hispanic female each time

15   you met with them?

16   A.   The dollar bill with the number on it.

17   Q.   A different dollar bill?

18   A.   Yeah.

19   Q.   Do you know how much cash you received in total?

20   A.   Total was about 203,000.

21   Q.   Did you ever count it?

22   A.   No.

23   Q.   How do you know it was 203,000?

24   A.   I remember the numbers, when they were adding up the

25   numbers.  I can't count that anyways.

```
 1    Q.   After the three transactions did you receive a call from
 2    anyone?
 3    A.   Yes.
 4    Q.   And --
 5              THE COURT:  Okay.  Let's start there after a break,
 6    okay.  The jury may step down.
 7              Please rise for the jury.
 8              (The jury left the courtroom at 11:13 a.m.)
 9              THE COURT:  Okay.  Let's take a ten-minute break.  The
10    jury needed a break so we're going to take a break.
11              You may step down, sir, but don't discuss your
12    testimony with anyone, please.  We're in recess.
13              (At 11:14 a.m., a brief recess was taken.
14              Back on the record at 11:37 a.m.)
15              LAW CLERK:  All rise.  The Court is back in session.
16              THE COURT:  I think we can have your -- oh, your
17    witness is back already, okay.
18              Have the jury come out, please.
19              LAW CLERK:  All rise for the jury.
20              (The jury entered the courtroom at 11:38 a.m.)
21              THE COURT:  Okay.  Thank you.  I'm satisfied the
22    jurors are present.  What about you, Mr. McDonald?
23              MR. McDONALD:  I'm satisfied, your Honor.
24              THE COURT:  Okay.  Mr. Fink?
25              MR. FINK:  Yes, Judge.
```

```
 1              THE COURT:  Okay.  Very well.  You're still under
 2   oath, sir.  You're continuing under oath.
 3              THE WITNESS:  I don't know --
 4              THE COURT:  I'm not going to swear you in again, but
 5   you are still under oath; okay?
 6              THE WITNESS:  Okay.
 7              THE COURT:  All right.  You may continue your direct.
 8              MR. McDONALD:  Thank you.
 9   BY MR. McDONALD:
10   Q.  Mr. Meskouris, when we last left off, I asked you if you
11   received a call from anyone after the three transactions at
12   CVS?
13   A.  Yes.
14   Q.  And who did you receive a call from?
15   A.  I received a call from Mr. Didani.  We just kept continuing
16   conversation.
17   Q.  Did you ever receive a call from any of the individuals who
18   brought the money?
19   A.  Yes.  Somebody called me from a number, like looked like an
20   overseas number I remember at the time.
21   Q.  Did you talk to that person?
22   A.  He just -- he, I guess, confirmed was everything okay, are
23   we going to continue to do this.  I was like I have no idea.  I
24   pretty much stopped it by then.
25   Q.  Okay.  Now, did you ever have -- I asked you this earlier.
```

1    I asked you if you ever personally met Mr. Didani?

2    A.   Yes, I have.

3    Q.   All right.  And where did you meet Mr. Didani?

4    A.   In Dominican Republic.

5    Q.   When was that?

6    A.   When?

7    Q.   Yes.  When?

8    A.   I don't have the exact date.

9    Q.   Okay.  Well, was it before or after you received the money?

10   A.   After.

11   Q.   All right.  And why did you go meet Mr. Didani in the

12   Dominican Republic?

13   A.   I brought the paperwork for the properties with me

14   basically to show like, you know, good faith, like here's the

15   ownership of the properties, you know, the deeds and the

16   corporation paperwork and some surveys.  I had them in New York

17   at the time.  He was in Dominican Republic.  So I met him out

18   there to show him like, you know, proof like, here, this is

19   what you're buying.

20   Q.   How long were you in the Dominican Republic?

21   A.   One day.

22   Q.   Did you, in fact, meet with Mr. Didani on that day?

23   A.   Yes.

24   Q.   And where did you meet with him?

25   A.   At a restaurant.

1    Q.   And what was -- and what happened during that meeting?

2    A.   So he was at a restaurant in the capital, Santo Domingo.

3    He gave me the address.  I went there, we spoke, showed him the

4    paperwork, and 20, 30 minutes later I left.

5    Q.   All right.  Now, I want to ask you about the chat again,

6    but before I do so do you ever remember receiving anything from

7    Mr. Didani about cars?

8    A.   Say that one more time.

9    Q.   Do you remember receiving any chats from Mr. Didani about

10   cars?

11   A.   Chats?

12   Q.   Chats.

13   A.   Yes, yes.

14   Q.   And what did he send you?

15   A.   He would send me photos of like, you know, like fancy cars.

16   Q.   Okay.  I want you to turn to 68-40.  Do you recognize --

17   A.   68-40?

18   Q.   Yes.  Specifically on box 763.

19   A.   763.  I'm looking at that.

20   Q.   All right.  And what is this?

21   A.   That's a message from Mr. Didani to me, and it's a photo of

22   a -- like a button and a car.

23   Q.   Are you sure it was a photo or could it have been a video?

24   A.   Could have been a video at the time.

25   Q.   Did you watch that video?

1    A.   That video I watched, yes.

2    Q.   And can you describe the video that you watched?

3    A.   It was a video of a truck, Mercedes truck.  And basically

4    it had like buttons on it that you could press and like secret

5    compartments popped open all over the place on the car.

6              MR. McDONALD:  Move for admission of 68.7.

7              THE COURT:  Any objection?

8              MR. FINK:  No objection, your Honor.

9              THE COURT:  68.7 is admitted.

10             (Government's Exhibit 68.7 admitted into evidence.)

11             MR. McDONALD:  May I publish 30 seconds of that video

12   for the jury?

13             THE COURT:  How long is the total?

14             MR. McDONALD:  I think the total is maybe 50 seconds,

15   but I don't need to show the whole thing.

16             THE COURT:  Okay.  You may.

17             (Video is played.)

18             MR. McDONALD:  For the record, the video is going in

19   and out again.  It appears to be a similar problem we've had

20   before.

21             Can you try again, Ms. DiCarlo.

22             (Video is played.)

23   BY MR. McDONALD:

24   Q.   I know that video went in and out, but was this the video

25   that you saw?

1    A.   Yes.

2    Q.   Now, looking at 68-40, does -- after Mr. Didani sends you

3    this video of this car, does he send you any additional

4    pictures or video?

5    A.   After this video he sends me another video it looks like or

6    photo.

7    Q.   And then turning to 68-41, I want you to look specifically

8    at box 766.  And can you tell us what that is?

9    A.   766?

10   Q.   Yes.

11   A.   It's a message from Mr. Didani to me at 9-23, 2020,

12   7:08 p.m.  "This is all mine."

13   Q.   "This all mine"?

14   A.   "This all mine," yes.

15   Q.   And does he send you a following message right after that?

16   A.   Yes.  Number 767, he sends me another message.

17   Q.   What's the date of that message?

18   A.   9-2, 2020, 7:08.

19   Q.   What does he tell you there?

20   A.   "Bulletproof."

21   Q.   All right.  Now, I want to direct your attention generally

22   to March of 2021.  During that timeframe did you meet with

23   agents from the DEA, March of 2021?

24   A.   You mean when this message over here are you talking about?

25   Q.   No.

1            THE COURT:  Wait.  Let's have the whole question all
2     at once in a minute.
3    BY MR. McDONALD:
4    Q.  My question is in March of 2021, did you have an occasion
5    to meet with federal agents in New York?
6    A.  Yes.
7    Q.  All right.  And at that time was there a search warrant
8    executed at your home?
9    A.  Yes.
10   Q.  All right.  And did you still have the money that you
11   received from Mr. Didani?
12   A.  Yes.
13   Q.  What did you do with that money during that timeframe?
14   A.  I gave it to the agents.
15   Q.  You gave it to the agents?
16   A.  Correct.
17   Q.  And did you at that point agree to cooperate in this
18   investigation?
19   A.  Yes, I did.
20   Q.  Did you have an interview with me and other agents?
21   A.  Yes, I did.
22   Q.  Did you do so under something called a proffer agreement?
23   A.  Yes, I did.
24   Q.  What was your understanding of that proffer agreement?
25   A.  Basically I explained everything to the agency from start

1    to finish, and everything I said that was truthful, and if I

2    didn't lie basically that was the whole agreement.

3    Q.   Okay.  And after that meeting did you have an opportunity

4    to receive a phone number from anyone?

5    A.   Say that again.

6    Q.   After that meeting, did you have an opportunity to get a

7    phone number from somebody, or a phone?

8    A.   Yes, a phone.  Yes, I did.

9    Q.   And who gave you that?

10   A.   Brandon.

11   Q.   Brandon who?  Do you know --

12   A.   Leach, a DEA Agent.

13   Q.   Brandon Leach?

14   A.   I think that was his name.  Brandon gave me the telephone

15   number.

16   Q.   And what did you do -- what was the purpose of him giving

17   that phone?

18   A.   Use this phone.

19   Q.   To do what?

20   A.   To communicate from now on moving forward.

21   Q.   To communicate with who?

22   A.   Mr. Didani.

23   Q.   I want you to turn to Exhibit number 69.0 and tell me if

24   you recognize that?

25   A.   69 what?

1   Q.   Point zero.

2   A.   Okay.

3   Q.   Do you recognize what that is?

4   A.   Yes.  This is the telephone number that Brandon gave me to

5   use.

6   Q.   And 69.0, though, as a whole, what is it?  What is the --

7   A.   It's a text message to Mr. Didani's telephone number.

8   Q.   From the number Mr. Leach gave you -- or Agent Leach gave

9   you?

10  A.   Correct.

11  Q.   Okay.  And when is the first message?

12  A.   The first message was sent 3-5, 2021.

13  Q.   All right.  Can you turn to the very last page, which is

14  69-37.  Can you tell us what the last message is?

15  A.   I'm on 69-37.

16  Q.   Right.  And what's the date of the last message?

17  A.   The last message was 3-30, 2021 at 1:19 p.m.

18       MR. McDONALD:  Move for admission of Exhibit 69.0.

19       THE COURT:  Any objection?

20       MR. FINK:  No objection.

21       THE COURT:  Very well.  It's admitted.

22       (Government's Exhibit 69.0 admitted into evidence.)

23  BY MR. McDONALD:

24  Q.   So, Mr. Meskouris, in March of 2021, this is the way you

25  were communicating -- was this the way you were communicating

1   with Mr. Didani?

2   A.   Yes, it was.

3   Q.   Were you still communicating with him on your other phone?

4   A.   No.

5   Q.   I want you to turn to 69-2121.

6          THE COURT:  I'm sorry.  Tell me.  69 dash what?

7          MR. McDONALD:  21.

8          THE COURT:  21, okay.

9   BY MR. McDONALD:

10  Q.   Do you recognize that?

11  A.   69-21.

12  Q.   Yes, in box 251.  Do you recognize what that is?

13  A.   251.  It looks like a message from Mr. Didani's phone to my

14  phone.

15  Q.   Okay.  And does Mr. Didani send anything to you at that

16  time?

17  A.   It looks like attachments.

18  Q.   All right.  Have you ever heard any audio messages sent to

19  Mr. Didani?

20  A.   Yes.

21  Q.   By Mr. Didani to you?

22  A.   Yes.

23         MR. McDONALD:  All right.  At this point I move to

24  admit 69.4.

25         THE COURT:  Any objection to 69.4?

```
 1                 Mr. Fink and Mr. Didani, please move the mic away from
 2      you when you're whispering at the table, okay.
 3                 MR. FINK:  No objection, your Honor.
 4                 THE COURT:  It's admitted as 69.4.
 5                 (Government's Exhibit 69.4 admitted into evidence.)
 6                 MR. McDONALD:  May I publish 69.4 for the jury?
 7                 THE COURT:  You may.
 8                 (Audio is played.)
 9      BY MR. McDONALD:
10      Q.  Mr. Meskouris, do you recognize the voice in that audio
11      message?
12      A.  Yes.
13      Q.  And whose voice is that?
14      A.  Mr. Didani's voice.
15      Q.  After Mr. Didani sends you that audio message do you reply?
16      A.  Yes.
17      Q.  And can you look at box 252.
18      A.  Yes.
19      Q.  And what's the date of that message?
20      A.  3-23, 2021, 10:01 a.m.
21      Q.  Let me back up for a second.  When Mr. Didani sent you that
22      audio file, what date did he send that to you?
23      A.  3-23, 8:16 a.m.
24      Q.  3-23 of what year?
25      A.  2021.
```

1    Q.   Okay.  Now, you said that you responded to his audio

2    message.  What did you say in box 252?

3    A.   In box 252, 3-23, 2021, 10:01 a.m. I wrote, "Take a

4    vacation, come to New York, get your doctor's appointment, then

5    go to Florida and relax a little."

6         MR. McDONALD:  And could you highlight the bottom box,

7    252.

8    BY MR. McDONALD:

9    Q.   It said, "Take a vacation, come to New York, get your

10   doctor's appointment and go to Florida, relax a little"; is

11   that right?

12   A.   Yes, that's correct.

13   Q.   Can you turn the Page to 69-22.  And can you identify the

14   box in 253?

15   A.   253?

16   Q.   Yes.

17   A.   A message from Mr. Didani to my phone.

18   Q.   On what date?

19   A.   3-23.

20   Q.   Of what year?

21   A.   2021.

22   Q.   And what does he say?

23   A.   "I have two, bro."

24   Q.   All right.  And then the following page, 254.

25   A.   254?

1    Q.   Yes.

2    A.   Text message from Mr. Didani's phone to my phone, 3-23,

3    2021, 10:03 a.m.

4    Q.   And what does Mr. Didani tell you here?

5    A.   "I thought I was gone to relax then boom the Sky ECC to

6    hell."

7            MR. McDONALD:  I'm sorry, your Honor.  May I have one

8    second?

9            (Briefly off the record.)

10   BY MR. McDONALD:

11   Q.   The next page, 69-24, in box 256, can you describe that?

12   A.   Box 256, Mr. Didani sends a message.

13   Q.   To you on what day?

14   A.   On 3-23, 2021, 10:03 a.m.

15   Q.   And what does he say?

16   A.   "More problems."  Looks like problems.

17   Q.   Okay.  And it says -- when it says -- does it say the word

18   "problem"?

19   A.   It doesn't say the word "problems."

20           MR. FINK:  We're on 255; right?

21           MR. McDONALD:  We're on --

22           THE COURT:  256, I thought.

23           MR. McDONALD:  255.

24           THE COURT:  255?

25           MR. McDONALD:  I may have misspoke.

```
 1              THE COURT:  Yes.  You said 256, I believe, but, okay,
 2    255.  And now it says what?  Is the date right, 3-23-21 at
 3    10:03?
 4              MR. McDONALD:  Yes.
 5              THE COURT:  Okay.  The question is does it say
 6    "problems"?
 7    BY MR. McDONALD:
 8    Q.  Does it say the word "problems"?
 9    A.  It does not say the word "problems."
10    Q.  What does it say?
11    A.  It says, "More prbl."
12    Q.  Okay.  And what do you take that to mean?
13    A.  Problems, probability.  I don't know.  It looks like
14    "problems."
15    Q.  I want you to turn to 69-26 and box 257.
16    A.  Box 257?
17    Q.  Yes.
18    A.  Mr. Didani sends a message, 3-23, 2021, 10:03 a.m.
19    Q.  Okay.  What does he say?
20    A.  "Crazy shit."
21    Q.  Do you respond to that message?
22    A.  Yes, I did.
23    Q.  And is that in box 258?
24    A.  Yes.
25    Q.  What do you say?
```

1    A.    "Wow."

2    Q.    What date is that?

3    A.    3-23, 2021.

4    Q.    Turning to the next page, 69-27.

5          THE COURT:   69 ...

6    BY MR. McDONALD:

7    Q.    Dash 27, box 259.

8    A.    Yes, 259.

9    Q.    Yeah.  Can you identify what that is?

10   A.    It's a text message from Mr. Didani to my new telephone

11   number, 3 -- the date is 3-23, 2021, 10:03 a.m.

12   Q.    Okay.  That's a message from you to Mr. Didani?

13   A.    Yeah.

14   Q.    All right.  And what do you say?

15   A.    "That's crazy shit.  I Googled it."

16   Q.    Read it again.

17   A.    "That's crazy.  I googled it."

18   Q.    Okay.  Moving to the next page, 69-28, box 260, can you

19   identify what that is?

20   A.    Yes.  It's a message from Didani's phone to mine, 3-23,

21   2021, 10:04 a.m.  It reads, "Yes, bro.

22   Q.    Do you respond to Mr. Didani in 261?

23   A.    Yes, I responded.

24   Q.    And what do you say?

25   A.    "It's all over the internet."

 1   Q.   All right.  And I'm looking at both 69-29 and 69-30.  Did

 2   Mr. Didani respond?

 3   A.   69-29?

 4   Q.   Yes.

 5   A.   Box 262.  Mr. Didani sends a message to me at 3-23, 2021,

 6   10:04 --

 7   Q.   You don't have to say the words if you're not comfortable.

 8   A.   "Fucked yo."

 9   Q.   Okay.  And 69-30?

10   A.   69-30.  Mr. Didani sends a message.

11   Q.   All right.  What does it say?

12   A.   "Up."

13   Q.   Okay.  And finally on 69-31 -- well, maybe not finally, but

14   on 69-31 do you recognize box 264?

15   A.   Yes.

16   Q.   And what is that?

17   A.   This is Didani sends a message, "I'm sick of my stomach."

18   Q.   Okay.  And does he send another message right after that on

19   Page 69-32?

20   A.   Yes.

21   Q.   What does he say?

22   A.   "No one knows what the fuck is going on."

23   Q.   All right.  Now, finally I want to show you 69-33 in the

24   top box, 274.  What is that?

