1

2

                    **UNITED STATES DISTRICT COURT**
                    **EASTERN DISTRICT OF MICHIGAN**
                        **SOUTHERN DIVISION**

3
                            —   —   —

UNITED STATES OF AMERICA,

4
                Plaintiff,

5

    v.                              Case No. 21-20264

6

YLLI DIDANI,

7

                Defendant.

8
_____/

9
                **JURY TRIAL - VOLUME 21 - EXCERPT**
        **Testimony of Jason Willock (Continued) and Philip Daskal**

10
              **BEFORE THE HONORABLE DENISE PAGE HOOD**
                  **UNITED STATES DISTRICT JUDGE**

11

12
              Theodore Levin United States Courthouse
                  231 West Lafayette Boulevard
                       Detroit, Michigan

13
                  Wednesday, March 26, 2025

14
    **APPEARANCES:**

15

    **For the Plaintiff:**        Mark Bilkovic

16
                                  Timothy McDonald
                                  UNITED STATES ATTORNEY'S OFFICE

17
                                  211 W. Fort Street, Suite 2001
                                  Detroit, Michigan  48226

18
                                  (313) 226-9623

19
    **For the Defendant:**        Wade Fink
                                  WADE FINK LAW, P.C.

20
                                  550 W. Merrill Street, Suite 100
                                  Birmingham, Michigan  48009

21
                                  (248) 712-1054

22
    **Also present:**             Special Agent Chad Hermans
                                  Maria DiCarlo, Paralegal

23

24

25
          *To obtain a copy of this official transcript, contact:*
              *Sheila D. Rice  Official Court Reporter*
              *(313) 234-2610 • sheila_rice@mied.uscourts.gov*

1

**TABLE OF CONTENTS**

2

MATTER                                                          Page

3

**JURY TRIAL - VOLUME 21 - EXCERPT**

4

**Government's Case in Chief (Continued)**

5

**JASON WILLOCK**
Continued direct examination by Mr. McDonald........   6

6

Cross-examination by Mr. Fink......................  12
Redirect examination by Mr. McDonald...............  55

7

Examination by the Court...........................  59

8

9

**PHILIP DASKAL**
Direct examination by Mr. Bilkovic.................  63
Cross-examination by Mr. Fink...................... 162

10

Redirect examination by Mr. Bilkovic.............. 194
Examination by the Court........................... 198

11

Recross by Mr. Fink................................ 199

12

Certificate of Court Reporter...................... 200

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                        E X H I B I T   I N D E X

3

Exhibit No.             Description          Identified    Admitted

4

   Government's 73.0     WhatsApp chats          73          75
5  Government's 73.2     Audio message           85          86
   Government's 73.11    Photograph              92          92
6  Government's 73.17    Photograph              89          90
   Government's 73.20    Photograph             126         126
7  Government's 73.24    Texts about token      146         148
                         prices
8  Government's 73.25    Voice message          150         150
   Government's 73.27    Audio message          151         151
9  Government's 73.42    Photograph             154         154
   Government's 73.45    Photograph             130         131
10 Government's 73.49    Audio message          136         137
   Government's 73.50    Text message screens   133         134
11 Government's 73.51    Photograph             138         139
   Government's 74.0     WhatsApp chats          77          79
12 Government's 74.5     Photo                  119         119
   Government's 74.6     Photo of texts         191         194
13 Government's 74.22    Screenshot of photo    152         152
   Government's 119.0    Invoices and sales      94          96
14 through 119.4         agreements
   Government's 120.0    Sales documents for     97          97
15 through 120.2         Lexus vehicle
   Government's 121.0    Sales documents for     98          98
16 through 121.4         Mercedes Benz
   Government's 123.0    Sales documents         98          99
17 through 123.3

18

19

20

21

22

23

24

25

1    Detroit, Michigan

2    Wednesday, March 26, 2025

3    9:42 a.m.

4                                          —    —    —

5            LAW CLERK:  All rise.

6            United States District Court for the Eastern District

7    of Michigan is now in session, the Honorable Denise Page Hood

8    presiding.

9            Calling Case Number 21-20264, United States of America

10   versus Ylli Didani.

11           Appearances, please.

12           MR. McDONALD:  Good morning, your Honor.  Tim McDonald

13   and Mark Bilkovic on behalf of the Government.  Also at counsel

14   table is Maria DiCarlo and Special Agent Chad Hermans.

15           THE COURT:  Okay.  Good morning to you, and you may be

16   seated.

17           MR. FINK:  Good morning, your Honor.  Wade Fink on

18   behalf of Ylli Didani who is present at counsel table to my

19   right.

20           THE COURT:  Okay.  Good morning to both of you, and

21   you may be seated also.

22           DEFENDANT DIDANI:  Good morning, your Honor.

23           THE COURT:  Okay.  Yesterday we were at the point of

24   having some voir dire relative to Mr. --

25           Is it Willock; is that right?

```
 1              MR. FINK:  Yes, your Honor.
 2              THE COURT:  Testifying as an expert.  And I think
 3    sufficient foundation has been laid for him to testify in this
 4    way, and that your questions can be taken up on
 5    cross-examination, Mr. Fink.
 6              MR. FINK:  Thank you, your Honor.
 7              THE COURT:  You're welcome.  Let's bring out the --
 8              Is your witness here?
 9              MR. McDONALD:  Yes, your Honor.
10              LAW CLERK:  All rise for the jury.
11              (The jury entered the courtroom at 9:44 a.m.)
12              THE COURT:  You may all be seated.
13              Are you satisfied -- good morning, jurors.  How are
14    you?
15              JURORS:  (Collectively) Good morning.
16              THE COURT:  Good.  Are you satisfied the jurors are
17    present and in their proper seats?
18              MR. McDONALD:  Yes, I am, your Honor.
19              THE COURT:  What about you, Mr. Fink?
20              MR. FINK:  I'm satisfied, Judge.
21              THE COURT:  You're laughing, but, you know, jurors
22    sometimes are pranksters, and they think they could change
23    their seats and no one will notice.  But usually somebody,
24    either the Judge or one of the counsel, are like really paying
25    attention to where people sit, so ...
```

```
 1              MR. FINK:  I studied it, Judge.  I'm comfortable.
 2              THE COURT:  All right.  Very well.
 3              Mr. Willock, that's never happened to you; right?
 4              THE WITNESS:  No, ma'am.
 5              THE COURT:  You're still under oath.
 6         There's hardly any room for humor in criminal cases.
 7    So whenever we come upon it we try to take it with no offense,
 8    of course, to the defense.
 9              THE WITNESS:  Absolutely.
10              THE COURT:  Please state your name again for the
11    record, and remember you need to speak right here, okay.
12              THE WITNESS:  Yes, your Honor.
13              THE COURT:  Okay.  Very good.  State your full name
14    again.
15              THE WITNESS:  Good morning.  Special Agent Jason
16    Willock from the --
17              THE COURT:  You're still under oath.
18              THE WITNESS:  Yes.
19              THE COURT:  Okay.  You may proceed, Mr. McDonald.
20              MR. McDONALD:  Thank you, your Honor.
21              THE COURT:  And I overruled Mr. Fink's objection
22    before you came out, okay.  All right.
23                   DIRECT EXAMINATION (Continued)
24    BY MR. McDONALD:
25    Q.  Agent Willock, I just have a few more questions for you.
```

```
 1              When we left off last time, we were talking about
 2    one-sided chats.
 3              THE COURT:  One -- say that again.
 4    BY MR. McDONALD:
 5    Q.  We were talking about one-sided Sky chats.  Do you remember
 6    that?
 7    A.  Yes, sir.
 8    Q.  All right.  And you started to say some of the reasons why
 9    there may be one-sided chats; is that accurate?
10    A.  Yes, sir.
11    Q.  All right.  In the course of your experience and your own
12    case in California, did you come across one-sided chats, Sky
13    chats?
14    A.  Yes, I did.
15    Q.  In the course of your own case and other cases you're
16    familiar with, did you come across chats that have been
17    duplicated?
18    A.  Yes, I did.
19    Q.  Can you describe what that will look like?
20    A.  So these chats were portrayed in a spreadsheet, in an Excel
21    spreadsheet document, or a CSB file, as an alternative.  And
22    each line would represent a message that was sent, the full
23    message.  And let's say that message was on line 5 of the
24    spreadsheet, line 6 would have the exact same data conveyed,
25    repeated, duplicated.
```

1    Q.   Okay.  So same content of the message?

2    A.   That's correct.

3    Q.   And what about date, time and other metadata that was

4    included?

5    A.   The same, yes.

6    Q.   What about in your experience have you come across data

7    that was produced where chats are tripled?

8                THE COURT:  Are what?

9                MR. McDONALD:  Tripled.

10               THE COURT:  Okay.

11               THE WITNESS:  So in the same format, if a message was

12   on line 5, it would be on line 6 and line 7 as well.  And then

13   if there was another side, a response to that message, 8, 9 and

14   10 would have the same message.

15   BY MR. McDONALD:

16   Q.   All right.  And were you given reasons why the data was

17   produced that way by France?

18   A.   Yes, I was.

19   Q.   And were some of those reasons what you told us yesterday?

20   A.   Yes, sir.

21   Q.   Now, do you know the total number of messages approximately

22   that were seized by Sky during their operation, or seized by

23   France during the Sky operation?

24   A.   As of today, that number is over one billion messages

25   intercepted.

```
 1   Q.   And those messages, does each message undergo a decryption
 2   process?
 3   A.   Each message that was intercepted during the course of
 4   investigation that has been decrypted has gone through a
 5   description process, yes.
 6   Q.   And do you know whether or not the decryption process is
 7   ongoing to this day?
 8   A.   It still is.  Messages are still being decrypted.
 9   Q.   Now, were you or investigators that you were involved with
10   in this investigation able to verify that the data on the
11   server in Roubaix, France was, in fact, Sky data from Sky
12   devices?
13   A.   Yes, sir.
14   Q.   And can you describe how you were able to determine that?
15   A.   So once we identified that Sky Global, Sky Technologies,
16   the couple running the Sky ECC app, had servers to facilitate
17   that communications network, we learned that they used a
18   software provided by BlackBerry.  It's called Unified Endpoint
19   Management, or UEM.
20        And I think I previously discussed how UEM is a
21   software tool used by major corporations around the globe to
22   manage mobile devices that are issued from that company.  It's
23   a way the security teams can remotely manage those devices and
24   ensure that the companies' data on those devices is properly
25   managed.
```

1       So that software runs on the same servers that Sky
2   Global utilized, and those servers, or that software, is
3   identified through a license, or an SRPID.
4   Q.   What's an SRPID?
5   A.   Server routing protocol ID.  It's a unique identifier that
6   those devices have to connect with to the server.  It's
7   basically a way that the device is validated to be on that
8   server.
9       And so by having those SRPIDs from BlackBerry, when we
10  interacted with them to get information about the licenses for
11  the software that Sky Global had, we were able to show that Sky
12  ECC application was running on those servers by means of having
13  those identifiers.
14  Q.   All right.  And how were you -- were you able to identify
15  the devices that were using those servers?
16  A.   Yes.
17  Q.   All right.  And how were you able to do that?
18  A.   So every device is managed by Sky ECC with a mobile device
19  management tool, and every device has on it an SRPID.  We asked
20  BlackBerry for all the devices that had that identifier.  We
21  also understood that the devices had to connect to these
22  servers through a mobile network, a cellular network.
23      And the bulk of those devices either had AT&T SIM
24  cards in them or a Dutch telecom known as KPN.  So the Dutch
25  interacted with KPN, and my team in the U.S., with me being the

1   primary liaison, interacted with AT&T.

2           And we requested a run of all the devices a couple of

3   times.  We didn't do it just once.  So that allowed us to get a

4   snapshot of all the devices on the network during those time

5   periods.

6   Q.  You talked yesterday about encryption and something called

7   Wireshark.  Am I saying that right?

8   A.  Yes, sir.

9   Q.  All right.  And do you know whether you or other

10  investigators in the foreign Sky investigation utilized

11  Wireshark to decrypt these messages?

12  A.  Yeah.  So the European team, the Dutch, Belgians and French

13  utilized the platform Wireshark.

14  Q.  Are you familiar with Wireshark?

15  A.  Just in general terms.

16  Q.  Do you know whether it's a commonly used tool in the

17  industry?

18  A.  Yes.

19  Q.  Yes, it is a common tool?

20  A.  Yes, it is.  Yes.

21          MR. McDONALD:  May I have one moment, your Honor?

22          THE COURT:  You may.

23          (Briefly off the record.)

24          MR. McDONALD:  No further questions.  Thank you.

25          THE COURT:  Cross-examine, please.

```
 1                        CROSS-EXAMINATION
 2    BY MR. FINK:
 3    Q.   Agent Willock, we've spoken before, but I'm Wade Fink,
 4    Mr. Didani's attorney.  Sorry to keep you an extra day.  I hope
 5    you enjoyed Detroit last night a little bit.
 6    A.   No worries.  Thank you, sir.
 7    Q.   Agent, do you know what Operation Argus is?
 8              THE COURT:  A-R-G-U-S?
 9              MR. FINK:  Yes, ma'am.
10              THE WITNESS:  I'm familiar with that name, yes, sir.
11    BY MR. FINK:
12    Q.   What is it, or what's your familiarity with it?
13    A.   That is the name that the Dutch authorities title their
14    investigation.
15    Q.   Do you know what the actual operation was or what it was
16    referring to?
17    A.   My understanding is that Argus is their approach to the Sky
18    ECC investigation.
19    Q.   The monitoring of the live messaging being sent once the
20    decryption had been done; correct?
21    A.   I think that's fair.  The Dutch did not discuss the name of
22    their investigation with me.  I could say I learned of it
23    afterwards.
24    Q.   Sure.  Do you know what Argus is?
25    A.   I do not.
```

1  Q.   You ever heard of the Greek mythology Argus Panoptes,

2  meaning the all-seeing one?  Does that sound familiar?

3  A.   That does sound familiar, yes.

4  Q.   Operation Argus, the all-seeing one; right?

5  A.   Absolutely.

6  Q.   Do you know how long it would have taken or how many

7  agents, or can you put into perspective how long it would have

8  taken the amount of information that was obtained from Sky ECC

9  to review all of it?

10  A.   I cannot answer that.

11  Q.   Are you aware that one French court estimated it would take

12  about 635 years or 400 agents to review all those messages?

13  A.   I've heard numbers along those lines.

14  Q.   My point being it's an extreme amount of data; correct?

15  A.   Absolutely.

16  Q.   Now, the United States -- you expressed on direct

17  examination some familiarity with U.S. efforts to combat the

18  concern of encryption services being used to commit crimes;

19  correct?

20  A.   Yes, sir.

21  Q.   And that's a longstanding effort by our government;

22  correct?

23  A.   Yes, it is.

24  Q.   In fact, it dates back to the '90s when we even heard of

25  encryption services; correct?

1    A.   My estimate is more than 20 years.

2    Q.   Sure.

3    A.   Yes.

4    Q.   Well, for example, have you ever heard of the Clipper chip?

5    A.   No, sir.

6    Q.   You ever heard of efforts previously to obtain access by

7    the United States government to encryption services?  Are you

8    familiar with any of the government's efforts prior to this

9    case?

10   A.   Well, I was involved in one of those cases, and I've heard

11   of others, yes.

12   Q.   Would you agree with me that there has been a debate, for

13   lack of better term, about what the balance is between the

14   right to privacy and the Fourth Amendment and the government's

15   efforts to decrypt or infiltrate encryption services?

16   A.   Absolutely.  It's a very serious concern.

17   Q.   And a lot of government efforts have been -- I'm using this

18   word, I'm not intending for you to, but thwarted or put on hold

19   by certain court decisions; correct?

20   A.   I understand that efforts have been limited, yes.

21   Q.   Sure.  Now, the United States' involvement with the Sky ECC

22   investigation to the best of your recollection began when?

23   A.   The summer of 2018.

24   Q.   And do you remember the genesis of the United States'

25   involvement, what sparked our government's interest or

1    collaboration in that effort?

2    A.   Well, my co-case agents on the investigation, we had worked

3    together targeting a company known as Phantom Secure.

4          THE COURT:  I'm sorry?

5          THE WITNESS:  My investigative team, the other agents

6    I worked with at the time, were fresh off of an investigation

7    targeting a company known as Phantom Secure that was located in

8    Vancouver, Canada.

9          And during the course of that investigation we learned

10   of the competitor, Sky Global, Sky Technologies, managing the

11   app, Sky ECC.  And through our investigative efforts, speaking

12   with confidential sources and others that were arrested during

13   that investigation, we learned and suspected that Sky Global

14   was involved in facilitating narcotics trafficking and

15   supporting organized criminal activities around the globe.

16   BY MR. FINK:

17   Q.   So the genesis of the United States' involvement with the

18   investigation, the collaborative effort with other nations into

19   Sky ECC, started with the case that you were working on?

20   A.   Well, initially the case file I opened was purely a

21   domestic case targeting individuals in the U.S. and in Canada.

22   We had communications with the Canadian authorities and other

23   federal agencies in the U.S., but at that time I was not

24   familiar with the European efforts or who was involved in

25   Europe.

1    Q.   And that's what I'm asking.  I mean, the one thing -- one

2    investigation per usual in federal cases led to another and the

3    discovery of Sky ECC and Sky Global and eventually to

4    international efforts that had been ongoing; is that accurate?

5    A.   I think that's a fair way to frame it.

6    Q.   Thank you.  Now, just put in perspective -- you did a

7    little bit of this on direct examination.  Broadly speaking,

8    and I know this might be a little different, the technology for

9    each app, but broadly speaking the idea of encrypted messaging

10   is one device sends a message to a server, and that server

11   sends the message to another device and it's hosted elsewhere.

12   Is that a general fair way to describe how the message goes

13   from one phone to another?

14   A.   That is a very common way.  There are other means, but,

15   yes, that is a common means of sending encrypted

16   communications.

17   Q.   And the idea is to keep those messages private or difficult

18   to discover to an outside source for whatever reason might want

19   to be seeing that information; right?

20   A.   That's correct.

21   Q.   And colloquially we know a lot of those apps exist just

22   domestically that the jurors, myself or anybody might use

23   themselves; right?

24   A.   Yes, sir.

25   Q.   We have Signal?

1    A.   Yes.

2    Q.   Which has become famous as of this week; right?

3    A.   Yes.

4    Q.   We have WhatsApp; right?  In fact, even iMessages have

5    end-to-end user encryption; correct?

6    A.   Yes.  They employ a type of encryption, yes.

7    Q.   Would you agree with me that the use of encryption devices

8    for messaging has numerous legitimate purposes, non-illegal

9    purposes?

10   A.   Yes.

11   Q.   Companies who have secrets or technology or communicate

12   about things that is proprietary might use it; correct?

13   A.   Absolutely, yes.

14   Q.   Drug manufacturers, for example?

15   A.   I believe they might have a need.

16   Q.   A company like Raytheon who has government contracts,

17   defense contracts; right?

18   A.   Yes.

19   Q.   There might be other legitimate uses like sources for

20   journalists; correct?

21   A.   That's correct.

22   Q.   Might be legitimate to be -- a whistleblower may want to

23   tell a journalist about something illegal going on, but doesn't

24   want to be discovered; right?

25   A.   That's correct.

1    Q.   It might be foreign intelligence whistleblowers that want

2    to help the U.S. or others that don't want to be discovered;

3    correct?

4    A.   Yes.

5    Q.   There's also just, believe it or not, general privacy that

6    people want; right?

7    A.   That's fair to say.

8    Q.   Maybe celebrities, for example, want to share information

9    about their lives and what's going on without fear of the

10   paparazzi or anyone similar intruding; correct?

11   A.   Yes.

12   Q.   Maybe people want to share intimate photos with partners

13   that live elsewhere; right?

14   A.   I could say that is correct.

15   Q.   I'm not saying that you know that to be the case.  I'm

16   saying that seems like a reasonable use.  If two people who

17   love each other live in different parts of the world and want

18   to intimate and don't want to share it with the world, that

19   could be one use; right?

20   A.   What use are they -- I guess I just don't --

21   Q.   Send intimate photos of each other, naked photos of each

22   other to people who love each other who don't live in the same

23   state and they don't want their naked pictures on the internet.

24   They might use encrypted services; right?

25   A.   A particular type of encrypted service, yes.

1   Q.   Sure.   Now, when you began your investigation, or the

2   impetus for your investigation became known when you were

3   investigating Phantom Secure and became aware of Sky Global,

4   you started building relationships with companies that may

5   utilize the Sky Global service; is that accurate?  I believe

6   you said BlackBerry, for example.

7   A.   Well, utilize tools from those companies, and those

8   relationships were already existing when the Sky Global

9   investigation commenced.

10  Q.   So in your other investigations you had already started

11  building those relationships with the companies and come across

12  Sky Global that just becomes another topic of investigation and

13  discussion with these relationships; correct?

14  A.   Well, it just -- it doesn't just become, you know.  Those

15  conversations were based off of investigative research and

16  quality controlling information that we had to ensure that we

17  were looking at something that was of a criminal nature.

18  Q.   Were you involved in the United States' investigations of

19  the CEOs of Sky Global?

20  A.   Yes.

21  Q.   Mr. Eap?

22  A.   Yes, sir.

23  Q.   I believe Mr. Herndon?

24  A.   Herdman.

25  Q.   Herdman?

Jury Trial, Volume 21 - Excerpt - March 26, 2025

1    A.   Herdman, yes.

2    Q.   Thank you.  You were one of the agents on those cases?

3    A.   Yes, sir.

4    Q.   And, correct me if I'm wrong, as your investigation

5    progressed, and feel free to -- I'm not trying to narrow your

6    answers, but just -- so if you need to expound tell me.  But at

7    some point the U.S. believed that the CEOs of this company, Sky

8    Global, were involved in illegality themselves; correct?

9    A.   That's correct.

10   Q.   And, generally speaking, the United States was intent on

11   indicting these two individuals in connection with their

12   creation of Sky ECC or Sky Global; correct?

13   A.   That was our investigative goal when we started the case.

14   Q.   What year, approximately?  I know it may not be precise.

15   What time and year at least did the United States' interest in

16   the leadership of Sky Global become a criminal investigation?

17   A.   Officially summer of 2018.

18   Q.   Summer of 2018, okay.  Now, the reason I ask that is, if I

19   heard you correctly, you were one of the United States'

20   representatives at a global meeting -- well, I should say an

21   international meeting.  Was it in the Netherlands?

22   A.   Yes, at The Hague.

23   Q.   You had a meeting at The Hague with other law enforcement

24   agencies to discuss Sky Global and strategies of combatting the

25   illegal activity; correct?

1   A.   Yes, sir.

2   Q.   Now, how many representatives of the United States were at

3   that meeting, approximately?

4   A.   I believe there were two prosecutors from the Southern

5   District of California, an intel analyst.  So that would be

6   three.  And maybe four agents.  So seven of us, approximately.

7   Q.   Relatively small group; correct?

8   A.   Yes, sir.

9   Q.   Makes you pretty famous in some circles who follow this;

10  right?

11  A.   I wouldn't use the word "famous," but I was humbled to be a

12  part of that meeting.

13  Q.   It was a big deal; right?

14  A.   It was significant.

15  Q.   And at that meeting there was a discussion amongst how many

16  nations, would you say, about combatting the ill effects that

17  law enforcement viewed was coming from Sky Global?

18  A.   I believe there were roughly 12 or 13 countries present at

19  that meeting.

20  Q.   And I know you're not going to list all of them, but can

21  you give a snapshot of the ones you recall involved?

22  A.   It might be easier for me to think about it going west to

23  east.

24  Q.   Sure.

25  A.   But England, Spain, France, Belgium, the Netherlands,

 1    Italy.  Germany may or may not have been there.  Australia,
 2    Canada and, of course, the U.S.  And I'm definitely missing --
 3    Q.   No, I understand.
 4    A.   Norway I believe was there.
 5    Q.   I think you said Belgium; correct?
 6    A.   Yes.
 7    Q.   Belgium, the Dutch and the Netherlands and France would you
 8    agree with me are three of the bigger international players in
 9    this investigation; is that accurate?
10    A.   France, Belgium and the Netherlands were the most
11    significant of the countries present.
12    Q.   Other than us; right?
13    A.   Yes.
14    Q.   Desire to indict the CEOs of Sky Global, or the desire to
15    at least investigate and hopefully result in an indictment if
16    the evidence bore it out, began in summer of 2018?
17    A.   Yes, sir.
18    Q.   This meeting occurred in February of 2019?
19    A.   Yes, sir.
20    Q.   That was a discussion point at that meeting; correct?
21    A.   Whether we would be able to indict the CEO?
22    Q.   The U.S.'s desire to indict the CEO.
23    A.   That was discussed, yes.
24    Q.   In fact, there was a tacit agreement between the United
25    States and these other countries that the United States would

 1    let these other countries finish their investigation and what

 2    they wanted to do before the United States indicted the CEOs;

 3    is that correct?

 4    A.   You said a tacit agreement.

 5    Q.   Are you aware of the French report that said there was a

 6    tacit agreement between the American and Dutch authorities that

 7    allowed the European investigations to continue with the

 8    American suspending further operations pending ongoing

 9    investigations?  Are you aware of that?

10    A.   I recall reading or seeing reporting along those lines.  I

11    just wanted to clarify the term you were using.

12    Q.   Sure.  I'm using it because that's from the French report,

13    but let's just take out the word "tacit" because I don't think

14    that's an important part.  There was some general

15    understanding --

16    A.   Yeah, I would say --

17    Q.   -- that the United States would hold off on indicting these

18    individuals while Europe continued doing what it was going to

19    do with its Sky ECC investigation; right?

20    A.   Yeah.  Nothing formally was signed or a handshake.  It was

21    a general agreement.

22    Q.   You had mentioned that -- I just want to understand, and I

23    know this is very complicated.  So I apologize if I'm jumping

24    around.  I apologize to the jury and you.  If I need to

25    reorient myself in the timeline, tell me.

```
 1              But my understanding from your direct testimony is --
 2    I'm going to use the word "you," but the United States, you,
 3    got a list of IP addresses and PINs from BlackBerry phones that
 4    had been seized, or from BlackBerry through requests, something
 5    along those lines?  Can you make me more precise with what I'm
 6    saying?
 7    A.   I guess I'm still trying to track what you're referring to.
 8    Q.   So you obtained information from BlackBerry that then
 9    eventually led to the seizure of the French -- the seizure of
10    the server in France; right?  Is that an accurate statement
11    generally?
12    A.   I think the information that we were able to secure, that
13    we were able to obtain, assisted France in their -- and the
14    Belgians and Dutch and the others involved with the seizure of
15    Sky servers.
16    Q.   That's what I'm asking.  I want to understand precisely
17    what you got and did with BlackBerry.
18    A.   Yeah.
19    Q.   And then what was transmitted to Europe.  So I may have
20    stated it as a layman who doesn't really understand the
21    technology like you do, but what did you do specifically with
22    BlackBerry?  What information did you get that you then
23    transmitted?
24    A.   I think it would be tough for me to give you a full
25    catalog.
```

1   Q.   Okay.  30,000 --

2   A.   Yeah.  So ultimately it was information related to the

3   types of accounts, the types of software, the types of tools

4   that Sky Global purchased from BlackBerry.  Also, data that

5   BlackBerry had related to phones that they were able to observe

6   or other computer-type tools that would interact with the

7   BlackBerry system or infrastructure.

8   Q.   And you made a request, you being the Government or whoever

9   may have done it, but you have knowledge that there was a -- I

10  believe you said a judicial request made of BlackBerry for this

11  information; is that correct?

