1                **UNITED STATES DISTRICT COURT**
                **EASTERN DISTRICT OF MICHIGAN**
2                   **SOUTHERN DIVISION**

3                       –   –   –

UNITED STATES OF AMERICA,

4

            Plaintiff,

5

   v.                       Case No. 21-20264

6

YLLI DIDANI,

7

            Defendant.

8  _____/

9            **JURY TRIAL - VOLUME 21 - EXCERPT**
           **Continued Testimony of Jason Willock**
10        **BEFORE THE HONORABLE DENISE PAGE HOOD**
            **UNITED STATES DISTRICT JUDGE**

11

12       Theodore Levin United States Courthouse
         231 West Lafayette Boulevard
            Detroit, Michigan
13         Wednesday, March 26, 2025

14

**APPEARANCES:**

15

 **For the Plaintiff:**       Mark Bilkovic
16                   Timothy McDonald
                   UNITED STATES ATTORNEY'S OFFICE
17                   211 W. Fort Street, Suite 2001
                   Detroit, Michigan  48226
18                   (313) 226-9623

19 **For the Defendant:**      Wade Fink
                   WADE FINK LAW, P.C.
20                   550 W. Merrill Street, Suite 100
                   Birmingham, Michigan  48009
21                   (248) 712-1054

22 **Also present:**          Special Agent Chad Hermans
                   Maria DiCarlo, Paralegal

23

24

     *To obtain a copy of this official transcript, contact:*
25       *Sheila D. Rice  Official Court Reporter*
      *(313) 234-2610 • sheila_rice@mied.uscourts.gov*

**TABLE OF CONTENTS**

MATTER                                                      Page

**JURY TRIAL - VOLUME 21 - EXCERPT**

**Government's Case in Chief (Continued)**

**JASON WILLOCK**
Continued direct examination by Mr. McDonald........   5
Cross-examination by Mr. Fink.......................  11
Redirect examination by Mr. McDonald................  54
Examination by the Court............................  58


Certificate of Court Reporter......................  62

E X H I B I T   I N D E X

| Exhibit No. | Description | Identified | Admitted |
|---|---|---|---|
| (None) | | | |

```
 1    Detroit, Michigan
 2    Wednesday, March 26, 2025
 3    9:42 a.m.
 4                              _   _   _
 5          LAW CLERK:  All rise.
 6          United States District Court for the Eastern District
 7    of Michigan is now in session, the Honorable Denise Page Hood
 8    presiding.
 9          Calling Case Number 21-20264, United States of America
10    versus Ylli Didani.
11          Appearances, please.
12          MR. McDONALD:  Good morning, your Honor.  Tim McDonald
13    and Mark Bilkovic on behalf of the Government.  Also at counsel
14    table is Maria DiCarlo and Special Agent Chad Hermans.
15          THE COURT:  Okay.  Good morning to you, and you may be
16    seated.
17          MR. FINK:  Good morning, your Honor.  Wade Fink on
18    behalf of Ylli Didani who is present at counsel table to my
19    right.
20          THE COURT:  Okay.  Good morning to both of you, and
21    you may be seated also.
22          DEFENDANT DIDANI:  Good morning, your Honor.
23          THE COURT:  Okay.  Yesterday we were at the point of
24    having some voir dire relative to Mr. --
25          Is it Willock; is that right?
```

```
 1              MR. FINK:  Yes, your Honor.
 2              THE COURT:  Testifying as an expert.  And I think
 3  sufficient foundation has been laid for him to testify in this
 4  way, and that your questions can be taken up on
 5  cross-examination, Mr. Fink.
 6              MR. FINK:  Thank you, your Honor.
 7              THE COURT:  You're welcome.  Let's bring out the --
 8              Is your witness here?
 9              MR. McDONALD:  Yes, your Honor.
10              LAW CLERK:  All rise for the jury.
11              (The jury entered the courtroom at 9:44 a.m.)
12              THE COURT:  You may all be seated.
13              Are you satisfied -- good morning, jurors.  How are
14  you?
15              JURORS:  (Collectively) Good morning.
16              THE COURT:  Good.  Are you satisfied the jurors are
17  present and in their proper seats?
18              MR. McDONALD:  Yes, I am, your Honor.
19              THE COURT:  What about you, Mr. Fink?
20              MR. FINK:  I'm satisfied, Judge.
21              THE COURT:  You're laughing, but, you know, jurors
22  sometimes are pranksters, and they think they could change
23  their seats and no one will notice.  But usually somebody,
24  either the Judge or one of the counsel, are like really paying
25  attention to where people sit, so ...
```

1             MR. FINK:  I studied it, Judge.  I'm comfortable.

2             THE COURT:  All right.  Very well.

3             Mr. Willock, that's never happened to you; right?

4             THE WITNESS:  No, ma'am.

5             THE COURT:  You're still under oath.

6             There's hardly any room for humor in criminal cases.

7    So whenever we come upon it we try to take it with no offense,

8    of course, to the defense.

9             THE WITNESS:  Absolutely.

10            THE COURT:  Please state your name again for the

11   record, and remember you need to speak right here, okay.

12            THE WITNESS:  Yes, your Honor.

13            THE COURT:  Okay.  Very good.  State your full name

14   again.

15            THE WITNESS:  Good morning.  Special Agent Jason

16   Willock from the --

17            THE COURT:  You're still under oath.

18            THE WITNESS:  Yes.

19            THE COURT:  Okay.  You may proceed, Mr. McDonald.

20            MR. McDONALD:  Thank you, your Honor.

21            THE COURT:  And I overruled Mr. Fink's objection

22   before you came out, okay.  All right.

23                  DIRECT EXAMINATION (Continued)

24   BY MR. McDONALD:

25   Q.  Agent Willock, I just have a few more questions for you.

1            When we left off last time, we were talking about

2    one-sided chats.

3            THE COURT:  One -- say that again.

4    BY MR. McDONALD:

5    Q.  We were talking about one-sided Sky chats.  Do you remember

6    that?

7    A.  Yes, sir.

8    Q.  All right.  And you started to say some of the reasons why

9    there may be one-sided chats; is that accurate?

10   A.  Yes, sir.

11   Q.  All right.  In the course of your experience and your own

12   case in California, did you come across one-sided chats, Sky

13   chats?

14   A.  Yes, I did.

15   Q.  In the course of your own case and other cases you're

16   familiar with, did you come across chats that have been

17   duplicated?

18   A.  Yes, I did.

19   Q.  Can you describe what that will look like?

20   A.  So these chats were portrayed in a spreadsheet, in an Excel

21   spreadsheet document, or a CSB file, as an alternative.  And

22   each line would represent a message that was sent, the full

23   message.  And let's say that message was on line 5 of the

24   spreadsheet, line 6 would have the exact same data conveyed,

25   repeated, duplicated.

1    Q.   Okay.  So same content of the message?

2    A.   That's correct.

3    Q.   And what about date, time and other metadata that was

4    included?

5    A.   The same, yes.

6    Q.   What about in your experience have you come across data

7    that was produced where chats are tripled?

8                THE COURT:  Are what?

9                MR. McDONALD:  Tripled.

10               THE COURT:  Okay.

11               THE WITNESS:  So in the same format, if a message was

12   on line 5, it would be on line 6 and line 7 as well.  And then

13   if there was another side, a response to that message, 8, 9 and

14   10 would have the same message.

15   BY MR. McDONALD:

16   Q.   All right.  And were you given reasons why the data was

17   produced that way by France?

18   A.   Yes, I was.

19   Q.   And were some of those reasons what you told us yesterday?

20   A.   Yes, sir.

21   Q.   Now, do you know the total number of messages approximately

22   that were seized by Sky during their operation, or seized by

23   France during the Sky operation?

24   A.   As of today, that number is over one billion messages

25   intercepted.

