```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF MICHIGAN
 2                         SOUTHERN DIVISION

 3    UNITED STATES OF AMERICA,

 4                  Plaintiff,

 5    -v-                                 Case No. 21-20264

 6    YLLI DIDANI,

 7                  Defendant.
      _____/
 8
                      JURY TRIAL - (VOLUME 13 EXCERPT)
 9
                    BEFORE THE HONORABLE DENISE PAGE HOOD
10                      United States District Judge
                    Theodore Levin United States Courthouse
11                      231 West Lafayette Boulevard
                             Detroit, Michigan
12                           March 10, 2025

13    APPEARANCES:

14    FOR THE PLAINTIFF:     Mark Bilkovic
                             Timothy P. McDonald
15                           Assistant United States Attorney
                             211 W. Fort Street, Suite 2001
16                           Detroit, MI 48226

17    FOR THE DEFENDANT:     Ylli Didani, Appearing Pro Se

18                           Wade Fink (Standby Counsel)
                             Wade Fink Law, P.C.
19                           550 W. Merrill Street, Suite 100
                             Birmingham, MI 48009
20
                             Samuel Churikian, on behalf of R. Larson
21                           43550 Elizabeth Road
                             Clinton Township, MI 48036
22
      ALSO PRESENT:          Chad Hermans, Special Agent
23                           Maria DiCarlo, Paralegal

24
                     To Obtain a Certified Transcript Contact:
25                   Shacara V. Mapp, CSR-9305, RMR, FCRR, CRR
                             www.transcriptorders.com
```

1                          TABLE OF CONTENTS

2     MATTER                                                     PAGE

3     **JURY TRIAL** - Volume 13
         (Excerpt of Ronald Larson)............................

4     WITNESSES:

5
      DONALD LARSON
6     **Direct Examination** By Mr. McDonald:......................   14

7

      EXHIBITS IDENTIFIED/RECEIVED:
8
      Exhibit 1.0(Photo)......................................    20
9     Exhibit 1.2(Photo)......................................    21
      Exhibit 1.3(Photo)......................................    23
10    Exhibit 5.4(Photo of $200,000)..........................    41
      Exhibit 5.5(Photo)......................................    42
11    Exhibit 5.6(Photo)......................................    42
      Exhibit 9.0($50,000 checks).............................    38
12    Exhibit 10(Photo of Checks).............................    43
      Exhibit 11(Personal Check)..............................    46
13    Exhibit 36(Text Thread Between Didani and Larson)........    54
      Exhibit 36-10(Text Message Thread)......................    58
14    Exhibit 36-20(Text Message Thread)......................    59
      Exhibit 36-21(Text Thread)..............................    60
15    Exhibit 36-22(Text Thread)..............................    61
      Exhibit 36-32(Text Thread)..............................    63
16    Exhibit 36-33(Text Thread)..............................    64
      Exhibit 36-35(Text Thread)..............................    65
17    Exhibit 36-5(Text Thread)...............................    55
      Exhibit 36-6(Text Thread)...............................    57
18    Exhibit 36-9(Text Message Thread).......................    57
      Exhibit 61(Communications between Didani and Larson)......    67
19    Exhibit 61-10(Text Thread)..............................    82
      Exhibit 61-11(Text Thread)..............................    83
20    Exhibit 61-12(Text Thread)..............................    83
      Exhibit 61-13(Text Thread)..............................    84
21    Exhibit 61-14(Article)..................................    86
      Exhibit 61-15(Photo)....................................    87
22    Exhibit 61-2(Text Thread)...............................    69
      Exhibit 61-3(Text Thread)...............................    69
23    Exhibit 61-4(Text Thread)...............................    71
      Exhibit 61-5(4 Photos)..................................    76
24    Exhibit 61-5(Text Thread)...............................    72
      Exhibit 61-6(Text Thread)...............................    80
25    Exhibit 61-9(Text Thread)...............................    81
      Exhibit 61.1(Screenshot)................................    73

Exhibit 61.2(Screenshot)................................... 75
Exhibit 61.3(Screenshot)................................... 76
Exhibit 61.4(Screenshot)................................... 76
Exhibit 61.9(Photo of Deposits)........................... 89
Exhibit 62-1(Photo)........................................ 93
Exhibit 62-2(Text Thread)................................. 90
Exhibit 62-6(Photo)........................................ 91
Exhibit 62.0(Text Thread)................................. 89
Exhibit 63-2(Text Thread)................................. 94
Exhibit 63-4(Text Thread)................................. 95
Exhibit 63.0(Text Message)................................ 94

Certificate of Reporter................................. 109

```
 1  Detroit, Michigan
 2  March 10, 2025
 3  9:42 a.m.
 4                          *       *       *
 5      THE COURT:  Stand and raise your right hand, please.
 6                          *       *       *
 7                       DONALD LARSON
 8          at 11:32 a.m., having first been duly sworn,
 9          was examined and testified on his oath as follows:
10                          *       *       *
11      THE COURT:  All right.  You may be seated.
12          And for the purpose of this particular instance, do
13  you all have any objection to me reading the order to him?
14      MR. MCDONALD:  I don't.
15      MR. CHURIKIAN:  No objection, Judge.
16      THE COURT:  And what about you, Mr. Didani?
17      DEFENDANT DIDANI:  No, Your Honor, I have no
18  objection, but I wanted to please, if the same -- if this
19  Court would read that to the jury, Your Honor, the compelling
20  testimony.
21      THE COURT:  I'm going to give them a jury instruction
22  about it.
23          Do I need to do that now?
24      MR. MCDONALD:  It's up to the Court whether you give
25  that instruction now, or after the end of his testimony, or
```

1      when the Court is instructing the jury at the end of the

2      trial.

3                 THE COURT:  Mr. Didani, I usually do that at the end,

4      during the jury instructions.  But I'll be happy to say he's

5      testifying under an order of immunity, and then I'll explain

6      that to them later because I have some other things I will

7      tell them about how they should treat his testimony.

8                 DEFENDANT DIDANI:  Yes, Your Honor.

9                 THE COURT:  Is it okay to do it during the jury

10     instructions?

11                DEFENDANT DIDANI:  That's all -- that's okay, Your

12     Honor.

13                THE COURT:  Okay.  And Mr. McDonald, you're examining

14     him?

15                MR. MCDONALD:  I am, Your Honor.

16                THE COURT:  Will it be sufficient for me to just

17     indicate that he's testifying under an order of immunity?

18                MR. MCDONALD:  I have no objection to that.

19                THE COURT:  Have you ever done this, Mr. Churikian?

20                MR. CHURIKIAN:  The only thing I would suggest is if

21     you're going to read it to him now, may I stand next to him in

22     case he has any questions?

23                THE COURT:  Absolutely.

24                Okay.  For this record, which is to advise you of

25     this order, I'm going to ask that you state your name for the

1    record.

2              THE WITNESS:  Donald Larson.

3              THE COURT:  And how do you spell your last name?

4              THE WITNESS:  L-a-r-s-o-n.

5              THE COURT:  S-o-n?

6              THE WITNESS:  Yes.

7              THE COURT:  Okay.  And the Government has indicated

8    that you were going to exercise your Fifth Amendment right not

9    to incriminate yourself by not testifying at this trial.

10              THE WITNESS:  Correct.

11              THE COURT:  And, therefore, the Government asked that

12    I enter an order compelling you to testify under a grant of

13    immunity.

14              Are you aware of that?

15              THE WITNESS:  I am now, yes.

16              THE COURT:  And did you exercise -- indicate that you

17    were going to refuse to testify?

18              THE WITNESS:  I did.

19              THE COURT:  Okay.  And --

20              THE WITNESS:  And I told the DA about it.

21              THE COURT:  Okay.  And by the DA, you mean the

22    Government's attorneys?

23              THE WITNESS: Yes.  Yes.

24              THE COURT:  Okay.  And you told them you were going

25    to do that because you were exercising your Fifth Amendment

1    rights?

2              THE WITNESS:  Yes.

3              THE COURT:  And your attorney advised you about that?

4    Don't tell me what he said, just that he advised you about

5    that.

6              THE WITNESS:  Yes.

7              THE COURT:  And do you continue to, if you aren't

8    granted immunity, wish to exercise your Fifth Amendment right

9    to --

10             THE WITNESS:  I do.

11             THE COURT:  -- not to incriminate yourself?

12             THE WITNESS:  Yes.

13             THE COURT:  Okay.

14             Is that satisfactory, Mr. McDonald?

15             MR. MCDONALD:  It is.

16             I just want to make sure the Court addresses the fact

17   that it's not a general immunity order.  It immunizes --

18             THE COURT:  I'm going to read it.

19             MR. MCDONALD:  Thank you.

20             THE COURT:  But I just want to know -- preliminarily,

21   I think I'd have to establish that he was going to exercise

22   his Fifth Amendment right not to testify.

23             MR. MCDONALD:  I agree.  Thank you.

24             THE COURT:  Is that satisfactory to you, Mr. Didani?

25             DEFENDANT DIDANI:  Yes, Your Honor.

```
 1              THE COURT:  Okay.

 2          And so, the Government requested a compulsion order,

 3   and I have signed such an order made by their application.

 4   And it indicates in paragraph one, that Donald Larson -- it

 5   appearing to my satisfaction, that you will be called to

 6   testify and provide other information on a trial in the above

 7   captioned case which is United States versus Ylli Didani.

 8          And two, in the judgment of the United States

 9   Attorney, Donald Larson has refused or is likely to refuse to

10   give testimony or provide other information on the basis of

11   this privilege against self-incriminate.

12          And three, in the judgment of the United States

13   Attorney, the testimony or other information in which Donald

14   Larson could give or provide is or may be necessary to the

15   public interest, and for the Government's application that has

16   been made with the approval Jennifer A. H. Hodge, Deputy

17   Assistant Attorney General Criminal Division United States

18   Department of Justice, pursuant to the authority vested in her

19   by 18, United States Code, Section 6003(b) and 28 C.F.R.,

20   Section 0.175.  It is hereby ordered pursuant to 18 U.S.C.,

21   Section 6002, that Donald Larson give testimony and provide

22   other information which he refuses to give or provide on the

23   basis of his privilege against self-incrimination at trial in

24   the above captioned case, and in any proceeding ancillary

25   thereto.
```

```
 1              And it is ordered further, pursuant to 18, United

 2    States Code, Section 6002, that no testimony or other

 3    information compelled under this order, or any information

 4    directly or indirectly derived from such testimony or other

 5    information may be used against Donald Larson in any criminal

 6    case except at prosecution for perjury, giving a false

 7    statement, or otherwise failing to comply with this order.

 8    And the order is signed by me and entered on February 19,

 9    2025.

10              Do you understand that?

11              THE WITNESS:  I do.

12              THE COURT:  Okay.  Now it has arisen that there may

13    have been that -- that there may be a question about whether

14    the statute of limitations relative to anything that's

15    occurring as part of this alleged criminal enterprise might

16    have been exhausted.  And I don't think the Government's

17    completely satisfied that that is necessarily true.

18              Is that accurate?

19              MR. MCDONALD:  That is accurate.

20              THE COURT:  And on the other hand, Mr. Didani think

21    that -- thinks that's absolutely true.

22              Do you understand what I mean by that?

23              THE WITNESS:  It's confusing by -- because the two

24    are --

25              THE COURT:  Okay.  Let me just -- maybe I should --
```

1           THE WITNESS:  I mean, is it or not?

2           THE COURT:  Well, that's the part that Mr. Didani

3   thinks, that the statute has completely run.  And the

4   Government is not willing to say that the statute, which is

5   five years in Federal Court, has completely run because they

6   don't know if there's any activity subsequent to the time

7   period in the indictment.

8           Do you understand that?

9           THE WITNESS:  Yes.

10          THE COURT:  Okay.  And on the state side, for which

11  I'm frankly not responsible, but the state statute of

12  limitations on the drug cases is six years, which is obviously

13  beyond today's date.  But the Government's position, and my

14  position would be that the language saying that your testimony

15  or other information compelled under this order or directly or

16  indirectly derived from such testimony cannot be used against

17  you in any criminal case and prosecution, in any criminal

18  case, including any -- meaning any criminal case --

19          THE WITNESS:  State.

20          THE COURT:  -- whether it's state or federal.

21          Do you understand that?

22          THE WITNESS:  Yes, I do.

23          THE COURT:  Okay.

24          Do you have any questions that you want to ask your

25  attorney to make sure you clearly understand the order?

```
 1                    THE WITNESS:  Just one.
 2                    THE COURT:  Okay.  You may.  Just don't go near the
 3      mic.
 4                    THE WITNESS:  All right, Your Honor.
 5                    THE COURT:  Do you understand, or do you have further
 6      questions?
 7                    THE WITNESS:  No, I have no -- no questions.
 8                    THE COURT:  All right.
 9              I think the way to do -- then, I'm satisfied.  Are
10      you satisfied, Mr. McDonald?
11                    MR. MCDONALD:  Yes, I am, Your Honor.
12                    THE COURT:  Are you satisfied, Mr. Didani?
13                    DEFENDANT DIDANI:  Yes, Your Honor.
14                    THE COURT:  Okay.
15              Then I think the way we should proceed is, I'm going
16      to, when the jury comes out, swear you again, okay?
17                    THE WITNESS:  Mm-hmm.
18                    THE COURT:  Because I only swore you for this part to
19      make sure that you understood your constitutional right, and
20      that you could assert it in the order that was entered giving
21      you immunity, okay?  And therefore, I'm going to re-swear you
22      when you come out, and ask you to state your name again, and
23      spell your last name again for the record, okay?
24                    THE WITNESS:  Okay.
25                    THE COURT:  And then we'll proceed with the
```

1    testimony.  I'll also be telling you -- do you want me to tell

2    the jury at the beginning that he's testifying under a grant

3    of immunity?

4            DEFENDANT DIDANI:  Yes, Your Honor.

5            MR. MCDONALD:  That's fine by me, Your Honor.  Thank

6    you.

7            THE COURT:  And that's all I'm going to tell them.

8    You should be aware that at the time I give the jury

9    instructions at the end of the trial, I will tell them how

10   they are to treat the testimony of someone indicted or

11   unindicted that, maybe, was alleged to be related or a

12   co-conspirator, and also how to treat the testimony given

13   under a grant of immunity, all right?

14           THE WITNESS:  Yes.

15           THE COURT:  And if you have a concern about what

16   those jury instructions will be, just tell your attorney.  And

17   the Government, once we've decided on the jury instructions,

18   will give your attorney a copy of the instructions that I'm

19   going to give to the jury.

20           You understand that as well, Mr. Churikian?

21           MR. CHURIKIAN:  Yes, Judge.

22           THE COURT:  Okay.  Very good.  Thank you for being

23   here.

24           Now, if you're asked a question and you don't know

25   whether or not you should answer it, you should just indicate

1     to me that you need a break, and we'll take a break because

2     you don't want to take that issue up in front of the jury.

3     We'll take a break, I'll allow your attorney to come up and

4     speak with you, and then we'll start back.  All right?

5                THE WITNESS:  Yes.

6                THE COURT:  Okay.

7                Now, you are going to need, when you testify, to talk

8     into this part of the microphone.  So you need to move it back

9     over.

10               THE WITNESS:  I will after I stand up.

11               THE COURT:  Okay.  And the chair doesn't move back

12    and forth, only side to side, all right?

