## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

UNITED STATES OF AMERICA,

     Plaintiff,

                            Case No. 21-CR-20264

v.

                            Hon. Denise Page Hood

YLLI DIDANI,

     Defendant.

---

## MOTION FOR JUDGMENT OF ACQUITTAL

Defendant Ylli Didani ("Didani"), by and through counsel, WADE FINK LAW, P.C., hereby moves this Court to enter a judgment of acquittal of all counts under Fed. R. Crim. P. 29. Didani orally moved for acquittal of Counts I and III prior to the jury's verdict and indicated that he reserved the ability to move, in writing, for acquittal of Count II, on the same record.

In support of this motion, undersigned counsel relies upon the law, facts, and arguments set forth fully in the attached brief.

WHEREFORE, undersigned counsel respectfully requests that this Honorable Court grant this motion.

Date:  May 29, 2025                         Respectfully Submitted,

WADE FINK LAW P.C.

/s/ Wade G. Fink
Wade G. Fink (P78751)
*Attorneys for Defendant*
550 W. Merrill St., Suite 100
Birmingham, MI 48009
248-712-1054
wade@wadefinklaw.com

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

                                  Case No. 21-CR-20264

v.

                                  Hon. Denise Page Hood

YLLI DIDANI,

      Defendant.

---

## BRIEF IN SUPPORT

## I.    RELEVANT BACKGROUND

After a three-month jury trial, on May 16, 2025, Didani was convicted, as charged, of (1) Count I: conspiracy to distribute controlled substance (21 U.S.C. § 841, 846); (2) Count II: conspiracy to distribute controlled substances on board a vessel subject to the jurisdiction of the United States (46 U.S.C. § 70503(a)); and, Count III: conspiracy to launder money (18 U.S.C. §1956(h)). *See* ECF No. 202.

Prior to the verdict, and reserved at the close of the government's proofs, Didani moved for a judgment of acquittal of Counts I and III orally. Didani also reserved his ability to move for a judgment of acquittal on the prosecutor's proofs on Count II in writing. The Court permitted such a reservation. This motion followed.

## II.   __ARGUMENT__

### A. Rule 29

Fed. R. Crim. P. 29(a) provides that after the government closes its evidence (or after all evidence is received), the Court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Didani is entitled to move for a judgment of acquittal, or renew such a motion, "within 14 days after a guilty verdict…" Fed. Crim. R. P. 29(c). This motion is therefore timely.

Because Didani moved orally for a judgment of acquittal on Count I and III, and reserved his ability to move on Count II in writing here, this Court "must decide the motion on the basis of the evidence at the time the ruling was reserved." *See* Fed. R. Crim. P. 29(b). Here, that would be at the government's close of proofs.[1]

### B. Sufficiency of the Evidence

When considering whether there is sufficient evidence to sustain a conviction, the Court asks "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *See Jackson v. Virginia,* 443 U.S. 307, 319 (1979).

---

[1] Undersigned counsel does not recall whether the Court denied or reserved ruling on Counts I and III at the time the argument was made. To be sure, Count II was reserved, at the time, for this writing, but to the extent the Court ruled on Counts I and III orally, Didani then renews his motion here.

2

### C. Counts I and III

Didani timely moved under Fed. R. Crim. P. 29 for a judgment of acquittal with regard to Counts I and III. He did so orally and relies on the arguments advanced during such argument. The Court, having reserved judgment, decides the motion at the time the motion was made, which was at the close of the prosecutor's proofs. *See,* though, fn. 1.

Again, Didani relies on the arguments advanced during his oral argument for Counts I and III. For purposes of summary only, Didani reminds and highlights for the Court, similar to Count II discussion below, that the government simply has not proven a sufficient nexus to the United States to sustain a conviction. This Court's decision to deny Didani a special verdict form, which would have allowed the jury to select which nexuses it found, if any, existed beyond a reasonable doubt, means we are left to look at the record as a whole to determine what a rational juror could have found.

No matter what, even with all reasonable inferences drawn from the evidence, no rational factfinder could conclude a sufficient connection to the United States. Under *United States v. Lopez-Vanegas*, 493 F.3d 1305 (11th Cir. 2007), as well as the other law more thoroughly described at oral argument and in ECF No. 52, Motion to Dismiss Counts I and III, "the government [] needs to establish some detrimental

effect within, or nexus to, the United States…" *United States v. Perlaza,* 439 F.3d 1149 (9th Cir. 2006). That did not happen on these proofs.

For these reasons, and those discussed at oral argument, the Court should enter a judgment of acquittal on Counts I and III.

