UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA

Case No. 21-cr-20264

v.

HON. DENISE PAGE HOOD
United States District Judge

D-1 YLLI DIDANI,

Defendant.

---

## GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL (ECF No. 204)

---

## I.    INTRODUCTION

On February 11, 2025, trial commenced against the defendant Ylli Didani on two drug trafficking conspiracy counts and one money laundering conspiracy count. During the trial, the government called over 20 witnesses, including one of Didani's co-conspirators, and introduced hundreds of exhibits. These exhibits included text messages, voice messages, videos, and photographs that were recovered from forensic extractions of Didani's iCloud account and his cell phones. Additional evidence included several of Didani's Sky ECC text message threads, cell phone records, shipping records, photographs of cocaine seizures, and representative samples of cocaine seized by law enforcement. The parties also

1

entered several stipulations as exhibits.

After a short deliberation, the jury convicted Didani of all three counts. (ECF No. 202). Didani now moves for judgment of acquittal under Fed. R. Crim. P. 29 alleging that the government did not present sufficient evidence for the jury to find Didani guilty of these counts and because the convictions violated Didani's right to due process. (ECF No. 204). The Court should deny Didani's motion because the government presented more than sufficient evidence to the jury on the essential elements of the charged offenses. Furthermore, the Court has previously ruled that Didani's due process rights were not violated.

## II.   LEGAL STANDARD

Rule 29 of the Federal Rules of Criminal Procedure states that, "[a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a).

"[A] defendant claiming insufficiency of the evidence bears a heavy burden." *United States v. Maliszewski,* 161 F.3d 992, 1005 (6th Cir.1998). "In reviewing a claim of insufficient evidence, 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Salgado*, 250 F.3d 438, 446 (6th Cir. 2001)

(emphasis in original) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319 (1979)). Stated differently, a court should not grant a motion of acquittal unless "'the prosecution's failure is clear.'" *Id.* (quoting *Burks v. United States*, 437 U.S. 1, 17 (1978).

To avoid a Rule 29 acquittal, the Government "must present substantial evidence as to each element of the offense." *Brown v. Davis*, 752 F.2d 1142, 1145 (6th Cir. 1985) (internal citations omitted). "Substantial evidence is more than a scintilla. It means such relevant evidence as a reasonable mind might accept to support a conclusion. It is evidence affording a substantial basis of fact from which the fact in issue can be reasonably inferred." *United States v. Martin*, 375 F.2d 956, 957 (6th Cir. 1967). "The government may meet its burden through circumstantial evidence alone, and such evidence need not exclude every possible hypothesis except that of guilt." *Salgado*, 250 F.3d at 446 (citing *United States v. Jackson,* 55 F.3d 1219, 1225 (6th Cir. 1995)). In evaluating challenges to the sufficiency of the evidence, courts must not "weigh the evidence presented, consider the credibility of the witnesses, or substitute [its] judgment for that of the jury." *United States v. Siemaszko*, 612 F.3d 450, 462 (6th Cir. 2010). Instead, "[a]ll conflicts in the testimony are resolved in favor of the government, and every reasonable inference is drawn in its favor." *Id.* (citing *United States v. Bashaw,* 982 F.2d 168, 171 (6th Cir. 1992).

## III.   ARGUMENT

### a. There was sufficient evidence at trial for a rational jury to have found Didani guilty of Count One and Count Three.

Count One charged Didani with conspiracy to possess with intent to distribute and distribute a controlled substance in violation of 21 U.S.C. § 841 and 846. Count Three charged Didani with conspiracy to launder monetary instruments in violation of 18 U.S.C. § 1956(h). (ECF No. 38, PageID.153-157, 169-172). After the government rested, Didani made an oral motion under Fed. R. Crim. P. 29 for a judgment of acquittal with respect to Counts One and Three. In his oral motion, and in his written Rule 29 motion, Didani argued that the government failed to prove a sufficient nexus to the United States to sustain a conviction on either count. (ECF No. 204, PageID.4443-46).

