UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THE UNITED STATES OF AMERICA,

Case No. 21-cr-20264

v.

HON. DENISE PAGE HOOD
United States District Judge

YLLI DIDANI

Defendant.

---

**GOVERNMENT'S SENTENCING MEMORANDUM**

---

## I.   INTRODUCTION

From at least 2015 until his arrest in March 2021, the defendant, Ylli Didani, directed two massive transnational cocaine distribution operations – one financed by a now deceased co-conspirator who resided in this district and the other financed by European co-conspirators. During this time, Didani personally orchestrated shipments of over 4000 kilograms of cocaine. Didani also utilized international money laundering organizations to move millions of dollars in drug proceeds around the world so he and other conspirators could purchase the cocaine, luxury armored vehicles, and so Didani could purchase a multimillion-dollar piece of oceanfront real estate in the Dominican Republic.

In March 2021, Didani's drug empire and his life of luxury sportscars,

1

oceanfront resorts, and champagne foot baths came crashing down when he was arrested in North Carolina after flying there (first class of course) from Ecuador. In May 2025, a jury guaranteed that Didani's drug empire would remain shuttered by convicting him of all three charges against him – two counts of conspiracy to commit drug trafficking and one count of conspiracy to commit money laundering.

For the reasons discussed below, the United States requests that the Court sentence Didani to **360 months' (30 years')** imprisonment.

## II.  COUNTS OF CONVICTION

On February 11, 2025, Didani's trial began on three counts contained in a Superseding Indictment. The Superseding Indictment charged Didani with: Count One – conspiracy to possess with intent to distribute five kilograms or more of cocaine in violation of 21 U.S.C. §§ 841 and 846; Count Two – conspiracy to possess with intent to distribute and distribute five kilograms or more of cocaine on board a vessel subject to the jurisdiction of the United States in violation of 46 U.S.C. §§ 70503(a) and 70506(b); and Count Three – conspiracy to launder monetary instruments in violation of 18 U.S.C. § 1956(h). (ECF No. 38, PageID.153-174).

On May 16, 2025, a jury found Didani guilty of all three counts contained in the Superseding Indictment. (ECF No. 202, PageID.4431-4433).

## III.  FACTS

### A. Count One and Count Three: The Michigan drug conspiracy and money laundering conspiracy.

In 2015, several law enforcement agencies were investigating Didani for cocaine trafficking. (PSR ¶ 12). In 2015 and 2016, law enforcement obtained search warrants for several of Didani's cellphones. These cellphones contained voluminous evidence that Didani was conspiring with others to traffic multi-kilogram quantities of cocaine and to launder U.S. currency.

For example, one of the cellphones contained screenshots of encrypted text messages between Didani and a co-conspirator discussing the fact that nobody in Columbia would pay for  Didani's "product" or put it on a "container." (Tr. Ex. 5.9, 5.10). There were also encrypted text message threads between Didani and a Michigan-based co-conspirator (CC-1) discussing the sale of cocaine and how they were going to conceal some of the cocaine sales from another Michigan-based co-conspirator (CC-2). (Tr. Ex. 36.21-36.33).

Through later extractions of Didani's iCloud account, and a review of bank records of several co-conspirators, law enforcement obtained additional evidence of the Michigan drug trafficking conspiracy as well as evidence that Didani had conspired with others to launder large quantities of U.S. currency to finance his drug business. For example, there were text messages between Didani and CC-1 about

how to "clean money" and there were text messages between them discussing plans to do so. (PSR ¶ 15) (Tr. Ex. 112.9):



Not only did Didani and his co-conspirators plan to launder U.S. currency, but they actually did so multiple times. For example, Between June 2016 and December 2016, CC-2 gave CC-1 approximately $864,000 in checks, most of which CC-1 cashed at local pawn shops and gold exchange businesses. CC-1 paid these businesses several thousand dollars per visit to do so, even though he could have cashed the checks for free at a bank. (PSR ¶ 16), (ECF No. 177, PageID. 2488-96).