25   A.   274?  It's a message from Mr. Didani to my new phone.  The

```
 1    date is 3-25, 2021.
 2    Q.   And does Mr. Didani send anything in that message?
 3    A.   Yes.  He sends -- it looks like some kind of attachment.
 4    Q.   All right.  Have you heard the audio files before?
 5    A.   Yes.
 6    Q.   In this chat?
 7    A.   Yes.
 8    Q.   Do you know whether or not this is an audio file?
 9    A.   Do I know if this is an audio file?
10    Q.   Yes.
11    A.   No, I don't know if it's an audio file or not.  I just see
12    attachments over here.
13    Q.   Did Mr. Didani ever send you an audio file regarding the
14    Government getting smarter?
15    A.   Yes.
16    Q.   Have you ever listened to that?
17    A.   Yes.
18         MR. McDONALD:  All right.  And move for admission of
19    69.5.
20         THE COURT:  Any objection?
21         MR. FINK:  I don't think I know offhand what this is,
22    Mr. McDonald.  I'm sorry.
23         THE COURT:  69 point -- what is it again, 69 what, 33?
24         MR. McDONALD:  This is 69.5.
25         THE COURT:  Okay.
```

```
 1              MR. FINK:  I know what it is now, Judge.  No
 2   objection.
 3              THE COURT:  And 69.5, is that the audio file?
 4              MR. McDONALD:  Yes, it is, your Honor.
 5              THE COURT:  Okay.
 6              MR. McDONALD:  May I publish that to the jury?
 7              THE COURT:  You don't have any objection?
 8              MR. FINK:  I now -- I realize what it is now, Judge,
 9   and I have no objection.
10              THE COURT:  All right.  It's admitted and, yes, you
11   may publish it to the jury.
12              (Government's Exhibit 69.5 admitted into evidence.)
13              (Audio is played.)
14   BY MR. McDONALD:
15   Q.  Now, finally, I just want to ask you about this piece of
16   property in the Dominican Republic.  Did you ever send sell it
17   to Mr. Didani?
18   A.  No, I never sold it to him.
19   Q.  All right.  Did you sell it to someone else?
20   A.  Yes.
21   Q.  And when did you sell it to someone else?
22   A.  About a year later.
23              MR. McDONALD:  May I have one moment?  Your Honor, may
24   I have one moment?
25              THE COURT:  Yes.
```

```
 1              MR. McDONALD:  Thank you.

 2              (Briefly off the record.)

 3              MR. McDONALD:  Thank you.  No other questions.

 4              THE COURT:  Do you want to cross-examine?

 5              MR. FINK:  Yes, your Honor.

 6              THE COURT:  Okay.  My jury is okay?  Yes?  Is that a

 7    yes from everyone?

 8              JURORS:  (Collectively) Yes.

 9              THE COURT:  Okay.  Great.  Thank you.

10              MR. FINK:  Your Honor, I'm just going to need one

11    minute to get set up here.  Sorry.

12              THE COURT:  Okay.  No problem.

13                          CROSS-EXAMINATION

14    BY MR. FINK:

15    Q.  Mr. Meskouris, my name is Wade Fink.  I represent

16    Mr. Didani.  I'm going to ask you some questions as well.

17              Mr. Meskouris, you -- your background is -- in

18    addition to just real estate you have other professional

19    pursuits; is that correct?

20    A.  Yes.

21    Q.  Your family owns a restaurant a business; is that accurate?

22    A.  Yes.

23    Q.  A pretty popular burger joint; right?

24    A.  Yes.

25    Q.  You're doing financially well; right?
```

1    A.   Yes.

2    Q.   Is the first time, correct me if I'm wrong, that you became

3    aware of a problem with your relationship with Mr. Didani was

4    when you were stopped at the airport in December of 2020?

5    A.   Repeat that?

6    Q.   Do you have any awareness of problems in your relationship

7    with Mr. Didani, law enforcement, legal, otherwise, prior to

8    your being stopped at the JFK airport in December of 2020?

9    A.   I don't understand what that means.

10   Q.   Well, you testified on direct examination that, you know,

11   you tried to focus on just the real estate deal.  Is that an

12   accurate characterization?

13   A.   Yes.

14   Q.   And you would ignore some messages that may or may not have

15   been suggestive of legally precarious messages?  Do you

16   remember that?

17   A.   Yes.

18   Q.   Sorry.  Do you remember that?

19   A.   Yes.

20   Q.   I think at one point you said something about, you know,

21   you would get rid of those messages because your kids might see

22   your phone or something like that.  Do you remember that?

23   A.   Yes.

24   Q.   Now, I'm asking if your awareness of any legal issues with

25   this case or any problems that might arise from your

1  relationship with Mr. Didani, did that first come to the

2  forefront of your mind when law enforcement stopped you at the

3  airport or did you have an earlier realization?

4  A.  No.

5  Q.  No, that wasn't the first time?

6  A.  No.

7  Q.  Tell me what you mean by that.  When did you --

8  A.  No.  That's what I mean, no.

9  Q.  I heard you say no.  Now I'm asking you at what point did

10  you become aware that there may be some legal problems with

11  your relationship --

12  A.  When I was approached by law enforcement.

13  Q.  And when was the first time you were approached by law

14  enforcement?

15  A.  I don't know the exact date.  You could check on the

16  paperwork.

17  Q.  Was the first time you were approached by law enforcement

18  in December of -- well, let me ask you this:

19        Were you stopped at the airport in December of 2020?

20  A.  Yes.

21  Q.  The JFK airport returning from Dominican Republic?

22  A.  Routine stuff like, you know, when you go through Customs.

23  Q.  Is that what you were told, it was routine?

24  A.  No.  That's what I'm just assuming like, you know, when you

25  go through Customs, like routine stuff when you go through the

1    screening and you take your shoes off, that type of stuff.

2    Q.   At the time did you believe it to be a routine stop?

3    A.   Yeah.

4    Q.   You believe it to be routine now or related to this case?

5    A.   Routine, because people -- they do that like randomly.

6    Q.   Do you remember being asked about your trip to the

7    Dominican Republic when you were stopped in December of 2020?

8    A.   Yes.

9    Q.   Do you remember telling law enforcement that you went there

10   to pick up baby gifts from your in-laws?

11   A.   No, I don't remember that.  It could have been --

12          THE COURT:  One second, Mr. --

13          THE WITNESS:  I could have been picking up baby gifts.

14   It's not a --

15          THE COURT:  One second.

16          (Briefly off the record.)

17          THE COURT:  Okay.  Go ahead.  I'm sorry.  What's your

18    question again?

19   BY MR. FINK:

20   Q.   Mr. Meskouris, in December of 2020, when you were stopped

21   at the airport at JFK returning from Dominican Republic, the

22   question I just asked you is if you recall being asked about

23   your trip to Dominican Republic, and you said yes; correct?

24   A.   I don't understand what you're saying.

25   Q.   Okay.  I'll--

1   A.   Asking me when I went to Dominican Republic?

2   Q.   I'll chop it up for you and we'll go through it piece by

3   piece.

4   A.   Exactly.

5   Q.   In December of 2020, you traveled to the Dominican

6   Republic; is that correct?

7   A.   Going to Dominican Republic you're talking about?

8   Q.   I'm sorry?

9   A.   You're talking about when I was going to Dominican

10  Republic?

11  Q.   In December of 2020, you went from New York to Dominican

12  Republic; is that correct?

13  A.   That's correct.

14  Q.   And at some point you returned from the Dominican Republic;

15  is that correct?

16  A.   Yes, that's correct.

17  Q.   And you entered JFK airport; right?

18  A.   Correct.

19  Q.   And you were stopped by law enforcement for an inspection

20  or interview of some kind; correct?

21  A.   Routine inspection, yes.

22  Q.   You're calling it routine, because that was your

23  observation; correct?

24  A.   Correct, unless you know something else.  I don't know.

25  Q.   Oh, I do.

1    A.   Okay.

2    Q.   Now, did they ask you about your trip to the Dominican

3    Republic?

4    A.   I don't remember what they asked me.

5    Q.   So you don't recall telling them that the purpose of your

6    trip was to get baby gifts for your pregnant wife?

7    A.   I could have said that, yeah.  That sounds normal.

8    Q.   That sounds right?

9    A.   Yeah.

10   Q.   Is that what you did on that trip?

11   A.   I did that also, yes.

12   Q.   Did you have baby gifts in your luggage?

13   A.   Yes.

14   Q.   What were they?

15   A.   I don't remember exactly.  I get baby gifts for my in-laws

16   all the time.

17   Q.   And you made no mention of your meeting with Mr. Didani;

18   correct?

19   A.   No.

20   Q.   The next interaction with law enforcement, correct me if

21   I'm wrong, was March of 2021; is that accurate?

22   A.   Yes.

23   Q.   And that's when law enforcement executed a search warrant

24   at 127 Beverly Road; is that accurate?

25   A.   Yes.

1    Q.   That's where your parents live?

2    A.   Yes.

3    Q.   And at the time, correct me if I'm wrong, you lived about

4    walking distance, around the corner from your parents in a

5    similar neighborhood; right?

6    A.   Yes.

7    Q.   And that was 332 Warwick; right?

8    A.   Yes.

9    Q.   You came into that search at your parents' house when it

10   was already in progress; is that an accurate statement?

11   A.   I don't know how long they were there before I got there.

12   Q.   Do you remember your dad called you?

13   A.   Yes.

14   Q.   And you came over to his house; right?

15   A.   No.  They came to my house where I was at first, and then

16   we went over together.

17   Q.   Do you recall going over to 127 Beverly Road?

18   A.   With the agents, yes, I do.

19   Q.   So when your father called you to tell you the agents were

20   at his home it's your testimony that the agents then went to

21   your house?

22   A.   They were already at my house.

23   Q.   You didn't come over to 127 Beverly?

24   A.   I did.

25   Q.   With the agents?

```
 1   A.   Yes.
 2   Q.   Did they search your house or did they --
 3   A.   They did.  I gave them permission to search it.
 4             THE COURT:  The Warwick address?
 5             THE WITNESS:  They searched the Warwick address.  They
 6    asked me for my permission.  I said, yeah, go ahead.
 7             THE COURT:  Okay.
 8   BY MR. FINK:
 9   Q.   If Agent Leach, who was one of the agents who conducted the
10   search warrant at your house, wrote that you arrived for your
11   first interaction of law enforcement by walking on foot to
12   127 Beverly, that's contrary to your memory?
13   A.   Yes.
14   Q.   You don't recall having a conversation outside of your
15   parents' house where agents were explaining to you that they
16   were conducting a search of your parents' house?
17   A.   Yes.
18   Q.   You do recall that?
19   A.   Conversation?
20   Q.   Yeah.
21   A.   Yes, I remember having a conversation.
22   Q.   But your contention is that this was after they had come to
23   your house?
24   A.   Correct.
25   Q.   Do you recall telling agents in this conversation that the
```

1   property they were searching at 127 Beverly was a home owned by

2   your father?

3   A.   Yes.

4   Q.   At some point did the agents explain to you that you were

5   the subject of their investigation?

6   A.   Yes.

7   Q.   And they asked you specifically if you had accepted any

8   cash payments from an Ylli Didani.  Do you remember that

9   question?

10  A.   I don't remember.

11  Q.   Do you want to see the agent's report?  Will that help

12  refresh your recollection?

13  A.   Yes, it can help.  Let's see it.

14          MR. FINK:  Judge, may I approach with my computer,

15  which I just showed the report that I'm referring to to the

16  Government?

17          THE COURT:  Yes, you may.

18          MR. FINK:  Thank you.

19          THE COURT:  Do you have any objection?

20          MR. McDONALD:  I don't have any objection, no.  Thank

21   you.

22          THE COURT:  Okay.

23  BY MR. FINK:

24  Q.   Mr. Meskouris, I'm going to --

25  A.   Yeah, sure.

 1    Q.   Mr. Meskouris, excuse me.  What I'm going to show you on my

 2    computer here, and paragraph 5 is what I'm going to point out

 3    to you.  Forgive me.  This doesn't sit well on the stand.

 4    Paragraph 5 is what I'm going to point out to you.  I'll stand

 5    close by, but I'd like you to read paragraph 5 and tell me if

 6    that refreshes your recollection as to your conversation.  It's

 7    lengthy and onto the next page.  So if you need my help

 8    scrolling with two fingers here let me know.

 9    A.   Yeah, I got it.  Let me just read it.

10    Q.   Sure.

11             THE COURT:  Stay close by.

12             MR. FINK:  You got it, Judge.

13             (Briefly off the record.)

14             THE WITNESS:  Do you want me to read this whole thing?

15    BY MR. FINK:

16    Q.   Just paragraph 5.

17    A.   Oh.

18    Q.   I'm sorry.

19    A.   Yeah, sorry.  I was just scanning through it.

20             Do you want me to read it out loud?

21    Q.   No.  I just want --

22    A.   Yeah, I have an idea.

23    Q.   -- you to read paragraph 5 to yourself.

24    A.   Okay.

25    Q.   Does that kind of jog your memory as to the conversation

1    you had with agents?

2    A.   Yes, it's pretty accurate.

3    Q.   It refreshes your recollection?

4    A.   Yes.

5    Q.   Okay.  Then I'm going to repeat.  The prior question is do

6    you remember them asking you if you had accepted cash, a cash

7    payment from Ylli Didani?

8    A.   I don't remember them asking me.  I'm reading it now, but I

9    don't remember them asking me.  I'm sure they did if it's in

10   the report.

11   Q.   Okay.  And do you remember answering the agents that, no,

12   you had not accepted cash from him?

13   A.   I don't remember that, but if it's in the report then it's

14   in the report.

15   Q.   So if Agent Leach says that's what you said, you don't

16   dispute it, you just don't have an independent recollection?

17   A.   I just don't remember.  You know, it was a tough time those

18   years during coronavirus years.  I had a lot on my mind.

19   Q.   Sure.

20   A.   The baby was just born three days before.

21   Q.   Sure.

22   A.   My wife just had a C-section.  So it was a little

23   overwhelming.

24   Q.   Sure.  To the extent that that is what you said to Agent

25   Leach who wrote it in his report, that would not be true;

1    correct?

2    A.   Say that again.

3    Q.   To the extent you told Agent Leach that you had not

4    received a cash payment from Mr. Didani or in connection with

5    Mr. Didani, your testimony would have to be today that that

6    wasn't true at the time; correct?

7    A.   I don't understand what you're asking.

8    Q.   Agent Leach alleges that you told him you had not received

9    a cash payment from Ylli Didani or associated with Ylli Didani

10   by March of 2021.  Would you agree with me that that's what

11   Agent Leach wrote?

12   A.   I'm agreeing that he wrote that, yeah.  I'm reading it just

13   like you.

14   Q.   Okay.  And, if that's his allegation, that would not have

15   been a true statement by you; correct?

16   A.   Correct.

17   Q.   When did you receive a cash payment that you allege was

18   associated with Ylli Didani, approximately?

19   A.   You have to check the date over here.  I don't have --

20   Q.   Summer of 2020?

21   A.   Whatever the date says on paper.

22   Q.   Okay.  Prior to you being raided by law enforcement?

23   A.   Prior, yes.

24   Q.   Okay.  So you lied to officers if indeed that's what you

25   said?

1    A.   If you're saying I lied, then I lied.

2    Q.   In fact, Agent Leach -- actually, it might have been Agent

3    Hermans sitting at this table.  Does he look familiar, Agent

4    Hermans?

5    A.   Yes, he does.

6    Q.   Okay.  He was there, too, do you remember that?

7    A.   Yeah.

8    Q.   And he warned you that lying to federal agents is a crime.

9    Do you remember that?

10   A.   Um-hmm.

11   Q.   And they asked you again did you get a cash payment in

12   association with Ylli Didani, and you said no.  Do you remember

13   that?

14   A.   Yes.

15   Q.   Now you do remember?

16   A.   Yeah.

17   Q.   Okay.  I appreciate your honesty.

18   A.   Thank you.

19   Q.   At the time you're being interviewed, they're searching

20   your parents' home; is that correct?

21   A.   Yes.

22   Q.   And they're about to search your home; right?

23   A.   No.  They already searched my home.

24   Q.   Oh, that's right.  Your contention is that they --

25   A.   You remember?

1   Q.   I understand.

2   A.   I told you that, right.

3   Q.   That's your memory, yes.  I do remember you saying that.

4   A.   I told you that, that they searched my home.  I gave them

5   permission to search my home.

6   Q.   You told me that your memory is that you gave them

7   permission to search your home, and I know they searched your

8   home.  I'm asking you the sequence.  And my understanding,

9   correct me if I'm wrong, is you believe they searched your home

10  before they spoke to you at your parents' house; right?

11  A.   They searched my home when they came to my house.  They

12  came to my house.  They searched my home.  I gave them

13  permission.  Then we walked over to my parents' house.

14  Q.   It's unimportant the agents recited differently.  But

15  nevertheless, the point is at some point you're observing your

16  parents' home being searched; correct?

17  A.   Correct.

18  Q.   Were you aware that your father had been dispossessed of

19  his firearm?

20  A.   No.

21  Q.   Were you aware that they were asked to stand to the side

22  while the search was conducted?

23  A.   Okay.

24  Q.   Were you?

25  A.   Yes, okay.  That's my --

1   Q.   The question is yes or no, were you aware of that?

2   A.   I was there, yeah, of course.

3   Q.   So the answer is yes?

4   A.   Yes.

5   Q.   This really isn't a trick.  It's a yes or no.

6   A.   No.

7   Q.   Would you like me to use a different tone?  Would that help

8   you to answer?

9            THE COURT:  Go to a new question.

10           THE WITNESS:  I just don't understand what you're

11   really asking.  You have a report.  You're reading a report;

12   right?