12  A.   Multiple different types.

13  Q.   What does that mean, a judicial request?

14  A.   So anything from a subpoena all the way up to a search

15  warrant.

16  Q.   So the United States went -- got process of some kind;

17  right?

18  A.   Yes.

19  Q.   Said, BlackBerry, we want X, X and X information; right?

20  A.   Yes.

21  Q.   We took that information from BlackBerry that was given to

22  us in response to these various judicial requests, right, "we"

23  being the United States?

24  A.   Yes.

25  Q.   We, the United States, then sent that to French, Dutch and

1   other authorities to assist in their investigation of Sky

2   Global, Sky ECC; right?

3   A.   Just to clarify.

4   Q.   Sure.

5   A.   To use the word "sent," there's a whole process.  So it

6   wasn't we received something and then we throw it in an

7   envelope and mail it over.  Some of this data or documentation

8   or information requires us to go through a process with

9   elements of the justice department in D.C. to get approval to

10  share.

11  Q.   So it may be similar to an MLAT.  There's processes by

12  which we get information to other countries; correct?

13  A.   Yes, sir.

14  Q.   I am using this in a very layman way just to understand

15  transactionally.  So I'm not trying to pin you down that

16  something was done improperly in terms of the sharing.  I'm

17  just asking that properly, I'm assuming --

18  A.   Yes.

19  Q.   -- this information that we got, the United States through

20  our process, was then shared with our European law enforcement

21  friends; correct?

22  A.   I can appreciate that.  I just felt the need to clarify

23  that.

24  Q.   I appreciate you.  But that's true generally what I said?

25  A.   Yes, sir.

1    Q.   Okay.  And it's your understanding that the information

2    that we obtained from BlackBerry through judicial process here

3    was at least part and parcel of seizing the very first server

4    of Sky Global in Roubaix, France; correct?

5    A.   I would offer it helped.  The information that we obtained

6    I think it's important to note France could have obtained it

7    without us.

8    Q.   The information we gave them, like IP addresses, helped

9    narrow where that server was; is that accurate?

10   A.   Bingo.  It did, yes.

11   Q.   So the time in which it was seized relative to when France

12   may have discovered it on their own certainly was aided by our

13   help; correct?

14   A.   I think that's fair to say.

15   Q.   So at this point in my timeline, which I know I'm not being

16   perfect on, but just going linearly as opposed to this date,

17   this date, this date, we have an investigation into -- I just

18   want to recap -- into the owners of Sky Global in summer of

19   '18, an agreement in February of '19 that we're not going to

20   charge them while this Sky ECC investigation continues to go

21   on.  And during the same time the U.S. is assisting its foreign

22   allies and law enforcement to discover the servers and other

23   information about Sky Global.  Is that a general recap of what

24   we just talked about?

25   A.   I think it's important to note they were assisting us as

```
 1    well in the U.S.
 2    Q.   To be sure, and I was going to get there, but the seizure
 3    of that server in France is really what led to the downriver
 4    flow here of everything that came after; right?  I'm talking
 5    about -- when I say that, I mean live -- reviewing messages
 6    live, being able to decrypt otherwise encrypted messages.   I
 7    mean, it all stems from getting that server; right?
 8    A.   I think in a simplistic way, yes, that's accurate.
 9    Q.   Black Friday, so to speak, of Sky Global came in March of
10    2021; right?
11    A.   Yes, sir.
12    Q.   And that was when it was made known that there was seizures
13    that all these messages had been discovered, Sky Global was
14    shut down; correct?
15    A.   Yeah.  Just to clarify, is it Black Friday or Black Monday?
16    Q.   I'm using that term generally speaking.  The day that
17    everyone knows for Sky Global happened in March of 2021; right?
18    A.   Yes.
19    Q.   Okay.  And the U.S. took Sky's website off the web;
20    correct?
21    A.   That's correct.
22    Q.   We seized their website?
23    A.   We did.
24    Q.   And three days after our European friends in law
25    enforcement shut down Sky Global, three days later we indicted
```

1  Mr. Eap and Mr. Herndon (ph)?

2  A.   Thomas Herdman.

3  Q.   Herdman; correct?

4  A.   I believe it was roughly three days, you know, with the

5  time difference and whatnot.

6  Q.   Understood.  You had mentioned in 2019 that prior to

7  seizing the server of Sky Global in France there had been a

8  judicial French warrant that authorized that seizure; is that

9  correct?

10  A.   Yes, sir.

11  Q.   Do you know -- have you seen that warrant?

12  A.   I have not.

13  Q.   Are you aware that at a similar time a Dutch judge had

14  denied the Netherlands permission to seize Sky chats in the

15  Netherlands?

16  A.   I do recall that during the course of the European

17  investigation with the Dutch, Belgians and French that each of

18  their courts granted and limited operations or requests.

19  Q.   Different countries had different views of what was

20  authorized and what wasn't; right?

21  A.   Yes.  We were even limited in the U.S.

22  Q.   We were limited by that darn thing called the Fourth

23  Amendment; right?

24  A.   We're limited by many amendments and statutes, yes.

25  Q.   Dutch judge, do you recall reading, "It could not be

1    established that the users of Sky ECC were using the system

2    exclusively for illegal purposes."  Do you recall that?

3    A.  I don't recall that exactly, but I do recall that there

4    were limitations.

5    Q.  The Dutch judge, "It has not yet fully clarified how

6    exactly the intercepted encrypted data was ultimately decrypted

7    in cooperation with the French."  Do you recall that?

8    A.  I do not.

9    Q.  Do you recall that a judge in Panama acquitted 28

10   defendants because of the significant flaws in the evidence

11   presented -- the electronic evidence presented from the servers

12   from Sky ECC?  Are you aware of that case?

13   A.  I am not.

14   Q.  Did you author any search warrants in the United States for

15   -- or are you aware of any of your colleagues authoring any

16   search warrants in the United States for Sky ECC chats?

17   A.  Not for chats.  For data, metadata, mobile tower location

18   history, things of that nature, but not for content in the U.S.

19   Q.  Are you aware or did you author any search warrants or any

20   of your colleagues for the seizure of that server in France?

21   A.  Not for the server in France, no, sir.

22   Q.  Are you aware of any search warrants or anything similar

23   for any real-time chats that were discovered as a result of

24   that seizure?

25   A.  Warrants in the U.S. for real-time chats, I'm not aware of

1    any of those.

2    Q.  Are you aware that the U.S. benefited from France, Belgium

3    and Dutch efforts to reveal real-time chats as a result of the

4    seizure of that server?

5    A.  I would ask you to define "benefit."

6              THE COURT:  I'm sorry?

7              THE WITNESS:  Your Honor, I'm asking him to define the

8     word "benefit."

9              THE COURT:  Okay.

10             MR. FINK:  I'll try to ask it more precisely, Judge.

11   BY MR. FINK:

12   Q.  Were investigations in the United States aided or furthered

13   in any way by the discovery of these real-time chats as a

14   result of the seizure of the server in France?

15   A.  I don't know that the real-time chats, because the U.S. did

16   not have access during the -- so there was a live phase where

17   messages were intercepted and decrypted real-time, but they

18   weren't read.  And then there was a phase during that period

19   where as the messages came in, they were read.  And we're

20   talking in the neighborhood of a million messages per day were

21   going across the network, and officers and agents across Europe

22   were reading those.  The U.S. was not a part of that wire room

23   or interception room.  We did not read any real-time messages.

24   Q.  Was there any information shared about any imminent dangers

25   or anything coming from those real-time chats that you know of?

1  A.   I do recall, we call it threat to life, TTL, that those

2  situations arose during the live phase in Europe and other

3  countries.

4  Q.   And that could be -- that information could be from United

5  States users, European users, it could be from anyone; right?

6  A.   It could.

7  Q.   Necessarily captured in this review of real-time messages

8  and historic messages, necessarily captured in that is a

9  tremendous amount of nonillegal activity; correct?

10         THE COURT:   Is a tremendous amount of what?

11 BY MR. FINK:

12 Q.   Nonillegal or otherwise legal activity; correct?

13 A.   I'm having trouble understanding that question, because

14 defining "nonillegal activity" is, I think, important.

15 Q.   You're going to capture conversations in a billion

16 messages?

17 A.   Right.

18 Q.   That say, hello, how are you, I'm good, how are you;

19 correct?

20 A.   But if I'm a criminal, if I'm engaging in criminal activity

21 and I'm talking to someone on the other end of that phone who's

22 also engaging in the same criminal activity, and I ask them how

23 are they doing and how is dinner, that's still a part of our

24 criminal relationship.

25 Q.   I don't disagree with that, but, Agent Willock, I don't

1   think you're going to disagree with me that every single chat

2   that was seized, monitored historically or a live was related

3   to unlawful activity; correct?  You're not seriously going to

4   say a billion messages were all unlawful activity, are you?

5   A.   There's no way I would say "all," but when I use the term

6   "vast majority, extremely high percentage," I'm comfortable

7   saying that.

8   Q.   How could you possibly know that when we agreed with each

9   other that it would take 635 years and 400 agents to read those

10  messages?

11  A.   Because of how I clarified the fact that those messages of,

12  hello, how are you, how's dinner, are part of a criminal

13  activity, a criminal practice, and that the Europeans utilize

14  software to search the messages, artificial intelligence

15  programs.  And then additionally we send out -- you offered

16  that we seized the website?

17  Q.   Yes.

18  A.   Broadcast messages were relayed saying if you are the owner

19  of a Sky device, or have been on a Sky network and utilized it

20  for nonillegal purposes or are concerned about your data,

21  please call the U.S., FBI, DEA, IRS, and we did not receive any

22  phone calls.

23  Q.   That was after the fact; correct?

24  A.   That was after the fact, yes.

25  Q.   Are you aware that the Canadian police were using Sky ECC

1   for their own purposes?

2   A.   Define "for their own purposes."

3   Q.   Law enforcement -- furthering law enforcement

4   investigations.

5   A.   Yes.  We were using it as well as in the U.S.

6   Q.   Those weren't illegal chats; correct?

7   A.   I don't know what the Canadians used it for.  I know that

8   we used it in an undercover capacity.  And I would anticipate,

9   you know, testing and understanding how the devices work.  I

10  can't articulate or answer that question for the Canadians, but

11  based on my experience with them, they would have been using it

12  for the same purpose.

13  Q.   I appreciate the acknowledgment that you can't know what

14  you don't know about what the Canadians were using it for, and

15  that's what I'm asking you, Agent Willock.  I'm asking you that

16  necessarily involve decrypting a billion messages are going to

17  be messages of a nature that have nothing to do with a criminal

18  investigation.  That's what my original question was.  You

19  don't agree with that?

20  A.   I just -- I need -- I deal in percentages or numbers.  And

21  to make a statement that was contradictory to what I believe,

22  if you could offer a value of what percentage were noncriminal.

23  Q.   Well, I mean, I've told you that many judges have denied

24  process to law enforcement who have asked, one a Dutch judge

25  and one a Panamanian judge at least, who believe the nexus

1    between criminal activity and the use of these encryption

2    services were insufficient; right?  That's an example I gave

3    you; correct?

4    A.   So you did provide those examples, and again you used the

5    word "many."  I also am aware of, I guess, we could say many

6    judges that upheld the fact that those messages were criminal

7    and the network was run by criminals, used by criminals,

8    facilitated by criminals.

9    Q.   Was there any discussion amongst your team that dealt with

10   the Sky Global investigation and your interactions with the

11   Europeans?  I'm talking just over many years here.  Was there

12   any discussion at any point about the constitutionality of your

13   efforts to seize messages from the Sky Global servers?

14   A.   Absolutely.

15   Q.   Was the Fourth Amendment discussed?

16   A.   In general terms, the Fourth Amendment served as the

17   background for how we would author judicial requests.

18   Q.   Did anybody express concern about allowing foreign

19   countries to do things that we couldn't do and then reaping the

20   benefits of that without having to use our process in the

21   Fourth Amendment?  Was there any discussion about that?

22   A.   No, because the technology didn't reside in the U.S.  The

23   servers were on foreign soil.

24   Q.   I'm not asking necessarily whether it would have been right

25   or legal or not legal.  I'm not asking you to draw a

```
 1    conclusion.  I'm asking if you, Agent Willock, and your team,
 2    had any concern about the privacy risks of asking foreign
 3    countries to do things the United States might not be able to
 4    do?  Was there any concern about that?
 5    A.   I think everything we do, all of the conversations, our
 6    training, our understanding of the law, we use that as a
 7    backdrop, right.  The concern is embedded.  And so we have
 8    constant dialogue with our attorneys and the counsel in our
 9    respective offices.
10    Q.   I ask that, because the United States made a conscious
11    choice to forego prosecution against two individuals in the
12    United States so that the Europeans could seize and otherwise
13    investigate Sky Global without any hindrance or notification;
14    right?  That statement is correct so far; right?
15    A.   We for -- whatever the past tense of "forego" is, we were
16    able to delay prosecution of identified individuals, but we
17    also pursued prosecution of other associates of Sky during that
18    time.
19    Q.   The reason you forewent, the reason that we -- I don't know
20    if that's right either.  The reason we agreed to do that was to
21    not hinder or otherwise jeopardize the investigation the
22    Europeans were doing; right?
23    A.   That's a common practice amongst --
24    Q.   I'm not saying it's wrong.  I'm just saying is that what we
25    were doing?  They made a request of us and we said, okay, we'll
```

1    honor that; right?

2    A.   Yes.  I can say that's fair to say, yes.

3    Q.   And my concern is that the United States then benefited

4    from the Europeans doing things under their more maybe, maybe

5    not, generous constitutions, and then we reap the benefits of

6    that investigation.  That's why I'm asking you was there a

7    conversation about these topics?

8            THE COURT:  And now is that a question, was there a

9    conversation --

10           MR. FINK:  Yes.

11           THE COURT:  Because you asked him that before, so ...

12           MR. FINK:  I'm trying to contextualize what I'm asking

13   they had a conversation on, Judge.

14           THE COURT:  Okay.  You may answer.

15   BY MR. FINK:

16   Q.   Did you have those concerns?

17   A.   I think -- I'll answer the question with a little

18   background.

19   Q.   Sure.

20   A.   You talked about the meeting that we had in The Hague in

21   the winter of 2019, in February 2019, and then there were many

22   other meetings.  The U.S. was committed to prosecuting,

23   obtaining an indictment on the principal figures at Sky, no

24   matter what happened in Europe.

25           At that meeting, one of my colleagues from the

1    Netherlands said that he believed we could reach our ultimate

2    goal, and multiple others said it would be impossible for us to

3    accomplish what we did.  It was somewhat unprecedented to

4    intercept encrypted traffic in the manner that the

5    investigative team did.

6    Q.   Completely agree with that.

7    A.   Right.  And so when I say -- I give you that background to

8    say we benefited, we, the U.S., the American people, drug

9    shipments were interdicted, lives potentially saved, in this

10   investigation.  But in a prior investigation that pretty much

11   mirrored the Phantom Secure investigation, we did not intercept

12   any messages.

13        So to say there was a benefit, I agree, but regardless

14   we were going to benefit.  So I don't think there was

15   necessarily an added benefit, an increased benefit, other than

16   investigations were furthered and a light was shined on

17   criminal activity.

18   Q.   Are you aware that the United States gave Belgium $800,000

19   to assist in its Sky Global investigation around the time of

20   that meeting?

21   A.   I am not aware of any funds being transferred.

22   Q.   I have a note here from your direct examination about the

23   United States.  I wrote "hooks into server in 2019, 2020."

24   What did you mean by that?

25   A.   So -- yeah.  I use a, you know, colloquial or

1      conversational term "hooked."  I'm not a telecommunications

2      specialist.  I'm not a computer scientist.  I never visited the

3      site where the servers are in France.  I only know what they

4      looked like and what type of system they were based off of what

5      I was told.

6              So those investigators needed to find a way to connect

7      in or to facilitate getting the data off of those servers.  So,

8      you know, as you might back up an iPhone on a computer or

9      transfer data from one computer to another onto a hard drive,

10     how you hook that appliance or facility into that computer

11     that's what I'm trying to reference by using that.

12     Q.  So the United States did have some hook or technological

13     connection to the servers that were seized in 2019 and '20;

14     correct?

15     A.  We did not -- when you say we had a hook --

16     Q.  Yeah.

17     A.  We had no connection, no -- we just had verbal or written

18     awareness.  We did not have any technical participation or

19     physical participation.

20              MR. FINK:  One moment, your Honor.

21              (Briefly off the record.)

22     BY MR. FINK:

23     Q.  Do you know Special Agent Bill Bogner?

24              THE COURT:  How do you spell it?

25              MR. FINK:  B-O-G-N-E-R, your Honor.

```
1              THE COURT:  Okay.
2              THE WITNESS:  Yes, sir.  He's a retired special agent
3   in charge of the office I work in.
4              THE COURT:  In Los Angeles?
5              THE WITNESS:  Los Angeles, yes.
6   BY MR. FINK:
7   Q.  We have a quote upon the arrest in March of 2021, in a
8   press release from the Department of Justice, "The DEA
9   maintains an evolving global reach, and combined with strong
10  law enforcement, foreign law enforcement partnerships, is
11  committed to searching out the most significant organized
12  criminal groups facilitating sophisticated narcotics
13  trafficking networks.  The joint effort to pursue these
14  individuals who hide behind encrypted communication platforms
15  shows that even the use of advanced technology will not enable
16  suspects to conceal their criminal activities from law
17  enforcement."
18             Do you agree with that statement?
19  A.  I do.
20  Q.  You started to discuss with Mr. McDonald some of the
21  information that is often received -- well, I guess using your
22  case as the example, information that you'll receive by MLAT of
23  the historical chats from Sky ECC and the format you receive
24  it.  Do you remember talking about that?
25  A.  Yes.
```

1    Q.   Okay.  And, generally speaking, in order to read these

2    chats, they come on an Excel spreadsheet; right?

3    A.   Typically.

4    Q.   Okay.  And basically you're looking at PIN number, content

5    of message, date, whatever other categories are in the Excel

6    spreadsheet; correct?

7    A.   Yes, sir.

8    Q.   The case that you're involved with, has that been

9    prosecuted yet?

10   A.   Both individuals that we indicted at the principal level of

11   Sky ECC are still out of the U.S. and awaiting extradition.

12   Q.   All right.  So you haven't in your case had to -- or maybe

13   you have.  Have you disclosed this information to defense

14   counsel yet, the Sky ECC data, do you know?

15   A.   So I --

16   Q.   If you know.

17   A.   Yeah.  I think I just need to organize my thoughts around

18   this.  I personally interviewed Mr. Thomas Herdman, one of the

19   people we indicted who is a principal figure, a distributor, a

20   lieutenant of Mr. Eap, the CEO.  He sought to cooperate with us

21   with his counsel.  I conducted those interviews with him after

22   the indictment.  Unfortunately, the French have taken him into

23   custody and charged him with crimes that he committed in their

24   country.  So he is currently in jail in France.

25             Our U.S. Attorneys, our Assistant U.S. Attorneys, met

1   with Mr. Eap, the CEO of Sky Global, with his attorneys in the

2   U.S.  I believe they turned over some information, some

3   discoverable material.

4   Q.  So you -- I could ask this question better.  Have you taken

5   part in packaging for discovery, packaging for an attorney, Sky

6   ECC chats?

7   A.  No.

8   Q.  Do you know the format?  Are you aware of what it looks

9   like when it's given to counsel or the court or shown in front

10  of a jury?  Do you know the format it would be shown in?

11  A.  I believe I've seen it, yes.

12  Q.  From my end, correct me if I'm wrong, as you understand it,

13  what I'm getting is Excel spreadsheets of these chats; right?

14  A.  Yes, sir.

15  Q.  Is there any metadata associated with what I'm receiving

16  from Sky ECC chats that come from overseas?

17  A.  It's my understanding that metadata would be in those

18  files.  It's included.  It should be.

19  Q.  The purported metadata of what it shows, the data itself;

20  right?

21  A.  Right.

22  Q.  Not the actual metadata as a thing.  I don't have the

23  actual code of the metadata?

24  A.  Right.  The actual encrypted messages, my understanding, my

25  experience, right, is when you obtain those messages from the

1  French, because they are the custodians of those messages, they

2  don't provide the raw information.

3  Q.  That's precisely what I'm driving at.  We receive, we being

4  the United States, you, law enforcement?

5  A.  Yes.

6  Q.  When you make a request by MLAT or otherwise to get these

7  chats, how it comes to you is in a summary format in an Excel

8  spreadsheet; right?

9  A.  That's correct.

10  Q.  So we are wholly reliant that we are being told the truth

11  and the whole truth from the party requested from; right?

12        How about -- let me strike that and ask it a different

13  way.  Agent Willock, would you have any idea, but for trust of

14  another law enforcement officer, that someone in France did not

15  manipulate or edit the Excel spreadsheets?

16  A.  I have additional trust in that --

17  Q.  I'm saying besides your trust.  Is there any way you would

18  know it just from looking at the spreadsheet?

19  A.  Well, I would know that the Netherlands Forensic Institute,

20  in June of 2022, did a comprehensive study of the data and the

21  messaging and issued a report that has been utilized in

22  European courts outside of the Netherlands.  So I know by

23  review of that report and talking to colleagues that were

24  involved, not necessarily with its production, but in a peer

25  review-type environment, that a study has been done by people

1    outside of France on the data and the integrity of it.

2            I'm also aware that the highest court in Belgium has

3    upheld convictions of subjects where Sky ECC data was utilized.

4    I know the Netherlands has other investigations.  I also am

5    understanding that in the country of Bosnia that data has been

6    upheld.

7    Q.   I'm hearing you loud and clear, and I'm hearing that I have

8    a lot of faith in the courts of other countries and other

9    agents.  I'm asking a very specific question.  When you receive

10   those chats from your European contemporaries --

11   A.   Yes.

12   Q.   Okay.  And they come to you on a disk and you click on the

13   Excel spreadsheet and it populates with the PIN number and

14   messaging and everything it populates.

15   A.   Yes.

16   Q.   Looking at that document, you cannot say one way or another

17   whether this has been manipulated or otherwise edited from its

18   original native format; correct?

19   A.   I'm not able to say that about any document I receive.

20   Q.   That's fair.

21   A.   Yeah.  Whether it's from France, another country, another

22   agency.

23   Q.   Whereas if you yourself --

24   A.   Right.

25   Q.   -- take a cell phone, plug it into your computer, upload it

1    onto Cellebrite, you can be far more confident that nothing was

2    manipulated because you did it; right?

3    A.   I can be confident that the process worked as I expected.

4    Q.   You personally can say I did not manipulate anything?

5    A.   That's correct.

6    Q.   I plugged this iPhone in and I loaded it up; right?

7    A.   Right.

8    Q.   And I'm not saying that that's what's happening, Agent

9    Willock.  I'm not accusing law enforcement of doing anything

10   untoward and I'm not accusing these prosecutors.  I'm not

11   making those allegations.  I'm asking you that you just can't

12   say you are dependent on what is sent to you; correct?

13   A.   Absolutely.

14   Q.   Okay.  And you look at it and you take it at face value,

15   this is what was said by these PIN numbers on this date,

16   because that's what it says on the spreadsheet; right?

17   A.   That's correct.

18   Q.   That's all I'm asking.  I appreciate that, and I wanted to

19   make that clear that I'm not accusing you or anyone of

20   anything.

21   A.   Thank you.

22   Q.   You gave me some examples of the veracity being tested in

23   other courts and other countries; right?

24   A.   Yes.

25   Q.   Okay.  Are you aware of the Milch report, M-I-L-C-H?

```
1    A.    I am not.
2    Q.    Are you aware of anything, in any other court, that courts
3    have found that there are nonvalidated tools that may not
4    contain -- that may contain errors that could lead to incorrect
5    results?  In other words, there's been findings of off-loading
6    these chats may be -- there may be unintended errors.  Are you
7    aware of that generally?
8    A.    I am aware that there can be errors, just not to the
9    severity of those errors.
10   Q.    And you mentioned, for example, on direct examination that
11   there -- one thing that you've noticed, at least in your cases
12   or in your experience, is sometimes we'll get one-sided chats;
13   right?
14   A.    That's correct.
15   Q.    And the one-sided chat meaning that we're getting one
16   person speaking, but we're not getting the responses or the
17   conversation; right?
18   A.    That's correct.
19   Q.    Now, sometimes we'll get both sides of the chat.  We'll
20   have an Excel spreadsheet that has -- I'm just going to use a
21   made up PIN.  PIN 1234.
22   A.    Right.
23   Q.    And it says all of these things.  And then you match it up
24   with PIN 678 --
25   A.    Right.
```

1    Q.    -- and their responses; right?

2    A.    Yes, sir.

3    Q.    Two separate files; right?

4    A.    Yes.

5    Q.    But what you're saying is sometimes we'll only end up with

6    PIN 1234 and not 678's responses; right?

7    A.    For a host of reasons.

8    Q.    Maybe in all legitimate and technological reasons, but that

9    does happen; right?

10    A.    Yes.

11    Q.    For the same reason that the technology may fail in giving

12    us one-sided chats, it may fail us in generating the actual

13    chats themselves; correct?

14    A.    I don't understand the word "generating."

15    Q.    I'll give you an example.  One of the reasons that you

16    gave, and my objection was overruled, one of the reasons you

17    gave in that whole discussion was maybe there's an outdated

18    version being used on one cell phone and, therefore, for some

19    reason when it gets uploaded onto whatever software to decrypt

20    it, it just doesn't spit everything out both sides of the chat.

21    That was one possibility you gave.  Do you remember that?

22    A.    Yeah.  So to explain that --

23    Q.    Sure.

24    A.    -- if -- you know, depending on what version you were on or

25    what actual private key you had, you know, the investigators

1    might not have had access to that key, or the tools that they

2    were employing weren't able to decrypt that message at that

3    time.  You know, I think everything is relative.  There's

4    certain messages that weren't decrypted two years ago that are

5    now decrypted.

6    Q.   There's just a lot of technological reasons that may

7    happen; right?

8    A.   That's correct.

9    Q.   And you're not in a position.  You're giving us

10   possibilities.  So for obvious reasons that doesn't necessarily

11   mean anything was manipulated; right?

12   A.   Right.

13   Q.   But that there's a lot of technological failings that maybe

14   we don't understand or appreciate that could have led to that;

15   right?

16   A.   That's fair to say, yes.

17   Q.   For that same reason, you can't say with certainty that we

18   have all messages, can you?

19   A.   Oh, we definitely do not have all messages.

20   Q.   Right.  So when we see a list of messages or we see

21   something, you know, in this trial of a Sky ECC message, it may

22   be missing the message before or after it, and we can't say for

23   certain.  All we can do is rely on what was sent to us; right?

24   A.   And focus on what we do have.

25   Q.   Of course.  But for the same reasons you spelled out that

 1   one side of a chat might be missing, specific texts might be

 2   missing; right?

 3   A.   Yes.

 4   Q.   In your cases that you've -- have you ever taken a case to

 5   trial using Sky ECC messages?

 6   A.   No, sir.

 7   Q.   Are you preparing one?  Is one going to -- do you know of

 8   going to trial?