1   Q.   And those messages, does each message undergo a decryption
2   process?
3   A.   Each message that was intercepted during the course of
4   investigation that has been decrypted has gone through a
5   description process, yes.
6   Q.   And do you know whether or not the decryption process is
7   ongoing to this day?
8   A.   It still is.  Messages are still being decrypted.
9   Q.   Now, were you or investigators that you were involved with
10  in this investigation able to verify that the data on the
11  server in Roubaix, France was, in fact, Sky data from Sky
12  devices?
13  A.   Yes, sir.
14  Q.   And can you describe how you were able to determine that?
15  A.   So once we identified that Sky Global, Sky Technologies,
16  the couple running the Sky ECC app, had servers to facilitate
17  that communications network, we learned that they used a
18  software provided by BlackBerry.  It's called Unified Endpoint
19  Management, or UEM.
20       And I think I previously discussed how UEM is a
21  software tool used by major corporations around the globe to
22  manage mobile devices that are issued from that company.  It's
23  a way the security teams can remotely manage those devices and
24  ensure that the companies' data on those devices is properly
25  managed.

```
 1              So that software runs on the same servers that Sky
 2    Global utilized, and those servers, or that software, is
 3    identified through a license, or an SRPID.
 4    Q.   What's an SRPID?
 5    A.   Server routing protocol ID.  It's a unique identifier that
 6    those devices have to connect with to the server.  It's
 7    basically a way that the device is validated to be on that
 8    server.
 9              And so by having those SRPIDs from BlackBerry, when we
10    interacted with them to get information about the licenses for
11    the software that Sky Global had, we were able to show that Sky
12    ECC application was running on those servers by means of having
13    those identifiers.
14    Q.   All right.  And how were you -- were you able to identify
15    the devices that were using those servers?
16    A.   Yes.
17    Q.   All right.  And how were you able to do that?
18    A.   So every device is managed by Sky ECC with a mobile device
19    management tool, and every device has on it an SRPID.  We asked
20    BlackBerry for all the devices that had that identifier.  We
21    also understood that the devices had to connect to these
22    servers through a mobile network, a cellular network.
23              And the bulk of those devices either had AT&T SIM
24    cards in them or a Dutch telecom known as KPN.  So the Dutch
25    interacted with KPN, and my team in the U.S., with me being the
```

1    primary liaison, interacted with AT&T.

2          And we requested a run of all the devices a couple of

3    times.  We didn't do it just once.  So that allowed us to get a

4    snapshot of all the devices on the network during those time

5    periods.

6    Q.  You talked yesterday about encryption and something called

7    Wireshark.  Am I saying that right?

8    A.  Yes, sir.

9    Q.  All right.  And do you know whether you or other

10   investigators in the foreign Sky investigation utilized

11   Wireshark to decrypt these messages?

12   A.  Yeah.  So the European team, the Dutch, Belgians and French

13   utilized the platform Wireshark.

14   Q.  Are you familiar with Wireshark?

15   A.  Just in general terms.

16   Q.  Do you know whether it's a commonly used tool in the

17   industry?

18   A.  Yes.

19   Q.  Yes, it is a common tool?

20   A.  Yes, it is.  Yes.

21          MR. McDONALD:  May I have one moment, your Honor?

22          THE COURT:  You may.

23          (Briefly off the record.)

24          MR. McDONALD:  No further questions.  Thank you.

25          THE COURT:  Cross-examine, please.

```
 1                      CROSS-EXAMINATION
 2    BY MR. FINK:
 3    Q.   Agent Willock, we've spoken before, but I'm Wade Fink,
 4    Mr. Didani's attorney.  Sorry to keep you an extra day.  I hope
 5    you enjoyed Detroit last night a little bit.
 6    A.   No worries.  Thank you, sir.
 7    Q.   Agent, do you know what Operation Argus is?
 8              THE COURT:  A-R-G-U-S?
 9              MR. FINK:  Yes, ma'am.
10              THE WITNESS:  I'm familiar with that name, yes, sir.
11    BY MR. FINK:
12    Q.   What is it, or what's your familiarity with it?
13    A.   That is the name that the Dutch authorities title their
14    investigation.
15    Q.   Do you know what the actual operation was or what it was
16    referring to?
17    A.   My understanding is that Argus is their approach to the Sky
18    ECC investigation.
19    Q.   The monitoring of the live messaging being sent once the
20    decryption had been done; correct?
21    A.   I think that's fair.  The Dutch did not discuss the name of
22    their investigation with me.  I could say I learned of it
23    afterwards.
24    Q.   Sure.  Do you know what Argus is?
25    A.   I do not.
```

1    Q.   You ever heard of the Greek mythology Argus Panoptes,

2    meaning the all-seeing one?  Does that sound familiar?

3    A.   That does sound familiar, yes.

4    Q.   Operation Argus, the all-seeing one; right?

5    A.   Absolutely.

6    Q.   Do you know how long it would have taken or how many

7    agents, or can you put into perspective how long it would have

8    taken the amount of information that was obtained from Sky ECC

9    to review all of it?

10   A.   I cannot answer that.

11   Q.   Are you aware that one French court estimated it would take

12   about 635 years or 400 agents to review all those messages?

13   A.   I've heard numbers along those lines.

14   Q.   My point being it's an extreme amount of data; correct?

15   A.   Absolutely.

16   Q.   Now, the United States -- you expressed on direct

17   examination some familiarity with U.S. efforts to combat the

18   concern of encryption services being used to commit crimes;

19   correct?

20   A.   Yes, sir.

21   Q.   And that's a longstanding effort by our government;

22   correct?

23   A.   Yes, it is.

24   Q.   In fact, it dates back to the '90s when we even heard of

25   encryption services; correct?

1    A.   My estimate is more than 20 years.

2    Q.   Sure.

3    A.   Yes.

4    Q.   Well, for example, have you ever heard of the Clipper chip?

5    A.   No, sir.

6    Q.   You ever heard of efforts previously to obtain access by

7    the United States government to encryption services?  Are you

8    familiar with any of the government's efforts prior to this

9    case?

10   A.   Well, I was involved in one of those cases, and I've heard

11   of others, yes.

12   Q.   Would you agree with me that there has been a debate, for

13   lack of better term, about what the balance is between the

14   right to privacy and the Fourth Amendment and the government's

15   efforts to decrypt or infiltrate encryption services?

16   A.   Absolutely.  It's a very serious concern.

17   Q.   And a lot of government efforts have been -- I'm using this

18   word, I'm not intending for you to, but thwarted or put on hold

19   by certain court decisions; correct?

20   A.   I understand that efforts have been limited, yes.

21   Q.   Sure.  Now, the United States' involvement with the Sky ECC

22   investigation to the best of your recollection began when?

23   A.   The summer of 2018.

24   Q.   And do you remember the genesis of the United States'

25   involvement, what sparked our government's interest or

1    collaboration in that effort?

2    A.   Well, my co-case agents on the investigation, we had worked

3    together targeting a company known as Phantom Secure.

4         THE COURT:  I'm sorry?

5         THE WITNESS:  My investigative team, the other agents

6    I worked with at the time, were fresh off of an investigation

7    targeting a company known as Phantom Secure that was located in

8    Vancouver, Canada.

9         And during the course of that investigation we learned

10   of the competitor, Sky Global, Sky Technologies, managing the

11   app, Sky ECC.  And through our investigative efforts, speaking

12   with confidential sources and others that were arrested during

13   that investigation, we learned and suspected that Sky Global

14   was involved in facilitating narcotics trafficking and

15   supporting organized criminal activities around the globe.

16   BY MR. FINK:

17   Q.   So the genesis of the United States' involvement with the

18   investigation, the collaborative effort with other nations into

19   Sky ECC, started with the case that you were working on?

20   A.   Well, initially the case file I opened was purely a

21   domestic case targeting individuals in the U.S. and in Canada.

22   We had communications with the Canadian authorities and other

23   federal agencies in the U.S., but at that time I was not

24   familiar with the European efforts or who was involved in

25   Europe.

1    Q.   And that's what I'm asking.  I mean, the one thing -- one

2    investigation per usual in federal cases led to another and the

3    discovery of Sky ECC and Sky Global and eventually to

4    international efforts that had been ongoing; is that accurate?

5    A.   I think that's a fair way to frame it.

6    Q.   Thank you.  Now, just put in perspective -- you did a

7    little bit of this on direct examination.  Broadly speaking,

8    and I know this might be a little different, the technology for

9    each app, but broadly speaking the idea of encrypted messaging

10   is one device sends a message to a server, and that server

11   sends the message to another device and it's hosted elsewhere.

12   Is that a general fair way to describe how the message goes

13   from one phone to another?

14   A.   That is a very common way.  There are other means, but,

15   yes, that is a common means of sending encrypted

16   communications.

17   Q.   And the idea is to keep those messages private or difficult

18   to discover to an outside source for whatever reason might want

19   to be seeing that information; right?

20   A.   That's correct.

21   Q.   And colloquially we know a lot of those apps exist just

22   domestically that the jurors, myself or anybody might use

23   themselves; right?

24   A.   Yes, sir.

25   Q.   We have Signal?

1    A.   Yes.

2    Q.   Which has become famous as of this week; right?

3    A.   Yes.

4    Q.   We have WhatsApp; right?  In fact, even iMessages have

5    end-to-end user encryption; correct?

6    A.   Yes.  They employ a type of encryption, yes.

7    Q.   Would you agree with me that the use of encryption devices

8    for messaging has numerous legitimate purposes, non-illegal

9    purposes?

10   A.   Yes.

11   Q.   Companies who have secrets or technology or communicate

12   about things that is proprietary might use it; correct?

13   A.   Absolutely, yes.

14   Q.   Drug manufacturers, for example?

15   A.   I believe they might have a need.

16   Q.   A company like Raytheon who has government contracts,

17   defense contracts; right?