13               THE WITNESS:  I noticed that.

14               THE COURT:  All right.  Everyone satisfied?

15               MR. MCDONALD:  Yes, Your Honor.

16               DEFENDANT DIDANI:  Yes.

17               THE COURT:  All right.  Very good.

18               Then, let's bring out the jury.

19               CASE MANAGER:  All rise for the jury.

20        (Jury entered courtroom at 11:43 a.m.)

21               THE COURT:  Okay.  You may all be seated.  I'm

22    satisfied the jurors are present and in their proper seats.

23               What about you, Mr. McDonald?

24               MR. BILKOVIC:  Yes, I am.  Thank you, Your Honor.

25               THE COURT:  Mr. Didani?

1           DEFENDANT DIDANI:  Yes, Your Honor.

2           THE COURT:  Okay.  Very good.

3           Call your next witness.

4           MR. MCDONALD:  The United States calls Donald Larson.

5           THE COURT:  Okay.  You may stand to be sworn in.

6                         *      *      *

7                         **DONALD LARSON**

8           at 11:44 a.m., having first been duly sworn,

9           was examined and testified on his oath as follows:

10                        *      *      *

11          THE COURT:  All right.  You may be seated.

12          When you're seated, state your full name, and spell

13  your last name for the record.

14          THE WITNESS:  Donald Larson, L-a-r-s-o-n.

15          MR. MCDONALD:  May I proceed?

16          THE COURT:  Yes.

17          I'm going to give the jury some instructions about

18  the testimony of a witness such as this later on, because

19  there may be some others, I don't know.  But for now, I'm

20  going to indicate to you that Mr. Larson is testifying under a

21  grant of immunity.

22          So you may proceed.

23          And I'll tell you more about that later, and how you

24  can consider that, all right?

25          MR. MCDONALD:  Thank you.

1          **DIRECT EXAMINATION**

2     BY MR. MCDONALD:

3     Q.   Mr. Larson, make sure you speak up loud enough so that the

4     person in the back row of the courtroom can hear you, okay?

5     A.   Yes.

6     Q.   Can you tell the ladies and gentlemen of the jury how old

7     you are?

8     A.   I'm 63 years old.

9     Q.   And where do you currently reside?

10    A.   St. Clair Shores, Michigan.

11    Q.   How long have you been living in Michigan?

12    A.   My whole life except for military service.

13    Q.   When did you serve in the military?

14    A.   1981 to '84.

15    Q.   Are you employed?

16    A.   I am.

17    Q.   And where are you employed?

18    A.   Fitness centers.  I own two fitness centers.

19    Q.   Do you have any criminal history?

20    A.   I do.

21    Q.   Can you tell the jury what your criminal history is?

22    A.   I served life in prison for cocaine.

23    Q.   Okay.  It was --

24    A.   And it was a parole of life, so I got out after 18 years.

25    Q.   Okay.  It was a drug-trafficking conviction?

1   A.   Yes.

2   Q.   Do you have any other convictions?

3   A.   A misdemeanor.

4   Q.   Okay.  I want to direct your attention to -- well, let me

5   back that -- let me back up just a little bit.

6          When was that drug-trafficking arrest, or when were

7   you sentenced?

8   A.   In 1992.

9   Q.   Okay.  Do you know -- do you know someone by the name of

10  Ylli Didani?

11  A.   I do.

12  Q.   Do you see him in the courtroom today?

13  A.   Yes, sir.

14  Q.   Will you point to him and identify what he's wearing?

15  A.   He's sitting at the table right there, with a light blue

16  shirt and a sport coat.

17         MR. MCDONALD:  Will the record reflect the witness

18  has identified the defendant?

19         THE COURT:  So noted, and preserved for the record.

20         MR. MCDONALD:  Thank you.

21  BY MR. MCDONALD:

22  Q.   Do you know if Mr. Didani knew about your criminal

23  history?

24  A.   He did.

25  Q.   I want to direct your attention to September 10, 2019.  Do

1   you remember that date?

2   A.   Dates are fuzzy, but I remember situations.

3   Q.   Okay.  In September of 2019, were you arrested by federal

4   agents?

5   A.   Oh, yes, sir.

6   Q.   And were you arrested on federal drug and money laundering

7   charges?

8   A.   I was.

9   Q.   Where were you arrested?

10  A.   I guess they were following me from my apartment, and they

11  pulled me over at Ten Mile and I-94.

12  Q.   Where was your apartment at that time?

13  A.   Nine and a half mile and Jefferson.

14  Q.   And what city is that in?

15  A.   St. Clair Shores.

16  Q.   And then you said you were -- you were pulled over?

17  A.   Yes.

18  Q.   And that was on -- what roads did you say?  I'm sorry.

19  A.   Ten Mile.  And I was just turning onto the freeway to go

20  to the gym.

21  Q.   Is -- is where you were pulled over, is that near your

22  apartment, or your apartment at the time?

23  A.   About two miles.

24  Q.   After your arrest, were you transported anywhere?

25  A.   Yes.

1    Q.   Where were you transported?

2    A.   They took me to Sterling Heights Police Department.

3    Q.   And at Sterling Heights Police Department, did you have an

4    opportunity to speak with federal agents?

5    A.   I did.

6    Q.   At that time, did you tell Sterling -- did you tell the

7    federal agents the full -- your full and complete involvement

8    in the crimes for which you were arrested?

9    A.   I did not.

10   Q.   Why didn't you?

11   A.   I didn't want to incriminate myself.

12   Q.   All right.  Were you scared?

13   A.   Of course.

14   Q.   Were you worried that you would get into trouble?

15   A.   If --

16   Q.   If you told the truth?

17   A.   Oh, yes.

18   Q.   Were you released from custody later that day?

19   A.   I was.

20   Q.   And after that first interview, did there come a time when

21   you spoke with the agents again?

22   A.   There was.

23   Q.   How long after the first day until you were arrested again

24   -- or until you spoke with them again?  Excuse me.

25   A.   Like I said, dates are fuzzy, but I really don't know

```
 1   exactly.
 2   Q.  Well, was it within a couple days, a couple weeks, a
 3   couple months?
 4   A.  It was within a month, I think, yeah.
 5   Q.  And do you know where you spoke with the agents?  Do you
 6   remember?
 7   A.  I think it was --
 8            THE COURT:  The second time?
 9   BY MR. MCDONALD:
10   Q.  The second time, I'm sorry.
11   A.  I think it was downtown.
12   Q.  Downtown Detroit?
13   A.  Yes.
14   Q.  And at that point, did you tell the agents the full --
15   about your full and complete involvement in this case?
16   A.  I had my attorney there.
17   Q.  Okay.  But you didn't answer my question.
18   A.  Yes.
19   Q.  My question was, at that point, the second time, did you
20   tell the agents your full and complete involvement in this
21   case?
22   A.  Yes.
23   Q.  Now, how do you know Mr. Didani?
24   A.  We were introduced by a friend I was in prison with.  We
25   were all going to the same gym.
```

1    Q.   All right.  And do you know approximately when you met

2    Mr. Didani?

3    A.   Maybe around 2014 or 2015.

4    Q.   And do you know Mr. Didani's first name?

5    A.   Ylli, but I always called him Lou.

6    Q.   Lou, L-o-u?

7    A.   Yes.

8    Q.   Why did you call him Lou?

9    A.   That's the name I was introduced to.

10   Q.   You have a book in front of you.  I want you to open it

11   and take a look at Exhibit 1.0.

12   A.   Yes.

13   Q.   Do you recognize that?

14   A.   That's a friend of Lou's I was introduced to.

15   Q.   Okay.  Well --

16           THE COURT:  What is it?  What is the number again?

17           MR. MCDONALD:  The number is 1.0, Your Honor.

18           THE COURT:  Okay.

19      (Referenced in Evidence:  Government Exhibit 1.0(Photo))

20   BY MR. MCDONALD:

21   Q.   When you say it's a friend, is that a photograph?

22   A.   Yes.

23   Q.   A photograph of a friend that Lou introduced you to?

24   A.   Right.

25   Q.   Do you know the name of that person, or who you were

1    introduced?

2    A.   Oh, well, he introduced him as Puzzo.

3            MR. MCDONALD:  Can you show that picture to the jury?

4    BY MR. MCDONALD:

5    Q.   And when did you meet -- did you say Puzzo?

6    A.   Yes.

7    Q.   When did you meet Puzzo?

8    A.   Maybe a year or two after I knew Lou.

9    Q.   All right.  Can you turn to the next page?  And, can you

10   describe what that is?

11   A.   That's another photo.

12   Q.   And is that Exhibit 1.2?

13   A.   It is.

14   Q.   And can you -- what is it a photograph of?

15   A.   That's Marty Tibbits.

16           MR. MCDONALD:  Can you show 1.2?

17     (Referenced in Evidence:  Government Exhibit 1.2(Photo))

18   BY MR. MCDONALD:

19   Q.   And how did you meet Marty Tibbits?

20   A.   I met Marty through his wife, Belinda.

21   Q.   Do you know when you met Marty Tibbits?

22   A.   Probably 2012 or '13.

23   Q.   And how do you know Belinda Tibbits?

24   A.   Well, I -- she started coming to my fitness center I

25   worked at, and I was a strength coach, and she -- I started

1    training her, strength training.  And then, she realized that

2    we knew each other back in the 80s.

3    Q.   Okay.

4    A.   And then we kind of, because she told me where she worked,

5    and that's where I think we knew each other before then.

6    Q.   Okay.  And you said you were introduced to Martin Tibbits

7    through Belinda?

8    A.   Yes.

9    Q.   And do -- and Belinda and Martin, what was their

10   relationship again?

11   A.   They were married.

12   Q.   Do you know if Mr. Tibbits is still alive?

13   A.   He is not.

14   Q.   Do you know when he died?

15   A.   When?

16   Q.   Yeah.

17   A.   2018, I believe.

18   Q.   Can you turn to the next page, which is Exhibit 1.3?  Do

19   you recognize that photograph?

20   A.   I do.

21   Q.   And what is that a photograph of?

22   A.   That's another friend Lou introduced me to.

23   Q.   And do you know that friend's name?

24   A.   I was introduced as Pete.  His name was Pete.

25          MR. MCDONALD:  All right.  Can you show Exhibit 1.3,

1    please?

2        (Referenced in Evidence:  Government Exhibit 1.3(Photo))

3    BY MR. MCDONALD:

4    Q.   And you said you were introduced.  Who introduced you?

5    A.   Lou introduced me.

6    Q.   Mr. Didani?

7    A.   Yes.

8    Q.   All right.  Do you know when you met Pete?

9    A.   I don't know when exactly, but we went to dinner, all

10   three of us.

11   Q.   You, Pete, and Mr. Didani?

12   A.   Yes.

13   Q.   All right.  Is that the only time you met him?

14   A.   No.

15   Q.   All right.

16   A.   That was the first time.

17   Q.   All right.  You don't know when that was?

18   A.   Not exactly, no.

19   Q.   All right.

20   A.   Like I said, my dates are fuzzy on dates.

21   Q.   All right.  Was it around the same time, or after you met

22   Mr. Puzzo?

23   A.   It could have been because they -- Puzzo and Pete are good

24   friends also.

25   Q.   Okay.  You can -- you can shut the book for the moment.

```
 1              I want you to tell the members of the Grand Jury what
 2     involvement you had, generally, in the drug-trafficking
 3     activities of Mr. Didani and/or Mr. Tibbits?
 4     A.   I mainly, like, facilitated cash.
 5     Q.   What do you mean you mainly?  What do you mean?
 6     A.   Well, like, if Lou said pick up some cash from Marty,
 7     Marty would give it to me, and then I would give it to Lou.
 8     Marty originally wanted to stay hands off, so I was like the
 9     middleman.
10     Q.   Okay.  You said you mainly facilitated money, but what --
11     what was your other involvement, if anything?
12     A.   Really, nothing with -- with the cocaine or anything, it
13     was just all pretty much money.
14     Q.   Did you invest any money in cocaine loads?
15     A.   I did.
16     Q.   And how -- you have to speak up, Mr. Larson.
17     A.   I did.
18     Q.   And how much money did you invest?
19     A.   Probably about 30,000, maybe.
20     Q.   Okay.  And when -- when I say invest in cocaine loads,
21     what does that mean to you?  What, specifically, did you do?
22     A.   Well, I was a minimum -- minimum partner, minimal partner.
23     Q.   Partner with whom?
24     A.   Lou.
25     Q.   And so, what -- what did your 30,000 get you?  What was
```

1  the -- what was the point of it?

2  A.  I didn't get anything from it, actually.  I didn't recoup

3  any money from what I invested.

4  Q.  Yeah, but that --

5  A.  Is that what you --

6  Q.  -- wasn't my question.

7  A.  Okay.

8  Q.  My question was, what was the point of investing $30,000?

9  What were you hoping to get out of it?

10  A.  Well, I was hoping to get a lot more than that.

11  Q.  Okay.  And how were you hoping to make money off of your

12  30,000?  Can you tell -- can you explain how you were going to

13  make money off of your investment, to the jury?

14  A.  Well, Lou said he was going to -- he was selling drugs,

15  and then we -- that's how Marty got into it.  We recoup -- we

16  would recoup profits from the sale of cocaine.

17  Q.  Okay.  Now, I want to direct your attention to some -- the

18  early part of 2016.  I know you're fuzzy with dates, but my

19  question is, did you ever have a conversation with Mr. Didani

20  about a load that had been -- a load of cocaine that he ordered

21  that was ultimately seized?

22  A.  A few conversations --

23  Q.  Okay.

24  A.  -- like that.

25  Q.  But I'm talking about the first conversation.  Do you

```
 1   remem -- do you remember that first --
 2   A.   Very first one.
 3   Q.   -- conversation?
 4   A.   Very first one.
 5   Q.   Very first one?
 6   A.   Yes.
 7   Q.   And what did he tell you?
 8   A.   He told me that he went to Chicago to do a drug deal, and
 9   it got seized, and the people that he was getting the drugs
10   from, he was paying for some of it, and then they were fronting
11   him some.  They were, like, loaning him some to be re-paid or
12   recouped after he sold it.
13   Q.   Okay.  Are you familiar with something called
14   "consignment?"
15   A.   Yes.
16   Q.   What is consignment?
17   A.   That's the same thing as, like -- I called it a front.
18   That's what we call it, when they front, when they give you
19   something and then you pay them back later.
20   Q.   Okay.  So Mr. Didani told you that he -- he went to
21   Chicago, bought a load of cocaine, and then --
22            DEFENDANT DIDANI:  Objection, Your Honor, he's
23    leading the witness.
24            THE COURT:  You are leading the witness.  Rephrase.
25   BY MR. MCDONALD:
```

1  Q.  Can you tell us again what Mr. Didani said about that

2  load?

3  A.  He said the load got busted, and that he -- when he back,

4  he told me about that the load got busted, and he -- and they

5  were going to kill his family if he didn't re-pay the money

6  that -- it was like $90,000.  So he -- I think -- he paid

7  90,000, they gave him $90,000 worth on the consignment.  And

8  when the load got busted, he said they were going to kill his

9  family.  He was crying.  And that's how I got involved, because

10  I have a lot of millionaire friends so he asked me if I could

11  somehow get $90,000 so he could take it to pay his debts so his

12  family wouldn't, you know, be killed.