**D. Count II**

Count II charged Didani under 46 U.S.C. §70503(a)(1) and its related subsections. In pertinent part, the Maritime Drug Law Enforcement Act (the "MDLEA") provides that "[w]hile on board a covered vessel, an individual may not knowingly or intentionally . . . manufacture or distribute, or possess with intent to manufacture or distribute, a controlled substance." *Id.* A "covered vessel" is "a vessel subject to the jurisdiction of the United States" *Id.* at 70503(e)(1). Whether a ship is subject to United States' jurisdiction is defined in several ways, but relevant here, it is defined as "a vessel registered in a foreign nation if that nation has consented or waived objection to the enforcement of the United States law by the United States." *Id.* at 70502(c)(1)(A), (C) (emphasis added).

**1. "While on board…"**

As a threshold matter, the trial testimony demonstrated what Didani has argued previously (ECF No. 54) was correct on the facts: it was impossible for the government to prove Count II occurred "while on board a covered vessel…" because the consenting countries under 46 U.S.C. §70502(c)(1)(A) and (C) did not consent

prior to boarding enforcement by the United States. The government's witnesses, including Agent Leach and Detective Hermans, all conceded that all seizures of narcotics from the vessels at issue occurred after the vessels had reached a foreign port. In order for a foreign flag vessel to fall under the jurisdiction of the United States, the foreign nation under whose laws the vessel is duly registered, must have consented at the time of the offense.

Indeed, the statutory phrase "**has consented**" is past tense. And our Supreme Court instructs that "Congress' use of a verb tense is significant in construing statutes." *United States v. Wilson,* 503 U.S. 329, 333 (1992). It is not possible "ha[ve] consented" *after* the offense took place. Congress further showed its intent with: "while on a covered vessel…". Sec. 70503(a). Then, subsection (e)(1) of that provision defines "covered vessel" as, inter alia, a "vessel subject to the jurisdiction of the United States," (as defined in 70502(c)(1)(C), i.e., where the flag state "has consented.") The word "while" is also temporal and makes even more clear that the prohibited conduct must take place on a qualified vessel. In duly registered, foreign flagged vessels, this means state consent must be given "while" the offense is being committed. There is no other plausible reading of "while."

Accordingly, because the government's proofs demonstrate, conclusively, in the testimony of their agents that all seizures occurred after the ship was ported in a foreign country, the offense could not have occurred "while on board a covered

vessel…" On this basis alone, based on the statutory construction of the MDLEA, a judgment of acquittal is required.

For these reasons, and the reasons stated in ECF No. 54 (Didani Motion to Dismiss Count II), the Court should acquit on the evidence and also find that it lacked subject matter jurisdiction consistent with Didani's prior motions.

### 2. Due Process

The Court must also enter a judgment of acquittal because the evidence at trial, even if believed, failed to establish a sufficient nexus to the United States. *See also,* ECF No. 54.

When criminal defendants are prosecuted for conduct abroad, the prosecution must establish that the conduct has some nexus to the United States in order to sustain a conviction. That is, there must be some effect on the United States. *See*, *e.g.*, *Strassheim v. Daily,* 221 U.S. 280, 285 (1911) (applying criminal jurisdiction to acts committed outside its territorial borders is only appropriate where an effect occurs within those borders); *See also Perlaza,* 439 F.3d at 1152 (9th Cir. 2006) ("For a United States court to properly exercise jurisdiction, the Government still needs to establish some detrimental effect within, or nexus to, the United States."); *United States v. Medjuck*, 156 F.3d 916, 918 (9th Cir. 1998) (holding that the government must demonstrate that there exists a sufficient nexus between the conduct condemned and the United States" such that the application of the statute would not

6

be arbitrary or fundamentally unfair to the defendant."). The Sixth Circuit has not expressly adopted this requirement but seemed to conclude there may be such a nexus requirement. *See, e.g., United States v. Iossifov,* 45 F.4th 899 (6th Cir 2022) (assuming for purposes of appeal that there was a Fifth Amendment limit on extraterritorial application of money laundering statute).

This nexus requirement is found in Fifth Amendment due process jurisprudence, which "concerns the fundamental fairness of government activity . . . [and requiring an analysis of] whether an individual's connection with a state are substantial enough to legitimate the state's exercise of power…" *Quill Corp v North Dakota,* 504 US 298, 312 (1992). The "analytic touchstone" of due process nexus analysis is whether there is "notice" or "fair warning" of enforcement. *Id.*

In analyzing this issue, this Court should adopt the Ninth Circuit's view described in *United States v. Perlaza,* 439 F.3d 1149 (9th Cir. 2006). In *Perlaza,* the Ninth Circuit explained that in addition to the statutory jurisdiction requirements, "due process requires the Government to demonstrate that there exists 'a sufficient nexus between the conduct condemned and the United States' such that the application of the statute would not be arbitrary or fundamentally unfair to the defendant." *Id.* at 1161. The Court concluded that because the government "did not present any evidence indicating that the cocaine jettisoned from the Go-Fast had any nexus to the United States," the case should have been dismissed. *Id.* at 1169.