In some respects, Counts One and Three are linked because the specified unlawful activity alleged in the money laundering conspiracy charged in Count Three mirrored the drug conspiracy charged in Count One. (ECF No. 38, PageID.169-172; ECF No. 199, PageID.4325-26). For example, the government argued at trial that the same money that was provided to Didani as part of the drug conspiracy in Count One was also tied to the money laundering conspiracy in Count Three. Furthermore, for Counts One and Three, the Court provided the jury with the venue instruction found in *Sixth Circuit Pattern Criminal Jury Instruction 3.07.* In part, the Court instructed the jury that the government must prove by a

preponderance of the evidence that at least one of the overt acts in furtherance of the charged conspiracies took place in the Eastern District of Michigan (EDMI) and that the government only had to prove that it was more likely than not that part of the conspiracies charged in Counts One and Three took place in the EDMI. (ECF. No. 199, PageID.4330).

For 10 weeks, the jury heard from numerous witnesses and saw a multitude of exhibits, that when viewed in the light most favorable to the government, could have convinced a rational jury to conclude that part of the conspiracies charged in Counts One and Three occurred in the EDMI. The evidence established that Martin Tibbitts wrote nearly $1,000,000 in checks in the EDMI, which were subsequently cashed in the EDMI by Donald Larson or someone else at Larson's direction. The evidence established that Larson delivered some of that money to Didani in the EDMI. There was also evidence that Larson flew from the EDMI to Washington D.C. aboard an airplane owned by Martin Tibbitts, where he delivered approximately $450,000 to Didani. Of course, the true figure was not exactly $450,000 because Larson incurred thousands of dollars of cashing fees to conceal that Didani was the intended recipient of the funds – which IRS Special Agent Derek Newsome testified was classic indicia of money laundering.

Larson further testified that Didani told him that the money was for cocaine purchases. Whether Larson knew with absolute certainty if Didani was being

5

truthful is not what matters. What matters is whether the jury, viewing the evidence in the light most favorable to the government, could have found that Didani intended to use the money to purchase cocaine. Larson's testimony that Didani told him that the money was to purchase cocaine ends the inquiry and satisfies the government's burden on this point.

But there was far more evidence that the drug conspiracy existed and that part of it took place in the EDMI. In November 2017, while Martin Tibbitts was living in the EDMI, he and Didani exchanged text messages about a seizure of drugs in the Netherlands and they acknowledged that they "just fucked up" so much so that it was necessary to "fix." (Gov. Trial Ex. 112.10). There was also evidence, including testimony, numerous text messages, and photographs that while Martin Tibbitts was living in the EDMI, he and Didani devised a plan to have a drone/torpedo built capable of transporting cocaine across the ocean while magnetically attached to a containership. (Gov. Trial Ex. 6.0). While living in the EDMI, Martin Tibbitts hired Peregrine 360 to build a prototype of the drone. The evidence established that Martin Tibbitts, using the alias of "Dale Johnson" was the brains behind the concept, while Didani supplied some of the financing via MoneyGram payments and regularly communicated with several unknown co-conspirators about the progress of the drone. (Gov. Trial Exs. 19.0, 23.0 – 28.1, 115.10 – 115.21).

Although Peregrine 360 was building the prototype in Canada, Martin Tibbitts, while living in the EDMI, regularly communicated with Peregrine 360 about the project. The jury also saw a notebook that Martin Tibbitts kept in his house in the EDMI, which contained drawings, notes and questions about the drone. (Gov. Trial Ex. 6.0).  Furthermore, Larson testified that he was aware of the idea for the drone and that he knew that its purpose was to transport cocaine. More importantly, Larson testified that he, Martin Tibbitts, and Didani discussed the drone while they were in the EDMI.

Larson also testified about the lengthy Viber text message thread between he and Didani – a thread that took place while Larson was living in the EDMI. (Gov. Trial Ex. 36.0). In that thread, Didani sent Larson a photograph of red and yellow brick-shaped packages consistent with kilograms of cocaine followed by an instruction to "Delete that." (*Id*. at 36-9). Larson and Didani also discussed needing to "move the last 7" and that Martin Tibbitts was aware that they had already "moved 10." (*Id*. at 36-21, 36-33). The jury didn't have to infer what Didani and Larson were discussing, because Larson testified that he and Didani were discussing moving cocaine. But even if Larson hadn't provided an explanation, the jury could have inferred based on all the other evidence that was presented, that Didani and Larson were discussing the sale of kilograms of cocaine. And again, these conversations occurred while Larson was living in the EDMI.