In June 2016, after cashing $200,000 in checks, CC-1 met Didani at CC-1's residence and gave him the cash. (PSR ¶ 16). Didani then took the cash to Illinois to purchase cocaine:



*Tr. Ex. 5.6*
*CC-1's residence in Frasier*

*Tr. Ex. 5.17*
*Elmwood Park, Illinois*

In December 2021, CC-1 flew on a private airplane owned by CC-2 to Washington D.C., where CC-1 met with Didani and gave him over $400,000 in cash from some of the checks written by CC-2. (PSR ¶ 12). Didani then drove the $400,000 to New York, where he gave it to a Chinese money launderer. (ECF No. 190, Tr. Transcript, PageID.3358). But before doing so, Didani posed with the cash in his hotel room in Washington D.C.:

*Tr. Ex. 115.25 – Didani with bulk cash at the JW Marriott in Washington D.C.*



To further the Michigan conspiracy, Didani and CC-2 devised the idea of building a submersible container (hereinafter "cocaine torpedo") large enough to hold bulk cocaine. Their plan was for the cocaine torpedo to attach magnetically to a containership, which would carry the cocaine torpedo and the bulk cocaine across the ocean. Once the containership was within a certain distance from land, the cocaine torpedo would detach from the containership, rise to the surface of the ocean, where it would be picked up by co-conspirators. (PSR ¶ 18).

Didani and several co-conspirators regularly discussed the progress of the cocaine torpedo utilizing expensive encrypted text messaging software. The following are just a few of the numerous screenshots discussing the cocaine torpedo:

*Tr. Ex. 5.6*
*Didani and CC-2*



*Tr. Ex. 5.17*
*Didani and unknown coconspirator*



*Tr. Ex. 5.16*
*Didani and unknown coconspirator*



Didani and CC-2's plan to design the cocaine torpedo was not just idle talk.

Didani and CC-2 hired a Canadian design company to construct a prototype for the

cocaine torpedo.[1] To mask his identity when communicating with the design company, CC-2 utilized the alias of "Dale Johnson." During the initial design phase of the prototype, Didani and CC-2 paid the design company at least $10,000 (CAD). (PSR ¶¶ 18-19), (Tr. Exs. 19.0, 28.1).

Unfortunately for Didani, CC-2 died unexpectedly in July 2018. Because CC-2 was the brains behind the cocaine torpedo and because it was exclusively CC-2 (Dale Johnson) who communicated with the design company, when CC-2 died, so did the cocaine torpedo. (PSR ¶ 18). Having lost his Michigan financer, Didani took refuge in the Dominican Republic and Ecuador for the next several years. During that time, he found new financers and substantially increased his cocaine business.

### B. Count 2 – Title 46 Cocaine Conspiracy

From 2019 until his arrest in March of 2021, Didani directed a massive international cocaine trafficking conspiracy using South American cocaine producers, European financers, and Chinese money launderers. During this time, Didani amassed a fortune in drug proceeds. He used over $800,000 of those drug proceeds to purchase luxury armored vehicles from Canada and he used a straw purchaser to purchase thousands of dollars of bulletproof jackets from a company located in the United States. (PSR ¶¶ 25, 43). But not all of Didani's cash went back

---

[1] The Canadian company was not aware that the purpose of the torpedo was to transport cocaine. Instead, CC-2 advised the company that the torpedo was going to be used to scrub the hull of containerships.

into his cocaine business. He spent lavishly on himself as well. Didani transferred

approximately $203,000 through the "token method" to New York as a down

payment on two properties in the Dominican Republic; a $2,775,000 beachfront

property in Cap Cana and a $1,050,000 property on a golf course. (ECF No. 193, Tr.

Trans. PageID.3724, 3747). Didani regularly travelled first class, stayed in the finest

oceanfront resorts, bought luxury jewelry, and recorded himself holding stacks of

money.

 

(Space intentionally left blank)

9






In 2019 and 2020, law enforcement in Europe, working in conjunction with United States law enforcement, seized several large shipments of cocaine belonging to Didani and his conspirators. Didani was convicted of Count Two of the Superseding Indictment which charged a conspiracy involving three cocaine

shipments. These cocaine shipments, as well as two others, were seized by law enforcement. (PSR ¶¶ 23, 26, 29, 35 & 36).