13  BY MR. FINK:

14  Q.   My job is to ask you questions, and your job is to answer

15  them truthfully.

16  A.   You're answering them.

17  Q.   All right.  When they searched your home, Mr. Meskouris,

18  your two children were home; correct?

19  A.   Yes.

20  Q.   Your wife?

21  A.   Yes.

22  Q.   How old were your children at the time?

23  A.   My daughter was just born.  She was four days old.  And my

24  son was about a year old.

25  Q.   You had just moved into that house; is that accurate?

1    A.   Yes.

2    Q.   I think you purchased it -- I don't know if you closed on

3    it, but you purchased it within months of that search warrant;

4    right?

5    A.   Yes.

6    Q.   Was this a jarring experience, was it, having your home

7    searched?

8    A.   Yes, it was.

9    Q.   Mr. Meskouris, you have a very established reputation in

10   the real estate world, do you not?

11   A.   Yes.

12   Q.   Do you recall Business Matters, UK's leading magazine,

13   interviewing you?

14   A.   It sounds familiar.

15   Q.   It sounds familiar?

16   A.   Um-hmm.

17   Q.   If I showed it to you, would you recognize it?

18   A.   Yeah, put it up.

19           MR. FINK:   Judge, I'm going to mark this as

20   Defendant's AA, starting over.

21           THE COURT:   Okay.   The Government has seen it?

22           MR. FINK:   They will momentarily, your Honor.

23           THE COURT:   Okay.

24           MR. McDONALD:   I've never seen this.   Can I take an

25   opportunity to read it, your Honor.

```
 1            THE COURT:  Yes.  How long is it?
 2            MR. McDONALD:  It looks like about a page and a half.
 3            THE COURT:  Okay.
 4            (Briefly off the record.)
 5            THE COURT:  Did you have a chance?
 6            MR. McDONALD:  I've had a chance to review it.  I have
 7   no objection.
 8            THE COURT:  All right.  Are you asking that it be
 9   admitted?
10            MR. FINK:  Judge, I'd just like to present it to him
11   first.
12            THE COURT:  Okay.
13   BY MR. FINK:
14   Q.  Mr. Meskouris, this is marked as Defendant's AA.  Take a
15   second to look at it.  Do you remember this article and this
16   interview?  The first page.  There's front and back, too.
17   A.  I'm just looking at it.
18   Q.  No, just take your time.
19   A.  Go ahead.  What's your question with this?
20   Q.  Well, first question is do you remember that article?
21   A.  So this article was done by like a media company that just
22   puts out articles.  You can get promotion on the internet.
23   Q.  Okay.  That's good to know.
24   A.  Yeah.
25   Q.  So you do remember it?
```

```
1   A.   I remember a lot of stuff, because I have different

2   marketing people.  The title looks the same.  I don't remember

3   what it says word for word.

4   Q.   But you gave an interview consistent --

5   A.   No, I didn't give an interview to anybody.

6   Q.   Are those your words that are answers to the questions --

7   A.   It's just like marketing people put it together so you can

8   get promotion on the internet.

9   Q.   So those aren't your actual answers?

10  A.   No.

11  Q.   So when you publicize this, this is for purposes of getting

12  business?

13  A.   Correct.

14  Q.   And the answers you're giving to the questions are just --

15  A.   Yeah, mostly --

16  Q.   Excuse me.  Excuse me.  Are attributed to you, but aren't

17  your actual words?

18  A.   Correct.  This is it just like real estate.

19  Q.   Okay.  Thank you.  So you're expecting people to call you

20  for business and leading them to believe that this is your

21  philosophical belief, but you disallow them?  You don't know

22  what --

23  A.   I didn't even read this to tell you the truth.

24  Q.   So you put this out in the Marketing Ether and hope people

25  call you, but have no idea what it says?
```

92

1    A.   Pretty much.

2          MR. FINK:  Okay.  May I retrieve that, please?

3          THE COURT:  Yes.

4    BY MR. FINK:

5    Q.   Do you care about your reputation in the real estate world?

6    A.   Yes.

7    Q.   I would imagine that to be the case, if you're hiring a

8    marketing company it's important to you to be publicizing and

9    presenting as a professional; correct?

10   A.   Yes.

11         MR. FINK:  Judge, I'm going to mark what I'm about to

12   show as BB, and the Government has seen it.

13         THE COURT:  Okay.

14   BY MR. FINK:

15   Q.   Mr. Meskouris, I'm going to show you another article from

16   Turk of America Business and Lifestyle.

17         MR. FINK:  May I approach, your Honor?

18         THE COURT:  Yes.

19         THE WITNESS:  Yes.

20   BY MR. FINK:

21   Q.   Mr. Meskouris, do you recognize that?

22   A.   Yes.

23   Q.   What is it?

24   A.   It's an article talking about the restaurant business.

25   This I was actually interviewed with the Turkish magazine.

1   Q.  And this is about the restaurant business that you and your

2   family are in; correct?

3   A.  Correct.

4   Q.  The burger restaurants?

5   A.  1950 style American diners.

6   Q.  And this interview is just about the success and the nature

7   of the family business and things of that nature; correct?

8   A.  Correct.

9   Q.  A profile for lack of a --

10  A.  About 1950as memorabilia, restoration, keeping old things

11  up to date.

12  Q.  Is that restaurant still in operation?

13  A.  Yes.

14  Q.  Is it franchised or ...

15  A.  What's your question?

16  Q.  Are there franchises of that restaurant?

17  A.  No.

18  Q.  Are there more than one location?

19  A.  Yes.

20  Q.  And doing interviews like that is good for the business

21  reputation and the family's business; correct?

22  A.  Correct.

23          MR. FINK:  May I retrieve that, Judge?

24          THE COURT:  You may.

25

1   BY MR. FINK:

2   Q.   Mr. Meskouris, with the efforts that you put into your

3   marketing and reputation and in preserving your family's

4   legacy, you would agree with me that a newspaper report about

5   an indictment for being a money launderer would not be helpful

6   to that effort; correct?

7   A.   A hundred percent.

8   Q.   And it would be your goal to avoid that sort of press

9   and/or not only publicly, but with your family; correct?

10  A.   Of course.

11  Q.   After the search warrants were executed, I know you may not

12  remember the exact date, but on March 3 of 2021, I don't think

13  the Government will dispute that, do you recall the following

14  day or if it was the same day, correct me if I'm wrong, going

15  into an office to talk to agents and a prosecutor?

16  A.   Yes.

17  Q.   Do you remember if it was the same day or the next day?

18  A.   I think it was -- it could have the same day or the next

19  day.  I'm not sure.

20  Q.   I actually don't know the answer to that.  So it could have

21  been the same day or might have been the next day; correct?

22  That's what you said?

23  A.   Yes.

24          MR. FINK:  Judge, I'm marking the proffer agreement

25  that was alluded to by the Government as Defendant's CC.

 1                THE COURT:  Okay.

 2                MR. FINK:  May I show it to him?

 3                THE COURT:  Yes.

 4   BY MR. FINK:

 5   Q.   Mr. Meskouris, do you recognize this letter?  And you can

 6   take your time.

 7   A.   Give me a minute.  I'm not a speed reader over here.

 8                Yeah, I remember this agreement.

 9   Q.   Okay.  And this is what Mr. McDonald was referring to on

10   your direct examination as a proffer agreement.  Do you recall

11   that?

12   A.   Yes.

13   Q.   And it's addressed to your lawyer, Aaron Shapiro; is that

14   accurate?

15   A.   Yes.

16   Q.   And, if you go to the last page, it appears to be signed by

17   you on March 3 of 2021; is that correct?

18   A.   That's correct.

19   Q.   And that date would suggest that this interview was the

20   same day; right?

21   A.   Correct.

22   Q.   As the execution of the search warrant?

23   A.   Um-hmm -- yes.

24   Q.   It's not dated by your counsel; correct?

25   A.   Correct.

1    Q.   But do you recall discussing it with him?

2    A.   Yes.

3    Q.   And you started to explain what your understanding of a

4    proffer agreement was when you were talking to Mr. McDonald a

5    few moments ago.  Do you remember that?

6    A.   Yes.

7    Q.   And you said your understanding was that the agreement was

8    you needed to be truthful; right?

9    A.   Correct.

10   Q.   And about your involvement or lack thereof?

11   A.   Correct.

12   Q.   In exchange for that, what did you get in return?

13   A.   Exchange for what?

14   Q.   For being honest.

15   A.   Nothing.

16            What did I get?

17   Q.   I'm asking you.

18   A.   Nothing.

19   Q.   Do you hope not to be charged?

20   A.   I didn't do anything wrong.  What did I do?

21   Q.   So I'm not here to answer questions.  This is how it works

22   is I'm going to ask you a question and you're going to answer

23   them if you can, right.  And my question to you is did you hope

24   by telling the truth that you would not be charged with a

25   crime?

```
 1    A.   I just told the truth.
 2              THE COURT:  His question is whether or not you hoped
 3    by telling the truth that you would not be charged.  Is that
 4    the question?
 5              THE WITNESS:  I didn't believe that I was in a crime.
 6    I just told the truth from day one.
 7              THE COURT:  Go to your next question.
 8    BY MR. FINK:
 9    Q.   Are you aware that the Government thought you committed a
10    crime?
11    A.   No.
12    Q.   Did the Government tell you anything along the lines of
13    "Meskouris' ability and willingness to assist Didani in
14    laundering these funds through corporate real estate purchases
15    through third-party investors in bulk currency pickups from
16    Chinese money couriers" made you a suspect?  Did they ever
17    discuss that with you?
18    A.   Now that you're reading it the way you're reading, it
19    sounds like it, yeah, but at the time I didn't think I was
20    doing anything wrong.
21    Q.   Mr. Meskouris, I really am not trying to catch you or be
22    controversial.
23    A.   No, I understand.
24    Q.   You had DEA agents show up at your house; correct?
25    A.   I understand, yes.
```

1   Q.   And you had young children when the search warrant was
2   being executed; right?
3   A.   Correct.
4   Q.   And you to find out that there's allegations and suspicions
5   against Mr. Didani; right?
6   A.   Correct.
7   Q.   And when you're talking to agents the first time you tell
8   them "I never received cash from Mr. Didani"; right?
9   A.   Um-hmm.
10  Q.   And that wasn't true?
11  A.   Correct.  I was caught off --
12  Q.   You were told that lying to federal agents was a crime;
13  right?
14  A.   I was caught off guard at the moment.
15  Q.   I don't blame you.
16  A.   Everything went fast, so I made a mistake.
17  Q.   I don't blame you.
18  A.   That was my biggest mistake.
19  Q.   I don't blame you.  That's a fine way to explain it.  All
20  I'm trying to establish is by cooperating with law enforcement
21  and talking to them the same day, your hope was you would not
22  get in trouble; correct?
23  A.   Yes, that's correct.
24  Q.   And that's still your hope today; right?
25  A.   Correct.

```
 1   Q.   Have you been charged?

 2   A.   No.

 3   Q.   Has the Government indicated that you will likely -- will

 4   not likely be charged?

 5   A.   No.

 6   Q.   You've never asked the Government's attorneys what the

 7   likelihood of you getting in trouble is?

 8   A.   No.  I just figured if I was going to go charged I would

 9   have been charged already.

10   Q.   You never asked your lawyer to ask the Government what they

11   were considering charging you?

12   A.   No.  I was never charged.

13   Q.   I understand that.  I'm asking you if you've ever had a

14   conversation about whether you'd be charged?

15   A.   With who?

16   Q.   With the prosecutors or your lawyer.  Not your

17   conversations directly with your lawyer, but asking your lawyer

18   to talk to the Government for you?

19   A.   No.  My lawyer just talked to them the first time, the

20   first day, and that was it.

21   Q.   After your proffer interview, which we'll go back to in a

22   little bit -- well, let me ask you this:

23            Are you aware that in February of 2021 you were being

24   surveilled by the Drug Enforcement agency?

25   A.   Am I aware?
```

1    Q.   Yes.  Are you aware that --

2    A.   Now I'm aware.

3    Q.   You're now aware that they were following you?

4    A.   No, I don't know if they were following me.  I was never

5    aware of that.

6    Q.   They make you aware of any GPS tracker or anything like

7    that?

8    A.   No, nothing.

9    Q.   They didn't tell you they were following you in New York?

10   A.   They could have mentioned it.  I don't remember.  I'm sure

11   they were.

12   Q.   After that interview under the proffer --

13          MR. FINK:  Judge, I neglected.  Can we admit

14   Defendant's CC, the proffer agreement?

15          THE COURT:  Any objection?

16          MR. McDONALD:  No objection.

17          THE COURT:  It's admitted.

18          (Defendant's Exhibit CC admitted into evidence.)

19   BY MR. FINK:

20   Q.   After that proffer interview, Mr. Meskouris, correct me if

21   I'm wrong, Detective Leach asked you to take a phone; is that

22   accurate?

23          THE COURT:  Take a what?

24   BY MR. FINK:

25   Q.   A phone, a cellular phone; right?

1    A.   Yes.

2    Q.   One that he provided to you?

3    A.   Yes.

4    Q.   He asked you to be a source of information; correct?

5    A.   Yes.

6    Q.   In exchange for being a source of information and using

7    that phone to contact Didani, what did Detective Leach tell you

8    you would get in exchange?

9    A.   Nothing.

10   Q.   He just said take this phone and use this to contact

11   Didani?

12   A.   To use this, so I used it.

13   Q.   You said, okay, no problem?

14           UNIDENTIFIED FEMALE:  That's not (indiscernible)

15           MR. FINK:  Did I hear something?

16           THE COURT:  Yes, I did, but I don't know who it was.

17           No?  Was it back there?

18           MR. FINK:  I have no idea.  I heard somebody say

19    something.

20           UNIDENTIFIED MALE:  Yes, your Honor.

21           MR. FINK:  I believe it was the lady in the --

22           THE COURT:  Okay.  All right.

23           MR. FINK:  Do you want to give an instruction, Judge?

24           THE COURT:  Yeah.  You can't talk out loud, okay.

25           All right.

```
 1              MR. FINK:  May we approach, Judge?

 2              THE COURT:  Yeah.

 3              (At 12:36 p.m., sidebar on the record, out of the

 4              hearing of the jury, as follows:)

 5              MR. FINK:  Just for your own edification, that's his

 6   wife, so ...

 7              THE COURT:  Oh.

 8              MR. FINK:  I don't know what was said.

 9              THE COURT:  I thought she had been talking, and so I

10   told Annie to approach her, but I don't think she

11   (Indiscernible) And she asked for security to pay attention to

12   her.

13              MR. FINK:  Okay.  I mean, I just wanted you to know

14   who it was, that's all.

15              THE COURT:  Okay.  I didn't know.

16              MR. FINK:  For fear if there's any future issue or

17   whatever.

18              THE COURT:  Wait a minute.  Let's see what Annie says.

19              LAW CLERK:  She does not have a device on her.

20              THE COURT:  And so she's just been talking out loud?

21              MR. BILKOVIC:  Will you just remind her that she

22   cannot make any statements in court.

23              MR. FINK:  Thank you.

24              (End of sidebar.)

25              THE COURT:  Okay.  The lady in back, you can't make
```

1    any statements out loud in court.  And you have been making

2    some, which I asked them to check on why you were doing that.

3    So don't make any, because, you know, the Court has the right

4    to exclude people who are disruptive, all right.

5         MR. McDONALD:  If appears that a juror is also waving

6    his hand.

7         THE COURT:  And what is the juror?  Starving?

8         JUROR:  No.  I'm sorry.  I just have to use the

9    restroom.  I'm sorry.

10         THE COURT:  How much more do you have of this witness?

11         MR. FINK:  Enough where there should be a break.

12         THE COURT:  Maybe we should go to lunch.  What do you

13    think?  Yeah?  Okay.

14         So please rise for the jury, and go to the restaurant

15    and to lunch.  How about that?

16         (The jury left the courtroom at 12:38 p.m.)

17         THE COURT:  Does your witness know not to leave the

18    building or to come back in an hour?

19         MR. McDONALD:  We will instruct him.

20         MR. BILKOVIC:  We'll make sure.  He uses the restroom

21    frequently.  He probably went to the restroom.

22         THE COURT:  So let's take a break now.  It's what,

23    12:40?  Come back in an hour.

24         Okay.  See you then.  Thank you.

25         DEFENDANT DIDANI:  Thank you, your Honor.

 1              (At 12:39 p.m., a lunch recess was taken.

 2              Back on the record at 1:54 p.m.)

 3              LAW CLERK:  All rise.  Court is back in session.

 4              THE COURT:  Okay.  Are you ready to proceed?

 5              MR. McDONALD:  The Government is ready, your Honor.

 6              MR. FINK:  Defense is ready.

 7              THE COURT:  The witness may step back up to the stand,

 8    please.

 9              LAW CLERK:  All rise for the jury.

10              (The jury entered the courtroom at 1:55 p.m.)

11              THE COURT:  Okay.  Good afternoon.

12              Are you satisfied the jurors are present and in their

13    proper seats?

14              MR. McDONALD:  Yes, I am, your Honor.

15              MR. FINK:  Yes, your Honor.

16              THE COURT:  Okay.  Very good.  You may all be seated.

17              You're still under oath, sir.  You may continue.

18              MR. FINK:  Thank you, Judge.

19    BY MR. FINK:

20    Q.  Mr. Meskouris, when we broke for lunch, we were discussing

21    your interview that you gave to the Government, two interviews

22    on March 23rd, March 3, 2021.  Do you recall that discussion

23    with me?

24    A.  Yes.

25    Q.  Okay.  And there was a discussion you had actually outside

 1  of your parents' home; right?

 2  A.   Yes.

 3  Q.   And then there was a discussion, which we are deducing, you

 4  and I, from the date of that letter occurred on the same day at

 5  a government office, too; right?