 9   A.   I know of at least two cases that could go to trial where

10   they would utilize Sky messages.

11   Q.   In those cases --

12   A.   Yes.

13   Q.   -- would you have the ability as a special agent to get on

14   the phone and call the person that prepared the data for you

15   and say, hey, we're going to need you in trial on March 31st,

16   I'll give you your reservation details?  Could you do that?

17   A.   The person that would be preparing that data --

18   Q.   They're contemporary in Europe.  So I don't know what

19   country it was.  Let's say the French you did an MLAT and

20   France, from France, says, hi, Agent Willock, I'm going to

21   prepare the stuff for you and send it by disk to you.  That

22   person, could you get that person to come to trial if you

23   wanted to?

24   A.   From my experience, it's difficult to get a foreign law

25   enforcement officer to appear in court here in the U.S.

1   Q.   Because France, as my made-up person, could be the person

2   that testified that, yes, this is the data that I took off the

3   server myself, loaded on and sent to Agent Willock, couldn't

4   he?

5   A.   If that person was able to be in a U.S. court, they could

6   speak to their methods and how they did what they accomplished.

7             MR. FINK:  One moment, your Honor.

8             (Briefly off the record.)

9   BY MR. FINK:

10  Q.   Agent Willock, are you aware of the processes by which

11  these messages were decrypted, what technology was used, how it

12  was done?

13  A.   I'm -- in general terms, yes.  Not in the specific

14  scientific details.

15  Q.   Are you aware that in certain instances that artificial

16  intelligence was used to generate some of these messages?

17  A.   I understand how artificial intelligence was used to search

18  the data, not create messages.

19  Q.   In other words, given the volume of information, AI was

20  used for certain portions of this to sort through the data; is

21  that accurate?

22  A.   That's my understanding, yes.

23  Q.   And this goes hand in hand with the idea of the human hours

24  to sort through this are just too great; right?

25  A.   As with a number of things, yes.

```
 1   Q.   Of course.  Does the production of these messages and any
 2   of the documents that are presented, at least in your case, I
 3   know that you didn't receive the ones in this case, dependent
 4   in any way, the content of them, on artificial intelligence?
 5            THE COURT:  Say that question again.
 6   BY MR. FINK:
 7   Q.   The content of the messages you received in the Excel
 8   spreadsheet format, in your experience, in your cases, I know
 9   you can't speak to this one --
10   A.   Right.
11   Q.   -- are do you know -- and your answer might be I don't
12   know, but do you know if the content of those messages, what is
13   written, is in any way produced or relied upon artificial
14   intelligence to put them on that spreadsheet?
15   A.   I'll answer it with I have not heard of artificial
16   intelligence being used.  So I don't know, but I have also not
17   heard.
18   Q.   You know of it being used in some capacity with data
19   sorting, but you haven't heard of it in the context of -- the
20   actual content of the messages; is that a fair
21   characterization?
22   A.   Yeah.  The way I heard artificial intelligence was used
23   from my colleagues involved in organizing the data was during
24   the live phase of the actual reading of the messages real-time
25   to search for certain terms and --
```

1    Q.   Because of the quantity?

2    A.   Yes.

3    Q.   This circumstance that you're describing, the reason that

4    you're here to testify in this case, in your world, in the law

5    enforcement world, has major implications; correct?  The

6    ability to specifically decrypt end-to-end encrypted messages;

7    right?

8    A.   Those implications are significant, or major, as you

9    categorize them, because typically we would want to work with a

10   company like Sky Global and issue them proper legal process.

11   Q.   Approximately 170,000 users are involved in Sky Global;

12   correct?

13   A.   That was the number that we believed to have been over the

14   history of the company.

15             THE COURT:  A hundred and how many?

16             MR. FINK:  Seventy thousand users.

17   BY MR. FINK:

18   Q.   Certainly there is not a United States search warrant for

19   all 170,000 users?  Whether it's required or not I'm not

20   saying, but certainly there is not one for 170,000 people;

21   correct?

22   A.   No.

23   Q.   And you're aware of the litigation not only in the

24   international courts, but here -- there's a particular one in

25   New York involving a defendant boxer making challenges to the

1    privacy concerns of seizing the data of 170,000 people without

2    a warrant; correct?

3    A.   I'm aware a lot people have concerns, yes.

4    Q.   Are you one of them?

5    A.   No.

6              MR. FINK:  Thank you.

7              THE COURT:  How is my jury over there?  Are you okay?

8    You need a break?  No?  You're all right?

9              A JUROR:  Yes.

10             THE COURT:  Yes, you need a break, or no?

11             JURORS:  (Collectively) Yes.

12             THE COURT:  Let's take a break.  The jury may step

13    down.

14             Please rise for the jury.

15             (The jury left the courtroom at 10:58 a.m.)

16             THE COURT:  You may step down during the break, too.

17             THE WITNESS:  Thank you, your Honor.

18             THE COURT:  Ten minutes, gentlemen.

19             MR. FINK:  Yes, your Honor.

20             MR. McDONALD:  Thank you, your Honor.

21             THE COURT:  All right.  Let's break for ten minutes.

22             (At 10:58 a.m., a brief recess was taken.

23             Back on the record at 11:12 a.m.)

24             LAW CLERK:  All rise.  Court is back in session.

25             THE COURT:  Okay.  We can bring them out; right?

1           MR. FINK:  Yes, Judge.

2           MR. McDONALD:  Yes, your Honor.

3           THE COURT:  Okay.

4           MR. FINK:  Judge, can we stop them for one second?

5    I'll make an objection about their next witness so we don't

6    have to excuse them a second time, or I guess when we see the

7    door open we can say --

8           THE COURT:  All right.  Go ahead and be seated then.

9           Your objection about their witness, Philip Daskal?

10          MR. FINK:  Yeah, the next witness, your Honor.  Do you

11   want me to --

12          THE COURT:  Are you making an objection to the person

13   appearing in court?

14          MR. FINK:  I'm objecting to his testimony, yes.

15          THE COURT:  No.  Let's bring them out.  I'll give them

16   another break.

17          MR. FINK:  That's fine.

18          LAW CLERK:  All rise.

19          (The jury entered the courtroom at 11:14 a.m.)

20          THE COURT:  Okay.  You may all be seated.  I'm

21   satisfied the jurors are present.  What about the Government?

22          MR. McDONALD:  Yes, your Honor.

23          THE COURT:  And defense?

24          MR. FINK:  Yes, your Honor.

25          THE COURT:  Okay.  Very good.

1           You're still under oath, sir.

2           THE WITNESS:  Yes, your Honor.

3           THE COURT:  Okay.

4           MR. McDONALD:  May I proceed with redirect?

5           THE COURT:  Redirect.

6           MR. McDONALD:  Thank you, your Honor.

7                      REDIRECT EXAMINATION

8   BY MR. McDONALD:

9   Q.  Agent Willock, Mr. Fink asked you about the timing of the

10  French investigation and your investigation in the Southern

11  District of California.  Do you remember that?

12  A.  Yes, sir.

13  Q.  Did the European investigation start on the basis of your

14  investigation alone?

15  A.  No, sir.  It's my understanding they were already

16  investigating Sky Global prior to 2018.

17  Q.  All right.  Two separate investigations?

18  A.  Yes, sir.

19  Q.  Okay.  Now, in your investigation, did you review the data

20  that was received from the French in your case?

21  A.  Yes, sir.

22  Q.  All right.  And --

23          THE COURT:  In his case in Los Angeles?

24          MR. McDONALD:  In Los Angeles, yes.

25

1    BY MR. McDONALD:

2    Q.   And from the content itself, did you observe any evidence

3    that attributed -- that showed user attribution?  Do you know

4    what I mean when I say that?

5    A.   User attribution whereas you could tell who the user was

6    based on --

7    Q.   On the content of the messages.

8    A.   That's correct.  Yes, I could.

9    Q.   All right.  And what kind of evidence gave you that user

10   attribution in your case in LA?

11        THE COURT:  Say that again.

12   BY MR. McDONALD:

13   Q.   What kind of evidence provided the user attribution in the

14   Sky messages in your case in LA?

15   A.   The individual would say their proper name, their nickname

16   or full name, in a message.  They would send a photograph of

17   themselves.  They would use other what we call personally

18   identifiable information.

19   Q.   All right.  Now, in terms of this -- well, let me back up

20   here.  Mr. Fink asked you a long list of things that encrypted

21   data could be used for like businesses or pharmaceutical

22   companies or military.  Do you remember him asking you that?

23   A.   Yes, sir.

24   Q.   In your experience, is that what Sky was used for?

25   A.   I did not observe Sky to be used in that manner.

1    Q.   What did you observe Sky to be used for?

2    A.   Well, at the beginning I saw it used to facilitate the

3    distribution of devices by employees of the company.

4              THE COURT:  Distribution of devices, like what?

5              THE WITNESS:  Like the actual phones containing the

6    encrypted application, Sky ECC, to interact with their clients

7    and to increase sales of those devices in the subscription

8    service.  I saw it used by members of transnational organized

9    criminal groups to facilitate money laundering and narcotics

10   trafficking.  And I also saw it used by other organized crime

11   figures engaged in other criminal activities in the U.S. and

12   abroad.

13   BY MR. McDONALD:

14   Q.   I want to talk specifically about the United States'

15   involvement and the searches conducted in France; okay?

16   A.   Yes, sir.

17   Q.   Did the U.S. author any affidavit to search OVH, the French

18   cloud server facility?

19   A.   No, sir.

20   Q.   Did the U.S. attend the search of OVH?

21   A.   No, sir.

22   Q.   Would you describe the searches in France as a foreign

23   operation conducted on foreign soil?

24   A.   Yes, I would.

25   Q.   Finally, the messages that you do have in your case in LA

1    and any messages that you have reviewed that have been

2    decrypted, did you find any evidence that those messages were

3    manipulated?

4    A.   I did not.

5    Q.   Did you find any evidence that those messages were

6    inaccurate?

7    A.   No, sir.

8           MR. McDONALD:  No other questions.  Thank you.

9           THE COURT:  Do you have other questions?

10          MR. FINK:  I do not, your Honor.

11          THE COURT:  Okay.  I have a couple.  And, you know, I

12    think I told you all that when Mr. Didani was representing

13    himself that if I ask a question and you had an objection to it

14    you should raise it, because if you don't it's waived to the

15    Court of Appeals.

16          You all understand that?  Mr. Fink, you understand

17    that?  I think the Government knows it.

18          MR. FINK:  I have great faith in your questions,

19    Judge.

20          THE COURT:  I'm happy for your faith, but I just want

21    you to know that if you don't object your objection is waived.

22          MR. FINK:  I understand it, Judge.

23          THE COURT:  And the Government understands that;

24    right?

25          MR. McDONALD:  I also understand that, Judge.

1      THE COURT:  My questions are not as high tech as the

2   questions that have been raised by these attorneys.

3                              EXAMINATION

4   BY THE COURT:

5   Q.   I want -- you testified that the U.S. government took down

6   the Sky website.  What did that mean for users?

7   A.   So, your Honor, the Sky Global, Sky ECC website was hosted

8   by the web hosting company, GoDaddy.

9   Q.   Okay.

10  A.   And we issued a warrant to take ownership of that website

11  from GoDaddy, we being the investigative team in the U.S., DEA,

12  FBI, IRS.  And then we changed the web page to reflect that we

13  now owned that website.

14  Q.   To reflect that those government agencies now controlled

15  that website?

16  A.   That's correct.

17  Q.   Okay.  And so does that mean that people who were users

18  could no longer use the Sky application?  I'm not sure if

19  that's the right word, but --

20  A.   Yeah.  So it was twofold; one to notify why their service

21  wasn't working.  The website did not interact with the

22  communication servers.

23  Q.   Okay.

24  A.   So on the particular day that, you know, to use a very

25  conversational term that the servers were unplugged, the

1    service ceased to work.

2    Q.   So if I had a phone with that application on it -- is that

3    the right word?

4    A.   Yes.

5    Q.   And the day that the servers went down, if I tried to use

6    that application, it just didn't work?

7    A.   It did not work.

8    Q.   And then you said that I think you notified people that

9    they could call in and say I have a problem?

10   A.   Your Honor, can I clarify one thing?

11   Q.   I think you were talking about that there was a notice to

12   users about Sky ECC.

13   A.   Yes.  Can I go back and clarify one thing about the

14   application not working anymore?

15   Q.   Okay.

16   A.   We learned or observed that some devices, some users, I

17   think we shut -- I think the operation happened on March 7th,

18   March 8th, because of the time difference with Europe when the

19   activities happened, that the company in Vancouver still had

20   some backup type server.

21   Q.   The company in Vancouver?

22   A.   Sky Global, yes.

23   Q.   Okay.

24   A.   And some devices did function for a day or so after.  They

25   kind of went into an emergency management to try to keep their

1    network going.  So there was some user activity for a day or so

2    following our day of action, or the Europeans' day of action

3    against the servers.  But then once we made this announcement

4    and took control of the website, obviously most users didn't

5    want to use their phone anymore.  So I just wanted to clarify

6    that.  Yeah.

7    Q.   Do they have things on their phone that weren't destroyed?

8    A.   Yes.

9    Q.   Would they download them?  If I had something on my phone

10   that was encrypted, could I send it to another phone or to my

11   you know iPad or computer?

12   A.   No, because the data on that device is all held within the

13   app, right, the Sky ECC app, the Sky phone that has that app.

14   And the only way to extract that data, right, would be through,

15   you know, some, you know, high-level system, which a user could

16   have --

17   Q.   Whichever data I had on there was lost to me, the user?

18   A.   For all intents and purposes, it was.  But, you know, there

19   could be an instance where you would be able to pull that data,

20   just how law enforcement has certain tools.  A very

21   sophisticated user could try to pull data off of their phone.

22   Q.   All right.  You can see that I'm not a very sophisticated

23   user, so ...

24          Okay.  And I -- oh.  And then you said you had a

25   notice that you put up to users and no one responded?

1    A.   That's correct.

2    Q.   And does it mean -- does no one mean nobody responded at

3    all of the -- what were there, 170,000 users?

4    A.   That was during the lifespan of the network was that many

5    accounts that we observed, but at the time there were over

6    20,000, probably even closer to 30,000 users on the network.

7    Q.   Okay.  And among those nobody responded?

8    A.   That is correct.

9              THE COURT:  All right.  I think that's all I have.

10             Anything else based on me asking those very simple

11   questions?  And now everyone knows how low tech I am.

12             MR. McDONALD:  Nothing from the Government.  Thank

13   you.

14             THE COURT:  Okay.

15             MR. FINK:  No, your Honor.

16             THE COURT:  All right.  Thank you for coming.  We

17   appreciate it.  You may step down, and you're excused, I think.

18             THE WITNESS:  Thank you, your Honor.

19             THE COURT:  All right.  Right, he's excused?

20             MR. McDONALD:  I have no objection.

21             THE COURT:  Okay.

22             MR. FINK:  Yes, he's excused.  Thank you.

23             (End of excerpt at 11:25 a.m.)

24                       _   _   _

25

```
 1              (Beginning of excerpt.)
 2              MR. BILKOVIC:  The Government would call Philip
 3    Daskal.
 4              THE COURT:  Right up here by the court reporter to be
 5    sworn in, okay.  There is good.  Raise your right hand.
 6              (Oath administered.)
 7              THE COURT:  All right.  You may be seated.  When
 8    you're seated, state your full name and spell your last name
 9    for the record.
10              THE WITNESS:  My name is Philip Jacob Daskal.  My last
11    name is spelled D-A-S-K-A-L.
12              THE COURT:  Thank you.
13              MR. BILKOVIC:  May I continue, your Honor?
14              THE COURT:  You may.
15                        *        *        *
16                        PHILIP DASKAL,
17         was called as a witness, after having been
18         duly sworn to testify to the truth.
19                        *        *        *
20                        DIRECT EXAMINATION
21    BY MR. BILKOVIC:
22    Q.  Sir, where do you live?
23    A.  I live in southern Florida at the moment in Hollywood.
24    Q.  How long have you lived in Florida?
25    A.  About four years.
```

1   Q.   Where did you live prior to Florida?

2   A.   Toronto, Canada.

3   Q.   Thus the accent?

4   A.   Thus the accent.  Toronto, Canada.

5            THE COURT:  I just didn't hear it.  You lived in

6    where?

7            THE WITNESS:  Toronto, Canada.

8   BY MR. BILKOVIC:

9   Q.   Toronto, Canada?

10  A.   Yeah.

11  Q.   And how long did you live in Canada prior to moving to

12  Florida?

13  A.   I was born in Canada.  So just under 40 years in Canada.

14           THE COURT:  You lived less than four years in Canada

15   or you lived your whole life there?

16           THE WITNESS:  I lived my whole life in Canada.

17           THE COURT:  Except for the past four years?

18           THE WITNESS:  Except for the past four years, correct.

19           THE COURT:  Go ahead, Counsel.

20  BY MR. BILKOVIC:

21  Q.   And how are you employed?

22  A.   I'm hired by a company named INKAS Armored Vehicle

23  Manufacturing.  I sell armored vehicles globally.

24  Q.   Does INKAS have an office in Florida?

25  A.   We do.

1    Q.   Is that why you live down in Florida?

2    A.   Yes.

3    Q.   Did you work for INKAS prior to moving to Florida?

4    A.   I did.

5    Q.   How long did you work -- when did you start working for

6    INKAS?

7    A.   I started working for INKAS in 2007.

8    Q.   And what are your duties at INKAS?  What do you do?

9    A.   I oversee sales, in charge of the sales department.  I set

10   forecasts.  I travel the world to sell vehicles.

11   Q.   And what type of vehicles does INKAS sell?

12   A.   We have many different platforms.  Specifically SUVs,

13   sedans, more on the luxury side.  We also build vehicles for

14   the banks, cash and transit.  We provide law enforcement

15   vehicles for law enforcement agencies.

16   Q.   And approximately how many employees are there at INKAS?

17   A.   I would say with our contract we're about 150.

18   Q.   And do you know who owns INKAS?

19   A.   Yes.

20   Q.   Is it a family-owned business?

21   A.   It is.

22   Q.   Are you part of that family?

23   A.   I am.

24   Q.   And obviously the title itself is probably

25   self-explanatory, but what does INKAS do with vehicles?

1   A.   So we -- INKAS is the largest manufacturer in North

2   America.  What we'll do is we'll bring a vehicle into our

3   factory, completely take it apart, have our welders build all

4   the ballistic protection, more or less like a capsule, and then

5   put it back together again like it looks like it just came out

6   of a dealership.

7   Q.   And approximately how long does it take to do this, go

8   through this process?

9   A.   Depends on the vehicle.  Majority of the time we keep all

10  material in stock.  So you would be looking at about six to

11  eight months -- six to eight-week turnaround time on average.

12  Q.   And how does INKAS -- is there a way that INKAS accepts

13  payments?

14  A.   Through electronic wire, bank wires.

15          THE COURT:  Only?

16          THE WITNESS:  Yes.  We have received checks from

17   government law enforcement agencies as well, so ...

18  BY MR. BILKOVIC:

19  Q.   Now, you're talking about now?

20  A.   Now, yeah.

21  Q.   Four or five years ago, were there other payment methods

22  that INKAS accepted?

23  A.   No.

24  Q.   If I wanted to purchase a vehicle through INKAS, what is

25  the process?

1    A.  You would call our office, speak to a salesman.  The

2    salesman would understand what type of threat you're, you know,

3    trying to avoid, trying to protect yourself against.  Majority

4    of the time we would let you know what we have currently

5    available in stock if it's a vehicle of your liking.  If it's

6    not a vehicle of your liking, then we can always just -- you

7    know, once a contract is signed and due diligence is made on

8    the customer, we move forward with purchasing a vehicle and

9    setting up the armory there.

10   Q.  I'm sorry.  What is it?

11   A.  We purchase the vehicle, bring it into our factory, and

12   we'll do the retrofitting from the beginning to the end there.

13   Q.  And back in 2020, did INKAS have a website?

14   A.  We did.

15   Q.  And you said sometimes you have vehicles in stock.  Would

16   you advertise certain vehicles on the website?

17   A.  On the website we wouldn't necessarily have what we have in

18   inventory.  The whole idea about our website is to have clients

19   give us a call to speak to a human being on the other side.

20   Q.  While working at INKAS back in 2020, were you contacted by

21   an individual who identified himself as Louie Didani?

22   A.  I was, yes.

23   Q.  Did you ever have face-to-face contact with him, not

24   necessarily in person, but did you ever have face-to-face

25   contact with the individual?

1    A.   A few times on FaceTime or WhatsApp video message.

2    Q.   And do you see that individual in court today?

3    A.   I do.

4    Q.   Can you please point to him and tell the jury what article

5    of clothing he's wearing?

6    A.   Yes.  According to my memory, it's the gentleman sitting on

7    the left there with the black blazer.

8              MR. BILKOVIC:  Let the record reflect the

9    identification of the defendant, Ylli Didani.

10             THE COURT:  So noted and preserved for the record.

11   BY MR. BILKOVIC:

12   Q.   Now, I want to take your attention to March of 2020.  Did

13   you have contact with Mr. Didani at that time?

14   A.   I did.

15   Q.   Where were you working at the time?

16   A.   I was working at INKAS.

17   Q.   Where at?  Which office?

18   A.   The Toronto office.

19   Q.   And how was it that you had the initial contact with him?

20   A.   It was a weekend call.  I had all the -- our main customer

21   lines forwarded over to my cell phone so that we don't miss any

22   calls.  And Mr. Didani called me on it was a Sunday, I believe,

23   Sunday afternoon.

24   Q.   And did you have a conversation with him?

25   A.   I did.

```
1    Q.   Was it a long conversation or a short conversation?

2    A.   It was relatively short.  Mr. Didani asked if I use

3    WhatsApp, and I said yes.  After a couple, you know, comments

4    we right away switched over to WhatsApp.

5    Q.   So did you provide him your WhatsApp number?

6    A.   I did.

7    Q.   And did he provide you his WhatsApp number?

8    A.   He called me from it.

9    Q.   I'm sorry?

10   A.   He called me from his number.

11   Q.   So would that have given you his number then, too?

12   A.   Correct, yes.

13   Q.   And so did the two of you then begin communicating over

14   WhatsApp?

15   A.   Yes.

16   Q.   And during these communications did Mr. Didani advise you

17   as to why he was contacting you?

18   A.   Yes.

19   Q.   What was the general nature of why he was contacting you?

20   A.   Mr. Didani said that he'd like to replenish his fleet of

21   existing vehicles; he lives in an area where violence is at an

22   all-time high, and was looking for newer vehicles for

23   protection.

24   Q.   And over the course of the next year, from March of 2020 to

25   March of 2021, did you end up selling Mr. Didani any armored
```

1  vehicles?

2  A.   I did.

3  Q.   Approximately how many?

4  A.   I sold to Mr. Didani I want to say five vehicles.

5  Q.   And we'll go through those a little later.  You said that

6  you would communicate with him on WhatsApp?

7  A.   Yes.

8  Q.   Again, what is WhatsApp?

9  A.   WhatsApp is just a -- it's an application that you can get

10 on any cell phone.  It gives you basically free long distance

11 around the world.  You're able to transfer photos, files,

12 contracts through this platform.  It's a very user-friendly

13 platform.

14 Q.   You said it's free long distance.  Do you pay for WhatsApp?

15 A.   No, you don't.  It's a free application.

16 Q.   Something like $1,500 for six months?

17 A.   No.

18 Q.   Nothing like that?

19 A.   No.

20 Q.   And through WhatsApp what are you allowed to do?  Basically

21 how are you allowed to communicate, in what specific forums?

22 A.   Same way like you would communicate on a regular phone in

23 the sense that -- I mean, the numbers are still the same

24 numbers, your text messages, you're able to text, you're able

25 to send out photos, send out videos to friends or clients, you

```
 1    can create groups of friends together, that can kind of have an
 2    open chat amongst your friends.
 3    Q.   What about voice messages?
 4    A.   Voice messages, yes, absolutely.
 5    Q.   Is there a function on WhatsApp where you can do video
 6    calls and see the person face-to-face?
 7    A.   Yes, there is.
 8    Q.   Did you ever do that with Mr. Didani?
 9    A.   I did.
10    Q.   Did you ever talk to him over the phone?
11    A.   Yes.
12    Q.   Did you ever communicate via text?
13    A.   Yes.
14    Q.   Did you ever send videos to Mr. Didani and receive videos
15    back from Mr. Didani?
16    A.   Yes.
17    Q.   Did you ever send photographs to Mr. Didani and receive
18    photographs back?
19    A.   Yes.
20    Q.   And when you communicated with Mr. Didani did you have one
21    number or did you use multiple numbers?
22    A.   I had two numbers of Mr. Didani.
23    Q.   For you.  I'm talking about for you.
24    A.   Oh, for me?  It's always been the same phone number.
25    Q.   Is that a number you still have?
```

1    A.   Yes.

2    Q.   What is that?

3    A.   (416) 904-9243.

4    Q.   When you communicated with Mr. Didani, do you know whether

5    he used one number, more than one number?

6    A.   He had called me from two different numbers.

7    Q.   And would you communicate with him via chat with both of

8    these numbers?

9    A.   Yes.

10        MR. BILKOVIC:  Your Honor, may I approach just to hand

11   the witness the exhibit book?

12        THE COURT:  You may.

13   BY MR. BILKOVIC:

14   Q.   Now, Mr. Daskal, you said that you for a period of time

15   were engaged in chats with Mr. Didani; correct?

16   A.   Yes.

17   Q.   And have you had an opportunity prior to testifying today

18   to review those chats?

19   A.   Yes.

20   Q.   Can you look at Government's proposed Exhibit 73.0, the

21   very first page.  And what I'm going to ask you to do is,

22   whatever you do, do not open the binder, because I did it the

23   other day and the stuff went flying.  So keep it closed if you

24   could.

25   A.   Sure.

```
 1   Q.  If you could go to 73.0 and tell me if you recognize that?

 2            THE COURT:  How is he going to do that without

 3   opening --

 4            THE WITNESS:  Yeah, I didn't --

 5            MR. BILKOVIC:  No.  He can flip the pages.  What I

 6   meant is -- I did this the other day.

 7            THE COURT:  Don't open the ring?

 8            MR. BILKOVIC:  Don't open the ring, yes.

 9            THE WITNESS:  I was a little confused as well.

10   BY MR. BILKOVIC:

11   Q.  I'm sorry.

12   A.  All right, 73.0 you said.

13   Q.  Yes.  Do you recognize that?

14   A.  I do.

15   Q.  And what is that?

16   A.  It's a chat.

17   Q.  Is that one of the chats that you and Mr. Didani engaged in

18   in WhatsApp?

19   A.  Yes.

20   Q.  And is your number in there in that chat, the

21   (416) 904-9343 number?

22   A.  9243, yes.

23   Q.  9243.  And is there a number in there for Mr. Didani?

24   A.  There is.

25   Q.  And what was that number?
```

 1    A.    1 (708) 400-1315.

 2    Q.    Now, is this the whole chat or is this excerpts of the

 3    whole chat?

 4    A.    It's excerpts of the whole chat.

 5    Q.    Part of it?

 6    A.    Part of it, yeah.

 7    Q.    And you reviewed this?

 8    A.    I have.

 9    Q.    And does it appear to be accurate to you?

10    A.    Yes.

11         MR. BILKOVIC:  Your Honor, at this time I would move

12    for admission into evidence of Government's proposed Exhibit

13    73.0.