18   A.   Yes.

19   Q.   There might be other legitimate uses like sources for

20   journalists; correct?

21   A.   That's correct.

22   Q.   Might be legitimate to be -- a whistleblower may want to

23   tell a journalist about something illegal going on, but doesn't

24   want to be discovered; right?

25   A.   That's correct.

1    Q.   It might be foreign intelligence whistleblowers that want

2    to help the U.S. or others that don't want to be discovered;

3    correct?

4    A.   Yes.

5    Q.   There's also just, believe it or not, general privacy that

6    people want; right?

7    A.   That's fair to say.

8    Q.   Maybe celebrities, for example, want to share information

9    about their lives and what's going on without fear of the

10   paparazzi or anyone similar intruding; correct?

11   A.   Yes.

12   Q.   Maybe people want to share intimate photos with partners

13   that live elsewhere; right?

14   A.   I could say that is correct.

15   Q.   I'm not saying that you know that to be the case.  I'm

16   saying that seems like a reasonable use.  If two people who

17   love each other live in different parts of the world and want

18   to intimate and don't want to share it with the world, that

19   could be one use; right?

20   A.   What use are they -- I guess I just don't --

21   Q.   Send intimate photos of each other, naked photos of each

22   other to people who love each other who don't live in the same

23   state and they don't want their naked pictures on the internet.

24   They might use encrypted services; right?

25   A.   A particular type of encrypted service, yes.

1   Q.   Sure.   Now, when you began your investigation, or the

2   impetus for your investigation became known when you were

3   investigating Phantom Secure and became aware of Sky Global,

4   you started building relationships with companies that may

5   utilize the Sky Global service; is that accurate?   I believe

6   you said BlackBerry, for example.

7   A.   Well, utilize tools from those companies, and those

8   relationships were already existing when the Sky Global

9   investigation commenced.

10  Q.   So in your other investigations you had already started

11  building those relationships with the companies and come across

12  Sky Global that just becomes another topic of investigation and

13  discussion with these relationships; correct?

14  A.   Well, it just -- it doesn't just become, you know.   Those

15  conversations were based off of investigative research and

16  quality controlling information that we had to ensure that we

17  were looking at something that was of a criminal nature.

18  Q.   Were you involved in the United States' investigations of

19  the CEOs of Sky Global?

20  A.   Yes.

21  Q.   Mr. Eap?

22  A.   Yes, sir.

23  Q.   I believe Mr. Herndon?

24  A.   Herdman.

25  Q.   Herdman?

19

1    A.   Herdman, yes.

2    Q.   Thank you.  You were one of the agents on those cases?

3    A.   Yes, sir.

4    Q.   And, correct me if I'm wrong, as your investigation

5    progressed, and feel free to -- I'm not trying to narrow your

6    answers, but just -- so if you need to expound tell me.  But at

7    some point the U.S. believed that the CEOs of this company, Sky

8    Global, were involved in illegality themselves; correct?

9    A.   That's correct.

10   Q.   And, generally speaking, the United States was intent on

11   indicting these two individuals in connection with their

12   creation of Sky ECC or Sky Global; correct?

13   A.   That was our investigative goal when we started the case.

14   Q.   What year, approximately?  I know it may not be precise.

15   What time and year at least did the United States' interest in

16   the leadership of Sky Global become a criminal investigation?

17   A.   Officially summer of 2018.

18   Q.   Summer of 2018, okay.  Now, the reason I ask that is, if I

19   heard you correctly, you were one of the United States'

20   representatives at a global meeting -- well, I should say an

21   international meeting.  Was it in the Netherlands?

22   A.   Yes, at The Hague.

23   Q.   You had a meeting at The Hague with other law enforcement

24   agencies to discuss Sky Global and strategies of combatting the

25   illegal activity; correct?

```
1    A.   Yes, sir.

2    Q.   Now, how many representatives of the United States were at

3    that meeting, approximately?

4    A.   I believe there were two prosecutors from the Southern

5    District of California, an intel analyst.  So that would be

6    three.  And maybe four agents.  So seven of us, approximately.

7    Q.   Relatively small group; correct?

8    A.   Yes, sir.

9    Q.   Makes you pretty famous in some circles who follow this;

10   right?

11   A.   I wouldn't use the word "famous," but I was humbled to be a

12   part of that meeting.

13   Q.   It was a big deal; right?

14   A.   It was significant.

15   Q.   And at that meeting there was a discussion amongst how many

16   nations, would you say, about combatting the ill effects that

17   law enforcement viewed was coming from Sky Global?

18   A.   I believe there were roughly 12 or 13 countries present at

19   that meeting.

20   Q.   And I know you're not going to list all of them, but can

21   you give a snapshot of the ones you recall involved?

22   A.   It might be easier for me to think about it going west to

23   east.

24   Q.   Sure.

25   A.   But England, Spain, France, Belgium, the Netherlands,
```

```
 1    Italy.  Germany may or may not have been there.  Australia,
 2    Canada and, of course, the U.S.  And I'm definitely missing --
 3    Q.  No, I understand.
 4    A.  Norway I believe was there.
 5    Q.  I think you said Belgium; correct?
 6    A.  Yes.
 7    Q.  Belgium, the Dutch and the Netherlands and France would you
 8    agree with me are three of the bigger international players in
 9    this investigation; is that accurate?
10    A.  France, Belgium and the Netherlands were the most
11    significant of the countries present.
12    Q.  Other than us; right?
13    A.  Yes.
14    Q.  Desire to indict the CEOs of Sky Global, or the desire to
15    at least investigate and hopefully result in an indictment if
16    the evidence bore it out, began in summer of 2018?
17    A.  Yes, sir.
18    Q.  This meeting occurred in February of 2019?
19    A.  Yes, sir.
20    Q.  That was a discussion point at that meeting; correct?
21    A.  Whether we would be able to indict the CEO?
22    Q.  The U.S.'s desire to indict the CEO.
23    A.  That was discussed, yes.
24    Q.  In fact, there was a tacit agreement between the United
25    States and these other countries that the United States would
```

```
 1    let these other countries finish their investigation and what
 2    they wanted to do before the United States indicted the CEOs;
 3    is that correct?
 4    A.   You said a tacit agreement.
 5    Q.   Are you aware of the French report that said there was a
 6    tacit agreement between the American and Dutch authorities that
 7    allowed the European investigations to continue with the
 8    American suspending further operations pending ongoing
 9    investigations?  Are you aware of that?
10    A.   I recall reading or seeing reporting along those lines.  I
11    just wanted to clarify the term you were using.
12    Q.   Sure.  I'm using it because that's from the French report,
13    but let's just take out the word "tacit" because I don't think
14    that's an important part.  There was some general
15    understanding --
16    A.   Yeah, I would say --
17    Q.   -- that the United States would hold off on indicting these
18    individuals while Europe continued doing what it was going to
19    do with its Sky ECC investigation; right?
20    A.   Yeah.  Nothing formally was signed or a handshake.  It was
21    a general agreement.
22    Q.   You had mentioned that -- I just want to understand, and I
23    know this is very complicated.  So I apologize if I'm jumping
24    around.  I apologize to the jury and you.  If I need to
25    reorient myself in the timeline, tell me.
```

```
 1            But my understanding from your direct testimony is --
 2   I'm going to use the word "you," but the United States, you,
 3   got a list of IP addresses and PINs from BlackBerry phones that
 4   had been seized, or from BlackBerry through requests, something
 5   along those lines?  Can you make me more precise with what I'm
 6   saying?
 7   A.   I guess I'm still trying to track what you're referring to.
 8   Q.   So you obtained information from BlackBerry that then
 9   eventually led to the seizure of the French -- the seizure of
10   the server in France; right?  Is that an accurate statement
11   generally?
12   A.   I think the information that we were able to secure, that
13   we were able to obtain, assisted France in their -- and the
14   Belgians and Dutch and the others involved with the seizure of
15   Sky servers.
16   Q.   That's what I'm asking.  I want to understand precisely
17   what you got and did with BlackBerry.
18   A.   Yeah.
19   Q.   And then what was transmitted to Europe.  So I may have
20   stated it as a layman who doesn't really understand the
21   technology like you do, but what did you do specifically with
22   BlackBerry?  What information did you get that you then
23   transmitted?
24   A.   I think it would be tough for me to give you a full
25   catalog.
```

1   Q.   Okay.   30,000 --

2   A.   Yeah.   So ultimately it was information related to the

3   types of accounts, the types of software, the types of tools

4   that Sky Global purchased from BlackBerry.   Also, data that

5   BlackBerry had related to phones that they were able to observe

6   or other computer-type tools that would interact with the

7   BlackBerry system or infrastructure.

8   Q.   And you made a request, you being the Government or whoever

9   may have done it, but you have knowledge that there was a -- I

10  believe you said a judicial request made of BlackBerry for this

11  information; is that correct?