13  Q.  Okay.  And after he told you this, did you go ask for the

14  90,000 from any -- from anybody?

15  A.  I did.

16  Q.  And who did you ask for the 90,000 from?

17  A.  I asked Marty Tibbits.

18  Q.  What did Marty say?

19  A.  He asked me if I trusted him, and I said yes.  And Marty

20  wanted to know what it was for, and I told him.  And, he ended

21  up giving me the $90,000, and I gave it to Lou.

22  Q.  Okay.  How did he give you the money?

23  A.  In cash.

24  Q.  And so, once you got the 90,000, what, if anything did you

25  do?

1    A.   He said he was taking it to Chicago.

2    Q.   Instead of using the word "he," if you could, just tell

3    us --

4    A.   Oh, Lou.  Lou said he was taking it to Chicago to pay his

5    debt.

6    Q.   Okay.  But after you got the $90,000 from Marty, what did

7    you do with it?

8    A.   I gave it to Lou.

9    Q.   Where did you give it to Lou at?

10   A.   At my house, in Fraser.

11   Q.   After you gave the money to Lou, what happened in?

12   A.   He left in a rental car and went to Chicago.

13   Q.   Okay.  Who rented the car?

14   A.   I usually rented a car for him every time he came to town.

15   Q.   Okay.  Do you know, by the way, if he had his own vehicle

16   at the time?

17   A.   I don't -- I don't think he did because every time he came

18   to town, I had to rent a car.

19   Q.   Okay.  And by the way, at any time that you've known him,

20   do you know if he had a legitimate job?  Did you ever see him

21   go to a job?

22   A.   He did not.

23   Q.   All right.  So you said that you rented a car, why not

24   just let him use your car?  Why did you rent a car?

25   A.   I only had one vehicle.

1   Q.   I know, but why not let him use your car?

2   A.   I had to get around myself.

3   Q.   How did you -- did you package the money in any way?

4   A.   I don't think that time.

5   Q.   All right.  So you just gave it to him?

6   A.   Yeah.  It was -- it was a small amount.  Like, they were

7   all hundreds.

8   Q.   Did Mr. Didani tell you what he did with that money?

9   A.   He did.

10  Q.   What did he tell you?

11  A.   He said when he went to Chicago to pay the $90,000, that

12  the Mexicans that he was meeting told him they just wanted to

13  make sure he was going to be honorable and pay the money, and

14  then they forgave him the debt.  They said he didn't have to --

15  he didn't have to pay it.  But I'm assume -- then --

16  Q.   Okay.  And when you say Mexicans, do you know what --

17  A.   He --

18  Q.   -- Mexicans associated with what?

19  A.   He said the Mexicans were from California, and they were

20  meeting him in Chicago, and they were part of the Colombian

21  people that they were dealing with.

22  Q.   Colombian Cartel?

23  A.   I -- I assume so, yeah.

24          DEFENDANT DIDANI:  Your Honor, he's leading the

25  witness.

 1              THE COURT:  You are leading the witness.

 2    BY MR. MCDONALD:

 3    Q.   Did Mr. Didani tell you that it was from Mexicans who were

 4    part of the Colombian Cartel?

 5    A.   He --

 6              DEFENDANT DIDANI:  Your Honor, Mr. McDonald is

 7     leading the witness.

 8              THE COURT:  You're suggesting the answer,

 9     Mr. McDonald, rephrase the question.

10              THE WITNESS:  He just said they were Colombians.

11              THE COURT:  Just a moment, let him rephrase the

12     question.

13              THE WITNESS:  Okay.

14    BY MR. MCDONALD:

15    Q.   What did Mr. Didani tell you about the Mexicans?

16    A.   He said the Mexicans worked for the Colombians.

17    Q.   Now, after this $90,000 transaction, can you describe the

18    relationship between Marty Tibbits and Mr. Didani?

19    A.   Well, Marty got more involved after this -- after he gave

20    me the $90,000 for Lou.  So we would communicate -- mainly, Lou

21    would communicate with me because Marty didn't want to talk

22    directly to Lou at first, so he would give me information, I'd

23    go meet Marty either at his house or a restaurant or something,

24    and I would tell him what's going on with what Lou's doing.

25    Q.   Did you begin to notice whether or not Mr. Didani and

1    Ms. Tibbits were spending more time together?

2    A.   They definitely were.

3    Q.   All right.  Did the three of you, Mr. Didani, Ms. Tibbits,

4    and yourself ever spend time together?

5    A.   We did.

6    Q.   All right.

7    A.   Once Marty got more comfortable with the situation with

8    Lou, then we would all three meet.

9    Q.   And how often would you meet with each other?

10   A.   Whenever Lou was in town.  Or, like, sometimes we would be

11   working out together in the gym, but Marty didn't want to

12   discuss anything in the gym so we would go across the street to

13   the restaurant.

14   Q.   And during those times, did the three of you ever discuss

15   drug trafficking?

16   A.   We did.

17   Q.   All right.  And during those times, did you ever discuss

18   money laundering?

19   A.   Yes.

20   Q.   What did you discuss about drug trafficking?

21   A.   Marty came up with this idea about creating this little

22   submarine he called a torpedo, to attach to the bottom of a

23   ship electronically, like a remote control.  And, it would

24   attach to the bottom of a ship and carry about 50 kilos, and

25   then the port would go into -- they would pick a ship where

 1    they wanted the destination of the cocaine to arrive.

 2    Q.   And did you --

 3    A.   What was that?

 4    Q.   I'm sorry, go ahead.

 5    A.   So that was the main -- one of the main things Marty

 6    thought of to avert the authorities, yeah.

 7    Q.   And you said 50 kilos.  Fifty kilos of what?

 8    A.   Cocaine.

 9    Q.   Do you remember any other specific conversations about

10    drug trafficking that the three of you had after -- at these

11    restaurants?

12    A.   Mainly, Marty wanted -- he didn't want anything to do with

13    bringing the drugs in the United States.  That was his main

14    thing.

15    Q.   What about these conversations about money laundering, do

16    you remember any specifics about that?

17    A.   There was a couple things that they were talking about.

18    Q.   And you --

19    A.   One was --

20    Q.   I'm sorry, Mr. Larson, when you say they, who do you mean?

21    A.   Who?  Lou and Marty.

22    Q.   Okay.

23         In your presence?

24    A.   Yes.

25    Q.   Okay.  Go ahead.

1    A.   So one was putting ATM machines in Albania because they

2    really didn't have any ATM machines there, and I think they

3    had, like, gambling casinos and places along the ocean where

4    tourists would go, and they didn't have any ATM machines.  So

5    they wanted to use the cash, like, buy a bunch of ATM machines

6    and get authorization to put them in different spots.  And

7    then, the drug money cash would go into the ATM machines, and

8    then the people who were tourists and stuff like that, they

9    would receive cash from their credit cards so it would

10   automatically wash money.

11   Q.   Besides this ATM machine idea, were you aware of any other

12   ideas they talked about?

13   A.   Lou wanted to buy a nightclub in Albania.

14   Q.   To launder money?

15   A.   Yes.

16   Q.   Okay.

17            DEFENDANT DIDANI:  Objection, Your Honor, he's

18    leading -- he's still leading the witness?

19            THE COURT:  You are suggesting the answer,

20    Mr. McDonald.

21            MR. MCDONALD:  What -- go ahead.

22            THE COURT:  I said the --

23            DEFENDANT DIDANI:  The whole testimony of

24    Mr. McDonald is leading.

25            THE COURT:  Mr. Didani, excuse me.  I said it was

```
 1    sustained, and the jury would disregard it, and he has to
 2    re-pose the question.
 3              DEFENDANT DIDANI:  Thank you.
 4              THE COURT:  And each time I said sustained, that's
 5    what I meant, and Mr. McDonald would have to rephrase.  Try
 6    not to lead the witness, Mr. McDonald.
 7              MR. MCDONALD:  Thank you.
 8    BY MR. MCDONALD:
 9    Q.   What was the purpose of the nightclub in Albania?
10    A.   To launder money selling liquor.
11    Q.   Were there any other ideas besides the nightclub and the
12    ATM machine?
13    A.   Not that I can recollect right now, but those were the
14    main two.
15    Q.   Okay.  What, if anything, did you, Marty, and Mr. Didani
16    talk about regarding the purchase of gyms?
17    A.   Purchase of?
18              THE COURT:  Purchase of what?
19              MR. MCDONALD:  Gyms, g-y-m-s.
20              DEFENDANT DIDANI:  Here we go again, Your Honor.  He
21    just asked a question about another business, and now he's
22    saying the purchase of a gym.
23              THE COURT:  Absolutely.  Absolutely.
24              DEFENDANT DIDANI:  Thank you.
25              THE COURT:  It's leading the witness because you're
```

1   suggesting an answer.

2              MR. MCDONALD:  Judge, my question was -- I don't want

3   to argue with the Court, but my question was, what, if

4   anything, did you discuss about purchasing gyms.

5              THE COURT:  Well, I think you should still rephrase

6   it because it's suggesting the answer, Mr. McDonald.

7   BY MR. MCDONALD:

8   Q.  Did you have any discussions with Mr. Didani about other

9   money laundering ideas?

10  A.  Yeah, now -- now that you've mentioned gyms, he wanted to

11  buy three of them.  I said let's start with --

12             DEFENDANT DIDANI:  Your Honor, objection again.  Did

13  you have any other discussion about money laundering with

14  Mr. Didani?

15             THE COURT:  Well, no, that's not discussing the

16  answer of the gyms, Mr. Didani, and that objection is

17  overruled.

18             DEFENDANT DIDANI:  Thank you.

19             THE COURT:  Go ahead with your answer, please.

20             THE WITNESS:  Yeah, he wanted to fund three gyms to

21  launder money through.  I said let's start with one and see if

22  you can do that, and then we'll go from there.  So I was

23  looking for a gym in Texas to build in Frisco.

24  BY MR. MCDONALD:

25  Q.  When you say Frisco?

1    A.   Frisco, Texas.

2    Q.   What, if anything, did Marty tell Belinda, if you know,

3    about -- about Marty's involvement with -- with you and

4    Mr. Didani and drug trafficking?

5    A.   I told Belinda nothing.

6    Q.   Okay.  Do you know if Marty told her anything?

7    A.   I do not.

8    Q.   All right.  Now, previously, you testified that you used

9    money -- strike that.

10            Previously, you testified that you facilitated the

11   movement of money; is that fair?

12   A.   Yes.

13   Q.   I want to direct your attention to May of 2016.  Again, I

14   understand you're -- you're not good with dates.  Did

15   Mr. Didani ever instruct you to pick up anything from someone

16   else?

17   A.   Yes.

18   Q.   And what -- and what did he instruct you to pick up?

19   A.   He instructed me to pick up $100,000 from Pete.

20   Q.   Did Mr. Didani instruct you where to pick this money up?

21   A.   Yes.

22   Q.   Where?

23   A.   I went to Pete's -- he had like a supermarket.

24   Q.   Where was that supermarket located?

25   A.   It was in Taylor, about two miles from my gym.

```
 1              THE COURT:  Two miles from where?

 2              THE WITNESS:  My gym.

 3   BY MR. MCDONALD:

 4   Q.   Did you know the name of the supermarket?

 5   A.   Cattleman's.

 6   Q.   Did you, in fact, go to Cattleman's in Taylor?

 7   A.   I did.

 8   Q.   Please tell the jury what happened when you arrived at

 9   Cattleman's.

10   A.   I went into the Cattleman's, and Pete was up in a -- in a

11   booth.  It was raised up above the floor with a glass top so he

12   could see into the market, to make sure no one was stealing, I

13   guess.

14   Q.   And what happened when you went into the office?

15   A.   I went up in there and he pulled $100,000 out of a safe

16   and handed it to me in a paper bag.

17   Q.   After you received the money from Pete, what, if anything,

18   did you do with it?

19   A.   I called Lou and told him I had it, and we were going to

20   meet at my house in Fraser.

21   Q.   That house in Fraser -- Fraser, were you renting, or did

22   you own that?

23   A.   I was renting.

24   Q.   What happened after that?

25   A.   I gave Lou the money and he left.
```

1  Q.  Did Mr. Didani tell you why he wanted that 100,000?

2  A.  Not that instance.

3  Q.  At any point?

4  A.  Yeah, he always was doing, you know, handling money for --

5  for cocaine deals.

6         THE COURT:  Okay.  Tell me that answer again.  I'm

7  sorry.

8         THE WITNESS:  All the money that was facilitated was

9  going towards cocaine deals.

10 BY MR. MCDONALD:

11 Q.  Did there come a point in time where you received four

12 checks from anyone?

13 A.  Yes.

14 Q.  And who did you receive it from?

15 A.  Marty.

16 Q.  Can you please turn to -- open your book and turn to

17 Exhibit 9?

18         MR. BILKOVIC:  9.0.

19         MR. MCDONALD:  Yeah, 9.0.

20         THE COURT:  9.1?

21         MR. MCDONALD:  9.0, Your Honor.

22         THE COURT:  I'm sorry.

23         MR. MCDONALD:  That's okay.

24    (Referenced in Evidence:  Government Exhibit 9.0 ($50,000

25     checks))

BY MR. MCDONALD:

Q.   Mr. Larson, do you recognize any of these items in 9.0?

A.   I do.

Q.   And what are --

A.   I do.

Q.   What are they?

A.   They're $50,000 checks, cashier's checks, from Marty.

Q.   And how many are there?

A.   Four.

Q.   And are they addressed to you or someone else?

A.   They're addressed -- they're addressed to me.

Q.   All four?

A.   Yes.

Q.   You sure?

A.   Yep.  Oh, Peter.

        I asked a friend of mine to help me cash them because
 I didn't want to be connected with so much money.

Q.   And what was your friend's name?

A.   Peter.

Q.   And --

A.   Peter Tocco.

Q.   -- why didn't you want all the checks written to you?

A.   I didn't want to be associated with cashing that much
money.  I know the Government -- or the check cashing place has
to alert the Government about anything over a certain amount of

```
 1   money.
 2   Q.   Okay.  Did you, in fact, cash those checks?
 3   A.   I did.
 4   Q.   Do you know where?
 5   A.   At a check cashing business.
 6   Q.   Just a --
 7   A.   I don't remember -- I don't remember the name of it.
 8   Q.   Okay.  And do you know if Mr. Tocco cashed the other two?
 9   A.   He did.
10   Q.   How do you know that?
11   A.   Because he was with me.
12   Q.   Were those catch -- excuse me.
13          Were those check cashing businesses in the Eastern
14    District of Michigan?
15   A.   Yes.
16   Q.   After Mr. Tocco cashed the checks, what, if anything, did
17   he do with the money?
18   A.   He gave it directly to me.
19   Q.   And what did you do with the money?
20   A.   I took it home to my house in Fraser.
21   Q.   What happened with the money at your house in Fraser?
22   A.   Well, on that instance, it was a pretty large sum, so Lou
23   suggested we get a Seal-a-Meal, one of those Seal-a-Meal
24   machines that would cryo seal the money so dogs couldn't sniff
25   it because he was going to take it to Chicago.
```

1    Q.   And did you, in fact, vacuum seal that money?

2    A.   We did.

3    Q.   And what did you do with the money after it was vacuum

4    sealed?

5    A.   We took out the back seat of the rental car and stashed

6    the money underneath the back seat in case he got pulled over.