7

Without a sufficient nexus, a district court errs "in exercising jurisdiction [over] members of an indisputably foreign-flagged vessel [and b]ecause nexus is an essential part of the jurisdictional analysis that our case law requires," reversal was required. *Id.*

The evidence at trial here unequivocally demonstrated that no drugs were taken from, or destined for, the United States. No fact witness – not Donald Larson, Piotr Synowiec, Alexander Meskouris, Philip Daskal, Carl Chamount, or any other – testified that they ever possessed cocaine in the United States or participated in any conspiracy to distribute narcotics in the United States. So, too, did the agents on the case – all agreed that with regard to Count II, no drugs on any of the three vessels at issue (MSC Anisha R, CMA Jean Gabriel, and Cartegena Express) ever originated from, or were destined for, the United States. Agent Hermans and Detective Leach both acknowledged this. In addition, there was not even a single conversation introduced related to Count II that occurred with both co-conspirators in the United States.

There must be some bare minimum connection to the United States proven by the government to sustain a conviction, or we have lost touch with all principled notions of foreseeability. It stands to reason that a criminal defendant could mount a better defense in a jurisdiction which he could have at least foreseen charging him, as the Supreme Court has noted in its "minimum contacts" Due Process

jurisprudence. *See International Shoe v. Washington,* 326 U.S. 310 (1945); *see also Perlaza,* at 1168 ("The nexus requirement is a judicial gloss applied to ensure that a defendant is not improperly haled before a court for trial . . . . [It] serves the same purpose as the 'minimum contacts' test in personal jurisdiction") (citations omitted).

For these reasons, and the reasons discussed in ECF No. 54 (Didani's Motion to Dismiss Count II), the Court should acquit on the evidence and also find that it lacked subject matter jurisdiction.

### 3. Failure of Proofs with Regard to Co-Conspirator on Board

No rational factfinder could conclude that the evidence at trial demonstrated beyond a reasonable doubt that Didani had a co-conspirator on board the MSC Anisha R, the CMA CGM Jean Gabriel, or the Cartagena Express.

As the Court recalls, the jury instruction it chose to read for the MDLEA provided, in pertinent part:

> First, that an agreement existed between at least two people to possess with intent to distribute and distribute a controlled substance while at least one of them was on board the MSC Anisha R, the CMA CGM Jean Gabriel, or the Cartagena Express.

The government was required to show, beyond a reasonable doubt, that Didani conspired with someone "**while**" they were on board one of the covered vessels at issue. No rational factfinder could conclude that Didani was conspiring with anyone that was on board any of the vessels.

9

The Court should ask itself this: who did Didani conspire with "while" that particular person was on a board a covered vessel? The evidence purported to establish Didani's knowledge of the loads, primarily messages, show only a general, mere presence-type connection to narcotics. But there is nothing in the record where anyone can conclude that Didani directly conspired with someone "while," **present tense**, that person was on board a covered vessel.

The Court will recall the "spiderman" videos, and other videos purportedly found on Didani's iCloud and in his SkyECC messages. But none of that evidence shows Didani conspiring with a crew member or someone while they were on board. The evidence shows Didani may have affiliated people with knowledge of narcotics and, *potentially,* discussed their efforts. But a MDLEA conspiracy requires more – it requires a conspiracy with someone while they are on board a covered vessel. And the proofs fail in this regard.

If the Court cannot answer the question of "who" did Didani conspired with "while" they were on board, then it must acquit on Count II.

### 4. Failure of Proofs with Regard to Proving Connection to Loads

To sustain a conviction under the MDLEA, under this Court's chosen instruction, the government was required to prove that Didani conspired with at least one person while they were on board the MSC Anisha R, the CMA Jean Gabriel, or the Cartegena Express. And the evidence at trial demonstrated the government was

clueless as to how any kilograms were seized, where loads originated, where they stopped, who boarded them, among other things. These failings require a judgment of acquittal because no rational factfinder could conclude that Didani conspired with any person on the specific loads for which the government claimed jurisdiction.

First, with regard to the MSC Anisha R, the narcotics were seized four months before the United States even knew there had been a seizure. The Court will recall that Detective Leach stumbled onto pictures in November of 2019 that he learned may have been related to a seizure that took place in The Netherlands in August of 2019. Detective Leach admitted that American law enforcement's claim to have been responsible for the seizure, as suggested, is incorrect.