There was much more evidence presented at trial, but the above recitation demonstrates that there was substantial evidence at trial from which a rational jury could have found beyond a reasonable doubt and, for the venue issue, by a preponderance of the evidence, that Didani committed the crimes charged in Counts One and Three.

To the extent that Didani's arguments with respect to Counts One and Three pertain to his previously raised argument that the government must prove that he intended for cocaine to be sent to or distributed in the United States, this argument has been previously litigated and rejected by the Court. (ECF Nos. 93, 159 & 160). Therefore, "the law of the case" on this issue has been established and Didani cannot reraise the same issue in his Rule 29 motion.

Under the law of the case doctrine, "findings made at one point in the litigation become the law of the case for subsequent stages of that same litigation." *United States v. Moored*, 38 F.3d 1419, 1421 (6th Cir. 1994); *Moore v. Mitchell*, 848 F.3d 774, 776 (6th Cir. 2017); *United States v. King*, No. 21-CR-255 (NSR), 2023 WL 6311450, *5-6 (S.D.N.Y. Sept. 28, 2023) (court denied defendant's Rule 29 motion holding that the law of the case doctrine barred the defendant from relitigating a previously raised claim). There are generally three situations where a court should reconsider an earlier ruling: "(1) where substantially different evidence is raised at trial; (2) where a subsequent contrary

8

view of law is decided by the controlling authority; or (3) where a decision is clearly erroneous and would work a manifest injustice." *Mitchell*, 848 F.3d at 776 (6th Cir. 2017) quoting *Hanover Ins. Co. v. American Engineering Co.* 105 F.3d 306, 312 (6th Cir. 2017). None of these reasons apply here.

### b. Count Two – There was sufficient evidence at trial for a rational jury to have found Didani guilty of Count Two.

#### i. Consent of Foreign Nations

Count Two charged Didani with conspiracy to possess with intent to distribute and distribute a controlled substance on board a vessel subject to the jurisdiction of the United States, in violation of 21 U.S.C. § 841 and 846. (ECF No. 38, PageID.158-159). Didani claims that for Count Two, the government was required to prove that the relevant foreign nation consented to jurisdiction over the relevant vessels at the time of the offense. (ECF No. 204, PageID. 4446-47). However, this argument has also been previously litigated and rejected by this Court. (ECF No. 93). In other words, because the law of the case has been established on the issue, Didani cannot raise it again in a Rule 29 motion. *Moored*, 38 F.3d at 1421; *Mitchell*, 848 F.3d 776; *King*, 2023 WL 6311450, *5-6.

#### ii. Nexus to the United States

Didani also claims that the government was required to establish a sufficient nexus to the United States. (ECF No. 204, PageID. 4448). Again, this argument was previously litigated and rejected by the Court. (ECF Nos. 93). Therefore, the

9

law of the case has been established on this issue and Didani cannot raise it again in a Rule 29 motion. *Moored*, 38 F.3d at 1421; *Mitchell*, 848 F.3d at 776; *King*, 2023 WL 6311450, *5-6.

Even if the government was required to prove that the conspiracy charged in Count Two had a nexus to the United States, the evidence established a sufficient nexus. For starters, to protect himself and his co-conspirators from the dangerous business of drug trafficking, Didani utilized Fatjon Bajrami, who was living in Chicago, to purchase nine bulletproof jackets for Didani and his conspirators. (Gov. Trial Exs. 65.8, 65.9, 65.11, & 65.12). Furthermore, Bajrami purchased the bulletproof jackets for Didani's organization from a company located in the United States. (Gov. Trial Exs. 35.0 – 35.6, 65.8 & 65.9). There was also evidence that Didani received the bulletproof jackets because he said so in text messages with Bajrami and there were videos depicting Didani and several others testing the bulletproof jackets. (Gov. Trial Exs. 65.0, 65.18, 65.19 & 66.0).

The bulletproof jackets were not the only evidence that connected the conspiracy to the United States. Didani also moved large amounts of drug proceeds to and through the United States. For example, Didani arranged for multiple wire transfers involving hundreds of thousands of dollars to be sent to Inkas for the purchase of several armored cars. Several of those wires were routed through the

United States banking system to ensure that Inkas received payment in United States dollars. (Gov. Trial Exs. 119.2 & 121.3).