The first charged seizure occurred on August 11, 2019, when law enforcement seized approximately 753 kilograms of cocaine located inside of a shipping container on the vessel, MSC Anisha R. (PSR ¶ 23). The second charged seizure occurred on February 22, 2020, when law enforcement seized 644 kilograms of cocaine located inside of a shipping container on the vessel, CMA CGM Jean Gabriel. (PSR ¶ 26). The last charged seizure occurred on April 7, 2020, when law enforcement seized 1000 kilograms of cocaine located inside of a shipping container on the vessel, Cartegena Express. (PSR ¶ 29).

Didani was also involved in two other cocaine shipments that were identified in Count Two of the Superseding Indictment as overt acts. One of the seizures occurred on April 20, 2020, in the Port of Bilboa in Spain, when law enforcement seized 1000 kilograms of cocaine located inside of a shipping container on the vessel, Jenny. (PSR ¶¶ 33-35). The other seizure occurred on September 21, 2020, at the Port of Dover in the United Kingdom, when law enforcement seized 952 kilograms of cocaine hidden in the hull of the vessel, Star Care. (PSR ¶ 36).

Law enforcement located extensive evidence of Didani's participation in each of these five seizures. In several instances, data found in Didani's iCloud accounts by the DEA was shared with foreign authorities who were able to seize the cocaine

11

after the particular vessel arrived in port. Didani's iCloud account was packed with encrypted text and chat messages about the planning and logistics involved in each of the five cocaine shipments. For example, for one of the cocaine shipments, at Didani's direction, a co-conspirator sent him videos of masked individuals loading the cocaine into a shipping container on the vessel. (PSR ¶ 27).

Law enforcement also located photographs and videos capturing the step-by-step process of loading cocaine hidden in banana boxes, export emails, shipping information and fraudulent container lock seals. (PSR ¶ 27). Didani's post-seizure activity was some of the most compelling evidence of his involvement in the five seized cocaine shipments. Didani shared news articles describing the seizures and discussed them via text and voice messages with seemingly anyone – his father, his girlfriend, his realtor, his armored vehicle salesman, his bulletproof vest straw purchaser, and of course, his coconspirators. In several of these messages, Didani blamed others for the seizures for using phones he didn't approve of, when in fact, it was Didani's arrogance in blatantly documenting virtually every step of his criminal activity that led to the seizures.

## II.   SENTENCING GUIDELINES CALCULATION

The Probation Department calculated the sentencing guidelines at Life, based

on a restricted offense level of 43[2] and a criminal history category of V. (PSR ¶¶ 58, 68). The government concurs in that calculation.[3] The Court is required to impose a minimum 10-year term of imprisonment for the two drug trafficking conspiracy convictions which may be imposed consecutively to the term of imprisonment imposed for the money laundering conspiracy conviction.

## III.   APPLICATION OF 18 U.S.C. § 3553(a)

Congress has provided, through 18 U.S.C. § 3553(a), the relevant objectives and factors to be considered by sentencing courts in imposing a sentence that is "sufficient, but not greater than necessary." Those objectives and factors are: (i) the nature and circumstances of the offense, and the history and characteristics of the defendant; (ii) the need for a sentence to reflect the basic aims of sentencing (including retribution, deterrence, incapacitation, and rehabilitation); (iii) the kinds of sentences legally available; (iv) the Sentencing Guidelines; (v) Sentencing Commission policy statements; (vi) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and (vii) the need for restitution.

---

[2] The Probation Department calculated an adjusted offense level of 48. In the "rare instances where the total offense level is calculated in excess of 43, the offense level will be treated as a level 43." (USSG Chapter 5, Part A (comment n2)).

[3] Didani objects to several paragraphs in the Presentence Investigation Report. The government's response to those objections is contained in PSR A-1 to A-8.

The government anticipates that Didani will request a sentence at or near 10 years, the minimum sentence that the Court must impose on Count One and Count Two. Such a sentence would be woefully insufficient to accomplish the goals of sentencing. Such a low prison sentence would not adequately reflect the seriousness of Didani's offenses; it would not provide just punishment, and it certainly would not protect the public from Didani's future crimes.

The most relevant factors applicable to Didani are set forth below.