 6  A.   Yes.

 7  Q.   Okay.  And do you remember some agents being present in

 8  that interview; correct?

 9  A.   Correct.

10  Q.   Okay.  And you remember the U.S. Attorney who did your

11  direct examination today, Mr. McDonald, he was present as well;

12  correct?

13  A.   Yes.

14  Q.   Okay.  And we looked at what was Defendant's CC.  I think

15  you should still have it up there, the proffer agreement.  You

16  see that; right?

17  A.   Yeah, I'm looking at it.

18  Q.   Okay.  And generally speaking, correct me if I'm wrong --

19  and you're welcome to take a look at the provisions.  The jury

20  has seen one of these before, so I'm not going to put it up on

21  the screen, but take your time if you need it.  The proffer

22  agreement provides for the information that you give to the

23  Government to not be used against you under certain

24  circumstances; is that accurate?

25  A.   Yes.

1    Q.   Is that your understanding of what the agreement was?

2    A.   Yes.

3    Q.   In other words, if you're truthful, among other things,

4    right, the Government wouldn't use what you tell them against

5    you, your words in a case against you; correct?

6    A.   Correct.

7    Q.   But that didn't preclude the Government -- and if you need

8    me to point you to it, I'm happy to discuss it with you, but I

9    want to know your understanding, that didn't preclude the

10   Government from derivative use of the information you're giving

11   them.  In other words, they could go find the information, they

12   just couldn't use your words.  Did you understand that?

13   A.   No.  Could you repeat what you said.

14   Q.   Sure.  I'd like you to look at Defendant's CC.

15   A.   Looking at this agreement?

16   Q.   Yeah.  I'm sorry.  It's the letter in front of you that's

17   addressed to Aaron Shapiro.

18   A.   Yeah.

19   Q.   It's labeled Defendant's CC.  I want you to look --

20   A.   CC?

21   Q.   That's the label for the Court.

22   A.   Oh, I'm sorry.

23   Q.   Don't worry.  That's my fault for --

24   A.   Okay.  No problem.

25   Q.   I want to direct your attention to Page 3 and 4, and it's

1  going to be in the little B.  It's above 9.  So it's Section

2  8-B.  It says "Derivative use of information."

3         Do you see that?

4  A.  Yes.

5  Q.  And it says, "There's no restriction on this office's use

6  of any evidence derived directly or indirectly from your

7  client's," and that's referring to you, "proffer statements."

8         Do you see that?

9  A.  Yes.

10 Q.  Did you know what that meant?

11 A.  No, not really.

12 Q.  Okay.  Do you understand that the derivative use means that

13 while they may not be able to use your words against you, they

14 can use other evidence to prove a case against you?  Do you

15 understand that?

16 A.  Now I'm understanding it.

17 Q.  But you didn't really understand it at the time?

18 A.  No.

19 Q.  Was your purpose in entering the proffer agreement with the

20 Government to be able to tell them the truth, but also protect

21 yourself?

22 A.  To tell the truth, yes.

23 Q.  But you also wanted some protection in return for what you

24 told them?

25 A.  Of course, yes.

1    Q.   I'm sorry?

2    A.   Yes.

3    Q.   So the idea was I'm going to tell them the information I

4    have, and in exchange those words will be protected; right?

5    A.   Yes.

6    Q.   Because obviously you don't want to incriminate yourself

7    and then be charged with a crime; correct?

8    A.   Correct.

9    Q.   Okay.  And you're here today to testify; correct?

10   A.   Correct.

11   Q.   And you don't have, at least to your knowledge, do you have

12   any agreement with the Government that they won't prosecute

13   you?

14   A.   No.

15   Q.   By showing up and telling the truth do you anticipate that

16   they will not prosecute you?

17   A.   Yes.

18   Q.   And that's because in the statement you're obligated to

19   tell the truth, and you think if you tell the truth they'll

20   follow through and not charge you; correct?

21   A.   Correct.

22   Q.   Now, Mr. Meskouris, I kind of touched on this in direct,

23   but I want wanted to follow up and clarify something, because I

24   don't know if I was clear.  The Government pointed out some

25   messages to you that were suggestive of unlawful conduct sent

1    to you by Mr. Didani.  Do you remember that?

2    A.   Could you repeat that one more time.

3    Q.   Sure.  Let me repeat it better.  Do you remember some

4    messages being pointed out to you on direct exam about losing

5    11 million dollars?

6    A.   Yes.

7    Q.   And an article about drugs being seized in a foreign place?

8    A.   Yes.

9    Q.   And the suggestion was that you were reading those

10   messages.  Do you remember that discussion during your direct

11   examination?

12   A.   Yes.

13   Q.   And one of the things you said was that -- I think you

14   responded something like "crazy" in one of them.  Do you

15   remember that?

16   A.   Yes.

17   Q.   And you said that you weren't necessarily reading the

18   messages, you would just delete them and give some generic

19   response; right?

20   A.   Correct.

21   Q.   I might be paraphrasing you, but generally speaking?

22   A.   Correct.

23   Q.   And one of the reasons you gave was, you know, your kids

24   might read it, for example?

25   A.   Correct.

1   Q.   Okay.  Now, what I want to point out, Mr. Meskouris, is

2   Mr. McDonald then asked you if you saw a car video; correct?

3   A.   Yes.

4   Q.   And you remember seeing that; right?

5   A.   Yes.

6   Q.   And you were able to identify it for them; right?

7   A.   Yes.

8   Q.   He put it on the screen and said, Mr. Meskouris, do you

9   recognize this video; right?

10  A.   Yes.

11  Q.   And obviously Mr. McDonald had some purpose of putting that

12  on the screen and he wanted to see if you remembered; right?

13  A.   Yes.

14  Q.   And you obliged and said, yes, I remember?

15  A.   Yes.

16  Q.   At the end of your proffer interview with the Government on

17  March 3 of 2021, this is I think when we started our break, was

18  it that day that you were given a cell phone from Detective

19  Leach?

20  A.   Yes.

21  Q.   He had it on him at the end of that interview?

22  A.   I believe so, yeah.

23  Q.   Okay.  And what was his explanation for what he expected

24  you to do?

25  A.   What do you mean his explanation?

1    Q.   So he --

2    A.   Basically he just --

3    Q.   -- hands you a cell phone; right?

4    A.   Yes.  I understand how --

5    Q.   And what were his instructions?  I mean, what did he tell

6    you?

7    A.   Use his phone for communications with Mr. Dildani (ph).

8    Q.   Okay.  And when you're saying the name of my client how are

9    you spelling it in your head, best guess?

10   A.   Maybe I'm pronouncing it wrong.

11   Q.   That's okay.

12   A.   Didani, D-I-D-L-A-N-I.  I don't know if there's an L in

13   there.  I'm not sure.

14   Q.   This is not a gotcha.  I just want to understand --

15   A.   No, no.  Excuse me if I'm pronouncing the name wrong.

16   Q.   You're completely excused, and there's no harm in it.  I

17   just want to clarify how well you know it or him.

18          Mr. Meskouris, so the instruction was use this to

19    contact Didani.  Was there any other instruction from Detective

20    Leach?

21   A.   Use it to contact him and -- what else was there?

22   Q.   I mean, was there some explanation for like here's what I'd

23   like you to discuss or not discuss, here's what you'd like to

24   follow up with us, those kind of things?

25   A.   Use this phone for all communications with him moving

1    forward.

2    Q.   They didn't tell you cease talking to him; right?

3    A.   No.

4    Q.   In fact, they encouraged you to keep talking to him; right?

5    A.   Correct.

6    Q.   Do you know that they identified you as a confidential

7    source?

8    A.   Say that again?

9    Q.   Do you know they identified you at that time as a

10   confidential source?

11   A.   What does that mean?

12   Q.   I'm asking you if you ever knew that?

13   A.   What does a confidential source mean exactly?

14   Q.   By you asking me that question, I presume your answer is

15   no, they didn't tell you you were identified as a confidential

16   source?

17   A.   What does that mean, a confidential source?

18   Q.   If you don't know what it means, they didn't tell you you

19   were labeled that; right?

20   A.   I don't know really know what that means.

21   Q.   Have you ever heard that phrase before?

22   A.   I've heard it, but I don't know the exact definition.

23   Q.   Do you recall anyone in this case saying you are going to

24   be a confidential source?

25   A.   I don't know.  Just explain to me what that means exactly?

```
 1   Q.  See, I get why you're asking, and I know you're trying to
 2   be precise and truthful.  I'm asking you a question, because if
 3   the answer is I don't know what that is or I don't remember,
 4   that's an okay answer, but I'm not going to answer the
 5   questions.
 6   A.  I don't remember.
 7   Q.  I think Judge would tell you that.
 8   A.  I don't remember.
 9          THE COURT:  He's not going to answer any questions.
10    Just answer his --
11          THE WITNESS:  No, I don't remember exactly what that
12    means.
13   BY MR. FINK:
14   Q.  That's a perfectly fine answer.  You don't remember being
15   told that; correct?
16   A.  No.
17   Q.  Okay.  Were you ever told by law enforcement that you would
18   be working for them in some way to assist them?
19   A.  Yes.
20   Q.  Okay.  And what was that explanation or what did they say
21   in that regard?
22   A.  Basically use this phone moving forward.  And they directed
23   me with a bank account.  Moving forward, if any transactions go
24   through, use this bank account to deposit any money in.
25   Q.  So, in other words, if there was going to be further
```

 1    contact or financial transactions, the Government wanted you to

 2    use a certain device and a certain bank account; correct?

 3    A.   Correct.

 4    Q.   Okay.  Now, did the Government tell you here's how we want

 5    you to follow up with us?  Did they give you any instruction

 6    for how to inform them of what was going on in the future?

 7    A.   We were in pretty much communication, constant

 8    communication.

 9    Q.   When you say "we," the pronoun "we" --

10    A.   Right.  I was mostly dealing with Brandon.

11    Q.   Okay.  That's Brandon Leach?

12    A.   Correct.

13    Q.   Okay.  And this was March 3 of 2021.  And, if I tell you my

14    client was arrested on March 31st of 2021, it's over a period

15    of then several weeks; is that accurate?

16    A.   Yes.

17    Q.   Because I believe, correct me if I'm wrong, you told

18    Brandon Leach that after his arrest there had been no more

19    contact; right?

20    A.   Correct.

21    Q.   Okay.  And over those few weeks we saw some of the messages

22    that you had with Mr. Didani; is that accurate?

23    A.   Yes.

24    Q.   Okay.  Now, this property that was being discussed with you

25    on direct examination, that existed?  That was a real property;

1    correct?

2    A.   Correct.

3    Q.   And your family owned it; right?

4    A.   Yes.

5    Q.   And it was a beachfront property in the Dominican Republic;

6    right?

7    A.   Yes.

8    Q.   So you've got a big slab of beach in front and then a space

9    behind it to build a house or a residence of some kind; right?

10   A.   Yes.

11   Q.   The Government showed kind of a slab of that in 68.1.  Do

12   you remember -- not a slab.  That's the wrong term.  A sketch

13   of that.  Do you remember that?

14   A.   Yes.

15   Q.   Okay.  There became an issue at some point, and I'm not

16   asking you to pinpoint the exact timeframe.  I might be in a

17   different point here in March of 2021.  But there became a

18   point where there was an issue between you and Mr. Didani about

19   the title of the land.  Do you remember that?

20   A.   Yes.

21   Q.   Can you describe for us kind of what the issue was?

22   A.   The issue was that the title that we owned, when we first

23   purchased the price, was some kind of duplicate title.  It

24   wasn't 100 percent clear to be transferred over.  So we were

25   working on clearing the title so when the transfer went through

1    it would be basically like a clean title delivered to

2    Mr. Didani, and then he could -- basically you could do the

3    sale.  You weren't able to do the sale unless the title was

4    completely cleared.  It had some issues on it.

5    Q.  And we're dealing with an island in a foreign country;

6    right?

7    A.  Exactly.

8    Q.  And their Register of Deeds may not be as good as

9    Michigan's or New York's; correct?

10   A.  No.

11   Q.  And you were trying to work on these issues of whether you

12   had clear title to then convey; right?

13   A.  It was -- basically it's a process like the way we go

14   through our closings here.  It's a closing process that they go

15   through over there.  It just takes more longer.

16   Q.  And Mr. Didani expressed some concerns; right?

17   A.  Yes.

18   Q.  And you responded with what you know you thought this

19   situation and how it would be resolved; right?

20   A.  Correct.

21   Q.  And then you both had attorneys; right?

22   A.  Correct.

23   Q.  They were both Dominican attorneys; right?

24   A.  Correct.

25   Q.  And they were both working on this title issue; correct?

1   A.   I gather they were working on it, yes.

2   Q.   And your intention was to close this, even though it never

3   came to fruition, was to close this deal, was it not?

4   A.   Yes.

5   Q.   And it was to do it the right way; right?

6   A.   Correct.

7   Q.   It certainly wouldn't have involved lawyers in a deal that

8   you thought was somehow unlawful; right?

9   A.   Say that it again.

10  Q.   You wouldn't have involved lawyers in a deal that you

11  thought you needed to keep quiet; right?

12  A.   Every real estate deal requires attorneys.

13  Q.   Would you have included your attorneys in a deal you knew

14  to be using the unlawful proceeds of drugs?

15  A.   No, I wouldn't have never done that.  No.

16  Q.   Right.  That's what I'm asking.

17  A.   No, no, no.

18  Q.   This was a legitimate deal to you, was it not?

19  A.   A hundred percent.

20  Q.   Do you recall a discussion about this property not being in

21  Mr. Didani's name?

22  A.   Repeat that.

23  Q.   Do you recall a discussion about this property being

24  transferred to a entity or someone that wasn't in Mr. Didani's

25  name?

1    A.   Yes, that was a concern.

2    Q.   And there was a discussion about potentially putting that

3    in a corporate entity of some kind?

4    A.   Yes.

5    Q.   That's not uncommon in real estate, is it?

6    A.   No.

7    Q.   In fact, some people own residential homes in the name of a

8    corporate entity here in the United States, do they not?

9    A.   That's correct.

10   Q.   And there's dozens, if not more, legitimate reasons in your

11   experience to do that; right?

12   A.   That's correct.

13   Q.   Now, there were some things that you called unusual about

14   this transaction; is that accurate?

15   A.   What things are you talking about?

16   Q.   Well, in your direct examination, Mr. McDonald asked you

17   about, for example, the cash aspects of the transaction.  I

18   believe you used the word "unusual"; is that accurate?

19   A.   Yes, correct.

20   Q.   It's true, though, that, correct me if I'm wrong, that

21   Mr. Didani wanted to do this transaction in the Dominican

22   Republic?  Do you recall that, the financial aspect?

23   A.   I don't remember that.

24   Q.   You don't recall answering Mr. Didani that it's better in

25   New York, quote/unquote?  Do you remember that?

1    A.   No.

2              (Briefly off the record.)

3              MR. FINK:  Your Honor, how we did this is the

4    Government, kind of in Exhibit 68, they summarized messages

5    that were relevant to direct.  We also have the raw messages in

6    a separate exhibit.

7              What I propose to do, and I don't think Mr. Bilkovic

8    or Mr. McDonald will object, is I'm going to admit one page,

9    and I can admit this as Defendant's DD.  It's going to be

10   Page 73 of the unredacted WhatsApp messages, and then I will

11   not object if the Government needs to contextualize that

12   message.

13             MR. McDONALD:  I don't have an objection to it.

14             THE COURT:  Okay.  So it's marked DD?

15             MR. FINK:  DD.  And it's an excerpt.

16             THE COURT:  And Page 73 of 68.22?

17             MR. FINK:  You nailed that, Judge.  I didn't even say

18   that.  Thank you very much.  That's exactly right.

19             THE COURT:  It's admitted.

20             (Defendant's Exhibit DD admitted into evidence.)

21             MR. FINK:  May I approach, Judge?

22             THE COURT:  You may.

23   BY MR. FINK:

24   Q.   I'm going to show you, Mr. Meskouris, you probably heard my

25   discussion with the Court, this is an unredacted or untruncated

```
 1    version of the WhatsApp messages.  And I'm particularly
 2    interested in message 288, but I also want you to have some
 3    context.  So feel free to read messages up, beneath or below,
 4    but I'm asking you to refresh your recollection on your
 5    preference of where the money went.  So take your time to
 6    review those messages and let me know if you're refreshed.
 7              And, if you need my assistance, please tell me.  I
 8    know it's on a computer.
 9    A.   No, I understand.  Basically what the messages saying, text
10    messages?
11    Q.   Correct.
12    A.   All right.  What --
13    Q.   I just want you to read it to see if that refreshes your
14    recollection about the destination of the money in that
15    discussion without reading them.  First I want to see if you
16    remember.
17    A.   Okay.  I'm looking at it now.
18    Q.   Okay.  Do you recall -- do you want me to grab it or do you
19    want to --
20    A.   You can take it.  You can take it.
21              MR. FINK:  He was showing me CC, Judge.  I'm going to
22    leave it up there for a moment.
23              THE COURT:  Okay.
24    BY MR. FINK:
25    Q.   Do you recall now a discussion in general about how the
```

1   cash deposit would be paid and where?

2   A.   In the text messages, it says that he could leave a deposit

3   in Dominican Republic or he could leave it in New York.

4   Q.   Exactly.

5   A.   And then -- okay.

6   Q.   Exactly.  Then ultimately you sent a text message, did you

7   not, saying it's better in New York; correct?

8   A.   Yes, because I'm not in Dominican Republic.  I'm just

9   answering you, probably.

10  Q.   I'm not saying it's not practical.  My question is your

11  preference was New York; correct?