14         THE COURT:  Okay.  Does it have a number of pages?

15         MR. BILKOVIC:  It does.  The exhibit number --

16         THE COURT:  How many is that?

17         MR. BILKOVIC:  It is 130 pages.  I'm not going to go

18    through all 130 pages.

19         THE COURT:  I just wanted to know how many.

20         Okay.  Any objection?

21         MR. FINK:  Same objection previously about its

22    relevance and foundation and hearsay that you've ruled on with

23    previous chats and the foundation for co-conspirators.

24         THE COURT:  Okay.  The same response relative to that

25    I've already ruled unless, Mr. Bilkovic, you have something new

1   to argue about it.

2             MR. BILKOVIC:  No, your Honor.

3             THE COURT:  Okay.  Very well.  Overruled.

4             MR. FINK:  Thank you, your Honor.

5             THE COURT:  And it's admitted as 73.0.

6             (Government's Exhibit 73.0 received into evidence.)

7             MR. BILKOVIC:  Thank you.

8   BY MR. BILKOVIC:

9   Q.  And in this chat are there basically photos and videos and

10  PDF contracts and things of that nature?

11  A.  Yes, there are.

12  Q.  And you've had an opportunity to review the enlarged

13  versions of those prior to testifying today?

14  A.  Yes.

15  Q.  I know you've never -- have you ever testified before?

16  A.  Never.

17  Q.  Okay.  So I talk fast, and I know a lot of times like

18  you'll think you know what I'm going ask you and so you start

19  answering.  If you could wait until I finish, just so the court

20  reporter can take everything down.  When both of us are

21  talking, it's kind of hard for her.

22  A.  Absolutely, yes.

23  Q.  Thank you.

24            THE COURT:  You may proceed.

25            MR. BILKOVIC:  Thank you.

1   BY MR. BILKOVIC:

2   Q.  Can you look at Page 1 of that chat, 73.0, and in message

3   1, the very first message, do you see a date in that message

4   under the timestamp?

5   A.  Yes.

6        MR. BILKOVIC:  And you don't have to bring this up

7   yet.  I'm sorry.

8   BY MR. BILKOVIC:

9   Q.  What is the date?  When did this chat start?

10  A.  March 22, 2020.

11  Q.  And, if you could go to the very last page, Page 130 of

12  Exhibit 73 and look at the very last message number, 2566, and

13  if you could indicate what date that message was?

14  A.  Sure.  That was October 22, 2020.

15  Q.  Now, if you could turn to Government's proposed Exhibit

16  74.0.  Tell me if you recognize that?

17  A.  I'm sorry.  I'm having difficulty finding what you're --

18        THE COURT:  Come up and help your witness find the

19   document.

20        MR. BILKOVIC:  I have another copy just in case.

21        THE WITNESS:  Thank you.

22  BY MR. BILKOVIC:

23  Q.  Do you see it?

24  A.  I do.

25  Q.  And do you recognize Government's proposed Exhibit 74?

1    A.   Yes, I do.

2    Q.   And what is that?

3    A.   It's also a chat.

4    Q.   And who is the chat between?

5    A.   Mr. Didani and myself.

6    Q.   Can you move the microphone closer to you?

7    A.   Mr. Didani and myself.

8    Q.   And in that chat are you using the same number from the

9    previous chat?

10   A.   Yes, I am.

11   Q.   And does Mr. Didani -- is he using a different number or

12   the same number as the previous chat in Government's Exhibit

13   73?

14   A.   He's using a different number.

15   Q.   And can you read that number into the record?

16   A.   It's 971554159856.

17   Q.   And prior to testifying today have you had an opportunity

18   to review this chat as well?

19   A.   Yes, I have.

20   Q.   And is it fair to say that again this is an excerpt, this

21   is not the entire chat, but a portion of the chat?

22   A.   Yes.

23   Q.   And how many pages is it?

24   A.   This chat has 438 pages.

25   Q.   Okay.  The whole chat.  I'm talking about the excerpt

1  itself.

2  A.  Correct.

3  Q.  Exhibit 74.  Do you see a page amount on the bottom next to

4  the "74" on the very last page?

5  A.  Yes.

6  Q.  And how many page numbers are there after the 74?

7  A.  34.

8          THE COURT:  Not 438?

9          MR. BILKOVIC:  No.

10         THE COURT:  Okay.  Is that what you have, too,

11 Mr. Fink, 34 pages?

12         MR. FINK:  On 74?

13         THE COURT:  Yes.

14         MR. FINK:  Yes.

15         THE COURT:  Okay.  Are you offering it?

16         MR. BILKOVIC:  I am offering that into evidence at

17 this time as Government's proposed Exhibit 74.0.

18         THE COURT:  You have the same objection?

19         MR. FINK:  Yes, your Honor.

20         THE COURT:  And the same response?

21         MR. BILKOVIC:  Yes, your Honor.

22         THE COURT:  Okay.  And it's overruled and noted and

23 preserved for the record.

24         MR. FINK:  Thank you.

25         THE COURT:  And admitted as 74.

```
 1              (Government's Exhibit 74 received into evidence.)
 2              MR. BILKOVIC:  Thank you, your Honor.
 3   BY MR. BILKOVIC:
 4   Q.   Can you look at Page 1 of 74.0 and the first message
 5   number, and tell the jury what the date is of that message?
 6   A.   Yes.  The date is November the 8th, 2020.
 7   Q.   And, if you could go to the very last page, Page 44, and
 8   look at message number 1254, and tell the jury what the date of
 9   that last message is in this excerpt?
10   A.   Yes.  The date is March 17, 2021.
11   Q.   So is it fair to say that you communicated with Mr. Didani
12   for approximately a year?
13   A.   Yes.
14   Q.   During your communications with Mr. Didani, did he identify
15   himself?  Did he tell you who he was?
16   A.   He referred to his first name as Lou, last name Didani.
17              MR. BILKOVIC:  Can we bring up message number 4 on
18   Page 73.0-2.
19              THE COURT:  Tell me that, please, again.
20              MR. BILKOVIC:  I'm sorry.  It's Exhibit 73-2.
21              May I proceed, your Honor?
22              THE COURT:  Yes.
23   BY MR. BILKOVIC:
24   Q.   So you're looking at message 4 here.  I'm going to ask you
25   a couple questions about it, but it will pertain to further
```

1   messages.  Do you see the -- on the far right-hand side where

2   it indicates "outgoing"?

3   A.   Yes.

4   Q.   Do you see that?

5   A.   Yes.

6   Q.   Now, is that Mr. Didani then sending this message to you?

7   A.   Yes.

8   Q.   So, if there's an incoming, that would be a message that

9   you're sending to him?

10  A.   Correct.

11  Q.   And in this message, message number 4, on March 22, 2020,

12  what does Mr. Didani text you?  What's the body of message?

13  A.   Mr. Didani texts, "My name is Lou Didani."

14  Q.   Can we go to the next message, message 5 on the same page.

15  And is this your response?

16  A.   Yes, it is.

17  Q.   And how do you respond?

18  A.   "Hi Lou.  I'm Philip."

19  Q.   And if we can go to the next Page, Exhibit 73.0-3.  And if

20  we can go to message number 10.  And this is another incoming

21  message; correct?

22  A.   Correct.

23  Q.   Now, these are all in the same day where we're talking

24  March 22nd; correct?

25  A.   Yes.

1   Q.   Did the two of you -- did you exchange text messages for a

2   while on March 22nd?

3   A.   We did.

4   Q.   And your message here to Mr. Didani, what did you text him?

5   A.   "So how can we help you" -- "How can we help?"

6   Q.   Can we go to message 11 on the same page.  And how did he

7   respond?

8   A.   "Philip, I was interested on your product."

9   Q.   Can we go to the next page, Page 4, message 12.  And is

10  this again an outgoing message to you from Mr. Didani?

11  A.   Yes, it is.

12  Q.   And if you could read the body of the message.

13  A.   "I need your help on some infos."

14  Q.   Infos?

15  A.   It's hard for me to see that.  I apologize.  "Infos," yes.

16  Q.   Can we go down to the bottom of the page.  Go to message

17  14.  And again, this is an outgoing message from Mr. Didani on

18  the same date?

19  A.   Yes, it is.

20  Q.   And what is the body of the message?

21  A.   "But please need this infos to stay confidential."

22  Q.   You said the word "please."  Is there an abbreviation

23  there?

24  A.   Yeah.  It's P-L-S.

25  Q.   Did you take that to mean "please"?

1   A.   Yes, I did.

2   Q.   If we could go to Page 5 of the same exhibit and start at

3   message 16.  And is this still Mr. Didani to you?

4   A.   It is.

5   Q.   And can you read the body?

6   A.   "I need few cars to Republica Dominicana."

7   Q.   And if we can go to the next message number on the same

8   page, message 17.  And is that again an outgoing message to you

9   from Mr. Didani?

10  A.   Yes, it is.

11  Q.   And what is the body of the message?

12  A.   "And Ecuador if it is possible."

13  Q.   And go to the next page, Page 6, and starting at the top,

14  message 18.  And again, is this an outgoing message on the same

15  day?

16  A.   Yes, it is.

17  Q.   And the body of the message from Mr. Didani?

18  A.   "I was looking on your website about G Class AMG."

19  Q.   Do you know what a G Class AMG is?

20  A.   I do.  It's a Mercedes Benz G63.

21  Q.   It's an SUV?

22  A.   Yes, sir.

23  Q.   And can we go to the next message, message 19 on the same

24  page.  Is that another outgoing message from Mr. Didani?

25  A.   Yes.

1    Q.   And what's the body of the message?

2    A.   "2020 Lexus."

3    Q.   Can we go to the next page, Page 7 of the same exhibit,

4    Exhibit 73 and go to message 34.

5            THE COURT:  Message number what?

6            MR. BILKOVIC:  34.

7    BY MR. BILKOVIC:

8    Q.   And is this an outgoing message?

9    A.   It is.

10   Q.   What is the body of the message?

11   A.   "And how long it will take to build."

12   Q.   And did you respond to Mr. Didani?

13           I'm sorry.  We'll put up the next message and you just

14   tell us what it is.  Do you see the next message --

15   A.   Yes.

16   Q.   Hold on.  Message 35?

17   A.   I do.

18   Q.   And did you respond to the previous message from

19   Mr. Didani?

20   A.   Yes.

21   Q.   And how did you respond?

22   A.   "Four months."

23   Q.   Now, does it take that long normally?

24   A.   Normally it doesn't.  Again, a vehicle like a Mercedes-Benz

25   G63 or Lexus SUV we keep the material in stock.  So it usually

1    takes, like I said, about six to eight weeks to produce.

2    However, there's a time -- there's the delay in trying to

3    source the vehicle in the beginning.  The vehicle can take up

4    to two months to source prior to delivery to the factory.

5    Q.   And did the two of you continue communications on that day?

6    A.   Yes.

7    Q.   I'm sorry?

8    A.   I'm sorry.  If I can go to the page and I'll tell you here.

9         Yes, we did.

10   Q.   I'm sorry?

11   A.   We did.

12   Q.   Okay.  Could you pull the microphone?  Just move it a over

13   a little bit.  When you look down or turn your head, it doesn't

14   pick you up.  There you go.

15        Can we go to the same exhibit, 73.0, Page 8, and could

16   we go to message 38.  Is that an outgoing message from

17   Mr. Didani on the same day, March 22, 2020?

18        You can look up here.  I've got it up on the board

19   now.

20   A.   Yes, it is.

21   Q.   And what was the message he sent you?

22   A.   "I like to buy for the moment the Lexus you have."

23   Q.   And if we could go to the next message on the same page,

24   message 39.  And again, that's an outgoing message to you?

25   A.   Yes.

1   Q.   And what is the body?

2   A.   "Order MB G63."

3   Q.   And what is an MB G63?

4   A.   A Mercedes-Benz G63, an SUV.

5   Q.   Can we go to the next page, Page 9 of Exhibit 73.0.  Go to

6   the top message 40.  And is that another outgoing message from

7   Mr. Didani on the same day?

8   A.   Yes, it is.

9   Q.   And what is it that he sent you there?

10  A.   "I need two more cars for Ecuador, but not this flashy."

11  Q.   Did Mr. Didani send you voice messages with respect to the

12  type of cars that he was looking for?

13  A.   Yes, he did.

14  Q.   And did you listen to those voice messages prior to coming

15  to court today?

16  A.   I did.

17          MR. BILKOVIC:  Your Honor, at this time I would move

18  for admission into evidence of Government's proposed Exhibit

19  73.2, which is a voice message contained on Page 11 of this

20  chat, message number 47.

21          THE COURT:  Okay.  Any objections?  Same objection?

22          MR. FINK:  Yes, your Honor.  And subject to your prior

23  ruling.  Obviously, I trust Mr. Bilkovic.  I don't know the

24  numbers on -- tailoring it to your prior ruling.

25          MR. BILKOVIC:  Your Honor, may I pause --

```
 1              THE COURT:  Okay.  This is 73.2?  Is that what you
 2       said?
 3              MR. BILKOVIC:  Yes, your Honor.
 4              THE COURT:  It's so noted for the record, and it's
 5       overruled, and you may --
 6              Do you wish to play it?
 7              MR. BILKOVIC:  Yes, but I want to go off for one
 8       second.
 9              (Briefly off the record.)
10              MR. BILKOVIC:  Your Honor, I just want to check
11       something based on the Court's ruling.
12              MR. FINK:  What was the number, your Honor?
13              THE COURT:  73.2.  It's a voice message.
14              Is it number 45?  Is that what you told me,
15       Mr. Bilkovic?
16              MR. BILKOVIC:  Yes.
17              THE COURT:  Okay.  45; is that right?
18              MR. BILKOVIC:  Your Honor, the exhibit is 73.2.  It's
19       message 47.
20              THE COURT:  I'm sorry.  Message 47, Mr. Fink.
21              MR. BILKOVIC:  Your Honor, Mr. Fink and I looked at
22       it.  It complies with the Court's ruling.  So if I could play
23       it at this time.
24              THE COURT:  You may.
25              (Video played.)
```

1    BY MR. BILKOVIC:

2    Q.   And did Mr. Didani in these chats, did he supply you with

3    his E-mail address?

4    A.   He did.

5           MR. BILKOVIC:  Can we bring up Government's Exhibit

6    73.0, Page 12, message 50.

7    BY MR. BILKOVIC:

8    Q.   And again, are we still on March 22, 2020?

9    A.   We are, yes.

10   Q.   And what is the body of the message from Mr. Didani to you?

11   A.   "Lou Didani, E-mail address MIFreight@yahoo.com."

12   Q.   And again, you said address.  Is there an abbreviation

13   there?

14   A.   Yes.

15   Q.   And what is the abbreviation?

16   A.   It says A-D-R, believe, from my vision here.

17   Q.   And you took that to be an address?

18   A.   I took that, yes.

19   Q.   I'm sorry?

20   A.   Yes, I did.  I took that as an address.

21   Q.   During your chats with Mr. Didani, did he ever bring up the

22   use of what is called a Sky phone?

23   A.   Yes.

24   Q.   If we could turn to Government's Exhibit 73.0, Page 44,

25   starting with message 538.  And what is the date of this

1    message?

2    A.   The date is April 20, 2020.

3    Q.   And again, is this -- so you and Mr. Didani by this point

4    you've been communicating for about a month?

5    A.   We have.

6    Q.   Did you have voice contact during that time?  Did you talk

7    to each other during that month?

8    A.   Yes.

9    Q.   And during that month did you send Mr. Didani contracts for

10   any of the vehicles?

11   A.   Yes, I did.

12   Q.   The message that he sent you in message 538, what is the

13   body of the message?

14   A.   "You ever hear about Sky phones."

15   Q.   If we could go to the next message on the same page,

16   message 539.  Now, here we've got a different date; correct?

17   A.   We do.

18   Q.   What is the date here?

19   A.   This is April 21, 2020.

20   Q.   So this is the next day from what was the previous message;

21   correct?

22   A.   Correct.

23   Q.   And is this an incoming message that you sent?

24   A.   Yes, it is.

25   Q.   And what is the body?

1   A.   "Hi, good morning."

2   Q.   Can you go to the next message, 540, message number 540 on

3   the same page.  And is this an incoming message from you?

4   A.   Yes, it is.

5   Q.   And what is it that you send?

6   A.   "What is a Sky phone?"

7   Q.   And can we go to the next message on the same page, message

8   number 541.  How does Mr. Didani respond?

9   A.   Mr. Didani responds, "Hi, bro.  Good morning."

10  Q.   And can we go to the next page, Page 45 of Exhibit 73.0.

11  If we could go to the top message, which would be message 542.

12  Did Mr. Didani send you a photograph?

13  A.   Yes, he did.

14  Q.   And have you had an opportunity to view a larger version of

15  that photograph?

16  A.   Yes, I have.

17  Q.   Can you look at Government's proposed Exhibit 73.17.  Can

18  you tell me if you recognize that?

19  A.   Yes, I do.

20  Q.   And what is that?

21  A.   It's a picture of a phone, someone holding the phone that

22  shows the Sky app.

23  Q.   And this is the -- is this a photograph that Mr. Didani

24  sent you?

25  A.   Yes, it is.

1        MR. BILKOVIC:  Your Honor, I would move for admission

2   into evidence of Government's proposed Exhibit 73.2.

3        THE COURT:  Any objection?

4        MR. FINK:  No objection, your Honor.

5        THE COURT:  Very well.  It's admitted.

6        MR. BILKOVIC:  Not 73.2.  That was the previous one.

7   I would move for the admission of 73.17.

8        THE COURT:  Any objection to that one, Mr. Fink?

9        MR. FINK:  No, your Honor.

10       THE COURT:  Very well.  It's admitted.

11       (Government's Exhibit 73.17 received into evidence.)

12       MR. BILKOVIC:  May I publish it to the jury?

13       THE COURT:  You may.

14  BY MR. BILKOVIC:

15  Q.   And what is it that we're looking at here?

16  A.   It's a photograph of somebody holding another phone with

17  the Sky app showing.

18  Q.   Had you ever seen anything like that before?

19  A.   I've never.

20  Q.   When he sent this to you, did you know what it was?

21  A.   I didn't.

22  Q.   Can we go to the next message on the same page, message

23  543.  After Mr. Didani sends you that photograph, does he

24  follow it up with a text message?

25  A.   Yes, he does.

1    Q.   And what is the body of the text message?

2    A.   "Very secure phone."

3    Q.   Can we go to the next page, Page 46.  Can we go to the

4    bottom text message, message 548.  And is that a message from

5    you on the same day, April 21st?

6    A.   Yes, it is.

7    Q.   And what is the body of the message?

8    A.   "Never heard about it."

9    Q.   Can we go to the next page, 73.0, Page 47, message 549 at

10   the top.  And again, are we on the same day, April 21st of

11   2020?

12   A.   Yes, we are.

13   Q.   And does Mr. Didani respond or send you a text message?

14   A.   Yes, he does.

15   Q.   And what is the body of the text message?

16   A.   "Yes.  All of us all over the world use this."

17   Q.   Do you recall any other photographs that Mr. Didani sent

18   you that had a Sky phone in them?

19   A.   No, I don't.

20        MR. BILKOVIC:  Can we bring up Government's -- Page

21   number 33 of the same exhibit, 74.0, message 341, Page 33,

22   message 341.

23   BY MR. BILKOVIC:

24   Q.   And do you see this message?

25   A.   I -- it's no message.  It's a picture.

1  Q.  It's an outgoing --

2  A.  Yes.

3  Q.  Is it an outgoing message from Mr. Didani?

4  A.  Yes, it is.

5  Q.  Is that a photograph that he sent you?

6  A.  Yes.

7  Q.  Can you look at Government's proposed Exhibit 73.11.  Tell

8  me when you find it.

9  A.  Yeah.

10  Q.  Does that appear to be an enlargement of the same

11  photograph?

12  A.  Yes, it does.

13        MR. BILKOVIC:  Your Honor, at this time I would move

14  for admission into evidence of Government's proposed Exhibit

15  73.11.

16        THE COURT:  Any objection?

17        MR. FINK:  No objection.

18        THE COURT:  Very well.  It's admitted.

19        (Government's Exhibit 73.11 received into evidence.)

20        MR. BILKOVIC:  Can I publish it to the jury?

21        THE COURT:  You may.

22        MR. BILKOVIC:  Can we zoom in on the bottom half.

23  BY MR. BILKOVIC:

24  Q.  And do you see what's depicted in the bottom half?

25  A.  Yes, I do.

1    Q.   And what is in the bottom half of the photograph?

2    A.   It's a picture of a phone holding -- carrying that app,

3    Sky.

4    Q.   And is there another phone next to it?

5    A.   Yes, there is.

6             MR. BILKOVIC:  And if we could zoom back out.  And can

7    we go to the top -- go to the top of the photograph.

8    BY MR. BILKOVIC:

9    Q.   Does that appear to be -- at the top does that appear to be

10   a map of some sort?

11   A.   Yes, it does.

12   Q.   Can we go to the next message on the same day, message 342

13   on Page 33.  After Mr. Didani sent that photograph, did he

14   follow it up with a text message?

15   A.   Yes, he did.

16   Q.   And what does the text message say?

17   A.   "Home working."

18   Q.   Now, you indicated that Mr. Didani ended up purchasing

19   several vehicles from you over the 12 months that you were in

20   communication with him?

21   A.   Yes.

22   Q.   And does INKAS keep records of business transactions?

23   A.   Yes, we do.

24   Q.   Do they keep contracts of all vehicles sold?

25   A.   Yes.

1    Q.   Payment information?

2    A.   Yes.

3    Q.   Invoice information?

4    A.   Yes.

5    Q.   Are those records that INKAS keeps in the regular course of

6    business?

7    A.   Yes.

8    Q.   As a salesman for INKAS, are those records that you

9    yourself prepare at times?

10   A.   Yes, they are.

11   Q.   Can you put that book aside.  And do you see the book down

12   by the TV there?

13         MR. BILKOVIC:  Your Honor, would you like me to come

14   up and get it for him so he doesn't have --

15         THE COURT:  I would.

16         MR. BILKOVIC:  Okay.

17   BY MR. BILKOVIC:

18   Q.   If you could look at Government's proposed Exhibit 119.0,

19   119.1, 119.2, 119.3 and 119.4.  Can you take a look at those,

20   and after you do tell me if you recognize those?

21   A.   Yes, I recognize them.

22   Q.   And what are those?

23   A.   Invoices and sales agreements.

24   Q.   Are those invoices and sales agreements regarding the sale

25   of a 2020 Lexus LX570 to Mr. Didani?

1  A.  Yes, it is.

2  Q.  Are these records that are kept in the ordinary course of

3  business at INKAS?

4  A.  Yes.

5  Q.  Are some of these records records that you yourself

6  prepared?

7  A.  Yes.

8         MR. BILKOVIC:  Your Honor, at this time I would move

9  for admission into evidence of Government's proposed Exhibits

10  119.0 to 119.4.

11         THE COURT:  Any objection?

12         MR. FINK:  To 119.1 and 4, I don't know if the imagery

13  from the brochure is necessary, but I don't have an objection

14  to the other ones or the content for which they're being

15  offered, which is the price and delivery schedule.

16         THE COURT:  And your objection to 119.1 and 119.4 is

17  what?

18         MR. FINK:  Is the imagery associated with the

19  description on Pages 4 and 5 of it.  Otherwise, I don't have an

20  objection.

21         MR. BILKOVIC:  Your Honor, to expedite this, I think

22  what we can do is agree that I will not get into any of that

23  right now, and if we need to take that up later with the Court

24  and the Court doesn't want that in there, we can remove those

25  at that time.  I don't plan on getting into any of the areas

1      that Mr. Fink is talking about with this witness with these

2      exhibits.

3              THE COURT:  Are they on the exhibit, though?

4              MR. BILKOVIC:  They're paper exhibits that we can

5      simply take part of the paper out.

6              MR. FINK:  I'm fine with the procedure, Judge.

7              THE COURT:  So you want to redact 119.1 and 119.4?

8              MR. FINK:  Yeah.  It's clear Mr. Bilkovic knows what

9      I'm talking about.  Sounds like we can resolve it.  I'm not

10     objecting to the purpose for which he's offering it.

11             THE COURT:  Okay.  Then pending that I will admit

12     119.0 through 119.4, and you can show 119.1 and .4 after you

13     have made the appropriate redactions.

14             (Government's Exhibit 119.0-119.4 received into

15             evidence.)

16             MR. BILKOVIC:  Your Honor, would it be -- in order to

17     save some time, if I needed to show just one page of those that

18     does not contain the material that Mr. Fink is talking --

19             THE COURT:  As long as you show it to Mr. Fink first.

20             MR. BILKOVIC:  Thank you.

21             MR. FINK:  I'm fine with that.

22             MR. BILKOVIC:  Very well.  We will proceed that way.

23     Thank you, your Honor.

24             THE COURT:  They're admitted.

25             MR. BILKOVIC:  Thank you.

1   BY MR. BILKOVIC:

2   Q.   Can you look at Government's proposed Exhibit 120.0, 120.1

3   and 120.2, and tell me if you recognize those?

4   A.   Yes, I do.

5   Q.   And are those documents that are kept in the ordinary

6   course of business by INKAS?

7   A.   Yes, they are.

8   Q.   And were those related to the purchase by Mr. Didani of a

9   2020 Lexus LX570?

10  A.   Yes, that's correct.

11          MR. BILKOVIC:  Your Honor, at this time I would move

12  for admission into evidence of Government's proposed Exhibit

13  120.0 to 120.2.  And the only exhibit that has the concerning

14  area for Mr. Fink is Exhibit 120.0, and we can redact that

15  later.  I do not plan on showing that to the jury.

16          THE COURT:  Otherwise, any objection?

17          MR. FINK:  No.  I agree with that procedure.  Thanks,

18   Judge.

19          THE COURT:  All right.  They're admitted.

20          (Government's Exhibit 120.0-120.2 received into

21          evidence.)

22  BY MR. BILKOVIC:

23  Q.   And could we go to Government's proposed Exhibit 121.0,

24  121.1, 121.2, 121.3 and 121.4.

25  A.   Yes.

1    Q.   And do you recognize those?

2    A.   Yes, I do.

3    Q.   And are those documents from INKAS related to the purchase

4    of a 2020 Mercedes-Benz G63 AMG by -- billed to Yefreddy Auto?

5    A.   Yes, they do.

6    Q.   And are those records kept in the ordinary course of

7    business from INKAS?

8    A.   Yes.

9         MR. BILKOVIC:  Your Honor, with the same agreements

10   that we had before, I would move for admission into evidence of

11   Government's proposed Exhibit 121.0 through 121.4.

12        THE COURT:  Any objection other than otherwise stated?

13        MR. FINK:  I'm fine with the same procedure again.

14   Thanks, Judge.

15        THE COURT:  All right.  They're admitted.

16        (Government's Exhibit 121.0-121.4 received into

17        evidence.)

18   BY MR. BILKOVIC:

19   Q.   Can we go to Government's proposed Exhibit 123.0, 123.1,

20   123.2 and 123.3.  Do you recognize those?

21   A.   Yes, I do.

22   Q.   And what are those?

23   A.   These are also sales documents.

24   Q.   And are those sales documents related to 2021 Chevrolet

25   Tahoes that were sold to Mr. Didani?

1   A.   Correct, yes.

2   Q.   And are those records -- these records records that are

3   kept in the ordinary course of business?