12  A.   Multiple different types.

13  Q.   What does that mean, a judicial request?

14  A.   So anything from a subpoena all the way up to a search

15  warrant.

16  Q.   So the United States went -- got process of some kind;

17  right?

18  A.   Yes.

19  Q.   Said, BlackBerry, we want X, X and X information; right?

20  A.   Yes.

21  Q.   We took that information from BlackBerry that was given to

22  us in response to these various judicial requests, right, "we"

23  being the United States?

24  A.   Yes.

25  Q.   We, the United States, then sent that to French, Dutch and

1    other authorities to assist in their investigation of Sky

2    Global, Sky ECC; right?

3    A.    Just to clarify.

4    Q.    Sure.

5    A.    To use the word "sent," there's a whole process.  So it

6    wasn't we received something and then we throw it in an

7    envelope and mail it over.  Some of this data or documentation

8    or information requires us to go through a process with

9    elements of the justice department in D.C. to get approval to

10   share.

11   Q.    So it may be similar to an MLAT.  There's processes by

12   which we get information to other countries; correct?

13   A.    Yes, sir.

14   Q.    I am using this in a very layman way just to understand

15   transactionally.  So I'm not trying to pin you down that

16   something was done improperly in terms of the sharing.  I'm

17   just asking that properly, I'm assuming --

18   A.    Yes.

19   Q.    -- this information that we got, the United States through

20   our process, was then shared with our European law enforcement

21   friends; correct?

22   A.    I can appreciate that.  I just felt the need to clarify

23   that.

24   Q.    I appreciate you.  But that's true generally what I said?

25   A.    Yes, sir.

1    Q.   Okay.  And it's your understanding that the information

2    that we obtained from BlackBerry through judicial process here

3    was at least part and parcel of seizing the very first server

4    of Sky Global in Roubaix, France; correct?

5    A.   I would offer it helped.  The information that we obtained

6    I think it's important to note France could have obtained it

7    without us.

8    Q.   The information we gave them, like IP addresses, helped

9    narrow where that server was; is that accurate?

10   A.   Bingo.  It did, yes.

11   Q.   So the time in which it was seized relative to when France

12   may have discovered it on their own certainly was aided by our

13   help; correct?

14   A.   I think that's fair to say.

15   Q.   So at this point in my timeline, which I know I'm not being

16   perfect on, but just going linearly as opposed to this date,

17   this date, this date, we have an investigation into -- I just

18   want to recap -- into the owners of Sky Global in summer of

19   '18, an agreement in February of '19 that we're not going to

20   charge them while this Sky ECC investigation continues to go

21   on.  And during the same time the U.S. is assisting its foreign

22   allies and law enforcement to discover the servers and other

23   information about Sky Global.  Is that a general recap of what

24   we just talked about?

25   A.   I think it's important to note they were assisting us as

1    well in the U.S.

2    Q.   To be sure, and I was going to get there, but the seizure

3    of that server in France is really what led to the downriver

4    flow here of everything that came after; right?  I'm talking

5    about -- when I say that, I mean live -- reviewing messages

6    live, being able to decrypt otherwise encrypted messages.  I

7    mean, it all stems from getting that server; right?

8    A.   I think in a simplistic way, yes, that's accurate.

9    Q.   Black Friday, so to speak, of Sky Global came in March of

10   2021; right?

11   A.   Yes, sir.

12   Q.   And that was when it was made known that there was seizures

13   that all these messages had been discovered, Sky Global was

14   shut down; correct?

15   A.   Yeah.  Just to clarify, is it Black Friday or Black Monday?

16   Q.   I'm using that term generally speaking.  The day that

17   everyone knows for Sky Global happened in March of 2021; right?

18   A.   Yes.

19   Q.   Okay.  And the U.S. took Sky's website off the web;

20   correct?

21   A.   That's correct.

22   Q.   We seized their website?

23   A.   We did.

24   Q.   And three days after our European friends in law

25   enforcement shut down Sky Global, three days later we indicted

1    Mr. Eap and Mr. Herndon (ph)?

2    A.   Thomas Herdman.

3    Q.   Herdman; correct?

4    A.   I believe it was roughly three days, you know, with the

5    time difference and whatnot.

6    Q.   Understood.  You had mentioned in 2019 that prior to

7    seizing the server of Sky Global in France there had been a

8    judicial French warrant that authorized that seizure; is that

9    correct?

10   A.   Yes, sir.

11   Q.   Do you know -- have you seen that warrant?

12   A.   I have not.

13   Q.   Are you aware that at a similar time a Dutch judge had

14   denied the Netherlands permission to seize Sky chats in the

15   Netherlands?

16   A.   I do recall that during the course of the European

17   investigation with the Dutch, Belgians and French that each of

18   their courts granted and limited operations or requests.

19   Q.   Different countries had different views of what was

20   authorized and what wasn't; right?

21   A.   Yes.  We were even limited in the U.S.

22   Q.   We were limited by that darn thing called the Fourth

23   Amendment; right?

24   A.   We're limited by many amendments and statutes, yes.

25   Q.   Dutch judge, do you recall reading, "It could not be

1    established that the users of Sky ECC were using the system

2    exclusively for illegal purposes."  Do you recall that?

3    A.  I don't recall that exactly, but I do recall that there

4    were limitations.

5    Q.  The Dutch judge, "It has not yet fully clarified how

6    exactly the intercepted encrypted data was ultimately decrypted

7    in cooperation with the French."  Do you recall that?

8    A.  I do not.

9    Q.  Do you recall that a judge in Panama acquitted 28

10    defendants because of the significant flaws in the evidence

11    presented -- the electronic evidence presented from the servers

12    from Sky ECC?  Are you aware of that case?

13    A.  I am not.

14    Q.  Did you author any search warrants in the United States for

15    -- or are you aware of any of your colleagues authoring any

16    search warrants in the United States for Sky ECC chats?

17    A.  Not for chats.  For data, metadata, mobile tower location

18    history, things of that nature, but not for content in the U.S.

19    Q.  Are you aware or did you author any search warrants or any

20    of your colleagues for the seizure of that server in France?

21    A.  Not for the server in France, no, sir.

22    Q.  Are you aware of any search warrants or anything similar

23    for any real-time chats that were discovered as a result of

24    that seizure?

25    A.  Warrants in the U.S. for real-time chats, I'm not aware of

1   any of those.

2   Q.   Are you aware that the U.S. benefited from France, Belgium

3   and Dutch efforts to reveal real-time chats as a result of the

4   seizure of that server?

5   A.   I would ask you to define "benefit."

6           THE COURT:   I'm sorry?

7           THE WITNESS:   Your Honor, I'm asking him to define the

8   word "benefit."

9           THE COURT:   Okay.

10          MR. FINK:   I'll try to ask it more precisely, Judge.

11  BY MR. FINK:

12  Q.   Were investigations in the United States aided or furthered

13  in any way by the discovery of these real-time chats as a

14  result of the seizure of the server in France?

15  A.   I don't know that the real-time chats, because the U.S. did

16  not have access during the -- so there was a live phase where

17  messages were intercepted and decrypted real-time, but they

18  weren't read.   And then there was a phase during that period

19  where as the messages came in, they were read.   And we're

20  talking in the neighborhood of a million messages per day were

21  going across the network, and officers and agents across Europe

22  were reading those.   The U.S. was not a part of that wire room

23  or interception room.   We did not read any real-time messages.

24  Q.   Was there any information shared about any imminent dangers

25  or anything coming from those real-time chats that you know of?

1   A.   I do recall, we call it threat to life, TTL, that those

2   situations arose during the live phase in Europe and other

3   countries.

4   Q.   And that could be -- that information could be from United

5   States users, European users, it could be from anyone; right?

6   A.   It could.

7   Q.   Necessarily captured in this review of real-time messages

8   and historic messages, necessarily captured in that is a

9   tremendous amount of nonillegal activity; correct?

10          THE COURT:  Is a tremendous amount of what?

11  BY MR. FINK:

12  Q.   Nonillegal or otherwise legal activity; correct?

13  A.   I'm having trouble understanding that question, because

14  defining "nonillegal activity" is, I think, important.

15  Q.   You're going to capture conversations in a billion

16  messages?

17  A.   Right.

18  Q.   That say, hello, how are you, I'm good, how are you;

19  correct?

20  A.   But if I'm a criminal, if I'm engaging in criminal activity

21  and I'm talking to someone on the other end of that phone who's

22  also engaging in the same criminal activity, and I ask them how

23  are they doing and how is dinner, that's still a part of our

24  criminal relationship.