7    Q.   Who -- who rented the car?

8    A.   I did.

9    Q.   And why did you -- strike that.

10          Can you please turn to Exhibit 5.4?

11   A.   Is that a duplicate of 5.5?

12          THE COURT:  Step up, Mr. McDonald, and show him the

13    exhibit you want him to look at, please.

14          THE WITNESS:  Looks like the same thing.

15          MR. MCDONALD:  Yeah, Your Honor, he's looking at the

16    right photograph.

17          THE COURT:  Okay.

18     (Received in Evidence:  Government Exhibit 5.4 (Photo of

19       $200,000))

20   BY MR. MCDONALD:

21   Q.   Can you identify what 5.4 is?

22   A.   That's the $200,000.

23   Q.   Do you recognize -- when you said that's the $200,000, is

24   that a photo of it?

25   A.   It is.

1   Q.   Now, Mr. Larson, do you recognize anything in this

2   photograph?

3   A.   That was my house in Fraser.

4   Q.   And 5.5, what is that?

5   A.   It's the same photo except there's a plastic bag and a --

6   maybe a Seal-a-Meal machine.

7       (Referenced in Evidence:  Government Exhibit 5.5(Photo))

8   BY MR. MCDONALD:

9   Q.   And when you say the plastic bag, do you see that in that

10  photograph?

11  A.   Yes.

12  Q.   All right.  And do you recognize anything about that

13  photograph?

14  A.   In 5.5?

15  Q.   Yes.

16  A.   Yes.  It's still my house.

17  Q.   All right.  What about 5.6?

18  A.   Yeah, that's -- that's after we sealed the money.

19      (Referenced in Evidence:  Government Exhibit 5.6(Photo))

20  BY MR. MCDONALD:

21  Q.   And do you recognize anything in that photograph?

22  A.   It's still my house.

23  Q.   Did Mr. Didani tell you what the $200,000 was for?

24  A.   He was taking it to Chicago to purchase more cocaine.

25  Q.   Do you know someone by the name of Jack?

1  A.  I heard the name, I don't know him personally.

2  Q.  All right.  And do you know whether any of this money was

3  for Jack?

4  A.  Not -- not this money, no.

5  Q.  In 2017, did you cash any additional checks written by

6  Ms. Tibbits?

7  A.  I did.

8  Q.  And each time you cashed a check, who did you give the

9  money to?

10  A.  I gave it to Lou.

11  Q.  Mr. Didani?

12  A.  Yes.

13  Q.  And for those checks in 2017, did Mr. Didani tell you what

14  he was going to do with the cash?

15  A.  Eventually.

16  Q.  What did he tell you?

17  A.  Well, Marty instructed me to fly 450 --

18  Q.  I'm talking about prior to -- to that, in early 2017.

19  A.  Yeah, I'm bad with dates, like I keep saying.

20  Q.  All right.  Can you -- can you take a look at Exhibit

21  Number 10?

22  A.  10?

23  Q.  Yes.  10.0.

24  A.  Okay.

25      (Received in Evidence:  Government Exhibit 10(Photo of

1         Checks))

2    BY MR. MCDONALD:

3    Q.   And can you identify what 10.0 is for the jury?

4    A.   That's another $50,000 cashier check.

5    Q.   And what's the date of that check?

6    A.   March 24, 2017.

7    Q.   How many different checks are in Exhibit Number 10?

8    A.   Just one, front and back.

9    Q.   No, the entire exhibit?

10   A.   Well, 10.2 you mean?

11   Q.   No, no, 10.0 to 10-2 --

12   A.   Well, that's what I mean, do you want me to go farther?

13   Q.   Yes.  How many total checks are in the entire Exhibit 10?

14   A.   There's six in -- in throughout the 10s.

15   Q.   All right.  And each of those checks is how much money?

16   A.   Each one is $50,000.

17   Q.   All right.  Now my math's not that good, but is that

18   300,000?

19   A.   Yes.

20   Q.   And was it just you who these checks were written to, or

21   someone else?

22   A.   It looks like they were all mine.  No, Peter again, yeah.

23        THE COURT:  I'm sorry?

24        THE WITNESS:  Peter Tocco again, helped me out.

25   BY MR. MCDONALD:

1    Q.   And how many checks were written to you, and how many

2    checks were written to Mr. Tocco?

3    A.   It looks like four are to me, and two are for Peter.

4    Q.   And did you cash these checks?

5    A.   We did.

6    Q.   Do you know where?

7    A.   At the check cashing place again.

8    Q.   All right.  And you cashed -- how many checks did you

9    cash?

10   A.   Four.

11   Q.   Do you know if Peter checked -- cashed those checks?

12   A.   He cashed two.

13   Q.   How do you know that?

14   A.   They were addressed to him.  They were signatured to him.

15   Q.   Right, but how do you know that Peter cashed it?

16   A.   He was with me.

17   Q.   And that $300,000, who did you give it to?

18   A.   I gave it to Lou.

19   Q.   And for what reason?

20   A.   To purchase cocaine.

21   Q.   All right.  Now, I want to direct your attention to

22   December of 2017.  Again, I know you're not good with dates,

23   but do you remember an additional set of checks that you

24   cashed?

25   A.   Yes.

1  Q.   I want to show -- okay.  I want to direct your attention

2  to Exhibit Number 11.  Can you look at that?

3  A.   Personal check from Marty.

4      (Referenced in Evidence:  Government Exhibit 11(Personal

5      Check))

6  BY MR. MCDONALD:

7  Q.   In the entire -- well, no, in the entire exhibit, how many

8  different personal checks are listed?

9  A.   There's one on 11.0 and one on 11.2, one on 3, 4, 5, 6, 7,

10  8, 9, and 10.  There's -- some of them were personal checks.

11  Q.   All right.  I want you to look through the personal checks

12  and tell me how many different personal checks are in the

13  Exhibit 11.

14  A.   1, 2, 3, 4, 5.  There's five personal checks.

15  Q.   Do you know the total amount of money, approximately?

16  A.   There should have been 450,000.

17  Q.   All right.

18        MR. MCDONALD:  Can you show 11.0, please?

19  BY MR. MCDONALD:

20  Q.   Mr. Larson, I want you to look at 11.0.  Tell me when

21  you're there.

22  A.   Okay.

23  Q.   Do you recognize any handwriting on this check?

24  A.   My handwriting.

25  Q.   Where is your handwriting on the check?

```
 1    A.   On pay to the order of, and on the date.

 2    Q.   Is the signature on the --

 3    A.   And the back is my signature also.

 4    Q.   Okay.  But is the signature on the front of the page your

 5    handwriting?

 6    A.   The date and the pay to the order of, not the --

 7    Q.   I'm talking about the --

 8    A.   Wait, wait, hold on.  Yeah, that's mine also.  He gave me

 9    blank checks.

10    Q.   The signature itself, you did not sign that, did you?

11    A.   No.

12              DEFENDANT DIDANI:  Objection, Your Honor, he's

13     leading the -- he's still leading the witness.

14              MR. MCDONALD:  The question was, did you sign -- you

15     did not sign that, did you?

16              THE WITNESS:  No.

17              THE COURT:  I'm going to allow that question.

18              DEFENDANT DIDANI:  He testified completely opposite.

19     Now, he led him a lie.

20              THE COURT:  Well, you can take that up on

21     cross-examination that he's saying something different.

22              Whose -- whose signature -- well, is that your

23     signature?

24              THE WITNESS:  Not endorsing the check, no.

25     BY MR. MCDONALD:
```

```
1    Q.   All right.  And why is your handwriting on this check?
2    A.   Because Marty gave me blank checks.  He was going to be
3    out of town.
4    Q.   Right.
5             And how did you know how much to write the checks
6     for?
7    A.   He told me how much.
8    Q.   And how did you know how many checks to write?
9    A.   Because he gave me four checks, five checks.
10   Q.   Right.
11            And how did you know how much to write on each check?
12   A.   He said not to do more than 100,000 on each one.
13   Q.   Where did you receive these checks?
14   A.   I went on -- I went to Marty's house in Grosse Pointe
15   Park.
16   Q.   And you said Marty was out of town?
17   A.   Yes.
18   Q.   Where -- where --
19   A.   He left them on the desk in the upstairs.  He gave me the
20   code to the door.
21   Q.   What, if anything, did you do with the checks?
22   A.   Well, I took them to the check cashing store, and they
23   said they didn't take personal checks.
24   Q.   So what did you do?
25   A.   I called Marty, and then he called the bank and instructed
```

 1   them to take the checks and give me cashier checks instead.

 2   Q.   Where did you get the cashier checks at?

 3   A.   At the bank.

 4   Q.   And then, what did you do with the cashier checks?

 5   A.   I went to cash them all, but they said they didn't have

 6   enough cash on hand.

 7   Q.   Okay.  You went to go cash them all where?

 8   A.   At the check cashing store.

 9   Q.   And who said they didn't have all the cash?

10   A.   Well, the people that worked there.  They said they didn't

11   have that much cash.

12   Q.   All right.  And so, were you able to cash any at the check

13   cashing place?

14   A.   I think I cashed $200,000 worth, and then I had to go back

15   to the bank, and told them I didn't have enough cash, if they

16   could cash them at the bank.  And the -- the manager told me

17   they didn't have enough, that they would have to order it from

18   the -- and have it delivered.

19   Q.   And so, were you able to get the cash that day?

20   A.   No.

21   Q.   When did you go back?

22   A.   I think it was like two days later when they finally got

23   it.  They gave me a call, said they had all the cash at the

24   bank, and I went and picked it up.

25   Q.   All right.

1           And then, what, if anything, were you instructed to

2      do with the $450,000?

3  A.   So I had to take it to Washington, D.C.

4  Q.   Who told you, you had to take it to Washington, D.C.?

5  A.   Well, Lou told me where to take it.  I had to meet him

6      there.

7  Q.   Okay.  But who told you, you had to take it -- take it to

8      Washington, D.C.?

9  A.   Well, Marty told me I had to give it to Lou, and Lou said

10     he was in Washington, D.C.

11  Q.   Oh, I see.  Okay.

12          So how did you get from Detroit to Washington, D.C.?

13  A.   Marty had a few airplanes.  He liked to fly war Aerojet

14     planes, and he had a two-seater commuter plane, and he had his

15     mechanic, who is also a pilot, fly us to -- the pilot and

16     myself, fly us to Washington, D.C.

17  Q.   And do you remember what time of day you flew to

18     Washington, D.C.?

19  A.   It was still daylight, but we were flying during dark

20     time, during the night.

21  Q.   I'm not sure what you mean by that?

22  A.   You mean -- did you ask what day, or what time of day?

23  Q.   I'm asking you, what time of day did you fly from Detroit

24     to Washington, D.C.?

25  A.   Like I said, it was still light out.

1   Q.   When you left?

2   A.   Yeah.

3   Q.   Okay.

4   A.   And then it was dark out by the time we even were like

5   halfway there.  It was dark.  We landed in the dark.  We were

6   flying and he was showing me how to fly by the radar and remote

7   control or whatever they call it, auto pilot.

8   Q.   And do you know the pilot's name by chance?

9   A.   It started with a D, Dan or Doug, or something like that.

10  Q.   Did you ever tell the pilot what you -- what was in your

11  bag?

12  A.   I did not.

13  Q.   Did you bring a bag?

14  A.   I did.

15  Q.   What kind of bag did you bring?

16  A.   It was a black duffle bag.

17  Q.   And what was in the duffle bag?

18  A.   $450,000 in cash.

19  Q.   Do you remember how long the flight is from Detroit to the

20  Washington, D.C. area?

21  A.   I think it was at least a couple hours.

22  Q.   During that flight, did you communicate with Mr. Didani?

23  A.   I wanted to make sure that he was there when we arrived,

24  so I was sending him text messages.  I sent him a couple of

25  pictures of the plane before we boarded.  And then while we

1     were flying there, I said we were approximately going to be

2     there at a certain time because we wanted to get back and

3     refuel.  He had to refuel the plane, and then we were going to

4     fly back.

5     Q.   What, if anything, did Mr. Didani tell you that the

6     $450,000 coming from Detroit to Washington, D.C. was for?

7     A.   He said the person he was dealing with to buy cocaine

8     wouldn't come up north to deliver it, so we had to bring the

9     money down to Washington to pay him for it.

10    Q.   How many seats are on that plane, by the way?

11    A.   Two.  Two.

12    Q.   All right.

13          And what, if anything, happened when you landed?

14    A.   Well, we went into like -- they had like a lobby, you

15    know, vending machines, so I was waiting for the pilot to

16    refuel the plane.  Well, he instructed someone else to do it,

17    whoever worked at the airport.  And then, I -- I was waiting

18    for Lou to show up.  And when he got there, he told me to come

19    out to the parking lot.  And he exited a vehicle real quick.  I

20    didn't see him.  It was really dark out in the parking lot, it

21    had pretty much no lights.  I just handed him the bag, he

22    jumped back in the car, and I went back into the building.

23    Q.   So once you landed, did you and the pilot separate or stay

24    together?

25    A.   Well, at -- yeah, at first, we separated.  I was still in

1   the building while he took the plane to where it gets refueled.

2   And then, the worker at the airport refueled the jet, and he

3   came back in while we waited for it to be refueled.

4   Q.   Can you tell us how long you were on the ground in D.C. to

5   the best of your memory?

6   A.   Maybe an hour.

7   Q.   After giving the money to Mr. Didani, what did you do?

8   A.   I just went back into the building, he went in the car.

9   Q.   Who went to the car?

10  A.   Lou.

11  Q.   With the bag you gave him?

12  A.   The bag, yes.

13  Q.   And then, once you went back into the building, what

14  happened next?

15  A.   Just, I waited with the pilot until the plane was

16  refueled.  We got on the plane and came back to Detroit.

17  Q.   Directly back to Detroit?

18  A.   Yes.

19  Q.   Okay.  I want to switch topics a little bit, and talk

20  about how you communicated with Mr. Didani.

21          What -- what ways did you communicate with

22   Mr. Didani?

23  A.   Well, in person, of course.  But then, a lot of times with

24  -- he had some Blackberry -- they were Blackberry phones, they

25  were encrypted.

1  Q.   Okay.  So in person, meaning?  Where were you when you

2  spoke with him?

3  A.   It was either at the gym or my house because he usually

4  stayed with me most of the time.

5  Q.   Which were in the Eastern District of Michigan?

6  A.   Yes.

7  Q.   Did you ever have any phone calls with Mr. Didani?

8  A.   Yes.

9  Q.   What about video chats like FaceTime, did you ever do

10  that?

11  A.   Very rare.

12  Q.   What about chatting or text messages?

13  A.   Yeah, that's what mostly -- mostly what it was.

14  Q.   Okay.  I want you to turn to Exhibit 36.

15  A.   36?

16  Q.   Yes.

17  A.   Okay.  I'm there.

18      (Referenced in Evidence:  Government Exhibit 36 (Text

19       Thread Between Didani and Larson))

20  BY MR. MCDONALD:

21  Q.   Do you recognize this?

22  A.   Yes.

23  Q.   What is it?

24  A.   It's a text message between Lou and myself.

25  Q.   Okay.  And when you say Lou and yourself, are there

1    different colors in this text message?