Second, with regard to the CMA Jean Gabriel, Detective Leach could not explain, credibly, the discrepancy in the amounts claiming to have been seized. The government claimed 644 kilograms were seized, while evidence suggested there was 657 kilograms allegedly shipped by Didani's conspirators. In addition, other reports suggest 664 kilograms. When you combine this fact with the admission by Detective Leach and Agent Pedrini that they were flat wrong about where the load originated from (they both said Ecuador, but it was 5,000 away in Chile), it is impossible for a rational factfinder to conclude that the evidence demonstrated *beyond a reasonable doubt* that this particular load was connected to Didani and a co-conspirator on board. If the government cannot tell a jury the port of origin, or the vessel's routes,

11

how can a rational factfinder conclude that indeed this *was* Didani's load (if the jury believed Didani was a narcotics dealer) and not someone else's?

Third, related to the Cartagena Express, Detective Leach and Agent Pedrini acknowledged the load originated on another vessel: the Limari. There is no basis to conclude that Didani conspired with anyone "while" on board the Limari, or to conclude which load was on which ship at which port. Instead, the government merely cobbles together messages over many years in a fashion that makes it seem as though this is all one seamless, linear conspiracy. Rather, the government has no idea which ship went where and when. Recall the inability of Detective Leach to identify which nation the Limari was flagged in, for example. How can any factfinder conclude that, indeed, this was the same load the messages purportedly had a relationship to.

Fourth, the MSC Jenny, for which the United States never had jurisdiction, and for which government witnesses first claimed had 1,100 kilograms, then amended to 1,000, transferred from two different ships in two different ports, with over a week sitting at port. There was no explanation from the government's evidence as to where the load occurred and who Didani conspired with here.

Fifth, the Stare Care. The government claimed a 1200 kilogram load was seized. Then that was later amended to 952 kilograms. Millions of dollars of a difference, explained away by mere scrivener's error.

In short, the government conflated general conversation, and what it views as generally incriminating discussion of narcotics, and tossed the same into the jury box asking it to find a direct conspiracy as to these specific loads and vessels that the Court found were subject to the United States jurisdiction. But when you examine each load on its own facts, and the errors and omissions by the government with regard to each load, no rational factfinder could conclude with confidence that *these specific loads* on those *specific* vessels indeed belonged to Didani and his alleged organization.

### 5. The evidence demonstrates that the MDLEA is unconstitutional as applied to Didani

As described in Didani's Motion to Dismiss Count II of the indictment, the evidence at trial bore out precisely what was at issue before trial: the conduct related to Count II was entirely foreign. Detective Leach and Agent Hermans testified that the case, as Professor Kontorovich previously told this Court, was the first of its kind: a foreign national, never aboard of a duly registered, foreign flagged vessel, charged with narcotics found on board the same vessel **at port** by foreign law enforcement. The evidence bore this out – the government applied American law to a foreign national for foreign conduct that did not occur on the high seas.

The defense is aware of no case with a common nucleus of facts where foreign conduct committed on foreign *land* was charged in a random district in the United States. As a general matter, a criminal defendant must show that a law "has in fact

13

been . . .unconstitutionally applied to him." *See McCullen v Coakley*, 573 U.S. 464 (2014). And, if "an as-applied challenge is successful, the statute [] may not be applied to the challenger but is otherwise enforceable." *See Phelps-Roper v. Ricketts*, 867 F.3d 883 (8th Cir. 2017).

Art. I, § 8, Cl. 10 of the Constitution of the United States does not reach this unique set of facts where the federal courts in Michigan convict a foreigner for conduct on foreign soil where that foreigner was not even aboard a ship. For all the reasons that the government has argued the MDLEA is facially constitutional, it is as-applied unconstitutional: these were not stateless vessels and these vessels were not boarded by American (or foreign) law enforcement *while on the high seas*.

For these reasons, and the reasons discussed in ECF No. 54 Section II.B, the Court should enter a judgment of acquittal because the evidence demonstrates that applying the MDLEA to Didani is unconstitutional, as Congress does not have authority to reach foreign conduct by a foreigner.

### III.   <u>CONCLUSION</u>

The Court should grant Defendant's Motion for Judgment of Acquittal on all Counts.

Date:  May 29, 2025                    Respectfully Submitted,

                                       WADE FINK LAW P.C.

                                       /s/ Wade G. Fink
                                       Wade G. Fink (P78751)
                                       *Attorneys for Defendant*
                                       550 W. Merrill St., Suite 100
                                       Birmingham, MI 48009
                                       248-712-1054
                                       wade@wadefinklaw.com

---

### PROOF OF SERVICE

I hereby certify that on May 29, 2024, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to counsel of record.

/s/ Wade G. Fink
Wade G. Fink (P78751)
550 W. Merrill St., Suite 100
Birmingham, MI 48009
248-712-1054
wade@wadefinklaw.com

---