Furthermore, Didani regularly discussed the transfer rates that the "Chinos" were charging him to move his drug proceeds throughout the world including the transfer of his drug proceeds to the United States. (e.g. Gov. Trial Ex. 61.1). And this wasn't just meaningless chatter. The government introduced evidence that Didani used the "token" method to transfer over $200,000 in drug proceeds to the United States so he could buy a $3,000,000 parcel of oceanfront property in the Dominican Republic. (Gov. Trial Exs. 68.0 & 69.0).

Didani also arranged for the transfer of drug proceeds while he was in the United States. For example, in December 2020, while Didani was in the United States, he arranged the transfer of drug proceeds from "Uncle" to "Mefi," who was identified as Didani's primary co-conspirator, Dayiberto Torres Rosario. (Gov. Trial Exs. 78.0 & 78.13).

Finally, in March 2021, Didani arrived in the United States carrying $10,000 in cash and was arrested. Didani had no legitimate employment – his only source of income was from his drug trafficking. Based on the evidence, a rational jury could reasonably infer that the $10,000 Didani brought into the United States was also drug proceeds.

While the government was not required to prove a nexus to the United

States, the evidence introduced at trial clearly established the existence of one.

### iii.   The conspiracy involved a co-conspirator on board a vessel subject to United States jurisdiction

Didani's claim that there was insufficient evidence to prove that he

conspired with a co-conspirator while the co-conspirator was on board a covered

vessel is based on a false premise. The government was not required to prove that

Didani *personally* conspired with a co-conspirator who was on board a covered

vessel. Instead, the government was required to prove only that an agreement

existed between at least two people to possess with intent to distribute a controlled

substance while at least one of them was on board a covered vessel. (ECF No. 199,

PageID.4313). The government was not required to prove that Didani was one of

these two people. Instead, the government was only required to prove that Didani

"knew of the conspiracy, its aims objects and goals, and …that [Didani] joined the

conspiracy with the intent that at least one of the conspirators engage in conduct

that satisfies the elements of possess with intent to distribute and to distribute a

controlled substance while on board a vessel subject to United States jurisdiction."

(ECF No. 199, PageID.4314).

Contrary to Didani's claim that he had to personally conspire with the

onboard conspirator, the jury was specifically instructed that the government was

not required to prove that Didani knew everyone else involved in the conspiracy;

or that he knew everything about the conspiracy; or even that he played a major role in the conspiracy. (ECF No. 199, PageID.4314-16). So, although the jury could easily have inferred that Didani directly conspired with an onboard conspirator based on DEA Special Agent Chad Hermans's testimony about Didani owning the security members on board the vessels, a direct connection between Didani and an onboard conspirator was not required.

      iv.  <u>The evidence overwhelmingly proved that Didani orchestrated several cocaine shipments</u>

Didani also claims there was insufficient evidence to convict him of Count Two. In making this claim, Didani asks the Court to do what it is not allowed to do when considering a Rule 29 motion – weigh the credibility of the witnesses and resolve any conflicts in the testimony against the government. Instead, when considering a Rule 29 motion, the Court must not assess the credibility of the witnesses and must resolve any conflicts in the testimony in favor of the government. *Siemaszko*, 612 F.3d at 462; *Bashaw,* 982 F.2d at 171.

When viewing the evidence in the light most favorable to the government, a rational jury could have found the essential elements of Count Two beyond a reasonable doubt. There was overwhelming evidence that a conspiracy existed and that Didani joined it. While Didani claims that that the evidence merely showed that he "may have affiliated [with] people with knowledge of narcotics…," (ECF No. 204, PageID.4452), Didani ignores the reality that his own text and Sky ECC

13

messages, and his own voice messages proved that he was one of the primary
conspirators responsible for the cocaine shipments.