## A. Nature and Circumstances of the Offense, and the History and Characteristics of the Offender, 18 U.S.C. § 3553(a)(1).

### 1. *The nature and circumstances of the offenses.*

Didani wasn't just a drug dealer. He orchestrated two separate drug conspiracies involving untold quantities of cocaine and he amassed a fortune in the process. To do so, he utilized innocent third parties (the prototype design company), and the United States banking system. To put Didani's cocaine trafficking into perspective, one only needs to look at the sentencing guidelines. For controlled substance crimes, under USSG 2D1.1(c)(1) the highest Base Offense Level is scored when the offense involves at least 450 kilograms of cocaine. The amount of cocaine seized from Didani was almost 10 times that amount. Furthermore, this doesn't factor in the successful cocaine shipments Didani orchestrated.

Didani's offenses didn't involve just cocaine. As discussed above, Didani also purchased several armored vehicles for himself and his conspirators. And at

14

Didani's request, the armored car company installed hidden compartments in several of the vehicles so Didani and his coconspirators would be able to conceal firearms in the vehicles. Furthermore, during the investigation, law enforcement obtained numerous photographs of Didani in possession of firearms during the Count Two conspiracy.

### 2. Didani's History and Characteristics.

Didani, who is 48 years old, is a five-time convicted felon with virtually no lawful employment history. (PSR ¶¶ 109). The reason for the lack of lawful employment history is simple – he made his living as a cocaine trafficker. His criminal history is replete with felony convictions, prison sentences, and parole violations.

Didani's felonious criminal history began at the age of 23 when in 2001, he was convicted of operating under the influence of alcohol-3rd offense. (PSR ¶ 60). 09). Didani was sentenced to 273 days in jail and a term of probation, which he violated. (PSR ¶ 60). Over the next four years, Didani was convicted three more times of operating under the influence of alcohol-3rd offense. (PSR ¶¶ 61, 64, 65).

In 2001, following his second felony conviction, Didani was again sentenced to a jail term and probation. (PSR ¶ 61). He violated his probation and was sentenced to prison. (PSR ¶ 61). In 2007, he was released on parole, which he violated, and was returned to prison. (PSR ¶ 61). Didani was twice convicted of

15

operating under the influence of alcohol felony offenses; one in 2005 and one in 2009. (PSR ¶¶ 64, 65). In the 2005 case, Didani was sentenced to prison, released on parole, and sent back to prison for violating his parole. (PSR ¶ 64). In the 2009 case, Didani was sentenced to prison. He was paroled in 2011 and discharged from parole in 2012. (PSR ¶ 65).

Less than two years later, Didani was convicted of assault and battery – one of Didani's 14 misdemeanor convictions. (PSR ¶¶ 66, 109). In that case, after using cocaine, Didani assaulted a female that he met at a strip club. During a search of Didani's apartment following the assault, officers recovered cocaine, a semi-automatic firearm, and three loaded magazines. (PSR ¶ 66).

In between his second and third felony convictions, Didani was also convicted of false pretenses. In 2002, Didani pleaded guilty after defrauding the victims of $100,000. Didani was originally charged with a felony but pleaded guilty to a misdemeanor pursuant to a plea bargain. (PSR ¶ 62).

The seriousness of Didani's cocaine trafficking and his repeated criminal behavior weigh heavily in favor of a 30-year prison sentence.

## B. Seriousness of the Offense, Promoting Respect for Law, and Providing Just Punishment, 18 U.S.C. § 3553(a)(2)(A).

The seriousness of Didani's offenses cannot be overstated. He was directly responsible for the shipments of over 4000 kilograms of cocaine from South America to Europe. The fact that the cocaine was not destined for the United States

does not make Didani's crimes any less serious. Didani utilized the United States banking system as well as straw purchasers, financers and businesses in the United States to advance his cocaine and money laundering business. Didani sourced his cocaine from South American drug cartels. Those same cartels flood the United States with cocaine, and other illicit substances. As a result, Didani's repeat business with the cartels helped keep the cartels viable. And as long as they remain viable cartels will continue to drive a national health crisis in the United States, compromise our border and domestic security, and strain the resources of U.S. law enforcement.