12  A.   Correct.

13  Q.   Okay.  Now, the context of what just came up, now that we

14  have established that, was I had asked you about some of the --

15  the word you used on direct examination of "unusual."  And the

16  first thing you said was cash was an unusual part of this

17  transaction; is that accurate?

18  A.   Yes.

19  Q.   Now, when you received -- I'm going to go back to the

20  circumstance of how you received the cash, but after you

21  received the cash in those three payments you described, or

22  three drop-offs as you described, where did you take the money?

23  A.   I took it with me in my car.

24  Q.   And then where?

25  A.   I brought it to my house.

```
 1   Q.   Your parents' house; right?

 2   A.   Yeah.

 3   Q.   Where in your parents' house did you put it?

 4   A.   You really want to know where I put it in my parents'

 5   house?

 6   Q.   Yes.

 7   A.   In a room someplace.

 8   Q.   A safe?

 9   A.   Hidden, hidden.  No.

10   Q.   Hidden?

11   A.   Yeah.

12   Q.   Ordinarily in a real estate transaction, correct me if I'm

13   wrong, I've only closed one, that money goes into escrow, does

14   it not?

15   A.   In an escrow account?

16   Q.   Correct.

17   A.   If it's a rent deposit, yeah, pretty much.

18   Q.   Well, good faith deposit of some kind or even a down

19   payment to show you have funds?

20   A.   In those years it was coronavirus, nothing was open.  There

21   was -- it was -- nothing made sense in the world.

22   Q.   You're jumping to the why and I get it, and --

23   A.   I'm just saying to you --

24   Q.   Hold on.  Hold on.  Hold on.

25   A.   I know what you're trying to do, but I'm just letting you
```

1  know.

2  Q.  Hold on, Mr. Meskouris.  I'm not blaming you for what you

3  did.  First I've just got to establish it was not in a bank

4  account; correct?

5  A.  Correct.

6  Q.  Now, I understand the answer you just gave is the answer to

7  why, and I get it and I'm not accusing you of anything, but

8  that is unusual with regard to real estate transactions,

9  correct, to not put it in a bank account?

10  A.  It is unusual yeah, I would agree.

11  Q.  Now, the balance was going to be paid by wire transfer;

12  correct?

13  A.  Correct.

14  Q.  That, for lack of a better term, would be more usual;

15  correct?

16  A.  A hundred percent.

17  Q.  And you gave Mr. Didani two options for Chase Bank

18  accounts; is that accurate?

19  A.  That's accurate.

20  Q.  And there's a reason you gave Chase Bank accounts.  Do you

21  remember?

22  A.  Yes.

23  Q.  And I think it's because the ownership --

24  A.  It was in Chase, yes, correct.

25  Q.  Correct, exactly.  And those bank accounts, one belonged to

1    your father and one your uncle; right?

2    A.   Yes.

3    Q.   And you didn't have a preference of where the wire went to;

4    is that --

5    A.   It would have been split probably 50/50.

6    Q.   Are they are the ones that actually owned the residence?

7    A.   Yes.

8    Q.   Or it wasn't a residence.  The land?

9    A.   The land.

10   Q.   March 3, 2021, we're back into our proffer session with the

11   Government after the search warrant, okay.  That's what I'm

12   referring to in terms of timeframe.

13   A.   We're back in the office.

14   Q.   We're back in the office, all right.  Do you recall that

15   you had two phones; right?

16   A.   Yes.

17   Q.   Okay.  I don't have offhand the one number, but one started

18   917-741; right?

19   A.   Correct.

20   Q.   And at the end of your proffer session it was either Agent

21   Hermans or Detective Leach asked you if you had that 917-741

22   number phone on you; right?

23   A.   Yes.

24   Q.   And you did not; right?

25   A.   No.

1    Q.   Okay.  In fact, you had left it at one of the burger

2    restaurants; right?

3    A.   Correct.

4    Q.   Okay.  So you took the agents to that burger restaurant;

5    correct?

6    A.   Yes.

7    Q.   Gave them the phone; right?

8    A.   Yes.

9    Q.   And consented to allowing them to dump, or copy, the phone;

10   right?

11   A.   Yes.

12   Q.   Okay.  That ended up being the phone that had all of the

13   messages, the WhatsApp messages with Mr. Didani; is that

14   correct?

15   A.   Yes.

16   Q.   Did you have your other phone with you at the time or the

17   Government was in possession of it?

18   A.   I had my other phone with me at the time.

19   Q.   Okay.

20   A.   They both look exactly the same.

21   Q.   Gotcha.  One for business, one for personal?

22   A.   Yeah, pretty much.  They both -- back and forth.  Both --

23   one's more geared towards real estate mostly, and the other

24   one's kind of like mixed use.

25   Q.   The one you didn't have on your possession was the WhatsApp

1  chat with Mr. Didani; correct?

2  A.   Correct.

3  Q.   Okay.  You ever been to Michigan before?

4  A.   Never.

5  Q.   You ever sell any real estate in Michigan?

6  A.   No.

7  Q.   Ever do any financial transaction with someone in Michigan?

8  A.   No.

9  Q.   Ever send some money to someone in Michigan that you know

10 of?

11 A.   No.

12 Q.   Did you ever engage in a drug conspiracy?

13 A.   No.

14 Q.   Did you ever sell drugs in the state of Michigan?

15 A.   No.

16 Q.   You ever sell drugs at all?

17 A.   No.

18 Q.   Did you ever see drugs when you were with Mr. Didani?

19 A.   No.

20 Q.   Did he ever ask you to sell drugs for him?

21 A.   Never.

22 Q.   Did he ever ask you to invest in a drug cartel?

23 A.   Never.

24 Q.   It would be ridiculous for the Government to accuse you of

25 being involved in some drug conspiracy in your opinion; right?

1   A.   Yes.

2   Q.   Because you weren't?

3   A.   Correct.

4   Q.   But it's very scary if the Government thinks you're part of

5   the one, is it not?

6   A.   A hundred percent.

7   Q.   If you are found to not be telling the truth in your

8   proffer agreement, that would be a problem for you; right?

9   A.   Yes.

10  Q.   Who decides whether you're telling the truth or not in that

11  proffer agreement from your understanding?

12  A.   The United States Government.

13  Q.   Mr. McDonald, right, and Mr. Bilkovic?

14  A.   Yes.

15  Q.   If they don't think you're telling the truth, you've

16  violated your proffer agreement; right?

17  A.   Yes.

18  Q.   During this whole ordeal, you have two kids; right?  Wife

19  was pregnant with one of them during it and then had another

20  kid; correct?

21  A.   Yes.

22  Q.   Married man; right?

23  A.   Yes.

24  Q.   You had been in the nightclub and strip club business in

25  years past, but in much different business these days; right?

1    A.   Yes.

2    Q.   You were talking to Mr. Didani about investing in New York

3    real estate; right?

4    A.   Probably.   I talk to people all the time about investing in

5    real estate in New York.

6    Q.   Because that was your interest; right?

7    A.   A hundred percent.

8    Q.   And I think I saw on your Twitter feed your belief is no

9    one could ever really can take property from you, that's why

10   it's such a good investment, it will always be there; right?

11   A.   Yes.

12   Q.   Solid asset?

13   A.   Correct.

14   Q.   You wouldn't jeopardize your profession or your livelihood

15   to be involved in a narcotics transaction, would you?

16   A.   Never.

17   Q.   In fact, even after this ordeal of being raided by federal

18   agents and asked to be their criminal informant, you still

19   pursued this foreign real estate for a legitimate buyer;

20   correct?

21   A.   Yes.

22   Q.   Posted on Twitter in September of 2021, "Lot 19 in Cap Cana

23   for sale," do you remember that?   "Cap Cana beachfront property

24   for sale, August 31, 2021."   Do you remember that?

25   A.   Yeah.   Probably all real estate promotions.

 1   Q.   You were still trying to sell the lot; right?

 2   A.   A hundred percent.

 3   Q.   Legitimately?

 4   A.   Always legitimately.

 5   Q.   I'm not disagreeing with you.  I'm just asking if that's

 6   the case.

 7           September of 2021, someone asked you if you would look

 8   at property in Haiti, and you said, "Sure, DM me on Twitter."

 9   Do you see that?

10   A.   Yeah, probably just -- yeah.

11   Q.   You don't know if Nadine Paguero (ph) who asked you to look

12   at this real estate was a drug dealer, do you?

13   A.   No.

14   Q.   They could be looking to sell their home or --

15   A.   Exactly.

16   Q.   -- do a legitimate business transaction; right?

17           Same thing with Commissioner Jack Brewer (ph) in

18   August of 2021.  "You're a good man, Mr. Brewer," when he asked

19   you to look at his property in Haiti; right?

20   A.   Yeah.

21           MR. FINK:  Judge, I'm going to approach with

22   Government's Exhibit 4 already admitted into evidence.

23           THE COURT:  All right.  Very well.

24   BY MR. FINK:

25   Q.   Mr. Meskouris, that's a piece of evidence that's been

1    admitted in this case.  Do you know what that is?

2    A.   What is this?

3    Q.   I'm asking do you know what it is from looking at it?

4    A.   Refresh my memory.

5    Q.   Your answer might be "I don't know."

6    A.   I don't know, no.

7    Q.   That's a perfectly okay answer if that's your answer.

8    A.   No, I don't know.

9    Q.   Okay.  Thank you.

10           MR. FINK:  Winding up, Judge.

11           THE COURT:  Okay.

12           MR. FINK:  I shouldn't say I'm winding up.  I guess

13   I'm finishing.

14           THE COURT:  It's okay.  I'm not holding you.

15           MR. FINK:  Bad analogy.

16           Your Honor, same thing here as I mentioned before.

17   There's a unredacted version, for both efficiency and relevant

18   and irrelevant information.  I'm going to point to the

19   unredacted version, an excerpt, and we'll call this Defendant's

20   EE.  It's an excerpt from 68.22, Page 7.  And I'd like to admit

21   it, but I'm going to show it to Mr. Meskouris.

22           THE COURT:  Okay.  Any objection?

23           MR. McDONALD:  No objection.

24           THE COURT:  I think that was "no objection"; is that

25   right?

```
 1                    MR. McDONALD:  I'm sorry.  No objection.
 2                    THE COURT:  All right.  You may show it to the
 3      witness.
 4      BY MR. FINK:
 5      Q.  Mr. Meskouris, I'm going to approach again.
 6                    THE COURT:  You want it admitted, Mr. Fink?
 7                    MR. FINK:  I do, yes.  May it be admitted as EE?
 8                    THE COURT:  Okay.  It's admitted.
 9                    (Defendant's EE admitted into evidence.)
10                    MR. FINK:  Thank you, Judge.
11      BY MR. FINK:
12      Q.  I'm going to point you to -- and please feel free to read
13      for any context, but I'm going to point you to message 25.  Do
14      you see that message, Mr. Meskouris?
15      A.  Yes.
16      Q.  It's a message from Mr. Didani to you; correct?
17      A.  Yes.
18      Q.  What's the date on it?
19      A.  9-20, 2020.
20      Q.  So it's right in the same vicinity of messages within those
21      couple days that you were talking about on direct exam;
22      correct?
23      A.  Say that again.
24      Q.  On direct examination you were discussing a lot of messages
25      between September 20th and 23rd and 24th.  Do you remember
```

1    that?

2    A.   Yes, yes.

3    Q.   So this is right in that same timeframe; correct?

4    A.   Um-hmm.

5    Q.   What does that message say that I'm referring to?

6    A.   It says -- it's a message from Mr. Didani to me on 9-20.

7    It says, "I pay mill for the elections just happened."

8    Q.   Do you remember that message?

9    A.   No, I don't remember.

10             MR. FINK:  May I show it to him?

11             THE COURT:  You may.

12             THE WITNESS:  Let me just see what I wrote.

13   BY MR. FINK:

14   Q.   Yeah, sure.  Take your time.

15   A.   Yeah, something I wrote back.  Three hours we talk.  I

16   don't know.

17   Q.   What was the message?  If you want to read the message back

18   or before, go ahead --

19   A.   He says to me, "I paid million for elections just

20   happened."

21   Q.   Do you remember anything about that message?

22   A.   No.

23   Q.   I'm going to retrieve this from you.

24   A.   Yeah, go ahead.

25   Q.   "I pay mill for elections just happened"; correct?

1    A.   That's what it says, yes.

2    Q.   I want to take you -- I know I'm jumping around a little

3    bit, but sometimes when you're listening to testimony you take

4    notes out of order.

5          The cash you received, Mr. Meskouris, in the CVS

6    parking lot, I want to talk about that, okay.  Do you know what

7    I'm talking about?

8    A.   Okay.

9    Q.   On direct examination, your testimony was that you received

10   that money from the same individual three times during the day;

11   is that correct?

12   A.   Yeah.

13   Q.   I believe you said it was the same woman; right?

14   A.   Yes.

15   Q.   I might have mischaracterized.  You actually didn't know,

16   it might have been on separate days or the same day; right?

17   A.   Correct.

18   Q.   But you did say it was the same woman all three times;

19   right?

20   A.   I believe so, yeah.

21   Q.   Okay.  When you spoke to Detective Leach, do you recall

22   telling Detective Leach that you drove to the CVS on three

23   separate occasions during daylight hours and received three

24   separate sums of bulk currency from three separate individuals?

25   Do you remember that?

1    A.    I remember that, yeah.

2    Q.    Okay.  Do you think that one is probably more accurate or

3    your testimony today?

4    A.    Probably the one closer to the date was fresher in my mind.

5    Q.    Sure.  So probably from different individuals?

6    A.    Repeat what you just said.

7    Q.    Sure, of course.  And, if you want to see it, you're

8    definitely permitted to see it.  But in a report offered by

9    Brandon Leach, did you remember telling him on that same day,

10   "Meskouris drove to the CVS on three separate occasions during

11   daylight hours and received three separate sums of bulk

12   currency from three separate individuals"?

13   A.    Correct.

14   Q.    Do you think that that's accurate, that it was from three

15   separate individuals?

16   A.    It probably was accurate, yeah.  Maybe I made a mistake.

17   Q.    And just misspoke this morning?

18   A.    Maybe, yeah.

19   Q.    I mean, it was five years ago now?

20   A.    Yeah, five years now.  Exactly.

21   Q.    Just a moment, Mr. Meskouris.  I'm almost finished.  I

22   might be finished.

23   A.    Take your time.

24   Q.    Mr. Didani ever purchase anything from you in the United

25   States?

1    A.   No.

2    Q.   Any real estate in the United States?

3    A.   No.

4    Q.   Any other items whatsoever?

5    A.   Nothing.

6    Q.   When you received that cash in the United States from those

7    three separate individuals, were any of them Mr. Didani?

8    A.   No.

9    Q.   You also said that in preparing to accept that cash you had

10   spoken to other individuals on the telephone; is that correct?

11   A.   Yes, that's correct.

12   Q.   One you described as having an Asian accent; right?

13   A.   Yes.

14   Q.   Another you described as having a Hispanic accent; right?

15   A.   Yes.

16   Q.   Now, you went through the messages that allegedly you and

17   Mr. Didani had about this currency.  You never spoke to

18   Mr. Didani on the phone coordinating it, though; correct?

19   A.   No, just that I received it.

20   Q.   Sure.  Well, when I say the phone, I guess I meant in

21   voice.  Other than text message?

22   A.   Yes.

23   Q.   Before this matter came to your intention by a raid by the

24   Government, for lack of a better term, in March of 2021, the

25   search warrant, before that you were building some sort of a

1    friendship with Mr. Didani; is that correct?

2    A.   We were talking on the phone for quite awhile.

3    Q.   On other matters besides real estate?  And I'm not saying

4    anything --

5    A.   Yes, I understand what you're saying.  Yes, we were

6    talking.

7    Q.   There was -- correct me if I'm wrong, your brother-in-law

8    was moving to Canada and potentially looking for a job; right?

9    A.   Yes.

10   Q.   And things of this nature that you were leaning on each

11   other's connections and relationships to help each other;

12   right?

13   A.   Rephrase that.

14   Q.   Well, you were building a friendship and using each

15   other's --

16   A.   We were talking, correct.

17   Q.   And when you do that, you know, you obviously are doing it

18   with someone you don't expect to be involved in anything

19   unlawful; correct?

20   A.   Correct.

21   Q.   Do you end up selling the Cap Cana land?

22   A.   Did I end up selling what?

23   Q.   The Cap Cana -- I don't know if I'm saying it --

24   A.   Yes, it got sold.

25   Q.   And you worked out the title?

1    A.   Correct.

2    Q.   And was the title issued, the same one that we --

3    A.   Yeah, everything was the same.  It just got cleared up, and

4    it took awhile.  It took a little process.  That was the reason

5    why we were on the phone, you know, dealing with this for so

6    long.

7    Q.   So for the new buyer --

8    A.   The new buyer worked out better for him, because it went

9    one, two, three.

10   Q.   Understood.  But for Mr. Didani it was taking awhile, but

11   it still needed to be resolved for anybody?

12   A.   Because that was the beginning.

13   Q.   But my point is it needed to be resolved for whoever bought

14   the property?

15   A.   Regardless, yeah.

16         MR. FINK:  That's all I have.  Thank you,

17   Mr. Meskouris.

18         THE WITNESS:  Thank you very much.

19         THE COURT:  Okay.  Any redirect?

20         MR. McDONALD:  Briefly.

21                    REDIRECT EXAMINATION

22   BY MR. McDONALD:

23   Q.   Mr. Meskouris, when you were approached by agents in March

24   of 2021, was that the first time you've ever been approached by

25   agents?

1    A.   Yes.

2    Q.   Have you ever been interrogated or asked questions by

3    federal agents before?

4    A.   No.

5    Q.   When they asked you about the money, why did you tell them

6    that you did not accept any cash from Mr. Didani?