4   A.   Yes, they are.

5   Q.   And again, some of these records you prepared yourself?

6   A.   Yes, I have.

7           MR. BILKOVIC:  Your Honor, at this time, with the same

8   understanding as the previous exhibits, I would move for

9   admission into evidence of Government's proposed Exhibits 123.0

10  through 123.3.

11          THE COURT:  Any objection other than otherwise stated?

12          MR. FINK:  No, your Honor, same thing.  Thank you.

13          THE COURT:  All right.  Very well.  They're admitted

14  with that limitation.

15          (Government's Exhibit 123.0-123.3 received into

16          evidence.)

17          MR. BILKOVIC:  Thank you, your Honor.

18          Can we bring up Government's proposed Exhibit 119.3,

19  please.  And could we go to the top starting where it says

20  "Sent."  And just zoom in on the -- go down to the bottom where

21  it's blue.  Go down to the bottom of that.

22  BY MR. BILKOVIC:

23  Q.   Do you recognize this?

24  A.   Yes, I do.

25  Q.   And what is this?

1    A.   This is an E-mail.

2    Q.   An E-mail from who?

3    A.   It's an E-mail sent from myself to Mr. Didani.

4    Q.   And Mr. Didani's E-mail address was what E-mail address?

5    A.   MIFreight@yahoo.com.

6    Q.   And this was sent by you when?

7    A.   March 22, 2020.

8    Q.   And it appears that there are attachments here.  What were

9    the attachments generally?

10   A.   These were the sales proposals for the vehicles that

11   Mr. Didani and myself discussed.

12           MR. BILKOVIC:  And could we go down to the body of the

13   E-mail, the bottom half.  And if we could just -- not the whole

14   thing.  Just keep going up.  Keep going up, up to the bottom

15   vehicle.  Right there.

16   BY MR. BILKOVIC:

17   Q.   And again, what is this that we're looking at here?

18   A.   This is an E-mail that I sent to Mr. Didani.

19   Q.   And this contains basically your description of the

20   vehicles that you're sending him information on?

21   A.   Correct.

22           MR. BILKOVIC:  Okay.  We can take that down.

23           And if we can go to Government's Exhibit 121.2.  And

24   if we could start from the "From" at the top and keep going

25   down, right there.  And just stop there, but go through the

1    whole body.

2    BY MR. BILKOVIC:

3    Q.   And what are we looking at here?

4    A.   This is an E-mail received -- that I received from

5    Mr. Didani.

6    Q.   And what date was this?

7    A.   This was also on Sunday, the 22nd of March 2020.

8    Q.   So is this a response from your E-mail that you just

9    testified about?

10   A.   Yes, it was.

11   Q.   And what is the body of the E-mail?

12   A.    It says, "Hi.  Thank you for sending this to me, and I was

13   very nice speaking to you, looking forward to do business with

14   you and your company."  Then it says, "Sent from my iPhone."

15         MR. BILKOVIC:  Can we go to 119.4, Page 1, and can we

16   just go to the bottom half, right there.

17   BY MR. BILKOVIC:

18   Q.   And what is it that we're looking at here?

19   A.   This is the cover page of our sales proposals where we

20   include the customer's information as well as the salesman's

21   information.

22   Q.   And this was a sales proposal that you sent Mr. Didani?

23   A.   Yes, it was.

24   Q.   And what date did you send him this?

25   A.   March 23, 2020.

```
 1              MR. BILKOVIC:  Can we go to Government's -- the same
 2     exhibit, but can we go to Page 6, 119.4, Page 6.  And go to the
 3     "Price & Delivery," right there.  And just go all the way
 4     across.  No, too much.  Keep going up higher, up into where it
 5     says "Optional Equipment."
 6     BY MR. BILKOVIC:
 7     Q.   So does this indicate the type of vehicle involved in the
 8     sales contract?
 9     A.   Yes, sir.
10     Q.   What type of vehicle?
11     A.   It's a 2020 Lexus LX570.
12     Q.   And what is the price in United States dollars for that
13     vehicle?
14     A.   140,000.
15     Q.   And these documents in here from Government's Exhibit 119,
16     the series of 119 through the series in 123, were those
17     documents also sent to Mr. Didani during your chats with him?
18     A.   Yes, they were.
19              MR. BILKOVIC:  Can we go to Government's Exhibit
20     119.1, the first page.  And can we go to the bottom portion of
21     this.
22     BY MR. BILKOVIC:
23     Q.   And again, this is for the same vehicle that you just
24     testified about, the Lexus; correct?
25     A.   Yes, it is.
```

1    Q.   Now, on here there is a different buyer.  The buyer is

2    named Yefreddy Auto?

3    A.   Correct.

4    Q.   Do you recall how that came about?

5    A.   Yes.  When it comes time to finalize our sales agreements,

6    we require full contact details of the client.  I requested

7    from Mr. Didani if he'll be purchasing this vehicle as himself

8    or under a company.  He mentioned that he'd be purchasing it

9    under a company and that this is his address where to issue the

10   contract to.  The company was called Yefreddy Auto.

11   Q.   Was the contract then changed to Yefreddy Auto?

12   A.   Yes, sir.

13   Q.   Other than Mr. Didani, did you ever talk to anybody in the

14   year that you were chatting with Mr. Didani that claimed to

15   work at Yefreddy Auto?

16   A.   Never.

17   Q.   Did you receive any E-mails or any type of communications

18   from anybody that claimed to work at Yefreddy Auto?

19   A.   I don't believe so, no.

20   Q.   And while you were doing this, how would you accept

21   payments, like on what type of a schedule?

22   A.   So, if it's a vehicle that we have in inventory, it's

23   already produced, then we request full balance at time of

24   signing the agreement.  If it's a vehicle that we need to

25   produce, and by produce I mean purchase the vehicle, put it

1   into production, then we will take -- we would request 60

2   percent at signing of the agreement and the balance prior to

3   shipment.

4   Q.  And this -- these vehicles that you sold to Mr. Didani, was

5   it kind of an ever-evolving thing or were they all purchased at

6   one time?

7   A.  It was evolving.

8   Q.  So were there vehicles that were purchased at different

9   points in time?

10  A.  Yes, sir.

11  Q.  And when the vehicles were purchased were payments made at

12  different points in time?

13  A.  Yes, sir.

14  Q.  And so when you got a payment what would you do with that

15  payment?  Would you apply it towards a specific vehicle or just

16  the overall total that Mr. Didani owed you?

17  A.  We would apply it to a specific order.  We'd patch it

18  together with that contract.

19          MR. BILKOVIC:  If you could look at Government's

20  Exhibit -- could we bring up 119.2.  And again, these are

21  documents related to the 2020 Lexus LX570.  And could we go to

22  the bottom half of that.  Keep going down.

23  BY MR. BILKOVIC:

24  Q.  Would you receive E-mails or send E-mails when payments

25  were made for vehicles that Mr. Didani was purchasing?

1   A.   Yes, I would.

2   Q.   And do you see -- does this exhibit, does this E-mail, is

3   there anything in here that reflects a payment that INKAS had

4   received?

5   A.   Yes, it does.

6   Q.   And could you tell the jury where that's at?

7   A.   Sure.  It's at the bottom E-mail, message from David

8   Khazanski.

9   Q.   What's the date?

10  A.   The date is June 16, 2020.

11  Q.   Okay.  And what is the subject of the E-mail?

12  A.   "Wire in Scotia, Yefreddy Auto.

13  Q.   What is the E-mail about?

14  A.   It's a wire transfer that we received from Yefreddy Auto

15  from Mr. Didani.

16  Q.   And the amount was ...

17  A.   63,800.

18  Q.   And would that have been in U.S. dollars?

19  A.   Yes, sir.

20  Q.   And there's a company next to that, Impact Point Trading?

21  A.   Yes.

22  Q.   Would that have been the company that sent the payment?

23  A.   Yes, it would be.

24  Q.   Throughout your dealings with Mr. Didani, did you receive

25  multiple -- or did INKAS receive multiple wire payments?

1   A.   Yes, we have.

2   Q.   Were they from the same company or were they from different

3   companies?

4   A.   Always different companies.

5   Q.   Always different companies?

6   A.   Yes, sir.

7   Q.   I'm sorry?

8   A.   Yes.

9   Q.   And was that vehicle completed by INKAS?

10  A.   Yes, it was.

11  Q.   And do you know where that vehicle was sent?

12  A.   To the Dominican Republic.

13  Q.   And who requested that it be sent to the Dominican

14  Republic?

15  A.   Mr. Didani.

16        MR. BILKOVIC:  Can we go to Exhibit 121.4, and can we

17  go to the bottom portion of this.

18  BY MR. BILKOVIC:

19  Q.   And what is this?

20  A.   This is also the cover page of our sales proposals.

21  Q.   Can you go to Page 6 of that document, 121.4, Page 6.

22        THE COURT:  Is that Page 6 -- or no?  Okay.

23        MR. BILKOVIC:  Can we go to the top -- down to where

24   it says "Optional Equipment."  Yeah.

25

1    BY MR. BILKOVIC:

2    Q.  And what was this sales proposal for?

3    A.  This was for the 2020 Mercedes Benz G63 AMG.

4    Q.  And what was the price of that initially?  What was the

5    initial quote for the price?

6    A.  285,000 U.S. dollars.

7    Q.  And was that a vehicle that Mr. Didani or Yefreddy Auto

8    ended up purchasing?

9    A.  Yes, sir.

10          MR. BILKOVIC:  Can you bring up the front page of

11   121.1.

12   BY MR. BILKOVIC:

13   Q.  And again, would this be the front page of the sales

14   proposal for that vehicle?

15   A.  Yes, that's correct.

16          MR. BILKOVIC:  And can we zoom in on the bottom third.

17   BY MR. BILKOVIC:

18   Q.  And again, the buyer in this case was changed from

19   Mr. Didani to who?

20   A.  Yefreddy Auto.

21   Q.  And that was done on what date?

22   A.  That was on March 30, 2020.

23   Q.  And who requested that the buyer be changed to Yefreddy

24   Auto?

25   A.  Mr. Didani.

1   Q.   And can we go to 121.0.  And what are we looking at here?

2   A.   This is a purchase invoice.

3           MR. BILKOVIC:  Can we go to the top half of it,

4   starting right there.  Go down to the total amount, right

5   there.

6   BY MR. BILKOVIC:

7   Q.   And what is the date on this?

8   A.   The date on this is September 1, 2020.

9   Q.   So would this kind of be like a billing statement as to

10  what's still owed on the vehicle?

11  A.   Yes, sir.

12  Q.   And again, this was billed to who?

13  A.   This was billed to Yefreddy Auto.

14  Q.   And this was for what vehicle?

15  A.   This was for the 2020 Mercedes G63.

16  Q.   And what was -- because I see under there the 285,000 you

17  talked about previously, but there are some additional charges

18  there as well?

19  A.   Yes, sir.

20  Q.   What would the total cost of that vehicle be?  Is that on

21  that?  Is it on this exhibit?

22  A.   It is.  Do you mind zooming it?  Thank you.

23  Q.   We'll zoom in for you.

24          THE COURT:  And this is the Mercedes?

25          MR. BILKOVIC:  Yes.

```
 1              THE COURT:  Okay.
 2   BY MR. BILKOVIC:
 3   Q.  Can you read that?
 4   A.  Yes, I can.
 5   Q.  And what did the total of the vehicle ended up being with
 6   all costs included?
 7   A.  All costs included came out to $295,350 U.S. dollars.
 8   Q.  Does that invoice reflect the payment that had been made?
 9   A.  Yes, sir.
10   Q.  As of September 1st of 2020?
11   A.  Correct.
12   Q.  And how much had been paid towards the vehicle?
13   A.  The $201,300 was applied to this vehicle.
14   Q.  The balance on this vehicle was how much?
15   A.  $94,050.
16   Q.  Now, when you -- were there times where you needed to
17   discuss payments with anybody for these vehicles on the buyer's
18   side, on Mr. Didani's side?
19   A.  Yes.
20   Q.  And who was it that you could discuss this with?
21   A.  Mr. Didani.
22   Q.  Anybody else?
23   A.  I apologize.  Mr. Didani did have a couple times contacts
24   call me to verify an account.
25   Q.  Okay.
```

1    A.   And funds.

2    Q.   I'm sorry?

3    A.   And to send funds.

4         MR. BILKOVIC:  If we could go to Government's Exhibit

5    120, Page 1.  Can we go to the bottom part of it.

6    BY MR. BILKOVIC:

7    Q.   And what are we looking at here?

8    A.   This is also the cover page of the different sales

9    agreement.

10   Q.   And can we go to -- before we get there, what's the date of

11   this?

12   A.   The date of this is August 12, 2020.

13   Q.   And the buyer is ...

14   A.   Yefreddy Auto.

15   Q.   If you could go to Page 6 of that exhibit, 120.0, Page 6.

16   And what type of vehicle is this?

17        MR. BILKOVIC:  If we can zoom in on the top third.

18   Right there.

19   BY MR. BILKOVIC:

20   Q.   What type of vehicle is this?

21   A.   This is a 2020 Lexus LX570 Sport.

22   Q.   So is this a different Lexus than what you had talked about

23   earlier?

24   A.   Yes, sir.

25   Q.   Is this an example of how the vehicles were being purchased

1    on an ongoing basis?  We're now in August of 2020.

2    A.   Correct.

3    Q.   What was the price on this vehicle before any modifications

4    or anything?

5    A.   $143,000, U.S. dollars.

6    Q.   And who requested that the buyer's name be -- that it be

7    put in the name of Yefreddy Auto?  Who requested that be done?

8    A.   Well, this is part of our sales agreement that request for

9    it to be written and signed by the customer.

10   Q.   Who requested that it be Yefreddy Auto as the buyer?

11   A.   Oh.  Mr. Didani.

12        MR. BILKOVIC:  Can you go to 120.0 -- I'm sorry,

13   120.1.  And can we go to the top -- right there, yeah.  And go

14   down to right there.

15   BY MR. BILKOVIC:

16   Q.   So this is labeled "Bill of Sale."  What is this?

17   A.   This is a bill of sale similar to a purchase invoice.  It

18   just shows the finalized vehicle.

19   Q.   And --

20   A.   The order.

21   Q.   I'm sorry?

22   A.   It shows the order of what was ordered and the pricing.

23   Q.   And this date was ...

24   A.   This was July 8, 2020.

25   Q.   Who is this billed to?

```
 1    A.   This is billed to a gentleman named Franklyn Martin
 2    Romero Morillo.
 3    Q.   And who requested that it be billed to Franklyn Martin
 4    Romero Morillo?
 5    A.   Mr. Didani.
 6    Q.   Did you ever meet Franklyn Martin Romero Morillo?
 7    A.   I have not.
 8    Q.   Did you ever talk to him?
 9    A.   I have not.
10    Q.   Did he ever attempt to contact you?
11    A.   No, sir.
12    Q.   Was this vehicle completed?
13    A.   Yes, it was, sir.
14    Q.   Do you know whether this was shipped?
15    A.   Yes.
16    Q.   Where was this shipped to?
17    A.   If you could just zoom in on the description, I can tell
18    you exactly which Lexus, I believe.
19              Yes, this was shipped to the Dominican Republic.
20    Q.   This was shipped to the Dominican Republic?
21    A.   Yes, sir.
22              MR. BILKOVIC:  If we could go to 123.0, and go to the
23    front page.
24    BY MR. BILKOVIC:
25    Q.   And what are we looking at here?
```

1   A.   We're looking at a sales document.

2          MR. BILKOVIC:  Can we go to the top half of it.

3   BY MR. BILKOVIC:

4   Q.   And what is the document title?

5   A.   "Purchase Invoice."

6   Q.   Now, again is this basically a billing statement as to

7   what's still owed for vehicles?

8   A.   Yes, sir.

9   Q.   And what is the date on this?

10  A.   The date on this one is March 3, 2021.

11  Q.   And who is this billed to?

12  A.   Mr. Didani.

13  Q.   And is there contact information there?

14  A.   There is.

15  Q.   And what is the contact information?

16  A.   It's an address in Ecuador as well as his E-mail address

17  and his WhatsApp telephone number.

18  Q.   The WhatsApp number ending in 1315?

19  A.   Yes, sir.

20  Q.   And what was this for?

21  A.   Whenever we --

22  Q.   I mean what vehicle was this?

23  A.   Oh, okay.  This is for two Chevrolet Tahoes, 2020 SUVs.

24  Q.   And again, the armored Tahoes?

25  A.   Yes, sir.

1    Q.   What was the cost of each one of these?

2    A.   Each one was $127,150 U.S. dollars.

3    Q.   And how much had been paid?  When this statement was sent

4    in March of 2021, how much had been paid towards those

5    vehicles?

6    A.   $200,000 U.S.

7              THE COURT:  That looks like a request for lunch to me,

8    okay.  All right.  I'm going to let them go to lunch.

9              Is this a good place to stop, Counsel?

10             MR. BILKOVIC:  Yes, your Honor.  I know it's

11   exhilarating testimony, but ...

12             THE COURT:  Okay.  All right.  Well, I'm not

13   commenting on that, but I'm going to let the jury go to lunch.

14             Remember that you're not permitted to talk about the

15   case among yourselves or with anyone else during the time

16   you're in recess.  And don't use any social media to indicate

17   anything to anyone or to find out anything about the case.  And

18   you may step down and come back in an hour, okay.  Thank you.

19             Please rise for the jury.

20             (The jury left the courtroom at 12:55 p.m.)

21             THE COURT:  You may step down, and please don't

22   discuss your testimony with anyone except your own lawyer;

23   okay?

24             THE WITNESS:  Yes.

25             THE COURT:  And come back in an hour, please.

```
 1              THE WITNESS:  Yes, your Honor.
 2              THE COURT:  All right.  Thank you.
 3              One hour, gentlemen.  Is that good?
 4          MR. BILKOVIC:  Yes, your Honor.
 5              THE COURT:  Did you want to bring up something,
 6     though?
 7          MR. BILKOVIC:  I was just going to raise -- I just
 8     wanted to make sure that Mr. Fink and I are on the same page.
 9     In all those contracts, they're all 11 pages long.
10              THE COURT:  They're all what?
11          MR. BILKOVIC:  The contracts themselves, the sales
12     agreements, are all approximately 11 pages long.  And within
13     them there is a -- basically it's almost like an advertisement
14     of four or five pages as to what the vehicles do, what they're
15     able to withstand, and there's pictures of bullets and things
16     like that.  We will take those out.  I was not planning on
17     getting into any of that, so we will take that out.  The
18     Government would agree to just redact those and just remove the
19     pages if that's acceptable to Mr. Fink.
20          MR. FINK:  Yes, it is.
21              THE COURT:  And you'll give me a copy of that; right?
22          MR. BILKOVIC:  Yes.  I won't be able to do it --
23              THE COURT:  It's okay.  I don't need to have it today.
24          MR. BILKOVIC:  I will get you a copy of all of them.
25     What I'm going to do, instead of redacting, is I'm just going
```

1    to remove the pages, which means our page numbers might be off.

2    So I don't know how the Court wants to handle that.  I don't

3    know that redacting five pages in a row looks great.

4                THE COURT:  So you and Mr. Fink decide how that will

5    look.

6                MR. BILKOVIC:  Okay.

7                THE COURT:  And then you tell me so we can have a

8    clear record if it.

9                MR. BILKOVIC:  Okay.  Very well.  Thank you.

10               THE COURT:  All right.  Anything else we need to take

11   up before the break?

12               MR. FINK:  No, your Honor.  I asked -- it's to do with

13   manpower, but if my client could be brought up a little bit

14   early before lunch, I will be grateful so I could have a few

15   minutes.

16               THE COURT:  That does have to do with manpower,

17   because that's the time other people are moving their

18   individuals as well.

19               MR. FINK:  Sure.

20               THE COURT:  Can he be brought up about 15 minutes

21   early, gentlemen?

22               MARSHAL:  We can do that, Judge.

23               THE COURT:  I mean the marshals.  And there's one

24   that's not a gentleman, so lady as well.

25               MR. FINK:  They're excellent, as you well know.  So

```
 1     I'll talk to them about it.

 2              THE COURT:  Okay.  That will be great.  I would

 3     appreciate it, and I thank you very much, okay.

 4              All right.  Let's take a recess.

 5              (At 12:57 p.m., a recess was taken for lunch.

 6              Back on the record at 2:14 p.m.)

 7              LAW CLERK:  All rise.  Court is back in session.

 8              THE COURT:  You may have your witness step back up.

 9     We're ready.

10              LAW CLERK:  All rise for the jury.

11              (The jury entered the courtroom at 2:15 p.m.)

12              THE COURT:  Okay.  You may all be seated.

13              Are you satisfied the jurors have returned and are in

14     their proper seats for the Government?

15              MR. BILKOVIC:  Yes, your Honor.

16              THE COURT:  What about for defense?

17              MR. FINK:  Yes, your Honor.

18              THE COURT:  Very good.  I'm satisfied as well.

19              And, Mr. Daskal, you're still under oath; all right?

20              THE WITNESS:  Yes.

21              THE COURT:  Okay.  You may continue.

22              MR. BILKOVIC:  Thank you, your Honor.

23              Could we bring up 119.0 again.  And could we zoom in

24     on the middle portion.

25
```

1    BY MR. BILKOVIC:

2    Q.   Mr. Daskal, again this was for the first Lexus; correct?

3    A.   Correct.

4    Q.   Now, in the middle under the description, under the vehicle

5    description, there's a description for a custom interior

6    modification for $6,000.  What was that for?

7    A.   Mr. Didani requested two separate hidden compartments

8    installed inside the vehicle.

9    Q.   And is that something that INKAS does or did you have to

10   basically farm that out?

11   A.   We outsourced it.  It's not something we regularly do.

12   Q.   And was that something that he did just on this car or was

13   that requested on other cars well?

14   A.   That was on multiple cars.

15   Q.   Now, you had said earlier --

16        MR. BILKOVIC:  You can take that down.  Thank you.

17   BY MR. BILKOVIC:

18   Q.   -- that some of the payments were made via wire; correct?

19   A.   Correct.

20   Q.   And when you received a wire would you let Mr. Didani know?

21   A.   Yes, I would.

22   Q.   And were there times when wires were sent that he would let

23   you know?

24   A.   Yes.

25   Q.   Can you look at Government's Exhibit 74, Page 9, and

 1    message number 585.  And actually, we're going to -- let me

 2    come grab that from you.

 3             MR. BILKOVIC:  May I approach, Judge?

 4             THE COURT:  Yes, you may.

 5             MR. BILKOVIC:  I'm going to go back here and -- 74.0,

 6     Page 9.  And could we bring up message number 585.

 7    BY MR. BILKOVIC:

 8    Q.  Now, I know the picture is blurry here, but do you see a

 9    photograph that Mr. Didani had sent you?

10    A.  Yes, I do.

11    Q.  And can you look at Government's proposed Exhibit 74.5.

12    A.  Yes.

13    Q.  And is that an enlarged version of that photograph that

14    Mr. Didani sent you?

15    A.  Yes, it is.

16    Q.  And is that basically a screenshot of a wire transfer that

17    was made to INKAS?

18    A.  Exactly, yes.

19             MR. BILKOVIC:  Your Honor, at this time I would move

20    for admission into evidence of Government's proposed Exhibit

21    74.5.

22             THE COURT:  Any objection?

23             MR. FINK:  No, your Honor.

24             THE COURT:  Very well.  It's admitted as 74.5.

25             (Government's Exhibit 74.5 received into evidence.)

1    BY MR. BILKOVIC:

2    Q.   I know it's blurry, so I'm not going to publish it to the

3    jury, but can you tell from here -- are you able to look at

4    that and read the date on it?  I have reading glasses if you

5    need them.

6    A.   I can see the date.

7    Q.   What is the date?

8    A.   The 10th of December 2020.

9    Q.   And what is the wire amount?

10   A.   It is blurry, but it looks like 189,300.

11   Q.   So 189,000?

12   A.   189,300 U.S. dollars -- sorry, Canadian dollars.

13   Q.   Canadian dollars.  And what was the company that sent that?

14   A.   Camaro Impex General Trading, LLC.

15   Q.   So this would be an example of another company sending the

16   wire?

17   A.   Yes, sir.

18   Q.   Did you have any contact with anybody at Camaro?

19   A.   I have not.

20   Q.   Have you had contact with -- let me ask you this.  Do you

21   know if the person that was running Camaro was running any

22   other trading companies?

23   A.   I don't know, no.

24   Q.   Now, you talked earlier about how INKAS would only accept

25   wire payment and on occasion checks, but in this case were

1    there times that you accepted cash?

2    A.  Yes, sir.

3    Q.  And was that basically unusual or unique for INKAS to do

4    that?

5    A.  It's very unique, yes.

6    Q.  And whose idea was it to pay cash?

7    A.  Mr. Didani's.

8    Q.  And was there a chat -- a text message chat about that?

9    A.  Yes.

10            THE COURT:  Say that question again.

11   BY MR. BILKOVIC:

12   Q.  Were there messages in the WhatsApp chat about that?

13   A.  Yes, there were.

14   Q.  If you could look at --

15            MR. BILKOVIC:  Actually, if we could bring up

16   Government's Exhibit 73.0, Page 20, and if we could start with

17   message 194.

18   BY MR. BILKOVIC:

19   Q.  And can you see from there the date on this?

20   A.  Yes.

21   Q.  And what is the date?

22   A.  March 28, 2020.

23   Q.  Maybe we better zoom in.

24   A.  Sorry.  March 26, 2020.

25   Q.  So this would be early on in the -- after you had recently

1    met Mr. Didani; correct?

2    A.   We never met.  Just on the phone, yes.

3    Q.   I mean, you started talking with them, I guess?

4    A.   Correct, yes.

5    Q.   And what is the message that he sent you?

6    A.   "I wish you can take cash."

7    Q.   And can we go to message 195 on the same page.  And how did

8    you respond?

9    A.   "I can."

10   Q.   And can we go to message 196 on the same page.  And did you

11   respond again?

12   A.   Yes, I did.

13   Q.   And what did you say?

14   A.   "Can you deliver cash?"

15   Q.   Can we go to the next page, Page 21 of Government's Exhibit

16   73.0 and go to the top message, 197.  And again, are we still

17   on March 26?

18   A.   Yes.  Do you mind zooming in on this a little bit if that's

19   okay?

20           MR. BILKOVIC:  Can you zoom in on the date and on the

21   body.

22           THE WITNESS:  Yes, that's March 26.

23   BY MR. BILKOVIC:

24   Q.   And how did Mr. Didani respond to you?

25   A.   He wrote, "I work with millions all over, but been little

 1   problem with my Chinos and Pakistani people from Dubai."

 2          MR. BILKOVIC:  Can we go to 73.0, Page 22, and can we

 3   go to message 203.  And could we just focus in on the date and

 4   the body of the message.

 5   BY MR. BILKOVIC:

 6   Q.   And the date again, we're still on March 26 of 2020?

 7   A.   Yes.

 8   Q.   Is that correct?

 9   A.   Yes, that's correct.

10   Q.   And this is a message you sent to Mr. Didani?

11   A.   Yes.

12   Q.   And what did you ask him?

13   A.   "Do you have someone in Toronto that can deliver USD?"

14   Q.   Can we go to the next page, 73.0, Page 23, or dash 23,

15   message 204.  And again, still on March 26, how does Mr. Didani

16   respond to you?  Can you see that?