25  Q.   I don't disagree with that, but, Agent Willock, I don't

```
 1    think you're going to disagree with me that every single chat
 2    that was seized, monitored historically or a live was related
 3    to unlawful activity; correct?  You're not seriously going to
 4    say a billion messages were all unlawful activity, are you?
 5    A.   There's no way I would say "all," but when I use the term
 6    "vast majority, extremely high percentage," I'm comfortable
 7    saying that.
 8    Q.   How could you possibly know that when we agreed with each
 9    other that it would take 635 years and 400 agents to read those
10    messages?
11    A.   Because of how I clarified the fact that those messages of,
12    hello, how are you, how's dinner, are part of a criminal
13    activity, a criminal practice, and that the Europeans utilize
14    software to search the messages, artificial intelligence
15    programs.  And then additionally we send out -- you offered
16    that we seized the website?
17    Q.   Yes.
18    A.   Broadcast messages were relayed saying if you are the owner
19    of a Sky device, or have been on a Sky network and utilized it
20    for nonillegal purposes or are concerned about your data,
21    please call the U.S., FBI, DEA, IRS, and we did not receive any
22    phone calls.
23    Q.   That was after the fact; correct?
24    A.   That was after the fact, yes.
25    Q.   Are you aware that the Canadian police were using Sky ECC
```

1    for their own purposes?

2    A.   Define "for their own purposes."

3    Q.   Law enforcement -- furthering law enforcement

4    investigations.

5    A.   Yes.  We were using it as well as in the U.S.

6    Q.   Those weren't illegal chats; correct?

7    A.   I don't know what the Canadians used it for.  I know that

8    we used it in an undercover capacity.  And I would anticipate,

9    you know, testing and understanding how the devices work.  I

10   can't articulate or answer that question for the Canadians, but

11   based on my experience with them, they would have been using it

12   for the same purpose.

13   Q.   I appreciate the acknowledgment that you can't know what

14   you don't know about what the Canadians were using it for, and

15   that's what I'm asking you, Agent Willock.  I'm asking you that

16   necessarily involve decrypting a billion messages are going to

17   be messages of a nature that have nothing to do with a criminal

18   investigation.  That's what my original question was.  You

19   don't agree with that?

20   A.   I just -- I need -- I deal in percentages or numbers.  And

21   to make a statement that was contradictory to what I believe,

22   if you could offer a value of what percentage were noncriminal.

23   Q.   Well, I mean, I've told you that many judges have denied

24   process to law enforcement who have asked, one a Dutch judge

25   and one a Panamanian judge at least, who believe the nexus

1    between criminal activity and the use of these encryption

2    services were insufficient; right?  That's an example I gave

3    you; correct?

4    A.   So you did provide those examples, and again you used the

5    word "many."  I also am aware of, I guess, we could say many

6    judges that upheld the fact that those messages were criminal

7    and the network was run by criminals, used by criminals,

8    facilitated by criminals.

9    Q.   Was there any discussion amongst your team that dealt with

10   the Sky Global investigation and your interactions with the

11   Europeans?  I'm talking just over many years here.  Was there

12   any discussion at any point about the constitutionality of your

13   efforts to seize messages from the Sky Global servers?

14   A.   Absolutely.

15   Q.   Was the Fourth Amendment discussed?

16   A.   In general terms, the Fourth Amendment served as the

17   background for how we would author judicial requests.

18   Q.   Did anybody express concern about allowing foreign

19   countries to do things that we couldn't do and then reaping the

20   benefits of that without having to use our process in the

21   Fourth Amendment?  Was there any discussion about that?

22   A.   No, because the technology didn't reside in the U.S.  The

23   servers were on foreign soil.

24   Q.   I'm not asking necessarily whether it would have been right

25   or legal or not legal.  I'm not asking you to draw a

1   conclusion.  I'm asking if you, Agent Willock, and your team,

2   had any concern about the privacy risks of asking foreign

3   countries to do things the United States might not be able to

4   do?  Was there any concern about that?

5   A.   I think everything we do, all of the conversations, our

6   training, our understanding of the law, we use that as a

7   backdrop, right.  The concern is embedded.  And so we have

8   constant dialogue with our attorneys and the counsel in our

9   respective offices.

10  Q.   I ask that, because the United States made a conscious

11  choice to forego prosecution against two individuals in the

12  United States so that the Europeans could seize and otherwise

13  investigate Sky Global without any hindrance or notification;

14  right?  That statement is correct so far; right?

15  A.   We for -- whatever the past tense of "forego" is, we were

16  able to delay prosecution of identified individuals, but we

17  also pursued prosecution of other associates of Sky during that

18  time.

19  Q.   The reason you forewent, the reason that we -- I don't know

20  if that's right either.  The reason we agreed to do that was to

21  not hinder or otherwise jeopardize the investigation the

22  Europeans were doing; right?

23  A.   That's a common practice amongst --

24  Q.   I'm not saying it's wrong.  I'm just saying is that what we

25  were doing?  They made a request of us and we said, okay, we'll

1    honor that; right?

2    A.   Yes.  I can say that's fair to say, yes.

3    Q.   And my concern is that the United States then benefited

4    from the Europeans doing things under their more maybe, maybe

5    not, generous constitutions, and then we reap the benefits of

6    that investigation.  That's why I'm asking you was there a

7    conversation about these topics?

8            THE COURT:  And now is that a question, was there a

9    conversation --

10           MR. FINK:  Yes.

11           THE COURT:  Because you asked him that before, so ...

12           MR. FINK:  I'm trying to contextualize what I'm asking

13    they had a conversation on, Judge.

14           THE COURT:  Okay.  You may answer.

15    BY MR. FINK:

16    Q.   Did you have those concerns?

17    A.   I think -- I'll answer the question with a little

18    background.

19    Q.   Sure.

20    A.   You talked about the meeting that we had in The Hague in

21    the winter of 2019, in February 2019, and then there were many

22    other meetings.  The U.S. was committed to prosecuting,

23    obtaining an indictment on the principal figures at Sky, no

24    matter what happened in Europe.

25           At that meeting, one of my colleagues from the

```
 1    Netherlands said that he believed we could reach our ultimate
 2    goal, and multiple others said it would be impossible for us to
 3    accomplish what we did.  It was somewhat unprecedented to
 4    intercept encrypted traffic in the manner that the
 5    investigative team did.
 6    Q.   Completely agree with that.
 7    A.   Right.  And so when I say -- I give you that background to
 8    say we benefited, we, the U.S., the American people, drug
 9    shipments were interdicted, lives potentially saved, in this
10    investigation.  But in a prior investigation that pretty much
11    mirrored the Phantom Secure investigation, we did not intercept
12    any messages.
13         So to say there was a benefit, I agree, but regardless
14    we were going to benefit.  So I don't think there was
15    necessarily an added benefit, an increased benefit, other than
16    investigations were furthered and a light was shined on
17    criminal activity.
18    Q.   Are you aware that the United States gave Belgium $800,000
19    to assist in its Sky Global investigation around the time of
20    that meeting?
21    A.   I am not aware of any funds being transferred.
22    Q.   I have a note here from your direct examination about the
23    United States.  I wrote "hooks into server in 2019, 2020."
24    What did you mean by that?
25    A.   So -- yeah.  I use a, you know, colloquial or
```

1    conversational term "hooked."  I'm not a telecommunications

2    specialist.  I'm not a computer scientist.  I never visited the

3    site where the servers are in France.  I only know what they

4    looked like and what type of system they were based off of what

5    I was told.

6              So those investigators needed to find a way to connect

7    in or to facilitate getting the data off of those servers.  So,

8    you know, as you might back up an iPhone on a computer or

9    transfer data from one computer to another onto a hard drive,

10   how you hook that appliance or facility into that computer

11   that's what I'm trying to reference by using that.

12   Q.  So the United States did have some hook or technological

13   connection to the servers that were seized in 2019 and '20;

14   correct?

15   A.  We did not -- when you say we had a hook --

16   Q.  Yeah.

17   A.  We had no connection, no -- we just had verbal or written

18   awareness.  We did not have any technical participation or

19   physical participation.

20             MR. FINK:  One moment, your Honor.

21             (Briefly off the record.)