2    A.   Yes.

3    Q.   What are the colors?

4    A.   Blue and white.

5    Q.   What color are your responses?

6    A.   White.

7    Q.   And what color are Mr. Didani's responses?

8    A.   Blue.

9    Q.   All right.

10           Have you reviewed this chat before today?

11   A.   Yes.

12   Q.   I want you to turn to 36-5.

13       (Referenced in Evidence:  Government Exhibit 36-5 (Text

14       Thread))

15   BY MR. MCDONALD:

16   Q.   Mr. Larson, it's also up on the screen here.  Mr. Larson.

17   A.   Okay.

18   Q.   It's also up on the screen here and the screen next to

19   you.

20   A.   I can't see that.

21   Q.   Can you see this?

22   A.   Yes.

23   Q.   All right.  I want to direct your attention to the middle

24   of that chat.  Can you read the first white bubble for the

25   jury?

1    A.   It says --

2            THE COURT:  On 36.5?

3            MR. MCDONALD:  Thirty-six dash five, Your Honor.

4            THE COURT:  Okay.

5            THE WITNESS:  "On 18642 Woodbine Road, Fraser,

6    Michigan 48026.  You gonna send me something today?  I don't

7    have $45 to even put minutes on that phone."

8    BY MR. MCDONALD:

9    Q.   What did you mean by that?

10   A.   It was a burner phone.

11   Q.   No, what did you mean by you have to send me something

12   today?

13   A.   Money.

14   Q.   And Mr. Didani's response?

15   A.   I try the latest tomorrow, I'm waiting on someone to get

16   it clean, that money -- or, clean that money and send the

17   order.

18   Q.   All right.  And then, what did you say?

19   A.   You can send me cash in FedEx packet inside a magazine.

20   Q.   What does that mean?  Why would you send cash in a

21   magazine?

22   A.   Because it was hard to wire money, so I asked him to send

23   it in a FedEx packet.

24   Q.   Why in a FedEx packet?

25   A.   Because it could get there the next day.

1    Q.  I want you to turn to 36-6, the very next page.

2        (Referenced in Evidence:  Government Exhibit 36-6 (Text

3         Thread))

4    BY MR. MCDONALD:

5    Q.  Did you see anything in this chat about photos of M?

6    A.  In 36-6?

7    Q.  Yes.

8    A.  Oh, yeah.  Yes.

9    Q.  Can you read that portion?

10   A.  Do you need hard photos from M?

11   Q.  That's you asking Mr. Didani?

12   A.  Yes.

13   Q.  And why were you asking Mr. Didani for hard photos from M?

14   A.  He wanted to get him a fake passport and he needed a photo

15   ID.

16   Q.  A fake passport for what?

17   A.  To travel so he don't have to travel under his name.

18   Q.  All right.

19           Can you turn to 36.9?  36-9, excuse me.

20   A.  I'm on it.

21       (Referenced in Evidence:  Government Exhibit 36-9(Text

22         Message Thread))

23   BY MR. MCDONALD:

24   Q.  Do you see any pictures in that chat?

25   A.  I do.

1    Q.   And who sent the picture, you or Mr. Didani?

2    A.   Lou sent it.

3    Q.   And then did he say anything after that?

4    A.   He said to delete it.

5    Q.   And the next page, 36-10.

6         (Referenced in Evidence:  Government Exhibit 36-10(Text

7         Message Thread))

8    BY MR. MCDONALD:

9    Q.   In the middle of that chat, do you see any chat from

10   Mr. Didani about your house?

11   A.   Yes.

12   Q.   What does it say?

13   A.   He was referring to the kilos in the bag, that that was --

14   when he sold those, that was going to pay for my house in

15   Texas.

16   Q.   Okay.  And again, you were renting a house at that time?

17   A.   In Michigan, yeah.

18   Q.   Did you own any houses?

19   A.   Never.  Back in, like, before -- I mean, I would buy a

20   house and fix it up and then sell it.  I was doing a couple

21   flips.

22   Q.   All right.  And so, your understanding, that text message

23   with Mr. Didani was showing you the kilos and telling you

24   that's your house?

25   A.   Yes.

1    Q.   And why is that your house again?

2    A.   Because I was trying to build a gym in Texas, and I need

3    -- and I was going to buy a house because they were beautiful

4    homes for like 350 grand.

5    Q.   Okay.

6    A.   In Texas, you can get something that's like a million

7    dollars here.

8    Q.   And so, how would the picture of the kilos be your house?

9    A.   When he sold them, he was going to use the money to send

10   it to me to buy a house.

11   Q.   All right.

12        Can you turn to 36-20?

13   A.   Okay.

14      (Referenced in Evidence:  Government Exhibit 36-20(Text

15       Message Thread))

16   BY MR. MCDONALD:

17   Q.   Reading from the top, can you read the first bubble there?

18   A.   "I'm waiting on Jack tomorrow or Sunday, and get the

19   dates."  If -- do you want me to keep going?

20   Q.   Yes, please.

21   A.   "If have time and I do it, have to go to Mexico next week.

22   Yes, I have to go when I get back.  I don't want to move 'til I

23   get something from Jack."

24   Q.   And what do you respond?

25   A.   "Getting pre-approved for a home loan."  He said, "I have

1    to pay off my credit card, nine grand, plus taxes, 8500, et

2    cetera.  I can get this house on Water Canal."

3    Q.   What house were you talking about?

4    A.   Oh, that -- that's -- that's the house in Michigan.  I was

5    trying to buy a house in Michigan on the canal.

6    Q.   And you were also trying to buy a house in Texas?

7    A.   Yeah.  Well, I wanted to live in Michigan because summers

8    were great.

9    Q.   Okay.  And also looking at 36.21 [sic].

10          After you tell Mr. Didani about this house, what does

11    he tell you?  What does he say?

12   A.   "We gonna pay all that."

13   Q.   At that time, did you know how Mr. Didani was making

14   money?

15   A.   Selling cocaine.

16   Q.   Also, in this same page, 36-21, can you read the bottom

17   starting with the white?

18          THE COURT:  I'm sorry, 36 dash what?

19          MR. MCDONALD:  36-21.

20      (Referenced in Evidence:  Government Exhibit 36-21(Text

21        Thread))

22   BY MR. MCDONALD:

23   Q.   Can you read the first white bubble on the bottom half of

24   that screen?  Do you see it up on the screen, Mr. Larson?

25   A.   Oh, yes.

1   Q.   And can you read that for the jury?

2   A.   "Need to move last seven."

3   Q.   And what did you mean when you said need to move the last

4   seven?

5   A.   Lou was telling me how he needed to move seven more -- the

6   last seven kilos of cocaine.

7   Q.   Okay.  So this is you saying, need to move that last

8   seven.  Why did you say that?

9   A.   Because I knew he had seven left.

10  Q.   All right.  And if he sold that seven, would you get

11  anything?

12  A.   I was supposed to get the money to put a down payment on

13  the house.

14  Q.   All right.

15       And then the next bubble, right below need to move

16  the last seven, what did Mr. Didani say?

17  A.   "I know."

18  Q.   And how did you respond?

19  A.   "Need money, I don't want to miss out on this house."

20  Q.   Can you turn to 36-22?

21       (Referenced in Evidence:  Government Exhibit 36-22(Text

22       Thread))

23  BY MR. MCDONALD:

24  Q.   Do you see any reference in that exhibit to engineers?

25  A.   Yes.

1  Q.  Can you read it?

2  A.  It says, "Same here.  Any engineers yet?"

3  Q.  All right.  And that's you, or Mr. Didani saying that?

4  A.  That's me.

5  Q.  All right.  Engineers for what?

6  A.  That's the - that's the torpedo or little submarine that

7  attaches to the bottom of the ship.

8  Q.  Do you know whether or not Mr. Tibbits obtained an

9  engineer for this project?

10 A.  He did.

11 Q.  And do you know where the engineer was located?

12 A.  Canada.

13 Q.  Did you ever have any conversations with Mr. Didani about

14 this torpedo?

15 A.  All three of us together, yes.

16 Q.  After Mr. Tibbits died, did you have any conversations

17 with Mr. Didani about the torpedo?

18 A.  Yes.

19 Q.  Can you tell us about that?

20 A.  He wanted me to continue having it built, but I didn't

21 know did guy's information, where he -- you know, how to get

22 ahold of him or anything like that, so that kind of died out.

23 Q.  And at the time you had the conversation with Mr. Didani,

24 where were you?

25 A.  Well, we were face-to-face.

1   Q.   In person?

2   A.   Yes.

3   Q.   And where, though?

4   A.   I don't remember.  But we talked about it, and like I

5   said, he wanted me to further it.

6   Q.   Okay.  Well, if you met in person, do you know what state

7   you were in?

8   A.   It would be in Michigan.

9   Q.   And do you know if it was in the Eastern District of

10   Michigan?

11   A.   Yes, it was.

12   Q.   Can you turn to 36-32?  Let me know when you're there,

13   Mr. Larson.

14   A.   I'm there.

15      (Referenced in Evidence:  Government Exhibit 36-32 (Text

16        Thread))

17   BY MR. MCDONALD:

18   Q.   Can you read the white bubble for the jury?

19   A.   Do I have to sign for it?

20   Q.   On the bottom -- excuse me, the bottom third of the --

21   A.   Oh, the bottom.

22        Okay.  I will leave a note on the door in case.

23   Don't tell M anything about Turkey, we will pay him back

24   everything on the other end, we need that money.

25   Q.   Who is M?

1  A.   Marty.

2  Q.   And what does that mean?

3  A.   Lou -- Lou sold more than the kilos he was letting on.  He

4  didn't want me to tell Marty how much we -- how much he sold.

5  And he wanted me to let him know that we only sold 10 so he

6  didn't have to pay so much money back.

7  Q.   Kilos of what?

8  A.   Kilos.  It was cocaine.

9  Q.   And does Mr. Didani respond to you after that?

10  A.   He said okay, you need to tell me what to say.

11  Q.   Can you turn to the next page?  That would be, for the

12  record, 36-33?

13  A.   Okay, yeah.

14     (Referenced in Evidence:  Government Exhibit 36-33 (Text

15      Thread))

16  BY MR. MCDONALD:

17  Q.   And beginning with the first white bubble at the top, can

18  you read that?

19  A.   I gotta get this house.  I'm gonna make it bad ass.  He

20  knows --

21  Q.   Okay.  Next one.

22  A.   He knows we moved 10.  Leave it at that.  He keeps asking

23  about the drone engineer.

24  Q.   Who knows you moved 10?

25  A.   Marty.

1   Q.  And who keeps asking about the drone engineer?

2   A.  Looks like -- he knows we moved 10, leave it at that.  He

3   keeps asking about the drone engineer.

4           Yeah, Marty.

5   Q.  All right.  And do you see a date on this chat anywhere?

6   A.  It says 10:53 a.m.  Oh, yeah, August 3, 2016.

7   Q.  Okay.

8           And when -- when he said he knows we moved 10, again,

9   what -- what are you talking about there?

10  A.  He knows -- I told him we moved 10 kilos.

11  Q.  Okay.  But then you said leave it at that.

12  A.  Right, because he moved -- he moved more than that.

13  Q.  Did you ever receive any cellular phones from Mr. Didani?

14  A.  I did.

15  Q.  And can you turn to 36-35?

16      (Referenced in Evidence:  Government Exhibit 36-35 (Text

17      Thread))

18  BY MR. MCDONALD:

19  Q.  In the middle of that chat, can you read the -- I guess it

20  would be the second white bubble?

21          THE COURT:  What's the exhibit number again?

22          MR. MCDONALD:  I'm sorry, Your Honor, 36-35.

23  BY MR. MCDONALD:

24  Q.  Mr. Larson, the second white bubble, can you read that?

25  A.  It says, I got it.

1    Q.   Then what?

2    A.   Turning it on.

3    Q.   Do you know what you're referencing there?

4    A.   Yeah, one of the encrypted Blackberry phones.

5    Q.   That you received from who?

6    A.   Well, Lou had it sent to my house in Fraser.

7    Q.   For you, or for someone else?

8    A.   He was definitely -- he was getting one for Marty, for

9    sure.

10   Q.   Okay.  And so, does -- does this message suggest that you

11   have the phone there?

12   A.   Yeah, it -- it arrived in the -- I think it was a FedEx

13   packet also.

14   Q.   And did Mr. Didani tell you, in this chat, what to do?

15   A.   Yeah, he was trying to instruct me on how to turn it on

16   and use it.

17   Q.   All right.  And then at the bottom, did he tell you to go

18   anywhere?

19   A.   Yeah, it says go to Sky ECC.

20   Q.   Do you know what Sky ECC is?

21   A.   I think that was the telecommunication encrypted company.

22   Q.   Okay.  Did you go to Sky ECC on that date, if you recall?

23   A.   Yeah, I was following his instructions because I didn't

24   know how to use it.

25   Q.   Can you turn to Exhibit Number 61?

```
 1   A.   Okay.
 2        (Referenced in Evidence:  Government Exhibit 61
 3         (Communications between Didani and Larson))
 4   BY MR. MCDONALD:
 5   Q.   Now, I want you to look at 61 all the way through 68.
 6   Excuse me, 61-8.  And can you tell me what that is?
 7   A.   This looks like communication between Lou and I.
 8   Q.   All right.  Make sure you speak up.
 9        Can you say that one more time?
10   A.   It was communications between Lou and I.
11   Q.   What type of communication; do you know?
12   A.   Well, I see the -- my phone number is on there as
13   participant.
14   Q.   Okay.  And --
15   A.   And the date stamped --
16   Q.   Okay.  And you're one of the participants, who is the
17   other participant?
18   A.   It was Lou.
19   Q.   All right.  I want you to turn to 61-2.
20        MR. FINK:  Your Honor, one of the jurors is trying to
21   get your attention.
22        PROSPECTIVE JUROR:  Your Honor, do you mind if I use
23   the restroom?  I'm so sorry.
24        THE COURT:  Oh, no, it's okay.  All of you can go,
25   okay?  It's no problem.
```

```
 1              Please rise for the jury.  I'm so sorry.

 2              Thank you, Mr. Fink.

 3         (Jury exited courtroom at 12:48 p.m.)

 4              THE COURT:  Okay.  You can all take 10 minutes.  And

 5    you may step down, Mr. Larson, during the 10 minutes, but

 6    don't speak to anyone except your own attorney about your

 7    testimony.

 8              Okay.  Let's take a break, all right?

 9              MR. BILKOVIC:  Thank you.

10         (Recess taken from 12:49 p.m. to 1:04 p.m.)

11              CASE MANAGER:  All rise.

12              Court is back in session.

13              THE COURT:  Are we ready to bring back out the jury?

14              MR. MCDONALD:  Yes, Your Honor.

15              DEFENDANT DIDANI:  Yes, Your Honor.

16              THE COURT:  Okay.  Step up, Mr. Larson, please.

17              CASE MANAGER:  All rise for the jury.

18         (Jury entered courtroom at 1:05 p.m.)

19              THE COURT:  Okay.  You may all be seated.

20              I'm satisfied the jurors are all present.  What about

21    you, Mr. McDonald?

22              MR. MCDONALD:  I am, Your Honor.  Thank you.

23              THE COURT:  What about you, Mr. Didani?

24              DEFENDANT DIDANI:  Yes, Your Honor.

25              THE COURT:  Good.
```

```
 1              Mr. Larson, you're still under oath.  But jurors, no
 2   problem if you need to take a break, just raise your hand, and
 3    someone will notice, okay?
 4   BY MR. MCDONALD:
 5   Q.   Mr. Larson, I was asking you about Exhibit 61,
 6   specifically, dash 2.
 7              THE COURT:  Dash 2?
 8              MR. MCDONALD:  Yes, 61-2.
 9      (Referenced in Evidence:  Government Exhibit 61-2 (Text
10        Thread))
11   BY MR. MCDONALD:
12   Q.   So that's small, but if you look on the screen --
13   A.   I can see it.
14   Q.   All right.  And this was a message from whom to whom?
15   A.   Lou was texting me.
16   Q.   What did he text you?
17   A.   He got two big loads in.
18   Q.   I want you to read what it says.
19   A.   Big load got very good, two.  The number two.
20   Q.   What do you know about loads?
21   A.   There's shipments that were successful, a load of cocaine.
22   Q.   All right.  Can you turn to 61-3?
23      (Referenced in Evidence:  Government Exhibit 61-3 (Text
24        Thread))
25              MR. MCDONALD:  And can you zoom in on the top,
```

 1   please?