With respect to the August 11, 2019, seizure of 752 kilograms of cocaine
from a container onboard the Anisha R., the government introduced photographs
and videos recovered from Didani's iCloud account depicting the step-by-step
process of the 752 kilograms of cocaine being packaged into banana boxes for
shipment, along with photographs of the lock seals for the container where the
cocaine was hidden. (Gov. Trial Exs. 87.0 – 87.27). There were also text messages
between Didani and an unknown co-conspirator where the unknown co-conspirator
advised Didani that the cocaine was packaged in two pallets – one with 39 boxes
and one with 36 boxes totaling 752 kilograms:

---

**Ex. 87.0 – WhatsApp Chat Between Ylli Didani & 593959232146
July 20 - 24, 2019**

| | |
|---|---|
| 593959232146: | One pallet with 39 and another pallet of 36 boxes |
| 593959232146: | 2 boxes of 11 |
| 593959232146: | 752 |
| Didani: | Send me all the photos, the locks, the seal and the photos of the truck. It passed security here, so it's safe. |
| Didani: | Bro, send me the rest of the photos |
| 593959232146: | (*Sends several photos of lock seals*) |
| Didani: | I need the number of the container |
| Didani: | loma keeps asking me |

---

The evidence proved that Didani was not a passive recipient of the photographs, videos, and text messages. These were all from encrypted chats that Didani was an active part of. For example, Didani requested information about the cocaine shipment weeks before it was seized. (Gov. Trial Ex. 87.0) And after receiving text messages describing how the cocaine was packaged, Didani requested additional information, including the container number so he could supply it to "Loma," who was identified as co-conspirator Thomas Sweeney. (*Id*.).

The day after the seizure, Didani began sending out articles describing the seizure and texting people that he was "hurt" and that he was "really fucked up." (Gov. Trial Ex. 65.0). A rational jury could infer from these text messages that Didani was personally involved and invested in the 752 kilograms of cocaine that was seized and that is why he was "hurt" and "really fucked up."

With respect to the February 22, 2020, seizure of approximately 644 kilograms of cocaine from a container onboard the Jean Gabriel, Detective Brandon Leach testified that Didani's iCloud account contained several videos in a chat between Didani and "Mefi22," identified as co-conspirator Dayiberto Torres Rosario. (Gov. Trial Ex. 80.0). The videos depicted the container being loaded with duffle bags containing the cocaine after the container had already been placed on the ship. (Gov. Trial Exs. 80.4, 80.5 & 78.17).

In the videos, one of the men loading the duffle bags of cocaine into the container was wearing a mask, while the other men were not. (Gov. Trial Exs. 80.4, 80.5 & 78.17).  The masked individual was also the person who broke into the container and sealed the container after the cocaine was loaded into it. (*Id*.). Based on the evidence introduced at trial, a rational jury could have inferred that this individual was wearing a mask because he worked on the vessel and as a result, had to conceal his identity.

Following the cocaine seizure, Didani also sent several text messages to co-conspirator Dayiberto Torres Rosario texting Rosario, "MSC and now this" and "this thing with CMA is really bad." (Gov. Trial Ex. 80.0). The government introduced evidence that the Mediterranean Shipping Company, or "MSC" owned the Anisha R. which was the vessel involved in the August 2019 seizure and that CMA owned the Jean Gabriel. (Gov. Trial Ex. 43.0 – 43.3). Didani also texted Rosario, "Thank God Loma believes in us 100%." (Gov. Trial Ex. 80.0). Finally, Didani texted Peter Synowiec advising him that he lost "20 mil" but that everything was fine "because he is sending 4 tons." (Gov. Trial Ex. 72.0).

Didani was also part of a chat month earlier where an unknown co-conspirator sent Didani a photograph of the Jean Gabriel containing two distinct hand drawn lines. (Gov. Trial Ex. 84.3):



One line started from the side of the Jean Gabriel and ended at a stack of

containers. (*Id*.). The second line started from the captain's bridge and ended at the

same stack of containers. (*Id*.). A rational jury could have concluded that this

photograph was sent to Didani as part of the planning process to eventually utilize

the Jean Gabriel to transport cocaine, and that the two lines were drawn on the

photograph to demonstrate where the ship could be boarded from in relation to

where a specific container would be as well as what could be seen from the bridge

of the Jean Gabriel.