To say Didani has no respect for the law is a gross understatement. His criminal history itself demonstrates a complete lack of respect for the law. He has spent the better part of the last 25 years under court supervision or behind bars. He has graduated from drunk driving to drug distribution. His disrespect for the law is underscored by his repeated violations of probation and parole and by his behavior while being held in custody on this case.

On September 3, 2025, FCI Milan officials conducted an administrative search of Didani's prison cell. During the search, officers discovered a black cell phone charging block wired into the cell's electrical outlet:



Officers continued the search of the cell and observed a box of miscellaneous documents for Didani. Inside an envelope in the box, Officers discovered a TCL smart cellphone concealed into a void cut into the paper:



Agents subsequently searched the cellphone pursuant to a federal warrant and discovered that Didani conducted internet searches for cocaine drug seizures, his co-conspirators and, of course, media stories about himself and this case. On several occasions Didani complained to the Court that he didn't have time to review

18

discovery and prepare for trial. Yet Didani spent hours using the phone to visit news websites and YouTube, access social media such as Facebook, Instagram and LinkedIn, and recorded at least one video of his discovery material, which Didani later sent to an individual using the contraband phone. Didani also had a photograph of kilograms of cocaine saved on the phone, similar to the kilograms seized by UK authorities in September 2020:



Didani's disrespect for the law is palpable. Didani flouted the policy of FCI Milan and committed another federal criminal offense by possessing a prohibited cellphone while in custody. In Didani's case, a 30-year prison sentence is necessary to promote respect for the law.

### C. To Afford Adequate Deterrence to Criminal Conduct and Protect the Public from Further Crimes of the Defendant, 18 U.S.C. § 3553(a)(2)(B) and (C).

Unfortunately, nothing in Didani's history or his behavior while in custody in this case can give the Court any confidence that when he is released, he will live a

crime-free life. Instead, Didani's history and his behavior in custody strongly suggests the opposite. Didani has proven time and again that he is undeterred by the threat of criminal consequences. Didani has had the benefit of incremental sentencing ranging from probation to prison. Despite the probationary and prison terms he has received, he remains committed to criminal activity.

No level of community supervision, probation, or parole—has proven effective in protecting the public from Didani. While a 30-year prison sentence may not deter Didani from committing future crimes, such a sentence could deter others from engaging in similar criminal behavior. At the very least, a 30-year prison sentence would protect the public from Didani's reckless and dangerous criminal behavior.

**D. The need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct. 18 U.S.C. § 3553(a)(6).**

The Court's sentence must avoid unwarranted disparities among similarly situated defendants. According to the Sentencing Commission, from 2020-2024, there were only eight defendants whose primary guideline was 2S1.1, who also had an Offense Level of 43 and a Criminal History Category of V. (PSR ¶ 114).[4] Certainly, the low number of defendants with the same Offense Level and Criminal

---

[4] This does not include defendants who received a §5K1.1 substantial assistance departure. (PSR ¶ 114).

History Category as Didani evidences how rare it is for a defendant to have such a high Offense Level combined with an elevated Criminal History Category.

For those eight defendants, the average length of imprisonment was 330 months, and the median  length of imprisonment was 360 months. (PSR ¶ 114). Under the circumstances, a sentence of 30 years imprisonment for Didani would not result in an unwarranted disparity between Didani and similarly situated defendants. In fact, a 30-year sentence of imprisonment is the median length of imprisonment imposed for similarly situated defendants.

## IV.  CONCLUSION

For the foregoing reasons, the Government respectfully recommends that the Court sentence the defendant, Ylli Didani, to **360 months' (30 years')** imprisonment followed by a lengthy term of supervised release.

Respectfully submitted,

Jerome F. Gorgon Jr.
United States Attorney

s/Mark Bilkovic                              s/Timothy P. McDonald
Mark Bilkovic                                Timothy P. McDonald
Assistant United States Attorney             Assistant United States Attorney
211 W. Fort Street, Suite 2001               211 W. Fort Street, Suite 2001
Detroit, Michigan 48226                      Detroit, Michigan 48226
(313) 226-9623                               (313) 226-0221
mark.bilkovic@usdoj.gov                      timothy.mcdonald@usdoj.gov

Date: March 24, 2026

21