7    A.   My head was spinning.  I was caught off guard.

8    Q.   Were you scared?

9    A.   I was scared, yeah.

10   Q.   Scared of what?

11   A.   I was just scared in general.  Probably one of the biggest

12   mistakes I ever did in my whole life.

13   Q.   Now, that same day, did agents ask if you were willing to

14   come back to their office to participate in an interview?

15   A.   Yes, they did.

16   Q.   And at that time did you tell them everything that you knew

17   about this money?

18   A.   I told them everything that I knew.

19   Q.   Now, on March 3, 2021, when you sat down with the agents,

20   did you learn or become aware of what Mr. Didani was suspected

21   of being involved with?

22   A.   Yes.

23   Q.   What was that?

24   A.   Drug dealing.

25   Q.   You were asked by Mr. Fink about a text message that said

 1   from Mr. Didani that "I paid millions for elections."  Do you

 2   still have that up there?

 3   A.   No, I don't have it, but I remember.  It's a text message.

 4   I saw it.

 5   Q.   Do you remember the date?

 6   A.   No, I don't remember the date.

 7           MR. McDONALD:  May I approach the witness?

 8           THE COURT:  Yes.

 9           MR. McDONALD:  I'm approaching with Mr. Fink's

10    computer that had the text message on it.

11   BY MR. McDONALD:

12   Q.   Tell me when you've had an opportunity to determine the

13   date of that message.

14   A.   The date was 9-20, 2020.

15   Q.   Read the message for us one time -- one more time.

16   A.   Didani says, "I pay mill for elections just happened."

17   Q.   Elections that just happened?

18   A.   "I pay mill for the elections just happened."

19   Q.   Okay.  And are you familiar with when election day is in

20   the United States?

21   A.   No.

22   Q.   All right.  Do you know -- but, whatever it is, the text

23   that he sent you was an election that happened before that.  Is

24   that what you read that --

25   A.   I don't know -- to tell you the truth, I didn't even --

1    Q.   No.  I want you to read the text.

2    A.   The text says -- he sends to me, "I pay mill for the

3    elections just happened."

4    Q.   Okay.  Did you take that to mean you paid -- he pays

5    millions for elections that happened prior to the date that he

6    sent you that message, because he said it just happened?

7    A.   Just happened, yeah.  I don't know is he talking about -- I

8    don't know what he's talking about.

9    Q.   Now, the last question or last set of questions that

10   Mr. Fink asked you was about whether or not you had any

11   conversations with Mr. Didani about this down payment.  Do you

12   remember those?

13           MR. FINK:  Can I have my computer back?

14           MR. McDONALD:  Oh, yes.

15           May I approach for Mr. Fink's computer?

16           THE COURT:  Yes.

17           MR. FINK:  I feel powerless without my computer,

18    Judge.

19           Thank you, Mr. McDonald.

20   BY MR. McDONALD:

21   Q.   Do you remember Mr. Fink asking you about whether or not

22   you had any phone conversations with Mr. Didani about the down

23   payment?

24   A.   Do I remember him asking me that, yes, yes.

25   Q.   He just asked you that and you said no?

1    A.   I said I don't remember.

2    Q.   Okay.  Did you have any text conversations where Mr. Didani

3    was updating you on when the money was going to be delivered to

4    you?

5    A.   Yes.

6              MR. McDONALD:  All right.  Thank you.

7              No other questions.  Thank you.

8              THE COURT:  Anything else?

9                        RECROSS EXAMINATION

10   BY MR. FINK:

11   Q.   Do you know when the Dominican Republic holds elections?

12   A.   No.

13   Q.   I wanted to clarify something, because I don't know if I

14   understood correctly.  After the meeting March 3, 2021,

15   Detective Leach gave you the phone; correct?  Right?

16   A.   Correct.

17   Q.   And he also gave you a bank account?  Did I understand that

18   correctly?

19   A.   Correct.

20   Q.   So, in other words, it was already some bank account,

21   routing number, already set up; right?

22   A.   Correct.

23   Q.   He gave you that information; right?

24   A.   Yes.

25   Q.   And said if any money is to be sent this is where we want

```
 1   it sent?

 2   A.  Yes.

 3            MR. FINK:  All right.  Understood.  Thank you very

 4   much.

 5            MR. McDONALD:  Nothing further from the Government.

 6   Thank you.

 7            THE COURT:  Is this witness excused?

 8            MR. McDONALD:  I would ask that the witness be

 9   excused.

10            MR. FINK:  He can be excused.  Yes, your Honor.

11            THE COURT:  All right.  You may step down, sir.  Thank

12   you for coming.

13            THE WITNESS:  Thank you.

14            THE COURT:  Is the Government ready to call your next

15   witness?

16            MR. McDONALD:  Yes.

17            Your Honor, I'm not sure if the jury needs a break

18   before we call --

19            THE COURT:  Do you need a break?  They were just out a

20   minute ago, but I'm happy to let you have another one if you

21   think you need it.

22            Yes, you do, jurors?

23            No, we don't.  No?

24            MR. McDONALD:  Okay.  Thank you.  That's okay with me.

25            THE COURT:  You guys need a break?
```

```
 1              MR. McDONALD:  I don't need a break, no.
 2              THE COURT:  You guys don't need a break; right?
 3              MR. FINK:  I was waiting to be asked, Judge.
 4              THE COURT:  I know, but you don't need one, do you?
 5              MR. FINK:  I'm totally fine.  Thank you for asking,
 6    Judge.
 7              THE COURT:  After this witness.
 8              MR. McDONALD:  Next witness is Special Agent Jason
 9    Willock.
10              THE COURT:  Okay.  You may step forward and be sworn
11    in, please, sir.
12              MR. McDONALD:  May I approach the witness and grab
13    some of the materials that are up there?
14              THE COURT:  After I swear him in you may.
15              Right there by the court reporter if you would.
16              (Oath administered.)
17              THE COURT:  All right.  You may be seated in the
18    witness box.
19              And you may retrieve the other documents.
20              MR. McDONALD:  Thank you.
21              THE COURT:  And then I'm going to ask you to state
22    your full name and spell your last name.  You need to speak
23    into this part of the mic loudly, and the seat does not go
24    forward; okay?
25              THE WITNESS:  Yes, ma'am.
```

```
 1              THE COURT:  All right.  Great.
 2              THE WITNESS:  Good afternoon.  Special Agent Jason
 3     Willock, W-I-L-L-O-C-K.
 4              MR. McDONALD:  May I proceed, your Honor?
 5              THE COURT:  Yes, you may.
 6                        *         *         *
 7                        JASON WILLOCK,
 8          was called as a witness at 2:46 p.m. after having been
 9          duly sworn to testify to the truth.
10                        *         *         *
11                        DIRECT EXAMINATION
12     BY MR. McDONALD:
13     Q.  Special Agent Willock, can you tell the jury where you're
14     employed?
15     A.  I'm employed with the Drug Enforcement Administration in
16     Los Angeles, California.
17     Q.  For how long have you been employed with the Drug
18     Enforcement Administration?
19     A.  A little over 16 years.
20     Q.  How long have you been assigned to Los Angeles?
21     A.  Just under 16 years.
22     Q.  All right.  Can you tell the jury what your current
23     assignment or duties are as a special agent in Los Angeles?
24     A.  I'm assigned to a task force known as the High Intensity
25     Drug Trafficking Area, known as HIDTA task force, and I'm in
```

1    the Homeland Security Investigations group, HIDTA Group 46.

2              THE COURT:  It stands for High Intensity what?

3              THE WITNESS:  Drug Trafficking Area.

4              THE COURT:  Okay.  Thank you.

5    BY MR. McDONALD:

6    Q.  And on a day-to-day basis what do you do?

7    A.  I conduct narcotics trafficking investigations, case work

8    that involves violations of Title 21 Controlled Substances Act,

9    money laundering investigations, organized crime.

10   Q.  Prior to your employment with the DEA in Los Angeles, were

11   you employed with the DEA in another location?

12   A.  I spent approximately two months in our Washington, D.C.

13   office after graduating the academy in Quantico, Virginia.

14   Q.  And prior to DEA in Washington, D.C. where were you

15   employed?

16   A.  So after university I worked in New York as a financial

17   analyst with Goldman Sachs in New York City, from 2001 to 2003.

18   Following that, I worked at a defense contractor in Washington,

19   D.C. called Analytic Services.  I spent time at the Pentagon

20   working at Homeland Defense and with the Air Force.  And in

21   2007, I joined the Mayor's office in Washington, D.C. as a

22   project manager working with D.C. public schools and doing city

23   planning work.

24   Q.  All right.  Outside of your current assignment, have you

25   been involved in investigating drug trafficking offenses?

1    A.   No, sir.

2    Q.   I'm sorry?

3    A.   Outside of my current employment?

4    Q.   Outside of your current assignment to the HIDTA task force.

5    A.   Oh.  Yes, sir.

6    Q.   And did those include multistate and international drug

7    conspiracies?

8    A.   Yes, they did.

9    Q.   How many international drug conspiracies do you think that

10   you've investigated while at DEA in Los Angeles?

11   A.   More than five long-term international complex conspiracy

12   cases.

13   Q.   Have you been the lead case agent on drug trafficking

14   investigations?

15   A.   Yes, sir.

16   Q.   And what are the responsibilities of a lead case agent on

17   an investigation?

18   A.   Those responsibilities would include organizing the team,

19   establishing the strategy for the investigation, communicating

20   with prosecutors, working with counterparts, setting daily

21   goals or organizing surveillances and other investigative

22   operations.

23   Q.   And in your 16 years at DEA in LA, can you estimate how

24   many drug trafficking investigations you've been involved with?

25   A.   Definitely more than 25.

1    Q.   Now, are these single-target investigations where you're

2    investigating one person or multitarget?

3    A.   All of my investigations typically involve multiple

4    targets, members of an organization or a group functioning

5    collaboratively.

6    Q.   Have you executed search warrants as a DEA special agent?

7    A.   Yes, sir.

8    Q.   And how many would you estimate that you've executed?

9    A.   North of 50 easily.

10   Q.   Have you been the affiant on a search warrant?

11   A.   Yes, sir.

12   Q.   What is an affiant?

13   A.   An affiant is someone who is the author, drafts that search

14   warrant, that judicial request, and details the facts of the

15   case and swears to the accuracy and the truthfulness of those

16   details.

17   Q.   And I don't know if I asked you this, but I'll ask it to

18   you anyway.  How many times have you been an affiant on a

19   search warrant affidavit?

20   A.   At least 25.

21   Q.   And what kinds of search warrants have you been an affiant

22   on?

23   A.   I've been an affiant on a search warrant for a residence or

24   a business, physical facility, a vehicle, mobile telephone

25   devices.

1   Q.   Okay.  During the course of your career, have you become

2   familiar with the ways in which drug traffickers communicate

3   with each other?

4   A.   Yes, sir.

5   Q.   And can you describe some of the methods that you're

6   familiar with?

7   A.   Well, voice telephone calls, text messages, other

8   applications where you would send written messages, dedicated

9   messaging apps, E-mails.  Those are the --

10  Q.   In person?

11  A.   And in person, yes, of course.

12  Q.   Do you know -- strike that.

13          Is it common in your experience in investigations for

14  drug traffickers to be using encrypted applications?

15  A.   It is.

16  Q.   What is an encrypted application?

17  A.   So an encrypted application is a communication, tool or

18  application that would reside on a computer or a mobile device,

19  and it would allow an individual to communicate to someone else

20  that has another device with comparable functionalities.

21  Q.   What are some types of encrypted applications that you're

22  familiar with?

23  A.   So they're some well-known applications or popular

24  applications, WhatsApp, Telegram, Signal.  I'm also familiar

25  with some more small-scale applications that have previously

1   been popular or used globally known as EncroChat, Cypher,

2   no1bc, Number One Business Communication, and Sky ECC.

3   Q.  All right.  Are you familiar with something called Phantom

4   Secure?

5   A.  Yes, sir.

6   Q.  What is Phantom Secure?

7   A.  Phantom Secure was an encrypted application and platform

8   that was on BlackBerry devices.  It was used to communicate

9   with individuals in a group chat or an individual basis.  And

10  it used what we call PGP encryption, pretty good privacy, just

11  a protocol for sending encrypted messages.

12  Q.  All right.  Now, this may be a silly question, but in your

13  experience why do drug traffickers use encrypted

14  communications?

15  A.  Typically, from my experience, drug traffickers are

16  concerned about their messages being read by others or being

17  detected by law enforcement.  So they reduce the risk of

18  apprehension and interception by law enforcement.

19  Q.  As a special agent in Los Angeles for DEA, have any had any

20  experience with any investigations involving drug trafficking

21  and encrypted communications?

22  A.  Yes, sir.  I've been a party to several of those

23  investigations.

24  Q.  All right.  And were you ever in a role where you advised

25  other agents on encrypted communications?

1    A.    Yes, sir.

2    Q.    And can you tell the jury a little about that?

3    A.    At approximately 2014, the team I was assigned to at the

4    time had an investigation into the company known as Phantom

5    Secure.   There were several other companies that my office and

6    my team were aware of.   And that was my initial introduction to

7    working and understanding the technology and methods used by a

8    provider, an encrypted application provider or platform such as

9    Phantom.

10          And over the years other investigators looking at

11   other encrypted applications have called me and members of my

12   team to exchange information or ideas in what is possible with

13   the interception or data that you can collect on those

14   companies.

15   Q.    Okay.  Did you ever serve as a -- without having case work,

16   did you ever serve as an advisor to other agents about

17   encrypted communications?

18   A.    Yes.

19   Q.    And when was that?

20   A.    So over the last ten years going back to 2015 or so,

21   agents -- the technology is constantly evolving and the

22   resources that are available.   So advising other agents and

23   counterparts as to the companies that help facilitate the

24   communications, the telecoms such as AT&T in the U.S., or maybe

25   a company known as Telefonica in Europe, the type of judicial

1   requests you can make to them and the type of records they can

2   provide.

3   Q.   Have you ever been a liaison for your agency regarding

4   encrypted communications?

5   A.   Yes, sir.

6   Q.   And when was that?

7   A.   Primarily started in 2018, working with several European

8   counterparts.

9   Q.   All right.  Have you ever been involved in an international

10   working group that was looking at encrypted communications?

11   A.   Yes, sir.

12   Q.   And when was that?

13   A.   That started pretty much around 2018 and still goes on

14   today.

15   Q.   You mentioned Sky, but are you familiar with something

16   called Sky Global?

17   A.   Yes, sir.

18   Q.   And how are you familiar with Sky Global?

19   A.   So I learned that the Sky ECC platform was managed and run

20   by a entity known as Sky Global, or Sky ECC Technologies, Inc.

21   Q.   And how are you familiar with Sky Global?

22   A.   Sky Global was a company that had a presence online, a

23   corporate website, detailing their offerings, the types of

24   services and support they provided to their clients.

25           I also had a relationship with BlackBerry, the company

1   that -- the device provider and software provider.  And through

2   engaging in relationships with professionals at BlackBerry, I

3   understood that Sky Global is a client of theirs.

4   Q.  And you said Sky Global had a footprint.  Do you know where

5   they were located?

6   A.  Sky Global is located in Vancouver, British Columbia,

7   Canada.

8   Q.  And what service does Sky Global provide, if any?

9   A.  Their primary service was a secure encrypted messaging app

10  known as Sky ECC.

11  Q.  Do you know what the ECC stands for?

12  A.  So ECC stands for Elliptic Curve Cryptography.

13  Q.  And what is that?

14  A.  It's a protocol for encryption, and it's based on

15  algebraic, algebra, the math of creating elliptic curves.  It's

16  kind of -- some people might have heard of RSA.  You might have

17  experienced that in your professional or schooling as a method

18  for providing security through your passwords or whatnot.  And

19  so ECC is a modern successor to RSA encryption.

20  Q.  And do you know whether or not the Sky ECC service was

21  provided by Sky Global to customers in the United States and

22  elsewhere?

23  A.  Yes.  I was able to observe Sky Global provide Sky ECC

24  services to customers both domestically and in the U.S. and

25  abroad.

1    Q.   Do you know anything about the subscription cost for Sky

2    ECC?

3    A.   Yeah.  It varied.  It wasn't well advertised on their

4    website.  So sometimes it was negotiable with the

5    representative that you'd interact with.  Sky Global, a/k/a Sky

6    ECC, utilized employees known as distributors or agents, and

7    you would negotiate that.  And it typically fell between 1,500

8    and $2,000 for a six-month subscription with a device.

9    Q.   Do you know when Sky Global was founded?

10   A.   In approximately 2010.

11   Q.   And do you know out of which phone or which devices it can

12   be used on?

13   A.   Yeah.  So initially Sky ECC was only on BlackBerry devices.

14   And then shortly thereafter they were able to develop their

15   application to be held on android devices, and then in 2018

16   they launched on iPhones.

17           THE COURT:  And what year was that?  What year did you

18    say that was for iPhones?

19           THE WITNESS:  IPhones was 2018.

20           THE COURT:  Okay.  Thank you.

21   BY MR. McDONALD:

22   Q.   Is Sky Global and Sky ECC still operating?

23   A.   No, sir.

24   Q.   And when was it shut down?

25   A.   In March of 2021.

1    Q.   Who shut it down?

2    A.   It was an international collaborative effort between the

3    U.S. and several foreign partners.  But I would like to offer

4    that the U.S. was primarily behind this shutdown of the company

5    through an indictment of the CEO.

6    Q.   And where was that indictment?

7    A.   In San Diego, California, the Southern District of

8    California.

9    Q.   And that's where LA is, the Southern District of

10   California?

11   A.   We're actually in the Central District in California, but

12   our chief partner, with me being at DEA, was FBI in San Diego,

13   and we indicted the case in San Diego.

14   Q.   Have you spoke to domestic and foreign law enforcement

15   officers about Sky ECC?