17   A.   Yes.  He responded, "I can ask Chinos."

18   Q.   And can we go to the next message, message 205 on the same

19   page.  And you responded?

20   A.   Okay.

21   Q.   And can we go to the last message on that page, message

22   206.  And again, we're on March 26?

23   A.   Yes.

24   Q.   Does Mr. Didani send you another text message that is

25   message 206?

```
 1    A.   Yes, he does.

 2    Q.   And what does he text you?

 3    A.   "Always been scared of USA, but I'm okay in Canada."

 4    Q.   Now, did he ever talk to you about "Chinos"?  Did he ever

 5    explain to you what "Chinos" meant?

 6    A.   He did, yeah.

 7    Q.   I'm sorry?

 8    A.   Yes, yeah.

 9    Q.   What did he tell you "Chinos" meant?

10    A.   Associates of Mr. Didani that were of Chinese heritage.

11    Q.   And did he tell you what they did?

12    A.   No.

13    Q.   Did you continue to discuss potentially receiving cash

14    payments from Mr. Didani?

15    A.   Yes.

16    Q.   And did there come a point in time where he explained to

17    you how that would work?

18    A.   Yes, there was.

19    Q.   If we could go to Government's Exhibit 73.0, Page 56,

20    starting with message 853.

21              THE COURT:  Okay.  Tell me that again.  It's message

22    853 from what?

23              MR. BILKOVIC:  73.0, Page 56.

24              THE COURT:  Got it.

25              MR. BILKOVIC:  And we're going to start at message
```

 1   853.

 2              THE COURT:  Okay.

 3              MR. BILKOVIC:  Thank you.

 4   BY MR. BILKOVIC:

 5   Q.  The date of these messages that we're going to start on

 6   now, what is the date?

 7   A.  Looks like May the 5th, 2020.

 8   Q.  So at this point in time had you accepted any cash yet from

 9   Mr. Didani?

10   A.  I had not.

11   Q.  Okay.  And what is it that he text you?

12   A.  "They do all the transfer all over the world."

13   Q.  If we can go to the next message on the same page, 854,

14   message 854.  And what does he text you?

15   A.  "Look how this work when you ready."

16   Q.  And can we go to the next page, Page 57 of 73.0, and go to

17   the bottom message, 856.  And what is it that he text you?

18   A.  "You have to send me pic of one dollar."

19   Q.  Can we go to the next page, which would be Page 58 of

20   Exhibit 73.0, and can we go to message 857 at the top.  And

21   here is this a photograph that Mr. Didani sent you?

22   A.  Yes, it was.

23   Q.  Can you look at Government's proposed Exhibit 73.20.

24              MR. FINK:  73.20?

25              MR. BILKOVIC:  73.20, yes.  Point 2-0.

1   BY MR. BILKOVIC:

2   Q.   Do you have it?

3   A.   I have it in the front of me, yes.

4   Q.   Is that an enlarged version of the photograph that

5   Mr. Didani you in message 857 on May 5th of 2020?

6   A.   Yes, it is.

7          MR. BILKOVIC:  Your Honor, at this time I would move

8   for admission into evidence of Government's proposed Exhibit

9   73.20.

10          MR. FINK:  No objection.

11          THE COURT:  No objection.  It's admitted as 73.20.

12          (Government's Exhibit 73.20 received into evidence.)

13          MR. BILKOVIC:  Thank you, your Honor.

14          May I publish it to the jury?

15          THE COURT:  Yes, you may.

16  BY MR. BILKOVIC:

17  Q.   So this is basically a photograph of what Mr. Didani sent

18  you?

19  A.   Yes.

20  Q.   Now, it's not the whole bill; correct?

21  A.   No, it isn't.

22  Q.   Do you see the serial number contained there?

23  A.   I do.

24  Q.   And if we could go to message -- the next message, 858, on

25  Page 58.  And did Mr. Didani send this message after sending

1    you that photograph?

2    A.   Yes, he did.

3    Q.   And what does he say in this message?

4    A.   "Like this."

5    Q.   Can we go to Exhibit 73.0, Page 59, and go to the top

6    message, which is 859.  And does the chat continue about this?

7    A.   Yes.

8    Q.   So we're still on May 5th here?

9    A.   Around May 5th, yes.

10   Q.   And Mr. Didani, what does he text you?

11   A.   "With numbers."

12   Q.   So what did you take that to mean?

13   A.   The serial numbers of the bill.

14   Q.   Why?  Do you think he wanted -- well, what did you think he

15   wanted you to do?

16   A.   I didn't know yet, actually, I'll be honest with you.

17   Yeah.

18   Q.   He's explaining this, and you don't know exactly what he's

19   asking?

20   A.   Actually, he was explaining it, and I was trying to

21   understand exactly what he wanted.

22   Q.   Okay.  Can we go to the next message on the same page,

23   which would be message 860.  And what does Mr. Didani text you?

24   A.   "Once you send me that I send to them."

25   Q.   And can we go to the next message, same page, 861, message

1   861.  And what does that say?

2   A.   "They will contact you and come to your address."  I

3   believe it's ADR abbreviated.

4   Q.   ADR?

5   A.   Address.

6   Q.   So it says "ADR."  You took that to mean address?

7   A.   Correct.

8   Q.   And can we go to the next message on the same page, 862.

9   And do you respond?

10  A.   I responded.

11  Q.   And how did you respond?

12  A.   "Now I'm confused."

13  Q.   Were you confused?

14  A.   Very.

15  Q.   Can we go to the next page, 73.0, Page 60, and go to the

16  top message, 863.  And did Mr. Didani send you another text

17  after you texted him that you were confused?

18  A.   Yes.

19  Q.   And what did he text you?

20  A.   "You have to pull out the same dollar."

21  Q.   Can we go to the next page, 73.0-61, or Page 61, message at

22  the top, 866.  And this is a message that Mr. Didani sent to

23  you?

24  A.   Yes.

25  Q.   I'm sorry?

1   A.   Yes, correct.

2   Q.   And what did he text you?

3   A.   "Can I call you?"

4   Q.   And can we go to the next message on the same page, message

5   867.  And you responded ...

6   A.   "Sure."

7   Q.   Did there come a point in time where you talked to him and

8   got clarification as to what needed to happen?

9   A.   Yes.

10  Q.   And what did he explain to you?  How did he explain to you

11  that this would work?

12  A.   He explained that the serial numbers of one bill, I should

13  take a picture of the serial number, send it to Mr. Didani.  He

14  would send it to his partners.  When the partners would come to

15  deliver the funds, I would have to present the same dollar bill

16  with the same serial number, and they would match it together

17  with whatever they had of the dollar bill.

18  Q.   And if they matched what would they do?

19  A.   They would provide me with cash.

20  Q.   And so did there come a point in time a few months later

21  where arrangements were made where you were going to receive a

22  cash payment?

23  A.   Yes, sir.

24  Q.   And who did you make those arrangements with?

25  A.   Mr. Didani.

1  Q.  Can we go to Exhibit -- stay on the same exhibit, 73.0.

2  Can we go to Page 103 and can we go to message 2247.  And so

3  this is an incoming message on September 9, 2020; is that

4  correct?

5  A.  That's correct.

6  Q.  Incoming means that's coming from you?

7  A.  Yes.

8  Q.  And what was it that you said?

9  A.  It was a picture of a bill of some currency.  Can you tell

10  me the number and I'll take a look.

11  Q.  I'm sorry?

12  A.  Can you --

13  Q.  I'm going to have you look at it.

14  A.  It's a Colombian peso.

15  Q.  This is a photograph of a bill that you sent to Mr. Didani?

16  A.  Yes, sir.

17  Q.  Can you look at Government's Exhibit 73.45.

18        MR. FINK:  73 point ...

19        MR. BILKOVIC:  73.45.

20  BY MR. BILKOVIC:

21  Q.  Do you have it?

22  A.  Yes.

23  Q.  And do you recognize that?

24  A.  I do.

25  Q.  Is that an enlarged version of the photograph that you sent

1   to Mr. Didani?

2   A.   Yes, it is.

3   Q.   And what is it a photograph of?

4   A.   It's a 10,000 peso Colombian note.

5           MR. BILKOVIC:  Your Honor, at this time I would move

6   for admission into evidence of Government's proposed Exhibit

7   73.45.

8           THE COURT:  Any objection?

9           MR. FINK:  Mark, which message was that?

10          MR. BILKOVIC:  It's message 2247.

11          MR. FINK:  No objection.

12          THE COURT:  Very well.  It's admitted.  And it's

13   73.45?

14          MR. BILKOVIC:  Correct.

15          THE COURT:  All right.  It's admitted.

16          (Government's Exhibit 73.45 received into evidence.)

17          MR. BILKOVIC:  May I publish it to the jury?

18          THE COURT:  Yes.

19   BY MR. BILKOVIC:

20   Q.   And again, this is the photograph of the bill that you sent

21   to Mr. Didani?

22   A.   Yes, it is.

23   Q.   And can we go to the next message on the same page, which

24   would be 2248.  Did Mr. Didani respond to you?

25   A.   Yes, he did.

1   Q.   And how did he respond?

2   A.   With laughter.

3   Q.   Pardon me?

4   A.   With laughter, "Ha, ha, ha, ha."

5   Q.   "Ha, ha, ha"?

6   A.   Many ha, ha's, yes.

7   Q.   Repeated multiple times?

8   A.   Correct, yes.

9   Q.   And then can we go to the next page, 73.0 dash -- or Page

10  104, message 2250 at the top.  And did he, Mr. Didani, make a

11  further comment on what you had sent him?

12  A.   Yes.  He said, "LOL," laugh out loud, "Colombian."

13  Q.   Now, did you have -- when you would make these requests for

14  payment, did you receive them always on time?

15  A.   No, I didn't.

16  Q.   And the first cash payment that you accepted, did you

17  receive it on time?

18  A.   I don't recollect, but I believe there was a delay.

19  Q.   And would you ever -- let me ask you this.  How was it --

20  would you be in contact with somebody other than Mr. Didani

21  with respect to the actual payment itself?

22  A.   So I would receive usually a text message from whoever

23  Mr. Didani gave the instruction to or when they will come, more

24  to confirm the address, or to go visit them to pick up the

25  cash.

1    Q.   And would you then engage in text messages with this person

2    to basically coordinate that?

3    A.   Very briefly.  I refused to go to any address outside of

4    the office, and I would take screenshots and I'd send it to

5    Mr. Didani.

6    Q.   You would take screenshots of what?

7    A.   Of the chat between this person and myself.

8    Q.   Can we go to Government's Exhibit 73.0, Page 106, the

9    bottom message, 2257.  Now, I know it's small, but is this a

10   screenshot of text messages that you sent to Mr. Didani?

11   A.   Yes, it is.

12   Q.   And that would have been on September 10, 2020?

13   A.   September 10, yes.

14   Q.   Can you look at Government's Exhibit proposed Exhibit

15   73.50.  Do you see that?

16   A.   Yes, I do.

17   Q.   And is that one of the text message screens that you sent

18   to Mr. Didani with respect to this transaction?

19   A.   Yes, it is.

20        MR. BILKOVIC:  Your Honor, at this time I would move

21   for admission into evidence of Government's proposed Exhibit

22   73.50.

23        THE COURT:  Any objection?

24        MR. FINK:  Depending on how it's used, Judge, I don't

25   have an objection as to it being the picture from the chat, but

1   what's contained in there, I suppose, unless I know how it's

2   being used would be hearsay.

3          THE COURT:  Mr. Bilkovic, do you want to respond to

4   that?

5          MR. BILKOVIC:  Yes, Judge.  Basically this is --

6   basically the content here is he is receiving information from

7   somebody.  There appears to be a disagreement between them.  He

8   then sends this information to Mr. Didani and gives him

9   instructions on what to do.

10         THE COURT:  Gives Mr. Didani instructions?

11         MR. BILKOVIC:  No.  Mr. Didani then gives him

12  instructions.

13         THE COURT:  Okay.  So now that you know how it's being

14  used --

15         MR. FINK:  For that purpose, I have no objection, just

16  not as to its truth.

17         THE COURT:  Okay.  Very well.  And it's offered for

18  that purpose.  And the jury will not consider it for the truth

19  of the matter asserted, and it's admitted.  And you may show

20  it, 73.50.

21         (Government's Exhibit 73.50 received into evidence.)

22         MR. BILKOVIC:  Thank you.

23         And can we zoom in just on the top half.

24  BY MR. BILKOVIC:

25  Q.  Now, are you in the green here or are you in the gray?

```
 1    A.   I would be in the green.
 2    Q.   So at the very top, 365 Weston Road, what does that
 3    signify?
 4    A.   That's our head office in Toronto for INKAS.
 5    Q.   Were you trying to get the person to deliver the money
 6    there?
 7    A.   Yes.
 8    Q.   Did they provide you a different address?
 9    A.   Yes, they did.
10    Q.   Can we go to the bottom portion.  And we start with the
11    green at the top.  You text.  What do you say?
12    A.   "I don't go there."
13    Q.   And then did they respond basically with an address?
14    A.   They gave me another address to go to.
15    Q.   And then how did you respond?
16    A.   I said, "File must be delivered at 34605 Weston Road.  We
17    do not do pick up.  Sorry.  If it cannot be delivered today,
18    then tomorrow morning.  Need to know ASAP, because my staff is
19    waiting and want to go home already."
20    Q.   And can we go to Government's Exhibit -- same exhibit,
21    73.0, Page 104, message 2252.  And this is -- is this another
22    screenshot of text messages that you were sending Mr. Didani
23    about what was going on with the payment?
24    A.   Yes, it is.
25    Q.   And that's in message 2252?
```

1    A.   That's in 2252, yes.

2    Q.   Now, at some point in time did Mr. Didani leave you a

3    message as to what to do, a voice message?

4    A.   There were many voice messages.  I'm sorry, yeah.

5    Q.   I want you to look at --

6         MR. BILKOVIC:  If we could bring up Government's

7    proposed Exhibit 106 -- I'm sorry, Government's Exhibit 73.0,

8    Page 106, message 2255.

9         THE COURT:  Say that again, 73.0 ...

10        MR. BILKOVIC:  73.0, Page 106, message 2255.

11        THE COURT:  Thank you.

12   BY MR. BILKOVIC:

13   Q.   And does this appear to be basically a message from

14   Mr. Didani that has no content?

15   A.   Yes, it does.

16   Q.   Do you see the bottom on there the blue that ends in

17   "Opus"?

18   A.   The blue underlining there?

19   Q.   Yes.

20   A.   Yes, I can.  Okay, yeah.

21   Q.   Do you know from looking at the chats and reviewing these

22   with the Government that those would be voice messages?

23   A.   They're audio messages, yes.

24        MR. BILKOVIC:  Your Honor, at this time I would move

25   for admission into evidence of Government's proposed Exhibit

```
 1    73.49, which is the audio message that was from this portion of

 2    the chat message 2255.

 3              THE COURT:  Any objection?

 4              MR. FINK:  Judge, I am just looking at the closed

 5    captioning to ensure.

 6              No objection, your Honor.

 7              THE COURT:  Okay.  73.49 is admitted.

 8              (Government's Exhibit 73.49 received into evidence.)

 9              MR. BILKOVIC:  May I play it for the jury, your Honor?

10              THE COURT:  Yes.

11              (Audio played.)

12    BY MR. BILKOVIC:

13    Q.  And can we go to the next message, 2256 on the same page,

14    Page 106 of Exhibit 73.  And did you respond to Mr. Didani's

15    audio message?

16    A.  Yes, I did.

17              MR. BILKOVIC:  Could we just zoom in on the body so we

18    can read it.

19    BY MR. BILKOVIC:

20    Q.  And what did you tell him?

21    A.  "I did that, and they wrote a different address for me to

22    pick up.  I told them we won't pick up.  Must be delivered."

23    Q.  Now, at some point in time did the money get dropped off to

24    you?

25    A.  It did.
```

1    Q.   And did you let Mr. Didani know that?

2    A.   Yes, I did.

3    Q.   Was there an issue with the way that it was dropped off to

4    you?

5    A.   Yes.

6    Q.   And what was the issue?

7    A.   It was delivered in Canadian dollars, multiple small

8    denominations in Canadian dollars mostly.

9    Q.   And did you let Mr. Didani know that in this text message

10   string?

11   A.   I mentioned to Mr. Didani it needs to be in American

12   dollars, USD.

13   Q.   And did you send Mr. Didani a photograph of the money that

14   you had received?

15   A.   Yes, I did.

16   Q.   Can we go to Page 110 of Exhibit 73.0, message 2271.  And

17   is that a photograph that you sent Mr. Didani on September 10,

18   2020?

19   A.   Yes, sir.

20   Q.   I'm sorry?

21   A.   Yes, sir.

22   Q.   And can you look at Government's proposed Exhibit 73.51.

23   A.   I'm here.

24   Q.   And what is that?

25   A.   That's a photograph of the Canadian dollars that we

1    received from Mr. Didani.

2    Q.   That's basically what we see here in message 2271, but the

3    enlarged version?

4    A.   Correct.

5             MR. BILKOVIC:  Your Honor, at the time I would move

6    for admission into evidence of Government's proposed Exhibit

7    73.51.

8             THE COURT:  Any objection?

9             MR. FINK:  No objection.

10            THE COURT:  Very well.  It's admitted at 73.51.

11            (Government's Exhibit 73.51 received into evidence.)

12            MR. BILKOVIC:  And may I publish it to the jury?

13            THE COURT:  Yes, you may.

14   BY MR. BILKOVIC:

15   Q.   Do you recall approximately how much money you received in

16   Canadian?

17   A.   I want to say a hundred.

18   Q.   If you don't, it's okay.

19   A.   I don't remember exactly that amount.  My mind is telling

20   me around 130 or 140,000 Canadian dollars, but I don't --

21   Q.   Did you let Mr. Didani know how much you had received in

22   Canadian?

23   A.   Yes, yes, absolutely.

24            MR. BILKOVIC:  Okay.  Can we bring up message 2255 in

25   Government's Exhibit 73.0, Page 108, and can we just zoom in on

 1   the message part.

 2   BY MR. BILKOVIC:

 3   Q.   Is this where you informed Mr. Didani as to how much you

 4   had received?

 5   A.   Yes.

 6   Q.   And how much had you received in Canadian?

 7   A.   We received 147,410 Canadian dollars.  Converted to USD is

 8   $111,760 at that time.

 9   Q.   So then what was done with that difference?

10   A.   I'm sorry?

11   Q.   So fair to say that Mr. Didani owed you an additional

12   $36,000?

13   A.   Yes.

14   Q.   So what was done with that?  How is that accounted for?

15   A.   I explained to Mr. Didani that we still -- there was still

16   a balance due.

17   Q.   Okay.  So it was just added onto his balance?

18   A.   Correct.

19   Q.   Any issues with that?

20   A.   No.

21        MR. BILKOVIC:  Can we take that down.

22   BY MR. BILKOVIC:

23   Q.   So where did you -- the person that dropped the money off

24   the first time, where did you meet them at?

25   A.   I met them in front of the -- right in the front doors of

1    our office.

2    Q.   And was it one person, two people?

3    A.   No.  It was two people.

4    Q.   Okay.

5    A.   What looked like a male and a female, middle-aged, in a

6    van, of Asian descent.

7              Do I explain how I --

8    Q.   Did you talk to them at all?

9    A.   Yes, I did.

10   Q.   Did you go outside?

11   A.   Yes.

12   Q.   And did they come inside your building?

13   A.   No, they didn't.

14   Q.   So did you go to the vehicle that they were in?

15   A.   Yes.

16   Q.   And what happened when you got to their vehicle?

17   A.   They asked to see the bill.

18   Q.   Did you show it to them?

19   A.   We did -- yes, I did.

20   Q.   And what happened then?

21   A.   And then they matched -- they took a look at their phone to

22   match the bill and opened their trunk and told me the bag's in

23   the back, take it.

24   Q.   And what happened with the bill?

25   A.   They kept it.

1   Q.   Did you want them to keep it?

2   A.   No.

3   Q.   Why didn't you want them to keep it?

4   A.   I collect funds from all over the world.  It was a

5   Colombian peso that I -- it's more my collectibles.  I didn't

6   think I'd have to give it to somebody.

7   Q.   And so they took it from?

8   A.   They took it from me.

9   Q.   And what was in the trunk of the vehicle or the back of the

10  vehicle?

11  A.   This denomination in plastic shopping bags.

12  Q.   That we just saw in the photograph.  Now, how many -- did

13  these people identify themselves?

14  A.   They didn't.

15  Q.   How many -- did you do any additional cash pickups in this

16  fashion?

17  A.   Yes.

18  Q.   Were they arranged with Mr. Didani?

19  A.   Yes.

20  Q.   How many did you do in addition to this one?

21  A.   Three times.

22  Q.   Three more or three total?

23  A.   Three total.

24  Q.   So two after this one?

25  A.   Yes, sir.

1    Q.   Were they done the same way where you would send basically

2    a photograph of a bill with a serial number?

3    A.   Exactly.

4    Q.   And who would you send that to?

5    A.   Mr. Didani.

6    Q.   And then after that would somebody contact you then to

7    basically arrange time and location for payment?

8    A.   Yes, sir.

9    Q.   And are those contained in the chats that we've already

10   admitted?

11   A.   Yes.

12   Q.   The other two times, where did you meet the people at?

13   A.   Also at the front doors at INKAS.

14   Q.   And were they the same -- so let's talk about the second

15   time.  Were they the same people or a different person?

16   A.   It was never the same person.

17   Q.   Different people all three times?

18   A.   Yes, sir.

19   Q.   Did any of them ever identify themselves to you?

20   A.   No.

21   Q.   And overall in this case -- and an estimate's fine, but in

22   wires that you or INKAS received through Mr. Didani,

23   approximately -- for all those vehicles, approximately how much

24   did INKAS receive in wires?

25   A.   I'd say a little over 600,000.

1   Q.   A little over?

2   A.   Wires, yes.

3   Q.   So $600,000 in United States funds?

4   A.   USD, yes.

5   Q.   And how much in the three cash payments approximately in

6   United States funds?

7   A.   I would say about 200,000.  $200,000.

8            THE COURT:  Did you say 200,000?

9            THE WITNESS:  200,000, yes.

10  BY MR. BILKOVIC:

11  Q.   And is that an estimate?

12  A.   It's an estimate, yes.

13  Q.   Did Mr. Didani ever discuss with you either over the phone

14  or through text messages about moving money, about how he would

15  move money?

16  A.   Sorry.  Can you repeat the question.

17  Q.   Did Mr. Didani ever discuss with you in text messages or

18  invoice messages about how he was moving money around?

19  A.   He never explained to me how, no.

20  Q.   Did he ever talk about it with you?

21  A.   He says he has money in a lot of countries around the

22  world.

23  Q.   And did he ever talk to you about rates that he would have

24  to pay to do that?

25  A.   Yes, he did.

1   Q.   Did you ever hear him refer to an individual by the name of
2   "Uncle"?
3   A.   Yes.
4   Q.   Or that he referred to as "Uncle"?
5   A.   Yes, sir.
6   Q.   And did he ever discuss with you the rate that he was being
7   charged to move money with people?
8   A.   He sent me a screenshot of different rates that he gets
9   from different countries.
10  Q.   Can we stay with Government 73.0.  Can we go to Page 64,
11  message 989.  And is this a message that Mr. Didani sent you on
12  May 28, 2020?
13  A.   Yes.
14  Q.   And what is the body of the message?
15  A.   It says, "Chinese going crazy, bro."
16  Q.   And can we go to the next message on the next page, which
17  would be Page 65 of Exhibit 73.0.  It would be message 990.
18          Now, I don't want you to read the "F" word out loud,
19  but is this another one that Mr. Didani sent you?
20  A.   Yes, sir.
21  Q.   And does it say -- I'm going to paraphrase it -- "They
22  F'ing us with transfers"?
23  A.   Exactly.
24  Q.   And can we go to message 992 on the same page.  And did
25  Mr. Didani follow that with a screenshot of text messages?

 1   A.   Yes.

 2   Q.   Can you look at Government's proposed Exhibit 73.24.  Tell

 3   me if you recognize that.

 4           THE COURT:  73.24?

 5           MR. BILKOVIC:  Point 24.

 6           THE WITNESS:  Yes, I'm here.

 7   BY MR. BILKOVIC:

 8   Q.   And what is that?

 9   A.   It's a screenshot of different countries where it looks

10   like rates that he would have percentages he'd have to pay.

11   Q.   And is that an enlargement of the text message -- or the

12   screenshot of message 992?

13   A.   Yes, sir.

14           MR. BILKOVIC:  Your Honor, may I move to admit that

15    and publish it to the jury?

16           THE COURT:  Yes, you may.

17           MR. FINK:  Objection.

18           THE COURT:  73.24?

19           What's your objection?

20           MR. FINK:  Hearsay.

21           THE COURT:  Do you want to respond to that?

22           MR. BILKOVIC:  Judge, this is coming from Mr. Didani.

23    It's an admission from a party opponent.  He is sending text

24    messages as he is explaining to Mr. Daskal how basically rates

25    -- his rates are going up all over the world.

1          MR. FINK:  It's a screenshot of text messages with

2     unknown discussion of people.  The fact of him sending it is

3     one thing.  The truth of what is in that text message is

4     hearsay.

5          MR. BILKOVIC:  Judge, we're also going to follow with

6     a voice message where Mr. Didani talks about this verbatim.

7          MR. FINK:  Once again --

8          MR. BILKOVIC:  Hold on.  I think we've also had

9     testimony, especially from Agent Willock, that basically to

10    take messages in encrypted phones you have to use another

11    device, which this is a photograph of.  It is somebody holding

12    it.  Mr. Didani is telling, explaining to Mr. Daskal how rates

13    are going up all over the world, how he's getting basically

14    screwed over on transfers, and this text message talks about

15    those rates.

16         MR. FINK:  Again, my objection is just to this picture

17    and the truth of what's in this picture, that it is hearsay.

18    All of those -- that wonderful testimony I'm sure can be got in

19    a different way.  I'm objecting that this can't be used that

20    way, that's all.

21         THE COURT:  I don't know whether or not -- well, I

22    think your objection should be noted for the record.  And I'm

23    going to overrule it, because I think that he can use it in

24    this way --

25         MR. FINK:  Thank you.

```
 1            THE COURT:  -- based on the testimony that has been
 2   presented so far relative to the conspiracy.
 3            MR. FINK:  Thank you, Judge.
 4            THE COURT:  It's admitted as 73.24.
 5            (Government's Exhibit 73.24 received into evidence.)
 6            MR. BILKOVIC:  Thank you.  May I publish it?
 7            And can we go to the top half.
 8   BY MR. BILKOVIC:
 9   Q.   Now, do you see a finger or a thumb on the left-hand side
10   holding this device?
11   A.   Yes, I do.
12   Q.   Okay.  You do not know who's talking here; is that fair to
13   say?
14   A.   Yes.
15   Q.   And I don't want you to use the "F" word, but the top
16   message does it say, "Token prices gone F all world"?
17   A.   Yes, it does.
18   Q.   What does the next message say?
19   A.   "UK to Dubai was 7."
20   Q.   Next one?
21   A.   "Now 11."
22   Q.   Next one?
23   A.   "Holland Dubai was 2, now it's 6."
24   Q.   Can you go down to the bottom half.
25   A.   "Holland ecu was 12, now 17.  Holland Brazil was 6, now 12.
```

1    Yes rape LOL."

2    Q.   And on the right-hand side, I don't want you to read them,

3    but is it apparent that the person in blue is not happy about

4    the rates?