22   BY MR. FINK:

23   Q.  Do you know Special Agent Bill Bogner?

24             THE COURT:  How do you spell it?

25             MR. FINK:  B-O-G-N-E-R, your Honor.

```
 1              THE COURT:  Okay.
 2              THE WITNESS:  Yes, sir.  He's a retired special agent
 3   in charge of the office I work in.
 4              THE COURT:  In Los Angeles?
 5              THE WITNESS:  Los Angeles, yes.
 6   BY MR. FINK:
 7   Q.  We have a quote upon the arrest in March of 2021, in a
 8   press release from the Department of Justice, "The DEA
 9   maintains an evolving global reach, and combined with strong
10   law enforcement, foreign law enforcement partnerships, is
11   committed to searching out the most significant organized
12   criminal groups facilitating sophisticated narcotics
13   trafficking networks.  The joint effort to pursue these
14   individuals who hide behind encrypted communication platforms
15   shows that even the use of advanced technology will not enable
16   suspects to conceal their criminal activities from law
17   enforcement."
18              Do you agree with that statement?
19   A.  I do.
20   Q.  You started to discuss with Mr. McDonald some of the
21   information that is often received -- well, I guess using your
22   case as the example, information that you'll receive by MLAT of
23   the historical chats from Sky ECC and the format you receive
24   it.  Do you remember talking about that?
25   A.  Yes.
```

1    Q.   Okay.  And, generally speaking, in order to read these

2    chats, they come on an Excel spreadsheet; right?

3    A.   Typically.

4    Q.   Okay.  And basically you're looking at PIN number, content

5    of message, date, whatever other categories are in the Excel

6    spreadsheet; correct?

7    A.   Yes, sir.

8    Q.   The case that you're involved with, has that been

9    prosecuted yet?

10   A.   Both individuals that we indicted at the principal level of

11   Sky ECC are still out of the U.S. and awaiting extradition.

12   Q.   All right.  So you haven't in your case had to -- or maybe

13   you have.  Have you disclosed this information to defense

14   counsel yet, the Sky ECC data, do you know?

15   A.   So I --

16   Q.   If you know.

17   A.   Yeah.  I think I just need to organize my thoughts around

18   this.  I personally interviewed Mr. Thomas Herdman, one of the

19   people we indicted who is a principal figure, a distributor, a

20   lieutenant of Mr. Eap, the CEO.  He sought to cooperate with us

21   with his counsel.  I conducted those interviews with him after

22   the indictment.  Unfortunately, the French have taken him into

23   custody and charged him with crimes that he committed in their

24   country.  So he is currently in jail in France.

25            Our U.S. Attorneys, our Assistant U.S. Attorneys, met

1    with Mr. Eap, the CEO of Sky Global, with his attorneys in the

2    U.S.  I believe they turned over some information, some

3    discoverable material.

4    Q.  So you -- I could ask this question better.  Have you taken

5    part in packaging for discovery, packaging for an attorney, Sky

6    ECC chats?

7    A.  No.

8    Q.  Do you know the format?  Are you aware of what it looks

9    like when it's given to counsel or the court or shown in front

10   of a jury?  Do you know the format it would be shown in?

11   A.  I believe I've seen it, yes.

12   Q.  From my end, correct me if I'm wrong, as you understand it,

13   what I'm getting is Excel spreadsheets of these chats; right?

14   A.  Yes, sir.

15   Q.  Is there any metadata associated with what I'm receiving

16   from Sky ECC chats that come from overseas?

17   A.  It's my understanding that metadata would be in those

18   files.  It's included.  It should be.

19   Q.  The purported metadata of what it shows, the data itself;

20   right?

21   A.  Right.

22   Q.  Not the actual metadata as a thing.  I don't have the

23   actual code of the metadata?

24   A.  Right.  The actual encrypted messages, my understanding, my

25   experience, right, is when you obtain those messages from the

1    French, because they are the custodians of those messages, they
2    don't provide the raw information.
3    Q.   That's precisely what I'm driving at.  We receive, we being
4    the United States, you, law enforcement?
5    A.   Yes.
6    Q.   When you make a request by MLAT or otherwise to get these
7    chats, how it comes to you is in a summary format in an Excel
8    spreadsheet; right?
9    A.   That's correct.
10   Q.   So we are wholly reliant that we are being told the truth
11   and the whole truth from the party requested from; right?
12           How about -- let me strike that and ask it a different
13   way.  Agent Willock, would you have any idea, but for trust of
14   another law enforcement officer, that someone in France did not
15   manipulate or edit the Excel spreadsheets?
16   A.   I have additional trust in that --
17   Q.   I'm saying besides your trust.  Is there any way you would
18   know it just from looking at the spreadsheet?
19   A.   Well, I would know that the Netherlands Forensic Institute,
20   in June of 2022, did a comprehensive study of the data and the
21   messaging and issued a report that has been utilized in
22   European courts outside of the Netherlands.  So I know by
23   review of that report and talking to colleagues that were
24   involved, not necessarily with its production, but in a peer
25   review-type environment, that a study has been done by people

1   outside of France on the data and the integrity of it.

2        I'm also aware that the highest court in Belgium has

3   upheld convictions of subjects where Sky ECC data was utilized.

4   I know the Netherlands has other investigations.  I also am

5   understanding that in the country of Bosnia that data has been

6   upheld.

7   Q.   I'm hearing you loud and clear, and I'm hearing that I have

8   a lot of faith in the courts of other countries and other

9   agents.  I'm asking a very specific question.  When you receive

10  those chats from your European contemporaries --

11  A.   Yes.

12  Q.   Okay.  And they come to you on a disk and you click on the

13  Excel spreadsheet and it populates with the PIN number and

14  messaging and everything it populates.

15  A.   Yes.

16  Q.   Looking at that document, you cannot say one way or another

17  whether this has been manipulated or otherwise edited from its

18  original native format; correct?

19  A.   I'm not able to say that about any document I receive.

20  Q.   That's fair.

21  A.   Yeah.  Whether it's from France, another country, another

22  agency.

23  Q.   Whereas if you yourself --

24  A.   Right.

25  Q.   -- take a cell phone, plug it into your computer, upload it

```
 1   onto Cellebrite, you can be far more confident that nothing was
 2   manipulated because you did it; right?
 3   A.   I can be confident that the process worked as I expected.
 4   Q.   You personally can say I did not manipulate anything?
 5   A.   That's correct.
 6   Q.   I plugged this iPhone in and I loaded it up; right?
 7   A.   Right.
 8   Q.   And I'm not saying that that's what's happening, Agent
 9   Willock.  I'm not accusing law enforcement of doing anything
10   untoward and I'm not accusing these prosecutors.  I'm not
11   making those allegations.  I'm asking you that you just can't
12   say you are dependent on what is sent to you; correct?
13   A.   Absolutely.
14   Q.   Okay.  And you look at it and you take it at face value,
15   this is what was said by these PIN numbers on this date,
16   because that's what it says on the spreadsheet; right?
17   A.   That's correct.
18   Q.   That's all I'm asking.  I appreciate that, and I wanted to
19   make that clear that I'm not accusing you or anyone of
20   anything.
21   A.   Thank you.
22   Q.   You gave me some examples of the veracity being tested in
23   other courts and other countries; right?
24   A.   Yes.
25   Q.   Okay.  Are you aware of the Milch report, M-I-L-C-H?
```

1    A.   I am not.

2    Q.   Are you aware of anything, in any other court, that courts

3    have found that there are nonvalidated tools that may not

4    contain -- that may contain errors that could lead to incorrect

5    results?  In other words, there's been findings of off-loading

6    these chats may be -- there may be unintended errors.  Are you

7    aware of that generally?

8    A.   I am aware that there can be errors, just not to the

9    severity of those errors.

10   Q.   And you mentioned, for example, on direct examination that

11   there -- one thing that you've noticed, at least in your cases

12   or in your experience, is sometimes we'll get one-sided chats;

13   right?

14   A.   That's correct.

15   Q.   And the one-sided chat meaning that we're getting one

16   person speaking, but we're not getting the responses or the

17   conversation; right?

18   A.   That's correct.

19   Q.   Now, sometimes we'll get both sides of the chat.  We'll

20   have an Excel spreadsheet that has -- I'm just going to use a

21   made up PIN.  PIN 1234.

22   A.   Right.

23   Q.   And it says all of these things.  And then you match it up

24   with PIN 678 --

25   A.   Right.

1    Q.   -- and their responses; right?

2    A.   Yes, sir.

3    Q.   Two separate files; right?

4    A.   Yes.

5    Q.   But what you're saying is sometimes we'll only end up with

6    PIN 1234 and not 678's responses; right?

7    A.   For a host of reasons.

8    Q.   Maybe in all legitimate and technological reasons, but that

9    does happen; right?

10   A.   Yes.

11   Q.   For the same reason that the technology may fail in giving

12   us one-sided chats, it may fail us in generating the actual

13   chats themselves; correct?

14   A.   I don't understand the word "generating."

15   Q.   I'll give you an example.  One of the reasons that you

16   gave, and my objection was overruled, one of the reasons you

17   gave in that whole discussion was maybe there's an outdated

18   version being used on one cell phone and, therefore, for some

19   reason when it gets uploaded onto whatever software to decrypt

20   it, it just doesn't spit everything out both sides of the chat.