 2   BY MR. MCDONALD:

 3   Q.   Who is this message from?

 4   A.   Also from Lou.

 5   Q.   And do you -- to you?

 6   A.   Yes.

 7   Q.   On what date?

 8   A.   1/22/2020.

 9   Q.   And what does Lou -- Mr. Didani tell you?

10   A.   He got three back to back.

11   Q.   I want you just to read what he says in this chat?

12   A.   It says, three back to back.

13   Q.   All right.  And you know what Mr. Didani meant when he

14   said three back to back?

15   A.   He completed three successful loads, or --

16   Q.   Of cocaine?

17   A.   -- shipments.

18        DEFENDANT DIDANI:  Your Honor, again, Mr. McDonald is

19   trying to lead, the cocaine.  Trying to lead the witness, Your

20   Honor, to answer.  Objection, Your Honor.

21        THE COURT:  Do you want to respond, Mr. McDonald?

22        MR. MCDONALD:  Judge, I simply asked him if he knew

23   what Mr. Didani was talking about when he said three back to

24   back.

25        THE COURT:  Well, you went a little further than

 1   that.  But that's all right, I'm going to allow it for the

 2   record.

 3          And your objection is noted for the record.  I think

 4   it's in keeping with the earlier testimony and answer to the

 5   prior question.

 6          DEFENDANT DIDANI:  Thank you.

 7   BY MR. MCDONALD:

 8   Q.   Mr. Larson, can you read the next line in 61-3?

 9   A.   But I had to stay very low key.

10   Q.   Who is this a message from?

11   A.   From Lou.

12   Q.   To who?

13   A.   To me.

14   Q.   And the date?

15   A.   1/22/2020.

16   Q.   And the next line, do you respond?

17   A.   Yeah, I said, "Okay, be safe."

18   Q.   What did you mean when you told Lou to be safe?

19   A.   Just to stay low key and be safe.

20   Q.   All right.

21   A.   Don't get caught.

22   Q.   I'm sorry?

23   A.   And don't get caught.

24   Q.   Can you turn to 61.4 [sic]?

25          (Referenced in Evidence:  Government Exhibit 61-4 (Text

```
 1          Thread))
 2   BY MR. MCDONALD:
 3   Q.   In the first chat there, can you read that for the jury?
 4   A.   "Need to send you phone like my."
 5             THE COURT:  And that's what exhibit again?
 6             MR. MCDONALD:  61-4, Your Honor.
 7   BY MR. MCDONALD:
 8   Q.   And who is that message from?
 9   A.   From Lou.
10   Q.   And again, the date on -- again, the date?
11   A.   1/22/2020, same day.
12   Q.   The next line?
13   A.   I said, "okay."
14   Q.   And what about the next line?
15   A.   "I don't keep this phone with me, only working phones."
16   Q.   Can you turn to 61-5?
17        (Referenced in Evidence:  Government Exhibit 61-5 (Text
18          Thread))
19   BY MR. MCDONALD:
20   Q.   I want you to look at the very first box, the first chat.
21   Can you describe what that is?
22   A.   You mean where the little picture is with the --
23   Q.   Nope, the very first chat.
24   A.   Oh, the chat, okay.
25   Q.   The very first one on 61-5, what is that?
```

1    A.   It says is that -- I said, "Is that bank transfer guy?".

2    Q.   Before that -- is that a chat from -- are you involved in

3    that chat?

4    A.   Oh, yes, it's my phone number still.

5    Q.   All right.  Are you the receiver, or are you sending it?

6    A.   I received it.

7    Q.   Who sent it?

8    A.   Lou.

9    Q.   And what did he send, if anything?

10   A.   It's very small, but it looks like there -- I believe that

11   at that particular time, he was sending me chats from other

12   people.  Like, he would take a picture of it and send it to me.

13   Q.   Have you ever seen larger photos of those four pictures?

14   A.   I don't think so.

15   Q.   Okay.  Go into your book and please look at 61.1.

16        (Received in Evidence:  Government Exhibit 61.1

17         (Screenshot))

18   BY MR. MCDONALD:

19   Q.   Do you recognize that?

20   A.   Oh, 61-1.  It looks like a phone conversation.  He said

21   brother.  Like, that's what he does when he wants to get my

22   attention.  I don't --

23   Q.   No, I'm asking you --

24   A.   61-1, right?

25   Q.   No, 61.1.

```
 1   A.   Oh, point one?

 2   Q.   Yeah.

 3   A.   I don't have it.  It goes from 61.0 to 61.2.

 4   Q.   Keep going.

 5   A.   61.3.

 6   Q.   Keep going.

 7           THE COURT:  No, can you step up and show him where

 8    you want him to go, please?

 9           MR. MCDONALD:  Okay.

10           THE WITNESS:  Oh, where was I at?  Oh, okay.

11           THE COURT:  And we're at 61.1; is that right?

12           MR. MCDONALD:  Yes, Your Honor.

13           THE COURT:  Thank you.

14   BY MR. MCDONALD:

15   Q.   And do you recognize that exhibit?

16   A.   Yes.

17   Q.   What is it?

18   A.   That was a screen shot from Lou and his Chinese friend.

19   Q.   How do you know it's a Chinese friend?

20   A.   Because he called him uncle.  He told me about it.

21   Q.   What did he tell you about uncle?

22   A.   He said he had to pay 16 percent to wash money.

23           THE COURT:  Is that 61.1?

24   BY MR. MCDONALD:

25   Q.   All right.  And 61.1 -- all right.  You said there's a 16
```

 1   percent you talked about?

 2              DEFENDANT DIDANI:  He's leading.  He said --

 3              THE COURT:  That's not leading.  He said, you said.

 4    That's not suggesting a new answer.  Overruled.

 5              Pose your question, please.

 6              MR. MCDONALD:  Thank you.

 7   BY MR. MCDONALD:

 8   Q.  You testified earlier about paying a little over 16

 9   percent?

10   A.  Yes.

11   Q.  Do you see that on this particular exhibit?

12   A.  I do.

13   Q.  All right.  Why don't we take a look at 61.2?

14       (Referenced in Evidence:  Government Exhibit 61.2

15        (Screenshot))

16   BY MR. MCDONALD:

17   Q.  Do you recognize this?

18   A.  Yes.

19   Q.  And what is it?

20   A.  Another picture of the chat between him and the Chinese

21   guy.

22   Q.  Okay.  And did you see any mention of uncle in this chat?

23   A.  Yes.

24   Q.  Can you read it?

25   A.  He says, "Uncle, send me tomorrow, two million in your

1   eco, e-c-o."

2   Q.  All right.

3   A.  "Very important."

4   Q.  Can you turn to 61.3?

5       (Referenced in Evidence:  Government Exhibit 61.3

6        (Screenshot))

7   BY MR. MCDONALD:

8   Q.  Do you recognize that?

9   A.  Pretty -- same thing.  A picture of his phone with his

10  chat between him and the Chinese guy.

11  Q.  And what does that say, the blue?

12  A.  It says, "pass me one," in letters, and then, "one million

13  here."

14  Q.  Okay.  And then, can you look at 61.4?  Do you recognize

15  that?

16  A.  Another picture of the chat between him and the Chinese

17  guy.

18      (Referenced in Evidence:  Government Exhibit 61.4

19       (Screenshot))

20  BY MR. MCDONALD:

21  Q.  All right.  Now, I want you to go back to 61-5.

22      (Referenced in Evidence:  Government Exhibit 61-5 (4

23       Photos))

24  BY MR. MCDONALD:

25  Q.  Do you recognize any of the four pictures here in this

```
 1   chat?
 2           Strike that.  Let me ask this another way.
 3           Do you know whether these four pictures are the same
 4    pictures we just saw in --
 5   A.   I see one picture in -- 61.5?
 6   Q.   No, 61-5.
 7   A.   Same thing?
 8   Q.   Nope, it's different.  61-5.
 9           MR. MCDONALD:  May I approach?
10           THE COURT:  Yes, you may.
11           THE WITNESS:  Oh, okay.
12   BY MR. MCDONALD:
13   Q.   My question was, in 61-5, do you recognize these four
14   images?
15   A.   From what I just looked at, yes.
16   Q.   And when you say what you just looked at, those were 61-1,
17   the bigger images?
18   A.   Right.
19   Q.   All right.
20           DEFENDANT DIDANI:  Objection, Your Honor, because
21    Mr. McDonald is showing pictures from Cellebrite, not --
22           THE COURT:  I'm sorry, tell me this again.
23           DEFENDANT DIDANI:  Mr. McDonald is showing pictures
24    from Cellebrite, not anything personal or from his phone, Your
25    Honor.
```

1          THE COURT:  Aren't these exhibits?

2          MR. MCDONALD:  They are, and they've been admitted,

3   Your Honor.

4          THE COURT:  And he asked him if he recognized them,

5   so what is your objection?

6          MR. DIDANI:  The objection is, Your Honor, those

7   photos is from Cellebrite.  Mr. Donald Larson right now is

8   only seeing photo from Cellebrite, not from the phone.

9          THE COURT:  And so, the objection is what?

10          DEFENDANT DIDANI:  That they are from Cellebrite,

11   Your Honor, and therefore --

12          THE COURT:  That they're from Cellebrite and,

13   therefore?

14          DEFENDANT DIDANI:  It's not showing him what's in the

15   phone.

16          THE COURT:  He hasn't shown him what now?

17          DEFENDANT DIDANI:  There's a lack of foundation, Your

18   Honor.

19          THE COURT:  From the exhibits that he's shown him?

20          DEFENDANT DIDANI:  Yes, Your Honor.

21          THE COURT:  And he asked him if he recognized them;

22   did he not?  And so, you want some other foundation shown?  I

23   think he's laid sufficient -- and aren't these admitted

24   already?

25          MR. MCDONALD:  Yes, they are, Your Honor.

1              THE COURT:  Okay.  I think there's a sufficient

2     foundation.  If he's never seen them, he can say he never saw

3     them, or he doesn't know what they are.

4              MR. MCDONALD:  Can you go back to 61-5, please?

5     BY MR. MCDONALD:

6     Q.  Mr. Larson, on the bottom of 61-5, do you see a message

7     from you to Mr. Didani?

8     A.  Yes.

9     Q.  And what's the date of that message?

10    A.  1/22/2020 again.

11    Q.  Can you read it?

12    A.  I asked, "Is that the bank transfer guy?"

13    Q.  And did Mr. Didani respond?

14    A.  He did.

15    Q.  What did he say?

16    A.  He said, "People, they pay me this only in three days."

17             THE COURT:  Now, just so we're clear, that is 61-5?

18             MR. MCDONALD:  Yes, Your Honor.

19             THE COURT:  Is that right?

20             MR. MCDONALD:  I do realize that is confusing.  It is

21    61-5 --

22             THE COURT:  Okay.

23             MR. MCDONALD:  -- as opposed to 61.5.

24             THE COURT:  All right.

25    BY MR. MCDONALD:

1   Q.  Can you turn to 61-6, the following -- the next page.

2       (Referenced in Evidence:  Government Exhibit 61-6 (Text

3       Thread))

4   BY MR. MCDONALD:

5   Q.  And do you respond to Mr. Didani from the prior page?

6   A.  I do.

7   Q.  And what do you say?

8   A.  "Damn, what's the 16 percent?"

9   Q.  And what's the date of that again?

10  A.  1/22/2020.

11  Q.  Does Mr. Didani respond to you?

12  A.  He does.

13  Q.  What does he say?

14  A.  "I have to pay, brother."

15          THE COURT:  I have to what?

16          THE WITNESS:  Pay.

17  BY MR. MCDONALD:

18  Q.  I have to pay, brother?

19  A.  Yes.

20  Q.  And then the message below that?

21  A.  "Chinese people to send me the men from Europe to Dubai,

22  then here."

23          MR. MCDONALD:  You can take that down.

24  BY MR. MCDONALD:

25  Q.  Do you know the places that Mr. Didani has lived since

1  you've known him?

2  A.   Yes.

3  Q.   And can you tell us?

4  A.   Well, Albania for sure.  He was in Ecuador and Dubai,

5  those three.  And then, of course, in the United States.

6  Q.   Where in the United States?

7  A.   His family lives in Chicago.

8  Q.   Okay.  What about in the Eastern District of Michigan, did

9  he ever live there?

10  A.   I'm not sure if he had his own apartment or own place, but

11  he did stay with me when he was -- when he was in town.

12  Q.   Now, can you turn to 61-9?

13       (Referenced in Evidence:  Government Exhibit 61-9 (Text

14        Thread))

15            MR. MCDONALD:  And the bottom third, can you zoom in,

16  please?

17            THE COURT:  And this is 61-9?

18            MR. MCDONALD:  Yes, Your Honor.

19  BY MR. MCDONALD:

20  Q.   Do you see a message between you and Mr. Didani on 61-9,

21  the first one?

22  A.   Yes.

23  Q.   And can you --

24  A.   Yes.

25  Q.   -- read that for the record?

1   A.   Can you send me 10 or 20 to get me caught up.

2   Q.   All right.  Is that a message from Mr. Didani to you, or

3   from you to Mr. Didani?

4   A.   That's from me to Lou.

5   Q.   Okay.  And what's the date on the message?

6   A.   February 6, 2020.

7   Q.   And you said, can you send me 10 or 20 to get me caught

8   up, what did you mean?

9   A.   Ten or 20 thousand dollars.

10  Q.   And the next message below that?

11  A.   I said, "My gym now is different."

12  Q.   After you sent those two messages, did Mr. Didani respond?

13  A.   Yes.

14  Q.   What did he say?

15  A.   "Let me ask when my guy is back in Chicago from Cali."

16  Q.   Can you turn to the next page, 61-10?

17       (Referenced in Evidence:  Government Exhibit 61-10 (Text

18       Thread))

19            MR. MCDONALD:  And could you zoom in on all the

20   messages there, please?

21  BY MR. MCDONALD:

22  Q.   Mr. Didani send you a message that shows up on 61-10?

23  A.   Yes.

24  Q.   What did he say?

25  A.   You can go to Chicago?  He asked if I can go to Chicago.

1   Q.   Okay.  And did you respond?

2   A.   I did.

3   Q.   What did you say?

4   A.   I said, "Yes."

5   Q.   And did Mr. Didani respond?

6   A.   He did.

7   Q.   And what did he say?

8   A.   He said, "Okay.  Let me talk to him."

9   Q.   What is the date of all three of these messages?

10  A.   February 6, 2020.

11  Q.   Can you turn to 61-11?

12       (Referenced in Evidence:  Government Exhibit 61-11 (Text

13        Thread))

14            MR. MCDONALD:  And could you zoom in on the bottom of

15   that?