With respect to the April 7, 2020, seizure of approximately 100 kilograms of

cocaine from a container onboard the Cartegena Express, Detective Leach again

testified that Didani's iCloud account contained videos in a chat between Didani and Dayiberto Torres Rosario. The videos depicted several men loading duffle bags of cocaine into the container after the container had already been placed on the ship. (Gov. Trial Exs. 80.12, 115.29 & 115.30). One of the men was wearing a ski mask. (*Id*.). The masked man could be seen in the video opening the container and sealing it with fraudulent lock seals after the cocaine was loaded inside the container. (*Id*.).

SA Hermans testified that he believed that the cocaine was loaded into the container after the Cartegena Express left port. He pointed to the fact that you could hear the ocean in the background. SA Hermans further testified that drug trafficking organizations utilize smaller vessels that pull up to the containerships, and conspirators then transfer the cocaine from the smaller boats to the containerships, where the cocaine is then hidden in pre-selected containers. Furthermore, Didani himself discussed loading cocaine at sea several times in text messages and his Sky ECC chats:

- "Captain of the ship coming to talk to marina and my guys for point of loading" (Gov. Trial Ex. 92.0).
- "Plus, the marina, they load 200 miles from the shore of ecua" (Gov. Trial Ex. 92.0).
- "We have boatman with big vessels. Whole crew + captain knows" (Gov. Trial Ex. 115.35).

And in July 2020, after several large cocaine seizures, Didani and an

unknown co-conspirator pondered why seizures were occurring to cocaine

shipments that were being loaded at sea:



In addition to the videos, Detective Leach testified that he located several

other items in Didani's iCloud account and cell phone connecting him to this

seizure. These items included a photograph of the container that the cocaine was

loaded into and a photograph of the reservation/itinerary for the Cartegena

Express. (Gov. Trial Exs. 116.7 & 116.8).

Furthermore, SA Hermans described one of Didani's Sky ECC chats that

contained a photograph of the cocaine being loaded into the container and a Sky

ECC chat that contained screenshots of law enforcement photographs of the cocaine after it was seized. (Gov. Trial Exs. 95.11 – 95.13).

The government also introduced several of Didani's text messages that followed the seizure. The day the cocaine was seized, Didani texted co-conspirator Dayiberto Torres Rosario that, "We have a problem bro. You will see in two days." (Gov. Trial Ex. 79.0). Didani then started discussing the seizure in Sky ECC chats texting, "We lost brother. PML1. All gone." (Gov. Trial Ex. 100.0).  SA Hermans testified that "PML1" was a stamp put on cocaine owned by Didani ("Panco"), Dayiberto Torres Rosario ("Mefi"), and Thomas Sweeney ("Loma"). In other Sky ECC chats, Didani also bragged that the PML1 stamped cocaine was his brand. (Gov. Trial Ex. 103.0). Finally, SA Hermans testified that the PML1 stamp was found on some of the kilograms of cocaine from the Cartegena Express seizure.

This brief only describes a small fraction of the evidence presented at trial. From the above-described evidence and the additional evidence admitted at trial, there was substantial evidence, viewed in the light most favorable to the government, from which the jury could have found the government proved the essential elements of Count Two beyond a reasonable doubt.

> v. <u>The law of the case prevents Didani from challenging the constitutionality of the Maritime Drug Law Enforcement Act (MDLEA) in a Rule 29 motion</u>

Didani's claim that the MDLEA is unconstitutional as applied to him has

been previously considered and rejected by the Court. (ECF Nos. 54, 93).

Therefore, the law of the case on this issue has been established and Didani should

not be permitted to reraise the claim in a Rule 29 motion. *Moored*, 38 F.3d at 1421;

*Mitchell*, 848 F.3d at 776; *King*, 2023 WL 6311450, *5-6.

## IV.   CONCLUSION

For the reasons stated above, the defendant Ylli Didani's motion should be

denied.

Respectfully submitted,


JEROME F. GORGON
United States Attorney

*/s/ Timothy P. McDonald*              */s/Mark Bilkovic*
Timothy P. McDonald                   Mark Bilkovic
Assistant United States Attorney      Assistant United States Attorney
211 W. Fort St., Suite 2001           211 W. Fort St., Suite 2001
Detroit, MI 48226                     Detroit, MI 48226
Phone: (313) 226-0221                 Phone: (313) 226-9623
timothy.mcdonald@usdoj.gov            mark.bilkovic@usdoj.gov


Dated: June 23, 2025