16   A.   Yes, sir.

17   Q.   Now, are you familiar with how Sky phones or Sky devices

18   work?

19   A.   Yes, I am.

20   Q.   Are you familiar with the functionality of the Sky phone

21   and what it can do, what it can't do?

22   A.   Yes, sir.

23   Q.   All right.  If I wanted to get a Sky phone when Sky ECC was

24   operating, how would I go about getting a Sky phone?

25   A.   So there's several ways, but the most common was to have a

1    relationship with an agent, a distributor or a reseller.  All

2    of those terms kind of go hand in hand.  It's just kind of

3    different levels of priority that they have.  These are

4    salesmen, saleswomen at the firm, and that would be your direct

5    connection.

6            If you did not have that relationship, you could go on

7    the website and go through kind of their contact best type

8    functionality, but no matter what they would ask for you to be

9    vetted.  They would ask, you know, how do you know about us,

10   you know, who do you know that uses a Sky phone, quality

11   control in who you are as a company, because they have a

12   smaller user base than say a major company like T Mobile or

13   Verizon here in the U.S.  And in some areas of South America

14   and Europe there would be mobile cellular phone shops where

15   resellers or agents would work and you could apply a phone

16   there.

17   Q.   So let's say I was able to get a Sky device and a

18   subscription service.

19   A.   Yes.

20   Q.   How much would I generally be paying for both?

21   A.   So, yeah, everything comes together for that initial phone

22   device, depending on if you want an iPhone or say a Google

23   pixel.  It might be a little cheaper than the iPhone, but they

24   had all the different available options.  You would be looking

25   around 1,500, 1,800, maybe up to 2,000, depending on how

1    sophisticated the device was.  And then after six months that

2    subscription would end.  You could potentially keep the phone

3    and do a renewal and you'd pay a lesser fee.

4    Q.   Well, could I just bring my own personal phone in to Sky

5    and say I want this application on it?  Did it work like that?

6    A.   Ninety-nine percent of the time, no.  There were a couple

7    examples that we observed where a high level or very

8    high-valued VIP type customer worked with a senior person in

9    the company to get their own device, but 99 percent of the

10   time, no.

11   Q.   Do you know whether prior to giving the Sky device to the

12   customer the phones are modified or restricted in any way?

13   A.   Yes.  The phones were heavily modified prior to being

14   issued to a customer.

15   Q.   And when you say heavily modified what do you mean by that?

16   A.   So Sky Global, the reps, to make the phone function with

17   the Sky ECC app, would put a device management software on the

18   device that was provided by BlackBerry.  And that particular

19   software is used heavily by corporations throughout the U.S.

20   and globally.  And it protects the phone in certain ways and it

21   allows you to enable certain features and restrict.  And

22   typically those restrictions included taking the GPS off of the

23   phone.  You wouldn't have maps functionality.

24           Camera usage would only be able to be used in the Sky

25   ECC app.  The microphone could only be used.  You couldn't make

1    phone calls.  You couldn't have the weather application.  You

2    couldn't have Instagram.  These types of things.

3    Q.   What's the reason to modify or restrict these phones?  What

4    would be the overriding reason for a company to do that?

5    A.   It hardens the device.  It makes it very secure.  It makes

6    it very difficult for anyone to track that phone or to get any

7    type of records of how that phone would communicate with a

8    cellular provider.  And it also gives Sky ECC the ability to do

9    things to that phone, to update it in a certain way, remotely

10   wipe it if that request was made.

11   Q.   Okay.  Now that you've mentioned that, what is remote

12   wiping?

13              MR. McDONALD:  Judge, just for the record, a juror has

14    his hand raised.

15              THE COURT:  Yes.  I'm sorry.  I didn't see.

16              You need a break?

17              JUROR:  Yes.

18              THE COURT:  Okay, you can.  All right.  You may step

19    down.

20              Please rise for the jury.

21              (The jury left the courtroom at 3:06 p.m.)

22              THE COURT:  Okay.  Everyone else can take a break,

23    too.

24              You may step down, but please don't discuss your

25    testimony with anybody, okay.

 1                    THE WITNESS:  Yes, your Honor.

 2                    THE COURT:  All right.  Ten minutes, gentlemen.

 3                    MR. FINK:  I'm sorry, Judge?

 4                    THE COURT:  Ten minutes.

 5                    MR. FINK:  Yes, your Honor.

 6                    MR. McDONALD:  Yes, your Honor.

 7                    THE COURT:  All right.  Great.  Thank you.

 8                    (At 3:07 p.m., a brief recess was taken.

 9                    Back on the record at 3:15 p.m.)

10                    LAW CLERK:  All rise.  Court is back in session.

11                    THE COURT:  Yes, we're ready?

12                    MR. McDONALD:  Yes, your Honor.

13                    THE COURT:  Let's bring out the jury, please.

14                    LAW CLERK:  All rise for the jury.

15                    (The jury entered the courtroom at 3:16 p.m.)

16                    THE COURT:  Okay.  You may all be seated.

17                    Are you satisfied the jurors are present,

18     Mr. McDonald?

19                    MR. McDONALD:  Yes, I am, your Honor.

20                    THE COURT:  Mr. Fink.

21                    MR. FINK:  Yes, Judge.

22                    THE COURT:  Okay.  Very well.  You may all be seated.

23                    You're still under oath, sir.

24                    THE WITNESS:  Yes, your Honor.

25                    MR. McDONALD:  May I proceed, your Honor?

1          THE COURT:  You may continue.

2          MR. McDONALD:  Thank you.

3  BY MR. McDONALD:

4  Q.   When we left off, you had mentioned something called remote

5  wiping?

6  A.   Yes, sir.

7  Q.   Can you describe what remote wiping is for the jury,

8  please?

9  A.   Remote wiping is a feature or functionality of a service

10 that Sky ECC utilized where an instruction or a signal can be

11 sent from an outside device controlled by one of the Sky ECC

12 administrators to remove the data to erase the data on a

13 device.

14 Q.   Are you familiar with something called a duress password?

15 A.   Yes, sir.

16 Q.   What is a duress password?

17 A.   So a duress password is different from your regular

18 day-to-day password to open your device.  If you put in this

19 alphanumeric character string for a duress password, it will

20 remove the content of the device associated with the Sky ECC

21 application and make the device look normal in every other

22 fashion.

23 Q.   So now that I have my Sky phone and I've subscribed to the

24 service, how am I identified in Sky?

25 A.   So Sky would provide you with a PIN, an alphanumeric

 1  string, a personal identification number.  It's six characters

 2  and it was unique to you.

 3  Q.   All right.  And could I make my own user name for Sky?

 4  A.   You would.  And that would be known as a moniker.

 5  Q.   All right.  And could I use my own photograph as like a

 6  profile photograph?

 7  A.   So there were stock photographs, but there were situations

 8  where you would have access to other photos, or you could take

 9  a photo inside the Sky app and utilize that as your profile

10  pic.

11  Q.   And so when you say there is -- there's a set of photos

12  available?

13  A.   Yes.

14  Q.   To Sky users to pick from; is that accurate?

15  A.   Yes.

16  Q.   For your profile photo?

17  A.   Yes.

18  Q.   Now, if I now have my phone and now I have my six-digit

19  PIN, how would I communicate with somebody?

20  A.   So you would --

21  Q.   Using Sky.  Excuse me.

22  A.   Yes.  So using the Sky application, because you couldn't

23  communicate with the phone in any other manner, outside of

24  making a 911 call, that was -- that's a whole nother thing, but

25  I just want to make that point, is that you would go into a

1    part of the application where you would enter in other PINs,

2    other ECC IDs, those six character PINs.  Then you would send

3    an invite request to another Sky user with their PIN and a

4    message saying, hello, this is such and such, or a stop message

5    saying this person wants to communicate with you.  And only

6    after they accepted your invite would they be added to your

7    address book and you'd have the ability to communicate with

8    them.  You couldn't freely add people to your address book

9    without the invite process.

10   Q.  Can someone who does not have Sky ECC app on their phone

11   communicate with the Sky user?

12   A.  No.

13   Q.  So I can send messages between my PIN and another PIN, or

14   can I put groups of people into a chat?

15   A.  So once you have other people in your address book, and

16   only after those people are in your address book, they've

17   previously accepted you as a contact through the invite

18   process, you could create a group chat.

19   Q.  All right.  Would I be able to send audio messages or

20   photographs or videos using my Sky ECC account?

21   A.  You would, but only the photos taken with the camera

22   function inside the Sky app or the audio messages generated

23   inside there.  Outside photographs and voice you would not be

24   able to.

25   Q.  How long are messages that have been sent to me or that I

1    have sent to someone else in Sky, how long are they available

2    for viewing?

3    A.  Well, that would be up to you as the user to set the clock

4    for how long those messages would stay on the phone.  You could

5    set a month, a week.  You could have no deletion, or a mode

6    that was as short as 30 seconds, known as flash mode.

7    Q.  Flash mode.  And are you familiar with, by looking at a Sky

8    message, whether or not the user has his or her settings to

9    delete the message at a particular time?

10   A.  Well, there were various evolutions, various versions of

11   Sky.  So at times you could see that.  But when it was

12   changed -- so, if I had it set for messages to expire or to

13   delete at a week and then I changed it to a day, you would get

14   a notification to see that, which you -- typically you wouldn't

15   see it all the time.

16   Q.  All right.  And what about on the actual message

17   themselves, is there anything that shows how long a message may

18   be --

19   A.  Yeah.  So there was like a little bar or clock embedded in

20   the app that would show you the countdown.

21   Q.  Do you know whether or not you could take a screenshot on

22   your Sky device of a chat?

23   A.  So I'm an iPhone user.  I have used androids.  A lot of

24   mobile phones, cellular phones, have a feature where you hit a

25   certain button and it captures, you know, what's on your screen

1   at any given time.

2          The software on the device, that device manager

3   software that I was talking about that Sky Global put on there,

4   restricted that.  So you would -- there was no way to take --

5   to capture the image displayed on your phone.

6   Q.  All right.  And so if I wanted to capture the messages on

7   my phone before they are removed or deleted how would I do

8   that?

9   A.  So the only way that I really knew of and I observed is you

10  would take another mobile phone, and then take a picture of

11  your screen to capture what was on your screen at any given

12  time.

13  Q.  As a DEA Agent in Los Angeles, did you ever participate in

14  any investigation with targets who were using Sky ECC?

15  A.  Yes, sir, I did.

16  Q.  And can you describe that investigation briefly for the

17  jury?

18  A.  So several -- DEA is a global agency.  We have offices

19  throughout the country and overseas.  The proximity of

20  San Diego to LA, I worked with our office down there, and they

21  have subjects that used Sky devices.  Our New York City office

22  had subjects engaged in narcotics trafficking and South America

23  and throughout Europe.

24          I also worked with offices in Croatia and Madrid,

25  Spain, where they had observed subjects buying these phones or

1    having relationships with these distributors or agents.  And I

2    assisted them with --

3              THE COURT:  I'm sorry?

4              MR. FINK:  Mr. McDonald asked if I was all right, and

5    I said thank you.  I apologize, Judge.

6              THE COURT:  Oh, okay.

7              I didn't hear the last part of your answer.

8              THE WITNESS:  I'll repeat it, your Honor.  I'm sorry.

9              So just saying that these other offices, San Diego,

10   New York, even our Miami office, and then Miami and Croatia we

11   have an office, I was familiar with those agents.  They were

12   looking at narcotics trafficking, transnational organized crime

13   groups, and they had observed these subjects to be using Sky

14   phones.  So I participated in their investigations with them.

15   BY MR. McDONALD:

16   Q.  I want to direct your attention to October of 2019.  Do you

17   recall that general timeframe?

18   A.  Yes, sir.

19   Q.  And during that general timeframe, where were you assigned

20   within DEA?

21   A.   I was at our main office in LA in the Sensitive

22   Investigations Unit.

23   Q.  What types of investigations did the Sensitive

24   Investigations Unit participate in?

25   A.   We focused on transnational organized crime groups,

1    narco-terrorism, weapons trafficking, money launderers using

2    cryptocurrency, sophisticated criminal groups that used

3    encrypted communications.

4    Q.   All right.  And what was your specific focus in this task

5    force?

6    A.   So, at that time in 2019, I was one of the lead case agents

7    targeting the company, Sky Global, Sky ECC Technologies.

8    Q.   And so is it fair that your focus was the encrypted

9    communications during the course of international drug

10   trafficking?

11   A.   Yes, sir.

12   Q.   All right.  Did there come a point in time that you became

13   aware of a strictly foreign investigation into Sky Global and

14   Sky ECC?

15   A.   Yes, sir, I did.

16   Q.   And when did you become aware of that?

17   A.   That would have been in late 2018, early 2019.

18   Q.   And do you know which foreign entities were involved in

19   that investigation?

20   A.   The lead agencies would have been La Gendarmerie from

21   France, federal police agency, and the federal police agencies

22   from the Netherlands and from Belgium.

23   Q.   At that time was the United States involved in that

24   investigation?

25   A.   We were not.  We were just a partner in a support role.

1    Q.   When you say you were just a partner in a support role,

2    what kinds of support did you provide to the investigation?

3    A.   So the user base of Sky ECC was spread throughout the

4    world, but the majority of the users were in Europe.  And the

5    technology utilized to power the Sky ECC network, several of

6    those companies were in the U.S.

7              AT&T SIM cards were very prolific in the devices.

8    BlackBerry, even though they're a Canadian-based company, have

9    a presence in the U.S. and receive our judicial process.

10   Google has products that Sky Global as a company utilized to

11   manage their network.  So we facilitated legal requests to

12   those companies.  We exchanged information.  We helped develop

13   strategies with our European partners.

14   Q.   Did you communicate with those manufacturers or companies

15   like AT&T, BlackBerry, Google?

16   A.   I did.

17   Q.   I want to direct your attention to February of 2019.  Did

18   you travel anywhere related to this foreign investigation of

19   Sky?

20   A.   Yeah.  I attended a large meeting in The Hague, Netherlands

21   at the police intelligence agency known as Europol.

22   Q.   What was the purpose of that meeting?

23   A.   That meeting was to establish a set of parameters of what

24   was possible in the investigation, that we had all collectively

25   -- all the countries present had identified Sky ECC, Sky

1    Global, as a criminal organization supporting other criminals.

2    And we were there to device a strategy for our investigation

3    and define our responsibilities.

4    Q.   And do you recall how long that meeting was, how many days,

5    how many weeks?

6    A.   It was during the course of a week.  We probably met for

7    three full days.

8    Q.   Besides attending that conference in February of 2009, did

9    you ever go back and forth between Europe and the United States

10   for this investigation?

11   A.   I did.  Several times throughout 2019 up through 2021, and

12   even following.  So the Sky network went down in March of '21,

13   and we even traveled back for follow-on meetings with the

14   Europeans.

15   Q.   And what was the purpose of you going back and forth from

16   United States to Europe?

17   A.   So these types of meeting we refer to them as coordination

18   meetings, strategy meetings.  And we'd meet in The Hague, we'd

19   meet in Brussels, Belgium, also had meetings in Madrid, Spain.

20   Q.   And again, the U.S., at least in the Southern District of

21   California, had an open investigation into Sky at that

22   particular time; is that correct?

23   A.   That's correct.

24   Q.   Did you speak with Dutch, French or Belgium law enforcement

25   about their investigation?

1   A.   I did, regularly.

2   Q.   Would you characterize it as extensively?

3   A.   Extensively, yes.

4   Q.   Based on your participation, did you become familiar with

5   the steps of the investigation?

6   A.   I did become familiar with the steps.  The investigation

7   was divided into different parts.  So with me being in Los

8   Angeles, and obviously the sensitivity of how other countries

9   manage their investigations, I was situationally aware,

10  generally aware, but not involved in the weeds, so to speak.

11  Q.   Okay.  Did you become aware that foreign investigators

12  undertook to identify and seize Sky data?

13  A.   Yes.

14  Q.   And do you know if the foreign investigators determined

15  where the servers containing Sky data were located?

16  A.   Yes.

17  Q.   Do you how they determined that?

18  A.   Yes.  So Sky ECC had a series of servers, and those servers

19  require software to be run on them.  And we understood that

20  software was provided by BlackBerry.  And so we sent a judicial

21  request to BlackBerry asking them to give us the records for

22  the client they knew to be Sky Global, Sky ECC Technologies,

23  some other aliases or other names known as.

24          And they provided us with serial numbers.  They have a

25  special serial number that BlackBerry refers to as an SRPID.

1    And so once we had those numbers, those identifiers, we matched

2    that with IP data, communications traffic, that showed those

3    servers were located in a town in France.

4    Q.   Okay.  We'll back up just a little bit.  What is a server?

5    A.   A server, for all intents and purposes, is a computer, a

6    data computer that allows different programs to run or to

7    communicate with other computers, data networks.

8    Q.   And what is an IP address?

9    A.   An IP address is kind of, in layman's terms, an identifier

10   that shows a location for a connection.  You know, it's kind of

11   a data locator for a computer or a device.

12   Q.   Okay.  Now, you said that investigators determined that the

13   servers were located in a town in France?

14   A.   Yes, sir.

15   Q.   What town is that, do you remember?

16   A.   Excuse my pronunciation, but Roubaix.

17   Q.   Can you spell that for the court reporter?

18   A.   I'm hopefully not going to misspell it, but I believe it's

19   R-O-U-B-A-I-X.

20   Q.   And did you -- do you know where in Roubaix, France that

21   these servers were being held?

22   A.   So there's a very large data center provider known as OVH.

23   OVH is a French company, but they're global.  And it was at one

24   of the OVH data centers in Roubaix.

25   Q.   Now, after investigators determined where the servers were

1    being held, do you know what happened after that in terms of

2    the investigation?