5    A.   Yes.

6    Q.   After Mr. Didani sent you that photograph --

7              MR. BILKOVIC:  If we could go to the next page,

8    Government's Exhibit 73.0, Page 66, message 993.  Can we put

9    that up.

10   BY MR. BILKOVIC:

11   Q.   And what did Mr. Didani text you on May 28, 2020?

12   A.   Do you mind zooming it in just a little bit?

13   Q.   After sending you the previous text message, what does he

14   text you?

15   A.   "They want for their 18 percent from 9 use to be."

16   Q.   And you were where?  Where were you?  What country were you

17   in?

18   A.   In Canada.

19   Q.   Mr. Didani ever send you messages about problems that he

20   was having with respect to transfers and shipping ports?

21   A.   Yes.

22             THE COURT:  Is that a question?

23             MR. BILKOVIC:  Yes.

24             THE COURT:  Okay.

25

 1    BY MR. BILKOVIC:

 2    Q.  Can we go to Government's Exhibit 73.0, Page 67.  And can

 3    we go to message 1015.  And again, is this an Opus message,

 4    which is a voice message?

 5    A.  Yes, sir.

 6    Q.  And have you had an opportunity to review the voice

 7    messages in this case prior to testifying today?

 8    A.  Yes, I have.

 9            MR. BILKOVIC:  Your Honor, at this time the Government

10    would move to admit Government's proposed Exhibit 73.25, which

11    is the voice message contained in message 1015.

12            THE COURT:  Any objection?

13            MR. FINK:  One moment, your Honor.

14            No objection, your Honor.

15            THE COURT:  Very well.  It's admitted.

16            (Government's Exhibit 73.25 received into evidence.)

17            MR. BILKOVIC:  And may I play it to the jury?

18            THE COURT:  You may.

19            (Video message played.)

20    BY MR. BILKOVIC:

21    Q.  Can we go to the next page, 73.0, Page 68, message 1017.

22    And now this is a message that was sent on June 2nd of 2020?

23    A.  Yes.

24    Q.  And again, you listened to all the voice messages in this

25    case?

1    A.   Yes, I have.

2            MR. BILKOVIC:  Your Honor, at this time I would move

3    for admission into evidence of Government's proposed Exhibit

4    73.27, which is the voice message attached to message 1017.

5            THE COURT:  Any objection to that?

6            MR. FINK:  No objection.

7            THE COURT:  All right.  It's admitted.

8            (Government's Exhibit 73.27 received into evidence.)

9            MR. BILKOVIC:  Can I publish it for the jury?

10           THE COURT:  Yes, you may.

11           MR. BILKOVIC:  Thank you.

12           (Video message played.)

13   BY MR. BILKOVIC:

14   Q.   If you could turn for a moment to Government's Exhibit

15   74.0 -- I'm sorry.  I'm going to put it up there.  You don't

16   have to turn to it.  Page 36, message 1191.  And I know it's

17   tough for you to see that, but you've gone through this before;

18   correct?

19   A.   I have.

20   Q.   Now, this is a message that was sent to you by Mr. Didani

21   on March 2, 2021 in message 1191?

22   A.   Yes.

23   Q.   And do you see the photograph there?

24           MR. BILKOVIC:  Can we zoom in on the photograph.

25           THE WITNESS:  Yeah.  Yes.

1   BY MR. BILKOVIC:

2   Q.   Do you see that photograph?

3   A.   I do.

4   Q.   And could you look at Government's proposed Exhibit 74.22.

5   A.   I'm here.

6   Q.   I'm sorry?

7   A.   I'm here, yes.

8   Q.   And do you recognize that?

9   A.   Yes.  This is a screenshot of Mr. Didani and what he

10  claimed to be his Chinese partner.

11  Q.   And is that an enlarged version of the photograph in

12  message 1191 that we just showed the jury?

13  A.   Yes, sir.

14          MR. BILKOVIC:  Your Honor, at this time I would move

15   for admission into evidence of Government's proposed Exhibit

16   74.22.

17          THE COURT:  74.22.  Mr. Fink, any objection?

18          MR. FINK:  One moment, your Honor.

19          No objection.

20          THE COURT:  It's admitted as 74.22.

21          (Government's Exhibit 74.22 received into evidence.)

22          MR. BILKOVIC:  And may I publish it to the jury?

23          THE COURT:  You may.

24          MR. BILKOVIC:  And can we zoom in on the top half.

25

1    BY MR. BILKOVIC:

2    Q.   Do you recognize the person there?

3    A.   Yes.

4    Q.   Who is that?

5    A.   That's Mr. Didani.

6             MR. BILKOVIC:  Can we go to the first one on the

7    bottom half.

8    BY MR. BILKOVIC:

9    Q.   Do you know who that person is?

10   A.   Never met him.

11   Q.   Were you ever on a call or a conversation with him and

12   Mr. Didani?

13   A.   Yes, I have been.

14   Q.   How did that come about?

15   A.   When I -- we were waiting on funds.  I believe it was the

16   fact that it was Canadian currency and not U.S. dollars; I

17   explained to Mr. Didani that we had an agreement that it would

18   be U.S. dollars.  And he would put the gentleman on the phone

19   every once in awhile.  It was, I believe, two or three times

20   total.

21   Q.   Would it be a video thing like this where you could see the

22   person?

23   A.   Yes.

24   Q.   Can we go to exhibit -- back to Exhibit 73.0, Page 96, item

25   2 -- or message 2028.  And is this a photograph that Mr. Didani

1    sent you on August 12th of 2020?

2    A.  Yes, it is.

3    Q.  Can you look at Government's proposed Exhibit 73.42 and

4    tell me if you recognize that?

5    A.  I'm sorry.  You said 43?

6    Q.  Government's Exhibit 73.42.

7    A.  42.  I'm here.

8    Q.  And do you recognize that?

9    A.  Yes, I do.

10   Q.  And is that basically an enlarged version of that

11   photograph?

12   A.  Yes, it is.

13         MR. BILKOVIC:  Your Honor, at this time I would move

14   for admission into evidence of Government's proposed Exhibit

15   73.42.

16         THE COURT:  Any objection?

17         MR. FINK:  One moment, your Honor.

18         No objection.

19         THE COURT:  It's admitted as 73.42.

20         (Government's Exhibit 73.42 received into evidence.)

21         MR. BILKOVIC:  And may I publish it to the jury?

22         THE COURT:  You may.

23         MR. BILKOVIC:  Can we zoom in on the -- starting -- go

24   lower, lower, down to the bottom of the note.  Right there.

25

1    BY MR. BILKOVIC:

2    Q.   And what are you looking at here?

3    A.   It's a screenshot of a lot of euros in what looks to be in

4    a safe.

5    Q.   Bulk currency?

6    A.   Bulk currency, yes.

7    Q.   And is there a note attached to it?

8    A.   Yes, there is.

9    Q.   Can you read the note, the first line of the note?

10   A.   Sure.  It's the date 31/3/2020.  Underneath he writes,

11   "PML" in capital letters, "coronavirus, cash."

12   Q.   And could we to the message -- the next page 73 point --

13         And you said these are euros?

14   A.   What looks to be euros, yes, sir.

15   Q.   Can we go to the next, Page 73 -- Exhibit 73, Page 97,

16   message 2031.  And is this a message from Mr. Didani after he

17   sent you that photograph?

18   A.   Yes, it is.

19   Q.   And what does it say?

20   A.   "80 mill."

21   Q.   Can I move you back to Government's Exhibit -- actually,

22   we'll stay with this exhibit.

23         Did Mr. Didani ever send you information about any

24   cocaine seizures?

25   A.   He sent me a link once of a seizure in Scotland.

1    Q.   Can we go to 73.0, Page 118, and could we go to the bottom

2    message, message 2417.  Is this the message that you're talking

3    about?

4    A.   Yes.  Looks like a link right above that, yes.

5    Q.   And the date on this was ...

6    A.   September 23, 2020, yes.

7            MR. BILKOVIC:  Okay.  And can we go back in on the

8    link -- or can we just enlarge the body, just zoom in on the

9    body.

10   BY MR. BILKOVIC:

11   Q.   And what does this appear to be?

12   A.    It's an article from National Crime Agency, a UK-based

13   government website talking about a seizure of a hundred million

14   dollars of cocaine at the port.

15   Q.   In Dover?

16   A.   I'm sorry?

17   Q.   Do you see "Dover" at the bottom?

18   A.   In Dover, yes, I see that.

19   Q.   And if we can go to the next page, 73.119.  I'm sorry --

20   yeah, 73, Page 119.  Can we go to the top message, 2418.  And

21   after Mr. Didani sent that to you did he follow it with a text

22   message?

23   A.   Yes.

24   Q.   And what was the text message?

25   A.   "You get the chills."

```
 1              THE COURT:  I'm sorry?
 2              THE WITNESS:  "You get the chills."
 3    BY MR. BILKOVIC:
 4    Q.   Now, can we go to message -- Exhibit 74.0 -- I'm sorry,
 5    Exhibit 74.0.  Can we go to Page 3.  And can we go to message
 6    221.  And is this a message from you to Mr. Didani?
 7    A.   Yes, it is.
 8    Q.   And what is the date?
 9    A.   The date is November 23, 2020.
10    Q.   And what do you say to him?
11    A.   "How was your weekend?"
12    Q.   Can we go to the next message, message 221 on the same
13    page.  221.  I'm sorry.  221 -- I'm sorry.  222, on the same
14    page.  And how does Mr. Didani respond?
15    A.   "Very bad brother."
16    Q.   Can we go to the next page, Page 4 of Exhibit 74.0.  Can we
17    go to the middle message, message 224.  And what does
18    Mr. Didani say?
19    A.   Do you mind zooming in just a little bit, please?  Thank
20    you.
21              "My partner, Loma, got to big fight in restaurants
22    drunk."
23    Q.   And how did he spell Loma?
24    A.   It could be an I.  That's how I read it.
25    Q.   Let's go back to it.
```

1    A.   It could be either a capitalized I or lower case L.

2    Q.   So either a capital case I or lower case L?

3    A.   Yes.

4    Q.   And, if it was a lower case L, that would be Loma?

5    A.   Loma.

6    Q.   Had you ever heard of Loma before?

7    A.   Never.

8    Q.   Mr. Didani described him here as his partner?

9    A.   Yeah.

10   Q.   Now, how many vehicles total were shipped?

11   A.   Shipped were -- four total vehicles were shipped.  Three of

12   them were received by Mr. Didani.

13   Q.   What countries?

14            THE COURT:  Three of them were what?

15            THE WITNESS:  Were received by Mr. Didani.  The fourth

16   one was not.

17   BY MR. BILKOVIC:

18   Q.   I'm sorry.  You have to talk louder or in the microphone.

19   You're trailing it.

20   A.   Sorry about that.

21   Q.   That's okay.

22   A.   Three vehicles were shipped to the Dominican and one

23   vehicle was shipped to Ecuador.

24   Q.   Now, you said a -- one of them -- three of them were

25   received by Mr. Didani?

1    A.   Yes, sir.

2    Q.   One was not?

3    A.   Correct.

4    Q.   What happened with that vehicle?

5    A.   It was stuck at the Port in Guayaquil, Ecuador.  At the

6    time we were -- you know, nobody was claiming the port --

7    claiming the container.  There's a bill of lading that somebody

8    needed to claim the container, present to the port, and no one

9    was doing it.  I was trying to contact Mr. Didani often and

10   wasn't getting a response.

11   Q.   And did you come to learn that the reason he wasn't

12   responding to you is he had been arrested on March 31, 2021?

13   A.   I found out later down the road, yes.

14   Q.   Now, in April of 2021, were you traveling from Canada to

15   Florida?

16   A.   Yes, I was.

17   Q.   And did you have a layover?

18   A.   I did.

19   Q.   And where was the layover?

20   A.   In Chicago O'Hare.

21   Q.   And on that layover were you approached by United States

22   law enforcement?

23   A.   Yes, I was.

24   Q.   Was Agent Hermans one of the people that approached you?

25   A.   Yes, he was.

1   Q.  And did they ask you questions about suspicious vehicle

2   sales?

3   A.  They did.

4   Q.  Without mentioning a name, did you have an idea of who they

5   were talking about?

6   A.  Right away.

7   Q.  And did you tell them that?

8   A.  I did.

9   Q.  And who was that person?

10  A.  Lou Didani, Mr. Didani.

11  Q.  And did you tell them what happened?

12  A.  I did.

13  Q.  And once you were done with that interview did you leave

14  and connect to your flight?

15  A.  I did.

16  Q.  Did you subsequently retain an attorney in this case?

17  A.  I did.

18  Q.  And did you agree to meet with the Government after that?

19  A.  Absolutely, yes.

20          MR. BILKOVIC:  May I have one moment, your Honor?

21          THE COURT:  Yes.

22          (Briefly off the record.)

23          MR. BILKOVIC:  Nothing further.

24          THE COURT:  Cross-examine.

25          MR. FINK:  I just need a moment to get myself

```
 1    situated, Judge.
 2            THE COURT:  Hold one second.
 3            MR. FINK:  Did you say something to me, Judge?  Did
 4    you say "hold on"?
 5            THE COURT:  Not yet.  Okay.
 6            MR. FINK:  Okay.
 7            THE COURT:  You said to wait a minute; right?
 8            MR. FINK:  I asked for a minute, but then I --
 9            THE COURT:  Then you changed your mind and went
10    straight to the podium.
11            MR. FINK:  Well, this is part of my minute.
12            THE COURT:  Okay.  Approach at sidebar, counsel.
13            MR. FINK:  Yes, Judge.
14            (At 3:11 p.m., sidebar off the record.)
15            THE COURT:  Okay.  Cross-examine.
16            My jurors are okay; right?
17            Oh, that's a thumbs up, okay.
18            JUROR:  We just have a question.  Could we use the
19    sidebar time for a stretch?
20            THE COURT:  If you want to.  Do you want to stretch
21    now?
22            JUROR:  I'm just asking.
23            THE COURT:  But you can stretch now if you want to.
24    Go ahead.  Everybody stretch.  People at the tables stretch in
25    solidarity, please.
```

 1              Do you need a stretch?

 2              THE WITNESS:  I'm good.

 3              MR. FINK:  You could do an aerobics video or

 4   something.

 5              THE COURT:  No, no, no, no.

 6              All right.  Go ahead, please.

 7              MR. FINK:  Thank you, your Honor.

 8                          CROSS-EXAMINATION

 9   BY MR. FINK:

10   Q.  Mr. Daskal, we met briefly, but my name is Wade Fink.  I

11   represent Mr. Didani.  I'm just going to ask you some follow-up

12   to your conversation with the Government.

13              Mr. Daskal, INKAS is a family business; right?

14   A.  Yes.

15   Q.  It's your family; right?

16   A.  It is.

17   Q.  Give me a little background.  Who started the company?

18   A.  It was started in the mid '90s by my mother and my

19   stepfather.

20   Q.  And was it always your plan to be part of INKAS or is it

21   like any family business, you resist and then you're in, like

22   me?  My dad was a lawyer.

23   A.  Yeah, yeah.  I started -- I reluctantly took my time away

24   from the family business for a while, working in other places

25   and then, of course, you know, an opportunity came forward and

1    I took it.

2    Q.   Is this still your business?

3    A.   It's not my business.

4    Q.   Well, is this still your work?

5    A.   Yes, it is.

6    Q.   Okay.  What's your title in the company now?

7    A.   VP.  Vice president of sales and business development.

8    Q.   It's still owned by your family or is it owned by --

9    A.   It is, yes.

10   Q.   And since the '90s; right?

11   A.   Mid '90s.

12   Q.   So 30-plus years in business?

13   A.   (Nod.)

14   Q.   Yes?

15   A.   Yes.

16   Q.   And developed -- I'm going to ask you to brag about your

17   company a little, but you developed a very good reputation for

18   what you do; correct?

19   A.   We have.

20   Q.   You've got news articles written about you; right?

21   A.   Yes, sir.

22   Q.   A lot of clientele from varying backgrounds; right?

23   A.   Yes.

24   Q.   You have government contracts; right?

25   A.   We do.

1    Q.   You provide armored vehicles and safe vehicles that are

2    safe for travel in foreign countries for governments and

3    dignitaries; right?

4    A.   Yes, sir.

5    Q.   That includes everyone from presidents and secretaries of

6    states and similar from many different countries; right?

7    A.   From government bodies, yes.

8    Q.   And -- I mean, in fact, the only one I know about, I'm sure

9    there's a lot of very cool stories, but there was a Nigerian

10   dignitary who was attacked and saved by being in one of your

11   vehicles; correct?

12   A.   That's correct.

13   Q.   And you provide vehicles, I presume, to a host of other

14   private people as well; right?

15   A.   We do have private sales as well, yes.

16   Q.   Wealthy individuals?

17   A.   Correct.

18   Q.   Who may live in areas that require some extra security?

19   A.   Yes, sir.

20   Q.   Perhaps celebrities in -- whether United States, Canada or

21   otherwise; right?

22   A.   Yes, sir.

23   Q.   There's a varied need for armored vehicles or extra

24   protection; right?

25   A.   I'm sorry?

1    Q.   There's a varied need for extra protection in your vehicle;
2    correct?
3    A.   Yes.
4    Q.   I mean, that could be just from being, you know, known to
5    be wealthy and need to be protected; right?
6    A.   Correct.
7    Q.   Or living in a dangerous area; right?
8    A.   Correct.
9    Q.   Your business' reputation -- this might seem obvious, but
10   your reputation is important to getting future clients; right?
11   A.   A hundred percent.
12   Q.   The company obviously would prefer not to be tied into some
13   drug conspiracy; correct?
14   A.   You're right.
15   Q.   It certainly wouldn't enter into a drug conspiracy
16   intentionally; right?
17   A.   Correct.
18   Q.   And when I say you, I mean you personally, Philip Daskal;
19   right?
20   A.   Correct.
21   Q.   But also, as an agent of the company, INKAS would not want
22   to do that either; right?
23   A.   Yes, sir.
24   Q.   And you wouldn't do that; right?
25   A.   I wouldn't.

 1   Q.   Now, when you were approached by federal agents in the
 2   airport in Chicago, I believe that was April of 2021, scary
 3   thing to face, is it not?
 4   A.   It was.
 5   Q.   And you're being confronted with this information and kind
 6   of having an epiphany, for lack of a better term, in your own
 7   head about, you know, what's being really going on; right?
 8   A.   Yes, sir.
 9   Q.   Just because you're putting it together, because you're
10   being faced with federal agents, doesn't mean you knew anything
11   during the process; right?
12   A.   Correct.
13   Q.   But at the same time, I presume, I haven't been in that
14   situation, knock on wood, I presume you're also worried about
15   self-preservation and your own safety; right?
16   A.   Absolutely.
17   Q.   Are they going to think I did something; right?
18   A.   Yes.
19   Q.   Do you remember that -- you may not remember specifics, but
20   do you remember generally giving, you know, a conversation or
21   an interview to those agents at the airport?
22   A.   I do.
23   Q.   Okay.  And you remember telling the agents that you thought
24   that Didani might have been in something like logistics or
25   crypto?  Do you remember that?

1    A.   Yes.

2    Q.   Okay.  You have a lot of clients, I presume, that have

3    obtained crypto wealth; correct?

4    A.   I have -- we don't accept crypto.  So I mean more on the

5    logistics' side was more my belief, yeah.

6    Q.   Sure.  I guess I should -- I ask it in a way that you're

7    often dealing either with, whether it's private or government,

8    some sort of wealth; correct?

9    A.   Correct.

10   Q.   And a new age of wealth has been crypto; correct?

11   A.   Yes.

12   Q.   Between April of 2021, when you were stopped at the

13   airport, and then a meeting that you had in November of 2021,

14   did you have -- and I should accept one more thing.  Any

15   conversation you've had in this courthouse.

16   A.   I'm sorry?

17   Q.   Any conversation you've had in this court, excluding that,

18   have you had any other meetings with the Government besides the

19   scenarios I just described?

20   A.   No.

21   Q.   So there was the airport; right?

22   A.   Yes.

23   Q.   And then there was another meeting in 2021 that you told

24   the Government you really didn't want to be involved; right?

25   A.   Well, I explained -- I told them what I'm telling you

1   today.

2   Q.   So November 10th of 2021, you remember meeting with Agent

3   Hermans?

4   A.   I do.

5   Q.   And there was a couple other agents.  There was Detective

6   Leach and Agent Newsome, Mr. Bilkovic and Mr. McDonald?

7   A.   Yes.

8   Q.   And you also had your attorney, Mr. Hurford; right?

9   A.   Correct.

10  Q.   And you were in Detroit for that meeting?

11  A.   I was.

12  Q.   You were or you --

13  A.   I was.  I was in Detroit, yes.

14  Q.   And, correct me if I'm wrong, is it true when the agent

15  writes that "Daskal stated he did wish to cooperate in the

16  investigation, however, wanted to confirm some dates before

17  making any further statements"; is that accurate?

18  A.   I don't recall, but, yes, sounds ...

19  Q.   "Daskal stated he would obtain this information and provide

20  it to investigators via his attorney at a later date."

21          Is that accurate about that meeting?

22  A.   Yes, it is.

23  Q.   So that specific meeting, was there any substantive

24  conversation or was it I'll get back to you?

25  A.   No, there was substantive conversation.

1    Q.   Okay.  So there was more than just I'll get back to you in

2    that discussion?

3    A.   Yes.

4    Q.   Do you know if that interview was recorded?

5    A.   I don't remember.

6    Q.   Okay.  Do you remember if agents were taking notes?

7    A.   I was -- my adrenaline was like up to there.

8    Q.   I get it.

9    A.   So I didn't really pay attention to that.

10   Q.   I get it.  If you're putting yourself in that situation and

11   you're trying to envision, you don't remember a recorder or

12   anyone taking notes?

13   A.   There was a long table, a bunch of agents.  I'm sure there

14   was a pad of paper in front of them.  I don't -- personally, I

15   don't recall it, though.  I can't see it in my head.

16   Q.   Okay.  But you said more than those two sentences I read to

17   you in that conversation?

18   A.   I said more than two sentences?

19   Q.   Two sentences that I read to you, you said more than that

20   in that conversation?

21   A.   Yes.

22   Q.   Okay.  How long was that meeting would you say?

23   A.   It was about under an hour, maybe an hour.

24   Q.   Okay.  Have you ever received any correspondence from the

25   Government, something in writing?  When I say correspondence, I

1    don't necessarily mean a formal letter, but anything that was

2    given to your attorney or you by the Government indicating how

3    they viewed you in the context of the case as a witness, as a

4    target, as someone who's going to be charged?  Anything like

5    that?

6    A.   I never received anything.

7    Q.   Did you ever enter into any sort of agreement with the

8    Government that in exchange for cooperating, testifying, the

9    Government would do X, Y and Z?

10   A.   No, sir.

11   Q.   Okay.  Are you aware that the Government was very

12   suspicious of your conduct?

13   A.   I would assume so, yes.

14   Q.   Well, did they tell you that?

15   A.   They were asking me questions.  My mind was everywhere.

16   Q.   Those questions intimated that they had suspicions; right?

17   A.   They had similar questions about the cash and the cash

18   receipts and the wire receipts.

19   Q.   Are you aware if agents or prosecutors or anyone associated

20   with the federal government in this case approached leadership

21   executives -- I'm using those titles -- your parents or anyone

22   at that company, INKAS?

23   A.   Yes.

24   Q.   They did?

25   A.   Yes.

1    Q.   Okay.  In fact, there was a discussion about the money that

2    was paid allegedly from Mr. Didani and whoever else to INKAS?

3    There was a conversation between INKAS and the Government about

4    that topic; right?

5    A.   Yes, sir.

6    Q.   And --

7              THE COURT:  Meaning the United States government?

8              MR. FINK:  Yes.

9    BY MR. FINK:

10   Q.   The federal government had a conversation with INKAS

11   through attorneys?

12   A.   Through attorneys, yes.

13   Q.   About the funds that were received allegedly at the

14   direction of Mr. Didani; right?

15   A.   I believe so.  I wasn't in any of these conversations.

16   Q.   So you weren't actually personally in those discussions,

17   but are you aware of them happening?

18   A.   I'm aware of them happening, yes.

19   Q.   Okay.  Are you aware that the federal government asked

20   INKAS to forfeit $800,000 to the federal government?

21   A.   I -- I'm aware of it, yes.  I was told from INKAS that.

22   Q.   Do you know, in fact, INKAS did pay the federal government

23   $800,000 as a forfeiture penalty?

24   A.   I don't know a hundred percent.  I'm sorry.

25   Q.   When you say you don't know a hundred percent, is that

1    something that is familiar to you, that you've heard around the

2    office?

3    A.   Well, it's not something that we discuss around the office

4    either, right.  It's just between probably the owners and the

5    legal team.

6    Q.   How about this, do you know, Mr. Daskal, yourself, have

7    personal knowledge, however you might know it, if there was a

8    sum of money paid from INKAS company to the federal government

9    as a forfeiture?

10   A.   I believe so, like from my head, yes.

11   Q.   Understood.  You might not know exactly how much?

12   A.   Correct.

13   Q.   It was a significant amount, wasn't it?

14   A.   I would assume so, yes.

15   Q.   And, correct me if I'm wrong, but when the federal

16   government says to you or your company, you as an agent of your

17   company, you have nearly a million dollars of drug money, give

18   it back, there's some pressure to do so, is there not?

19   A.   I would assume so, yes.

20   Q.   The company doesn't want to get indicted, does it?

21   A.   No.

22   Q.   You don't want to get indicted, do you?

23   A.   Definitely not, no.

24   Q.   And when I ask you this next question, I'm not blaming you.

25   I might do the same thing.  But when you're asked to cooperate

1   your inclination is to say yes so you won't get in trouble;

2   right?

3   A.   Yes.

4   Q.   If indeed INKAS or you were charged with some sort of crime

5   or some sort of conspiracy as it relates to what they at this

6   table believe happened here, that would have a bad impact on

7   your ability to get work, would it not?

8   A.   Yes.

9   Q.   You know your client base; right?

10  A.   I do.

11  Q.   And you've developed relationships with them; right?

12  A.   Absolutely.

13  Q.   They would probably hesitate to do business with someone

14  accused of being involved in an international drug

15  organization; right?

16  A.   Absolutely.

17  Q.   You are incentivized to do what is possible to avoid that;

18  right?

19  A.   What do you mean by "incentivized"?

20  Q.   You don't want to get charged with a crime; right?

21  A.   I don't.

22  Q.   And you will do what is necessary to not get charged with a

23  crime; right?

24  A.   Sure.

25  Q.   I'm not saying anything other than --

 1    A.   Yes, yes, yes.

 2    Q.   -- what you can do?

 3    A.   No.

 4    Q.   You have children; right?

 5    A.   Thank God.

 6              THE COURT:  I'm sorry?

 7              THE WITNESS:  Thank God.  Yes, I do.

 8    BY MR. FINK:

 9    Q.   Would you have put yourself in a situation where you

10    believed that you were somehow involved in the allegation that

11    you now know the Government is making against my client?