21   That was one possibility you gave.  Do you remember that?

22   A.   Yeah.  So to explain that --

23   Q.   Sure.

24   A.   -- if -- you know, depending on what version you were on or

25   what actual private key you had, you know, the investigators

1    might not have had access to that key, or the tools that they

2    were employing weren't able to decrypt that message at that

3    time.  You know, I think everything is relative.  There's

4    certain messages that weren't decrypted two years ago that are

5    now decrypted.

6    Q.   There's just a lot of technological reasons that may

7    happen; right?

8    A.   That's correct.

9    Q.   And you're not in a position.  You're giving us

10   possibilities.  So for obvious reasons that doesn't necessarily

11   mean anything was manipulated; right?

12   A.   Right.

13   Q.   But that there's a lot of technological failings that maybe

14   we don't understand or appreciate that could have led to that;

15   right?

16   A.   That's fair to say, yes.

17   Q.   For that same reason, you can't say with certainty that we

18   have all messages, can you?

19   A.   Oh, we definitely do not have all messages.

20   Q.   Right.  So when we see a list of messages or we see

21   something, you know, in this trial of a Sky ECC message, it may

22   be missing the message before or after it, and we can't say for

23   certain.  All we can do is rely on what was sent to us; right?

24   A.   And focus on what we do have.

25   Q.   Of course.  But for the same reasons you spelled out that

1    one side of a chat might be missing, specific texts might be

2    missing; right?

3    A.   Yes.

4    Q.   In your cases that you've -- have you ever taken a case to

5    trial using Sky ECC messages?

6    A.   No, sir.

7    Q.   Are you preparing one?  Is one going to -- do you know of

8    going to trial?

9    A.   I know of at least two cases that could go to trial where

10   they would utilize Sky messages.

11   Q.   In those cases --

12   A.   Yes.

13   Q.   -- would you have the ability as a special agent to get on

14   the phone and call the person that prepared the data for you

15   and say, hey, we're going to need you in trial on March 31st,

16   I'll give you your reservation details?  Could you do that?

17   A.   The person that would be preparing that data --

18   Q.   They're contemporary in Europe.  So I don't know what

19   country it was.  Let's say the French you did an MLAT and

20   France, from France, says, hi, Agent Willock, I'm going to

21   prepare the stuff for you and send it by disk to you.  That

22   person, could you get that person to come to trial if you

23   wanted to?

24   A.   From my experience, it's difficult to get a foreign law

25   enforcement officer to appear in court here in the U.S.

1  Q.   Because France, as my made-up person, could be the person

2  that testified that, yes, this is the data that I took off the

3  server myself, loaded on and sent to Agent Willock, couldn't

4  he?

5  A.   If that person was able to be in a U.S. court, they could

6  speak to their methods and how they did what they accomplished.

7            MR. FINK:  One moment, your Honor.

8            (Briefly off the record.)

9  BY MR. FINK:

10 Q.   Agent Willock, are you aware of the processes by which

11 these messages were decrypted, what technology was used, how it

12 was done?

13 A.   I'm -- in general terms, yes.  Not in the specific

14 scientific details.

15 Q.   Are you aware that in certain instances that artificial

16 intelligence was used to generate some of these messages?

17 A.   I understand how artificial intelligence was used to search

18 the data, not create messages.

19 Q.   In other words, given the volume of information, AI was

20 used for certain portions of this to sort through the data; is

21 that accurate?

22 A.   That's my understanding, yes.

23 Q.   And this goes hand in hand with the idea of the human hours

24 to sort through this are just too great; right?

25 A.   As with a number of things, yes.

```
 1   Q.   Of course.  Does the production of these messages and any
 2   of the documents that are presented, at least in your case, I
 3   know that you didn't receive the ones in this case, dependent
 4   in any way, the content of them, on artificial intelligence?
 5             THE COURT:  Say that question again.
 6   BY MR. FINK:
 7   Q.   The content of the messages you received in the Excel
 8   spreadsheet format, in your experience, in your cases, I know
 9   you can't speak to this one --
10   A.   Right.
11   Q.   -- are do you know -- and your answer might be I don't
12   know, but do you know if the content of those messages, what is
13   written, is in any way produced or relied upon artificial
14   intelligence to put them on that spreadsheet?
15   A.   I'll answer it with I have not heard of artificial
16   intelligence being used.  So I don't know, but I have also not
17   heard.
18   Q.   You know of it being used in some capacity with data
19   sorting, but you haven't heard of it in the context of -- the
20   actual content of the messages; is that a fair
21   characterization?
22   A.   Yeah.  The way I heard artificial intelligence was used
23   from my colleagues involved in organizing the data was during
24   the live phase of the actual reading of the messages real-time
25   to search for certain terms and --
```

1    Q.   Because of the quantity?

2    A.   Yes.

3    Q.   This circumstance that you're describing, the reason that

4    you're here to testify in this case, in your world, in the law

5    enforcement world, has major implications; correct?  The

6    ability to specifically decrypt end-to-end encrypted messages;

7    right?

8    A.   Those implications are significant, or major, as you

9    categorize them, because typically we would want to work with a

10   company like Sky Global and issue them proper legal process.

11   Q.   Approximately 170,000 users are involved in Sky Global;

12   correct?

13   A.   That was the number that we believed to have been over the

14   history of the company.

15              THE COURT:  A hundred and how many?

16              MR. FINK:  Seventy thousand users.

17   BY MR. FINK:

18   Q.   Certainly there is not a United States search warrant for

19   all 170,000 users?  Whether it's required or not I'm not

20   saying, but certainly there is not one for 170,000 people;

21   correct?

22   A.   No.

23   Q.   And you're aware of the litigation not only in the

24   international courts, but here -- there's a particular one in

25   New York involving a defendant boxer making challenges to the

```
 1    privacy concerns of seizing the data of 170,000 people without
 2    a warrant; correct?
 3    A.   I'm aware a lot people have concerns, yes.
 4    Q.   Are you one of them?
 5    A.   No.
 6              MR. FINK:  Thank you.
 7              THE COURT:  How is my jury over there?  Are you okay?
 8     You need a break?  No?  You're all right?
 9              A JUROR:  Yes.
10              THE COURT:  Yes, you need a break, or no?
11              JURORS:  (Collectively) Yes.
12              THE COURT:  Let's take a break.  The jury may step
13     down.
14              Please rise for the jury.
15              (The jury left the courtroom at 10:58 a.m.)
16              THE COURT:  You may step down during the break, too.
17              THE WITNESS:  Thank you, your Honor.
18              THE COURT:  Ten minutes, gentlemen.
19              MR. FINK:  Yes, your Honor.
20              MR. McDONALD:  Thank you, your Honor.
21              THE COURT:  All right.  Let's break for ten minutes.
22              (At 10:58 a.m., a brief recess was taken.
23              Back on the record at 11:12 a.m.)
24              LAW CLERK:  All rise.  Court is back in session.
25              THE COURT:  Okay.  We can bring them out; right?
```

```
 1                    MR. FINK:  Yes, Judge.

 2                    MR. McDONALD:  Yes, your Honor.

 3                    THE COURT:  Okay.

 4                    MR. FINK:  Judge, can we stop them for one second?

 5       I'll make an objection about their next witness so we don't

 6       have to excuse them a second time, or I guess when we see the

 7       door open we can say --

 8                    THE COURT:  All right.  Go ahead and be seated then.

 9                    Your objection about their witness, Philip Daskal?

10                    MR. FINK:  Yeah, the next witness, your Honor.  Do you

11       want me to --

12                    THE COURT:  Are you making an objection to the person

13       appearing in court?

14                    MR. FINK:  I'm objecting to his testimony, yes.

15                    THE COURT:  No.  Let's bring them out.  I'll give them

16       another break.

17                    MR. FINK:  That's fine.

18                    LAW CLERK:  All rise.

19                    (The jury entered the courtroom at 11:14 a.m.)

20                    THE COURT:  Okay.  You may all be seated.  I'm

21       satisfied the jurors are present.  What about the Government?

22                    MR. McDONALD:  Yes, your Honor.

23                    THE COURT:  And defense?

24                    MR. FINK:  Yes, your Honor.

25                    THE COURT:  Okay.  Very good.
```

```
1                    You're still under oath, sir.
2                    THE WITNESS:  Yes, your Honor.
3                    THE COURT:  Okay.
4                    MR. McDONALD:  May I proceed with redirect?
5                    THE COURT:  Redirect.
6                    MR. McDONALD:  Thank you, your Honor.
7                          REDIRECT EXAMINATION
8     BY MR. McDONALD:
9     Q.   Agent Willock, Mr. Fink asked you about the timing of the
10    French investigation and your investigation in the Southern
11    District of California.  Do you remember that?
12    A.   Yes, sir.
13    Q.   Did the European investigation start on the basis of your
14    investigation alone?
15    A.   No, sir.  It's my understanding they were already
16    investigating Sky Global prior to 2018.
17    Q.   All right.  Two separate investigations?
18    A.   Yes, sir.
19    Q.   Okay.  Now, in your investigation, did you review the data
20    that was received from the French in your case?
21    A.   Yes, sir.
22    Q.   All right.  And --
23                   THE COURT:  In his case in Los Angeles?
24                   MR. McDONALD:  In Los Angeles, yes.
25
```

1    BY MR. McDONALD:

2    Q.   And from the content itself, did you observe any evidence

3    that attributed -- that showed user attribution?  Do you know

4    what I mean when I say that?