16  BY MR. MCDONALD:

17  Q.   Can you read that message in the bottom of 61-11?

18  A.   "How much are you going to send?"

19  Q.   And who said that, you or Mr. Didani?

20  A.   I did.

21  Q.   Do you know the date?

22  A.   April 21, 2020.

23  Q.   Can you turn the page and look at 61-12?

24       (Referenced in Evidence:  Government Exhibit 61-12 (Text

25        Thread))

1            MR. MCDONALD:  Can you zoom in on the top half?

2    BY MR. MCDONALD:

3    Q.   After you asked Mr. Didani how much he's going to send,

4    did he respond?

5    A.   He did.

6    Q.   What did he say?

7    A.   3,000.

8    Q.   And can you read the rest of that conversation that's on

9    the screen, for the jury, please?

10   A.   The next one?

11   Q.   The next one.

12   A.   It says, "Okay, getting the numbers right now."

13   Q.   And then the next one?

14   A.   I gave him my routing and account number, and the swift

15   code for the bank.

16   Q.   Did Mr. Didani respond after you gave him the swift code?

17   A.   Yes.

18   Q.   What did he say?

19   A.   Need address.

20   Q.   And, anything else?

21   A.   And then he said, "Name.  Last name.  All" -- then he

22   said, "All, brother."

23   Q.   Can you turn to 61-13?

24       (Referenced in Evidence:  Government Exhibit 61-13 (Text

25        Thread))

 1           MR. MCDONALD:  Could you zoom in on the top two,

 2    please?

 3    BY MR. MCDONALD:

 4    Q.   And Mr. Larson, on 61-13, did you send Mr. Didani

 5    anything?

 6    A.   I sent him my name, full name and address.

 7    Q.   Okay.  And is that your -- whose -- is that your address?

 8    A.   No.

 9    Q.   Whose address is that?

10    A.   That's my brother's address.

11    Q.   Why did you give Mr. Didani your brother's address?

12    A.   Because that was the official name on my bank account

13    because I moved around a lot, so I used my brother's address as

14    the main address.

15    Q.   And in the -- the next message, does Mr. Didani send you

16    anything?

17    A.   It's very small.

18    Q.   Can you look at 61.5?  That's the other one.

19           MR. MCDONALD:  May I approach?

20           THE COURT:  Yes, you may.

21           THE WITNESS:  Yeah, that's way back here, I think.

22    Further up?  Oh, here it is.

23           MR. MCDONALD:  Do you recognize -- I'm sorry, I'll

24    wait until I get in front of the microphone.

25    BY MR. MCDONALD:

1    Q.    Do you recognize 61.5?

2    A.    I don't recall it, no.

3              MR. MCDONALD:   Can you show 61.5?

4    BY MR. MCDONALD:

5    Q.    All right.  Mr. Larson, can you go back to the chat here

6    on 61-14?

7         (Referenced in Evidence:  Government Exhibit 61-14

8          (Article))

9              THE COURT:   61-14?

10             MR. MCDONALD:   Yes, Your Honor.

11             THE COURT:   Okay.

12             MR. MCDONALD:   Could you zoom in on the whole page?

13   BY MR. MCDONALD:

14   Q.    Mr. Larson, was there ever a time where Mr. Didani sent

15   you any articles?

16   A.    Yes.

17   Q.    And what did he send you articles of?

18   A.    He sent me articles of shipments that got busted.

19   Q.    All right.  In looking at 61-14, does that appear to be

20   one of those articles, or is that something different?

21   A.    The one with the link?

22   Q.    The one in the middle there, on the screen.

23   A.    It's small, but it could be, yeah.  He sent me -- he sent

24   me like links if one of his shipments got busted, to show that

25   he didn't make any money that time, you know.

1    Q.   Did Mr. Didani ever send you any money?

2    A.   Very little, 3,000.

3    Q.   And do you remember when he sent you that 3,000?

4    A.   I don't remember the exact -- that's the chat we were

5    talking about when he sent me the 3,000, right? -- on there.

6    Q.   I don't know, I'm asking --

7    A.   I know, but we were just talking about that.

8    Q.   Okay.  I want you to turn to --

9    A.   He wired me $3,000.

10   Q.   -- 61-15.

11        MR. MCDONALD:  Could you zoom in on the middle of

12   that?

13      (Referenced in Evidence:  Government Exhibit 61-15 (Photo))

14   BY MR. MCDONALD:

15   Q.   Do you recognize any images in that -- in 61-13?  Fifteen,

16   excuse me.

17   A.   Very small.

18   Q.   Okay.  You don't know what that is, just looking at it,

19   Mr. Larson?

20   A.   I can't -- still can't see it.

21   Q.   All right.

22        Do you know if Mr. Didani ever sent you any spread

23   sheets or drug ledgers?

24   A.   Yes.

25   Q.   And I want -- I want you to take a look at 61.9.

```
 1   A.   I'm on it.
 2   Q.   Do you recognize that?
 3   A.   Yes.
 4   Q.   And what is it?
 5   A.   Those were the deposits he showed me, that the Chinese guy
 6   transferred to his account.
 7   Q.   The uncle guy?
 8   A.   Yes.
 9   Q.   And that's a photograph that you're looking at?
10   A.   It's a -- he took a picture of his phone.
11   Q.   All right.  Does that fairly and accurately depict what he
12   showed you on that date, --
13   A.   Yes.
14   Q.   -- on the spreadsheet?
15            MR. MCDONALD:  Move for admission of 61-9?
16            THE COURT:  Any objection?
17            DEFENDANT DIDANI:  Your Honor, I object to
18   speculation.  It's just pictures, it's speculations.  It's
19   just pure speculations.
20            THE COURT:  It's -- what's speculation, his answer?
21            DEFENDANT DIDANI:  The picture in there, exactly, and
22   his answer, too, Your Honor.  It's pure speculation.
23            THE COURT:  Do you want to respond to that.
24            MR. MCDONALD:  Judge, I asked Mr. Larson if
25   Mr. Didani ever sent him a photograph of drug ledgers.  He
```

1    said, yes.  I showed him that photograph and he identified

2    that as a ledger that -- where Mr. Didani received money from

3    Mr. Uncle -- a person by the name of Uncle.  He said that

4    fairly and accurately depicts what he viewed.  It's not

5    speculation.

6          Move for admission.

7          THE COURT:  You can take it up on cross-examination

8    if you want to challenge it.  Overruled.

9          It's admitted at 61.9.

10     (Received in Evidence:  Government Exhibit 61.9 (Photo of

11      Deposits))

12         MR. MCDONALD:  Thank you.

13   BY MR. MCDONALD:

14   Q.  Finally, Mr. Larson -- well, probably not finally, but can

15   you turn to Exhibit Number 62?  Are you there?

16   A.  Yes.

17     (Referenced in Evidence:  Government Exhibit 62.0 (Text

18      Thread))

19   BY MR. MCDONALD:

20   Q.  Do you recognize what 62.0 is?

21   A.  No.

22   Q.  You don't know what this is?

23   A.  It looks like it's in a translation from a different

24   language.

25   Q.  Not the first box, --

1    A.   Okay.

2    Q.   -- the document as a whole.  Do you know what it is?

3    A.   On 62.0?

4    Q.   62.0 and 62 point -- the first dash.

5    A.   Okay.  The first box is a different translation, and then

6    it says brother.  So he's saying it.

7    Q.   I'm not asking about the content, I'm asking if you know

8    what this.  Is this -- do you --

9    A.   Oh, that's from an encrypted phone.

10   Q.   But what is it?  What is this document, the document

11   itself?

12   A.   The -- it's a -- you're intercepting his phone calls, I

13   guess.

14   Q.   Is this a text message chat?

15   A.   Oh, yeah.

16   Q.   Okay.  And do you know who it's a --

17   A.   It's from Lou to my phone.

18   Q.   Okay.  I want you to look specifically at 62-2.  You see

19   that?

20   A.   Yes.

21         MR. MCDONALD:  Can you show 62-2?

22      (Referenced in Evidence:  Government Exhibit 62-2 (Text

23       Thread))

24   BY MR. MCDONALD:

25   Q.   Can you read the messages on 62-2?

1    A.  I say, "Great, where are you?"  And he responded,

2    "Chicago."

3    Q.  And what was the date of that message?

4    A.  November 5, 2016 -- 18.  2018.

5    Q.  All right.  Can you turn to 62-6?

6         MR. MCDONALD:  And could you zoom in on the

7    photograph of 62-6?

8       (Referenced in Evidence:  Government Exhibit 62-6 (Photo))

9    BY MR. MCDONALD:

10   Q.  Do you recognize that photograph, Mr. Larson?

11   A.  It's blurry.

12        THE COURT:  Do you want to step down and walk over so

13   you can see it better?

14        THE WITNESS:  Can I look at this one?  I can see this

15   one better.

16        THE COURT:  Okay.

17        THE WITNESS:  Can you zoom back out a little bit so

18   it's not so blurry?  A little bit.

19   BY MR. MCDONALD:

20   Q.  Do you recognize who that is?

21   A.  It looks like Lou with a bunch of kilos in the background.

22   Q.  Okay.  I want you to turn the page to 62.1.

23        DEFENDANT DIDANI:  Your Honor, objection.  That's a

24   gym behind.  That's a photo in the gym, not a kilo.

25        THE WITNESS:  Oh, that's a photo I can see.

 1          MR. MCDONALD:  I'm going to show him a larger

 2    picture, Your Honor.

 3          THE COURT:  Excuse me.  He said what he thought it

 4    was.  That's his answer.  You may dispute that, and you may

 5    take that up on cross-examination.

 6          Or, you may take it up as well, if you'd like,

 7    Mr. McDonald, okay?

 8          MR. MCDONALD:  I will.  Thank you.

 9          DEFENDANT DIDANI:  Well, Your Honor, Mr. McDonald is

10    the prosecutor, this is -- Mr. McDonald needs to correct what

11    is in there because he provided it as an exhibit, Your Honor.

12          THE COURT:  No.  No.

13          DEFENDANT DIDANI:  Mr. McDonald need to correct it.

14          THE COURT:  He could be wrong.  And that's why

15    there's cross-examination so you can test whether or not he's

16    correct, okay?  But he, apparently, is going to ask some more

17    questions about it, all right?  But the witness's answer was

18    what it looked like to him.

19    BY MR. MCDONALD:

20    Q.  Mr. Larson --

21          MR. MCDONALD:  May I proceed, Your Honor?

22          THE COURT:  Yes, you may.  That objection is

23    overruled.  I'm not exactly sure what it was, but it's

24    overruled.

25    BY MR. MCDONALD:

1   Q.   Mr. Larson, can you look at Exhibit 62.1?

2   A.   Yes.

3   Q.   Can you see that?

4   A.   Yes.

5   Q.   And does that photograph appear to be the same photograph

6   that was a smaller version?

7   A.   Yes.

8   Q.   Okay.  Can you describe what that photograph is, please?

9           THE COURT:  Wait, before you do that, this is Exhibit

10   what?

11          MR. MCDONALD:  62.1, Your Honor.

12          THE COURT:  62.1.  Okay.

13   BY MR. MCDONALD:

14   Q.   Can you describe what that photograph is, please?

15   A.   Yeah, it's Lou showing me a picture.  He's inside a

16   building.  I can't tell if it's in a gym or not.

17   Q.   Okay.  You can't tell whether it's kilos or not?

18   A.   No, it was very blurry in that last picture.

19   Q.   Okay.

20          MR. MCDONALD:  Move for admission of 62.1.

21          THE COURT:  Any objection to 62.1?

22          DEFENDANT DIDANI:  No objection, Your Honor.

23          THE COURT:  All right.  It's admitted.

24      (Received in Evidence:  Government Exhibit 62-1 (Photo))

25   BY MR. MCDONALD:

1  Q.  And finally, turn to 63.0, please.

2  A.  63.0?

3  Q.  Yes, the exhibit as a whole.

4     (Referenced in Evidence:  Government Exhibit 63.0 (Text

5       Message))

6          THE WITNESS:  It just says that messages to this chat

7   and calls are now secured with end-to-end encryption, tap for

8   more details.

9  BY MR. MCDONALD:

10  Q.  Is this message a chat?  Excuse me.  Is this exhibit a

11  chat?

12  A.  I don't see any chat in it.  It's from the encrypted

13  phone.

14  Q.  Can you turn to the next page, 63-2?

15     (Referenced in Evidence:  Government Exhibit 63-2 (Text

16       Thread))

17  BY MR. MCDONALD:

18  Q.  Do you see any chats there?

19  A.  Yes.

20  Q.  Who do you see chats between?

21  A.  Lou and myself.

22  Q.  On 63-2, --

23          MR. MCDONALD:  Can you zoom in on the top?

24  BY MR. MCDONALD:

25  Q.  -- can you read the first two boxes for us?

1    A.    "Need little luck, brother."

2    Q.    Who said that?

3    A.    Lou.

4    Q.    And what was the date of that?

5    A.    October 15, 2019.

6    Q.    What's the nest -- what's the next message?

7    A.    He said, "That it."

8    Q.    Lou said that?

9    A.    Yes.

10   Q.    Do you respond to Mr. Didani's message?

11   A.    I did.

12   Q.    What did you say?

13   A.    "Out fox them.  You've got to be smarter than them."

14   Q.    What did you mean by that?

15   A.    Well, I knew -- I knew he was being watched.  I told him

16   before, but I just told him, you've got to out fox them.

17   Q.    Out fox who?

18   A.    The -- the authorities.

19   Q.    And finally, can you turn to 63.4, top of 63-4?

20         (Referenced in Evidence:  Government Exhibit 63-4 (Text

21          Thread))

22   BY MR. MCDONALD:

23   Q.    Could you read the first message there at the top of 63-4?

24   A.    "You sure they are not watching, question mark."

25   Q.    And is that -- that's from whom to who?

1   A.   That was from me to Lou.

2   Q.   And what was the date of that?

3   A.   October 15, 2019.

4   Q.   Did Mr. Didani respond to that?

5   A.   He said, "Me."

6   Q.   All right.

7           MR. MCDONALD:  You can go back out and zoom in on the

8    bottom, please.

9   BY MR. MCDONALD:

10  Q.   After Mr. Didani said me, did he respond again?

11  A.   He said, "Where."

12  Q.   And what about you, what did you say, if anything?

13  A.   I said, "Oh, you get caught too many times."

14  Q.   What did you mean by that?

15  A.   Well, he was losing like six out of 10 shipments.  And I

16  said -- I told him, you've got to be being watched.  Somebody's

17  got to be watching you, the average is one out of 10, and he

18  was getting caught, six out of 10.  So I said, they've got to

19  be watching you.  And he blamed everything on everybody else.

20  Q.   Six out of 10 shipments of what?

21  A.   Cocaine.

22          THE COURT:  All right.  I think we're going to stop

23   here for the day.