3    A.   So we knew early on in the investigation about the servers

4    being located in France, and then specifically in that town.

5    The French investigators secured a search warrant signed by a

6    French judge that was deemed legal and valid in that country,

7    and they did some analysis of that server during 2019.  And

8    then later on --

9    Q.   Let me stop you there.  You said that the French

10   investigators secured a search warrant?

11   A.   Yes.

12   Q.   Was that search warrant issued by a French judge?

13   A.   Yes, sir.

14   Q.   Did the United States have anything to do with that search?

15   A.   No, sir.

16   Q.   Now, and what was the purpose of the search of OVH?

17   A.   So when we communicate with someone like BlackBerry or

18   Google, the information they give us we have to validate it,

19   right.  It might say, hey, this is this particular model and,

20   you know, brand of server or whatnot, but investigators needed

21   to physically go and see that everything that was indicated was

22   there.  And this is something that these investigators hadn't

23   previously done was look to take data off of a server such as

24   that that possessed encrypted data and communications.  So it

25   was to say a learning experience for those investigators.

```
 1    Q.   All right.  Do you know when the search of the French cloud
 2    company or server was conducted?
 3    A.   So, as I indicated, I wasn't a part of that search, and I
 4    wasn't present or, you know, communicating with the French on a
 5    daily basis, but it's my understanding it was during the summer
 6    of 2019.
 7    Q.   All right.  And you know all of this how?  How do you know?
 8    A.   We would have weekly, monthly conference calls, meetings.
 9    We would be provided updates by the French, Dutch intelligence.
10    Q.   All right.  Now, after the French search warrant in the
11    summer -- you said of 2019?
12    A.   Yes, sir.
13    Q.   Do you know what the next step was in the foreign
14    investigation?
15    A.   So once they understood how those servers were set up and
16    some of the technical aspects, these investigators or agents,
17    officers like myself, but they have very specialized training,
18    telecommunication specialists, computer scientists, so
19    definitely more advanced than I am in that area.  They sought
20    another search warrant, and ultimately what we would call here
21    in the U.S. a wire intercept to be able to hook into that
22    server and to take data off of it.
23    Q.   Do you know when that was?
24    A.   That would have been later in 2019, towards the end of
25    2019, going into the beginning of 2020.
```

1   Q.  All right.  And, if you obtained a search warrant to

2   intercept communications, can you tell the jury how that would

3   work in terms of the investigation?

4   A.  Maybe ask it a different way to make sure I understand.

5   Q.  All right.  When you say that the next step in this

6   investigation was to, in U.S. terms, obtain a wire intercept?

7   A.  Yes, sir.

8   Q.  What is the purpose of a wire intercept?

9   A.  Yes.  My apologies.  So, as investigators, we had deemed

10  and suspected that the communications on these servers in

11  France was of a criminal nature, that the users of Sky ECC were

12  not using the device to communicate primarily for anything

13  other than facilitating their criminal activities.  And so we

14  needed to look at that data to -- "we" being the investigative

15  team, the Europeans and ultimately other countries -- to show

16  that it was criminal.  And so that data was encrypted, and the

17  data that they took off of it we were not able to read at that

18  time.

19  Q.  Okay.  And then what happened?

20  A.  They continued to better understand the technology and come

21  up with a solution that was pretty much successfully

22  accomplished at the end of 2020, in December, where they could

23  decrypt the messaging, the data being transmitted through those

24  servers in France.

25  Q.  All right.  And if you could simply explain encryption and

1  decryption for the jury and how you would take encrypted data

2  and decrypt it.

3  A.   Yes.

4  Q.   Can you please do that?

5  A.   So there's various types of encryption.  People hear about

6  end-to-end encryption.  And I did my best to try to explain

7  what this the Elliptic Curve Cryptography is, public key

8  encryption and then having private keys.  So encryption is just

9  a way of coding and making the information being sent --

10  putting it into a format that is not readable.  And then with

11  the encryption protocol, the way it's coded and organized, you

12  would apply a key and that would decrypt, decode, the data.

13       And so the Sky ECC network utilized a combination of a

14  public key and a private key, a public key to encrypt the data

15  and a private key to decrypt it.  And you need both of those

16  keys, which they acquired from doing the analysis, they being

17  the investigators in France, an analysis of this server, and

18  was able to get access to a database that had those keys and

19  then apply those keys through some software tools that are

20  well-known throughout the world, the software called Wireshark,

21  which takes data, organizes it and analyzes it and applies the

22  keys to the data.

23  Q.   All right.  Now, you had said at one point that there was

24  some live intercepts of Sky data?

25  A.   Yes, sir.

1    Q.   Did the United States in realtime receive any of that live

2    data?

3    A.   No, sir.

4    Q.   All right.  Did they review any of that live data?

5    A.   No, sir.

6    Q.   Now, you said that the decryption process started in late

7    2020, December of 2020, the receiving of the documents and

8    beginning to decrypt?

9    A.   Yeah, because earlier in 2020, June or so, they were --

10   June of 2020, able to create what we call a virtual machine,

11   another server.  And all that data, a police-controlled server

12   was loaded onto that server.

13          And in December of 2020 -- there's a term known as a

14   "man in the middle," a man-in-the-middle attack.  And the

15   Belgians, Dutch and French were able to inject themselves

16   in-between the traffic going from the phones, to the server, to

17   the other end user phones.  So, if you're in a group chat, the

18   other phones are an individual, and they had the private keys

19   and they were reading those messages realtime.

20   Q.   And did there come a point in time during the foreign

21   investigation where the Sky server in Roubaix, France was

22   seized by a foreign government?

23   A.   That is true, and that happened in March of 2021.

24   Q.   What country seized the messages?

25   A.   France.  As the servers in the intercept had happened in

1    France, France was the custodian of those records.

2    Q.   And that was in when?  Did you say March --

3    A.   March of 2021.

4    Q.   And once the server is seized in France are you aware of a

5    way in which investigators in the United States could obtain

6    those messages?

7    A.   Yes, sir.

8    Q.   And how would you go about doing that?

9    A.   So the French devised a request procedure where it had to

10   be formally done, and you had to draft this expansive document

11   called an MLAT.

12   Q.   Do you know what an MLAT stands for?

13   A.   It's -- hopefully, you can help me -- a Mutual Legal

14   Authority Treaty.

15   Q.   Assistance Treaty?

16   A.   Assistance Treaty, yes.  That's correct.  A Mutual Legal

17   Assistance Treaty, an MLAT.  And that is -- investigators work

18   on it with a prosecutor and Assistant U.S. Attorney.  It has to

19   go to Washington, D.C. to be reviewed by other attorneys and

20   then sent to the equivalent in that country.  They review it.

21   It's kind of a lengthy process.

22   Q.   All right.  Did you ever request an MLAT for Sky messages

23   in one of your -- any of your own investigations in

24   Los Angeles?

25   A.   I did.  Following March of '21, I did.  Yes.

1   Q.  And in terms of the MLAT, what information do you need to

2   put in the MLAT to get the data back from France so that you

3   know you're getting the data you want?

4   A.  The French required you to provide that ECC ID or PIN, that

5   Sky PIN we talked about, the six-character alphanumeric string.

6   So you needed that.  And you needed to put language in the

7   document explaining why you were requesting it, what the nature

8   of your investigation was, and some background on who you

9   believed the user of that PIN -- that ECC ID was.

10  Q.  Along with -- strike that.

11        Did you ever in your case receive a response from

12  France?

13  A.  Yes, sir.

14  Q.  From the MLAT?

15  A.  I did.

16  Q.  And what was the response?

17  A.  So the response was a series of files, you know, that

18  included spreadsheets and multimedia pictures, things of that

19  nature.

20  Q.  Along with the files, did the French send anything that

21  authenticates the data, a certificate or anything like that?

22  A.  I did not receive a certificate, no.

23  Q.  Did you receive any French documents about having received

24  the United States' request and have produced something on the

25  basis of the U.S. request?

1    A.   Yes.  The French sent, you know, the equivalent of

2    letterhead or official transmission, you know, showing from

3    French legal police agency that they are responding to your

4    MLAT request and that the documents could be used judicially,

5    it was judicially obtained.

6    Q.   Can you tell the jury in what format you received the files

7    from the French?

8    A.   How the files were conveyed or what the actual files were?

9    Q.   How the files were conveyed to you.

10   A.   It's my recollection it was on a disk, a physical disk.

11   Q.   And then --

12   A.   Compact disk, DVD.

13   Q.   I'm sorry.  Go ahead.

14   A.   Like a compact disk or DVD-type format.

15   Q.   All right.  And when you opened that disk what was on the

16   disk?

17   A.   So they're various folders that would be named or organized

18   by those ECC IDs with Sky PINs.  And then within those folders

19   would be subfolders for chats that that particular ID was

20   having with other chats, with other PINs or IDs.  And then

21   there would be folders that contained pictures or audio files

22   or whatever else that wasn't data of texts, of messaging.

23   Q.   So, if I understand you, there's a spreadsheet in the

24   folder that contains chat data for whatever PIN you've

25   requested?

1    A.   Right.

2    Q.   And, in addition to that, there's a folder that contained

3    the photos, audio or video, that was found within that

4    spreadsheet?

5    A.   That's correct.

6    Q.   All right.  And on the spreadsheet does the spreadsheet

7    give you any information as to the date or the time of the

8    chat?

9    A.   Yeah.  The spreadsheets were expansive.  They're, you know,

10   multiple columns, not just three or four columns with just text

11   messaging type content.  It had all the what we call metadata,

12   right, for the messaging.  I believe it's in Greenwich Mean

13   Time and down to the second when the message was sent and other

14   identifiers, message IDs, because each message, you know, had a

15   certain coding to it.  So there was a lot of technical

16   information in the spreadsheets.

17   Q.   All right.  And in terms of the -- to the extent a photo, a

18   video or audio was referenced in the chat, how would it be

19   referenced?

20   A.   So each file, each multimedia, whether it's audio or

21   picture, would have a long alphanumeric, or maybe just a

22   numeric string.

23   Q.   In the body of the chat?

24   A.   In the body of the chat, yes.

25   Q.   And so how would you locate the actual photo or video or

 1  audio that's associated with that long string?

 2  A.   You would have to search.

 3  Q.   Search what?

 4  A.   Well, if you -- in the folders with the other files, that's

 5  what the file would be named.

 6  Q.   Oh.  In the media folder you're saying?

 7  A.   Yes.

 8  Q.   So you would take that number and look for it in the media

 9  folder?

10  A.   I believe -- yes, yes.

11  Q.   Now, in the course of -- strike that.

12          Did you have an opportunity to review the data that

13  was sent to you in your investigation by the French?

14  A.   I did.

15  Q.   And in the course of your review, did you ever review or

16  receive a chat that contained only one-sided data of a PIN

17  number?

18  A.   I did.

19  Q.   And based on your experience and knowledge of this

20  investigation, why would that be?

21  A.   It's my understanding and belief that there's several

22  reasons.  During the history of Sky ECC as an application, you

23  know, that network was around for over a decade.  There would

24  be updates to the network, to the version, the software.

25          And, if you were on an older version and the person

1    you were communicating had already updated, that could affect

2    how the data obtained by the French was gathered.  There might

3    be some missing different devices, some people being on an

4    iPhone, some people being on an Android could affect things

5    with the types of private keys that the officers had acquired

6    for decrypted --

7              MR. FINK:  Judge, can I voir dire on this answer

8    before I lodge an objection from further going on on it?

9              THE COURT:  Yes, you could.

10             Do you have any objection, Mr. McDonald?

11             THE COURT:  Well, could he finish his answer first?

12             MR. FINK:  The problem is I want to know the

13   foundation for where he's getting this is the reason why.  Is

14   it based on somebody telling him this, is it his personal

15   knowledge?  That's the question --

16             THE COURT:  I'll let him ask that question.  Answer --

17   well, we should wait for the answer.  You can pose the question

18   again, okay.

19             Note where that question is for the record so we can

20   read it back, okay.

21             MR. FINK:  Thanks, Judge.

22             THE COURT:  Okay.

23   BY MR. McDONALD:

24   Q.  My question to you --

25             THE COURT:  Well, wait a minute.  Are you going to go

1   ahead?

2          MR. FINK:  Are you asking me to --

3          THE COURT:  Yes.

4          MR. FINK:  Oh.  Thank you.  I misunderstood.

5                    VOIR DIRE EXAMINATION

6   BY MR. FINK:

7   Q.  The answer, Agent, that you're giving as reasons why the

8   chat might be one-sided --

9   A.  Right.

10  Q.  -- forgive me for interrupting you, but the question -- the

11  basis, the foundation question is these reasons you're giving,

12  what are those conclusions based on specifically?  Where did

13  you get them from?

14  A.  Those reasons, they're not my own ideas.  They are borne

15  out of conversations with the technical specialists that were

16  involved in the investigation and also analysis that was done

17  after the fact by other investigators that weren't a part of

18  the investigation that were reviewing the methodology for the

19  investigation.

20  Q.  So you are summarizing conclusions of others who have

21  worked pre and post obtaining this information and theorizing

22  as to why the result is sometimes one-sided chat; is that fair?

23  A.  That's correct and fair.

24         MR. FINK:  Thank you, Agent.

25         THE COURT:  Okay.

```
 1            MR. FINK:  Judge, I'm not sure that this is a proper
 2   bases to give an opinion or personal knowledge.  I mean, it's
 3   speculative as to why, but the fact is we don't have full
 4   chats.  We would need the person here to tell us the reasons,
 5   not someone summarizing another opinion.
 6            THE COURT:  Mr. McDonald?
 7            MR. McDONALD:  Judge, this witness has testified for
 8   now over an hour and a half about his experience with Sky,
 9   about how he has his own investigation into Sky, about how he
10   participated in the foreign investigation and had numerous
11   conversations with foreign investigators, that he knows all of
12   the steps, and that he knows based on those conversations why
13   investigators have seen why you would only have a one-sided
14   chat.  I think I've laid a proper foundation for him to answer
15   this question.
16            MR. FINK:  I think it's important, though, Judge, that
17   he specifically says these are not my ideas.  And I appreciate
18   the candor, but there's no personal knowledge or expert
19   foundation to base it on.
20            THE COURT:  Well, I don't think we know that yet.
21   Well, maybe we do.  Maybe we know some expert foundation for
22   that.
23            And what was your other part that you wanted to argue
24   about?
25            MR. FINK:  My point is even an expertise, even if it's
```

1    not his personal knowledge, it has to be based on something

2    other than just what someone else told him.  It has to be

3    something that he can opine as to the veracity of it.  And, if

4    these are not my ideas and based on other people's work, just

5    summarizing their hearsay is not expert testimony.

6         MR. McDONALD:  Well, on one hand he says you don't

7    have to have personal knowledge.  On the other hand, he says

8    you don't need personal knowledge.

9         The fact is the witness has testified about all his

10   involvement in this investigation, his conversations, his

11   experience with the foreign investigation, the relay of

12   information back and forth.  He can certainly speak to that and

13   his own experience with Sky messages in his own investigation.

14   There's certainly an appropriate foundation for him to answer,

15   if he knows, why that the messages come out only one-sided on

16   occasion.

17        MR. FINK:  My two-sided argument is quite consistent,

18   because the Government is offering hybrid testimony.  He's

19   being a lay witness and an expert witness.  So I'm telling you

20   why under both circumstances it's inappropriate.  That's why

21   I'm doing it that way, Judge.

22        THE COURT:  All right.  I hate to do this to you, but

23   I'm going to send the jury home.

24        MR. McDONALD:  Okay.

25        THE COURT:  And so remember that you're not permitted

1    to talk about the case among yourselves or with anyone else

2    until I tell you it's time to deliberate.  And you can't use

3    any social media or the internet or anything like that to find

4    out anything about the case, anyone involved in it, any place

5    involved in it, or to communicate anything about the case to

6    anybody else, okay.  And then leave your packets, your

7    notebooks, in the same way you've been leaving them for the

8    past few weeks, okay.

9           All right.  I'll see you tomorrow at 9:30.  Okay.  You

10   may step down.

11          Please rise for the jury.

12          (The jury left the courtroom at 3:55 p.m.)

13          THE COURT:  You may step down, but can you come back

14   tomorrow?

15          THE WITNESS:  Yes, ma'am.

16          THE COURT:  All right.  Very good.  Thank you.

17          THE WITNESS:  Thank you, your Honor.

18          THE COURT:  You may step down.

19          Okay.  Let's take this up a little further tomorrow --

20          MR. McDONALD:  Yes, your Honor.

21          THE COURT:  -- first thing, okay.

22          MR. McDONALD:  Yes, your Honor.

23          MR. FINK:  Yes, Judge.

24          THE COURT:  Anything else we need to do tonight?

25          MR. McDONALD:  Nothing from the Government.  Thank

1    you.

2              THE COURT:  All right.  Very good.  Then have a good

3    evening, and I will see you tomorrow.

4              MR. FINK:  Thank you, Judge.

5              MR. McDONALD:  Thank you.

6              (The proceedings were adjourned at 3:56 p.m.)

7                        —   —  —

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1

 2

 3                    CERTIFICATE OF COURT REPORTER

 4

 5          I, Sheila D. Rice, Official Court Reporter of the

 6   United States District Court, Eastern District of Michigan,

 7   appointed pursuant to the provisions of Title 28, United States

 8   Code, Section 753, do hereby certify that the foregoing pages

 9   is a correct transcript from the record of proceedings in the

10   above-entitled matter.

11

12

13                         s/Sheila D. Rice
                           Sheila D. Rice, CSR-4163, RPR, RMR, FCRR
14                         Federal Official Court Reporter
                           United States District Court
15                         Eastern District of Michigan

16
     Date:  04/11/2025
17   Detroit, Michigan.

18

19

20

21

22

23

24

25
```