12    A.   Can you repeat the question?

13    Q.   Would you have continued the business relationship?  Would

14    you have put yourself in a situation where you knew or believed

15    to be happening what the Government is accusing my client of

16    doing?

17    A.   No.

18    Q.   You do business in quite a few countries; right?

19    A.   Yes, sir.

20    Q.   Azerbaijan?  I might be saying it poorly.

21    A.   Azerbaijan.  We had a couple contracts previously.

22    Q.   Canada?

23    A.   Yes.

24    Q.   Mexico?

25    A.   Yes.

```
 1    Q.   Chile?

 2    A.   Yes.

 3    Q.   Ukraine?

 4    A.   Yes.

 5    Q.   Israel?

 6    A.   Yes.

 7    Q.   Indonesia?

 8    A.   Yes.

 9    Q.   Malaysia?

10    A.   Yes.

11    Q.   Nigeria?

12    A.   Yes.

13    Q.   Philippines?

14    A.   Yes.

15    Q.   Peru?

16    A.   Yes.

17    Q.   European Union countries?

18    A.   Yes.

19    Q.   Russia?

20    A.   No.

21    Q.   Austria?

22    A.   No.

23    Q.   Bahrain?

24    A.   No.

25    Q.   Switzerland?
```

1  A.   No.

2  Q.   These last ones that I'm getting to, do you have a sister

3  company or a company that you work with on contracts in those

4  countries?

5  A.   No.  I'm just talking about actual physical sales that went

6  to those clients.  I mean, there's prospects all around the

7  world, of course, but I'm talking about closed deals.

8  Q.   Spain?

9  A.   Yes.

10 Q.   And recently, I believe -- or I guess correct me if I'm

11 wrong, you have an office in the United States as well?

12 A.   We do.

13 Q.   Is that recent?

14 A.   It's four years old.

15 Q.   What year did that office open?

16 A.   2021.

17 Q.   After?

18 A.   After.

19 Q.   Mr. Didani had been arrested; right?

20 A.   Yes, sir.

21 Q.   Miami?

22 A.   Miami.

23 Q.   Is that where you are currently?

24 A.   I am.

25 Q.   All right.  All of the business that you conducted with

 1   Mr. Didani was outside the continental USA; correct?

 2   A.   Any communication was through phones.  I didn't know where

 3   he was --

 4   Q.   That's a bad question.  Let me break it down for you.

 5            You at the time, your business and you personally,

 6   were located in Canada; correct?

 7   A.   Correct.

 8   Q.   Yes?

 9   A.   Yes.

10   Q.   And, at least from what you knew, Mr. Didani was either in

11   the Dominican or overseas or in countries foreign to the United

12   States; correct?

13   A.   Yes.

14   Q.   Okay.  Your sales to Mr. Didani, the actual physical items

15   that ever got delivered or any business that you did, those

16   items were delivered to foreign countries; correct?

17   A.   Yes, sir.

18   Q.   Did any items get delivered to Michigan?

19   A.   Not that I'm aware of.

20   Q.   Did you have any contact that you know of with anyone in

21   Michigan?

22   A.   In relation to Mr. Didani, no.

23   Q.   I'm totally talking about Mr. Didani that you're aware of.

24   Do you know of anyone in Michigan that you dealt with related

25   to Mr. Didani?

1    A.   I don't.

2    Q.   Okay.  Are you aware of anyone in the United States that

3    you dealt with related to Mr. Didani?

4    A.   I don't remember.

5    Q.   If you know.

6    A.   I believe -- I don't.

7    Q.   You don't think you did?

8    A.   Yeah, I don't think I did.

9    Q.   And I want to be precise about this, because on direct

10   examination you said something about wire transfers and United

11   States dollars.  Remember that?

12   A.   Yes.

13   Q.   When you were saying United States dollars, you were giving

14   the value in United States dollars; correct?

15   A.   Correct.

16   Q.   You never actually dealt in USD with Mr. Didani; is that

17   accurate?

18   A.   Can you rephrase the question maybe?

19   Q.   Sure.  The cash that he gave you was never United States

20   dollars; correct?

21   A.   I believe once it was United States dollars.

22   Q.   You never saw any pictures of that, though?

23   A.   No.

24   Q.   Okay.  But you're saying you recall there was one time in

25   United States dollars?

1   A.   I believe so, yeah.

2   Q.   The wire transfers, those were in CAD, or Canadian dollars;

3   correct?

4   A.   They were in USD and CAD.

5   Q.   So when we say -- I just want to -- I guess what I'm saying

6   is when you say U.S. dollars, you are saying the value in U.S.

7   dollars regardless of the currency that the transfer came in;

8   right?

9   A.   Yes.

10  Q.   Okay.

11          THE COURT:  Do you know whether or not the wire

12  transfer was in U.S. dollars or Canadian dollars?

13          THE WITNESS:  I do.

14          THE COURT:  Which one was it?

15          THE WITNESS:  They were both.  They were different

16  wire transfers, one in Canadian and the rest in United States.

17          THE COURT:  So it wasn't just a U.S. dollars

18  equivalent, it was actual a wire transfer of U.S. dollars?

19          THE WITNESS:  Yes.

20          THE COURT:  Okay.  I'm sorry.  The same rule applies

21  about me asking questions.

22          MR. FINK:  Excellent question, Judge.  It's an

23  excellent question.

24          THE COURT:  That doesn't mean you don't object to it.

25          MR. FINK:  I have no objection.

```
 1                THE COURT:  Okay.
 2    BY MR. FINK:
 3    Q.  Mr. Daskal, as I look through the documents here, I see
 4    euros and I see Canadian dollars.  You're telling me you
 5    specifically recall United States dollars being a transaction?
 6    A.  Yes.
 7    Q.  In all those countries that I listed and the business that
 8    you've done, have you ever been called to testify related to
 9    any cases regarding these vehicles or sales?
10    A.  Never.
11    Q.  No other country has called you to testify?
12    A.  Never.
13    Q.  The Ecuadorian government hasn't called you to testify
14    about the cars you delivered for their government officials?
15    A.  No.  And they were law enforcement vehicles.
16    Q.  Law enforcement, police?
17    A.  Yeah.
18    Q.  Same with the Nigerian government; correct?
19    A.  Correct.
20    Q.  Even after the Boko Haram attack, or whatever that was,
21    never called you to testify?
22    A.  No, sir.  This is the first time we've ever been called to
23    testify.
24    Q.  The Government talked a lot to you about the cash
25    transactions.  Do you recall that?
```

1  A.   Yes.

2  Q.   And I believe there was a suggestion that you agreed with,

3  and correct me if I'm wrong, this is what my notes are, that it

4  was Mr. Didani that suggested cash.  Is that your recollection?

5  A.   Yes.

6  Q.   Okay.  Do you recall a time when Mr. Didani actually said

7  no more cash?

8  A.   Do I recall a time that he said no more cash?

9  Q.   That he was going to stop doing cash --

10 A.   Yes, I do.

11 Q.   Okay.  In fact, he said, "Not doing this cash no more,

12 brother."  Do you remember that?

13 A.   Yes.

14 Q.   Okay.  He says, "Better banks," quote/unquote, better banks

15 as in better to use banks.  Do you remember that?

16 A.   Yes.

17 Q.   Okay.  Doing things by bank and wire transaction, it

18 creates a paper trail, doesn't it?

19 A.   Yes, it does.

20 Q.   Whereas cash, a nefarious, dark, you know, delivery that

21 the Government describes this, would be in an effort to be

22 harder to trace; right?

23 A.   Yes.

24 Q.   So someone who is suggesting no more cash, but better to do

25 banks, is making it more transparent that there's a transaction

1    of some kind; correct?

2    A.   I would believe so.  Throughout our communication, I was

3    always saying let's do wire transfers, you know.

4    Q.   I don't think you were doing anything to suggest it.  I'm

5    saying Mr. Didani -- the suggestion by the Government to you

6    that he was asking to do cash also should be given complete

7    context.  And I'm asking you, you remember he actually asked

8    you to do more bank transactions afterwards; right?

9    A.   Yes.

10   Q.   "No more cash, bro"?

11   A.   Yes, I remember that.

12   Q.   Do you remember the message where he said he's scared of

13   the USA?

14   A.   Yes, yes.

15   Q.   Mr. Didani with you went through great lengths to avoid

16   connection to the United States, did he not?

17   A.   I don't know about great lengths.  He just said it's easier

18   to transfer money in Canada.

19   Q.   Well, what did you take it to mean when he said, "I'm

20   scared of the USA"?

21   A.   I took his answer.  I didn't think anything of it.

22   Q.   The cash drops that you described, Mr. Daskal, those took

23   place only in Canada; correct?

24   A.   Yes.

25   Q.   Okay.  Never in Michigan?

1    A.   Never.

2    Q.   Never in the United States?

3    A.   Never.

4    Q.   What were the period of time -- you don't have to give me

5    months, but years -- that you were dealing with Mr. Didani?

6    A.   Basically one year, one full year.

7    Q.   2020?

8    A.   2020.  March 2020 to March 2021.

9    Q.   March '20 to March 2021, did you ever come to the United

10   States in that time?

11   A.   I probably have, yes.

12   Q.   For business?

13   A.   Yes.

14   Q.   Ever related to Mr. Didani?

15   A.   No, not once.

16   Q.   Did Mr. Didani ever show you by text message or in person

17   or in any capacity pictures of cocaine?

18   A.   No.

19          Oh.  Through that article.  Only through that article

20   there was a picture --

21   Q.   Sent you a link about a cocaine seizure?

22   A.   Yes.

23          THE COURT:  Do you recall when that was?

24          THE WITNESS:  I don't recall.  I can --

25          THE COURT:  Do you know what seizure it was, what it

1    was?

2           THE WITNESS:  Yeah.  It was a seizure in Scotland for

3    -- in Dover, I believe.

4    BY MR. FINK:

5    Q.  Do you remember what year that occurred?

6    A.  I don't.  I'm sorry.

7    Q.  We've seen the text messages.  That's all right.

8           Mr. Didani ever ask you to do anything with drugs?

9    A.  No.

10   Q.  He ever ask you to put drugs in the armored cars somewhere?

11   A.  Never.

12   Q.  That he was buying the armored cars to protect him from his

13   dealings in the drug world?

14   A.  To protect him, but nothing about the drug world.

15   Q.  Related to dangers of the drug world, or something like

16   that?

17   A.  No, he never specifically said anything like that.

18   Q.  Did you ever sell any drugs for Mr. Didani?

19   A.  Never.

20   Q.  You guys developed a sort of personal relationship, did you

21   not?

22   A.  We did.

23   Q.  You were having an issue with a business name in Dubai.  Do

24   you remember that?

25   A.  Yes, I do.

```
 1    Q.   Mr. Didani tried to use one of his contacts and lawyers out
 2    there to try to help you; right?
 3    A.   Correct.
 4    Q.   From what you observed of Mr. Didani, he was generous with
 5    the people around him; correct?
 6    A.   Yes.
 7    Q.   Kids in poor countries; right?
 8    A.   Yes.
 9              MR. BILKOVIC:  Objection, relevance.
10              THE COURT:  How is it relevant?
11              MR. FINK:  A lot of this, Mr. Bilkovic's entire direct
12    examination of a lot of these witnesses, is how actions that
13    are otherwise legal are somehow nefarious.  So I'd like some
14    actions that suggest otherwise, Judge.
15              THE COURT:  All right.  Overruled.
16              You may answer.  Was he generous with kids in poor
17    countries?
18              THE WITNESS:  Yes, he was.
19    BY MR. FINK:
20    Q.   You feel he was someone you could ask to help you with
21    something?
22    A.   To help me with something.  I mean, personally probably --
23    I mean, I never met Mr. Didani, but we developed a pretty
24    strong relationship over the phone.  So we talked very openly.
25    Q.   Do you remember that screenshot me and Mr. Bilkovic argued
```

1    about, we put up about the rates up there?

2    A.   Yes.

3    Q.   Did you notice, correct me if I'm wrong, that none of them

4    said anything about the United States, correct, currency?

5    A.   I can take a look, but I don't remember.

6    Q.   Yeah, let's take a look.

7         MR. FINK:   Ms. DiCarlo, could you help me out with

8    73.24?  I'm grateful.   Thank you.

9    BY MR. FINK:

10   Q.   You remember looking at this; right?

11   A.   Yes.

12   Q.   UK to Dubai, the percentage allegedly going up, Holland,

13   Dubai, Holland to ECU, Holland, Brazil.  Do you see all those?

14   A.   Yes, I do.

15   Q.   No mention of the U.S.; right?

16   A.   No, sir.

17        MR. FINK:   Thank you very much, Ms. DiCarlo.

18   BY MR. FINK:

19   Q.   Did agents ever ask you for access to your cellular phone?

20   A.   Yes.

21   Q.   Did you give it to them?

22   A.   Yes.

23   Q.   Okay.  Did they take a copy of it?

24   A.   Yes.

25   Q.   Was it -- do you remember the context in which you did

1   that?

2   A.   How it happened?

3   Q.   Yeah, like when and who asked and the details.

4   A.   Yeah.  It was, I want to say, maybe a week or two after I

5   was -- after I returned back from Florida after my stop in

6   Chicago.

7   Q.   Okay.

8   A.   They -- I was given an address in downtown Toronto where to

9   provide my cell phone for them to extract.

10  Q.   So, if you were stopped April of 2021, about sometime May,

11  June or so, you were contacted again?

12  A.   I'll be honest.  I don't remember how it happened, but I

13  remember I had to go to downtown Toronto to give my phone.

14  Q.   So there was -- and I know this may have been just

15  forgotten, so I'm not saying you're omitting anything, but

16  there was some other interaction after your stop at the O'Hare

17  Airport before November with law enforcement; right?

18  A.   Well, my mind is leaning on probably our attorneys probably

19  told --

20  Q.   I see.

21  A.   -- the executives at INKAS.

22  Q.   Understood.

23  A.   I believe so.  Again, I'm so sorry, I don't remember.

24  Q.   Don't apologize, and I don't think you did anything wrong.

25  I just want to clarify what I do and don't know.

```
 1              Your phone, you were asked by your lawyer to go into
 2    the police station, or you were informed by somebody to go take
 3    it --
 4    A.   Informed by somebody.
 5    Q.   And you went to a police station?
 6    A.   It wasn't a police station.
 7    Q.   What was it?
 8    A.   It was some sort of office basically that I gave my phone.
 9    He had some sort of system on his -- on a program.  I had to
10    leave my phone with him for about a week, and in the meanwhile
11    he was extracting all the copies from --
12    Q.   Was it a government agent?
13    A.   It may have been contracted by the government.
14    Q.   Okay.  A Canadian official?
15    A.   Canadian.
16              THE COURT:  Was it in a government building?
17              THE WITNESS:  It wasn't in a government building, no.
18              THE COURT:  Sorry, Mr. Fink.  Go ahead.
19    BY MR. FINK:
20    Q.   You believe it was a government building?  Was that the --
21    A.   I don't believe it was a government building.
22    Q.   You don't believe it was, okay.  Is it possibly you were
23    asked by your own counsel or company to do it?
24    A.   Possible.
25    Q.   So you're not sure if you were requested by the Government
```

1   or not?

2   A.   I don't remember that part, yeah.  I'm sorry.

3   Q.   Don't be sorry.  You went to some building in Toronto, you

4   surrendered your phone for a week, and then got it back?

5   A.   Correct.

6   Q.   Do you know if that copy of the phone was then submitted to

7   the federal government, if you know?

8   A.   I don't know.  I would assume so.

9   Q.   Okay.  Was the company dealing with this?

10  A.   Was the company ...

11  Q.   Was the company dealing with this issue of your phone?

12  A.   Yes.

13  Q.   The company attorneys?

14  A.   Yes.

15  Q.   So not Mr. Hurford, but the company attorneys?

16  A.   Mr. Hurford was involved in it as well, because --

17  Q.   As your personal --

18  A.   -- he represented myself.

19  Q.   And then the company had other lawyers?

20  A.   Correct.

21  Q.   And they arranged something maybe with the federal

22  government for the production of your phone?

23  A.   I don't know.

24  Q.   You don't know, okay.  No problem.  But you do know it was

25  copied somewhere?

1   A.   It was copied, yeah.

2   Q.   All right.  We got that much.  Do you know if anything

3   else, any other of your materials from INKAS were surrendered

4   or otherwise copied; computers, other devices, anything like

5   that?

6   A.   No.  Just the documents that you see here, you know, sales

7   agreements and purchase invoices.

8   Q.   Your contacts with Mr. Didani, were they exclusively on

9   WhatsApp?

10  A.   Yes.

11  Q.   Was there any text messages or other apps that were ever

12  used?

13  A.   Never.

14  Q.   Was cellular telephone, not just the calling service within

15  WhatsApp, but was a cellular device used for any calling?

16  A.   No, it wasn't.  The numbers didn't -- on a regular line

17  didn't correspond to Mr. Didani.  Only the WhatsApp numbers

18  did.

19  Q.   Did you have just one cellular device?

20  A.   I had one cell phone, yes.

21  Q.   At the time?

22  A.   Yes.

23  Q.   Do you remember Mr. Didani and some messages to you talking

24  about his involvement in Dominican politics?  You don't have to

25  remember specifics, just generally.

1    A.    Yeah.

2    Q.    Do you remember him talking about when it was election

3    time, quote/unquote?

4    A.    I don't remember that part, but we've had many discussions,

5    yeah.

6    Q.    Do you remember him saying, "I've invested too much money

7    in politics"?

8    A.    I believe so.

9             MR. FINK:  One moment, Mr. Daskal.

10            (Briefly off the record.)

11            MR. FINK:  Your Honor, one moment.  I just wanted to

12   do this exhibit efficiently that my client has pointed out to

13   me.

14            Judge, can I approach Mr. Daskal with what's marked as

15   Government's 74.6?

16            THE COURT:  Yes.

17   BY MR. FINK:

18   Q.    Actually, I think you might have it in your book,

19   Mr. Daskal, 74.6.

20   A.    74.6.

21            THE COURT:  Is this already admitted?

22            MR. FINK:  Not yet, Judge.

23            THE COURT:  Okay.

24            THE WITNESS:  Okay.  I'm here.

25

```
 1    BY MR. FINK:
 2    Q.   Can you take a look at that screenshot and read through it
 3    and tell me if you recognize it and remember?
 4    A.   Yes.  It looks like an attachment of a wire transfer
 5    receipt, and then it says, "Bank CAD 189300.PDF."
 6    Q.   And you're in the green, right, and Mr. Didani is in the
 7    gray?
 8    A.   Yes, sir.
 9    Q.   Okay.  And you're asking why was it sent in Canadian --
10    A.   Yes.
11    Q.   -- it should be USD?  Do you see that?
12    A.   Yes.
13    Q.   And Mr. Didani's response is, "Dubai can't do USD and
14    Canada, need to do local, can you manage?"  Do you see that?
15    A.   Yes.
16    Q.   And you said, "Of course they can, the account was a USD
17    account"?
18    A.   Yes.
19    Q.   And talking about how can you manage and you're doing the
20    transfer of funds from Canadian to USD.  Do you see that
21    conversation?
22    A.   How can I manage -- yeah.
23    Q.   Okay.  And is this an example of, you know, a situation you
24    were facing where Mr. Didani was trying to send foreign funds,
25    this time CAD, and your desire or need to do it in USD;
```

1    correct?

2    A.   Yeah.  It only came to our attention that it was received

3    in CAD at the time.  It was supposed to be USD the whole --

4    Q.   It was received in CAD; right?

5    A.   Yes.

6    Q.   And that's why you're telling him the conversion, because

7    actually because of the conversion rate there's more owed;

8    right?

9    A.   Yes.

10   Q.   My invoice is in USD?

11   A.   Yes.

12   Q.   And you're sending Canadian?

13   A.   Correct.

14   Q.   So I actually got less in value?

15   A.   Yes, sir.

16   Q.   And here's what's owed?

17   A.   Yes.

18            MR. FINK:  One moment.

19            (Briefly off the record.)

20   BY MR. FINK:

21   Q.   As far as you can recall, Mr. Daskal, did all wire

22   transfers that Mr. Didani or someone on his behalf, that you

23   believe to be on his behalf, were they all initiated from

24   foreign banks?  When I say foreign, I mean not U.S. banks, as

25   far as you know.

1    A.   As far as I recall, they were all foreign.

2    Q.   Foreign banks initiated?

3    A.   Foreign banks, yes, as far as I recall.

4    Q.   Dubai being one of them?

5    A.   Dubai is one of them.  There was one in Europe as well.

6         MR. FINK:  That's all I have, your Honor.  Ten minutes

7    to spare.

8         THE COURT:  There's never any time to spare, Mr. Fink.

9         Mr. Bilkovic, do you have redirect?

10        MR. BILKOVIC:  I may not take ten, but I need a few.

11        May I proceed?

12        THE COURT:  You may.

13                       REDIRECT EXAMINATION

14   BY MR. BILKOVIC:

15   Q.   So that exhibit that Mr. --

16        MR. BILKOVIC:  Judge, I would actually move to admit

17   that into evidence.

18        THE COURT:  Any objection?

19        MR. FINK:  No objection.

20        THE COURT:  It's admitted.

21        (Government's Exhibit 74.6 received into evidence.)

22   BY MR. BILKOVIC:

23   Q.   So that was basically --

24        MR. BILKOVIC:  Thank you, your Honor.

25

1    BY MR. BILKOVIC:

2    Q.   That was the exhibit that you sent after you received from

3    Mr. Didani the screenshot of 74.5, the $189,000 from Camaro;

4    correct?

5    A.   Yes.

6    Q.   And that was a Canadian -- it was sent in Canadian --

7    A.   It was received in Canadian dollars into our U.S. account.

8    Q.   Where the other wires were received in U.S. dollar funds?

9    A.   U.S. dollars, correct.

10   Q.   Did INKAS -- do you know much about the banking system?

11   A.   Not too much.

12   Q.   Let me ask you this.  Do you know what a corresponding bank

13   is?

14   A.   Yes.

15   Q.   Do you know if INKAS had a corresponding bank in the United

16   States?

17   A.   We did.

18   Q.   Do you know why INKAS had a corresponding bank in the

19   United States?

20   A.   I would assume it's in order to have someone that can issue

21   U.S. dollars.

22   Q.   Are you aware of that, that that's required if you want

23   U.S. dollars --

24   A.   Yes.

25   Q.   -- to be paid?

1   A.   Yes.  You're referring to an intermediary bank?

2   Q.   Yes.

3   A.   Yes.

4   Q.   And INKAS had one in the United States?

5   A.   We did, yes.

6   Q.   Okay.  And the trading companies, do you remember one by

7   the name of Debonair?

8   A.   Yes.

9   Q.   And Impact Power or OnPoint Trading?

10  A.   OnPoint I remember, yeah, and Debonair.

11  Q.   And you said I think before they were all different?

12  A.   We never received from the same company or organization.

13  Q.   Now, if that were to happen today --

14  A.   Yes.

15  Q.   -- would INKAS have a different process versus what they

16  had back then?

17  A.   Oh, yeah.

18            MR. FINK:  Objection.

19            THE COURT:  That's what?

20            MR. FINK:  Objection to relevance as to what their

21   remedial measures are or what they're doing now.  I don't see

22   how that's relevant.

23            MR. BILKOVIC:  Let me withdraw it.  I'll --

24            THE COURT:  Yeah, sustained.

25            MR. BILKOVIC:  I'll re-ask it a different way.

```
 1              THE COURT:  Go to another question.
 2   BY MR. BILKOVIC:
 3   Q.   Again, you do not know who ran these companies; correct?
 4   A.   I do not.
 5   Q.   Do you know if it was one person or ten people?
 6   A.   No, I don't.
 7   Q.   Do you know if it was person running all of the companies?
 8   A.   No, I don't.
 9   Q.   In any event, did any of those wires come from an account
10   that had Mr. Didani's name on it?
11   A.   Never.
12   Q.   Did any of those wires come from an account that had
13   "Yefreddy" on it?
14   A.   No.
15   Q.   So basically if you wanted to trace that money you would
16   have to trace it to one of these many trading companies in
17   Dubai?
18   A.   Yes, sir.
19   Q.   You mentioned something to Mr. Fink about -- or he brought
20   up to you about logistics, that you believe that that's what
21   Mr. Didani did was logistics?
22   A.   Yes.
23   Q.   Did he ever tell you that he owned a coal mining company?
24   A.   Not that I remember.
25   Q.   What is logistics?
```

1    A.   Logistics, the way I see it, is moving -- it's

2    transportation companies, you know, dealing with ships, moving,

3    you know, import, export cargo.  It could be anything from, you

4    know, agriculture to machinery.

5    Q.   Cocaine from one country to another?

6    A.   Cocaine from one country to another, yes.

7    Q.   And just, finally, Mr. Fink brought up that Mr. Didani --

8    you thought he was generous because he would help poor kids?

9    A.   Yes.

10   Q.   Do you know where he got the money to do that?

11   A.   I do not.

12   Q.   Do you have some ideas after what you now know about this

13   case and after he sent you that article?

14   A.   Yes, I do.

15        MR. BILKOVIC:  Nothing further.

16                          EXAMINATION

17   BY THE COURT:

18   Q.   I have a couple questions.  The same rule applies, okay.

19        And that is when you were involved this period of

20   about a year with Mr. Didani, did you accept any cash payments

21   from any other companies that were purchasing anything from

22   you?

23   A.   No, your Honor.

24   Q.   Have you ever done that before?

25   A.   No, I haven't, your Honor.

1   Q.   And do you still have an office in Toronto?

2   A.   Yes, we do.

3   Q.   Do you have them in any other cities other than Miami and

4   Toronto?

5   A.   We have an office in Toronto, an office in Miami, we have

6   an office in Lagos, Nigeria as well.  It's a service center

7   basically, maintenance and service center.  It's also used as a

8   sales office.

9            THE COURT:  Okay.  That's all I have.

10           Do you have any other questions?

11           MR. BILKOVIC:  I have nothing further.

12           MR. FINK:  Just following up on one of your questions,

13    Judge.

14                       RECROSS EXAMINATION

15   BY MR. FINK:

16   Q.   That Miami office was open after your dealings with

17   Mr. Didani; correct?

18   A.   Yes, sir.

19           MR. FINK:  Nothing further, Judge.

20           THE COURT:  Okay.  Anything further?

21           MR. BILKOVIC:  No.  I'd ask the witness be excused.

22           THE COURT:  Okay.  You may step down.

23           And he's free to go; right?

24           MR. BILKOVIC:  Yes.

25           MR. FINK:  Yes, he is.  Thank you, Mr. Daskal.

1          THE WITNESS:  Thank you.

2          (End of excerpt at 3:52 p.m.)

3                          _  _  _

4

5

6

7              CERTIFICATE OF COURT REPORTER

8

9          I, Sheila D. Rice, Official Court Reporter of the

10    United States District Court, Eastern District of Michigan,

11    appointed pursuant to the provisions of Title 28, United States

12    Code, Section 753, do hereby certify that the foregoing pages

13    is a correct transcript from the record of proceedings in the

14    above-entitled matter.

15

16

17                    **s/Sheila D. Rice**
                      Sheila D. Rice, CSR-4163, RPR, RMR, FCRR
18                    Federal Official Court Reporter
                      United States District Court
19                    Eastern District of Michigan

20
      Date:  04/11/2025
21    Detroit, Michigan.

22

23

24

25