5    A.   User attribution whereas you could tell who the user was

6    based on --

7    Q.   On the content of the messages.

8    A.   That's correct.  Yes, I could.

9    Q.   All right.  And what kind of evidence gave you that user

10   attribution in your case in LA?

11        THE COURT:  Say that again.

12   BY MR. McDONALD:

13   Q.   What kind of evidence provided the user attribution in the

14   Sky messages in your case in LA?

15   A.   The individual would say their proper name, their nickname

16   or full name, in a message.  They would send a photograph of

17   themselves.  They would use other what we call personally

18   identifiable information.

19   Q.   All right.  Now, in terms of this -- well, let me back up

20   here.  Mr. Fink asked you a long list of things that encrypted

21   data could be used for like businesses or pharmaceutical

22   companies or military.  Do you remember him asking you that?

23   A.   Yes, sir.

24   Q.   In your experience, is that what Sky was used for?

25   A.   I did not observe Sky to be used in that manner.

1  Q.   What did you observe Sky to be used for?

2  A.   Well, at the beginning I saw it used to facilitate the

3  distribution of devices by employees of the company.

4        THE COURT:  Distribution of devices, like what?

5        THE WITNESS:  Like the actual phones containing the

6  encrypted application, Sky ECC, to interact with their clients

7  and to increase sales of those devices in the subscription

8  service.  I saw it used by members of transnational organized

9  criminal groups to facilitate money laundering and narcotics

10  trafficking.  And I also saw it used by other organized crime

11  figures engaged in other criminal activities in the U.S. and

12  abroad.

13  BY MR. McDONALD:

14  Q.   I want to talk specifically about the United States'

15  involvement and the searches conducted in France; okay?

16  A.   Yes, sir.

17  Q.   Did the U.S. author any affidavit to search OVH, the French

18  cloud server facility?

19  A.   No, sir.

20  Q.   Did the U.S. attend the search of OVH?

21  A.   No, sir.

22  Q.   Would you describe the searches in France as a foreign

23  operation conducted on foreign soil?

24  A.   Yes, I would.

25  Q.   Finally, the messages that you do have in your case in LA

1   and any messages that you have reviewed that have been

2   decrypted, did you find any evidence that those messages were

3   manipulated?

4   A.   I did not.

5   Q.   Did you find any evidence that those messages were

6   inaccurate?

7   A.   No, sir.

8           MR. McDONALD:  No other questions.  Thank you.

9           THE COURT:  Do you have other questions?

10          MR. FINK:  I do not, your Honor.

11          THE COURT:  Okay.  I have a couple.  And, you know, I

12  think I told you all that when Mr. Didani was representing

13  himself that if I ask a question and you had an objection to it

14  you should raise it, because if you don't it's waived to the

15  Court of Appeals.

16          You all understand that?  Mr. Fink, you understand

17  that?  I think the Government knows it.

18          MR. FINK:  I have great faith in your questions,

19  Judge.

20          THE COURT:  I'm happy for your faith, but I just want

21  you to know that if you don't object your objection is waived.

22          MR. FINK:  I understand it, Judge.

23          THE COURT:  And the Government understands that;

24  right?

25          MR. McDONALD:  I also understand that, Judge.

```
 1              THE COURT:  My questions are not as high tech as the

 2    questions that have been raised by these attorneys.

 3                             EXAMINATION

 4    BY THE COURT:

 5    Q.   I want -- you testified that the U.S. government took down

 6    the Sky website.  What did that mean for users?

 7    A.   So, your Honor, the Sky Global, Sky ECC website was hosted

 8    by the web hosting company, GoDaddy.

 9    Q.   Okay.

10    A.   And we issued a warrant to take ownership of that website

11    from GoDaddy, we being the investigative team in the U.S., DEA,

12    FBI, IRS.  And then we changed the web page to reflect that we

13    now owned that website.

14    Q.   To reflect that those government agencies now controlled

15    that website?

16    A.   That's correct.

17    Q.   Okay.  And so does that mean that people who were users

18    could no longer use the Sky application?  I'm not sure if

19    that's the right word, but --

20    A.   Yeah.  So it was twofold; one to notify why their service

21    wasn't working.  The website did not interact with the

22    communication servers.

23    Q.   Okay.

24    A.   So on the particular day that, you know, to use a very

25    conversational term that the servers were unplugged, the
```

1  service ceased to work.

2  Q.   So if I had a phone with that application on it -- is that

3  the right word?

4  A.   Yes.

5  Q.   And the day that the servers went down, if I tried to use

6  that application, it just didn't work?

7  A.   It did not work.

8  Q.   And then you said that I think you notified people that

9  they could call in and say I have a problem?

10  A.   Your Honor, can I clarify one thing?

11  Q.   I think you were talking about that there was a notice to

12  users about Sky ECC.

13  A.   Yes.  Can I go back and clarify one thing about the

14  application not working anymore?

15  Q.   Okay.

16  A.   We learned or observed that some devices, some users, I

17  think we shut -- I think the operation happened on March 7th,

18  March 8th, because of the time difference with Europe when the

19  activities happened, that the company in Vancouver still had

20  some backup type server.

21  Q.   The company in Vancouver?

22  A.   Sky Global, yes.

23  Q.   Okay.

24  A.   And some devices did function for a day or so after.  They

25  kind of went into an emergency management to try to keep their

1    network going.  So there was some user activity for a day or so

2    following our day of action, or the Europeans' day of action

3    against the servers.  But then once we made this announcement

4    and took control of the website, obviously most users didn't

5    want to use their phone anymore.  So I just wanted to clarify

6    that.  Yeah.

7    Q.   Do they have things on their phone that weren't destroyed?

8    A.   Yes.

9    Q.   Would they download them?  If I had something on my phone

10   that was encrypted, could I send it to another phone or to my

11   you know iPad or computer?

12   A.    No, because the data on that device is all held within the

13   app, right, the Sky ECC app, the Sky phone that has that app.

14   And the only way to extract that data, right, would be through,

15   you know, some, you know, high-level system, which a user could

16   have --

17   Q.   Whichever data I had on there was lost to me, the user?

18   A.   For all intents and purposes, it was.  But, you know, there

19   could be an instance where you would be able to pull that data,

20   just how law enforcement has certain tools.  A very

21   sophisticated user could try to pull data off of their phone.

22   Q.   All right.  You can see that I'm not a very sophisticated

23   user, so ...

24         Okay.  And I -- oh.  And then you said you had a

25   notice that you put up to users and no one responded?

1    A.   That's correct.

2    Q.   And does it mean -- does no one mean nobody responded at

3    all of the -- what were there, 170,000 users?

4    A.   That was during the lifespan of the network was that many

5    accounts that we observed, but at the time there were over

6    20,000, probably even closer to 30,000 users on the network.

7    Q.   Okay.  And among those nobody responded?

8    A.   That is correct.

9           THE COURT:  All right.  I think that's all I have.

10          Anything else based on me asking those very simple

11   questions?  And now everyone knows how low tech I am.

12          MR. McDONALD:  Nothing from the Government.  Thank

13   you.

14          THE COURT:  Okay.

15          MR. FINK:  No, your Honor.

16          THE COURT:  All right.  Thank you for coming.  We

17   appreciate it.  You may step down, and you're excused, I think.

18          THE WITNESS:  Thank you, your Honor.

19          THE COURT:  All right.  Right, he's excused?

20          MR. McDONALD:  I have no objection.

21          THE COURT:  Okay.

22          MR. FINK:  Yes, he's excused.  Thank you.

23          (End of excerpt at 11:25 a.m.)

24                          —   —   —

25

```
1
2
3                       CERTIFICATE OF COURT REPORTER
4
5          I, Sheila D. Rice, Official Court Reporter of the
6    United States District Court, Eastern District of Michigan,
7    appointed pursuant to the provisions of Title 28, United States
8    Code, Section 753, do hereby certify that the foregoing pages
9    is a correct transcript from the record of proceedings in the
10   above-entitled matter.
11
12
13                          s/Sheila D. Rice
                            Sheila D. Rice, CSR-4163, RPR, RMR, FCRR
14                          Federal Official Court Reporter
                            United States District Court
15                          Eastern District of Michigan
16
     Date:  04/11/2025
17   Detroit, Michigan.
18
19
20
21
22
23
24
25
```