24          MR. MCDONALD:  That was my last question.

25          THE COURT:  That was your last question?

```
 1              MR. MCDONALD:  That was my last question.  I've just
 2    got to ask Mr. Bilkovic something.
 3              THE COURT:  We're going to start up tomorrow.  So
 4    Mr. Larson, you have to return tomorrow, all right?
 5              THE WITNESS:  Yes, ma'am.
 6              THE COURT:  And you have to return at 9:30.  You need
 7    to come slightly earlier, like 9:25, okay?
 8              THE WITNESS:  My lawyer has a --
 9              THE COURT:  Your lawyer can't come tomorrow?
10              THE WITNESS:  Not early.
11              THE COURT:  Okay.  Let's send the jury to the jury
12    room.  But before you do, I want to tell you, you're not
13    permitted to talk about the case amongst yourselves or with
14    anyone else until I tell you it's time to deliberate.  And
15    also, don't use any social media, the internet to communicate
16    anything about the case, find out anything about the case
17    including the people, places, or the things, all right?
18              And is there anything else you want me to tell them
19    today, Mr. McDonald?
20              MR. MCDONALD:  Nothing from the Government.
21              THE COURT:  Mr. Didani?
22              DEFENDANT DIDANI:  No, Your Honor.
23              THE COURT:  All right.  You may step down.  Have a
24    good evening.
25              Please leave your pads as indicated by Ms. Daley, or
```

 1    by Ms. Saulsberry.  All right.  Have a good evening.

 2        (Jury exited courtroom at 1:40 p.m.)

 3            THE COURT:  You may step down, sir.  Please don't

 4    discuss your testimony with anybody except your own attorney.

 5            You may all be seated.

 6            Now, tell me about tomorrow, Mr. McDonald.

 7            MR. MCDONALD:  Your Honor, Mr. Churikian has

 8    indicated to me that he has a matter tomorrow morning, I

 9    believe, at 8:30, in 37th District Court, but he thought he

10    could be to the courthouse here by 10:00.

11            THE COURT:  Okay.  And what do you have between 9:30

12    and 10:00, Mr. McDonald?

13            MR. MCDONALD:  I guess we could put another witness

14    on for half hour.  I'd prefer not to do that, and just

15    continue into the cross-examination at 10:00 a.m., of

16    Mr. Larson, since we're starting at 9:30 anyway, Your Honor.

17            THE COURT:  All right.  Any objection?

18            DEFENDANT DIDANI:  No, no objection, Your Honor.

19            THE COURT:  Good.

20            All right then, do you have any matters that you're

21    going to want to take up before the jury comes in?

22            MR. MCDONALD:  I have none.

23            THE COURT:  Do you have any Mr. Didani?

24            DEFENDANT DIDANI:  No, Your Honor.

25            I just want to bring to your attention --

1    THE COURT:  No, do you have any matters that you're

2    going to bring up tomorrow?

3    DEFENDANT DIDANI:  No.  No, I just wanted to bring --

4    no, in front of the jury, no, Your Honor.  I just wanted to

5    bring to the attention before we leave.

6    THE COURT:  Hang on one second.  We can tell

7    Mr. Larson and Mr. Churikian that you can come back tomorrow

8    at 10:00, okay?

9    MR. CHURIKIAN:  Thank you, Judge.

10    THE COURT:  All right.  You're welcome.

11    What else do you want to bring to my attention

12    because I have a 2:00, and it involves a number of people so I

13    need time for you all to be able to gather your things so the

14    people that are going to be here can have their hearing.

15    What do you want to bring to my attention?

16    DEFENDANT DIDANI:  Very quick, Your Honor, I want to

17    bring to your attention, I'm having an issue with this -- this

18    e-mail that was given to me, you know, and the my -- a copy of

19    Marty Tibbits' computer.

20    THE COURT:  You're having a problem with the e-mail

21    from Mr. Tibbits' computer?

22    DEFENDANT DIDANI:  No, I was given a USB to take a

23    look at all these e-mails and I could not access those on any

24    computer in Milan.  Also, I was given a copy of Marty's

25    computer, Surface Pro, that Mr. Fink tried to make a copy of

```
 1    it so we could have examined, evidence.  There is a lot of
 2    evidence on that, on those -- on those -- in those computer
 3    and e-mail.  So basically, I could not e-mail -- I could not
 4    access none of those, too.  And Mr. -- I could access the
 5    e-mail or Mr. Fink cannot access the computer.  But today, in
 6    the morning, it was two computers.
 7            THE COURT:  You can't access your own e-mail?
 8            DEFENDANT DIDANI:  There is an e-mail that belongs --
 9    that was given to me.
10            THE COURT:  Evidence in the case is this e-mail
11    between you and Mr. Fink from the prison?
12            DEFENDANT DIDANI:  Yes, Your Honor.
13            THE COURT:  That's which --
14            DEFENDANT DIDANI:  No, we're talking about e-mails,
15    Your Honor, me, Fink, e-mails that Mr. Tibbits or Mr. Larson
16    have sent to me through e-mails.  There is an e-mail that --
17            THE COURT:  That's on the USB port?
18            DEFENDANT DIDANI:  Apparently, the USB was tried in
19    every computer at Milan, and we cannot get access to that,
20    Your Honor.  And there is another --
21            THE COURT:  Okay.  So how long have you been trying
22    to do this?
23            DEFENDANT DIDANI:  About for a few days, Your Honor.
24            THE COURT:  How many is a few?
25            DEFENDANT DIDANI:  Since last week when it was given
```

```
 1   to me from Agent Hermans.
 2            THE COURT:  Okay.  You got it when?
 3            DEFENDANT DIDANI:  It was a Friday, not this Friday
 4   past, Your Honor, but the Friday before.
 5            THE COURT:  A week ago Friday?
 6            DEFENDANT DIDANI:  Yes, Your Honor.
 7            THE COURT:  So you haven't been able to look at it
 8   all that time?
 9            DEFENDANT DIDANI:  No, Your Honor.
10            THE COURT:  Okay.  So next time, you need to tell me
11   a lot faster, okay?
12            And tell me this, you can't open the Surface Pro
13   either?
14            DEFENDANT DIDANI:  Mr. Fink tried to open it.  I was
15   opening it in Milan, but for some reason I couldn't open it
16   today that it was -- those, both the USB and copy was taken
17   out of my position -- my -- from Milan's higher up.
18            THE COURT:  They took -- the Surface Pro's
19   information was taken from your possession?
20            DEFENDANT DIDANI:  The Surface Pro and the e-mail.
21            THE COURT:  They were taken from you by whom?
22            DEFENDANT DIDANI:  By Milan.
23            THE COURT:  By Milan?  Milan doesn't take anything
24   from anybody, there has to be a person involved.
25            DEFENDANT DIDANI:  Oh, there's Mr. Oslyn.
```

```
 1              THE COURT:  And who is he?
 2              DEFENDANT DIDANI:  He's a -- I think he is a case
 3    manager at Milan, with FDC.
 4              THE COURT:  And do you know why he took it?
 5              DEFENDANT DIDANI:  He -- Mr. Fink.
 6              MR. FINK:  Do you want me to tell you the factual
 7    matters, Judge?
 8              THE COURT:  I have a 2:00, and there are going to be
 9    a bunch of people here, but yes, you all can have five more
10    minutes.
11              MR. FINK:  I'm sorry, Judge, I'm just trying to
12    expedite it for you.
13              I was forwarded an e-mail from the U.S. Marshal
14    Service to me that was from Milan.  They, apparently,
15    confiscated two drives, one was the thumb drive Yahoo e-mail
16    account of Mr. Didani and the laptop Surface Pro.  The reason,
17    without reading you the whole e-mail, is they were unable to
18    verify that it was quote on quote, legit, because I was the
19    one who brought them to the prison, and to inform me of proper
20    procedures of how to bring them to the prison.  The Court will
21    recall that the Government and I have tried very hard to make
22    this as expeditious as possible, so I will bring this to a
23    counselor with the Lieutenant's permission all in one room
24    looking at what I was given.  Nevertheless, there seems to be
25    total miscommunication between the departments there.
```

 1          The Government has done its part to help.  They have

 2    verified that those drives are from -- produced by them to me

 3    and then sent to Mr. Didani.  But I'm kind of at a loss of how

 4    Milan expects me to do this in a timely fashion with him

 5    representing himself.

 6          So in sum, Judge, he has been dispossessed of those

 7    two items because they were brought by me to the prison rather

 8    than what they view as proper procedures, I guess, sent by the

 9    Government.  That was an e-mail from Ms. Amanda Seeger from

10    the U.S. Marshals Service to me.

11          THE COURT:  And these he hasn't had in a week?

12          MR. FINK:  He -- no, he lost possession, physical

13    possession of them, this morning.

14          DEFENDANT DIDANI:  This morning.

15          MR. FINK:  As far as access goes, it has been about a

16    week anyway because of the inaccessible computers.  And I will

17    say the Surface Pro, the computer that I had doesn't have the

18    ram to load that software, so I will have to get something

19    that I can.  So I don't doubt that I can.  And I've heard from

20    his counselors that there has been a problem loading that

21    stuff as well.

22          THE COURT:  Okay.  And so, you want me to do what?

23          DEFENDANT DIDANI:  So Your Honor, those are -- those

24    are evidence, you know, the computer --

25          THE COURT:  That's not my question.  I know they're

1   evidence or potential evidence, but what do you want me to do?

2            DEFENDANT DIDANI:  I need those evidence in my

3   possession, Your Honor.

4            THE COURT:  And so, what are you asking me to do?

5            DEFENDANT DIDANI:  Maybe a --

6            THE COURT:  Do you want -- excuse me.  Do you want

7   another copy?

8            DEFENDANT DIDANI:  Yes, Your Honor.  Yes, please, if

9   it's possible, for both of them.

10           THE COURT:  Is that possible?

11           DEFENDANT DIDANI:  I'm sorry I cut you, Your Honor.

12           THE COURT:  Oh, I don't think so, but go ahead.

13           DEFENDANT DIDANI:  But those copies that can be

14  useful, Your Honor, not copies that are encrypted, Your Honor.

15  Both of those copies have encryption.  That's what I was

16  trying to explain to you.  They give me a copy and that's been

17  an issue with the e-mails.  And I printed some of them, me and

18  -- me and Counsel Green, we went through all the computers and

19  everything comes with encryption.  It's all encrypted.  There

20  is no messages coming up.  So I would like to -- for the

21  Government to give us something that works so we can see.

22           THE COURT:  Mr. McDonald.

23           MR. MCDONALD:  Your Honor, we've produced to

24  Mr. Didani what we've received.  The Surface Pro, he's had

25  that, he's accessed it, as far as I know.  He's only recently

 1    been dispossessed.

 2              In terms of the e-mails, the e-mails come in a unique

 3    fashion.  They're in a text file.  They're not in a Word file.

 4    They're not in any other readable file.  That's what we have.

 5    Mr. Didani has that.  So he has to open the file.  And within

 6    that slew of information in there is, in fact, the message

 7    between whatever e-mail and Mr. Didani or Mr. Didani and

 8    another e-mail.  We can produce another copy of those e-mails.

 9    I just fear that it's going to be the same thing.  I mean,

10    maybe he doesn't know exactly what he's looking for.  We can

11    certainly sit down with him with a copy, and show him what it

12    is that he should be looking at.

13              THE COURT:  Okay.  Could you --

14              MR. MCDONALD:  The Surface Pro -- I'm sorry, Your

15    Honor.

16              THE COURT:  Could you do that?  Could you sit down

17    and be able to look at the e-mails to show how he and his

18    standby counsel, how they should gain access to it?

19              MR. MCDONALD:  Of course.  The Surface --

20              THE COURT:  Okay.  And what about the Surface Pro?

21    Can you do that?  When can you do that?

22              MR. MCDONALD:  I can do that as -- as early as this

23    afternoon if Mr. Fink is available.  If he wants to come over,

24    I can show him.

25              THE COURT:  Are you available?

1          MR. FINK:  I know how the e-mails in Surface Pro

2     works, this is a Mr. Didani and accessing it in prison issue.

3          MR. MCDONALD:  Well --

4          MR. FINK:  I don't have the issue.  My issue was due

5     to having access to a computer that has enough ram to load it.

6          THE COURT:  Okay.  So the e-mail part, Mr. McDonald

7     needs to show Mr. Didani?

8          MR. FINK:  I can be present there, I just don't know

9     how --

10          THE COURT:  I think you need to be present?

11          MR. FINK:  Oh, I'll absolutely be present, Your

12     Honor, I'm just trying to tell you --

13          THE COURT:  Can you do it this afternoon?

14          MR. FINK:  I'll do whatever you ask me to do.  I just

15     think it's a computer issue, not a user issue, necessarily.

16          THE COURT:  Okay.

17          MR. MCDONALD:  And with respect to the Surface Pro,

18     it doesn't sound like he's having a problem accessing it, it's

19     a problem that he was dispossessed of that this morning.

20          THE COURT:  Okay.  Now, what can we do about

21     dispossession?

22          MR. BILKOVIC:  Judge, we'll check with Milan to find

23     out why that happened.  If they need something from us, we'll

24     get them whatever they need.

25          THE COURT:  Okay.  And can you tell them if they're

```
 1    going to let him have it back, to do it as soon as possible?
 2              MR. BILKOVIC:  Yes, Your Honor.
 3              THE COURT:  Okay.  Great.
 4              So if you want, Mr. McDonald, where do you want to do
 5    this, because Mr. Didani is in custody?  Do you want me to
 6    keep him here until a quarter to 4:00 and you'll do it here,
 7    or what?
 8              MR. MCDONALD:  Well, I guess I was hoping Mr. Fink
 9    would come over to my office, I will show him, and he has an
10    open line of communication with Mr. Didani.  I think it's not
11    that difficult.
12              THE COURT:  I think what he just said was he already
13    did that, and he thinks the issue is something at the prison,
14    right?
15              MR. FINK:  I have -- Mr. McDonald was kind -- this
16    has nothing to do with the Government.  Mr. McDonald was kind
17    enough to do a summary of e-mails of what he was looking for.
18    He gave him hard copies of those.  I discussed it with Agent
19    Hermans, how to look at them, and I've done my best to explain
20    that.  Judge, the issue is loading it onto my own computer, I
21    don't think it's a, I can't read this.
22              MR. MCDONALD:  Judge, may I suggest you bring up
23    Mr. Didani tomorrow morning at 9:30, we'll have an extra copy,
24    and we'll sit here in this court and go through it?
25              THE COURT:  All right.
```

1        MR. FINK:  Sounds like a good idea.

2        THE COURT:  All right.

3        Okay.  Anything else right now?

4        DEFENDANT DIDANI:  No, Your Honor.  Thank you.

5        MR. BILKOVIC:  No, Your Honor.

6        DEFENDANT DIDANI:  Thank you, nothing from us.

7        MR. BILKOVIC:  I just want to know if I can approach

8   and grab the exhibit book, please?

9        THE COURT:  Yes, you may.

10       MR. BILKOVIC:  Thank you.  Have a good rest of the

11   day and evening.

12       THE COURT:  Thank you.

13     (The proceeding was adjourned at 1:52 p.m.)

14                    *     *     *

15               C E R T I F I C A T E

16   I certify that the foregoing is a correct transcription of

17   the record of proceedings in the above-entitled matter.

18

19   S/ Shacara V. Mapp                    04/13/2025

20   Shacara V. Mapp,                      Date

21   CSR-9305, RMR, FCRR, CRR

22   Official Court Reporter

23

24

25